PAUL J. PASCUZZI, State Bar No. 148810
JASON E. RIOS, State Bar No. 190086
THOMAS R. PHINNEY, State Bar No. 159435
FELDERSTEIN FITZGERALD WILLOUGHBY
    PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA  95814
Telephone:    (916) 329-7400
Facsimile:    (916) 329-7435
Email:        ppascuzzi@ffwplaw.com
              jrios@ffwplaw.com
              tphinney@ffwplaw.com

ORI KATZ, State Bar No. 209561
ALAN H. MARTIN, State Bar No. 132301
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    (415) 434-9100
Facsimile:    (415) 434-3947
Email:        okatz@sheppardmullin.com
              amartin@sheppardmullin.com

Proposed Attorneys for The Roman Catholic
Archbishop of San Francisco

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 23-30564 |
| THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, | Chapter 11 |
| Debtor and Debtor in Possession. | **DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED INVESTMENT ACCOUNTS; (2) AUTHORIZING MAINTENANCE OF EXISTING BUSINESS FORMS, (3) EXCUSING COMPLIANCE WITH SECTION 345(b); (4) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY; AND (5) SCHEDULING A FINAL HEARING** |
| | *Filed concurrently with Declaration of Joseph J. Passarello* |

| | |
|---|---|
| Date: | August 24, 2023 |
| Time: | 1:30 p.m. |
| | Via ZoomGov |
| | |
| Judge: | Hon. Dennis Montali |

*Hearing Requested on Shortened Time*

# **TABLE OF CONTENTS**

Page

I.     JURISDICTION ...................................................................................................1

II.    BACKGROUND ...................................................................................................2

III.   RELIEF REQUESTED ........................................................................................3

IV.  FACTUAL BACKGROUND FOR RELIEF REQUESTED .................................5

     A.    Cash Management System .......................................................................5

          1.    Sources of Receipts .....................................................................6

          2.    Main Sources of Disbursements ..................................................8

     B.    Investment Accounts ...............................................................................9

     C.    Bank Accounts Related to the Debtor's Cash Management System....................10

     D.    Debtor's General Operating Accounts ...................................................11

     E.    Corporate Credit Card Program .............................................................13

V.    LEGAL ARGUMENT ........................................................................................14

     A.    Maintaining the Debtor's Current Bank Accounts Is in the Best Interests of the Estate and Is Authorized Pursuant to Section 105(a) .......................................14

     B.    Maintaining the Debtor's Existing Business Forms Is in the Best Interest of the Estate ...................................................................................................16

     C.    Maintenance of the Debtor's Existing Cash Management System Is in the Best Interest of the Estate...............................................................................17

     D.    Continued Use of Investment Practices .................................................18

VI.  NOTICE ............................................................................................................21

VII. WAIVER OF BANKRUPTCY RULE 6004(H) .................................................21

VIII. CONCLUSION .................................................................................................22

SMRH:4892-4648-3321.1

CASH MANAGEMENT MOTION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Baldwin-United Corp.*
  79 B.R. 321 (Bankr. S.D. Ohio 1987) ................................................................. 14

*In re Diocese of Buffalo, N.Y.*
  621 B.R. 91 (Bankr. W.D.N.Y. 2020) ............................................................. 19, 20

*In re eStyle, Inc.*
  Case No. 08-13518, ECF 96 (Bankr. C.D. Cal. April 18, 2008 order) .................................. 16

*In re Gold Standard Baking, Inc.*
   179 B.R. 98 (Bankr. N.D. Ill. 1995) ............................................................. 14, 16

*In re Heller Ehrman LLP*
  Case No. 08-32514, ECF 23 (Bankr. N.D. Cal. Dec. 30, 2008 order) ............................. 16, 18

*In re King Mountain Tobacco Co., Inc.*
  623 B.R. 323 (Bankr. E.D. Wash. 2020) ........................................................... 20, 21

*In re PG&E Corp. et al.*
  Case No. 19-30088, ECF 209 (Bankr. N.D. Cal. Jan. 31, 2019) .................................... 16, 18

*In re Roman Catholic Bishop of Stockton*
  Case No. 14-20371-C-11, ECF 64 (Bankr. E.D. Cal. Jan. 24, 2014 order) ....................... 16, 18

*In re Serv. Merch., Co., Inc.*
  240 B.R. 894 (Bankr. M.D. Tenn. 1999) .............................................................. 20

*In re Young*
  205 B.R. 894 (Bankr. W.D. Tenn 1997) .............................................................. 16

*In re Zacky Farms, LLC*
  Case No. 12-37961-B-11, ECF 41 (Bankr. E.D. Cal. Nov. 5, 2012 order) ...................... 16, 18

**Statutes**

11 U.S.C. §§ 101, *et seq.* .......................................................................... 1

11 U.S.C. § 105(a) ................................................................................. 1, 14

11 U.S.C. § 345 .................................................................. 4, 11, 18, 19, 20

11 U.S.C. § 345(a) .................................................................................. 18

11 U.S.C. § 345(b) ........................................................ 1, 4, 18, 19, 21, 22

| | | |
|---|---|---|
| 11 U.S.C. § 1107 | ............................................................ | 2 |
| 11 U.S.C. § 1108 | ............................................................ | 2 |
| 28 U.S.C. § 157 | ............................................................. | 1 |
| 28 U.S.C. § 157(b) | .......................................................... | 1 |
| 28 U.S.C. § 959(b) | .......................................................... | 19 |
| 28 U.S.C. § 1334 | ............................................................ | 1 |
| 28 U.S.C. § 1408 | ............................................................ | 1 |
| 28 U.S.C. § 1409 | ............................................................ | 1 |
| CLC | ........................................................................ | 1, 10 |
| CSA Corp. Code §§ 10000-10015 | ..................................... | 1 |
| RFRA | ..................................................................... | 1 |

Other Authorities

| | | |
|---|---|---|
| Fed. R. Bankr. P. 2002 | ..................................................... | 21 |
| Fed. R. Bankr. P. 6004(h) | .................................................. | 21 |
| Local Rule 2015-1 | ....................................................... | 1, 14, 18, 22 |
| United States Constitution First Amendment | .......................... | 1 |

SMRH:4892-4648-3321.1

CASH MANAGEMENT MOTION

The Roman Catholic Archbishop of San Francisco ("RCASF" or the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "Bankruptcy Case"), hereby moves the Court (the "Motion") for entry of an order (1) authorizing the continued use of existing cash management system, operational bank accounts and related investment accounts; (2) maintaining existing business forms, (3) excusing compliance with section 345(b); and (4) authorizing continued use of current investment policy. In support of this Motion, the Debtor relies upon the *Declaration of Joseph J. Passarello in Support of Chapter 11 Petition and First Day Motions* ("Passarello Background Decl."), the *Declaration of Paul E. Gaspari in Support of Chapter 11 Petition and First Day Motions* ("Gaspari Decl."), and the *Declaration of Joseph J. Passarello* filed in support of this Motion ("Passarello Decl."),[1] as well as all exhibits filed in support of the declarations. In further support of this Motion, the Debtor respectfully represents as follows:

**I.**

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory bases for the relief requested herein are Bankruptcy Code[2] sections 105(a) and 345(b) and Rule 2015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Local Rules").

