PAUL J. PASCUZZI, State Bar No. 148810
JASON E. RIOS, State Bar No. 190086
THOMAS R. PHINNEY, State Bar No. 159435
FELDERSTEIN FITZGERALD WILLOUGHBY
    PASCUZZI & RIOS LLP
500 Capitol Mall, Suite 2250
Sacramento, CA 95814
Telephone:    (916) 329-7400
Facsimile:    (916) 329-7435
Email:        ppascuzzi@ffwplaw.com
              jrios@ffwplaw.com
              tphinney@ffwplaw.com

ORI KATZ, State Bar No. 209561
ALAN H. MARTIN, State Bar No. 132301
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    (415) 434-9100
Facsimile:    (415) 434-3947
Email:        okatz@sheppardmullin.com
              amartin@sheppardmullin.com

Proposed Attorneys for The Roman Catholic
Archbishop of San Francisco

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>        Debtor and<br>        Debtor in Possession. | Case No. 23-30564<br><br>Chapter 11<br><br>**DECLARATION OF JOSEPH J. PASSARELLO IN SUPPORT OF CHAPTER 11 PETITION AND DEBTOR'S EMERGENCY MOTIONS**<br><br>Date:     August 24, 2023<br>Time:    1:30 p.m.<br>         Via ZoomGov<br><br>Judge:   Hon. Dennis Montali |

I, Joseph J. Passarello, hereby declare under penalty of perjury as follows:

1. I am the Chief Financial Officer ("CFO") of The Roman Catholic Archbishop of San Francisco, the debtor and debtor in possession herein ("RCASF" or the "Debtor"). I have been the CFO of the RCASF since January 2014. Before that, I have been the CFO for several other companies including Serena Software, Aptina Imaging, AMI Semiconductor, and Therma-Wave, Inc. I have a Master of Business Administration from Santa Clara University and a Bachelor of Science in Economics and Business Administration from St. Mary's College. I am authorized to provide this declaration (the "Declaration") setting forth the general structure and history of the RCASF. In the course and scope of my duties as CFO, I am familiar with the record keeping practices and policies of the RCASF and how it regularly maintains its business records.

2. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by people who report to me, upon information supplied to me by the RCASF's professionals and consultants, upon my review of relevant documents, or upon my opinion based on my experience and knowledge regarding the RCASF's operations, financial condition, and related business issues. The documents submitted herewith, referenced herein or otherwise relied upon by me for purposes of this Declaration are the business records of the RCASF, prepared and maintained in the ordinary and regularly conducted business activity of the RCASF, and used by me for those purposes. If I were called upon as a witness, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the RCASF.

## PRELIMINARY STATEMENT

3. A tragedy that runs contrary to every teaching and tradition of the Church[1] has unfolded in the Church as a whole, as well as in the RCASF. At least seventeen states have enacted legislation to allow individuals to assert claims that otherwise would have been barred by the applicable statute of limitations by temporarily or fully eliminating the limitations periods, allowing older survivors of child sexual abuse to bring suit decades after the harms occurred.

---

[1] References to the term "Church" refer to the universal church of Roman Catholic belief, seated in the Vatican and currently headed by Pope Francis.

Case: 23-30564   Doc# 14   Filed: 08/21/23   Entered: 08/21/23 15:09:25   Page 2 of 21

4. Today, the Church as a whole, and the RCASF in particular, is committed to ensuring the safety of all children. As discussed later in this Declaration, the RCASF has made great efforts to address and curtail the sexual abuse of minors since the late 1980s and early 1990s, as the RCASF became aware of the problem both in American society at large and the Church. The RCASF proactively educated and informed clergy, school employees, other agency leaders, and even parents, how to recognize and report suspicions of child abuse. In fact, as early as 1992, then Archbishop John Quinn formally issued the RCASF's "Child Abuse Policy and Procedures," to establish a written policy and practices for the RCASF to ensure the efficacy of the policies and practices then in place regarding the sexual abuse of minors. Ten years later, the United States Conference of Catholic Bishops ("USCCB") adopted the *Charter for the Protection of Children and Young People* (the "Charter") to address and respond to the problem of sexual abuse in the Church.

5. Between the Charter and the RCASF's history of actions to address sexual abuse of minors as quickly and as proactively as possible, the RCASF has demonstrated its commitment to the safety of children and minors throughout the entire Archdiocese. For over twenty years, the RCASF's policies have gone above and beyond the requirements and recommendations of the Charter to protect children from abuse and to provide healing for those who have been harmed, including, but not limited to providing resources – both monetary and non-monetary – for survivors of abuse.

6. I believe that because of education and awareness, continuous improvement of policies, proactive measures to prevent abuse, and accountability efforts, the RCASF has demonstrated its commitment to the safety of all those who are part of its community, especially children.

7. While no amount of money can adequately compensate a survivor for the harms he or she has suffered, collectively, the RCASF and its insurers have paid more than $70 million over the past 20 years to survivors, either directly or by funding group settlement funds, to fulfill the RCASF's responsibility for the abuse of minors by a diocesan clergy. However, the cost of fulfilling the RCASF's responsibility has increased dramatically as the trend of expanding the limitations period governing claims and causes of action alleging abuse has accelerated.

