CHRISTINA L. GOEBELSMANN (CA SBN 273379)
Assistant United States Trustee
JASON BLUMBERG (CA SBN 330150)
Trial Attorney
TREVOR R. FEHR (CA SBN 316699)
Trial Attorney
PHILLIP J. SHINE (CA SBN 318840)
Trial Attorney
Office of the United States Trustee
450 Golden Gate Avenue, Room 05-0153
San Francisco, California 94102
Phone: (415) 705-3333
Facsimile: (415) 705-3379
Email: jason.blumberg@usdoj.gov

Attorneys for Tracy Hope Davis,
United States Trustee for Region 17

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>Debtor and Debtor in Possession. | Bankruptcy Case No. 23-30564<br><br>Chapter 11<br><br>Date: August 24, 2023<br>Time: 1:30 p.m.<br>Place: Via ZoomGov<br><br>Judge: Hon. Dennis Montali |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO DEBTOR'S FIRST DAY MOTIONS AND RESERVATION OF RIGHTS [ECF Nos. 7 & 9]**

Tracy Hope Davis, United States Trustee for Region 17 (the "UST"), hereby files this omnibus objection (the "Omnibus Objection") to two first-day motions filed in this case. These first day motions are referred to collectively hereafter as the "First Day Motions", or individually, as set forth below:

- *Debtor's Emergency Motion for Order (1) Authorizing Payment of Prepetition Wages, Salaries, and Employee Expenses; (2) to Pay Accrued Employee Benefits and Taxes; and (3) Directing Banks to Honor Payroll and Expense Checks* (ECF No. 7) (the "Wages Motion"); and

- *Debtor's Emergency Motion for Interim and Final Orders (1) Authorizing Continued Use of Existing Cash Management System, Operational Bank Accounts and Related Investment Accounts; (2) Authorizing Maintenance of Existing Business Forms, (3) Excusing Compliance with Section 345(b); (4) Authorizing Continued Use of Current Investment Policy; and (5) Scheduling a Final Hearing* (ECF No. 9) (the "Cash Management Motion").[1]

This Omnibus Objection is supported by the following memorandum of points and authorities and any argument the Court may permit on the Omnibus Objection.[2]

## I. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction

1. The Debtor's requests for relief in the First Day Motions should be: (a) denied; (b) denied in part; or (c) limited to only emergency relief to permit the Debtor to sustain business operations. The UST is scheduling the initial debtor interview. The meeting of creditors pursuant to 11 U.S.C. § 341 will be held on September 28, 2023. The UST is in the process of soliciting creditors to form an official committee of unsecured creditors. In the best interest of creditors, the Court should either sustain this Omnibus Objection or adjourn the hearing on these First Day Motions to a later date to allow any creditors committee or other creditors a meaningful opportunity to evaluate these First Day Motions.

---

[1] The UST takes no position at this time on the following additional "first day motions" filed by the Debtor: (i) the motion regarding utility services under 11 U.S.C. § 366 (ECF No. 8); (ii) the motion to establish notice and confidentiality procedures and to temporarily suspend the claims bar date (ECF No. 10); (iii) the application to appoint Omni Agent Solutions, Inc. as claims and noticing agent (ECF No. 11); (iv) the motion to continue insurance programs (ECF No. 12); and (v) the motion with respect to abuse survivors' assistance and safe environment programs (ECF No. 13). The UST reserves all rights, including to object to any final relief sought by the Debtor in these motions.

[2] The UST requests that the Court take judicial notice of the pleadings and documents filed in this case pursuant to Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 201. To the extent that the Omnibus Objection contains factual assertions predicated upon statements made by the Debtor, any of its current or former affiliates, agents, attorneys, professionals, officers, directors or employees, the UST submits that such factual assertions are supported by admissible evidence in the form of admissions of a party opponent under Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Evidence 801(d)(2).

2. The UST reserves all rights with respect to all the Debtor's First Day Motions which are scheduled for hearing on the above-captioned date and time, including, but not limited to her right to take any appropriate action under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the U.S. Bankruptcy Court for Northern District of California.

