UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re:

THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO

Debtor.

) Case No. 23-30564
) Chapter 11
)
) San Francisco, California
) Thursday, August 24, 2023
) 1:30 PM
)

DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (1) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICE, (2) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR POST-PETITION UTILITY SERVICES UNDER 11 U.S.C. § 366, (3) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT, AND (4) SCHEDULING A FINAL HEARING FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [8]

DEBTOR'S EMERGENCY APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE APPOINTMENT OF OMNI AGENT SOLUTIONS, INC. AS CLAIMS AND NOTICING AGENT, AND (II) GRANTING RELATED RELIEF FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [11]

DEBTOR'S EMERGENCY MOTION TO (1) ESTABLISH NOTICE PROCEDURES, (2) FILE CONFIDENTIAL INFORMATION UNDER SEAL, AND (3) TEMPORARILY SUSPEND DEADLINE FOR FILING PROOFS OF CLAIMS FILED BY THE ROMAN CATHOLIC

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 1 of 83

ARCHBISHOP OF SAN FRANCISCO [10]

DEBTOR'S EMERGENCY MOTION FOR ORDER (1) AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES, AND EMPLOYEE EXPENSES; (2) TO PAY ACCRUED EMPLOYEE BENEFITS AND TAXES; AND (3) DIRECTING BANKS TO HONOR PAYROLL AND EXPENSE CHECKS FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [7]

DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, OPERATIONAL BANK ACCOUNTS AND RELATED INVESTMENT ACCOUNTS; (2) AUTHORIZING MAINTENANCE OF EXISTING BUSINESS FORMS, (3) EXCUSING COMPLIANCE WITH SECTION 345(B); (4) AUTHORIZING CONTINUED USE OF CURRENT INVESTMENT POLICY; AND (5) SCHEDULING A FINAL HEARING FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [9]

DEBTOR'S EMERGENCY MOTION TO CONTINUE INSURANCE PROGRAMS FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [12]

DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (1) PAY CERTAIN PREPETITION INVOICES FOR ABUSE SURVIVORS' ASSISTANCE AND SAFE ENVIRONMENT PROGRAMS, AND (2) CONTINUE ITS PREPETITION PRACTICE OF PAYING FOR ABUSE SURVIVORS ASSISTANCE AND SAFE

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 2 of 83

ENVIRONMENT PROGRAMS FILED BY THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO [13]

HEARING REGARDING CASE MANAGEMENT

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENNIS MONTALI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (All present by video or telephone):

For the Debtor: PAUL J. PASCUZZI, ESQ.
Felderstein Fitzgerald Willoughby Pascuzzi & Rios LLP
500 Capitol Mall
Suite 2250
Sacramento, CA 95814
(916)329-7400

For the Debtor: ORI KATZ, ESQ.
Sheppard, Mullin, Richter & Hampton LLP
4 Embarcadero Center
17th Floor
San Francisco, CA 94111
(415)774-3238

For the Debtor: PAUL E. GASPARI, ESQ.
Weintraub Tobin Chediak Coleman & Grodin
475 Sansome Street
Suite 510
San Francisco, CA 94111
(415)772-9618

For Office of the U.S. Trustee: JASON BLUMBERG, ESQ.
United States Department of Justice
501 I Street
Suite 7-500
Sacramento, CA 95814
(916)930-2076

Also Present: Paul H. Deutch
Executive Vice President, Omni Agent Solutions, Inc.

Joseph J. Passarello
Chief Financial Officer

Paula Carney
Debtor's Representative

Wayne Weitz
Debtor's financial advisor professional

Paul H. Deutch
Executive Vice President, Omni Agent Solutions, Inc.

Court Recorder: LORENA PARADA
United States Bankruptcy Court
450 Golden Gate Avenue
San Francisco, CA 94102

Transcriber: RIVER WOLFE
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 4 of 83

SAN FRANCISCO, CALIFORNIA, THURSDAY, AUGUST 24, 2023, 1:31 PM

-oOo-

(Call to order of the Court.)

THE CLERK: Court is now in session, the Honorable Dennis Montali presiding. Calling the matter of the Roman Catholic Archbishop of San Francisco, case 23-30564.

THE COURT: All right. Good afternoon, everyone. Welcome to the San Francisco Bankruptcy Court remote edition. And let me get the appearances of principal counsel. And for counsel, at the moment, let's defer for the time being the introduction of the representatives of the debtor. But let me just get the counsels' appearances.

MR. PASCUZZI: Thank you, Your Honor. Paul Pascuzzi, Felderstein Fitzgerald Willoughby Pascuzzi & Rios, for the debtor, the Roman Catholic Archbishop of San Francisco, a corporation sole. We do have cocounsel on the line as well.

THE COURT: And is that Mr. Katz? Is he going to make an appearance? Yes.

MR. KATZ: Yes, Your Honor. Good afternoon. Ori Katz, Sheppard, Mullin, Richter & Hampton, appearing as proposed cocounsel to the debtor.

THE COURT: Good afternoon, Mr. Katz.

Mr. Blumberg.

MR. BLUMBERG: Good afternoon, Your Honor. Jason Blumberg for the United States Trustee.

THE COURT: Okay. Well, Mr. Pascuzzi, consistent with the order that I issued and your response to my clerk, why don't you go ahead and introduce the client representatives and then make whatever kind of an appropriate statement that you would like to make as the first hearing in this important case.

MR. PASCUZZI: Thank you, Your Honor. I noticed that Father Patrick Summerhays is not at least on the windows that I see. If he's out there, if we could add him, please.

THE COURT: Yes. Well, Father Summerhays, if you're there, I see you are there. I see your name on the list. You need to raise your hand if you're ready to come in, and my staff will bring you in. Let's keep a lookout for him and go ahead with your other introductions, Mr. Pascuzzi.

MR. PASCUZZI: Okay. Thank --

THE CLERK: Excuse me, Your Honor.

THE COURT: Yes.

THE CLERK: Father Summerhays has joined.

THE COURT: Okay.

MR. PASCUZZI: Okay. Your --

FR. SUMMERHAYS: I apologize, Your Honor.

THE COURT: No problem.

MR. PASCUZZI: Your Honor, so the client team we have here with us includes Father Patrick Summerhayes, who's the vicar general and moderator of the curia for the debtor. We filed the application to appoint him as the responsible

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 6 of 83

individual, which I understand the Court has issued that order.

We also have the debtor's CFO, Joseph Passarello, who is the primary declarant on the first day motion declarations. We have in-house counsel for the debtor Paula Carney. We also have state court litigation counsel from the Weintraub Tobin firm in San Francisco, Paul Gaspari. We have a representative from the proposed noticing agent Omni. That's Paul Deutch. We might need him a little bit later. And then Wayne Weitz -- I see him there, Wayne Weitz from B. Riley, who is our proposed financial advisors.

THE COURT: Well, welcome to all of the individuals. I haven't seen Mr. Gaspari in an awful long time, but we go back many decades and --

MR. GASPARI: It's good to see you, Your Honor.

THE COURT: Nice to see you.

And Mr. Passarello, I don't need you to say anything, but I want to thank you for the very comprehensive declaration by way of background. In any Chapter 11, any time, it's very helpful to get the kind of background. I don't need to have it repeated again, but it was quite useful and informative.

Mr. Pascuzzi, why don't you say what you wish to say by way of introduction -- I mean, by opening comment, and then we'll deal with the various motions and housekeeping matters.

MR. PASCUZZI: Okay. Thank you, Your Honor. As you likely saw from the papers, Your Honor, the debtor, the Roman

Catholic Archbishop of San Francisco, has been around for over 150 years since it was incorporated as a California corporation sole in 1854. The primary role of the debtor is to provide resources, spiritual leadership, direction, support, planning, leadership development, and other services to individuals of the Roman Catholic faith, the eighty-eight parishes, numerous schools, cemeteries, and other Catholic-based social and community-service organizations that operate in the archdiocese territory. We outlined many of those organizations and their legal civil status in the Passarello declaration.

THE COURT: I want to interrupt you just for a minute.

For all the people who are on the camera, you're welcome to stay on the camera, but I find that some people are uncomfortable with that. And I don't want you to feel embarrassed if you want to turn your camera off or pay attention by listening. But if you stay on, that's fine, too.

All right. Sorry. Go ahead. Mr. Pascuzzi.

MR. PASCUZZI: Thank you, Your Honor. So we're here because in January 2020, California again reopened the statute of limitations for child sexual abuse claims via what we call AB 218. It's actually codified in the California Code of Civil Procedure at Section 340.1, which revived claims previously barred by the statute of limitations. The statutory amendment created a three-year window that closed December 31st, 2022.

Approximately 537 complaints have been filed against

the debtor, and they're pending in a joint coordinated proceeding, 5108, in the Alameda County Superior Court. There were two cases set for trial in San Francisco County Superior Court this yesterday, August 23rd. Mediation efforts prior to trial were unsuccessful. There were two other cases selected to be set for trial and were likely to be scheduled for a little bit later this year.

The debtor and state court counsel at Weintraub Tobin reviewed the AB 218 claims as best as possible, given the information available. As far as we can tell now, these AB 218 claims are all historical claims. The dates of alleged abuse range from the 1950s to approximately 2008.

Nearly half of the clergy members who were previously accused and nearly half involve clergy members who are previously accused in the last reopening of the statute of limitations or clergy members long since deceased. That seems to be typical in these Chapter 11 cases in California filed so far, which means to us that the efforts outlined in the Passarello declaration of the debtor and other dioceses are working to help stop this horrific problem.

The debtor filed this case to reorganize its financial affairs due to the AB 218 lawsuits. It was basically a preventing-a-race-to-the-courthouse situation, where some claimants get to the courthouse first and get treated better than others who end up later. So to ensure that the debtor

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 9 of 83

fulfills both its foundational and moral obligations to the survivors, the faithful, and others who've put their trust in the Roman Catholic Archbishop of San Francisco, it's made the difficult decision to commence this case.

Your Honor, there have been about thirty or so of these Catholic diocese/archdiocese religious order Chapter 11 cases over the years. You may know that my firm filed one of those cases in 2014, the Roman Catholic Bishop of Stockton in Sacramento. And my office is currently handling the Roman Catholic Bishop of Santa Rosa case, pending in the Oakland division before Judge Novak.

Generally, the way these cases go is a global mediation with all parties-in-interest, including the debtor, the committee, and insurance companies. First, we obtain our critical relief in the first day motions. We get the schedules filed, employ professionals, participate in the initial debtor interview with the U.S. Trustee, have the 341 meeting.

The committee gets appointed. It gets its professionals. As part of the process, the committee will want information from the debtor and about its insurance and other things. If everyone plays nicely, usually we can do that informally.

We work with the committee that will be appointed to put together claims, noticing procedures, and deadlines that would be approved by the Court. That just occurred in the

Santa Rosa and Oakland diocese cases. We work with the committee and the other parties-in-interest to select a mediator once everybody's ready, and we establish mediation procedures. One of our goals in this case, Your Honor, is to do our part to be ready for that mediation as early as possible. Then we go to the mediation and hopefully come out with a Chapter 11 plan.

Your Honor, that was basically the opening and background statement that I wanted to make. I know your order mentioned you wanted to go over some other things before we dive into the motions, but between Mr. Katz and I, we'll be handling -- we've divided up responsibility for each of the motions.

THE COURT: No, that's the kind of statement that I wanted you to make. And to the extent that you repeated some of the historical facts, again, I complimented Mr. Passarello for his declaration. I suppose you and Mr. Katz and others had a hand in helping him prepare it, but the point is that it's very traditional for the first day.

Remember, you and I and Mr. Katz, the bankruptcy people, know the drill here, and first day motions sometimes occur on the hundredth day and sometimes they occur on the first day and this one's on the fourth day. But it's the first opportunity for the judge to learn some information, and it's very helpful. And it puts context to -- there's not much that

surprised me about what you've described.

This is the first Roman Catholic diocese case that I presided over, but I did serve as the mediator for a few days in the very early bankruptcy of the Portland Catholic Diocese. I sorry to report that the mediation that I was involved with was not successful. But the point is, I had a lot of exposure to the issues, and I'm familiar with it and the way it plays out.

I'm going to make just a couple of other statements. You and Mr. Katz, again, are long-time veterans of me. I've been on the bench longer than most bankruptcy judges now. And I take some pride in moving cases through.

And again, you, personally -- this is to stroke Mr. Pascuzzi a little bit -- has played a major role in the PG&E bankruptcies that's been before me, and those cases involve enormous tragedies for people who didn't choose to take the risk of becoming creditors like the survivors of the abuse here. And unlike creditors who loaned money and take a risk, that's not the case for fire victims or abuse victims or mass tort victims. And I take some pleasure in trying to play a role in making sure that the system moves and the bankruptcy structure does not become an impediment.

Again, this is not a contest. I'm not in it for anything other than to do my job. But let me say that Chapter 11, from my point of view, is not a parking lot. In simpler

cases, I've pointed out that it's more like a car wash. That's a lousy metaphor for this case. But I welcome the commitment from you and your clients, and I hope that comes from everyone else to make sure this case moves. And so if it's going to be successful, it should move successfully. If it's going to be unsuccessful, then we should know that, too, on an expedited basis.

I'm going to make another general comment. It has nothing to do with how I will make decisions before me. But I'm a native of the Bay Area, and I don't believe someone who suffered abuse in San Rafael should be treated any differently from someone who suffered it in Novato or in Walnut Creek.

And this is the metropolitan area of the Northern California -- the Northern District of California. And my two colleagues in the Oakland court, I'm not second guessing them, nor do I think they will second guess me. But I want to do everything possible to make sure that at least procedurally, a survivor of abuse in any of the three places, or God forbid, maybe a survivor who is already in more than one of them, that the same procedures be treated fairly and administratively simple so that there is no disadvantage.

The strength or the weakness of any particular claimant's claim should turn on the merits and the defenses, not on the fact that this case was filed in August and the Oakland case was filed in whatever it was, May, and the Santa

Rosa case was filed in -- two months before that or whatever. You know the answers. And so therefore, to the extent that we can make things similar, I want that to be one of the goals for you and Mr. Katz, particularly, as you bring these matters before me. I won't dwell on that today. There's not much we need to talk about.

I will make another statement for those of you on the screen here who have never been involved in a bankruptcy before. A lot of what we do is pretty routine and pretty not very exciting, but it's pretty necessary, including some of the matters that we're dealing with today. And today is, as I told you, it's my first opportunity to learn what we've been talking about and to deal with these matters that for most instances shouldn't and can't wait. There are lots of things that are much more deliberate that Mr. Pascuzzi mentioned, the mediation, the plan process, the involvement of other players like the creditors committee.

And also, more importantly for laypersons or others monitoring this case, in a few weeks, there will be a meeting of creditors presided over, not by a judge, but by the United States Trustee. And at that meeting of creditors, individuals will be allowed to question representatives of the debtor and to comment and do things. That's why it's not appropriate today. I don't want to seem insensitive to the views of people who are interested in the case. I'm obviously very concerned

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 14 of 83

about all of those. But we have to deal with what the law requires today, and that's to deal with these, I'm going to say, administrative matters.

So with that, Mr. Pascuzzi, I'd like to turn to the two motions that the United States Trustee objected to, unless you want to do something in a different way, because I've already given you my tentative thinking on the motions. But Mr. Blumberg was good enough to spend a lot of time preparing his concerns. Are you ready to discuss those two?

MR. PASCUZZI: Yes, Your Honor. And Mr. Katz and Mr. Blumberg had a meet and confer this morning. So those two motions, the cash management and payroll motions, I'll turn over to Mr. Katz to address, and then --

THE COURT: Okay.

MR. PASCUZZI: -- we can go from there.

THE COURT: Mr. Katz, please.

MR. KATZ: Thank you, Your Honor. I did meet and confer this morning with Mr. Blumberg, and I also want to thank him for filing the objection and framing the issues in writing, which is always helpful.

THE COURT: He did a -- I would say so too. He did a -- he did a very good job in a very short time frame. Appreciate it.

MR. KATZ: He did, Your Honor. And also, I want to thank him for making himself available this morning to talk it

through. We've discussed the concerns he raised, and I'm pleased to report that we've resolved them. And so my idea is to walk the Court through the resolution and then see if Mr. Blumberg agrees with how I framed it up and then do the same thing with respect to the wages motion, where we --

THE COURT: Okay.

MR. KATZ: -- also have a resolution.

THE COURT: Okay. Go for it.

MR. KATZ: So there are four main points, Your Honor, that we've talked through. The first is actually my statement right now on the record that the debtor acknowledges that the United States Trustee, any statutory committee or committees appointed in the case, or any other party-in-interest reserve all rights, including under Section 345(b) of the Bankruptcy Code, to object or otherwise challenge the proposed treatment of the B of A investment account and the investment pool account that's invested with fund managers in the separate custodial accounts with U.S. Bank.

That language I just recited, in addition to my statement on the record, is going to be added and has been added to the interim order as well. That interim order, Your Honor, is at docket 9 of our filing. It's starting at page 29 of 35. And we'll include it there, and we'll, of course, run the form of order by Mr. Blumberg before uploading. That's number one, Your Honor.

Number two, we've added language at the end of paragraph 2 of the interim order. And Your Honor, this is at page 30 of 35. And for this one, it might be helpful for you to turn to that page and get to paragraph 2.

THE COURT: Yeah, I was looking. I was trying to follow you. I'll do that in a moment. I was looking at the bullet points that Mr. Blumberg indicated, little items (a) through (g) on page 13 of his filing. So give me a second here.

MR. KATZ: Yes, Your Honor, (a) through (g) are going to be my fourth point, Your Honor, because we covered those as well.

THE COURT: Yeah, but I've got to slow you down for a minute. Okay. This is tab 4 in the binder. And you're telling me it's the proposed order there.

MR. KATZ: That's right, which it's docket 9, starting at page 30. Wait, excuse me. Starting at page --

THE COURT: Oh, I (indiscernible). You were nice enough to get me all these copies, but they don't have the docket footers.

MR. KATZ: Oh, so --

THE COURT: That's because you got them to me in a hurry.

MR. KATZ: That's right, Your Honor. It's --

THE COURT: Wait, never mind. Hold on. I'll catch

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 17 of 83

(indiscernible).

MR. KATZ: Okay. Okay.

THE COURT: Well, you know what, actually, I don't see it, so okay. Give me a second. I can pull it up on the screen. I guess, am I missing something, Mr. Katz? It's not in the proposed -- in the hard-copy binder you gave me, isn't it?

MR. KATZ: Your Honor, it would have been Exhibit 1, probably behind the Passarello declaration, or maybe even sandwiched between that and the motion itself as Exhibit 1. So if we didn't have tab that binder for you in our rush to get it over, it may be hidden.

THE COURT: One second. I'll see if I can find it because it's not a problem. I don't want to get bogged down on this. Let me look at that exhibit. And the last thing that I do is waste time by my trying to find the document.

Now, I'm going to -- give me one second, Mr. Katz. I'm going to bring it up on the screen. So tell me again the docket number, please.

MR. KATZ: Docket number 30, Your Honor.

MR. PASCUZZI: No, docket 9 --

MR. KATZ: I apologize, Your Honor. Page 30 of --

MR. PASCUZZI: -- at page 30.

MR. KATZ: -- docket 9. Thank you, Mr. Pascuzzi.

THE COURT: Yeah. Got it. Got it. Got it. Okay.

MR. KATZ: And Your Honor, docket 9 is the motion itself, but it's an exhibit to the motion.

THE COURT: Yeah, it's just coming up on my screen.

MR. KATZ: Okay.

THE COURT: One second. I'm a little slow, and I'm used to -- I have the whole docket here coming up on the screen, and I can look at it. But really, you wanted me to look at the particular language that's being changed slightly; is that --

MR. KATZ: Correct, Your Honor.

