# EXHIBIT B

1   ALEXANDER POTENTE (BAR NO. 208240)
    *alex.potente@clydeco.us*
2   JASON J. CHORLEY (BAR NO. 263225)
    *jason.chorley@clydeco.us*
3   CLYDE & CO US LLP
    150 California Street, 15th Floor
4   San Francisco, CA 94111 USA
    Telephone:    415-365-9800
5   Facsimile:    415-365-9801

6   Attorneys for Plaintiffs CENTURY INDEMNITY
    COMPANY, PACIFIC INDEMNITY COMPANY,
7   and WESTCHESTER FIRE INSURANCE
    COMPANY
8

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**07/28/2023**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

9           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                  **COUNTY OF SAN FRANCISCO**

11  CENTURY INDEMNITY COMPANY,           **Case No.:        CGC-23-607975**
    PACIFIC INDEMNITY COMPANY,
12  AND WESTCHESTER FIRE
    INSURANCE COMPANY ,                  **COMPLAINT FOR DECLARATORY**
13                                       **RELIEF AND REIMBURSEMENT**
                Plaintiffs,
14
        v.
15
    THE ROMAN CATHOLIC
16  ARCHBISHOP OF SAN FRANCISCO, a
    corporation sole, and DOES 1 through 50;
17
                Defendants.
18

19

20         Plaintiffs Century Indemnity Company, as successor to CCI Insurance Company, as

21  successor to Insurance Company of North America; Pacific Indemnity Company, and

22  Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance

23  Company for policies  JU835-8355  and JU895-0964 (collectively, "the Insurers") bring this

24  complaint for declaratory relief in their favor and against defendant The Roman Catholic

25  Archbishop of San Francisco (the "Archdiocese of San Francisco"), and in support of the

26  Complaint allege as follows:

27

28

## **NATURE OF THE ACTION**

1.      This is an action seeking declaratory relief for the purpose of resolving an insurance coverage dispute between the Insurers and Archdiocese of San Francisco with respect to hundreds of underlying lawsuits brought by alleged survivors of childhood sexual abuse under the California Child Victims Act, AB 218, codified as California Code of Civil Procedure § 340.1, et seq. (the "CCVA Claims"), more fully described below.  The Archdiocese of San Francisco, together with affiliated parishes and schools under its control, seeks defense and indemnity from the Insurers for the CCVA Claims under one or more insurance policies allegedly issued by the Insurers to the Archdiocese of San Francisco from 1951 to 1972, and 1981 to 1986. The Insurers seek a declaration that they have no defense or indemnity obligations under any of their insurance policies for the CCVA Claims or any other similar sexual abuse or molestation claims against the Archdiocese of San Francisco or any of its affiliates that claim insured status under the Insurers' insurance policies on the basis that CCVA claims either did not result from an occurrence or accident, did not result in bodily injury, or were expected or intended by the Archdiocese of San Francisco or its affiliates.

## **THE PARTIES**

2.      Plaintiff Century Indemnity Company ("Century") is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania, and is licensed to operate in the State of California.  Century's predecessor, Insurance Company of North America, issued primary and excess insurance policies to the Archdiocese of San Francisco under which the Archdiocese of San Francisco now seeks coverage for the CCVA Claims.

3.      Plaintiff Pacific Indemnity Company ("Pacific Indemnity") is a corporation organized under the laws of Wisconsin with its principal place of business in  New Jersey and is licensed to operate in the State of California.  Pacific Indemnity issued primary insurance policies to the Archdiocese of San Francisco under which the Archdiocese of San Francisco now seeks coverage for the CCVA Claims.

2

4.     Plaintiff Westchester Fire Insurance Company ('Westchester") is a corporation organized under the laws of Pennsylvania with its principal place of business in Pennsylvania and is licensed to operate in the State of California.  Westchester Fire Insurance Company is the successor in interest to policies JU835-8355 and  JU895-0964 issued by Industrial Underwriters Insurance Company, which issued excess insurance policies to the Archdiocese of San Francisco under which the Archdiocese of San Francisco now seeks coverage for the CCVA Claims.

