1   PAUL J. PASCUZZI, State Bar No. 148810
    JASON E. RIOS, State Bar No. 190086
2   THOMAS R. PHINNEY, State Bar No. 159435
    FELDERSTEIN FITZGERALD
3   WILLOUGHBY PASCUZZI & RIOS LLP
    500 Capitol Mall, Suite 2250
4   Sacramento, CA  95814
    Telephone:     (916) 329-7400
5   Facsimile:     (916) 329-7435
                   ppascuzzi@ffwplaw.com
6                  jrios@ffwplaw.com
                   tphinney@ffwplaw.com
7
    ORI KATZ, State Bar No. 209561
8   ALAN H. MARTIN, State Bar No. 132301
    SHEPPARD, MULLIN,
9   RICHTER & HAMPTON LLP
    Four Embarcadero Center, 17th Floor
10  San Francisco, CA  94111
    Telephone:     (415) 434-9100
11  Facsimile:     (415) 434-3947
                   okatz@sheppardmullin.com
12                 amartin@sheppardmullin.com
13  Attorneys for The Roman
    Catholic Archbishop of San Francisco
14

15                  UNITED STATES BANKRUPTCY COURT

16      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

17  In re:                                  CASE NO.  23-30564

18  THE ROMAN CATHOLIC ARCHBISHOP           Chapter 11
    OF SAN FRANCISCO,
19                                          NOTICE OF FILED DECLARATIONS AND
              Debtor and                    QUESTIONNAIRES OF ORDINARY
20            Debtor In Possession.         COURSE PROFESSIONALS IN SUPPORT
                                            OF THE RETENTION OF (1) BPM, LLP; (2)
21                                          NICOLAY CONSULTING GROUP, INC.; (3)
                                            GRANT THORNTON, LLP; (4) GLOBAL
22                                          RETIREMENT PARTNERS, D.B.A
                                            HEFFERNAN RETIREMENT SERVICES;
23                                          (5) STEWARDSHIP PLANNED GIVING; (6)
                                            KORN FERRY
24
25                                          Judge:        Hon. Dennis Montali

26

27          On October 16, 2023, the Court entered an *Order Pursuant to 11 U.S.C. §§ 105(a), 327,*

28  *328, and 330 Authorizing the Debtor to Employ Professionals Used in the Ordinary Course of*

*Business* [Docket No. 211] (the "OCP Order")[1].

Pursuant to the procedures set forth in the OCP Order, the debtor and debtor in possession, The Roman Catholic Archbishop of San Francisco (the "Debtor") hereby provides to the Court and the Reviewing Parties the executed "OCP Declaration" and the "Retention Questionnaire," copies of which are attached hereto, for the following ordinary course professionals:

| Exhibit | Name of Ordinary Course Professional |
|---------|--------------------------------------|
| Exhibit 1 | BPM, LLP |
| Exhibit 2 | Nicolay Consulting Group, Inc. |
| Exhibit 3 | Grant Thornton, LLP |
| Exhibit 4 | Global Retirement Partners, d.b.a Heffernan Retirement Services |
| Exhibit 5 | Stewardship Planned Giving |
| Exhibit 6 | Korn Ferry |

Dated: November 10, 2023        FELDERSTEIN FITZGERALD WILLOUGHBY PASCUZZI & RIOS LLP


                                By:    */s/ Jason E. Rios*
                                       PAUL J. PASCUZZI
                                       JASON E. RIOS
                                       THOMAS R. PHINNEY

                                       Attorneys for The Roman Catholic Archbishop of San Francisco


Dated: November 10, 2023        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                By:    */s/ Ori Katz*
                                       ORI KATZ
                                       ALAN H. MARTIN

                                       Attorneys for The Roman Catholic Archbishop of San Francisco

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Ordinary Course Professionals Order.

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Case No. 23-30564 |
| THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, | Chapter 11 |
| Debtor and Debtor In Possession. | **DECLARATION AND DISCLOSURE STATEMENT OF SHANNON S. WINTER, ON BEHALF OF BPM LLP** |

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Shannon S. Winter, hereby declare as follows:

1.      I am a Partner of BPM LLP, located at One California Street, Suite 2500, San Francisco, CA 94111 (the "Firm").

2.      The Debtor in the above-captioned chapter 11 case has requested that the Firm provide financial statement audit services to the Debtor, and the Firm has consented to provide such services (the "Services"). Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement"). The Engagement Agreement contains indemnification and/or limitation of liability provisions as set forth on pages 5 and 8 of the Engagement Agreement.

3.      The Services include, but are not limited to, the following:

Firm will audit The Central Administrative Office of the Roman Catholic Archbishop of San Francisco which comprise the statements of financial position as of June 30, 2023, and the related statements of activities, functional expenses, and cash flows for the year then ended, and the related notes to the financial statements.

4.      The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case. As part of its customary practice, the Firm is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The

Firm does not perform services for any such person in connection with this chapter 11 case.  In addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

5.      Neither I, nor any principal of, or professional employed by the Firm has agreed to share or will share any portion of the compensation to be received from the Debtor with any other person other than principals and regular employees of the Firm.

6.      Neither I nor any principal of, or professional employed by the Firm, insofar as I have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

7.      As of the commencement of this chapter 11 case, the Debtor owed the Firm $0 in respect of prepetition services rendered to the Debtor.

8.      If at any time during the period of its employment, if the Firm should discover any facts bearing on the matters described herein, the Firm will supplement the information contained in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration and Disclosure Statement was executed on November 1, 2023, at 9:20 am.

_Shannon S. Winter_
_____
Shannon S. Winter

EXHIBIT 2 TO ORDER ON MOTION TO EMPLOY PROFESSIONALS

 

One California Street, Suite 2500, San Francisco, CA 94111
**Phone** 415-421-5757 | **Fax** 415-288-6288 | bpm@bpm.com

October 26, 2023

Michael Flanagan, Chief Financial Officer
Roman Catholic Archbishop of San Francisco
One Peter Yorke Way
San Francisco, CA  94109

Dear Mr. Flanagan:

You have requested that we audit the basic financial statements of The Central Administrative Office of the Roman Catholic Archbishop of San Francisco (the "Central Administrative Office" or the "entity"), which comprise the statements of financial position as of June 30, 2023, and the related statements of activities, functional expenses and cash flows for the year then ended, and the related notes to the financial statements. We are pleased to confirm our acceptance and our understanding of this audit engagement by means of this letter. This letter supersedes the letter that was sent to you on May 1, 2023.

The objectives of our audit are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with auditing standards generally accepted in the United States of America ("U.S. GAAS") will always detect a material misstatement when it exists. Misstatements, including omissions, can arise from fraud or error and are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

The following supplementary information accompanying the Central Administrative Office's financial statements will be subjected to the auditing procedures applied in our audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America U.S. GAAS, and we will provide an opinion on it in relation to the financial statements as a whole in a separate written report accompanying our auditors' report on the financial statements:

1) Combining Statement of Activities by Fund for the Year Ended June 30, 2023
2) Combining Statement of Activities by Fund for the Year Ended June 30, 2022
3) Statement of Current Fund Activities by Sub Fund for the Year Ended June 30, 2023
4) Statement of Current Fund Activities by Sub Fund for the Year Ended June 30, 2022

**Auditor Responsibilities**

We will conduct our audit in accordance with U.S. GAAS. As part of an audit in accordance with U.S. GAAS, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of controls.

- Obtain an understanding of the system of internal control in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. However, we will communicate to you in writing concerning any significant deficiencies or material weaknesses in internal control relevant to the audit of the financial statements that we have identified during the audit.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

- Conclude, based on the audit evidence obtained, whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Central Administrative Office's ability to continue as a going concern for a reasonable period of time.

Because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk that some material misstatements may not be detected exists, even though the audit is properly planned and performed in accordance with U.S. GAAS.

Our responsibility as auditors is limited to the period covered by our audit and does not extend to any other periods.

As part of obtaining reasonable assurance about whether the financial statements are free of material misstatement, we will perform tests of the Central Administrative Office's compliance with certain provisions of laws, regulations, contracts, and grants that could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions is not an objective of our audit, and accordingly, we will not express such an opinion.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, direct confirmation of contribution or other receivables, and certain assets and liabilities by correspondence with selected individuals, funding sources, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement and they may bill you for responding to this inquiry.

We may, from time to time and depending on the circumstances, use third-party service providers in serving your account. We may share confidential information about you with these service providers but remain committed to maintaining the confidentiality and security of your information. Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of your personal information. In addition, we will secure confidentiality agreements with all service providers to maintain the confidentiality of your information and we will take reasonable precautions to determine that they have appropriate procedures in place to prevent the unauthorized release of your confidential information to others. In the event that we are unable to secure an appropriate confidentiality agreement, you will be asked to provide your consent prior to the sharing of your confidential information with the third-party service provider. Furthermore, we will remain responsible for the work provided by any such third-party service providers. From time to time, and depending on the circumstances, third-party service providers located in other countries may participate in the services we provide to the Central Administrative Office. In some cases, we may transfer information to or from the United States or another country. Although applicable privacy laws may vary depending on the jurisdiction, and may provide less or different protection than those of the Central Administrative Office's home country, we require that all third-party service providers observe our policies concerning any confidential client information that we provide to them.

**Management Responsibilities**

Our audit will be conducted on the basis that management those charged with governance acknowledge and understand that they have responsibility:

a. For the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America;

b. For the design, implementation, and maintenance of the system of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to error, fraudulent financial reporting, misappropriation of assets, or violations of laws, governmental regulations, grant agreements, or contractual agreements; and

c. To provide us with:

i. Access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters;

ii. Additional information that we may request from management for the purpose of the audit;

iii. Unrestricted access to persons within the entity and others from whom we determine it necessary to obtain audit evidence;

iv. A written acknowledgement of all the documents that management expects to issue that will be included in the annual report and the planned timing and method of issuance of that annual report; and

v. A final version of the annual report (including all the documents that, together, comprise the annual report) in a timely manner prior to the date of the auditors' report.

d. For including the auditor's report in any document containing financial statements that indicates that such financial statements have been audited by us;

e. For identifying and ensuring that the entity complies with the laws and regulations applicable to its activities;

f. For adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the current year period(s) under audit are immaterial, both individually and in the aggregate, to the financial statements as a whole;

g. For acceptance of nonattest services, including identifying the proper party to oversee nonattest work;

h. For maintaining adequate records, selecting and applying accounting principles, and safeguarding assets;

i. For informing us of any known or suspected fraud affecting the entity involving management, employees with a significant role in the system of internal control, and others where fraud could have a material effect on the financials; and

j. For the accuracy and completeness of all information provided.

k. With regard to the supplementary information referred to above, you acknowledge and understand your responsibility: (a) for the preparation of the supplementary information in accordance with the applicable criteria; (b) to provide us with the appropriate written representations regarding supplementary information; (c) to include our report on the supplementary information in any document that contains the supplementary information and that indicates that we have reported on such supplementary information; and (d) to present the supplementary information with the audited financial statements, or if the supplementary information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of the supplementary information no later than the date of issuance by you of the supplementary information and our report thereon.

l. You agree to inform us of facts that may affect the financial statements of which you may become aware during the period from the date of the auditors' report to the date the financial statements are issued.

As part of our audit process, we will request from management those charged with governance, written confirmation concerning representations made to us in connection with the audit.

**Nonattest Services**

We will also assist in preparing the financial statements of the Central Administrative Office in conformity with U.S. GAAP based on information provided by you.

We will not assume management responsibilities on behalf of the Central Administrative Office. However, we may provide advice and recommendations to assist management of the Central Administrative Office in performing its responsibilities.

The Central Administrative Office's management is responsible for (a) making all management decisions and performing all management functions; (b) assigning a competent individual to oversee the services; (c) evaluating the adequacy of the services performed; (d) evaluating and accepting responsibility for the results of the services performed; and (e) designing, implementing, and maintaining the system of internal control, including the process used to monitor the system of internal control.

Our responsibilities and limitations of the nonattest services are as follows:

- We will perform the services in accordance with applicable professional standards.
- The nonattest services are limited to those outlined above. Our firm, in its sole professional judgment, reserves the right to refuse to do any procedure or take any action that could be construed as making management decisions or assuming management responsibilities, including determining account coding and approving journal entries. Our firm will advise the Central Administrative Office with regard to tax positions taken in the preparation of the tax return, but the Central Administrative Offices (its management and Board of Directors, as applicable) must make all decisions with regard to those matters.

**Reporting**

We will issue a written report upon completion of our audit of the Central Administrative Office's basic financial statements. Our report will be addressed to the Board of Directors of the Central Administrative Office. Circumstances may arise in which our report may differ from its expected form and content based on the results of our audit. Depending on the nature of these circumstances, it may be necessary for us to modify our opinion, add an emphasis-of-matter or other-matter paragraph(s) to our auditors' report, or if necessary, withdraw from the engagement.

**Other**

We understand that your employees will prepare all confirmations, locate documents selected by us for testing, provide copies as requested and prepare schedules as outlined in a separate list of client prepared documents for the dates requested. We may request certain schedules within three business days prior to the agreed upon start of fieldwork to ensure that such schedules have been completed. Should there be a need to reschedule the start of audit fieldwork due to an inadequate amount of schedules being complete, we will assess an additional charge equal to the greater of 15% of the engagement fee or $5,000 for the rescheduling of the job. This fee will also be assessed if we need to leave the field due to schedules being incomplete upon the first day of scheduled audit fieldwork.

We will plan the engagement based on the assumption that your personnel will cooperate and provide assistance by performing tasks such as preparing requested schedules, retrieving supporting documents, and preparing confirmations. If, for whatever reason, your personnel are unavailable to provide the necessary assistance in a timely manner, it will substantially increase the work we have to do to complete the engagement within the established deadlines, resulting in an increase in fees over our original fee estimate.

Shannon S. Winter is the engagement partner for the audit services specified in this letter and is responsible for supervising BPM LLP's ("BPM") services performed as part of this engagement and signing or authorizing another qualified firm representative to sign the audit report.

We estimate that our fees for these services will be $148,000. The Central Administrative Office has already paid $16,050 of this fee and the remaining balance of $131,950 is due based on the table below. Direct out-of-pocket expenses such as travel, outside consultants, lodging, and other similar expenses are billed at our cost. These charges are billed as an additional charge on a monthly basis as we bill for our services. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. If significant additional time is necessary, our fees will be adjusted accordingly and additional invoices will be discussed for out of scope items. Our audit engagement ends upon delivery to you of our audit report.

Future invoices will be billed based on the following:

| | | |
|---|---|---|
| – | Before the start of fieldwork | $37,450 |
| – | Upon the first week of fieldwork | $48,150 |
| – | Upon start of testing out-of-scope - leases | $ 6,000 |
| – | Before delivery of draft report | $26,750 |
| – | Before meeting with management | $ 8,560 |
| – | Before issuance of report | $ 5,040 |

If you intend to publish or otherwise reproduce the financial statements and make reference to our firm, you agree to provide us with printers' proofs or masters for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

BPM shall have the right to assign its rights to perform a portion of the services described above to any employees of our subsidiaries located outside the United States, affiliates, agents, or contractors (collectively, a "Permitted Assignee") without the Central Administrative Office's prior consent. If such assignment is made, the Central Administrative Office agrees that, unless it enters into an engagement letter directly with the Permitted Assignee, all of the applicable terms and conditions of this agreement shall apply to the Permitted Assignee. We agree that we shall not permit the Permitted Assignee to perform any work until it agrees to be bound by the applicable terms and conditions of this agreement. We further agree that we will remain primarily responsible for the services described above, unless we and the Central Administrative Office agree otherwise, and we will properly supervise the work of the Permitted Assignee to ensure that all such services are performed in accordance with applicable professional standards. From time to time, and depending on the circumstances, Permitted Assignees located in other countries may participate in the services we provide to the Central Administrative Office. In some cases, we may transfer information to or from the United States or another country. Although applicable privacy laws may vary depending on the jurisdiction, and may provide less or different protection than those of the Central Administrative Office's home country, we require that all Permitted Assignees observe our policies concerning any confidential client information that we provide to them.

BPM is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

See Exhibit A for discussion of Records Retention and Dispute Resolution.

To the fullest extent of the law, BPM's liability for all claims, damages and costs of the Central Administrative Office arising from this engagement is limited to the total amount of fees paid by the Central Administrative Office to BPM for services rendered under this agreement.

