1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                          ) Case No. 23-30564
                                    ) Chapter 11
5   THE ROMAN CATHOLIC              )
    ARCHBISCHOP OF SAN FRANSISCO,   ) San Francisco, California
6                                   ) Thursday, November 9, 2023
                         Debtor.    ) 1:30 PM
7                                   )
                                    ) DEBTOR'S MOTION FOR ORDER:
8   _____  ) (1) FIXING TIME FOR FILING
                                      PROOFS OF CLAIM; (2)
9                                     APPROVING PROOF OF CLAIM
                                      FORMS; (3) PROVIDING
10                                    CONFIDENTIAL PROTOCOLS; AND
                                      (4) APPROVING FORM AND MANNER
11                                    OF NOTICE FILED BY THE ROMAN
                                      CATHOLIC ARCHBISHOP OF SAN
12                                    FRANCISCO [220]

13              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE DENNIS MONTALI
14            UNITED STATES BANKRUPTCY JUDGE

15  APPEARANCES:
    For the Debtor:             PAUL J. PASCUZZI, ESQ.
16                               Felderstein Fitzgerald Willoughby
                                 Pascuzzi & Rios LLP
17                               500 Capital Mall
                                 Suite 2250
18                               Sacramento, CA 95814
                                ORI KATZ, ESQ.
19
                                 Sheppard, Mullin, Richter and
20                               Hampton LLP
                                 4 Embarcadero Center
21                               17th Floor
                                 San Francisco, CA 94111
22
    For Office of the United    JASON BLUMBERG, ESQ.
23  States Trustee:             United States Department of
                                 Justice
24                               501 I Street
                                 #7-500
25                               Sacramento, CA 95814

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 1 of 118

```
1
    For The Official Committee   JAMES I. STANG, ESQ.
2   of Unsecured Creditors:      Pachulski Stang Ziehl & Jones LLP
                                  10100 Santa Monica Boulevard
3                                 11th Floor
                                  Los Angeles, CA 90067
4
    For Certain Underwriters     CATALINA J. SUGAYAN, ESQ.
5   at Lloyd's, Lond and         Clyde & Co US LLP
    Certain London Market        55 West Monroe Street
6   Companies:                   Suite 3000
                                  Chicago, IL 60603
7
    For Westport Insurance       MATTHEW M. WEISS, ESQ.
8   Corporation:                 Parker, Hudson, Rainer & Dobbs LLP
                                  303 Peachtree Street NE
9                                 Suite 3600
                                  Atlanta, GA 30308
10
    For Century Indemnity        ANDREW T. FRANKEL, ESQ.
11  Company:                     Simpson Thacher & Bartlett LLP
                                  425 Lexington Avenue
12                                New York, NY 10017

13  Also Present:                Archbishop Cordileone

14                               Patrick Summerhays
                                  Responsible Individual
15
                                 Joseph J. Passarello
16                                Chief Financial Officer

17                               Paula Carney
                                  Debtor's General Counsel
18
                                 Paul Gaspari
19                                Debtor's Special Corporate and
                                  Litigation Counsel
20
                                 Barron Weinstein
21                                Debtor's Insurance Counsel

22

23

24

25
```

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 2 of 118

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   Court Recorder:           LORENA PARADA

19                           United States Bankruptcy Court

                           450 Golden Gate Avenue

20                           San Francisco, CA 94102

21   Transcriber:               MICHAEL DRAKE

22                           eScribers, LLC

                           7227 N. 16th Street

23                           Suite #207

                           Phoenix, AZ 85020

                           (800) 257-0885

24

   Proceedings recorded by electronic sound recording;

25   transcript provided by transcription service.

1    SAN FRANCISCO, CALIFORNIA, THURSDAY, NOVEMBER 9, 2023, 1:32 PM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  Calling the matter of the Roman Catholic

5        Archbishop of San Francisco.

6            THE COURT:  All right.  Let me get the appearances

7    from debtor's two counsel.  And then I have a request about

8    other people who wish to be heard.

9            MR. PASCUZZI:  Thank you, Your Honor.  Paul Pascuzzi,

10   Felder, Stein, Fitzgerald, Willoughby Pascuzzi & Rios, for the

11   debtor Roman Catholic Archbishop of San Francisco.  For the

12   record, Your Honor, on the Zoom, not that they need to be

13   brought on the screen, but Father Summerhays is participating,

14   Joseph Passarello, Paula Carney who's the general counsel.  I

15   believe Mr. Gaspari, our special litigation counsel, just in

16   case we need them.  I don't know that we will.  And also Barry

17   Weinstein who's our special insurance counsel.  Again, I don't

18   know that we'll need them, but just in case.

19           THE COURT:  Okay.  Mr. Katz.

20           MR. KATZ:  Good afternoon, Your Honor.  Ori Katz,

21   cocounsel to the debtor.

22           THE COURT:  Mr. Blumberg?

23           MR. BLUMBERG:  Good afternoon, Your Honor.  Jason

24   Blumberg for the United States Trustee.

25           THE COURT:  Then we have counsel for the committee,

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 4 of
118

1    Ms. Parada?

2            THE CLERK:  Oh, yes, Your Honor.

3            MR. PASCUZZI:  It's probably Mr. Stang just to help

4    out.

5            THE COURT:  To help out, huh?

6            THE CLERK:  I don't see a Mr. Stang.

7            THE COURT:  Well, counsel for the committee who wish

8    to be heard today, please raise your hand.  And any counsel for

9    insurers who wish to be heard and speak, please raise your

10   hand.  If you just want to observe, you don't have to do

11   anything.  You're welcome to just do what you're doing.  But I

12   need a hand up if you expect to be called upon.

13           So I have a J-I-S.  Is that Mr. Stang?  I recognize

14   his initials but --

15           THE CLERK:  I believe so, Your Honor.

16           THE COURT:  -- only in lowercase and with no picture.

17   All right.  Mr. Stang, are you going to grace us with your

18   presence?

19           MR. STANG:  Your Honor, I'm trying.  My computer is

20   telling me I don't have a camera though I'm looking right into

21   it.

22           THE COURT:  Well, you can see me, but that's okay.

23           MR. STANG:  I can see you.  I'm trying to make sure

24   you can see me.

25           THE COURT:  Well, at the moment --

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 5 of
118

1          MR. STANG:  I'm working on it, Your Honor.

2          THE COURT:  -- I can't.  I can't.  Now I see a Ms.

3     Sugayan, but I don't know if you wish to be heard.  So if you

4     wish to be heard and seen, turn on your camera and your

5     microphone or at least your microphone.

6          MS. SUGAYAN:  Good afternoon, Your Honor.  Kathy

7     Sugayan.  I'm an attorney at Clyde & Co in the Chicago office.

8     And I'm coverage counsel for certain underwriters at Lloyd's,

9     London and London Market Insurers.

10         THE COURT:  Okay.  And Mr. Weiss?

11         MR. WEISS:  Good afternoon, Your Honor.  Matt Weiss on

12    behalf of Fireman's Fund Insurance Company, Chicago Insurance

13    Company, Westport Insurance Corporation, and Appalachian

14    Insurance Company.

15         THE COURT:  So preliminarily, Mr. Stang, I'm going to

16    assume that you can hear me.  I want to say for your benefit

17    and for debtor's cocounsel, I have looked quickly but not

18    deeply into the motion regarding 2004 exam and the debtor's

19    response.  I have not taken the time to act on it.  And I don't

20    expect either of you expected me -- or expecting me to act on

21    it today.  And I don't expect to.  What I am going to direct is

22    that counsel meet and confer just like we do in any discovery

23    disputes.  And unless there's something urgent, I will expect

24    at the next regular archbishop hearing on November 30th, if

25    there are any issues that need to be resolved, I will take it

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 6 of
118

1    up.  And I'll ask the debtors counsel to file a status report

2    on that discrete issue, say November 28th.  But I again, I

3    don't need to have any discussion about it today.

4              MR. STANG:  Your Honor?

5              THE COURT:  Yes.

6              MR. STANG:  I want you to know that I can hear you.

7    My IT department is in my office trying to fix the camera

8    issue.

9              And, Your Honor, our ex parte -- we did file it on ex

10   parte basis.  I heard what you said.  We are committed, as we

11   said in our papers, to working with the diocese, not -- the

12   archdiocese, notwithstanding the ex parte nature of it.  But

13   obviously, you'll do what you're going to do.

14             THE COURT:  Mr. Stang, you don't have to be on the

15   camera.  I'm happy to have you just appear audibly.  But again,

16   just to repeat, you're not here often, the other counsel are,

17   it has been my practice pretty routinely to enter 2004 orders

18   promptly, but I will not do it in this case, given the depth of

19   the breadth of the request and the opposition and the fact that

20   there's no reason to not worry about the -- excuse me, there's

21   reason to assume that there will be a fruitful meet-and-confer

22   and progress on that.

23             And one other point, Mr. Stang.  Again, this is

24   just -- it's semantics, but I want to make sure at least from

25   what Mr. Katz and Mr. Pascuzzi have mentioned previously, the

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 7 of
118

1  debtor the formal name of the debtor is the Archbishop of San
2  Francisco, et cetera, not the archdiocese.  And so although
3  it's a little bit awkward to identify an individual who isn't
4  personally in bankruptcy but he is as archbishop corporation
5  sole, so I'm not asking you to change anything but just be
6  mindful that the terminology that I'm using, as I learned from
7  debtor's counsel, is the debtor is the archbishop, not the
8  archdiocese.

9        Now, turning to the subject for today, Mr. Pascuzzi, I
10  appreciate the last-minute filings, lengthy.  Unfortunately,
11  they are so lengthy that I didn't get to them.  And yet I was
12  able to look enough.  I mean, one of the things that maybe
13  there are some judges that are newer at this than I am and I
14  don't do well on a quick read of a hundred page red line or
15  whatever length of the red line it is.  And so I was able to
16  glean a few of the responses to the comments that I have made
17  and some of the things that were stated in what you submitted
18  your status update report.  I'm prepared to just hear from all
19  counsel who want to be heard on any matters that are still in
20  dispute about. the things that are on the docket for today.

21        And by the way, a number of the counsel representing
22  insurers apparently do want to be heard.  So if it's on that
23  subject that are part of what you've reported, then that's
24  fine.  And if it's on something else, that that's also fine.
25  We'll just take them in order.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 8 of
118

1          So I ask you, Mr. Pascuzzi, unless your colleague,

2    Brother Katz, is in charge of this aspect, to let me know what

3    you believe are still the open issues and maybe start by

4    telling me which of the points that I raised in my comments, if

5    any, are not agreed to by your client and need to be discussed

6    in any detail.

7          MR. PASCUZZI:  Okay.  Your Honor, I think if it works

8    for you, if we could go through the red line of the proposed

9    order first.

10          THE COURT:  Well, it works for me, but it's a little

11    slow.  I mean, in other words, I can do it.  But as I say,

12    sometimes going through red lines is tedious because so much of

13    it can be kind of so routine.  But --

14          MR. PASCUZZI:  Yeah.  Well, what I can do -- I'm

15    sorry.

16          THE COURT:  No, you go ahead.

17          MR. PASCUZZI:  It starts at page 19 of the docket 297

18    we filed yesterday.  And I do apologize that it was filed late.

19    And I do recognize there are a lot of pages.  But we really

20    thought it important to get on the docket for everybody's

21    review the clean and red line versions.

22          I don't think there are a ton of issues that we need

23    to deal with, but there are a few.

24          THE COURT:  Okay.

25          MR. PASCUZZI:  And I hope to be able to highlight them

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 9 of
118

1    for everybody and then step aside and let the committee and the

2    insurers provide their input.  And if I skip anything, of

3    course they can mention it.

4           But as to the proposed order, we did add references to

5    the limited objections that were filed and the Court's

6    preliminary comments.

7           THE COURT:  Well, Mr. Pascuzzi, let me interrupt you.

8    I'm not -- as you know from prior experience, I'm old

9    fashioned.  I like to have hard copies.  I can make a hard

10   copy, but I haven't taken the time to.  I've got the red line

11   of the order on my screen.  And I can go through it with you.

12   But we don't need to waste time with all the edits that have to

13   do with titles and local references to rules and dates of

14   hearings.  So feel free to go right to where you think there's

15   something worth commenting, which appears to be on page 21 at

16   paragraph 2.  But I'm with you, and I will go down it with you

17   as you walk through every provision.  Just skip the

18   boilerplates.

19          MR. PASCUZZI:  Yeah.  And actually, Your Honor, I can

20   cut to the chase.  I think where the first issue comes up is in

21   paragraph 17.  And that issue is in paragraph 17C, which I

22   believe is on page 27, the docket page 27.  And it has to do --

23          THE COURT:  Okay.  I'm there.  I'm there.

24          MR. PASCUZZI:  It has to do with the confidentiality

25   agreement and who's going to sign the confidentiality

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 10 of
118

1  agreement.  Is there one person that can sign on behalf of

2  entities, or do we need each person to sign?

3         And I believe there's been some meeting and conferring

4  among the debtor and the insurers today on that issue.  It's

5  somewhat related to also in in 17E4, but maybe I should let

6  either Mr. Stang or one of the insurance counsel tell us

7  whether they've agreed on any language or what their particular

8  issues are.

9         THE COURT:  Let me call on Mr. Stang on this first,

10  but give me one second, Mr. Stang.  I want to read 17A.  One

11  second here.

12         Okay, go ahead, Mr. Stang.

13         MR. STANG:  Thank you, Your Honor.  And I've

14  discovered what the problem is with my camera.  Over the

15  weekend, my firm went to a cloud-based server, and apparently

16  the cameras on our computers were not reset.  And I would have

17  had to have left the hearing and come back on.  And I didn't

18  want to do that.  So next time you'll see me.

19         THE COURT:  Nothing personal.  I don't have to see

20  you.

21         MR. STANG:  All right.  So, Your Honor, the issue is

22  whether someone has to personally sign a confidentiality

23  agreement to become a permitted party.  The order provides that

24  the law firms do not need to have each lawyer and each employee

25  sign.  So for my firm, I can sign on behalf of anyone in my

1   firm who has access to the -- and therefore can have access to

2   these documents.

3         The insurers and their immediate affiliates also do

4   not have to have each person sign the confidentiality agreement

5   for the insurers to become permitted parties.  And that is

6   spelled out -- that is spelled out in paragraph D on my page --

7   PDF page 28.  I'm in the red line.  And it talks about the

8   insurers and. And --

9         THE COURT:  I have paragraph D, 17D on my screen.

10        MR. STANG:  Okay.  So the question is, if an insurance

11  companies hires an outside party to assist it in its analysis

12  of the claims, should that outside vendor be allowed to sign on

13  behalf of everyone in the company or should everyone who has

14  the -- can contact -- touches the forms, if you will, virtually

15  or otherwise, whether they have to personally sign it.

16        The precedent that the debtor attached from Santa Rosa

17  and Oakland says that the natural person must sign.  Why is

18  this important to us?  There have been, in other cases,

19  breaches of the confidentiality agreement when the insurer has

20  contracted with a vendor.  The litigation regarding the nature

21  of the breach and the proper remedy for that breach is ongoing

22  in the Rockville Center case, is ongoing in the Rochester case,

23  and I believe in Camden.  It's throughout several of the cases

24  in New York.

25        I don't think anyone on this call in this hearing

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 12 of
118

1   would challenge that the confidentiality must be maintained.

2   These are the most heinous things that have happened to our

3   survivors.  It's the risk of family members discovering when

4   they haven't been told by the survivor or their community

5   discovering when they haven't shared it with the community,

6   leads to all sorts of damages to the survivor.  And we may get

7   into more of the data about survivor experiences another time,

8   Judge.  But I can tell you that suicides are not uncommon in

9   this population.

10          And so we want to avoid -- and I think everyone wants

11  to avoid breaching.  And we're not trying to set anybody up

12  that we can point a finger and say, oh, you've breached.  But

13  if there is a breach, we need to understand who might be the

14  person responsible.  Law firms ordinarily and typically

15  maintain all sorts of safeguards to be sure that the

16  confidential information that we have is not shared.  It was

17  (audio interference) reinsurers and their administrators have

18  similar protection, because why?  We are prepared to simply

19  have the institution -- someone sign on behalf of the

20  institution.

21          But I don't know if a vendor, much like the vendor in

22  Rockville Center, who got information that it was not allowed

23  to receive because it had not signed a confidentiality

24  agreement and then that vendor shared confidential information

25  with an entity that wasn't even within the scope of the

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 13 of
118

1   confidentiality permitted parties, that happens.  Stuff

2   happens.  And it's important to us to have accountability for

3   the people who are seeing the documents.

4           Now, the insurers say in their opposition, well, what

5   about the person that's writing a check to a survivor?  Does

6   that person have to sign?  Well, Your Honor, I have handled the

7   vast majority of cases since 2004 on behalf of committees.  My

8   colleague, Brittany Michael, has handled pretty much the

9   balance of them when she was at another law firm.  Insurance

10  companies don't write checks to survivors in Chapter 11 cases.

11  They write checks to a settlement trust.

12          They talk about an IT department that might have

13  access to forms when they're working on the servers.  Yeah,

14  exactly.  I want to know who that person is, because if there's

15  a breach, that person may have been the one who breached.

16          So this is about protecting the confidentiality that

17  everyone acknowledges is important and ensuring that for

18  unknown vendors who we can't be -- don't know what protocols

19  they have in place to protect this information should be

20  transparent about who has access to it.  And that's how we view

21  the matter, Your Honor.

22          THE COURT:  Well, let's back up for a minute, Mr.

23  Stang.  If an IT person in your law firm breaches, then your

24  law firm has to pay the consequences.  And presumably you will

25  take out the consequences on the wrongdoer.  But the debtor --

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 14 of
118

1    the only people who know of the individual in that IT
2    department will be you.  But that individual wouldn't have had
3    to sign anything, right?
4              MR. STANG:  That is correct, Your Honor.
5              THE COURT:  Okay.
6              S1:  So now go to the insurance company.  So the
7         insurance company has lawyers and executives and IT
8         personnel.  And I take it you're not asking them
9         individually to do it either but rather the insurance
10        company itself.  And so under respondeat superior type
11        principles, if a if an employee, whether it's an IT person
12        or -- it doesn't matter who it is, an employee of an
13        insurance company discloses things improperly, then that
14        person will be accountable.  But the insurance company
15        will be on the hook for any kind of liability.  Same
16        thing, right?
17             MR. STANG:  Yes, Your Honor.
18             THE COURT:  Okay.  So then who are you -- who are you
19   extending this to?  The insurance company hires ABC claims
20   analyst or some other vendor.  What's wrong with the same
21   principle of making sure the vendor commits but why does the
22   vendor have to identify each and every employee of that vendor?
23   I don't understand why it should be different.  If the low
24   level -- I leave out low level.  If someone other than the
25   responsible officer of that vendor breaches, it's his or her

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 15 of
118

1  culpability, but the vendor is also liable under the same

2  principles.  Why is it different than for a nonexecutive person

3  of a vendor to be treated differently from a nonexecutive

4  person of an insurance company or a law firm?

5           MR. STANG:  Your Honor, we believe that law firms and

6  insurance companies have -- understand the gravitas of what

7  they're dealing with and understand -- and have protocols and

8  protective measures in place because they all every day deal

9  with sensitive information.

10          We don't know what outside vendor an insurer will --

11  or anyone for that matter will employ.  We have no idea what

12  protocols they have in place to ensure that when they're told,

13  hey, this is confidential, that the measures will be taken to

14  ensure that.  And so while signing the agreement in and of

15  itself does not mean that John Doe -- that the protocols exist.

16  John Doe employee has signed, but we have no idea what the

17  protocols are.  We seem to be satisfied if John Doe has signed.

18  And the reason we're satisfied is because John Doe has read the

19  agreement.  John Doe, by reading the agreement, acknowledges

20  his understanding or her understanding of the importance of

21  keeping confidentiality.

22          So for us, there are certain institutions which we are

23  comfortable have protections in place based on their

24  experience.  But not knowing who these vendors are and not

25  knowing what protocols may be in place with those vendors, we

1    feel that a personal signature will bring home to that person

2    the importance of the confidentiality.

3            THE COURT:  Is it a fair statement that a number of

4    these insurance companies that are involved in the Archbishop

5    of San Francisco case have also been involved in other

6    archbishop or bishop cases and have also employed third-party

7    vendors and have protocols?  We don't assume that the universe

8    of insurance companies in this case are different from many

9    other cases.  Should we assume that?

10            MR. STANG:  Your Honor, the insurance companies

11    involved in this case, I can't say all of them, but many of

12    them are regular players in these cases.

13            THE COURT:  Right.  That's what I --

14            MR. STANG:  And that was my point about --

15            THE COURT:  That's what I assumed.

16            MR. STANG:  -- mentioning -- well, but, Your Honor,

17    that was my point of mentioning to you the confidentiality

18    breach in Rockville, Camden, and at least Rochester, if not

19    also Buffalo.  The insurance company utilized a vendor, an

20    outside vendor, to analyze whether certain claims could be

21    fraudulent.  Now there was a breakdown by that insurance

22    company because that vendor, while within the scope of

23    permitted parties, had not actually signed an agreement.  So

24    when they sent that information over to that vendor, they

25    messed up.  That vendor subsequently shared some of that

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 17 of
118

1   information with another insurance carrier who is not involved
2   in those cases at all because they're trying to match claims to
3   see if there's a fraudulent claim.
4           And so did the insurance company -- in our opinion,
5   this is subject to discovery.  The subject of matters pending
6   before the Court.  But the insurance company in that case has
7   acknowledged that the initial vendor they employed had not
8   signed the confidentiality agreement.  There's no dispute about
9   that.
10          THE COURT:  But doesn't that --
11          MR. STANG:  (Indiscernible) --
12          THE COURT:  May I stop right there?  Can I stop right
13  there?  Can I also assume that the insurance company that
14  didn't vet its vendor and maybe the vendor itself probably has
15  some pretty measurable damages that might have to be paid
16  either to the individual survivor or perhaps the particular
17  religious institution that's in the bankruptcy.  Should I
18  assume that?
19          I guess what I'm getting at, Mr. Stang, is if a person
20  of -- an irresponsible person who wants to intentionally or
21  even carelessly disclose confidences, I don't know how having
22  an individual person, a nonexecutive person signing a document,
23  changes the outcome.  If Joe Schmoe of XYZ Vendor does
24  something wrong, there are consequences.  But it would seem to
25  me that the consequences fall also on the vendor for

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 18 of
118

1 responsibility under the same principles.

2       What I'm trying to do is not question your intentions

3 here but rather the scope of it. How far does this reach?

4 Because if the vendor calls up a sandwich delivery guy to bring

5 lunch over while the people are meeting, does the sandwich guy

6 have to sign a confidentiality agreement? It seems to me it

7 gets a little bit convoluted and complex.

8       MR. STANG: Well, Your Honor, look, the consequence

9 between the employee and his or her employer is one thing. I'm

10 thinking about the consequence of the survivor if there's a

11 breach.

12       And using your example -- or a janitor is cleaning up,

13 you know what, when you leave that day, you should be putting

14 those claim forms in a secure place --

15       THE COURT: Right.

16       MR. STANG: -- and not leaving them on your desk.

17       THE COURT: Correct.

18       MR. STANG: And so I appreciate what you what you're

19 saying. I really do understand it. But from our perspective,

20 when a vendors employee is told, hey, you know, this stuff is

21 confidential, don't let anybody see it versus that person

22 having to read -- it's not a long agreement; it's only two or

23 three pages -- and they have to read it and sign it, that

24 brings home in a very different way the significance of what

25 they're working on. And it also ensures E-N, ensures, that if

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 19 of 118

1 there is a breach, at least at that level of employment where
2 we think it's more likely than in the case of the ones where
3 people can institutionally sign, that we can find out who might
4 be in the line of people that should be asked, hey, were you
5 careless, did you intentionally do something.

6 So that's what this is about, Judge. We don't see it
7 as very burdensome. There are lots of words about, oh, this is
8 terribly burdensome. Well, no one says why. I mean, just have
9 them read the agreement and sign it.

10 THE COURT: Well, Mr. Stang, again, I don't want to
11 create a problem where none exists. And I don't question your
12 motives here. I'm questioning the janitor who comes in to
13 clean the office of a person who works for the vendor who maybe
14 doesn't even speak English is being asked to sign a form that
15 he or she doesn't even understand. And I'm not assuming that
16 janitor intentionally is going to breach a confidence. But
17 having that person sign a document that maybe isn't even in his
18 or her native language is almost meaningless if that person
19 even accidentally throws the thing out and it falls into hands
20 that then it's misused.

21 But again, rather than go off on a hypothetical, let
22 me go back and find out from Mr. Pascuzzi or the insurance
23 representatives what they say because I'm neutral about it. I
24 want to do the right decision, but I don't want to create
25 something that's not workable.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 20 of
118

1          So, Mr. Pascuzzi, is this an issue for you or is it
2    simply perhaps for the insurance companies?
3          MR. PASCUZZI:  Your Honor, I think you should hear
4    from the insurance companies.  Certainly, the need for
5    confidentiality is a valid concern.  And the practical issues
6    are also valid.  But I think I'd defer to the committee and the
7    insurance companies on this particular issue.
8          THE COURT:  Okay.  And I think we picked up one
9    counsel who didn't identify himself first.  Is that Mr.
10   Frankel?  Are you also representing for one of the insurance
11   companies?
12         MR. FRANKEL:  Yes, Your Honor.  I'm representing
13   Century Indemnity, Pacific Indemnity, and Westchester Fire.
14         THE COURT:  Okay.  So we have three different
15   attorneys representing insurance companies on the screen.  Who
16   gets the duty on this issue?
17         MR. WEISS:  Your Honor, I'll --
18         THE COURT:  Mr. Weiss?
19         MR. WEISS:  -- take the first bite if that's okay.  As
20   I said, I represent Fireman's Fund, Chicago Insurance,
21   Westport, and Appalachian Insurance Company.
22         The issue here -- and we have others that we would
23   like to address later, especially things that came up in the
24   red line that weren't in the previous version.  But with
25   respect to this issue, which we did brief, this is just about

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 21 of
118

1    making -- finding the balance between protecting the

2    confidentiality of the proofs of claim from survivors and

3    making something that's administratively workable and that all

4    the parties are able to adhere to, make sure all relevant

5    parties that might have access to the information are aware of,

6    but not create something that is so challenging or burdensome

7    that insurers or other parties could be in violation of this

8    order almost immediately.

9            In some ways, this is broader and more protective than

10   what the committee wants.  They want every single individual

11   employee of any third-party vendor to sign an agreement saying

12   they're familiar with the confidentiality protocols.  We're

13   saying any vendor needs to have someone sign the agreement.

14   We're not questioning that.  But they can sign -- just like the

15   law firms and just like the insurers, they can sign on behalf

16   of the company.  They're taking responsibility on behalf of the

17   company for what happens by the company's employees.

18           We have also offered to the committee during our

19   meet-and-confer today to add some language saying that they

20   will inform any employee who they reasonably think might have

21   access of the confidentiality protocols.  And we think that

22   would further address any concern about this information being

23   improperly disclosed.

24           But the bottom line is there's just no need to collect

25   potentially hundreds of signed confidentiality agreements from

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 22 of
118

1    people at all levels of various organizations, many of whom we
2    have no idea now who might have to come across the claim.  As I
3    said, it's not -- we're not talking about maybe people that are
4    primarily focused on reviewing claims.  But there are plenty of
5    other situations where people may come across not only the
6    claim but also confidential information.  That's another thing
7    that was added into this new version.  It's now permitted
8    parties are restricted from sharing not only the proofs of
9    claim forms but also confidential information which is defined
10   in footnote 5 as any information contained in a confidential
11   survivor proof of claim form.  So even if --
12            THE COURT:  So Mr. Weiss, am I correct that it seems
13   to me that the two critical documents for sure are the proof of
14   claim and the supplemental information, those two?  And then
15   perhaps if there is either formal or informal discovery
16   directed at a particular claimant, that goes beyond one or both
17   of those other documents.
18            But is there some other kind of situation that there
19   might be yet other information that would come up some other
20   way?
21            MR. WEISS:  No.  Well, the way the order as proposed
22   now says would be any information contained in a confidential
23   survivor proof of claim form.  There's limited exceptions if it
24   was otherwise publicly known.
25            THE COURT:  Okay.  But what I'm getting at is that

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 23 of
118

1    what if there's a letter, what if there's something that

2    doesn't fit those definitions?  The point is, in my sense about

3    this -- I mean, it's well established that I don't have

4    experience in other church bankruptcies except the Portland one

5    that I was involved in early on, briefly as a mediator.  So I

6    don't pretend to have the expertise that all of you and Mr.

7    Stang have.  But what I'm saying is that it strikes me that the

8    claim and the voluntary supplement are the two principal

9    documents, and there may be others, but they're probably all

10   within that same category of things.  They are information that

11   a claimant must submit if he or she expects to participate in

12   this bankruptcy.  They have to do anything if they don't want

13   to participate or be compensated about.

