1  PAUL J. PASCUZZI, State Bar No. 148810
   JASON E. RIOS, State Bar No. 190086
2  THOMAS R. PHINNEY, State Bar No. 159435
   FELDERSTEIN FITZGERALD
3     WILLOUGHBY PASCUZZI & RIOS LLP
   500 Capitol Mall, Suite 2250
4  Sacramento, CA 95814
   Telephone:    (916) 329-7400
5  Facsimile:    (916) 329-7435
   Email:        ppascuzzi@ffwplaw.com
6                jrios@ffwplaw.com
                 tphinney@ffwplaw.com
7
   ORI KATZ, State Bar No. 209561
8  ALAN H. MARTIN, State Bar No. 132301
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
9     A Limited Liability Partnership
      Including Professional Corporations
10 Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
11 Telephone:    (415) 434-9100
   Facsimile:    (415) 434-3947
12 Email:        okatz@sheppardmullin.com
                 amartin@sheppardmullin.com
13
   Attorneys for The Roman Catholic
14 Archbishop of San Francisco

15              UNITED STATES BANKRUPTCY COURT

16       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

17

18 In re                                    Case No. 23-30564

19 THE ROMAN CATHOLIC ARCHBISHOP            Chapter 11
   OF SAN FRANCISCO,
20                                          **DECLARATION OF DAVID BRILL IN
            Debtor and                      SUPPORT OF DEBTOR'S APPLICATION
21          Debtor in Possession.           TO EMPLOY TRANSPERFECT LEGAL
                                            SOLUTIONS TO PROVIDE LITIGATION
22                                          SUPPORT CONSULTING AND E-
                                            DISCOVERY SERVICES UNDER
23                                          BANKRUPTCY CODE SECTIONS 327(a)
                                            AND 328(a)**
24
                                            *[No Hearing Required]*
25
                                            Judge:      Hon. Dennis Montali
26

27

28

SMRH:4865-1612-7150.1

I, David Brill, declare:

1.    The matters stated herein are true and correct and are within my personal knowledge or information provided to me by other partners, managing directors, directors, senior managers, managers, independent contractors, employees, and administrative staff of TransPerfect Document Management, Inc. and Chancery Staffing Solutions, LLC (d/b/a TransPerfect Staffing Solutions), together known as TransPerfect Legal Solutions ("TransPerfect").  If called upon to testify as a witness, I could and would testify competently thereto.

2.    This declaration (the "Declaration") is made in support of the *Debtor's Application to Employ TransPerfect Legal Solutions to Provide Litigation Support Consulting and E-Discovery Services Under Bankruptcy Code Sections 327(a) and 328(a)* (the "Application"), filed by the Roman Catholic Archbishop of San Francisco (the "Debtor" or "RCASF"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Bankruptcy Case") seeking to employ TransPerfect as its litigation support consultant and e-discovery vendor.  I give capitalized terms not defined here the same meaning given to them in the Application.

3.    I am the Director, Strategic Accounts of TransPerfect, and as such am authorized to make this Declaration on behalf of TransPerfect.

4.    I understand that the Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case has issued a subpoena (the "Subpoena") seeking information relating to, among other things, the Debtor's financial affairs, organizational structure, and information relating to pending litigation claims by sexual abuse claimants.  Such information spans broad subjects stretching across many years and requiring the capture, review, and processing of thousands of voluminous emails, books, and records of the Debtor.

5.    I further understand that the Committee has served or is expected to serve additional discovery requests on the Debtor seeking similar and related information and documents.  The RCASF has requested, and TransPerfect has agreed, subject to Court approval, to provide litigation support and e-discovery services (collectively, the "Services"), including, but not limited to, collection, storage, identification, review, preparation, and production of certain data and documents

DECLARATION OF DAVID BRILL IN SUPPORT OF
APPLICATION TO EMPLOY TRANSPERFECT

SMRH:4865-1612-7150.1

responsive to the Subpoena and discovery requests made by the Committee, and as described more fully in the Application and below.

6. TransPerfect provides its clients with fulsome litigation support consulting and e-discovery services that include data collection, data processing, secure data hosting, general litigation support and project management. TransPerfect is the third largest e-discovery service provider in the world and a leading provider of legal support services with over 20 years of experience providing such services to every AmLaw 200 and Global 100 law firm, as well as virtually every Fortune 500 company. TransPerfect is supported by over 100 offices on six continents, including over 20 production centers with the ability to provide expedited document review and production services, Relativity hosting, and analysis by licensed attorneys.

7. Subject to Court approval, the Debtor has agreed to compensate TransPerfect, including partners, managing directors, directors, senior managers, managers, independent contractors, employees, and administrative staff employed by TransPerfect as necessary, for providing the Services. Attached to this Declaration as Exhibit 1 is a copy of the TLS Case Agreement (the "Engagement Agreement"), dated December 6, 2023, that will govern the scope and terms of the Services TransPerfect is providing to the Debtor. Although the Engagement Agreement was signed on December 6, 2023, TransPerfect did not provide any services to the RCASF until December 21, 2023, at which time the Court approved the stipulated protective order between the Debtor and the Committee. TransPerfect has since reviewed and executed that Acknowledgement and Agreement to Be Bound by the Protective Order.

8. The fees and expenses described in the Application, this declaration, and the Engagement Agreement are comparable to compensation generally charged by litigation support consultants similar to TransPerfect for similar engagements. The Debtor also has agreed to reimburse TransPerfect for reasonable expenses incurred on the Debtor's behalf, including, but not limited to, reasonable and customary out-of-pocket expenses that are billed directly to the engagement, subject to the guidelines set forth by the Office of the United States Trustee ("U.S. Trustee") and Court approval.

9.     The Debtor has not paid TransPerfect a retainer for any services performed or to be performed by TransPerfect on behalf of the Debtor, and to date, the RCASF has not paid TransPerfect for any fees and expenses incurred by TransPerfect on behalf of the RCASF.  As of December 31, 2023, TransPerfect has invoiced the RCASF for $905.06 for services performed between December 21, 2023, and December 31, 2023.  A true and correct copy of TransPerfect's invoice to the RCASF for services performed by December 21, 2023, and December 31, 2023, is attached to this declaration as Exhibit 2.  The attached invoice is consistent with the type of invoice customarily generated and issued to clients in TransPerfect's ordinary course of business.  TransPerfect will continue billing for its services and issuing invoices to the RCASF in this manner in the ordinary course.

10.     TransPerfect understands that payments made to compensate it for the services provided on behalf of the RCASF are subject to interim and final award and allowance by the Bankruptcy Court after notice and hearing.  Accordingly, TransPerfect will file interim monthly fee statements as well as interim and final fee applications seeking award and allowance of its fees and reimbursement of expenses as set forth in that certain *Order Establishing Procedures and Authorizing Payment of Professional Fees and Expenses on a Monthly Basis* [ECF No. 212] granting that *Motion for an Order Establishing Procedures and Authorizing Payment of Professional Fees and Expenses on a Monthly Basis* [ECF No. 132].

