James I. Stang (CA Bar No. 94435)
Debra I. Grassgreen (CA Bar No. 169978)
Andrew W. Caine (CA Bar No. 110345)
Brittany M. Michael *(Pro Hac Vice)*
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, California 94104-4436
Telephone: 415-263-7000
Email: jstang@pszjlaw.com
      dgrassgreen@pszjlaw.com
      acaine@pszjlaw.com
      bmichael@pszjlaw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>        Debtor. | Case No. 23-30564<br><br>Chapter 11<br><br>**COMMITTEE'S RESPONSE TO DECLARATION OF JOSEPH J. PASSARELLO IN SUPPORT OF CHAPTER 11 PETITION AND DEBTOR'S EMERGENCY MOTIONS**<br><br>[Relates to Docket No. 14]<br><br>Judge:   Hon. Dennis Montali |

**PRELIMINARY STATEMENT**

At least 550 children, ranging in ages from 2 to 17, were sexually abused in the Archdiocese of San Francisco. Each was profoundly affected by this most intimate physical and emotional violation. Upon passage of California's "window" in the statute of limitations, each had an opportunity to speak truth to power; their truth is what happened to them and how the Archdiocese, its parishes, and its affiliates are collectively responsible to redress their life-long harm. As one Committee member said to Archbishop Cordileone at the 341(a) meeting:

> As children, we were unprotected, we were victimized. We had no voice and no recourse. We were maimed, and this how we walked through life. . . . [A]s you pointed out and others have pointed out [because of the bankruptcy], we do not get a

day in court like other American citizens would get. We do not have an opportunity to have a voice before a judge and jury.[1]

On the first day of the case—before survivors were represented by an official creditors' committee and had time to sufficiently research the Archdiocese's unsupported statements and legal conclusions—the Archdiocese gave the Court its view of, among other topics, the "Debtor's Legal Structure", "[t]he Clergy Sex Abuse Crisis and the RCASF Response", and "Events Precipitating the Bankruptcy Case."[2] The Committee presents this response to that one-sided presentation.

This response, although not linked to any request for relief, is necessary to correct the record currently on this Court's docket. The Committee contests the Debtor's conclusions and many of the statements presented as objective facts in the Passarello Declaration. For example, the Archdiocese is not operationally separate from the parishes, schools, cemeteries and "various other Catholic-based social and community service organizations that operate in the Archdiocese."[3] It is a single enterprise with the Archbishop at the hub and the various divisions or affiliates serving as the spokes.[4] The parishes, schools, and cemeteries are divisions of the Archdiocese, not separate legal entities. The Archdiocese created and capitalized the Support Corporations[5] to put distance between the enterprise's assets and its liabilities. According to the City and County of San Francisco, the Support Corporations were created following the first California "window" so that the Archdiocese "could demonstrate, when, if and as necessary, that both of its pockets are empty' in order to protect its assets from future litigants' claims or other liabilities."[6] Additionally, compared to most other Catholic dioceses,[7] this Archdiocese is failing to do even the bare minimum to prevent future abuse or promote reconciliation with sexual abuse survivors. Finally,

---

[1] Declaration of Brittany Michael ("Michael Decl."), Ex. 1, 31:18-20 (Transcript of Continued 341 Meeting on October 12, 2023).
[2] *Declaration of Joseph J. Passarello in Support of Chapter 11 Petition and Debtor's Emergency Motions* ("Passarello Declaration"), Docket No. 14; *Declaration of Joseph J. Passarello In Support of Debtor In Possession's Emergency Motion to Continue Insurance Programs* ("Passarello Insurance Declaration"). Docket No. 12-1.
[3] *Id.* at ¶15.
[4] Michael Decl., Ex. 2, at 32. (Reply Brief of Petitioner the Roman Catholic Archbishop of San Francisco, a Corporation Sole, on the Second Cause of Action ("Reply Brief"), No. CGC-10-498795).
[5] Defined below.
[6] Michael Decl., Ex. 2, at 1 (Reply Brief).
[7] The Committee does not endorse that *any* Catholic diocese is adequately protecting the rights of children.

this bankruptcy case was clearly not filed for the benefit of survivors, but rather to protect the interests of the Archdiocese and its enterprises.