2. The RCASF does not, by filing its petition for relief and other documents in the Bankruptcy Case, waive any of its rights under any applicable law, including, without limitation, the Code of Canon Law, the First Amendment of the United States Constitution, the Constitution for the State of California, California's law on corporations sole (California Corporations Code §§ 10000-10015), the Religious Freedom Restoration Act, the church autonomy doctrine, charitable

---

[1] Capitalized terms not otherwise defined in this Motion shall have the same meanings ascribed to them in the Passarello Background Decl., the Gaspari Decl., and the Passarello Decl.
[2] Unless otherwise indicated, all section references in this Motion are to the "Bankruptcy Code," 11 U.S.C. §§ 101, *et seq.*

trust law, California trust law, and the rights to object to disclosure of information and to contend that certain assets discussed in the Motion are not property of the estate.

## II.

### BACKGROUND

3.     On August 21, 2023 ("Petition Date"), the RCASF filed a voluntary Chapter 11 petition.  The Debtor remains in possession of its estate, and neither a trustee nor an examiner has been requested or appointed.  The Debtor is operating and managing its business and financial affairs as a debtor in possession under Bankruptcy Code sections 1107 and 1108.

4.     The RCASF filed this Bankruptcy Case to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly, and equitably compensate survivors of sexual abuse by clergy or others associated with the RCASF and bring healing to survivors, parishioners and others affected by past acts of sexual abuse.  The RCASF requires the Bankruptcy Court's protection and the protection of the bankruptcy laws to make fair and equitable payment on all of the claims against it, including the claims by survivors of abuse, trade creditors, and others, while continuing its ministries and support it offers to Catholic Parishes and communities.

5.     The Archdiocese of San Francisco (the "Archdiocese")[3] was canonically established on July 29, 1853, by Pope Pius IX.  The Archdiocese now includes 88 parishes some of which have missions associated with them ("Parishes").  The Archdiocese consists of approximately 442,000 Catholics in the counties of San Francisco, San Mateo, and Marin covering approximately 2,325 square miles.  Archdiocesan priests and permanent deacons, along with priests, brothers and nuns from multiple religious orders serve Parishes, Schools (defined below), Catholic hospitals and do other outreach within the San Francisco Archdiocese.

6.     The primary role of the RCASF is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to individuals

---

[3] The term "Archdiocese" is used herein exclusively to refer to geographic territory under the jurisdiction of the RCASF, and the terms RCASF and Debtor are used herein exclusively to refer to the secular legal embodiment of the Archdiocese.

of the Roman Catholic faith, the Parishes, four Archdiocesan Catholic high schools (Archbishop Riordan High School, Sacred Heart Cathedral Preparatory, Marin Catholic High School and Junipero Serra High School (collectively, the "High Schools")), numerous elementary schools and private independent schools (collectively, the "Schools"), cemeteries ("Cemeteries") and various other Catholic-based social and community service organizations that operate in the Archdiocese. The RCASF has approximately 54 employees (full time equivalent), 37 hourly employees, 32 Clergy and Religious Order payees and 14 stipend Seminarians.

7. As a religious organization, the RCASF has no significant ongoing for-profit business activities. The RCASF's receipts principally come from the Archdiocesan Annual Appeal, fees for services provided to the certain Non-Debtor Catholic Entities, revenue from insurance billings, donations, grants, rental income from owned properties, and RCASF ministry revenue. The RCASF's fiscal 2023 operating budget is approximately $55 million in revenues. The RCASF operates on a fiscal year ending June 30.

8. Additional information regarding the circumstances leading to the commencement of the Bankruptcy Case and information regarding the Debtor's operations and structure is set forth in the Passarello Background Decl.

### III.

### RELIEF REQUESTED

9. By this Motion, the Debtor seeks, *inter alia*, entry of an order, in substantially the form appended to this Motion as Exhibit 1, (a) waiving the Bankruptcy Local Rules and United States Trustee Guidelines ("UST Guidelines") to the extent necessary in order for the Debtor to continue its use of its existing cash management system, (b) authorizing the Debtor to continue using its prepetition bank accounts and business forms, including a waiver of the requirement that the legend "debtor in possession" be imprinted on any existing checks and business forms, and (c) authorizing the Debtor to continue the use of its existing cash management system and accounting policies and practices. The Debtor also seeks to continue using its commercial credit cards and investment policies during this Bankruptcy Case, without posting any bonds as required under

section 345(b) of the Bankruptcy Code. The Debtor seeks this authorization to ensure its orderly transition into bankruptcy and to help administer its operations efficiently while avoiding the disruptions, distractions, delays, and significant expense that otherwise would inevitably divert the Debtor's attention from urgent matters during the initial stages of its bankruptcy case.

10. As noted below in more detail, all of the relevant banks where the RCASF's Bank Accounts (defined below) are located are FDIC-insured banking institutions that have complied with the United States Trustee's (the "U.S. Trustee") special depository procedures under Bankruptcy Code section 345 and are on the U.S. Trustee's list of authorized depositories for the Northern District of California, except for the accounts at First Republic Bank ("FRB"), Bank of San Francisco ("Bank of SF"), and California Bank & Trust ("CB&T"). While FRB is not a FDIC-insured banking institution, it has been acquired by JPMorgan Chase Bank ("JPMC"), which is a FDIC-insured institution on the U.S. Trustee's Authorized Depository list as of July 10, 2023. Bank of SF, while not on the U.S. Trustee's Authorized Depository list, is FDIC-insured. Additionally, the RCASF keeps its account balance at the Bank of SF at approximately the $250,000 limit of FDIC insurance, so there is little risk of losing money from this account. Finally, while CB&T is not on the U.S. Trustee's authorized depository list or FDIC-insured, it is a division of Zions Bancorporation, N.A., which is FDIC-insured.

11. The Debtors also have certain investment and money market accounts that the Debtors request Court authority to continue to maintain without the need to comply strictly with section 345, including the maintenance of the Pooled Investment Accounts and its BofA Investment Account (as defined below) that is used to invest in the BlackRock Liquidity Funds Portfolio Institutional Class, which is a money market mutual fund that currently yields approximately 5.2% of interest per year.

12. The RCASF's current cash management system has been in place for at least the last ten years, when Joseph Passarello, the current chief financial officer (the "CFO"), joined the Archdiocese. The RCASF has implemented the cash management system described below to ensure the orderly management of the RCASF's operations. Due to the complicated nature of the RCASF's

cash management system, the Debtors respectfully request that it is able to continue to operate the cash management system in the ordinary course of business.