Case: 23-30564   Doc# 14   Filed: 08/21/23   Entered: 08/21/23 09:25   BRUSCHERA DECLARATION OF PASSARELLO   Page 3 of 21

8.     In light of these developments, the RCASF has determined that it has neither the financial means nor the practical ability to litigate the multitude of abuse claims on multiple timelines, while still serving the faithful individuals, Parishes, Schools, Cemeteries, and various other Catholic-based social and community service organizations that operate in the Archdiocese (each as defined below).  Thus, to ensure that the RCASF fulfills both its foundational and moral obligations to the survivors, the faithful, and others who have put their trust in the RCASF, it has made the difficult decision to commence this case (the "Bankruptcy Case") by filing a voluntary chapter 11 petition on August 21, 2023 ("Petition Date").

9.     It is critical to note that the RCASF did not commence this Bankruptcy Case to avoid responsibility for past clergy misconduct, hide the truth, or deny claimants their respective day in court.  The RCASF filed for chapter 11 relief for precisely the opposite reason:  to design and implement a fair and equitable plan under which all claimants and plaintiffs can recover, rather than to award certain claimants and plaintiffs more, simply because he or she was the first to "race to the courthouse," or less, because she or he was not prepared to bring her or his claims when a majority of other claimants and plaintiffs were.  The RCASF believes that neither the timing of a claimant or plaintiff's readiness to seek redress nor the financial status of the RCASF at any given point should determine the appropriate outcome for all stakeholders (including the survivors, other creditors of the RCASF, and the faithful) in this Bankruptcy Case.

10.    Part of the multitude of factors the RCASF has considered in making this difficult decision to seek relief under chapter 11 is that the RCASF is not the first, nor does it expect to be the last, Catholic entity or religious institution to file for bankruptcy protection in response to numerous pending lawsuits seeking to hold archdioceses and dioceses accountable for harms committed by individuals who committed atrocious harms against minors and other parties.  A large number of these chapter 11 cases have allowed religious institutions and non-profit organizations who are debtors and debtors in possession to emerge from chapter 11 with a plan, acceptable to a majority of survivors and other parties in interest, to address and compensate, both monetarily and non-monetarily, survivors while continuing to serve their respective constituents and operate in the

ordinary course. The RCASF desires a similar outcome in this Bankruptcy Case and is working diligently toward that end.

11. As has been the case in each other successful chapter 11 case involving mass tort liability for clergy sexual abuse, I believe that active engagement and dialog between the RCASF as debtor and any committee (the "Committee") appointed to represent the interests of the survivors and other creditors of the RCASF will be imperative to a good outcome in this Bankruptcy Case. The RCASF welcomes the prompt formation of the Committee, and is ready and willing to engage with the Committee immediately and honestly, so that all parties can work toward achieving the best possible result in the shortest, reasonable amount of time.

12. Part I of this Declaration provides a description and overview of the Debtor's legal structure. Part II discusses in greater detail the events and circumstances precipitating the commencement of this Bankruptcy Case, including the Debtor's efforts to resolve a number of abuse claims without bankruptcy protection, and Part III addresses the RCASF's restructuring goals.

## Part I

### A. Description of the Archdiocese of San Francisco

13. The current Archbishop of the RCASF is Archbishop Salvatore Cordileone who was appointed July 27, 2012.

14. The RCASF was incorporated as a California corporation sole in 1854. The Archdiocese of San Francisco (the "Archdiocese")[2] was canonically established on July 29, 1853, by Pope Pius IX. The Archdiocese now includes 88 parishes some of which have missions associated with them ("Parishes"). The Archdiocese consists of approximately 442,000 Catholics in the counties of San Francisco, San Mateo, and Marin covering approximately 2,325 square miles. Archdiocesan priests and permanent deacons, along with priests, brothers and nuns from multiple religious orders serve the Parishes, Schools (defined below), Catholic hospitals and do other outreach within the San Francisco Archdiocese.

---

[2] The term "Archdiocese" is used herein exclusively to refer to geographic territory under the jurisdiction of the RCASF, and the terms RCASF, or Debtor are used herein exclusively to refer to the secular legal embodiment of the Archdiocese.

15.     The primary role of the RCASF is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development and other services to individuals of the Roman Catholic faith, the 88 Parishes, four Archdiocesan Catholic high schools (Archbishop Riordan High School, Sacred Heart Cathedral Preparatory, Marin Catholic High School and Junipero Serra High School (collectively, the "High Schools")), numerous elementary schools and private independent schools (collectively, the "Schools"), cemeteries ("Cemeteries") and various other Catholic-based social and community service organizations that operate in the Archdiocese. The RCASF has approximately 54 salaried employees, 37 hourly employees, and 32 Clergy and Religious Order payees and 14 stipend seminarians.