B. **Background Facts and Procedural Posture**

3. On August 21, 2023 (the "Petition Date"), the Debtor commenced the above-captioned case under Chapter 11 of the Bankruptcy Code. *See* ECF No. 1. The Debtor is currently a debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code.

4. On the Petition Date, the Debtor filed its list of 20 largest unsecured creditors. *See* ECF No. 1.

5. The Debtor has not yet filed the required Schedules and Statements, including Schedule A/B, Schedule D, Schedule E/F, and the Statement of Financial Affairs. *See* Bankruptcy Docket, *generally*.

6. The UST is in the process of scheduling the Initial Debtor Interview.

7. The UST is in the process of soliciting creditors to form an official committee of unsecured creditors.

8. The meeting of creditors under 11 U.S.C. § 341(a) will be held on September 28, 2023.

9. According to the first day declaration of Joseph J. Passarello (ECF No. 14) (the "First Day Declaration"), the Debtor was established in 1853 and "consists of approximately 442,000 Catholics in the counties of San Francisco, San Mateo, and Marin covering approximately 2,325 square miles." *See* First Day Declaration, at ¶ 14. There are 88 parishes

within the archdiocese. *Id*. The parishes are "unincorporated associations" under California law. *Id.*, at ¶ 18.

10. In 2007, the Debtor created two support corporations - known as "CASC" and "RPSC" - to "own and maintain certain capital assets and real properties so that the civil structure of asset ownership conforms closely with Canon Law and historical practice, and to support the mission of Parishes, Schools and Cemeteries." *See* First Day Declaration, at ¶¶ 21-28.

11. According to the First Day Declaration, there are "approximately 537 separate, active lawsuits pending against the Debtor filed by plaintiffs alleging sexual abuse by clergy or others associated with the Debtor." *See* First Day Declaration, at ¶ 53.

## II. ARGUMENT

12. Four principles for Courts to consider with regard to first day motions are:

> First, the requested relief should be limited to that which is minimally necessary to maintain the existence of the debtor, until such time as the debtor can affect appropriate notice to creditors and parties in interest. In particular, a first day order should avoid substantive rulings that irrevocably determine the rights of parties.
>
> Second, first day orders must maintain a level of clarity and simplicity sufficient to allow reasonable confidence that an order will effect no unanticipated or untoward consequences.
>
> Third, first day orders are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established. In particular, first day orders should provide no substitute for the procedural and substantive protections of the plan confirmation process.
>
> Fourth, no first day order should violate or disregard the substantive rights of parties, in ways not expressly authorized by the Bankruptcy Code.

*See In re The Colad Group, Inc.*, 324 B.R. 208, 213-14 (Bankr. W.D.N.Y. 2005).

4

Case: 23-30564    Doc# 25    Filed: 08/23/23    Entered: 08/23/23 15:07:38    Page 4 of 15

13. Accordingly, the relief sought in the First Day Motions, if granted at all, should be granted only on an interim basis, with a final hearing set so that an Official Committee of Unsecured Creditors, if one can be formed, can review and respond to the final relief sought, preferably after schedules are filed and a meeting of creditors is held.

A. **The Wages Motion**

14. As set forth in the Wages Motion, the Debtor has 54 salaried employees, 37 hourly employees, 32 Clergy and Religious Order payees, and 14 stipend seminarians. *See* Wages Motion, at ¶ 5.

15. The Debtor seeks authority to, *inter alia*, pay (i) pre-prepetition employee compensation of approximately $20,000,[3] (ii) pre-petition benefit obligations (including honoring vacation and PTO in the ordinary course and paying employees for unused amounts upon termination),[4] and (iii) unreimbursed pre-petition employee expenses in an unknown amount. It appears that the Debtor seeks to pay these pre-petition claims only to the extent such claims are entitled to priority under 11 U.S.C. §§ 507(a)(4) or 507(a)(5). *See* Wages Motion, at ¶¶ 3-4, 23, 38, 55-56.

16. The UST takes no position on the payment of (i) pre-petition claims of the Debtor's non-insider employees that are entitled to priority under Sections 507(a)(4) and 507(a)(5), or (ii) the related payroll taxes, deductions and withholdings, provided these amounts do not exceed the statutory cap.