THE COURT: Okay. And so what is the -- tell me again the page number, the footer --

MR. KATZ: Yeah, it's page 30 of 35, and I'm --

THE COURT: Got it.

MR. KATZ: -- looking at paragraph 2.

THE COURT: Okay.

MR. KATZ: And really, I'm focused on the end of that paragraph, lines 25 and 26, where it reads, "ascertain to trace recorded properly and distinguished between pre-petition and post-petition transactions". And then instead of a period there, we have a comma, and we've added the words "and between debtor and nondebtors". And this relates to a comment from Mr. Blumberg that he was concerned that we would be able to trace and track transfers pre and post-petition, but we were silent as to whether we could also trace between debtor and nondebtor.

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 19 of 83

We can, and we've added that explicitly at the end of paragraph 2 to speak to the concern.

THE COURT: Okay. I got it.

MR. KATZ: Okay.

THE COURT: I'm there.

MR. KATZ: Third change, Your Honor, is also a statement on the record by me, which is that the debtor acknowledges that the relief being sought is expressly interim in nature only.

And then finally, fourth, Your Honor, I now am turning to paragraph 35, (a) through (g) of U.S. Trustee's objection, which is docket 25.

THE COURT: Right. And I have that in my hand. Yeah, I have the hard copy --

MR. KATZ: Okay.

THE COURT: -- of it right here so --

MR. KATZ: And what I thought I would do is just run through those relatively quickly.

In paragraphs A, B, and C. Your Honor, we're going to revise those so that the debtor will use reasonable efforts to close or designate the respective accounts, and the debtor will provide proof of same, either that the accounts' been closed or designated, within three business days of such closure or designation. The thought here, Your Honor, is just a hard fifteen-day deadline where the result is potentially in the

hands of a banking institution that may move slowly. And we didn't want to be in a situation where we're potentially running afoul of a court order. So we just gave ourselves a little wiggle room, and we're going to work in good faith to get it done prior to fifteen days (indiscernible) --

THE COURT: And let me -- no, that's fine and very understandable. But Mr. Blumberg, what struck me when I read your objection, in paragraph (c), (c), so it's 35(c), I didn't see U.S. Bank, and I wonder if that was just an oversight. U.S. Bank is already listed as one of the qualified depositories, but don't you want the debtor-in-possession label on that one as well, or not?

MR. BLUMBERG: Thank you, Your Honor. Jason Blumberg for the United States Trustee. The thinking there, Your Honor, is that while U.S. Bank is an authorized depository, the account that is at issue here is an investment account, and I'm actually not a hundred percent sure it's actually at U.S. Bank. It might be at a securities arm at U.S. Bank. So that'll probably be something we need to explore after the hearing with Mr. Katz and (indiscernible).

THE COURT: Okay. That's good enough for me. Okay.

Go ahead, Mr. Katz, then.

MR. KATZ: Thank you, Your Honor. So then just moving along to paragraphs (d) and (f), those are unchanged, and so those will be adopted as written into the revised and redlined

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 21 of 83

interim order.

And then at paragraph (g), that change, that is not going to be made. That is coming out because the change we made at the end of paragraph 2 spoke to the concern there about tracing.

THE COURT: Okay. And that's fine. I understand that. But when I went through (a) through (g), I wrote in the margin, what about B of A securities, which was identified in the text of the U.S. Trustee's objection but not in the interim order list.

So Mr. Blumberg, was that an oversight there or not?

MR. BLUMBERG: Thank you, Your Honor. Jason Blumberg for the United States Trustee. I think, in effect, we're punting on BofA -- Bank of America Securities and the U.S. Bank pooled investment account. As Mr. Katz indicated, all of the United States Trustee's rights, including to raise an objection under Section 345(b), will be preserved. This is just for purposes of the interim relief that would be --

THE COURT: Okay.

MR. BLUMBERG: -- granted today.

THE COURT: Okay. Then that's perfectly fine with me. And I realize, again, going back to my compliment to you, you've covered a lot of ground in short time, and I was trying to keep up with you with all the accounts. And it looks like you and Mr. Katz have solved the problem. So I'm good to go

with everything you described, Mr. Katz.

MR. KATZ: Thank you, Your Honor. So we've prepared a redlined order that we're running by Mr. Blumberg now and anticipate having that uploaded this afternoon. I'm ready to move on to the wages motion next.

THE COURT: Well, let me say, is there anyone who wished to be heard who hasn't appeared yet in response to or regarding what we'll call the cash account motion that the U.S. Trustee and Mr. Katz have been working on? Raise your hand if you want to be heard on that subject. If not, we'll move on.

And Ms. Parada, please let me know if there are any hands up. I don't see any; do you?

THE CLERK: No one has raised a hand. No, Your Honor.

Okay. So Mr. Katz, I'm satisfied with the resolution. I compliment you and Mr. Blumberg for working it out. And so we can consider this a closed subject. The motion will be granted as to the cash accounts motion as modified on this record.

MR. KATZ: Thank you, Your Honor. So I was going to move next to the wage motion, which is at docket 7. This motion has also been resolved via discussion between Mr. Blumberg and I, and we got there in two different ways. And Your Honor, let me know if I should pause a moment so that you could pull that up if you don't --

THE COURT: No, I've got it. I've got it --

MR. PASCUZZI: Okay.

THE COURT: -- in hard copy.

MR. KATZ: So first, it's going to be resolved via the following unequivocal statement that I'm going to make on behalf of the debtor, and the statement is as follows. The right that -- the payments pursuant to the motion will only be on account of claims entitled to statutory priority and only up to the amount of the statutory cap. We think that was embodied in the proposed form of order, but to avoid any confusion, we're making this statement as well. That's one.

And then two, Your Honor, we added some language to paragraph 9 of the proposed form of order. That's at docket 7 starting at page 31.

THE COURT: Okay.

MR. KATZ: And I'm looking specifically at paragraph 9, Your Honor, which is at page 33 of 34. And we added a new sentence at the end of paragraph 9. I'll give you a moment to get there.

THE COURT: Actually, don't. Just go ahead. I'm going to look through. I --

MR. KATZ: Okay. The new language says the provisions of this paragraph are without prejudice or waiver of the rights of the United States Trustee, any statutory committee or committees appointed in this case, or any other party in interest to object to or otherwise challenge payments

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 24 of 83

made pursuant to this order. And paragraph 9, Your Honor, is the paragraph that dealt with not making payments to credibly accuse perpetrators of abuse. So that provision was inserted to resolve the concern that had been raised in the objection.

THE COURT: Well, in all my experience, and I've never had a objection like that before, it dawned on me that if the debtor has a known abuser, whether it's a credible accusation or a incredible one, I wonder why that person is on the payroll. But secondly, it dawned on me that even if you are an abuser, which I don't condone, you're still entitled to be paid. So I don't know how we can ignore the right of a person to be paid if that person is paid, even though he or she may be under criticism for something unrelated to the paycheck.

So I believe, if I'm not mistaken, in the Oakland case, there was no limitation. In the Santa Rosa one, there was something similar. But I guess the way you're suggesting it, Mr. Katz, is that it's functionally out with a reservation in case one gets through, right; is that a fair way to say it?

MR. KATZ: Yes, Your Honor. I mean, functionally, we won't be making these payments on account of pre-petition claims, even if they would otherwise be entitled to priority, pending some further order of the Court. And to the extent anybody wants to step forward to challenge that mechanism or a payment that's been made, they're free to do so.

To borrow from Mr. -- I don't know if it was from Mr.

Blumberg or from you, Your Honor, it's intended to be sort of a punt. I think this language has developed over time, in many cases, with input from a committee, and that when we get a committee, they'll give us input, and we'll be able to resolve this at that time. So this is for another day, Your Honor.

THE COURT: Yeah. I understand. My point is a different one. If you have a convicted felon on your payroll, that felon is still entitled to his paycheck. And one might question, well, why would there be a convicted felon on the payroll? Well, that's not for today.

So my point is, I think the way we do it is just trust the system and meanwhile, don't violate applicable law that protects employees to get paid. And of course, I understand there is a different issue if you're in bankruptcy, but not if I'm approving a payroll that pays 130 people that have no criticism of their conduct and 1 person that perhaps is under a cloud of criticism. So I'm satisfied with it.

Mr. Blumberg, you're satisfied with the reservation here?

MR. BLUMBERG: Yes, Your Honor. Thank you.

THE COURT: Okay. Well, then again, I'll do the same thing I did in the last motion. Is there anyone who wishes to be heard on what we'll call the wage motion? Raise your hand and you'll be recognized.

Ms. Parada, no hands up?

THE CLERK: No, Your Honor.

THE COURT: By the way, an interruption again. Mr. Katz and Mr. Pascuzzi know my staff very well, but Lorena Parada is my longtime courtroom deputy, and Ms. Ankey Thomas is my not-quite-as-long judicial assistant. And they are the two people that make the Court function vis-a-vis the public and frankly, make my job a lot easier.

So you both know them. You principal lawyers know them. I want you to recognize them, and they are there to serve everyone in this case in the normal fashion.

I just make one other comment. Mr. Katz, I have no problem with the wage motion. I will say that it is a little different from many because for cases that aren't as perhaps high visibility as this case and more simple and less with the emotions and the history, we get a lot of detail about who's getting paid what. I recently had a small sandwich shop in bankruptcy, and the entire payroll was all about eight people whose -- the highest paid employee made fifteen dollars an hour.

I am not here to complain that there is not a lot of information about the existing payroll. I know you know, and if the U.S. Trustee, for example, wishes to have access to that information as part of their responsibilities, I presume you'll be cooperative. I don't and am not going to spread it on the public record, for all the obvious reasons, but that just, it

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 27 of 83

was a little unusual because there wasn't a whole lot of detail.

And same with the so-called credit card debt, but we've got that resolved?

MR. KATZ: Yes, Your Honor.

THE COURT: Okay. How did that get resolved?

MR. KATZ: At least on an interim basis, it's approved as granted. The only changes are the ones I've indicated.

THE COURT: Okay. Okay.

MR. KATZ: I can also --

MR. BLUMBERG: Your Honor.

THE COURT: Yes.

MR. BLUMBERG: I'm sorry to interrupt. This is Jason Blumberg for the United States. As I read paragraph 9 of the proposed interim order, I believe it does provide for the debtor to file a list of the employees to be paid, including the accrual dates and amounts to be paid and a summary of this information. So I do think --

THE COURT: Okay.

MR. BLUMBERG: -- there is an obligation to file something.

THE COURT: Okay. That's fine. Then Mr. Katz, the motion, what we'll call the wage motion, will be granted, except as modified with your comments on the record.

MR. KATZ: Thank you, Your Honor. So I think that

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 28 of 83

brings us through the first two motions you had asked us to take up. And we're happy to move to whatever is next on your list.

THE COURT: Well, what's next on my list was really just what I put in my order. And again, I wrote that order, including the typo, about the open-ended fee schedule and the without-a-budget. So I take responsibility for the typo.

But I identified the utilities motion, the cash management motion, and the wages motion as somewhat routine, and they are. And the same is true with the utilities. So I don't need to spend any time on it, unless you have something to report. I presume you haven't heard from any utility in response to this motion?

MR. PASCUZZI: Your Honor, this is Mr. Pascuzzi. Yeah, that's my motion. I was just going to ask if we could just consider that one taken care of. I've got no opposition. The U.S. Trustee didn't have any issues. Haven't heard from any utilities.

THE COURT: Right. Okay. So of course, that's that motion. And as I told you in the order, unless there is an objection -- I guess I should go through the formality here.

Ms. Parada, would you tell me if a hand is raised by any party attending the hearing who wishes to be heard on the utilities motion?

THE CLERK: No, Your Honor.

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 29 of 83

THE COURT: Okay.

THE CLERK: No one has raised a hand.

THE COURT: As promised in the order, that motion's granted.

MR. PASCUZZI: Then Your Honor, this is Mr. Pascuzzi again. Would you like to turn to the noticing agent motion, which I think is --

THE COURT: Well, I guess so.

MR. PASCUZZI: -- the last on the --

THE COURT: I must say, that's a concern. And as I say, I did make a typo in there because I wanted to -- I wanted to see a -- I said there wasn't an estimate of a budget, but I left out the word "without". So I hope you knew what I was talking about.

MR. PASCUZZI: I didn't even notice it, Your Honor. So I got the -- I got the gist.

THE COURT: Look, let me put it this --

MR. PASCUZZI: Your Honor --

THE COURT: Let me put it this way. I haven't met Mr. Passarello, but Mr. Passarello is the CFO of a complicated organization. He must know where his money is being spent. And I bet he knows what the lawyers are charging. And he should know what the claims agent is going to be charging.

I don't know, and the motion doesn't tell me. And it seems to me that, again, for a case that doesn't compare to

some of the mega cases, in terms of numbers, that I have a lot of experience with that you know about, there shouldn't be a whole lot of work. For a case with a almost-closed universe of 537 known complaints, how can there be much to do to keep track of the claims? And so even though we could differ on whether there needs to be a claims agent, I'll accept that there's to be a claims agent. But I don't have a sense as to whether the claims agent is going to be billing a staggering amount of money or a modest amount of money because there's no clue in the motion unless I missed it.

So that's what's on my mind, and it was also on my mind -- again, I don't want to put this on you, Mr. Pascuzzi, but as the lead counsel for two out of three Catholic diocese pending within fifteen miles of each other, why three different claims agents? So that's a second question, but you can answer both of the them.

MR. PASCUZZI: Yep. Yep. I've got it, Your Honor. So let me start with the "why three". Let me just describe the process.

So in Santa Rosa, there are certain claims agents who have experience in these types of cases. And the reason that is very important is because the claims agent and noticing agent are very integral to making sure that survivor information, names and addresses, are treated and handled confidentially, properly, that there is no accidental leaks,

that nothing gets filed with the Court that accidentally has somebody's name. Virtually all of these lawsuits that have been filed are filed under a Doe name for the plaintiff. And we want to respect that. And we want to -- and we want to take that into consideration. So having a claims agent who knows what they're doing, who has substantial experience in handling these types of cases, who we can trust and rely on to handle the data the way it should be is very, very important.

So the way we did the process of selecting in Santa Rosa, I did it. I knew of two particular claims agents that had significant experience. Asked them to give me a bid. They gave me a bid. I gave it to the client. The client made a decision on who to hire based on those proposals. Again, my job was to make sure that we got good deals for the estate, as well as somebody who knows what they're doing and significant experience in this case.

In the Norwich case, Your Honor, you might not be aware, but one of the claims agent there, there was a breach of survivor names and information, and that was an extremely upsetting and disturbing situation. So Omni, in fact, took over for the claims agent in Norwich when that happened.

And so we wanted to make sure we had the right people for this job. So that's the process. I did the same thing here in San Francisco. In Santa Rosa, we ended up hiring Donlen. In this case, we ended up hiring Omni. Kind of a

competitive process, the good old American way, and Omni won out this time.

On the budget situation, Your Honor, the proposed order provides that the monthly billings by Omni will be served on, of course, the debtor, but the U.S. Trustee, any committee, as well as any party requesting notice in the case. So there will be complete visibility toward what the charges are.

There will also be -- any payments will be reported in the monthly operating reports. The order provides that the Court retains jurisdiction to review any disputes over any amounts that Omni is paid in connection with these services. And that is, we believe that is substantial and sufficient supervision of what's going on.

Plus, I know how much it cost in Santa Rosa, and this is exactly the way it was set up in Santa Rosa. It's exactly the way it was set up in Oakland. And so to your comment earlier about treating the cases similarly, unless there might be a reason not to, this is exactly how we had it set up in Santa Rosa. And I did go back and look at the Oakland order to make sure that this is exactly the same as well.

THE COURT: But again, I'm going to ask a rhetorical question. I don't want Mr. Passarello to answer it, in fact. But my rhetorical question to Mr. Passarello is, do you know how much you're paying per month or per quarter for the claims agent? And the answer -- if he knows the answer, I'm glad to

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 33 of 83

know that he knows it because CFOs are supposed to know things like that. I don't know it. The public record doesn't know it.

And Mr. Pascuzzi, I'm probably not going to ask you or Mr. Katz or any other employed counsel to file a proposed legal budget. But I guess I have to say, I don't think it's out of -- it's unusual or abnormal to say to the professional -- again, this is not a criticism of Omni -- but say, well, this is fine. We need somebody to do the right thing. What's it going to cost?

And to answer, oh, well, you can review the bills at the end of the time isn't a good answer. And so if Mr. Weitz said it's going to cost 100,000 dollars a month, I probably would deny the motion without even further discussing it. If he says it's going to cost 10,000 for the first three months, different audience.

So again, that's my frustration. It is not a criticism of Omni at all. As you know, we've been used to some very complex claims agent and noticing in other cases. But I think I've got to have a sense as to what this is about because, again, Mr. Pascuzzi, you got to understand, I still have some question about why it's such a big deal to know -- let me rephrase that.

It is a big deal to maintain the confidentiality. I couldn't agree more. And if there are 537 existing complaints

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 34 of 83

all filed by a Doe, that's understandable. But I doubt that Mr. Gaspari doesn't know who the complaints are or his trial counsel, whoever was getting ready to start a trial yesterday. They know a lot about who the claimants are, I suspect. And the question is, what else is there to know about? This really bleeds into the whole question of a claims bar date. This is a, I believe, almost finite universe of claimants.

So I'm having trouble just with whether it's a very complicated and expensive remedy to do something that should be more manageable, even though it's important to maintain the confidentiality, for all the reasons that we both agreed.

MR. PASCUZZI: Your Honor, how about this. This is a large case under the U.S. Trustee fee guidelines, so all of the lawyers have to provide a budget as part of -- to the client in terms of our anticipated fees in the case and certify to that effect in our employment applications. And so why don't we include a budget from Omni and that gets approved by the Court. And I'd be happy to report to the Court that the budget has been provided to the client and it's been approved.

And I will say, it wouldn't be at the end of the case that their fees or monthly fees would be shown. They would be in each monthly operating report. So you'll know what the fees are, and you'll have jurisdiction. The order reserves jurisdiction for anybody to dispute those fees.

THE COURT: No, I know all that. But you know --

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 35 of 83

MR. PASCUZZI: Okay.

THE COURT: -- and I know that reserving jurisdiction to review something a year after somebody got paid something is it's different. Look, I'll take your suggestion of a budget.

There's even a simpler answer. If I get a supplemental declaration for Mr. Passarello that says I'm the CFO, I'm in charge of keeping the books and making sure this thing runs, and I'm satisfied that paying the claims agent X dollars a month or a quarter is within my business judgment, then I will trust that he's using his judgment, not he was just handed an employment application and has no idea. And that's why I don't want him to answer the question.

I hope he knows the answer already, but I don't want him to have to say it. I want to be assured that somebody who is paying the bill -- not somebody who can complain six months after the fact that there was a bill that was 500 dollars too high and they won't adjust it. But somebody who is paying the bill knows that this is money well spent as part of the run.

So I'm not going to belabor the point. I will approve the claims agent as Mr. (indiscernible) suggested, even though I still have my reservations about why you need three for three similar cases. But I'll defer to your judgment on it with a promise that there'll be such a declaration and a filing and an explanation from the agent on what its estimated budget is, and with including recognizing there could be deviations too.

Fair enough?

MR. PASCUZZI: Fair enough, Your Honor.

THE COURT: Okay.

MR. PASCUZZI: You did have one other question in there. I'm not looking to open more questions for myself, but I didn't want to skip over it --

THE COURT: Okay.

MR. PASCUZZI: -- about indemnification.

THE COURT: Yeah, well, no surprise, right?

MR. PASCUZZI: No surprise. I read your policies and procedures ahead of time on this issue.

Your Honor, the indemnity issue, and I'd like to mention that although the U.S. Trustee did not file an objection with regard to this, they did ask us to supplement the exception to indemnification to include not only gross negligence and willful misconduct but also bad faith, self-dealing, breach of fiduciary duty, if any, which we've agreed to do.