5.     Defendant The Roman Catholic Archbishop of San Francisco is a corporation sole established by the Vatican in or about 1853, with its principal place of business in San Francisco, California.  The Archdiocese of San Francisco is made up of three counties:   San Francisco County, Marin County, and San Mateo County.  The Archdiocese of San Francisco controls and operates approximately 88 parishes, 120 schools, and one seminary.  The Archdiocese of San Francisco included The Roman Catholic Bishop of Oakland until its separation in or about January 13, 1962, The Roman Catholic Bishop of Santa Rosa until its separation in or about January 13, 1962, and The Roman Catholic Bishop of San Jose until its separation in or about 1981.

6.     The Insurers are ignorant of the true names and capacities of each of the defendants designated in this complaint as Does 1-50.  The Insurers are informed and believe and, on that basis, allege that each of the defendants sued as Does 1-50 is in some manner interested in the controversy alleged in this complaint.  Upon learning the true name and capacity of each of the Doe defendants, the Insurers will amend this complaint accordingly.

7.     The Insurers are informed and believe and thereon allege that at all times relevant hereto each of the defendants, including without limitation Does 1-50, was the agent, affiliate, officer, director, manager, principal, alter-ego or employee of the other defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship or employment and actively participated in, or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged herein, with full knowledge of all the facts and circumstances.

3

## JURISDICTION AND VENUE

8.    The Court has personal jurisdiction pursuant to Cal. Code Civ. Proc. § 410.10 over the Archdiocese of San Francisco and its affiliates residing in and conducting business in the State of California.

9.    This Court also has personal jurisdiction over the Insurers who, at all relevant times herein, were authorized to and did conduct business within the State of California.

10.   Venue is proper in this Court pursuant to Cal. Code Civ. Proc. § 395(a) and (b) because The Archdiocese of San Francisco is a resident of the County of San Francisco and the insurance policies were issued to the Archdiocese of San Francisco at 421 Church Street, San Francisco, California.

## FACTUAL ALLEGATIONS

### *The Insurance Policies*

11.   The Archdiocese of San Francisco alleges that Pacific Indemnity issued comprehensive liability policies to named insured "The Roman Catholic Archbishop of San Francisco, a Corporation Sole" as well as, among others, "all other corporations, companies, organizations, and/or other entities which are under the direct control and jurisdiction of The Roman Catholic Archbishop of San Francisco, a Corporation sole," for consecutive three-year policy periods from October 25, 1951 to October 25, 1954 (policy no. LAC 57120), October 25, 1954 to October 25, 1957 (policy no. LAC 76333), October 25, 1957 to October 25, 1960 (policy no. LAC 101275), October 25, 1960 to October 25, 1963 (policy no. LAC 127792), and October 25, 1963 to October 25, 1966 (policy no. LAC 155500) (collectively, the "Pacific Indemnity Policies").  For the Pacific Indemnity Policies allegedly in effect from October 25, 1951 to October 25, 1960, and from October 25, 1963 to October 25, 1966, no policies have been located and the terms and conditions relied upon in this Complaint are based on specimen policy forms that may or may not have been included with the Pacific Indemnity Policies.

12.   The Pacific Indemnity Policies provide coverage only pursuant to all of the terms, conditions, limitations, exclusions, and endorsements contained within the policies.

13.   Century, through its predecessor, issued comprehensive liability policies to named

insured "The Roman Catholic Archbishop of San Francisco, a Corporation Sole" as well as, among others, "all other corporations, companies, organizations, and/or other entities which are under the direct control and jurisdiction of The Roman Catholic Archbishop of San Francisco, a Corporation sole," for consecutive three-year policy periods from October 25, 1966 to October 25, 1969 (policy no. LAB 15766) and October 25, 1969 to July 8, 1972 (policy no. LAB 15802) (collectively the "Century Primary Policies"). The Century Primary Policies provide coverage only pursuant to all of the terms, definitions, conditions, limitations, exclusions, and endorsements contained within the policies.

14. Century, through its predecessor Insurance Company of North America, issued excess liability policies to named insured "The Roman Catholic Archbishop of San Francisco, a Corporation Sole" as well as, among others, "all other corporations, companies, organizations, and/or other entities which are under the direct control and jurisdiction of The Roman Catholic Archbishop of San Francisco, a Corporation sole," for consecutive three-year policy periods from October 25, 1966 to October 25, 1969 (policy no. XBC24296) and, as alleged by the Archdiocese of San Francisco, from October 25, 1969 to July 8, 1972 (policy no. unknown) (collectively the "Century Excess Policies"). The Century Excess Policies provide coverage only pursuant to all of the terms, definitions, conditions, limitations, exclusions, and endorsements contained within the policies.