The Central Administrative Office agrees to hold BPM harmless from any and all claims of the Central Administrative Office which are attributable to false or incomplete representations to BPM by management/employees of the Central Administrative Office, or the intentional withholding or concealment of information from BPM by management/employees of the Central Administrative Office. The Central Administrative Office also agrees to indemnify BPM for any claims made against BPM by third parties which arise from any of these actions by management/employees of the Central Administrative Office unless otherwise prohibited by law.

Regarding the electronic dissemination of audited financial statements, including financial statements published electronically on your Internet website, you understand that electronic sites are a means to distribute information and, therefore, we are not required to read the information contained in these sites or to consider the consistency of other information in the electronic site with the original document.

Professional standards prohibit us from being the sole host and/or the sole storage for your financial and non-financial data. As such, it is your responsibility to maintain your original data and records and we cannot be responsible to maintain such original information. By signing this engagement letter, you affirm that you have all the data and records required to make your books and records complete.

The audit documentation for this engagement is the property of BPM and constitutes confidential information. However, we may be requested to make certain audit documentation available to certain regulatory agencies, pursuant to authority given to it by law or regulation. If requested, access to such audit documentation will be provided under the supervision of BPM's personnel. Furthermore, upon request, we may provide copies of selected audit documentation to the regulatory agency. The regulatory agency may intend, or decide, to distribute the copies of information contained therein to others, including other governmental agencies.

The financial statement audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

The Central Administrative Office agrees that it will not, directly or indirectly, agree to assign or transfer any claim against BPM arising out of this engagement to anyone.

This engagement letter, including the terms and conditions in Exhibit A and any other attachments, reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or the termination of this engagement.

BPM may elect to use the Central Administrative Office's name in proposals or client lists that we distribute to potential clients for marketing purposes. Unless you request otherwise, this communication confirms our understanding regarding such use. In addition, your email address will be added to relevant marketing mailing lists to receive emails regarding free resources, events, and trends in your industry. If you would like to be removed from our email lists, you will have the opportunity to unsubscribe at any time.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it us.

Sincerely,

*BPM LLP*

BPM LLP

**Acknowledged:**

The services and terms set forth in this engagement letter and attached Exhibit A are agreed to by Roman Catholic Archbishop of San Francisco.

_____     10/25/2023
Michael Flanagan, Chief Financial Officer          Date


_____     _____
Kathy Grogan, Audit Committee Chair          Date

**EXHIBIT A**

**Fees and Payment Schedule**

Our billings are due and payable upon receipt and will be considered past due after 30 days, and we will assess a finance charge on any balances that are more than 45 days past due at the rate of 12% per annum (1% per month). If the Central Administrative Office fails to meet any payment obligation under this engagement letter, BPM may immediately suspend performance of the services to be performed or terminate this engagement letter. If we elect to suspend performance due to nonpayment, the services will not be resumed until your account is paid as agreed, including any retainer that we may require to continue the services under this arrangement. Alternatively, if we elect to terminate the engagement due to nonpayment, you will be obligated to compensate us for all time and expenses incurred through the date of such termination. If our work is suspended or terminated, you agree that we will not be responsible for your failure to meet governmental or other deadlines, for any penalties or interest that may be assessed against you resulting from your failure to meet such deadlines, and for any other damages (including but not limited to consequential, indirect, lost profits, or punitive damages) incurred as a result of the suspension or termination of our services.

**Records Retention**

It is our policy to keep records related to this engagement for seven years. However, we do not keep any original client documents, so we will return those to you upon completion of the services rendered under this engagement. When records are returned to you, it is your responsibility to retain and protect your records for possible future use, including potential examination by any governmental or regulatory agencies. By your signature to the foregoing letter, you acknowledge and agree that upon the expiration of the seven-year period, BPM shall be free to destroy our records related to this engagement without further notification.

**Dispute Resolution**

If any dispute arises among the parties hereto, the parties agree first to try in good faith to settle the dispute by mediation before resorting to litigation. The costs of any mediation proceeding shall be shared equally by all parties. Any costs for legal representation shall be borne by the hiring party. Disputes are governed by California law and any mediation, arbitration or litigation will be held in California.

The Central Administrative Office and BPM both agree that any dispute solely over fees charged by BPM to the Central Administrative Office will be submitted for resolution by arbitration to Judicial Arbitration and Mediation Service (JAMS) in accordance with the Code of Civil Procedure §1280 to §1294. In agreeing to arbitration, we both acknowledge that in the event of a dispute over fees charged by BPM, each of us is giving up the right to have the dispute decided in a court of law before a judge or jury and instead we are accepting the use of arbitration for resolution.

**Hiring of Personnel**

The Central Administrative Office acknowledges that the value of the services provided by BPM results from the experience and knowledge of its employees and/or agents. The Central Administrative Office agrees not to knowingly solicit, recruit, contract or otherwise engage the services of BPM's employees engaged in providing services under this engagement, in any capacity, either during the term of this agreement or for a period of two (2) years following the termination of this agreement. Nothing in this paragraph shall prevent employment resulting from such personnel's response to general solicitations or advertisements.

**Brokerage or Investment Advisory Statements**

If you provide us with copies of brokerage (or investment advisory) statements and/or read-only access to your accounts, we will use the information solely for the purpose described on page one of this engagement letter. We will rely on the accuracy of the information provided in the statements and will not undertake any action to verify this information. We will not monitor transactions, investment activity, provide investment advice, or supervise the actions of the entity or individuals entering into transactions or investment activities on your behalf. We recommend that you receive and carefully review all statements upon receipt, and direct any questions regarding account activity to your banker, broker or investment advisor.

**Potential Impact of COVID-19 on Services**

We and you acknowledge that governmental authorities may restrict travel and/or the movement of citizens due to the COVID-19 pandemic. In addition, we and you may restrict personnel from travel and onsite work, whether at a client facility or our facility. Accordingly, to the extent that the services described in the Agreement requires or relies on personnel to travel and/or perform work onsite, we and you acknowledge and agree that the performance of such work may be delayed, significantly or indefinitely, or may require modification. We and you agree to provide the other with prompt written notice in the event any of the services described herein must be rescheduled, suspended, or modified. We and you also both acknowledge and agree that any delays or modifications may increase the cost of the services. We will obtain your prior written approval for any increase in the cost of our services that may result from the impact of COVID-19 on our services.

**Force Majeure**

Neither party shall be held liable for any delays resulting from circumstances or causes beyond our reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, epidemics or pandemics as defined by The Centers for Disease Control and Prevention, or any law, order or requirement of any governmental agency or authority. However, no Force Majeure event shall excuse you and the Central Administrative Office of any obligation to pay any outstanding invoice or fee or from any indemnification obligation under this engagement letter agreement.

**Electronic Data Communication and Storage**

In the interest of facilitating our services to you, we may send data over the Internet, temporarily store electronic data via computer software applications hosted remotely on the Internet, or utilize cloud-based storage. Your confidential electronic data may be transmitted or stored using these methods. In using these data communication and storage methods, BPM employs measures designed to maintain data security. We use reasonable efforts to keep such communications and electronic data secure in accordance with our obligations under applicable laws, regulations, and professional standards.

You recognize and accept that we have no control over the unauthorized interception or breach of any communications or electronic data once it has been transmitted or if it has been subject to unauthorized access while stored, notwithstanding all reasonable security measures employed by us. You consent to our use of these electronic devices and applications during this engagement. In addition, it is your responsibility to protect your login, password, or other authentication credentials.

**Client Portals**

To enhance our services to you, we will utilize Suralink, a collaborative, virtual workspace in a protected, online environment. Suralink permits real-time collaboration across geographic boundaries and time zones and allows BPM and you to share data, engagement information, knowledge, and deliverables in a protected environment. In order to use Suralink, you may be required by the provider of Suralink to execute a client portal agreement and agree to be bound by the terms, conditions and limitations of such agreement. You agree that we have no responsibility for the activities of Suralink and agree to indemnify and hold us harmless with respect to any and all claims arising from or related to the operation of Suralink. In addition, it is your responsibility to protect your login, password, or other authentication credentials.

BPM is not a host for any of your information. You are responsible for maintaining your own copy of this information. We do not provide back-up services for any of your data or records, including information we provide to you. Portals are utilized solely as a method of transferring data and are not intended for the storage of your information. Information on a portal may be deleted by BPM.

If you decide to transmit your confidential information to us in a manner other than with the Suralink portal, you accept responsibility for any and all unauthorized access to your confidential information.

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

Debtor and
Debtor In Possession.

Case No.  23-30564

Chapter 11

**RETENTION QUESTIONNAIRE**

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023**.

All questions **must** be answered.   Please use "none," "not applicable," or "N/A," as appropriate.  If more space is needed, please complete on a separate page and attach.

1.      Name and address of professional:

BPM LLP One California Street, Suite 2500, San Francisco, CA 94111

2.      Date of retention: May 1, 2023 (date of the original engagement letter which was superseded with the letter dated October 26, 2023 (copy attached).

3.      Type of Services to be provided:

Financial statement audit services

4.      Brief description of services to be provided:

BPM LLP will audit The Central Administrative Office of the Roman Catholic Archbishop of San Francisco which comprise the statements of financial position as of June 30, 2023 and the related statements of activities, functional expenses, and cash flows for the year then ended, and the related notes to the financial statements.

5.      Arrangements for compensation (hourly, contingent, etc.):

Flat fee, estimated at $148,000, BPM had already received and advanced payment of $16,050 and the remaining fee to be paid for the services is $131,950. Flat fee to be paid in accordance with the installments noted in the attached engagement letter.

(a)      Average hourly rate (if applicable):  N/A – see above

1    (b)    Estimated average monthly compensation based on prepetition retention (if company

2    was employed prepetition):  N/A – see above

3  6.    Prepetition claims against the Debtor held by the company (if any):

4    Amount of claim:  $ 0

5    Date claim arose:  N/A

6    Nature of claim:  N/A

7  7.    Prepetition claims against the Debtor (if any) held individually by any member, associate, or

8  employee of the company: To the knowledge of BPM LLP

9    Name:  N/A

10    Status:  N/A

11    Amount of claim: $ N/A

12    Date claim arose:  N/A

13    Nature of claim:  N/A

14  8.    Disclose the nature and provide a brief description of any interest adverse to the Debtor or

15  its estate for the matters on which the professional is to be employed:

16  N/A

17

18  9.    Name and title of individual completing this form:

19  Shannon S. Winter

20  Dated: November 1, 2023

21

22  Declarant Name

23

24

25

26

27

28

Exhibit 3 to Order on Motion to Employ Professionals

-2-

# EXHIBIT 2

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

　　　　　Debtor and
　　　　　Debtor In Possession.

Case No.  23-30564

Chapter 11

**DECLARATION AND DISCLOSURE
STATEMENT OF ANTHONY NICOLAY,
ON BEHALF OF NICOLAY
CONSULTING GROUP**

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Anthony Nicolay, hereby declare as follows:

1.　　I am a Pension Services Manager of Nicolay Consulting Group, located at 231 Sansome St. Ste 300, San Francisco, CA 94104 (the "Firm").

2.　　The Debtor in the above-captioned chapter 11 case has requested that the Firm provide pension actuarial and benefit administration services to the Debtor, and the Firm has consented to provide such services (the "Services").  Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement").  The Engagement Agreement contains indemnification and/or limitation of liability provisions as set forth at page 4 (section 8) of the Engagement Agreement.

3.　　The Services include, but are not limited to, the following:

Annual pension valuations, benefit statements, benefit claims processing, plan document and summary review and update and cost projections for two Archdiocesan non-qualified pension plans (lay and priest).  Please note we also provide services for two Archdiocesan qualified pension plans (lay and priest) where are fees are paid directly from a qualified trust.  Our understanding is these qualified plans are outside the scope of the bankruptcy filing.

4.　　The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case.  As part of its customary practice, the Firm is retained in cases,

proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The Firm does not perform services for any such person in connection with this chapter 11 case. In addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

5.      Neither I, nor any principal of, or professional employed by the Firm has agreed to share or will share any portion of the compensation to be received from the Debtor with any other person other than principals and regular employees of the Firm.

6.      Neither I nor any principal of, or professional employed by the Firm, insofar as I have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

7.      As of the commencement of this chapter 11 case, the Debtor owed the Firm $2,459.66 in respect of prepetition services rendered to the Debtor.

8.      If at any time during the period of its employment, if the Firm should discover any facts bearing on the matters described herein, the Firm will supplement the information contained in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration and Disclosure Statement was executed on _October 31_, 2023, at _San Francisco CA._

Anthony Nicolay, Pension Services Manager

EXHIBIT 1 TO ORDER ON MOTION TO EMPLOY

## MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement") is entered into as of this day of _9_ April, 2021 (the "Effective Date") by and between Nicolay Consulting Group, Inc., a California corporation ("NCG") with headquarters at 530 Bush Street, Suite 500, San Francisco, CA 94108 and the Archdiocese of San Francisco ("Client"), with offices at One Peter Yorke Way, San Francisco, CA 94109.

| | |
|---|---|
| Client: | Archdiocese of San Francisco |
| Street Address: | One Peter Yorke Way |
| City, State, Zip: | San Francisco, CA 94109 |
| Client Contact: | Joe Passarello |
| NCG Contact: | Gary E. Cline |
| Effective Date: | April _9_ , 2021 |

The Initial Term shall be one year from the Effective Date to April _9_ , 2022.

For good consideration, the parties agree that NCG will provide services to the Client according to the Terms and Conditions and Schedules annexed hereto, which are incorporated herein by reference.

### ACKNOWLEDGED AND AGREED:

CLIENT_____

By: _____

Name: Joe Passarello

Title: Chief Financial Officer

Date: 04.07/2021

By: _____

Name: Rev. Patrick Summerhays

Title: Vicar General & Moderator of the Curia

Date: 04.07.2021

NICOLAY CONSULTING GROUP, INC.

By: _____

Name: Gary E. Cline

Title: Chief Operations Officer

Date: April 9, 2021

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 20 of 87

# MASTER SERVICES AGREEMENT
## TERMS AND CONDITIONS

1. **The Services; Statement of Works; Provision of Client's Data.**

(a) In consideration for, and subject to, the mutual undertakings set forth herein, NCG agrees to provide the consulting services (collectively, "Services") described in any "Statement of Work" executed pursuant hereto. The Services may include the provision of services with respect to any employee benefit plans maintained by Client (each, a "Plan"). Each Statement of Work shall be in the form of Exhibit A hereto and shall describe the Services to be rendered by NCG, the amounts to be paid for such Services by Client, any schedule for completion, any deliverables to be provided by NCG, and any additional terms agreed to by the parties. Each Statement of Work shall be signed by both parties. It is acknowledged and understood that, unless expressly stated to the contrary, any timeframes for performance and delivery set forth in any Statement of Work represent good faith estimates and assume that Client will take or provide whatever actions may be necessary on its part to support and facilitate the Services.

(b) The provisions of this Agreement are incorporated by reference in, and constitute a part of, each Statement of Work. In the event of a conflict between any term of this Agreement and a Statement of Work, the terms of this Agreement shall prevail.

Changes in the scope of the Services described in a Statement of Work, the price to be paid by Client in respect thereof, or any other material matter set forth in a Statement of Work, shall be made only in writing executed by authorized representatives of both parties. Changes in the scope of Services includes without limitation, for example, the following changes to the Services: (i) changes resulting from changes in applicable law, except to the extent such changes are made by NCG at no cost for all of its clients receiving substantially similar services, (ii) changes required or resulting from Client direction, or Client interpretation of applicable law which is different than NCG's clients generally, (iii) if the Services relate to any Plan, changes resulting from unique Plan terms, and (iv) amendment of or changes to Plan structure, type, terms or provisions.

(c) The Services to be provided by NCG may require Client to deliver to NCG certain data, documents or other information ("Client Information"), all in a timely, complete and accurate manner. NCG will have no obligation to test or otherwise verify the accuracy or completeness of the Client Information, and NCG will not be responsible for any errors or omissions contained therein or for the modification or correction of such errors or omissions. NCG shall be fully protected in relying upon the accuracy and/or veracity of all information supplied by Client or Client's agents and shall have no responsibility or liability for any errors, delays or additional costs resulting from the receipt of incomplete, inaccurate or untimely information or data or information or data provided in an unacceptable manner, format or media from Client or Client's agents.

2. **Term.** This Agreement shall be effective as of the Effective Date and shall continue in effect thereafter for a period of 12 months unless earlier terminated in accordance with the provisions of Section 2 hereof. This Agreement will automatically be extended for additional terms of twelve (12) months each unless Client or NCG gives written notice to the other at least ninety (90) days before the expiration of the initial or any subsequent term. Statements of Work in effect at the time of the expiration or sooner termination of this Agreement shall continue under the terms and conditions of this Agreement until the term of the Statement of Work expires or the Statement of Work is otherwise completed or terminated, whichever is sooner.