14          But can you give me an example of -- without naming

15   actual companies, what an example of a kind of vendor that

16   we're talking about?

17          MR. WEISS:  Yeah.  We talked about claims processing.

18   And I know Mr. Stang said he's not aware of any situation where

19   an insurer directly paid claimants.  I believe that has

20   happened before.  And just because it is not --  maybe even if

21   that -- taking his argument is true isn't the norm in a

22   dioceses case, maybe that there's nothing precluding it from

23   happening in this case.

24          THE COURT:  No.  But this debtor, like the Oakland and

25   Santa Rosa cases locally and I'm sure in the other church cases

1 around the country, there typically are claims administrators

2 hired by the debtor, and presumably the debtor has protocols in

3 place that extend to that person. Do the insurers higher their

4 own claims processors that do things like that?

5       MR. WEISS: Well, or there's other separate entities

6 that handle the claims administration or claims processing.

7 That's another --

8       THE COURT: But do they -- but are they handling it on

9 behalf of the debtor or separately on behalf of the insurer?

10       MR. WEISS: On behalf of the insurer.

11       THE COURT: Okay. All right. So what do you do if

12 it's a large company that has hundreds, if not thousands of

13 employees that come and go? And today one of them might be

14 employed and the next day might be gone and a new employee

15 comes on at every level? Is that -- that's the likelihood,

16 right?

17       MR. WEISS: Well, I think the first response to that

18 is that it shows you how unworkable it would be to require

19 every single one of those people to sign an agreement.

20       THE COURT: But having the vendor sign obligates them

21 as a legal matter.

22       MR. WEISS: Right.

23       THE COURT: And what the janitor or the temporary

24 employee who doesn't speak English does obligates and commits

25 the vendor under --

1           MR. WEISS:  Correct.

2           THE COURT:  -- any typical principles, right?

3           MR. WEISS:  That's the idea.  And they -- I think

4   there are -- you could have language in there that would have

5   them share the protocols with anyone who they reasonably

6   believe might come in contact with the claims within their

7   company to address.

8           THE COURT:  Well, yeah, but the janitor might not

9   reasonably be in that category.  So I would assume that that if

10  I'm in charge of the claims department for the Archbishop of

11  San Francisco case and I have a trusted employee, I tell that

12  employee you're bound too.  But if the employee says, by the

13  way, we have a new janitor on duty tonight, we don't

14  necessarily assume that that janitor is going to have the

15  information or be exposed to that information because we assume

16  that the employees will safeguard it, right?

17          MR. WEISS:  Correct.  Well, I mean, I think that's

18  more of a reason why you need an agreement covering the whole

19  company as a vendor as opposed to an individual by --

20          THE COURT:  Right.  And you're agreeing to that.  But

21  you seem to be agreeing to that.

22          MR. WEISS:  Well, I'm arguing why you don't need --

23  the janitor should not --

24          THE COURT:  Yeah, no.  I think we're on the same page.

25          MR. WEISS:  Yeah.

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 26 of
118

1          THE COURT:  Mr. Stang wants it to be as broad as

2     possible.  I believe I'm agreeing with you that if XYZ company

3     is the vendor that your client, Fireman's, uses to do whatever

4     it does, first of all, assume that Fireman's has chosen that

5     vendor to do something that it's necessary for that vendor to

6     have this information and you're arguing that that vendor will

7     be obligated and therefore we don't have to worry about the

8     janitor or even the responsible employees of that vendor

9     because the vendor will commit to inform the responsible

10    employees.

11          Can you tell me if you know, or Mr. Stang, has been

12    the resolution of this issue in Oakland and Santa Rosa?

13          MR. STANG:  Your Honor, in both cases -- and I can --

14    based on the request for judicial notice, I can point you to

15    exactly where it appears in the request for judicial notice,

16    both in Oakland and in Santa Rosa, a natural person is required

17    to sign.

18          THE COURT:  Every one of them?

19          MR. STANG:  Well, understand, Your Honor, it's not --

20    first of all, the notion that hundreds of people will be

21    touching these files is in itself troubling.  That's what

22    Mr. -- it says Weiss, but I thought you said Weinstein.  But

23    anyway, the idea that hundreds of people are touching this is

24    like, wow, I had no idea it would be hundreds.  This is about

25    someone who has -- who's handling the file.

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 27 of
118

1          THE COURT:  Yeah, no.  I understand.

2          MR. STANG:  But Santa Rosa -- to answer your

3   question, Judge, Santa Rosa and Oakland both say that outside

4   of that institutional group that we talked about, natural

5   persons have to sign.  And I don't know if these carriers

6   fought it like this in the other two cases, but that's what the

7   orders say.

8          THE COURT:  Well, I don't want to get into what they

9   did.  Mr. Weiss and you, Mr. Stang, weren't in my recollection

10  at the first hearing.  And I made it very clear to debtor's

11  counsel and anybody else that I didn't see we should have a

12  different procedure or a different rule in place because

13  someone suffered abuse in Oakland versus in Santa Rosa or in

14  San Francisco.  I mean, it just makes no sense.  What happened

15  in Buffalo or Poughkeepsie, New York is bad enough.  But to me,

16  the Greater Bay Area, it happens to an accident of perhaps of

17  history of why it's three different Catholic diocese instead of

18  one, which it was historically long time ago.  And to me, it's

19  offensive or troublesome to think that a victim in Oakland or a

20  survivor in Oakland would be treated differently from a

21  survivor in San Francisco.

22         So I'm inclined to go with the Oakland and Santa Rosa

23  procedure to be consistent on this.  But I guess, Mr. Weiss,

24  and I'll say to you, it seems to me that this isn't a question

25  of having every employee of this vendor sign something.  It's

1 having the employees who are entrusted and expected to have

2 access to this information sign something. And so my

3 non-English-speaking janitor shouldn't have to sign because he

4 shouldn't or she shouldn't be exposed to the document in any

5 way.

6        Am I right, Mr. Stang? I mean, if Mr. Smith or Mr. X

7 is an employee of the vendor and Ms. Y is his trusted

8 colleague, they perhaps should sign. But they don't have to

9 get a signature from the janitor who's on -- comes in and

10 cleans the office at night.

11        MR. STANG: We would not expect that, Your Honor.

12        THE COURT: But you would expect that Mr. Smith and --

13 or Mr. X and Ms. Y, since they are being entrusted and expected

14 to have access to the information, should be obligated. That's

15 consistent with Oakland and Santa Rosa?

16        MR. STANG: Yes, Your Honor. I would expect, given

17 that they signed something, that when they leave at night, they

18 would put those documents in a drawer.

19        THE COURT: Well, no. I understand.

20        MR. STANG: Locked drawer.

21        THE COURT: Where they where they leave it is --

22        MR. STANG: That's up to --

23        THE COURT: -- it's a different issue. The question

24 is, if the information gets out and it turns out it got out

25 because the janitor got it and the janitor got it because the

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 29 of
118

1   janitor said Ms. X left it on her desk, then Ms. X perhaps has

2   some personal culpability.  But certainly the vendor ought to

3   have some culpability just again, under the principles of

4   respondeat superior.

5          Mr. Weiss, It seems to me that, well, consistent with

6   what I believe is an important principle to follow here, I'd be

7   inclined to go with the way Mr. Stang Explains it, and assume

8   that that your client and the similar insurers have enough --

9   and I don't mean to say this incorrectly.  I will presume that

10  they are responsible of course and that they are going to make

11  sure their vendors are responsible and that their vendors act

12  responsibly and so on.

13         I see Mr. Frankel wishes to be heard on this.  So

14  Frankel, on this subject?

15         MR. WEISS:  Your Honor, can I respond quickly to --

16         THE COURT:  Well, yes.  But he did have his hand up.

17  Go ahead, Mr. Weiss.

18         MR. WEISS:  Okay.  Just real quick.  I mean, on the

19  issue of Oakland and Santa Rosa, this is being raised now

20  because what we've seen in other cases recently since those

21  orders were negotiated was efforts by committee counsel in

22  cases to try to play, I'd say, gotcha with insurers if they

23  based on individual employees not signing confidentiality

24  agreements.  And this is really an effort to preserve the

25  confidentiality by not making it a trap for the unwary by

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 30 of
118

1  creating opportunities to say, well, this person didn't sign

2  it, so there's a violation.  I think -- that's not the purpose

3  of these agreements.

4          And yes, I mean, had we known that that was a

5  possibility when Oakland and Santa Rosa were being negotiated,

6  I think we would have pushed there too.  But it's just a --

7  it's a new issue that's come up recently.

8          THE COURT:  But Mr. Weiss, can you -- again, without

9  unless you want to disclose particular vendors.  I'm not asking

10 you to, but you must know what vendors your client uses and

11 will use.  And I guess the question I would have, if there is

12 such a known vendor, how many human beings are we likely to

13 assume will have access to this information?  I assume it's a

14 small number and should be a small number.

15         MR. WEISS:  Yeah.  I don't -- I mean -- I didn't say

16 hundreds and hundreds of people are going to be touching it.

17 But the part of this situation is you don't know necessarily

18 for somebody doing IT work -- I mean, theoretically, every

19 person that does IT work might have to sign it because you

20 don't know who's going to go in and need to work on somebody's

21 computer that might have -- where that information might be

22 secured or somebody that's handling the shredded documents

23 file.  You don't know ahead of time who's going to be doing

24 that.  So the only way to --

25         THE COURT:  Or the person who delivers the sandwiches

1    to drop on drops off the sandwiches happened to see a form on

2    the desk.  We don't know that that person is going to do it

3    either.  But we all seem to agree that -- I seem to agree.  I

4    don't think Mr. Stang would assume the sandwich delivery guy

5    has to sign the form.

6         MR. WEISS:  Well, I wouldn't call the sandwich

7    delivery guy a vendor associate.

8         THE COURT:  No.  But he has access.  He comes onto the

9    premises into the office of a vendor.  Well, let's see what Mr.

10   Frankel wants to add.

11        MR. FRANKEL:  Yeah, just a couple of things, Your

12   Honor.  I don't want to be duplicative.  But first of all, I

13   think it should be clear that the current language in the

14   proposed order is quite different from what Mr. Stang is

15   describing.  The current language in the order says only the

16   law firms are required to sign a single confidentiality

17   agreement.  Everybody else, including insurance companies and

18   their employees, have to get individual signatures from each

19   natural person.  So at a minimum, that would need to be changed

20   to reflect the new agreement and understanding.

21        But stepping back, insurers are governed by the

22   insurance code in California which requires that this

23   information has to be kept confidential.  And so as a practical

24   matter, the mediations and the underlying litigations in which

25   insurers participate, insurers don't -- as a practical matter

1  usually don't even sign the protective orders, let alone

2  individuals, because everybody understands that, number 1,

3  insurers have an obligation to maintain the confidentiality.

4  And the claimants understand that nobody's going to get paid if

5  they don't have that information.

6       And so there are vendors -- for example, I think the

7  number of claims in this case, it's not going to be like the

8  PG&E case, but it'll be significantly a larger number of claims

9  than Oakland and Santa Rosa.  And there are other claims that

10 insurers have to track, and they add up.  And the insurers have

11 a responsibility to not just evaluate the claims but to track

12 things like the abuse alleged period so they know which

13 policies are potentially implicated.  And there's a lot of

14 data, a lot of information that, yes, everybody understands

15 needs to be maintained as confidential.  But requiring

16 individuals even at a vendor is particularly onerous.

17      And there's another issue here, Your Honor, besides

18 having individuals at the vendors which I think easily could be

19 advised of the protections in the protective order and the

20 confidentiality order.  There are a couple issues.  Number 1 is

21 you're not just asking individuals to sign a form.  All the

22 personal individuals that sign the form are submitting to the

23 jurisdiction of this Court.  So to require even if it's a dozen

24 employees that are working for a vendor in Philadelphia to

25 submit to the jurisdiction in their individual capacity in this

1  Court, it is fairly significant.

2  Another issue is that while my law firm might be able
3  to sign -- if I go out and hire -- my client wants to hire a
4  consulting expert, not just to look at testifying expert but a
5  consulting expert that would work on a privilege basis, it
6  would be work product, I normally in any other litigation
7  wouldn't have to disclose to other parties the identity of the
8  consulting expert.  And what Mr. Stang is suggesting, even
9  under his revised proposal, not just that all individuals at
10  vendors and consultants have to sign, but even if the entity
11  has to sign, we have to disclose that to the committee, to the
12  debtor.  And I think at least with respect to like consulting
13  experts that might have a role in terms of analyzing and
14  assisting the insurers and their counsel understand the
15  validity and the amount of the claims It encroaches on some
16  work product and confidentiality issues.  The way parties --

17  THE COURT:  But I'm confused because I thought we
18  agreed that if your law firm hires somebody to do things to
19  work on the case, they don't have to put that -- they don't
20  sign a separate agreement.  You or some member of your firm
21  committed to your firm, and that commits everybody under it and
22  assumes any direct agents of your firm as well, right?  Why
23  wouldn't it?

24  MR. FRANKEL:  No, I agree with that, Your Honor.

25  THE COURT:  Okay.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 34 of
118

1          MR. FRANKEL:  But I think what I hear from counsel for

2    the committee is that, and I may have been wrong about this,

3    but if my firm hires a consulting expert, that's not an

4    employee of my firm.  That needs to not only be signed by all

5    the individuals, but whoever signs the agreement, even if it's

6    the firm itself, not the law firm, but the consultant that

7    needs to be disclosed.  Even if it's --

8          THE COURT:  Disclosed even just the signing, the

9    hiring.  Mr. Stang, is that is that what you believe?

10          MR. STANG:  Your Honor, much like we have to disclose

11    every expert we hire and the debtor has to disclose every

12    expert they hire, the companies who are contractually allowed

13    to direct the defense of the claims and who has a -- and to

14    whom the Archbishop owes an obligation to cooperate in the

15    defense of claims, yes, they should be under no further

16    protection of the confidentiality of who they're hiring than I

17    am or Mr. Katz or Mr. Pascuzzi.

18          THE COURT:  But what --

19          MR. STANG:  Let's have a --

20          THE COURT:  But I'm still --

21          MR. STANG:  Let's have a level playing field here.

22          THE COURT:  But I'm still confused.  If your law firm

23    hires someone to work on the Archbishop of San Francisco case,

24    do you have to disclose the hiring to anybody?

25          MR. STANG:  How did I get them paid, Your Honor?

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 35 of
118

1          THE COURT:  I didn't ask how you get them paid.

2          MR. STANG:  But the answer is yes.

3          THE COURT:  Well, first of all, they're hired.  But

4    wait a minute.  If you if you if you're preparing for just

5    traditional litigation, not this case but any litigation, when

6    you hire someone on your team, you don't have to disclose.  You

7    hire a new associate at your firm.  You don't have to disclose

8    who that associate is, right?  And --

9          MR. STANG:  Well, we're not talking about --

10          THE COURT:  And --

11          MR. STANG:  Oh, sorry.

12          THE COURT:  Well, no, no.  But if you hire a contract

13   lawyer to come to the Pachulski Stang firm, you don't have to

14   disclose it in every case because that person is part of your

15   firm, an agent of your firm.

16          So what would happen in this case if your firm hires a

17   new associate to work on the Archbishop of San Francisco case?

18   Who are you --

19          MR. STANG:  They're an --

20          THE COURT:  -- disclosing it to?  What?

21          MR. STANG:  Well, they're an employee of the firm.

22          THE COURT:  No.

23          MR. STANG:  We do --

24          THE COURT:  A contractor.  No, not an employee of the

25   firm, a contract lawyer.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 36 of
118

1      MR. STANG:  Well, they will certainly appear on any

2  bill that we submit.  People will know that they're working on

3  the matter.  But we're not --

4      THE COURT:  Well, maybe at some point in the future,

5  Mr. Stang.  If you -- if you today  on November 9th, hire a

6  contract lawyer to work on some project but you don't have any

7  occasion to identify or disclose that until some future date

8  when you submit your fees, whether you have to identify that

9  person or not -- I'm not sure you have to, by the way.  But

10  let's assume you have to at least report the time for that

11  person.  That's not quite the same as the kind of thing we're

12  talking about here.  And then if --

13      MR. STANG:  Your Honor, I think ---

14      THE COURT:  -- the Fireman's fund hires a new member

15  of its legal department who is going to work on the Archbishop

16  of San Francisco case, it doesn't have to disclose anything,

17  right?

18      MR. STANG:  No, they don't.

19      But, Your Honor, your comparison to other kinds of

20  litigation, I don't have to tell anyone in that case --

21      THE COURT:  Right.  I agree.

22      MR. STANG:  -- that I'm hiring and consulting the

23  expert.  But I do in this case.  If we hired -- there's a

24  company, Your Honor, called CLARO which does valuation work in

25  a lot of these cases.  They've been in Camden.  They've been in

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 37 of
118

1  Boy Scouts.  They work on the committee's side.  If I hired
2  CLARO to advise the committee on the value of claims, I have to
3  get an employment application on file and everybody knows I've
4  hired CLARO.  When Mr. Frankel's client or his firm hire
5  somebody, he's saying you don't get to know that I've even
6  hired them.

7         And hiring somebody is a far stretch from invading the
8  work product privilege or attorney-client privilege.
9  Communications.  We're not asking what is -- not saying give us
10 the report.  But let us know that you hired KCIC which is a
11 firm that on the plaintiff's side -- I'm sorry, on the defense
12 side, does this similar kind of work.

13        I mean, really, how about a level playing field here
14 that they get to know who -- and this is about we get we get to
15 keep something from you, Mr. Stang.  We get to keep something
16 from you, Mr. Katz, because by virtue of not signing the
17 confidentiality agreement, we have to --

18        THE COURT:  Well, I think we're far afield from --

19        MR. STANG:  We are.

20        THE COURT:  -- what we're talking about.  And I don't
21 know that I agree with you that that I agree and understand
22 that what your argument is.

23        But let's go back to -- Mr. Weiss, did you want to say
24 something?

25        MR. WEISS:  Yeah.  I have two quick points.  One is I

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 38 of
118

1    guess it's really intertwined with this disclosure language.

2    And it's an instance where this is potentially problematic,

3    even if you're looking at the core claim handlers.

4            So Chicago Insurance Company and Fireman's Fund, which

5    are two of the four insurers I represent, have a third-party

6    claim hand handler called AZRA.  So under the current language

7    in this order that would be a vendor, even though it's

8    basically an affiliate that does all the claims handling work.

9    And every single employee there would be required to -- at any

10   level that could potentially touch the claim be required to

11   sign a confidentiality agreement.  So I think that is a

12   situation we're not talking about the sandwich guy or the

13   janitor.  So I think that's something that we need to keep in

14   mind and at a minimum address that situation.

15           And that also tracks into another change that was made

16   in the revised order.  On Section 17(e)(4), you'll notice in

17   the red line, it's at the top of page 29, the word

18   administrators was struck through in the list of sort of

19   insurance parties that can be permitted parties.  I would

20   contend that AZRA is an administrator.  The word administrator

21   included in the Oakland and Santa Rosa bar date orders.

22           So I think on two levels.  1, the word administrator

23   needs to be put back into the order.  And then 2, I think that

24   the -- as Mr. Frankel said, even if we're just limiting it to

25   insurers that don't have to sign the individual -- the natural

1  person requirement, that needs to be expanded beyond that to

2  situations like to encompass AZRA.

3          So and then the other point I wanted to make quickly

4  on this issue, Mr. Stang brought up on disclosure of experts

5  and how the debtor and the committee have to do it, they

6  have -- they're getting paid out of the estate.  Of course they

7  have to get permission from the Court and list who they're

8  getting paid from.  That has nothing to do with the

9  confidentiality issue.  And we don't -- we're not paying our

10 experts out of the estate, so we don't have to disclose that

11 with the Court.  And there's no -- we shouldn't use the

12 confidentiality protocols as a way to get -- entitle the

13 committee or the debtor to something they wouldn't otherwise

14 have in under the Bankruptcy Code.

15         MR. STANG:  Your Honor, I don't know if the horse is

16 quite dead.  It may still be maimed.  But let me just say this.

17 They want to put -- I have to be consistent, right?  I pointed

18 you to Oakland.  I point you to Santa Rosa.  If the word

19 administrators is in their orders, put it back in ours.

20         But I find it interesting that Mr. Weiss raises AZRA,

21 because AZRA is exactly the entity that was involved in the

22 breaches in the New York cases.  But if you want to put

23 administrators back in, I'm not dying on that hill because I'm

24 asking for consistency with the other two.  I cited them as

25 kind of precedent.

But I was really surprised that AZRA came up because they're the subject of the investigation that's going on in the other dioceses.

THE COURT: Well, okay. But again, I'm not here to understand enough about that. If Fireman's Fund or any of the other insurance companies that are involved in this case wish to hire that company, that's their business.

MR. STANG: Yep.

THE COURT: And if there are some protocols in place, then that's what my responsibility is to be consistent. And if any insurance company makes the mistake again of hiring a vendor who causes grief and problem, then it's their problem. And we have other remedies for gross abuses, but we're not talking about that.

Look, I think there's a sense here that I want to follow the Oakland and Santa Rosa procedures. That doesn't mean, if I understand what we've been saying here, that every employee of a third-party vendor has to sign, but rather it has to be the persons that are exposed to the information and likely to be within the course of their employment. I think what Mr. Weiss or Mr. Frankel have said is that that's the way it is. Am I right? Am I correct, Mr. Weiss, that if your company has insurance claims in Oakland, then the third-party vendors that are employed by your client and who are handling the Oakland cases will have had to sign individual

1   nondisclosures if they are the People that are likely to have

2   access to the information, right?  That's what -- that's the

3   deal.  Did I get it correctly?

4           MR. WEISS:  Oakland and Santa Rosa for outside

5   vendors, there's not a -- they do have a natural person

6   requirement.  As I said, it wasn't an issue that was

7   contemplated as being problematic at that point when those

8   orders were --

9           THE COURT:  No.  But I'm sorry.  I guess I'm -- now

10  I'm confused.  What is the rule in Oakland?

11          MR. WEISS:  Regarding natural -- whether natural --

12          THE COURT:  Yes, yes.

13          MR. WEISS:  In Oakland, it's -- I believe it's counsel

14  for the --

15          THE COURT:  What's the rule for vendors, for vendors

16  working for the insurance company?

17          MR. WEISS:  For venders, they have to -- they have to

18  have natural persons sign.

19          THE COURT:  Okay.  Then that's the way I'm going to do

20  it here.  But they don't have to have every person on the

21  payroll.  They have to have the people who are -- as part of

22  their job have access, correct?

23          MR. WEISS:  I believe it's anybody that's exposed

24  to --

25          THE COURT:  Well --

1      MR. WEISS:  I don't have the exact wording in front of

2  me.

3      THE COURT:  But it doesn't reach the janitor or the

4  sandwich guy.

5      MR. WEISS:  Well, I mean, that's how -- it's the

6  problem is how that might be interpreted.  Of course, it

7  doesn't say -- it doesn't go --

8      MR. PASCUZZI:  Your Honor, might I interject?  Paul

9  Pascuzzi here.

10      So why don't we revise the language to be like the

11  Oakland order?  The Oakland order, I think what it says is the

12  debtor, the committee, the insurer, parties, insurer authorized

13  parties, which is a group it includes administrators, can sign

14  on behalf of their counsel one form and clients one form.  And

15  then anybody else has to sign an individual form.  So we can

16  revise this paragraph to be consistent with that language if

17  that's where the Court is coming out.

18      THE COURT:  Well, it goes back to this fundamental

19  starting point that I don't see any reason to depart.  I

20  realize already in this case there may be some differences

21  between the way my two judge colleagues in Oakland are doing

22  those two cases.  But I want to keep some of these things as

23  consistent as possible.  So to the extent --

24      MR. FRANKEL:  Your Honor --

25      THE COURT:  -- that reaches certain third-party

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 43 of
118

1  individuals, so be it.  I want to be consistent with that.

2          Again, I don't want a survivor who was abused in San

3  Francisco to be treated differently from a survivor who was

4  abused in Oakland by maybe the same wrongdoer.  But whatever --

5          MR. FRANKEL:  Your Honor --

6          THE COURT:  -- the reason is, I just simply am not

7  going to tolerate some -- or at least endorse some different

8  rule all of twelve miles across the bay when I could solve this

9  problem by transferring this case to Oakland or asking the

10  Oakland judges to transfer two cases to San Francisco and solve

11  the problem and have one administration.  But I'm not doing

12  that and no one's asked me to.  And I don't intend to.

13          So to the extent that that imposes a bit of a burden

14  on vendors who are working for insurance companies, so be it.

15  And I think that the essence of this to me is that we're not

16  getting janitors and sandwich delivery people, but we're

17  getting responsible agents of those vendors who have or likely

18  as part of their job, to have access to the kind of information

19  that Mr. Stang wants protected.

20          Mr. Frankel?

21          MR. FRANKEL:  Yes, Your Honor.  I'm sorry.  Not to

22  belabor the point.  I'm not going to reargue any of the prior

23  issues.

24          But if I can make one request with respect to vendors

25  and consultants and the like, that we understand Your Honor's

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 44 of
118

1  ruling.  But to address the confidential consulting expert type
2  situation, can we at least have a provision that counsel for
3  the insurer that uses that vendor or consultant will maintain
4  copies of the confidentiality agreements without disclosing it
5  to the world unless there is a showing of good cause?  That's
6  the way it's typically done where there is a requirement if you
7  want to hire a consulting expert and there's a requirement that
8  that consulting expert has to sign on to a protective order.
9  They sign it, return it to counsel.  But you don't disclose
10  that to the other parties unless there's good cause in which --
11  like if there's a the rare instance of --
12          THE COURT:  Well, there's certainly going to be good
13  cause if there's a disclosure of witnesses or if there's formal
14  discovery.  But Mr. Frankel, if I follow you correctly, if your
15  client hires a consultant, then that consultant has to -- you
16  have to know who it is as counsel, but you don't have to
17  disclose it to the committee or the debtor.
18          MR. FRANKEL:  Right, Your Honor.
19          THE COURT:  Mr. Stang, it seems to me that that seems
20  reasonable.
21          MR. STANG:  Your Honor, first of all, it's not in the
22  Oakland order.  Second -- so just to let you know, it's not.
23          Second, we've already heard Mr. Frankel say there's
24  attorney-client -- I thought he said attorney-client, but I'm
25  not sure.  But he certainly said work product.  And so I don't

1  know that there's a good cause exception to the work product

2  privilege or a good cause -- except for a case of criminal

3  conduct of course, a good cause exception for the

4  attorney-client privilege. So I don't quite know -- it seems

5  like an impenetrable curtain that's being drawn across the

6  issue of who is signing a confidentiality agreement.

7            THE COURT: But Mr. Stang, if there is a -- if there's

8  a dispute and you wish on behalf of the committee to discover

9  what Mr. Frankel has in his file, we can deal with work product

10  or crime fraud exceptions or other exceptions.

11            I believe what Mr. Frankel is worried about is just

12  the handing it over when there's nothing to disclose. And to

13  me, that seems consistent with the notion that if he and his

14  firm, his client, hire someone, that's part of work product.

15  And there's no affirmative obligation to say let's tell Mr.

16  Stang that we just hired so-and-so. And I agree with him. I

17  just don't think that we're ready to go there.

18            So what I don't know -- and again, this goes back to

19  my opening comments to Mr. Pascuzzi. I simply haven't absorbed

20  the detail, the black line of the documents that I haven't

21  studied. So I'm going to defer to Mr. Pascuzzi to make sure

22  that that what I -- what comes out of this hearing is

23  consistent with what we are now discussing. And I assume that

24  that will be that will be so.

25            Mr. Weiss, again, well, as long as you're on the

1  screen, by the way, I'm not trying -- I don't think you have to
2  put up your hand.  We're having a discussion.  But you put your
3  hand up.  So say again what you want to say.
4          MR. WEISS:  Fair enough, Your Honor.  One more thing I
5  just wanted to add on the confidentiality protocols that we
6  hadn't discussed.
7          In the new 17D, which is in the middle of page 28,
8  there's a sentence or a clause that says permitted parties may
9  not use confidential information and the optional confidential
10 survivor supplement for any objections to a survivor proof of
11 claim.  That is, to my knowledge, not included in the Oakland
12 or Santa Rosa orders.  Our position is that's not -- the end
13 result of that is that the parties will have to take
14 substantial extra discovery to get the same information that's
15 in this supplement which will be an unnecessary use of estate
16 resources, unnecessary burden on the Court.  So we would ask
17 them for that language not to be included in this.
18         THE COURT:  So that's in D?
19         MR. WEISS:  Yeah.  It's in the -- it's kind of
20 two-thirds of the way down, new D.
21         THE COURT:  Yeah.
22         MR. STANG:  Your Honor --
23         THE COURT:  I think I saw that in the papers leading
24 up to this hearing.  And I frankly didn't quite understand it.
25         Mr. Stang, why -- if there is a proof of claim or more

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 47 of
118

1  importantly a confidential information supplement that someone

2  submits, why can the substance of that document not be the

3  subject of an objection to the claim?