11.     TransPerfect maintains a computerized database of its clients and has performed a computerized conflict check to ensure the best of its knowledge that TransPerfect does not hold any interest adverse to the interests of the Debtor's estate.

12.     TransPerfect has agreed not to share with any person or entity any compensation received by it in the Bankruptcy Case, except as among the partners, managing directors, directors, senior managers, managers, independent contractors, employees, and administrative staff of TransPerfect.  Neither TransPerfect, nor any of the professionals that have provided services to the Debtor have any connection with the Debtor, its creditors, the United States Trustee, the bankruptcy judges of the United States Bankruptcy Court for the Northern District of California, or any other

party with an actual or potential interest in the Bankruptcy Case or its attorneys or accountants, except as set forth in this Declaration.

13.     TransPerfect personnel and their family members may have business associations with certain creditors of the Debtor unrelated to the Bankruptcy Case.  TransPerfect may have advisory or other commercial or professional relationships with such entities or persons completely unrelated to the Debtor or its business affairs.  No such relationships are in any way related to the Bankruptcy Case.  Additionally, in the ordinary course of its business, TransPerfect may engage counsel or other professionals in unrelated matters who now represent, or who may in the future represent, the Debtor, creditors, or other interested parties in the Bankruptcy Case and any related adversary proceeding.  Currently, TransPerfect only has a professional relationship with the Debtor's co-counsel of record in this case, Sheppard, Mullin, Richter & Hampton, LLP.  To the best of my knowledge, no other professional relationships exist between members of TransPerfect and other professionals involved or proposed to be involved in this case.

14.     If TransPerfect discovers additional information that requires disclosure, TransPerfect will file a supplemental disclosure with the Court.

15.     TransPerfect has not been retained to assist any entity or person other than the Debtor on matters relating to, or in connection with, the Bankruptcy Case or any related adversary proceeding.  If this Court approves the Debtor's proposed employment of TransPerfect, TransPerfect will not accept any engagement or perform any services for any entity or person other than the Debtor in the Bankruptcy Case or any related adversary proceeding.  TransPerfect will, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of the Debtor or parties in interest in the Bankruptcy Case, provided, however, that such services do not relate to, or have any direct connection with, the Bankruptcy Case or any related adversary proceeding.

16.     To the best of my knowledge, TransPerfect and the professionals that are providing services to the Debtor are disinterested persons who do not hold or represent an interest adverse to the Debtor's estate and do not have any connections with the Debtor, the Debtor's creditors, or any other party in interest or with their respective attorneys or accountants, or any judge of the United

States Bankruptcy Court for the Northern District of California, the United States Trustee, or any person employed in the office of the United States Trustee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of January, 2024, at Dallas, Texas.

DocuSigned by:

A56A96DED72D462

DAVID BRILL

DECLARATION OF DAVID BRILL IN SUPPORT OF
APPLICATION TO EMPLOY TRANSPERFECT

SMRH:4865-1612-7150.1

**EXHIBIT 1**

[Engagement Agreement]

DECLARATION OF DAVID BRILL IN SUPPORT OF
APPLICATION TO EMPLOY TRANSPERFECT – Ex. 1

# WE KNOW HOW™

## THE GLOBAL SOLUTION FOR LEGAL SUPPORT

# TLS

## CASE AGREEMENT

Sheppard Mullin Richter & Hampton, LLP
Roman Catholic Archbishop of San Francisco
December 6, 2023

| PREPARED FOR: | PREPARED BY: |
|---|---|
| Steven Gersten | Zoe Saumell |
| Associate | Account Executive |
| Sheppard Mullin | TransPerfect Legal Solutions |
| 2200 Ross Ave, FL 20 | 1717 Main St. Suite 3950 |
| Dallas, TX 75201 | Dallas, TX 75201 |
| SGersten@sheppardmullin.com | Zoe.Saumell@transperfect.com |
| 469-391-7444 | 469-203-1527 |



# AT A GLANCE





## $1.1
### BILLION
#### AND GROWING

**170+** **LANGUAGES** SUPPORTED

**29** YEARS OF **GROWTH** 

**116** CONSECUTIVE **PROFITABLE** QUARTERS



**120+** CITIES **WORLDWIDE**     **46** COUNTRIES     **6** CONTINENTS

| OUR TEAM | SUPPORTS **100%** OF AM LAW 200 AND GLOBAL 100 LAW FIRMS | PARTNERS WITH THE MAJORITY OF **FORTUNE 500** CORPORATE LEGAL DEPARTMENTS | OFFERS **24/7** CASE METRICS AND SPEND ANALYTICS THROUGH TELESCOPE DASHBOARD |
|---|---|---|---|



TRANSPERFECT LEGAL SOLUTIONS

# GLOBAL E-DISCOVERY PRODUCTION CENTERS

## AMERICAS

| | | | | | |
|---|---|---|---|---|---|
| Atlanta ■ ◆ | Cupertino | Mexico City | Philadelphia ■ ◆ | San José | West Palm Beach ■ |
| Austin ■ | Dallas ■ ◆ | Miami ■ ◆ | Phoenix | San Juan | Wilmington |
| Boston ■ ◆ | Denver ■ | Milwaukee | Pittsburgh | São Paulo | York |
| Boulder | Hartford | Minneapolis ■ | Portland | Seattle | |
| Buenos Aires | Honolulu | Montreal | Princeton ■ | Sioux Falls | |
| Charlotte | Houston ■ | New York ■ ◆ | Research | Tampa | |
| Chicago ■ ◆ | Las Vegas | Newark ■ | Triangle Park ■ | Tempe | |
| Cleveland ■ | Los Angeles ■ ◆ | Newport Beach ■ ◆ | Reston ■ | Toronto ■ ◆ | |
| Columbus | Maynard | Newton | San Diego | Vancouver ■ | |
| Corvallis | Medellín | Orlando | San Francisco ■ ◆ | Washington, DC ■ ◆ | |

## EMEA

| | | | |
|---|---|---|---|
| Amsterdam ■ ◆ | Dublin | Manchester | Sophia Antipolis |
| Athens | Düsseldorf | Milan | Stockholm |
| Barcelona | Edinburgh | Montpellier | Tel Aviv |
| Berlin | Geneva | Munich | Utrecht |
| Bordeaux | Helsinki | Oslo | Vienna |
| Brussels | Johannesburg | Palma | Warsaw |
| Bucharest | Kragujevac | Paris | Zurich |
| Budapest | Lisbon | Prague | |
| Casablanca | London ■ ◆ | Rennes | |
| Copenhagen | Luxembourg | Rome | |
| Dubai ■ ◆ | Madrid | Saint Petersburg | |

## APAC

| | |
|---|---|
| Bangkok | Shanghai |
| Beijing ■ | Shenzhen |
| Chennai | Singapore |
| Hong Kong ■ ◆ | Sydney ■ ◆ |
| Melbourne ■ | Taipei |
| Pune ■ | Tokyo |
| Seoul | |

■ Global E-Discovery Production Centers
◆ Digital Forensic Labs

## REGIONAL HEADQUARTERS



**NEW YORK**

1250 Broadway
32nd Floor
New York, NY 10001
+1 212.689.5555



**LONDON**

Aldgate House, 1st Floor
33 Aldgate High Street
London, EC3N 1AH
+44 20.7061.2000



**HONG KONG**

19F, YF Life Tower
33 Lockhart Road
Wan Chai, Hong Kong
+852 2292.9900

## OFFICES IN OVER 100 CITIES WORLDWIDE

# WHO WE ARE

TransPerfect Legal Solutions (TLS) is a division of TransPerfect—the world's leading privately held provider of language services and technology solutions. For over 20 years, TLS has been the trusted provider of legal support services to every Am Law 200 and Global 100 law firm, as well as virtually every Fortune 500 company. Supported by over 100 offices on 6 continents, including 20+ production centers, we have established round-the-clock production capabilities that enable us to offer the fastest turnaround times in the industry. At TLS, we can ensure accurate, specialized, and timely solutions backed by second-to-none client service.