# PART I

## Legal Structure of the RCASF and Its Enterprise

The Roman Catholic Archbishop of San Francisco ("Debtor" or "Archdiocese" or "RCASF") is a corporation sole, which is the incorporation of the office of the Archbishop of San Francisco. The leader of the Archdiocese, the Archbishop, is the sole member of the corporation sole.

One purpose of the corporation sole is to ensure the continuity of property ownership for the religious entity and not for the natural person holding the office of the Archbishop.[8] Under California law,[9] the parishes, schools, and cemeteries in the Archdiocese are not incorporated and are not unincorporated associations with a separate legal identity from the Archdiocese. The parishes, schools, and cemeteries are divisions of the RCASF; their property interests are property of the Archdiocese. Mr. Passarello's non-expert legal conclusion that parishes are "unincorporated associations" has been contradicted by RCASF before and after his testimony. In the June 30, 2020 and 2021 audited financial statements for the Central Administrative Office of the Archdiocese, the Archdiocese's own auditors explain the Debtor's structure as follows:

> The Roman Catholic Archbishop of San Francisco, a California Corporation Sole (the "Corporation Sole"), was incorporated on February 24, 1854. The Corporation Sole operates the Central Administrative Office of the Roman Catholic Archdiocese of San Francisco (the "Chancery"). Other *operating divisions* of the Corporation Sole include certain parishes, schools, cemeteries, and certain Catholic sites within the Archdiocese such as the Vallombrosa Center.[10]

Moreover, RCASF's attorneys have admitted that the parishes do not exist as civil entities. At the Section 341(a) meeting, Debtor's defense counsel for the past 40 years stated that the

---

[8] *Berry v. Society of Saint Pius X*, 69 Cal. App. 4th 354 (1999) ("One purpose of the corporation sole is to insure [sic] the continuation of ownership of property dedicated to the benefit of a religious organization which may be held in the name of its titular head."); *In re Roman Catholic Archbishop of Portland*, 335 B.R. 842, 856 (Bankr. D. Or. 2005).
[9] Arguments regarding entity structures under Canon law, the internal governance code of the Catholic Church, are not relevant in this civil court.
[10] Michael Decl., Ex. 3 (2021 Financial Statement) (emphasis added).

parishes have not appeared in any of the state court lawsuits because "[t]hey do not exist."[11] Some Archdiocese affiliates are incorporated, but the Archbishop ultimately controls them.

**Parishes and Schools**

There are eighty-eight parishes in the Archdiocese of San Francisco. There are thirteen Catholic high schools, fifty-four elementary schools, and twenty-four preschools.[12] The Committee disputes the Debtor's characterization of the parishes as "unincorporated associations" under California law and dismisses as irrelevant its characterization of the parishes as "juridic persons" under Canon Law. Momentarily putting aside the dispute, the Debtor and Committee agree that the Debtor, as a corporation sole, operates the parishes and schools within the Archdiocese.[13] The Archdiocese has policies controlling every aspect of parish operations, ranging from how to run bingo games, access the parishes' Quickbooks accounting systems, contract for remodeling projects in excess of $2500, manage employees, handle legal affairs, and dispose of assets.[14]

Real property, and its ownership, will be a central issue in this case. Despite Mr. Passarello's statements, there is no evidence that the property transferred to the Archdiocese in 1854 was conveyed for the benefit of parishes, most of which likely did not even exist in 1854. Absent a deed to the RCASF reflecting the interest of the parishes in the real estate, or clear and convincing proof that parishes ever had an interest in the RCASF's property, the Archdiocese owned the legal and beneficial interests of real property deeded to it.[15]

---

[11] *Id.*, Ex. 1, 39:5-9 (Transcript of Continued 341 Meeting on October 12, 2023).

[12] *See Archdiocese of San Francisco Catholic Directory 2023-24 Edition*, pp. 37, 48, 52, *available at* https://www.sfarchdiocese.org/wp-content/uploads/2023/11/2023-2024-ArchSF-Directory.pdf.

[13] Michael Decl., Ex. 4, at 4 (Archdiocese's Verified Complaint for Declaratory Relief; Verified Petition for Writs of Mandate; and Request for Stay Order, No. CGC-10-498795 ("Archdiocese's Complaint")).

[14] Policy Index, Archdiocese of San Francisco, https://www.sfparishconnect.com/policy-index/ (last visited Apr. 10, 2024).