**IV.**

**FACTUAL BACKGROUND FOR RELIEF REQUESTED**

**A.    Cash Management System**

13.    The Debtor operates an intricate cash management system (the "Cash Management System")[4], which is illustrated on Exhibit 2 attached hereto.  The Debtor primarily uses its Cash Management System to, among other things, receive (i) unrestricted gifts, bequests, and collections; (ii) restricted donations including proceeds of  the Archdiocesan Annual Appeal (the "AAA"); (iii) payments for various insurance coverages paid by RCASF on behalf of other non-diocesan entities; (iv) commercial rental income; (v) fees for administrative services to certain other Non-Debtor Catholic Entities; (vi) investment income; and (vii) non-Chancery payroll funding on a pass-through basis.  Additionally, in the ordinary course of business, the RCASF is required to make the following disbursements: (i) mission-driven disbursements; (ii) ordinary trade payables and operating expenses; (iii) payroll; (iv) commercial insurance premiums; (v) employer portion of employee benefits; (vi) Parish refunds in excess of the targets set pursuant to the AAA.  The Debtor maintains the following bank accounts (collectively, the "Bank Accounts" or individually, a "Bank Account"):

| Identifying Schematic Number on Exhibit 2[5] | Account Name | Balance as of July 31, 2023 (unless otherwise noted) |
|---|---|---|
| **Bank Accounts at BofA** | | |
| 1. | The Main Operating Account (#5250) | $3,107,959 |
| 2. | Accounts Payable Checking Account (#0220) | $388,344 |

---

[4] For purposes of this Motion, Cash Management System shall also include the Debtor's use of its accounting methods, business forms, credit card program, Investment Accounts,  as further detailed below.
[5] There are two accounts listed on the bank account schematic attached to the Motion as Exhibit 2 that are not listed here – the Segal Bryant (#8815) and the First Republic (#9117) accounts – because the Debtor is closing those accounts post-petition.

SMRH:4892-4648-3321.1

| Identifying Schematic Number on Exhibit 2[5] | Account Name | Balance as of July 31, 2023 (unless otherwise noted) |
|---|---|---|
| **Bank Accounts at BofA** | | |
| 3. | Investment Pool Checking Account (#4129) | $900 |
| 4. | Chancery Payroll Account (#2233) | $62,890 |
| 5. | Coordinated Payroll Account (#4287) | $2,697,976 |
| 6. | Restricted Donations Account (#7083) | $5,222,779 |
| **Bank Accounts at Bank of SF** | | |
| 7. | Interest Bearing Bank Account (#1486) | $246,041 |
| **Bank Accounts at FRB** | | |
| 8. | Interest Bearing Bank Account (#1534) | $257,115 |
| 9. | Stock Transfer Account (#0589) | $15,602 |
| **Imprest Accounts** | | |
| 10. | Settlement Payment Imprest Account (#4577) | $14,946 |
| 11. | Priest Medical Imprest Account (#8561) | $48,397 |
| 12. | General Liability Imprest Account (#9479) | $96,606 |
| **City National Bank Account** | | |
| 13. | Workers' Comp Collateral (#9001) | $75,816 |
| **U.S. Bank Investment Pool Account** | | |
| 14. | Investment Pool Account (as of June 30, 2022) | $104,737,665 |
| **BofA Securities Account** | | |
| 15. | BofA Securities Account (#9371) | $57,789,941 |

### 1.    <u>Sources of Receipts</u>

14.    **Unrestricted Gifts, Bequests, and Collections.** Throughout the year, Parishes solicit donations in the form of Second Collections for a variety of mission-driven programs, including Priestly Vocations, Human Life & Dignity, Pastoral Ministry, Missions Office, Faith Formation, Marriage & Family Life, Chinese Ministry, and the African American Ministry. These

funds are forwarded from the Parishes to RCASF, which categorizes them as "Custodial," indicating that they are set aside for a specific purpose and are held in a restricted bank account. Passarello Decl. ¶ 5.

15. **Restricted Donations.** Periodically, donors make donations to the RCASF and Parishes in the form of marketable securities. Such securities are received into the FRB account **(#0589)**, which is a brokerage account established and maintained specifically to liquidate donated securities. Once the securities are liquidated, cash proceeds are transferred into BofA restricted checking account **(#7083)**, and then transferred to the intended recipient, either the RCASF or a Parish. Passarello Decl. ¶ 6.

16. **Insurance Premium Payments**. The RCASF administers a health plan for its employees and the employees of several non-Chancery entities (the "Participating Entities") through Reta Trust ("Reta"). The RCASF pays 100% of the premiums billed by Reta for its employees and for the employees of the Participating Entities and then invoices the Participating Entities for their respective premiums. Passarello Decl. ¶ 7.

17. **Rental Income.** The RCASF receives approximately $190,000 under monthly rental or lease agreements. The following four rental properties account for approximately 80% of the monthly rental income: (1) an office building occupied by a non-profit advocacy group; (2) a commercial building occupied by a mattress retailer, a Toyota dealership and an electric vehicle company; (3) an apartment rented to the RCASF's communications director; and (4) a residential structure located on the grounds of St. Patrick's Seminary & University leased to Chesterton Academy of St. James. Passarello Decl. ¶ 8.

18. **Fees for Services.** The RCASF provides administrative services to certain Non-Debtor Catholic Entities pursuant to service management agreements and similar arrangements. The RCASF receives fees for these services, for which it bills the respective parties. For example, the RCASF charges administrative fees for its administrative support provided by the Department of Catholic Schools, accounting, legal, human resources, and support for certain Non-Debtor Catholic Entities. Additionally, the RCASF has an arrangement to charge a small administrative fee to

administer payroll for certain Non-Debtor Catholic Entities. The RCASF also charges a land use fee to Holy Cross Cemetery and other Cemeteries. Passarello Decl. ¶ 9.

19. **Non-Chancery Payroll.** The RCASF administers payroll for approximately 3,500 employees of Parishes and Schools. Employees are paid on up to two pay dates each month, the 15th and the last. All funds for payroll are pulled by ADP, the payroll processor, from the RCASF's Coordinated Payroll Account **(#4287)**. In advance of each pay date, Parishes' and Schools' funds are deposited into this account to meet each payroll funding obligation. Passarello Decl. ¶ 10.

## 2. **Main Sources of Disbursements**

20. **Mission Driven Disbursements.** The RCASF disburses proceeds to numerous missions and related causes. These funds are raised via the AAA and occasional direct donations. Passarello Decl. ¶ 11.

21. **Ordinary Accounts Payable.** In the ordinary course of business, the RCASF makes disbursements to trade vendors, service providers, and employees for reimbursement of approved expenses, and Wells Fargo debits this account as its credit card issuer. Passarello Decl. ¶ 12.

22. **Payroll.** The RCASF processes payroll for its own employees. ADP draws the funds from **(#2233)** Chancery Payroll Account via ACH to meet payroll and associated payroll and income tax obligations. Additionally, the RCASF processes payroll for approximately 3,500 employees of Parishes and Schools, on a pass-through basis. This account is pre-funded by the respective employers in advance of each pay date. ADP draws the funds from **(#4287)** (the Coordinated Payroll Account via ACH to meet payroll and associated payroll and income tax obligations. Passarello Decl. ¶ 13.

23. **Commercial Insurance Premiums.** As further discussed in the *Debtor's Emergency Motion to Continue Insurance Programs* (the "Insurance Motion") filed concurrently herewith, the RCASF maintains and administers certain commercial insurance coverages. It administers the commercial insurance programs for certain Non-Debtor Catholic Entities and then invoices premium amounts to such Non-Debtor Catholic Entities for the Non-Debtor Catholic Entities' allocation of the cost of the insurance policies program. Passarello Decl. ¶ 14.