16.     As a religious organization, the RCASF has no significant ongoing for-profit business activities or business income.   The RCASF's receipts principally come from the Archdiocesan Annual Appeal (held in trust for named ministries only), fees for services provided to the Non-Debtor Catholic Entities (defined below), revenue from insurance billings, donations, grants, rent from owned properties, and RCASF ministry revenue.   The RCASF's fiscal 2023 operating budget is approximately $55 million in revenues.   The RCASF operates on a fiscal year ending June 30.

17.     The Debtor will file its schedules shortly after the Petition Date.   The petition indicates assets and liabilities exceeding $100 million.

**B.     Legal Structure of the RCASF and Parishes and other Non-Debtor Catholic Entities**

18.     Since its inception and incorporation in 1854, the RCASF has been, and continues to be, a California corporation sole.   When the Archdiocese was created, most, if not all, of the real property of the Parishes was conveyed to the RCASF for the benefit of each Parish.   The Parishes operate as separate juridic persons under Canon Law (defined below) and as unincorporated associations under California law.

**Parishes**

19.     Each of the 88 Parishes has been canonically established separately over the history of the Archdiocese.   Code of Canon Law ("Canon Law") and the Archdiocesan Parish & School Financial Policy Manual ("Policy Manual") provide the basis for Parishes and the governing rules

to guide the Parish in managing its operations. The Policy Manual requires the pastor for each Parish to form a Finance Council. Finance Councils must meet at least quarterly and keep minutes. The Finance Councils serve an advisory role to the pastor.

20. Each of the Parishes has its own bank accounts, most have their own accounts at the CASC (defined below) and each holds the beneficial interest in its real property titled in the RPSC (defined below). Each Parish pays all of its operational and maintenance expenses, including parish real property, and school operations (if any), and related insurance, payroll, and any applicable property taxes. Each Parish also has its own employer identification number, keeps track of and manages its own finances and bank accounts, and reports annually to the RCASF. The RCASF provides administrative services to each Parish and its schools for insurance pooling, payroll, human resources, legal and finance services. The Parishes also pay the RCASF an annual "Rental and Investment Tax" on 80% of rental income from rental properties the Parishes operate and an investment "tax" on a certain portion of income on unrestricted Parish funds held by CASC.[3]

**CASC and RPSC**

21. In 2007, the Archdiocese reorganized into its current structure. The RCASF created two support corporations to own and maintain certain capital assets and real properties so that the civil structure of asset ownership conforms closely with Canon Law and historical practice, and to support the mission of Parishes, Schools and Cemeteries.

22. The Archdiocese of San Francisco Parish, School and Cemetery Juridic Persons Capital Assets Support Corporation ("CASC") was incorporated in 2007 as a California nonprofit religious corporation. The CASC articles state that the CASC shall operate exclusively to support, benefit, and carry out the purposes of the RCASF specifically to advance the mission of those Parish and School Juridic persons, duly established under Canon Law, the governance and operations of which are overseen by the RCASF. The CASC articles also state that all property is irrevocably dedicated to religious, charitable, or educational purposes.

---

[3] A portion of the Rental and Investment Tax is used by the RCASF to fund its Chancery budget and a portion is redistributed to Parishes in need of financial assistance.

23.     At the time of CASC's creation, certain assets were transferred from the RCASF, Parishes, Schools and Cemeteries to the CASC primarily consisting of investments owned by the Parishes, Schools, and Cemeteries. The CASC assumed all civil and canonical obligations regarding the use of such funds, subject to any existing restrictions. The CASC requested all donor documents and made inquiries of Parishes, Schools and Cemeteries to determine the proper net asset classification of such funds and has listed such funds accordingly in its financial statements as restricted or not.

24.     The CASC maintains a deposit and loan fund for the Parishes and Schools located within the Archdiocese. The Parishes and Schools generally remit any funds in excess of two months of projected cash needs to the CASC, which funds are managed either in a deposit and loan fund or long term investment funds. No RCASF funds are managed or held by the CASC. The CASC maintains separate financial statements which are audited annually. The CASC keeps detailed accounting records of the beneficial interest of each Parish and parish school in the assets held by the CASC.

25.     The CASC and the RCASF are parties to a written Technical Services Contract under which the RCASF agrees to perform for CASC certain human resources, finance and accounting and legal services for approximately $65,000 per year as an independent contractor. CASC administers its own payroll.

26.     The Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support Corporation ("RPSC") was incorporated in 2007 as a California nonprofit religious corporation. The RPSC articles of incorporation state that the RPSC shall operate exclusively to support, benefit, and carry out the purposes of the RCASF specifically to advance the mission of the Parish and School Juridic persons, duly established under Canon Law, the governance and operations of which are overseen by the RCASF. The RPSC articles also state that all property is irrevocably dedicated to religious, charitable, or educational purposes. The RPSC's separate statement of cash receipts and disbursements is audited annually.

27.     At the time of RPCS's creation, certain real property assets (primarily that owned by the Parishes and Schools) were transferred from the RCASF, Parishes and Schools to the RPSC.

The RPSC's operations include managing the maintenance and operation of the real properties. To the best of my knowledge, no RCASF-owned real property is held by the RPSC. The costs of the RPSC's operations are paid by the entities whose property is being held and managed by the RPSC (*i.e.*, the Parishes and Schools). These costs are billed to the Parishes and Schools at the time of the package insurance billing described in paragraph 39 below.