---

[3] The Debtor adjusted its payroll schedule to pay its pre-petition payroll obligations prior to the Petition Date. *See* Cash Management Motion, at ¶ 16.

[4] The Debtor estimates that accrued vacation and PTO claims total approximately $900,000, of which $750,000 is entitled to priority status. *See* Cash Management Motion, at ¶ 38.

5

17. However, the UST opposes any payments on claims that are not entitled to priority status (including reimbursement of pre-petition business expenses) or do not comply with 11 U.S.C. § 503(c)(1) and (3). *See, e.g., In re B & W Enterprises, Inc.,* 713 F.2d 534, 537 (9th Cir. 1983) ("The Necessity of Payment Rule was created for and has been applied only to railroad cases. Absent compelling reasons, we deem it unwise to tamper with the statutory priority scheme devised by Congress in the 1978 Act."); *In re EcoSmart, Inc.*, 2015 WL 9274245, at *9 (Bankr. C.D. Cal. Dec. 18, 2015) ("[A]bsent the priority status of claims, the courts have not seen justification to allow payment of prepetition claims of so-called 'critical vendors,' and this court will follow such examples and require Debtor to demonstrate that the priority status of wage, salary and commission claims of its employees and independent contractors … to warrant immediate payment in advance of general distribution on prepetition claims.").[5]

18. Additionally, paragraph 9 of the proposed interim Order states that "[n]othing in this Order authorizes the Debtor to make any payments that benefit, directly or indirectly, any *credibly accused perpetrator of abuse*, whether for wages, support, housing, prepetition claims, retirement or otherwise." *See* ECF No. 7, at p. 33 of 34 (emphasis added). The Motion does not define the concept of "credibly accused" or disclose whether the Debtor maintains a public list of allegations that it has determined to be credible.

---

[5] The Debtor asserts that in *In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987), the Ninth Circuit recognized the doctrine of necessity. *See* Wages Motion, at ¶ 67. The narrow issue before the Court of Appeals, however, was whether a good faith finding under Section 364(e) mooted an appeal challenging the legality of a cross-collateralization clause in a post-petition financing. *In re Adams Apple, Inc.*, 829 F.2d at 1486. Thus, the quoted language from the *Adams Apple* case in the Wages Motion is dicta. *See*, *e.g.*, *In re Timberhouse Post and Beam Ltd.*, 196 B.R. 547, 550 (Bankr. D. Mont. 1996).

19. Given the sensitivities, consideration of payments to persons who have been accused of abuse should be deferred until a final hearing on notice to parties in interest, including a committee. See, e.g., *In re The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D.N.Y. Sept. 19, 2019) (order entered as ECF No. 42, at ¶ 3). *But see In re The Roman Catholic Bishop of Santa Rosa*, Case No. 23-10113 (Bankr. N.D. Cal. Mar. 17, 2023) (order entered as ECF No. 30, at ¶ 9) (only payments to those *credibly* accused of abuse were not authorized); *In re The Roman Catholic Bishop of Oakland*, Case No. 23-40523 (Bankr. N.D. Cal. May 11, 2023) (order entered as ECF No. 36) (no prohibition of payments to accused abusers).

B. **The Cash Management Motion**

20. In the Cash Management Motion, the Debtor seeks authorization to (i) continue to use its existing cash management system, (ii) continue to use its pre-petition accounts and business forms, (iii) continue its investment policies without posting bonds pursuant to 11 U.S.C. § 345(b), and (iv) continue using its credit cards. See Cash Management Motion, at ¶ 9.

1. **Bankruptcy Code Section 345(b).**

21. Bankruptcy Code Section 345(b) protects creditors against the loss of estate funds deposited or invested by debtors. *See In re Columbia Gas Systems Inc.*, 33 F.3d 294, 301 (3d Cir. 1994) ("Ensuring the safety of the bankruptcy funds has been the foremost goal."); *In re CWNevada LLC,* 602 B.R. 717, 744 (Bankr. D. Nev. 2019) ("[t]hose requirements are designed to ensure the safety of the funds held by a trustee or debtor in possession as a fiduciary of a bankruptcy estate").

22. Specifically, Section 345(b) provides that money of the estate shall be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States. Money of the estate may also

7

be deposited in an entity that has posted a bond in favor of the United States or has deposited securities with the Federal Reserve Bank.