What I will say on the indemnification provision is that the order does contain significant provisions that limit the indemnification, provide for court review, provide that nobody's getting any indemnification without a motion being filed on notice. Everybody's rights are reserved. The Court retains jurisdiction to deal with that.

The arbitration provision is not going to control. I

confirmed that with Mr. Deutch beforehand. And I believe the order already kind of covers that, that this Court has jurisdiction to approve the fees and any disputes over the fees and any indemnification.

These are the exact same terms that were in the Santa Rosa order as well as the Oakland order. They're very similar to your terms that were in the PG&E order as well. It's standard in the industry, is my experience. We believe we've really tailored this particular order to address these issues as best as possible.

THE COURT: Okay.

MR. PASCUZZI: And I think they've satisfied the U.S. Trustee's office as well.

THE COURT: Mr. Pascuzzi, by reminding me of a question that you didn't really want to answer, you've satisfied me. I accept your answer and your explanation.

And again, Ms. Parada, would you see if a hand goes up.

Does anyone want to be heard on the motion for selection of the claims agent and all the matters that Mr. Pascuzzi just described?

Any hands --

THE CLERK: No one has raised a hand, Your Honor.

THE COURT: Okay. Then Mr. Pascuzzi, with that explanation and the adjustments that you've discussed with Mr.

Blumberg and the statements on the record, I will approve that motion as well.

MR. PASCUZZI: Your Honor, just one question as to that. I don't believe we had set that up as an interim order. Omni has to do a bunch of work for us, getting the notice of the bankruptcy out and all of that. Plus they worked very hard with us in connection with the claims procedures as well.

And so while I understand your questions about what's the big deal. There's only 500 creditors. It really is a big deal. This is one of the most important parts of the case, in my view, for due process purposes, proper notice, proper handling of sensitive survivor information, and we just really need their help.

THE COURT: No, it's not an issue. It's not interim. It's the order. I'm approving the --

MR. PASCUZZI: All right.

THE COURT: -- employment. And I wish and want Mr. Deutch and Omni to understand I didn't come to this with some complaint or issue about his company. I had no criticism at all. No basis to. But I also have certain pet peeves, and I accept the explanations for it.

And Mr. Pascuzzi, I couldn't agree with you more about the sensitivity and the importance of it. But what I call is a big deal, it's a small number of things, but the sensitivity is obviously great. Of course. Okay. Let's move on.

MR. PASCUZZI: Okay. I think next in your order, Your Honor, is the insurance program motion, and you had a question about whether it impacts any existing insurance on the abuse claims that precipitated the case. While we had assigned this one to Mr. Katz, I think I can answer it. And if you get into more detail, maybe not.

But the answer is basically no, and there's a provision in the existing order that we put in there in paragraph 5 that specifically provides that we are not to pay any deductibles or self-insured retentions on any of the pre-petition abuse claims, pending an order confirming a plan or further order of the Court. The abuse claims will impact mostly old insurance, not --

THE COURT: Right.

MR. PASCUZZI: -- the existing insurance that is governing July 1 to June 30th right now for the debtor. So I --

THE COURT: Well, and that's the answer I expected. And the point is that the explanation, again, about the complexity of the various insurance programs that the debtor has to maintain, again, it's not run of the mill. It's very, very detailed. And I appreciated learning it.

And the more I read and the more I saw how complicated it was, it struck me that this couldn't possibly impact on the kind of insurance that you've described for the claims that

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 40 of 83

have been resolved and again, the ones that I know have been resolved in other cases. And I knew the -- I knew the answer, but I wanted to -- I mean, I knew what better be the answer, and you gave me the answer that I expected. So I'm satisfied.

And again, Ms. Parada, please see if anyone has raised a hand wishing to be heard on what we call the insurance program motion.

THE CLERK: No one has raised a hand, Your Honor.

THE COURT: No hands up? Okay. Mr. Pascuzzi, I'll approve that motion.

MR. PASCUZZI: Okay. I think --

THE COURT: Okay.

MR. PASCUZZI: -- we're on to the notice procedures next.

THE COURT: Right.

MR. PASCUZZI: Your first question is, is there any difference in these procedures than the other two cases, Santa Rosa and Oakland. There's no difference from the Santa Rosa motion. Basically, it's the same. That's what we modeled this on. The Oakland motion, though, did have an additional request for relief that we have not asked for here. And that had to do with their request to seal the names of all the perpetrators that hadn't already been publicly disclosed.

I think they -- I didn't monitor it closely, but my understanding is they amended the motion to narrow that, and

then Judge Lafferty ruled on it. But the bottom line is that's not part of this motion in this case. This motion is pretty much exactly what we did with Santa Rosa, other than the bar date issue, which I'll explain when we get to that next.

THE COURT: Okay. Well, the bar date is obviously the one that I was most concerned about, so that explanation is fine.

MR. PASCUZZI: Okay. So let me explain. It was my idea to ask the Court to deal with the bar date, and here's why. So in Santa Rosa, a bar date got appointed or got set right away. So that had to go in the notice of the bankruptcy. It's on the court's docket.

And what we thought at the time was we would be able to get into court, get through all of the first stage of the case, administrative stuff, get to the committee, negotiate the claims procedures, get a motion on file, get that approved, and then be able to send out notices. And it's not just to the 500 people. We have to publish. We have to -- we really canvas with our notice campaign.

THE COURT: Well, but wait. But expand on that. I mean, again --

MR. PASCUZZI: Okay.

THE COURT: -- this isn't the 80,000 fire victims in PG&E. So I mean, you're not going to be spending money on a Wall Street Journal ad, are you?

MR. PASCUZZI: We are going to spend money on one thing, and the reason, Your Honor, is due process. These allegations go back to the 1950s. And so we don't know when somebody out there might have -- a claim might of arose. They might not be within the jurisdiction of the San Francisco Bay Area.

We don't do extensive publishing in national newspapers, but we do hit Los Angeles, maybe USA Today or the Wall Street Journal once. We publish in all the Catholic newspapers. We send mailing notices to parish mailing lists, school mailing lists. It is extremely important that the notice is as broad as possible because otherwise, somebody could come up later and say, I didn't get notice of anything here. And we're doing this for the finality of the discharge.

So anyway, it is a very important part of it. But and it takes some time to put all that together. So by the time you --

THE COURT: I got it. Okay. But listen, explain something to me. I understand the due process, but we also have a statute of limitations issue. And the State of California changed the law. And I don't know whether the people in Sacramento are worried about due process. But if the claim was barred by the statute of limitations, it's barred, isn't it?

MR. PASCUZZI: No. If they --

THE COURT: No?

MR. PASCUZZI: -- reopen it again, it's not.

THE COURT: Well, has any court said that?

MR. PASCUZZI: Your Honor, there's a (indiscernible) --

THE COURT: I mean, is it a statute of limitations, or is it a -- is it a -- as it a statute of repose? In other words, can a person who didn't know that he or she had a right to file a claim assert a claim after the state law deadline has passed?

MR. PASCUZZI: That's exactly what happened on this reopening, Your Honor -- and this exact issue, and I'm getting out over my skis here a little bit and I don't want to make any admissions for the case, but my understanding is that all of the claims that we're dealing with right now, we're barred by the statute of limitations. The California legislature reopened it, revived all of those claims.

THE COURT: No, that's right. Understood.

MR. PASCUZZI: It can do that again in the future. And it's in Mr. Gaspari's declaration, there actually is a bill in California to open the statute of limitations and get rid of it completely so --

THE COURT: No, I understand that. I understand that. But that's not the law now. And if the California legislature changes that, I don't know what we do about it in this

bankruptcy. I don't want you speculate either. But --

MR. PASCUZZI: What we're going to do -- what I'm going to do about it is make sure there's as broad a notice as possible so that there's due process so that the discharge applies as broadly as possible, regardless of if the statute of limitations is reopened.

THE COURT: Okay. Mr. Gaspari, you have your hand up, but you don't have to put your hand up when you're already on the screen. You just need to turn your mic on. Go ahead.

MR. GASPARI: I was just going to chime in, Your Honor, that the limitation period is a terribly moving target. The statute has been amended several times since the 1980s. Even aside from the -- what I think Your Honor is alluding to, sort of the absolute bar date of December 31, which actually, some lawyers will argue was extended by virtue of the COVID tolling statutes to June 30, for a certain subset of claimants, there is actually a discovery period, a three-year -- a three-year discovery period built into the statute where those claimants could be out there and have not yet discovered that they have harm relating back to child sexual abuse. And those claims may be ripe, irrespective of the 12/31 bar date.

THE COURT: Well, I understand. I mean, I understand, particularly in this very sensitive area, the legislatures have been moving alone, and I presume they're also happening with the opioid crisis and other things. But you know, and I

presume I think I correctly distinguish between a statute of limitation and a statute of repose.

Now, which is it here? Is it a statute of limitations or a statute of repose, or do you speculate on that?

MR. KATZ: We have argued that it is a statute of repose all the way to the United States Supreme Court and have been knocked down a bit.

THE COURT: Okay. All right. Let's go back, then, to you, Mr. Pascuzzi. I still have -- I have some hesitation about moving the claims bar date. So let's assume that you believe it's in your client's best interest, and I'll say, the best interest of claimants, to extend it, to when? I mean, because I don't want to have a situation where six months from now we can't get a plan on file because we're still waiting for the claims deadline.

MR. PASCUZZI: Your Honor, I understand that. And what I was explaining, and I think I didn't quite finish my explanation, was that with a bar date that's set right now, we might not be in front of the Court with claims procedures and an order and mailing it out so that that bar date will give sufficient notice to claimants. And so what we did in Santa Rosa, we just vacated it. We filed a motion later, and it was vacated. Then we filed our claims procedures motion and got a bar date set.

I'm not asking to move it out. I'm not doing

anything. But if a notice goes out now with a bar date that later we file a motion and say we want a different bar date, there is some confusion.

And then there's also the fact that these survivor claims, all of the claims procedures provide that they're filed basically confidentiality so that survivors can put their names on there, have descriptions of what happened, and things like that, information necessary for us to understand the claim, understand insurance coverage. So it would not be a good thing for a survivor to feel like they have to file a claim because there's a bar date out there without the claims procedures process already having concluded and had those confidentiality provisions.

Your Honor, having said all that, if you're not comfortable, deny that part of the motion without prejudice. If we run into a problem with the deadline coming too soon for us for where we are, we'll file a motion to vacate it. That's what we did in Santa Rosa. I just thought maybe to get ahead of it --

THE COURT: I mean, I (indiscernible) I don't like doing that. Again, Mr. Pascuzzi, I hate to -- you and I have to stop talking about PG&E, but as you know, in PG&E, we had to open up a couple of different claims deadlines for obvious reasons that were not dissimilar. They weren't, again, the kind of tort that you've described. But as you know, we had

thousands of fire victims who we don't even know where they were. They didn't have homes anymore. And I don't want to put the debtor or anyone to the expense or the confusion of sending out a notice and then having to retract that in another notice.

But I got to give you a preview. I'm not inclined to make the proof of claim that has to be filed to be the equivalent of the twenty-nine-part questionnaire that the fire victims had to play that I'm going to -- I'm all for the confidentiality of what a claimant must say to the debtor and to the committee, but I am not a fan of -- remember, I'm the author of the BAP decision called Heath. If you remember, the presumption of validity of a claim can be filed and can apply if it's almost completely deficient, and it says you've got to deal with it a different way.

I want to be respectful of that principle, but I don't want to get bogged down in the early weeks of this case with endless debate about what a proof of claim has to say because I don't buy it. I believe a proof of claim has to assert, "I have a claim against the debtor," period. And I don't want to make it impossible for not fulfilling the goals that you want to do as due process. I'm not a fan of the kind of money that gets spent on these massive cases that go out on the Wall Street Journal. I wonder who in the world ever sees those notices.

But so just keep in mind, I guess I'm willing to keep

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 48 of 83

open for the short period of time a claims bar date. And don't be surprised if we have a debate about what the proof of claim has to say compared to what the claimant has to be prepared to demonstrate to get past what would otherwise be a facial challenge to say your claim doesn't state a claim for relief. We know what we're talking about, and if there are 537 known claimants, those 537, I don't want to make a new rule that makes life more difficult for them if doing so is necessary to let some more claimants show up because they don't know about this bankruptcy until they read about it in the national press.

So I hope you understand my thinking on this subject. And tell me if I'm wrong, I believe, the two Oakland cases, they are sticking with pretty much that same philosophy; isn't that correct?

MR. PASCUZZI: Yes, Your Honor.

THE COURT: Okay. Well, then that's reason enough to assume that we're going to be consistent with that approach.

MR. PASCUZZI: I was just going to say, lucky for us, I guess, those two motions have been granted. And we see how they were granted so --

THE COURT: Well, I hate to -- I hate to act like I have a different approach because I don't think I do, but that one little case that I wrote about fifteen years ago gets a lot of attention because it simply focuses on the presumption of validity of a proof of claim, but it doesn't say that the claim

fails because someone objects to it because it doesn't have a lot of detail. So okay.

MR. PASCUZZI: Yeah. Our purpose is really on that, Your Honor, not to get too far ahead of things, is to get enough information so that we can evaluate the claims and hook them up with the right insurance policies and get insurers to pay so we can --

THE COURT: I got it. I got it. I got it. But you cannot get this out of my head that Mr. Gaspari is familiar with 537 Doe complaints, and he and his legal staff know what that claimant is asserting and knows whether there is insurance and all the other kinds of stuff. And I don't want those 537 claimants to have to do anything more than file a proof of claim that says, see my complaint or see whatever. Do something, something that at least satisfies the very traditional statute of -- bankruptcy statute of limitations for asserting your claim.

So I'll accept your suggestion that for now, we override the Rule that's somewhat unique in our district, I think. We're really, I believe, in the minority of districts that have that quick deadline on the claims in a Chapter 11. But we're going to revisit this early and with some finality not too long out from now. So keep that in mind.

MR. PASCUZZI: Understood, Your Honor, and --

THE COURT: Okay.

MR. PASCUZZI: -- as soon as the committee is appointed, it'll be one of the first things we turn to.

THE COURT: Okay. Does anyone in the audience want to raise a hand to be heard on the claims bar date and the other aspects of the debtor's motion that Mr. Pascuzzi and I have been talking about at some length, I guess?

All right. Ms. Parada, anyone?

THE CLERK: No, Your Honor. No one.

THE COURT: Okay. That motion will be granted, subject to the colloquy that we've placed on the record.

I guess we're down to survivors assurance assistance, which seems to be perfectly understandable, and I -- yeah. Do you want to elaborate on that? I mean, I understand it, and it's a very modest amount of pre-petition claim and almost not worth worrying about. I mean, I'll grant it, of course, but is there anything that you need to talk about or want to raise on that subject?

MR. PASCUZZI: Just one thing, Your Honor. The U.S. Trustee's office provided us comments. It didn't file a formal objection because Mr. Blumberg and I had worked out beforehand that we would add to the paragraph that says we're authorized to pay pre-petition amounts up to the aggregate of 10,000.

I know the motion said we're estimating 4,000 dollars' worth of pre-petition costs, but I requested for a little bit of a cushion there, just in case something else came up. And

if it ended up being 5,000, and we didn't want to have to spend the money to file another motion to have more. So the 10,000-dollar cap amount, I believe, was acceptable to the U.S. Trustee. Other than that, unless there were some other questions you had about it, I didn't plan to say anything else.

THE COURT: Anyone in the audience want to be heard on the -- we'll call the survivors assistance program motion?

Ms. Parada, any hands up?

THE CLERK: No, Your Honor.

THE COURT: Okay. That will be granted, thank you, with that comment with the U.S. Trustee.

Mr. Pascuzzi, I'm reminded of another thing, and again I apologize for keeping referring to that other big case. But one of the things that was difficult for me, and I asked the counsel to be mindful of it, is I don't want the proposed order to be where the real motion is. And I'm fine when there is a motion and then the debtor has a colloquy with the U.S. Trustee or a committee or somebody who says, well, we've solved this problem and we'll fix it in the order. I can read the orders too.

But when I'm given a motion, I want the motion to tell me what the moving party wants. I don't want to have to read the motion and then decide whether the order is consistent. I expect the lawyer to be consistent, to submit an order that's consistent with the motion that was requested under the thing

we all learned in the first year of law school. When you sue somebody for a certain remedy, you can't put in the judgment more than you sought in the complaint to begin with.

So if there's a motion that says this is what I want to do, A, B, C, D, but then you submit an order to the Court that adds E, F, and G, that's not fair. And it is fair, however, to work out differences and to say to the judge, we've resolved some disputes or something's come up and we're changing it. But I don't want to give the impression that I don't read everything that people submit to me. I try to. But I don't read proposed orders because I trust that they are consistent with the motions that I'm asking in the first place.

So all I'm asking is that you try to keep that in mind. And I welcome -- and I obviously welcome completely dealing with informal objections or things that nobody thought about ahead of time and fixing them in orders and then just explaining to it. But I will confess that particularly when I have a lot of reading to do, I don't read the proposed orders because I trust the drafter of the order to be consistent with as the drafter of the request to begin with. Okay. Is that clear?

MR. PASCUZZI: Yeah. And is that in reference to this survivor assistance motion that I (indiscernible) --

THE COURT: No. No, it's just generally. I mean, in other words --

MR. PASCUZZI: Okay.

THE COURT: -- and again, I got to make, sure this is not a criticism. It's just the way I have to be able to deal with it when their cases are happening. It's not that this overwhelmed me that I couldn't read it. Of course I read everything, and I appreciate all the hard work you and Mr. Katz put together to get us the documents ahead of time. But --

MR. PASCUZZI: Okay. Understood.

THE COURT: -- I just, I focus on the tradition of looking at what somebody wants rather than focusing on how they want what they want memorialized in the form of an order because it's a temptation to put some awful scary things in that order that you never put in the motion. Right.

MR. PASCUZZI: Understood, Your Honor. Understood. So do we need to set a final hearing date then, for these? Is that what you'd like to do next or --

THE COURT: Well, this just goes to the final point in my order. And that is what do you want to do going forward generally, and then we can kind of circle back. And --

MR. PASCUZZI: okay

THE COURT: -- we can have -- we can have nothing or I can give you dedicated days or we can schedule a Chapter 11 status conference. To me, we don't need a Chapter 11 status conference. We just had one. So I really want you to tell me what you want and --

MR. PASCUZZI: Okay.

THE COURT: -- that's my invitation.

MR. PASCUZZI: Okay. Thank you, Your Honor. So upcoming motions, I would expect, just to give you an idea, and then we can talk about whether we need special days or something like that, there'll be, of course, the further hearings on these interim motions. There'll be interim compensation procedures motion, the claims procedures motion, probably an ordinary course professionals motion. Not a lot, in my experience from Santa Rosa, unless something unexpected comes up.

So I don't know that we need a dedicated day. It's not going to be anything like that other case that we had since -- we keep mentioning that. It would be good to have the option for a special day. If Your Honor would prefer -- I don't know how heavy your normal Friday calendars are. If you would prefer to set things in this case on Thursdays, that would work with Katz and I --

THE COURT: I can set it on any day. The question that Ms. Parada and I didn't know and we kind of speculated on is what kind of a crowd would we get today. We have a limit of one hundred for a Zoom, and so we were ready to have an overflow crowd for AT&T.

So my prediction is that we probably won't have heavy crowds, but I also think that as with any complicated case,

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 55 of 83

particularly in its early days, there are times that get consumed. So I don't like to take something that's likely to take a lot of time and perhaps a lot of matters that are unique. I mean, this isn't a run-of-the-mill real estate case with the first sublender and the second lender wants adequate protection. So I would not -- I would rather have a dedicated time so we can pay attention to everything and not make you wait through the run-of-the-mill relief from stay calendar and/or the Chapter 13 calendar.