15. Westchester, through its predecessor in interest on certain policies, Industrial Underwriters Insurance Company, issued excess liability policies to named insured "The Roman Catholic Archbishop of San Francisco, a Corporation Sole" as well as, among others, "all other corporations, companies, organizations, and/or other entities which are under the direct control and jurisdiction of The Roman Catholic Archbishop of San Francisco, a Corporation sole," for consecutive policy periods from July 8, 1981 to July 1, 1984 (policy no. JU835-8355), July 1, 1984 to July 1, 1985 (policy no. JU835-8355), and July 1, 1985 to July 1, 1986 (policy no. JU895-0964) (collectively the "Westchester Excess Policies").[1] The Westchester Excess Policies

---

[1] The Pacific Indemnity Policies, the Century Primary Policies, the Century Excess Policies, and the Westchester Excess Policies are collectively referred to herein as the "Insurer Policies."

provide coverage only pursuant to all of the terms, definitions, conditions, limitations, exclusions, and endorsements contained within the policies.

16. The Insurer Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, provide insurance coverage to the Archdiocese of San Francisco and certain of its affiliates for covered "accidents" or "occurrences," as those terms are defined in the Chubb Policies, resulting in bodily injury during specified policy periods. The Insurer Policies, however, do not cover liability for bodily injury that does not result from an "accident" or "occurrence," or that was either expected or intended by the insured. Moreover, the Insurer Policies do not cover liability for CCVA claims that do not result in bodily injury.

17. The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, provide insurance coverage for all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person.

18. The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, only apply to accidents or occurrences which take place during the policy period.

19. The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, limit the Insurers' liability as follows:

> The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person in any one occurrence; the limit of such liability stated in the declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more person in any one occurrence.

6

20.     The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, require that in the event of bodily injury, sickness or disease, including death at any time resulting therefrom, … written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable, and such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstance of such injury, the names and addresses of the injured and of available witnesses.

21.     The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, require that if claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representatives.

22.     The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, require that the insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits.

23.     The Pacific Indemnity Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, and to the extent they contain such language based on specimen forms, provide that the insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of injury.

24.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, provides coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury sustained by any person, and arising out of … all other operations of the insured."

7

25.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines bodily injury as "bodily injury, sickness or disease, including death at any time resulting therefrom, and, if arising from any of the foregoing, mental anguish."

26.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, only applies to "occurrences which happen during the policy period."

27.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines an "occurrence" as "an *accident* happening during the policy period or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* causes injury … All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  (Emphasis added.)

28.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, limits the Insurers' liability as follows:

> The limit of bodily injury liability so stated as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury sustained by one person as the result of any one occurrence; the limit of such liability so stated as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury sustained by two or more person in any one occurrence.

29.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "when an occurrence takes place, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably

obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured, and of any available witnesses."

30.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "if claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representatives."

31.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "the insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

32.     The Century Primary Policy in effect from October 25, 1966 to October 25, 1969 (policy no. LAB 15766), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "the insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to other as shall be imperative at the time of injury."

33.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, provides coverage for "all sums which the insured shall become legally obligated to pay as damages because of personal injury … to which this insurance applies, caused by an occurrence and arising out of … all other operations of the insured."

34.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines "personal injury" as "bodily injury and if arising from bodily injury, mental anguish."

35.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and

endorsements, defines "bodily injury" as "bodily injury, sickness or disease, sustained by any person."

36.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines an "occurrence" as "an injurious exposure to conditions, which results, during the policy period, in personal injury or property damage **neither expected nor intended** from the standpoint of the Insured."  (Emphasis added.)

37.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, only applies to "personal injury … which occurs during the policy period.

38.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, limits the Insurers' liability as follows:

> The limit of personal injury liability stated in the declarations as applicable to "each person" is the limit of INA's liability for all damages, including damages because of personal injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of INA for all damages because of personal injury sustained by two or more person as the result of any one occurrence shall not exceed the limit of personal injury liability as stated in the declarations as applicable to "each occurrence".