3. **Fees and Expenses, Invoicing and Payment.** The fees for NCG's Services shall be set forth in each Statement of Work. In addition to the fees specified in each Statement of Work, Client agrees to pay to NCG an amount equal to all out-of-pocket expenses incurred by NCG in connection with the provision of the Services including, without limitation, copying, telephone charges, computerized research, postage and the like. NCG will invoice Client on a monthly basis for all fees and expenses due and payable by Client. Client agrees to pay all invoiced amounts within thirty (30) days of the receipt by Client of NCG's invoice. Any amount not paid by Client when due shall bear interest at the rate of one percent (1%) per month or the highest permissible rate under applicable law, whichever is less, until paid.

4. **Confidentiality.**

(a) Both NCG and Client recognize that in the course of performing Services under this Agreement, information will be exchanged consisting of confidential trade secret or business information or

2

personally identifiable information of plan participants ("Confidential Information"). Each party shall treat the other party's Confidential Information as it would treat its own confidential trade secret or business information. Except as otherwise provided in this paragraph, each party agrees not to disclose the other party's Confidential Information to anyone except its own respective employees or agents who have a need to know such information, which employees or agents will be instructed to maintain the confidentiality of the Confidential Information in the same manner as they would the confidential trade secret or business information of their own company.

(b) It is understood that the foregoing obligations of confidentiality do not apply to (a) information already lawfully known to the recipient prior to the date of this agreement and which is not known by the recipient to be subject to any non-disclosure covenants, (b) information publicly available or which becomes publicly available without a breach of this or any other agreement by the recipient (including its directors, officers, employees, agents or advisors), (c) information rightfully received from a third party who is not known by the recipient to be bound by non-disclosure covenants with the discloser or another party, with respect to the confidential information, (d) information independently developed by the recipient prior to receipt of such confidential information or (e) any confidential information required to be disclosed by law, legal process or regulatory authority having jurisdiction over the disclosing party. In addition, NCG reserves the right to use non-confidential client information for press releases and marketing materials. Nothing in this paragraph is intended to relieve a party of any obligations it may have under HIPAA or other obligation to hold plan participants' personally identifiable information in confidence.

5.    NCG's Proprietary Rights; Work Product. Client acknowledges and agrees that all proprietary rights (including, but not limited to, trade secrets, copyrights, trademarks, service marks, trade names, specifications, data base structures, techniques, know-how, methods, procedures and documentation) in or relating to the Services or other products used by NCG to perform the Services, including all additions, improvements and modifications made thereto in the course of NCG performing Services, hereunder and hereafter ("Proprietary Information"), are proprietary in nature and belong exclusively to NCG. The work product NCG delivers to Client in connection with this engagement is intended for Client's, and to the extent specified in a Statement of Work, certain of Client's affiliates', internal use and, except as otherwise indicated in a Statement of Work, Client will retain

ownership of the work product and any information specific to Client's employees or business, and as such, Client shall have the exclusive right to use, reproduce and adapt it for internal purposes within its organization (and to the extent specified in a Statement of Work, certain of Client's affiliates) as Client deems appropriate, provided that nothing in the foregoing shall be construed to imply that Client attain any ownership interest in any Proprietary Information that may be embedded or included within such work product and NCG will retain exclusive ownership of such Proprietary Information. To the extent any Proprietary Information is embedded or included within any work product, Client will have a non-exclusive, non-transferable license for the term specified in the Statement of Work to use such Proprietary Information only in connection with the authorized use of the work product.

6.    Independent Contractor; Service Provider; Fiduciary Status. Nothing in this Agreement is intended or shall be construed to give NCG discretionary authority or discretionary responsibility in the management of Client's business operations or administration of any Client employee health, welfare or other benefit plan (if applicable). The relationship of NCG (or any of its officers, directors or employees) to Client (or any of its officers, directors or employees) is intended to be only that of an independent contractor and service provider and not employee, agent, fiduciary or other similar relationship.

To the extent the Services provided in any way relate to any Plan, the parties further agree: (i) NCG is not the administrator, plan sponsor or a fiduciary of the Plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) NCG Services are ministerial services provided at the direction of Client or the administrator of the Plan within a framework of data, documents, policies, interpretations, rules, practices, and procedures provided to NCG by Client or the administrator of the Plan; (iii) the administrator of the Plan or Client (and not NCG) has the authority to make all Plan benefit determinations; (iv) NCG has no authority or control over eligibility under, or the administration or operation of, the Plan; (v) NCG does not provide investment or legal advice ; (vi) NCG is not responsible for the interpretation of any Plan document or legal, regulatory or accounting requirements applicable thereto; (vii) NCG is not responsible or liable for verifying or determining that the Plan, or any direction or instruction of Client or the administrator of the Plan, complies with or satisfies any legal, regulatory or accounting requirement applicable thereto; (viii) NCG has no discretionary

3

authority, responsibility or control in the administration of the Plan; (ix) Client and the administrator of the Plan (and not NCG) are solely responsible for maintaining the qualified status of the Plan; and (x) NCG's legal counsel on ERISA matters represents only NCG in connection with the provision of services under any Statement of Work.

7.    Limited Warranty. NCG warrants to Client that the Services performed under this Agreement will be performed in accordance with generally accepted industry standards. EXCEPT FOR THIS EXPRESS LIMITED WARRANTY, NCG MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES TO BE PROVIDED OR ANY DELIVERABLES DELIVERED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION THEIR MERCHANTABILTY OR FITNESS FOR A PARTICULAR PURPOSE.

8.    Limitation on Liability.

(a) NCG will not be responsible for claims, damages, or liabilities arising from (i) failure to perform any Services other than those agreed to pursuant to this Agreement and the Statement of Works executed hereunder or; (ii) actions or failures to act based on instructions or directions from Client, the administrator of a Plan, participants in the Plan, or other service providers, or from their agents, employees, trustees, or fiduciaries; or (iii) errors or failure to provide the Services to the extent such errors or failure are caused by (A) any error or omission or delay in the data, documents or information provided by Client, the Plan administrator, or the Plan participants; (B) failure of Client to perform its obligations or provide resources as required by this Agreement or (C) any event of *force majeure* as set forth in Section 13 below.

(b) NCG's cumulative aggregate liability, whether in contract, tort or otherwise, for all direct damages arising out of or relating to this Agreement in the aggregate, regardless of the number of claims, will not exceed two times the recurring annual fees as billed in the most recently completed calendar year prior to the year in which the service issue arose.. For the avoidance of doubt, NCG shall not be at risk under this Agreement for more than the aforementioned amount.

(c) NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT WILL NCG BE LIABLE TO CLIENT, ANY OF CLIENT'S PLANS OR PLAN ADMINISTRATORS (IF APPLICABLE), OR ANY PLAN PARTICIPANT, OR TO ANY BENEFICIARY OF THE SERVICES HEREUNDER, FOR INDIRECT, INCIDENTAL, EXEMPLARY, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOSS OF PROFITS, INCOME, GOODWILL OR DATA) ARISING OUT OF PERFORMANCE OR NON-PERFORMANCE. ALL LIMITATIONS OF SECTION 8 SHALL BE WITHOUT REGARD TO THE LEGAL THEORY OF SUCH DAMAGES, WHETHER SUCH DAMAGES ARE BASED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, INDEMNITY, NEGLIGENCE, GROSS NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.

9.    NCG Outside Counsel. From time to time, NCG may consult with its outside ERISA counsel on matters concerning legal aspects of Services to be provided under a Statement of Work, the expense of which may be charged to Client pursuant to provisions of Paragraph 3, above. NCG will identify its outside ERISA counsel to Client if and as such occasion arises.

10.    Authorization and Reliance. In the event NCG will be providing Services with respect to any Plan, Client hereby authorizes, and shall cause the administrator of the Plan to authorize, NCG to provide information to and accept instructions from Plan participants to engage in activities permitted under the Plan by use of all means specified in this Agreement and any Statement of Work hereunder. NCG shall be entitled to provide information to and act upon instructions received from any person representing himself or herself to be a Plan participant, including the exchange of any or all monies held in his or her account(s) under the Plan, provided that NCG employs reasonable procedures for verifying the identity and status of the person to whom the information is provided or who engages in the activity. Requiring the use of the participant's Social Security number (or other unique identifying number) and a personal identification number shall be deemed reasonable for this purpose.

11.    Termination.

(a) If either party materially breaches this Agreement with respect to any Statement of Work executed hereunder, and such breach is not cured within thirty (30) days after the breaching party receives written notice of the breach, then in addition to all other rights and remedies of law or equity or otherwise, the non-breaching party shall have the right

4

to terminate the applicable Statement of Work; provided, however, that if Client breaches this Agreement by failing to pay any amounts due under a Statement of Work, and such breach is not cured within such thirty (30) day period, then NCG, in its discretion, may terminate this Agreement and all outstanding Statement of Works. Failure of the non-breaching party to exercise such rights of termination immediately upon expiration of the thirty (30) day period shall not constitute a waiver, at any time thereafter, of the non-breaching party's rights under this Section provided the breach has not been cured. In the event any Statement of Work is terminated hereunder, Client shall immediately pay NCG's invoice for all Services accrued up to the effective date of the termination of such Statement of Work.

(b) Notwithstanding any other provision of this Agreement, if Client adopts any amendment to a Plan that NCG reasonably determines is not consistent with NCG's administration or operational practices, procedures or capabilities, then NCG may immediately terminate any Statement of Work that involves administrative services with respect to the Plan, upon written notice thereof to Client; provided, however, that at Client's request NCG will continue to provide the applicable Services under Client's prior Plan for a transition period not to exceed six (6) months.

(c) Obligations Upon Termination:

(i) _Payments._ Upon termination of this Agreement or a Statement of Work, (i) Client shall pay NCG all unpaid amounts due hereunder and a written request of Client, NCG will return to Client *including without limitation any early termination fees,* and (ii) NCG's obligations to provide Services under the Agreement and/or the applicable Statement of Work shall cease.

(ii) _Return of Information._ Upon receipt by NCG of payment of all amounts due it hereunder and a written request of Client, NCG will return to Client all Client Information necessary to transition the work to another service provider, in a format provided for in the applicable Statement of Work or as otherwise mutually agreed. NCG shall have no obligation to retain Client Information. The foregoing does not pertain to digitized data on backup tapes not susceptible to return, which shall nonetheless be subject to the confidentiality requirements of this Agreement.

(iii) _Transition Services._ Transition services shall be provided by NCG pursuant to a separately

executed transition services agreement detailing the scope of services and fees at the time such services are to be provided.

12. _Force Majeure._ NCG will be excused from delays in performing or from its failure to perform hereunder to the extent that such delays or failures result from causes beyond its reasonable control. Without limitation of the foregoing, NCG's nonperformance or delay of performance under this Agreement shall also be excused if and to the extent such nonperformance or delay results from Client's failure or delay in performance of its responsibilities. Notwithstanding prevention or delay of NCG's performance during any such period of *force majeure,* Client agrees to pay NCG's invoice for all Services up to the effective date of such *force majeure.*

13. Complete Agreement; Governing Law; Venue; Compliance with Laws; No Assignment; Amendment. This writing contains the entire agreement of the parties with respect to the matters dealt with herein, supersedes all previous agreements between the parties with respect to the matters dealt with herein, and there are no promises, understandings or agreements of any kind pertaining to this Agreement other than stated herein. This Agreement will be construed and enforced in accordance with the laws of California of the United States of America, without regard to its choice of law or conflicts of laws provisions. Any suit brought hereunder shall be brought in the state or federal courts sitting in San Francisco, California, the parties hereby waiving any claim or defense that such forum is not convenient or proper. Each party agrees that any such court shall have personal jurisdiction over it. The parties agree to comply with all provisions of law applicable to this Agreement and the Services to be performed hereunder and with all applicable rules, regulations orders, and directives of all governmental bodies having jurisdiction. Client may not voluntarily or involuntarily assign its rights or delegate its duties under this Agreement to any person without the prior written consent of NCG, which it may withhold or condition in its commercially reasonable discretion. NCG is permitted to subcontract and/or offshore Services. This Agreement may be amended only by a writing signed by the parties hereto.

14. Notice. Any notice or other communication given pursuant to this Agreement shall be in writing and shall be effective either (b) when delivered personally to the party for whom intended, or (b) one (1) day following delivery by commercial express delivery service (e.g., FedEx) provided such delivery

5

provides for written receipt. Either party may designate a different address by notice to the other given in accordance herewith.

**To Client:**
Name:     Joe Passarello
Client:   Archdiocese of San Francisco
Address:  One Peter Yorke Way
          San Francisco, CA  94109

**To NCG Consultants:**
Name      Gary E. Cline
Address:  530 Bush Street, Suite 500
          San Francisco, CA  94108

.

15.     Alternative Dispute Resolution.

(a) *Negotiation.* Before initiating any arbitration or litigation proceedings, the parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement (or any particular Scope of Work) promptly by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within 15 days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and response shall include with reasonable particularity (i) a statement of each party's position and a summary of arguments supporting that position, and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within 30 days after delivery of the notice, the executives of both parties shall meet at a mutually acceptable time and place.

        (1)     Unless otherwise agreed in writing by the negotiating parties, the above-described negotiation shall end at the close of the first meeting of executives described above ("First Meeting"). Such closure shall not preclude continuing or later negotiations, if desired.

        (2)     All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

        (3)     At no time prior to the First Meeting shall either side initiate an arbitration or litigation related to this Agreement except to pursue a provisional remedy that is authorized by law or by JAMS Rules or by agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements to meet and confer above.

        (4)     All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this subparagraph (a) above are pending and for 15 calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling.

(b) *Mediation.* If the matter is not resolved by negotiation pursuant to paragraph 1, above, then the matter will proceed to mediation as set forth below.

        (1)     The parties agree that any and all disputes, claims or controversies arising out of or relating to this Agreement shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to the clause set forth in subparagraph (c) below.

        (2)     Either party may commence mediation by providing to JAMS and the other party a written request for mediation, setting forth the subject of the dispute and the relief requested.

        (3)     The parties will cooperate with JAMS and with one another in selecting a mediator from the JAMS panel of neutrals and in scheduling the mediation proceedings. The parties agree that they will participate in the mediation in good faith and that they will share equally in its costs.

        (4)     All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential,

6

privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

(5)    Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or at any time following 45 days from the date of filing the written request for mediation, whichever occurs first ("Earliest Initiation Date"). The mediation may continue after the commencement of arbitration if the parties so desire.

(6)    At no time prior to the Earliest Initiation Date shall either side initiate an arbitration or litigation related to this Agreement except to pursue a provisional remedy that is authorized by law or by JAMS Rules or by agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of subparagraph (b) above.

(7)    All applicable statutes of limitation and defenses based upon the passage of time shall be tolled until 15 days after the Earliest Initiation Date. The parties will take such action, if any, required to effectuate such tolling.

(c) *Arbitration.* Any dispute, claim or controversy arising out of or relating to this Agreement (or any particular Scope of Work) or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in San Francisco, California before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures pursuant to JAMS' Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of

arbitration from a court of appropriate jurisdiction. THE PARTIES HEREBY WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY PROCEEDINGS CONDUCTED PURSUANT TO ANY CLAIM ARISING UNDER THIS AGREEMENT. The parties shall maintain the confidential nature of the arbitration proceeding and any award, including the arbitration hearing, except as may be necessary to prepare for or conduct the arbitration hearing on the merits, or except as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement, or unless otherwise required by law or judicial decision.

(1)    In any arbitration arising out of or related to this Agreement, the arbitrator is not empowered to award punitive or exemplary damages, except where permitted by statute, and the parties waive any right to recover any such damages.

(2)    In any arbitration arising out of or related to this Agreement, including any particular Scope of Work, the arbitrator may not award any incidental, indirect or consequential damages, including damages for lost profits.

(3)    In any arbitration arising out of or related to this Agreement (or any particular Scope of Work), the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

(4)    If the arbitrator determines a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

16.    Post-Termination Provisions. Sections 1(c), 4-5, 7--16 shall survive termination or expiration of this Agreement.

7

Template Statement of Work as referenced by MSA clause 1(a).

## Exhibit A

## Statement of Work No. ____

This Statement of Work No. ____ is entered into this ____ day of _____, 20____ pursuant and subject to that certain MASTER SERVICES AGREEMENT (the "Agreement") made and effective as of _____, 20____ by and between Nicolay Consulting Group, Inc. ("NCG") and _____ ("Client").