4          MR. STANG:  Your Honor, this is critically important

5  to us.  So you know, this is not just an aside regarding this

6  bar date motion.  And it comes out of the experience that we

7  had in Rockville Center where for only the second time in all

8  of the cases that have ever been filed that I'm aware of,

9  Archdiocese Milwaukee was one but Rockville Center is the most

10  current, where the debtor filed objections to survivor claims,

11  almost unheard of in these cases.  And it was extremely

12  expensive.  It was extremely burdensome on the survivors

13  themselves.  And I can tell you caused enormous emotional

14  distress.  So that's the backdrop for why this came up.

15          Because while I appreciate what you said, Judge, about

16  trying to keep things consistent with Oakland and Santa Rosa,

17  at least in my view, procedural issues, if we're going to do

18  every case the same, let's just go back to the Diocese of

19  Portland, Oregon in 2002 and just have a cookie cutter.  We've

20  learned --

21          THE COURT:  And what?  And what?

22          MR. STANG:  Just have a cookie cutter.  We've learned

23  over the last twenty years how to make these cases run more

24  smoothly.  And if people want a mediation process where people

25  are being open with each other, are giving information that can

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 48 of
118

1   lead to a mediated resolution, then the information that's

2   discussed should not be the subject of litigation. If people

3   want to object to claims and commence contested proceedings in

4   500-plus cases, they're certainly at liberty to do that. And

5   they'll have their formal discovery opportunities. And state

6   court counsel will have an opportunity to object to those

7   efforts and vice versa. There will be an opportunity for state

8   court counsel on behalf of their individual clients and 538

9   separate claims objections to get discovery from the Archbishop

10  and parishes and schools and anyone else who was involved in

11  their abuse.

12          So our effort was to have open communications with all

13  of the mediation parties which I hope will include the

14  insurance companies. Sometimes they have tried to on this

15  jurisdictional issue to date not become "mediation parties."

16  But our goal is to have an open communication with the parties

17  that are going to fund this case.

18          And so that's why it's in there. It was -- it

19  brought -- there are lots of reasons Rockville Center is in the

20  position it's in, which is no -- which are at an impasse as

21  described by the mediators. It didn't help that over sixteen

22  groups of claims objections were filed there. So I've learned

23  from that. I learned that that is a burden on the mediation

24  process. But nothing precludes the carriers who will have seen

25  these voluntary statements to use them, if you will, as a model

1  for their formal discovery.

2        Now, these are voluntary forms. People don't have to

3  fill them out. I read your tentative. That's what we call it

4  down here in in Los Angeles, tentative rulings. I read it.

5        THE COURT: Yeah, I know what you call it. I know

6  what we call it here too, okay?

7        MR. STANG: And knew I you knew, Judge. I knew you

8  knew. I didn't know if everyone else did.

9        And there's a warning sign in that tentative that

10  says, hey, if you all don't fill out these forms fully or you

11  don't get enough people turning into forms, this could turn

12  into claims objections. Everyone read that.

13        The state court counsel who are in this case, many of

14  them, if not all of them -- and when I say state court counsel,

15  Judge, I mean those who represent committee members, are in

16  Oakland and in Santa Rosa. And Mr. Pascuzzi will tell you that

17  north of ninety percent of the survivors in those cases have

18  submitted the voluntary statements. I'm not in those cases. I

19  don't know how robust the answers were. But he got a really

20  high turnout in terms of responses.

21        So to me, we have to make a decision at this point.

22  Are we going to have an open mediation process where

23  information is shared or is everyone pulling out their swords

24  and sabers and saying we are going to have 538 claims

25  objections because that's how we're going to get the

1    information?  That's not how we want this case to go forward.
2    We want this case to reach a mediated settlement.  We want it
3    to reach it quickly.  The time these cases are taking is too
4    long.  Years have gone by in certain cases.  That's not
5    acceptable to survivors.  But this issue of whether this
6    information can be used in the claims objection resets the
7    entire table and resets the entire tone of this case.
8         THE COURT:  What do you suggest?
9         MR. STANG:  I suggest that the voluntary
10   questionnaires be used only -- well, not be used for claims of
11   objections and be --
12        THE COURT:  Wait, not used forever?
13        MR. STANG:  No, forever.  They can take formal
14   discovery and ask the exact same questions that are in the
15   voluntary questionnaire and more if that's the litigious route
16   they want to go.  But give peace a chance here.  Let's see if
17   the turnout that we saw in Santa Rosa and in Oakland can be
18   replicated here in terms of at least how many people are
19   responding.
20        But nothing in this order, not a thing of this order
21   stops Mr. Weiss or Mr. Frankel or Ms. Sugayan -- I'm just
22   pulling out the insurers, Your Honor, from filing a claim
23   objection tomorrow if that's the way they want to go.  It's not
24   the way we want to go.  But if they want to have the discovery,
25   let them go take it.  I hope they don't.

1           THE COURT:  Mr. --

2           MR. STANG:  They have that right.

3           THE COURT:  Mr. Stang, we have a claims bar date,

4      right?

5           MR. STANG:  Yes.

6           THE COURT:  So haven't proved it yet, but it looks

7      like we have one.  So comes that claims bar date, it would seem

8      to me on the day after that bar date, there is a -- pretty much

9      a good fix on what the universe of claims will be.  Admittedly,

10     there may be some late claims.  There may be some unknown

11     claims that come in.  But by and large, I suspect and my

12     personal impression is that there will probably be 500 and some

13     odd claims that the minimum and may be substantially more, but

14     they'll be there.

15          Now, are you -- you're suggesting that -- and it seems

16     to me that some of those claims, whether they're -- whether

17     they're complete on their own or they are joined by a voluntary

18     supplement, will provide sufficient information to recognize

19     that whereas one claim may be totally frivolous, another claim

20     may be totally valid.  And in the former case, leaving aside

21     when it happens, the first one should be objected to, the

22     second one shouldn't be objected to.  And so I don't understand

23     what you're concerned about and/or similarly what you would

24     propose if the mediation is unsuccessful.  There needs to be

25     some resolution of a disputed claim.  And so I guess I'm having

1  trouble understanding what your concern is.  If you think that

2  some sort of blanket claims objection early would be

3  disruptive, that separate.  Again, and I might very well agree

4  with you that that for a time period there should be no

5  objections to claim.

6          But it seems to me that for you to suggest that there

7  be a permanent bar on it is inconsistent with the notion that a

8  claim that's deemed allowed, if not objected to, can't be

9  objected to.  And you seem --

10         MR. STANG:  Well, Your Honor, I --

11         THE COURT:  -- to say, well, folks, if you object to

12  claim that's nuclear war and there won't be a mediation.  Then

13  you cite some other place where it didn't happen.  I guess I

14  have more confidence in the process than you believe I have.

15         So what am I missing about the -- if I agree with you,

16  that at least for a short period of time, there be no objection

17  to claim?

18         MR. STANG:  Your Honor, I did not say there should not

19  be -- I'm not asking for a ruling that there be no objections

20  to claims.  If someone wants to file an objection to a claim

21  the day after the claim is filed, I'm not suggesting there be

22  any limitation on that.

23         Insofar as the insurers' abilities to vet these

24  claims, let's not forget that they have -- maybe not -- they

25  all should have copies of the complaints that were filed in

1  state court.  Because you're right.  The number of claims

2  beyond the ones that were filed in the window, I'm not sure how

3  many there will be.  The bulk of them are going to be the ones

4  that were filed.

5  THE COURT:  There aren't going to be.  But is it it's

6  fair to say, isn't it, I'm right.  There aren't going to be

7  many?

8  MR. STANG:  Probably not.

9  THE COURT:  Okay.

10  MR. STANG:  But there is the statute of limitations

11  and ability if you are -- if you're under the age of forty-five

12  that you --

13  THE COURT:  I understand that.

14  MR. STANG:  -- (indiscernible) --

15  THE COURT:  I understand that.  Maybe there will be

16  ten.  Maybe there will be twenty.  There won't be 10,000.  That

17  will be --

18  MR. STANG:  I hope you're right.

19  THE COURT:  Okay.

20  MR. STANG:  We all hope you're right.  But so let's

21  just deal with those.  They have copies of the complaints.  The

22  statute had built in protections where certificate of -- I'm

23  not sure exactly what the term is but --

24  THE COURT:  It doesn't matter.  I know.  I know what

25  you're saying.

1  MR. STANG: That had to be done. I don't know what
2  discovery has gone on between -- not discovery -- what exchange
3  of documents there has been between the archbishop and his
4  insurers in connection with the obligation to cooperate in the
5  defense. So they're not without information. And insofar as
6  who the perpetrators might be, if it's the same perpetrators
7  that came up in the first window, well, certainly they had lots
8  of opportunities for discovery regarding those perpetrators,
9  not these claimants, of course, but those perpetrators.
10  And so I am not saying put a pause button on claims,
11  objections. What I'm saying is if you want a robust process
12  that enables the open exchange of information, do not hang the
13  threat of using these voluntary forms in litigation. Let it be
14  that they can only be used in mediation.
15  And let's assume people don't respond to the forms.
16  You signaled in your tentative that between the bar date of
17  February 20th, there would be about sixty days for everyone to
18  get the voluntary claim forms in. That's the way I read your
19  tentative.
20  THE COURT: Well, the tentative didn't -- the
21  tentative didn't say anything about objection to claim. It
22  said --
23  MR. STANG: No, it didn't.
24  THE COURT: It said the Court will likely order a
25  sixty-day period before formal discovery. I didn't think about

1   objection to claim because I wasn't even focusing on that.

2           MR. STANG:  I guess I don't know how there could be

3   discovery of an individual survivor if it wasn't in the context

4   of an individual objection, but you may be right.  Maybe it is

5   a process --

6           THE COURT:  Well, we have a presumption.  The law

7   presumes the claim is valid, right?  And so you can't defeat

8   the presumption without in a formal sense objecting to the

9   claim.

10          MR. STANG:  Right.

11          THE COURT:  So it can't --

12          MR. STANG:  So they would --

13          THE COURT:  Pardon me?

14          MR. STANG:  I apologize, Your Honor.  It's the phone.

15          THE COURT:  No.  I just didn't hear what you said.

16          MR. STANG:  I said They would object to the claim.

17  They would propound discovery on the survivor.

18          THE COURT:  Right.

19          MR. STANG:  And we'd be in a -- and people, as I said,

20  could object to the discovery protective orders, whatever it

21  might be.  I'm really trying to avoid this scenario where abuse

22  survivors say, you know what, if I'm weaponizing this voluntary

23  form, you're telling me it's voluntary, right?  I don't have to

24  fill it out.  No, you don't have to fill it out.  And I would

25  have rights and protections if this were mandatory, right, like

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 56 of
118

1   a document production request or a notice of deposition.  You'd

2   be there, right, objecting to the objectionable stuff.  Yeah,

3   that's right.  I would be there.

4        Well, then why am I filling this out now?  That's not

5   the scenario that I want.  I want a scenario where people

6   because they know it's privileged and know it cannot be used in

7   in claims litigation -- again, we're talking about not using it

8   in claims litigation.  I want to be clear that that's the limit

9   that we're looking for.  Then I think it's going to be a much

10   more robust settlement negotiation process.

11        THE COURT:  Well, I have to tell you --

12        MR. STANG:  People who want to lift this restriction

13   are asking -- or not asking for -- are setting up a scenario

14   where this case is going to become very litigious.  And we want

15   to avoid that.

16        THE COURT:  Mr. Stang, I don't quite follow you.  I

17   don't want to have it be litigious either.  And what I

18   thought -- what I had in mind when I prepared my statement was

19   exactly that, that submitting the confidential information

20   would provide information to allow the insurers or the

21   dioceses, the archbishop to vet  more fully if they haven't

22   already the validity of any particular proof of claim.  And I

23   didn't think or say that I wouldn't permit an objection.  You

24   say, well, they can just go ahead and file an objection.  I

25   don't think that would be productive either.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 57 of
118

1        But I don't understand what it means to say, please

2    submit this information, it will only be used as part of a

3    group settlement, a mediation, because I don't know what

4    happens next.  If there's a mediated settlement -- let's assume

5    that the mediator brings about -- and I don't question your

6    experience and the fact that you personally and your law firm

7    have been involved in many, many, many other successfully

8    mediated abuse cases.  But I don't know what happens in those

9    cases when there is a particular claim that's challengeable.

10        And so if you tell me that in dioceses -- some unknown

11    dioceses where there's a confirmed plan and a mediated

12    settlement, that there's no claims vetting process ever, and

13    every claim that got filed got allowed, I guess I would say

14    great, but how can that be because there have got to be some

15    claims in there that are suspect or that need to be vetted more

16    carefully.  And I just -- and my instincts tell me you can't --

17    just because you have a global solution that says we're

18    creating a fund, whether it be a channeled trust or a fixed sum

19    of money or something, that therefore we're not going to object

20    to individual claims.

21        And what am I missing here?

22        MR. STANG:  This is what happens.  And I'm going to

23    use the Archbishop and us as an example.  We and the Archbishop

24    reached agreement that the Archbishop and the parishes and

25    anyone else who's going to be a released party as an affiliate

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 58 of
118

1    is going to pay 100 dollars.

2            THE COURT:  Okay.

3            MR. STANG:  And we take that hundred dollars into the

4    settlement fund.

5            Now, in the process of them coming up  -- or us coming

6    up with an agreement on the 100, Mr. Pascuzzi and Mr. Katz have

7    kicked the hell out of these claims.  They've looked to see if

8    the priest was assigned to that parish or had any reason to be

9    at that parish where the abuse allegedly occurred.  They

10   will -- I mean, I had one case, Your Honor, in Alaska where a

11   survivor said to me, well, that claim is false, Jim.  I said

12   how do you know that?  Because he says he was abused on the

13   school bus trip.  We don't have any roads into our village.

14   There are no school busses.

15           So in the process of negotiating the deal with the

16   debtor, the debtor will have vetted the claims.  And if there

17   is claims that the debtor says you guys want 125 dollars, but

18   we think this is only worth 100 dollars, again, total, then

19   we'll have to respond in the give-and-take of the mediation

20   about that.

21           So now we've got one hundred bucks in the settlement

22   fund.  And there will -- this is how these case -- I think all

23   of them have worked out this way that have agreed -- that have

24   had plans.  We now have 100 dollars in the settlement fund.  We

25   have to divide that money up.  There will be a claims protocol

1   that will be in the plan that will go through the elements of

2   how to allocate that 100 dollars, including a credibility

3   determination.  And in Boy Scouts where there was a provision

4   for a convenience class, Judge -- I'm sorry, the court and the

5   committees, the ad hoc committee, agreed that there would be

6   what people call the fraud filter, where they'd have to be some

7   determination even for those people who got a convenience class

8   payment that they were valid claims.

9           So the way this works out is if we reach a negotiated

10  settlement, each side has vetted the credibility of their

11  claims.  And when there's a division of the money, there's a

12  credibility determination because some people might get goose

13  egged, if you'll allow me to use that term, in division of the

14  money, the 100 dollars, because it's not credible.  That guy

15  who said he was abused on a bus trip, he didn't get any money

16  because --

17          THE COURT:  So what happened to his proof of claim?

18          MR. STANG:  -- the protocol provided for that.

19          THE COURT:  What happened to his proof of claim?

20          MR. STANG:  Under the protocol, he was -- did not get

21  a distribution and his claim was discharged.  It was not

22  formally disallowed.

23          THE COURT:  But what happened to --

24          MR. STANG:  It was not formally disallowed.  He

25  just --

1            THE COURT:  Mr. Stang.

2            MR. STANG:  -- didn't get any money.

3            THE COURT:  Mr. Stang, what happened to the

4   presumption of a liability of his proof of claim?

5            MR. STANG:  We've got a plan that allowed for

6   creditors who did not have credible claims to receive no

7   distribution.

8            THE COURT:  Wait, I don't quite -- I don't understand

9   that.  In other words, it sounds to me like an informal

10  objection.

11           MR. STANG:  I guess we could call it that.

12           THE COURT:  It sound to me like the guy who made up

13  the claim saying he was abused on a bus when there was no bus

14  had a phony claim.  Instead of objecting to the proof of claim,

15  you figured let's just not distribute to him.  Well, that's

16  great, but it sounds like a de facto objection to the claim.

17           MR. STANG:  Well, Your Honor, I --

18           THE COURT:  So what am I missing?

19           MR. STANG:  Sorry.

20           THE COURT:  What?

21           MR. STANG:  I'm not going to argue with you about

22  whether it was a de facto or not.  But I will tell you that I

23  have objected to claims that I had concluded were false because

24  you can't be abused in the same month in three different places

25  in the country.  And it was clear this guy was a fraudster.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 61 of
118

1          By the way, we are talking about a very, very minimal

2     problem in terms of the fraud issue.  But we have objected to

3     claims as a committee when in other cases.  Ad whether you call

4     the claims protocol that can goose egg you a de facto objection

5     or not, the fact is that there was a process both in the

6     negotiation for the settlement amount.  And by the way, this is

7     true for the insurers as well.  I was just picking on Mr.

8     Pascuzzi because it was easier for me to use that as a

9     hypothetical.  But everyone is vetting the claims and coming up

10    with what the reasonable settlement amount is --

11          THE COURT:  All I'm -- listen --

12          MR. STANG:  -- for the proof of claims.

13          THE COURT:  You seem to be missing my point.  I fully

14    expect vetting to take place at the insurance level, the

15    committee level, the debtor level.  I start with something that

16    is black letter law that a proof of claim is deemed allowed.

17    And the way you get rid of a proof of claim that's deemed

18    allowed is you get the claimant to withdraw it or you object to

19    it.

20          You seem to be arguing to a situation that there can

21    never be an objection because objections are sensitive and it

22    forces -- if there's a potential for objection, there's a

23    deterrent for submission of the confidential information.  And

24    the point I was trying to make in my preliminary thoughts was

25    if you don't -- if you don't submit the formal -- excuse me,

1  don't submit the voluntary questionnaire, you might have your

2  claim objected to, but I would consider maybe no formal

3  discovery, which might have been an error on my part not to say

4  or a claim objection and formal discovery.

5  　　　　But the fact is, you know as well as I that if there

6  is a questionable claim in any bankruptcy, whether it's an

7  abuse case or your run-in-the-mill nonabuse bankruptcy, if the

8  claimant doesn't withdraw it, you object to the claim.  You

9  don't -- you don't create a class that says this -- if we

10  decide that your claim is bullshit, then we're not going to pay

11  it; therefore we're putting you in this class.  So the answer

12  is you object to the claim.  And it's that simple.  So look,

13  I --

14  　　　　MR. STANG:  Your Honor, perhaps our protocols in the

15  plan in this case will require that if we think the claim is

16  not credible, that rather than have the claims reviewer make

17  the credibility assessment, that there would actually be a

18  claim objection.  But we're talking about using this voluntary

19  information in the context of the insurers or, in fact, well, I

20  guess anyone doing a claim objection, to be fair.  It would be

21  anyone.

22  　　　　And if they want to file a -- if anyone wants to file

23  a claim, objection, I am not asking you to put a pause button

24  on that at any point in time.  What I'm trying to convey is

25  that keeping this voluntary submissions outside of the claims

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 63 of
118

1  objection process will make -- I think significantly increase

2  the likelihood of a negotiated settlement because people are

3  going to be more open with one another.  But if it turns out

4  that we are hitting a roadblock because not enough people have

5  submitted the claim form -- I mean, the voluntary information,

6  or those that have have not filled it out completely, then at

7  any point in time -- but hopefully they would wait until we see

8  what kind of responses we get.  But at any point in time,

9  people can file a claim objection on the basis that there is

10  insufficient information.  I mean, whatever 502 says about the

11  right to object to a claim.  If there's insufficient

12  information, then they can proceed the way they want.

13        I'm not asking the Court to impose any pause on the

14  right to object to a claim or any of the discovery rights that

15  go along with that.  I'm simply asking that if someone submits

16  a voluntary form, that that form -- their answers -- that form

17  and the answers on that form not be used as Exhibit A to a

18  claim objection.  And people can go through that form in a

19  discovery request via document production, request for

20  admissions, interrogatories, deposition, and ask every question

21  on that form and the other 200 questions they may have and

22  submit it as a form of discovery.  But then at least the

23  survivor is in a position where they understand that the nature

24  of the case, at least for them individually, has changed.

25        Right now, we're trying to keep peace so that we can

1 have fulsome, complete, and open discussions about the claims
2 in general and individual claims, if that's how granular we
3 get.
4          THE COURT:  Okay.  I've got several --
5          MR. PASCUZZI:  Your Honor --
6          THE COURT:  I want to ask Mr. Pascuzzi first.
7          MR. PASCUZZI:  Okay.
8          THE COURT:  What's your take on this?  What do you
9 want me to do about it?
10          MR. PASCUZZI:  Thank you, Your Honor.  I did want
11 to -- I don't mean to step in front of the insurers, but I do
12 think you should hear from the debtor first.
13          THE COURT:  No, I called on you.  I called on you.
14          MR. PASCUZZI:  Okay.  Thank you.  Well, Your Honor,
15 this was a compromised position.  As Mr. Stang notes and as the
16 Court notes, we cannot get -- we cannot force the survivors to
17 submit the voluntary supplement.  That is an evolution in these
18 kinds of cases, starting with Buffalo, then Oakland, and then
19 Santa Rosa.  But we all acknowledge and agree that we need this
20 information.  And the Court recognized that in its preliminary
21 comments, tentative ruling.  We need the information to move
22 the case forward.
23          My goal is to get this case to mediation as soon as
24 possible.  And so if you were to order that some -- that these
25 supplements, and it's just the supplements, not the 410 form,

1    just the supplements can be used for claim objections, then I

2    think Mr. Stang is going to tell you that we're not going to

3    get any supplements filled out. So we're going to have the

4    official 410 form. And then for us to go to mediation, for us

5    to negotiate with the carriers, negotiate with the committee,

6    we're going to have to do discovery before we even do that. So

7    we look at that as an enormously expensive, enormously

8    time-consuming, and enormously wasteful time.

9           So we negotiated a small carveout for the use of the

10   supplemental -- the supplemental forms, the confidential

11   information in the supplemental forms, so that they can't be

12   used for claim objections. And the reason that was acceptable

13   to us is because we want to go to mediation. And if mediation

14   fails and we have to do something else, we'll figure that out

15   if and when that happens.

16          But in the meantime, we don't want to be doing

17   discovery on 500-plus claims just to be able to go to

18   mediation. So that's why we agreed to the compromise here.

19   And yes, it is not in Oakland. It is not in Santa Rosa. The

20   Oakland and Santa Rosa committees both agreed to submit support

21   letters for -- urging the survivors to complete the supplement

22   because it is so useful and so necessary to the mediation

23   process.

24          So this committee is taking a little bit of a

25   different position. But the alternative is we don't get the

1  information.  We get the official form 10 which isn't going to

2  have enough information.  And then we have to spend six to nine

3  months trying to get more information through discovery and

4  litigation which we just don't see that as productive.

5          THE COURT:  Do you want me to go further and say there

6  can be no claim objection until later date?

7          MR. PASCUZZI:  No, no.  I don't think Mr. Stang is

8  asking you for that.  The only thing --

9          THE COURT:  No, no, no.  He's not

10          MR. PASCUZZI:  The only thing --

11          THE COURT:  He's not.

12          MR. PASCUZZI:  Yeah.

13          THE COURT:  I'm asking you.

14          MR. PASCUZZI:  No, I don't want you to do that.  I

15  don't want to tie anybody's hands.  I would like it the way

16  it's been negotiated.  The supplemental form only cannot be

17  used for claim objections.  But as Mr. Stang said, discovery

18  can happen.  Claim objections can happen.  I hope that isn't

19  necessary, but hopefully we'll have a robust response with the

20  voluntary supplements, I can report in Santa Rosa about ninety

21  percent of the claims included supplements.  I can't say that

22  each one was fully and completely filled out, but it was a good

23  response.  I think that's a similar response rate in Oakland.

24          THE COURT:  But you said there's no prohibition on use

25  of the supplement in Santa Rosa.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 67 of
118

1          MR. PASCUZZI:  There is not.  But they are voluntary.

2     And the committee encouraged the survivors and their lawyers to

3     complete them.

4          THE COURT:  Okay.  Okay.  So --

5          MR. PASCUZZI:  If we end up in a situation here where

6     the committee and the survivor lawyers are saying don't fill

7     out the supplements, then we will be left in a position where

8     we'll have the official 410 form.  And we will then have to do

9     costly and time-consuming discovery to get to mediation.

10          THE COURT:  Okay.  Okay.  I got it.  So this is

11     another way of saying you accept Mr. Stang's language and you

12     want me to adopt that.

13          MR. PASCUZZI:  I want you to adopt it the way it is,

14     yes.

15          THE COURT:  Okay.  All three counsel for the

16     committee -- sorry, for the insurers have raised their hand.

17     I'll just go left to right, starting with you, Mr. Frankel, and

18     then Ms. Sugayan and then Mr. Weiss.

19          MR. FRANKEL:  Yeah.  Thank you, Your Honor.  I'll

20     start.

21          I think what they're asking for is -- first of all, it

22     might have the opposite effect.  They're basically asking to

23     cloak the supplements in mediation confidentiality protection,

24     because if you can't use it for any purpose, if you can't use

25     the claim supplement for any purpose, it's going to, as a

1  practical matter, be like mediation confidentiality.

2       MR. PASCUZZI:  I don't mean to interrupt, but that's

3  not what it says.

4       MR. FRANKEL:  Well --

5       MR. PASCUZZI:  It's not You can't use it for any

6  purpose.

7       MR. FRANKEL:  You can't --

8       MR. PASCUZZI:  It says you can use it for any purpose

9  except claim objections.  I'm sorry.  We just -- let's be

10 accurate, please.

11      MR. FRANKEL:  No, I'm -- you're right, Mr. --

12      THE COURT:  Gentlemen, slow down.  I'm trying to read

13 it too, so hold on.  Let me just read it.

14      May not use confidential information in the

15 confidential settlement for any objections to a surviving proof

16 of claim.

17      Okay.  Go ahead, Mr. Frankel.

18      MR. FRANKEL:  So Mr. Pascuzzi is correct.  I misspoke.

19 You can't use it for purposes of a claim objection.

20      So this caught my eye.  And I attempted to meet and

21 confer with Mr. Stang's partner to try to understand the scope

22 of this.  And I said, let me take -- let's take an example.

23 You have a claim supplement.  And based on the information in

24 the supplement, it shows that it's really not a valid claim.

25 But can you object to that claim without using the supplement

1   if you now the information -- you know the claim is invalid.
2   The answer is no, because if you're using the supplement at
3   all, unless you have some independent basis to object to that
4   claim, you can't object.  And so what that means is that you're
5   going to -- you're going to force parties -- unless there's a
6   global successful resolution, you're going to force discovery
7   on these claims to get information underlying the claim that
8   you wouldn't get from the proof of claim form.

9           And I think the fact that in Oakland and in Santa Rosa
10  where you didn't have this cloak of mediation prohibited use,
11  yet you still had ninety percent -- over ninety percent of the
12  claimants agree to submit the form -- and in other cases, it's
13  subject to a disclosure that the supplement -- if you don't
14  fill it out, it could provide a basis for a disallowance of the
15  claim.

16          I think that actually motivates claimants to complete
17  the information.  It doesn't motivate them to just kind of
18  stand back because they know that if they don't provide this
19  information, not only might they not get paid, not only might
20  not there be a successful confirmed plan, but their claim might
21  be objected to.  And so it avoids the need for discovery.  It
22  facilitates a potential resolution.  And by cloaking it in this
23  confidentiality where you can't use it to object to a claim, I
24  just think it's counterproductive.

25          No other case that I'm aware of, no other archbishop

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 70 of
118

1 case -- some of them require the proofs of -- the supplements

2 as part of the -- as a mandatory process.

3          THE COURT:  No, I know that.  And I don't like that

4 idea.

5          MR. FRANKEL:  This would go the opposite extreme.  It

6 would basically say you could have this information for

7 mediation purposes only and that's it.  And so we just think

8 it's counterproductive.,  And it could have the opposite

9 effect.

10          THE COURT:  Okay.  Ms. Sugayan, you wish to be heard?

11 Thank you for your patience.

12          MS. SUGAYAN:  Thank you, Your Honor.  Kathy Sugayan on

13 behalf of certain underwriters at Lloyd's.

14          Your Honor, I've been doing this a long time.  In

15 fact, I was involved with the first diocese bankruptcy just

16 like you, Portland and Oregon.  And typically when we've been

17 involved in these cases, the requests for information is to get

18 information so we can understand the claims, hopefully get

19 involved in a global mediation in settlement, have the

20 opportunity to vet claims.  That's the reason why early on in

21 these cases, my client is always asking us to request as much

22 information as we need to determine the legitimacy of the

23 claims, whether or not other defendants should be paying them,

24 issues like that.  But Your Honor, already covered that, so

25 I'll just move on.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 71 of
118

1            I agree with Mr. Frankel that the process of allowing

2    claim objections based on the POC forms or the supplements is

3    going to be much less disruptive and less costly than having to

4    do the discovery that Mr. Stang is talking about.