# WHAT WE DO

| | |
|---|---|
| **Forensic Technology & Consulting** | TLS forensic data technologists are based around the world and can complete the most demanding and sensitive assignments with the highest level of technical expertise. |
| **E-Discovery & Early Data Assessment** | Digital Reef is the world's fastest e-discovery engine capable of processing up to 17 TB per day. TLS is the third-largest e-discovery service provider in the world measured by Relativity user licenses, and our hosting team is made up of certified PMs and battle-tested support personnel. |
| **Managed Review & Legal Staffing** | With TLS managed review facilities in major markets around the globe, we handle review engagements of any size, scope, and subject—including large volume and multi-language reviews—anywhere in the world. |
| **Language Services** | TLS translates more legal documents than any other company worldwide. Our proven record shows a long-standing commitment to quality, speed, and subject-area expertise for international litigation. |
| **Deposition & Trial Support** | TLS supports the entire trial process from planning through execution, including vetting and scheduling court reporters, formulating presentation strategy, preparing electronic exhibits, and assembling video clips and transcripts for trial use. |
| **Paper Discovery & Production** | We've built a network of reprographic support locations in major markets around the world, allowing us to offer expedited service and enhanced logistics for pick-up and delivery. |

v.392030

# SCOPE

Pursuant to this Case Agreement ("Agreement") and subject to entry of an order by the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") approving this Agreement and authorizing the Roman Catholic Archbishop of San Francisco ("RCASF" or "Client") to enter into this Agreement, TransPerfect Document Management, Inc. and/or Chancery Staffing Solutions, LLC (d/b/a TransPerfect Staffing Solutions) (collectively, "TransPerfect Legal Solutions" or "TLS"), will provide some, if not all, of the services described herein to the Client.[1]

- Forensic collection and preservation
- Data processing and advanced culling
- Relativity hosting
- Contract review attorneys
- Court reporting

# FORENSIC SERVICE CASE PARAMETERS

- Administrator credentials/access will be provided to all workstations/devices/servers/environments and an IT representative will be available to assist TLS FT&C staff as needed.
- Work will be conducted during normal business hours: 8:00 AM to 8:00 PM, Monday through Friday. Nighttime hours (8:00 PM to 8:00 AM, Monday through Thursday) and weekend hours (8:00 PM Friday through 8:00 AM Monday) will be invoiced at an hourly rate of $445 per hour.
- Expenses for this project may include items such as transportation costs (airfare, car rental, taxi, fuel, tolls, hotel, etc.) and other unforeseen expenses related to carrying out the engagement as required. Expenses are invoiced at cost.
- Work pertaining to additional tasks that fall outside of the scope of the provided cost estimate and if encryption is encountered will be invoiced at our standard hourly rate of $295 per hour.
- The quantities listed below for hourly tasks are estimates based on years of experience. Ultimately, however, we will bill for the hours actually spent on the task, which can be shorter or greater than the estimate.
- Senior Forensic Consulting hours are incurred by Managers or Directors in the FT&C division to, e.g., consult with clients on advanced forensics workflows, prepare clients for meet-and-confers or negotiations with opposing counsel, explain the content of forensic reports and perform quality control checks on forensic acquisitions which will be invoiced at an hourly rate of $350 per hour.
- Due to Covid-19 and the government restrictions that have been imposed to control the spread of the pandemic, certain forensic tasks may be executed from the home offices of forensic practitioners (e.g., if Client needs to send a computer in for imaging in a jurisdiction with "shelter in place" restrictions). To maintain our commitment to client service while ensuring the utmost security and confidentiality around home office forensic projects, TLS has vetted our practitioners' home office environments and restricted such services to home offices satisfying the security and confidentiality protocols established by TLS. If the Client prefers to redirect such work to a forensic laboratory in a jurisdiction that has ended its shelter in place requirements, TLS can accommodate that request, but additional time and costs may be incurred.

---

[1] TransPerfect Staffing Solutions is the legal entity that executes document review services. TransPerfect Document Management is the legal entity that executes all other services under this Agreement, including forensics, e-discovery, deposition, paper discovery and language services.

v.392030

- The prices listed below for remote kit rentals are charged a one-time $85 rate. However, should the equipment not be returned in a timely manner, TLS reserves the right to charge $750.00 daily after 3 days from shipment receipt.

# MANAGED REVIEW PARAMETERS

| | |
|---|---|
| Project Details | • Onsite Document Reviewers |
| Required Background/Skills | • Licensed Attorney in any US Jurisdiction |
| TLS Responsibilities | • Identification of Document Reviewers<br>• "Payrolling" of Document Reviewers |
| Client/Counsel Responsibilities | • Counsel shall properly allocate work, direct, and supervise the Document Reviewer(s) performing work for Client.<br>• Counsel shall ensure that the Document Reviewer(s) are selected, directed, and supervised by a licensed attorney who maintains an attorney-client relationship on the matter. |
| Hourly Rate | • Estimated at the rates below, per Document Reviewer.<br>• Hours worked in excess of 40 per week per Document Reviewer will be billed at the overtime rate of 1.5 times the hourly rate. Written approval from RCASF is required before Document Reviewers may work/bill over 40 hours in a week.<br>• For reviews occurring in California, the below overtime rates apply:<br>   ○ Daily overtime: 1.5 pay for any hours over eight (8) and double pay (2 x regular rate) for any hours over twelve (12)<br>   ○ Weekly overtime: 1.5 for any hours over 40<br>   ○ 7th consecutive day: 1.5 for first eight (8) hours and double pay for any hours over eight (8)<br>• The payroll workweek starts on Saturday and ends on Friday.<br>• Engagements lasting a continuous 6 months or longer will accumulate reviewer paid time off billed to Client. A maximum of 3 paid days off per reviewer will be billed to the client.<br>• A weekend facilities management fee of $50 per reviewer per weekend day will be billed for each reviewer on-site working on a Saturday or Sunday as directed and approved by Client.<br><br>• It will be the responsibility of Client to electronically approve time records within 48 hours of receiving the time records from a TLS staff member. Hours not approved nor disputed by this point will be considered approved by the Client, subject to final review and approval by the Bankruptcy Court as part of Client's chapter 11 bankruptcy case, *In re Roman Catholic Archbishop of San Francisco*, Case No. 23-30564 (the "Bankruptcy Case"). All hours will be rounded up to the nearest one-tenth of an hour.<br>• Failure to cancel a scheduled workday, or request the release of a specific Document Reviewer, without at least 24 hours' notice will result in a charge equivalent to 4 hours of work per assigned Document Reviewer. |
| Terms & Definitions | • This Agreement is between TLS and RCASF, being represented by Sheppard Mullin Richter & Hampton LLP ("SHEPPARD MULLIN") as general bankruptcy co-counsel in the Bankruptcy Case. |