[15] See Cal. Ev. Code sec. 662 ("The owner of the legal title is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof"); *In re Marriage of Haines*, 33 Cal.App.4th 277, 294 (Cal. Ct. App. 1995)( "The Comment of the Law Revision Commission states: "Section 662 codifies a common law presumption recognized in the California cases.").

The Parishes[16] and Schools[17] are divisions of the Debtor, not unincorporated associations as stated in the Passarello Declaration.[18] Divisions of a corporation lack "existence as a legal entity and the capacity to sue or be sued."[19] To determine whether an entity is a division of a larger corporation (as opposed to a separate, unincorporated association), courts consider whether the entity (i) operates "within the charter of a larger corporation," (ii) submits financial reports to the parent, (iii) obtains parental approval for certain operational actions, (iv) submits to the parent's authority over its leadership and (v) holds property in the parent's name.[20] Ultimately, "[c]ourts have held that the control that an archdiocese exerts over its parishes and schools is a determining factor of whether they are separate from or the same as the archdiocese."[21]

The Archdiocese exercises the same control over the parishes and schools that a corporation exerts over its divisions. While the Parishes and Schools operate with some autonomy, like a corporate division, that autonomy is not the equivalent of the rights of independent associations.

---

[16] As defined in the Passarello Declaration, ¶ 14 ("88 parishes some of which have missions associated with them.").

[17] As defined in the Passarello Declaration, ¶ 15 ("[F]our Archdiocesan Catholic high schools (Archbishop Riordan High School, Sacred Heart Cathedral Preparatory, Marin Catholic Highschool and Junipero Serra High School,… numerous elementary schools and private independent schools.").

[18] Passarello Declaration, ¶ 14. Under California law, an unincorporated association is an "unincorporated group of two or more persons joined by mutual consent for a common lawful purpose, whether organized for profit or not." Cal. Corp. Code § 18035.

[19] Michael Decl., Ex. 5, at 11 of 23 (*Decision and Order Granting Committee's Motion for Summary Judgment Under Bankruptcy Rule 7056*, Case No. 19-00001, Dist. of Guam "Guam Decision") (citing *In re Fed.-Mogul Glob. Inc*., 411 B.R. 148, 163-64 (Bankr. D. Del. 2008); *United States v. ITT Blackburn Co., a Div. of ITT*, 824 F.2d 628, 631 (8th Cir. 1987) (an unincorporated division of a parent company lacks capacity to be sued).

[20] *See Galiano v. Inst. of Governmental Studies at Univ. of California at Berkeley,* 07-05557 SBA, 2008 WL 4155594, at *4 (N.D. Cal. Sept. 5, 2008) (holding the entity at issue was a division *not* a separate legal entity because it submitted annual financial reports and its board was appointed by the head of the parent); *E.E.O.C. v. St. Francis Xavier Parochial Sch.,* 77 F. Supp. 2d 71, 75 (D.D.C. 1999), aff'd sub nom. *E.E.O.C. v. St. Francis Xavier Sch.,* 254 F.3d 315 (D.C. Cir. 2000); *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio,* 291 F. Supp. 3d 21, 29 (D.D.C. 2017); *F.E.L. Publ'ns, Ltd. v. Catholic Bishop of Chi.*, 754 F.2d 216, 221 (7th Cir. 1985).

[21] Michael Decl., Ex. 5, at 14-15 of 23 (Guam Decision) (citing *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 754 F.2d 216, 221 (7th Cir. 1985), cert. denied 474 U.S. 824 (1985);*E.E.O.C. v. St. Francis Xavier Parochial Sch.,* 77 F. Supp. 2d 71, 75 (D.D.C. 1999), aff'd sub nom. *E.E.O.C. v. St. Francis Xavier Sch.,* 254 F.3d 315 (D.C. Cir. 2000)).