24.     **Employee Benefits.**  As further detailed in the *Debtor's Emergency Motion for Order (1) Authorizing Payment of Prepetition Wages, Salaries, and Employee Expenses; (2) to Pay Accrued Employee Benefits and Taxes; and (3) Directing Banks to Honor Payroll and Expense Checks* filed concurrently herewith, the RCASF administers a health plan to provide its employees and the employees of several Participating Entities with general medical, dental, and vision insurance plans.  Total premiums for the general healthcare benefits package are approximately $2.3 million per month.  The RCASF invoices premium amounts to the Non-Debtor Catholic Entities for their employees' share of the premiums.  Passarello Decl. ¶ 15.

**B.     Investment Accounts**

25.     The Chancery maintains several interest-bearing accounts to diversify its holdings and yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment.  The Chancery office administers funds on behalf of itself and certain Catholic entities in an investment pool account invested with fund managers in separate custodial accounts at U.S. Bank.  Investments held in the investment pool are categorized by RCASF as Designated, Restricted, Endowments, and Investments Held for Others.  As of July 15, 2023, the respective balances were approximately:  Designated - $61.4 million; Restricted - $19.9 million; and Endowments - $18.7 million.  Amounts held in trust for others, Contemplatives of St. Joseph and St. Thomas More School, St. Patrick's Seminary totaled approximately $2.6 million.  Passarello Decl. ¶ 16.

26.     One of RCASF's investment accounts is BofA Securities account **(#9371)** (the "BofA Investment Account").  Excess funds from the Main Operating Account **(#5250)** are transferred to the BofA Investment Account where they are invested in BlackRock Liquidity Funds Fed Fund Portfolio Institutional Class, which is a money market mutual fund that currently yields approximately 5.2% of interest per year.  Passarello Decl. ¶ 17.

27.     The Chancery also administers an Institutional Deposit & Loan fund solely on behalf of its High Schools and certain institutions which are not equipped with the administrative staff to oversee the accounts.  Each depositor has its own account with Charles Schwab for its Deposit &

1  Loan deposits, which are kept segregated from the RCASF's accounts. These accounts are not listed

2  in the schematic because each account is owned by the respective depositor and not held under the

3  RCASF's name. The Debtor discloses such accounts out of an abundance of caution, but is not

4  seeking any additional relief with respect thereto other than continue to operate its own pooled

5  account and oversee the other pooled accounts. Passarello Decl. ¶ 18.

6      28.     The RCASF has a Finance Council comprised of the Archbishop, Rev. Summerhays,

7  three priests, seven independent lay investment advisors (generally CPAs and attorneys), and the

8  CFO. The Finance Council historically met approximately eight times per year, but has met monthly

9  since October 2022. The Finance Council is responsible for advising on all matters of financial

10 concern, and to provide consent to certain investment decisions, investment policy statements and

11 financial actions in accordance with Canon Law. They are also responsible for approving the annual

12 budget. Passarello Decl. ¶ 19.

13     29.     The RCASF Investment Committee (the "<u>Investment Committee</u>"), a subset of the

14 Finance Council, is responsible to ensure that the RCASF is acting as a prudent investor and

15 investing in a diversified and balanced manner. The Investment Committee was established by the

16 Finance Council and consists of Rev. Summerhays, the CFO, and five lay professionals with strong

17 investment backgrounds. The Investment Committee meets at least quarterly (and more frequently

18 as necessary) to establish investment and asset allocation policies and to review investment

19 performance. Passarello Decl. ¶ 20.

20 **C.   <u>Bank Accounts Related to the Debtor's Cash Management System</u>**

21     30.     As of the Petition Date, the Debtor's Cash Management System includes a total of

22 15 Bank Accounts, six of which are held with BofA, two with FRB, one with Bank of SF, one with

23 City National Bank, and three (the Imprest Accounts) held and managed by third parties

24 (collectively, the "<u>Cash Management Banks</u>"). Passarello Decl. ¶ 21.

25     31.     While FRB, Bank of SF, and CB&T, are not on the U.S. Trustee's authorized list of

26 banking institutions, BofA, which holds the vast majority of the Debtor's operating cash, is an

27 FDIC-insured banking institution that has complied with the United States special depository

28

procedures under Bankruptcy Code section 345 and is on the U.S. Trustee's list of authorized depositories for this district. Although FRB is not on the U.S. Trustee's authorized list of depositories, it is owned by JPMC, which is one of the most well-capitalized banks in the U.S., and on the U.S. Trustee's list of authorized depositories. Passarello Decl., at ¶ 22. Additionally, the Bank of SF is an FDIC-insured institution, and the RCASF generally holds in its accounts at the Bank of SF at or less than approximately $250,000, which amount is the limit of FDIC insurance. Passarello Decl. ¶ 22. Finally, while CB&T is not on the U.S. Trustee's authorized depository list, it is a division of Zions Bancorporation, N.A., which is FDIC-insured. Passarello Decl. ¶ 22.

32.     In the ordinary course of business, the RCASF maintains the Bank Accounts to facilitate the financial operations of its central administrative offices. Passarello Decl. ¶ 23.

**D.     Debtor's General Operating Accounts**

33.     The RCASF maintains one main general operating checking account at BofA **(#5250)** (the "Main Operating Account"). The Main Operating Account acts as the Debtor's central repository of funds. All unrestricted incoming deposits from the Parishes, donors and, lessees are first deposited into this account and then money is transferred to other accounts and to fund disbursements, as necessary. Passarello Decl. ¶ 24.

34.     In addition to the Main Operating Account, the RCASF maintains the following accounts at BofA:

- An accounts payable account **(#0220)** (the "Accounts Payable Checking Account"), from which all payments to trade vendors are paid. The RCASF transfers money from the Main Operating Account to fund the Accounts Payable Disbursements Account, as necessary.

- The investment pool checking account **(#4129)** (the "Investment Pool Checking Account"), which the RCASF uses as a clearing account to move money between the Main Operating Account and the Investment Pool Checking Account, for internal tracking purposes.

- An account to fund Chancery payroll **(#2233)** (the "<u>Chancery Payroll Account</u>"). The RCASF transfers funds from the Main Operating Account to the Chancery Payroll Account and then transfers money from Chancery Payroll Account to ADP to fund payroll.

- Account **(#4287)** is used to hold and fund payroll for the Non-Debtor Catholic Entities such as Parishes and Schools (the "<u>Coordinated Payroll Account</u>"). The Parishes and Schools prefund this account in advance of each payroll disbursement.

- The restricted donations account **(#7083)** (the "<u>Restricted Donations Account</u>") holds restricted funds such as AAA proceeds, donor restricted gifts, funds held as a custodian for certain Non-Debtor Catholic Entities and funds that have been liquidated from the Stock Transfer Account (as defined below) and other funds held in trust. FRB liquidates the securities and the RCASF remits the proceeds to the intended beneficiary. Passarello Decl. ¶ 25.