28. The RPSC and the RCASF are parties to a written Technical Services Contract under which the RCASF agrees to perform for RPSC certain human resources, finance and accounting and legal services for $1 per month as an independent contractor on a month to month basis. However, the services provided are minimal, as the RPSC administers its own payroll. The RPSC has agreed to provide certain real estate services for the RCASF under a separate written Technical Services Contract for $1 per month on a month to month basis.

**Benedict XVI**

29. Several other separate and independent Catholic entities operate within the territory of the Archdiocese along with the Parishes, CASC and RPSC. The Benedict XVI Institute for Sacred Music and Divine Worship ("Benedict XVI") was incorporated on October 21, 2013, as a California nonprofit religious corporation. The specific purpose of Benedict XVI is to inculcate and disseminate the religious values and teachings of the Catholic Church; to engage administrators and faculty as ministers to teach, support and foster the liturgical and musical heritage of the Catholic Church; to teach and train interested clergy, seminarians, musicians, lay persons, and other ministers as liturgical ministers and in the performance of traditional Catholic music; and to develop, as a perpetual resource for the Catholic Church in San Francisco and beyond, a body of competent and certified liturgical ministers and ministerial musicians capable of engaging in this religious mission. Benedict XVI administers its own payroll and maintains its own insurance.

**Seminary**

30. The Roman Catholic Seminary of San Francisco (the "Seminary") was originally incorporated in 1891. The Seminary is a California nonprofit religious corporation operated exclusively for religious purposes with its property irrevocably dedicated to religious purposes. The Seminary was created to establish, endow and maintain a Seminary for the instruction and education

1   of young men for the priesthood of the Roman Catholic Church.  The Seminary is part of, and pays

2   its share of, the pooled insurance program for property and casualty insurance administered by the

3   RCASF (except it does not participate in the self-insurance fund).  The RCASF and the Seminary

4   are parties to a written Technical Services Contract under which the RCASF agrees to perform

5   certain human resources, finance and accounting and legal services for approximately $100,000 per

6   year as an independent contractor.

7           **Catholic Charities**

8           31.     Catholic Charities CYO of the Archdiocese of San Francisco ("Catholic Charities")

9   was originally incorporated in 1946 and is a nonprofit California corporation.  Catholic Charities is

10  one of the largest, most comprehensive human services agencies in Northern California reaching

11  more than 70,000 people annually in San Francisco, San Mateo, and Marin Counties. Catholic

12  Charities is an integral part of and plays a role in keeping neighborhoods diverse, productive, safe,

13  and healthy through over 30 programs and social justice advocacy.  As a separate entity, Catholic

14  Charities works with the RCASF to support the mission-driven staff and partner organizations across

15  San Francisco, Marin, and San Mateo counties as Catholic Charities shares its message of peace and

16  hope to a world in need.  Catholic Charities has an outstanding loan from the RCASF that is

17  documented by a promissory note and recorded deed of trust on separate real property owned by

18  Catholic Charities.  The balance due is approximately $2.8 million.  Catholic Charities is part of,

19  and pays its share of, the pooled insurance program for property and casualty insurance administered

20  by the RCASF, except for the self-insurance fund.  Catholic Charities is named as a defendant in

21  approximately 18 abuse lawsuits.  Catholic Charities administers its own payroll.

22          **Schools, Including the High Schools**

23          32.     There are four Archdiocesan sponsored high schools within the Archdiocese, three

24  of which were started in the 1940s and 1950s (as defined below, ARHS, MCHS, and JSHS) and one

25  of which was formed in the 1980s as the result of a merger (SHCP).[4]  There is a high school teachers'

26  union that collectively represents the teachers at the four high schools.  The RCASF Department of

27

28  _____

[4] There are nine other independent Catholic sponsored high schools within the Archdiocese.

Case: 23-30564   Doc# 14   Filed: 08/21/23   Entered: 08/21/23 15:09:25   Page 10 of
21

Catholic Schools supervises and works with these four High Schools and the other Schools to focus on Catholic identity, academic excellence, and service. The RCASF administers the four High Schools' payroll and insurance programs, and performs certain accounting, human resources, and legal services, for which each of the High Schools pays its share based on enrollment. The High Schools participate in the RCASF Institutional Deposit and Loan under written agreements for administering their deposits. The Department of Catholic Schools provides further support and services to the High Schools in exchange for an Administrative Assessment and Support fee calculated according to a formula which for 2023 is approximately $73 per student. Each of the four High Schools is discussed below:

a. Archbishop Riordan High School ("ARHS") is an unincorporated association with its own operations separate from the RCASF. ARHS has its own Board and Finance Committee, financial systems and controls, IT department, and employer identification number. The ARHS maintains separate financials which are audited annually. There is no sharing of funds between the ARHS and the RCASF. ARHS is responsible for maintaining accreditation under the Western Association of Schools and Colleges ("WASC") and the Western Catholic Education Association ("WCEA"). The ARHS excess short term cash is on deposit in the Institutional Deposit and Loan, while its capital assets and endowments are in the CASC and its real property is titled in the RPSC.