23. A court may waive the requirements of Section 345 upon a showing of "cause." *See* 11 U.S.C. § 345(b). Thus, the Court may modify the requirements of Section 345(b) for "'just cause' where strict compliance might 'work to *needlessly handcuff* larger, more sophisticated debtors.'" *See In re Ditech Holding Corp.*, 605 B.R. 10, 22 (Bankr. S.D.N.Y. 2019) (emphasis added).

24. To ensure compliance with Section 345(b), the UST has implemented guidelines for debtors in possession regarding bank accounts (the "UST Guidelines"). Among other things, the UST Guidelines require debtors in possession to close their pre-petition bank accounts and provide proof of the establishment of debtor in possession account(s) at an authorized depositary. *See United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession* (Region 17), at § 3, available at https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11.[6]

25. Authorized depositories have agreed to maintain collateral, unless an order of the bankruptcy court provides otherwise, in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* United States Trustee Program Policy and Practices Manual, Volume 7, "Banking and Bonding," (the "UST Manual"), §§ 7-1.1 and 7-1.2.1, at pp. 1-2, available at

---

[6] The UST is mindful that some courts have concluded that guidelines established by the UST do not have the force and effect of law. *See, e.g., In re Young*, 205 B.R. 894, 897 (Bankr. W.D. Tenn. 1997); *In re Lani Bird, Inc.*, 113 B.R. 672, 673 (Bankr. D. Hawaii 1990); *In re Gold Standard Baking, Inc.*, 179 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995); *In re Johnson*, 106 B.R. 623, 624-25 (Bankr. D. Neb. 1989). As a result, "if the court is to require debtors to comply with particular provisions of the U.S.T.'s Guidelines, it must be for a reason independent of the Guidelines themselves." *Johnson*, 106 B.R. at 624.

https://www.justice.gov/ust/united-states-trustee-program-policy-and-practices-manual. Authorized depositories have also agreed to make periodic reports so that the UST can monitor compliance. *See* UST Manual, § 7-1.3.2, at p. 5.

    **2.**    **The Debtor's Bank Accounts.**

    26.    Here, according to the Cash Management Motion and Exhibit 2 thereto, it appears that the Debtor maintains thirteen (13) bank accounts and four (4) investment accounts. *See* ECF No. 9, at p. 35 of 35 ("Exhibit 2"); Cash Management Motion, at ¶ 13 & n.5. Specifically, the Debtor holds:

    a.  six (6) bank accounts at Bank of America. The combined balance in these accounts is approximately $11,000,000;

    b.  one (1) "Imprest" bank account at Bank of America (#4577) with a balance of $14,946;

    c.  one (1) bank account at the Bank of San Francisco (#1486) with a balance of $246,041;

    d.  two (2) bank accounts at First Republic Bank ("FRB"). The FRB account ending with digits 1534 has a balance of $257,115. The Debtor intends to close the FRB account ending with the digits 9117 (the "FRB 9117 Account");

    e.  one (1) brokerage account at FRB (#0589) (the "FRB Brokerage Account") with a balance of $15,602. The FRB Brokerage account is used to liquidate donated securities;

    f.  one (1) "Imprest" bank account at Bridge Bank (#8561) with a balance of $48,397;

    g.  one (1) "Imprest" bank account at California Bank & Trust ("CB&T") (#9479) with a balance of $96,606;

    h.  one (1) bank account at City National Bank (#9001) with a balance of $75,816;

    i.  one (1) investment account at Segal Bryant (#8815). The Debtor intends to close this account;

   j. one (1) investment pool account(s) at U.S. Bank with a balance of $104,737,665. The Cash Management Motion does not disclose the holdings in this account; and

   k. one (1) investment account at BoFA Securities (#9371) with a balance of $57,789,941. The funds in this account "are invested in BlackRock Liquidity Funds Fed Fund Portfolio Institutional Class, which is a money market mutual fund that currently yields approximately 5.2% of interest per year."

*See* Cash Management Motion, at ¶¶ 11, 13, 15, 26 & n. 5; Exhibit 2.