And it happens that here we are on a Thursday afternoon. It could be on Thursday afternoons. But I want to accommodate you. Really. We don't have a lot of congestion that we can't handle. And you can --

MR. PASCUZZI: Thursdays would be great, Your Honor.

THE COURT: -- think about it if you want also.

MR. PASCUZZI: Well, Thursdays would be great. I talked to Mr. Katz about it, and if that would work for you, whether it's morning or afternoon and --

THE COURT: Well, we should -- personally, it might be better in the afternoon, but I can make it in the morning. Would --

MR. PASCUZZI: Afternoon's fine.

THE COURT: Well, do you know -- from the other case in Santa Rosa, particularly, do you anticipate that we'll get a lot of -- a lot of other motions? I mean, I presume there

might be some plaintiffs that want relief from stay and the --

MR. PASCUZZI: But so far, Your Honor, there's been one relief from stay motion filed in Santa Rosa. So I'm not expecting, unless this case turns out to be significantly different, which it very well could be, substantial on motion activity.

What we've been doing in the Santa Rosa case is Judge Novack let me set hearings either on his Friday Oakland-Oakland calendar or his Wednesday Santa Rosa calendar, either one. So I've just been on the normal law and motion calendar, and the traffic hasn't been too bad.

The other thing about Judge Novak's court, and I think Judge Lafferty, is they have kind of a hybrid, in-person Zoom thing. So there have not been crowds in the courtroom. I've been the only one showing up, and Mr. Blumberg showed up in person a few times. So I don't know if that's an option for your court because you did mention live or in person. But just letting you know what they're doing in this.

THE COURT: Well, you don't even know where I am now, do you?

MR. PASCUZZI: I don't.

THE COURT: I'm actually in Judge Efremsky's chambers in Oakland, but I've been conducting routine hearings from my home. But there were other reasons that I wasn't going to -- didn't do that there. I've discussed with Judge Blumenstiel

and my staff about getting back to live hearings in San Francisco for all the more obvious reasons.

And that's when it occurred to me, even though I know where you hang out, not in Oklahoma or San Francisco. I know where Mr. Katz is. I haven't seen Mr. Gaspari in a long time, but he used to be in San Francisco. I assume he still is. And of course, this is the diocese in San Francisco. So to me, it -- and the archbishop.

So it seems to me that the hearings belong in San Francisco, just because this is San Francisco, and San Francisco is my home base. But it's also convenient to be able to do it like this. And if we were going to have evidentiary hearing, testimony, cross-examination, then for sure. I have to tell you, I'm not a fan of the so-called hybrid, even if Judge Lafferty is, because it's a bit of a nuisance, frankly, from a technical point of view because you have to have different sound arrangements and feedback and so on.

So I think what I'd prefer to do, at least for the short-term, is just continue to be on Zoom, but with the promise that if there's a reason, any reason, to why you think a in-person hearing would be favorable, I certainly will accommodate you. It's not that I can't come to San Francisco. It's where I spent my entire law practice and judge practice until COVID.

And so how about this. What if we give you sort of a

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 58 of 83

Archbishop case every other Thursday, or at least Thursday two weeks from now and maybe two after that and two after that for the short-term, recognizing that anyone filing any kind of motion or the routine motions that you wish to have heard, we'll put on that, say, 1:30 Thursday calendar. And I'll put it on the open calendar, and if somebody wishes to, much like we've done in so many other cases, and my open calendar is there. But the point is, if it's one matter that can be handled in two minutes or it's ten matters that take three hours, it won't get cluttered up with all the other matters that we all have to handle. And so does that work for you?

MR. PASCUZZI: We really appreciate that, Your Honor. We appreciate your flexibility in that as well, definitely.

THE COURT: Ms. Parada, why don't we give all counsel and on the record, let's say the next three 1:30 Thursdays beginning two weeks, four weeks, six weeks, and then perhaps for now, we won't post anything after that. But Mr. Pascuzzi or Mr. Katz might be in touch with you and work out something for the future. But at least we'll have the default is the Archbishop case will be on Thursday afternoons.

MR. PASCUZZI: Your Honor, one requested tweak to that. I mean, we were thinking that a final hearing on these motions might be good on the 14th, September 14th. So --

THE COURT: Oh, okay.

MR. PASCUZZI: -- if the Court's available, that's

three weeks out. And the reason I say that is because it gives time for a committee to be appointed and to get counsel. It may just happen at that point in time, and we may have to continue those hearings. But then if you went three, then another two weeks, two weeks, like you were saying.

THE COURT: Okay. So three, five, seven. In other words, no hearing for until September 14?

MR. PASCUZZI: That's what I was thinking.

THE COURT: Okay. Ms. Parada, can we accommodate those dates?

THE CLERK: Yes, Your Honor. September 14th at 1:30 is available.

THE COURT: Okay. And then two weeks after that?

THE CLERK: September 28th at 1:30 is available. And October 12 at 1:30 is available.

THE COURT: Okay. Mr. Pascuzzi, what we'll do for -- I'm stating this on the record. Ms. Parada just said it. I'm putting on our calendar the hearing, we'll call the continued -- excuse me, the motions that were styled and not disposed of today that were interim relief are continued to September 14th at 1:30 for either continued interim or final, as appropriate. And that date, September 28th and October 12th, will be posted on our court's calendar as dedicated for Archbishop debtor cases. And that means that if somebody wants to file something, they have to pick those dates unless they

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 60 of 83

work out something or there's reason to put it on some other schedule, the same way we would do any case that has to be set on an expedited basis. That work?

MR. PASCUZZI: Yes, Your Honor. The one caveat there is that the September 28th date is when the 341 meeting is. But I don't know that we'll have any hearings for that date or not. And we've got cocounsel here, so we've got enough bodies to cover these.

THE COURT: Well, what time is that going to be, in that (indiscernible) --

MR. PASCUZZI: 10 o'clock. 10 o'clock.

THE COURT: Well, I mean, do you -- but I mean, do you expect it to be several hours? I think the -- I think the principal -- I mean, I don't want -- your cocounsel is fine, but I don't want anybody to have to be in two places at the same time. So what would you like me to do? Want me to -- want me just move that date to the next day or something different?

Actually, the last the last day of every month in the afternoon is our AP status conference. But no, I mean, look, we can fix this right now by making the 28th something, make it on the Wednesday, the day before, if that's available. I think your client would presumably want its principal lawyers available for both the 341 and the continued hearing, and I don't want to interfere with that process.

Ms. Parada, is Wednesday the 27th available?

THE CLERK: Yes, Your Honor, it's available.

THE COURT: Mr. Pascuzzi, which of those choices do you prefer?

MR. PASCUZZI: Let's go with the 27th. Sorry --

THE COURT: Okay.

MR. PASCUZZI: -- I was looking at my calendar too.

THE COURT: Okay. So we're booking three Thursdays. However, the second of the three Thursdays is actually a Wednesday. So Thursday, September 14th, 1:30, Wednesday, September 27th, 1:30, Thursday, October 12th, 1:30, those are what we're scheduling for the short-term future of Archbishop cases. And for now, they will all be remote with Zoom. But if there's a reason to go back to something more traditional, we'll do so.

MR. PASCUZZI: And we would just contact Ms. Parada if we want to request a in-person or something?

THE COURT: Of course. And the same --

MR. PASCUZZI: Okay.

THE COURT: -- if you want to adjust the time or set something specially --

MR. PASCUZZI: Okay.

THE COURT: -- just like always.

THE CLERK: Excuse me, Your Honor. Will the clerk's office issue a status conference?

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 62 of 83

THE COURT: Oh, so now, do you want -- I'm not a fan, Mr. Pascuzzi, that some my colleagues do, of just setting Chapter 11 status conferences just for the sake of it when I've already essentially had the status conference. So do you see any reason why we should separately set a Chapter 11 status conference?

MR. PASCUZZI: Your Honor, at this point, if we could say no, and then we could revisit it on the 14th if we change our minds at that point. But I think you're right. We'll be in front of the Court and can update you on what's going on.

THE COURT: Well, remember, my standard Chapter 11 order says at the status conference, sometimes it really is the first day, and it's be prepared to tell me what your exit strategy is, what your plan -- what your plan for a plan is. As you know, sometimes the debtor says, I'm not going to file a plan. I'm going to sell all the assets and dismiss. That's fine. Or somebody will say, well, it's a sub V and we're going to have a plan on file. And some will say, we don't know what we're doing. And I don't care. I'm not pressing this debtor three days into the case to commit to a plan deadline.

So let's do this. Those dates are available for you and your client. If you want to call it a status report or to discuss something that you don't want to -- don't have a good name for it, call it a status conference, and we'll deal with it. I don't want to get bogged down on labels. What we really

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 63 of 83

want to do is make sure we can accommodate your needs, but also the needs of your opponents, whoever they are. Okay.

MR. PASCUZZI: We really appreciate that, Your Honor.

THE COURT: Okay.

MR. PASCUZZI: One more thing I wanted to inform the Court of, we will be filing an application to extend the time to file schedules. I'm aware of Your Honor's policies and procedures, that you don't like to grant those beyond thirty days, so we're not -- after the petition date. We're not going to ask for more than that, but we will probably need until the 21st of September.

THE COURT: Okay.

MR. PASCUZZI: We'll do our best to get it done before then. But I communicated with Mr. Blumberg, that particular timing in connection with him setting the 341 meeting date and the initial debtor interview date. So I just thought I'd let the Court know as well that that's coming.

THE COURT: No, that's helpful. And if necessary, I've been known to, say, get certain schedules on file no matter what if you don't have all the other ones. I'm not going to worry about it in this case. The debtor is well-counseled with experience. The two of you experienced. Mr. Blumberg is watching the store for the U.S. Trustee. And so if you need time to complete the schedules, I'm not going to stand in the way. Not worried about that.

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 64 of 83

MR. PASCUZZI: And then I'd --

THE COURT: Okay.

MR. PASCUZZI: -- just ask if Mr. Katz has anything else, any comments or anything if --

MR. KATZ: Nothing from me, Your Honor.

THE COURT: Well, and one more time to the audience. Does anyone wish to be heard on any matter that we discussed and have any questions or concerns about what I've just been discussing for the last hour or so with counsel?

MR. BLUMBERG: Your Honor, this is Jason Blumberg. May I make two quick kind of early case status comments?

THE COURT: Yes, sir.

MR. BLUMBERG: The first is, I just wanted to inform the Court, as the Court probably expects, that on the petition date, the United States Trustee began the process of soliciting creditors for the appointment of a committee or committees, plural.

And then the second quick kind of status point I wanted to make was that after this hearing, my office will be initiating a discussion with debtor's counsel regarding whether the appointment of a fee examiner may be appropriate. We always consult with the debtor and the committee in assessing whether a fee examiner may be necessary. And so to the extent a committee or committees are appointed, we will also consult with their counsel before taking any sort of action or coming

to any sort of decision on that issue, Your Honor.

THE COURT: Okay. Actually, Mr. Blumberg, your comment reminds me of something I meant to ask Mr. Pascuzzi.

Tell me if I'm wrong. I would assume that your focus is obviously on the survivors and the abuse claims -- that's what's driven the Archbishop to put the debtor into bankruptcy -- and that other creditors are almost incidental, not incidental in a sense that they aren't significant amount of money, but more likely than not they'll be unimpaired and treated under a plan like more ordinary course and that all the action is going to be with the survivors and their counsel and the kinds of things that you and I both know is what is endemic for these cases. And is that a fair assumption?

MR. PASCUZZI: That's a fair assumption, Your Honor. Yes.

THE COURT: Yeah. I mean, see, that's relevant also to things like claims bar date because chances are there may not even be any claims filed because if your schedules are complete and somebody that's owed money for some service that was rendered and scheduled correctly, that person doesn't even have to file a claim.

So I'm not changing my view on whether when the claims bar date is. I understand we're having two claims bar dates for this case because despite the U.S. Trustee definitions or the Administrative Office of U.S. Courts' definition of mega

cases, to me, mega case is really more proper function for the complexity of the creditor problems you're dealing with, not just the asset side. So again, I'm not holding you to that. It's what I anticipated, and this is all about dealing with the abuse claimants.

Okay. Last call. Does anyone in the audience wish to be heard or raise any question? Raise your hand now, and I'll call on you.

Ms. Prada, as you see, she's very good gatekeeper here.

THE CLERK: No, Your Honor. No one has raised a hand.

THE COURT: All right. Mr. Pascuzzi, Mr. Katz, Mr. Blumberg, Mr. Gaspari, you're still on the screen, thank you for participating and for informing me. And I'm going to thank you for your attendance and conclude the hearing.

MR. PASCUZZI: Thank you, Your Honor.

MR. KATZ: Thank you, Your Honor.

MR. GASPARI: Thank you, Your Honor.

(Whereupon these proceedings were concluded at 3:04 PM)

I N D E X

| RULINGS: | PAGE | LINE |
|---|---|---|
| Debtor's cash accounts motion is granted, as modified on the record | 23 | 16 |
| Debtor's wage motion is granted, as modified on the record | 28 | 22 |
| Debtor's utilities motion is granted | 30 | 3 |
| Debtor's claims agent selection motion is granted, as modified with adjustments from the U.S. Trustee and statements made on the record | 38 | 24 |
| Debtor's insurance program motion is granted | 41 | 9 |
| Debtor's claims bar date motion is granted, subject to statements made on the record | 51 | 9 |
| Debtor's survivors assistance program motion is granted | 52 | 10 |

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

_______________________________________

/s/ RIVER WOLFE, CDLT-265

eScribers
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020

Date: August 31, 2023

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 69 of 83

## A

**AB (4)** 8:21;9:9,10,22
**able (6)** 19:23;26:4;42:13, 17;54:3;58:11
**abnormal (1)** 34:7
**absolute (1)** 45:14
**abuse (13)** 8:20;9:11;12:17,19; 13:11,18;25:3;40:3, 11,12;45:20;66:5; 67:5
**abuser (2)** 25:7,10
**accept (4)** 31:6;38:16;39:21; 50:18
**acceptable (1)** 52:3
**access (1)** 27:22
**accidental (1)** 31:25
**accidentally (1)** 32:1
**accommodate (4)** 56:12;58:22;60:9; 64:1
**account (8)** 16:16,17;21:16,16; 22:15;23:8;24:7; 25:20
**accounts (4)** 16:18;20:21;22:24; 23:17
**accounts' (1)** 20:22
**accrual (1)** 28:17
**accusation (1)** 25:7
**accuse (1)** 25:3
**accused (2)** 9:14,15
**acknowledges (2)** 16:11;20:8
**act (1)** 49:21
**action (2)** 65:25;66:11
**activity (1)** 57:6
**actually (13)** 8:21;16:10;18:3; 21:17,17;24:19; 44:20;45:14,17; 57:22;61:19;62:9; 66:2
**ad (1)** 42:25
**add (2)** 6:8;51:21
**added (7)** 16:20,21;17:1; 19:21;20:1;24:11,16
**addition (1)** 16:19
**additional (1)** 41:20
**address (2)** 15:13;38:9
**addresses (1)** 31:24
**adds (1)** 53:6
**adequate (1)** 56:5
**adjust (2)** 36:17;62:20
**adjustments (1)** 38:25
**administrative (3)** 15:3;42:15;66:25
**administratively (1)** 13:20
**admissions (1)** 44:14
**adopted (1)** 21:25
**advisors (1)** 7:10
**affairs (1)** 9:22
**afoul (1)** 21:3
**afternoon (9)** 5:7,19,22,24;23:4; 56:11,18,20;61:20
**afternoons (2)** 56:11;59:20
**Afternoon's (1)** 56:22
**again (33)** 7:20;8:19;11:16; 12:10,13,23;18:18; 19:11;22:22;26:21; 27:2;29:5;30:6,25; 31:12;32:13;33:21; 34:8,17,21;38:17; 40:19,21;41:1,5; 42:21;44:2,19;47:21, 24;52:12;54:2;67:3
**against (2)** 8:25;48:19
**agent (17)** 7:7;30:6,23;31:6,7, 8,22,23;32:5,18,21; 33:25;34:19;36:8,20, 24;38:20
**agents (3)** 31:15,20;32:10
**aggregate (1)** 51:22
**ago (1)** 49:23
**agree (2)** 34:25;39:22
**agreed (2)** 35:11;37:17
**agrees (1)** 16:4
**ahead (11)** 6:3,13;8:17;21:22; 24:19;37:11;45:9; 47:18;50:4;53:16; 54:7
**Alameda (1)** 9:2
**allegations (1)** 43:3
**alleged (1)** 9:11
**allowed (1)** 14:22
**alluding (1)** 45:13
**almost (4)** 35:7;48:13;51:14; 66:7
**almost-closed (1)** 31:3
**alone (1)** 45:24
**along (1)** 21:24
**although (1)** 37:13
**always (3)** 15:20;62:23;65:22
**amended (2)** 41:25;45:12
**amendment (1)** 8:23
**America (1)** 22:14
**American (1)** 33:1
**amount (6)** 24:8;31:8,9;51:14; 52:3;66:8
**amounts (3)** 28:17;33:11;51:22
**and/or (1)** 56:9
**Angeles (1)** 43:8
**Ankey (1)** 27:4
**anticipate (2)** 23:4;56:24
**anticipated (2)** 35:15;67:4
**anymore (1)** 48:2
**AP (1)** 61:20
**apologize (3)** 6:20;18:22;52:13
**appearance (1)** 5:18
**appearances (2)** 5:9,12
**appeared (1)** 23:7
**appearing (1)** 5:20
**applicable (1)** 26:12
**application (3)** 6:25;36:11;64:6
**applications (1)** 35:16
**applies (1)** 45:5
**apply (1)** 48:12
**appoint (1)** 6:25
**appointed (8)** 10:18,23;16:13; 24:24;42:10;51:2; 60:2;65:24
**appointment (2)** 65:16,21
**Appreciate (5)** 15:23;54:6;59:12, 13;64:3
**appreciated (1)** 40:22
**approach (2)** 49:17,22
**appropriate (4)** 6:4;14:23;60:22; 65:21
**approve (4)** 36:19;38:3;39:1; 41:10
**approved (5)** 10:25;28:7;35:17, 19;42:16
**approving (2)** 26:15;39:15
**Approximately (2)** 8:25;9:12
**arbitration (1)** 37:25
**Archbishop (10)** 5:6,15;8:1;10:3; 58:8;59:1,20;60:24; 62:12;66:6
**archdiocese (1)** 8:8
**Area (4)** 13:10,13;43:6; 45:23
**argue (1)** 45:15
**argued (1)** 46:5
**arm (1)** 21:18
**arose (1)** 43:4
**around (1)** 8:1
**arrangements (1)** 58:17
**ascertain (1)** 19:18
**aside (1)** 45:13
**aspects (1)** 51:5
**assert (2)** 44:9;48:18
**asserting (2)** 50:11,17
**assessing (1)** 65:22
**asset (1)** 67:3
**assets (1)** 63:16
**assigned (1)** 40:4
**assistance (3)** 51:11;52:7;53:23
**assistant (1)** 27:5
**assume (4)** 46:10;49:17;58:6; 66:4
**assumption (2)** 66:13,14
**assurance (1)** 51:11
**assured (1)** 36:14
**AT&T (1)** 55:23
**attendance (1)** 67:15
**attending (1)** 29:23
**attention (3)** 8:16;49:24;56:7
**audience (5)** 34:16;51:3;52:6; 65:6;67:6
**AUGUST (3)** 5:1;9:4;13:24
**author (1)** 48:11
**authorized (2)** 21:15;51:21
**available (11)** 9:10;15:25;59:25; 60:12,14,15;61:22,24; 62:1,2;63:21