39.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "in the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured, and of available witnesses, shall be given by or for the Insured to INA or any of its authorized agents as soon as practicable."

40.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and

10

endorsements, requires that "if claim is made or suit is brought against the Insured, the Insured shall immediately forward to INA every demand, notice, summons, or other process received by him or his representatives."

41.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "the Insured shall cooperate with INA and, upon INA's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of personal injury or property damage with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses."

42.     The Century Primary Policy in effect from October 25, 1969 to July 8, 1972 (policy no. LAB 15802), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, requires that "the Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident."

43.     The Century Excess Policy in effect from October 25, 1966 to October 25, 1969 (policy no. XBC24296), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, agrees to "indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated … for damages, including damages for care and loss of services, because of personal injury, including death at any time resulting therefrom, sustained by any person or persons."

44.     The Century Excess Policy in effect from October 25, 1966 to October 25, 1969 (policy no. XBC24296), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines "personal injury" as "bodily injury, sickness, disease, disability, shock, mental anguish and mental injury."

45.     The Century Excess Policy in effect from October 25, 1966 to October 25, 1969 (policy no. XBC24296), subject to its terms, definitions, conditions, limitations, exclusions, and

11

endorsements, "applies only to occurrences happening anywhere during the policy period."

46. The Century Excess Policy in effect from October 25, 1966 to October 25, 1969 (policy no. XBC24296), subject to its terms, definitions, conditions, limitations, exclusions, and endorsements, defines "occurrence" as "an ***accident*** happening during the policy period or a continuous or repeated exposure to conditions which ***unexpectedly and unintentionally*** causes injury … All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Emphasis added.)

47. The Westchester Excess Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, agrees "to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated … for (a) Personal Injury Liability.'

48. The Westchester Excess Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, defines "personal injury" as "bodily injury, sickness, disease, disability, shock, mental anguish and mental injury."

49. The Westchester Excess Policies, subject to their terms, definitions, conditions, limitations, exclusions, and endorsements, defines "occurrence" as "an accident or happening or event or a continuous or repeated exposure to conditions ***which unexpectedly and unintentionally*** causes injury to persons or tangible property during the policy period. … All damages arising out of such exposure shall be considered as arising out of one occurrence." (Emphasis added.)

50. The Insurers started adding sexual molestation exclusions in their excess policies from 1986 forward and in their primary policies from 1988 forward.

51. The Insurers have been defending the Archdiocese of San Francisco under a full reservation of rights, in connection with certain CCVA Claims that allege sexual abuse during one or more of the Insurers' primary policy periods at issue, and are continuing to investigate and accept the defense of additional CCVA Claims contemporaneously with the filing of this Complaint. As part of the agreement to defend, the Insurers expressly reserved the right to recoup all defense costs and expenses associated with uncovered claims.

***Claims Against the Archdiocese of San Francisco***

52.     Governor Gavin Newsom signed California Assembly Bill 218 into law in October 2019.  That statute is called the California Child Victims Act (the "CCVA").  The CCVA allows survivors of child sexual assault to bring civil lawsuits arising out of their sexual assault until their 40th birthday, or within five years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual assault, whichever is later.

53.     The CCVA also opened a "revival window" during which all survivors (regardless of age) were permitted to file civil lawsuits.  This window opened on January 1, 2020, and closed on December 31, 2022.

54.     The Archdiocese of San Francisco has been named as a defendant in hundreds of lawsuits under the CCVA alleging childhood sexual abuse.  These lawsuits include claims of abuse by priests and clergy who served the Archdiocese of San Francisco in senior leadership roles.

55.     The Archdiocese of San Francisco established the Office of Child and Youth Protection ("OCYP") "to address allegations of past or current sexual abuse by clergy, religious or other people who work or volunteer for the Archdiocese."  In a 2018 town hall, Archbishop Cordileone said that the Archdiocese of San Francisco had paid about $87,000,000 to settle sex abuse cases against priests and others associated with the church (together with any pending OCYP claims, "OCYP Settlement Claims").  Insurers paid the majority of that amount.