**Term of Statement of Work:** [Set forth the term of the SOW.]

**Scope of Services:** [Include detailed description of services and any project schedule.]

**Fees:** [Describe fees with respect to the services identified.]

**Additional Terms:** [Include any additional terms to this SOW not described in the MSA.]

**Nicolay Consulting Group, Inc.**                    **[CLIENT]**

By:_____                    By:_____

Name:_____                    Name:_____

Title:_____                    Title:_____

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC<br>ARCHBISHOP OF SAN FRANCISCO,<br><br>       Debtor and<br>       Debtor In Possession. | Case No. 23-30564<br><br>Chapter 11<br><br>**RETENTION QUESTIONNAIRE** |

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023.**

All questions **must** be answered. Please use "none," "not applicable," or "N/A," as appropriate. If more space is needed, please complete on a separate page and attach.

1.      Name and address of professional:

                  Nicolay Consulting Group Inc,

                  231 Sansome St. Ste 300

                  San Francisco, CA 94104

2.      Date of retention: June 2, 1992

3.      Type of Services to be provided:

Actuarial and benefits administration services for Archdiocesan pension plans (lay and priest)

4.      Brief description of services to be provided:

Annual pension valuations, benefit statements, benefit claims processing, plan document and summary review and update and cost projections for two Archdiocesan non-qualified pension plans (lay and priest). Please note we also provide services for two Archdiocesan qualified pension plans (lay and priest) where are fees are paid directly from a qualified trust. Our understanding is these qualified plans are outside the scope of the bankruptcy filing.

5.      Arrangements for compensation (hourly, contingent, etc.):

Time and materials (hourly), fixed fee per count for certain types of benefit claims processing

      (a)      Average hourly rate (if applicable): varies depending on employee ($90 – $350)

(b)     Estimated average monthly compensation based on prepetition retention (if company was employed prepetition):

- Supplemental Priest and Lay Pension Plans: $3,000/month

6.     Prepetition claims against the Debtor held by the company (if any):

Amount of claim:  $ 2,459.66

Date claim arose:   Services for August, 2023 (before August 21, 2023)

Nature of claim:   Actuarial valuation for lay SERP non-qualified plan

7.     Prepetition claims against the Debtor (if any) held individually by any member, associate, or employee of the company:

Name:  N/A _____

Status: _____

Amount of claim: $_____

Date claim arose: _____

Nature of claim: _____

_____

8.     Disclose the nature and provide a brief description of any interest adverse to the Debtor or its estate for the matters on which the professional is to be employed:

N/A _____

_____

_____

9.     Name and title of individual completing this form:

Anthony Nicolay, Pension Services Manager

Dated: _October 31_, 2023          **NICOLAY CONSULTING GROUP, INC.**

Anthony Nicolay, Pension Services Manager

# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC<br>ARCHBISHOP OF SAN FRANCISCO,<br><br>Debtor and<br>Debtor In Possession. | Case No. 23-30564<br><br>Chapter 11<br><br>**DECLARATION AND DISCLOSURE STATEMENT OF DANIEL ROMANO ON BEHALF OF GRANT THORNTON LLP** |

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Daniel Romano, hereby declare as follows:

1. I am a Partner of Grant Thornton LLP, located at 757 Third Avenue, New York, NY 10017 (the "Firm").

2. The Debtor in the above-captioned chapter 11 case has requested that the Firm provide UBIT Tax Consulting services to the Debtor, and the Firm has consented to provide such services (the "Services"). Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement"). The Engagement Agreement contains indemnification and/or limitation of liability provisions as set forth at Attachment A, Article 2 of the Engagement Agreement.

3. The Services include, but are not limited to, the following:
Review of information to determine unrelated business income, preparation of applicable federal and state tax returns, and interaction with taxing authorities in this regard, as necessary.

4. The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case. As part of its customary practice, the Firm is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The Firm does not perform services for any such person in connection with this chapter 11 case. In

EXHIBIT 2 TO ORDER ON MOTION TO EMPLOY PROFESSIONALS

-1-

Case: 23-30564   Doc# 304   Filed: 11/10/23   Entered: 11/10/23 12:08:15   Page 31 of 87

addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

5.     Neither I, nor any principal of, or professional employed by the Firm has agreed to share or will share any portion of the compensation to be received from the Debtor with any other person other than principals and regular employees of the Firm.

6.     Neither I nor any principal of, or professional employed by the Firm, insofar as I have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

7.     As of the commencement of this chapter 11 case, the Debtor owed the Firm $2,296.31 in respect of prepetition services rendered to the Debtor.

8.     If at any time during the period of its employment, if the Firm should discover any facts bearing on the matters described herein, the Firm will supplement the information contained in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration and Disclosure Statement was executed on October 26, 2023.



_____
Daniel Romano

EXHIBIT 2 TO ORDER ON MOTION TO EMPLOY
PROFESSIONALS

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 32 of
87

DocuSign Envelope ID: 13545A07-D03F-4B80-B068-BDBAB6D64F71



# Roman Catholic Archdiocese of SF
## Statement of Work for Tax Compliance Services

**Effective Date:** July 13, 2023

This Statement of Work ("Statement of Work") becomes a part of and is subject to the terms and conditions of the Agreement between Roman Catholic Archbishop of San Francisco, A Corporation Sole ("Client") and Grant Thornton LLP ("Grant Thornton") dated February 23, 2015.

The purpose of this Statement of Work is to describe the scope of services ("Services") Client is requesting Grant Thornton to perform, and to set forth the agreed fee, timing and other matters related to the Services. Any capitalized terms that are not defined in this Statement of Work shall have the meanings in the Agreement.

## The Services Grant Thornton will provide

### Tax Compliance

The Services Grant Thornton will provide to Client include preparation of the following specific returns and/or forms ("Deliverables") for the designated taxable year(s).

Returns/forms prepared:

- See *Addendum – Listing of returns/forms included in this Statement of Work.*

Taxable year(s) ended: June 30, 2023

Grant Thornton will assist with the preparation of federal and state extension forms for the taxable year(s) ended above, as applicable.

Grant Thornton will discuss with Client any circumstances that require additional work, which may include, but are not limited to, work to satisfy obligations under applicable professional standards including additional fact gathering, analysis and preparation of disclosure forms, unforeseen scope changes including additional state returns or previously unidentified transactions or tax positions requiring analysis, and late or incomplete Client provided information. If it appears that the stated fee will be exceeded, Grant Thornton will consult with Client before continuing with the engagement.

### Third-Party Solution Access

Grant Thornton has made payment for and will provide access to Client and the applicable Client employees to the CCH Integrator (the "Third-Party Solution") during this engagement, unless terminated earlier, in order for Client and the applicable Client employees to access and use the Third Party Solution to facilitate delivery of Grant Thornton's Services.

"Grant Thornton" refers to Grant Thornton LLP, the U.S. member firm of Grant Thornton International Ltd (GTIL), and/or refers to the brand under which the GTIL member firms provide audit, tax and advisory services to their clients, as the context requires. GTIL and each of its member firms are separate legal entities and are not a worldwide partnership. GTIL does not provide services to clients. Services are delivered by the member firms in their respective countries. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the United States, visit GT.COM for details.

U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 13545A07-D03F-4B80-B068-BDBAB6D64F71



Client is hereby granted the right to access and use the Third-Party Solution for its internal business purposes to upload and modify the required documentation and data (the "Data") as needed during the term of the Services. Other than Client's right to use the Third-Party Solution as set forth herein, Grant Thornton and/or the third-party provider retains all right, title, and interest in and to the Third-Party Solution, including all intellectual property rights therein. Grant Thornton reserves the right to terminate Client access to the Third-Party Solution or to remove any Data from the Third-Party Solution at any time for any reason whatsoever with or without notice. Client is solely responsible for the Data and shall prevent unauthorized access to or use of the Third-Party Solution. Client warrants that the Data uploaded to the Third-Party Solution is not illegal and is appropriate for the Services. The Third-Party Solution is not a Deliverable.

Client acknowledges and agrees that Grant Thornton is not the developer or manufacturer of the Third-Party Solution and Grant Thornton is reliant upon the third-party provider's support services, updates, error corrections and/or related materials to correct any performance issues in the Third-Party Solution. As such, Grant Thornton shall use reasonable efforts to cause the third-party provider to address any material defects.

Grant Thornton disclaims all warranty and liability related to the Third-Party Solution. Client's sole and exclusive remedy related to the Third-Party Solution is to terminate its use of the Third-Party Solution.

Client acknowledges and agrees that the third-party provider is an express third-party beneficiary of Attachment A with respect to Section 1 ("Business Risk Allocation") and the third-party provider shall have the right to enforce such provision directly against Client.

If additional assistance is requested by Client, Grant Thornton will confirm the scope, fees, timing, and deliverable in writing (includes email) before providing such assistance.

## Limitations

Only tax returns and information returns detailed above or in the Addendum are covered by this Statement of Work. Grant Thornton's responsibility under this Statement of Work extends only to Services expressly agreed to provide herein and does not extend to any prior or subsequent periods.

If, based on new reporting requirements or tax law changes, additional analysis or computations are necessary in order to prepare and sign the return(s), Grant Thornton will discuss these out-of-scope services with Client and mutually agree on the fee required to complete the additional work.

The Services do not include assistance with any tax accounting method change (including, but not limited to, method changes relating to ASC 606 and IRC Section 451 revenue recognition, the ASC 842 leasing standard or the final regulations under IRC Section 263A relating to inventory costs). Such services will be provided under a separate Statement of Work.

Please note that the fees for Services do not include significant professional effort with respect to Client's functional expense allocations. Accordingly, such information, if required, will be requested from Client. To the extent Client would like Grant Thornton to prepare or assist in the preparation of the functional expense allocation, Grant Thornton will discuss with Client an estimated cost to provide such assistance before incurring significant professional effort.

Client management is solely responsible for calculating and determining any amounts recorded in the Client's books, records, financial statements and footnotes thereto.

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 34 of 87



### General tax consulting

The Services Grant Thornton may provide, upon Client's request, under this Statement of Work consist of routine time-to-time tax consulting services extending beyond the scope of Services defined above that do not exceed $10,000 in fees. This assistance will be provided at Grant Thornton's discounted hourly rates below.

| Professional Rank | Rate per hour |
|---|---|
| Partner/Managing Dir. | $680 |
| Senior Manager/Director | $590 |
| Manager | $510 |
| Senior Associate | $375 |
| Associate | $250 |

Services constituting distinct projects or otherwise requiring a separate Statement of Work as may be required, regardless of the nature of service or fees, will be performed under a separate Statement of Work.

## Delivering the services

Grant Thornton will discuss with Client an appropriate timeline for providing the Services described above, including an agreed upon timeframe for completion and delivery. Grant Thornton will provide Client with a request for information required to complete the Services based on the mutually agreed timeline.

Grant Thornton's responsibility under this Statement of Work extends only to Services and Deliverables expressly agreed to provide herein, including any addendums to this Statement of Work. Grant Thornton's responsibility does not extend to any prior or subsequent periods and does not include, for example, studies, detailed research or analysis not specifically set forth in this Statement of Work. If such items arise or Client requests additional services, Grant Thornton will provide a fee estimate and a new Statement of Work before investing significant professional time.

U.S. federal and state tax laws are ever-changing and complex. Grant Thornton is engaged to provide only those Services expressly set forth in this Statement of Work, in accordance with applicable professional standards. Such obligation expressly does not include any obligation or responsibility to identify, suggest, model or advise on tax minimization or deferral opportunities, including but not limited to, any such matters that may arise from recently enacted legislation or regulatory guidance.

All engagements undertaken by Grant Thornton are subject to evaluating and resolving any potential or actual conflict of interest or independence concerns. While the occurrence is highly unusual, matters may arise from the ordinary course of either party's business operations, requiring Grant Thornton to resolve a conflict matter and/or terminate or suspend this engagement until any conflict or independence issue is resolved.

Additionally, Grant Thornton may use third parties to provide administrative and operational support to Grant Thornton business operations. All of these third-party service providers are subject to



confidentiality obligations to protect the confidentiality of client data. Such entities may be located within or outside the United States.

### Information collection and use authorization

Grant Thornton is committed to using technology to improve quality and efficiency in providing tax services, including reducing or eliminating duplicative requests for information from clients. The information Client provides to Grant Thornton in connection with a particular engagement may be necessary or useful in other engagements for which Client has also engaged Grant Thornton, whether tax, audit, or advisory. Client authorizes Grant Thornton to use the information Client provides to Grant Thornton to perform both tax and non-tax services in any engagement letter or Statement of Work executed with Grant Thornton.

Completion by Client of all information and data requests, electronic or otherwise, is expected to be timely, and Client agrees that the accuracy and completeness of information provided to Grant Thornton by any Client representative, to be relied on for the purpose of delivering the Services, is the responsibility of Client.

### Use of Grant Thornton Affiliate

Appropriate use of technology and resources is an important aspect of service delivery. In tax return preparation and tax consulting processes, Grant Thornton uses the technology and resources of GT US Shared Services Center India Private Limited ("GTSSC") and/or the Grant Thornton Knowledge and Capability Center India Private Limited ("KCC"), affiliates of Grant Thornton located in India, to assist in providing tax services.

Grant Thornton's contract with such affiliates requires that they maintain the confidentiality of any tax return information provided to them in connection with providing tax services.

Professional and regulatory standards require us to obtain Client's written consent prior to providing Client tax return information to such affiliates, to include only current and prior year(s) information in the possession of Grant Thornton that is necessary for the purpose of providing the Services covered by this Statement of Work.

If Client does not advise Grant Thornton of a specific duration of consent, Client's consent is valid for one year from the date of signature or the time period necessary to complete the Services under this Statement of Work, whichever is greater. Client may limit the amount, type, or scope of tax return information disclosed by letting Grant Thornton know in writing.

To acknowledge consent to the disclosure of Client tax return information as set forth above, please sign this Statement of Work.

## Fees and payment terms

### Fees

We estimate that our fee for the above-mentioned Services will be as outlined in the Addendum based on the assumption, as we have discussed, that we will receive accurate and complete information from you at least six weeks prior to the earlier of the filing date or the date required for board or other review. If all information is not received by this date our costs will increase significantly due to our inability to leverage the work and our fee estimate will increase to at least 15 percent.

4



**Payment schedule**

The billings for the Services described in this Statement of Work will be rendered as follows:

| Description | Billing Date | Amount to be billed |
|---|---|---|
| Initial Billing | Upon receipt of signed SOW | $9,000 |
| Final Billing | Upon completion of returns | Remaining balance |

If applicable, Grant Thornton may bill Client for reasonable direct, out-of-pocket expenses, including but not limited to, travel, lodging, overtime meals, and similar expense items.

In addition, Grant Thornton will bill Client an administrative recovery fee equal to 7% of fees for the administrative time incurred on this engagement.

Grant Thornton's billings are payable upon receipt.

From time to time, Grant Thornton may receive certain incentives in the form of bonuses and rewards from its corporate card and other vendors. Such incentives to the extent received will be retained by Grant Thornton to cover firm expenses.

Client is solely responsible for any applicable taxes related to the Services. Where the Services are subject to U.S. state and local sales, use, VAT or gross receipts taxes, Grant Thornton will collect such taxes from Client in addition to the fees outlined above and remit such taxes to the proper jurisdictions.

## Entire agreement

This Statement of Work represents the parties' entire understanding with respect to the Services described in this document. This Statement of Work does not modify or amend the Agreement. In the event of a conflict between this Statement of Work and the Agreement, and any other exhibit or attachment included in the Agreement, the terms of the Agreement shall govern.

## Agreed and accepted

The undersigned hereby agree to the terms and conditions as set forth.

**GRANT THORNTON LLP**

_____   Date:_____
Daniel Romano, Tax Partner

7/13/2023

5



**ROMAN CATHOLIC ARCHDIOCESE OF SF**

_Joe Passarello_
_____ Date:_____ 8/7/2023
Joe Passarello, Chief Financial Officer

Enc    Reportable Transactions Questionnaire

6



# Addendum – List of returns/forms included in this Statement of Work

### Roman Catholic Archbishop of San Francisco, A Corporation Sole

- Preparation of Form 990-T and California Form 109 — $7,000
- Preparation of additional state returns — $1,100 per state

## Important Information

The returns and other forms listed above are the only Deliverables that Grant Thornton will prepare under this Statement of Work. Grant Thornton is not responsible for the preparation of amended returns, or any non-income tax returns, including, but not limited to, sales and use tax returns, local property tax returns, payroll or other trust tax returns, and information returns for employee benefit plans, unless otherwise stated herein. If there are additional returns or other compliance-related matters to be addressed, please advise Grant Thornton as soon as possible. Subject to appropriate approval and mutual agreement, this Addendum may be amended to include such additional services that Grant Thornton will provide subject to this Agreement. Except where a separate Statement of Work is used, the terms of this Statement of Work and the attached Grant Thornton LLP Engagement Terms (Attachment A) will also apply to any amendments to this Agreement.