5            I was involved in in Milwaukee.  I was also involved

6    in Rockville Center, and we were involved in watching all the

7    claim objections.  My clients had a number of the claims that

8    were being objected to.  I was involved at a number -- or at

9    least monitored a number of the hearings.  The type of

10   objections there were sort of omnibus objections that affected

11   groups of claims, things like were there double claims so you

12   could get rid of duplicates.  Issues, were they filed after the

13   bar date or after the CVA window closed, things like did the

14   abuse happen at a school or some entity and was the abuse by a

15   person who had no affiliation with the diocese?  That was the

16   purpose of that first group of claims.

17           My understanding of the claimants' objections from

18   that claims process is that some felt that they didn't have the

19   opportunity on the objections that went to propensity, whether

20   or not the diocese had sufficient knowledge in order to have a

21   viable cause of action for negligence, felt like they didn't

22   have the chance to do sufficient discovery.  And the judge

23   there, Judge Glenn, they're allowed to appeal that issue.  Some

24   of them were allowed the opportunity to supplement their claim

25   forms.  I can understand in that situation, we don't want to

1    weaponize anybody, defendants or insurers.  If someone needs an

2    opportunity to replead or amend, then tat process should

3    happen.

4            But again, the whole issue here is I think that using

5    the claim -- using the PLCs is a basis for any claim objections

6    when you have reasons such as duplication or that perp was not

7    an employee of the diocese, issues like that.  We should be

8    able to, I guess, flesh out the claims that aren't legitimate.

9            THE COURT:  What do you think -- well, what do you

10   what do you think about my musing about maybe a timeout before

11   there can be a claim objection?  Do you think that's helpful or

12   just or not?

13           MS. SUGAYAN:  If we could agree on -- if everyone

14   could agree on a mediation process and then try it that way,

15   and if there was a sufficient exchange of information, we would

16   be agreeable.  Again, the devil is --

17           THE COURT:  No, no.  No, let me rephrase that.  If the

18   principal players here -- and without trying to pick who they

19   are -- if there was a consensus that we've picked a mediator

20   and we're going to go to mediation on whatever date and I said

21   fine, and you said and therefore we're going to put a time out

22   on claims objection, it would seem to me that would be helpful.

23   But at the moment, we don't have that.  And no one's reporting

24   that.

25           So you're making an argument which is consistent with

1   my sense that you can get rid of a lot of specific claims that

2   are questionable without forcing the hand of the claimant or

3   the victim who has a viable claim and yet may have been

4   deterred from filing that supplemental information because he

5   or she would have been frightened off at the risk of having to

6   defend it in court.  So it's kind of a dilemma that I wonder if

7   we can avoid.  And I don't know what the easy answer is.

8          Well, go ahead.  I stopped you.  Finish your point.

9   And then allow Mr. Weiss to add his thoughts.

10         MS. SUGAYAN:  Well, I guess just one kind of final

11   point on that are two final points.

12         We are willing to respect confidentiality concerns in

13   connection with anything throughout this entire process.  So

14   that shouldn't be an issue here.

15         And I think lastly, by objecting to claims and being

16   able to, I guess, eliminate the illegitimate claims, then the

17   legitimate claimants actually have a larger pot of money in

18   which they can share.  And you're not having people who don't

19   have legitimate claims voting for the plan at the end of the

20   day, which is why I understand Mr. Stang to be saying.

21         THE COURT:  Depends on what the plan is.  If the plan

22   pays everybody in full, the votes aren't very difficult.  If

23   the plan is a pot plan, that obviously we got a different

24   situation.

25         SO Ms. Sugayan, what do you think would happen if a

1 person filled out a confidential supplement and you couldn't --

2 you couldn't use it for objecting to the claim and you filed an

3 objection to the claim that said give me all the facts that

4 support your proof of claim? Wouldn't that -- wouldn't that

5 force the very exchange of information that has just kept

6 confidential? I mean, and it doesn't -- it seems to me --

7 well, what would happen in that case?

8 MS. SUGAYAN: Well, I guess that that just goes to the

9 reason why we should be able to use a proof of claim and we

10 should be able to file objections under various confidentiality

11 protocols. I guess we'd have to --

12 THE COURT: No, no. But the proposed order says that

13 the supplement can't be used to support a proof of claim

14 objection. But what I'm saying is, suppose you have a proof of

15 claim that's blank, I was abused and I want a million dollars,

16 period, but the supplement gives a lot of detail. But you

17 can't use the supplement, so you file an objection to the proof

18 of claim and say give me all the facts just like -- just like

19 you would happen outside of bankruptcy. Give me all the facts

20 that supports your assertion of your claim. Wouldn't that

21 force the claimant to provide the information, the very same

22 information that's in the confidential settlement?

23 MS. SUGAYAN: Well, I agree. You're still saying that

24 we're going to be given the opportunity to file objections.

25 We're just saying here that using the supplement, like you

1  said, it would be much less disruptive and less costly because

2  you wouldn't be filing discovery and seeking answers which

3  takes a lot of time.

4          THE COURT:  Okay.

5          MS. SUGAYAN:  I understand we're getting to the same

6  place at the end of the day.

7          THE COURT:  Mr. Weiss?

8          MR. WEISS:  Thank you, Your Honor.  Just a couple of

9  additional points.

10          I think really the end of the conversation, my opinion

11  is that we should all follow what the same thing that was done

12  in Oakland and Santa Rosa.  Mr. Stang or the first part of this

13  hearing said that was very important.  And then suddenly when

14  the issue doesn't favor him, we need to try something new.

15          And looking at those two cases, Mr. Pascuzzi said that

16  ninety percent of the claimants provided supplements, and there

17  was no bar on using them for claim objections.  So it clearly

18  didn't dissuade him there.

19          I can't speak to what the committee may or may not do

20  here.  I haven't had any conversations with them.  But it seems

21  like -- that doesn't seem like it would be a major bar to

22  getting the information.

23          And we are involved in those two cases.  And the

24  discussion there was -- there was a debate about whether or not

25  the supplements should be mandatory.  And the argument was

1    that, well, if it's mandatory, that's going to dissuade people
2    from providing supplements, so we should make it optional.
3    That's what both those courts ruled.
4         So now the argument the committee is making here is
5    well, it's optional, so people are going to not just not do it
6    if you can use it as a -- if it can be applied to a claim
7    objection.  So I think it's -- there's just a lot of
8    inconsistent positions between these cases.  And I know it's
9    not the same committee counsel, but it just seems like if we're
10   going to make this optional, which is what the consensus
11   appears to be, then they should get the benefit and the burden
12   of submitting it.  They're submitting these supplements and
13   they're going to get the benefit of it being deemed allowed
14   subject to objection.  But there should be an objection.
15   Right?  This is part of the bankruptcy rules and the bankruptcy
16   process.
17        THE COURT:  But there doesn't have to be an objection
18   early.  Sometimes it's a waste of time and money to object to
19   early.  If you don't have any money to pay creditors, you don't
20   like to waste time objecting.  And if you have -- I'm not
21   suggesting that's the case here, but I'm saying sometimes
22   timing on a claim objection is constructive and a good thing to
23   do.  Which gets back to my suggestion before thinking out loud,
24   why don't I just have a moratorium on claims objection?
25        But I want to come back to Pascuzzi -- well, Mr.

1    Weiss, have you finished that your point?

2            MR. WEISS:  Well, the one other thing I'll just say is
3    Mr. Stang talked a lot about how in some of these other cases
4    there weren't objections up front or according to the rules,
5    but then there was a procedure within a plan to address it.
6    And that's not a good substitute for the established process
7    for objecting to claims.  I think that we've talked about the
8    need -- it's all part of the process of negotiating a deal
9    between the committee and the debtor and then that -- then the
10   claims get sorted out in the plan process.

11           But what could happen, what's happened in some cases
12   we've been in is once the debtor gets a deal -- and I'm not
13   saying that's going to happen here, but it happens in cases
14   where it caps their liability, they don't have an incentive to
15   object to claims anymore.  It's on the other parties.  So if
16   we're not part -- if the insurers aren't part of that
17   discussion, then it becomes -- it falls to them.  And if they
18   don't have the access to these supplements, then it's --
19   they're certainly at square 1 as far as discovery.

20           THE COURT:  So what happened -- what's happened in
21   other cases where there's been a fixed sum of money set aside
22   and what you say that there's no motive for the church or the
23   diocese to object to claims?  So who objects to the claims that
24   are phony?

25           MR. WEISS:  So in the -- I mean, I think Camden is one

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 78 of
118

1    case where I think that's -- we've seen that. And some of the
2    insurance companies had to file their own objections.
3            THE COURT: So they've done it. So the insurance
4    companies have stepped up and object to the claims. The
5    committee has not in those cases?
6            MR. WEISS: The committee -- I'm not aware of any
7    objections being filed by the committee in those cases.
8            And the last thing I'll add is just even if you were
9    to say let's do it through a plan process, there's -- not
10   knowing what the plan would be, you can't really speculate.
11   But there's all kinds of foreseeable problems in a plan that
12   would not give the same vigorous vetting of claims that you
13   would get under a normal bankruptcy rules procedure.
14           And the last thing I'll say is the key here is to
15   allow the payment of valid claims, not every claim that's
16   filed. And I think to --
17           THE COURT: Well, right. I mean, isn't that the point
18   I was trying to make? Whether you do it early in the case or
19   late in the case, unless this is a one hundred percent payment
20   in full case, you have to get rid of the bad claims because the
21   bad claims dilute the good claims. And let's face it, from
22   life experiences, we know there are likely to be some bad
23   claims.
24           And so to me, it's a question of when and whether to
25   permit the objection process to go forward. Mr. Stang seems

1   to -- and I do find Mr. Sagan's comments to be a bit

2   inconsistent.  He says don't let them used the confidential

3   information, but they can object any time they want to, which

4   is an invitation perhaps to either blow up the mediation

5   process or to create a complete contradiction to say I can't

6   use the very thing that I want to use to base my objection,

7   which I don't -- don't make any make any sense to me.

8          But I want to come back to Mr. Pascuzzi.  But for both

9   you and Mr. Weiss and Mr. Sugayan -- well, Mr. Weiss, you did

10  it.  But Ms. Sugayan, I need you either to take down your hand

11  or finish your point.  It's not that I want to be rude.  I

12  just -- I want to not be rude.

13         Okay.  Mr. Stang has his hand up.  Mr. Stang, I'll

14  come back to you.

15         Mr. Pascuzzi, I kind of go back to you.  I'm

16  struggling to figure out the right thing to do.  My instincts

17  still tell me that I should not make claim objection

18  prohibitive and impossible.  But I do think maybe a timeout on

19  it would be constructive.  But you don't seem to be supportive

20  of that.

21         So tell me again, given the fact that this committee

22  is the committee you're stuck with or dealing with, stuck with

23  is a term of endearment, this is your committee in this case,

24  and unlike the Santa Rosa case where you are also principal

25  counsel, what do you want me to do given these concerns?

1   Again, repeat it or refine it.

2           MR. PASCUZZI:  Your Honor, our goal is to get to

3   mediation as soon as possible.  To get to mediation, we need

4   the information in the supplement because we can't make the

5   supplement mandatory.  It's optional.  So in order to get that

6   information, if we need to say we won't use the confidential

7   information in the supplement as a basis to object to claims,

8   I'm willing to do that.  That doesn't mean we can't object to

9   claims or anybody can't object to claims.  Mr. Stang said that

10  we're not planning on objecting to claims; we want to go to

11  mediation.

12          I think the whole objection to claim issue right now

13  is not focusing on what's important right now, getting to

14  mediation and getting the information.  The result of not

15  putting that in the order now, it very likely could be,

16  according to our conversations with committee counsel, is we're

17  not going to get the information.  So we will have to do

18  discovery in order to get to mediation.

19          And doesn't mean that fraudulent claims or bad claims

20  or claims that deserve to be objected to won't be objected to

21  later in the case, they'll get paid anything.  That will all

22  get handled.  It gets handled in every one of these cases by

23  competent professional people that the claims review process is

24  an important element of every Chapter 11 plan in these cases.

25          So my goal again, is to get to mediation as soon as

possible. I don't want to have to do discovery to get the information that is put forth in these voluntary supplements. And in my communications and conversations with Mr. Stang, if we agree to this limitation, we will have a good turnout of the optional supplement. And that's what's most important right now for the progress of the case.

THE COURT: Okay. So the person who listens to this discussion and believes you, and I adopt your recommendation, the person fills out the confidential information. And the mediation occurs. And whether it's successful or not, what do you do when it's time to object to that person's claim when that person says you committed not to use the information I gave you? What do you -- what do you tell -- what do you do to deal with them to get that claim clarified?

MR. PASCUZZI: You said it and Mr. Stang said it. You could object to the claim not based on the supplement but based on the proof of claim. And you could send them interrogatories, take their depositions, send them document requests for all the information that supports their claim. And that information will be produced in part of the normal claim objection process. And the claim -- everyone will have their fair hearing to prove up the claim or object to the claim. And so I don't understand why that is an issue.

THE COURT: All right. So the claimant provides a response to the discovery. Are you allowed to compare that

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 82 of
118

1  response to whatever that same claimant submitted on his

2  supplement?  Or stated differently, what if the objection is --

3  when the discovery is one objection, tell me anything -- tell

4  me everything you said in your supplement

5          MR. PASCUZZI:  Well, I'll let Mr. Stang answer that.

6          THE COURT:  No, I want you --

7          MR. PASCUZZI:  Okay.

8          THE COURT:  Because you're the lawyer for two

9  dioceses, one of which has the procedure one way and one of

10 which has the procedure another way.  And I want to know how

11 you can handle it.  Well, I'll ask Mr. Stang he same question.

12 And I'm not trying to put you on the spot, but to some extent I

13 am asking you to put yourself on the spot.

14         MR. PASCUZZI:  Yeah.  I don't think you can use the --

15 under the order, you can't use what's in the optional

16 supplement for claim objections.

17         THE COURT:  But can you ask what facts you have to

18 support your proof of -- your assertion?

19         MR. PASCUZZI:  Yes, yes.

20         THE COURT:  And what would you do if there was an

21 inconsistency between what that claimant submitted now with

22 what he -- that he or she submitted previously?

23         MR. PASCUZZI:  I don't think you could use the

24 optional supplement confidential information to deal with that

25 issue.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 83 of
118

1    THE COURT:  Mr. Stang, what does Mr. Pascuzzi do in

2 that situation?  Is it fair game to object to the claim and

3 include a request for admission?  Is everything you said in

4 your supplement true or something like that?  Can he do that?

5    MR. STANG:  Your Honor, I don't think so.

6    THE COURT:  Okay.

7    MR. STANG:  But if you wanted to include in your

8 interrogatories or in your deposition questions the exact same

9 questions that were posed in the voluntary submission, then you

10 could do that. You're certainly free to do it.

11    THE COURT:  Can he then compare the two answers?

12    MR. STANG:  Well, I guess he could -- I don't think he

13 could use it in a claim objection, saying -- well, I'll take

14 that back.  He cannot use it in a claim objection that says

15 under the voluntary statement you said it was Father Smith, and

16 now in our formal discovery, you said it was Father Jones.

17 That that would not be permissible.  But --

18    THE COURT:  He couldn't even mention the one who's

19 named in the first --

20    MR. STANG:  Well, he could ask him, did Father Smith

21 abuse you?  He could ask if Father Jacoby abused you or Father

22 Suarez or --

23    THE COURT:  We don't -- I guess what I'm getting at is

24 what -- not as the presiding judge here, but as if I were in

25 practice and I had to advise my client whether or not to submit

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 84 of
118

1  this voluntary supplemental form, what would I tell that person

2  about what might happen with that information?  If you're

3  telling me it's somehow sacred and can never be reexamined,

4  that's one thing.  If you tell me that, oh, they can get it

5  some other way in the future, the same information, it seems to

6  me we're dealing with facts, not fantasies.  And facts are

7  facts and facts need to be -- can be discovered in discovery.

8         So tell me again, under your scheme, whether there's a

9  mediated result or not, what happens to that information that

10 the person has admitted voluntarily?

11        MR. STANG:  That information can be used in the

12 mediation context of the negotiations with the parties who are

13 going to fund the plan.  And they can counteroffer or offer

14 based on their assessment of the credibility.  So that is how

15 it can be used in the context of trying to reach a deal.

16        Your Honor, there are -- you've been gracious in

17 acknowledging my experience.  I have handled enough cases.  I

18 probably have handled cases with over 40,000 survivors.  I have

19 objected to claims as committee counsel.  It is rare because I

20 think the quote, phony claims are extremely rare.  And

21 California, by virtue of how -- of its statute of limitations,

22 amendment and the creation of the window, put an extra layer of

23 protection against what you call the phony claims.

24        I don't think people here need the motivation that Mr.

25 Frankel talked about, because for these people, nearly most of

1    their lives, because most of them were abused when they were

2    young, has been trying to find a remedy for what happened to

3    them. And I can assure everyone on this call that if there is

4    any group that wants a speedy resolution of this case, it is

5    the survivors, maybe even more so than the archbishop himself.

6        As you know, Judge, this is an aging population.

7    People who were sexually abused as children, generally

8    speaking, are not in the best of health because -- for a lot of

9    reasons related to their abuse. So this is not something that

10    we want to drag out. So we don't need the motivation that Mr.

11    Frankel suggested.

12        And as far as Ms. Sugayan's comments are concerned, if

13    there are duplicate claims, you don't need the voluntary

14    supplement to identify those. If there is no affiliation with

15    the Archbishop, there are complaints on file that will be

16    attached to the 410 form. There are files that the Archbishop

17    has regarding abuse claims that can identify whether a

18    religious order was involved. Now, not every -- I'm not saying

19    there's a form, there's a file on every claim form, on every

20    proof of claim that has been filed. But if the complaint says

21    I was abused at a Franciscan parish or a Franciscan high

22    school, well, you don't need the supplement to go to the

23    archdiocese and say what is the relationship between the

24    Franciscans and the archbishop as to this school. And the

25    person is not -- that's the what I call the not us. It wasn't

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 86 of
118

1   us; it was the Franciscans.  It would it wasn't even Catholics.
2   I've had those.  I had to prove a claim once that said -- well,
3   I'll leave that alone.

4         THE COURT:  That doesn't matter.  Mr. Stang, in my in
5   my brief experience in the Portland case, there were -- there
6   was at least one claim asserted by someone who claims to have
7   been abused.  But unfortunately, he was in prison at the time
8   he claimed that he'd been abused.  So I understand the fact
9   there can be a problem.

10        But your situation, I assume in your hypothetical, an
11  objection to claim could say I object to this claim because the
12  Franciscan priests are not part of this diocese.  And if that
13  objection-- that would be the end of that claim.  Right?

14        MR. STANG:  Right.  And by the way, Your Honor, that
15  prisoner, I think it's the guy who was talking about when I
16  said I objected to the claim because I had a guy who was doing
17  this serially and he was in prison the whole time.

18        THE COURT:  Okay.  But Mr. Stang --

19        MR. FRANKEL:  So --

20        THE COURT:  Mr. Stang, if we had the dude from Alaska
21  who claims to have been abused on the bus and if he filed a
22  claim in the San Francisco case, presumably an objection could
23  say we don't -- we didn't run any busses in Alaska and that
24  would be the end of that claim.  But then your point is that --
25  I think if I'm following you, there is a way to get rid of

1    duplicates or claims that are simply asserted against someone

2    other than anyone who's affiliated with the Archbishop of San

3    Francisco and so on.  And that's what you want to do.  And I

4    gather -- and I'm not going to ask you what you would do if you

5    were counsel for the Santa Rosa Committee, because you're not.

6    But Mr. Pascuzzi believes that the better thing here is to

7    adhere to your suggestion and not to take a position one way or

8    the other on claims objection, therefore not for me to put any

9    kind of a time out on client objection but to take the language

10   that we've been talking about for the last two hours and stick

11   with it.  And okay, I got the message.  I don't need to have

12   any further discussion.

13        Mr. Pascuzzi, I will defer to your judgment on this

14   and I won't -- I'll accept that language.  I'm still having

15   trouble -- and we maybe haven't even gotten near being

16   finished -- going through the black line.  And I for one, am

17   getting a little -- want to take a break and maybe everybody

18   else does.

19        But I'm not going to worry about whether you have to

20   deal with a slightly different situation in Santa Rosa.  You

21   have urged and committee counsel has made an impressive

22   argument about why to do what we're doing here.  I still have

23   some concerns, and I'd be interested in whether you have a

24   solution for me at this point, whether we should put in the

25   language something about something in the future.  In other

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 88 of
118

1  words, I want to avoid being inconsistent if there is a

2  mediated result on whether there is an absolute bar on ever

3  using the supplement to support an objection or not. And I

4  gather Mr. Stang would say never, just have to have some other

5  basis for objection. And that's what you want to live with

6  also, right?

7          MR. PASCUZZI: Yes, Your Honor.

8          THE COURT: Okay. Well, I'm going to defer to the

9  committee and to the debtor's wishes on this.

10          And for the three counsel who made the argument for

11  the for the insurers, I'm not going to tell you. You may or

12  may not object your claims. I'm going to stick with the let

13  the parties figure out a way. And if the debtor believes or

14  the committee believes that somehow the insurers shouldn't be

15  permitted to object to claims at some earlier date, they can --

16  first of all, that hasn't happened. And second of all, if

17  there is a basis to consider staying any claims objection, I'll

18  deal with it when there's something to deal with.

19          So Mr. Pascuzzi, unless you think we're going to wrap

20  up quickly, I'm going to suggest we take a personal convenience

21  break. What do you anticipate for the balance of what we need

22  to cover? And we certainly haven't covered much of the markup,

23  but we certainly covered a critical component of it.

24          MR. PASCUZZI: Yeah, I think we hit some -- most of

25  the major issues. There's probably one other issue that I

1  believe may revolve around the insurers' request for that

2  additional question.  And your preliminary comments said put it

3  in there.  I did put it in there.  I believe the committee has

4  some comments about that.

5         There's a footnote in paragraph 17C regarding the U.S.

6  Trustee access to the survivor proofs of claim.  I'm not really

7  sure if -- the committee wants that out.  I think the U.S.

8  Trustee was not taking a position, so I don't know.

9         THE COURT:  Slow down.  Give me the footnote or what

10 page it's on.

11        MR. PASCUZZI:  It's on page 27 of the red line.  And

12 it's the footnote -- I think it's 4 about The U.S. Trustee

13 shall have full access to the survivor proofs of claim.

14        THE COURT:  Hold on, please.  Slow down.  I can't find

15 it.  Oh, okay.  Notwithstanding -- and the committee wants that

16 out?

17        MR. STANG:  No.  Your Honor, the footnote is fine.

18        THE COURT:  Oh.  Mr. Blumberg?  Oh, footnote is fine?

19 SO that's what you want, Mr. Blumberg?

20        MR. BLUMBERG:  Your Honor, Jason Blumberg.

21         The additional language was at the United States

22     trustee's request.  I believe it was at the committee's

23     request.  As I conveyed to counsel yesterday, we have no

24     position on the additional language.  So --

25        THE COURT:  Okay.  Mr. Pascuzzi, you want to come back

1  in a moment or now or after a break about --

2          MR. PASCUZZI:  We can take a break, Your Honor,

3  because I'm not sure how quickly the other discussion will be,

4  but I don't think we're going to be another hour hopefully.

5  Hopefully we'll be within thirty to forty-five minutes at the

6  most.  But I'm happy to take a break.

7          THE COURT:  Well, one second.

8          Mr. Stang, You apparently do not agree with the one

9  provision that I said could go in.  So can you explain that?

10          MR. STANG:  Yes, Your Honor.

11          THE COURT:  You're on a roll here with getting me to

12  back off.

13          MR. STANG:  Well --

14          THE COURT:  Tell me what the problem is.

15          MR. STANG:  I'll tell you, Your Honor.  So I am

16  looking at the language.  And we are -- we have met and

17  conferred with -- and I apologize, counsel, I don't know which

18  of you, but someone who was speaking on behalf of several of

19  the insurers.  And this is our difficulty with the language.

20          THE COURT:  Slow down for a minute.  Can you point me

21  to the language in the order?  I mean, I've got my preliminary

22  comments, but I want to see it in the order.

23          MR. PASCUZZI:  Your Honor, if I --

24          MR. STANG:  I may have to --

25          MR. PASCUZZI:  -- can interject.

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 91 of
118

1          MR. STANG:  -- ask Mr. Pascuzzi for help on that.

2          MR. PASCUZZI:  Yeah.  It's actually in the Survivor

3    claim supplement.  So it's on page 71 of the docket 297.

4          THE COURT:  Okay.  I'm there.

5          MR. PASCUZZI:  And it's the item J that was added.  Do

6    you have personal knowledge or a reason to believe?

7          MR. STANG:  Yes.

8          THE COURT:  Okay.  Got it.  Okay.

9          MR. STANG:  That's the question, Your Honor.

10         THE COURT:  Got it.  Mr. Stang, yes.  That's right.

11          That is the language that I believe I picked from the

12      insurers and said seemed to be okay.  And so you don't

13      like that language, right?

14         MR. STANG:  Well, I don't like the language, but we're

15    not adverse to something that we think is actually more

16    relevant.

17         And, Your Honor, I just -- as a very quick backdrop,

18    the archbishop's liability can be based on a number of

19    theories.  Was there a fiduciary relationship between the

20    archbishop and the survivor?  Was there a -- that does not

21    require, in our belief, notice of the particular priest's

22    abusive proclivities -- proclivity, I guess is --

23         THE COURT:  Okay.

24         MR. STANG:  Proclivity.  Second, if not a fiduciary

25    duty, was there a special relationship that existed?

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 92 of
118

1 California recognizes that the existence of a special

2 relationship can be the basis for liability regardless of

3 notice.  That's our belief of one of the theories.  And then,

4 of course, there's the theory of, hey, you knew or should have

5 known that the priest had this proclivity, different than

6 fiduciary duty, different than special relationship.  That

7 theory may require some form of notice.

8          So I want you to -- I would like you to appreciate

9 that notice is not the be-all and end-all of these cases and

10 the basis for the archbishop's liability.

11          With that being said, Question J is way too broad.  We

12 think it should say did you tell any -- I mean, do you know if

13 anyone told the Archbishop?  So question J because that's the

14 red line -- I'm sorry, I, is did you tell anyone.  We think the

15 appropriate question is do you know if anyone else told the

16 archbishop?  And if the answer is yes, who do you think that

17 person was?  Let's call it the reporter.  Who did the reporter

18 tell and when?

19          But this is the problem with the question is posed by

20 the carriers and that you tentatively adopted.  I may think

21 that the archdiocese knew about the abuse because I read about

22 it in the San Francisco Examiner.  And it said the Archbishop

23 knew.  There is a website, Your Honor, called Bishop

24 Accountability.  I think its title tells you what it's about.

25 Lots of people go to Bishop Accountability.  It has a long list

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 93 of
118

1  of abusers in every -- in many of the dioceses in the country.

2  I've read Bishop Accountability.  Pretty convincing to me.  I

3  think the Archbishop knew or I spoke with someone.

4         THE COURT:  I read about it; therefore, I think he

5  knew.  Okay.

6         MR. STANG:  Right.

7         THE COURT:  I get it.

8         MR. STANG:  Or someone came up to me once and said all

9  those priests -- and I don't personally believe this -- all

10  those priests are molesters.  Yeah, yeah, you're pretty

11  credible guy.  Yeah, maybe they did.

12         So I really think that if you're looking for a

13  question of did the Archbishop get notice, the appropriate

14  question is did you tell the archbishop or do you know if

15  someone else told the archbishop.  And we're fine with that

16  question.  And we have circulated a draft version of that

17  question to -- and again, I apologize, but one of the counsel

18  on this call --

19         THE COURT:  Okay.  Okay.

20         MR. STANG:  -- before this hearing started.

21         THE COURT:  Well, I'll get a chance to hear from them.

22         But may I clarify something?  This is a question that

23  you would rephrase in the confidential questionnaire.  And so

24  the answer would say yes, I -- the answer might be I called up

25  the priest and said -- or wrote a letter to the archbishop and

1   told them Father so-and-so did something to me or I told my

2   counselor or my teacher --

3           MR. STANG:  My mother.

4           THE COURT:  -- or my mother or something.  But that

5   doesn't -- I told my mother, but that doesn't say anything

6   about what the writer says that his mother did.

7           MR. STANG:  Right.  So question I deals with I told my

8   mom.

9           THE COURT:  Okay.

10          MR. STANG:  The question we are proposing is, do you

11   know if your mom told the archbishop?