v.392030

| | | | |
|---|---|---|---|
| | | | • For purposes of this Agreement, "The Roman Catholic Archbishop of San Francisco" and "RCASF" refer to and include CLIENT and its parents, subsidiaries, affiliates, and successors. |
| OSHA Compliance | | | • Should Client control the facilities in which assigned Document Reviewers work, it is agreed that Client is primarily responsible for compliance with the Occupational Safety and Health Act and comparable country and state laws and regulations there under, to the extent those laws apply to assigned Document Reviewers assigned to Client's facility. |

# PRICING

| | Service | Unit | Rate |
|---|---|---|---|
| **PHASE I**<br>**Forensic Collection** | Standard Forensic Acquisitions | Hour | $315.00 |
| | Forensic Consulting & Analysis | Each | $375.00 |
| | Senior Forensic Consulting | Hour | $595.00 |
| | Remote Collection Kit – Domestic | Each | $85.00 |
| | Storage Media – 1 TB | Set | $230.00 |
| **PHASE II**<br>**Data Processing** | Pre-Review Analytics* | GB | WAIVED |
| | Ingestion | GB | $10.00 |
| | ECA Hosting | GB | $2.00 |
| | Export for Review | GB | $75.00 |
| **PHASE III**<br>**Review** | US-Based Review Attorney – English | Hour | $50.00 |
| | Off-Shore Review Attorney – English | Hour | $28.00 |
| | Review Manager – English | Hour | $85.00 |
| | Project Manager | Hour | $125.00 |
| **PHASE IV**<br>**Production & Hosting** | Relativity Hosting – Monthly | GB | $6.00 |
| | Relativity User License – Monthly | Each | $75.00 |
| | Production | GB | $250.00 |
| | Technology-Assisted-Review | Doc | WAIVED |
| | Project Management* | Hour | $175.00 |
| | Senior Project Management* | Hour | $275.00 |
| | Consulting* | Hour | $450.00 |
| **PHASE V**<br>**Depo Support** | Court Reporter and Videographer | Jurisdictional | Available upon request |

v.392030

# DETAILS FOR E-DISCOVERY PROJECTS

| | |
|---|---|
| **\*Pre-Review Analytics** | This service is complimentary when using Digital Reef, TLS's proprietary processing platform, to process data<br><br>Pre-Review Analytics® includes the following:<br>• **Cull:** Date filters, Boolean searches, email domain lists, case word lists, etc.<br>• **Learn:** Detailed reporting, date histograms, pattern recognition, including PII, PHI and PCI.<br>• **Analyze:** "Find More Like This," Clustering, Near Dupe analysis.<br>• **Organize:** Custodian views, custom tags and folders, discard pile.<br>• **Validate:** Quality check results with comparison sets and random samples.<br>Using Pre-Review Analytics®, TLS regularly increases filtering rates from the industry standard rate (80%) up to as high as 95%, thus substantially lowering downstream costs. |
| **\*Project Management** | TLS Project Management:<br>• Oversee and coordinate data from collections through processing, hosting, review, and production<br>• Format, run, revise, and report on search terms, date ranges, and other filtering criteria for data culling<br>• Provide data and production tracking/reporting<br>• Conduct Relativity/Digital Reef training<br>• Prepare reports on data types, data volumes, and review metrics<br>• Setup and manage review database, including structure and workflows<br>• Prepare and execute document productions<br>• Load, organize, and index data in review database |
| **\*Senior Project Management** | TLS Senior Project Management:<br>• Perform advanced ECA analysis/complex filtering criteria<br>• Review and advise on ESI stipulation specifications<br>• Execute Relativity Structured Analytics + update TAR rankings<br>• Implementing advanced or complex review workflows, including pre-save event handlers<br>• Perform complex or custom reporting/analyze search term results and suggest alterations |
| **\*Consulting** | TLS Consulting:<br>• TAR, CAL, Analytics, and multi-lingual consulting<br>• Advise and Execute Custom Redaction workflows (including duplicate propagation and PII mass redaction)<br>• Custom scripting and application development<br>• Custom deduplication<br>• Consult regarding external databases, applications, and non-standard data sources<br>• Assist on construction of foreign-language search terms<br>• Advise on cross-border data transfers and privacy concerns<br>• Advise on atypical, unorthodox, burdensome ESI stipulations<br>• Provide overall eDiscovery strategy consulting |
| **\*Senior Consulting** | TLS Senior Consulting:<br>• Consult on spoliation motion practice<br>• Provide affidavits and expert testimony<br>• Develop legal hold strategy and implementation<br>• Prepare counsel for (or conduct directly) Rule 26f conference<br>• Design and negotiate TAR and translation protocols |

v.392030

# TERMS AND CONDITIONS

1. <u>Invoicing and Payment for Non-Staffing Services.</u> RCASF has the sole responsibility to make full payment of all charges and expenses relating to the services contemplated in this Agreement (the "Project") within thirty (30) days of entry of an order by the Bankruptcy Court awarding and allowing fees earned and reimbursement of expenses incurred by TLS and authorizing RCASF to make payment(s) to TLS.. Applicable taxes may be added to Client's invoices and are payable by Client. Invoices not paid within the foregoing period or disputed in accordance with Section 3 below are hereby deemed delinquent ("Delinquent Invoices"). In the event that the duration of any Project extends beyond thirty (30) days, the Client will be invoiced according to the billing schedule contained in this Agreement (if any) or for work completed to date in 30-day intervals. Collection of related payments from any third party (including, without limitation, any client of the Client) is a private matter of the Client and shall not affect the Client's responsibility for payment to TLS. Upon signing this Agreement, Client shall provide TLS with any special address, internal coding or purchase order number to ensure that Client's payments to TLS is remitted in accordance with this Agreement and any other applicable agreement, and Client's failure to provide such information shall not relieve Client of the provisions of this Paragraph. As of the first anniversary of the date hereof, and on each anniversary thereafter, TLS shall increase all fees covered by this Agreement and any related SOW by ten percent (10%). Invoices shall be sent to RCASF, care of Paula Carney, with copy to SHEPPARD MULLIN care of STEVEN GERSTEN. Any amounts payable to any aggregator, third party vendor manager, business process outsourcing company or other third party retained by Client which charges a fee for the processing and/or payment of any invoice from Client to TLS shall be paid by the Client or may be added to the amount of each applicable invoice. In the event TLS is required to re-submit an invoice for any reason, the time period for payment hereunder shall continue to be measured from the date of receipt of the initial invoice.