The Parishes do not have a board of trustees; "in terms of the governance of the parish, it's the pastor."[22] Those pastors are placed in the parishes by the Archbishop and can be removed from their positions if they fail to comply with the Archbishop's requests.[23]

The Archdiocese's policies document that control. For example, many of the Parish bank accounts cited in the Passarello Declaration[24] are "linked to the Archdiocese."[25] The Archdiocese obtains "comprehensive lists of all parish accounts from financial institutions" to check the accuracy of Parishes' financial reporting to the Archdiocese.[26]

Further, the Archdiocese dictates how the Parishes and Schools manage the money in those accounts. The Archdiocese requires all Parishes to deposit their excess cash in the deposit and loan fund or in the CASC.[27] The Archdiocese also prohibits Parishes, Schools, agencies and institutions from investing funds outside of the Archdiocesan pooled investment program.[28]

The Archdiocese also controls the Parishes' ability to generate income. The Archdiocese's Director of Stewardship administers the Archbishop's fundraising policies "among all parishes and missions, schools (Archdiocesan elementary and high schools), Archdiocesan agencies, departments, offices and apostolates, the Catholic Youth Organization, Catholic Charities, and St. Patrick's Seminary."[29] The Archdiocese prohibits Parishes and Schools and other "agencies, departments, offices and apostolates" from endorsing or promoting products as part of their fundraising endeavors.[30]

Parishes require permission of the Archdiocese to set their personnel holiday and vacation schedules and policies. The Archdiocese's Vicar for Administration or Vicar General must sign any policy before it can go into effect.[31] All Parish employees are required to be paid through the

---

[22] *Id.*, Ex. 1, 36:11-33(Transcript of Continued 341 Meeting on October 12, 2023).
[23] *Id.*, Ex. 18, 50:24 – 51:18 (Transcript of 341 Meeting on September 28, 2023).
[24] Passarello Declaration, ¶ 20.
[25] Michael Decl., Ex. 6, at 26 (Parish Finance Policy Training Feb. 1, 2018)
[26] *Id.*, Ex. 7, A1 (H) (Financial Policy Manual)
[27] Defined below. The Archdiocese allows Parishes to keep approximately two months operating cash. *Id.*, Ex. 6, at 12 (Parish Finance Policy Training Feb. 1, 2018)
[28] *Id.*, Ex. 7, E1 (A) (Financial Policy Manual) ("No parish or school or agency or institution may invest funds in equites/bonds outside of this Archdiocesan pooled investment program. Any parish, school, agency or institution which reserves stocks as a surplus must immediately convert that stock to cash.").
[29] *Id.* at (C).
[30] *Id.* at D9 (V).
[31] *Id.*, Ex. 8, at 2 (Parish Holiday Policy).

Archdiocese's payroll "<u>without exception</u>."[32] The Archdiocese also dictates policies on harassment,[33] records retention,[34] stipends,[35] electronic and internet fundraising,[36] internet usage,[37] and construction,[38] among other areas.

Parishes and Schools also do not outwardly operate with any legal autonomy. Business licenses are held in the name of the Archdiocese. For example, the Archdiocese's "Policy and Guidelines for Childcare/Preschool Programs in Parishes of the Archdiocese of San Francisco" states that "the school program would be sponsored by the *corporate operator of the schools, The Roman Catholic Archbishop of San Francisco, A Corporation Sole*."[39] The Archdiocese is listed as the licensee for thirteen Catholic pre-schools in San Francisco.[40]

Additionally, Parish employees are "not authorized" to sign legal agreements binding the Parishes for amounts exceeding $10,000, for a period of time exceeding one year, or relating to employment contracts.[41] Such documents may only be signed by the Archdiocese's Offices of the Vicar General or Archdiocesan legal counsel.[42] Finally, "[n]o parish, school, or agency may initiate legal action or formally engage the services of outside legal counsel without the approval of, and continued oversight by, the Archdiocesan Legal Office."[43]

Parishes and Schools must comply with Archdiocese policy regarding the use of "Archdiocesan property."[44] Those "Policies and Procedures are designed to provide Pastors, Principals and Agency Heads with a ready resource when faced with proposed uses of *Archdiocesan properties* by outside individuals and organizations. The Vicar for Administration or Archdiocesan Legal Counsel should be contacted well in advance of the proposed event or use."[45]

---

[32] *Id.*, Ex. 7, C5 (G) (Financial Policy Manual) (emphasis in original).
[33] *Id.*, Ex. 9 (Harassment Policy).
[34] *Id.*, Ex. 10 (Record Retention Policy).
[35] *Id.*, Ex. 11 (Stipend Policy).
[36] *Id.*, Ex. 12 (Electronic and Internet Fundraising Policy).
[37] *Id.*, Ex. 13 (Internet Usage Policy).
[38] *Id.*, Ex. 14 (Construction Policy).
[39] *Id.*, Ex. 15 (Daycare Policy PDF) (emphasis added).
[40] *Id.*, Ex. 19 (Daycare License Chart).
[41] Michael Decl., Ex. 7, H1 (A) (Financial Policy Manual).
[42] *Id.,* at H1(A)
[43] *Id.*, at M1.
[44] *Id.*, at K5 (B).
[45] *Id.* (emphasis added).