35. The RCASF maintains an interest earning account at the Bank of SF **(#1486)** (a "<u>Interest Bearing Account</u>") which earns modest interest. The Debtor keeps this account balance at or around $250,000 to ensure that it is within the FDIC insured amount range. Passarello Decl. ¶ 26.

36. The RCASF maintains the following Bank Accounts at FRB:

- An interest-bearing account **(#1534)** where the RCASF transfers excess cash from the Main Operating Account to earn modest interest.

- The FRB brokerage account **(#0589)** ("<u>Stock Transfer Account</u>"), a restricted account, receives gifts of marketable securities. The RCASF then sends the money from the restricted account to the Parishes or the RCASF to which the respective donation was directed. As this account is effectively a clearing account that zeros out with each transaction, no balance is recorded on the books and records of the RCASF. Passarello Decl. ¶ 27.

37. The RCASF maintains the following accounts that are also funded through the Main Operating Account, but held and managed by third parties (collectively, the "<u>Imprest Accounts</u>"):

- An account **(#4577)** ("<u>Settlement Payments Imprest Account</u>") managed by AJ Gallagher Insurance Brokers as signatories on the account, to make payments in accordance with prior settlement agreements.

- An account **(#8561)** managed by UAS Benefit, which reimburses medical costs incurred by retired priests not covered by general medical insurance ("<u>Priest Medical Imprest Account</u>").

- An account **(#9479)** managed by George Hills Company Inc. as third-party administrator and signatory on the account, which is used to process general liability claims (the "<u>General Liability Imprest Account</u>").

Passarello Decl. ¶ 28.

38.     The RCASF maintains account **(#9001)** at City National Bank ("<u>Workers' Comp Collateral</u>"), which serves as collateral and a funding source for workers' compensation claims paid out in connection with an old workman's compensation policy(s).  Passarello Decl. ¶ 29.

39.     Finally, the RCASF maintains a restricted account at U.S. Bank to hold assets of the Lay SERP Plan, held by U.S. Bank as Trustee.

**E.      Corporate Credit Card Program**

40.     The RCASF uses corporate credit cards primarily to pay miscellaneous business expenses incurred by the employees and employees working at the Chancery.  There are roughly 25-30 credit cards in use at the Chancery, with about $40,000 total monthly in credit card charges. Each month, a cardholder receives a statement online, which gets reviewed and approved by a supervisor.  Once approved, Wells Fargo debits the RCASF account for the prior month's credit card charges around the 7th or the 8th day of each month.  Passarello Decl. ¶ 31.

/ / /

/ / /

/ / /

/ / /

/ / /

## V.

## LEGAL ARGUMENT

**A.** **Maintaining the Debtor's Current Bank Accounts Is in the Best Interests of the Estate and Is Authorized Pursuant to Section 105(a)**

41.     The U.S. Trustee has established certain operating guidelines for debtors in possession.  One such provision requires a chapter 11 debtor in possession to open new debtor in possession bank accounts and to close all existing accounts.  *See* UST Guidelines 4.4.6.  The UST Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the U.S. Trustee.  *See* UST Guidelines 4.4.6(a).  In addition, Bankruptcy Local Rule 2015-1 requires the chapter 11 debtor indicate "debtor in possession" on any signature card for a debtor's bank account.

42.     The Debtor seeks a waiver, under Bankruptcy Code section 105(a), of the U.S. Trustee's requirements and Bankruptcy Local Rule 2015-1 regarding the closing and re-opening of new bank accounts.  This requirement would unnecessarily disrupt the Debtor's operations and would not provide any significant benefit to the Debtor's estate, its creditors, or parties in interest. More specifically, the Debtor has a complex and efficient cash management system with approximately 15 Bank Accounts at six banking institutions, not including the three Imprest Accounts held and managed by third parties.  To require the Debtor to close and reopen these Bank Accounts would unduly burden the estate and cause countless interruptions to operations.

43.     Courts have long recognized that the strict enforcement of bank account closing requirements does not serve the rehabilitative purposes of chapter 11.  Accordingly, courts regularly have waived such requirements and permitted debtors to maintain their existing bank accounts and cash management systems, treating such a request as a relatively "simple matter."  *See, e.g.*, *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Moreover, the UST Guidelines do not have the force of law, and the Court may excuse compliance with certain of them.  *See In re Gold Standard Baking, Inc.*, 179 B.R. 98, 101-02 (Bankr. N.D. Ill. 1995) (U.S. Trustee lacks statutory authority to direct how a debtor should conduct its ordinary course business operations).

All parties in interest to the reorganization case, including the Debtor, non-RCASF entities, employees, trade vendors and other creditors, and parishioners within the Archdiocese will be best served by preserving operational continuity and avoiding the disruption and delay to the RCASF's financial activities and payroll that would necessarily result from closing the Debtor's existing accounts and opening new "debtor in possession" accounts.

44. The Debtor requests authority to maintain and continue to use the existing Bank Accounts in the names and with the account numbers existing immediately prior to the Petition Date. The Debtor further requests authority to deposit funds in, and withdraw funds from, any such accounts by all usual means, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits, and to treat the existing accounts for all purposes as debtor in possession accounts.

45. The Debtor has endeavored to ensure that no checks in payment of prepetition obligations remain outstanding as of the Petition Date. To further ensure against the payment of prepetition debts – except for prepetition debts that the Court specifically authorizes to be paid – the RCASF will stop payment on any checks for prepetition obligations that are outstanding as of the Petition Date and will begin issuing new checks postpetition with a significant gap in the numbering sequence, to make it easier to distinguish between prepetition and postpetition checks.

46. The Debtor further requests authority for the banks at which it maintains existing accounts, subject to and in accordance with the terms of any account agreements and applicable non-bankruptcy law, to accept and honor all representations or instructions from the Debtor as to which checks, drafts, wire transfers, or other transfers (each, an "Item" and, collectively, the "Items") should be honored or dishonored. The Debtor requests that its banks have absolute authority to follow such representations and instructions, regardless of the particular transferee named on an Item, the date of such Item (prepetition or postpetition), and the Cash Management Banks' knowledge or belief as to the existence of Court authorization for the transfer; provided, however, that the Cash Management Banks will not be required to honor any Item for which there are insufficient funds in the applicable account.

47.     The Debtor also requests a waiver of the requirement of UST Guideline 4.4.6, which requires the Debtor to establish specific bank accounts for tax payments.  The Debtor believes that its tax obligations can be paid most efficiently out of its existing accounts, and its monthly operating reports will permit the U.S. Trustee to monitor tax payments.  The Debtor submits that the creation of new debtor in possession accounts designated solely for tax obligations is unnecessary and inefficient.

**B.     <u>Maintaining the Debtor's Existing Business Forms Is in the Best Interest of the Estate</u>**

48.     To minimize administrative expense and delay, the Debtor requests authority to continue to use its correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, charitable solicitation materials, and checks (collectively, the "<u>Business Forms</u>"), substantially in the form that they existed immediately prior to the Petition Date, without reference to the RCASF's status as a debtor in possession.  The Debtor has made no secret of the serious issues it faces as described in the Passarello Background Declaration and the Passarello Declaration.  The financial condition of the Debtor and the status of the Abuse cases against the Debtor have been the subject of local media scrutiny for several years.  This Bankruptcy Case will likely generate substantial public reports and comments, both locally and nationally.  It is most likely that any party to a transaction with the Debtor will be aware of its status as a debtor in possession.