b. Sacred Heart Cathedral Preparatory ("SHCP") is an unincorporated association with its own operations separate from the RCASF. SHCP has its own Board and Finance Committee, financial systems and controls, IT department, and employer identification number. The SHCP maintains separate financials which are audited annually. There is no sharing of funds between the SHCP and the RCASF. SHCP is responsible for maintaining accreditation under WASC and WCEA. The SHCP excess short term cash is on deposit in the Institutional Deposit and Loan, while its capital assets and endowments are in the CASC and its real property is titled in the RPSC.

c. Marin Catholic High School ("MCHS") is an unincorporated association with its own operations separate from the RCASF. MCHS has its own Board and Finance Committee,

Case: 23-30564    Doc# 14    Filed: 08/21/23    Entered: 08/21/23 15:09:25    Page 11 of
21    DECLARATION OF RASSARELLO

financial systems and controls, IT department, and employer identification number. The MCHS maintains separate financials which are audited annually. There is no sharing of funds between the MCHS and the RCASF. MCHS is responsible for maintaining accreditation under WASC and WCEA. The MCHS excess short term cash is on deposit in the Institutional Deposit and Loan, while its capital assets and endowments are in the CASC and its real property is titled in the RPSC.

d. Junipero Serra High School ("JSHS") is an unincorporated association with its own operations separate from the RCASF. JSHS has its own Board and Finance Committee, financial systems and controls, IT department, and employer identification number. The JSHS maintains separate financials which are audited annually. There is no sharing of funds between the JSHS and the RCASF. JSHS is responsible for maintaining accreditation under WASC and WCEA. The JSHS excess short term cash is on deposit in the Institutional Deposit and Loan, while its capital assets and endowments are in the CASC and its real property is titled in the RPSC. JSHS has an outstanding loan from the RCASF Institutional Deposit and Loan with an approximate balance of $6.6 million that matures in November of 2027.

33. Numerous Parishes operate Schools, including preschools and elementary schools. Other religious entities operate private independent schools within the Archdiocese territory. Each School is affiliated with a Parish or Order and controlled by that affiliate Parish or Order. The RCASF Department of Catholic Schools oversees the curriculum and provides support for the 22 preschools, 55 elementary schools, and 13 high schools in Marin, San Francisco and San Mateo counties.[5] Otherwise, the Schools are autonomous. The Department of Catholic Schools provides funds for student financial aid. Otherwise, the Schools do not receive financial support from the RCASF.

**Catholic Cemeteries**

34. Six operating Cemeteries within the Archdiocese of San Francisco are operated as a separate unincorporated association through Catholic Cemeteries. These are Holy Cross Catholic-Colma, Holy Cross-Menlo Park, Holy Cross-Saint Mary Magdalene, Mt. Olivet, Our Lady of the

---

[5] The Department of Catholic Schools also provides support for two schools that are not associated with a particular parish, Saint Brigid School and St. Thomas More School.

Case: 23-30564    Doc# 14    Filed: 08/21/23    Entered: 08/21/23 15:09:25    Page 12 of
21

1  Pillar (includes St. Anthony's Pescadero), and Tomales Catholic Cemetery. The Cemeteries are run

2  centrally by a Director of Cemeteries and a Catholic Cemetery Advisory Board that meets regularly

3  to review financials, approve budgets, and provide counsel to the Director and the Cemeteries'

4  managers. The Cemeteries have their own funding and separate payroll. As of June 30, 2022, the

5  Cemeteries held approximately $67 million in funds in the Cemetery Endowment Care Fund in

6  CASC, which is an account held in accordance with California Health & Safety Code section 8726

7  and can be used only for the "care, maintenance and embellishment of the cemeteries." Title to the

8  real property used by the Cemeteries is held in the RCASF, for which the Cemeteries have an

9  agreement to pay a land-use fee of 11.5% of sales to the RCASF. The Cemeteries administer their

10  own payroll.

11  **Vallombrosa Retreat Center**

12      35.     The Vallombrosa Retreat Center was purchased by the RCASF in 1947 to serve as a

13  retreat house for women. Over the years its mission has expanded, and while continuing to serve as

14  a retreat house, the Vallombrosa Retreat Center also sponsors and hosts a variety of seminars and

15  programs of a spiritual and educational nature. The Vallombrosa Retreat Center operates with an

16  advisory board, has its own budget, bank accounts, and staff, maintains its own books and records,

17  and is not funded by the RCASF. When parties rent the center, they contract directly with the

18  Vallombrosa Center and all revenue remains with the Vallombrosa Center for use to maintain and

19  operate the center.