  27. According to the Cash Management Motion, the Debtor "primarily uses its Cash Management System to, among other things, receive (i) unrestricted gifts, bequests, and collections; (ii) restricted donations including proceeds of the Archdiocesan Annual Appeal … ; (iii) payments for various insurance coverages paid by RCASF on behalf of other non-diocesan entities; (iv) commercial rental income; (v) fees for administrative services to certain other Non-Debtor Catholic Entities; (vi) investment income; and (vii) non-Chancery payroll funding on a pass-through basis." *See* Cash Management Motion, at ¶ 13.

  28. Bank of America, Bridge Bank, City National Bank, and U.S. Bank are authorized depositories in the Northern District of California. Moreover, CB&T is a division of Zions Bancorporation, N.A., which is also an authorized depository in the Northern District of California. Similarly, after it failed, FRB was acquired by JPMorgan Chase, which is also an authorized depository in the Northern District of California. *See* https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11; *see also* Cash Management Motion, at ¶¶ 10, 31.

  29. Bank of San Francisco, BoFA Securities, Inc., and Segal Bryant are not authorized depositories in the Northern District of California. *See* https://www.justice.gov/ust-regions-r17/region-17-general-information#ch11; *see also* Cash Management Motion, at ¶¶ 10, 31.

### 3. The Debtor Has Not Established Cause for a Waiver of Section 345(b).

30. In determining whether cause exists under 11 U.S.C. § 345(b), courts have examined the totality of the circumstances. *See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999); *In re Ditech Holding Corp.*, 605 B.R. at 17. As part of this analysis, courts have considered the following factors:

> 1. The sophistication of the debtor's business;
>
> 2. The size of the debtor's business operations;
>
> 3. The amount of investments involved;
>
> 4. The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor-in-possession funds are held;
>
> 5. The complexity of the case;
>
> 6. The safeguards in place within the debtor's own business of insuring the safety of the funds;
>
> 7. The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;
>
> 8. The benefit to the debtor;
>
> 9. The harm, if any, to the estate; and
>
> 10. The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. at 896.[7]

31. The Debtor has not addressed some of the factors identified by the *Serv. Merch.* court, including most importantly, the Debtor's ability to reorganize if a financial institution holding the Debtor's funds fails. Given the size of the investments at U.S. Bank and BoFA

---

[7] The Debtor cited the *Serv. Merch.* case in the Cash Management Motion. *See* Cash Management Motion, at ¶ 59.

Securities, which total approximately $160 million or approximately 90 percent of the Debtor's funds, there appears to be a significant risk to the estate.[8]

32. Accordingly, the UST objects to the Cash Management Motion and the entry of an Order waiving the requirements of Section 345 because the Debtor has failed to provide sufficient evidence that supports a finding that cause exists for this waiver.

33. While the Debtor suggests that funds in one or more of the accounts may or may not be property of the estate, the overriding concern of the UST is that, should a failure contemplated by Section 345 occur resulting in the loss of funds in the accounts, the Debtor would remain liable. In contrast, by virtue of the collateralization and reporting requirements imposed on authorized depositories, compliance with the UST Guidelines will ensure compliance with the requirements of 11 U.S.C. § 345(b). These requirements would not "needlessly handcuff" the Debtor, but rather protect estate funds as Congress envisioned. *Cf. In re Ditech Holding Corp.*, 605 B.R. at 22 (requiring debtors to bring accounts into compliance with Section 345(b)).

///

///

---

[8] The Debtor's reliance on 28 U.S.C. § 959(b), *In re Diocese of Buffalo, N.Y.*, 621 B.R. 91 (Bankr. W.D.N.Y. 2020) and California's Uniform Prudent Management of Institutional Funds Act ("UPMIFA") may be misplaced. *See* Cash Management Motion, at ¶¶ 56-67. The UPMIFA provides that the manager of an institutional fund must consider, *inter alia*, the "needs of the institution and the fund to make distributions and to *preserve capital*." *See* Cal. Prob. Code § 18503 (emphasis added). Here, the Debtor has more than $160 million invested in two investment accounts. The invested amount in the *Diocese of Buffalo* case was much less, approximately $21.8 million. 621 B.R. at 92. The increased risk posed by the Debtor's waiver request suggests that the holding in *In re Ditech Holding Corp.* may be more on point. 605 B.R. at 21 (requiring debtors to bring accounts into compliance with Section 345(b), where accounts had daily aggregate deposits of $95 million and "even a minor disruption to their access to the funds … likely would have dire consequences to their business operations and their ability to reorganize under chapter 11").