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 70 of 83

**avoid (1)**
24:9
**aware (2)**
32:18;64:7
**away (1)**
42:11
**awful (2)**
7:12;54:12

## B

**back (9)**
7:13;22:22;33:19;43:3;45:20;46:8;54:19;58:1;62:14
**background (3)**
7:18,19;11:9
**bad (2)**
37:16;57:11
**Bank (8)**
16:18;21:9,10,15,17,18;22:14,14
**banking (1)**
21:1
**bankruptcies (1)**
12:15
**Bankruptcy (15)**
5:8;11:20;12:4,11,21;14:8;16:14;26:14;27:17;39:6;42:11;45:1;49:10;50:16;66:7
**BAP (1)**
48:11
**bar (19)**
35:6;42:3,5,9,10;45:14,21;46:10,18,20,24;47:1,2,11;49:1;51:4;66:17,23,23
**barred (4)**
8:23;43:23,23;44:15
**base (1)**
58:11
**based (1)**
32:13
**basically (5)**
9:22;11:8;40:7;41:19;47:6
**basis (4)**
13:7;28:7;39:20;61:3
**Bay (2)**
13:10;43:5
**become (1)**
12:22
**becoming (1)**
12:17
**beforehand (2)**
38:1;51:20
**began (1)**
65:15
**begin (2)**
53:3,20
**beginning (1)**
59:16
**behalf (1)**
24:5
**behind (1)**
18:9
**belabor (1)**
36:19
**belong (1)**
58:9
**bench (1)**
12:11
**best (5)**
9:9;38:10;46:11,12;64:13
**bet (1)**
30:22
**better (3)**
9:24;41:3;56:20
**beyond (1)**
64:8
**bid (2)**
32:11,12
**big (6)**
34:22,24;39:9,9,24;52:13
**bill (4)**
36:15,16,18;44:20
**billing (1)**
31:8
**billings (1)**
33:4
**bills (1)**
34:11
**binder (3)**
17:14;18:6,11
**Bishop (2)**
10:8,10
**bit (7)**
7:8;9:7;12:14;44:13;46:7;51:24;58:15
**bleeds (1)**
35:6
**Blumberg (37)**
5:23,24,25;15:8,11,18;16:4,24;17:7;19:23;21:7,13,13;22:11,12,12,20;23:3,15,22;26:1,18,20;28:11,13,14,20;39:1;51:20;57:15;64:14,23;65:10,10,13;66:2;67:13
**Blumenstiel (1)**
57:25
**bodies (1)**
61:7
**BofA (1)**
22:14
**bogged (3)**
18:14;48:16;63:25
**booking (1)**
62:8
**books (1)**
36:7
**borrow (1)**
25:25
**both (6)**
10:1;27:8;31:16;35:11;61:24;66:12
**bottom (1)**
42:1
**breach (2)**
32:18;37:17
**bring (3)**
6:12;14:4;18:18
**brings (1)**
29:1
**broad (2)**
43:12;45:3
**broadly (1)**
45:5
**budget (8)**
30:12;33:3;34:6;35:14,17,18;36:4,24
**built (1)**
45:18
**bullet (1)**
17:7
**bunch (1)**
39:5
**business (2)**
20:23;36:9
**buy (1)**
48:18

## C

**calendar (11)**
56:8,9;57:9,9,10;59:5,6,7;60:18,23;62:7
**calendars (1)**
55:16
**CALIFORNIA (11)**
5:1;8:2,19,21;9:17;13:14,14;43:21;44:16,21,24
**Call (13)**
5:3;8:20;23:8;26:23;28:23;39:23;41:6;52:7;60:18;63:22,24;67:6,8
**called (1)**
48:11
**Calling (1)**
5:5
**came (1)**
51:25
**camera (3)**
8:12,13,15
**campaign (1)**
42:19
**can (40)**
9:10;10:21;14:3;15:15;18:4,13;19:7;20:1;23:16;25:11;28:10;31:4,15;32:7;34:11;36:15;40:5;44:8,19;47:6;48:12,12;50:5,7;52:19;54:19,21,21,22,22;55:5,19;56:7,13,20;59:8;60:9;61:21;63:10;64:1
**canvas (1)**
42:18
**cap (2)**
24:8;52:3
**car (1)**
13:1
**card (1)**
28:3
**care (2)**
29:16;63:19
**Carney (1)**
7:4
**case (54)**
5:6;6:5;9:21;10:4,10;11:4;12:2,19;13:2,4,24,25;14:1,19,25;16:13;24:24;25:15,18;27:10,14;30:25;31:3;32:16,17,25;33:6;35:13,15,20;39:10;40:4;42:2,15;44:14;48:16;49:23;51:25;52:13;55:13,17,25;56:4,23;57:4,7;59:1,20;61:2;63:20;64:21;65:11;66:24;67:1
**cases (28)**
9:3,5,17;10:7,8,12;11:1;12:12,15;13:1;26:3;27:13;31:1,21;32:7;33:17;34:19;36:22;41:2,17;48:22;49:12;54:4;59:7;60:24;62:13;66:13;67:1
**cash (4)**
15:12;23:8,17;29:8
**catch (1)**
17:25
**Catholic (12)**
5:6,15;8:1,6;10:3,6,8,10;12:2,4;31:13;43:9
**Catholic-based (1)**
8:7
**caveat (1)**
61:4
**cemeteries (1)**
8:7
**certain (5)**
31:20;39:20;45:16;53:2;64:19
**certainly (1)**
58:21
**certify (1)**
35:15
**CFO (3)**
7:2;30:20;36:7
**CFOs (1)**
34:1
**challenge (4)**
16:15;24:25;25:23;49:5
**chambers (1)**
57:22
**chances (1)**
66:17
**change (4)**
20:6;22:2,3;63:8
**changed (2)**
19:8;43:21
**changes (2)**
28:8;44:25
**changing (2)**
53:9;66:22
**Chapter (12)**
7:18;9:17;10:6;11:7;12:24;50:21;54:22,23;56:9;63:3,5,11
**charge (1)**
36:7
**charges (1)**
33:7
**charging (2)**
30:22,23
**child (2)**
8:20;45:20
**chime (1)**
45:10
**choices (1)**
62:3
**choose (1)**
12:16
**circle (1)**
54:19
**civil (2)**
8:10,21
**claim (21)**
13:23;43:4,23;44:9,9;47:8,10;48:6,12,17,18,19;49:2,5,5,25,25;50:14,17;51:14;66:21
**claimant (3)**
48:9;49:3;50:11
**claimants (11)**
9:24;35:4,7;45:16,19;46:12,21;49:7,9;50:13;67:5
**claimant's (1)**
13:23
**claims (53)**
8:20,22;9:9,11,11;10:24;24:7;25:21;

30:23;31:5,6,7,8,15, 20,22;32:5,10,18,21; 33:24;34:19;35:6; 36:8,20;38:20;39:7; 40:4,11,12,25;42:16; 44:15,17;45:21; 46:10,15,19,23;47:5, 5,11,23;49:1;50:5,21; 51:4;55:8;66:5,17,18, 22,23
**clear (1)** 53:21
**clergy (3)** 9:13,14,16
**CLERK (17)** 5:4;6:2,15,17; 23:13;27:1;29:25; 30:2;38:23;41:8;51:8; 52:9;60:11,14;62:2, 24;67:11
**clerk's (1)** 62:24
**client (8)** 6:3,22;32:12,12; 35:14,19;61:23;63:22
**clients (1)** 13:3
**client's (1)** 46:11
**close (1)** 20:21
**closed (3)** 8:24;20:22;23:16
**closely (1)** 41:24
**closure (1)** 20:23
**cloud (1)** 26:17
**clue (1)** 31:9
**cluttered (1)** 59:10
**cocounsel (4)** 5:16,21;61:7,14
**Code (2)** 8:21;16:15
**codified (1)** 8:21
**colleagues (2)** 13:15;63:2
**colloquy (2)** 51:10;52:17
**comfortable (1)** 47:15
**coming (6)** 19:3,6;22:3;47:16; 64:17;65:25
**comma (1)** 19:21
**commence (1)** 10:4
**comment (8)** 7:22;13:8;14:23; 19:22;27:11;33:16; 52:11;66:3
**comments (4)** 28:24;51:19;65:4, 11
**commit (1)** 63:20
**commitment (1)** 13:2
**committee (19)** 10:14,18,19,23; 11:2;14:17;16:12; 24:24;26:3,4;33:5; 42:15;48:10;51:1; 52:18;60:2;65:16,22, 24
**committees (4)** 16:12;24:24;65:16, 24
**communicated (1)** 64:14
**community-service (1)** 8:8
**companies (1)** 10:14
**company (1)** 39:19
**compare (1)** 30:25
**compared (1)** 49:3
**compensation (1)** 55:8
**competitive (1)** 33:1
**complain (2)** 27:20;36:15
**complaint (3)** 39:19;50:14;53:3
**complaints (5)** 8:25;31:4;34:25; 35:2;50:10
**complete (3)** 33:7;64:24;66:19
**completely (3)** 44:22;48:13;53:14
**complex (1)** 34:19
**complexity (2)** 40:20;67:2
**complicated (4)** 30:20;35:9;40:23; 55:25
**compliment (2)** 22:22;23:15
**complimented (1)** 11:16
**comprehensive (1)** 7:17
**concern (4)** 20:2;22:4;25:4; 30:10
**concerned (3)** 14:25;19:23;42:6
**concerns (3)** 15:9;16:1;65:8
**conclude (1)** 67:15
**concluded (2)** 47:12;67:19
**condone (1)** 25:10
**conduct (1)** 26:16
**conducting (1)** 57:23
**confer (2)** 15:11,18
**conference (8)** 54:23,24;61:20; 62:25;63:4,6,12,24
**conferences (1)** 63:3
**confess (1)** 53:17
**confidentiality (5)** 34:24;35:11;47:6, 12;48:9
**confidentially (1)** 31:25
**confirmed (1)** 38:1
**confirming (1)** 40:11
**confusion (3)** 24:9;47:3;48:3
**congestion (1)** 56:12
**connection (3)** 33:11;39:7;64:15
**consider (2)** 23:16;29:16
**consideration (1)** 32:5
**consistent (7)** 6:1;49:17;52:23,24, 25;53:12,19
**consult (2)** 65:22,24
**consumed (1)** 56:2
**contact (1)** 62:16
**contain (1)** 37:20
**contest (1)** 12:23
**context (1)** 11:25
**continue (2)** 58:19;60:4
**continued (4)** 60:19,20,21;61:24
**control (1)** 37:25
**convenient (1)** 58:11
**convicted (2)** 26:7,9
**cooperative (1)** 27:24
**coordinated (1)** 9:1
**copies (1)** 17:19
**copy (2)** 20:14;24:2
**corporation (2)** 5:16;8:2
**correctly (2)** 46:1;66:20
**cost (4)** 33:14;34:10,13,15
**costs (1)** 51:24
**counsel (15)** 5:9,10;7:4,5;9:8; 31:13;34:5;35:3; 52:15;59:14;60:2; 65:9,20,25;66:11
**counseled (1)** 64:22
**counsels' (1)** 5:12
**County (2)** 9:2,3
**couple (2)** 12:9;47:23
**course (12)** 16:23;26:13;29:19; 33:5;39:25;51:15; 54:5;55:6,9;58:7; 62:18;66:10
**Court (170)** 5:3,4,7,8,17,22;6:1, 9,16,18,21;7:1,5,11, 15;8:11;9:2,4,8; 10:25;11:14;13:15; 15:14,16,21;16:3,6,8; 17:5,13,18,22,25; 18:3,13,25;19:3,5,11, 14,16;20:3,5,13,16; 21:3,6,21;22:6,19,21; 23:6,25;24:2,14,19; 25:5,22;26:6,21;27:2, 6;28:6,9,12,19,22; 29:4,19;30:1,3,8,10, 17,19;32:1;33:10,21; 35:17,18,25;36:2; 37:3,7,9,21,23;38:2, 11,14,24;39:14,17; 40:12,14,18;41:9,12, 15;42:5,9,14,20,23; 43:18;44:1,3,3,6,18, 23;45:7,22;46:6,8,19; 47:20;49:16,21;50:8, 25;51:3,9;52:6,10; 53:5,24;54:2,9,17,21; 55:2,19;56:15,19,23; 57:12,17,19,22;59:14, 24;60:6,9,13,16;61:9, 12;62:3,6,8,18,20,23; 63:1,10,11;64:4,6,12, 17,18;65:2,6,12,14, 14;66:2,16;67:12
**courthouse (1)** 9:24
**courtroom (2)** 27:4;57:14
**Courts' (1)** 66:25
**court's (3)** 42:12;59:25;60:23
**cover (1)** 61:8
**coverage (1)** 47:9
**covered (2)** 17:11;22:23
**covers (1)** 38:2
**COVID (2)** 45:15;58:24
**created (1)** 8:24
**credible (1)** 25:7
**credibly (1)** 25:2
**credit (1)** 28:3
**creditor (1)** 67:2
**creditors (8)** 12:17,18;14:17,20, 21;39:9;65:16;66:7
**Creek (1)** 13:12
**crisis (1)** 45:25
**critical (1)** 10:15
**criticism (7)** 25:13;26:16,17; 34:8,18;39:19;54:3
**cross-examination (1)** 58:13
**crowd (2)** 55:21,23
**crowds (2)** 55:25;57:14
**curia (1)** 6:24
**currently (1)** 10:9
**cushion (1)** 51:25
**custodial (1)** 16:18

## D

**data (1)**
32:8
**date (27)**
35:6;42:4,5,9,10;45:14,21;46:10,18,20,24;47:1,2,11;49:1;51:4;54:15;60:22;61:5,6,17;64:9,15,16;65:15;66:17,23
**dates (6)**
9:11;28:17;60:10,25;63:21;66:23
**dawned (2)**
25:6,9
**day (15)**
7:3;10:15;11:19,21,22,23,23;26:5;55:12,15,19;61:17,19,22;63:13
**days (8)**
12:3;20:23;21:5;54:22;55:5;56:1;63:20;64:9
**deadline (6)**
20:25;44:9;46:15;47:16;50:21;63:20
**deadlines (2)**
10:24;47:23
**deal (14)**
7:23;14:13;15:1,2;34:22,24;37:24;39:9,10,24;42:9;48:14;54:3;63:24
**dealing (6)**
14:11;37:17;44:15;53:15;67:2,4
**deals (1)**
32:14
**dealt (1)**
25:2
**debate (2)**
48:17;49:2
**debt (1)**
28:3
**debtor (39)**
5:11,15,21;6:24;7:4,25;8:3;9:1,8,19,21,25;10:13,16,20;14:22;16:11;19:22,25;20:7,20,21;24:5;25:7;28:16;33:5;40:16,20;48:3,9,19;52:17;60:24;63:15,19;64:16,21;65:22;66:6
**debtor-in-possession (1)**
21:11
**debtor's (3)**
7:2;51:5;65:20
**decades (1)**
7:13
**deceased (1)**
9:16
**December (2)**
8:24;45:14
**decide (1)**
52:23
**decision (4)**
10:4;32:13;48:11;66:1
**decisions (1)**
13:9
**declarant (1)**
7:3
**declaration (8)**
7:17;8:10;9:19;11:17;18:9;36:6,23;44:20
**declarations (1)**
7:3
**dedicated (4)**
54:22;55:12;56:6;60:23
**deductibles (1)**
40:10
**default (1)**
59:19
**defenses (1)**
13:23
**defer (2)**
5:10;36:22
**deficient (1)**
48:13
**definitely (1)**
59:13
**definition (1)**
66:25
**definitions (1)**
66:24
**deliberate (1)**
14:15
**demonstrate (1)**
49:4
**Dennis (1)**
5:5
**deny (2)**
34:14;47:15
**depositories (1)**
21:11
**depository (1)**
21:15
**deputy (1)**
27:4
**describe (1)**
31:18
**described (5)**
12:1;23:1;38:21;40:25;47:25
**descriptions (1)**
47:7
**designate (1)**
20:21
**designated (1)**
20:23
**designation (1)**
20:24
**despite (1)**
66:24
**detail (4)**
27:15;28:2;40:6;50:2
**detailed (1)**
40:22
**Deutch (3)**
7:7;38:1;39:18
**developed (1)**
26:2
**development (1)**
8:5
**deviations (1)**
36:25
**differ (1)**
31:5
**difference (2)**
41:17,18
**differences (1)**
53:7
**different (15)**
15:6;23:22;26:7,14;27:13;31:14;34:16;36:4;47:2,23;48:14;49:22;57:5;58:17;61:18
**differently (1)**
13:11
**difficult (3)**
10:4;49:8;52:14
**diocese (5)**
11:1;12:2,4;31:13;58:7
**diocese/archdiocese (1)**
10:6
**dioceses (1)**
9:19
**direction (1)**
8:4
**disadvantage (1)**
13:21
**discharge (2)**
43:14;45:4
**disclosed (1)**
41:23
**discovered (1)**
45:19
**discovery (2)**
45:17,18
**discuss (2)**
15:9;63:23
**discussed (4)**
16:1;38:25;57:25;65:7
**discussing (2)**
34:14;65:9
**discussion (2)**
23:21;65:20
**dismiss (1)**
63:16
**disposed (1)**
60:20
**dispute (1)**
35:24
**disputes (3)**
33:10;38:3;53:8
**dissimilar (1)**
47:24
**distinguish (1)**
46:1
**distinguished (1)**
19:19
**District (2)**
13:14;50:19
**districts (1)**
50:20
**disturbing (1)**
32:20
**dive (1)**
11:11
**divided (1)**
11:12
**division (1)**
10:11
**docket (13)**
16:22;17:16,20;18:19,20,21,24;19:1,6;20:12;23:20;24:12;42:12
**document (1)**
18:16
**documents (1)**
54:7
**Doe (3)**
32:3;35:1;50:10
**dollar (1)**
52:3
**dollars (4)**
27:18;34:13;36:9,16
**dollars' (1)**
51:23
**done (3)**
21:5;59:7;64:13
**Donlen (1)**
32:25
**doubt (1)**
35:1
**down (6)**
17:13;18:14;46:7;48:16;51:11;63:25
**drafter (2)**
53:19,20
**drill (1)**
11:21
**driven (1)**
66:6
**due (7)**
9:22;39:11;43:2,19,22;45:4;48:21
**duty (1)**
37:17
**dwell (1)**
14:5

## E

**earlier (1)**
33:17
**early (6)**
11:5;12:4;48:16;50:22;56:1;65:11
**easier (1)**
27:7
**edition (1)**
5:8
**effect (2)**
22:13;35:16
**efforts (3)**
9:4,18;20:20
**Efremsky's (1)**
57:22
**eight (1)**
27:17
**eighty-eight (1)**
8:6
**either (5)**
20:22;45:1;57:8,9;60:21
**elaborate (1)**
51:13
**else (5)**
13:4;35:5;51:25;52:5;65:4
**embarrassed (1)**
8:15
**embodied (1)**
24:8
**emotions (1)**
27:15
**employ (1)**
10:16
**employed (1)**
34:5
**employee (1)**
27:18
**employees (2)**
26:13;28:16
**employment (3)**
35:16;36:11;39:17
**end (8)**
9:25;17:1;19:17;20:1;22:4;24:17;34:12;35:20
**ended (3)**
32:24,25;52:1
**endemic (1)**
66:12
**endless (1)**
48:17
**enormous (1)**
12:16
**enough (8)**
15:8;17:19;21:21;37:1,2;49:16;50:5;