56.     Senior Archdiocese of San Francisco officials have known for decades about the clergy committing sexual abuse.  Knowledge of Archdiocese of San Francisco officials is reflected in various public sources.  A partial sample of public statements reflecting the Archdiocese of San Francisco's historical knowledge of sexual abuse in its midst includes the following:

    a.     Father Maurice Healy, the Archdiocese of San Francisco director of communications, said on March 10, 2003, that the Archdiocese of San Francisco believes that senior diocesan officials "knew" decades ago of sexual abuse complaints concerning

13

a particularly notorious priest who was a serial abuser (Austin Peter Keegan). Yet no one reported anything to the police or even took meaningful measures internally to prevent further abuse.

b. Indeed, in 2005, a jury in San Francisco County Superior Court issued a unanimous verdict in favor of four plaintiffs against the Archdiocese of San Francisco and other defendants, finding that "the Archbishop of San Francisco, by December 31, 1973, kn[e]w or ha[d] reason to know, or was . . . otherwise on notice, that Father Joseph Pritchard had committed unlawful sexual conduct." Kavanaugh Jury Form, April 19, 2005, at 4. Pritchard was another notorious serial abuser. The Archdiocese of San Francisco never mentioned the abuse when buying or renewing its insurance coverage.

c. More recently, in a series of town halls in 2018, Archdiocese of San Francisco Archbishop Cordileone told community members that he "can't express adequately the deepest shame for you, our victims, and for what has been done to you, and for those in positions of authority who did not respond responsibly but rather allowed abusive priests to continue unchecked." Archbishop Cordileone stated that the Archdiocese of San Francisco had recently discovered it had paid $60,000 to settle two cases in Stockton in the 1950s, which was then part of the Archdiocese of San Francisco. No one from the Archdiocese of San Francisco reported this to law enforcement or other relevant authorities.

57. The CCVA Claims against the Archdiocese of San Francisco allege sexual abuse by the Archdiocese of San Francisco and its clergy, agents, and employees from the 1950s through the 1980s.

58. The CCVA Claims assert that the Archdiocese of San Francisco or its affiliates knew about the sexual abuse of minors. In the Master Complaint for the CCVA Claims, it is alleged that "the RELIGIOUS ENTITY DEFENDANTS, and each of them, knew or should have known that the DOE PERPETRATOR was unfit, posed a risk of harm to minor children, and/or posed a risk of childhood sexual assault to minor children in its care, custody and control.

14

Specifically, RELIGIOUS ENTITY DEFENDANTS knew or should have known, or were otherwise on notice, that the DOE PERPETRATOR had engaged in misconduct that created the risk of childhood sexual assault and failed to take reasonable steps or to implement reasonable safeguards to avoid acts of childhood sexual assault by the DOE PERPETRATOR on minors, including Plaintiff." (Master Complaint in JCCP 5108, ¶ 33.)

59.     The CCVA Claims further assert that the Archdiocese of San Francisco or its affiliates committed intentional conduct by hiring, not supervising, or transferring to other posts clergy about whom they had notice regarding abuse of the plaintiff or other victims. In the Master Complaint for the CCVA Claims, it is alleged as follows:

Defendants also intentionally and willfully implemented various measures intended and designed to, or which effectively, made the DOE PERPETRATOR's conduct harder to detect including, but not limited to:

a.     Assigning and permitting the DOE PERPETRATOR to remain in a position of authority and trust after DEFENDANT RELIGIOUS ENTITIES and DOES 1through 500 knew or should have known that was an unfit agent, servant, employee, member and/or volunteer;

b.     Assigning and permitting the DOE PERPETRATOR to remain in a position of authority and trust after DEFENDANT RELIGIOUS ENTITIES and DOES 1 through 500 knew or should have known that was in misconduct that created a risk of childhood sexual assault to be perpetrated by the DOE PERPETRATOR;

b.     Placing the DOE PERPETRATOR in a separate and secluded environment, including placing him in charge of children, which allowed the DOE PERPETRATOR to sexually and physically interact with and assault the children, including Plaintiff;

c.     Authorizing the DOE PERPETRATOR to come into contact with minors, including Plaintiff, without adequate supervision;

d.     Failing to inform, or concealing from Plaintiff's parents and law enforcement officials the fact that Plaintiff and others were or may have been sexually assaulted after Defendants knew or should have known that the DOE PERPETRATOR may have sexually assaulted Plaintiff or others, thereby enabling Plaintiff to continue to be endangered and sexually assaulted, and/or creating the circumstance where the Plaintiff and others were less likely to receive medical/mental health care and treatment, thus exacerbating the harm to Plaintiff;

e.     Holding out and affirming the DOE PERPETRATOR to Plaintiff and Plaintiffs parents, other children and their parents, and to the community as

15

being in good standing and trustworthy;

    f.    Failing to take reasonable steps, and to implement reasonable safeguards to avoid acts of unlawful sexual conduct by the DOE PERPETRATOR with students minor children; and

    g.    Failing to put in place a system or procedure to supervise or monitor employees, volunteers, representatives or agents to insure that they did not molest or assault minors in Defendants' custody or care, including Plaintiff.