"Grant Thornton" refers to Grant Thornton LLP, the U.S. member firm of Grant Thornton International Ltd (GTIL), and/or refers to the brand under which the GTIL member firms provide audit, tax and advisory services to their clients, as the context requires. GTIL and each of its member firms are separate legal entities and are not a worldwide partnership. GTIL does not provide services to clients. Services are delivered by the member firms in their respective countries. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the United States, visit GT.COM for details.

U.S. member firm of Grant Thornton International Ltd



# TAX-EXEMPT ENTITY REPORTABLE TRANSACTION QUESTIONNAIRE

*Certain types of transactions, known as "reportable transactions" must be disclosed to the IRS or state tax authorities. This questionnaire is supplemental to your Statement of Work (SOW) package for compliance services and helps us gather appropriate information to assist you in complying with the rules.*

### Covered Taxpayers and Tax Periods

The questions below relate to the entities or individuals for the current or most recent taxable period described in the corresponding SOW(s). If we are being engaged to perform compliance services for multiple taxable periods, we will ask you to complete a separate questionnaire each year to document any new transactions that occur in the subsequent periods covered by the SOW(s). Additionally, the questions below apply to any related entity or trust that does not file a separate Federal income tax return (such as a "grantor trust" or a "disregarded entity," or other corporations included in the same consolidated or combined Federal income tax return), as well as any controlled foreign corporation.

A list of IRS and state webpages is included at the bottom of this questionnaire so that you may review the relevant source materials on Reportable Transactions prior to answering the questions. *If you need more information on any of the transactions and would like to discuss further with us, please indicate as such by checking the "Unsure" box below.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**1  "Listed Transactions"**

"Listed transactions" are specific tax shelters that have been identified by the IRS (or certain States) as abusive or potentially abusive. Links to resources are provided below.

|  | Yes | No | Unsure | Comments: |
|---|---|---|---|---|
| To best of your knowledge (including information received with a Schedule K-1), did you participate directly or indirectly in any "listed transaction" during the tax year? | ☐ | ☒ | ☐ | |

**2  Confidential Transactions**

|  | Yes | No | Unsure | |
|---|---|---|---|---|
| To the best of your knowledge, did you participate directly or indirectly in any transaction that may be reflected on your tax return under an agreement or understanding limiting your right or ability to disclose a tax advisor's tax strategies or the tax treatment or tax structure of the transaction? | ☐ | ☒ | ☐ | |

**3  Contingent Fees**

|  | Yes | No | Unsure | |
|---|---|---|---|---|
| To the best of your knowledge, have you or a related party paid or agreed to pay any fees that are contingent or refundable depending on the amount of federal income tax benefits that may be realized or reflected on your tax return? | ☐ | ☒ | ☐ | |

After completing the Questionnaire, please sign below.

*I certify that the above answers, to the best of my knowledge, are true and complete.*

Signature: _Joe Passarello_____     Date: _8/7/2023_____

Print Name: Joe Passarello

Title: CFO

**Please visit the following websites/URLs for guidance on the respective federal and state Listed Transactions and Transactions of Interest. We can also provide a written summary of these transactions upon your request.**

| | |
|---|---|
| Federal Listed Transactions | https://www.irs.gov/businesses/corporations/listed-transactions |
| Federal Transactions of Interest | https://www.irs.gov/businesses/corporations/transactions-of-interest |
| California Listed Transactions | https://www.ftb.ca.gov/tax-pros/abusive-tax-shelters/index.html |
| Colorado Listed Transactions | https://www.sos.state.co.us/CCR/GenerateRulePdf.do?ruleVersionId=8043 |
| New York Listed Transactions | https://www.tax.ny.gov/enforcement/audit/tax_shelter.htm |

## Certificate Of Completion

Envelope Id: 13545A07D03F4B80B068BDBAB6D64F71                                    Status: Completed
Subject: Please DocuSign: SF Arch FY23 Tax Engagement Documents with Grant Thornton, LLP
Source Envelope:
Document Pages: 9                              Signatures: 3                      Envelope Originator:
Certificate Pages: 5                           Initials: 0                        Courtney Hogben
AutoNav: Enabled                                                                  3333 Finley Rd
EnvelopeId Stamping: Enabled                                                      Ste 700
Time Zone: (UTC-06:00) Central Time (US & Canada)                                Downers Grove, IL  60515-1253
                                                                                 Courtney.Hogben@us.gt.com
                                                                                 IP Address: 52.177.205.51

## Record Tracking

Status: Original                               Holder: Courtney Hogben           Location: DocuSign
          7/13/2023 3:52:04 PM                         Courtney.Hogben@us.gt.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Daniel Romano<br>Daniel.Romano@us.gt.com<br>Partner<br>Grant Thornton LLP<br>Security Level: Email, Account Authentication<br>(Optional) | Signature Adoption: Uploaded Signature Image<br>Using IP Address: 134.238.184.74 | Sent: 7/13/2023 3:58:38 PM<br>Viewed: 7/13/2023 4:11:55 PM<br>Signed: 7/13/2023 4:12:24 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| Joe Passarello<br>PassarelloJ@sfarch.org<br>CFO<br>Archdiocese of San Francisco<br>Security Level: Email, Account Authentication<br>(Optional) | *Joe Passarello*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 73.158.207.151 | Sent: 7/13/2023 4:12:26 PM<br>Resent: 7/31/2023 2:17:09 PM<br>Resent: 8/7/2023 11:20:37 AM<br>Viewed: 8/7/2023 11:22:04 AM<br>Signed: 8/7/2023 11:22:04 AM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 8/1/2023 12:11:58 PM<br>   ID: 03ab8190-ae2c-4f62-9651-ee11a177e0bd | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| GT eSign Support<br>gt.esign@us.gt.com<br>Grant Thornton LLP<br>Security Level: Email, Account Authentication<br>(Optional) | COPIED | Sent: 8/7/2023 11:22:05 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/13/2023 3:58:38 PM |
| Certified Delivered | Security Checked | 8/7/2023 11:22:04 AM |
| Signing Complete | Security Checked | 8/7/2023 11:22:04 AM |
| Completed | Security Checked | 8/7/2023 11:22:05 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Grant Thornton LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

## Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

## Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

## Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

## All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Grant Thornton LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: hypercare@us.gt.com

**To advise Grant Thornton LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at hypercare@us.gt.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Grant Thornton LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to hypercare@us.gt.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Grant Thornton LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to hypercare@us.gt.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Grant Thornton LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Grant Thornton LLP during the course of your relationship with Grant Thornton LLP.

EXHIBIT 3 TO ORDER ON MOTION TO EMPLOY PROFESSIONALS

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

        Debtor and
        Debtor In Possession.

Case No. 23-30564

Chapter 11

**RETENTION QUESTIONNAIRE**

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023**.

All questions **must** be answered. Please use "none," "not applicable," or "N/A," as appropriate. If more space is needed, please complete on a separate page and attach.

1.     Name and address of professional:

Daniel Romano, Partner

Grant Thornton LLP

757 3rd Avenue

New York, NY 10017

2.     Date of retention: February 23, 2015

3.     Type of Services to be provided:

UBIT Tax Consulting

4.     Brief description of services to be provided:

Review of information to determine unrelated business income, preparation of applicable federal and state tax returns, and interaction with taxing authorities in this regard, as necessary.

5.     Arrangements for compensation (hourly, contingent, etc.):

Fixed fee, plus additional, per state filing and hourly rates for related matters such as dealing with taxing authorities

    (a)     Average hourly rate (if applicable): $500, for non-fixed aspects of engagement, as necessary

-1-

(b) Estimated average monthly compensation based on prepetition retention (if company was employed prepetition): $1,600

6. Prepetition claims against the Debtor held by the company (if any):

Amount of claim: $2,496.31_____

Date claim arose: July 2023_____

Nature of claim: For tax services provided in connection with year-end June 30, 2022__

7. Prepetition claims against the Debtor (if any) held individually by any member, associate, or employee of the company:

Name: N/A

Status: N/A_____

Amount of claim: $N/A_____

Date claim arose: N/A_____

Nature of claim: N/A_____

_____

8. Disclose the nature and provide a brief description of any interest adverse to the Debtor or its estate for the matters on which the professional is to be employed:

N/A_____

_____

_____

9. Name and title of individual completing this form:

Daniel Romano, Partner

Dated: October 30, 2023

_____

Daniel Romano

# EXHIBIT 4

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

    Debtor and
    Debtor In Possession.

Case No. 23-30564

Chapter 11

**DECLARATION AND DISCLOSURE
STATEMENT OF BLAKE THIBAULT,
ON BEHALF OF HEFFERNAN
FINANCIAL SERVICES**

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Blake Thibault, hereby declare as follows:

1.    I am a President of Heffernan Financial Services, located at1350 Carlback Ave., Walnut Creek, CA (the "Firm").

2.    The Debtor in the above-captioned chapter 11 case has requested that the Firm provide Investment Advisory and Fiduciary Governance services to the Debtor, and the Firm has consented to provide such services (the "Services"). Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement").

3.    The Services include, but are not limited to, the following:

Fiduciary governance, investment advisory services, plan design consulting, investment policy statement design.

4.    The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case. As part of its customary practice, the Firm is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The Firm does not perform services for any such person in connection with this chapter 11 case. In addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the

matters on which the Firm is to be retained.

5.      Neither I, nor any principal of, or professional employed by the Firm has agreed to share or will share any portion of the compensation to be received from the Debtor with any other person other than principals and regular employees of the Firm.

6.      Neither I nor any principal of, or professional employed by the Firm, insofar as I have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

7.      As of the commencement of this chapter 11 case, the Debtor owed the Firm $0.00 in respect of prepetition services rendered to the Debtor.

8.      If at any time during the period of its employment, if the Firm should discover any facts bearing on the matters described herein, the Firm will supplement the information contained in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration and Disclosure Statement was executed on November 2, 2023, at Heffernan Insurance Brokers, 1350 Carlback Ave., Walnut Creek, CA 94549.

Blake Thibault

## 3(21) INVESTMENT ADVISORY AGREEMENT

HEFFERNAN RETIREMENT SERVICES
Because You're Different
A DIVISION OF HEFFERNAN INSURANCE BROKERS

The Archdiocese of San Francisco 403(b) Plan

THIS INVESTMENT ADVISORY AGREEMENT is made on the Effective Date identified below by and between Global Retirement Partners, LLC ("Advisor"), doing business as Heffernan Retirement Services, and the entity shown on Appendix A attached hereto ("Client"), with reference to the following:

The Sponsor named on Appendix A sponsors and maintains a retirement plan ("Plan"). Client is responsible for designating investment alternatives available to participants for the investment of their individual accounts under the terms of the Plan and to enter into contractual arrangements with third parties to assist in the discharge of these and related duties. The type of Plan is specified on Appendix A.

Advisor is a Registered Investment Adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and is willing to render advisory and other services under the terms and conditions of this Agreement through its advisory representatives ("Advisory Representatives"). Advisory Representatives are named in Appendix A.

In connection with and in discharge of its duties with respect to the Plan, Client desires to engage the services of Advisor and the Advisory Representative for the purposes specifically set forth below.

NOW, THEREFORE, in consideration of the following mutual promises and covenants, Client and Advisor agree as follows:

### 1. Appointment of Advisor

**Investment Advisor.** Client hereby engages Advisor and the Advisory Representative to provide the investment advisory and other services described by this Agreement. Client and Advisor agree and acknowledge that (a) Advisor and the Advisory Representative shall act in a solely advisory capacity and shall not have or exercise any discretionary authority or discretionary control respecting management or the investment of the assets of the Plan, and (b) Advisor and the Advisory Representative will not be responsible for investment decisions made by the Plan participants with respect to the investment of their individual accounts.

### 2. Services– See Appendix B

### 3. Term

The term of this Agreement shall commence on the Effective Date set forth below, and shall continue unless and until terminated by either party on not less than thirty (30) days written notice to the other party.

### 4. Termination of Agreement

This Agreement may be terminated by either party upon providing written notification to the other party. If the effective date of termination of this Agreement occurs during the quarter in which the notice of termination is given and is other than the last day of a calendar quarter for which Advisor has

Case: 23-30564 Doc# 304 Filed: 11/10/23 Entered: 11/10/23 12:08:15 Page 52 of 87

received payment, Advisor shall be entitled to fees in connection with the services provided hereunder for the period to such termination. Client will be responsible for a pro rata portion of its quarterly fee for such additional period. Any such additional fee shall be paid concurrently with the notice of termination if given by Client and within five (5) business days following the notice of termination by Advisor. The termination of this Agreement shall not affect provisions of this Agreement relating to the arbitration of disputes, the validity of any action taken before termination, or liabilities for actions taken prior to termination.

5. **Compensation**

Advisor shall be paid for services by the party and in the manner selected in Appendix C. Advisor will not charge a termination fee for early termination of this Agreement, but certain fees or adjustments may apply upon the sale or other termination of investments made by the Plan. Please review the prospectus or other offering documents that apply to the investments made by your Plan.

Client agrees and acknowledges that it has received a copy of this Agreement and Appendix C for review reasonably in advance of entering this Agreement. This Agreement together with Appendix B and Appendix C describes the services to be provided by Advisor and Advisor's compensation for services under this Agreement.

6. **Acknowledgements, Representations, Warranties and Disclosures of Client**

(a) Client acknowledges that (i) it has selected the investment(s) and investment manager(s) to be held by or offered under the Plan, and (ii) Advisor is acting in an advisory capacity only and has no discretion over the investments held by or offered under the Plan.

(b) Client acknowledges that Client (or if required by the Plan, the Plan's participants) is solely responsible for the voting of proxies and exercise of other shareholder rights with respect to securities held by the Plan and Advisor does not provide any advice with respect to such matters.

(c) Client has been advised by Advisor that investments fluctuate in value and the value of the investments when sold may be greater or lesser than the original cost. Client acknowledges that (i) Advisor does not warrant or guarantee any level of performance by any of the investments or that any investment will be profitable over time, (ii) the Plan and its participants are assuming the market risk involved in the investment of Plan assets, and (iii) past investment performance does not necessarily guarantee any level of future investment performance.

(d) Notwithstanding any other provision of this Agreement, neither Advisor nor your Advisory Representative may provide any investment or other advice with respect to (i) assets of the Plan that may be invested in stock issued by the plan sponsor, (ii) a self-directed brokerage option that permits participants the opportunity to allocate some or all of their participant accounts to other investments, or (iii) with respect to whether to continue such investments as a part of the Plan.

(e) Client represents and warrants that Client has the power and authority to enter into and perform this Agreement, and there are no authorizations, permits, certifications, licenses, filings, registrations, approvals or consents that must be obtained by it from any third party, including any governmental authority, in connection with this Agreement. Client represents and warrants that it

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 53 of 87

is a fiduciary of the Plan with authority to select the Plan's other service providers and the Plan's investments, and Client has responsibility to determine whether the Plan's service arrangements including compensation paid by the Plan is reasonable.

(f) Client acknowledges that the Plan will pay fees and expenses in connection with the Plan's investment transactions, which will be in addition to the Advisor's fees. If the Plan invests in mutual funds, the fee table that is located in the summary section at the front of each mutual fund prospectus describes fees and expenses paid from a mutual fund's assets, including its total annual operating expenses. If the Plan purchases a variable annuity contract or other insurance product ("insurance product"), the total annual operating expense of each variable investment option provided under an insurance product, and all other charges, fees, or penalties that may be imposed in connection with the purchase, holding, exchange or termination of the insurance product are described in disclosure materials provided by the insurance company issuer for your review. The Advisory Representative may provide copies of mutual fund prospectus and insurance company disclosure materials to Client before Client selects a mutual fund or insurance product, and will obtain and provide additional copies on the Client's request.

(g) Client represents and warrants that this Agreement has been duly authorized and executed and constitutes the legal, valid and binding Agreement of Client and Plan, enforceable in accordance with its terms.