12          THE COURT:  Okay. And so that -- you would phrase

13   it -- you would phrase it in the alternative, the questionnaire

14   who himself or herself reported it to somebody who's a part of

15   an agent or the -- not the archbishop himself, but someone,

16   someone in authority, or do you know of somebody else who did

17   it.

18          MR. STANG:  Yes.  We're not limiting I to telling an

19   agent.  It's like did you tell anybody.  You could have told a

20   friend.  You could have told your mom, your dad, anybody.  The

21   question is not limited to -- I'm sorry, archbishop agents.

22          THE COURT:  Well, do you --

23          MR. STANG:  And it's not an alternative question.

24   It's did you tell mom, yes, no.  If it's yes, do you know if

25   mom told the archbishop?

1        THE COURT:  Yeah.  No, I got it.  But it's not just

2    Mom.  It's anyone.

3        MR. STANG:  Well, yeah.  Yes.  It would be anybody in

4    question.  Now in delineated question I says did you tell

5    anyone?  And it gives examples.  Parents, relatives, friends,

6    the archdiocese.  Knowing what you said about that, we'll

7    change that to archbishop.  Counselors, law enforcement

8    authorities.  And we of course, we use the word "include" which

9    is nonlimiting.

10        THE COURT:  Well, that seems reasonable to me.  Let me

11    see if any of the insurance counsel who were on the call want

12    to be heard on it.  And I mean, maybe one of you could admit to

13    having the conversation with Mr. Stang.

14        MR. FRANKEL:  I had I had the conversation with Mr.

15    Stang's partner --

16        THE COURT:  Mr. Frankel, okay.

17        MR. FRANKEL:  -- earlier today.

18        THE COURT:  So is that language acceptable?

19        MR. FRANKEL:  Well, I think we've gone back and forth

20    with some language.  What I would suggest is I think the key

21    issue here is to establish the archdiocese's independent

22    liability as opposed to the abuser.  Our view is and the

23    archdiocese's view has been that the claimant has to show that

24    the -- that there was some prior knowledge of the abuser's

25    propensity to commit the abuse at the time.  And without that,

1  there are additional defenses.

2       I think we could work out something that's acceptable

3  between Mr. Stang and the insurers and the debtor.  And rather

4  than spend more time today wordsmithing, I think the problem

5  with this language is it seems a little bit too narrow, but

6  we're kind of headed in a similar direction.

7       So unless Your Honor wants to spend the time to

8  wordsmith it now, my suggestion is we try to work this out,

9  send it to Mr. Pascuzzi after we meet and confer, and we can

10  probably come to a --

11       THE COURT:  Well, I'm not a big fan of drafting by

12  committee on the public with everybody participating.  And I

13  really mean when I say I'm not trying to second guess any of

14  you that I know better language.  I accepted from the papers

15  filed by the insurers something that seemed right and a good

16  idea.  And Mr. Stang, in my mind, has improved on it.  Mr.

17  Frankel, I'll take you up on your proposal and not take the

18  time on this hearing on the public record.  I will encourage

19  you and Mr. Stang and any of your cocounsel here who are

20  participating in the hearing or not on the hearing to come up

21  with some agreed language.

22       And Mr. Pascuzzi, I presume that you're indifferent to

23  it if you can a consensus among these counsel on how to --

24  because, again, we're talking about something that goes into

25  the very document that is going to have very limited

1   circulation and disclosure but serves the purposes.  Okay.

2           MR. FRANKEL:  That sounds fine, Your Honor.  We'll try

3   and come up with something.

4           THE COURT:  I'm confident that you will.  I really --

5   I don't -- I don't think it's -- I don't enjoy these long, long

6   hearings when we're trying to come up with some solution and

7   I'm kind of in the dark.

8           So we can call it a day unless there's something else

9   you want to cover.  And I'll -- we'll take a break again for

10  everybody's convenience but only if we're going to resume for

11  any more meaningful amount of time.  So you're good to go?

12          MR. PASCUZZI:  Your Honor, what I would say is we made

13  the revisions that your tentative ruling requested, the adding

14  caption, different things like that.  I think they're are

15  pretty much noncontroversial.  I didn't have anything else that

16  I was aware of that there were issues.  I don't know if the

17  committee or the insurers do though.

18          THE COURT:  Okay.  Well, let's start with the

19  committee.

20          Mr. Stang, are you satisfied with where things stand

21  and with the one issue that needs to be resolved, consistent

22  with what we just talked about?

23          MR. STANG:  Your Honor, we are done.

24          THE COURT:  Okay.  And all three counsel who have been

25  active, anybody want to raise anything further?

1          MS. SUGAYAN:  Your Honor, we're done as well.  And as

2    far as the language that you suggested for J, we can accept

3    that.  But we're willing to work with Mr. Stang if he wants to

4    tweak it.

5          THE COURT:  Well, what Mr. Stang read to me sounded to

6    be more effective, but I'll defer to you all.  Okay.

7          Then does anyone on the call who is entitled to be

8    heard wish to be heard today?  Raise your hand and I'll call on

9    you.

10          MR. WEISS:  Nothing further, Your Honor.

11          THE COURT:  I'm sorry.  What did you say, Mr. Weiss?

12          MR. WEISS:  I said nothing further.

13          THE COURT:  Yeah.  No, no.  I meant I was -- I wasn't

14    looking to the three of you.  I was looking to see -- we have

15    these new rules that drive me crazy on who can participate in

16    these video hearings and who can't.  And I'm supposed to follow

17    what they tell me at headquarters, but I don't always agree

18    with what they tell me.

19          Okay.  Thank you all for your very, very helpful

20    contributions, the hard work going on everyone's side.  And I'm

21    trying to keep up with you.  And I appreciate the full

22    explanations and education on this about the right thing to do.

23    And I'm not going to worry about at least one hopefully minor

24    difference between this case and the one in the north counties,

25    North Bay across the Golden Gate Bridge.  I'll let Mr. Pascuzzi

1    worry about those differences.  And Mr. Pascuzzi and Mr. Stang,

2    I hope your predictions are such that the turnout and the

3    response level in the confidential supplement is helpful for

4    the process.

5            So I will conclude the hearing.  I will look forward

6    to either further dispute or further resolution of the 2004

7    dispute with you all at the hearing on November 30th and call

8    it a day.  Have a nice evening, everyone.  And thank you to the

9    staff also for facilitating the hearing today.

10           IN UNISON:  Thank you, Your Honor.

11       (Whereupon these proceedings were concluded at 3:59 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, Michael Drake, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

/s/ MICHAEL DRAKE, CER-513, CET-513


eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020


Date:  December 1, 2023

## A

**ABC (1)** 15:19
**abilities (1)** 53:23
**ability (1)** 54:11
**able (10)** 8:12,15;9:25;22:4;34:2;66:17;73:8;74:16;75:9,10
**absolute (1)** 89:2
**absorbed (1)** 46:19
**abuse (14)** 28:13;33:12;49:11;56:21;58:8;59:9;63:7;72:14,14;84:21;86:9,17;93:21;96:25
**abused (14)** 44:2,4;59:12;60:15;61:13,24;75:15;84:21;86:1,7,21;87:7,8,21
**abuser (1)** 96:22
**abusers (1)** 94:1
**abuser's (1)** 96:24
**abuses (1)** 41:13
**abusive (1)** 92:22
**accept (3)** 68:11;88:14;99:2
**acceptable (4)** 51:5;66:12;96:18;97:2
**accepted (1)** 97:14
**access (16)** 12:1,1;14:13,20;22:5,21;29:2,14;31:13;32:8;42:2,22;44:18;78:18;90:6,13
**accident (1)** 28:16
**accidentally (1)** 20:19
**according (2)** 78:4;81:16
**accountability (4)** 14:2;93:24,25;94:2
**accountable (1)** 15:14
**accurate (1)** 69:10
**acknowledge (1)** 65:19
**acknowledged (1)** 18:7
**acknowledges (2)** 14:17;16:19
**acknowledging (1)** 85:17
**across (5)** 23:2,5;44:8;46:5;99:25
**act (3)** 6:19,20;30:11
**action (1)** 72:21
**active (1)** 98:25
**actual (1)** 24:15
**actually (7)** 10:19;17:23;63:17;70:16;74:17;92:2,15
**ad (2)** 60:5;62:3
**add (7)** 10:4;22:19;32:10;33:10;47:5;74:9;79:8
**added (2)** 23:7;92:5
**adding (1)** 98:13
**additional (5)** 76:9;90:2,21,24;97:1
**address (6)** 21:23;22:22;26:7;39:14;45:1;78:5
**adhere (2)** 22:4;88:7
**administration (2)** 25:6;44:11
**administratively (1)** 22:3
**administrator (3)** 39:20,20,22
**administrators (6)** 13:17;25:1;39:18;40:19,23;43:13
**admission (1)** 84:3
**admissions (1)** 64:20
**admit (1)** 96:12
**admitted (1)** 85:10
**Admittedly (1)** 52:9
**adopt (3)** 68:12,13;82:8
**adopted (1)** 93:20
**adverse (1)** 92:15
**advise (2)** 38:2;84:25
**advised (1)** 33:19
**affected (1)** 72:10
**affiliate (2)** 39:8;58:25
**affiliated (1)** 88:2
**affiliates (1)** 12:3
**affiliation (2)** 72:15;86:14
**affirmative (1)** 46:15
**afield (1)** 38:18
**afternoon (4)** 4:20,23;6:6,11
**Again (26)** 4:17;7:2,15,23;20:10,21;30:3;31:8;41:4,11;44:2;46:18,25;47:3;53:3;57:7;59:18;73:4,16;80:21;81:1,25;85:8;94:17;97:24;98:9
**against (2)** 85:23;88:1
**age (1)** 54:11
**agent (3)** 36:15;95:15,19
**agents (3)** 34:22;44:17;95:21
**aging (1)** 86:6
**ago (1)** 28:18
**agree (18)** 32:3,3;34:24;37:21;38:21,21;46:16;53:3,15;65:19;70:12;72:1;73:13,14;75:23;82:4;91:8;99:17
**agreeable (1)** 73:16
**agreed (8)** 9:5;11:7;34:18;59:23;60:5;66:18,20;97:21
**agreeing (3)** 26:20,21;27:2
**agreement (27)** 10:25;11:1,23;12:4,19;13:24;16:14,19,19;17:23;18:8;19:6,22;20:9;22:11,13;25:19;26:18;32:17,20;34:20;35:5;38:17;39:11;46:6;58:24;59:6
**agreements (4)** 22:25;30:24;31:3;45:4
**ahead (7)** 9:16;11:12;30:17;31:23;57:24;69:17;74:8
**Alaska (3)** 59:10;87:20,23
**alleged (1)** 33:12
**allegedly (1)** 59:9
**allocate (1)** 60:2
**allow (4)** 57:20;60:13;74:9;79:15
**allowed (12)** 12:12;13:22;35:12;53:8;58:13;61:5;62:16,18;72:23,24;77:13;82:25
**allowing (1)** 72:1
**almost (3)** 20:18;22:8;48:11
**alone (2)** 33:1;87:3
**along (1)** 64:15
**alternative (3)** 66:25;95:13,23
**although (1)** 8:2
**always (2)** 71:21;99:17
**amend (1)** 73:2
**amendment (1)** 85:22
**among (2)** 11:4;97:23
**amount (4)** 34:15;62:6,10;98:11
**analysis (1)** 12:11
**analyst (1)** 15:20
**analyze (1)** 17:20
**analyzing (1)** 34:13
**and/or (1)** 52:23
**Angeles (1)** 50:4
**anticipate (1)** 89:21
**anymore (1)** 78:15
**apologize (4)** 9:18;56:14;91:17;94:17
**Appalachian (2)** 6:13;21:21
**apparently (3)** 8:22;11:15;91:8
**appeal (1)** 72:23
**appear (2)** 7:15;37:1
**appearances (1)** 4:6
**appears (3)** 10:15;27:15;77:11
**application (1)** 38:3
**applied (1)** 77:6
**appreciate (5)** 8:10;19:18;48:15;93:8;99:21
**appropriate (2)** 93:15;94:13
**Archbishop (39)** 4:5,11;6:24;8:1,4,7;17:4,6;26:10;35:14,23;36:17;37:15;49:9;55:3;57:21;58:23,23,24;70:25;86:5,15,16,24;88:2;92:20;93:13,16,22;94:3,13,14,15,25;95:11,15,21,25;96:7
**archbishop's (2)** 92:18;93:10
**archdiocese (7)** 7:12;8:2,8;48:9;86:23;93:21;96:6
**archdiocese's (2)** 96:21,23
**Area (1)** 28:16
**argue (1)** 61:21
**arguing (3)** 26:22;27:6;62:20
**argument (7)** 24:21;38:22;73:25;76:25;77:4;88:22;89:10
**around (2)** 25:1;90:1
**aside (4)** 10:1;48:5;52:20;78:21
**aspect (1)** 9:2
**asserted (2)** 87:6;88:1
**assertion (2)** 75:20;83:18
**assessment (2)** 63:17;85:14
**assigned (1)**

12:18,23;14:7,10;
17:6,9,12;18:2;24:25,
25;27:13;28:6;30:20,
22;37:25;40:22;
41:25;43:22;44:10;
48:8,11,23;49:4;
50:17,18;51:3,4;58:8,
9;62:3;65:18;70:12;
71:17,21;76:15,23;
77:8;78:3,11,13,21;
79:5,7;81:22,24;
85:17,18;93:9
**category (2)**
24:10;26:9
**Catholic (3)**
4:4,11;28:17
**Catholics (1)**
87:1
**caught (1)**
69:20
**cause (7)**
45:5,10,13;46:1,2,
3;72:21
**caused (1)**
48:13
**causes (1)**
41:12
**Center (6)**
12:22;13:22;48:7,9;
49:19;72:6
**Century (1)**
21:13
**certain (6)**
6:8;16:22;17:20;
43:25;51:4;71:13
**Certainly (11)**
21:4;30:2;37:1;
45:12,25;49:4;55:7;
78:19;84:10;89:22,23
**certificate (1)**
54:22
**cetera (1)**
8:2
**challenge (1)**
13:1
**challengeable (1)**
58:9
**challenging (1)**
22:6
**chance (3)**
51:16;72:22;94:21
**change (3)**
8:5;39:15;96:7
**changed (2)**
32:19;64:24
**changes (1)**
18:23
**channeled (1)**
58:18
**Chapter (2)**
14:10;81:24
**charge (1)**
9:2;26:10

**chase (1)**
10:20
**check (1)**
14:5
**checks (2)**
14:10,11
**Chicago (4)**
6:7,12;21:20;39:4
**children (1)**
86:7
**chosen (1)**
27:4
**church (3)**
24:4,25;78:22
**circulated (1)**
94:16
**circulation (1)**
98:1
**cite (1)**
53:13
**cited (1)**
40:24
**claim (127)**
18:3;19:14;22:2;
23:2,6,9,11,14,23;
24:8;39:3,6,10;47:11,
25;48:3;51:22;52:19,
19,25;53:5,8,12,17,
20,21;55:18,21;56:1,
7,9,16;57:22;58:9,13;
59:11;60:17,19,21;
61:4,13,14,14,16;
62:16,17;63:2,4,6,8,
10,12,15,18,20,23;
64:5,9,11,14,18;66:1,
12;67:6,17,18;68:25;
69:9,16,19,23,24,25;
70:1,4,7,8,15,20,23;
72:2,7,24;73:5,5,11;
74:3;75:2,3,4,9,13,15,
18,20;76:17;77:6,22;
79:15;80:17;81:12;
82:11,14,16,17,19,21,
21,22,23;83:16;84:2,
13,14;86:19,20;87:2,
6,11,11,13,16,22,24;
90:6,13;92:3
**claimant (10)**
23:16;24:11;62:18;
63:8;74:2;75:21;
82:24;83:1,21;96:23
**claimants (7)**
24:19;33:4;55:9;
70:12,16;74:17;76:16
**claimants' (1)**
72:17
**claimed (1)**
87:8
**claims (113)**
12:12;15:19;17:20;
18:2;23:4;24:17;25:1,
4,6,6;26:6,10;33:7,8,
9,11;34:15;35:13,15;

38:2;39:8;41:23;
48:10;49:3,9,22;
50:12,24;51:6,10;
52:3,7,9,10,11,13,16;
53:2,20,24;54:1;
55:10;57:7,8;58:12,
15,20;59:7,16,17,25;
60:8,11;61:6,23;62:3,
4,9,12;63:16,25;65:1,
2;66:17;67:21;70:7;
71:18,20,23;72:7,11,
11,16,18;73:8,22;
74:1,15,16,19;77:24;
78:7,10,15,23,23;
79:4,12,15,20,21,21,
23;81:7,9,9,10,19,19,
20,23;85:19,20,23;
86:13,17;87:6,21;
88:1,8;89:12,15,17
**clarified (1)**
82:14
**clarify (1)**
94:22
**CLARO (3)**
37:24;38:2,4
**class (4)**
60:4,7;63:9,11
**clause (1)**
47:8
**clean (2)**
9:21;20:13
**cleaning (1)**
19:12
**cleans (1)**
29:10
**clear (4)**
28:10;32:13;57:8;
61:25
**clearly (1)**
76:17
**CLERK (4)**
4:4;5:2,6,15
**client (12)**
9:5;27:3;30:8;
31:10;34:3;38:4;
41:24;45:15;46:14;
71:21;84:25;88:9
**clients (3)**
43:14;49:8;72:7
**cloak (2)**
68:23;70:10
**cloaking (1)**
70:22
**closed (1)**
72:13
**cloud-based (1)**
11:15
**Clyde (1)**
6:7
**Co (1)**
6:7
**cocounsel (3)**
4:21;6:17;97:19

**code (2)**
32:22;40:14
**colleague (3)**
9:1;14:8;29:8
**colleagues (1)**
43:21
**collect (1)**
22:24
**comfortable (1)**
16:23
**coming (4)**
43:17;59:5,5;62:9
**commence (1)**
49:3
**commenting (1)**
10:15
**comments (10)**
8:16;9:4;10:6;
46:19;65:21;80:1;
86:12;90:2,4;91:22
**commit (2)**
27:9;96:25
**commits (3)**
15:21;25:24;34:21
**committed (3)**
7:10;34:21;82:12
**committee (46)**
4:25;5:7;10:1;21:6;
22:10,18;30:21;
34:11;35:2;38:2;40:5,
13;43:12;45:17;46:8;
50:15;60:5;62:3,15;
66:5,24;68:2,6,16;
76:19;77:4,9;78:9;
79:5,6,7;80:21,22,23;
81:16;85:19;88:5,21;
89:9,14;90:3,7,15;
97:12;98:17,19
**committees (3)**
14:7;60:5;66:20
**committee's (2)**
38:1;90:22
**communication (1)**
49:16
**Communications (3)**
38:9;49:12;82:3
**community (2)**
13:4,5
**companies (19)**
12:11;14:10;16:6;
17:4,8,10;21:2,4,7,11,
15;24:15;32:17;
35:12;41:6;44:14;
49:14;79:2,4
**Company (29)**
6:12,13,14;12:13;
15:6,7,10,13,14,19;
16:4;17:19,22;18:4,6,
13;21:21;22:16,17;
25:12;26:7,19;27:2;
37:24;39:4;41:7,11,
23;42:16
**company's (1)**

22:17
**compare (2)**
82:25;84:11
**comparison (1)**
37:19
**compensated (1)**
24:13
**competent (1)**
81:23
**complaint (1)**
86:20
**complaints (3)**
53:25;54:21;86:15
**complete (6)**
52:17;65:1;66:21;
68:3;70:16;80:5
**completely (2)**
64:6;67:22
**complex (1)**
19:7
**component (1)**
89:23
**compromise (1)**
66:18
**compromised (1)**
65:15
**computer (2)**
5:19;31:21
**computers (1)**
11:16
**concern (3)**
21:5;22:22;53:1
**concerned (2)**
52:23;86:12
**concerns (3)**
74:12;80:25;88:23
**conclude (1)**
100:5
**concluded (2)**
61:23;100:11
**conduct (1)**
46:3
**confer (3)**
6:22;69:21;97:9
**conferred (1)**
91:17
**conferring (1)**
11:3
**confidence (2)**
20:16;53:14
**confidences (1)**
18:21
**confident (1)**
98:4
**confidential (28)**
13:16,24;16:13;
19:21;23:6,9,10,22;
32:23;33:15;45:1;
47:9,9;48:1;57:19;
62:23;66:10;69:14,
15;75:1,6,22;80:2;
81:6;82:9;83:24;
94:23;100:3

**confidentiality (38)**
10:24,25;11:22;
12:4,19;13:1,23;14:1,
16;16:21;17:2,17;
18:8;19:6;21:5;22:2,
12,21,25;30:23,25;
32:16;33:3,20;34:16;
35:16;38:17;39:11;
40:9,12;45:4;46:6;
47:5;68:23;69:1;
70:23;74:12;75:10
**confirmed (2)**
58:11;70:20
**confused (3)**
34:17;35:22;42:10
**connection (2)**
55:4;74:13
**consensus (3)**
73:19;77:10;97:23
**consequence (2)**
19:8,10
**consequences (4)**
14:24,25;18:24,25
**consider (2)**
63:2;89:17
**consistency (1)**
40:24
**consistent (13)**
28:23;29:15;30:5;
40:17;41:10;43:16,
23;44:1;46:13,23;
48:16;73:25;98:21
**constructive (2)**
77:22;80:19
**consultant (4)**
35:6;45:3,15,15
**consultants (2)**
34:10;44:25
**consulting (9)**
34:4,5,8,12;35:3;
37:22;45:1,7,8
**contact (2)**
12:14;26:6
**contained (2)**
23:10,22
**contemplated (1)**
42:7
**contend (1)**
39:20
**contested (1)**
49:3
**context (4)**
56:3;63:19;85:12,
15
**contract (3)**
36:12,25;37:6
**contracted (1)**
12:20
**contractor (1)**
36:24
**contractually (1)**
35:12
**contradiction (1)**

80:5
**contributions (1)**
99:20
**convenience (4)**
60:4;7;89:20;98:10
**conversation (3)**
76:10;96:13,14
**conversations (3)**
76:20;81:16;82:3
**convey (1)**
63:24
**conveyed (1)**
90:23
**convincing (1)**
94:2
**convoluted (1)**
19:7
**cookie (2)**
48:19,22
**cooperate (2)**
35:14;55:4
**copies (4)**
10:9;45:4;53:25;
54:21
**copy (1)**
10:10
**core (1)**
39:3
**Corporation (2)**
6:13;8:4
**correctly (2)**
42:3;45:14
**costly (3)**
68:9;72:3;76:1
**counsel (43)**
4:7,14,15,17,25;5:7,
8;6:8,22;7:1,16;8:7,
19,21;11:6;21:9;
28:11;30:21;34:14;
35:1;42:13;43:14;
45:2,9,16;49:6,8;
50:13,14;68:15;77:9;
80:25;81:16;85:19;
88:5,21;89:10;90:23;
91:17;94:17;96:11;
97:23;98:24
**counselor (1)**
95:2
**Counselors (1)**
96:7
**counteroffer (1)**
85:13
**counterproductive (2)**
70:24;71:8
**counties (1)**
99:24
**country (3)**
25:1;61:25;94:1
**couple (3)**
32:11;33:20;76:8
**course (9)**
10:3;30:10;40:6;
41:20;43:6;46:3;55:9;

93:4;96:8
**Court (219)**
4:3,6,19,22,25;5:5,
7,16,22,25;6:2,10,15;
7:5,14;9:10,16,24;
10:7,23;11:9,19;12:9;
14:22;15:5,18;17:3,
13,15;18:6,10,12;
19:15,17;20:10;21:8,
14,18;23:12,25;
24:24;25:8,11,20,23;
26:2,8,20,24;27:1,18;
28:1,8;29:12,19,21,
23;30:16;31:8,25;
32:8;33:23;34:1,17,
25;35:8,18,20,22;
36:1,3,10,12,20,22,
24;37:4,14,21;38:18,
20;40:7,11;41:4,9;
42:9,12,15,19,25;
43:3,17,18,25;44:6;
45:12,19;46:7;47:16,
18,21,23;48:21;49:6,
8;50:5,13,14;51:8,12;
52:1,3,6;53:11;54:1,5,
9,13,15,19,24;55:20,
24,24;56:6,11,13,15,
18;57:11,16;59:2;
60:4,17,19,23;61:1,3,
8,12,18,20;62:11,13;
64:13;65:4,6,8,13,16,
20;67:5,9,11,13,24;
68:4,10,15;69:12;
71:3,10;73:9,17;74:6,
21;75:12;76:4,7;
77:17;78:20;79:3,17;
82:7,24;83:6,8,17,20;
84:1,6,11,18,23;87:4,
18,20;89:8;90:9,14,
18,25;91:7,11,14,20;
92:4,8,10,23;94:4,7,
19,21;95:4,9,12,22;
96:1,10,16,18;97:11;
98:4,18,24;99:5,11,13
**courts (1)**
77:3
**Court's (1)**
10:5
**cover (2)**
89:22;98:9
**coverage (1)**
6:8
**covered (3)**
71:24;89:22,23
**covering (1)**
26:18
**crazy (1)**
99:15
**create (5)**
20:11,24;22:6;63:9;
80:5
**creating (2)**
31:1;58:18

**creation (1)**
85:22
**credibility (5)**
60:2,10,12;63:17;
85:14
**credible (4)**
60:14;61:6;63:16;
94:11
**creditors (2)**
61:6;77:19
**crime (1)**
46:10
**criminal (1)**
46:2
**critical (2)**
23:13;89:23
**critically (1)**
48:4
**culpability (3)**
16:1;30:2,3
**current (4)**
32:13,15;39:6;
48:10
**curtain (1)**
46:5
**cut (1)**
10:20
**cutter (2)**
48:19,22
**CVA (1)**
72:13

## D

**dad (1)**
95:20
**damages (2)**
13:6;18:15
**dark (1)**
98:7
**data (2)**
13:7;33:14
**date (12)**
37:7;39:21;48:6;
49:15;52:3,7,8;55:16;
67:6;72:13;73:20;
89:15
**dates (1)**
10:13
**day (9)**
16:8;19:13;25:14;
52:8;53:21;74:20;
76:6;98:8;100:8
**days (1)**
55:17
**de (3)**
61:16,22;62:4
**dead (1)**
40:16
**deal (14)**
9:23;16:8;42:3;
46:9;54:21;59:15;
78:8,12;82:14;83:24;

85:15;88:20;89:18,18
**dealing (3)**
16:7;80:22;85:6
**deals (1)**
95:7
**debate (1)**
76:24
**debtor (28)**
4:11,21;8:1,1,7;
11:4;12:16;14:25;
24:24;25:2,2,9;34:12;
35:11;40:5,13;43:12;
45:17;48:10;59:16,
16,17;62:15;65:12;
78:9,12;89:13;97:3
**debtors (1)**
7:1
**debtor's (6)**
4:7;6:17,18;8:7;
28:10;89:9
**decide (1)**
63:10
**decision (2)**
20:24;50:21
**deemed (4)**
53:8;62:16,17;
77:13
**deeply (1)**
6:18
**defeat (1)**
56:7
**defend (1)**
74:6
**defendants (2)**
71:23;73:1
**defense (4)**
35:13,15;38:11;
55:5
**defenses (1)**
97:1
**defer (5)**
21:6;46:21;88:13;
89:8;99:6
**defined (1)**
23:9
**definitions (1)**
24:2
**delineated (1)**
96:4
**delivers (1)**
31:25
**delivery (4)**
19:4;32:4,7;44:16
**depart (1)**
43:19
**department (5)**
7:7;14:12;15:2;
26:10;37:15
**Depends (1)**
74:21
**deposition (3)**
57:1;64:20;84:8
**depositions (1)**

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 105 of 118

82:18
**depth (1)**
7:18
**described (1)**
49:21
**describing (1)**
32:15
**deserve (1)**
81:20
**desk (3)**
19:16;30:1;32:2
**detail (3)**
9:6;46:20;75:16
**determination (3)**
60:3,7,12
**determine (1)**
71:22
**deterred (1)**
74:4
**deterrent (1)**
62:23
**devil (1)**
73:16
**difference (1)**
99:24
**differences (2)**
43:20;100:1
**different (18)**
15:23;16:2;17:8;
19:24;21:14;28:12,
12,17;29:23;32:14;
44:7;61:24;66:25;
74:23;88:20;93:5,6;
98:14
**differently (4)**
16:3;28:20;44:3;
83:2
**difficult (1)**
74:22
**difficulty (1)**
91:19
**dilemma (1)**
74:6
**dilute (1)**
79:21
**diocese (9)**
7:11;28:17;48:18;
71:15;72:15,20;73:7;
78:23;87:12
**dioceses (7)**
24:22;41:3;57:21;
58:10,11;83:9;94:1
**direct (3)**
6:21;34:22;35:13
**directed (1)**
23:16
**direction (1)**
97:6
**directly (1)**
24:19
**disallowance (1)**
70:14
**disallowed (2)**