2. <u>Invoicing and Payment for Staffing Services Only:</u>
To the extent that a Project includes Staffing services (i.e., supplying contract review attorneys or non-attorney reviewers (a "Document Reviewer")), the terms in this paragraph apply to such Staffing services.

TLS will invoice Client every month. Invoices shall be accompanied by the pertinent reviewer timesheets or applicable electronic records pertaining to time worked and contain descriptions of the work performed corresponding to the time billed. Client's signature and/or electronic approval on TLS's timesheets certifies that the hours shown are correct and authorizes TLS to bill Client for the hours worked by the named Document Reviewer.

No Payroll Transfer: Client agrees not to directly or indirectly cause or permit any engaged Document Reviewer assigned to Client by TLS pursuant to this Agreement to transfer to another entity's payroll, or to perform services for Client while on the payroll of any person or firm other than TLS during the term of this Agreement and for a period of 12 months thereafter. If an engaged Document Reviewer is hired or engaged directly by Client, Client shall pay TLS a fee equal to:
- 20% of the Document Reviewer's annualized hourly bill rate (hourly bill rate X 2080) if the Document Reviewer is hired/engaged from days 0 to 60.
- 15% of the Document Reviewer's annualized hourly bill rate (hourly bill rate X 2080) if the Document Reviewer is hired/engaged from days 61 to 120.

- 10% of the Document Reviewer's annualized hourly bill rate (hourly bill rate X 2080) if the Document Reviewer is hired/engaged any time after day 121.

This provision shall survive termination of this Agreement.

3. <u>Unpaid Invoices.</u> TLS reserves the right to suspend or terminate any Project and performance hereunder and under all other agreements with the Client if the Client has any Delinquent Invoices or falls into arrears. Further, Delinquent Invoices are subject to interest of one and a half percent (1.5%) per month on any outstanding balance, or the maximum permitted by law, whichever is less. Invoices Shall Not Be Considered Delinquent Invoices until 30 days after the Bankruptcy Court approves payment of the Invoice. In the event that Client disputes any invoiced amount in good faith, Client shall (i) notify TLS of such disputed within thirty (30) days of receipt of the disputed amount; (ii) pay all undisputed sums in accordance with Section 1 of this Agreement; and (iii) work with TLS in good faith to resolve such dispute promptly. In the event Client fails to make any undisputed payment due under this Agreement, Client shall reimburse TLS for its fees, expenses and costs of collection, including without limitation, court costs and reasonable attorneys' fees.

4. <u>Changes to Project; AI Usage.</u> A) Should the Client change the parameters of a Project while it is in progress (e.g., turnaround time accelerated, source files not provided on time, project's scope/size expanded, etc.), TLS reserves the right to bill additional charges and/or extend the deadline for performance in accordance with the change requested. Further, should the Client request additional services to be performed, then such services will be billed to Client. Client agrees to pay any charges billed in accordance with this Paragraph 3 in addition to any charges set forth in this Agreement. Any additional charges to the Client will be billed at the rates set forth in this Agreement and are not billed as an "upcharge" or "surcharge."

b) Client hereby grants to TLS all rights and permissions in or relating to all information, data, records and other materials that are uploaded or otherwise received, directly or indirectly, from Client ("Client Data") to process such Client Data, in compliance with its confidentiality obligations.

5. <u>Notice of Concerns.</u> The Client must notify TLS of any concerns with TLS' performance of a Project within thirty (30) days of receipt of deliverables or completion of services or service milestones (as set forth in this Agreement) via certified letter (return receipt requested) or via electronic mail to a TLS account representative. If TLS is not so notified, the Client waives all rights and claims arising out of such performance. With respect to any certification or other document that may be issued by TSS attesting to the scope of work done and the conformity of such work with any applicable laws, rules, regulations, specifications, workflow requirements or industry standards, such certification is limited to the work actually undertaken by TSS pursuant hereto and in accordance with Client's specific instructions.

6. <u>Limitation of Liability.</u>
a) TLS EXPRESSLY DISCLAIMS ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, NONINFRINGEMENT AND THOSE ARISING

v.392030

STATUTE OR OTHERWISE IN LAW OR FROM A COURSE OF DEALING OR USE OF TRADE) TO THE FULLEST EXTENT PERMITTED BY LAW, WHETHER RELATED TO THE PROVISION OF SERVICES PROVIDED UNDER THIS AGREEMENT OR OTHERWISE.

b) IN NO EVENT SHALL TLS OR ANY OF ITS PARENTS, SUBSIDIARIES OR AFFILIATES BE LIABLE UNDER ANY THEORY AT LAW OR OTHERWISE, TO CLIENT OR ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO LOSS OF PROFITS OR REVENUES, LOSS OF SAVINGS OR THE FAILURE OF CLIENT (OR ITS CLIENT) TO RECEIVE THE BENEFITS IT EXPECTS TO DERIVE FROM THE SERVICES, EVEN IF TLS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN THE EVENT THAT CLIENT IS ENTITLED TO RECOVER DAMAGES FROM TLS, ALL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT AND TLS'S PERFORMANCE OF SERVICES PROVIDED HEREUNDER ARE LIMITED, REGARDLESS OF CAUSE, INCLUDING, BUT NOT LIMITED TO, ANY CLAIM, LOSS OR DAMAGES UNDER ANY THEORY OF LAW, INCLUDING CONTRACT, TORT, OR NEGLIGENCE, TO A MAXIMUM AGGREGATE AMOUNT EQUAL TO THE AMOUNT OF FEES ACTUALLY PAID BY CLIENT TO TLS FOR THE SERVICES PROVIDED UNDER THIS AGREEMENT.

c) THE SERVICES PROVIDED UNDER THIS AGREEMENT MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF EQUIPMENT AND TECHNOLOGY TO PROVIDE OR DELIVER THE SERVICES. TLS DOES NOT GUARANTEE THAT THE SERVICES WILL BE PERFORMED ERROR-FREE OR UNINTERRUPTED. TLS IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

d) Any action against TLS in connection with or arising out of services performed under this Agreement must be commenced within 1 year after the claim arose.

e) Client acknowledges that: (i) TLS has relied on the enforceability of the disclaimers and limitations contained herein in entering into this Agreement (collectively, the "Limitations"), (ii) the Limitations have been separately negotiated and form an essential part of this Agreement, and (iii) the parties desire that the Limitations be enforceable even if any provided remedies fail of their essential purposes.