As with corporate divisions in other contexts, the Parishes and Schools control certain aspects of their operations but must ultimately operate within the policies and legal confines of the Archdiocese.

Finally, the Archdiocese represents the Parishes and Schools as part of its legal entity to third parties. The Passarello Insurance Declaration states that the Parishes and Schools are Insurance Participating Entities.[46] However, Archdiocesan insurance policies dating back to at least 1960 do not name the Parishes and Schools in the definition of insureds that list specific insureds by name. Therefore, for the Parishes and Schools to be "insureds" in accordance with the Passarello Insurance Declaration, they fall under the policies' catch-all language for entities "operated or controlled by or operating under the auspices of the [RCASF]."[47] The Archdiocese also attests to Parishes and Schools being "part of" the RCASF for purposes of tax exemption.[48]

**The Cemeteries**

The Cemeteries[49] are also divisions of the Archdiocese. At the 341(a) meeting, in response to the question "are any of [the six cemeteries] separate incorporated entities under California law?" Archbishop Cordileone answered, "No."[50]

In addition to the above cited policies that apply to Archdiocesan property, agencies, offices, and divisions, in their "governance" documents, the Cemeteries describe themselves as an Archdiocese department. The bylaws for the Archdiocese of San Francisco Cemetery *Department* Advisory Board states the body's purpose is to oversee that the responsibility for the Catholic cemeteries "is caried out in the Archdiocese of San Francisco *through its Cemetery Department* in a manner befitting a corporal work of mercy. In fulfilling this responsibility, the Board functions as an advisory to the Ordinary *of the Archdiocese* in Cemetery matters."[51] The organization chart for the Catholic Cemeteries *Department* further situates the Cemeteries as a department for which

---

[46] Passarello Insurance Dec., para. 4.
[47] Michael Decl., Ex. 21 (TNCRRG policy). The definitions of "insured" are not all worded **exactly** the same but essentially mean the same thing. All other policies were produced to the Committee subject to confidentiality.
[48] *See, e.g.,* Michael Decl., Ex. 20 (Letter Regarding St. Hilary School).
[49] As defined in the Passarello Declaration, ¶ 15.
[50] *Id.* at 50:20-22.
[51] Michael Decl., Ex. 16 (Cemeteries Production, CEMETERIES 00001).

the Director of Cemeteries reports to the Archdiocesan Vicar for Administration, who consults with the Cemetery Advisory Board and who, in turn, reports to the Archbishop.[52]

**The Support Corporations**

In 1953, the Debtor created the Roman Catholic Welfare Corporation of San Francisco (the "Welfare Corporation") and transferred civil law title to real property utilized by the Schools ("School Properties") to the Welfare Corporation. Civil law title to the Parish real property remained with the Debtor.[53]

In 2007, two new corporations were created: The Archdiocese of San Francisco Parish and School Juridic Persons Capital Assets Support Corporation ("CASC") and The Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support Corporation ("RPSC" and, together with CASC, the "Support Corporations").[54] In April 2008, the Welfare Corporation was dissolved and its assets, including the School Properties were distributed to the Debtor.[55] The Debtor then transferred at least 232 properties[56] to RPSC.[57] At approximately the same time, the Debtor presumably also transferred capital assets to CASC.

At the time of the 2008 transfer, the City and County of San Francisco (which was seeking to collect transfer taxes on account of the 232 property transfer) accused the Debtor of transferring the properties "'elsewhere precisely so it could demonstrate, when, if and as necessary, that both of its pockets are empty' in order to protect its assets from future litigants' claims or other liabilities."[58] The Debtor did not refute that accusation, but merely noted that "any allegations concerning future claims or liabilities are wholly speculative and unfounded."[59]

The Support Corporations may have separate boards of directors, but the boards "are comprised of the Archbishop himself or persons appointed by the Archbishop *at his pleasure* or