49.     Moreover, the Court has the power to allow the Debtor to deviate from the UST Guidelines on this point.  *See, e.g.*, *In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn 1997) (U.S. Trustee may not require debtor to imprint the words "debtor in possession" on his checks); *see also In re Gold Standard Baking*, 197 B.R. at 102 (same).  In other large cases, bankruptcy courts in various California Districts have allowed debtors to use their prepetition business forms.  *See PG&E Corp. et al.*, Case No. 19-30088, ECF 209 (Bankr. N.D. Cal. Jan. 31, 2019); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11, ECF 64 (Bankr. E.D. Cal. Jan. 24, 2014 order)*; In re Zacky Farms, LLC*, Case No. 12-37961-B-11, ECF 41 (Bankr. E.D. Cal. Nov. 5, 2012 order); *In re eStyle, Inc.*, Case No. 08-13518, ECF 96 (Bankr. C.D. Cal. April 18, 2008 order); *In re Heller Ehrman LLP*, Case No. 08-32514, ECF 23 (Bankr. N.D. Cal. Dec. 30, 2008 order).

50.     If the Debtor is not permitted to maintain and use its existing accounts and to continue to use its existing Business Forms, the resulting prejudice will include: (a) disruption in the ordinary financial affairs and business of operations of the Debtor, to the detriment of employee morale and vendor and parishioner relationships; (b) delay in the administration of the Debtor's estate and to the pastoral care and services provided to all of the parishioners within the Debtor; and (c) cost to the Debtor and its estate to set up new systems, open new accounts, and print new Business Forms. If the Debtor exhausts its existing supply of checks during these chapter 11 cases, the Debtor will print or order checks with the designation "Debtor-in-Possession" and the corresponding bankruptcy case number.

**C.     Maintenance of the Debtor's Existing Cash Management System Is in the Best Interest of the Estate**

51.     The Cash Management System is maintained in the ordinary course and is essential to the Debtor's ongoing operations, especially to services provided by the Debtor to the non-RCASF entities under the Servicing Agreements and other arrangements. The preservation and continuation of the Cash Management System is essential to the Debtor's continued operations.

52.     The existing Cash Management System, which includes the Bank Accounts, Investment Accounts, and the use of credit cards, allows the Debtor to segregate, trace and account properly for restricted funds and manage all of its cash flow needs centrally. The existing Cash Management System includes necessary accounting controls to enable the Debtor, as well as its creditors and the Court, to trace funds through the system and ensure all transactions are documented and ascertainable. The existing Cash Management System has proven to be an efficient and effective system to manage the Debtor's cash flow and supports the Debtor's obligations under the Servicing Agreements, which provide a significant source of income for the Debtor. In accordance with past practices, the Debtor will continue to maintain current records with respect to all transactions involving the Debtor's Cash Management System. Given its central role in funding numerous of the Debtor's vital operating expenses, such as performing under the Servicing Agreements, collecting and maintaining restricted funds, payroll, employee benefits and other

payables, the Debtor's inability to continue using the Cash Management System would severely, and perhaps irreparably, disrupt its operations and is mission.

53. In addition, given the Debtor's financial structure, it would be difficult, if not impossible, for the Debtor to establish an entirely new system of accounts and a new cash management system simply to comply with Bankruptcy Local Rule 2015-1 and the UST Guidelines. In other large cases, bankruptcy courts in various California Districts have allowed debtors to continue to use their existing cash management systems. *See In re PG&E Corp. et al.*, Case No. 19-30088, ECF 209, (Bankr. N.D. Cal. Jan. 31, 2019); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11, ECF 64 (Bankr. E.D. Cal. Jan. 24, 2014 order); *In re Zacky Farms, LLC*, Case No. 12-37961-B-11, ECF 41 (Bankr. E.D. Cal. Nov. 5, 2012 order); *In re Heller Ehrman LLP*, Case No. 08-32514, ECF 23 (Bankr. N.D. Cal. Dec. 30, 2008 order).

**D.** <u>**Continued Use of Investment Practices**</u>

54. The Debtor also seeks a waiver of the deposit guidelines set forth in section 345(b) to the extent necessary to allow the Debtor to maintain its Bank Accounts and Investment Accounts. Section 345 of the Bankruptcy Code authorizes a debtor to invest cash and money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Section 345(b) of the Bankruptcy Code provides that, unless the bankruptcy court orders otherwise "for cause,"

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested--
>
> > (1) a bond--
> > > (A) in favor of the United States;
> > > (B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
> > > (C) conditioned on--
> > > > (i) a proper accounting for all money so deposited or invested and for any return on such money;
> > > > (ii) prompt repayment of such money and return; and
> > > > (iii) faithful performance of duties as a depository; or
> > (2) the deposit of securities of the kind specified in section 9303 of title 31.

Case: 23-30564    Doc# 9    Filed: 08/21/23    Entered: 08/21/23 14:27:49    Page 23 of 35

18

Case No. 23-30564

SMRH:4892-4648-3321.1

CASH MANAGEMENT MOTION

11 U.S.C. § 345(b).

55.     Section 345 expressly provides that the Court may modify a debtor's investment requirements for "cause."  The Debtor submits that cause exists for allowing it to invest its excess cash in accordance with its existing investment policies, without meeting the strict bond requirements of section 345(b).

56.     The Debtor submits that its practices conform to the intent of section 345(b) to protect and maximize the value for its estate.  The Debtor believes that its existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, sufficient cause  exists to waive the investment requirements of section 345(b) to allow the Debtor to continue its existing investment procedures.  Cause further exists because the Debtor has an obligation under 28 U.S.C. § 959(b) to comply with the requirements of California's Uniform Prudent Management of Institutional Funds Act ("UPMIFA").  Section 959(b) of title 28 of the United States Code provides that "a trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  28 U.S.C. § 959(b).

57.     In *In re Diocese of Buffalo, N.Y.*, 621 B.R. 91 (Bankr. W.D.N.Y. 2020), the bankruptcy court held that waiver of section 345(b) was appropriate because the investment accounts held by debtor in an affiliated pooled investment account made available to parishes and other dioceses complied with New York's Prudent Management of Institutional Funds Act, which is similar to the UPMIFA.  *See id.* at 94 ("Having an obligation under 28 U.S.C. § 959(b) to comply with the requirements of the Prudent Management of Institutional Funds Act, the Diocese has satisfied its burden to establish cause for a waiver of the requirements of 11 U.S.C. § 345(b).").  In determining that cause existed to waive section 345(b)'s bonding requirement, the bankruptcy court considered the debtor's arguments that, among other things, the pooling fund was professionally managed, employed strategies to assure both safety and a reasonable level of income, and that

collateralization of the debtor's accounts would entail unnecessary costs and administrative burdens. *Id.* at 92.