20  **Serra Clergy House**

21      36.     The Serra Clergy House is a full service residence for retired priests. The Serra

22  Clergy House real property is titled in the RPSC. Typically, there are eight to ten retired priests in

23  residence at the Serra Clergy House. Serra Clergy House receives approximately $600 per month

24  per priest from the resident priests, approximately $1000 per month from the Long Term Clergy

25  Care Fund and funding from the RCASF to cover its remaining operating costs.

26  **Archdiocesan Annual Appeal**

27      37.     In January of each year, the RCASF begins the Archdiocesan Annual Appeal

28  ("AAA") campaign to raise restricted funds for specified ministries and needs of the Archdiocese.

Case: 23-30564    Doc# 14    Filed: 08/21/23    Entered: 08/21/23 15:09:25    Page 13 of 21    DECLARATION OF JOSEPH PASSARELLO

For 2023, these include Clergy Support, Parish Ministry and Schools, Social Ministry, and Universal Church and Communications. Each Parish is provided with an assessment amount based on 20% of ordinary income for the fiscal year of the Parish. Parish AAA goals are communicated by the Archbishop to each Pastor in December. The 2023 AAA goal is $6.4 million. The Parishes are supported during the AAA campaign by the Mission Advancement Office with numerous programs and forms of assistance to help achieve their goal. Any Parish that exceeds its AAA fund raising goal will receive 100% of the excess in the form of a rebate payment.

38. The Parishes, CASC, RPSC, Benedict XVI, Seminary, Catholic Charities, Schools, and Cemeteries, are hereafter referred to collectively as the "Non-Debtor Catholic Entities."

39. The RCASF procures package insurance coverage for property/buildings, liability (including sexual misconduct insurance), and workers compensation based on a pooled insurance plan. Generally, the Non-Debtor Catholic Entities participate in this pooled insurance program such that there is common insurance for all, except as otherwise noted in this declaration or my other declarations in support of first day motions.

40. Except as otherwise stated, each of the Non-Debtor Catholic Entities owns its own property, finances its own activities, manages its own assets and is responsible for its own operational activities. The Non-Debtor Catholic Entities have not sought bankruptcy relief and are not debtors in this Bankruptcy Case.

## Part II

### A. The Clergy Sex Abuse Crisis and the RCASF Response

41. As discussed at the outset of this Declaration, the RCASF is committed to using available resources of the RCASF to provide for all survivors of abuse, known and yet to be known, in a fair, just and equitable manner.

42. Throughout the United States of America during the late 1980s, there was a growing awareness to the societal problem of sexual abuse of minors. The RCASF responded to this epidemic by creating its own proactive and educational initiative, conducting workshops throughout the Archdiocese for clergy, school employees, other agency leaders, and even parents. Presenters included members of law enforcement, social services agencies, and other professionals who trained

the attendees how to recognize signs and report suspicions of child abuse. In September 1992, then Archbishop John Quinn issued the "*Child Abuse Policy and Procedures*," and thereby established a written policy and practices for the RCASF to address issues of sexual abuse of minors. This document covered practical skills for those who work with children, including detection of abuse and mandated reporting procedures. It outlined new human resource procedures, including a screening process for new employees and immediate suspension and investigation when an employee is suspected of abuse. For survivors and their families, the RCASF pledged its support in the healing process through both medical intervention and counseling services. Thus, even before the 2002 Charter discussed below, the RCASF had enacted protocols to respond to reports of abuse.

43. In the spring of 2002, the USCCB adopted the Charter, which adopted a "one strike" policy regarding clergy serving in any active, public ministry, and also included:

- permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor;
- requirement of criminal background checks for adults, including clergy, who work with children and youth;
- implementation of educational programs to prevent child sexual abuse for both adults and children;
- provision of behavioral guidelines/ethical standards for ministry;
- establishment of outreach for survivors; and
- creation of a review board to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

44. In response to the Charter, the RCASF issued additional guidelines, and in 2003, revised Archdiocesan policies accordingly. As part of these developments, among other things, a new Office of Child and Youth Protection was created to implement a comprehensive and rigorous safe environment program throughout the entire Archdiocese. Over the years, not only has the RCASF continuously satisfied the Charter, but it has taken additional steps not required by the Charter to protect children from abuse and to provide healing for those who have been harmed. Examples of the measures taken by the RCASF include:

- established an Office of Child and Youth Protection to address allegations of past or current sexual abuse by clergy, religious or other people who work or volunteer for the Archdiocese;
- established a Safe Environment Coordinator to monitor and assure compliance with the Charter;

Case: 23-30564   Doc# 14   Filed: 08/21/23   Entered: 08/21/23 15:09:25   Page 15 of 21

- responding as needed to assist people abused or affected by abuse;
- in some instances, offering counseling for claimants whose cases have been dismissed or settled;
- implementing an Archdiocesan Independent Review Board comprised of a psychologist, two physicians, a retired police officer, a survivor, and other men and women including parents, to review claims of sexual abuse and advise the Archbishop;[6]
- requiring background-screening and fingerprinting of employees and clerics;
- requiring Safe Environment education for priests, deacons, staff and volunteers in all parishes and schools;
- providing age-appropriate education for school and religious education children to equip them with the skill to help them protect themselves from abuse; and
- participating in annual compliance audits, conducted by independent auditors, to review the implementation of policies and procedures regarding the protection of children.