### 4. Any Approval of the Cash Management Motion Should be on an Interim Basis Only.

34. To the extent the Court is inclined to approve the Cash Management Motion, such approval should be on an interim basis only and such relief should be limited to the accounts specially identified in Paragraph 13 of the Cash Management Motion.[9]

35. Moreover, the interim Order should:

   a. require the Debtor to close its Segal Bryant investment account within 15 days of entry of the Interim Order and provide proof of same to the UST no later than the final hearing on the First Day Motions;

   b. require the Debtor to close the FRB 9117 Account within 15 days of entry of the Interim Order and provide proof of same to the UST no later than the final hearing on the First Day Motions;

   c. require the Debtor to have its bank accounts at Bank of America, City National Bank, Bridge Bank, FRB, and CB&T designated as "Debtor in Possession" accounts by the institutions within 15 days of entry of the Interim Order and provide proof of same to the UST no later than the final hearing on the First Day Motions;

   d. require the Debtor to institute a system to regularly "sweep" the funds from the FRB Brokerage Account into a debtor in possession account at an authorized depository;

   e. require the Debtor to institute a system to "sweep" any funds in excess of $250,000 from its bank account at Bank of San Francisco on a daily basis into a debtor in possession account at an authorized depository;

   f. prohibit the Debtor from opening new accounts unless such accounts are debtor in possession accounts at authorized depositories in the Northern District of California;[10] and

   g. require the Debtor to track all intercompany transactions.

---

[9] Paragraph 2 of the proposed Interim Order indicates that the requested relief is not limited to the accounts specifically identified in the Cash Management Motion. *See* ECF No. 9, at p. 30 of 35 ("The Debtor is authorized to … maintain … any and all of its existing bank accounts … including, without limitation, those accounts identified in the Motion ….").

[10] Paragraph 6 of the proposed Interim Order appears to provide broader authority to open new accounts. *See* ECF No. 9, at pp. 31-32 of 35.

36. With respect to the eight (8) "Additional Accounts" at Bank of America identified in the Debtor's supplement to the Cash Management Motion (ECF No. 22) (the "Supplement"), the Debtor has represented that such accounts "are being used by four High Schools [and] do not contain funds of the Debtor, and the Debtor does not use or control the operation of the Additional Bank Accounts." See Supplement, at ¶¶ 1-2.

37. Based on this representation, the UST does not oppose, on an interim basis only, the Debtor's request for continued use of the Additional Accounts "without need to designate such accounts as debtor in possession accounts or otherwise complying with the requirements of Bankruptcy Code section 345(b)." See Supplement, at ¶ 2. The UST reserves all rights with respect to the Additional Accounts.

38. Finally, the UST opposes payment of any pre-petition balances owing on the Debtor's credit cards. The Debtor has not demonstrated that payment of pre-petition claims (if any) is necessary to avoid immediate and irreparable harm. See Fed. R. Bankr. P. 6003(b).

### III. CONCLUSION

39. In view of the shortened notice provided to creditors and the Debtor's failure to establish a sufficient evidentiary record for the relief sought, the objected to First Day Motions should either be denied in the entirety, denied in part as set forth herein, or any relief granted should be limited for the Debtor to sustain operations and to provide adequate protection, if any. Alternatively, the First Day Motions should be adjourned until a later date. The adjournment would permit parties that were not provided sufficient notice and any committee the opportunity to be heard on the First Day Motions. The UST reserves all her rights with respect to the First Day Motions and other motions filed on the Petition Date.

**WHEREFORE**, the UST requests the Court to sustain her Omnibus Objection; and grant such other relief as is just under the circumstances.

Dated: August 23, 2023

TRACY HOPE DAVIS
UNITED STATES TRUSTEE

By: /s/ Jason Blumberg
Jason Blumberg
Trial Attorney for the United States Trustee