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 73 of 83

61:7
**ensure (1)**
9:25
**entire (2)**
27:17;58:23
**entitled (4)**
24:7;25:10,21;26:8
**equivalent (1)**
48:7
**essentially (1)**
63:4
**establish (1)**
11:3
**estate (2)**
32:14;56:4
**estimate (1)**
30:12
**estimated (1)**
36:24
**estimating (1)**
51:23
**evaluate (1)**
50:5
**even (17)**
18:9;25:9,12,21;30:15;31:5;34:14;35:10;36:5,20;45:13;48:1;57:19;58:3,14;66:18,20
**everybody's (2)**
11:3;37:23
**everyone (4)**
5:7;10:21;13:3;27:10
**evidentiary (1)**
58:12
**exact (2)**
38:5;44:12
**exactly (6)**
33:15,15,18,20;42:3;44:11
**examiner (2)**
65:21,23
**example (1)**
27:22
**except (1)**
28:24
**exception (1)**
37:15
**exciting (1)**
14:10
**Excuse (4)**
6:15;17:17;60:19;62:24
**Exhibit (4)**
18:8,10,15;19:2
**existing (5)**
27:21;34:25;40:3,8,15
**exit (1)**
63:13
**expand (1)**
42:20
**expect (3)**
52:24;55:4;61:13
**expected (2)**
40:18;41:4
**expecting (1)**
57:4
**expects (1)**
65:14
**expedited (2)**
13:6;61:3
**expense (1)**
48:3
**expensive (1)**
35:9
**experience (9)**
25:5;31:2,21;32:6,11,16;38:8;55:10;64:22
**experienced (1)**
64:22
**explain (3)**
42:4,8;43:18
**explaining (2)**
46:17;53:17
**explanation (6)**
36:24;38:16,25;40:19;42:6;46:18
**explanations (1)**
39:21
**explicitly (1)**
20:1
**explore (1)**
21:19
**exposure (1)**
12:6
**expressly (1)**
20:8
**extend (2)**
46:12;64:6
**extended (1)**
45:15
**extensive (1)**
43:7
**extent (4)**
11:15;14:2;25:22;65:23
**extremely (2)**
32:19;43:11

**F**

**facial (1)**
49:4
**fact (5)**
13:24;32:20;33:22;36:16;47:4
**facts (1)**
11:16
**fails (1)**
50:1
**fair (7)**
25:18;37:1,2;53:6,6;66:13,14
**fairly (1)**
13:20
**faith (3)**
8:6;21:4;37:16
**faithful (1)**
10:2
**familiar (2)**
12:7;50:9
**fan (4)**
48:10,21;58:14;63:1
**far (4)**
9:10,18;50:4;57:2
**fashion (1)**
27:10
**Father (4)**
6:7,9,17,23
**favorable (1)**
58:21
**fee (4)**
29:6;35:13;65:21,23
**feedback (1)**
58:17
**feel (2)**
8:14;47:10
**fees (7)**
35:15,21,21,22,24;38:3,3
**Felderstein (1)**
5:14
**felon (3)**
26:7,8,9
**few (3)**
12:3;14:19;57:16
**fiduciary (1)**
37:17
**fifteen (4)**
21:5;27:18;31:14;49:23
**fifteen-day (1)**
20:25
**file (19)**
28:16,20;34:5;37:13;42:16;44:9;46:14;47:2,10,17;50:13;51:19;52:2;60:25;63:15,18;64:7,19;66:21
**filed (21)**
6:25;8:25;9:17,21;10:7,16;13:24,25;14:1;32:1,3,3;35:1;37:23;46:22,23;47:5;48:6,12;57:3;66:18
**filing (6)**
15:19;16:22;17:8;36:23;59:3;64:6
**final (4)**
54:15,17;59:22;60:21
**finality (2)**
43:14;50:22
**finally (1)**
20:10
**financial (2)**
7:10;9:21
**find (3)**
8:13;18:13,16
**fine (11)**
8:16;21:6;22:6,21;28:22;34:9;42:7;52:16;56:22;61:14;63:17
**finish (1)**
46:17
**finite (1)**
35:7
**fire (4)**
12:19;42:23;48:1,7
**firm (2)**
7:6;10:7
**first (23)**
6:5;7:3;9:24;10:14,15;11:19,21,23,23;12:2;14:12;16:10;24:3;29:1;34:15;41:16;42:14;51:2;53:1,12;56:5;63:13;65:13
**Fitzgerald (1)**
5:14
**five (1)**
60:6
**fix (2)**
52:19;61:21
**fixing (1)**
53:16
**flexibility (1)**
59:13
**focus (2)**
54:9;66:4
**focused (1)**
19:17
**focuses (1)**
49:24
**focusing (1)**
54:10
**follow (1)**
17:6
**following (1)**
24:4
**follows (1)**
24:5
**footer (1)**
19:12
**footers (1)**
17:20
**forbid (1)**
13:18
**form (4)**
16:24;24:9,12;54:11
**formal (1)**
51:19
**formality (1)**
29:21
**forward (2)**
25:23;54:18
**foundational (1)**
10:1
**four (2)**
16:9;59:16
**fourth (3)**
11:23;17:11;20:10
**FR (1)**
6:20
**frame (1)**
15:22
**framed (1)**
16:4
**framing (1)**
15:19
**FRANCISCO (18)**
5:1,6,8,15;7:6;8:1;9:3;10:3;32:24;43:5;58:2,4,6,7,10,10,11,22
**frankly (2)**
27:7;58:15
**free (1)**
25:24
**Friday (2)**
55:16;57:8
**front (2)**
46:19;63:10
**frustration (1)**
34:17
**fulfilling (1)**
48:20
**fulfills (1)**
10:1
**function (2)**
27:6;67:1
**functionally (2)**
25:17,19
**fund (1)**
16:17
**further (4)**
25:22;34:14;40:12;55:6
**future (3)**
44:19;59:19;62:12

**G**

**Gaspari (10)**
7:6,12,14;35:2;45:7,10;50:9;58:5;67:13,18
**Gaspari's (1)**
44:20
**gatekeeper (1)**
67:9
**gave (5)**
18:6;21:3;32:12,12;41:4
**general (2)**
6:24;13:8
**Generally (3)**

10:12;53:24;54:19
**gets (7)**
10:18,18;25:18; 32:1;35:17;48:22; 49:23
**gist (1)**
30:16
**given (3)**
9:9;15:7;52:21
**gives (1)**
60:1
**glad (1)**
33:25
**global (1)**
10:12
**goals (3)**
11:4;14:3;48:20
**God (1)**
13:18
**goes (3)**
38:17;47:1;54:17
**Good (18)**
5:7,19,22,24;7:14; 15:8,22;21:4,21; 22:25;32:14;33:1; 34:12;47:9;55:14; 59:23;63:23;67:9
**governing (1)**
40:16
**grant (2)**
51:15;64:8
**granted (9)**
22:20;23:17;28:8, 23;30:4;49:19,20; 51:9;52:10
**great (3)**
39:25;56:14,16
**gross (1)**
37:15
**ground (1)**
22:23
**guess (10)**
13:16;18:5;25:16; 29:21;30:8;34:6; 48:25;49:19;51:6,11
**guessing (1)**
13:15
**guidelines (1)**
35:13

**H**

**half (2)**
9:13,14
**Hampton (1)**
5:20
**hand (17)**
6:11;11:18;20:13; 23:9,13;26:23;29:22; 30:2;38:17,23;41:6,8; 45:7,8;51:4;67:7,11
**handed (1)**
36:11
**handle (3)**
32:7;56:13;59:11
**handled (2)**
31:24;59:9
**handling (4)**
10:9;11:12;32:6; 39:12
**hands (6)**
21:1;23:12;26:25; 38:22;41:9;52:8
**hang (1)**
58:4
**happen (1)**
60:3
**happened (3)**
32:21;44:11;47:7
**happening (2)**
45:24;54:4
**happens (1)**
56:10
**happy (2)**
29:2;35:18
**hard (5)**
20:14,24;24:2;39:6; 54:6
**hard-copy (1)**
18:6
**harm (1)**
45:20
**hate (3)**
47:21;49:21,21
**head (1)**
50:9
**heard (13)**
23:7,10;26:23; 29:12,17,23;38:19; 41:6;51:4;52:6;59:4; 65:7;67:7
**hearing (12)**
6:5;21:19;29:23; 54:15;58:13,21; 59:22;60:7,18;61:24; 65:19;67:15
**hearings (7)**
55:7;57:8,23;58:1, 9;60:4;61:6
**Heath (1)**
48:11
**heavy (2)**
55:16,24
**help (2)**
9:20;39:13
**helpful (5)**
7:19;11:25;15:20; 17:3;64:18
**helping (1)**
11:18
**here's (1)**
42:9
**hesitation (1)**
46:9
**hidden (1)**
18:12
**high (2)**
27:14;36:17
**highest (1)**
27:18
**himself (1)**
15:25
**hire (1)**
32:13
**hiring (2)**
32:24,25
**historical (2)**
9:11;11:16
**history (1)**
27:15
**hit (1)**
43:8
**Hold (1)**
17:25
**holding (1)**
67:3
**home (2)**
57:24;58:11
**homes (1)**
48:2
**Honor (101)**
5:13,19,24;6:6,15, 20,22;7:14,24,25; 8:18;10:5;11:4,8; 15:10,17,24;16:9,22, 25;17:2,10,11,24; 18:8,20,22;19:1,10; 20:6,10,19,24;21:13, 14,23;22:12;23:2,13, 19,23;24:11,16;25:1, 19;26:1,5,20;27:1; 28:5,11,25;29:14,25; 30:5,15,18;31:17; 32:17;33:3;35:12; 37:2,12;38:23;39:3; 40:2;41:8;43:2;44:4, 12;45:11,13;46:16; 47:14;49:15;50:4,24; 51:8,18;52:9;54:14; 55:3,15;56:14;57:2; 59:12,21;60:11;61:4; 62:2,24;63:7;64:3; 65:5,10;66:1,14; 67:11,16,17,18
**Honorable (1)**
5:4
**Honor's (1)**
64:7
**hook (1)**
50:5
**hope (4)**
13:3;30:13;36:13; 49:11
**hopefully (1)**
11:6
**horrific (1)**
9:20
**hour (2)**
27:19;65:9
**hours (2)**
59:10;61:13
**housekeeping (1)**
7:23
**hundred (2)**
21:17;55:22
**hundredth (1)**
11:22
**hurry (1)**
17:23
**hybrid (2)**
57:13;58:14

**I**

**idea (4)**
16:2;36:11;42:9; 55:4
**identified (2)**
22:8;29:8
**ignore (1)**
25:11
**impact (2)**
40:12,24
**impacts (1)**
40:3
**impediment (1)**
12:22
**importance (1)**
39:23
**important (7)**
6:5;31:22;32:8; 35:10;39:10;43:11,15
**importantly (1)**
14:18
**impossible (1)**
48:20
**impression (1)**
53:9
**incidental (2)**
66:7,8
**inclined (1)**
48:5
**include (3)**
16:23;35:17;37:15
**includes (1)**
6:23
**including (7)**
10:13;14:10;16:14; 22:16;28:16;29:6; 36:25
**incorporated (1)**
8:2
**incredible (1)**
25:8
**indemnification (6)**
37:8,15,19,21,22; 38:4
**indemnity (1)**
37:12
**indicated (3)**
17:7;22:15;28:8
**indiscernible (9)**
17:18;18:1;21:5,20; 36:20;44:5;47:20; 53:23;61:10
**individual (1)**
7:1
**individuals (3)**
7:11;8:5;14:21
**industry (1)**
38:8
**inform (2)**
64:5;65:13
**informal (1)**
53:15
**informally (1)**
10:22
**information (11)**
9:10;10:20;11:24; 27:21,23;28:18; 31:24;32:19;39:12; 47:8;50:5
**informative (1)**
7:20
**informing (1)**
67:14
**in-house (1)**
7:4
**initial (2)**
10:16;64:16
**initiating (1)**
65:20
**in-person (3)**
57:13;58:21;62:17
**input (2)**
26:3,4
**insensitive (1)**
14:24
**inserted (1)**
25:3
**instances (1)**
14:13
**instead (1)**
19:20
**institution (1)**
21:1
**insurance (12)**
10:14,20;40:2,3,13, 15,20,25;41:6;47:9; 50:6,11
**insurers (1)**
50:6
**integral (1)**
31:23
**intended (1)**
26:1
**interest (3)**
24:25;46:11,12
**interested (1)**
14:25
**interfere (1)**
61:25
**interim (15)**
16:21,21;17:2;20:8; 22:1,9,18;28:7,15;

39:4,14;55:7,7;60:20, 21
**interrupt (2)** 8:11;28:13
**interruption (1)** 27:2
**interview (2)** 10:17;64:16
**into (10)** 11:11;21:25;32:5; 35:6;40:5;42:14; 45:18;47:16;63:20; 66:6
**introduce (1)** 6:3
**introduction (2)** 5:11;7:22
**introductions (1)** 6:13
**invested (1)** 16:17
**investment (4)** 16:16,16;21:16; 22:15
**invitation (1)** 55:2
**involve (2)** 9:14;12:15
**involved (2)** 12:5;14:8
**involvement (1)** 14:16
**irrespective (1)** 45:21
**issue (11)** 21:16;26:14;37:11, 12;39:14,19;42:4; 43:20;44:12;62:25; 66:1
**issued (2)** 6:2;7:1
**issues (4)** 12:7;15:19;29:17; 38:9
**items (1)** 17:7

**J**

**January (1)** 8:19
**Jason (5)** 5:24;21:13;22:12; 28:13;65:10
**job (5)** 12:24;15:22;27:7; 32:14,23
**joined (1)** 6:17
**joint (1)** 9:1
**Joseph (1)** 7:2
**Journal (3)** 42:25;43:9;48:23
**Judge (12)** 10:11;11:24;14:20; 42:1;53:7;57:7,12,13, 22,25;58:15,23
**judges (1)** 12:11
**judgment (4)** 36:9,10,22;53:2
**judicial (1)** 27:5
**July (1)** 40:16
**June (2)** 40:16;45:16
**jurisdiction (7)** 33:10;35:23,24; 36:2;37:24;38:3;43:5

**K**

**Katz (71)** 5:17,19,20,22; 11:11,17,20;12:10; 14:4;15:10,13,16,17, 24;16:7,9;17:10,16, 21,24;18:2,5,8,17,20, 22,24;19:1,4,10,13, 15,17;20:4,6,15,17; 21:20,22,23;22:15,25; 23:1,2,9,14,19;24:3, 15,21;25:17,19;27:3, 11;28:5,7,10,22,25; 34:5;40:5;46:5;54:6; 55:18;56:17;58:5; 59:18;65:3,5;67:12, 17
**keep (8)** 6:12;22:24;31:4; 48:25,25;50:23; 53:13;55:14
**keeping (2)** 36:7;52:13
**kind (15)** 6:4;7:19;11:14; 32:25;38:2;40:25; 47:25;48:21;54:19; 55:20,21;57:13;59:3; 65:11,18
**kinds (2)** 50:12;66:12
**knew (5)** 30:13;32:10;41:2,2, 3
**knocked (1)** 46:7
**known (4)** 25:7;31:4;49:6; 64:19
**knows (8)** 30:22;32:5,15; 33:25;34:1;36:13,18; 50:11

**L**

**label (1)** 21:11
**labels (1)** 63:25
**Lafferty (3)** 42:1;57:13;58:15
**language (6)** 16:19;17:1;19:8; 24:11,21;26:2
**large (1)** 35:13
**last (8)** 9:15;18:15;26:22; 30:9;61:19,19;65:9; 67:6
**later (6)** 7:8;9:7,25;43:13; 46:22;47:2
**law (8)** 15:1;26:12;43:21; 44:9,24;53:1;57:10; 58:23
**lawsuits (2)** 9:22;32:2
**lawyer (1)** 52:24
**lawyers (5)** 27:8;30:22;35:14; 45:15;61:23
**laypersons (1)** 14:18
**lead (1)** 31:13
**leadership (2)** 8:4,5
**leaks (1)** 31:25
**learn (2)** 11:24;14:12
**learned (1)** 53:1
**learning (1)** 40:22
**least (7)** 6:7;13:17;28:7; 50:15;58:18;59:1,19
**left (1)** 30:13
**legal (3)** 8:10;34:5;50:10
**legislature (2)** 44:16,24
**legislatures (1)** 45:23
**lender (1)** 56:5
**length (1)** 51:6
**less (1)** 27:14
**letting (1)** 57:18
**life (1)** 49:8
**likely (4)** 7:25;9:6;56:2;66:9
**limit (2)** 37:20;55:21
**limitation (3)** 25:15;45:11;46:2
**limitations (11)** 8:20,23;9:16;43:20, 23;44:6,16,21;45:6; 46:3;50:16
**line (2)** 5:16;42:1
**lines (1)** 19:18
**list (5)** 6:10;22:10;28:16; 29:3,4
**listed (1)** 21:10
**listen (1)** 43:18
**listening (1)** 8:16
**lists (2)** 43:10,11
**litigation (1)** 7:5
**little (11)** 7:8;9:7;12:14;17:7; 19:5;21:4;27:12;28:1; 44:13;49:23;51:24
**live (2)** 57:17;58:1
**loaned (1)** 12:18
**long (4)** 7:12;9:16;50:23; 58:5
**longer (1)** 12:11
**longtime (1)** 27:4
**long-time (1)** 12:10
**look (8)** 18:15;19:7,8;24:20; 30:17;33:19;36:4; 61:20
**looking (7)** 17:5,6;19:15;24:15; 37:5;54:10;62:7
**lookout (1)** 6:12
**looks (1)** 22:24
**Lorena (1)** 27:3
**Los (1)** 43:8
**lot (21)** 12:6,25;14:9;15:8; 22:23;27:7,15,20; 28:1;31:1,3;35:4; 49:23;50:2;53:18; 55:9;56:3,3,12,25,25
**lots (1)** 14:14
**lousy (1)** 13:2
**lucky (1)** 49:18

**M**

**mailing (4)** 43:10,10,11;46:20
**main (1)** 16:9
**maintain (3)** 34:24;35:10;40:21
**major (1)** 12:14
**makes (1)** 49:8
**making (8)** 12:21;15:25;24:10; 25:2,20;31:23;36:7; 61:21
**manageable (1)** 35:10
**management (2)** 15:12;29:9
**managers (1)** 16:17
**many (5)** 7:13;8:9;26:2; 27:13;59:7
**margin (1)** 22:8
**mass (1)** 12:19
**massive (1)** 48:22
**matter (4)** 5:5;59:8;64:20; 65:7
**matters (9)** 7:23;14:4,11,13; 15:3;38:20;56:3;59:9, 10
**may (12)** 10:7;13:25;18:12; 21:1;25:12;45:21; 60:3,3;65:11,21,23; 66:17
**maybe (6)** 13:19;18:9;40:6; 43:8;47:18;59:2
**mean (20)** 7:22;25:19;41:3; 42:21,24;44:6;45:22;