(Master Complaint in JCCP 5108, ¶ 36.)

60.    The CCVA Claims further assert that the Archdiocese of San Francisco or its affiliates failed to stop the sexual abuse, covered it up, and then lied about it. In the Master Complaint for the CCVA Claims, it is alleged that, "This failure was a part of Defendants' intended plan and arrangement to conceal wrongful acts, to avoid and inhibit detection, to block public disclosure, to avoid scandal, to avoid the disclosure of their tolerance of child sexual molestation and assault, to preserve a false appearance of propriety, and to avoid investigation and action by public authority including law enforcement." (Master Complaint in JCCP 5108, ¶ 39.)

61.    The CCVA Claims allege different legal theories, including intentional torts, strict liability, and negligence.

62.    The Archdiocese of San Francisco seeks coverage under the Insurer Policies for certain of the CCVA Claims and OCYP Settlement Claims. Based on the specific allegations of each case, the Insurers have agreed to defend the Archdiocese of San Francisco in certain of the CVA-related lawsuits that allege abuse during one or more of the policy periods of the Pacific Indemnity Policies and Century Primary Policies, subject to a full reservation of rights, and is continuing to investigate additional claims that have been tendered by the Archdiocese of San Francisco. As part of the agreement to defend, the Insurers expressly reserved the right to recoup all defense costs and indemnity costs associated with uncovered claims.

63.    Among other things, the Insurers reserved the right to deny coverage for any claim arising out of an injury that was not caused by an accident or occurrence or that was expected or intended.

16

*Requests for Information*

64. For certain claims, the Insurers lack information needed to evaluate and adjust the claims for which the Archdiocese of San Francisco seeks coverage under the Insurer Policies.

65. Archdiocese of San Francisco has advised the Insurers that it does not have relevant documents related to the CCVA Claims and OCYP Settlement Claims. The Archdiocese of San Francisco, however, does have, and has not provided, the Insurers with material documents. These include documents describing the Archdiocese of San Francisco's procedures, policies, and practices for handling clergy sexual abuse allegations, documents reflecting the Archdiocese of San Francisco's knowledge of the scope and pervasiveness of sexual abuse by clergy in the Archdiocese of San Francisco; documents concerning the possible concealment of sexual abuse; documents regarding transfer of clergy who were accused of sexual abuse; and documents showing what the Archdiocese of San Francisco did to monitor clergy sexual abuse and protect children.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Declaratory Judgment: No Duty to Indemnify CCVA Claims)**

66. Plaintiffs incorporate by reference, as if fully restated herein, each of the preceding paragraphs.

67. An actual controversy has arisen and now exists between the Insurers, on the one hand, and Archdiocese of San Francisco, on the other hand, concerning their respective rights and duties under the Insurer Policies as respects potential indemnity with respect to the CCVA Claims.

68. The Insurers contend that they have no duty to indemnify the Archdiocese of San Francisco or its affiliates for any CCVA Claims or other similar sexual abuse claims that the Archdiocese of San Francisco or its affiliates have tendered or may tender to the Insurers, on the following grounds, including without limitation:

    a. to the extent that the bodily injuries alleged in the CCVA Claims were either expected or intended from the standpoint of the Archdiocese of San Francisco or its