(h) Client acknowledges and agrees that Client is required to provide Advisor with current statements of investment holdings and such other information as Advisor may reasonably require in performing services under this Agreement. Client agrees to coordinate as needed with the Plan's other service providers (e.g., trustee or custodian, record keeper and/or investment provider) to provide (or provide Advisor access or authorization to access) such statements and other information to Advisor. Client agrees that Advisor may rely on all financial and other information provided or to be provided to Advisor by Client or any of the Plan's other service providers to enable Advisor to perform services under this Agreement as true, correct and complete in all material respects. Client further acknowledges that Advisor's performance of services including without limitation the delivery of reports to Client depends upon Advisor's timely receipt of all required information and that Advisor is not responsible for verifying the accuracy of the financial and other information provided by Client or any other of the Plan's service providers. Client agrees to promptly notify Advisor in writing of any material change in the financial and other information provided to Advisor and to promptly provide any such additional information as may be requested by Advisor. Further, Client represents and warrants that the information provided on Appendix A with respect to the Sponsor, Client and Plan is accurate and correct. Client shall notify Advisor immediately of any change to Client and Plan information provided on Appendix A.

(i) Client acknowledges that Advisor shall not, and cannot, provide legal, accounting or tax advice to Client or the Plan. Client is responsible to maintain the Plan in compliance with applicable qualification requirements of the Internal Revenue Code and Advisor shall have no responsibility for such matters. Client agrees to seek the advice of its legal advisor as to matters that might arise relating to the operation and administration of the Plan.

(j) Client acknowledges that Client is solely responsible for the administration of the Plan in accordance with applicable law and regulation.

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 54 of 87

(k) Receipt of Disclosure Statement: Client acknowledges receipt of Advisor's Brochure (Part 2A and 2B of Form ADV) prior to or contemporaneously with execution of this agreement and understands that this agreement may be terminated without penalty within five (5) business days after entering this Agreement.

## 7. Representations, Warranties and Disclosures of Advisor

(a) Advisor represents and warrants that (i) Advisor is registered as an investment adviser under the Advisers Act and shall maintain such registration through the term of this Agreement, and (ii) all personnel assigned by Advisor to render services hereunder shall be appropriately licensed as required by law.

(b) Advisor represents and warrants that it has no material affiliation or contractual relationship with any other party in the selection of the investment options under the Plan.

(c) Advisor represents and warrants that Advisor has the power and authority to enter into and perform this Agreement, and there are no authorizations, permits, certifications, licenses, filings, registrations, approvals or consents which must be obtained by it from any third party, including any governmental authority, in connection with this Agreement.

(d) Advisor represents and warrants that this Agreement has been duly authorized and executed and constitutes the legal, valid and binding Agreement of Advisor, enforceable in accordance with its terms.

## 8. Standard of Care; Limits on Liability

(a) In performing its duties hereunder, Advisor will act in a manner consistent with the requirements of a fiduciary under ERISA charged with performing the duties specified in this Agreement. Accordingly, Client acknowledges that the sole standard of care imposed on Advisor and its agents hereunder is to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent investor acting in a like capacity would use.

(b) Client agrees that the only responsibilities of Advisor hereunder are to render the services described by this Agreement, and Advisor shall have no other responsibility with respect to Client or the Plan. Neither Advisor nor any "person associated with" Advisor, as such term is defined in Section 202(a)(17) of the Advisers Act, shall have the authority to take custody or possession of any assets of the Plan.

(c) Advisor will not be subject to any claim arising from any act or failure to act of Sponsor, Client, any other representative of the Plan, any employee or agent of the Sponsor, any other service provider to the Plan, or any participant under the Plan, or any failure of Sponsor, Client or any other representative of the Plan (or any of their employees or agents), or any other service provider to the Plan, to comply with any of its obligations relating to the Plan. Advisor shall not be liable for any action taken, suffered or omitted by it or for any error in judgment made by it in the performance of its duties hereunder, in the absence of negligence, intentional misconduct or material breach of Agreement on the part of Advisor.

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 55 of 87

(d) Sponsor (and to the extent permitted by applicable law, the Plan) shall indemnify Advisor, and each of its current or future subsidiaries or affiliates, and their shareholders, directors, officers, employees, agents or other representatives, and hold each of them harmless from and against any and all claims, losses, expenses, liabilities, demands, obligations, costs, attorneys' fees or damages of every kind and character without limitation arising out of or connected with (i) any breach of Client's acknowledgements, representations and warranties under Section 6 or other failure to comply with its obligations under this Agreement, and (ii) any action taken or failed to be taken by Sponsor, Client or any other representative of the Plan (or any of their employees or agents), or any other service provider to the Plan, in connection with the operation or administration of the Plan (including without limitation, the selection or retention of investments, investment managers or investment providers not recommended by Advisor) in the absence of Advisor's negligence, intentional misconduct or material breach of this Agreement.

(e) The provisions of this Section 8 shall survive termination of this Agreement. Notwithstanding the foregoing, nothing in this Agreement shall operate as a waiver or limitation of the Plan's rights under federal or state securities laws.

## 9. Custody

All Plan assets will be maintained by a designated custodian selected by the Client. Advisor will not act as custodian for any Plan assets and will not take possession of cash and/or securities of the Plan. Advisor will not be liable to Client for any act, conduct or omission by the custodian.

## 10. Non-Exclusive Services; Relationship of Parties

Client understands that Advisor and its affiliates and agents, including its Advisory Representatives, perform, among other things, brokerage and investment advisory services for other clients, including other plans. Client recognizes that Advisor or any of its affiliates or agents including its Advisory Representatives may give advice and take action in the performance of its duties for such other clients (including those who may have similar retirement plan arrangements as the Plan) which may differ from advice given, or in the timing and nature of action taken, with respect to Client and the Plan. Nothing in this Agreement shall be deemed to impose on Advisor, or any of its affiliates or agents including its Advisory Representatives, any obligation to advise Client with respect to the Plan in the same manner as Advisor (or any of its affiliates or agents including its Advisory Representatives) may advise any other clients. Client also acknowledges that Advisor (and its affiliates and agents including its Advisory Representatives) may, by reason of its other activities as described above from time to time acquire confidential information. Client acknowledges and agrees that Advisor (and its affiliates and agents including its Advisory Representatives) are not permitted to divulge to Client or any other party, or to act upon, any such confidential information in providing services under this Agreement.

Client acknowledges that certain Advisory Representatives of Advisor may engage in outside business activities that are not supervised by the Adviser such as (without limitation) providing consulting, administration, recordkeeping or similar services with respect to retirement plans. Client acknowledges and agrees that Advisor (i) does not endorse or recommend any Advisory Representative to provide services to Client or the Plan that are not within the scope of and subject to this Agreement, and (ii) is not responsible for and does not supervise any Advisory Representative with respect to any such

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 56 of 87

outside business activities. If Client engages the Advisory Representative to provide services other than the services described by this Agreement and Appendix A, Advisor shall not supervise such services and shall have no responsibility for the Advisory Representative's provision of such services.

**11. Expenses**

Advisor shall be entitled to reimbursement of any reasonable and necessary expenses incurred by it at the request of Client in the performance of its duties hereunder promptly upon presentation of invoices. In the event of any litigation involving the Plan, Client shall reimburse Advisor for all costs of providing records, preparing reports and preparing for and providing testimony in such litigation, including the reasonable compensation of its employees in performing such functions, whether or not Advisor is a party to such action. This provision shall survive termination of this Agreement.

**12. General Provisions**

(a) **Entire Agreement**. This Agreement constitutes the entire agreement between Client and Advisor with respect to the matters set forth herein, and each party acknowledges and agrees that no representations, warranties, inducements, promises or agreements other than those set forth herein have been made by any party to the other. In addition, this Agreement shall supersede all previous Agreements between the Client and Advisor with respect to matters herein.

(b) **Amendments**. Advisor may propose to amend this Agreement by written notice to Client, and Client will be deemed to agree and the amendment will be effective, unless Client objects in writing within thirty (30) days of receipt of such notice. No other modifications, amendments or attempted waiver of any provisions of this Agreement shall be valid unless in writing and signed by both parties hereto.

(c) **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, except to the extent federal law preempts state law.

(d) **Nonassignability; Binding Effect**. Neither party to this Agreement may assign nor delegate any rights or obligations hereunder without first obtaining the written consent of the other, but this Agreement shall be binding upon and inure to the benefit of the parties and their permitted successors and assigns.

(e) **Notice**. All notices required by this Agreement shall be in writing and delivered by U.S. Mail, overnight express delivery, facsimile or email and shall be effective on the date of delivery if personally delivered or delivered by email or on the date of posting if mailed. Notices shall be delivered to the following addresses:

If to Advisor:     Global Retirement Partners, LLC
                   Attn.: Compliance Officer
                   4340 Redwood Highway, Suite B60
                   San Rafael, CA 94903
                   (415) 526-2750 phone
                   (415) 492-1229 facsimile

Case: 23-30564     Doc# 304     Filed: 11/10/23     Entered: 11/10/23 12:08:15     Page 57 of 87

A copy of any notice to the Advisor shall also be sent to the Advisory Representative at the address on Appendix A.

(f) **Advice of Counsel**. Each party represents and warrants that in executing this Agreement it has had the opportunity to obtain independent accounting, financial, investment, legal, tax and other appropriate advice; that the terms of the Agreement have been carefully read by such party and its consequences explained to such party by his or their independent advisors, and that such party fully understands the terms and consequences of this Agreement. Each party further represents and warrants that, in executing this Agreement, it has not relied on any inducements, promises or representations made by the other party (except those expressly set forth herein) or the accountants, attorneys or other agents representing or serving the other party. Each party represents and warrants that its execution of this Agreement is free and voluntary.

(g) **Interpretation**. This Agreement shall be construed in accordance with its fair meaning as if prepared by all parties hereto, and shall not be interpreted against either party on the basis that it was prepared by one party or the other. The captions, headings, and subheadings used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions thereof. Words used herein in the masculine gender shall include the neuter and feminine gender, words used herein in the neuter gender shall include the masculine and feminine, words used herein in the singular shall include the plural, and words used in the plural shall include the singular, wherever the context so reasonably requires.

(h) **Arbitration**. In the event of a dispute arising from or relating to this Agreement or a breach thereof, the parties agree to try in good faith to resolve the dispute through direct discussions. If such direct discussions do not resolve the dispute, the parties agree to endeavor to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures, the New York Stock Exchange, Inc., or Financial Industry Regulatory Authority (FINRA), as Advisor may designate before resorting to arbitration. If they are unable to resolve the dispute through mediation, within sixty (60) days from the date notice is first given by one party to the other as to the existence of such a dispute, they agree to submit to resolution by arbitration before a panel of independent arbitrators and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, the New York Stock Exchange, Inc., or Financial Industry Regulatory Authority (FINRA), as Advisor may designate. Such arbitration shall be binding and final, the judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrators will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute. This provision survives termination of this Agreement.

The Parties have caused this Agreement to be signed by their duly authorized representatives as **of** [ _09/01/2019_ ] (the "Effective Date").

| Authorized Signer for Named Plan Fiduciary | | Investment Advisor Representative | |
|---|---|---|---|
| Signature: | _[signature]_ | Signature: | _[signature]_ |
| Print Name: | Joseph Passarello | Print Name: | Blake Thibault |
| DBA: | The Archdiocese of San Francisco | DBA: | Heffernan Retirement Services |
| Address: | One Peter York Way | Address: | 1350 Carlback Ave |
| City, ST Zip: | San Francisco, CA 94109 | City, ST Zip: | Walnut Creek, CA 94596 |
| Email: | PassarelloJ@sfarch.org | Email: | blaket@heffgroup.com |
| Date: | 9/16/19 | Date: | 9/18/19 |

| Authorized Signer for Named Plan Fiduciary (Complete only if second signature required) | | Investment Advisor Representative | |
|---|---|---|---|
| Signature: | _[signature]_ | Signature: | |
| Print Name: | Reverend John Piderit, S.J. | Print Name: | |
| DBA: | The Archdiocese of San Francisco | DBA: | |
| Address: | One Peter York Way | Address: | |
| City, ST Zip: | San Francisco, CA 94109 | City, ST Zip: | |
| Email: | PideritsJ@sfarch.org | Email: | |
| Date: | 9-16-19 | Date: | |

| Authorized Signer for Named Plan Fiduciary (Complete only if third signature required) | | RIA Acceptance |
|---|---|---|
| Signature: | | |
| Print Name: | | |
| DBA: | | |
| Address: | | |
| City, ST Zip: | | |
| Email: | | |
| Date: | | |

Case: 23-30564　Doc# 304　Filed: 11/10/23　Entered: 11/10/23 12:08:15　Page 59 of 87

# APPENDIX A

**Plan Name:** The Archdiocese of San Francisco 403(b) Plan

**Named Plan Fiduciary (Client):** The Archdiocese of San Francisco

**Plan Sponsor Name:** Joseph Passarello

**Plan Sponsor Address/ Phone/Email:**
One Peter Yorke Way, San Francisco, CA 94109
(415) 614-5511
PassarelloJ@sfarch.org

**Plan Tax ID:** 94-1498472

**List All Authorized Signers, POAs, or anyone with discretion over the plan: (attach separate page as needed)**
Reverend John Piderit, S.J.

**Plan Type:     Please Specify** 403(b) Church Plan

**Vendor/Provider Name:** Fidelity

**Advisory Representative:** Blake Thibault

**Advisory Representative Address: (Include Phone and Email)**
1350 Carlback Ave
Walnut Creek, CA 94596

| Internal Use - To be Completed by IAR | |
|---|---|
| Estimated Plan Participants as of the effective date of the agreement: | $60M |
| Total Estimated Plan Assets as of the effective date of the agreement: | 750 |

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 60 of 87

# APPENDIX B - SERVICES

## Investment Advisory Services (Select all that apply)

☑ **Investment Policy Statement.**
Advisor will prepare an initial draft investment policy statement ("IPS") for the Plan, including investment objectives, policies, and constraints consistent with the Plan's requirements and provide an annual review of the IPS. Client is responsible for reviewing and adopting the IPS, and updating the IPS to reflect changes in the Plan and investments of the Plan from time to time. Advisor provides no assurances that the Plan will achieve the investment objectives in the IPS.

☑ **Ongoing Investment Selection and Recommendations.**
Advisor will review the Plan's investments and recommend investment manager(s) and investment(s) consistent with the requirements of the Plan's IPS as adopted by Client. Advisor will assist Client to implement the Plan's investment program solely upon Client's direction. Advisor will recommend, for consideration and selection by Client, investment replacements if an existing investment is no longer suitable as an investment option.

☑ **Ongoing Investment Monitoring.**
Advisor will perform ongoing monitoring of investment options in relation to the criteria provided by the Client to the Advisor.

☐ **Non-Discretionary Model Portfolios.**
Advisor will recommend, for consideration and approval by Client, (i) asset allocation target-date or risk-based model portfolios for the Plan to make available to Plan participants, (ii) funds from the line-up of investment options chosen by the Client to include in such model portfolios.

☑ **Performance Reports.**
Advisor will prepare periodic reports reviewing the performance of all Plan investment options, as well as comparing the performance thereof to benchmarks with Client. The information used to generate the reports will be derived directly from information such as stated provided by Client, investment providers and/or third parties.

*Agreed Upon Plan Reviews (Annually):*
☐ *Quarterly*
☑ *Semi-Annually (* ☐ *1Q&3Q or* ☑ *2Q&4Q)*
☐ *Annually*

Case: 23-30564     Doc# 304     Filed: 11/10/23     Entered: 11/10/23 12:08:15     Page 61 of 87

## Consulting Services (Select all that apply)

☑ **Service Provider Liaison.**
Advisor shall assist the Plan by acting as a liaison between the Plan and service providers, product sponsors and/or vendors. In such cases, Advisor shall act only in accordance with instructions from the Client on investment or Plan administration matters and shall not exercise judgment or discretion.

☑ **Education Services to Plan Committee.**
Advisor will provide education, training, and/or guidance for the members of the Plan Committee with regard to plan features, retirement readiness matters, or duties and responsibilities or the Committee, including education with respect to fiduciary responsibilities.

☑ **Participant Enrollment.**
Advisor will assist Client in enrolling Plan participants in the Plan, including conducting an agreed upon number of enrollment meetings. As part of such meetings, Advisor will provide participants with information about the Plan, which may include information on the benefits of Plan participation, the benefits of increasing Plan contributions, the impact of preretirement withdrawals on retirement income, the terms of the Plan and the operation of the Plan.

*Agreed Upon Enrollment Meetings (Annually):* _____

☑ **Participant Education.**
If the Plan is participant-directed, Advisor may provide investment education and information to participants as agreed from time to time, including in-person group sessions and printed education materials (which may include posters, payroll stuffers, and emails) and other similar services.