60:22,24
**discharged (1)**
60:21
**disclose (16)**
18:21;31:9;34:7,11;
35:10,11,24;36:6,7,
14;37:7,16;40:10;
45:9,17;46:12
**disclosed (3)**
22:23;35:7,8
**discloses (1)**
15:13
**disclosing (2)**
36:20;45:4
**disclosure (5)**
39:1;40:4;45:13;
70:13;98:1
**discover (1)**
46:8
**discovered (2)**
11:14;85:7
**discovering (2)**
13:3,5
**discovery (39)**
6:22;18:5;23:15;
45:14;47:14;49:5,9;
50:1;51:14,24;55:2,2,
8,25;56:3,17,20;63:3,
4;64:14,19,22;66:6,
17;67:3,17;68:9;70:6,
21;72:4,22;76:2;
78:19;81:18;82:1,25;
83:3;84:16;85:7
**discrete (1)**
7:2
**discussed (3)**
9:5;47:6;49:2
**discussing (1)**
46:23
**discussion (7)**
7:3;47:2;76:24;
78:17;82:8;88:12;
91:3
**discussions (1)**
65:1
**dispute (5)**
8:20;18:8;46:8;
100:6,7
**disputed (1)**
52:25
**disputes (1)**
6:23
**disruptive (3)**
53:3;72:3;76:1
**dissuade (2)**
76:18;77:1
**distress (1)**
48:14
**distribute (1)**
61:15
**distribution (2)**
60:21;61:7
**divide (1)**

59:25
**division (2)**
60:11,13
**docket (5)**
8:20;9:17,20;10:22;
92:3
**document (8)**
18:22;20:17;29:4;
48:2;57:1;64:19;
82:18;97:25
**documents (9)**
12:2;14:3;23:13,17;
24:9;29:18;31:22;
46:20;55:3
**Doe (5)**
16:15,16,17,18,19
**dollars (8)**
59:1,3,17,18,24;
60:2,14;75:15
**done (6)**
45:6;55:1;76:11;
79:3;98:23;99:1
**double (1)**
72:11
**down (8)**
10:16;47:20;50:4;
69:12;80:10;90:9,14;
91:20
**dozen (1)**
33:23
**draft (1)**
94:16
**drafting (1)**
97:11
**drag (1)**
86:10
**drawer (2)**
29:18,20
**drawn (1)**
46:5
**drive (1)**
99:15
**drop (1)**
32:1
**drops (1)**
32:1
**dude (1)**
87:20
**duplicate (1)**
86:13
**duplicates (2)**
72:12;88:1
**duplication (1)**
73:6
**duplicative (1)**
32:12
**during (1)**
22:18
**duty (4)**
21:16;26:13;92:25;
93:6
**dying (1)**
40:23

**E**

**earlier (2)**
89:15;96:17
**early (6)**
24:5;53:2;71:20;
77:18,19;79:18
**easier (1)**
62:8
**easily (1)**
33:18
**easy (1)**
74:7
**edits (1)**
10:12
**education (1)**
99:22
**effect (2)**
68:22;71:9
**effective (1)**
99:6
**effort (2)**
30:24;49:12
**efforts (2)**
30:21;49:7
**egg (1)**
62:4
**egged (1)**
60:13
**either (11)**
6:20;11:6;15:9;
18:16;23:15;32:3;
57:17,25;80:4,10;
100:6
**element (1)**
81:24
**elements (1)**
60:1
**eliminate (1)**
74:16
**else (14)**
8:24;28:11;32:17;
43:15;49:10;50:8;
58:25;66:14;88:18;
93:15;94:15;95:16;
98:8,15
**emotional (1)**
48:13
**employ (1)**
16:11
**employed (4)**
17:6;18:7;25:14;
41:24
**employee (22)**
11:24;15:11,12,22;
16:16;19:9,20;22:11,
20;25:14,24;26:11,12,
12;28:25;29:7;35:4;
36:21,24;39:9;41:18;
73:7
**employees (9)**
22:17;25:13;26:16;

27:8,10;29:1;30:23;
32:18;33:24
**employer (1)**
19:9
**employment (3)**
20:1;38:3;41:20
**E-N (1)**
19:25
**enables (1)**
55:12
**encompass (1)**
40:2
**encourage (1)**
97:18
**encouraged (1)**
68:2
**encroaches (1)**
34:15
**end (7)**
47:12;68:5;74:19;
76:6,10;87:13,24
**end-all (1)**
93:9
**endearment (1)**
80:23
**endorse (1)**
44:7
**enforcement (1)**
96:7
**English (2)**
20:14;25:24
**enjoy (1)**
98:5
**enormous (1)**
48:13
**enormously (3)**
66:7,7,8
**enough (9)**
8:12;28:15;30:8;
41:5;47:4;50:11;64:4;
67:2;85:17
**ensure (2)**
16:12,14
**ensures (2)**
19:25,25
**ensuring (1)**
14:17
**enter (1)**
7:17
**entire (3)**
51:7,7;74:13
**entities (2)**
11:2;25:5
**entitle (1)**
40:12
**entitled (1)**
99:7
**entity (4)**
13:25;34:10;40:21;
72:14
**entrusted (2)**
29:1,13
**error (1)**

63:3
**especially (1)**
  21:23
**essence (1)**
  44:15
**establish (1)**
  96:21
**established (2)**
  24:3;78:6
**estate (3)**
  40:6,10;47:15
**et (1)**
  8:2
**evaluate (1)**
  33:11
**even (29)**
  13:25;18:21;20:14,
  15,17,19;23:11;
  24:20;27:8;33:1,16,
  23;34:8,10;35:5,7,8;
  38:5;39:3,7,24;56:1;
  60:7;66:6;79:8;84:18;
  86:5;87:1;88:15
**evening (1)**
  100:8
**everybody (9)**
  10:1;32:17;33:2,14;
  34:21;38:3;74:22;
  88:17;97:12
**everybody's (2)**
  9:20;98:10
**everyone (13)**
  12:13,13;13:10;
  14:17;50:8,12,23;
  55:17;62:9;73:13;
  82:21;86:3;100:8
**everyone's (1)**
  99:20
**evolution (1)**
  65:17
**ex (3)**
  7:9,9,12
**exact (3)**
  43:1;51:14;84:8
**exactly (5)**
  14:14;27:15;40:21;
  54:23;57:19
**exam (1)**
  6:18
**Examiner (1)**
  93:22
**example (6)**
  19:12;24:14,15;
  33:6;58:23;69:22
**examples (1)**
  96:5
**except (3)**
  24:4;46:2;69:9
**exception (2)**
  46:1,3
**exceptions (2)**
  23:23;46:10,10
**exchange (4)**

55:2,12;73:15;75:5
**excuse (2)**
  7:20;62:25
**executives (1)**
  15:7
**Exhibit (1)**
  64:17
**exist (1)**
  16:15
**existed (1)**
  92:25
**existence (1)**
  93:1
**exists (1)**
  20:11
**expanded (1)**
  40:1
**expect (8)**
  5:12;6:20,21,23;
  29:11,12,16;62:14
**expected (3)**
  6:20;29:1,13
**expecting (1)**
  6:20
**expects (1)**
  24:11
**expensive (2)**
  48:12;66:7
**experience (7)**
  10:8;16:24;24:4;
  48:6;58:6;85:17;87:5
**experiences (2)**
  13:7;79:22
**expert (11)**
  34:4,4,5,8;35:3,11,
  12;37:23;45:1,7,8
**expertise (1)**
  24:6
**experts (3)**
  34:13;40:4,10
**explain (1)**
  91:9
**Explains (1)**
  30:7
**explanations (1)**
  99:22
**exposed (4)**
  26:15;29:4;41:19;
  42:23
**extend (1)**
  25:3
**extending (1)**
  15:19
**extent (3)**
  43:23;44:13;83:12
**extra (2)**
  47:14;85:22
**extreme (1)**
  71:5
**extremely (3)**
  48:11,12;85:20
**eye (1)**
  69:20

**F**

**face (1)**
  79:21
**facilitates (1)**
  70:22
**facilitating (1)**
  100:9
**fact (9)**
  7:19;58:6;62:5;
  63:5,19;70:9;71:15;
  80:21;87:8
**facto (3)**
  61:16,22;62:4
**facts (8)**
  75:3,18,19;83:17;
  85:6,6,7,7
**fails (1)**
  66:14
**fair (6)**
  17:3;47:4;54:6;
  63:20;82:22;84:2
**fairly (1)**
  34:1
**fall (1)**
  18:25
**falls (2)**
  20:19;78:17
**false (2)**
  59:11;61:23
**familiar (1)**
  22:12
**family (1)**
  13:3
**fan (1)**
  97:11
**fantasies (1)**
  85:6
**far (6)**
  19:3;38:7,18;78:19;
  86:12;99:2
**fashioned (1)**
  10:9
**Father (7)**
  4:13;84:15,16,20,
  21,21;95:1
**favor (1)**
  76:14
**February (1)**
  55:17
**feel (2)**
  10:14;17:1
**fees (1)**
  37:8
**Felder (1)**
  4:10
**felt (2)**
  72:18,21
**few (2)**
  8:16;9:23
**fiduciary (1)**
  92:19,24;93:6

**field (2)**
  35:21;38:13
**figure (3)**
  66:14;80:16;89:13
**figured (1)**
  61:15
**file (17)**
  7:1,9;27:25;31:23;
  38:3;46:9;53:20;
  57:24;63:22,22;64:9;
  75:10,17,24;79:2;
  86:15,19
**filed (18)**
  9:18,18;10:5;48:8,
  10;49:22;53:21,25;
  54:2,4;58:13;72:12;
  75:2;79:7,16;86:20;
  87:21;97:15
**files (2)**
  27:21;86:16
**filing (3)**
  51:22;74:4;76:2
**filings (1)**
  8:10
**fill (6)**
  50:3,10;56:24,24;
  68:6;70:14
**filled (4)**
  64:6;66:3;67:22;
  75:1
**filling (1)**
  57:4
**fills (1)**
  82:9
**filter (1)**
  60:6
**final (2)**
  74:10,11
**find (6)**
  20:3,22;40:20;80:1;
  86:2;90:14
**finding (1)**
  22:1
**fine (7)**
  8:24,24;73:21;
  90:17,18;94:15;98:2
**finger (1)**
  13:12
**Finish (2)**
  74:8;80:11
**finished (2)**
  78:1;88:16
**Fire (1)**
  21:13
**Fireman's (7)**
  6:12;21:20;27:3,4;
  37:14;39:4;41:5
**firm (28)**
  11:15,25;12:1;14:9,
  23,24;16:4;34:2,18,
  20,21,22;35:3,4,6,6,
  22;36:7,13,15,15,16,
  21,25;38:4,11;46:14;

58:6
**firms (5)**
  11:24;13:14;16:5;
  22:15;32:16
**first (22)**
  9:9;10:20;11:9;
  21:9,19;25:17;27:4,
  20;28:10;32:12;36:3;
  45:21;52:21;55:7;
  65:6,12;68:21;71:15;
  72:16;76:12;84:19;
  89:16
**fit (1)**
  24:2
**Fitzgerald (1)**
  4:10
**fix (2)**
  7:7;52:9
**fixed (2)**
  58:18;78:21
**flesh (1)**
  73:8
**focused (1)**
  23:4
**focusing (2)**
  56:1;81:13
**folks (1)**
  53:11
**follow (6)**
  30:6;41:16;45:14;
  57:16;76:11;99:16
**following (1)**
  87:25
**footnote (6)**
  23:10;90:5,9,12,17,
  18
**force (5)**
  65:16;70:5,6;75:5,
  21
**forces (1)**
  62:22
**forcing (1)**
  74:2
**foreseeable (1)**
  79:11
**forever (2)**
  51:12,13
**forget (1)**
  53:24
**form (31)**
  20:14;23:11,23;
  32:1,5;33:21,22;
  43:14,14,15;56:23;
  64:5,16,16,16,17,18,
  21,22;65:25;66:4;
  67:1,16;68:8;70:8,12;
  85:1;86:16,19,19;
  93:7
**formal (12)**
  8:1;23:15;45:13;
  49:5;50:1;51:13;
  55:25;56:8;62:25;
  63:2,4;84:16

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 107
of 118

**formally (2)**
60:22,24
**former (1)**
52:20
**forms (14)**
12:14;14:13;19:14;
23:9;50:2,10,11;
55:13,15,18;66:10,11;
72:2,25
**forth (2)**
82:2;96:19
**forty-five (2)**
54:11;91:5
**forward (4)**
51:1;65:22;79:25;
100:5
**fought (1)**
28:6
**four (1)**
39:5
**Franciscan (3)**
86:21,21;87:12
**Franciscans (2)**
86:24;87:1
**FRANCISCO (16)**
4:1,5,11;8:2;17:5;
26:11;28:14,21;
35:23;36:17;37:16;
44:3,10;87:22;88:3;
93:22
**Frankel (38)**
21:10,12;30:13,14;
32:10,11;34:24;35:1;
39:24;41:21;43:24;
44:5,20,21;45:14,18,
23;46:9,11;51:21;
68:17,19;69:4,7,11,
17,18;71:5;72:1;
85:25;86:11;87:19;
96:14,16,17,19;97:17;
98:2
**Frankel's (1)**
38:4
**frankly (1)**
47:24
**fraud (3)**
46:10;60:6;62:2
**fraudster (1)**
61:25
**fraudulent (3)**
17:21;18:3;81:19
**free (2)**
10:14;84:10
**friend (1)**
95:20
**friends (1)**
96:5
**frightened (1)**
74:5
**frivolous (1)**
52:19
**front (3)**
43:1;65:11;78:4

**fruitful (1)**
7:21
**full (4)**
74:22;79:20;90:13;
99:21
**fully (4)**
50:10;57:21;62:13;
67:22
**fulsome (1)**
65:1
**Fund (11)**
6:12;21:20;37:14;
39:4;41:5;49:17;
58:18;59:4,22,24;
85:13
**fundamental (1)**
43:18
**further (9)**
22:22;35:15;67:5;
88:12;98:25;99:10,
12;100:6,6
**future (4)**
37:4,7;85:5;88:25

**G**

**game (1)**
84:2
**Gaspari (1)**
4:15
**Gate (1)**
99:25
**gather (2)**
88:4;89:4
**gave (1)**
82:13
**general (2)**
4:14;65:2
**generally (1)**
86:7
**Gentlemen (1)**
69:12
**gets (6)**
19:7;21:16;29:24;
77:23;78:12;81:22
**give-and-take (1)**
59:19
**given (5)**
7:18;29:16;75:24;
80:21,25
**gives (2)**
75:16;96:5
**giving (1)**
48:25
**glean (1)**
8:16
**Glenn (1)**
72:23
**global (3)**
58:17;70:6;71:19
**goal (4)**
49:16;65:23;81:2,
25

**goes (5)**
23:16;43:18;46:18;
75:8;97:24
**Golden (1)**
99:25
**Good (18)**
4:20,23;6:6,11;
45:5,10,12;46:1,2,3;
52:9;67:22;77:22;
78:6;79:21;82:4;
97:15;98:11
**goose (2)**
60:12;62:4
**gotcha (1)**
30:22
**governed (1)**
32:21
**grace (1)**
5:17
**gracious (1)**
85:16
**granular (1)**
65:2
**gravitas (1)**
16:6
**great (2)**
58:14;61:16
**Greater (1)**
28:16
**grief (1)**
41:12
**gross (1)**
41:13
**group (5)**
28:4;43:13;58:3;
72:16;86:4
**groups (2)**
49:22;72:11
**guess (20)**
18:19;28:23;31:11;
39:1;42:9;52:25;
53:13;56:2;58:13;
61:11;63:20;73:8;
74:10,16;75:8,11;
84:12,23;92:22;97:13
**guy (12)**
19:4,5;32:4,7;
39:12;43:4;60:14;
61:12,25;87:15,16;
94:11
**guys (1)**
59:17

**H**

**hand (12)**
5:8,10,12;30:16;
39:6;47:2,3;68:16;
74:2;80:10,13;99:8
**handing (1)**
46:12
**handle (2)**
25:6;83:11

**handled (6)**
14:6,8;81:22,22;
85:17,18
**handler (1)**
39:6
**handlers (1)**
39:3
**handling (5)**
25:8;27:25;31:22;
39:8;41:24
**hands (2)**
20:19;67:15
**hang (1)**
55:12
**happen (12)**
36:16;53:13;67:18,
18;72:14;73:3;74:25;
75:7,19;78:11,13;
85:2
**happened (13)**
13:2;24:20;28:14;
32:1;60:17,19,23;
61:3;78:11,20,20;
86:2;89:16
**happening (1)**
24:23
**happens (11)**
14:1,2;22:17;28:16;
52:21;58:4,8,22;
66:15;78:13;85:9
**happy (2)**
7:15;91:6
**hard (3)**
10:9,9;99:20
**headed (1)**
97:6
**headquarters (1)**
99:17
**health (1)**
86:8
**hear (8)**
6:16;7:6;8:18;21:3;
35:1;56:15;65:12;
94:21
**heard (14)**
4:8;5:8,9;6:3,4;
7:10;8:19,22;30:13;
45:23;71:10;96:12;
99:8,8
**hearing (15)**
6:24;11:17;12:25;
28:10;46:22;47:24;
76:13;82:22;94:20;
97:18,20,20;100:5,7,9
**hearings (4)**
10:14;72:9;98:6;
99:16
**heinous (1)**
13:2
**hell (1)**
59:7
**help (4)**
5:3,5;49:21;92:1

**helpful (4)**
73:11,22;99:19;
100:3
**herself (1)**
95:14
**hey (5)**
16:13;19:20;20:4;
50:10;93:4
**high (2)**
50:20;86:21
**higher (1)**
25:3
**highlight (1)**
9:25
**hill (1)**
40:23
**himself (4)**
21:9;86:5;95:14,15
**hire (12)**
34:3,3;35:11,12;
36:6,7,12;37:5;38:4;
41:7;45:7;46:14
**hired (8)**
25:2;36:3;37:23;
38:1,4,6,10;46:16
**hires (8)**
12:11;15:19;34:18;
35:3,23;36:16;37:14;
45:15
**hiring (6)**
35:9,16,24;37:22;
38:7;41:11
**historically (1)**
28:18
**history (1)**
28:17
**hit (1)**
89:24
**hitting (1)**
64:4
**hoc (1)**
60:5
**hold (2)**
69:13;90:14
**home (2)**
17:1;19:24
**Honor (86)**
4:9,12,20,23;5:2,15,
19;6:1,6,11;7:4,9;9:7;
10:19;11:13,21;14:6,
21;15:4,17;16:5;
17:10,16;19:8;21:3,
12,17;27:13,19;29:11,
16;30:15;32:12;
33:17;34:24;35:10,
25;37:13,19,24;
40:15;43:8,24;44:5,
21;45:18,21;47:4,22;
48:4;51:22;53:10,18;
56:14;59:10;61:17;
63:14,65:5,16,24;
68:19;71:12,14,24;
76:8;81:2;84:5;85:16;

87:14;89:7;90:17,20;
91:2,10,15,23;92:9,
17;93:23;97:7;98:2,
12,23;99:1,10;100:10
**Honor's (1)**
44:25
**hook (1)**
15:15
**hope (7)**
9:25;49:13;51:25;
54:18,20;67:18;100:2
**hopefully (6)**
64:7;67:19;71:18;
91:4,5;99:23
**horse (1)**
40:15
**hour (1)**
91:4
**hours (1)**
88:10
**huh (1)**
5:5
**human (1)**
31:12
**hundred (4)**
8:14;59:3,21;79:19
**hundreds (7)**
22:25;25:12;27:20,
23,24;31:16,16
**hypothetical (3)**
20:21;62:9;87:10

**I**

**idea (8)**
16:11,16;23:2;26:3;
27:23,24;71:4;97:16
**identify (7)**
8:3;15:22;21:9;
37:7,8;86:14,17
**identity (1)**
34:7
**illegitimate (1)**
74:16
**immediate (1)**
12:3
**immediately (1)**
22:8
**impasse (1)**
49:20
**impenetrable (1)**
46:5
**implicated (1)**
33:13
**importance (2)**
16:20;17:2
**important (10)**
9:20;12:18;14:2,17;
30:6;48:4;76:13;
81:13,24;82:5
**importantly (1)**
48:1
**impose (1)**

64:13
**imposes (1)**
44:13
**impossible (1)**
80:18
**impression (1)**
52:12
**impressive (1)**
88:21
**improperly (2)**
15:13;22:23
**improved (1)**
97:16
**incentive (1)**
78:14
**inclined (2)**
28:22;30:7
**include (4)**
49:13;84:3,7;96:8
**included (4)**
39:21;47:11,17;
67:21
**includes (1)**
43:13
**including (2)**
32:17;60:2
**inconsistency (1)**
83:21
**inconsistent (4)**
53:7;77:8;80:2;
89:1
**incorrectly (1)**
30:9
**increase (1)**
64:1
**Indemnity (2)**
21:13,13
**independent (2)**
70:3;96:21
**indifferent (1)**
97:22
**Indiscernible (2)**
18:11;54:14
**individual (18)**
8:3;15:1,2;18:16,
22;22:10;26:19;
30:23;32:18;33:25;
39:25;41:25;43:15;
49:8;56:3,4;58:20;
65:2
**individually (2)**
15:9;64:24
**individuals (8)**
33:2,16,18,21,22;
34:9;35:5;44:1
**inform (1)**
22:20;27:9
**informal (2)**
23:15;61:9
**information (87)**
13:16,22,24;14:19;
16:9;17:24;18:1;22:5,
22;23:6,9,10,14,19,

22;24:10;26:15,15;
27:6;29:2,14,24;
31:13,21;32:23;33:5,
14;41:19;42:2;44:18;
47:9,14;48:1,25;49:1;
50:23;51:1,6;52:18;
55:5,12;57:19,20;
58:2;62:23;63:19;
64:5,10,12;65:20,21;
66:11;67:1,2,3;69:14,
23;70:1,7,17,19;71:6,
17,18,22;73:15;74:4;
75:5,21,22;76:22;
80:3;81:4,6,7,14,17;
82:2,9,12,19,20;
83:24;85:2,5,9,11
**initial (1)**
18:7
**initials (1)**
5:14
**input (1)**
10:2
**Insofar (1)**
53:23;55:5
**instance (2)**
39:2;45:11
**instead (2)**
28:17;61:14
**instincts (2)**
58:16;80:16
**institution (3)**
13:19,20;18:17
**institutional (1)**
28:4
**institutionally (1)**
20:3
**institutions (1)**
16:22
**insufficient (2)**
64:10,11
**insurance (47)**
4:17;6:12,12,13,14;
11:6;12:10;14:9;15:6,
7,9,13,14,19;16:4,6;
17:4,8,10,19,21;18:1,
4,6,13;20:22;21:2,4,7,
10,15,20,21;32:17,22;
39:4,19;41:6,11,23;
42:16;44:14;49:14;
62:14;79:2,3;96:11
**insurer (8)**
12:19;16:10;24:19;
25:9,10;43:12,12;
45:3
**insurers (39)**
5:9;6:9;8:22;10:2;
11:4;12:3,5,8;14:4;
22:7,15;25:3;30:8,22;
32:21,25,25;33:3,10,
10;34:14;39:5,25;
51:22;55:4;57:20;
62:7;63:19;65:11;
68:16;73:1;78:16;

89:11,14;91:19;
92:12;97:3,15;98:17
**insurers' (2)**
53:23;90:1
**intend (1)**
44:12
**intentionally (3)**
18:20;20:5,16
**intentions (1)**
19:2
**interested (1)**
88:23
**interesting (1)**
40:20
**interference (1)**
13:17
**interject (2)**
43:8;91:25
**interpreted (1)**
43:6
**interrogatories (3)**
64:20;82:18;84:8
**interrupt (2)**
10:7;69:2
**intertwined (1)**
39:1
**into (14)**
5:20;6:18;13:7;
20:19;23:7;28:8;32:9;
39:15,23;50:11,12;
59:3,13;97:24
**invading (1)**
38:7
**invalid (1)**
70:1
**investigation (1)**
41:2
**invitation (1)**
80:4
**involved (18)**
17:4,5,11;18:1;
24:5;40:21;41:6;
49:10;58:7;71:15,17,
19;72:5,5,6,8;76:23;
86:18
**irresponsible (1)**
18:20
**issue (34)**
7:2,8;10:20,21;
11:4,21;21:1,7,16,22,
25;27:12;29:23;
30:19;31:7;33:17;
34:2;40:4,9;42:6;
46:6;49:15;51:5;62:2;
72:23;73:4;74:14;
76:14;81:12;82:23;
83:25;89:25;96:21;
98:21
**issues (14)**
6:25;9:3,22;11:8;
21:5;33:20;34:16;
44:23;48:17;71:24;
72:12;73:7;89:25;

98:16
**item (1)**
92:5

**J**

**Jacoby (1)**
84:21
**janitor (16)**
19:12;20:12,16;
25:23;26:8,13,14,23;
27:8;29:3,9,25,25;
30:1;39:13;43:3
**janitors (1)**
44:16
**Jason (2)**
4:23;90:20
**Jim (1)**
59:11
**J-I-S (1)**
5:13
**job (2)**
42:22;44:18
**Joe (1)**
18:23
**John (5)**
16:15,16,17,18,19
**joined (1)**
52:17
**Jones (2)**
84:16
**Joseph (1)**
4:14
**Judge (12)**
13:8;20:6;28:3;
43:21;48:15;50:7,15;
60:4;72:22,23;84:24;
86:6
**judges (2)**
8:13;44:10
**judgment (1)**
88:13
**judicial (2)**
27:14,15
**jurisdiction (2)**
33:23,25
**jurisdictional (1)**
49:15

**K**

**Kathy (2)**
6:6;71:12
**Katz (8)**
4:19,20,20;7:25;
9:2;35:17;38:16;59:6
**KCIC (1)**
38:10
**keep (7)**
38:15,15;39:13;
43:22;48:16;64:25;
99:21
**keeping (2)**

16:21;63:25
**kept (2)**
  32:23;75:5
**key (2)**
  79:14;96:20
**kicked (1)**
  59:7
**kind (17)**
  9:13;15:15;23:18;
  24:15;37:11;38:12;
  40:25;44:18;47:19;
  64:8;70:17;74:6,10;
  80:15;88:9;97:6;98:7
**kinds (3)**
  37:19;65:18;79:11
**knew (9)**
  50:7,7,7,8;93:4,21,
  23;94:3,5
**knowing (4)**
  16:24,25;79:10;
  96:6
**knowledge (4)**
  47:11;72:20;92:6;
  96:24
**known (4)**
  23:24;31:4,12;93:5
**knows (1)**
  38:3

## L

**language (29)**
  11:7;20:18;22:19;
  26:4;32:13,15;39:1,6;
  43:10,16;47:17;
  68:11;88:9,14,25;
  90:21,24;91:16,19,21;
  92:11,13,14;96:18,20;
  97:5,14,21;99:2
**large (2)**
  25:12;52:11
**larger (2)**
  33:8;74:17
**last (4)**
  48:23;79:8,14;
  88:10
**lastly (1)**
  74:15
**last-minute (1)**
  8:10
**late (3)**
  9:18;52:10;79:19
**later (3)**
  21:23;67:6;81:21
**law (17)**
  11:24;13:14;14:9,
  23,24;16:4,5;22:15;
  32:16;34:2,18;35:6,
  22;56:6;58:6;62:16;
  96:7
**lawyer (5)**
  11:24;36:13,25;
  37:6;83:8

**lawyers (3)**
  15:7;68:2,6
**layer (1)**
  85:22
**lead (1)**
  49:1
**leading (1)**
  47:23
**leads (1)**
  13:6
**learned (5)**
  8:6;48:20,22;49:22,
  23
**least (16)**
  6:5;7:24;17:18;
  20:1;34:12;37:10;
  44:7;45:2;48:17;
  51:18;53:16;64:22,
  24;72:9;87:6;99:23
**leave (5)**
  15:24;19:13;29:17,
  21;87:3
**leaving (2)**
  19:16;52:20
**left (4)**
  11:17;30:1;68:7,17
**legal (2)**
  25:21;37:15
**legitimacy (1)**
  71:22
**legitimate (3)**
  73:8;74:17,19
**length (1)**
  8:15
**lengthy (2)**
  8:10,11
**less (4)**
  72:3,3;76:1,1
**letter (3)**
  24:1;62:16;94:25
**letters (1)**
  66:21
**level (11)**
  15:24,24;20:1;
  25:15;35:21;38:13;
  39:10;62:14,15,15;
  100:3
**levels (2)**
  23:1;39:22
**liability (7)**
  15:15;61:4;78:14;
  92:18;93:2,10;96:22
**liable (1)**
  16:1
**liberty (1)**
  49:4
**life (1)**
  79:22
**lift (1)**
  57:12
**likelihood (1)**
  25:15;64:2
**likely (8)**