7.  Indemnification.
a) The Client shall indemnify, defend and hold harmless TLS, its Affiliates and each of their respective owners, principals, managers, representatives, partners, officers, directors, agents and employees against any and all claims, damages, losses, judgments, settlements, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively, "Losses") incurred by TLS with respect to claims or demands by a third party against TLS to the extent arising out of or related to (i) any gross negligence or willful misconduct by the Client; (ii) infringement of a third party's intellectual property rights by any materials, data or information provided to TLS by Client, (iii) an act or negligence by Client that constitutes a breach of privacy law (e.g. unlawful processing, storage or data leakage and (iv) any tangible property damage or personal injury caused by Client in performance of their obligations under this Agreement. In the event TLS or any of its Affiliates receive a subpoena, document request or other legal demand for information in connection with any work done for Client hereunder, the Client shall pay all fees, costs and expenses incurred by TLS and such Affiliate in responding thereto, including, without limitation, the collection, processing and reviewing of documents in response to the subpoena, document request or other legal demand for information

and any fees, costs and expenses incurred in motion practice related thereto. As used herein, "Affiliate" shall mean any persons or entity now or hereafter in control, controlled by or under common control with a party hereto and shall also include any direct or indirect subsidiary of any of the foregoing and any company in which such party has more than a ten percent (10%) ownership interest.

b) TLS shall indemnify, defend and hold harmless Client, and its Affiliates and each of their respective owners, principals, managers, representatives, partners, officers, directors, agents and employees against any and all Losses incurred by Client with respect to claims or demands by a third party against Client to the extent arising out of or related to (i) any gross negligence or willful misconduct by TLS; and (ii) any tangible property damage or personal injury caused by TLS in performance of its obligations under the Agreement.

c) Client shall use reasonable efforts to seek full recovery under all insurance policies and/or indemnification agreements with third parties to the same extent as Client would if the applicable claim were not subject to indemnification hereunder. In the event an insurance or other recovery is made at any time within two (2) years of an indemnification payment by TLS with respect to such claim, then, to the extent of the amount of such payment, a refund equal to the aggregate net amount of the recovery shall be made promptly to TLS.

d) The obligation of any indemnifying party to defend, indemnify and hold harmless any indemnified party is subject to the indemnified parties: (i) notifying the indemnifying parties in writing no later than forty-five (45) days after receipt by an indemnified party of notification of a potential claim; (ii) giving the indemnifying parties sole control over the defense and settlement of any such claim; (iii) providing the indemnifying parties full cooperation for the defense of any such claim, at the indemnifying parties' expense; and (iv) not entering into any settlement or compromise of any such claim without the prior written approval of the indemnifying parties.

e) THE EXPRESS PROVISIONS OF THIS SECTION ARE IN LIEU OF, AND TO THE EXCLUSION OF, ALL OTHER INDEMNITY AND CONTRIBUTION OBLIGATIONS OF ANY KIND, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, RELATING TO THE CLAIMS, AND ALL SUCH INDEMNITY AND CONTRIBUTION OBLIGATIONS ARE EXCLUDED FROM THIS AGREEMENT AND WAIVED TO THE FULLEST EXTENT NOT PROHIBITED BY LAW.

8.  Remedies; Waiver. In the event of a breach, violation or default of this Agreement, nothing herein shall prevent the non-breaching party from pursuing all remedies it is now or hereafter entitled to under law or in equity. If TLS must resort to collection of Delinquent Invoices by an agency or through legal action, the Client agrees to pay collection fees and reasonable attorney fees incurred by TLS. A party's failure to insist, in one or more instances, upon the strict performance of any provision herein, or failure or delay to take advantage of any of its rights or remedies hereunder, or failure to notify the other party of any breach, violation, or default, shall not be construed as a waiver of any such performance, provision, rights, remedies, breach, violation or default either then or in the future.

9.  Confidentiality. Each party agrees that all materials, data or information received by it from the other party is confidential and proprietary, whether or not expressly designated as such ("Confidential Material"), and agrees to use its best efforts to protect the confidentiality of the Confidential Material using at least the same measures it takes to protect its own confidential information of like kind, and shall restrict access to Confidential Material to its employees,

v.392030

contractors and agents (collectively "Personnel") on a need to know basis and to those performing the Project(s), and agrees not to disclose the Confidential Material to any third party, except as contemplated by the Project, without the disclosing party's prior authorization or unless directed to do so by court order. TLS further agrees that, to the extent applicable to any documents provided to TLS, it will review, acknowledge, abide by, and, as applicable, sign any protective order entered in the Bankruptcy Case, including, if necessary, ensuring that each of its Personnel with access to the documents provided by Client has reviewed and signed the Protective Order. Additionally, each party agrees that the terms or proposed terms of this Agreement shall be deemed Confidential Material and not disclosed to any third parties except that this Agreement may be filed with the Bankruptcy Court as necessary for the RCASF to employ TLS. The recipient shall be liable for any breach of this Agreement by any of its Personnel or other third parties to whom it discloses Confidential Material. In the event either party receives a subpoena or other validly issued administrative or judicial process requesting information that constitutes Confidential Material in accordance with this Paragraph 8, the receiving party shall promptly notify the other party of such receipt to the extent permitted by law, so that the other party may seek a protective order or other appropriate relief and the receiving party may, thereafter, comply with such subpoena or process, provided that the information so disclosed shall, except for such required disclosure, continue to be maintained in confidence by recipient as Confidential Material pursuant hereto. The receiving party shall immediately give notice to the disclosing party of any unauthorized use or disclosure of disclosing party's Confidential Material. The receiving party agrees to assist the disclosing party in remedying any such unauthorized use or disclosure of disclosing party's Confidential Material. Confidential Material shall be returned or destroyed upon the request of the party designating such material as Confidential Material, or upon the completion or earlier termination of any work provided under this Agreement, and the cost of so returning the Confidential Material shall be borne by the party requesting its return.

10. Non-Solicitation; Non-Hiring. In addition to the restrictions set forth in Section 2 regarding future employment or other retention of Document Reviewers, during the period in which services are being performed under this Agreement, and for a period of one (1) year thereafter, neither Client nor any of its Affiliates shall, directly or indirectly, solicit the employment of, employ, or contract with, any other employee or contractor of TLS or any of its Affiliates with whom Client or any of its Affiliates had contact, either directly or indirectly, or whom performed the Project. If Client or any of its parents, affiliates or subsidiaries (or any of their respective parents, affiliates and subsidiaries) breaches this paragraph, Client shall pay as liquidated damages, and not as a penalty, the sum of $75,000 per individual, which such amount the parties agree bears a reasonable relationable proportion to the probable loss. The parties hereto acknowledge and agree that liquidated damages is an appropriate remedy for a breach of this paragraph. If TLS waives its right to such liquidated damages, Client shall reimburse TLS mutually agreed upon costs of external recruitment, training, and lost revenues.

11. No oral modification or waiver. Neither this Agreement nor the terms of any Project may be orally modified. Only a modification in writing, agreed to by both parties, will be enforceable. Either party may give its authorization to any written modification via electronic mail which shall constitute such party's written agreement to such modification. No waiver of any breach hereof will be effective unless in writing and signed by an authorized representative of the party against whom enforcement is sought. No waiver of any breach of the terms of any Project or this Agreement and no course of dealing between the

parties will be construed as a waiver of any subsequent breach of such terms or this Agreement.

12. Force Majeure. Performance by TLS of any Project is excused as long as, and to the extent that, such performance is prevented by events outside of TLS' reasonable control (each a "Force Majeure Event"), including, but not limited to, an act of God, act of public enemy or terrorist, epidemic, pandemic, quarantine, embargo, war (whether declared or undeclared), civil disturbance, restraint of any governments, ruler or people, or any other event, whether similar or dissimilar, that affects TLS or its suppliers.