---

[52] *Id.* (Cemeteries Production, CEMETERIES 00023)
[53] *Id.*, Ex. 4, at 8 (Archdiocese's Complaint).
[54] Passarello Decl., ¶¶ 22, 26.
[55] Michael Decl., Ex. 4, at 8 (Archdiocese's Complaint).
[56] This number only includes those properties transferred in the City and County of San Francisco. *Id.* at 5. Additional properties in Marin and San Mateo counties were also likely transferred.
[57] *Id.* at 11
[58] *Id.*, Ex. 2, at 1 (Reply Brief).
[59] *Id.*, at 1.

confirmed by the Archbishop, in *his sole discretion*."[60] The board of directors of each of the Support Corporations includes seven members: three must be members of the Archdiocese Financial Council and four must be members of the Archdiocese College of Consultors.[61] "[I]t is the Archbishop who appoints (and can remove) each of the members of the Finance Council and the College of Consultors."[62] Further, "the Archbishop has the sole discretion to confirm that members of the Finance Council and the College of Consultors satisfy the canonical standards necessary for membership on those bodies."[63]

Put simply (and in the Archdiocese's own words), "the Corporation Sole has the power to administer and manage the affairs, *property*, and temporalities of the Church, which include, without limitation [selection and removal of officers and employees, powers and duties of officers, making rules and regulations, conducting and managing the temporal affairs, adopting a corporate seal and borrowing money]."[64] In the proceedings regarding its potential transfer tax liability, the Archdiocese maintained that beneficial ownership did not change despite the transfers.[65]

## PART II

**The RCASF Response to the Clergy Abuse Crisis**

In 2022, a lay organization of faithful Catholics, Voice of the Faithful,[66] published a report in which it examined the websites of all 177 dioceses and archdioceses in the United States and assigned each one a score based on its child protection content.[67] The scoring was based on a thirty-three question survey evaluating the following categories: Policy; Code of Conduct; Reporting Abuse; Background Checks; Prevention Education & Training; Contact Information; Annual Audit Reporting; Diocesan Review Boards; List of Accused Clergy; and Victim

---

[60] *Id.*, at 34.
[61] *Id.*, at 34.
[62] *Id.*, at 35.
[63] *Id.*, at 35.
[64] *Id.*, at 35.
[65] *Id.*, at 37.
[66] Voice of the Faithful is a "lay organization of faithful Catholics, who organized in 2002 as a response to the sexual abuse crisis in the Catholic Church." Their mission "is to provide a prayerful voice, attentive to the Spirit, through which the faithful can actively participate in the governance and guidance of the Catholic Church." *See About Us*, *available at* https://www.votf.org/about/.
[67] Michael Decl., Ex. 17, (2022 Report: Measuring Abuse Prevention and Safe Environment Programs as Reported Online in Diocesan Policies and Practices.

Assistance.[68] The report looked *solely* at the (arch)dioceses' publicly available policies, it did not evaluate compliance with those policies.[69]

The Archdiocese of San Francisco ranked 167 out of 177 dioceses with a score of only 44.5 out of 100.[70] The report noted that, at the time of the report, the Debtor was "the only archdiocese with no publicly accessible policy"[71] relating to child protection. The Debtor similarly received a 6 out of 15 for its background check policies, 9 out of 18 for its prevention education and training, 3 out of 6 for its display of contact information, 0 out of 10 for its reporting regarding USCCB audit report findings, 10 out of 18 for its diocesan review board, 0 out of 5 for publication of the names of clergy accused of abuse, and 3.5 out of 5 for its victim assistance.[72] The Debtor only received full marks on two categories: 5 points for its code of conduct and 8 for its diocesan abuse reporting process.[73]

One item that Voice of the Faithful highlighted was that diocese "must fully disclose credibly accused offenders' information."[74] The report specifically notes that "[d]isclosures are a recognized best practice for abuse prevention and as a deterrent to future abuse. Full disclosure can demonstrate diocesan transparency about issues of clergy sexual abuse and positively inform the needed trust in the institution."[75] According to ProPublica's research, as of 2020, the Archdiocese of San Francisco was the fifth largest diocese in the country not to have published a credibly accused list and is one of only 41 out of 219 dioceses and orders that had not released such a list.[76] To this day, the Archdiocese has still not published a credibly accused list.

At the 341(a) meeting, Archbishop Cordileone stated, in response to an inquiry as to whether the Archdiocese keeps a list of clergy for whom the Internal Review Board has made a determination that the sexual abuse accusation was sustained: "We know which ones those are.