58.     Here, the Debtor maintains two different types of Investment Accounts.  First, it has the Pooled Investment Accounts, and the BofA Securities Account, the contents of which are invested in a BlackRock money market mutual fund.  These Investment Accounts are monitored by the Investment Committee, which believes that these funds are diversified and generally safe. Because the Investment Accounts and the BofA Securities Account collectively hold approximately $160 million, which funds are not needed by the RCASF on a daily basis, the RCASF is abiding by the UPMIFA by investing such funds with a measured approach to make a reasonable return while acting as a prudent investor.  It would take a significant amount of estate resources to liquidate such funds and place them with a banking institution that would provide a bond for such accounts. Requiring the Debtor to open multiple accounts at different banks so that the deposits in each such bank would be insured by the FDIC would be unnecessarily burdensome and would lead to the same delays and disruption of the Debtor's business that this Motion seeks to avoid.  This would be unworkable and a strain on the Debtor's resources.  Moreover, divesting these accounts in favor of a U.S. Trustee approved bank account that pays a modest interest rate would not serve the Debtor's goals to maximize recoveries for survivors of abuse.  For example, the BofA Securities Account, which invests in the BlackRock money market fund, earns about 5.2% interest a year.  If the Debtor were required to liquidate the investments and place in numerous Bank Accounts, the estates would be missing out on earning approximately $250,000 a month in interest on these funds.

59.     Courts have routinely granted requests to approve the continued use of deposit guidelines that do not comply strictly with section 345.  This is especially the case when, as here, the manner of the proposed investments is safe and prudent.  *See, e.g.*, *In re Serv. Merch., Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (enumerating factors to be considered in waiving requirements of section 345, including size of business and safety of debtor's proposed investments). In *In re King Mountain Tobacco Co., Inc.*, 623 B.R. 323, 334 (Bankr. E.D. Wash. 2020), the bankruptcy court held that the debtor was not required to divest its investment accounts because the

"totality of the circumstances presented" established cause for waiver of 345(b). Namely, the debtor showed that its investments were safe and that divestment would harm the estate more than it would help increase safety. *See id.* at 333 (approving continued use of investment procedures because "the debtor's management appears to have made a reasonable business decision that the benefits of maintaining banking relationships and harmony with prepetition operational practices" and that "sticking with the status quo is the path most likely to maximize the value of the debtor's business (and hence the bankruptcy estate)").

60. Here, because the Debtor's investments are prudent, reasonably safe, and unlikely to lose value, the Court should allow the Debtor to maintain its pooled Investment Accounts and BofA Securities brokerage account. The Debtor submits that given the totality of the circumstances, its request is reasonable and cause exists for the Court to relieve the Debtor from compliance with the requirements of Bankruptcy Code section 345(b). For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate.

## VI.

### NOTICE

61. Notice of this Motion has been provided to the 20 largest unsecured creditors, the secured creditors if any, the Cash Management Banks, the Office of the U.S. Trustee, the Internal Revenue Service, corresponding state agencies, as well as other governmental agencies, to the extent required by the Bankruptcy Rules and the Bankruptcy Local Rules, and those persons who have formally appeared and requested service in this case pursuant to Bankruptcy Rule 2002. Given the nature of the relief requested, the Debtor submits that no further notice of this Motion is necessary.

## VII.

### WAIVER OF BANKRUPTCY RULE 6004(h)

62. To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Motion, the Debtor requests that such stay be waived.

/ / /

/ / /

# VIII.

## CONCLUSION

63.     Just as the financial reorganization of commercial debtors depends upon their business relationships continuing unimpeded by those reorganizations, it is equally critical to the Debtor that its reorganization case be transparent to the tens of thousands of men and women who daily seek services and solace from the RCASF and from the Parishes, Schools, other Non-Debtor Catholic Entities, and charities the RCASF serves.  Granting the motion will help ensure that the RCASF can continue its mission.

WHEREFORE, the RCASF respectfully requests that the Court enter an Order substantially in the form attached hereto as Exhibit 1 as follows:

1.     Granting the Motion on an interim basis;

2.     Authorizing the RCASF on an interim basis to continue to use its existing Cash Management System;

3.     Authorizing the RCASF on an interim basis to maintain and use its existing Bank Accounts, accounting policies and practices, Business Forms and credit cards;

4.     Waiving Local Rule 2015-1 and UST Guideline 4.4.6 on an interim basis to the extent necessary, as described in the Motion;

5.     Authorizing the RCASF on an interim basis to continue its investment practices in lieu of the investment requirements of 11 U.S.C. § 345(b);

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1       6.      Scheduling a final hearing on the Motion; and

2       7.      Granting such other relief as the Court deems just and proper under the

3 circumstances.

4 Dated: August 21, 2023

5                                FELDERSTEIN FITZGERALD WILLOUGHBY
6                                PASCUZZI & RIOS LLP

7

8                              By          */s/ Paul J. Pascuzzi*
                                      PAUL J. PASCUZZI
9                                  JASON E. RIOS
                                  THOMAS R. PHINNEY

10                              Proposed Attorneys for The Roman Catholic
11                              Archbishop of San Francisco

Dated: August 21, 2023

12                            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

13

14                              By          */s/ Ori Katz*
15                                    ORI KATZ
                                  ALAN H. MARTIN
16

17                              Proposed Attorneys for The Roman Catholic
                              Archbishop of San Francisco
18

19

20

21

22

23

24

25

26

27

28

Case: 23-30564   Doc# 9   Filed: 08/21/23   Entered: 08/21/23 14:27:49   Page 28 of 35

SMRH:4892-4648-3321.1                                    Case No. 23-30564

CASH MANAGEMENT MOTION

**Exhibit 1**

**(Proposed Interim Order)**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 23-30564 |
| THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, | Chapter 11 |
| Debtor and Debtor in Possession. | **[PROPOSED] INTERIM ORDER (1) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED INVESTMENT ACCOUNTS; (2) AUTHORIZING MAINTENANCE OF EXISTING BUSINESS FORMS, (3) EXCUSING COMPLIANCE WITH SECTION 345(b); (4) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY; AND (5) SCHEDULING A FINAL HEARING** |
| | Date: August 24, 2023 Time: 1:30 p.m. Location: Via ZoomGov |
| | Judge: Hon. Dennis Montali |
| | *Hearing Requested on Shortened Time* |

The motion of The Roman Catholic Archbishop of San Francisco ("<u>Debtor</u>"), debtor in possession, the *Debtor's Emergency Motion for Interim and Final Orders (1) Authorizing Continued Use of Existing Cash Management System, Operational Bank Accounts and Related Investment Accounts; (2) Authorizing Maintenance of Existing Business Forms, (3) Excusing Compliance With Section 345(b); (4) Authorizing Continued Use of Current Investment Policy; and*

*Scheduling a Final Hearing*, filed on August __, 2023, as ECF No. [•] (the "<u>Motion</u>"),[1] came on for hearing on August [__], 2023 at [_____], in Courtroom [__] of the Unites States Bankruptcy Court for the Northern District of California.  The Debtor appeared through its undersigned counsel.  Other appearances were noted on the record.