45.   As noted above, currently in the Archdiocese, all individuals over the age of 18 who interact with minors (i.e., clergy, employees, and volunteers) are required to be background-screened and fingerprinted.  In addition, they must participate in training every three years in maintaining safe practices and detecting the signs of abuse.  The Office of Child and Youth Protection continues to improve the content of its trainings, and today, the Archdiocese employs an online synchronous platform known as VIRTUS, designed by the National Catholic Risk Retention Group, Inc., an international leader in abuse awareness training.  Furthermore, children in our Faith Formation programs and schools also receive annual grade-level appropriate training in recognizing inappropriate behavior and what to do if they see or experience it.

46.   As required by the USCCB Charter, the Archdiocese is audited for compliance annually, with an onsite review every three years.  The Archdiocese has successfully passed its audits every year.  In addition to these preventive measures, the Archdiocesan Victim's Assistance Office maintains a hotline and offers various services to assist victims, including counseling and spiritual direction.

---

[6] The Archdiocesan Independent Review Board also reviewed all claims that had been made historically to determine if anything else needed to be done with respect to those claims.

**B.      The RCASF's Responses to Allegations of Abuse**

47.      The Archdiocesan Independent Review Board ("IRB") is an essential step in the procedures for handling allegations of sexual abuse of minors.  The current practice involves a qualified investigator who investigates allegations and then submits a report to the IRB.  Upon review of this report, the IRB members evaluate whether there is sufficient evidence to warrant a canonical trial or if the accusation is manifestly unfounded and then make their recommendation. The IRB meets at least quarterly to review allegations of abuse and critically evaluates the current procedures for handling allegations.  I am informed and believe that the Archbishop attends every quarterly meeting, as well as additional ad hoc meetings.

48.      The RCASF publishes and maintains a current list of the names of priests and deacons in good standing with faculties to minister in the Archdiocese.  Those with questions about a priest or deacon can refer to this list.  A link to the list can be found in the "Contact Us" section of the website under "Protecting Children."  When there are sexual abuse lawsuits filed, the RCASF addresses allegations through appropriate legal channels.  Other than allegations that are factually impossible, investigations are initiated for any claims received.  Any priest under investigation is prohibited from exercising public ministry under Canon Law as well as RCASF and USCCB policies.

49.      The Archdiocese of San Francisco has actively worked with survivors (with or without attorneys) to provide some compensation for the harm which they suffered.

50.      The Archdiocesan resources for Child Protection are available on its website at https://www.sfarchdiocese.org/protecting-children.    These resources include the Archdiocesan Policy for the Protection of Children and Young People, the Charter, Standards of Conduct for Adults Working with Minors, Survivor Assistance resources, Questions and Answers page, How to Report Suspected Abuse, Live Scan electronic fingerprinting, information about the Independent Review Board, contact information for the Archdiocesan Victim Assistance Coordinator, and other resources.

51.      The RCASF and its insurers have paid more than $70 million over the past 20 years. This amount includes prior settlements totaling approximately $68 million, in the aggregate when

Case: 23-30564     Doc# 14     Filed: 08/21/23     Entered: 08/21/23 15:09:25     Page 17 of
21     DECLARATION OF JOSEPH PASSARELLO

California previously revised the statute of limitation in 2003, and approximately $3-4 million, in the aggregate, between 2008 to 2023.

## Part III

**A.**     **Events Precipitating the Bankruptcy Case**

52.     Until recently, the RCASF has maintained financial viability while funding compensation for abuse survivors and continued litigation regarding claims of abuse.  As stated above, the RCASF and its insurers have paid more than $70 million in legal settlements over the past 20 years in an effort to fulfill the RCASF's responsibility for abuse of minors by a diocesan clergy.

53.     In October 2019, Governor Newsom signed California Assembly Bill No. 218 ("AB 218").  AB 218 revived the statute of limitations for individuals to file civil lawsuits for childhood sexual abuse.  The enactment of AB 218 allowed certain individuals to bring what had been time-barred claims against individuals and entities for abuse claims through and including December 31, 2022.  As of the date of this Declaration, I am informed and believe there are approximately 537 separate, active lawsuits pending against the Debtor filed by plaintiffs alleging sexual abuse by clergy or others associated with the Debtor.

54.     The Debtor has neither the financial means nor the practical ability to litigate each of the abuse claims in state court.  This Bankruptcy Case will allow all of the claims to be filed and decided in a single forum and will ensure that all meritorious abuse claims be paid on a fair and equitable basis under an approved plan.

55.     The RCASF with its counsel Weintraub Tobin Chediak Coleman Grodin Law Corporation have investigated and taken action as to any credible allegation of abuse.  We are reviewing all of the information currently available regarding the approximately 537 lawsuits under existing protocols to determine what action must be taken regarding any allegations involving living clergy in service at this time.  As of the date of this declaration, no priest with a credible allegation of abuse remains in ministry.