46:12;47:20;51:13,15;53:24;56:4,25;59:22;61:12,12,14,20;66:16
**means (2)** 9:18;60:24
**meant (1)** 66:3
**meanwhile (1)** 26:12
**mechanism (1)** 25:23
**Mediation (7)** 9:4;10:13;11:3,5,6;12:5;14:16
**mediator (2)** 11:3;12:3
**meet (2)** 15:11,17
**meeting (5)** 10:17;14:19,21;61:5;64:15
**mega (3)** 31:1;66:25;67:1
**members (3)** 9:13,14,16
**memorialized (1)** 54:11
**mention (2)** 37:13;57:17
**mentioned (2)** 11:10;14:15
**mentioning (1)** 55:14
**merits (1)** 13:23
**met (1)** 30:19
**metaphor (1)** 13:2
**metropolitan (1)** 13:13
**mic (1)** 45:9
**might (14)** 7:8;17:3;21:18;26:8;32:17;33:17;43:4,4,5;46:19;56:19;57:1;59:18,23
**miles (1)** 31:14
**mill (1)** 40:21
**mind (6)** 17:25;31:11,12;48:25;50:23;53:14
**mindful (1)** 52:15
**minds (1)** 63:9
**minority (1)** 50:20
**minute (2)** 8:11;17:14
**minutes (1)** 59:9
**misconduct (1)** 37:16
**missed (1)** 31:10
**missing (1)** 18:5
**mistaken (1)** 25:14
**modeled (1)** 41:19
**moderator (1)** 6:24
**modest (2)** 31:9;51:14
**modified (2)** 23:17;28:24
**moment (4)** 5:10;17:6;23:23;24:17
**money (11)** 12:18;30:21;31:9,9;36:18;42:24;43:1;48:21;52:2;66:9,19
**monitor (1)** 41:24
**monitoring (1)** 14:19
**Montali (1)** 5:5
**month (4)** 33:24;34:13;36:9;61:19
**monthly (4)** 33:4,9;35:21,22
**months (4)** 14:1;34:15;36:15;46:13
**moral (1)** 10:1
**more (25)** 13:1,19;14:15,18;27:14;34:25;35:10;37:5;39:22;40:6,23,23;49:8,9;50:13;52:2;53:3;58:2;62:14;64:5,10;65:6;66:9,10;67:1
**morning (5)** 15:11,18,25;56:18,20
**most (4)** 12:11;14:13;39:10;42:6
**mostly (1)** 40:13
**motion (66)** 7:3;16:5;18:10;19:1,2;23:5,8,16,17,20,21;24:6;26:22,23;27:12;28:23,23;29:8,9,9,13,15,20,24;30:6,24;31:10;34:14;37:22;38:19;39:2;40:2;41:7,10,19,20,25;42:2,2,16;46:22,23;47:2,15,17;51:5,9,23;52:2,7,16,17,21,21,23,25;53:4,23;54:13;55:8,8,9;57:3,5,10;59:4
**motions (18)** 7:23;10:15;11:11,13,21;15:5,7,12,12;29:1;49:19;53:12;55:4,7;56:25;59:4,23;60:19
**motion's (1)** 30:3
**move (9)** 13:5;21:1;23:5,10,20;29:2;39:25;46:25;61:17
**moves (2)** 12:21;13:4
**moving (6)** 12:12;21:23;45:11,24;46:10;52:22
**much (9)** 11:25;14:5,15;31:4;33:14,24;42:3;49:13;59:6
**Mullin (1)** 5:20
**must (3)** 30:10,21;48:9
**myself (1)** 37:5

## N

**name (4)** 6:10;32:2,3;63:24
**names (4)** 31:24;32:19;41:22;47:6
**narrow (1)** 41:25
**national (2)** 43:7;49:10
**native (1)** 13:10
**nature (1)** 20:9
**Nearly (2)** 9:13,14
**necessary (5)** 14:10;47:8;49:8;64:18;65:23
**need (18)** 6:11;7:8,16,19;14:6;21:19;29:11;34:9;36:21;39:13;45:9;51:16;54:15,23;55:5,12;64:10,24
**needs (3)** 31:6;64:1,2
**negligence (1)** 37:16
**negotiate (1)** 42:15
**new (3)** 24:16,21;49:7
**newspapers (2)** 43:8,10
**next (10)** 23:5,20;29:2,4;40:1;41:14;42:4;54:16;59:15;61:17
**Nice (2)** 7:15;17:18
**nicely (1)** 10:21
**nobody (1)** 53:15
**nobody's (1)** 37:22
**nondebtor (1)** 19:25
**nondebtors (1)** 19:22
**nor (1)** 13:16
**normal (3)** 27:10;55:16;57:10
**Northern (2)** 13:13,14
**Norwich (2)** 32:17,21
**notice (15)** 30:15;33:6;37:23;39:5,11;41:13;42:11,19;43:12,13;45:3;46:21;47:1;48:4,4
**noticed (1)** 6:6
**notices (3)** 42:17;43:10;48:24
**noticing (5)** 7:7;10:24;30:6;31:22;34:19
**not-quite-as-long (1)** 27:5
**Novack (1)** 57:8
**Novak (1)** 10:11
**Novak's (1)** 57:12
**Novato (1)** 13:12
**nuisance (1)** 58:15
**number (6)** 16:25;17:1;18:19,20;19:12;39:24
**numbers (1)** 31:1
**numerous (1)** 8:6

## O

**Oakland (12)** 10:10;11:1;13:15,25;25:14;33:16,19;38:6;41:18,20;49:12;57:23
**Oakland-Oakland (1)** 57:8
**object (2)** 16:15;24:25
**objected (1)** 15:5
**objection (10)** 15:19;20:11;21:8;22:9,16;25:4,6;29:21;37:14;51:20
**objections (1)** 53:15
**objects (1)** 50:1
**obligation (1)** 28:20
**obligations (1)** 10:1
**obtain (1)** 10:14
**obvious (3)** 27:25;47:23;58:2
**obviously (5)** 14:25;39:25;42:5;53:14;66:5
**occur (2)** 11:22,22
**occurred (2)** 10:25;58:3
**o'clock (2)** 61:11,11
**October (3)** 60:15,22;62:11
**off (1)** 8:15
**office (6)** 10:9;38:13;51:19;62:25;65:19;66:25
**Oklahoma (1)** 58:4
**old (2)** 33:1;40:13
**Omni (11)** 7:7;32:20,25;33:1,4,11;34:8,18;35:17;39:5,18
**once (2)** 11:3;43:9
**one (46)** 10:7;11:4;13:19;14:3;16:25;17:3;18:13,17;19:5;21:10,12;23:13;24:10;25:8,

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 77 of 83

15,18;26:7,8;27:11;29:16;30:2;32:18;37:4;38:23;39:3,10;40:5;41:8;42:6;43:1;49:23;51:2,8,18;52:14;54:24;55:22;57:3,9,15;59:8,21;61:4;64:5;65:6;67:11
**ones (3)** 28:8;41:1;64:20
**one's (1)** 11:23
**only (7)** 20:9;24:6,7;28:8;37:15;39:9;57:15
**oOo- (1)** 5:2
**open (6)** 37:5;44:21;47:23;49:1;59:6,7
**open-ended (1)** 29:6
**opening (2)** 7:22;11:8
**operate (1)** 8:8
**operating (2)** 33:9;35:22
**opioid (1)** 45:25
**opponents (1)** 64:2
**opportunity (2)** 11:24;14:12
**opposition (1)** 29:16
**option (2)** 55:15;57:16
**order (50)** 5:3;6:2;7:1;10:6;11:9;16:21,21,24;17:2,15;21:3;22:1,10;23:3;24:9,12;25:1,22;28:15;29:5,5,20;30:3;33:4,9,19;35:23;37:20;38:2,6,6,7,9;39:4,15;40:1,8,11,12;46:20;52:15,19,23,24;53:5,19;54:11,13,18;63:12
**orders (4)** 52:19;53:11,16,18
**ordinary (2)** 55:9;66:10
**organization (1)** 30:21
**organizations (2)** 8:8,9
**Ori (1)** 5:19
**others (4)** 9:25;10:2;11:17;14:18
**otherwise (5)** 16:15;24:25;25:21;43:12;49:4
**ourselves (1)** 21:3
**out (31)** 6:8;11:6;12:8;13:1;22:3;23:15;25:17;30:13;31:13;33:2;34:6;39:6;42:17;43:4;44:13;45:19;46:20,25;47:1,11;48:4,22;50:9,23;51:20;53:7;57:4;58:4;59:18;60:1;61:1
**outlined (2)** 8:9;9:18
**over (13)** 8:1;10:7;11:10;12:3;14:20;15:13;18:12;26:2;32:21;33:10;37:6;38:3;44:13
**overflow (1)** 55:23
**override (1)** 50:19
**oversight (2)** 21:9;22:11
**overwhelmed (1)** 54:5
**owed (1)** 66:19

**P**

**page (12)** 16:22;17:3,4,8,17,17;18:22,23;19:12,13;24:13,16
**paid (10)** 25:11,12,12;26:13;27:16,18;28:16,17;33:11;36:3
**papers (1)** 7:25
**Parada (14)** 23:11;26:25;27:4;29:22;38:17;41:5;51:7;52:8;55:20;59:14;60:9,17;62:1,16
**paragraph (18)** 17:2,4;19:15,18;20:1,11;21:8;22:2,4;24:12,15,17,22;25:1,2;28:14;40:9;51:21
**paragraphs (2)** 20:19;21:24
**parish (1)** 43:10
**parishes (1)** 8:6
**parking (1)** 12:25
**part (8)** 10:19;11:5;27:23;35:14;36:18;42:2;43:15;47:15
**participate (1)** 10:16
**participating (1)** 67:14
**particular (5)** 13:22;19:8;32:10;38:9;64:14
**particularly (5)** 14:4;45:23;53:17;56:1,24
**parties-in-interest (2)** 10:13;11:2
**parts (1)** 39:10
**party (4)** 24:25;29:23;33:6;52:22
**party-in-interest (1)** 16:13
**Pascuzzi (110)** 5:13,13,14;6:1,6,13,14,19,22;7:21,24;8:17,18;12:14;14:15;15:4,10,15;18:21,23,24;24:1;27:3;29:14,14;30:5,5,9,15,18;31:12,17;34:4,21;35:12;36:1;37:2,4,8,10;38:12,14,21,24;39:3,16,22;40:1,15;41:9,11,13,16;42:8,22;43:1,25;44:2,4,11,19;45:2;46:9,16;47:21;49:15,18;50:3,24;51:1,5,18;52:12;53:22;54:1,8,14,20;55:1,3;56:14,16,22;57:2,21;59:12,17,21,25;60:8,16;61:4,11;62:3,5,7,16,19,22;63:2,7;64:3,5,13;65:1,3;66:3,14;67:12,16
**Passarello (11)** 7:2,16;8:10;9:19;11:16;18:9;30:20,20;33:22,23;36:6
**passed (1)** 44:10
**past (1)** 49:4
**Patrick (2)** 6:7,23
**Paul (3)** 5:13;7:6,7
**Paula (1)** 7:4
**pause (1)** 23:23
**pay (5)** 8:15;40:9;50:7;51:22;56:7
**paycheck (2)** 25:13;26:8
**paying (4)** 33:24;36:8,15,17
**payment (1)** 25:24
**payments (5)** 24:6,25;25:2,20;33:8
**payroll (7)** 15:12;25:9;26:7,10,15;27:17,21
**pays (1)** 26:15
**peeves (1)** 39:20
**pending (5)** 9:1;10:10;25:22;31:14;40:11
**people (12)** 8:12,13;11:21;12:16;14:24;26:15;27:6,17;32:22;42:18;43:22;53:10
**per (2)** 33:24,24
**percent (1)** 21:17
**perfectly (2)** 22:21;51:12
**perhaps (4)** 26:16;27:13;56:3;59:16
**period (6)** 19:20;45:11,17,18;48:19;49:1
**perpetrators (2)** 25:3;41:22
**person (8)** 25:8,11,12;26:16;44:8;57:16,17;66:20
**personally (2)** 12:13;56:19
**pet (1)** 39:20
**petition (3)** 40:11;64:9;65:14
**PG&E (5)** 12:14;38:7;42:24;47:22,22
**philosophy (1)** 49:13
**pick (1)** 60:25
**place (1)** 53:12
**placed (1)** 51:10
**places (2)** 13:18;61:15
**plaintiff (1)** 32:3
**plaintiffs (1)** 57:1
**plan (12)** 11:7;14:16;40:11;46:14;52:5;63:14,14,14,16,18,20;66:10
**planning (1)** 8:4
**play (2)** 12:20;48:8
**played (1)** 12:14
**players (1)** 14:16
**plays (2)** 10:21;12:7
**please (5)** 6:8;15:16;18:19;23:11;41:5
**pleased (1)** 16:2
**pleasure (1)** 12:20
**plural (1)** 65:17
**Plus (2)** 33:14;39:6
**PM (2)** 5:1;67:19
**point (15)** 11:18;12:6,25;17:11;26:6,11;36:19;40:19;54:17;58:16;59:8;60:3;63:7,9;65:18
**pointed (1)** 13:1
**points (2)** 16:9;17:7
**policies (3)** 37:10;50:6;64:7
**pool (1)** 16:16
**pooled (1)** 22:15
**Portland (1)** 12:4
**possible (7)** 9:9;11:6;13:17;38:10;43:12;45:4,5
**possibly (1)** 40:24
**post (1)** 59:17
**posted (1)** 60:23
**post-petition (2)** 19:20,24
**potentially (2)** 20:25;21:2

**practice (2)**
58:23,23
**Prada (1)**
67:9
**pre (1)**
19:24
**pre- (1)**
40:10
**precipitated (1)**
40:4
**prediction (1)**
55:24
**prefer (4)**
55:15,17;58:18;
62:4
**prejudice (2)**
24:22;47:15
**prepare (1)**
11:18
**prepared (3)**
23:2;49:3;63:13
**preparing (1)**
15:8
**pre-petition (5)**
19:19;25:20;51:14,
22,24
**preserved (1)**
22:17
**presided (2)**
12:3;14:20
**presiding (1)**
5:5
**press (1)**
49:10
**pressing (1)**
63:19
**presumably (1)**
61:23
**presume (5)**
27:23;29:12;45:24;
46:1;56:25
**presumption (2)**
48:12;49:24
**pretty (5)**
14:9,9,10;42:2;
49:13
**preventing-a-race-to-the-courthouse (1)**
9:23
**preview (1)**
48:5
**previously (3)**
8:22;9:13,15
**pride (1)**
12:12
**primary (2)**
7:3;8:3
**principal (4)**
5:9;27:8;61:14,23
**principle (1)**
48:15
**prior (2)**
9:4;21:5
**priority (2)**
24:7;25:21
**probably (8)**
18:9;21:19;34:4,13;
55:9,24;64:10;65:14
**problem (7)**
6:21;9:20;18:14;
22:25;27:12;47:16;
52:19
**problems (1)**
67:2
**procedurally (1)**
13:17
**Procedure (1)**
8:22
**procedures (15)**
10:24;11:4;13:20;
37:11;39:7;41:13,17;
42:16;46:19,23;47:5,
11;55:8,8;64:8
**proceeding (1)**
9:2
**proceedings (1)**
67:19
**process (15)**
10:19;14:16;31:19;
32:9,23;33:1;39:11;
43:2,19,22;45:4;
47:12;48:21;61:25;
65:15
**professional (1)**
34:7
**professionals (3)**
10:16,19;55:9
**program (3)**
40:2;41:7;52:7
**programs (1)**
40:20
**promise (2)**
36:23;58:20
**promised (1)**
30:3
**proof (7)**
20:22;48:6,17,18;
49:2,25;50:13
**proper (3)**
39:11,11;67:1
**properly (2)**
19:19;31:25
**proposals (1)**
32:13
**proposed (14)**
5:21;7:7,9;16:15;
17:15;18:6;24:9,12;
28:15;33:3;34:5;
52:15;53:11,18
**protection (1)**
56:6
**protects (1)**
26:13
**provide (7)**
8:3;20:22;28:15;
35:14;37:21,21;47:5
**provided (2)**
35:19;51:19
**provides (3)**
33:4,9;40:9
**provision (4)**
25:3;37:19,25;40:8
**provisions (3)**
24:22;37:20;47:13
**public (3)**
27:6,25;34:2
**publicly (1)**
41:23
**publish (2)**
42:18;43:9
**publishing (1)**
43:7
**pull (2)**
18:4;23:24
**punt (1)**
26:2
**punting (1)**
22:14
**purpose (1)**
50:3
**purposes (2)**
22:18;39:11
**pursuant (2)**
24:6;25:1
**put (19)**
10:2,24;29:5;30:17,
19;31:12;40:8;43:16;
45:8;47:6;48:2;53:2;
54:7,12,13;59:5,5;
61:1;66:6
**puts (1)**
11:25
**putting (1)**
60:18

**Q**

**qualified (1)**
21:10
**quarter (2)**
33:24;36:9
**questionnaire (1)**
48:7
**quick (3)**
50:21;65:11,18
**quickly (1)**
20:18
**quite (2)**
7:20;46:17

**R**

**Rafael (1)**
13:11
**raise (8)**
6:11;22:16;23:9;
26:23;51:4,16;67:7,7
**raised (9)**
16:1;23:13;25:4;
29:22;30:2;38:23;
41:5,8;67:11
**range (1)**
9:12
**rather (2)**
54:10;56:6
**read (12)**
21:7;28:14;37:10;
40:23;49:10;52:19,
22;53:10,11,18;54:5,5
**reading (1)**
53:18
**reads (1)**
19:18
**ready (7)**
6:11;11:3,5;15:9;
23:4;35:3;55:22
**real (2)**
52:16;56:4
**realize (1)**
22:22
**really (18)**
19:7,17;29:4;35:5;
38:9,15;39:9,12;
42:18;50:3,20;54:24;
56:12;59:12;63:12,
25;64:3;67:1
**reason (10)**
31:21;33:18;43:2;
49:16;58:20,20;60:1;
61:1;62:14;63:5
**reasonable (1)**
20:20
**reasons (5)**
27:25;35:11;47:24;
57:24;58:2
**recently (1)**
27:16
**recited (1)**
16:19
**recognize (1)**
27:9
**recognized (1)**
26:24
**recognizing (2)**
36:25;59:3
**record (11)**
16:11,20;20:7;
23:18;27:25;28:24;
34:2;39:1;51:10;
59:15;60:17
**recorded (1)**
19:19
**redlined (2)**
21:25;23:3
**reference (1)**
53:22
**referring (1)**
52:13
**regard (1)**
37:14
**regarding (2)**
23:8;65:20
**regardless (1)**
45:5
**relates (1)**
19:22
**relating (1)**
45:20
**relatively (1)**
20:18
**relevant (1)**
66:16
**relief (9)**
10:15;20:8;22:18;
41:21;49:5;56:8;57:1,
3;60:20
**religious (1)**
10:6
**rely (1)**
32:7
**remedy (2)**
35:9;53:2
**Remember (4)**
11:20;48:10,11;
63:11
**reminded (1)**
52:12
**reminding (1)**
38:14
**reminds (1)**
66:3
**remote (2)**
5:8;62:13
**rendered (1)**
66:20
**reopen (1)**
44:2
**reopened (3)**
8:19;44:17;45:6
**reopening (2)**
9:15;44:12
**reorganize (1)**
9:21
**repeated (2)**
7:20;11:15
**rephrase (1)**
34:23
**report (6)**
12:5;16:2;29:12;
35:18,22;63:22
**reported (1)**
33:8
**reports (1)**
33:9
**repose (4)**
44:7;46:2,4,6
**representative (1)**
7:6
**representatives (3)**
5:11;6:3;14:22
**request (4)**
41:20,22;53:20;
62:17
**requested (3)**
51:24;52:25;59:21
**requesting (1)**

33:6
**requires (1)**
15:2
**reservation (2)**
25:17;26:18
**reservations (1)**
36:21
**reserve (1)**
16:13
**reserved (1)**
37:23
**reserves (1)**
35:23
**reserving (1)**
36:2
**resolution (3)**
16:3,7;23:14
**resolve (2)**
25:4;26:4
**resolved (8)**
16:2;23:21;24:3;28:4,6;41:1,2;53:8
**resources (1)**
8:4
**respect (2)**
16:5;32:4
**respectful (1)**
48:15
**respective (1)**
20:21
**response (3)**
6:2;23:7;29:13
**responsibilities (1)**
27:23
**responsibility (2)**
11:12;29:7
**responsible (1)**
6:25
**result (1)**
20:25
**retains (2)**
33:10;37:24
**retentions (1)**
40:10
**retract (1)**
48:4
**review (4)**
33:10;34:11;36:3;37:21
**reviewed (1)**
9:9
**revise (1)**
20:20
**revised (1)**
21:25
**revisit (2)**
50:22;63:8
**revived (2)**
8:22;44:17
**rhetorical (2)**
33:21,23
**Richter (1)**
5:20
**rid (1)**
44:21
**right (30)**
5:7;8:17;16:11;17:16,24;20:13,16;24:6;25:11,18;29:19;32:22;34:9;37:9;39:16;40:14,16;41:15;42:11;44:8,15,18;46:8,18;50:6;51:7;54:13;61:21;63:9;67:12
**rights (4)**
16:14;22:16;24:23;37:23
**Riley (1)**
7:9
**Rios (1)**
5:14
**ripe (1)**
45:21
**risk (2)**
12:17,18
**role (3)**
8:3;12:14,21
**Roman (8)**
5:5,15;7:25;8:6;10:3,8,9;12:2
**room (1)**
21:4
**Rosa (22)**
10:10;11:1;14:1;25:15;31:20;32:10,24;33:14,15,19;38:6;41:18,18;42:3,10;46:22;47:18;55:10;56:24;57:3,7,9
**routine (4)**
14:9;29:9;57:23;59:4
**rule (2)**
49:7;50:19
**ruled (1)**
42:1
**run (5)**
16:23;20:17;36:18;40:21;47:16
**running (2)**
21:3;23:3
**run-of-the-mill (2)**
56:4,8
**runs (1)**
36:8
**rush (1)**
18:11