17

affiliates;

    b.    to the extent that the CCVA Claims do not involve an "accident" or "occurrence" within the meaning of the Insurer Policies;

    c.    to the extent that the CCVA Claims resulted from the Archdiocese of San Francisco's or its affiliates' failure to mitigate;

    d.    to the extent that the CCVA Claims resulted from the Archdiocese of San Francisco's or its affiliates' failure to promptly take all reasonable steps to prevent other bodily injury arising out of the same or similar conditions that gave rise to the initial accident, occurrence, claim, or suit;

    e.    to the extent that the Archdiocese of San Francisco or its affiliates failed to cooperate with the Chubb Insurers as required under the Insurer Policies;

    f.    to the extent the Archdiocese of San Francisco or its affiliates made voluntary payments for the CCVA Claims;

    g.    to the extent that the Archdiocese of San Francisco or its affiliates failed to provide timely notice of an accident, occurrence, claim, or suit, as required under the Insurer Policies;

    h.    to the extent that the Insurer Policies contain exclusions relating to sexual abuse;

    i.    to the extent that the CCVA Claims do not allege any bodily injury during the relevant policy periods;

    j.    to the extent that the CCVA Claims do not implicate the attachment points of the excess policies at issue;

    k.    to the extent that the Archdiocese of San Francisco or its affiliates are not insureds under the Insurer Policies; or

    l.    to the extent that the Archdiocese of San Francisco or its affiliates have not met their burden to establish the existence of or material terms and conditions of the Insurer Policies.

18

69. The Archdiocese of San Francisco contends that the Insurers have an obligation to indemnify the Archdiocese of San Francisco for the CCVA Claims.

70. Pursuant to Cal. Code Civ. Proc. § 1060, the Insurers desire a judicial determination of their rights and obligations under the Insurer Policies with respect to indemnity of the Archdiocese of San Francisco for the CCVA Claims.

71. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without judicial adjudication. Accordingly, the Insurers have no plain, speedy and adequate remedy at law. The Insurers request a declaratory judgment, adjudging that the Insurers have no duty to indemnify the Archdiocese of San Francisco for the CCVA Claims.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment: No Duty to Indemnify OCYP Claims)

72. Plaintiffs incorporate by reference, as if fully restated herein, each of the preceding paragraphs.

73. An actual controversy has arisen and now exists between the Insurers, on the one hand, and the Archdiocese of San Francisco, on the other hand, concerning their respective rights and duties under the Insurer Policies as respects potential indemnity with respect to the OCYP Settlement Claims.

74. The Insurers contend that they have no duty to indemnify the Archdiocese of San Francisco or its affiliates for any OCYP Settlement Claims or other similar sexual abuse claims that the Archdiocese of San Francisco or its affiliates have tendered or may tender to the Insurers , on the following grounds, including without limitation:

a. to the extent the Archdiocese of San Francisco or its affiliates made voluntary payments for the OCYP Settlement Claims;

b. to the extent that the Archdiocese of San Francisco or its affiliates failed to provide timely notice of an accident, occurrence, claim, or suit, as required under the Insurer Policies;

19

c.     to the extent the Archdiocese of San Francisco or its affiliates failed to seek consent from the Insurers under the Insurer Policies;

d.     to the extent that the underlying bodily injuries in the OCYP Settlement Claims were either expected or intended from the standpoint of the Archdiocese of San Francisco or its affiliates;

e.     to the extent that the underlying OCYP Settlement Claims do not involve an accident, occurrence, claim, or suit within the meaning of the Insurer Policies;

f.     to the extent that the OCYP Settlement Claims involve harm that resulted from the Archdiocese of San Francisco's or its affiliates' failure to mitigate;

g.     to the extent that the OCYP Settlement Claims involve harm that resulted from the Archdiocese of San Francisco's or its affiliates' failure to promptly take all reasonable steps to prevent other bodily injury arising out of the same or similar conditions that gave rise to the initial accident, occurrence, claim, or suit;

h.     to the extent that the Archdiocese of San Francisco or its affiliates failed to cooperate with the insurer as required under the Insurance Policies;

i.     to the extent that the Insurer Policies contain exclusions relating to sexual abuse;

j.     to the extent that the OCYP Settlement Claims do not involve any bodily injury during the relevant policy periods;

k.     to the extent that the OCYP Settlement Claims do not implicate the attachment points of the excess policies at issue;

l.     to the extent the Archdiocese of San Francisco or its affiliates are not additional insureds or insureds under the Chubb Policies;

m.     to the extent that the Archdiocese of San Francisco or its affiliates have not met their burden to establish the existence of or material terms and conditions of the Insurer Policies; or

n.     to the extent that the Archdiocese of San Francisco or its affiliates had no legal liability to make any payments for the OCYP Settlement Claims.