Heffernan or affiliates will not solicit nor accept any individual advisory accounts.

*Agreed Upon Education Meetings (Annually):* _____

☐ **Provide a Comprehensive Wellness Program.**

☑ **Plan Search Support/Vendor Analysis.**
Advisor will assist Client with the preparation of requests for proposals, evaluation of proposals and bids, and interviews of investment providers (e.g., insurance or brokerage firms or mutual fund complexes offering plan recordkeeping and investment services) and/or other plan service providers, as requested by Client, from time to time. Advisor will assist Client with conversions between investment providers and other plan service providers. In performing service provider search support services, Advisor acts in a solely advisory capacity; Client shall be responsible for selecting the Plan's investment platform provider and other plan service vendors and determining whether their compensation is reasonable.

☑ **Benchmarking Services.**
Advisor will provide Client with comparisons of Plan data (e.g., regarding fees, services, participant enrollment and contributions) to data from the Plan's prior years and/or a benchmark group of similar plans.

☑ **Assistance Identifying Plan Fees.**
Advisor will assist Client in identifying the fees and other costs borne by the Plan for, as specified by Client, investment management, recordkeeping, participant education, participant communication and/or other services provided with respect to the Plan.

## APPENDIX C – FEE SCHEDULE

**Payment Source:**

☐ **Investment Provider or other third party, and/or out of Plan assets:**

Sponsor authorizes the investment provider or other third party ("Third Party Payor") to pay compensation due to RIA and Advisory Representative(s) pursuant to the below terms. A periodic statement setting forth the compensation deducted from the Plan shall be provided by Third Party Payor. (Note: additional authorization forms may be required by the Third Party Payor.) Check applicable payor:

**Name of Payor:**_____

**Payment Account/Contract Ref#:**_____

☑ **Client:** Fees shall be billed to the Sponsor. Fees shall be due upon receipt of the billing notice.

**Advisor Compensation:**

☐ **Annual Fee for Service.** Fee for service based on percentage of Plan assets of _____ basis points (bps). _____

_____

☑ **Annual Flat Fee for Service: $** ___52,500___ _____

_____

☐ **First Year Transition Expense fee of $**_____ or _____ **bps** (one time).

☐ **One-time Fee of $**_____, for Project-Specific work.

☐ **Annual Fee for Service – Tiered.** Fee for service based on a percentage of Plan assets, per the tiered schedule below:

| Value of Plan Assets (range) | Fee |
|---|---|
| | _____ Basis Points |
| | _____ Basis Points |
| | _____ Basis Points |
| | _____ Basis Points |
| | _____ Basis Points |
| *Note: Subject to Vendor approval and execution* | |

**Payment Frequency, Timing, and Method:**

**Frequency:**
- ☐ Monthly
- ☑ Quarterly
- ☐ Other:_____

**Timing:**
- ☑ In arrears
- ☐ In advance

**Method:**
- ☐ Based on the value of Plan assets in the method determined by the Third Party Payor,
- ☐ Based on the value of Plan Assets at ( ☐ beginning or ☐ end) of the quarter
- ☐ Based on the average market value for the frequency selected above
- ☑ Flat Fee, as noted above

Late Fee: To compensate for additional collection expense to Advisor, 3% of amount due, payable directly to Advisor by Sponsor, for any advisory fee unpaid 60 days after due date.

Case: 23-30564    Doc# 304    Filed: 11/10/23    Entered: 11/10/23 12:08:15    Page 65 of 87

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

        Debtor and
        Debtor In Possession.

Case No. 23-30564

Chapter 11

**RETENTION QUESTIONNAIRE**

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023**.

All questions **must** be answered. Please use "none," "not applicable," or "N/A," as appropriate. If more space is needed, please complete on a separate page and attach.

1.     Name and address of professional:

        Blake A. Thibault, President
        Heffernan Financial Services
        1350 Carlback Ave.
        Walnut Creek, CA 94549

2.     Date of retention: September 19, 2019

3.     Type of Services to be provided:

Investment Advisory related to the retirement programs offered to employees.

4.     Brief description of services to be provided:

Fiduciary governance, Investment policy statement design and implementation, quarterly investment reviews, plan design consulting, investment committee education conduct investment reviews.

5.     Arrangements for compensation (hourly, contingent, etc.):

Annual fee of $52,500 billed quarterly in arrears. Quarterly fee paid in July. Next quarterly fee to be paid in October.

    (a)     Average hourly rate (if applicable): N/A

    (b)     Estimated average monthly compensation based on prepetition retention (if company

was employed prepetition): N/A

6. Prepetition claims against the Debtor held by the company (if any):

Amount of claim: $0.00

Date claim arose: N/A

Nature of claim:

7. Prepetition claims against the Debtor (if any) held individually by any member, associate, or employee of the company:

Name: None, Not applicable _____

Status: _____

Amount of claim: $_____

Date claim arose: _____

Nature of claim: _____

_____

8. Disclose the nature and provide a brief description of any interest adverse to the Debtor or its estate for the matters on which the professional is to be employed:

Not applicable

9. Name and title of individual completing this form:

Blake Thibault, President, Heffernan Financial Services, November 2, 2023

Blake Thibault, President of
Heffernan Financial Services

# EXHIBIT 5

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>       Debtor and<br>       Debtor In Possession. | Case No. 23-30564<br><br>Chapter 11<br><br>**DECLARATION AND DISCLOSURE STATEMENT OF MARK HENRY, ON BEHALF OF STEWARDSHIP PLANNED GIVING** |

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Mark Henry, hereby declare as follows:

1.     I am the President of Stewardship Planned Giving, located at 6713 Old Jacksonville Hwy., Suite 105, Tyler, Texas 75703 (the "Firm").

2.     The Debtor in the above-captioned chapter 11 case has requested that the Firm provide planned giving development services to the Debtor, and the Firm has consented to provide such services (the "Services"). Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement The Engagement Agreement does not contain indemnification and/or limitation of liability provisions.

3.     The Services include, but are not limited to, the following: planned giving development services.

4.     The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case. As part of its customary practice, the Firm is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The Firm does not perform services for any such person in connection with this chapter 11 case. In addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the

-1-

matters on which the Firm is to be retained.

5.      Neither I, nor any principal of, or professional employed by the Firm has agreed to share or will share any portion of the compensation to be received from the Debtor with any other person other than principals and regular employees of the Firm.

6.      Neither I nor any principal of, or professional employed by the Firm, insofar as I have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its estate with respect to the matters on which the Firm is to be retained.

7.      As of the commencement of this chapter 11 case, the Debtor owed the Firm $0.00 in respect of prepetition services rendered to the Debtor.

8.      If at any time during the period of its employment, if the Firm should discover any facts bearing on the matters described herein, the Firm will supplement the information contained in this declaration.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration and Disclosure Statement was executed on October 24, 2023.

Mark Henry for Stewardship Planned Giving

 

**MARK HENRY, JD**
**STEWARDSHIP PLANNED GIVING**
6713 Old Jacksonville Hwy, Suite 105
Tyler, Texas 75703
Tel. 903-787-5093
mark@stewardshipplannedgiving.com

June 14, 2023

Via email: fr.summerhays@gmail.com; linharesrsfarch.org

Fr. Patrick Summerhays, Vicar General
Rod Linhares, Director of Development
Archdiocese of San Francisco
One Peter Yorke Way
San Francisco, CA 94109

Re: Engagement for Planned Giving Development Services

Gentlemen,

Thank you for your interest in hiring us to provide planned giving development services to the Archdiocese of San Francisco. I look forward to assisting you in helping donors and friends of the Archdiocese financially support your Archdiocese with new sources of planned gifts and blended gifts.

The purpose of this "Engagement Letter' and the attachment is to document the terms of the engagement by which we will agree to provide planned giving development services to the Archdiocese. Please read it and make sure you understand the scope of our engagement.

If the terms of our engagement are acceptable, please sign the enclosed copy of this engagement letter and return to our office. Please contact this office immediately if you do not understand, or wish to discuss, any aspect of the terms of this engagement.

**Purpose and Scope**
The engagement of Stewardship Planned Giving is to provide planned giving development services to the Archdiocese of San Francisco. I am the primary provider of services for the Archdiocese and may be replaced only with written consent of the Archdiocese.

The schedule attached as "Attachment A" provides a timeline and budget for the planned giving development services to be provided. Within five (5) days of our receipt of the signed engagement letter and retainer payment, Archdiocese will be provided with a detailed description of the planned giving campaign. We will ensure that all services are provided in a professional manner in accordance with the campaign description noted therein. The Archdiocese of San Francisco understands that the services provided will require cooperation by and assistance from parish staff and diocesan staff that is reasonably necessary for us to provide the services contracted for.

**Period of Engagement**
This engagement will start upon acceptance of the terms of engagement by the Archdiocese of San Francisco as noted by date of the signing of this letter. The engagement will end six (6) months after the engagement begins, unless extended in writing by mutual agreement of the parties.

**Confidentiality**

In conducting this engagement, information acquired by us in the course of the engagement is subject to strict confidentiality requirements. That information will not be disclosed by us to other parties except as required or allowed for by law, or with your consent. Prior to disclosure of this information as required or allowed by law, we will provide Director of Mission Advancement Rod Linhares, written notification, including, but not limited to, the related court order or other record.

**Professional Fees and Costs**

The fee arrangement is based on the expected amount of time and the skill level of staff required to complete the services required. Where quotations have been provided for specific services, these quotations will provide adequate detail of allocated staff and rates. In the event that circumstances of the services to be provided change from the original quotation, a new quotation between the two parties will be agreed before any further work is undertaken.

**Terms of Payment**

An initial retainer of $8000 is due upon signature of this agreement. Thereafter, services will be billed on or by the first day of each month. The terms of payment of the monthly invoice are seven (7) business days from Rod Linhares' receipt of the invoice. Payment will be made by wiring funds to our bank account and bank account information will be provided to you within twenty-four (24) hours of our receipt of this signed engagement letter. Accounts overdue by fifteen (15) business days incur an administration fee of 1% of the outstanding balance.

Once you are satisfied with the terms of our engagement, please sign and date both copies of this letter. One copy of the signed engagement letter should be scanned and emailed to us as evidence of your acceptance of the terms of our engagement. Please return the signed engagement letter to:

**mark@stewardshipplannedgiving.com**

One copy of the signed engagement letter should be emailed to us as evidence of your acceptance of the terms of our engagement, along with the $8000 retainer (by wire) to the designated account.

You should retain the other copy of this letter as your evidence of our engagement.

We thank you for the opportunity to provide planned giving development services to the Archdiocese of San Francisco and we welcome the opportunity to be faithful collaborators with you in helping your friends and donors financially support your Archdiocese.

Thanks and God bless!

*Mark Henry, JD*

I, Rev. Patrick Summerhays, of the Archdiocese of San Francisco, agree to all the terms and conditions as noted in this letter and Attachment A

(Signed by)

Dated: June 15, 2023

For the Archdiocese of San Francisco

Rev. Patrick J. Summerhays, Vicar General

# Attachment "A"

## Budget and Timeline

| Project Phase | Duration | Professional Fee |
|---|---|---|
| Planned Giving Campaign Preparation Phase | 4 weeks | $2000 per week |
| Planned Giving Campaign Implementation Phase | 5 months | $8000 per month (<u>See</u>, Note 1 below) |
| Continuation Program | to be determined | (<u>See</u>, Note 2 below) |

## Proposed Budget

| Planned Giving Services | Estimated Cost |
|---|---|
| Planned Giving Campaign Preparation Phase | $8000 |
| Planned Giving Campaign Implementation Phase | $40000 |
| **Total Fee:** | **$48,000** |

| **Initial Retainer** | **$8000** (<u>See</u>, Note 3 below) |
|---|---|

Note 1: Does not include expenses incurred by Mark Henry while providing professional services including travel, lodging, meals and other costs. Such expenses will be billed to client at cost and approved in advance.

Note 2: The focus on the initial six (6) month planned giving campaign is to implement the planned giving program and expeditiously generate planned gifts. This expedited schedule often leaves other avenues for generating planned gifts not fully developed. There may be other planned giving donors who are able and willing to make planned gifts but whose planned gifts were not completed by the time the initial program is concluded. Additional planned giving development services can be negotiated after initial campaign is concluded.

Note 3: Initial $8000 retainer is due upon client's signature of Engagement Letter and will be applied against first month's invoice. First invoice will be sent on or by the 1st day of the month beginning after the month the Engagement Letter is signed and returned to Stewardship Planned Giving. Client will be emailed invoice every month and payment will be due within seven (7) business days from Rod Linhares' receipt of the invoice.

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

Debtor and
Debtor In Possession.

Case No. 23-30564

Chapter 11

**RETENTION QUESTIONNAIRE**

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023**.

All questions **must** be answered. Please use "none," "not applicable," or "N/A," as appropriate. If more space is needed, please complete on a separate page and attach.

1. Name and address of professional: Stewardship Planned Giving, 6713 Old Jacksonville Hwy., Ste. 105, Tyler, Texas 75703

2. Date of retention: June 15, 2023

3. Type of Services to be provided: Planned Giving Development Services

4. Brief description of services to be provided: Develop a campaign for generating bequests and other planned gifts. Survey parishes for planned gift generating capacity, provide training for diocesan staff, parish staff, priests and lay persons; prepare planned gift marketing and promotion materials; develop parish based planned giving events; conduct parish based planned giving events; planned gift cultivation and closing assistance and other related services.

5. Arrangements for compensation (hourly, contingent, etc.):
Flat fee of $8000 per month, not including travel related costs.

    (a) Average hourly rate (if applicable): <u>(not applicable)</u>

    (b) Estimated average monthly compensation based on prepetition retention (if company was employed prepetition): $8000 per month.

6. Prepetition claims against the Debtor held by the company (if any):

    Amount of claim: $ <u>none</u>

-1-

1    Date claim arose:  N/A

2    Nature of claim:  N/A

3    7.    Prepetition claims against the Debtor (if any) held individually by any member, associate, or

4    employee of the company:

5        Name:  N/A

6        Status:  N/A

7        Amount of claim: $ none

8        Date claim arose:  N/A

9        Nature of claim:  N/A

10

11   8.    Disclose the nature and provide a brief description of any interest adverse to the Debtor or

12   its estate for the matters on which the professional is to be employed:

13    none

14

15

16   9.    Name and title of individual completing this form:

17   Mark Henry

18   Dated: Oct. 26, 2023

19

20                                    Mark Henry for Stewardship Planned Giving

# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC<br>ARCHBISHOP OF SAN FRANCISCO,<br><br>Debtor and<br>Debtor In Possession. | Case No. 23-30564<br><br>Chapter 11<br><br>**DECLARATION AND DISCLOSURE<br>STATEMENT OF TRAVIS PARSONS, ON<br>BEHALF OF KORN FERRY (US)** |

To be completed by Professionals engaged by The Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), in the above-captioned chapter 11 case.

I, Travis Parsons, hereby declare as follows:

1. I am a Senior Client Partner of Korn Ferry (US), whose headquarters office is located at 1900 Avenue of the Stars, Suite 1500, Los Angeles, CA 90067 (the "Firm").

2. The Debtor in the above-captioned chapter 11 case has requested that the Firm provide retained search services to the Debtor, and the Firm has consented to provide such services (the "Services"). Attached hereto is a true and correct copy of the engagement agreement between the Debtor and the Firm (the "Engagement Agreement"). The Engagement Agreement contains indemnification and/or limitation of liability provisions as set forth at pages 3-4 of the Engagement Agreement.

3. The Services include, but are not limited to, the following: conducting a retained search for and recruitment of a Chief Financial Officer.

4. The Firm may have performed services in the past and may perform services in the future, in matters unrelated to this chapter 11 case, for persons that are parties in interest in the Debtor's chapter 11 case. As part of its customary practice, the Firm is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be claimants or employees of the Debtor, or other parties in interest in this chapter 11 case. The Firm does not perform services for any such person in connection with this chapter 11 case. In addition, the Firm does not have any relationship with any such person, such person's attorneys, or such person's accountants that would be adverse to the Debtor or its estate with respect to the

EXHIBIT 2 TO ORDER ON MOTION TO EMPLOY<br>1<br>PROFESSIONALS

1 matters on which the Firm is to be retained.

2     5.     Neither I, nor any principal of, or professional employed by the Firm has agreed to
3 share or will share any portion of the compensation to be received from the Debtor with any other
4 person other than principals and regular employees of the Firm.