20:2;31:12;41:20;
  42:1;44:17;55:24;
  79:22;81:15
**limit (1)**
  57:8
**limitation (2)**
  53:22;82:4
**limitations (2)**
  54:10;85:21
**limited (4)**
  10:5;23:23;95:21;
  97:25
**limiting (2)**
  39:24;95:18
**line (14)**
  8:14,15;9:8,21;
  10:10;12:7;20:4;
  21:24;22:24;39:17;
  46:20;88:16;90:11;
  93:14
**lines (1)**
  9:12
**list (3)**
  39:18;40:7;93:25
**listen (1)**
  62:11
**listens (1)**
  82:7
**litigation (11)**
  4:15;12:20;34:6;
  36:5,5;37:20;49:2;
  55:13;57:7,8;67:4
**litigations (1)**
  32:24
**litigious (3)**
  51:15;57:14,17
**little (6)**
  8:3;9:10;19:7;
  66:24;88:17;97:5
**live (1)**
  89:5
**lives (1)**
  86:1
**Lloyd's (2)**
  6:8;71:13
**local (1)**
  10:13
**locally (1)**
  24:25
**Locked (1)**
  29:20
**London (2)**
  6:9,9
**long (8)**
  19:22;28:18;46:25;
  51:4;71:14;93:25;
  98:5,5
**look (7)**
  8:12;19:8;34:4;
  41:15;63:12;66:7;
  100:5
**looked (2)**
  6:17;59:7

**looking (8)**
  5:20;39:3;57:9;
  76:15;91:16;94:12;
  99:14,14
**looks (1)**
  52:6
**Los (1)**
  50:4
**lot (10)**
  9:19;33:13,14;
  37:25;74:1;75:16;
  76:3;77:7;78:3;86:8
**lots (4)**
  20:7;49:19;55:7;
  93:25
**loud (1)**
  77:23
**low (2)**
  15:23,24
**lowercase (1)**
  5:16
**lunch (1)**
  19:5

## M

**maimed (1)**
  40:16
**maintain (3)**
  13:15;33:3;45:3
**maintained (2)**
  13:1;33:15
**major (2)**
  76:21;89:25
**majority (1)**
  14:7
**makes (2)**
  28:14;41:11
**making (6)**
  15:21;22:1,3;30:25;
  73:25;77:4
**mandatory (5)**
  56:25;71:2;76:25;
  77:1;81:5
**many (12)**
  17:8,11;23:1;31:12;
  50:13;51:18;54:3,7;
  58:7,7,7;94:1
**Market (1)**
  6:9
**markup (1)**
  89:22
**match (1)**
  18:2
**Matt (1)**
  6:11
**matter (11)**
  4:4;14:21;15:12;
  16:11;25:21;32:24,
  25;37:3;54:24;69:1;
  87:4
**matters (2)**
  8:19;18:5

**may (28)**
  13:6;14:15;16:25;
  18:12;23:5;24:9;35:2;
  40:16;43:20;47:8;
  52:10,10,13,19,20;
  56:4;64:21;69:14;
  74:3;76:19,19;89:11,
  12;90:1;91:24;93:7,
  20;94:22
**maybe (23)**
  8:12;9:3;11:5;
  18:14;20:13,17;23:3;
  24:20,22;37:4;44:4;
  53:24;54:15,16;56:4;
  63:2;73:10;80:18;
  86:5;88:15,17;94:11;
  96:12
**mean (31)**
  8:12;9:11;16:15;
  20:8;24:3;26:17;
  28:14;29:6;30:9,18;
  31:4,15,18;38:13;
  41:17;43:5;50:15;
  59:10;64:5,10;65:11;
  69:2;75:6;78:25;
  79:17;81:8,19;91:21;
  93:12;96:12;97:13
**meaningful (1)**
  98:11
**meaningless (1)**
  20:18
**means (2)**
  58:1;70:4
**meant (1)**
  99:13
**meantime (1)**
  66:16
**measurable (1)**
  18:15
**measures (2)**
  16:8,13
**mediated (7)**
  49:1;51:2;58:4,8,
  11;85:9;89:2
**mediation (33)**
  48:24;49:13,15,23;
  50:22;52:24;53:12;
  55:14;58:3;59:19;
  65:23;66:4,13,13,18,
  22;68:9,23;69:1;
  70:10;71:7,19;73:14,
  20;80:4;81:3,3,11,14,
  18,25;82:10;85:12
**mediations (1)**
  32:24
**mediator (3)**
  24:5;58:5;73:19
**mediators (1)**
  49:21
**meet (3)**
  6:22;69:20;97:9
**meet-and-confer (2)**
  7:21;22:19

meeting (2)
  11:3;19:5
member (2)
  34:20;37:14
members (2)
  13:3;50:15
mention (2)
  10:3;84:18
mentioned (1)
  7:25
mentioning (2)
  17:16,17
message (1)
  88:11
messed (1)
  17:25
met (1)
  91:16
Michael (1)
  14:8
microphone (2)
  6:5,5
middle (1)
  47:7
might (31)
  13:13;14:12;18:15;
  20:3;22:5,20;23:2,19;
  25:13,14;26:6,8;
  31:19,21,21;34:2,13;
  43:6,8;53:3;55:6;
  56:21;60:12;63:1,3;
  68:22;70:19,19,20;
  85:2;94:24
miles (1)
  44:8
million (1)
  75:15
Milwaukee (2)
  48:9;72:5
mind (3)
  39:14;57:18;97:16
mindful (1)
  8:6
minimal (1)
  62:1
minimum (3)
  32:19;39:14;52:13
minor (1)
  99:23
minute (3)
  14:22;36:4;91:20
minutes (1)
  91:5
missing (4)
  53:15;58:21;61:18;
  62:13
misspoke (1)
  69:18
mistake (1)
  41:11
misused (1)
  20:20
model (1)

49:25
molesters (1)
  94:10
mom (6)
  95:8,11,20,24,25;
  96:2
moment (3)
  5:25;73:23;91:1
money (10)
  58:19;59:25;60:11,
  14,15;61:2;74:17;
  77:18,19;78:21
monitored (1)
  72:9
month (1)
  61:24
months (1)
  67:3
moratorium (1)
  77:24
more (20)
  13:7;20:2;22:9;
  26:18;47:4,25;48:23;
  51:15;52:13;53:14;
  57:10,21;58:15;64:3;
  67:3;86:5;92:15;97:4;
  98:11;99:6
most (7)
  13:2;48:9;82:5;
  85:25;86:1;89:24;
  91:6
mother (4)
  95:3,4,5,6
motion (2)
  6:18;48:6
motivate (1)
  70:17
motivates (1)
  70:16
motivation (2)
  85:24;86:10
motive (1)
  78:22
motives (1)
  20:12
move (2)
  65:21;71:25
much (11)
  9:12;13:21;14:8;
  35:10;52:8;57:9;
  71:21;72:3;76:1;
  89:22;98:15
musing (1)
  73:10
must (4)
  12:17;13:1;24:11;
  31:10

**N**

name (1)
  8:1
named (1)

84:19
naming (1)
  24:14
narrow (1)
  97:5
native (1)
  20:18
natural (9)
  12:17;27:16;28:4;
  32:19;39:25;42:5,11,
  11,18
nature (3)
  7:12;12:20;64:23
near (1)
  88:15
nearly (1)
  85:25
necessarily (2)
  26:14;31:17
necessary (3)
  27:5;66:22;67:19
need (36)
  4:12,16,18;5:12;
  6:25;7:3;9:5,22;
  10:12;11:2,24;13:13;
  21:4;22:24;26:18,22;
  31:20;32:19;39:13;
  58:15;65:19,21;
  70:21;71:22;76:14;
  78:8;80:10;81:3,6;
  85:7,24;86:10,13,22;
  88:11;89:21
needs (9)
  22:13;33:15;35:4,7;
  39:23;40:1;52:24;
  73:1;98:21
negligence (1)
  72:21
negotiate (2)
  66:5,5
negotiated (6)
  30:21;31:5;60:9;
  64:2;66:9;67:16
negotiating (2)
  59:15;78:8
negotiation (2)
  57:10;62:6
negotiations (1)
  85:12
neutral (1)
  20:23
New (15)
  12:24;23:7;25:14;
  26:13;28:15;31:7;
  32:20;36:7,17;37:14;
  40:22;47:7,20;76:14;
  99:15
newer (1)
  8:13
next (4)
  6:24;11:18;25:14;
  58:4
nice (1)

100:8
night (2)
  29:10,17
nine (1)
  67:2
ninety (5)
  50:17;67:20;70:11,
  11;76:16
nobody's (1)
  33:4
nonabuse (1)
  63:7
noncontroversial (1)
  98:15
nondisclosures (1)
  42:1
none (1)
  20:11
non-English-speaking (1)
  29:3
nonexecutive (3)
  16:2,3;18:22
nonlimiting (1)
  96:9
norm (1)
  24:21
normal (2)
  79:13;82:20
normally (1)
  34:6
north (3)
  50:17;99:24,25
notes (2)
  65:15,16
notice (9)
  27:14,15;39:16;
  57:1;92:21;93:3,7,9;
  94:13
notion (3)
  27:20;46:13;53:7
notwithstanding (2)
  7:12;90:15
NOVEMBER (5)
  4:1;6:24;7:2;37:5;
  100:7
nuclear (1)
  53:12
number (13)
  8:21;17:3;31:14,14;
  33:2,7,8,20;54:1;72:7,
  8,9;92:18

**O**

Oakland (38)
  12:17;24:24;27:12,
  16;28:3,13,19,20,22;
  29:15;30:19;31:5;
  33:9;39:21;40:18;
  41:16,23,25;42:4,10,
  13;43:11,11,21;44:4,
  9,10;45:22;47:11;
  48:16;50:16;51:17;

65:18;66:19,20;
  67:23;70:9;76:12
object (30)
  49:3,6;53:11;56:16,
  20;58:19;62:18;63:8,
  12;64:11,14;69:25;
  70:3,4,23;77:18;
  78:15,23;79:4;80:3;
  81:7,8,9;82:11,16,22;
  84:2;87:11;89:12,15
objected (13)
  52:21,22;53:8,9;
  61:23;62:2;63:2;
  70:21;72:8;81:20,20;
  85:19;87:16
objecting (8)
  56:8;57:2;61:14;
  74:15;75:2;77:20;
  78:7;81:10
objection (52)
  48:3;51:6,23;53:2,
  16,20;55:21;56:1,4;
  57:23,24;61:10,16;
  62:4,21,22;63:4,18,
  20,23;64:1,9,18;67:6;
  69:19;73:11,22;75:3,
  14,17;77:7,14,14,17,
  22,24;79:25;80:6,17;
  81:12;82:21;83:2,3;
  84:13,14;87:11,22;
  88:8,9;89:3,5,17
objection- (1)
  87:13
objectionable (1)
  57:2
objections (32)
  10:5;47:10;48:10;
  49:9,22;50:12,25;
  51:11;53:5,19;55:11;
  62:21;66:1,12;67:17,
  18;69:9,15;72:2,7,10,
  10,17,19;73:5;75:10,
  24;76:17;78:4;79:2,7;
  83:16
objects (1)
  78:23
obligated (2)
  27:7;29:14
obligates (2)
  25:20,24
obligation (4)
  33:3;35:14;46:15;
  55:4
observe (1)
  5:10
obviously (2)
  7:13;74:23
occasion (1)
  37:7
occurred (1)
  59:9
occurs (1)
  82:10

**odd (1)**
52:13
**off (4)**
20:21;32:1;74:5;
91:12
**offensive (1)**
28:19
**offer (1)**
85:13
**offered (1)**
22:18
**office (5)**
6:7;7:7;20:13;
29:10;32:9
**officer (1)**
15:25
**official (3)**
66:4;67:1;68:8
**often (1)**
7:16
**old (1)**
10:8
**omnibus (1)**
72:10
**once (3)**
78:12;87:2;94:8
**one (55)**
7:23;8:12;11:1,6,
10,10;14:15;19:9;
20:8;21:8,10;23:16;
24:4;25:13,19;27:18;
28:18;38:25;43:14,
14;44:11,24;47:4;
48:9;52:7,19,21,22;
59:10,21;64:3;67:22;
74:10;78:2,25;79:19;
81:22;83:3,9,9,9;
84:18;85:4;87:6;88:7,
16;89:25;91:7,8;93:3;
94:17;96:12;98:21;
99:23,24
**onerous (1)**
33:16
**ones (3)**
20:2;54:2,3
**one's (2)**
44:12;73:23
**ongoing (2)**
12:21,22
**only (20)**
5:16;15:1;19:22;
23:5,8;31:24;32:15;
35:4;48:7;51:10;
55:14;58:2;59:18;
67:8,10,16;70:19,19;
71:7;98:10
**onto (1)**
32:8
**oOo- (1)**
4:2
**open (8)**
9:3;48:25;49:12,16;
50:22;55:12;64:3;

65:1
**opening (1)**
46:19
**opinion (2)**
18:4;76:10
**opportunities (3)**
31:1;49:5;55:8
**opportunity (7)**
49:6,7;71:20;72:19,
24;73:2;75:24
**opposed (2)**
26:19;96:22
**opposite (3)**
68:22;71:5,8
**opposition (2)**
7:19;14:4
**optional (8)**
47:9;77:2,5,10;
81:5;82:5;83:15,24
**order (32)**
4:3;8:25;9:9;10:4,
11;11:23;22:8;23:21;
32:14,15;33:19,20;
39:7,16,23;43:11,11;
45:8,22;51:20,20;
55:24;65:24;72:20;
75:12;81:5,15,18;
83:15;86:18;91:21,22
**orders (9)**
7:17;28:7;30:21;
33:1;39:21;40:19;
42:8;47:12;56:20
**ordinarily (1)**
13:14
**Oregon (2)**
48:19;71:16
**organizations (1)**
23:1
**Ori (1)**
4:20
**others (2)**
21:22;24:9
**otherwise (3)**
12:15;23:24;40:13
**ought (1)**
30:2
**ours (1)**
40:19
**out (49)**
5:4,5;12:6,6;14:25;
15:24;20:3,19,22;
29:24,24,24;34:3;
40:6,10;43:17;46:22;
48:6;50:3,10,23;
51:22;56:24,24;57:4;
59:7,23;60:9;64:3,6;
66:3,14;67:22;68:7;
70:14;73:8,21;75:1;
77:23;78:10;80:16;
82:9;86:10;88:9;
89:13;90:7,16;97:2,8
**outcome (1)**
18:23

**outside (8)**
12:11,12;16:10;
17:20;28:3;42:4;
63:25;75:19
**Over (8)**
11:14;17:24;19:5;
46:12;48:23;49:21;
70:11;85:18
**owes (1)**
35:14
**own (3)**
25:4;52:17;79:2

**P**

**Pachulski (1)**
36:13
**Pacific (1)**
21:13
**page (13)**
8:14;9:17;10:15,22,
22;12:6,7;26:24;
39:17;47:7;90:10,11;
92:3
**pages (2)**
9:19;19:23
**paid (9)**
18:15;24:19;33:4;
35:25;36:1;40:6,8;
70:19;81:21
**papers (3)**
7:11;47:23;97:14
**Parada (1)**
5:1
**paragraph (7)**
10:16,21,21;12:6,9;
43:16;90:5
**Pardon (1)**
56:13
**Parents (1)**
96:5
**parish (3)**
59:8,9;86:21
**parishes (2)**
49:10;58:24
**part (17)**
8:23;31:17;36:14;
42:21;44:18;46:14;
58:2;63:3;71:2;76:12;
77:15;78:8,16,16;
82:20;87:12;95:14
**parte (3)**
7:9,10,12
**participate (4)**
24:11,13;32:25;
99:15
**participating (3)**
4:13;97:12,20
**particular (8)**
11:7;18:16;21:7;
23:16;31:9;57:22;
58:9;92:21
**particularly (1)**

33:16
**parties (23)**
12:5;14:1;17:23;
22:4,5,7;23:8;34:7,
16;39:19,19;43:12,
13;45:10;47:8,13;
49:13,15,16;70:5;
78:15;85:12;89:13
**partner (2)**
69:21;96:15
**party (3)**
11:23;12:11;58:25
**Pascuzzi (71)**
4:9,9,10;5:3;7:25;
8:9;9:1,7,14,17,25;
10:7,19,24;20:22;
21:1,3;35:17;43:8,9;
46:19,21;50:16;59:6;
62:8;65:5,6,7,10,14;
67:7,10,12,14;68:1,5,
13;69:2,5,8,18;76:15;
77:25;80:8,15;81:2;
82:15;83:5,7,14,19,
23;84:1;88:6,13;89:7,
19,24;90:11,25;91:2,
23,25;92:1,2,5;97:9,
22;98:12;99:25;100:1
**Passarello (1)**
4:14
**patience (1)**
71:11
**Paul (2)**
4:9;43:8
**Paula (1)**
4:14
**pause (2)**
55:10;63:23;64:13
**pay (4)**
14:24;59:1;63:10;
77:19
**paying (2)**
40:9;71:23
**payment (3)**
60:8;79:15,19
**payroll (1)**
42:21
**pays (1)**
74:22
**PDF (1)**
12:7
**peace (2)**
51:16;64:25
**pending (1)**
18:5
**people (42)**
4:8;14:3;15:1;19:5;
20:3,4;23:1,3,5;
25:19;27:20,23;
31:16;37:2;42:1,21;
44:16;48:24,24;49:2;
50:2,11;51:18;55:15;
56:19;57:5,12;60:6,7,
12;64:2,4,9,18;74:18;

33:16
**percent (6)**
50:17;67:21;70:11,
11;76:16;79:19
**perhaps (8)**
18:16;21:2;23:15;
28:16;29:8;30:1;
63:14;80:4
**period (5)**
33:12;53:4,16;
55:25;75:16
**permanent (1)**
53:7
**permissible (1)**
84:17
**permission (1)**
40:7
**permit (1)**
57:23;79:25
**permitted (8)**
11:23;12:5;14:1;
17:23;23:7;39:19;
47:8;89:15
**perp (1)**
73:6
**perpetrators (4)**
55:6,6,8,9
**person (45)**
11:1,2;12:4,17;
13:14;14:5,6,14,15,
23;15:11,14;16:2,4;
17:1;18:19,20,22,22;
19:21;20:13,17,18;
25:3;27:16;31:1,19,
25;32:2,19;36:14;
37:9,11;40:1;42:5,20;
72:15;75:1;82:7,9,12;
85:1,10;86:25;93:17
**personal (7)**
11:19;17:1;30:2;
33:22;52:12;89:20;
92:6
**personally (5)**
8:4;11:22;12:15;
58:6;94:9
**personnel (1)**
15:8
**persons (3)**
28:5;41:19;42:18
**person's (1)**
82:11
**perspective (1)**
19:19
**PG&E (1)**
33:8
**Philadelphia (1)**
33:24
**phone (1)**
56:14
**phony (4)**
61:14;78:24;85:20,
23

**phrase (2)**
95:12,13
**pick (1)**
73:18
**picked (3)**
21:8;73:19;92:11
**picking (1)**
62:7
**picture (1)**
5:16
**place (12)**
14:19;16:8,12,23,
25;19:14;25:3;28:12;
41:9;53:13;62:14;
76:6
**places (1)**
61:24
**plaintiff's (1)**
38:11
**plan (17)**
58:11;60:1;61:5;
63:15;70:20;74:19,
21,21,23,23;78:5,10;
79:9,10,11;81:24;
85:13
**planning (1)**
81:10
**plans (1)**
59:24
**play (1)**
30:22
**players (2)**
17:12;73:18
**playing (2)**
35:21;38:13
**PLCs (1)**
73:5
**please (5)**
5:8,9;58:1;69:10;
90:14
**plenty (1)**
23:4
**PM (2)**
4:1;100:11
**POC (1)**
72:2
**point (26)**
7:23;13:12;17:14,
17;24:2;27:14;37:4;
40:3,18;42:7;43:19;
44:22;50:21;62:13,
24;63:24;64:7,8;74:8,
11;78:1;79:17;80:11;
87:24;88:24;91:20
**pointed (1)**
40:17
**points (4)**
9:4;38:25;74:11;
76:9
**policies (1)**
33:13
**population (2)**
13:9;86:6

**Portland (4)**
24:4;48:19;71:16;
87:5
**posed (2)**
84:9;93:19
**position (9)**
47:12;49:20;64:23;
65:15;66:25;68:7;
88:7;90:8,24
**positions (1)**
77:8
**possibility (1)**
31:5
**possible (5)**
27:2;43:23;65:24;
81:3;82:1
**pot (2)**
74:17,23
**potential (2)**
62:22;70:22
**potentially (4)**
22:25;33:13;39:2,
10
**Poughkeepsie (1)**
28:15
**practical (4)**
21:5;32:23,25;69:1
**practice (2)**
7:17;84:25
**precedent (2)**
12:16;40:25
**precludes (1)**
49:24
**precluding (1)**
24:22
**predictions (1)**
100:2
**preliminarily (1)**
6:15
**preliminary (5)**
10:6;62:24;65:20;
90:2;91:21
**premises (1)**
32:9
**prepared (3)**
8:18;13:18;57:18
**preparing (1)**
36:4
**presence (1)**
5:18
**preserve (1)**
30:24
**presiding (1)**
84:24
**presumably (3)**
14:24;25:2;87:22
**presume (2)**
30:9;97:22
**presumes (1)**
56:7
**presumption (3)**
56:6,8;61:4
**pretend (1)**

24:6
**pretty (7)**
7:17;14:8;18:15;
52:8;94:2,10;98:15
**previous (1)**
21:24
**previously (2)**
7:25;83:22
**priest (3)**
59:8;93:5;94:25
**priests (3)**
87:12;94:9,10
**priest's (1)**
92:21
**primarily (1)**
23:4
**principal (3)**
24:8;73:18;80:24
**principle (2)**
15:21;30:6
**principles (5)**
15:11;16:2;19:1;
26:2;30:3
**prior (3)**
10:8;44:22;96:24
**prison (2)**
87:7,17
**prisoner (1)**
87:15
**privilege (5)**
34:5;38:8;46:2,4
**privileged (1)**
57:6
**probably (8)**
5:3;18:14;24:9;
52:12;54:8;85:18;
89:25;97:10
**problem (12)**
11:14;20:11;41:12,
12;43:6;44:9,11;62:2;
87:9;91:14;93:19;
97:4
**problematic (2)**
39:2;42:7
**problems (1)**
79:11
**procedural (1)**
48:17
**procedure (6)**
28:12,23;78:5;
79:13;83:9,10
**procedures (1)**
41:16
**proceed (1)**
64:12
**proceedings (2)**
49:3;100:11
**process (29)**
48:24;49:24;50:22;
53:14;55:11;56:5;
57:10;58:12;59:5,15;
62:5;64:1;66:23;71:2;
72:1,18;73:2,14;

74:13;77:16;78:6,8,
10;79:9,25;80:5;
81:23;82:21;100:4
**processing (2)**
24:17;25:6
**processors (1)**
25:4
**proclivities (1)**
92:22
**proclivity (3)**
92:22,24;93:5
**produced (1)**
82:20
**product (7)**
34:6,16;38:8;45:25;
46:1,9,14
**production (2)**
57:1;64:19
**productive (2)**
57:25;67:4
**professional (1)**
81:23
**progress (2)**
7:22;82:6
**prohibited (1)**
70:10
**prohibition (1)**
67:24
**prohibitive (1)**
80:18
**project (1)**
37:6
**promptly (1)**
7:18
**proof (23)**
23:11,13,23;47:10,
25;57:22;60:17,19;
61:4,14;62:12,16,17;
69:15;70:8;75:4,9,13,
14,17;82:17;83:18;
86:20
**proofs (5)**
22:2;23:8;71:1;
90:6,13
**propensity (2)**
72:19;96:25
**proper (1)**
12:21
**proposal (2)**
34:9;97:17
**propose (1)**
52:24
**proposed (5)**
9:8;10:4;23:21;
32:14;75:12
**proposing (1)**
95:10
**propound (1)**
56:17
**protect (1)**
14:19
**protected (1)**
44:19

**protecting (2)**
14:16;22:1
**protection (4)**
13:18;35:16;68:23;
85:23
**protections (4)**
16:23;33:19;54:22;
56:25
**protective (6)**
16:8;22:9;33:1,19;
45:8;56:20
**protocol (2)**
59:25;60:18,20;
62:4
**protocols (16)**
14:18;16:7,12,15,
17,25;17:7;22:12,21;
25:2;26:5;40:12;41:9;
47:5;63:14;75:11
**prove (2)**
82:22;87:2
**proved (1)**
52:6
**provide (6)**
10:2;52:18;57:20;
70:14,18;75:21
**provided (2)**
60:18;76:16
**provides (2)**
11:23;82:24
**providing (1)**
77:2
**provision (4)**
10:17;45:2;60:3;
91:9
**public (2)**
97:12,18
**publicly (1)**
97:18
**pulling (2)**
50:23;51:22
**purpose (6)**
31:2;68:24,25;69:6,
8;72:16
**purposes (3)**
69:19;71:7;98:1
**pushed (1)**
31:6
**put (19)**
29:18;34:19;39:23;
40:17,19,22;47:2,2;
55:10;63:23;73:21;
82:2;83:12,13;85:22;
88:8,24;90:2,3
**putting (3)**
19:13;63:11;81:15

## Q

**questionable (2)**
63:6;74:2
**questionnaire (4)**
51:15;63:1;94:23;

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 115
of 118

95:13
**questionnaires (1)**
51:10
**quick (4)**
8:14;30:18;38:25;
92:17
**quickly (6)**
6:17;30:15;40:3;
51:3;89:20;91:3
**quite (7)**
32:14;37:11;40:16;
46:4;47:24;57:16;
61:8
**quote (1)**
85:20

## R

**raise (4)**
5:8,9;98:25;99:8
**raised (3)**
9:4;30:19;68:16
**raises (1)**
40:20
**rare (3)**
45:11;85:19,20
**rate (1)**
67:23
**rather (6)**
15:9;19:3;20:21;
41:18;63:16;97:3
**reach (6)**
19:3;43:3;51:2,3;
60:9;85:15
**reached (1)**
58:24
**reaches (1)**
43:25
**read (16)**
8:14;11:10;16:18;
19:22,23;20:9;50:3,4,
12;55:18;69:12,13;
93:21;94:2,4;99:5
**reading (1)**
16:19
**ready (1)**
46:17
**real (1)**
30:18
**realize (1)**
43:20
**really (15)**
9:19;19:19;30:24;
38:13;39:1;41:1;
50:19;56:21;69:24;
76:10;79:10;90:6;
94:12;97:13;98:4
**reargue (1)**
44:22
**reason (11)**
7:20,21;16:18;
26:18;43:19;44:6;
59:8;66:12;71:20;

75:9;92:6
**reasonable (3)**
45:20;62:10;96:10
**reasonably (1)**
22:20;26:5,9
**reasons (3)**
49:19;73:6;86:9
**receive (2)**
13:23;61:6
**recently (2)**
30:20;31:7
**recognize (3)**
5:13;9:19;52:18
**recognized (1)**
65:20
**recognizes (1)**
93:1
**recollection (1)**
28:9
**recommendation (1)**
82:8
**record (2)**
4:12;97:18
**red (11)**
8:14,15;9:8,12,21;
10:10;12:7;21:24;
39:17;90:11;93:14
**reexamined (1)**
85:3
**references (2)**
10:4,13
**refine (1)**
81:1
**reflect (1)**
32:20
**regarding (7)**
6:18;12:20;42:11;
48:5;55:8;86:17;90:5
**regardless (1)**
93:2
**regular (2)**
6:24;17:12
**reinsurers (1)**
13:17
**related (2)**
11:5;86:9
**relationship (5)**
86:23;92:19,25;
93:2,6
**relatives (1)**
96:5
**released (1)**
58:25
**relevant (2)**
22:4;92:16
**religious (2)**
18:17;86:18
**remedies (1)**
41:13
**remedy (2)**
12:21;86:2
**repeat (2)**
7:16;81:1

rephrase (2)
73:17;94:23
**replead (1)**
73:2
**replicated (1)**
51:18
**report (5)**
7:1;8:18;37:10;
38:10;67:20
**reported (2)**
8:23;95:14
**reporter (2)**
93:17,17
**reporting (1)**
73:23
**represent (3)**
21:20;39:5;50:15
**representatives (1)**
20:23
**representing (4)**
8:21;21:10,12,15
**request (13)**
4:7;7:19;27:14,15;
44:24;57:1;64:19,19;
71:21;84:3;90:1,22,
23
**requested (1)**
98:13
**requests (2)**
71:17;82:19
**require (6)**
25:18;33:23;63:15;
71:1;92:21;93:7
**required (4)**
27:16;32:16;39:9,
10
**requirement (4)**
40:1;42:6;45:6,7
**requires (1)**
32:22
**requiring (1)**
33:15
**reset (1)**
11:16
**resets (2)**
51:6,7
**resolution (7)**
27:12;49:1;52:25;
70:6,22;86:4;100:6
**resolved (1)**
6:25;98:21
**resources (1)**
47:16
**respect (4)**
21:25;34:12;44:24;
74:12
**respond (3)**
30:15;55:15;59:19
**respondeat (2)**
15:10;30:4
**responding (1)**
51:19
**response (8)**