13. Severability. If any term, clause, or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and the invalid term, clause or provision shall be deemed to be severed from this Agreement.

14. Termination. Either party may terminate this Agreement without cause upon giving the other party thirty (30) days prior written notice. During the thirty (30) day termination period, Client shall maintain TLS staffing levels existing at the time of the notice of termination and shall reimburse TLS for any reasonable demobilization expenses such as equipment, personnel or real estate lease terminations, etc. The effective termination date shall be the last day of such thirty (30) day termination period and Client shall be responsible for paying all fees, expenses and other monies incurred up to and including the effective termination date, including for all undisputed products and services provided at the rates agreed to within this Agreement, In the event the use of any Technology Services is terminated prior to the end of the then-existing term of the applicable license for any reason other than cause, Client shall pay a cancellation fee equal to one hundred percent (100%) of the total fees payable for the unexpired term of such license. In the event any portion of the fees for such Technology Services are based on usage, the fees shall be calculated based on the prior 12 month average (or such lesser period if the license has been in effect for less than 12 months) of the monthly fees paid for such Technology Services. As used herein, "Technology Services" means all software, SaaS application services, hosting, and product integrations licensed hereunder.

Either party may terminate this Agreement for any continued material and substantial breach of the terms and conditions of this Agreement upon giving the other party fifteen (15) days prior written notice identifying specifically the alleged breach, provided that the breaching party does not cure such breach within the fifteen (15) day notice period (or commence such cure with respect to any breach that will reasonably take longer than fifteen (15) days to cure).

15. Future Projects. The Client may place any future orders for copying, scanning, document management or litigation support services from TLS, by electronic mail to TLS, which shall constitute authorization by the Client for any projects and services set forth in such order, and shall constitute the Client's acceptance that any such order shall be subject to this Agreement.

16. Data Storage/Return Upon Project Completion or Termination. Client agrees to notify TLS when a Project (or the litigation or investigation with respect to which a Project relates) is closed and/or no longer active. At such time, it is TLS's policy to securely destroy the electronically-stored information (ESI) that is in TLS's possession by (a) securely purging it from our servers and stored media and (b) providing to Client a Certificate of Destruction. If Client prefers that TLS securely

v.392030

return the ESI to Client prior to remediation from TLS's systems, or that TLS continue to store the ESI for Client, additional fees will apply.

17. <u>GDPR Compliance.</u> In order for the parties to comply with EU General Data Protection Regulation 2016/679 (the "**GDPR**"), Client acknowledges and agrees that it shall notify TLS in writing at such time as Client provides any documents or information to TLS containing "personal data" of European citizens (a "GDPR-Governed Project"). The parties further agree that for any GDPR-Governed Projects, the parties will execute a Data Protection Addendum Addressing Article 28 GDPR (Processor Terms) and Incorporating Standard Contractual Clauses for Controller to Processor Transfers of Personal Data from the EEA to a Third Country (the "GDPR Addendum").

18. <u>Governing Law; Dispute Resolution.</u> This Agreement and all rights and obligations of the parties relating hereto shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any conflicts of law rules that would cause the application of the laws of any other jurisdiction. Any and all claims arising under or relating directly or indirectly to this Agreement, whether sounding in contract or tort, shall be exclusively brought in and subject to the exclusive jurisdiction of the Bankruptcy Court.

19. <u>No Legal Advice.</u> Client acknowledges and understands that neither TLS nor any of its employees will be providing legal advice to Client and that an attorney-client relationship does not exist between TLS and Client. Client agrees not to request that TLS provide legal advice in connection with this Agreement or the Project. Notwithstanding the foregoing, the parties acknowledge that TLS is being engaged to assist Client's counsel's representation of Client and that TLS may obtain information from Client or its counsel that may be subject to the attorney-client, work-product and/or other applicable privileges and that such information is being provided to TLS without any waiver of such privileges by Client.

20. <u>Entire Agreement.</u> This Agreement represents the full and complete agreement with respect to the subject matter set forth herein, and supersedes any other agreements, promises, representations, whether written or oral.

21. <u>Survival.</u> The terms of Paragraphs 1, 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 18, 20 and 21, and other paragraphs which by their nature are intended to extend beyond termination, shall survive termination of this Agreement for any reason.

The contents of this Agreement are proprietary to TLS. Client shall not, without the prior written consent of TLS, disclose this document or the contents herein to any third party.

In Witness, whereof, the parties hereto have caused this Agreement to be executed by their duly authorized officers or agents as of the day and year written below.

TRANSPERFECT LEGAL SOLUTIONS

Signature: _____

Printed Name:

Title:

Date:

The Roman Catholic Archbishop of San Francisco

Signature: _[signature]_____

Printed Name: _REV. PATRICK J. SUMMERHAYS_

Title: _VICAR GENERAL / MODERATOR OF THE CURIA_

Date: _12/6/23_

BILLING INFORMATION

Name: _PAULA CARNEY_

Title: _GENERAL COUNSEL_

Company: _ARCHDIOCESE OF SAN FRANCISCO_

Case/Reference No.: _23 - 30564_

Address 1: _1 PETER YORKE WAY_

Address 2: _SAN FRANCISCO, CA 94109_

Email: _carneyp@sfarch.org_

Phone: _(415) 614-5623_

v.392030

return the ESI to Client prior to remediation from TLS's systems, or that TLS continue to store the ESI for Client, additional fees will apply.

17. GDPR Compliance. In order for the parties to comply with EU General Data Protection Regulation 2016/679 (the "GDPR"), Client acknowledges and agrees that it shall notify TLS in writing at such time as Client provides any documents or information to TLS containing "personal data" of European citizens (a "GDPR-Governed Project"). The parties further agree that for any GDPR-Governed Projects, the parties will execute a Data Protection Addendum Addressing Article 28 GDPR (Processor Terms) and Incorporating Standard Contractual Clauses for Controller to Processor Transfers of Personal Data from the EEA to a Third Country (the "GDPR Addendum").

18. Governing Law; Dispute Resolution. This Agreement and all rights and obligations of the parties relating hereto shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any conflicts of law rules that would cause the application of the laws of any other jurisdiction. Any and all claims arising under or relating directly or indirectly to this Agreement, whether sounding in contract or tort, shall be exclusively brought in and subject to the exclusive jurisdiction of the Bankruptcy Court.

19. No Legal Advice. Client acknowledges and understands that neither TLS nor any of its employees will be providing legal advice to Client and that an attorney-client relationship does not exist between TLS and Client. Client agrees not to request that TLS provide legal advice in

connection with this Agreement or the Project. Notwithstanding the foregoing, the parties acknowledge that TLS is being engaged to assist Client's counsel's representation of Client and that TLS may obtain information from Client or its counsel that may be subject to the attorney-client, work-product and/or other applicable privileges and that such information is being provided to TLS without any waiver of such privileges by Client.

20. Entire Agreement. This Agreement represents the full and complete agreement with respect to the subject matter set forth herein, and supersedes any other agreements, promises, representations, whether written or oral.

21. Survival. The terms of Paragraphs 1, 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 18, 20 and 21, and other paragraphs which by their nature are intended to extend beyond termination, shall survive termination of this Agreement for any reason.