---

[68] *Id.*, at 1.
[69] *Id.*, at 1.
[70] *Id.*, at 8.
[71] *Id.,* at 8.
[72] *Id.*, at B-6.
[73] *Id.*, at B-6.
[74] *Id.*, at 2.
[75] *Id.* (emphasis added).
[76] Lexi Churchill, Ellis Simani and Topher Sanders, *Catholic Leaders Promised Transparency About Child Abuse. They Haven't Delivered*, ProPublica (Jan. 28, 2020), *available at* https://www.propublica.org/article/catholic-leaders-promised-transparency-about-child-abuse-they-havent-delivered

Yeah, we have our own list."[77] When asked how a survivor could know whether his or her abuser was "credibly accused according to the Archdiocese," Archbishop Cordileone responded that such survivor would have to contact the Archdiocese's victim assistance coordinator.[78] In other words, a survivor's only option to obtain such information is to personally contact the institution that allowed the harm to occur in the first place.

The Archdiocese has failed to take even the minimal steps taken by other Catholic dioceses to protect children and promote healing.

## PART III

### Events Precipitating the Bankruptcy Case

The Passarello Declaration discusses the Archdiocese's decision to file for bankruptcy due to the "approximately 537 separate, active lawsuits pending against the Debtor filed by plaintiffs alleging sexual abuse by clergy or others associated with the Debtor."[79] The declaration continues by stating that the "avalanche of lawsuits puts the RCASF in immediate and direct financial distress and in need for a forum to resolve those claims."[80]

The bankruptcy was not, however, filed shortly after those 537 were filed in state court rather, but was filed two days prior to the commencement of the first trial in one of those actions - over two and half years after the first of the lawsuits was filed. Prior to the eve of trial, the Debtor was apparently less concerned about "its moral obligation to compensate all abuse survivors fairly and within a reasonable period of time."[81]

Prior to the bankruptcy filing, all cases against the Archdiocese filed in California state court were administered through Judicial Council Coordination Proceeding 5108. All discovery was stayed in the pending cases except for the two bellwether cases scheduled for trial on August 23, 2023, and two additional cases designated as second round bellwether cases that had not yet

---

[77] Michael Decl., Ex. 1, 31:18-20 (Transcript of Continued 341 Meeting on October 12, 2023).
[78] *Id.*, 32:28-32.
[79] Passarello Declaration, ¶ 53.
[80] *Id.*, ¶ 56.
[81] *Id.* ¶ 59. At the 341 meeting, Archbishop Cordileone did concede that plaintiffs were informed of the potential bankruptcy two weeks prior to the filing. Michael Decl., Ex. 1, 12:10-23(Transcript of Continued 341 Meeting on October 12, 2023).

been set for trial. The only exceptions to the stay were for the "Institutional Defendants" to receive "fact sheets" and authorizations for educational, mental health, medical, and employment records and to share the "initial document demand sheet." Additionally, the Plaintiffs entitled to the Institutional Defendants' fact sheets were permitted to share their consolidated requests for production of documents.

In June 2023, the two bellwether cases were transferred to San Francisco Superior Court for trial. As late as two business days prior to the bankruptcy filing, June 17, 2023, the Archdiocese was still filing motions in preparation for the scheduled trial, including an attempt to continue to silo claims and prohibit Plaintiff sexual abuse survivors from referencing other accusations related to the same perpetrator at trial.

After almost four years of litigation and only days away from the opportunity for two survivors to finally receive their long-awaited day in court, the Archdiocese allegedly developed a concern about "fairness" that led it to file this bankruptcy. The bankruptcy has halted survivors' opportunity to publicly disclose the Archdiocese's role in their abuse.

Now, the Archdiocese is choosing to hide behind its bankruptcy to shield assets through legal fictions and transfers, to protect the identity of individuals it allowed to abuse children, and to prevent survivors from having a voice. For the time being, this Court is the only judicial forum for survivors to be heard. The Committee does not believe that the Debtor's narrative in the Passarello Declaration accurately depicts the Archdiocese in relation to the parishes and affiliates and created a misimpression of the background and dynamics of this case. By this response to the Archdiocese's first day declaration, the Committee is giving voice to the survivors.

Dated: April 19, 2024

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By /s/ *Brittany M. Michael*
James I. Stang
Debra I. Grassgreen
Andrew W. Caine
Brittany M. Michael

Attorneys for the Official Committee of Unsecured Creditors