The Court considered the Motion, the *Declaration of Joseph J. Passarello in Support of Chapter 11 Petition and First Day Motions* (ECF __) ("<u>Passarello Background Decl.</u>"), the *Declaration of Paul E. Gaspari in Support of Chapter 11 Petition and First Day Motions* (ECF ___) ("<u>Gaspari Decl.</u>"), the *Declaration of Joseph J. Passarello* filed in support of this Motion ("<u>Passarello Decl.</u>"), all exhibits filed in support of these declarations, and the matters reflected in the record of the hearing held on the Motion.  The Court having found that it has jurisdiction over this proceeding; that this is a core proceeding; that notice of the Motion has been given to the Office of the U.S. Trustee, the Cash Management Banks, the twenty largest unsecured creditors, all secured creditors, if any, and any applicable governmental entities; that no further notice is necessary; that the relief sought in the Motion is in the best interests of the Debtor, its estate, and its creditors; and that good and sufficient cause exists for such relief.

Accordingly, it is hereby ORDERED as follows:

1.      The Motion is GRANTED on an interim basis;

2.      The Debtor is authorized to: (a) designate, maintain, and continue to use any and all existing bank accounts with the same account numbers, including, without limitation, the accounts identified in the Motion; provided however, that the accounts shall be designated as debtor in possession accounts to the extent possible by the relevant banks; and (b) continue to use its existing Cash Management System, which includes use of the Investment Accounts and credit cards.  In connection with the ongoing use of the Cash Management System, the Debtor shall continue to maintain strict records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, recorded properly, and distinguished between pre-petition and post-petition transactions.

---

[1] Unless otherwise indicated, capitalized terms not otherwise defined in this Order shall have the same meanings ascribed to them in the Motion.

Case: 23-30564   Doc# 9   Filed: 08/21/23   Entered: 08/21/23 14:27:49   Page 30 of 35
SMRH:4892-4648-3321.1

3.        Each of the Debtor's existing depository and disbursement banks (collectively, the "Cash Management Banks") is authorized to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtor's accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.

4.        Any of the Debtor's Cash Management Banks may rely on the representations of the Debtor with respect to whether any check or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court without any duty of further inquiry and without liability for following the Debtor's instructions.

5.        That (i) those certain existing deposit agreements between the Debtor and its Cash Management Banks shall continue to govern the post-petition cash management relationship between the Debtor and the Cash Management Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect, and (ii) the Debtor and the Cash Management Banks may, without further Order of this Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts.

6.        Nothing contained herein shall prevent the Debtor from opening any additional bank accounts or closing any existing Bank Account(s) as it may deem necessary and appropriate, and the Cash Management Banks are authorized to honor the Debtor's request to open or close, as the case may be, such bank accounts or additional bank accounts, provided however, that any new account shall be with a bank that is insured with the Federal Deposit Insurance Corporation that is organized under the laws of the United States or any State thereof and that such account is either

bonded or securitized as described in 11 U.S.C. § 345(b) should the account exceed the FDIC insurance limit.

7.     Any and all accounts opened by the Debtor on or after the Petition Date at any Bank shall, for all purposes under this Order, similarly be subject to the rights and obligations of this Order.

8.     The Debtor and the Cash Management Banks are hereby authorized to continue to perform pursuant to the terms of any pre-petition agreements that may exist between them, except to the extent otherwise directed by the terms of this Order. The parties to such agreements shall continue to enjoy the rights and remedies afforded to them under such agreements, except to the extent modified by the terms of this Order or by operation of the Bankruptcy Code.

9.     The Debtor is authorized to continue to use its existing business forms and stationery without alteration or change.

10.     The Debtor is authorized to continue its current investment practices as described in the Motion and related pleadings, including but not limited to the use of the BofA Securities Investment Account, the Investment Pool Checking Account, the Restricted Donations Account, and the Stock Transfer Account.

11.     Neither this Order, nor the Debtor's payment of any amounts authorized by this Order, shall: (i) result in any assumption of any executory contract by the Debtor; (ii) result in a commitment to continue any plan, program, or policy of the Debtor; or (iii) impose any administrative, pre-petition, or post-petition liabilities upon the Debtor.

12.     In granting the Motion, the Court is not making any findings or determinations as to what is or is not property of the estate. Nothing herein constitutes a judicial approval or disapproval, or judicial determination, of what assets are or are not restricted or held in trust or property of the estate or what expenditures are reasonable or appropriate.

13.     To the extent the fourteen day stay of Bankruptcy Rule 6004(h) may be construed to apply to the subject matter of this Order, such stay is hereby waived.

14. Nothing in this Order authorizes the Debtor to make any payments that benefit, directly or indirectly, any credibly accused perpetrator of abuse, whether for wages, support, housing, prepetition claims, retirement or otherwise.

15. The Debtors are authorized to take the actions necessary to effectuate the relief granted in this Order.

16. The Court shall retain jurisdiction to hear and determine all matters arising from implementation of this Order.

17. The final hearing on the Motion shall be heard on _____, 2023, at _____ _.m. Opposition, if any, to the granting of the Motion on a final basis shall be filed by _____, 2023. The Debtor's reply to any opposition shall be filed by _____, 2023.

18. Counsel to the Debtor is directed to serve a copy of this Order on all parties on the Limited Service List, as defined in the Debtor's Motion For Order Establishing Notice Procedures on file herein, within five (5) days of the entry of this Order and to file a certificate of service with the Clerk of the Court.

**\*\*END OF [PROPOSED] ORDER\*\***

Line numbers 1 through 28 appear in the left margin.

**Exhibit 2**

**(Illustration of Cash Management System)**



RCASF Operating Account Overview

CONFIDENTIAL

Donors

Commercial Rental Income

Collections | Securities | Second Collections and Restricted Gifts | Donations

FRB Brokerage **0589 Stock Transfer Account (9)

AAA Funds

2nd Collection and Designated Beneficiaries

Bank of America **5250 Main Operating Account (1)

BofA Securities **9371 Investment Account (15)

Bank of America **4129 Inv Pool Checking (3)

First Repub **1534 (8)
Bank of SF **1486 (7)
Interest Bearing Bank Accounts

Securities Proceeds

Bank of America **7083 Restricted Donations (6)

AAA Funds xferred quarterly; some securities donations

Securities Proceeds

Assessments and Fees for Services

Parishes / Schools

Bank of America **4287 Coordinated Payroll Account (5)

Bank of America **2233 Chancery Payroll Account (4)

Bank of America **0220 Accounts Payable Disb. Account (2)

ADP

Imprest Accounts:

Bank of America **4577 Survivor Support Pmts (10)

Bridge Bank **8561 Priest Medical (11)

CA Bank & Trust **9479 Gen'l Liability (12)

Legend:
- ADSF Unrestricted (yellow)
- Restricted / Held for Others (orange)
- Imprest (light blue)
- ADSF Unrestricted (Liquidating) (green)

City National Bank **9001 Workers' Comp Collateral (13)

Segal Bryant **8815 Being Liquidated

First Republic **9117 MM - Closing

8/17/23 2p ET