56.     Based on our experience in past situations and recent plaintiff demands, the RCASF expects the initial demands to be more than $2 million per claim.  Based on these demands, I am

Case: 23-30564     Doc# 14     Filed: 08/21/23     Entered: 08/21/23 15:09:25     Page 18 of 21
DECLARATION OF FR. PASSARELLO

1    informed and believe that the RCASF's total exposure is likely to exceed its assets. The RCASF is

2    a not-for-profit religious organization and while it does have significant resources including

3    insurance, these resources could be inadequate to respond to over 500 lawsuits. Thus, this avalanche

4    of lawsuits puts the RCASF in immediate and dire financial distress and in need of a forum to resolve

5    these claims while continuing to serve the faithful and those in need.

6        57.    Although the AB 218 claims do not involve abuse having occurred in recent history,

7    that does not diminish the pain and horrific acts which occurred before then, and which have affected

8    far too many. The RCASF is committed to preventing abuse from ever occurring again in the

9    Archdiocese. Rebuilding the confidence of our congregants and society is a paramount goal for

10   everyone in the Archdiocese.

11   **B.    The Reorganization Case**

12       58.    The RCASF does not seek chapter 11 relief to avoid responsibility for past

13   misconduct by clergy, nor to hide the truth or to deny claimants their day in court. The RCASF is

14   committed to pursuing the truth on all allegations of abuse. The RCASF has made and requires

15   criminal referrals to be made for all credible allegations of sexual abuse. Archbishop Cordileone

16   has apologized for the past misconduct of the personnel of the Archdiocese and has met with

17   survivors to bring comfort to such individuals, as did his predecessors. The Archdiocese has

18   established stringent standards for the training and background assessment of all employees, clerics

19   and volunteers who will likely interact with children and young people.

20       59.    The RCASF has filed the Bankruptcy Case as a further step toward fulfilling its moral

21   obligation to compensate all abuse survivors fairly and within a reasonable period of time. As a

22   result, the RCASF cannot allow any single plaintiff to recover a disproportionate share of the

23   resources available from the RCASF and its insurance simply because that plaintiff's case proceeds

24   to trial first. Through the Bankruptcy Case, the RCASF seeks to ensure that fair, equitable, and

25   reasonable recoveries are available to individuals with bona fide abuse claims through an expedited

26   resolution mechanism.

27       60.    In addition to the RCASF's obligations to all of its creditors, the Archdiocese has a

28   foundational and moral obligation to the Catholic faithful it serves, to the donors who have entrusted

Case: 23-30564    Doc# 14    Filed: 08/21/23    Entered: 08/21/23 15:09:25    Page 19 of
21

the Archdiocese with donations to serve the Archdiocese's missions, and to the larger communities which it serves, to continue the ministries of the Church in fulfillment of the Debtor's canonical and secular legal purposes. To fulfill these obligations, the RCASF must survive.

61. I understand the Bankruptcy Court provides a forum and the Bankruptcy Code provides a mechanism whereby all the claims can be determined and paid on a fair and equitable basis and ensures that all claimants with similarly situated claims are essentially treated the same. The RCASF requires the Bankruptcy Court's protection and the protection of the bankruptcy laws to make fair and equitable payment of the claims against it, including the survivors of abuse, trade creditors, and others.

62. The RCASF's goals in seeking chapter 11 relief are twofold: (a) to protect and preserve the RCASF's assets that are properly available for distribution to the RCASF's creditors and ensure that whatever assets can be marshaled be distributed equitably to all creditors, not just a few; and (b) to continue the work of the Church within the Archdiocese to the fullest extent possible using the resources dedicated to those purposes.

63. The RCASF intends to negotiate a plan of reorganization as early as possible which will: (a) allocate the RCASF's resources fairly among the legitimate competing interests for such property; (b) provide a process to fully, fairly and expeditiously liquidate claims of abuse survivors; and (c) permit the RCASF to carry on its essential ministries and services so it can continue to meet the needs of the Non-Debtor Catholic Entities, parishioners, and others who rely on the RCASF's ministry, education, and charitable outreach.

64. An expeditious reorganization process is extremely important given the Debtor's resources and because it is a not-for-profit religious corporation. The Archdiocese depends upon the charity of its faithful to sustain its very existence. This Bankruptcy Case will cast a shadow upon the RCASF, the Parishes, and the various Non-Debtor Catholic Entities and their numerous ministries. Some faithful may believe that, going forward, their charitable gifts to any Catholic entity will be diverted from their intended purpose and used to satisfy the claims of the Debtor's creditors rather than to fund the ongoing ministries of the Church that benefit the faithful and their community. The Debtor will use its best efforts to dispel this misconception by communicating

Case: 23-30564    Doc# 14    Filed: 08/21/23    Entered: 08/21/23 15:09:25    Page 20 of 21

openly and often about the chapter 11 process. However, I respectfully believe that the best way to alleviate these concerns is to address the insurmountable abuse claims in the bankruptcy forum and emerge from bankruptcy as soon as reasonably possible.

I declare under penalty of perjury under the laws of the United States of America that the foregoing it true and correct. Executed on August 18, 2023, at San Francisco, California.

_____
Joseph J. Passarello

Case No. 23-____
FIRST DAY DECLARATION OF J. PASSARELLO