S

**Sacramento (2)**
10:9;43:22
**sake (1)**
63:3
**same (14)**
13:20;16:4;20:22;26:21;28:3;29:10;32:23;33:20;38:5;41:19;49:13;61:2,16;62:18
**SAN (19)**
5:1,6,8,15;7:6;8:1;9:3;10:3;13:11;32:24;43:5;58:1,4,6,7,9,10,10,22
**sandwich (1)**
27:16
**sandwiched (1)**
18:10
**Santa (22)**
10:10;11:1;13:25;25:15;31:20;32:9,24;33:14,15,19;38:5;41:17,18;42:3,10;46:21;47:18;55:10;56:24;57:3,7,9
**satisfied (7)**
23:14;26:17,18;36:8;38:12,16;41:4
**satisfies (1)**
50:15
**saw (2)**
7:25;40:23
**saying (1)**
60:5
**scary (1)**
54:12
**schedule (3)**
29:6;54:22;61:2
**scheduled (2)**
9:6;66:20
**schedules (5)**
10:15;64:7,19,24;66:18
**scheduling (1)**
62:12
**school (2)**
43:11;53:1
**schools (1)**
8:7
**screen (7)**
14:8;18:5,18;19:3,7;45:9;67:13
**seal (1)**
41:22
**second (11)**
13:15,16;17:8;18:4,13,17;19:5;31:15;56:5;62:9;65:18
**secondly (1)**
25:9
**Section (3)**
8:22;16:14;22:17
**securities (3)**
21:18;22:8,14
**seem (1)**
14:24
**seems (4)**
9:16;30:25;51:12;58:9
**sees (1)**
48:23
**select (1)**
11:2
**selected (1)**
9:5
**selecting (1)**
32:9
**selection (1)**
38:20
**self- (1)**
37:16
**self-insured (1)**
40:10
**sell (1)**
63:16
**send (2)**
42:17;43:10
**sending (1)**
48:3
**sense (3)**
31:7;34:20;66:8
**sensitive (2)**
39:12;45:23
**sensitivity (2)**
39:23,24
**sentence (1)**
24:17
**separate (1)**
16:17
**separately (1)**
63:5
**September (10)**
59:23;60:7,11,14,21,22;61:5;62:10,11;64:11
**serve (2)**
12:3;27:10
**served (1)**
33:4
**service (1)**
66:19
**services (2)**
8:5;33:11
**session (1)**
5:4
**set (16)**
9:3,6;33:15,16,18;39:4;42:10;46:18,24;54:15;55:17,19;57:8;61:2;62:20;63:5
**setting (2)**
63:2;64:15
**seven (1)**
60:6
**several (2)**
45:12;61:13
**sexual (2)**
8:20;45:20
**Sheppard (1)**
5:20
**shop (1)**
27:16
**short (3)**
15:22;22:23;49:1
**short-term (3)**
58:19;59:3;62:12
**show (1)**
49:9
**showed (1)**
57:15
**showing (1)**
57:15
**shown (1)**
35:21
**side (1)**
67:3
**significant (4)**
32:11,15;37:20;66:8
**significantly (1)**
57:4
**silent (1)**
19:24
**similar (4)**
14:3;25:16;36:22;38:6
**similarly (1)**
33:17
**simple (2)**
13:21;27:14
**simpler (2)**
12:25;36:5
**simply (1)**
49:24
**situation (5)**
9:23;21:2;32:20;33:3;46:13
**six (3)**
36:15;46:13;59:16
**skip (1)**
37:6
**skis (1)**
44:13
**slightly (1)**
19:8
**slow (2)**
17:13;19:5
**slowly (1)**
21:1
**small (2)**
27:16;39:24
**so-called (2)**
28:3;58:14
**social (1)**
8:7
**sole (2)**
5:16;8:3
**soliciting (1)**
65:15
**solved (2)**
22:25;52:18
**somebody (15)**
32:15;34:9;36:3,14,

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 80 of 83

15,17;43:4,12;52:18;53:2;54:10;59:6;60:24;63:17;66:19
**somebody's (1)** 32:2
**someone (3)** 13:10,12;50:1
**something's (1)** 53:8
**sometimes (4)** 11:21,22;63:12,15
**somewhat (2)** 29:9;50:19
**soon (2)** 47:16;51:1
**Sorry (4)** 8:17;12:5;28:13;62:5
**sort (5)** 26:1;45:14;58:25;65:25;66:1
**sought (2)** 20:8;53:3
**sound (1)** 58:17
**speak (1)** 20:2
**special (2)** 55:5,15
**specially (1)** 62:21
**specifically (2)** 24:15;40:9
**speculate (2)** 45:1;46:4
**speculated (1)** 55:20
**spend (4)** 15:8;29:11;43:1;52:1
**spending (1)** 42:24
**spent (4)** 30:21;36:18;48:22;58:23
**spiritual (1)** 8:4
**spoke (1)** 22:4
**spread (1)** 27:24
**staff (4)** 6:12;27:3;50:10;58:1
**stage (1)** 42:14
**staggering (1)** 31:8
**stand (1)** 64:24
**standard (2)** 38:8;63:11
**start (2)** 31:18;35:3
**starting (4)** 16:22;17:16,17;24:13
**state (5)** 7:5;9:8;43:20;44:9;49:5
**statement (10)** 6:4;11:9,14;14:7;16:10,20;20:7;24:4,5,10
**statements (2)** 12:9;39:1
**States (11)** 5:25;14:21;15:5;16:12;21:14;22:13,16;24:23;28:14;46:6;65:15
**stating (1)** 60:17
**status (13)** 8:10;54:23,23;61:20;62:25;63:3,4,5,12,22,24;65:11,18
**statute (19)** 8:19,23;9:15;43:20,23;44:6,7,16,21;45:5,12,18;46:1,2,3,4,5;50:16,16
**statutes (1)** 45:16
**statutory (5)** 8:23;16:12;24:7,8,23
**stay (5)** 8:13,16;56:8;57:1,3
**step (1)** 25:23
**sticking (1)** 49:13
**still (8)** 25:10;26:8;34:21;36:21;46:9,14;58:6;67:13
**Stockton (1)** 10:8
**stop (2)** 9:20;47:22
**store (1)** 64:23
**strategy (1)** 63:14
**Street (3)** 42:25;43:9;48:23
**strength (1)** 13:22
**stroke (1)** 12:13
**struck (2)** 21:7;40:24
**structure (1)** 12:22
**stuff (2)** 42:15;50:12
**styled (1)** 60:19
**sub (1)** 63:17
**subject (5)** 23:10,16;49:11;51:10,17
**sublender (1)** 56:5
**submit (3)** 52:24;53:5,10
**subset (1)** 45:16
**substantial (3)** 32:6;33:12;57:5
**successful (2)** 12:6;13:5
**successfully (1)** 13:5
**sue (1)** 53:1
**suffered (2)** 13:11,12
**sufficient (2)** 33:12;46:21
**suggested (1)** 36:20
**suggesting (1)** 25:16
**suggestion (2)** 36:4;50:18
**summary (1)** 28:17
**Summerhayes (1)** 6:23
**Summerhays (4)** 6:7,9,17,20
**Superior (2)** 9:2,3
**supervision (1)** 33:13
**supplement (1)** 37:14
**supplemental (1)** 36:6
**support (1)** 8:4
**suppose (1)** 11:17
**supposed (1)** 34:1
**Supreme (1)** 46:6
**sure (13)** 12:21;13:4,17;21:17;31:23;32:14,22;33:20;36:7;45:3;54:2;58:13;64:1
**surprise (2)** 37:9,10
**surprised (2)** 12:1;49:2
**survivor (8)** 13:18,19;31:23;32:19;39:12;47:4,10;53:23
**survivors (7)** 10:2;12:17;47:6;51:11;52:7;66:5,11
**suspect (1)** 35:4
**system (2)** 12:21;26:12

## T

**tab (2)** 17:14;18:11
**tailored (1)** 38:9
**talk (4)** 14:6;15:25;51:16;55:5
**talked (2)** 16:10;56:17
**talking (5)** 14:12;30:14;47:22;49:6;51:6
**target (1)** 45:11
**team (1)** 6:22
**technical (1)** 58:16
**telling (1)** 17:15
**temptation (1)** 54:12
**ten (1)** 59:9
**tentative (1)** 15:7
**terms (4)** 31:1;35:15;38:5,7
**terribly (1)** 45:11
**territory (1)** 8:9
**testimony (1)** 58:13
**that'll (1)** 21:18
**therefore (1)** 14:2
**there'll (3)** 36:23;55:6,7
**thinking (5)** 15:7;21:14;49:11;59:22;60:8
**Third (1)** 20:6
**thirty (2)** 10:5;64:8
**Thomas (1)** 27:4
**though (6)** 25:12;31:5;35:10;36:20;41:20;58:3
**thought (6)** 20:17,24;42:13;47:18;53:15;64:16
**thousands (1)** 48:1
**three (16)** 13:18;20:23;31:13,14,18;34:15;36:21,21;59:9,15;60:1,4,6;62:8,9;63:20
**three- (1)** 45:17
**three-year (2)** 8:24;45:17
**THURSDAY (9)** 5:1;56:10,11;59:1,1,5,20;62:10,11
**Thursdays (6)** 55:17;56:14,16;59:15;62:8,9
**times (3)** 45:12;56:1;57:16
**timing (1)** 64:15
**Tobin (2)** 7:5;9:8
**today (10)** 14:5,11,11,24;15:2;22:20;26:10;43:8;55:21;60:20
**together (3)** 10:24;43:16;54:7
**told (2)** 14:11;29:20
**tolling (1)** 45:16
**took (1)** 32:20
**tort (2)** 12:20;47:25
**touch (1)** 59:18
**toward (1)** 33:7
**trace (3)** 19:18,23,25
**tracing (1)** 22:5
**track (2)** 19:24;31:4
**tradition (1)** 54:9
**traditional (3)** 11:19;50:16;62:14
**traffic (1)** 57:11
**tragedies (1)** 12:16
**transactions (1)** 19:20

**transfers (1)** 19:24
**treated (5)** 9:24;13:11,20; 31:24;66:10
**treating (1)** 33:17
**treatment (1)** 16:15
**trial (5)** 9:3,5,6;35:2,3
**trouble (1)** 35:8
**true (1)** 29:10
**trust (6)** 10:2;26:11;32:7; 36:10;53:11,19
**Trustee (20)** 5:25;10:17;14:21; 15:5;16:12;21:14; 22:13;23:9;24:23; 27:22;29:17;33:5; 35:13;37:13;52:4,11, 17;64:23;65:15;66:24
**Trustee's (5)** 20:11;22:9,16; 38:13;51:19
**try (2)** 53:10,13
**trying (4)** 12:20;17:5;18:16; 22:23
**turn (8)** 8:15;13:23;15:4,12; 17:4;30:6;45:9;51:2
**turning (1)** 20:10
**turns (1)** 57:4
**tweak (1)** 59:21
**twenty-nine-part (1)** 48:7
**two (29)** 9:3,5;13:14;14:1; 15:5,9,11;17:1;23:22; 24:11;27:5;29:1; 31:13;32:10;41:17; 49:12,19;59:1,2,2,9, 16;60:5,5,13;61:15; 64:22;65:11;66:23
**types (2)** 31:21;32:7
**typical (1)** 9:17
**typo (3)** 29:6,7;30:11

**U**

**unchanged (1)** 21:24
**uncomfortable (1)** 8:14
**under (8)** 16:14;22:17;25:13; 26:16;32:3;35:13; 52:25;66:10
**understandable (3)** 21:7;35:1;51:12
**Understood (5)** 44:18;50:24;54:8, 14,14
**unequivocal (1)** 24:4
**unexpected (1)** 55:10
**unimpaired (1)** 66:9
**unique (2)** 50:19;56:4
**United (11)** 5:25;14:20;15:5; 16:12;21:14;22:13, 16;24:23;28:14;46:6; 65:15
**universe (2)** 31:3;35:7
**unless (9)** 15:5;29:11,20; 31:10;33:17;52:4; 55:10;57:4;60:25
**unlike (1)** 12:18
**unrelated (1)** 25:13
**unsuccessful (2)** 9:5;13:6
**unusual (2)** 28:1;34:7
**up (36)** 9:25;11:12;16:4; 18:4,18;19:3,6;22:24; 23:12,24;24:7;26:25; 29:2;32:24,25;33:15, 16,18;38:18;39:4; 41:9;43:13;45:7,8; 47:23;49:9;50:6; 51:22,25;52:1,8;53:8; 55:11;57:15,15;59:10
**upcoming (1)** 55:4
**update (1)** 63:10
**uploaded (1)** 23:4
**uploading (1)** 16:24
**upsetting (1)** 32:20
**USA (1)** 43:8
**use (1)** 20:20
**used (3)** 19:6;34:18;58:6
**useful (1)** 7:20
**using (1)** 36:10
**usually (1)** 10:21
**utilities (4)** 29:8,10,18,24
**utility (1)** 29:12

**V**

**vacate (1)** 47:17
**vacated (2)** 46:22,23
**validity (2)** 48:12;49:25
**various (2)** 7:23;40:20
**veterans (1)** 12:10
**via (3)** 8:20;23:21;24:3
**vicar (1)** 6:24
**victims (6)** 12:19,19,20;42:23; 48:1,8
**view (4)** 12:25;39:11;58:16; 66:22
**views (1)** 14:24
**violate (1)** 26:12
**Virtually (1)** 32:2
**virtue (1)** 45:15
**vis-a-vis (1)** 27:6
**visibility (2)** 27:14;33:7

**W**

**wage (4)** 23:20;26:23;27:12; 28:23
**wages (3)** 16:5;23:5;29:9
**wait (5)** 14:14;17:17,25; 42:20;56:8
**waiting (1)** 46:14
**waiver (1)** 24:22
**walk (1)** 16:3
**Wall (3)** 42:25;43:9;48:22
**Walnut (1)** 13:12
**wants (5)** 25:23;52:22;54:10; 56:5;60:24
**wash (1)** 13:1
**waste (1)** 18:16
**watching (1)** 64:23
**way (20)** 7:18,22;10:12;12:7; 15:6;25:16,18;26:11; 27:2;30:19;32:8,9; 33:1,15,16;46:6; 48:14;54:3;61:2; 64:25
**Wayne (2)** 7:8,9
**ways (1)** 23:22
**weakness (1)** 13:22
**Wednesday (5)** 57:9;61:22;62:1,10, 10
**weeks (10)** 14:19;48:16;59:2, 16,16,16;60:1,5,5,13
**Weintraub (2)** 7:5;9:8
**Weitz (3)** 7:8,9;34:12
**Welcome (6)** 5:8;7:11;8:13;13:2; 53:14,14
**well- (1)** 64:21
**weren't (1)** 47:24
**what's (7)** 29:4;31:11;33:13; 34:9;39:8;63:10;66:6
**Whereupon (1)** 67:19
**whole (4)** 19:6;28:1;31:3; 35:6
**who's (2)** 6:23;27:15
**whose (1)** 27:18
**who've (1)** 10:2
**wiggle (1)** 21:4
**willful (1)** 37:16
**willing (1)** 48:25
**Willoughby (1)** 5:14
**window (1)** 8:24
**windows (1)** 6:7
**wish (5)** 7:21;39:17;59:4; 65:7;67:6
**wished (1)** 23:7
**wishes (4)** 26:22;27:22;29:23; 59:6
**wishing (1)** 41:6
**within (4)** 20:23;31:14;36:9; 43:5
**without (6)** 24:22;30:13;34:14; 37:22;47:11,15
**without-a-budget (1)** 29:7
**won (1)** 33:1
**wonder (3)** 21:9;25:8;48:23
**word (1)** 30:13
**words (4)** 19:21;44:8;53:25; 60:7
**work (13)** 10:23;11:1;21:4; 31:3;39:5;53:7;54:6; 55:18;56:17;59:11, 18;61:1,3
**worked (2)** 39:6;51:20
**working (3)** 9:20;23:9,15
**world (1)** 48:23
**worried (2)** 43:22;64:25
**worry (1)** 64:21
**worrying (1)** 51:15
**worth (2)** 51:15,24
**writing (1)** 15:19
**written (1)** 21:25
**wrong (2)** 49:12;66:4
**wrote (3)** 22:7;29:5;49:23

**Y**

**year (4)**
9:7;36:3;45:18;53:1
**years (3)**
8:2;10:7;49:23
**Yep (2)**
31:17,17
**yesterday (2)**
9:4;35:3

**Z**

**Zoom (4)**
55:22;57:13;58:19;62:13

**1**

**1 (4)**
18:8,10;26:16;40:16
**1:30 (9)**
59:5,15;60:11,14,15,21;62:10,11,11
**1:31 (1)**
5:1
**10 (2)**
61:11,11
**10,000 (2)**
34:15;51:22
**10,000- (1)**
52:2
**100,000 (1)**
34:13
**11 (11)**
7:18;9:17;10:6;11:7;12:25;50:21;54:22,23;63:3,5,11
**12 (1)**
60:15
**12/31 (1)**
45:21
**12th (2)**
60:23;62:11
**13 (2)**
17:8;56:9
**130 (1)**
26:15
**14 (1)**
60:7
**14th (6)**
59:23,23;60:11,21;62:10;63:8
**150 (1)**
8:2
**1854 (1)**
8:3
**1950s (2)**
9:12;43:3
**1980s (1)**
45:12

**2**

**2 (5)**
17:2,4;19:15;20:2;22:4
**2008 (1)**
9:12
**2014 (1)**
10:8
**2020 (1)**
8:19
**2022 (1)**
8:24
**2023 (1)**
5:1
**218 (4)**
8:21;9:9,10,22
**21st (1)**
64:11
**23-30564 (1)**
5:6
**23rd (1)**
9:4
**24 (1)**
5:1
**25 (2)**
19:18;20:12
**26 (1)**
19:18
**27th (3)**
62:1,5,11
**28th (4)**
60:14,22;61:5,21
**29 (1)**
16:22

**3**

**3:04 (1)**
67:19
**30 (7)**
17:3,17;18:20,22,23;19:13;45:16
**30th (1)**
40:16
**31 (2)**
24:13;45:14
**31st (1)**
8:24
**33 (1)**
24:16
**34 (1)**
24:16
**340.1 (1)**
8:22
**341 (4)**
10:17;61:5,24;64:15
**345b (2)**
16:14;22:17
**35 (4)**
16:23;17:3;19:13;20:11
**35c (1)**
21:8

**4**

**4 (1)**
17:14
**4,000 (1)**
51:23

**5**

**5 (1)**
40:9
**5,000 (1)**
52:1
**500 (3)**
36:16;39:9;42:17
**5108 (1)**
9:2
**537 (7)**
8:25;31:4;34:25;49:6,7;50:10,12

**7**

**7 (2)**
23:20;24:12

**8**

**80,000 (1)**
42:23

**9**

**9 (10)**
16:22;17:16;18:21,24;19:1;24:12,16,17;25:1;28:14

Case: 23-30564 Doc# 57 Filed: 08/31/23 Entered: 08/31/23 12:12:37 Page 83 of 83