75.     The Archdiocese of San Francisco contends that the Insurers have an obligation to indemnify the Archdiocese of San Francisco for the OCYP Settlement Claims.

76.     Pursuant to Cal. Code Civ. Proc. § 1060, the Insurers desire a judicial determination of their rights and obligations under the Insurer Policies with respect to indemnity of Archdiocese of San Francisco for the OCYP Settlement Claims.

77.     A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without judicial adjudication.  Accordingly, the Insurers have no plain, speedy and adequate remedy at law.  The Insurers request a declaratory judgment, adjudging that the Insurers have no duty to indemnify the Archdiocese of San Francisco for the OCYP Settlement Claims.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment:  No Duty to Defend)

78.     Plaintiffs incorporate by reference, as if fully restated herein, each of the preceding paragraphs.

79.     An actual controversy has arisen and now exists between the Insurers, on the one hand, and Archdiocese of San Francisco, on the other hand, concerning their respective rights and duties under the Insurer Policies as respects defense of the CCVA Claims.

80.     The Insurers have been defending the Archdiocese of San Francisco, under a full reservation of rights, in connection with the CCVA Claims that allege sexual abuse during one or more of the policy periods of the Pacific Indemnity Policies and Century Primary Policies.  As part of the agreement to defend, the Insurers expressly reserved the right to recoup all defense costs associated with uncovered claims.

81.     The Archdiocese of San Francisco contends that the Insurers have an obligation to defend the Archdiocese of San Francisco for the CCVA Claims.

82.     Pursuant to Cal. Code Civ. Proc. § 1060, the Insurers desire a judicial determination of their rights and obligations under the Insurer Policies with respect to defense of the Archdiocese of San Francisco for the CCVA Claims that, to the extent the Insurers have no

21

duty to indemnify the Archdiocese of San Francisco for the CCVA Claims, they also have no duty to defend the CCVA Claims.

83.     A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties as aforementioned. Said controversy is incapable of resolution without judicial adjudication. Accordingly, the Insurers have no plain, speedy and adequate remedy at law. The Insurers request a declaratory judgment, adjudging that the Insurers have no duty to defend the Archdiocese of San Francisco for the CCVA Claims.

## FOURTH CAUSE OF ACTION

### (Reimbursement)

84.     Plaintiffs incorporate by reference, as if fully restated herein, each of the preceding paragraphs.

85.     Insurers have and/or will incur attorneys' fees and other expenses in connection with their defense of the Archdiocese of San Francisco in the CCVA Claims.

86.     Insurers have no duty under any of the Insurer Policies to afford a defense to the Archdiocese of San Francisco in the CCVA Claims, and therefore the Insurers have a right to be reimbursed by the Archdiocese of San Francisco for some or all attorneys' fees, costs, and other expenses that they have or may pay or incur in the defense of the CCVA Claims, pursuant to *Buss v. Superior Court*, 16 Cal.4th 35 (1997), *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal.4th 643 (2005), and related cases.

87.     Insurers have no duty under any of the Insurer Policies to indemnify the Archdiocese of San Francisco in the CCVA Claims, and therefore the Insurers have a right to be reimbursed by the Archdiocese of San Francisco for some or all indemnify that they have or may pay or incur for the CCVA Claims, pursuant to *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001) and related cases.

88.     Insurers reserved their rights to reimbursement in correspondence to the Archdiocese agreeing to pay or defend certain of the CCVA Claims.

22

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court enter judgment against the Archdiocese of San Francisco:

a. declaring that the Insurers do not have any indemnification obligations to the Archdiocese of San Francisco or its affiliates for any CCVA Claims or OCYP Settlement Claims;

b. declaring that to the extent the Insurers have no indemnification obligation, they have no defense obligation to the Archdiocese of San Francisco or its affiliates for any CCVA Claims;

c. declaring that the Insurers are entitled to recoup all of the defense or indemnity costs that they have paid to the Archdiocese of San Francisco and its affiliates for any CCVA Claims; and

d. granting any other relief that the Court deems just and proper.

Dated: July 28, 2023

**CLYDE & CO. US LLP**

Alexander Potente
Jason J. Chorley

*Attorneys for Plaintiffs Century Indemnity Company, Pacific Indemnity Company, and Westchester Fire Insurance Company*