5     6.     Neither I nor any principal of, or professional employed by the Firm, insofar as I
6 have been able to ascertain, holds or represents any interest materially adverse to the Debtor or its
7 estate with respect to the matters on which the Firm is to be retained.

8     7.     As of the commencement of this chapter 11 case, the Debtor owed the Firm $0 in
9 respect of prepetition services rendered to the Debtor.

10     8.     If at any time during the period of its employment, if the Firm should discover any
11 facts bearing on the matters described herein, the Firm will supplement the information contained
12 in this declaration.

13     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the
14 United States of America that the foregoing is true and correct, and that this Declaration and
15 Disclosure Statement was executed on November 1, 2023, at _____.

16

17                            Travis Parsons

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 2 TO ORDER ON MOTION TO EMPLOY PROFESSIONALS



KORN FERRY®

One Montgomery St. 22nd Fl.
San Francisco, CA 94104

## TALENT ACQUISITION LETTER OF ENGAGEMENT – EXECUTIVE SEARCH

**PRIVATE AND CONFIDENTIAL**

May 3, 2023

Fr. Patrick Summerhays
Vicar General | Moderator of the Curia
Archdiocese of San Francisco
1 Peter Yorke Way
San Francisco, CA 94109-6602

Dear Fr. Summerhays,

Thank you for the opportunity to assist Archdiocese of San Francisco with this important search for a Chief Financial Officer. This letter of engagement sets forth our understanding of your needs, and the terms and conditions on which our services will be provided. Archdiocese of San Francisco may be referred to as "ASF," "**Client**," "**you**," or "**your**." Korn Ferry (US), on behalf of itself and its affiliates (one or more of which may be performing services) and doing business as Korn Ferry, may be referred to as "**Korn Ferry**," "**we**," "**our**," or "**us**." This letter of engagement forms the agreement (the "**Agreement**") under which we will work together. Korn Ferry will provide the professional services described below (the "**Services**").

## Outline of Services

Our experience has shown that the most successful search assignments are those in which we work closely and partner with our client. While we seek to identify and recommend suitable candidates for a position, you will decide whom to hire. There are several responsibilities that you will undertake to ensure that qualified candidates are made available. Among others, these include:

- Provide Korn Ferry with the appropriate access to key leadership and the final hiring authority.
- Clearly indicate those areas relevant to the search that you wish us to keep confidential.
- Provide timely feedback to Korn Ferry on all aspects of the assignment.
- Schedule interviews promptly with candidates and report your findings as soon as possible.
- Provide Korn Ferry with information on candidates you may have identified from other sources or from within your organization, so that they may be evaluated as part of the search process.
- Provide information to candidates about your company that will enable them to make informed career decisions.
- Agree on a communication strategy to discuss the progress of the search, including marketplace intelligence affecting the search.



## Professional Fees and Expenses

Our professional fees are equal to one third (1/3) of the total first year compensation (base salary, target or guaranteed incentive bonus, and all other compensation including sign-on bonus) for each position we are seeking to fill and we will bill a minimum professional fee of $75,000 (the "**Minimum Professional Fee**").

We will invoice the Minimum Professional Fee in three (3) monthly installments of thirty four percent (34%) ("**First Installment**"), thirty three percent (33%) ("**Second Installment**"), and thirty three percent (33%) ("**Third Installment**"). The First Installment is due and payable upon your acceptance of this Agreement. Invoices for the Second and Third Installments will be rendered thirty (30) and sixty (60) days respectively after the date of your acceptance of this Agreement. All invoices are due and payable upon receipt.

Korn Ferry assesses an administrative services fee for items such as database, search assessment, and research services, cyber security, and data privacy compliance (the "**Administrative Services Fee**"). The Administrative Services Fee will be billed at a monthly rate equal to four percent (4%) of the Minimum Professional Fee each month for a total of three (3) months. In addition, any direct, out-of-pocket expenses such as candidate and consultant travel, accommodation, and other costs will be billed monthly as incurred.

If the Minimum Professional Fee has been fully invoiced prior to the completion of the assignment, no further professional fees will be billed until the engagement has been concluded, but we will continue to bill all direct expenses monthly.

At the conclusion of the search assignment, we will calculate the final professional fee based on the placed candidate's first year compensation for the position (the "**Final Professional Fee**") as reflected in a signed offer letter or contract which you provide to us. If the Final Professional Fee is greater than the Minimum Professional Fee, we will invoice you for the balance. If more than one executive is hired (or otherwise retained as a consultant or independent contractor) because of the work performed by Korn Ferry, a fee equal to one third (1/3) of the placed candidate's first year compensation will be due for each additional individual hired and will be invoiced by Korn Ferry upon placement.

Upon execution of this Agreement, Client may identify candidates in writing that it is already considering for the role and who it wants Korn Ferry to completely exclude from Korn Ferry's recruitment, evaluation, and assessment process ("Carve Out Candidates"). If Client hires a Carve Out Candidate, Client can terminate this search engagement and will only be responsible for those portions of the Minimum Professional Fee, Administrative Services Fee and direct expenses invoiced prior to the termination effective date.

Client will be responsible for all applicable taxes (excluding taxes imposed on Korn Ferry's net income) imposed by any taxing authority, whether designated as value-added (VAT), sales, use, or other similar taxes ("**Transaction Taxes**"), now in effect or hereafter imposed, resulting from the fees arising pursuant to this Agreement. If Client is exempt from Transaction Taxes, Client must inform Korn Ferry of its exemption and provide Korn Ferry complete and proper documentation evidencing the exemption.

All prices in this Agreement are exclusive of Transaction Taxes. If Client is required by applicable law to deduct or withhold taxes from any payment due to Korn Ferry, Client will: (a) withhold the legally required amount from payment; (b) remit the withheld tax to the applicable taxing authority; and (c) promptly deliver to Korn Ferry original documentation or a certified



copy evidencing remittance of withheld tax. If Client does not provide evidence of payment of withheld taxes, Client will reimburse Korn Ferry for the tax withheld from payment to Korn Ferry. Client will comply with all applicable income tax treaties and protocols in determining the amount of tax to withhold.

We are a retained executive search firm. Our fees and expenses are neither refundable nor contingent upon our success in placing a candidate with your organization. Our fee structure applies even if an internal candidate emerges as your final choice.

If payment is not made in a timely manner, Korn Ferry reserves the right to suspend services until all invoices are paid in full.

We will mutually agree on any changes to the services, including modifications of the job specification or candidate profile, and any pricing associated with such changes.

## Termination and Liability

Either party may terminate this Agreement upon written notice to the other party at any time (acknowledged email acceptable), subject to the Client's payment obligations as set out below.

| Termination Date | Payment Obligation |
|---|---|
| During the first thirty (30) days after Client's acceptance of this Agreement: | The First Installment is a minimum retainer and non-refundable. Client will also be billed for (i) the Administrative Services Fee and direct expenses incurred up to the date of termination; and (ii) direct expenses that cannot be cancelled. |
| Between thirty-one (31) and sixty (60) days from Client's acceptance of this Agreement: | The First and Second Installments are due and payable in full. Client will also be billed for (i) the Administrative Services Fee and direct expenses incurred up to the date of termination; and (ii) direct expenses that cannot be cancelled. |
| Sixty-one (61) days or more from Client's acceptance of this Agreement: | The Minimum Professional Fee is payable in full. Client will also be billed for (i) the Administrative Services Fee up through the three-month capped period and direct expenses incurred up to the date of termination; and (ii) direct expenses that cannot be cancelled. |

In addition, a Final Professional Fee and any additional hire fee shall be due for all candidates (except for Carve Out Candidates) hired prior to or within twelve (12) months after the effective date of termination.

Korn Ferry will indemnify and defend Client and its affiliates, from and against all third-party suits, claims, and all related liabilities and costs that are or are alleged to arise from: (a) Korn Ferry's gross negligence, willful misconduct, or fraud in the performance of the Agreement; (b) Korn Ferry's breach of this Agreement; or (c) intellectual property infringement.

Client will indemnify and defend Korn Ferry and its affiliates from and against all third-party



suits, claims, and all related liabilities and costs that are or are alleged to arise from: (a) Client's decision to take any employment action regarding any individual identified, evaluated, or assessed by Korn Ferry; and (b) Client's breach of this Agreement. In addition, if Korn Ferry receives a subpoena from any party relating to the Services or this Agreement, Client will pay all costs Korn Ferry incurs to respond to the subpoena.

Neither party will be liable for any indirect, special, exemplary, consequential, punitive, or incidental damages of any type, including lost profits or business interruption. Our aggregate liability for any damages, losses, costs, and expenses arising out of this Agreement will not exceed in the aggregate the total amount of the professional fees paid to Korn Ferry pursuant to this Agreement. Nothing in this Agreement shall be interpreted to create a fiduciary relationship between you and Korn Ferry.

## Confidentiality

Each of us will maintain the confidentiality of the other's confidential information. We may use and include information obtained in the engagement in our databases and use de-identified data for research and to improve our offerings. We continue to own our pre-existing intellectual property, including databases, assessments, tools, and methodology, and grant you a limited license to use the reports provided solely for your internal use.

## Compliance with Legal and Regulatory Requirements

Each party represents and warrants that it: (a) will comply with all applicable legal and regulatory requirements in connection with this Agreement, which include: (i) information privacy and data protection laws and regulations relating to the protection, disclosure and use of individuals' personal data (such as the General Data Protection Regulation (GDPR) if applicable) and other laws and regulations that mandate the protection of personal data; (ii) anti-bribery, anti-corruption, anti-money laundering laws and regulations; and (iii) international trade sanctions, embargoes, or export bans of the US, EU, UK, UN and any other governmental or supranational body with jurisdiction over this Agreement or either party ("**Sanctions**"); (b) is not a subject of Sanctions; (c) is not owned or controlled by any person or entity subject to Sanctions; and (d) is not located or organized in, or owned or controlled by persons or entities in a jurisdiction subject to Sanctions (including Cuba, Iran, North Korea, Syria, and the Crimea Region of the Ukraine) ("**Sanctioned Jurisdiction**").

Client further represents and warrants that it will not transfer, provide access, or use the Services or work product (including tools and intellectual property) to or for the benefit of any Specially Designated National and Blocked Person (as designated by the U.S. Department of the Treasury's Office of Foreign Assets Control), to or in any Sanctioned Jurisdiction, or to any other party if such transfer, access, or use would constitute a violation of Sanctions.

Any breach of this section is a material breach of this Agreement and grounds for immediate termination by the non-breaching party.

Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement requires Korn Ferry to do any act or refrain from doing any act which would result in Korn Ferry violating (or becoming subject to any penalty under) any laws to which it is subject.

## Korn Ferry's Assessment Tool

Built into our search process and included in the Administrative Services Fee is Korn Ferry's



assessment tool, our state-of-the-art candidate insight platform. This tool will be used during the search engagement, along with other data points to assist you in determining the most appropriate leadership characteristics for the role. We then use our proprietary assessment methodology to help evaluate candidates fit against these desired criteria, as well as your corporate culture. In addition, when applicable, we may use the expertise of our in-house industrial psychologist to assist you in interpreting results.

## Client Satisfaction

Korn Ferry actively seeks client feedback on the quality of our work. At the conclusion of the assignment, we may ask you to take part in Korn Ferry's Client Satisfaction Survey conducted by an independent organization. We seek your candid assessment of our work so that we may be responsive to any suggestions regarding our professional service.

## The Consulting Team

A key component of the Korn Ferry search process is the appointment of the consulting team. Travis Parsons, Dee Lonn and Isabelle Harounian will have primary responsibility for the assignment, and will be supported by other Korn Ferry personnel. The contact information of the key personnel is below:

| | | |
|---|---|---|
| **Travis Parsons**<br>**Senior Client Partner** | Mobile:<br>Email: | **(650) 400-1788**<br>**Travis.Parsons@kornferry.com** |
| **Dee Lonn**<br>**Managing Consultant** | Mobile:<br>Email: | **(612) 998-3350**<br>**Dee.Lonn@kornferry.com** |
| **Isabelle Harounian**<br>**Project Coordinator** | Mobile:<br>Email: | **(310) 776-0026**<br>**Isabelle.Harounain@kornferry.com** |

## Client Acknowledgement

This Agreement constitutes the entire agreement between you and Korn Ferry regarding the subject matter and supersedes any prior representations, advertisements, statements, proposals, negotiations, discussions, understandings, or agreements regarding the same subject matter. Pre-printed terms and conditions on any purchase order issued by Client, or terms and conditions included in Client's vendor set up process are superseded in their entirety by this Agreement and without force or effect, even if Korn Ferry signs the purchase order or acknowledges such terms to be set up as a vendor in Client's systems and whether such signature or acknowledgement occurs prior to or after the execution of this Agreement. Under no circumstances will Korn Ferry's acknowledgement of any such terms be considered an amendment to this Agreement.

If this Agreement accurately describes the terms of our engagement, please have an authorized representative of Archdiocese of San Francisco sign, fill out the billing information below (including any required Purchase Order detail), and return the entire Agreement to me at **TravisParsons@kornferry.com**. Our receipt of this Agreement signed by you authorizes us to proceed with our Services.



Korn Ferry appreciates the opportunity to be of service to Archdiocese of San Francisco. If you have any questions now or during our engagement, please call me at **(650) 400-1788.**

Sincerely,

**KORN FERRY (US)**

TRAVIS PARSONS

**Accepted by:**

Archdiocese of San Francisco                **KORN FERRY (US)**

| | | | |
|---|---|---|---|
| **By:** | | **By:** | |
| **Name:** | Fr. Patrick Summerhays, J.C.L. | **Name:** | Travis Parsons |
| **Title:** | Vicar General \| Moderator of the Curia | **Title:** | Senior Client Partner |
| **Date:** | May 4, 2023 | **Date:** | 5/10/23 |



## Billing Information – To Be Completed by Client

Invoices will be sent to the following address:

| Company: | Archdiocese of San Francisco |
|---|---|
| Address: | One Peter Yorke Way |
| Address: | |
| Attn (Name, Title): | Rev. Patrick Summerhays |
| Email, Phone: | summerhays.patrick@sfarch.org, (415) 614-5588 |

### Accounts Payable Contact:

| Company: | Archdiocese of San Francisco |
|---|---|
| Address: | One Peter Yorke Way |
| Address: | |
| Attn (Name, Title): | Lourdes Molina |
| Email, Phone: | molinal@sfarch.org, (415) 614-5519 |

If a Purchase Order is required with an invoice, we must receive the Purchase Order Number with or immediately after acceptance of the Agreement. Please check the box below if a Purchase Order Number is required on an invoice and if so, insert the Number.

☐ PO # [INSERT]

Please provide a copy of the Purchase Order with your signed agreement.

Supplier portal: __Yes _X_No

If yes, portal name/website where invoices are submitted: _____

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

In re:

THE ROMAN CATHOLIC
ARCHBISHOP OF SAN FRANCISCO,

Debtor and
Debtor In Possession.

Case No. 23-30564

Chapter 11

**RETENTION QUESTIONNAIRE**

To be completed by Professionals engaged by Roman Catholic Archbishop of San Francisco, as debtor and debtor in possession ("Debtor"), which filed the above-captioned chapter 11 case on **August 21, 2023**.

All questions **must** be answered. Please use "none," "not applicable," or "N/A," as appropriate. If more space is needed, please complete on a separate page and attach.

1.    Name and address of professional: Korn Ferry (US), 1900 Avenue of the Stars, Suite 1500, Los Angeles, CA 90067

2.    Date of retention: May 3, 2023

3.    Type of Services to be provided: Retained search services

4.    Brief description of services to be provided: Search for and recruitment of a Chief Financial Officer

5.    Arrangements for compensation (hourly, contingent, etc.): Retained fee due in three installments with additional professional fee due upon placement of a candidate

    (a)    Average hourly rate (if applicable): N/A

    (b)    Estimated average monthly compensation based on prepetition retention (if company was employed prepetition): Three monthly installments of $24,750 each.

6.    Prepetition claims against the Debtor held by the company (if any): N/A

7.    Prepetition claims against the Debtor (if any) held individually by any member, associate, or employee of the company: N/A

8.    Disclose the nature and provide a brief description of any interest adverse to the Debtor or its estate for the matters on which the professional is to be employed: None.

EXHIBIT 3 TO ORDER ON MOTION TO EMPLOY PROFESSIONALS

1    9.    Name and title of individual completing this form: Travis Parsons, Senior Client Partner.

2

3    Dated: November 1, 2023

4                                                    _____

5                                                    Travis Parsons

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28