6:19;25:17;67:19,
23,23;82:25;83:1;
100:3
**responses (3)**
8:16;50:20;64:8
**responsibility (4)**
19:1;22:16;33:11;
41:10
**responsible (7)**
13:14;15:25;27:8,9;
30:10,11;44:17
**responsibly (1)**
30:12
**restricted (1)**
23:8
**restriction (1)**
57:12
**result (4)**
47:13;81:14;85:9;
89:2
**resume (1)**
98:10
**return (1)**
45:9
**review (2)**
9:21;81:23
**reviewer (1)**
63:16
**reviewing (1)**
23:4
**revise (2)**
43:10,16
**revised (2)**
34:9;39:16
**revisions (1)**
98:13
**revolve (1)**
90:1
**rid (5)**
62:17;72:12;74:1;
79:20;87:25
**right (62)**
4:6;5:17,20;10:14;
11:21;15:3,16;17:13;
18:12,12;19:15;
20:24;25:11,16,22;
26:2,16,20;29:6;
34:22;36:8;37:17,21;
40:17;41:22;42:2;
45:18;52:2,4;54:1,6,
18,20;56:4,7,10,18,
23,25;57:2,3;64:11,
14,25;68:17;69:11;
77:15;79:17;80:16;
81:12,13;82:5,24;
87:13,14;89:6;92:10,
13;94:6;95:7;97:15;
99:22
**rights (2)**
56:25;64:14
**Rios (1)**
4:10
**risk (2)**

13:3;74:5
**roadblock (1)**
64:4
**roads (1)**
59:13
**robust (4)**
50:19;55:11;57:10;
67:19
**Rochester (2)**
12:22;17:18
**Rockville (7)**
12:22;13:22;17:18;
48:7,9;49:19;72:6
**role (1)**
34:13
**roll (1)**
91:11
**Roman (2)**
4:4,11
**Rosa (30)**
12:16;24:25;27:12,
16;28:2,3,13,22;
29:15;30:19;31:5;
33:9;39:21;40:18;
41:16;42:4;47:12;
48:16;50:16;51:17;
65:19;66:19,20;
67:20,25;70:9;76:12;
80:24;88:5,20
**route (1)**
51:15
**routine (1)**
9:13
**routinely (1)**
7:17
**rude (2)**
80:11,12
**rule (4)**
28:12;42:10,15;
44:8
**ruled (1)**
77:3
**rules (5)**
13:13;77:15;78:4;
79:13;99:15
**ruling (4)**
45:1;53:19;65:21;
98:13
**rulings (1)**
50:4
**run (2)**
48:23;87:23
**run-in-the-mill (1)**
63:7

## S

**S1 (1)**
15:6
**sabers (1)**
50:24
**sacred (1)**
85:3

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 114
of 118

**safeguard (1)**
26:16
**safeguards (1)**
13:15
**Sagan's (1)**
80:1
**Same (22)**
15:15,20;16:1;19:1;
24:10;26:24;37:11;
44:4;47:14;48:18;
51:14;55:6;61:24;
75:21;76:5,11;77:9;
79:12;83:1,11;84:8;
85:5
**SAN (16)**
4:1,5,11;8:1;17:5;
26:11;28:14,21;
35:23;36:17;37:16;
44:2,10;87:22;88:2;
93:22
**sandwich (7)**
19:4,5;32:4,6;
39:12;43:4;44:16
**sandwiches (2)**
31:25;32:1
**Santa (30)**
12:16;24:25;27:12,
16;28:2,3,13,22;
29:15;30:19;31:5;
33:9;39:21;40:18;
41:16;42:4;47:12;
48:16;50:16;51:17;
65:19;66:19,20;
67:20,25;70:9;76:12;
80:24;88:5,20
**satisfied (3)**
16:17,18;98:20
**saw (2)**
47:23;51:17
**saying (23)**
19:19;22:11,13,19;
24:7;38:5,9;41:17;
50:24;54:25;55:10,
11;61:13;68:6,11;
74:20;75:14,23,25;
77:21;78:13;84:13;
86:18
**scenario (4)**
56:21;57:5,5,13
**scheme (1)**
85:8
**Schmoe (1)**
18:23
**school (5)**
59:13,14;72:14;
86:22,24
**schools (1)**
49:10
**scope (4)**
13:25;17:22;19:3;
69:21
**Scouts (2)**
38:1;60:3

**screen (5)**
4:13;10:11;12:9;
21:15;47:1
**second (10)**
11:10,11;45:22,23;
48:7;52:22;89:16;
91:7;92:24;97:13
**Section (1)**
39:16
**secure (1)**
19:14
**secured (1)**
31:22
**seeing (1)**
14:3
**seeking (1)**
76:2
**seem (12)**
16:17;18:24;26:21;
32:3,3;52:7;53:9;
62:13,20;73:22;
76:21;80:19
**seemed (2)**
92:12;97:15
**seems (17)**
19:6;23:12;28:24;
30:5;45:19,19;46:4,
13;52:15;53:6;75:6;
76:20;77:9;79:25;
85:5;96:10;97:5
**semantics (1)**
7:24
**send (3)**
82:17,18;97:9
**sense (6)**
24:2;28:14;41:15;
56:8;74:1;80:7
**sensitive (2)**
16:9;62:21
**sent (1)**
17:24
**sentence (1)**
47:8
**separate (4)**
25:5;34:20;49:9;
53:3
**separately (1)**
25:9
**serially (1)**
87:17
**server (1)**
11:15
**servers (1)**
14:13
**serves (1)**
98:1
**set (2)**
13:11;78:21
**setting (1)**
57:13
**settlement (16)**
14:11;51:2;57:10;
58:3,4,12;59:4,21,24;

60:10;62:6,10;64:2;
69:15;71:19;75:22
**several (3)**
12:23;65:4;91:18
**sexually (1)**
86:7
**shall (1)**
90:13
**share (2)**
26:5;74:18
**shared (5)**
13:5,16,24;17:25;
50:23
**sharing (1)**
23:8
**short (1)**
53:16
**show (1)**
96:23
**showing (1)**
45:5
**shows (2)**
25:18;69:24
**shredded (1)**
31:22
**side (5)**
38:1,11,12;60:10;
99:20
**sign (52)**
10:25;11:1,2,22,25,
25;12:4,12,15,17;
13:19;14:6;15:3;19:6,
23;20:3,9,14,17;
22:11,13,14,15;25:19,
20;27:17;28:5,25;
29:2,3,8;31:1,19;32:5,
16;33:1,21,22;34:3,
10,11,20;39:11,25;
41:18,25;42:18;
43:13,15;45:8,9;50:9
**signaled (1)**
55:16
**signature (2)**
17:1;29:9
**signatures (1)**
32:18
**signed (8)**
13:23;16:16,17;
17:23;18:8;22:25;
29:17;35:4
**significance (1)**
19:24
**significant (1)**
34:1
**significantly (2)**
33:8;64:1
**signing (6)**
16:14;18:22;30:23;
35:8;38:16;46:6
**signs (1)**
35:5
**similar (5)**
13:18;30:8;38:12;

67:23;97:6
**similarly (1)**
52:23
**simple (1)**
63:12
**simply (6)**
13:18;21:2;44:6;
46:19;64:15;88:1
**single (4)**
22:10;25:19;32:16;
39:9
**situation (13)**
23:18;24:18;31:17;
39:12,14;45:2;62:20;
68:5;72:25;74:24;
84:2;87:10;88:20
**situations (2)**
23:5;40:2
**six (1)**
67:2
**sixteen (1)**
49:21
**sixty (1)**
55:17
**sixty-day (1)**
55:25
**skip (2)**
10:2,17
**slightly (1)**
88:20
**slow (5)**
9:11;69:12;90:9,14;
91:20
**small (3)**
31:14,14;66:9
**Smith (4)**
29:6,12;84:15,20
**smoothly (1)**
48:24
**so-and-so (2)**
46:16;95:1
**sole (1)**
8:5
**solution (3)**
58:17;88:24;98:6
**solve (2)**
44:8,10
**somebody (7)**
31:18,22;34:18;
38:5,7;95:14,16
**somebody's (1)**
31:20
**somehow (2)**
85:3;89:14
**someone (21)**
11:22;13:19;15:24;
22:13;27:25;28:13;
35:23;36:6;46:14;
48:1;53:20;64:15;
73:1;87:6;88:1;91:18;
94:3,8,15;95:15,16
**sometimes (4)**
9:12;49:14;77:18,

21
**somewhat (1)**
11:5
**soon (3)**
65:23;81:3,25
**sorry (12)**
9:15;36:11;38:11;
42:9;44:21;60:4;
61:19;68:16;69:9;
93:14;95:21;99:11
**sort (3)**
39:18;53:2;72:10
**sorted (1)**
78:10
**sorts (2)**
13:6,15
**sound (1)**
61:12
**sounded (1)**
99:5
**sounds (3)**
61:9,16;98:2
**speak (4)**
5:9;20:14;25:24;
76:19
**speaking (2)**
86:8;91:18
**special (5)**
4:15,17;92:25;93:1,
6
**specific (1)**
74:1
**speculate (1)**
79:10
**speedy (1)**
86:4
**spelled (2)**
12:6,6
**spend (3)**
67:2;97:4,7
**spoke (1)**
94:3
**spot (2)**
83:12,13
**square (1)**
78:19
**staff (1)**
100:9
**stand (2)**
70:18;98:20
**Stang (175)**
5:3,6,13,17,19,23;
6:1,15;7:4,6,14,23;
11:6,9,10,12,13,21;
12:10;14:23;15:4,17;
16:5;17:10,14,16;
18:11,19;19:8,16,18;
20:10;24:7,18;27:1,
11,13,19;28:2,9;29:6,
11,16,20,22;30:7;
32:4,14;34:8;35:9,10,
19,21,25;36:2,9,11,
13,19,21,23;37:1,5,

Case: 23-30564   Doc# 354   Filed: 12/01/23   Entered: 12/01/23 12:04:08   Page 115
of 118

13,18,22;38:15,19;
40:4,15;41:8;44:19;
45:19,21;46:7,16;
47:22,25;48:4,22;
50:7;51:9,13;52:2,3,
5;53:10,18;54:8,10,
14,18,20;55:1,23;
56:2,10,12,14,16,19;
57:12,16;58:22;59:3;
60:18,20,24;61:1,2,3,
5,11,17,19,21;62:12;
63:14;65:15;66:2;
67:7,17;72:4;74:20;
76:12;78:3;79:25;
80:13,13;81:9;82:3,
15;83:5,11;84:1,5,7,
12,20;85:11;87:4,14,
18,20;89:4;90:17;
91:8,10,13,15,24;
92:1,7,9,10,14,24;
94:6,8,20;95:3,7,10,
18,23;96:3,13;97:3,
16,19;98:20,23;99:3,
5;100:1

**Stang's (3)**
68:11;69:21;96:15
**start (4)**
9:3;62:15;68:20;
98:18
**started (1)**
94:20
**starting (3)**
43:19;65:18;68:17
**starts (1)**
9:17
**state (5)**
49:5,7;50:13,14;
54:1
**stated (2)**
8:17;83:2
**statement (3)**
17:3;57:18;84:15
**statements (2)**
49:25;50:18
**States (2)**
4:24;90:21
**status (2)**
7:1;8:18
**statute (3)**
54:10,22;85:21
**staying (1)**
89:17
**Stein (1)**
4:10
**step (2)**
10:1;65:11
**stepped (1)**
79:4
**stepping (1)**
32:21
**stick (2)**
88:10;89:12
**still (10)**

8:19;9:3;35:20,22;
40:16;70:11;75:23;
80:17;88:14,22
**stop (2)**
18:12,12
**stopped (1)**
74:8
**stops (1)**
51:21
**stretch (1)**
38:7
**strikes (1)**
24:7
**struck (1)**
39:18
**struggling (1)**
80:16
**stuck (2)**
80:22,22
**studied (1)**
46:21
**Stuff (3)**
14:1;19:20;57:2
**Suarez (1)**
84:22
**subject (10)**
8:9,23;18:5,5;
30:14;41:2;48:3;49:2;
70:13;77:14
**submission (2)**
62:23;84:9
**submissions (1)**
63:25
**submit (12)**
24:11;33:25;37:2,8;
58:2;62:25;63:1;
64:22;65:17;66:20;
70:12;84:25
**submits (2)**
48:2;64:15
**submitted (6)**
8:17;50:18;64:5;
83:1,21,22
**submitting (4)**
33:22;57:19;77:12,
12
**subsequently (1)**
17:25
**substance (1)**
48:2
**substantial (1)**
47:14
**substantially (1)**
52:13
**substitute (1)**
78:6
**successful (3)**
70:6,20;82:10
**successfully (1)**
58:7
**suddenly (1)**
76:13
**suffered (1)**

28:13
**sufficient (4)**
52:18;72:20,22;
73:15
**Sugayan (17)**
6:3,6,7;51:21;
68:18;71:10,12,12;
73:13;74:10,25;75:8,
23;76:5;80:9,10;99:1
**Sugayan's (1)**
86:12
**suggest (5)**
51:8,9;53:6;89:20;
96:20
**suggested (2)**
86:11;99:2
**suggesting (4)**
34:8;52:15;53:21;
77:21
**suggestion (3)**
77:23;88:7;97:8
**suicides (1)**
13:8
**sum (2)**
58:18;78:21
**Summerhays (1)**
4:13
**superior (2)**
15:10;30:4
**supplement (35)**
24:8;47:10,15;48:1;
52:18;65:17;66:21;
67:25;68:25;69:23,
24,25;70:2,13;72:24;
75:1,13,16,17,25;
81:4,5,7;82:5,16;83:2,
4,16,24;84:4;86:14,
22;89:3;92:3;100:3
**supplemental (7)**
23:14;66:10,10,11;
67:16;74:4;85:1
**supplements (16)**
65:25,25;66:1,3;
67:20,21;68:7,23;
71:1;72:2;76:16,25;
77:2,12;78:18;82:2
**support (5)**
66:20;75:4,13;
83:18;89:3
**supportive (1)**
80:19
**supports (2)**
75:20;82:19
**suppose (1)**
75:14
**supposed (1)**
99:16
**sure (15)**
5:23;7:24;13:15;
15:21;22:4;23:13;
24:25;30:11;37:9;
45:25;46:21;54:2,23;
90:7;91:3

**surprised (1)**
41:1
**surviving (1)**
69:15
**survivor (24)**
13:4,6,7;14:5;
18:16;19:10;23:11,
23;28:20,21;44:2,3;
47:10,10;48:10;56:3,
17;59:11;64:23;68:6;
90:6,13;92:2,20
**survivors (12)**
13:3;14:10;22:2;
48:12;50:17;51:5;
56:22;65:16;66:21;
68:2;85:18;86:5
**suspect (2)**
52:11;58:15
**swords (1)**
50:23

# T

**table (1)**
51:7
**talk (1)**
14:12
**talked (6)**
24:17;28:4;78:3,7;
85:25;98:22
**talking (14)**
23:3;24:16;36:9;
37:12;38:20;39:12;
41:14;57:7;62:1;
63:18;72:4;87:15;
88:10;97:24
**talks (1)**
12:7
**tat (1)**
73:2
**teacher (1)**
95:2
**team (1)**
36:6
**tedious (1)**
9:12
**telling (5)**
5:20;9:4;56:23;
85:3;95:18
**tells (1)**
93:24
**temporary (1)**
25:23
**ten (1)**
54:16
**tentative (9)**
50:3,4,9;55:16,19,
20,21;65:21;98:13
**tentatively (1)**
93:20
**term (3)**
54:23;60:13;80:23
**terminology (1)**

8:6
**terms (4)**
34:13;50:20;51:18;
62:2
**terribly (1)**
20:8
**testifying (1)**
34:4
**theoretically (1)**
31:18
**theories (2)**
92:19;93:3
**theory (2)**
93:4,7
**therefore (7)**
12:1;27:7;58:19;
63:11;73:21;88:8;
94:4
**thinking (2)**
19:10;77:23
**third-party (4)**
17:6;22:11;39:5;
41:18,23;43:25
**thirty (1)**
91:5
**though (3)**
5:20;39:7;98:17
**thought (5)**
9:20;27:22;34:17;
45:24;57:18
**thoughts (2)**
62:24;74:9
**thousands (1)**
25:12
**threat (1)**
55:13
**three (8)**
19:23;21:14;28:17;
61:24;68:15;89:10;
98:24;99:14
**throughout (2)**
12:23;74:13
**throws (1)**
20:19
**THURSDAY (1)**
4:1
**tie (1)**
67:15
**time-consuming (2)**
66:8;68:9
**timeout (2)**
73:10;80:18
**timing (1)**
77:22
**title (1)**
93:24
**titles (1)**
10:13
**today (13)**
5:8;6:21;7:3;8:9,
20;11:4;22:19;25:13;
37:5;96:17;97:4;99:8;
100:9

**told (14)**
13:4;16:12;19:20;
93:13,15;94:15;95:1,
1,5,7,11,19,20,25
**tolerate (1)**
44:7
**tomorrow (1)**
51:23
**ton (1)**
9:22
**tone (1)**
51:7
**tonight (1)**
26:13
**top (1)**
39:17
**total (1)**
59:18
**totally (2)**
52:19,20
**touch (1)**
39:10
**touches (1)**
12:14
**touching (3)**
27:21,23;31:16
**track (1)**
33:10,11
**tracks (1)**
39:15
**traditional (1)**
36:5
**transfer (1)**
44:10
**transferring (1)**
44:9
**transparent (1)**
14:20
**trap (1)**
30:25
**treated (3)**
16:3;28:20;44:3
**tried (1)**
49:14
**trip (2)**
59:13;60:15
**trouble (2)**
53:1;88:15
**troublesome (1)**
28:19
**troubling (1)**
27:21
**true (3)**
24:21;62:7;84:4
**trust (2)**
14:11;58:18
**trusted (2)**
26:11;29:7
**Trustee (4)**
4:24;90:6,8,12
**trustee's (1)**
90:22
**try (6)**

30:22;69:21;73:14;
76:14;97:8;98:2
**trying (22)**
5:19,23;7:7;13:11;
18:2;19:2;47:1;48:16;
56:21;62:24;63:24;
64:25;67:3;69:12;
73:18;79:18;83:12;
85:15;86:2;97:13;
98:6;99:21
**turn (2)**
6:4;50:11
**turning (2)**
8:9;50:11
**turnout (4)**
50:20;51:17;82:4;
100:2
**turns (2)**
29:24;64:3
**tweak (1)**
99:4
**twelve (1)**
44:8
**twenty (2)**
48:23;54:16
**two (19)**
4:7;19:22;23:13,14;
24:8;28:6;38:25;39:5,
22;40:24;43:21,22;
44:10;74:11;76:15,
23;83:8;84:11;88:10
**two-thirds (1)**
47:20
**type (3)**
15:10;45:1;72:9
**typical (1)**
26:2
**typically (4)**
13:14;25:1;45:6;
71:16

## U

**uncommon (1)**
13:8
**under (17)**
15:10;16:1;19:1;
25:25;30:3;34:9,21;
35:15;39:6;40:14;
54:11;60:20;75:10;
79:13;83:15;84:15;
85:8
**underlying (2)**
32:24;70:7
**understands (2)**
33:2,14
**underwriters (2)**
6:8;71:13
**Unfortunately (2)**
8:10;87:7
**unheard (1)**
48:11
**UNISON (1)**

100:10
**United (2)**
4:24;90:21
**universe (2)**
17:7;52:9
**unknown (3)**
14:18;52:10;58:10
**unless (11)**
6:23;9:1;31:9;45:5,
10;70:3,5;79:19;
89:19;97:7;98:8
**unlike (1)**
80:24
**unnecessary (2)**
47:15,16
**unsuccessful (1)**
52:24
**unwary (1)**
30:25
**unworkable (1)**
25:18
**up (42)**
5:12;7:1;10:20;
13:11;14:22;17:25;
19:4,12;21:8,23;
23:19;29:22;30:16;
31:7;33:10;40:4;41:1;
47:2,3,24;48:14;55:7;
57:13;59:5,6,25;
61:12;62:9;68:5;78:4;
79:4;80:4,13;82:22;
89:20;94:8,24;97:17,
20;98:3,6;99:21
**update (1)**
8:18
**upon (1)**
5:12
**urged (1)**
88:21
**urgent (1)**
6:23
**urging (1)**
66:21
**use (32)**
31:11;40:11;47:9,
15;49:25;58:23;
60:13;62:8;66:9;
67:24;68:24,24;69:5,
8,14,19;70:10,23;
75:2,9,17;77:6;80:6,
6;81:6;82:12;83:14,
15,23;84:13,14;96:8
**used (15)**
51:6,10,10,12;
55:14;57:6;58:2;
64:17;66:1,12;67:17;
75:13;80:2;85:11,15
**useful (1)**
66:22
**uses (3)**
27:3;31:10;45:3
**using (12)**
8:6;19:12;55:13;

57:7;63:18;69:25;
70:2;73:4,5;75:25;
76:17;89:3
**usually (1)**
33:1
**utilized (1)**
17:19

## V

**valid (7)**
21:5,6;52:20;56:7;
60:8;69:24;79:15
**validity (2)**
34:15;57:22
**valuation (1)**
37:24
**value (1)**
38:2
**various (2)**
23:1;75:10
**vast (1)**
14:7
**venders (1)**
42:17
**vendor (49)**
12:12,20;13:21,21,
24;15:20,21,22,22,25;
16:1,3,10;17:19,20,
22,24,25;18:7,14,14,
23,25;19:4;20:13;
22:11,13;24:15;
25:20,25;26:19;27:3,
5,5,6,8,9;28:25;29:7;
30:2;31:12;32:7,9;
33:16,24;39:7;41:12,
18;45:3
**vendors (19)**
14:18;16:24,25;
17:7;19:20;30:11,11;
31:9,10;33:6,18;
34:10;41:24;42:5,15,
15;44:14,17,24
**versa (1)**
49:7
**version (3)**
21:24;23:7;94:16
**versions (1)**
9:21
**versus (2)**
19:21;28:13
**vet (4)**
18:14;53:23;57:21;
71:20
**vetted (3)**
58:15;59:16;60:10
**vetting (4)**
58:12;62:9,14;
79:12
**via (1)**
64:19
**viable (2)**
72:21;74:3

**vice (1)**
49:7
**victim (2)**
28:19;74:3
**video (1)**
99:16
**view (4)**
14:20;48:17;96:22,
23
**vigorous (1)**
79:12
**village (1)**
59:13
**violation (2)**
22:7;31:2
**virtually (1)**
12:14
**virtue (2)**
38:16;85:21
**voluntarily (1)**
85:10
**voluntary (24)**
24:8;49:25;50:2,18;
51:9,15;52:17;55:13,
18;56:22,23;63:1,18,
25;64:5,16;65:17;
67:20;68:1;82:2;84:9,
15;85:1;86:13
**votes (1)**
74:22
**voting (1)**
74:19

## W

**wait (4)**
36:4;51:12;61:8;
64:7
**walk (1)**
10:17
**wants (14)**
13:10;18:20;22:10;
27:1;32:10;34:3;
44:19;53:20;63:22;
86:4;90:7,15;97:7;
99:3
**war (1)**
53:12
**warning (1)**
50:9
**waste (3)**
10:12;77:18,20
**wasteful (1)**
66:8
**watching (1)**
72:6
**way (38)**
8:21;19:24;23:20,
21;26:13;29:5;30:7;
31:24;34:16;37:9;
40:12;41:21;42:19;
43:21;45:6;47:1,20;
51:23,24;55:18;

Case: 23-30564     Doc# 354     Filed: 12/01/23     Entered: 12/01/23 12:04:08     Page 117
of 118

59:23;60:9;62:1,6,17;
64:12;67:15;68:11,
13;73:14;83:9,10;
85:5;87:14,25;88:7;
89:13;93:11
**ways (1)**
22:9
**weaponize (1)**
73:1
**weaponizing (1)**
56:22
**website (1)**
93:23
**weekend (1)**
11:15
**Weinstein (2)**
4:17;27:22
**Weiss (57)**
6:10,11,11;21:17,
18,19;23:12,21;
24:17;25:5,10,17,22;
26:1,3,17,22,25;
27:22;28:9,23;30:5,
15,17,18;31:8,15;
32:6;38:23,25;40:20;
41:21,22;42:4,11,13,
17,23;43:1,5;46:25;
47:4,19;51:21;68:18;
74:9;76:7,8;78:1,2,
25;79:6;80:9,9;99:10,
11,12
**welcome (1)**
5:11
**weren't (3)**
21:24;28:9;78:4
**Westchester (1)**
21:13
**Westport (2)**
6:13;21:21
**What's (8)**
15:20;42:15;65:8;
78:11,20;81:13;82:5;
83:15
**whereas (1)**
52:19
**Whereupon (1)**
100:11
**whole (4)**
26:18;73:4;81:12;
87:17
**who's (11)**
4:14,17;10:25;
27:25;29:9;31:20,23;
58:25;84:18;88:2;
95:14
**willing (3)**
74:12;81:8;99:3
**Willoughby (1)**
4:10
**window (4)**
54:2;55:7;72:13;
85:22
**wish (9)**

4:8;5:7,9;6:3,4;
41:6;46:8;71:10;99:8
**wishes (2)**
30:13;89:9
**withdraw (2)**
62:18;63:8
**within (7)**
13:25;17:22;24:10;
26:6;41:20;78:5;91:5
**without (9)**
24:14;31:8;45:4;
55:5;56:8;69:25;
73:18;74:2;96:25
**witnesses (1)**
45:13
**wonder (1)**
74:6
**word (5)**
39:17,20,22;40:18;
96:8
**wording (1)**
43:1
**words (4)**
9:11;20:7;61:9;
89:1
**wordsmith (1)**
97:8
**wordsmithing (1)**
97:4
**work (24)**
31:18,19,20;34:5,6,
16,19;35:23;36:17;
37:6,15,24;38:1,8,12;
39:8;45:25;46:1,9,14;
97:2,8;99:3,20
**workable (2)**
20:25;22:3
**worked (1)**
59:23
**working (8)**
6:1;7:11;14:13;
19:25;33:24;37:2;
42:16;44:14
**works (4)**
9:7,10;20:13;60:9
**world (1)**
45:5
**worried (1)**
46:11
**worry (5)**
7:20;27:7;88:19;
99:23;100:1
**worth (2)**
10:15;59:18
**wow (1)**
27:24
**wrap (1)**
89:19
**write (2)**
14:10,11
**writer (1)**
95:6
**writing (1)**

14:5
**wrong (3)**
15:20;18:24;35:2
**wrongdoer (1)**
14:25;44:4
**wrote (1)**
94:25

---

## X

**XYZ (2)**
18:23;27:2

---

## Y

**years (2)**
48:23;51:4
**Yep (1)**
41:8
**yesterday (2)**
9:18;90:23
**York (3)**
12:24;28:15;40:22
**young (1)**
86:2

---

## Z

**Zoom (1)**
4:12

---

## 1

**1 (4)**
33:2,20;39:22;
78:19
**1:32 (1)**
4:1
**10 (1)**
67:1
**10,000 (1)**
54:16
**100 (6)**
59:1,6,18,24;60:2,
14
**11 (2)**
14:10;81:24
**125 (1)**
59:17
**17 (1)**
10:21
**17A (1)**
11:10
**17C (2)**
10:21;90:5
**17D (2)**
12:9;47:7
**17E4 (2)**
11:5;39:16
**19 (1)**
9:17

---

## 2

**2 (2)**
10:16;39:23
**200 (1)**
64:21
**2002 (1)**
48:19
**2004 (4)**
6:18;7:17;14:7;
100:6
**2023 (1)**
4:1
**20th (1)**
55:17
**21 (1)**
10:15
**27 (3)**
10:22,22;90:11
**28 (2)**
12:7;47:7
**28th (1)**
7:2
**29 (1)**
39:17
**297 (2)**
9:17;92:3

---

## 3

**3:59 (1)**
100:11
**30th (2)**
6:24;100:7

---

## 4

**4 (1)**
90:12
**40,000 (1)**
85:18
**410 (4)**
65:25;66:4;68:8;
86:16

---

## 5

**5 (1)**
23:10
**500 (1)**
52:12
**500-plus (2)**
49:4;66:17
**502 (1)**
64:10
**538 (2)**
49:8;50:24

---

## 7

**71 (1)**
92:3

---

## 9

**9 (1)**
4:1
**9th (1)**
37:5

Case: 23-30564    Doc# 354    Filed: 12/01/23    Entered: 12/01/23 12:04:08    Page 118
of 118