The contents of this Agreement are proprietary to TLS. Client shall not, without the prior written consent of TLS, disclose this document or the contents herein to any third party.

In Witness, whereof, the parties hereto have caused this Agreement to be executed by their duly authorized officers or agents as of the day and year written below.

TRANSPERFECT LEGAL SOLUTIONS

Signature: _Kevin Obarski_
Kevin Obarski (Dec 6, 2023 22:08 AST)

Printed Name: Kevin Obarski

Title: Chief Growth Officer

Date: Dec 6, 2023

The Roman Catholic Archbishop of San Francisco

Signature: _____

Printed Name:

Title:

Date:

BILLING INFORMATION

Name: _____

Title: _____

Company: _____

Case/Reference No.: _____

Address 1: _____

Address 2: _____

Email: _____

Phone: _____

v.392030

1

**Exhibit 2**

2

[Form of Invoice]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Please note that our address has changed**

**Bill To:**

Sheppard Mullin Richter & Hampton LLP
Attn: Steven Gersten
2200 Ross Ave
20th floor
Dallas, TX 75201
USA

**Requested By:**

Steven Gersten
Sheppard Mullin Richter & Hampton LLP
2200 Ross Ave
20th floor
Dallas, TX 75201
USA

| | | | |
|---|---|---|---|
| **Invoice #:** | 248078 | **Sales Contact:** | Zoe Saumell (zoe.saumell@transperfect.com) |
| **Invoice Date:** | 12/31/2023 | **Payment Terms:** | Net 30 |
| **Invoice Due:** | 01/30/2024 | | |
| **Contract #:** | **DM0277735** | **Purchase Order #:** | |
| **Case Name:** | RCASF Bankruptcy | **Matter #:** | RCASF Bankruptcy |

**Requested Date:** 12/07/2023
**Project Notes:**
 RCASF Hosting Month

| Description | Quantity | Unit | Unit Cost(US$) | Extended Cost(US$) |
|---|---|---|---|---|
| **2023 December** | | | | |
| Digital Reef Hosting - Adv ECA | 2.93 | GB | 2.000 | 5.86 |
| Monthly Storage Fees | 4.00 | GB | 6.000 | 24.00 |
| Project Management | 2.75 | Hours | 175.000 | 481.25 |
| Monthly User Access Fee | 2.00 | Each | 75.000 | 150.00 |
| **December 2023 - ESI** | | | | |
| Data Ingestion - Advanced ECA | 2.42 | GB | 10.000 | 24.20 |
| Data Export - Advanced ECA | 2.93 | GB | 75.000 | 219.75 |

| | |
|---|---|
| **Total to Bill This Contract:** | US$905.06 |
| **Tax Amount:** | US$0.00 |
| **Total Amount Due:** | **US$905.06** |

TRANSPERFECT LEGAL SOLUTIONS IS A DIVISION OF TRANSPERFECT
TRANSPERFECT GLOBAL HQ • 1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001
T +1 212.689.5555 F +1 212.689.1059 • E-MAIL AR@TRANSPERFECT.COM
WWW.TRANSPERFECT.COM

1 of 2

| **PAYMENT INSTRUCTIONS** | <span style="color:red">Please note, TransPerfect always prefers to receive payments electronically whenever possible.</span> |

<u>**Please remit payment to:**</u>
TransPerfect Document Management, Inc.
Attn.: Accounts Receivable
1250 Broadway, 32nd Floor
New York, NY 10001
212.689.5555
ar@transperfect.com

<u>**Wire Transfer Details:**</u>
**Flagstar Bank, N.A.**
**A/C #: 1500646914**
**ABA Routing #: 026013576**
**SWIFT CODE: SIGNUS33**

**Please reference the Contract # DM0277735 and Invoice # 248078 with your remittance.**
Interest will be charged at the rate of 1.5% per month (or the maximum allowed by law)
for accounts more than 30 days past due.

TRANSPERFECT LEGAL SOLUTIONS IS A DIVISION OF TRANSPERFECT
TRANSPERFECT GLOBAL HQ • 1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001
T +1 212.689.5555 F +1 212.689.1059 • E-MAIL AR@TRANSPERFECT.COM
WWW.TRANSPERFECT.COM

# DocuSign

## Certificate Of Completion

Envelope Id: 8263FAA8D68142F183DA062932E099A8   Status: Completed
Subject: Complete with DocuSign: RCASF - Declaration ISO Application to Employ TransPerfect 4883-1019-71...
Source Envelope:
Document Pages: 23   Signatures: 1   Envelope Originator:
Certificate Pages: 5   Initials: 0   Gianna Segretti
AutoNav: Enabled   333 South Hope Street, 43rd Floor
EnvelopeId Stamping: Disabled   Los Angeles, CA  90071
Time Zone: (UTC-08:00) Pacific Time (US & Canada)   GSegretti@sheppardmullin.com
IP Address: 12.146.203.103

## Record Tracking

Status: Original   Holder: Gianna Segretti   Location: DocuSign
        1/18/2024 3:49:47 PM          GSegretti@sheppardmullin.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| David Brill<br>dbrill@transperfect.com<br>Director, Strategic Accounts<br>Security Level: Email, Account Authentication (None) | *[signature: Drawn on Device]*<br>A56A96DFD72D462...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 174.244.24.37<br>Signed using mobile | Sent: 1/18/2024 3:57:14 PM<br>Viewed: 1/18/2024 3:59:37 PM<br>Signed: 1/18/2024 4:01:41 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/18/2024 3:59:37 PM<br>    ID: 90445763-3727-4389-a199-2d766145fb04 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Elizabeth Garcia<br>EGarcia@sheppardmullin.com<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 1/18/2024 3:57:14 PM<br>Viewed: 1/18/2024 4:10:14 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Gianna Segretti<br>gsegretti@sheppardmullin.com<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 1/18/2024 3:57:14 PM<br>Resent: 1/18/2024 4:01:45 PM<br>Viewed: 1/18/2024 4:02:35 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jeannie Kim<br>jekim@sheppardmullin.com<br>Sheppard, Mullin, Richter & Hampton LLP<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 1/18/2024 3:57:14 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/18/2024 3:57:14 PM |
| Certified Delivered | Security Checked | 1/18/2024 3:59:37 PM |
| Signing Complete | Security Checked | 1/18/2024 4:01:41 PM |
| Completed | Security Checked | 1/18/2024 4:01:41 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Sheppard, Mullin, Richter & Hampton LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Sheppard, Mullin, Richter & Hampton LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: DocuSignSupport@sheppardmullin.com

**To advise Sheppard, Mullin, Richter & Hampton LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at DocuSignSupport@sheppardmullin.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Sheppard, Mullin, Richter & Hampton LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email at DocuSignSupport@sheppardmullin.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Sheppard, Mullin, Richter & Hampton LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to DocuSignSupport@sheppardmullin.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Sheppard, Mullin, Richter & Hampton LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Sheppard, Mullin, Richter & Hampton LLP during the course of your relationship with Sheppard, Mullin, Richter & Hampton LLP.