# EXHIBIT 1

**MEETING OF CREDITORS FOR THE**

**ROMAN CATHOLIC ARCHBISHOP**

**OF SAN FRANCISCO**

**DATE:  OCTOBER 12, 2023**



**Court Reporting • Video**

310.230.9700 • els@elitigationservices.com
www.elitigationservices.com

**BLUMBERG:**      All right.  So, this is the continued meeting of creditors for the Roman Catholic Archbishop of San Francisco.  That's Case No. 23-30564.  This case filed on August 21, 2023.  Today's date is October 12, 2023.  It's approximately 9:05 a.m.  My name is Jason Blumberg.  I'm a trial attorney with the Office of the United States Trustee.  This meeting is required under §341(a) of the Bankruptcy Code.  The purpose of the meeting is to allow for an examination of the debtor, under oath.  Questions may include, but are not limited to why the case was filed, the operation of the business, and the prospects for reorganization.  I will initially question the debtor. Creditors will also have the opportunity to examine the debtor.

As a reminder, this meeting is being digitally recorded.  Please remember that the recorder cannot see who you are or your head nodding, so identify yourself when asking a question, and please remember to give verbal responses which can be picked up by the recorder.  The recorder works best when only one person is speaking at a time, so please allow for questions to be completed before answering, and wait for answers to be completed before asking follow-up questions.  Whenever you are not speaking, please mute your line to prevent background noise.  We keep the recording for two years after case closure.  If anyone would like to obtain a duplicate of today's proceeding or a transcript, the arrangements are made through the Office of the United States Trustee.

Now, before we proceed with the continued 341 meeting, I'm going to take a few minutes to explain what this meeting is and how it will proceed.  As I mentioned, this meeting is being conducted under §341 of the United States Bankruptcy Code in conjunction with the bankruptcy case currently pending before the United States Bankruptcy Court in the Northern District of California.  As such, it is expected that every participant will conduct themselves in a manner appropriate for a legal proceeding.  Preliminarily, the statutory purpose of the meeting is to provide creditors with the opportunity to examine the debtor under oath.  If you do not have any questions for the debtor's representatives, you may stay on the line and listen.  You may drop off the call at any time, though.  The representatives of the debtor are Archbishop Cordileone, Father Patrick Summerhays, and Joseph Passarello.  By court order, Father Summerhays has been designated as the debtor's responsible individual in this case.  Mr. Passarello is the debtor's senior financial director.  He signed the debtor's schedules and statements.

The meeting is an opportunity for creditors to ask questions about the debtor's general financial affairs.  If you have concerns about your specific claim or situation, this is the not the appropriate time to express those concerns.  This is a legal proceeding, with the debtor's representatives testifying under oath about the debtor's financial affairs.  To ensure that there is enough time for everyone to ask questions, please keep questions concise and avoid asking repeat questions.  While I understand that many people's claims arose under very troubling and painful

October 12, 2023 | eLitigation Services, Inc.    2
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 3 of 132

1   circumstances, this is not the place to address specific claims.  To the extent you
2   need additional information about the debtor of this bankruptcy case, you should
3   visit the court's electronic docket or the debtor's claim's agent website.  Information
4   on the claim's agent website is available to you free of charge and will be updated
5   as additional information becomes available.  The website address is
6   https://omniagentsolutions.com/rcasf.  You should also carefully review any filings
7   or notices you receive to preserve your rights.

8   The examination today will be conducted as if it were in court.  This means that
9   only the representatives will answer questions.  If a representative does not know
10  the answer, then the answer will simply be, "I don't know."  If the purpose of the
11  meeting is being frustrated by anyone's conduct, then I may stop the meeting.  Of
12  note, the following rules should be followed and need to be followed today.  First,
13  the same question should not be asked repeated times even by different people.  It
14  is, therefore, important that you listen to each question and each answer and not ask
15  the same question again.  Second, only one persons may ask questions of the
16  representatives at a time.  Third, questions can only be asked of the representatives.
17  It is not appropriate to speak to anyone other than the representatives.  Fourth, if the
18  representatives do not know the answer to a question, pleases do not ask the
19  question again, including by asking it in a different way.  Fifth, the person asking
20  the question should not be combative or engage in personal attacks.

21  Now that the purpose and the rules of the meeting have been established, the order
22  of the meeting will be as follows.  I will appearance of counsel for the debtor and
23  counsel for the Official Committee of Unsecured Creditors.  I will then put the
24  representatives of the debtor under oath.  I will then permit the debtor's counsel and
25  the Archbishop to make an opening statement, if they so choose.  A statement is not
26  mandatory.  I then may ask questions of the debtor's representatives.  Please listen
27  to all my questions, if I ask any.  If I've already asked a question, you don't need to
28  repeat the question.  After I conclude my questions, I will ask members of the
29  Creditor's Committee if they wish to ask questions.  After that period concludes, I
30  will ask all creditors, any creditors, if they wish to ask questions, and then finally, I
31  will ask if counsel for the Creditor's Committee wishes to ask any questions.  So,
32  please don't indicate that you wish to ask a question until I announce that the
33  question and answer session has begun.  Once I announce that that general question
34  and answer period has started, if you do wish to ask a question, you must provide
35  your full name, with spelling, prior to speaking.  Please note, if you don't identify
36  yourself, I will ask the operator to mute your line.  Sandy is the operator.  I believe
37  when we get to that section, what you would do is you would press *1, but we'll
38  come back to that as we proceed.

39  If everyone cooperates and there are no repeat questions, this call may be able to be
40  concluded today.  I anticipate that it will be concluded today because this is a

October 12, 2023 | eLitigation Services, Inc.    3
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 4
of 132

1    continued meeting.  However, we will not require the representatives to provide
2    testimony for more than three hours.  If the meeting is not concluded at the three-
3    hour mark, we will discontinue the meeting, and I will decide whether I will
4    schedule a continued meeting of creditors in the future for additional questioning.
5    As I noted though, because this is the continued meeting, it is unlikely that this
6    meeting will be continued.  But if the meeting is continued, the notice of the new
7    date and time will be on the website set forth on the claim's agent website, which
8    again, is https://omniagentsolutions.com/rcasf, also on the court docket for this
9    case.

10    All right.  Could I ask the debtor's attorney to please make his appearance for the
11    record?

12    **PASCUZZI:**  Good morning, Mr. Blumberg.  This is Paul Pascuzzi, bankruptcy counsel for the
13    debtor the Roman Catholic Archbishop of San Francisco, and also here is Paul
14    Gaspari, special litigation counsel approved by the court from Weintraub Tobin.

15    **BLUMBERG:**    Good morning.  May I ask counsel for the Official Committee of
16    Unsecured Creditors to make his appearance as well?

17    **STANG:**  Good morning.  James Stang S-T-A-N-G, Pachulski, Stang, Ziehl & Jones, counsel
18    to Official Creditors Committee.

19    **BLUMBERG:**    Good morning.  Father Patrick Summerhays, are you on the line, sir?

20    **SUMMERHAYS:**    Yes, I am.

21    **BLUMBERG:**    Good morning to you.

22    **SUMMERHAYS:**    Good morning.

23    **BLUMBERG:**    Would you please raise your right hand and let me know when you're
24    doing that?

25    **SUMMERHAYS:**    I am doing that.

26    **BLUMBERG:**    Do you swear or affirm that you will tell the truth, the whole truth, and
27    only the truth?

28    **SUMMERHAYS:**    I do.

29    **BLUMBERG:**    Do you understand that you are testifying under penalty of perjury?

30    **SUMMERHAYS:**    I do.

31    **BLUMBERG:**    Is there reason why you can't give your best testimony today?

32    **SUMMERHAYS:**    No.

October 12, 2023 | eLitigation Services, Inc.    4
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | And would you mind just stating your full name for the record? |
| 2 | **SUMMERHAYS:** | My full name is Patrick John Summerhays. |
| 3<br>4 | **BLUMBERG:** | And you are the same Father Summerhays who signed the petition in this case, correct, sir? |
| 5 | **SUMMERHAYS:** | That is correct. |
| 6 | **BLUMBERG:** | Mr. Passarello, are you there sir? |
| 7 | **PASSARELLO:** | Yes, I am. |
| 8<br>9 | **BLUMBERG:** | Would you please raise your right hand and let me know when you are doing that, sir? |
| 10 | **PASSARELLO:** | I am doing that. |
| 11<br>12 | **BLUMBERG:** | Do you swear or affirm that you will tell the truth, the whole truth, and only the truth? |
| 13 | **PASSARELLO:** | Yes, I do. |
| 14 | **BLUMBERG:** | Do you understand that you are testifying under penalty of perjury? |
| 15 | **PASSARELLO:** | Yes, I do. |
| 16 | **BLUMBERG:** | Is there any reason why you can't give your best testimony today? |
| 17 | **PASSARELLO:** | No, there is not. |
| 18 | **BLUMBERG:** | And would you please state your full name for the record? |
| 19 | **PASSARELLO:** | Joseph James Passarello, Jr. |
| 20<br>21 | **BLUMBERG:** | And sir, are you the same Mr. Passarello that signed the schedules and statements in this case? |
| 22 | **PASSARELLO:** | Yes, I am. |
| 23 | **BLUMBERG:** | Thank you.  Archbishop Cordileone, are you there, sir? |
| 24 | **CORDILEONE:** | Yes, I am. |
| 25<br>26 | **BLUMBERG:** | Would you please raise your right hand and let me know when you are doing that? |
| 27 | **CORDILEONE:** | I'm doing that. |
| 28<br>29 | **BLUMBERG:** | Do you swear or affirm that you will tell the truth, the whole truth, and only the truth? |

October 12, 2023 | eLitigation Services, Inc.   5
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| 1 | **CORDILEONE:** | I do. |
|---|---|---|
| 2 | **BLUMBERG:** | Do you understand that you are testifying under penalty of perjury? |
| 3 | **CORDILEONE:** | I do. |
| 4 | **BLUMBERG:** | Is there any reason why you can't give your best testimony today? |
| 5 | **CORDILEONE:** | No, there is not. |
| 6 | **BLUMBERG:** | And sir, would you please state your full name for the record? |
| 7 | **CORDILEONE:** | Salvatore Joseph Cordileone. |

8  **BLUMBERG:**    Thank you.  Mr. Pascuzzi, all the debtor's representatives are in the same
9                  room with you, sir?

10 **PASCUZZI:**  That's correct.

11 **BLUMBERG:**    Okay.  So, I would ask that when someone asks a question to the debtor's
12                  representatives, that they ask -- rather answer the questions based on their own
13                  knowledge, and if they are going to seek guidance or some kind of reference from
14                  another source, that they clearly disclose that for the record.  So, that means that
15                  there shouldn't be any notes being passed back and forth unless that's noted for the
16                  record.

17                  Mr. Pascuzzi, would you like to make an opening statement today, sir?

18 **PASCUZZI:**  No, but the Archbishop would.

19 **BLUMBERG:**    Okay.  Archbishop, would you like to make an opening statement, sir?

20 **CORDILEONE:**    Yes, I would.

21 **BLUMBERG:**    Okay.  Please go ahead, sir.

22 **CORDILEONE:**    Thank you.  And thank you for arranging a time to speak with me at
23                  greater length.  I wish to repeat that I am in full agreement with Pope Francis who
24                  has called the sexual abuse of a minor monstrous, noting that even one such case
25                  perpetrated by a member of the clergy would be abhorrent.  In hearing the harm and
26                  confusion these acts of abuse have caused in the lives of innocent children and their
27                  families, the stories of abuse survivors are stories of stolen innocence.  Having sat
28                  with victims and listened to their stories, I'm always moved and deeply saddened.
29                  These acts have no place in any society, and especially within a church where there
30                  should be a greater sense of security and compassion.  Pope Francis has exhorted all
31                  his brother Bishops to shoulder the weight of these past sins.  I pray every day for
32                  continued healing for all survivors in hopes that they find the peace they deserve.
33                  Around the time I was appointed as Bishop, the issue of clergy sexual abuse became

October 12, 2023 | eLitigation Services, Inc.    6
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

a national story.  The revelation of these abominable acts within the church over previous decades had a lasting impact on how I approach the responsibility of being first a Bishop and now an Archbishop.  I have striven to maintain an unwavering commitment to fighting sexual abuse of minors and helping the church atone for the sins of the past perpetrated by her ministers.

At the heart of our outreach to abuse survivors, is creating a welcoming environment and providing compassion and assistance, which includes a variety of counseling, spiritual direction and other healing services.  I have appointed three diligent and serious people who spend all their time at the Archdiocese on managing different aspects of our safe environment department.  These professionals engage in regular education, background screening and fingerprinting of employees and volunteers who work with minors.  The Archdiocese of San Francisco has, in fact, established policies and protocols to protect children and address and reports incidents of sexual abuse of minors even before the U.S. bishops adopted the Charter for the Protection of Children and Young People in 2002.

Our reporting process is straightforward.  Cases of abuse in which the alleged abuser and the abuse survivor are of the same household are reported to Child Protective Services.  Allegations of abuse of minors by clerics, church employees or volunteers are first reported to civil authorities and then to the Archdiocesan Victim Assistance coordinator.  Every allegation is treated seriously, and immediate steps are taken to protect the rights of both the alleged abuse survivor and the alleged abuser.  We have taken exhaustive steps to satisfy the Charter by immediately keeping out of active ministry any minister accused of sex abuse of a minor while an investigation or canonical trial is pending.  And we would remove permanently from ministry any priest for which the statable evidence abuse has been determined.

We require criminal background checks for clergy employees and volunteers who work with youth, and we implement educational programs for both children and adults to prevent abuse.  We maintain an Independent Review Board, which we refer to as the IRB, as an essential step in internal procedures or handling allegations of sexual abuse.  A qualified investigator conducts investigations into allegations and submits a report to the IRB whose members include an abuse survivor, psychologist, two physicians, and a retired police officer.  These are experts in their respective fields with unique experiences that I do not possess, so I heavily rely on their expertise.  They make recommendations as to whether there is sufficient evidence to warrant a canonical trial or if, on the other hand, an accusation is manifestly unfounded.  Their recommendations are indispensable to me in helping to determine the best course of action, including when injustice we should remediate damage to the reputation of a priest who has been wrongly accused.  I have always followed their guidance.

October 12, 2023 | eLitigation Services, Inc.    7
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

The Archdiocese also has an Office of Child and Youth Protection to maintain the highest standards for its Preventative Safe Environment Program and address allegations of past and current abuse by any clergy, employee, or volunteer.  We employee safe environment coordinators to monitor compliance with the Charter.  In addition, a victim assistance coordinator maintains a hotline for reporting abuse, provides counseling, and offers other supportive services.  The office is also responsible for coordinating the fingerprinting of employees, volunteers, and clerics who interact with children, as well as facilitating annual compliance audits conducted by independent auditors to review the implementation of policies and procedures for the protection of children.

As I indicated previously, I am grateful to my predecessors and other leaders in the Archdiocese who have worked hard to put effective educational and preventative measures in place, as I am encouraged by the fact that occurrences of abuse within the Catholic church are now very rare.  I believe the church has set the standard today for other organizations showing what can and should be done to protect our children.

After listening carefully to the opening remarks of the Committee's attorney in last month's call, I want people listening to know that filing for Chapter 11 bankruptcy was not our first choice.  We work very hard to settle cases, just as we successfully did in 2003.  We started, as we did in 2003, by looking at settling small groups of cases.  But with more than 500 cases, and the skyrocketing financial demands made by several plaintiff attorneys, we realized that it was financially impossible to settle cases.  Without the financial means to meet the demands that were being placed upon us, we were left with no choice but to file for Chapter 11, and we signaled to the attorneys in advance that we were strongly considering a Chapter 11 filing.  We realize that the bankruptcy process does not provide abuse survivors with the opportunity to tell their stories as they would be able to in a trial setting.  I recognize that this is an important part of the healing process, as I have sat and listened to the powerful stories shared by abuse survivors, including those survivors who serve us so well on our Independent Review Board.  I know first hand the courage and resilience shown by these individuals in the face of so much suffering.  While we recognize that financial remuneration alone will not compensate for all the suffering caused, we do believe the Chapter 11 bankruptcy process is the best solution for providing timely, fair, and equitable compensation to the innocent abuse survivors who have been harmed.  The process is transparent and under the supervision of bankruptcy court.  It brings all parties to the table, including our insurance carriers, and works to resolve difficult claims collectively, rather than one at a time.  It eliminates a scenarios where the first few cases that are resolved extend all available resources to pay claims leaving nothing for survivors whose cases are resolved later.  The Chapter 11 process also allows the Archdiocese to reorganize,

October 12, 2023 | eLitigation Services, Inc.    8
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 9 of 132

1    to continue its vital ministries to the faithful and to the communities that rely on its
2    services and charity. We will work to emerge from Chapter 11 as quickly as
3    possible to provide a faster, more equitable resolution for abuse survivors, provide
4    them with fair compensation and, hopefully, some level of closure and peace.
5    Thank you.

6  **BLUMBERG:**    Thank you, Archbishop. This is Jason Blumberg again from the United
7    States Trustee's office. Next, at this point, we are going to turn to the question and
8    answer period, and this first question and answer period will be directed or
9    permitted or will be directed again at members of the Official Committee of
10    Unsecured Creditors. Sandy, the operator on the line, can you please give
11    instructions about how the committee members will indicate that they wish to ask
12    questions?

13  **SANDY:**    Yes. If they'd like to ask a question, please unmute your phones, record your name
14    clearly when prompted, and your name is required to introduce your question. You
15    will need to press *1 to do this.

16  **BLUMBERG:**    And I would also ask that, in addition to that, when your line is opened up,
17    that you state your name again for the record and that you spell it, just so that we
18    have a good record in the event that there's a transcript.

19  **SANDY:**    Just one moment, please. The person that just asked to speak for the *1, I'm going
20    to remove your selection, and please come back, but this time unmute your phone
21    and record your name, please. Once again, if you'd like to ask a question, please
22    press *1, unmute your phone and record your name. All right. Our first question
23    comes from Margie O'Driscoll. [phonetic] You may go ahead, ma'am.

24  **O'DRISCOLL:**    Thank you. Archbishop, I'm Margie O'Driscoll, and I serve as the co-chair
25    of the survivor's committee.

26  **BLUMBERG:**    Ms. O'Driscoll, I'm sorry to interrupt you. Could I just ask you to spell
27    your name for the record just so we have it? I apologize.

28  **O'DRISCOLL:**    Yes. My legal name is Margaret M-A-R-G-A-R-E-T, and my last name
29    O'Driscoll O-D-R-I-S-C-O-L-L.

30  **BLUMBERG:**    Thank you. Please go ahead.

31  **O'DRISCOLL:**    Archbishop, I'm Margie O'Driscoll, and I serve as co-chair of the
32    Survivor's Committee, however, I speak to you today as an individual. Archbishop,
33    I've heard you tell the story that you received your calling to become a priest while
34    at a college retreat. My last experience at a Catholic retreat was when one of the
35    priests from my Catholic high school attempted to rape me when I was 16. Our
36    difference experiences at a retreat shape both of our lives, and it has brought you

October 12, 2023 | eLitigation Services, Inc.   **9**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   and I and over 536 people together in this moment.  Your retreat brought you to
2   lead this Archdiocese and my retreat led me to sit with hundreds of others to ask
3   you some questions today relating to the business of the Archdiocese.  I know
4   understand, after many years, that the abuse I suffered is a part of culture that had to
5   do with the operations and financing of my high school that was led by Archdiocese
6   priests.  This culture has resulted in several priests leaving the ministry.  Thus, my
7   questions to you are about today, and most particularly your August letter to the
8   faithful in which you said that the Archdiocese today uses stringent processes to
9   screen volunteers, employees, and priests.  I would like to understand specifically
10  the amount of money and the processes that are used to review current priests and
11  employees, in other words, are new employees or all employees screened by the
12  Archdiocese today?

13  **CORDILEONE:**        Thank you for your question, and first of all I want to express my
14  sorrow for what you experienced on the high school retreat.  It is very distressing
15  and I am outraged by it, and I apologize.  I am not able to say how much money we
16  spend on our safe environment policies and that work, but standard procedures
17  include fingerprinting for all those who interact with minors, letters of good
18  standing for priests coming from outside of the Archdiocese or coming here to do
19  ministries.  There's a training -- online training about -- to be educated about what
20  constitutes abuse and for signs of abuse.  We also have professional outside auditors
21  audit our compliance with the USCCD polices every year and -- to ensure that we
22  are compliant, which we have been.

23  **O'DRISCOLL:**        Thank you.  I have another question, which is: How do you inform
24  parishioners and parents and children in grammar schools and high schools where
25  accused, credibly accused people work of allegations and confirmed cases of abuse?

26  **CORDILEONE:**        I have not yet received a credible allegation against a priest, although I
27  have received allegations.  When that happens, our procedures require that he be
28  kept from exercising ministry until an investigation is completed.  If there is reason
29  for going further to a canonical trial, he remains out of ministry.  I have not had to
30  do that, so far in my 11 years as the Archbishop of San Francisco.  When the
31  allegation arise and it's necessary to keep him from ministry, we announce that to
32  the parish on either an official from the chancery or some other collaborator will
33  announce it typically, but we've done it this way that they announce it to the parish
34  at the Sunday masses.

35  **O'DRISCOLL:**        And my final question, Archbishop.  You mentioned in your opening
36  remarks that the choice that you made as the Archbishop to go into a bankruptcy
37  proceeding prevented creditors, in other words, the survivor's committee and so
38  many others who stand with me, from being able to speak openly about the abuses
39  for which they have suffered, and that has to do with the formality of the

October 12, 2023 | eLitigation Services, Inc.    10
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 11
of 132

1  bankruptcy proceedings as opposed to other means.  And so I guess my question to
2  you is would you be willing to work with the committee to come up with a way that
3  that opportunity could be afforded to those who have been damaged throughout this
4  process in some other form?

5  **CORDILEONE:**          As I said, I've listened to these powerful stories before, and I'm
6  willing to continue to do that, and it reveals to me the courage and resilience shown
7  by individuals who have endured so much suffering.  There's a difficulty in meeting
8  with those associated with claims during the bankruptcy proceedings, future legal
9  proceedings, but we do have a process in place for survivors to meet with our
10  victim assistance coordinator.  I want -- so that avenue certainly is available, and
11  I'm always open to meeting with survivors who wish to meet with me when that is
12  legally and ethically proper to do so.  I also want abuse survivors to know that I
13  keep a list of their names on the altar in my chapel, for which I offer prayers for
14  their healing and peace every day.

15  **O'DRISCOLL:**      So, just so I understand, you would be willing to meet with the -- I guess
16  the legal term is the creditors, we think of ourselves as survivors in this process, in a
17  public forum by which people could express what is happening to them and how the
18  church is moving forward?

19  **CORDILEONE:**      First of all, my understanding is that it's not appropriate to meet during
20  bankruptcy, so any encounter would have to take place after bankruptcy, and I
21  would discuss the best venue for that to happen in order to arrive at peace and
22  reconciliation.

23  **O'DRISCOLL:**      Thank you.

24  **CORDILEONE:**      You're welcome.

25  **SANDY:**      The next call is Jan **ZOCCOLI:**  You may go ahead.

26  **ZOCCOLI:** Thank you for taking my call.  Archbishop, my name --

27  **BLUMBERG:**          Oh, madam?  Oh, I'm sorry.  I was going to cut you off, but would you
28  mind just stating your name and just spelling it for the record?

29  **ZOCCOLI:** Sure.  My name is Jan Zoccoli.  J-A-N, last name Z-O-C-C-O-L-I.  I've come to this
30  meeting as a sister of two abused brothers.  One who deals with his abuse every
31  day.  The other, who endured sexual abuse multiple times, was not strong enough
32  and sadly silenced the demons in his head and committed suicide last May.  I ask
33  you when you talk about bankruptcy helping the expendable resources early on, my
34  question is, isn't each case covered by insurance by occurrence, not by a filing date?
35  Shouldn't that be taken into consideration as you state this was the best way to deal

October 12, 2023 | eLitigation Services, Inc.   11
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    with all the cases?  All the cases in my estimations will have multiple insurance
2    carriers involved in this.

3    **CORDILEONE:**      First of all, again, I am so very sorry for what your family has endured.  I -
4    - I almost can't speak when I hear what you say.  I'm so ashamed of my fellow
5    clergy who have committed such atrocities.  My understanding is that even with
6    insurance we have available, we still have to work out what insurance is available.
7    We don't know for sure yet what insurance is available, but it was clear with the
8    demands that were being made, that even with insurance coverage, it would not
9    have been enough to cover all of the settlements.

10   **ZOCCOLI:** I guess working in the business industry, I have a hard time with that as most of the
11   insurance companies have caps of, you know, in my understanding in (inaudible)
12   some of this procedure, is that there's -- we're talking six million, $5 million, and
13   my question we'll come back to, the insurance carriers as far as is this per
14   occurrence?  Is this per victim?  Is it per plaintiff?  Those questions have still yet to
15   be answered.  I also know you filed bankruptcy the day before a very large lawsuit
16   that was about to hit, and the timing, you know, I hear you say that you've thought
17   long and hard about this.  I feel the timing, literally the day before a very large
18   lawsuit was to hit, was pretty -- pretty speaking volumes as to what was happening.

19   **CORDILEONE:**      I understand that perception.  We did send notice two weeks before filing
20   that we were likely going to do it.  It took a lot of work to prepare for the filing.  I
21   have a great staff and they work very hard and long hours to have all of the legal
22   proceedings in place.  So, that took so much time that we went up right close to the
23   day before the trial, before we were able to file.

24   **GASPARI:** Ms. Zoccoli, this is Paul Gaspari, state court litigation counsel.  Insurance coverage
25   raises case-specific issues for each case.  Your lawyers are aware that we have
26   posted through the mediation process, the various insurance policies.  They are very
27   complex, and we are certainly doing everything in our power to get every carrier to
28   participate, but the -- it is complex, and it is case specific.

29   **ZOCCOLI:** I guess the -- my question is, every year when you file for insurance, there is a piece
30   in there that indicates who was your carrier in the prior year.  So, I'm assuming
31   people are going to have to go back into the '70s to find out who carriers were?
32   These aren't listed on a balance sheet or a P&L somewhere as to who insurance
33   was, what the time frame was?  It's also my understanding that the fiscal year end is
34   June.

35   **GASPARI:**  You're correct, and we are discussing that with liaison counsel.

October 12, 2023 | eLitigation Services, Inc.   12
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **ZOCCOLI:** Okay. So, then, I guess my next question, it might have to come from liaison
2  counsel, regarding insurance, is the fact that are these cases being looked at as to
3  date of abuse or calendar year of abuse?

4  **GASPARI:** That, again, you're asking a case-specific legal question. There is a different answer
5  for each insurance policy, and we will certainly work with liaison counsel on that.

6  **ZOCCOLI:** I appreciate that. And I'm also assuming that if there were any disbursements made
7  from the Diocese checking account back to the parishes that (inaudible) will also be
8  looked at?

9  **PASCUZZI:** Yes. This is Paul Pascuzzi. Yes. All of that has to be disclosed as part of the
10  process.

11  **ZOCCOLI:** Because it's my understanding that the parishes are limited as to assets that they can
12  hold at their parish levels. I have to assume then when they breach that level, the
13  monies then get forwarded to the Diocese; is that correct?

14  **PASSARELLO:**      This is Joseph Passarello with the Archdiocese. Any excess funds, cash or
15  investments, are transferred to the Capital Asset Support Corp., which is a separate
16  legal entity of the Archdiocese of San Francisco -- the Roman Catholic Archdiocese
17  of San Francisco. So, those assets are transferred by the parish or school to the
18  Capital Asset Support Corp.

19  **ZOCCOLI:** So, is this Capital Asset Support that you're speaking of right now part of the
20  protected portion of the bankruptcy, or is part of the assets from the Diocese?

21  **PASSARELLO:**      They're not a -- they are not a debtor in this proceeding.

22  **ZOCCOLI:** So, then the money that is being collected at the parishes or the ministries that is
23  feeding the Diocese are separate?

24  **CORDILEONE:**      This is Archbishop Cordileone. I'll try to answer the question as clearly as
25  I can. The real property support of the Capital Asset Support Corporation holds the
26  capital assets of the parishes. The parishes keep whatever certain amount they're
27  allowed to keep for their operations, but the excess, as Mr. Passarello has said, is
28  kept in this separate corporation. That is a different corporation from the Roman
29  Catholic Archbishop of San Francisco. The parishes keep their own money. They
30  have a right to that money. They do pay some fees and assessments to the
31  corporation's sole for the services the corporation's sole gives back to the parishes.
32  But the parishes' money belongs to the parishes.

33  **ZOCCOLI:** So, the capital assets that are held separately are owned by the parishes or owned by
34  the Diocese?

35  **CORDILEONE:**      They're parish assets. They're owned by the parishes.

October 12, 2023 | eLitigation Services, Inc.   13
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **ZOCCOLI:** Who controls that? Is it a separate accounting company? Is it -- who essentially
2    has control over that (inaudible) et cetera?

3   **PASSARELLO:**    Sorry for the interruption. This is Joe Passarello again. The Capital Asset
4    Support Corp. is a separate legal entity with a separate board. The Capital Asset
5    Support Corp was incorporated in 2007, and assets of the parishes and schools
6    where transferred to the Capital Asset Support Corp. in 2008.

7   **ZOCCOLI:** Thank you. So, then my question goes back to the prior meeting when it was
8    learned that a million two and 5.9 checks were written to Sacred Heart and to the
9    other parish. Where did that come from? Did that come from the Capital Asset or
10    did that come from the Diocese?

11   **PASSARELLO:**    If I -- and thank you for the question. This is Joseph Passarello again. If I
12    remember from a week and a half or two weeks ago, the funds -- the question --
13    there was a question about a $5 million payment transfer of funds from the
14    Institutional Deposit and Loan of the Archdiocese of San Francisco to the Sacred
15    Heart High School. They had funds on deposit. They had funds on deposit with the
16    Institutional Deposit and Loan, and they had requested that those funds be
17    transferred -- that their funds that are held by the Institutional Deposit and Loan are
18    -- were to be transferred to their high school for their use, either use for a capital
19    project or a project internally or to transfer to Capital Asset Support for a long-term
20    investment. And then there was -- and then to continued, I believe there was
21    another million dollar payment that was for another high school and that was the
22    same purpose. There were funds -- there are funds that they had on deposit that
23    they, being that high school, had on deposit with the Institutional Deposit and Loan
24    of the Archdiocese of San Francisco. They had requested those funds to be
25    transferred either to the high school for use for a capital project or internal needs or
26    to invest long-term in the Capital Asset Support Corp and their investment.

27   **ZOCCOLI:** Okay. So, just so I'm clear, the disbursements that we're speaking of came from the
28    Archdiocese?

29   **PASSARELLO:**    They were held in the Institutional Deposit and Loan fund of the
30    Archdiocese of San Francisco, and they were there funds that are on deposit in a
31    separate account held by the Archdiocese of San Francisco --

32   **ZOCCOLI:** Okay.

33   **PASSARELLO:**    -- in what's called an Institutional Deposit and Loan.

34   **ZOCCOLI:** So we have something called the Institutional Deposit, but then we also have
35    something else called Capital Assets where the parish's money goes to?

36   **PASSARELLO:**    That's correct.

October 12, 2023 | eLitigation Services, Inc.   14
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-1   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 15 of 132

**ZOCCOLI:** Okay. So, what I'm hearing then is the Diocese did in fact disburse the money even though you're calling it under the Institutional. So, we have all these little caveats of where money is being put so it doesn't look like it's part of the Archdiocese. I appreciate your time, gentlemen. Thank you.

**SANDY:** Our next caller is Madeline McFeely. You may go ahead.

**McFEELY:** Thank you. My name is Madeline McFeely. The last name is spelled McFeely. I am a survivor and a member of the creditor's committee. I have a comment and a question for the Archbishop, and I want to say I thank you for your extensive remarks at the beginning, and I'm glad to know that there are policies and procedures in place so that what happened to me and other survivors, hopefully, these incidents can be limited in the future. I have been struck by the phrase that you continue to use, which is "fair and equitable compensation for survivors." And -- but I also have heard you mention, and not just you, but other people within the Diocese and elsewhere, mention that the incidents that have provoked our lawsuits were more than 30 years in the past or even farther. And it strikes me that you say this and other people say this to highlight the fact that under normal circumstances these cases would be beyond a statute of limitations. I want to point out to you that as a survivor and a representative of survivors, that this process that you have initiated, the bankruptcy process, is organically not going to be fair or equitable to survivors. I know that you have said that your resources, it would absolutely (inaudible) the ability to pay, but we actually don't know that as was pointed out in the last caller -- by the last caller, there are so many ways in which the assets are obscured. You don't know as a matter of fact that you would not be able to litigate and pay these claims. As children, we were unprotected, we were victimized. We had no voice and no recourse. We were maimed, and that is how we walked through life, and I think you have expressed that you are -- you have witnessed the harm that this has done by speaking to many survivors. As adults now, the California legislature has passed the look-back period, and that also does finally a chance to have our voices heard, and maybe to obtain some resolution, maybe some justice. But we didn't get this. We are not going to get this, because, as you pointed out and others have pointed out, we do not get a day in court like other American citizens would get. We do not have the opportunity to have a voice before a judge and jury. I appreciate the fact that maybe some day at some point you would listen in a public forum to what has happened to us. I hope that would happen. I'm not sure that it will. We don't have the opportunity to request compensatory or punitive damages. Instead, we ended up in the consolidation of cases, the Northern California consolidation of cases, that process. And even in that process, you were asked -- the parties were asked to sit down and start to resolve these cases, to settle these cases. Again, you mention you don't have the resources to do that. Well, you didn't do that. You chose not to do that. You chose bankruptcy instead, and I have

October 12, 2023 | eLitigation Services, Inc.    15
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 16 of 132

1   to submit to you that Chapter 11 in no way represents fairness or equity, the phrase
2   that you use over and over again.  It's not fair to survivors.  What we think, and I
3   say this as a representative of survivors, we think that this represents a soft landing
4   for your tax-exempt corporation, and enables you to continue the business
5   enterprise.  That's the way it seems to us.  And while I appreciate everything that
6   you're trying to do going forward to prevent what has happened to use from
7   happening to anyone else, it doesn't solve our problem.  It doesn't solve the problem
8   of equity and fairness for the people that I'm trying to represent.  I wonder -- it
9   seems to me that although you profess to understand it, your actions -- the actions
10  of the bankruptcy do not demonstrate that and, in fact, it seems that there is a
11  breathtaking lack of empathy.  I will -- I thank the committee for their indulgence,
12  and I would ask you for list of options to my statement.  Thank you.

13  **CORDILEONE:**    Yes.  We did attempt to settle.  That was my preference.  I was hoping to
14  be able to avoid doing this.  We made very since efforts to settle.  However, the first
15  two cases that came up, seeing what the demands that were being made, it was clear
16  with 537 settlements to make that we would not have the resources for it.  We have
17  a finite amount of resources, and it was very clear with what was being demanded
18  in those first two cases that we wouldn't have enough to cover them all that that
19  standard.  So, I say "fair and equitable" because if we had gone ahead, the first few
20  survivors in line would have gotten very large settlements, and there would have
21  been nothing left for those after them.  So, in order for all of the survivors to receive
22  some compensation, this was the only alternative that we had.

23  **McFEELY:** Thank you.  But again, I say we don't know that's the truth because we don't know
24  the extent of your assets.

25  **PASCUZZI:**  This is Paul Pascuzzi.  I appreciate your comments, and part of the bankruptcy
26  process is working with your committee to put in a transparent way to make sure
27  that the committee does understand that as part of the process and that we can reach
28  a fair settlement for all involved.

29  **McFEELY:** Thank you.

30  **SANDY:**    The next person is Manny Suarez.  You may go ahead, sir.  Sir, you want to check
31  your mute button, please?

32  **SUAREZ:**    Good morning.  My name is Manny Suarez, spelled M-A-N-U-E-L, last name
33  Suarez S-U-A-R-E-Z.  Good morning, U.S. Trustee, Archbishop, and legal counsel.
34  I represent survivors on the (inaudible) committee.  I want to first thank all my
35  fellow survivors for their courage.  I have several questions for the Archbishop.
36  First question is, are you aware that there are several dozen claims by creditors
37  arising from childhood sexual assaults committed at Corpus Christi elementary

October 12, 2023 | eLitigation Services, Inc.    16
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    school in San Francisco between 1970 and 1989 by a Salesian Brother named
2    Salvatore Billante?

3    **CORDILEONE:**    I am aware of that name and that he was -- he's been accused of serial
4    abuse.  I'm aware of that, yes.

5    **SUAREZ:**  Who is the person most knowledgeable concerning the terms, conditions, and
6    contractual relationships between the Salesian Society and the Archdiocese with
7    regard to staffing and management of Corpus Christi School and parish between
8    1970 and 1989.

9    **GASPARI:**  This is Paul Gaspari, special litigation counsel.  You're now asking questions that
10   are specific to individual cases.  This is not the opportunity to ask those questions.
11   We will be working with counsel in those specific cases to respond to questions
12   such as that.

13   **SUAREZ:**  Why was Corpus Christi closed in 2012 and who made that decision?

14   **CORDILEONE:**    That was right before I came to the Archdiocese.  I haven't spoken to
15   anyone about the decision.  What I can say is normally those decisions are made
16   based on enrollment and finances.

17   **SUAREZ:**  Did the Archbishop of San Francisco corporation sole hold the California
18   Department of Education (inaudible) permitting the operation of Corpus Christi
19   school?

20   **CORDILEONE:**    I don't know about the legalities of those.  I don't know if any of the others
21   in the room do.

22   **SUAREZ:**  Does anyone else on the call have an answer to that question?

23   **PASSARELLO:**    This is Joseph Passarello.  I do not.

24   **UNIDENTIFIED**:    (inaudible) work with the committee to provide that answer.

25   **SUAREZ:**  Why was the Corpus Christi website changed to remove the representative that
26   Corpus Christi parish is a joint parish of the San Francisco Archdiocese and the
27   Salesians of Don Bosco?

28   **CORDILEONE:**    I'm not aware of that having been done, so no one spoke to me about it.

29   **SUAREZ:**  Does anyone on the call have an answer to that question?

30   **SUMMERHAYS:**    This is Father Patrick Summerhays.  Our pastors normally and their staff
31   are the ones who maintain and edit their websites.  We don't dictate anything from
32   the chancery level.  That's a decision that's made on a very local level.  So, when
33   they make changes and updates to their website, it's generally done at that level.

October 12, 2023 | eLitigation Services, Inc.    17
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 18
of 132

1   **SUAREZ:**   With no approval from the Archdiocese?

2   **SUMMERHAYS:**   That's correct.

3   **SUAREZ:**   Does the Archbishop corporation sole admit between 1970 and 1989 that Corpus
4   Christi parish was owned and controlled by Archbishop corporation?

5   **GASPARI:**   I'm sorry.  This is Paul Gaspari again.  You're asking -- a) you're asking for a legal
6   conclusion, and b) you're talking about specific questions about specific cases, and
7   we will deal with the lawyers on those cases on that issue.

8   **SUAREZ:**   My last question about Corpus Christi school again, isn't it true that the diplomas
9   we students received from Corpus Christi Elementary School were issued and
10   contained the name of the Archdiocese of San Francisco, not the Salesian Society?

11   **CORDILEONE:**   I cannot answer that because I've never seen the diploma.

12   **SUAREZ:**   We'll be happy to provide you a copy of that, sir.  That's all the questions I had.
13   Thank you very much.

14   **SANDY:**   The next questions come from Steve Moreno.  You may go ahead, sir.

15   **MORENO:**   Good morning, Archbishop Cordileone.  My name is Steve Moreno, S-T-E-V-E,
16   last name Moreno M-O-R-E-N-O.  Archbishop Cordileone, I come to you today
17   from the perspective as a child of God, as you are.  I have -- I was born and raised
18   in San Jose, attended St. Martin of Tours, Bellarmine College Prep in Santa Clara.  I
19   have two beautiful children who are also biproducts of a private Catholic education.
20   My question, Archbishop, most of the survivors of abuse on the creditor's
21   committee and the 529 others are all about the same age vintage as you are.  So, I'm
22   curious if anyone close to you suffered the same experiences as those on this call or
23   those we represent?

24   **CORDILEONE:**   The question is if I personally am close to someone who has been -- who
25   is a survivor of abuse by a member of the clergy?

26   **MORENO:**   That's correct, sir.

27   **CORDILEONE:**   I have gotten to know people after they experienced the abuse, but I
28   cannot say growing up that I knew anyone who had been abused by a priest.

29   **MORENO:**   Thank you.  I hope that we can tap into your, not only sympathy, but your empathy.
30   And I would say, as earlier mentioned, I do think your statement today was much
31   kinder and gentler to those on this committee.  I appreciate that.  I really do.  I'd
32   also say in the statement to the dear faithful of the Archdiocese of San Francisco
33   where you stated, "I remain committed to the healing and care of survivors who
34   have suffered irreversible harm because of the sins of the church's ministers."  I just

October 12, 2023 | eLitigation Services, Inc.   18
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-1   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 19
of 132

1  want to make one correction to the word "irreversible" when referring to harm to
2  survivors. I sleptwalked through 40 years of my life with buried secrets, shame,
3  guilt, and confusion, multiple attempts on my own life, demonic dreams, periods of
4  drug and alcohol abuse, inability to maintain healthy relationships due to lack of
5  boundaries, being sexualized at the age of eight, nine, or ten. That added another
6  layer of confusion and complexity. I even missed my sister's wedding because the
7  pastor who presided over it was my abuser. That took 40 years before I divulged
8  that to my sister, and it took many years of harm in that relationship. The good
9  news, the past ten years have been a journey of incredible healing, and this healing
10 had to be excavated because it's so deeply buried in my being. I'd add the church
11 was not there for me, nor any -- nor provided any services. My journey back to
12 Steve and God has been done away with the church. The pastor who is my abuser,
13 was actually already determined to be an abuser, Father Joseph T. Pritchard out of
14 St. Martin of Tours, and nobody reached to me. So, Archbishop, as stated in your
15 comment referenced earlier, are you truly committed to the healing and care of
16 survivors? And if so, I hope and pray that a sole -- as corporate sole, you will bring
17 not just closure, but transparency and dignity to the survivors of the church abuse
18 that you work to protect, as well as the interest of the Archdiocese, which we are
19 also part of. So, the question is, will you bring close, dignity, and respect to us as
20 children of God, and also members of your Diocese?

21 **CORDILEONE:**     I'm committed to doing all I can to achieve that goal. I praise God for
22 your healing. It's a sign of the resilience I mentioned in my opening comments,
23 which is inspiring. I apologize you did not receive assistance, looking for
24 assistance from the church. We do have, as I mentioned in my opening comments,
25 an office for child and youth protection. We have a victim's assistance coordinator
26 who is the point of contact to help provide survivors with the help that they need.
27 I'm committed to that.

28 **MORENO:** I appreciate that. Thank you.

29 **SANDY:**     At this time, there are no additional comments or remarks, and if you'd like to make
30 one, please press *1, please unmute your phone and record your name clearly when
31 prompted. And your name is required to be introduced for your question. One
32 moment, please. Our next comments come from Mr. McGarris. (phonetic) You
33 may go ahead. Sir, please unmute your phone. I'm sorry, Mr. McGarris. I'm --
34 we're unable to hear you at this time. Sir, can you please make sure your phone is
35 unmuted?

36 **VILLEGAS:** I'm sorry. Was the Villegas that you called?

37 **SANDY:**     Yes, sir. Yes, sir.

38 **VILLEGAS:** Oh, sorry. Yeah, sorry. Villegas. I heard an "M," I'm sorry.

October 12, 2023 | eLitigation Services, Inc.     19
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 20 of 132

1   **SANDY:**      I apologize.

2   **VILLEGAS:**  Yes.  My name Alfredo Villegas.  I'm an attorney with Zalkin law firm.  I have
3              three questions, Archbishop Cordileone.  Thank you for your time.  My first
4              question is, in what way do you think that filing bankruptcy shows that you are
5              totally compassionate to the complainant and how will this satisfy the process?

6   **CORDILEONE:**      As I mentioned a moment ago, it was clear to us that a few survivors
7              would receive very large settlements, and most would receive little to nothing.  In
8              order for all survivors to receive some compensation distributed in an equitable
9              manner, this seemed to be the only way to accomplish that.

10  **VILLEGAS:**  Thank you.

11  **CORDILEONE:**      You're welcome.

12  **VILLEGAS:**  My second question, will you allow the committee to have full access to all
13              insurance records of personnel of those working with the Diocese -- Archdiocese,
14              and how?

15  **GASPARI:**  Well, this is Paul Gaspari, special litigation counsel.  We are working with liaison
16              counsel on disclosure of insurance coverage.  That's a legal question.  I am happy to
17              work with the committee on that.  It's not appropriate for the Archbishop to answer
18              that question.

19  **VILLEGAS:**  No problem.  Thank you.  My last question, will you allow the committee to have
20              full access to all financial records with respect to the finances of affiliate entities,
21              and by affiliate, that would include any corporation in which the Archbishop of San
22              Francisco had reversionary interest at the time that non-debtor corporation
23              dissolves.

24  **PASCUZZI:**  And this is Paul Pascuzzi.  The -- I -- we will be working with the creditor's
25              committee.  I'm very sure that they will be requesting documents and information
26              from the debtor, and that's a normal part of the process, and we will be working
27              with them within the rules and the structure of the bankruptcy case to provide the
28              appropriate information.

29  **VILLEGAS:**  Thank you.  That's all my questions.

30  **SANDY:**      At this time, if you'd like to ask a question, please press *1, please unmute your
31              name and record your name clearly when prompted.  Your name is required to be
32              introduced.  One moment while we wait for any additional questions to come in.
33              Our next question is from Jan Zoccoli.  You may go ahead.

34  **ZOCCOLI:** My name is Jan Zoccoli, and this is my second set of questions.  This is in follow
35              up to the attorney who just spoke regarding the bankruptcy.  And Mr. Gaspari, this

October 12, 2023 | eLitigation Services, Inc.   20
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-1   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 21
of 132

1   may be for you, and it may not be able to be answered, but my question is, during
2   this bankruptcy action, when all of these cases are unfortunately going to be
3   grouped together as I keep hearing it's the easiest and most equitable way because
4   the initial cases may have received too much money, again, I'll go back to my
5   comment that isn't each case looked at by the insurance company, and again has to
6   be evaluated based on that insurance carrier at the time.  My question here is, does
7   this bankruptcy allow for one deductible for the Archdiocese?  Is that what's
8   happening here is the Archdiocese pays one deductible for all these claims and then
9   insurance has to pick up the rest?

10  **GASPARI:**   Thank you for your question, Ms. Zoccoli.  This is Paul Gaspari.  And again, to
11              specifically answers your question is there just one deductible that might be paid,
12              the answer to that question is no.  But again, every insurance policy is written on a
13              separate policy document with separate terms and conditions, is incredibly
14              complex, and we will be working closely with your attorney, Mr. Mezzetti, and the,
15              you know, other counsel and the creditor committee to maximize insurance
16              coverage, and hopefully (inaudible).

17  **ZOCCOLI:**   Thank you.  So, my follow up question to that is, the bankruptcy proceedings,
18              whether allowed or not to go forward, are mandating the insurance carrier's ability
19              to continue to settle and to pay.  Everything things to be stayed while this is going
20              on?

21  **GASPARI:**   Again, you know, and I apologize, you know, if my answer is going to be, you
22              know, a bit obtuse, but there are lots of legal complexities here.  We will be, over
23              the coming the months, again, working very clearly with committee counsel, state
24              court litigation counsel, coverage counsel, the insurance companies, to work
25              towards a resolution.  Yes, there is a blanket automatic stay in place, but that will
26              not prevent negotiations to attempt to reach the best possible settlement for all
27              parties.

28  **ZOCCOLI:**   I appreciate that.  Thank you.

29  **SANDY:**    As a reminder, if you'd like to ask a question, please press *1, unmute your phone,
30              and record your name.  One moment while we wait for any additional ones to come
31              in.  As a reminder, if you'd like to ask a question, please press *1, unmute your
32              phone, and record your name.  Hello?  The next question comes from Sheryl Neil.
33              You may go ahead.

34  **NEIL:**     Hi.  I'm Cheryl Neil, C-H-E-R-Y-L N-E-I-L, and I'm talking on behalf of my
35              husband.  And the question is, is there a differentiation between single occurrence
36              and serial occurrences?

October 12, 2023 | eLitigation Services, Inc.    21
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 22 of 132

| | | |
|---|---|---|
| 1 | **GASPARI:** | This is Paul Gaspari again.  Again, I think you're asking a question that is relatively |
| 2 | | overbroad.  It is -- there clearly are arguments for coverage for single occurrences. |
| 3 | | Some insurance policies have what are called aggregate.  Again, it is legally |
| 4 | | complex, and those are issues that we're working with committee counsel, liaison |
| 5 | | counsel, and coverage counsel. |
| 6 | **NEIL:** | Okay.  Thank you. |
| 7 | **SANDY:** | Once again, as a reminder, if you'd like to ask a question, please press *1, unmute |
| 8 | | your phone, and record your name so you can be introduced for your question.  At |
| 9 | | this time there appears to be no additional questions. |
| 10 | **BLUMBERG:** | Thank you, Sandy.  Mr. Stang, would you like to ask a question, sir, on |
| 11 | | behalf of the committee? |
| 12 | **STANG:** | Thank you.  Thank you, I would.  Archbishop, my name is Jim Stang.  I am the |
| 13 | | attorney who asked you some questions at the September 28 341 hearing.  I have |
| 14 | | questions that at the time committee decided not to ask because of the time limits on |
| 15 | | the examination, and I also have some questions following up on things that were |
| 16 | | said at the examination, and also some of the questions that were answered today. |
| 17 | | Archbishop, have you had the opportunity to review a written transcript of the |
| 18 | | examination of September 28? |
| 19 | **CORDILEONE:** | No. |
| 20 | **STANG:** | Do you know if your counsel has ordered or has a transcript of that examination? |
| 21 | **CORDILEONE:** | I believe they do. |
| 22 | **PASCUZZI:** | Mr. Stang, this is Paul Pascuzzi.  I have a copy of the audio that I just got.  It has |
| 23 | | not been transcribed.  So, we did order a copy from the U.S. Trustee's office, which, |
| 24 | | as you know, the procedure probably, they send you a CD.  It has not been typed |
| 25 | | up, nor has -- |
| 26 | **STANG:** | Mr. Pascuzzi, I'm going to save the estate some money and tell you that we've had it |
| 27 | | done, and we'll be happy to share our copy with you. |
| 28 | **PASCUZZI:** | Well, thank you. |
| 29 | **STANG:** | You're welcome.  Archbishop, I'm going to quote to you some of the things that you |
| 30 | | said at the hearing since you have not had the chance to -- the matter has not been |
| 31 | | transcribed yet for you.  If you think that I am misstating it or if perhaps the |
| 32 | | transcriber got it wrong, please correct me, because I don't want the examination to |
| 33 | | be based on an inaccurate recollection of what you said.  In your opening statement, |
| 34 | | you said, "The Pope called on his brother bishops to shoulder the sins of past |
| 35 | | generations."  You were referring to abuse when you were talking about -- child |

October 12, 2023 | eLitigation Services, Inc.    22
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 23 of 132

1    abuse when you were talking about the sins.  Do you believe that your pastors
2    should shoulder the sins of past generations?

3    **CORDILEONE:**    I'm not quite sure how to answer that question.  I'm -- because I would
4    look at it more in a spiritual sense, that we're a family of faith, and we share a
5    communion of our beliefs, of our practices.  And so as St. Paul says when he speaks
6    about the church as the body of Christ, whatever happens to one member of the
7    body happens to the whole body.  So, in a sense, there's this kind of a corporate
8    sense where even if the individual wasn't guilty of such a horrendous act, we all
9    suffer because of it.

10    **STANG:**    Well, in practical terms, what does it mean for you to "shoulder the sins of past
11    generations?"  You as the Archbishop of San Francisco.

12    **CORDILEONE:**    It means that I need to do all I can to bring about healing, please, and
13    reconciliation.

14    **STANG:**    Do you think that's the obligation of your pastors as well?

15    **CORDILEONE:**    Yes.  It's certainly part of the mission of the church, so it's part of the
16    duties of the pastor and parish.

17    **STANG:**    Do you think it is the day of your laity to do that?

18    **CORDILEONE:**    I would say everyone has a vocation in the church, so within the
19    appropriateness of this vocation, their stated life, we're supposed to live the gospel
20    in keeping with that vocation, and so as it corresponds to that vocation, yes.

21    **STANG:**    Do you think that that responsibility of the laity includes supporting the church's
22    financial compensation of survivors?

23    **CORDILEONE:**    Did you say "reporting financial compensation?"

24    **STANG:**    Supporting the financial compensation of survivors.

25    **CORDILEONE:**    I would put it this way, the lay faithful have the responsibility of
26    supporting the church's works, and in period of history, that's part of the church's
27    works, but it comes out of a -- I -- we speak about a spirituality of stewardship,
28    which is a sharing of time, talent, and treasure.  So part of that sharing of the
29    treasure, if you're talking about financial compensation, they live this spirituality of
30    stewardship, and as -- then we apply those resources as they're needed for the
31    mission of the church.

32    **STANG:**    As part of the fundraising by the Archdiocese since you became Archbishop, have
33    you ever said in a fundraising effort that the funds will not be used to pay the claims
34    of sexual abuse survivors?

October 12, 2023 | eLitigation Services, Inc.    23
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 24
of 132

**CORDILEONE:** I've said that that the Archdiocese has an annual appeal, which we ask the parishes to make a contribution for the operations of the chancery and the central offices of the Archdiocese. Those contributions go to designated services, and I've said because these are designated, they're restricted for these purposes. Those funds will not go to settle -- to the settlements.

**STANG:** Have you ever made an appeal to your parishes or laity that money be contributed for the compensation of sexual abuse survivors?

**CORDILEONE:** No. I've never made that specific appeal.

**STANG:** Okay. You said in your statement that, and I'm quoting you now, again as transcribed, "And I am encouraged by the fact," it says occurrency, but I think you said "occurrences of abuse within the Catholic church by now is very rare." What facts do you have that allowed you to reach that -- to be encouraged that abuse in the church is now very rare?

**CORDILEONE:** As you may be aware, the United States Conference of Catholic Bishops commissioned two studies on this problem by the John Jay College of Criminal Justice, and nature and scope, and a causes and context. The nature and scope study traced the incidences of allegations of abuse from 1950 to 2002. The graph clearly showed an increase in the 1960s and continued into the '70s. It peaked somewhere around the early '80s, if I recall correctly, then started to decline and decline precipitously in the 1990s. So, we have that hard data. Since 2002, we 've heard of very few incidences of allegations. Now, one might say that those who suffer the abuse go for years without reporting it. That may be a factor, but we also have very strict policies that every Diocese in the United States is following, and again, we're audited for compliance with those policies.

**STANG:** Okay. You said to -- I'm sorry. (Inaudible). I don't know that I always wrote down the name of the person who was asking you the questions, but you said that, I believe it may have been in response to Ms. O'Driscoll's questions, that you were willing to work with the committee to disclose the background of the abuse history in the Archdiocese. Is that -- did I generally capture that correctly?

**CORDILEONE:** I don't recall saying that.

**STANG:** You don't recall saying you were willing to work with the committee to disclose the background of abuse in the Archdiocese?

**CORDILEONE:** No.

**STANG:** Okay. Do you know Archbishop Wester of the Archdiocese of Santa Fe?

**CORDILEONE:** Yes, I do.

October 12, 2023 | eLitigation Services, Inc.   24
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

STANG:     Okay. Archbishop Wester, at the 341 meeting of that Archdiocese, made a public commitment that upon the confirmation of the plan of reorganization, all abuse documents related to abuse in that Archdiocese would be placed in a public archive at an educational institution at (inaudible) University, and that that would be done at the expense of the Archdiocese. So, my question to you is, would you be willing upon confirmation of a reorganization plan in this case, create a public archive of all documents related to abuse in the Archdiocese of San Francisco? And I'll just say parenthetically, redacting confidential information of survivors.

CORDILEONE:     One thing I can say absolutely is that I am committed to doing what is necessary to bring about peace, healing, and reconciliation. As we go through the discussions in the bankruptcy proceedings, any specific proposal, I will evaluate within that light.

STANG:     So, do I take from your answer that at this point in time you're not willing to make that commitment?

CORDILEONE:     That's incorrect. I'm saying I'll make that evaluation if and when that proposal is made down the line.

STANG:     Okay. That proposal is being -- I don't want to be -- argue with you, because that's not what this is about. But I'd like you to know we will put this in formal presentation. We are asking for that commitment.

CORDILEONE:     Thank you for letting me know.

STANG:     Okay. So, let me go on to more questions. I'd like to focus for a few minutes on what I'll call the child protection issues. And I appreciate that in your statement you described aspects of the child protection program, but specifically regarding the Internal Review Board. Does the Internal Review Board review abuse claims against religious order priests?

CORDILEONE:     Well, that's a good question because I don't recall us receiving an allegation against a religious order priest during my time here.

STANG:     Okay. So, my understanding is there are approximately 500 -- [crosstalk] I apologize. I thought you were done.

CORDILEONE:     What would happen in -- I could say if we were to receive such an allegation we'd work with the religious order, but it's really the responsibility of the order for -- because he's their priest. But, I mean, there would be communication between the Archdiocese and the order about it.

STANG:     Okay. And I apologize to the gentleman who was asking about Corpus Christi, I didn't get -- I didn't write down the name. He clearly was referring to abuse that he believes was perpetrated by a Salesian. Of the 536 complaints that have been filed,

October 12, 2023 | eLitigation Services, Inc.   25
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-1   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 26 of 132

1    that's the number I heard referenced earlier, do any of them allege abuse implicating
2    a religious order priest?

3  **CORDILEONE:**    I haven't seen all the names of the priests who have been accused, but I
4    would -- I believe some are religious order priests.

5  **GASPARI:**  Mr. Stang, this is Paul Gaspari.  Of course they do.

6  **STANG:**  Right.  And so, Archbishop, what -- let's just, you know, for the heck of it, say there
7    are ten just because it helps me to be concrete about numbers.  What has the
8    Archdiocese done vis a vis those allegation -- those ten allegations against religious
9    order priests?

10 **GASPARI:**  Well, Mr. Stang, again, this is Paul Gaspari.  If you're asking about how the
11    litigation was handled, that's obviously a matter of attorney work product and
12    attorney-client privilege.

13 **STANG:**  I was not asking about that.  The Archbishop said that they, again, I apologize,
14    Archbishop, I'm not a tape recorder.  But essentially, you work with or consult with
15    or somehow communicate with the religious order.  So, of the hypothetical ten
16    cases that -- of 536 that had allegations against a religious order priest, what has the
17    Archdiocese done in that regard with the religious orders?  And I'm not asking
18    about legal proceedings.  I'm asking about your reference to my previous question.

19 **CORDILEONE:**    I'm not clear these are historical cases.  They're not -- they're from a long
20    time ago.  Most of those accused are now dead.  So, I'm not really clear on your
21    question.

22 **STANG:**  Well, are there any that are not dead of the religious order --

23 **CORDILEONE:**    Again, I haven't read all the names.  From what I understand, not all of
24    them are dead.  Most are but not all is what I've been told.

25 **STANG:**  Okay.  So, for the -- I understand these are historical claims.  In a sense, every claim
26    is historical.  No one's calling you as they're being abused.  Of the ones that are
27    alive, what has the Archdiocese done to communicate with the religious order
28    whose member is the subject of an abuse complaint on file in court?

29 **GASPARI:**  Well, again, Mr. Stang, this is Paul Gaspari.  Those are matters that are being
30    handled by counsel.

31 **STANG:**  So, Archbishop, when you get a -- if you have a complaint against a Salesian or a
32    Jesuit or a Franciscan, do you or your clergy support staff have any communication
33    with a religious order to notify them that there's been a complaint alleged against
34    one of their members.

October 12, 2023 | eLitigation Services, Inc.   26
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

**CORDILEONE:**    If I were to receive a complaint of abuse against a currently serving priest who belongs to a religious order, I would refer that to the order.

**STANG:**    Okay.  To me this is very important because if there are people -- if there are clergy, religious order clergy who are alive who are the subject of an existing complaint, those folks are out there, and they might pose a risk to children if the allegations are true.  And so, do you have a process in place to determine if the religious order clergy is alive that would then be appropriate for you to communicate with the religious order?

**CORDILEONE:**    Okay.  My memory is starting to kick in.  I do recall now a couple of years ago, we have a pastor who is in a religious order who was accused and so he was kept out of ministry while our own Independent Review Board conducted an investigation.  His order's Independent Review Board also conducted an investigation, and so we were in contact with them.  Both review boards concluded the allegation was not sustained.

**STANG:**    Good.  In reviewing the 536 complaints that have been filed, and again, I may not have the exact number right, but I'm talking about the universe of them, has the Archdiocese determined which of the priests that are named in those complaints are alive?

**CORDILEONE:**    I haven't gone down to that level of detail.  I don't know if anyone in the room can answer that question.

**STANG:**    Okay.  By the way, is -- my operating assumption is that whoever is speaking in response to a question, whether or not they've been sworn in because obviously counsel has not been sworn in, but if the sworn in witnesses disagree with the statement, that they'll speak up.  Otherwise I'm going to assume that they would testify consistently with what the other person said.  And if I'm wrong about that, please let me know.  The -- do you -- if there were a living priest who is the subject of one of these complaints, do you consider that a complaint -- or a case, I'm sorry, (inaudible) a case that should be referred to the Internal Review Board?

**CORDILEONE:**    If there's a priest who's serving with faculties, and there's an accusation against him, I would bring that to the Independent Review Board and would commission an investigation unless it's clearly is -- has no foundation such as the facts don't line up.  If he was -- if the abuse, for example, was alleged to have happened at a certain parish at a certain timeframe and that priest was not there at that time.  Other than that, we keep them out of ministry while the investigation goes -- is conducted.

**STANG:**    Got it.  So the fact that these are in civil litigation complaints as opposed to someone calling up the Archdiocese and saying, hey, I'm complaining about

October 12, 2023 | eLitigation Services, Inc.    27
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    somebody.  These complaints are within the universe of accusations that could be
2    sent to the Internal Review Board?

3   **CORDILEONE:**    Yes.

4   **STANG:**    Okay.  So, before something goes to the Internal Review Board, is there someone
5    who makes a determination as to the credibility of the claim?  Because it sounded
6    like you were -- it suggested to me that someone's looking at this to determine if it's
7    manifestly unfounded, I think was the phrase you used earlier in your statement.  Is
8    there someone screening that before it goes to the Internal Review Board?

9   **CORDILEONE:**    It automatically goes to the Internal Review Board and going through our
10    legal counsel, or victim's assistance coordinator, the usual first point of contact.

11   **STANG:**    So any accusation of child sex abuse that comes into the Archdiocese goes to the
12    Internal Review Board?  There's no filter before it goes to them; is that correct?

13   **CORDILEONE:**    Correct.

14   **STANG:**    So, you said that in the 11 years of your service as the Archbishop, you've not yet
15    received a credible accusation against a priest.  Did I get that right?

16   **CORDILEONE:**    So far, correct.

17   **STANG:**    Okay.  I'll try to keep it up.  Since you became Archbishop, how many investigation
18    -- how many cases have been submitted to the Internal Review Board?

19   **CORDILEONE:**    Let's say there's been accusations in which we've had to conduct an
20    investigation, maybe seven, I believe, maybe eight.  Seven I could think of offhand.

21   **STANG:**    Okay.  I'm sorry, Archbishop.  I have to come back to something I was asking you
22    about earlier.  You just said "that we've had to conduct," "investigations that we've
23    had to conduct."  My understanding is that whatever accusation comes in goes to
24    the Internal Review Board.

25   **CORDILEONE:**    Yes.

26   **STANG:**    So -- okay.  I want to make sure that that -- your comment about how to conduct it
27    implies some kind of filter before it went to them.

28   **CORDILEONE:**    When I say "conduct an investigation," "we conduct an investigation," I
29    mean the Independent Review Board discusses it and then hires a professional
30    investigator to conduct the investigation.  That's what I -- that's what I mean when I
31    say "we conduct the investigation."  I mean it's under the direction of the
32    Independent Review Board.

33   **STANG:**    Got it.  And who is the "we" in that "we conduct the investigation?"

October 12, 2023 | eLitigation Services, Inc.    28
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 29
of 132

1    **CORDILEONE:**    The Independent Review Board.  So, an accusation is made.

2    **STANG:**    Yes.

3    **CORDILEONE:**    Some official in the chancery office, it could be our legal counsel, victim's
4    assistance coordinator, as I had said, and then we review it, present it the
5    Independent Review Board and, again, if the facts at least line up, then the priest
6    informed he has to stay out of ministry while we conduct the investigation.  "We"
7    being the internal Independent Review Board advised me that an investigation
8    needs to be conducted.

9    **STANG:**    Okay.

10    **CORDILEONE:**    And then the Board will identify an investigator to do that.

11    **STANG:**    Got it.  All right.  Thank you.  That's helping me understand the process a little
12    better.  Who appoints the members of the Internal Review Board?

13    **CORDILEONE:**    I do.

14    **STANG:**    And of the, I think there are five members, if I remember correctly, who has had the
15    short -- who is the shortest seniority, I mean, how recently is the last appointee
16    appointed?

17    **CORDILEONE:**    Oh, I think it's -- I think two years ago.

18    **STANG:**    Got it.

19    **CORDILEONE:**    Is it okay if I ask someone in the room who may know the answer?

20    **STANG:**    Sure.  Thank you.

21    **CORDILEONE:**    Yeah, that's right.  I was reminded.  There's one who just started recently
22    this year.

23    **STANG:**    And who is that?  By the way, their names are public.  They're on your website, so
24    I'm not invading anyone's privacy by asking you that.

25    **CORDILEONE:**    His name is Paul.  He's the survivor on the --

26    **STANG:**    Right.  All right.  I know his last name.  So, thank you.  Does the Internal Review
27    Board have any role in reviewing the child protection policies of the Archdiocese?

28    **CORDILEONE:**    Yes.

29    **STANG:**    And how often does the Internal Review Board review those policies?

30    **CORDILEONE:**    We would review those policies usually after we're audited, and if there
31    are suggestions that are made, we would review it then.  For example, one thing

October 12, 2023 | eLitigation Services, Inc.    29
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 30
of 132

1  we've done more recently was clarify an issue of sort of by-laws for the Board, so
2  we have more --

3  **STANG:**    Mm-hmm.

4  **CORDILEONE:**    We have some already, but we defined them more clearly.

5  **STANG:**    Does the Archdiocese maintain the records of Internal Review Board proceedings?

6  **CORDILEONE:**    Yes.

7  **STANG:**    And where -- who is responsible for the maintenance of those records?

8  **CORDILEONE:**    Our victim's assistance coordinator and -- with our legal counsel.

9  **STANG:**    Okay.  Are any of those documents considered by you to be subject to, I believe, it's
10  Canon 489 which establishes that certain files are to be under your exclusive
11  control?

12  **CORDILEONE:**    I hadn't really thought about that.  The question's never come up.

13  **STANG:**    Okay.  The physical files, they are in the office of the victim's assistance
14  coordinator; is that correct?

15  **CORDILEONE:**    Of the legal counsel.  I believe the legal counsel keeps those.

16  **STANG:**    Got it.  Okay.  If an abuse accusation is made against an employee of the
17  Archdiocese other than clergy, does the Internal Review Board have any
18  involvement in the assessment of those allegations?

19  **CORDILEONE:**    What I can say is, such cases have been discussed at the Review Board.

20  **STANG:**    Okay.  I think you earlier said -- you talked about -- I want to make -- you were
21  talking about the reporting process, and you said if it's clergy, it's first reported to
22  the civil authorities.  I assume you meant, like, governmental authorities, and then
23  the victim assistance coordinator, and if it's -- the abuser is in the same household it
24  goes to child protective services.  What do you do with an accusation against
25  someone who is not clergy and not interhousehold abuse situation?  Your janitor is
26  accused of abusing someone.  What do you do with that?

27  **CORDILEONE:**    Well, we investigate the claim and make sure there's some credibility to it,
28  that the employee is not having any contact with minors.

29  **STANG:**    Do you call the police?

30  **CORDILEONE:**    Yes.

31  **STANG:**    Immediately after you receive the accusation?

October 12, 2023 | eLitigation Services, Inc.    30
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **CORDILEONE:**      Yes.

2  **STANG:**     Okay.  There were a lot of questions that I asked last time about whether the
3                 Archdiocese maintains a list of credibly accused priests.  Do you have -- can you
4                 provide me today a definition of what this Archdiocese -- how this Archdiocese
5                 defines "credibly accused?"

6  **CORDILEONE:**      As you know, that's not a category in law, so different -- I've heard
7                 different theories as to what "credibly accused" means.  I try not to use that term
8                 and rather use a term "sustained" or "not sustained."

9  **STANG:**     Does the term -- I'm sorry, Archbishop.

10 **CORDILEONE:**      No, go ahead.

11 **STANG:**     I apologize.  I thought you were --

12 **CORDILEONE:**      Go ahead.

13 **STANG:**     Well, does the Internal Review Board, when they report to you the outcome of an
14                investigation, you said there have been some during your tenure, what do they say?
15                Do they say "This accusation is sustained," "This accusation is not sustained?"  Is
16                that how the phrase their report to you?

17 **CORDILEONE:**      Yes.

18 **STANG:**     Okay.  Does the Archdiocese have a list of clergy who are -- where the Internal
19                Review Board has made a determination that the accusation is sustained?

20 **CORDILEONE:**      We know which ones those are.  Yeah, we have our own lists.

21 **STANG:**     Okay.  Is it important to the Catholic community of the Bay area that there be a
22                consistent standard treatment of abuse claims, say example Santa Rosa, Oakland, or
23                San Francisco.  Do you think it's important that there be a standard approach to how
24                abuse claims are addressed?

25 **CORDILEONE:**      Well, within the church we do have a standard approach.

26 **STANG:**     Okay.

27 **CORDILEONE:**      We have the, you know, policies of the Charter for the Protection of
28                Children and Young People.  Our Dioceses follow those procedures.

29 **STANG:**     Right.  So, the Diocese of Santa Rosa publishes, and I don't know if they use the
30                term "sustained" or "credibly accused."  I'll stick with your terminology.  They have
31                published -- I'm sorry, it has published a list of sustained -- subjects of sustained
32                accusations.  The Diocese of Oakland has done that, and I may have said it while
33                you were still on the phone last time, every Diocese in California has done it except

October 12, 2023 | eLitigation Services, Inc.   31
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 32
of 132

1  for the Archdiocese of San Francisco.  Can you tell me why the Archdiocese of San
2  Francisco has not published the list of sustained -- a list of the names of those who
3  have sustained accusations?

4  **CORDILEONE:**  We publish a list of the names of priests and deacons in good standing
5  with faculties in the Archdiocese.  So, if anyone has a question about someone
6  presenting himself as a priest or a deacon, they can check the list to see if that name
7  is on the list.

8  **STANG:**  I understand that list exists, and I've looked at it.  Can you tell me why the
9  Archdiocese of San Francisco has not published the names of those who are the
10  subject of sustained accusations?

11  **CORDILEONE:**  I don't -- nobody's given me a reason why -- what -- a reason for doing so.
12  The most important thing is that our young people are being protected and that
13  those who abuse are kept out of ministry.  We're doing that.

14  **STANG:**  I agree with you that that is if not the most important thing, very close to the most
15  important thing.  But if I were the subject of sexual abuse by a priest in the
16  Archdiocese, do you think it is relevant at all to my healing to know whether the
17  Archdiocese has sustained accusations against my perpetrator?

18  **CORDILEONE:**  Yes.

19  **STANG:**  How do I know that?

20  **CORDILEONE:**  The name is not on our list of priests and deacons in good standing.  And I
21  haven't been involved in these investigations in the past.  If I were to be in an
22  investigation now, certainly the survivor would be informed of that.

23  **STANG:**  If my perpetrator were dead, he wouldn't be on the list, would he?

24  **CORDILEONE:**  That depends.

25  **STANG:**  Well, the ministers who are in good standing that you publish are all alive, aren't
26  they?

27  **CORDILEONE:**  Oh, that list.  That's correct.

28  **STANG:**  So, I wouldn't know because my perpetrators are deceased.  I wouldn't know if any
29  accusation had been sustained against him?  There's a question mark at the end of
30  that sentence.

31  **CORDILEONE:**  Oh, I see.  A survivor could obtain that information by contacting our
32  victim assistance coordinator.

October 12, 2023 | eLitigation Services, Inc.   32
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-1   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 33 of 132

1  **STANG:**  Okay.  I'm just pausing for a moment to see if this list -- on this trial protection
2             issue if the questions have already been answered.

3  **CORDILEONE:**   Okay.

4  **STANG:**  Does the Archdiocese -- I -- am I correct that the Archdiocese has a personnel file
5             on it's currently serving -- on its priests who are in active ministry?

6  **CORDILEONE:**   Yes.

7  **STANG:**  Okay.  And does -- if I were to lodge a complaint against Father X today for abuse,
8             does that -- and I do that in writing, it's a written accusation, does that accusation go
9             into his personnel file?

10  **CORDILEONE:**   Yes.

11  **STANG:**  So, there's actually a physical file that you would call a personnel file?

12  **CORDILEONE:**   Yes.

13  **STANG:**  Okay.  I ask it that way because in my other cases, I've learned that the phrase
14             "personnel file" sometimes is not actually a physical file with Father X's name on it,
15             so that's why I was asking.  And any correspondence regarding Father X's ministry,
16             would it -- does it go into his personnel file?

17  **CORDILEONE:**   Yes.

18  **STANG:**  So, I don't have to comb other offices to try to find information about Father X and
19             how he's performed his ministry.  It's in one location?

20  **CORDILEONE:**   You know, I would have to double check, but certainly when there is an
21             accusation, so, that would be with the legal counsel.  I'm presuming they make a
22             copy to put it in the priest's personnel file, but I've never thought to ask if they
23             actually do that.  But if someone needs to see that file, it is available.  If they don't
24             find it in the priest's personnel file, they can find it in the file of the legal counsel.

25  **STANG:**  Okay.  Does the Diocese have a document retention policy for personnel files for
26             deceased priests?

27  **CORDILEONE:**   I don't recall if we do or not.  If we do, it was put in place before I came
28             here.

29  **STANG:**  Do you know if the Archdiocese has a policy of destroying personnel files of
30             deceased priests?

31  **CORDILEONE:**   No, I don't.

October 12, 2023 | eLitigation Services, Inc.   33
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **STANG:**     Would the personnel file include the documentation of the Internal Review Board's
2             consideration of an accusation against that priest or is that a separate doc -- a
3             separate file?

4   **CORDILEONE:**     Again, if it's not in the priest's personnel file, then it would be in the file
5             that is kept in the -- with the legal counsel.

6   **STANG:**     Right.  So, I got the Internal Review Board minutes of a meeting regarding Father
7             X.  That's either going to be -- there's the Review Board's file, which I think you
8             said was kept with the victim assistance coordinator.  It might be in his personnel
9             file, and it might be in the legal file.  Is that where does -- [crosstalk].

10  **CORDILEONE:**     I think I need to correct myself.  I believe these cases or these
11            investigations are kept with the legal counsel, not the victim's assistance
12            coordinator.

13  **STANG:**     And how about the historical ones?  The ones that were completed in -- are
14            completed.  Would they be with legal as well?  I'm sorry.  I'm sorry.  I -- we spoke
15            over each other.

16  **CORDILEONE:**     I would need -- I would need to confirm this, but I believe it's -- they're all
17            kept with the legal counsel.

18  **STANG:**     Okay.  Mr. Gaspari, can you -- I appreciate you're not a witness today, but how long
19            have you been representing the Archdiocese on defense of sexual abuse claims?

20  **GASPARI:** About 40 years.

21  **STANG:**     Okay.  You go back far enough.  Archbishop, you were the auxiliary bishop in San
22            Diego in 2002; is that correct?

23  **CORDILEONE:**     Yes.  That's the year I was named a bishop.

24  **STANG:**     Yeah.  Wikipedia got it right.  Were you serving in the Diocese of San Diego during
25            its bankruptcy case?

26  **CORDILEONE:**     Yes.

27  **STANG:**     And what was your position at that time?

28  **CORDILEONE:**     More pastoral presence out in the Diocese.  The bishop and the vicar
29            general were more involved in the bankruptcy proceedings.  I didn't get involved in
30            that myself.

31  **STANG:**     Were you assigned to a parish, or were you working at -- through -- out of the
32            chancery?

October 12, 2023 | eLitigation Services, Inc.    34
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

**CORDILEONE:**    I was working out of the chancery.  I had three different residences.  One I was a pastor for awhile, but then I stepped down as pastor and auxiliary bishop (inaudible) be the pastor of a parish and priest was assigned as the pastor, but I remained in residence there for several months before I moved to another location.

**STANG:**    I'm guessing I didn't meet you because I was counsel in San Diego to the committee.

**CORDILEONE:**    Yeah, that's right.

**STANG:**    So, in your statement, you said that $70 million over the past 20 years has been paid to survivors either directly or by funding group settlement funds.  Do you know how many survivors' claims were settled by payment of that $70 million?

**CORDILEONE:**    No, I don't.

**STANG:**    Do you know how much of the $70 million was covered by insurance carriers?

**CORDILEONE:**    I don't recall the exact number, but I believe it was the majority of it.

**STANG:**    Okay.  As part of the settlements with the survivors, did the Diocese cancel any of its insurance policies in order to get money from the carriers?

**CORDILEONE:**    I don't believe so, because we still have the insurance.

**STANG:**    Okay.  Do -- and this is maybe you might think I'm asking you the same question, do you know what the average settlement was for -- well, let me step back.  How many claims were filed against the Archdiocese of San Francisco during California's first window in the early 2000s?  It was a one-year window.  Do you know how many were filed?

**CORDILEONE:**    I don't know.  Someone else in the room may know, but I don't know.

**STANG:**    Mr. Gaspari, can you help us with this one?

**GASPARI:** I'm happy to work with you to give you that number.  If I gave you a number today, I'd be guessing off the top of my head, and I don't think that's appropriate.

**STANG:**    Okay.  Mr. Gaspari testified that -- you didn't testify -- said that insurance policies had been given to, I think you said liaison counsel as part of the mediation process.  Archbishop, do you know of the 536 claims that have been filed, what is the earliest date of abuse?  And if you know approximately, that would be okay too.

**CORDILEONE:**    I'd have to guess.  I know we have some cases going back to the '50s.  I don't know if we have any that go back further than that.

**STANG:**    Okay.  Do you know whether the Archdiocese is missing any insurance policies for the claims that have been asserted in the 536 complaints?

October 12, 2023 | eLitigation Services, Inc.    35
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    **CORDILEONE:**    No, I don't know.

2    **STANG:**    Mr. Gaspari, is that something -- I'm not asking -- going to ask you year by year,
3    but I'm just curious as to whether the insurance policies that have been produced in
4    the mediation, which we have not received yet as the committee, are -- whether any
5    years of coverage are missing in terms of the insurance policies.

6    **GASPARI:**    Again, we'd be happy to work with you, you know, offline with our coverage
7    counsel and your coverage counsel. You know, as you can imagine, the existence
8    of policies are in different states, I mean, different states, small "s." There are -- we
9    have complete copies of some policies. We have partial copies of some policies.
10    We have secondary evidence of some policies.

11    **STANG:**    Okay. All right. You're right. We're -- it's probably not all that more useful today
12    to get into that, so I'm going to move on. Archbishop, it's my understanding that the
13    parishes of the Archdiocese are not separate California -- are not California
14    corporations; is that correct?

15    **CORDILEONE:**    Yes. That's correct. Each parish is not its own separate corporation.

16    **STANG:**    Okay.

17    **CORDILEONE:**    In State law.

18    **STANG:**    I believe the -- I'm sorry.

19    **CORDILEONE:**    I'd say in State law, capital "S."

20    **STANG:**    Yeah, yeah. No, I understand. I generally am familiar with the concept of juristic
21    person. So, I got it, under State law. That's what I was asking.

22    **CORDILEONE:**    Yes.

23    **STANG:**    The testimony on September 28 was that a parish does not have a governance
24    structure other than the pastor himself. There's no Board of Trustees. There's no
25    board that manage the -- I mean, I know there's committees. There's the finance
26    committee, there's a pastoral committee, there's a ritual committee. I know there are
27    those kinds of committees. But in terms of the administration of the parish itself,
28    it's the pastor period. Is that right?

29    **CORDILEONE:**    That is through the governance of the parish. Canon law, universal law of
30    the church, requires the finance counsel.

31    **STANG:**    Yeah.

32    **CORDILEONE:**    Local policy requires the pastoral counsel. But in terms of the governance
33    of the parish, it's the pastor.

October 12, 2023 | eLitigation Services, Inc.    36
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **STANG:**     Okay.  And prior to the filing of the bankruptcy, say 30 days before the bankruptcy
2                      was filed, did you meet with -- I've heard it described different -- well, let me step
3                      back.  I have heard the term "Presbyteral Council," "college of Consultors."  In
4                      understanding of those phrases, it's basically the pastors of the Archdiocese.  Do
5                      you have a term that you would use to describe as a body, the pastors?  I want to
6                      make sure we're using the same terminology.

7  **CORDILEONE:**     So, the presbyteral council, there's a representative groups of priests in the
8                      Archdiocese, priest of what we call the presbyterate.  This presbyterate are those
9                      priest who are either incardinated into the Archdiocese or are serving in the
10                      Archdiocese by appointment from the Archbishop.  So, as you probably know,
11                      they're religious order priests that are doing other work that's not on behalf of the
12                      Archdiocese in their schools and so forth.  They're not a part of the presbyterate.
13                      So, those Presbyteral Council is a representative group appraised, so they are the
14                      deans -- a deanery is geographical area consisting of all the parishes in that area and
15                      other institutions under the Archdiocese.  So, there's a dean to coordinate their
16                      activity that consists of their always -- almost always, if not always, pastors.  And
17                      then there are other representatives, the two representatives from religious orders,
18                      there's a representative of the parochial vicars, a representative of those in what we
19                      call special ministry, not parish ministry, but some other form of ministry.  That's
20                      the Presbyteral Council.  The College of Consultors is mostly pastors, but the vicar
21                      general is on that college, and the vicar for clergy, if I recall correctly is on that
22                      college, and they're consulted for more technical and higher level importance of
23                      administrative decisions.

24  **STANG:**     Okay.  Prior -- say within 30 days prior to the bankruptcy, did you call a meeting of
25                      all of your pastors to inform them of the possibility of the bankruptcy filing?

26  **CORDILEONE:**     I recall having had a meeting with the priests, but I don't remember
27                      exactly when it was.

28  **SUMMERHAYS:**     Mr. Stanger --

29  **STANG:**     It was regarding the possibility of filing the bankruptcy?

30  **CORDILEONE:**     Yes.  I think the summaries may be able to fill in some information here.

31  **SUMMERHAYS:**     Mr. Stanger, this is Father Summerhays.  We did, within 30 days, call a
32                      meeting of the presbyterate together, and we had that meeting on the morning that
33                      we filed for Chapter 11.

34  **STANG:**     Okay.  Were there minutes of that meeting maintained?

35  **SUMMERHAYS:**     No, there were not.

36  **STANG:**     And it wasn't recorded by anyone that you know of?

October 12, 2023 | eLitigation Services, Inc.    37
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 38
of 132

1    **SUMMERHAYS:**    Not that I know of.

2    **STANG:**    Okay.  Archbishop, did you attend that meeting?

3    **CORDILEONE:**    Yes.

4    **STANG:**    Did you inform the pastors that had gathered that parishes would be expected or not
5    expected to contribute to the financial settlement of the abuse claims?

6    **PASCUZZI:**  Mr. Stang, this is Paul Pascuzzi.  I was at that meeting as well, and so I don't -- I
7    don't think questions about the communications at that meeting are appropriate.
8    They are probably attorney-client privileged and otherwise privileged.

9    **STANG:**    So, I could ask some follow-up questions about that, but I'm not sure that that's the
10    best use of my time today.  But I'll just say -- I hate using this terms, but
11    occasionally you have to -- for the record, I'm not sure that the mere presence of
12    counsel who is not communicating or receiving confidential communications would
13    constitute privilege, but we'll perhaps discuss that offline.  I just didn't want my
14    moving onto another topic to be some kind of concession that that was -- that we
15    agreed with that conclusion.  So, I'll move on.

16    Archbishop, did you communicate with the Holy See regarding your decision to file
17    bankruptcy for the Archdiocese?

18    **CORDILEONE:**    Yes.

19    **STANG:**    And did you ask permission of the Holy See to file the bankruptcy?

20    **CORDILEONE:**    Yes.

21    **STANG:**    And when did you send that -- when did you communicate that request to the Holy
22    See?

23    **CORDILEONE:**    It was some time in early August or mid-August.

24    **STANG:**    Okay.  Presumably they said yes.

25    **CORDILEONE:**    Mr. Passarello has a more exact answer.

26    **PASSARELLO:**    I believe it was late July.  This is Joe Passarello.

27    **STANG:**    Okay.  Did the Holy See respond that request?

28    **CORDILEONE:**    Yes.

29    **STANG:**    Okay.  And I said I'll assume they said yes.  I'm going to stay with the parish
30    relationship just for a few more minutes.  Had the parishes retained any legal
31    counsel -- well, let me step back, Archbishop.  I have not looked at the individual

October 12, 2023 | eLitigation Services, Inc.    38
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 39
of 132

1    lawsuits that constitute the body of the 536 complaints, but I'm assuming parishes
2    were some -- in some cases parishes were named as defendants.  Have any of the
3    parishes retained counsel separate from Mr. Gaspari's firm to defend them in those
4    abuse claim -- in those abuse cases?

5    **GASPARI:**  I can answer that question and the question is well, not only no, but parishes have
6    not appeared in any of those lawsuits.

7    **STANG:**    Appeared meaning they're not named or they haven't made appearances in court?

8    **GASPARI:**  In some instances they were named, but there have been no appearances.  They do
9    not exist.

10   **STANG:**    Got it.  Okay.  See, Archbishop, lawyers can't even understand each other when a
11   simple word like "appearances" is made -- is used.  Are there any written
12   agreements between the Archdiocese and its parishes in which the Archdiocese
13   agrees to be responsible for claim -- abuse claims against parishes?

14   **CORDILEONE:**      No.

15   **STANG:**    Okay.  And are there written contracts, written agreements, between the
16   Archdiocese and parishes for services that the Archdiocese may render to the parish
17   such as financial consultation, bookkeeping services, that sort of thing?

18   **CORDILEONE:**      I'm not aware of anything in writing about those services.

19   **STANG:**    Okay.  Got it.  And does the Archdiocese collect -- and this may be an arching term,
20   Archbishop, but excuse me if I'm not up on the terminology.  Does the Archdiocese
21   collect a cathedral tax from the parishes?

22   **CORDILEONE:**      This is what we call the assessment for the annual appeal.

23   **STANG:**    Okay.  So, there's no payment from the parishes to the Archdiocese based on its
24   general weekly corrections; is that correct?

25   **CORDILEONE:**      Each parish is assessed for what they pay, what they're asked to contribute
26   to the appeal, and it's based on their annual collections.

27   **STANG:**    The amount they're supposed to raise for the appeal is based on their collection --
28   the weekly collections?

29   **CORDILEONE:**      Yes. Yes.

30   **STANG:**    Okay.  Got it.  Got it, got it, got it. Okay.  Okay.  So, I'm going to ask a few
31   questions about how money moves around inside the Archdiocese, and I appreciate,
32   Archbishop, that a lot of those questions might be answered by Mr. Passarello.  But

October 12, 2023 | eLitigation Services, Inc.    39
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 40
of 132

1         I would again ask that if you disagree with anything he has said, I would ask you to
2         speak up.

3   **CORDILEONE:**     I will.

4   **STANG:**     So, and I apologize, is it Passarelli or Passarello?

5   **PASSARELLO:**     Passarello.

6   **STANG:**     Passarello. Okay, I'll --

7   **PASSARELLO:**     Passarello, yes.

8   **STANG:**     Passarello, okay. All right. Thank you. So, I would like to make -- let's do a
9         hypothetical. I would like to make a hundred dollar contribution to the
10        Archdiocese, unrestricted. I send the money in, it's a check. What happens with
11        that check when it arrives at the Archdiocese?

12  **CORDILEONE:**     If it arrives at the chancery, and it is for the chancery, it goes into our
13        general fund.

14  **STANG:**     Directly into a general operating account?

15  **CORDILEONE:**     Correct.

16  **STANG:**     It does not pass go, it does not go through any other kind of concentration account.
17        It just does directly, weekly, and daily, whatever you do deposit wise, it goes right
18        into the general account?

19  **CORDILEONE:**     If it's a hundred -- what I heard is a hundred dollar deposit that's made to --
20        that's unrestricted, just a hundred dollar gift out of the blue.

21  **STANG:**     Right. Okay. If I hand that check to the pastor of my parish, do you know what
22        happens with that check?

23  **CORDILEONE:**     If it's for the parish --

24  **STANG:**     It says -- it says Archdiocese of San Francisco, but I just didn't want to mail it in. I
25        was too lazy to go downtown. I hand it to Father X. Does that happen?

26  **CORDILEONE:**     I don't know if that happens.

27  **STANG:**     Okay. So, now I want to make a contribution to the church, to the Archdiocese, but
28        I only want it to go for, let's make up a purpose, seminary and training. I -- the
29        check arrives at the chancery. What happens to that check?

30  **CORDILEONE:**     We would open the envelope, post it, and then review what the -- if there
31        are any restrictions on use, and if there is a -- that would be if there is a note or an

October 12, 2023 | eLitigation Services, Inc.   40
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1        indication that it is restricted for seminary and training, then we would note that in
2        our records and we would put that in a restricted bank account.

3  **STANG:**    Does that check get deposited in the general operating account before it -- well,
4        where does the check get deposited?

5  **CORDILEONE:**    It gets deposited in a restricted bank account.

6  **STANG:**    So, there's a separate bank account with a separate account number at Bank -- I
7        don't know where you bank, say Bank of America.  There's actually a separate bank
8        account that is where only restricted funds go?

9  **CORDILEONE:**    That's correct.

10  **STANG:**    And it does not go through a general operating account?

11  **CORDILEONE:**    That's correct.

12  **STANG:**    Okay.  And the financial office staff reviews the check with any accompanying
13        documentation to determine whether or not it's restricted and the nature of the
14        restriction?

15  **CORDILEONE:**    That's correct.

16  **STANG:**    Okay.  When Sacred Heart High School deposited -- well, let me step back.  The
17        hypothetical is the parish has excess funds, and it wants to deposit that money in the
18        institutional deposit and loan fund.  It has a check for that excess funds.  Typically,
19        who is that check made out to or a wire transfer, yeah.  I'm being -- trying to be a
20        little mechanical here, but, you know, I know that not everything goes by check
21        these days.

22  **PASSARELLO:**    Okay.  And so, Mr. Stang, my understanding of your question is, and this
23        is Joseph Passarello, is that there is a check that comes in from the -- that a check --
24        the parish has extra -- excess funds and wants to deposit that into an account to earn
25        interest.  Because it's from the parish, it would go to the Capital Asset Support
26        Corp., and it would be deposited by the Capital Asset Support Corp. at the -- based
27        on the instructions of the parish.

28  **STANG:**    So, if it's made out to the Archdiocese -- so, the check would be deposited directly
29        into the CASC?

30  **PASSARELLO:**    It would go directly to Capital Asset Support Corp., and their accounting
31        and operations would handle the accounting and deposit of that.

32  **STANG:**    That check does not go into a general operating account of the Archdiocese; is that
33        correct?

October 12, 2023 | eLitigation Services, Inc.    41
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 42
of 132

1    **PASSARELLO:**      That's correct.

2    **STANG:**      And Mr. Passarello, how long have you been -- I'm sorry.  Your title is what today?

3    **PASSARELLO:**      Excuse me.  My current title is Senior Financial Director.  I informed the
4            Archbishop and Father Summerhays in January that I was going to be retiring in
5            January of 2024, and we made a public announcement to the finance council and
6            the investment committee and the team here in February.

7    **STANG:**      That's so quick, Mr. Passarello.  Do you know if, since the inception of the CASC,
8            have deposits ever first gone through the general operating account of the
9            Archdiocese before they ended up at CASC?

10   **PASSARELLO:**      I don't know what's happened since inception of CASC.  That was prior to
11           my appointment as Chief Financial Officer and now as Senior Financial Director.  I
12           will say that I am not aware, but that's not saying that it could not have happened
13           where a check was inadvertently provided here, deposited, and then ultimately
14           transferred the Capital Assets Support Corp.  I'm not aware of --

15   **STANG:**      Is this -- sorry.  Is there an accounting policy manual or written direction on how
16           funds received at the chancery are to be dealt with if directed -- if intended for the
17           CASC?

18   **PASSARELLO:**      I'm not aware of -- there may be and there may not be.  I'm not aware if
19           there is or there is not.

20   **STANG:**      What is -- if I'm a parish, do I get to deposit money with the institutional deposit
21           and Loan fund?

22   **PASSARELLO:**      No, you're not.  No.

23   **STANG:**      All right.  So, parishes don't put their money there.  Can you generally describe the
24           entities that do put their money in the deposit and loan fund?

25   **CORDILEONE:**      Yes.  Generally is the four Archdiocesan high schools.  It is St. Patrick
26           Seminary.  There's some Catholic charities, and the Holy Cross Cemetery.

27   **STANG:**      Okay.  So, when Sacred Heart wants to deposit money into the -- if I can, I'll use the
28           term DLF, into the DLF --

29   **CORDILEONE:**      Yeah. Institutional Deposit and Loan, correct.

30   **STANG:**      Yeah.  Can I call it DLF for shorthand just for today?

31   **CORDILEONE:**      Yeah.

32   **STANG:**      Okay.  So, Sacred Heart wants to send you a hundred dollars -- wants to send a
33           hundred dollars to be deposited in the DLF.  How does that happen, mechanically?

October 12, 2023 | eLitigation Services, Inc.    42
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **CORDILEONE:**      They send a check to the Archdiocese of San Francisco and it gets
2                          deposited in a general account, and then it is transferred to a separate with an
3                          investment group.

4   **STANG:**   Okay.  And is there a prescribed period of time between the deposit of that money
5               into the general account and the delivery into this second account that you just
6               described?

7   **CORDILEONE:**      No.  It happens as soon as possible or practical may be a better term.

8   **STANG:**   Mm-hmm.  And who makes the decision to move money from the -- who decides
9               when it's practical to move money from the general operating account to the DLF?

10  **CORDILEONE:**      It -- practical would be if it's received on Friday after the -- after banking -
11                         - the close of the bank, then it would be done as early as possible the following
12                         week.

13  **STANG:**   Okay.  So, other than banking hours, would you say there's no judgment involved of
14              any individual as to when to move the money?

15  **CORDILEONE:**      I don't believe there's any judgment that's placed on that.

16  **STANG:**   Okay.  When someone -- when Sacred Heart wanted to withdraw the $5 million
17              from the DLF, as I understood the testimony, Father Summerhays sits on the Board
18              of Sacred Heart, Archbishop, you sit on the Board at Sacred Heart.  So, Sacred
19              Heart's Board has decided that it wants to pull $5 million out of the DLF.  Maybe
20              we'll get into someday how that decision got made, but not today.  They want $5
21              million.  How does that --

22  **CORDILEONE:**      I don't think that that decision goes to the governance board of the high
23                         school.

24  **STANG:**   Really?

25  **CORDILEONE:**      We receive -- it may be done, but what we receive is a letter from the high
26                         school president requesting the transfer of those funds, either the high school
27                         president or the finance director at the high school, copying the president of the
28                         high school requesting a transfer of those funds.  That --

29  **STANG:**   Okay.  Like I said, we'll get -- maybe someday we'll explore, you know, the
30              decision making to get that $5 million out, but you're right.  You're focusing right
31              now on what I'm curious about.  So, some communication is made, an email, a
32              letter.  Does it have to be in writing or could it be a phone call?

33  **CORDILEONE:**      It's a letter from the institution requesting the funds.

34  **STANG:**   Okay.

October 12, 2023 | eLitigation Services, Inc.   43
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    **CORDILEONE:**        I believe it's a letter.  I'm only aware of letters that have come through,
2                    written requests.

3    **STANG:**        Okay.  And so the letter comes in, and Sacred Heart has asked for $5 million.  Do
4                    you recollect that particular transaction, so we're not talking about a hypothetical?

5    **CORDILEONE:**        I remember something came in.  There was a $5 million request and
6                    payment that occurred.

7    **STANG:**        Okay.  So, who determines at the DLF that it will honor that request?

8    **CORDILEONE:**        We honor the request based on the request -- we honor the request because
9                    it came from the high school.

10    **STANG:**        So, there's no process by which that request is reviewed to determine if that's an
11                    appropriate withdrawal?

12    **CORDILEONE:**        Not -- no.  We don't do that.  What we do do is we ensure that if they're
13                    reviewing it for a capital project -- well, we don't -- no.  We don't -- we do not -- I
14                    am not involved, and I don't believe we go through and ensure that they can
15                    withdraw -- that there's a question about them withdrawing the funds.  If they want
16                    to withdraw the funds, we -- we're -- we approve that and we execute that
17                    transaction.

18    **STANG:**        Yeah.  And I'm generally familiar that sometimes Dioceses have to review capital
19                    projects and affiliates and so forth, but again, I'm really trying to focus on the
20                    process of withdrawing the money, not the decision on the taking, you know, to
21                    take it out.  So, you get the letter --

22    **CORDILEONE:**        There -- Mr. Stang, there is -- I believe that there is a parish or a mission
23                    that has a small amount of funds in the Institutional Deposit and Loan.

24    **STANG:**        Okay.  All right.  But staying with Sacred Heart for a moment, it sent in a letter for
25                    $5 million, and that was honored without any judgment by any party as to whether
26                    that withdrawal should be allowed -- at the DLF level, no judging by anyone at the
27                    DLF level.

28    **CORDILEONE:**        It wasn't the -- we didn't question that.  There wasn't judgment.  If there
29                    were delays in payments, they were not intentional.

30    **STANG:**        Okay.  Archbishop, you sit on the board of Sacred Heart High School.  Why did
31                    Sacred Heart High School withdraw $5 million from the DLF?

32    **CORDILEONE:**        That question was never discussed our -- any meeting of the governance
33                    board.

October 12, 2023 | eLitigation Services, Inc.    44
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    **STANG:**    Father Summerhays, do you recall any discussion of why Sacred Heart was
2           withdrawing $5 million from the DLF?

3    **SUMMERHAYS:**    This is Father Summerhays. I don't remember any conversations ever at
4           the governance board meetings about withdrawing money.

5    **STANG:**    What happened to this -- where did that money go when it arrived to Sacred Heart?

6    **SUMMERHAYS:**    I can't say.

7    **STANG:**    Was that the Archbishop responding or Father Summerhays?

8    **CORDILEONE:**    That was Father Summerhays. I just repeat Father Summerhays. We --
9           this was never discussed. We were not informed about it. We don't get involved in
10           the day-to-day finances of the school. So, we're not able to answer the question.

11    **PASSARELLO:**    This is Joe Passarello. They either used that for a capital project, or they
12           transferred it to Capital Assets Support Corp because they wanted to invest it long
13           term in the investment pool with the Capital Assets Support Corp.

14    **STANG:**    Do you have -- is there anyone testifying today who has a recollection, and I
15           apologize, I don't have it front of me, when that withdrawal was made?

16    **PASCUZZI:**    Mr. Stang, this is Pascuzzi. I believe it's on the schedules.

17    **STANG:**    I'm sure it is, but I'm sitting in a hotel room in Austin, and I don't have all my
18           paperwork. Was it within the last year?

19    **PASSARELLO:**    Yes.

20    **STANG:**    Okay.

21    **PASSARELLO:**    This is Joe Passarello again. It was within the last --

22    **STANG:**    Archbishop, are there any capital projects being constructed at Sacred Heart High
23           School in the past year?

24    **CORDILEONE:**    Not in the past year. There was a major project maybe two years ago. I
25           can't remember if it was last summer or the summer before they had a major capital
26           project. I don't recall any since then.

27    **STANG:**    Okay. So, Archbishop, either -- well, I'll ask both you. Neither Father
28           Summerhays nor you, Archbishop, know why Sacred Heart High School took out
29           $5 million from the DLF in the past year; is that correct?

30    **CORDILEONE:**    That's correct.

31    **SUMMERHAYS:**    That's correct.

October 12, 2023 | eLitigation Services, Inc.    45
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **STANG:**    All right.  And did either of you have any discussions in your capacity as board
2  members at the high school as to whether that money should be deposited to the
3  CASC, because Mr. Passarello suggested it might have gone there.  Do you
4  recollect any discussion regarding how the $5 million was to be deposited once it
5  came back to the high school?

6  **SUMMERHAYS:**    Mr. Stang, this is Father Summerhays.  Just to restate it, I don't recall ever
7  discussing any withdrawals at any Board of Governance meeting and any type of
8  decision and what should be done with the withdrawal.

9  **CORDILEONE:**    This is Archbishop Cordileone.  I would say the same for myself.

10  **STANG:**    Okay.  Um, Archbishop, how many religious order priests are currently serving in
11  the Archdiocese of San Francisco?  How many different religious orders are there
12  that are operating in the Archdiocese?

13  **CORDILEONE:**    (Inaudible).

14  **STANG:**    I mean, like, I don't mean how many priests, but how many religious orders there
15  are.

16  **CORDILEONE:**    (Inaudible) how many religious order priests.  Religious order priests?

17  **STANG:**    Yes.

18  **CORDILEONE:**    Maybe eight or nine.

19  **STANG:**    Okay.  Does the Archdiocese have written agreements with any of those religious
20  orders regarding the relationship between the Archdiocese and the religious order?

21  **CORDILEONE:**    No written agreements with any specific religious order, just what's in
22  universal law of the church.

23  **STANG:**    Okay.  Do you know if historically there were any written agreements between
24  religious orders whose members were serving the Archdiocese?

25  **CORDILEONE:**    I don't know for sure.

26  **STANG:**    Okay.  When the Archdiocese -- does the Archdiocese -- say there's a religious
27  order priest who's serving at a -- who's serving in the Archdiocese.  Does the
28  Archdiocese pay the priest or does the Archdiocese pay the religious order for say
29  the employment benefits or for services?

30  **CORDILEONE:**    I don't know how the money is channeled, but the priest's source of salary
31  pays what a secular Diocese priest would make.  Now, I don't know how the money
32  is channeled, if it goes to the priest and the priest sends it to the order or if the

October 12, 2023 | eLitigation Services, Inc.    46
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1        source of salary sends it directly to the order.  Mr. Passarello may know about any
2        religious order priests working for the Archdiocese.

3  **PASSARELLO:**    So, if it's at a parish, the parish handles that with the order priest whether it
4        be to the order or to the priest directly.  It depends.  Here at the Chancery, same
5        thing.  It could go directly to the order or it could go to the priest.

6  **STANG:**    And who makes that decision?  Is that a matter between and the order and the
7        Archbishop -- the order and the Archdiocese and it varies from order to order?  I
8        mean, there are two different scenarios.  How do you know what to do?

9  **CORDILEONE:**    We receive direction from the Vicar of Clergy office here at the chancery,
10       whether it's where the -- where and how the payment will be made.

11  **STANG:**    Okay.  Archbishop, can a parish close a parish school without consulting with you?

12  **CORDILEONE:**    No.  That's a -- no.  They need to consult first.

13  **STANG:**    Okay.  And when I say "you," I include any of your predecessors.

14  **CORDILEONE:**    Yeah.  They -- yeah.

15  **STANG:**    Okay.  And if a parish changes its website, is the Archdiocese notified of that?

16  **CORDILEONE:**    No.

17  **STANG:**    Okay.  Does the Archdiocese (inaudible) review the content of parish websites?

18  **CORDILEONE:**    No.

19  **STANG:**    Okay.  All right.  Father Summerhays, did you review the statement the -- well, do
20       you know what a Statement of Financial Affairs is that was filed in the bankruptcy?
21       Are you aware of what that document is?

22  **SUMMERHAYS:**    Yes, I am.

23  **STANG:**    Okay.  Did you review it before Mr. Passarello signed it?

24  **SUMMERHAYS:**    Yes.

25  **STANG:**    Okay.  Why didn't you sign it?

26  **SUMMERHAYS:**    I wasn't asked to sign it.

27  **STANG:**    Mr. Passarello, who asked you to sign it?

28  **PASSARELLO:**    I was -- as a senior financial director or the Chief Financial Officer, I
29       believe that I have responsibility for the financial matters here at that Archdiocese,
30       and that was consistent with my day one consent or declaration.  I signed that.  It

October 12, 2023 | eLitigation Services, Inc.    47
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  just seemed natural for me to sign that, after having reviewed it -- reviewed that
2  document, and other documents as well.

3  STANG:    Okay.  Father Summerhays, in the transcript that I have of the 341 meeting, Mr.
4  Blumberg asked you the following question.  "Does the debtor have access to the
5  books and records and accounting systems of these non-debtor Catholic entities
6  within the Archdiocese?"  And "these" he was referring to in a prior question,
7  parishes and schools.  And your response was, "We can see them."  Can you
8  describe to me how it that can see them?

9  SUMMERHAYS:    Well, my understanding is we use, with our parishes, a cloud-based
10  financial accounting system that allows us to look at, you know, entries made in
11  real time, and then we have a similar system for our high schools.

12  PASSARELLO:    This is Joe Passarello.  For the high schools, we -- they are in Intact, a
13  cloud-based system, and they have a separate general ledger and system, and we
14  have visibility to that, but the high schools are responsible for that.  Or the parishes
15  and parish schools, they are on a cloud-based system called Quickbooks Online,
16  and they are responsible, the parish and the schools, are responsible for those
17  administering and those statements, and they send an annual report to us annually,
18  which (inaudible) believe is consistent with our policy.

19  STANG:    Okay.  If it seems like I'm hitting lots of different topics, I'm working through the
20  transcript and asking some follow-up questions.  So, I wanted to explain why it may
21  seem like I'm bouncing around a little bit.  Archbishop, who is on the Board of
22  Directors of the Archdiocese of San Francisco Real Property Support Corporation?

23  CORDILEONE:    Oh, I don't remember offhand.  Certainly John Christian is in charge of the
24  corporation, but I can't [crosstalk].

25  STANG:    Do you know how many members are on -- there's a Board of Directors; is that
26  correct?

27  CORDILEONE:    Yes.  Yes.  I know I appointed -- sorry, my memory.  I appointed two
28  priests to the Board.  I can't even now remember who they are.

29  STANG:    You just answered my next question, which was who appoints the Board members.
30  So, it sounds like you appoint the Board members.

31  CORDILEONE:    I appoint the priests.

32  STANG:    Okay.  Who appoints the lay members?

33  CORDILEONE:    Hmm.  I, yeah, you know, I don't recall.

34  STANG:    Do you have to approve the lay individuals who are appointed to the Board?

October 12, 2023 | eLitigation Services, Inc.   48
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

**CORDILEONE:** Not exclusively, but obviously if there's -- if someone's a problem and it's brought to my attention (inaudible) find a way to fix the problem. But I'm not -- I don't explicitly give a letter of appointment or a letter of endorsement.

**STANG:** Do you know whether you have a veto right over the appointment of a lay person?

**CORDILEONE:** I don't know what's in the by-laws of the Board. So, if I -- practically speaking, if I had a problem with someone who I was told was going to be invited to be on the board, I would speak with Mr. Christian about it.

**STANG:** Okay. And what is Mr. Christian's title at the Real Property Support Corporation?

**CORDILEONE:** I don't know. Do you know? I don't --

Unidentified: I think it's Executive Director of the Real Property Support Corp.

**STANG:** Okay. Got it. Is there any other governance board for the Real Property Support Corporation other than the Board of Directors?

**CORDILEONE:** No.

**STANG:** Okay. I'm going to ask you now --

**PASSARELLO:** They could -- let me answer that. This is Joe Passarello. They could have an audit committee. They have a separate audit report. They may have -- they may -- I'm not aware of it, but it's possible that they could have an audit committee.

**STANG:** Got it. I mean, there are some institutions -- I'm sorry.

**PASSARELLO:** As you're probably aware, it's not part of their governance, but certain administrative (inaudible) decisions have to be consulted or even approved by the finance counsel and College of Consultors. So, it's sort of a check on administration.

**STANG:** Right. Right. Some entities that I've encountered in other cases have a Board of Directors and something called a Board of Members. For example, educational institutions often have a Board of Directors, and say it's a Jesuit institution, there's a Board of Members, which are made up entirely of clergy. That structure does not -- my question is, does that structure exist in connection with the Real Property Support Corporation where there's a Board of Trustees and another governance board?

**CORDILEONE:** No.

**STANG:** Okay. Let's talk about the Capital Asset Support Corporation. Archbishop, do you appoint the directors in that entity?

October 12, 2023 | eLitigation Services, Inc.    49
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **CORDILEONE:**     Again, I know I appoint two priests. I don't recall if I've ever explicitly
2         appointed the lay members.

3   **STANG:**     Great. If I ask you the questions about CASC that I asked you about the Real
4         Property Corporation, would your answers be the same?

5   **CORDILEONE:**     Yes.

6   **STANG:**     Okay. We'll save the time then. Is the cemetery operation separately incorporated?

7   **CORDILEONE:**     Yes.

8   **PASSARELLO:**     No.

9   **CORDILEONE:**     No. Wait, Joe is shaking his head. I thought it was.

10   **PASSARELLO:**     The Holy Cross Cemetery is not a separate civil corporation.

11   **STANG:**     Okay. Is that the -- I'm sorry. Does the Archdiocese have more -- I know there
12         may be parish cemeteries. Does the Archdiocese have more than one cemetery?

13   **CORDILEONE:**     Yes.

14   **STANG:**     And is -- what's the name of that one?

15   **CORDILEONE:**     Well, there are six individual cemeteries in separate locations through the
16         Archdiocese that are managed and covered under what are called -- what we call
17         Holy Cross Cemeteries, and there's a single executive or director of the cemeteries.

18   **STANG:**     Is that Monica Williams?

19   **CORDILEONE:**     Yes, it is.

20   **STANG:**     So, those six cemeteries, are any of them separate incorporated entities under
21         California law?

22   **CORDILEONE:**     No.

23   **STANG:**     Okay. Mr. Blumberg asked you a question, and I'm going to give you a page
24         reference, because I promised Mr. Pascuzzi I would send him the transcript, and it
25         might help him find what I'm talking about. So, this is on Page 23 of the transcript.
26         I know none of you have it. Mr. Blumberg asked, "Are there any active clergy
27         operating or ministering within the Archdiocese who are not on the list of good
28         standing?" And Father Summerhays, you responded with a question. "Who are
29         ministering?" Now, his question was "operating or ministering," and Father
30         Summerhays, you said, "Who are ministering?" Mr. Blumberg said, "Yes." And
31         you said, "No." So, my question is, is there a difference between a priest who is
32         operating and priest who is ministering? Because Mr. Blumberg used both terms,

October 12, 2023 | eLitigation Services, Inc.   **50**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    but you responded to only the ministering question, and I wanted to know if there
2    was a difference in your mind between those two.

3  **SUMMERHAYS:**    Mr. Stang, this is Father Summerhays.  I just was confused by the phrasing
4    of the question.  I kept thinking of the word "operating" for machinery, and when he
5    mentioned ministering, that made more sense to me.  I wasn't quite sure what
6    operating referred to.  That was just trying to get clarification on the question.

7  **STANG:**    Okay.  Thank you.  So, I'd like to focus on -- go back to the Deposit and Loan Fund
8    for a moment, but get away from the mechanics that I was exploring with you.  And
9    by the way, Mr. Blumberg, I'll -- I think I'll be done within, you know, the three
10    hours.  So, Mr. Passarello, Mr. Blumberg was trying to understand the different
11    Schwab accounts, and you said at Page 27, regarding Account 7149, you said,
12    "7149 is an account that is held with Charles Schwab.  It's a debtor's corpus."  That's
13    the way it's transcribed.  "It's related to our Institutional Deposit and Loan Fund."
14    What did you mean when you said, "It's a debtor's corpus?"  Can you explain that to
15    me.

16  **PASSARELLO:**    That may have been misquoted or mistranscribed, but it's a depositor's
17    corpus.  It's the net excess -- it's the net equity or fund balance of the Institutional
18    Deposit and Loan that belongs to the depositors.  So, it is the net equity of the
19    participants, which would be the entities that I described that have funds on deposit
20    with the Institutional Deposit and Loan Fund.  Yeah.

21  **STANG:**    Okay.  Mr. Passarello, you might want to retire a little earlier than you promised.
22    We'll get into document productions with our financial advisor as to these accounts,
23    so I'm not going to get into what the account statement looks like and all of that.
24    That will be reflected in the documents, but you might consider retiring a little
25    earlier, because these document productions are not fun.

26  **PASSARELLO:**    Noted.  Noted.

27  **STANG:**    Trying to inject just a little humor into this process if I could.  Okay.  So, Mr.
28    Blumberg asked you at Page 28 regarding another Schwab account, 7149, and he
29    said, "Does the debtor control that account?"  And you said, "It is controlled by the
30    Institutional Deposit and Loan Committee or Advisory Board."  Is the Committee
31    and the Advisory Board different things, or is that just synonymous terms.

32  **PASSARELLO:**    There is one committee.

33  **STANG:**    Okay.  So, there is not Advisory Board.  It's just there's a Committee.

34  **PASSARELLO:**    Right.

35  **STANG:**    Okay.

October 12, 2023 | eLitigation Services, Inc.    51
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1 | **PASSARELLO:** | And I think we use the term "Advisory Board," but it is a |
| 2 | | Committee/Advisory Board. |
| 3 | **STANG:** | Okay. So, who -- how many people are on the, I'll call it the Committee. Who -- |
| 4 | | how many people are on the Committee? |
| 5 | **PASSARELLO:** | There is a Chairperson who's a member of the Finance Counsel. There's a |
| 6 | | Superintendent of the Department of Catholic Schools. There's the Executive |
| 7 | | Director of the cemetery. There's the Chief Financial Officer of Catholic Charities, |
| 8 | | and then there's the Director of Finance and Operations of St. Patrick's Seminary. |
| 9 | **STANG:** | Except for Catholic Charities, are those people appointed by the Archbishop? |
| 10 | **PASSARELLO:** | They're not appointed by the Archbishop. They're appointed -- my -- the |
| 11 | | practice that we've had is that they are standing -- they're positions that are standing |
| 12 | | members. So, if a Superintendent -- the previous Superintendent was on the |
| 13 | | Committee. When she left the Archdiocese, she was replaced by the current |
| 14 | | Superintendent. |
| 15 | **STANG:** | Archbishop, do you appoint the Superintendent? |
| 16 | **CORDILEONE:** | Yes. |
| 17 | **STANG:** | Okay. Is there anyone in that group of people that Mr. Passarello just described that |
| 18 | | you do not appoint? |
| 19 | **PASSARELLO:** | You don't appoint the Chief Financial Officer of Catholic Charities. |
| 20 | **CORDILEONE:** | Right. Or at the seminary either. |
| 21 | **STANG:** | Okay. Mr. Passarello was asking you question on Page 31 about artwork. And, |
| 22 | | let's see, he said, "Do you know if any of the artwork is specifically identified on |
| 23 | | any insurance policy or rider?" He said -- Mr. Passarello, you said, "I'm not aware |
| 24 | | that there is. There could be. I don't know for sure. I don't know." Archbishop, |
| 25 | | does that Archdiocese have an inventory of its personal property? |
| 26 | **CORDILEONE:** | I've always presumed so, but I've never really inquired about that. |
| 27 | **STANG:** | Okay. Are you aware of any canons that require the Archdiocese to have an |
| 28 | | inventory of its personal property? |
| 29 | **CORDILEONE:** | I don't recall offhand. |
| 30 | **PASSARELLO:** | I believe there -- I've read that there is a canon that -- and I don't know |
| 31 | | how frequently, but that there should be an inventory of the asset or the property of |
| 32 | | the Archdiocese. |

October 12, 2023 | eLitigation Services, Inc.    52
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1<br>2 | **STANG:** | And Archbishop, in the -- during your tenure, are you aware of any Archdiocese-wide inventory that's been taken? |
| 3 | **CORDILEONE:** | No. |
| 4<br>5<br>6<br>7 | **STANG:** | Okay.  On Page 32, Mr. Blumberg asked about certain real properties, and he said, "Have any of these properties been appraised in the last year?"  And the answer, Mr. Passarello, was "We have not had an appraisal completed."  My question is, in the last year has the Archdiocese ordered any appraisals of real property? |
| 8 | **PASSARELLO:** | No.  This is Joe Passarello.  No, we have not. |
| 9<br>10<br>11<br>12<br>13<br>14<br>15 | **STANG:** | Okay.  On Page 35, there was discussion regarding what was referred to as the Thomas Moore land, that sounds like it was a suppressed parish, because Mr. Passarello, you testified that it is no longer a parish, but that it is subject -- let's see, I want to be -- you said, "There is a long-term lease that is signed for," and then you said -- it looks like you were trying to say a term, and then the transcriber said, "I'm not -- I'm not sure."  Is the Thomas Moore land leased out to a third-party? [crosstalk] |
| 16<br>17<br>18 | **PASSARELLO:** | There is a piece of property at St. Thomas Moore where there is a 99-year lease where the funds were prepaid, and there was a third-party that built a retirement facility on that property -- on that land. |
| 19<br>20 | **STANG:** | Does that third party have any relationship, other than the lease relationship, with the Archdiocese? |
| 21 | **PASSARELLO:** | I'm not aware if there's a relationship or not.  I don't believe there is. |
| 22<br>23 | **STANG:** | So, it's not performing part of the mission of the Archdiocese as a housing authority or senior living mission?  It's unrelated in that sense? |
| 24 | **PASSARELLO:** | As far as I know, that's true. |
| 25<br>26 | **STANG:** | Okay.  There was a discussion on Page 35 regarding an account that has the name Regen R-E-G-E-N.  Does that refresh your recollection, Mr. Passarello? |
| 27 | **PASSARELLO:** | No, it doesn't. |
| 28<br>29<br>30<br>31 | **STANG:** | Okay.  Do you have -- I'm going to read Mr. Blumberg's question.  "And then 76.2 is described as a beneficial interest and perpetual trust/Regen."  What is Regen or Regen if I'm mispronouncing.  You said Passarello -- I'm sorry.  You said "Regen is --" |
| 32<br>33 | **PASSARELLO:** | Oh, it's -- I believe what that was in reference is there was a -- there's a beneficial interest in what's called the Regen Trust. |

October 12, 2023 | eLitigation Services, Inc.    53
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **STANG:** Regen, got it. Okay.

2 **PASSARELLO:** Yeah. And that was -- that's a beneficial interest where it is -- the assets
3 are held by a third party and we -- the income off of that is restricted for use for, I
4 think, seminary education or training or something to that effect.

5 **STANG:** And does the term of the trust dictate the restriction, or is that something that the
6 Archdiocese has designated for those funds?

7 **PASSARELLO:** I don't know. I'm not -- I don't know. It's been --

8 **STANG:** Okay. There was then a discussion about perpetual trust Praut P-R-A-U-T, at least
9 that's how it was transcribed, and again, Mr. Pascuzzi said, "They are used for the
10 same purpose as the Regen Trust." My same question, do you know if that is -- that
11 restricted use is a term of the Trust or is that a designation by the Archdiocese?

12 **PASSARELLO:** I -- again, I'm not sure. I don't know.

13 **STANG:** Okay. Mr. Passarello and Mr. Blumberg, you had a conversation on Page 37 where
14 you talking about that there's a search for a new superintendent. I think it was the
15 superintendent of schools. And Mr. Passarello, you said, "Oh, it's for the
16 Department of Catholic Schools that has oversight over the four high schools and
17 the parish schools." So, I think there was a discussion about, I guess it was perhaps
18 an executive search type agreement where you were trying to find a new
19 superintendent. What oversight does the superintendent have over the parish
20 schools?

21 **PASSARELLO:** They are -- they provide oversight as with regards to the curriculum,
22 working with the Archbishop on Catholic -- the Catholic identity of the schools.
23 There is accreditation that they assist with, and there's a service agreement between
24 the Department of Catholic Schools and the entities for that.

25 **STANG:** Okay. And then I have one last group of questions that I'd like to ask, and is has to
26 do with the relationship between the real estate corporation, the parishes, and the
27 Archdiocese. Are the parish -- are the properties where the parishes are located
28 owned by the Real Estate Support Corporation?

29 **CORDILEONE:** They are owned by the Real Property Support Corporation.

30 **STANG:** Real Property. I'm sorry. Thank you. Real Property. The Real Property Support
31 Corporation has a lease agreement with who for those properties?

32 **CORDILEONE:** I believe the lease agreement is between the chancery and the -- or the
33 Archdiocese and the Real Property Support Corp.

34 **STANG:** Okay. And does the Archdiocese then have a lease agreement with the parish?

October 12, 2023 | eLitigation Services, Inc. 54
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    **CORDILEONE:**    I don't believe we do.

2    **STANG:**    Okay. So, the Real Estate Corporation, we got -- and I apologize. I don't know the
3    names of all your -- of any of your parishes, really. So, I'm going to be taking a
4    crazy leap of faith here and say there's a St. Mary's parish, hypothetical. St. Mary's
5    parish sits on a piece of real estate. That real estate is owned by the Real Property
6    Support Corporation. That property is leased to the Archdiocese. How is it that St.
7    Mary's parish is operating on that property? Is there a lease -- is there an agreement
8    between the Archdiocese and the parish? What documents, if any document exists,
9    the right of the parish to be there?

10    **CORDILEONE:**    I am not familiar with the arrangements between Real Property Support
11    Corp and the lease agreements between Real Property Support Corp, the
12    Archdiocese of San Francisco, and how they use the parish and school properties
13    are covered by a lease arrangement. I am not familiar with that.

14    **STANG:**    Okay. Anyone else at this hearing today who can explain the relationship between
15    the Archdiocese and the parish as it relates to the use of the real property?

16    **PASCUZZI:**  Mr. Stang, this is Paul Pascuzzi. We're looking into that. That all happened
17    before everybody's time in a way here, so we're looking into that and I'm sure you'll
18    be asking us for whatever documents exist, and we will, of course, respond within
19    the rules. But I think that's the best we can do for the moment. [crosstalk]

20    **BLUMBERG:**    Mr. Stang, it's Jason Blumberg for a second. I just want to interject for a
21    second. We're coming up on 12:00 p.m. Sandy, the operator, I want to make sure
22    that we're not going to lose the line at 12:00 p.m. Are we still good for a few more
23    minutes? Sandy?

24    **STANG:**    I think that was directed to your operator. I only have, like, one or two more
25    questions.

26    **BLUMBERG:**    Okay. Go ahead. I just don't want to lose the line, but go ahead, sir.

27    **STANG:**    Okay. So, Mr. Passarello, does the parish pay the Archdiocese any money for the
28    use of the real property?

29    **PASSARELLO:**    No. I'm no aware of any.

30    **STANG:**    Does the parish pay any money to the Real Property Support Corporation for the
31    use of the property/

32    **PASSARELLO:**    I don't believe so.

33    **STANG:**    Okay. Does the parish maintain property insurance like fire insurance and -- well,
34    let's say fire insurance. Does it maintain insurance on the real estate?

October 12, 2023 | eLitigation Services, Inc.     55
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

**PASSARELLO:**      Insurance is maintained on the properties of the Archdiocese of San Francisco.  The parish, the schools, the chancery, and other entities through a (inaudible) insurance program that we have.

**STANG:**      Is the Archdiocese the insured party, or is it the Real Property Corporation?

**PASSARELLO:**      The Real Property Support Corporation is a party to the insurance.

**STANG:**      Got it.  Okay.  I actually do have one more question, and this really is the last one.  At Page 52 of the transcript, Mr. Mozetti (phonetic) was asking questions about the use of the Archbishop's income in the past two years that has been paid out for charitable purposes.  And Mr. Passarello, you said "Percentage of his own income?"  And Mr. Mozetti said, "Well, the income of the Archdiocese."  And Mr. Passarello, you answered, "It is less than -- the dollar amount is less than $40,000 per year."  Mr. Mozetti was asking about the income of the Archdiocese.  Am I correct in understanding that your testimony was the Archdiocese's charitable expenditures are $40,000 a year?

**PASSARELLO:**      We have made donations or attended fundraisers that are consistent with the mission of the Archdiocese of San Francisco and the Catholic Church over the -- historically that are below -- less than $40,000.

**STANG:**      So this was money -- [crosstalk]

**CORDILEONE:**      Can I interject here?  Mr. Passarello could correct me if I'm wrong.  I believe that $40,000 is a fund for the Archbishop to make charitable contributions from for organizations outside the Archdiocese.  Is that what you were --

**PASSARELLO:**      Well, that is correct.  That is --

**CORDILEONE:**      We put that in the budget so that I -- I receive a lot of requests from different church organizations for financial support, so I'm able to take money out of that fund to give them a contribution.

**STANG:**      Kind of like a discretionary fund, Archbishop?

**CORDILEONE:**  Yes.  But specifically for charitable contributions, yes.

**STANG:**      Right.  Okay. I was confused because I thought, well, they (inaudible) spend a little more than $40,000 on charitable items, but now I understand.  It's your -- I'm using the term discretionary fund.  It's a fund where you get to -- United Way or --

**CORDILEONE:**      I -- yes.  My discretion on where to send the charitable contributions, yeah.

**STANG:**      Got it.  Okay.  Mr. Blumberg, I don't have any more questions for the 341 hearing today.

October 12, 2023 | eLitigation Services, Inc.   56
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **BLUMBERG:**  All right.  Thank you.  I thank everyone for their participation today, and
2    the meeting is concluded.  Thank you all.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

October 12, 2023 | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com
57

1   I hereby certify that the foregoing is a true and correct transcription of the audiotape labeled

2   10-12-23 JB RECORDING.

3

4     10/31/2023                              Carol Holmes

5       DATE                                       Printed Name

6

7

8                                             Signature

9

October 12, 2023 | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com
58

Case: 23-30564    Doc# 610-1    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 59 of 132

# EXHIBIT 2

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   JEFFREY M. VESELY  #67895
2  KERNE H. O. MATSUBARA  #178895
   RICHARD E. NIELSEN #72104
3  50 Fremont Street
   Post Office Box 7880
4  San Francisco, CA  94120-7880
   Telephone: (415) 983-1000
5  Facsimile:  (415) 983-1200

6  Attorneys for Plaintiffs and Petitioners
   THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION
7  SOLE, and THE ARCHDIOCESE OF SAN FRANCISCO PARISH AND SCHOOL
   JURIDIC PERSONS REAL PROPERTY SUPPORT CORPORATION

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 CITY AND COUNTY OF SAN FRANCISCO

11                   UNLIMITED CIVIL JURISDICTION

12  _____
                                        )
13  THE ROMAN CATHOLIC ARCHBISHOP )      No.  CGC-10-498795
    OF SAN FRANCISCO, A CORPORATION )    (Assigned to Hon. Richard A. Kramer)
14  SOLE, a California corporation sole; THE )
    ARCHDIOCESE OF SAN FRANCISCO )        REPLY BRIEF OF PETITIONER THE
15  PARISH AND SCHOOL JURIDIC )           ROMAN CATHOLIC ARCHBISHOP
    PERSONS REAL PROPERTY SUPPORT )       OF SAN FRANCISCO, A
16  CORPORATION, a California religious )   CORPORATION SOLE, ON THE
    corporation, )                        SECOND CAUSE OF ACTION
17                                        )
              Plaintiffs and Petitioners, )
18                                        )
         vs.                             )  Trial Date:  February 8, 2011
19                                        )  Time: 9:30 A.M.
    CITY AND COUNTY OF SAN )             Place: Dept. 304
20  FRANCISCO, a municipal corporation; )
    CITY AND COUNTY OF SAN )
21  FRANCISCO REAL PROPERTY )
    TRANSFER TAX REVIEW BOARD; and )     Complaint Filed:  April 16, 2010
22  PHIL TING, ASSESSOR - RECORDER OF )
    CITY AND COUNTY OF SAN )
23  FRANCISCO, )
                                        )
24  Defendants, Respondents and Real Party in )
    Interest. )
25                                        )
                                        )
26                                        )
                                        )
27                                        )
                                        )
28

702699704

TABLE OF CONTENTS

|  |  |  |  | Page |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| II. | STANDARD OF REVIEW | | | 4 |
| III. | ARGUMENT | | | 6 |
| | A. | Transfer Tax Cannot Be Imposed Because the Parish and School Properties Were Not "Realty Sold." | | 6 |
| | | 1. | The intra-Diocesan restructuring was not a sale in form, substance or intent. | 6 |
| | | 2. | No consideration was involved in the Diocesan restructuring. | 11 |
| | | | a. Deed A | 12 |
| | | | b. Deed B | 18 |
| | | 3. | Any conceivable benefit is not consideration. | 20 |
| | | 4. | Intra-diocesan transfers are not "sales" under California law. | 20 |
| | B. | The Intra-Diocesan Restructuring Is Exempt From Transfer Tax as a "Change in Form" Under SF Transfer Tax Ordinance § 1106(d). | | 25 |
| | | 1. | The Review Board erred in that it applied the wrong legal test for determining whether the change in form exemption applies. | 25 |
| | | | a. The so-called "continuity of interest" test does not apply. | 25 |
| | | | b. The *Columbia Gas* beneficial ownership test is controlling. | 27 |
| | | 2. | The Review Board's findings are not supported by substantial evidence. | 31 |
| | | 3. | Petitioner satisfied the requirements of the "change in form" exemption under SF Transfer Tax Ordinance § 1106(d). | 36 |
| | | | a. The administrative record establishes that the Diocesan restructuring did not change the beneficial ownership of the Parish and School Properties | 37 |
| | | | b. Respondent refers to other factors that are irrelevant for purposes of the change in form exemption. | 38 |

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION – CGC-10-498795

Case: 23-30564   Doc# 610-4   Filed 03/24/25   Entered 03/24/25 15:55:24   Page 62 of 132

| | | | c. | *Episcopal Church Cases* confirms that church canons are relevant in civil law matters. | 40 |

C.   The Restructuring Is Also Exempt Under California RTC § 11925(d). ............................................................. 42

     1.   San Francisco, as a charter city, does not have unlimited powers. ........................................................ 43

     2.   San Francisco adopted RTC § 11925(d) through its own ordinance and in practice. ................................... 46

D.   Deed B Is Not Subject to Tax Because the Transfer of the Parish and School Properties to the Support Corporation Has Not Been Completed. ........................................................................ 49

E.   Respondent is Estopped From Imposing a Transfer Tax In This Case. .............................................................................. 51

F.   Respondent's Attempt to Impose a Transfer Tax in a Non-Neutral Fashion Is Violative of the First Amendment. ........................ 54

     1.   Petitioner has exhausted its administrative remedies and appropriately preserved the Constitutional issues for review. ....... 54

          a.   Petitioner timely filed its petition for review with the Review Board. ..................................................... 55

          b.   Petitioner's petition for review complied with the Review Board's procedural rule regarding form and content. ................................................................. 55

          c.   Petitioner raised and preserved its Constitutional issues below. ....................................................... 56

          d.   The exhaustion doctrine does not preclude consideration of Petitioner's Constitutional objections. ............................................................... 57

     2.   The City's failure to administer the transfer tax neutrally violates the Establishment and Free Exercise Clauses. ............ 59

     3.   The City's non-neutral administration of the transfer tax gives rise to excessive government entanglement in Church affairs. ................................................................. 61

IV.   CONCLUSION. ............................................................... 63

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION – CGC-10-498795

1

# TABLE OF AUTHORITIES

2                                                                    Page

3                                   Cases

4   Andal v. City of Stockton,
5       137 Cal. App. 4th 86 (2006)...........................................................58

6   Associated Oil Co. v. County of Orange,
        4 Cal. App. 2d 5 (1935)...............................................................58

7   Batt v. City and County of San Francisco,
8       184 Cal. App. 4th 163 (2010).......................................................24

9   Beatrice v. State Board of Equalization,
        6 Cal. 4th 767 (1993).....................................................13, 15, 19

10  Berkeley Savings and Loan Ass'n v. United States,
11      301 F. Supp. 22 (Dist. NJ 1969).....................................................7

12  Berry v. Kavanagh,
        137 F.2d 574 (6th Cir. 1943)..........................................................7

13  Berry v. Society of Saint Pius X,
14      69 Cal. App. 4th 354 (1999).........................................................10

15  Brenner v. City of Los Angeles,
        160 Cal. 72 (1911)........................................................................58

16  California Federal Savings & Loan Assn. v. City of Los Angeles,
17      54 Cal. 3d 1 (1991).....................................................................43

18  Capitol Square Review and Advisory Bd. v. Pinette,
        515 U.S.753 (1995)......................................................................60

19  Church of Lukumi Babalu Aye. Inc. v. Hialeah,
20      508 U.S. 520 (1993).....................................................................60

21  Columbia Gas of Md., Inc. v. United States,
        177 Ct. Cl. 97 (Ct. Cl. 1966) ........................................................30

22  Columbia Gas of Pennsylvania, Inc. v. United States,
23      446 F.2d 320 (3d Cir. 1971)...................................................*passim*

24  Davant v. Commissioner,
        366 F.2d 874 (5th Cir. 1966).........................................................26

25

26  Employment Div., Dept. of Human Resources of Ore. v. Smith,
        494 U.S. 872 (1990).....................................................................60

27  Emporium Capwell Co. v. Anglim,
28      140 F.2d 224 (9th Cir. 1944).........................................................14

Episcopal Church Cases,
    45 Cal. 4th 467 (2009) ........................................................ 40, 62

Everson v. Board of Education of Ewing,
    330 U.S. 1 (1947) ........................................................ 60

Fisher v. County of Alameda,
    20 Cal. App. 4th 120 (1993) ........................................................ 44

Frohliger v. Richardson,
    63 Cal. App. 209 (1923) ........................................................ 23, 41

Gates Rubber Co. v. Ulman,
    214 Cal. App. 3d 356 (1989) ........................................................ 5

Ghirardo v. Antonioli,
    8 Cal. 4th 791 (1994) ........................................................ 5

Greyhound Corp. v. United States,
    1953 U.S. Dist. LEXIS 4352 (N.D. Ill. 1953) ........................................................ 16, 17

Grotenhuis v. County of Santa Barbara,
    182 Cal. App. 4th 1158 (2010) ........................................................ 52

Henneberry v. Henneberry,
    164 Cal. App. 2d 125 (1958) ........................................................ 49

Holmes v. McColgan,
    17 Cal. 2d 426 (1941) ........................................................ 7

Home Construction Corp. v. United States,
    439 F.2d 1165 (5th Cir. 1971) ........................................................ 26

Innes v. McColgan,
    47 Cal. App. 2d 781 (1941) ........................................................ 7

Jones v. Wolf,
    443 U.S. 595 (1979) ........................................................ 40

Kern River Co. v. County of Los Angeles,
    164 Cal. 751 (1913) ........................................................ 58

Lemon v. Kurtzman,
    403 U.S. 602 (1971) ........................................................ 59, 62, 63

Lockyer v. City and County of San Francisco,
    33 Cal. 4th 1055 (2004) ........................................................ 58

McDonald's Corp. v. Board of Supervisors,
    63 Cal. App. 4th 612 (1998) ........................................................ 21, 22, 24

Meanley v. McColgan,
    49 Cal. App. 2d 313 (1942) ........................................................ 7, 8, 27

702699704

iv

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION – CGC-10-498793

Case: 23-30564    Doc# 610-1    Filed: 10/19/24    Entered: 10/19/24 15:35:29    Page 65 of 132

Mole-Richardson Co. v. Franchise Tax Bd.,
    220 Cal. App. 3d 889 (1990) ................................................................. 5

Moyer v. Workmen's Comp. Appeals Bd.,
    10 Cal. 3d 222 (1973) ....................................................................... 47

New v. Kroger,
    167 Cal. App. 4th 800 (2008) ........................................................ 40, 41

Newman v. Franchise Tax Bd.,
    208 Cal. App. 3d 972 (1989) ............................................................ 5, 57

Pac. Coast Co. v. Wells,
    134 Cal. 471 (1901) .......................................................................... 58

Park 'N Fly of San Francisco, Inc. v. City of South San Francisco,
    188 Cal. App. 3d 1201 (1987) ............................................................ 58

Parrott & Co. v. City & County of San Francisco,
    131 Cal. App. 2d 332 (1955) ............................................................. 58

Perry v. Wallner,
    206 Cal. App. 2d 218 (1962), ........................................................... 49

R. H. Macy & Co. v. United States,
    107 F. Supp. 883 (S.D.N.Y. 1952) ................................................ 16, 17

Rexall Drug Co. v. Peterson,
    113 Cal. App. 2d 528 (1952), ........................................................... 15

Rochelle Inv. Corp. v. Fontenot,
    34 F. Supp. 118 (E.D. La. 1940), .................................................. 13, 14

Security Industrial Ins. Co. v. United States,
    702 F.2d 1234 (5th Cir. 1983) ....................................................... 26, 27

Socony-Vacuum Oil Co. v. Sheehan,
    50 F. Supp. 1010 (E.D. Mo. 1943) .................................................... 15

Star-Kist Foods, Inc. v. Quinn,
    54 Cal. 2d 507 (1960) ....................................................................... 57

Steinhart v. County of Los Angeles,
    47 Cal. 4th 1298 (2010) .................................................................... 58

Stone v. Graham,
    449 U.S. 39 (1980) ........................................................................... 60

Thrifty Corp. v. County of Los Angeles,
    210 Cal. App. 3d 881 (1989) ......................................................... 21, 22

Tide Water Associated Oil Co. v. Jones,
    57 F. Supp. 482 (W.D. Okla. 1944) ............................................... 15, 16

702699704           v

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

United States v. Niagara Hudson Power Corporation,
53 F. Supp. 796 (S.D.N.Y. 1944) ..........................................................6, 7

United States v. Seattle-First National Bank,
321 U.S. 583 (1944) .........................................................6, 7, 8, 14, 20

Van Wagner Communications, Inc. v. City of Los Angeles,
84 Cal. App. 4th 499 (2000) ..................................................................51

Walz v. Tax Commission of the City of New York,
397 U.S. 664 (1970) ..............................................................................62

Wheelock v. First Presbyterian Church of Los Angeles,
119 Cal. 477 (1897) .........................................................................23, 45

Yamaha Corp. of America v. State Bd. of Equalization,
19 Cal. 4th 1 (1998) ..............................................................................51

Statutes and Codes

California Civil Code
Section 1429 .........................................................................................11
Section 1605 ...................................................................................11, 12

California Corporations Code
Section 9132(a) ..............................................................................15, 17
Section 10002 .......................................................................................34

California Government Code
Section 53725 .................................................................................44, 45

California Revenue and Taxation Code
Section 62(k) ................................................2, 12, 21, 22, 23, 43, 45
Section 207 ............................................................................................33
Section 11901 .................................................................................29, 46
Section 11911 .................................................................................22, 47
Section 11923(d) .........................................................................31, 40, 47
Section 11925(d) ..............................................................................passim

Internal Revenue Code (Title 26, United States Code)
Section 368(a)(1) ........................................................................26, 28, 30
Section 501(c)(3) ............................................................................27, 34
Former section 800, et. seq., Schedule A, subd. 8 ..................................7
Former section 3482 ..............................................................................7
Former section 4361 ..........................................................................7, 47
Former section 4382 ....................................................27, 31, 40, 47

San Francisco Real Property Transfer Tax Ordinance
Section 1101 ...........................................................29, 43, 46, 47
Section 1102 .........................................6, 7, 8, 21, 22, 24, 47
Section 1106(d) .................................................................................passim
Section 1108(d) .....................................................................................48
Section 1114 .................................................................................8, 9, 27
Section 1115.2 .......................................................................................55

Case: 23-30564    Doc# 610-7    Filed: 09/18/24    Entered: 09/18/24 13:35:25    Page 67
of 132

### Constitutional Provisions

United States Constitution

     First Amendment to the United States Constitution .................................................. 59

California Constitution

     Article III, Section 3.5 ................................................................. 58

### Regulations

United States Treasury Regulations
     Section 47.4361-1(a)(4)(ii) .......................................................... 12, 20
     Section 47.4361-2(b)(2) ...................................................... 12, 14, 16, 17

### Other Authorities

California Attorney General Opinion
     No. 98-1203, 82 Ops. Cal. Atty. Gen. 56 (Mar. 26, 1999)............................*passim*

1    I.    INTRODUCTION

2          Respondent City and County of San Francisco resorts to a favorite tactic it used

3    before the San Francisco Transfer Tax Review Board ("Review Board") to now misdirect

4    this Court from the real issues at hand.  The sole question before this Court in this Second

5    Cause of Action is whether the San Francisco transfer tax applies to an intra-Diocesan

6    restructuring.  Yet, Respondent attempts to sensationalize and color this case by raising the

7    specter of sexual abuse lawsuits, a favorite straw man when it comes to church issues.

8          Respondent alleges in its Opposition Brief that Petitioner Corporation Sole

9    "transferred the subject properties elsewhere precisely so it could demonstrate, when, if and

10   as necessary, that both of its pockets are empty" in order to protect its assets from future

11   litigants' claims or other liabilities.  Respondent's Opposition Brief ("Resp. Br." at 3:15-17,

12   23-26).  Contrary to Respondent's allegations, the administrative record establishes that

13   there were no pending claims or lawsuits against Petitioner at the time of the internal

14   restructuring of the Archdiocese of San Francisco (the "Archdiocese") and any allegations

15   concerning *future* claims or liabilities are wholly speculative and unfounded.  VII AR

16   2515:1-6.[1]

17         More importantly, the issue regarding lawsuits and claims is completely irrelevant

18   to transfer tax law.  As an excuse for raising such issue, Respondent argues that Petitioner

19   "cannot have it both ways"—that is, Petitioner must choose between avoiding such liability

20   or paying the transfer tax.  Resp. Br. at 4:4-13.  Respondent presents a false dilemma,

21   which simply does not exist.  As a legal matter, there is nothing in San Francisco's transfer

22   tax ordinance, or any legal authority pertaining thereto, that provides that corporations must

23   surrender their rights or privileges accorded under civil law, including liability protection,

24   or else pay a transfer tax.  Thus, by raising the specter of lawsuits, Respondent is deflecting

25   attention away from what Respondent is attempting to do here—the unprecedented and

26

27   _____

28   [1]  References to the Administrative Record ("AR") of the Review Board in this matter are
     preceded by the volume number, followed by the page number.

702699704                                              1
REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1   unlawful taxing of an internal church restructuring that is cause for concern not only by the

2   Roman Catholic Church (or "Church") but by all religious faiths.

3        It is important, therefore, for this Court to remain focused on the issue before it—

4   namely, whether the intra-Diocesan transfers of real property (the "Parish and School

5   Properties") among the Corporation Sole, the Welfare Corporation and the Support

6   Corporation[2] pursuant to an internal restructuring within the Roman Catholic Archdiocese

7   of San Francisco ("Archdiocese") are subject to San Francisco's transfer tax. Petitioner

8   submits that San Francisco's transfer tax ordinance, including federal and California legal

9   authority pertaining thereto, compels a determination that such transfers are not subject to

10  tax.

11        First, the threshold issue is whether the Parish and School Properties were "sold"

12  pursuant to the internal Diocesan restructuring. Because the transfer tax is only imposed on

13  "realty sold," the transfer tax does not even arise if realty has not been sold. In its ruling

14  (the "Board's Ruling"), the Review Board determined that the "realty sold" requirement

15  was satisfied because "valuable consideration existed with respect to Grant Deed A and

16  Grant Deed B." IX AR 3612:24-25.[3] The Review Board erred as a matter of law in that it

17  (1) ignored the word "sold" and determined that a sale is not required for transfer tax to

18  arise, (2) failed to consider that intra-Diocesan transfers of real property are not sales under

19  California law (see, e.g., Cal. Rev. & Tax. Code ("RTC") § 62(k)), and (3) relied on the

20  wrong legal definition of "consideration" for transfer tax purposes.

21        Second, even if the Parish and School Properties somehow can be considered to

22  constitute "realty sold," said transfers are exempt from tax under San Francisco Real

23  ───────────────

24  [2] The Corporation Sole, the Welfare Corporation and the Support Corporation herein refer, respectively, to The Roman Catholic Archbishop of San Francisco, A Corporation Sole,

25  The Roman Catholic Welfare Corporation of San Francisco, and The Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support Corporation.

26  [3] The 111 Archdiocesan school properties ("School Properties") are listed on the exhibit attached to the deed dated April 25, 2008 from the Welfare Corporation to the

27  Corporation Sole ("Deed A"). I AR 15. The 232 Parish and School Properties are listed on the exhibit attached to the deed dated April 25, 2008 from the Corporation Sole to the

28  Support Corporation ("Deed B," and together with Deed A, the "Deeds"). I AR 22.

1  Property Transfer Tax Ordinance ("SF Transfer Tax Ordinance") § 1106(d), because the

2  internal Diocesan restructuring effected a mere "change in form." In applying the "change

3  in form" exemption, the Review Board relied upon so-called "differences" in the "purpose,

4  control and/or powers" of the Corporation Sole, the Welfare Corporation and the Support

5  Corporation. IX AR 3614:9-20, 3616:9-17. In so doing, the Review Board used the wrong

6  legal test. Rather, the proper legal test is set forth in *Columbia Gas of Pennsylvania, Inc. v.*

7  *United States*, 446 F.2d 320 (3d Cir. 1971), which establishes that the "change in form"

8  exemption is satisfied if the beneficial ownership of the real property remains the same

9  before and after the restructuring. Here, it is uncontroverted that the Parish and School

10  Properties were and remain owned by the Roman Catholic Church for the benefit of Church

11  schools and parishes in San Francisco. The internal Diocesan restructuring did not change

12  that fact.[4]

13        Third, an alternative exemption to the transfer tax applies in this case—namely,

14  RTC § 11925(d), which exempts from tax the transfer of title to real property between legal

15  entities, where the direct or indirect ownership interests in the realty remain unchanged.

16  Respondent hides behind its status as a charter city in an attempt to disavow the

17  applicability of RTC § 11925(d). Notwithstanding such status, charter cities do not have

18  unlimited powers. The City cannot, for example, simply ignore State law that intra-

19  denominational transfers of real property between religious corporations are not changes in

20  ownership of realty, due to the unique features of religious corporations as agents holding

21  title to the property for the Church. In any case, in adopting the SF Transfer Tax

22  Ordinance, the City explicitly linked it to the California Transfer Tax Statute, which

23  includes RTC § 11925(d). Because the Church remains the owner of the Parish and School

24

25

___

[4] The Review Board's findings and conclusions regarding purpose, control and power are
26  also factually erroneous. In concluding that the purpose, control and power of the subject
    corporations were "different," the Review Board erroneously failed to consider the unique
27  features of religious corporations and, in particular, the central role of the incumbent
    Roman Catholic Archbishop of San Francisco ("Archbishop") as the "hub of the wheel"
28  around which the Archdiocesan family of religious purpose corporations are connected.

1   Properties for the benefit of its schools and parishes, the intra-Diocesan transfers should be

2   exempt from transfer tax.

3         Fourth, Respondent should be estopped from imposing a transfer tax in this case.

4   Petitioner justifiably relied on Respondent's long-standing and consistent past practice of

5   not taxing intra-denominational transfers. Petitioner also justifiably relied on the verbal

6   representations made by the Recorder's office when it submitted the Deeds for recordation.

7   Respondent's conduct in this matter is precisely the type of action or inaction that the

8   doctrine of equitable estoppel was designed to address.

9         Fifth, contrary to Respondent's arguments, Petitioner exhausted its administrative

10   remedies and appropriately raised and preserved the Constitutional issues for review before

11   this Court. The City's attempt to impose its transfer tax in a non-neutral fashion violates

12   the First Amendment. The City has interpreted and administered the transfer tax in a

13   manner that treats religious corporations such as Petitioner less favorably than non-religious

14   corporations, in violation of the Free Exercise and Establishment Clauses. The City's non-

15   neutral administration of the transfer tax also gives rise to excessive government

16   entanglement in Church affairs.

17         It is important to note that *any* of the contentions enumerated above, by itself, is

18   sufficient to compel a decision that no transfer tax may be imposed with respect to either

19   Deed A or Deed B.[5] In sum, the Review Board erred in this matter. No transfer tax is

20   owing in this case.

21   II.     <u>STANDARD OF REVIEW</u>

22         Respondent contends that Petitioner misstates and misapplies the applicable

23   standard of review. Resp. Br. at 10:21-11:13. After spending several pages of its

24   Opposition Brief (Resp. Br. at 4-7) reciting the relevant authority regarding administrative

25   mandamus and the scope of review it is clear that there is not a dispute between the parties

26

27   [5] Even if intra-Diocesan transfers are somehow found to be subject to transfer tax, no
transfer tax can be imposed with respect to Deed B, because delivery of that deed to the

28   Support Corporation has not been completed.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    as to the relevant principles regarding the standard of review. Compare, Petitioner's

2    Opening Brief ("Pet. Open. Br.") at 17-18. Rather, Respondent chooses to focus on the

3    substantial evidence test while deemphasizing the de novo review standard applicable to

4    questions of law.[6]

5        Petitioner contends that the resolution of this matter hinges on questions of law.

6    Also, contrary to Respondent's assertions that a four day trial (Resp. Br. at 11:3)

7    necessitates the existence of disputed facts in the record, the evidence introduced by both

8    parties was virtually uncontroverted. Petitioner's evidence centered around organizational

9    and transactional documents such as corporate articles and bylaws as well as oral testimony

10   regarding such documents. Respondent's evidence elicited further explanation concerning

11   the admitted documents and testimony from the Recorder's perspective of various events.

12   The evidence presented by both parties was essentially uncontroverted. Furthermore, if

13   there exists any dispute of some fact, the resolution of which is not evident from the record

14   below, such would not be material to the legal issues. Therefore any review of the facts in

15   this matter is subject to de novo review.[7] Where there are no conflicts in the evidence and

16   the facts are undisputed, only questions of law confront a court and the findings do not bind

17   the court. *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 799 (1994); *Mole-Richardson Co. v.*

18   *Franchise Tax Bd.*, 220 Cal. App. 3d 889, 894 (1990). The court may examine the facts

19   and make its own conclusions and findings. *Gates Rubber Co. v. Ulman*, 214 Cal. App. 3d

20   356, 363 (1989); *Newman v. Franchise Tax Bd.*, 208 Cal. App. 3d 972, 977 (1989).

21

22

---

23   [6] Respondent states "the appropriate standard of review involves not solely an analysis of

24   the legal issue de novo, but also an assessment of ... whether substantial evidence exists
in the TTRB's administrative record to support the findings." Resp. Br. at 11:8-11.

25   However, if the findings are not legally sustainable it is unnecessary to conduct a review
of the evidentiary record under the substantial evidence test. In addition, because the

26   facts relating to the primary legal issues are undisputed any such review would still be de
novo.

27   [7] As stipulated, the parties agree that this Second Cause of Action does "not involve any
material facts in dispute." Stipulation Concerning Various Procedural Matters and

28   Scheduling, filed August 2, 2010, ¶ 3.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1   This Court should not be distracted by Respondent's misguided focus away from the

2   dispositive legal (including constitutional) issues in this matter:  the interpretation and

3   application of local transfer tax provisions to an internal Church restructuring.  To the

4   extent necessary, the Court may examine the uncontroverted facts to reach its own

5   conclusions and findings.  Even if the substantial evidence test may be applicable in this

6   matter, Petitioner submits that Respondent has failed to establish there is substantial

7   evidence in the record to support the Review Board's findings and conclusions.

8   III.   <u>ARGUMENT</u>

9        A.   <u>Transfer Tax Cannot Be Imposed Because the Parish and School Properties
            Were Not "Realty Sold."</u>

10

11            1.   <u>The intra-Diocesan restructuring was not a sale in form, substance or
                 intent.</u>

12   SF Transfer Tax Ordinance § 1102 provides that the transfer tax is imposed on

13   "realty sold" to a "purchaser or purchasers."  Thus, the purchase and sale of realty are

14   required for the transfer tax to even apply.  Respondent reads past the express words of the

15   ordinance and argues that the ordinance does not mean what it says—that is, "realty 'sold'

16   does not require an actual sale" (Resp. Br. at 17:14-18).  Respondent's argument is directly

17   contrary to the holding of the United States Supreme Court in *United States v. Seattle-First*

18   *National Bank*, 321 U.S. 583, 590 (1944), wherein the Court ascribed to the words "sold"

19   and "purchaser or purchasers" their ordinary meaning.  In concluding that a bank

20   consolidation was not subject to the federal documentary stamp tax—upon which the SF

21   Transfer Tax Ordinance is based—the Court held:

22            Nor can the realty be said to have been "sold" or vested in a "purchaser or
            purchasers" within the ordinary meaning of those terms.  Only by straining
23            the realities of the statutory consolidation process can respondent be said
            to have "bought" or "purchased" the real property.  That we are unable to
24            do.

25   321 U.S. at 590.  Similarly, in another federal documentary stamp tax case, *United States v.*

26   *Niagara Hudson Power Corporation*, 53 F. Supp. 796, 801 (S.D.N.Y. 1944), the Court

27   looked to whether the "elements characteristic of a 'sale'" were present in interpreting the

28

Case3:11-cv-02585 Document1 Filed05/27/11 Page74 of 132

1  terms "realty sold" and "purchaser." In concluding that the federal documentary stamp tax

2  did not apply, the Court held:

3       In the transaction now under consideration the elements characteristic of a
         "sale" are lacking; there is no agreement to sell; there is no deed
4        containing the description of the realty. The usual bargaining leading up
         to and culminating in a sale and fixing the value of the property are absent.
5        The change of title results from the filing of the Certificate of
         Consolidation; it was a form of transfer, but not a sale.

6

7  53 F. Supp. at 801. In *Berry v. Kavanagh*, 137 F.2d 574, 576 (6th Cir. 1943), yet another

8  federal documentary stamp tax case, the Court held that "realty sold" is confined to "actual

9  sales" and thus looked to the intention of the parties to ascertain whether a sale had

10  occurred.   See also *Berkeley Savings & Loan Assn. of Newark, N.J. v. United States*, 301

11  F. Supp. 22, 26 (D.N.J. 1969) (citing *Berry* that "[w]hether a taxable sale occurs depends

12  upon the intention of the parties gathered from their whole writing when giving to the

13  words and phrases used, their ordinary signification. . . . If Congress had intended to levy a

14  tax on every transfer of title it could have expressed its purpose in a sentence, but it is clear

15  from the language of the section that it intended to confine the tax to actual sales.").[8] Thus,

16  Respondent's argument that a "sale" is not required for the transfer tax to apply is simply

17  incorrect.

18       Respondent does not cite to any legal authority that specifies that a "sale" is not

19  required for the transfer tax to apply. Instead, Respondent argues that *Seattle-First* does not

20  apply to the instant case. Resp. Br. at 17:20-18:11. Respondent observes that *Seattle-First*

21  _____

22  [8] Respondent asserts that neither *Berry* nor *Berkeley* "have any bearing on this case."
     Resp. Br. at 18:12-16. However, both *Berry* and *Berkeley* interpret the term "realty sold"
23   under the federal documentary stamp tax, which had been in existence as far back as 1932
     until its repeal in 1968. See former IRC § 4361, and its predecessors, former IRC § 3482
24   and IRC § 800, Schedule A-8). SF Transfer Tax Ordinance § 1102 uses the same terms
     as in the federal documentary stamp tax statute, upon which the San Francisco transfer
25   tax is based. Because the SF Transfer Tax Ordinance is patterned after the federal
     documentary stamp tax, *Berry* and *Berkeley* are controlling. See, e.g., *Holmes v.*
26   *McColgan*, 17 Cal. 2d 426, 430 (1941); *Innes v. McColgan*, 47 Cal. App. 2d 781, 784
     (1941); *Meanley v. McColgan*, 49 Cal. App. 2d 313, 317 (1942); see also Attorney
27   General Opinion No. 98-1203, 82 Ops. Cal. Atty. Gen. 56 (Mar. 26, 1999) (applying
     federal documentary stamp tax authorities for purposes of interpreting California's
28   transfer tax).

1  "predates the Documentary Stamp Tax Regulations," which "were not even promulgated in
2  this form until 1959." Resp. Br. at 17:21-22, 18:7-8. Aside from the fact that Respondent
3  also cites to numerous cases throughout its brief which predate such Regulations (see, e.g.,
4  Resp. Br. at 18:27-28, 19:9-11), Respondent's observation misses the point. *Seattle-First*
5  involves the very tax upon which the SF Transfer Tax Ordinance is based and squarely
6  addresses the identical term "realty sold" that is used in both the federal tax statute and SF
7  Transfer Tax Ordinance § 1102. It is a well-settled principle of statutory construction that,
8  when a tax statute is based on or patterned after a federal tax statute, federal authorities
9  (here, the United States Supreme Court's decision in *Seattle-First*) controls. See, e.g.,
10  *Meanley*, 49 Cal. App. 2d at 317 and authorities cited in footnote 8, above.

11      Respondent then attempts to re-cast the holding in *Seattle-First* as standing for the
12  proposition that: "Essentially, the Supreme Court was making the distinction between a
13  consolidation forced by operation of law and a consolidation resulting from voluntary acts,
14  with the former not being taxable and the latter being taxable." Resp. Br. at 18:4-6.
15  Respondent's characterization of *Seattle-First* essentially guts the Court's holding in
16  *Seattle-First*. The *Seattle-First* Court did not hold that voluntary acts are taxable. Rather,
17  the Court held that the ordinary meaning of the terms "sold" and "purchase or purchaser"
18  must be given to those terms and that courts must look to the "realities" of the subject
19  transaction to determine whether the transferee can "be said to have 'bought' or 'purchased'
20  the real property." 321 U.S. at 590.

21      Lastly, Respondent attacks *Seattle-First* on the basis that the Court "was not
22  addressing the definition of 'sold' found in the Documentary Stamp Tax Regulations."
23  Resp. Br. at 18:6-7. Again, Respondent misses the point. The issue before this Court is
24  whether the Diocesan restructuring can be said to constitute "realty sold" as that term is
25  used in SF Transfer Tax Ordinance § 1102. San Francisco Transfer Tax Ordinance § 1114
26
27
28

1  does *not* provide that the Documentary Stamp Tax Regulations[9] are the exclusive source of

2  authority for interpreting the transfer tax provisions; it states that the transfer tax provisions

3  must be interpreted *consistently* with those Regulations. The bottom line is that Petitioner's

4  position *is consistent* with the Documentary Stamp Tax Regulations.

5        In the instant case, and looking at the plain realities of the Diocesan restructuring, it

6  cannot be said that the Parish and School Properties were sold. Nor can it be said that the

7  Corporation Sole or the Support Corporation purchased such properties. The administrative

8  record compels a finding that the Diocesan restructuring was not a sale—in form, substance

9  or by intention of the parties.

10        In form, the Diocesan restructuring was not structured as a sale. The restructuring

11  involved no bargaining or other indicia of a purchase or sale. No purchase or sale

12  agreements were executed in connection with the restructuring. No sales proceeds were

13  generated. In the course of his review of the transaction, Respondent's witness testified that

14  he did not see any purchase or sale agreement. VI AR 2387:8-11.

15        In substance, the Diocesan restructuring involved the dissolution of the Welfare

16  Corporation, the return of the School Properties from the Welfare Corporation upon its

17  dissolution to the Corporation Sole (whence they originally came in 1953), and the

18  entrustment of the Parish and School Properties from the Corporation Sole to the newly

19  formed Support Corporation. As the Archbishop plainly stated in his letter, "the real

20  property and capital assets belonging to the parishes and school under Church law have

21  been segregated from the real property and capital assets of the Archdiocese and are now

22  *entrusted* to two distinct non-profit religious corporations. . . . " I AR 81-82 (emphasis

23  added).[10] Respondent points out that the "Corporation Sole's use of the word 'entrust'

24

_____

25  [9] The Documentary Stamp Tax Regulations to which SF Transfer Tax Ordinance § 1114
26  refers are Treas. Reg. §§ 47.4361-1, 47.4361-2 and 47.4362-1.

27  [10] Under the restructuring, the real property and capital assets of the parishes and schools
     were entrusted, respectively, to the Support Corporation and The Archdiocese of San
     Francisco Parish, School and Cemetery Juridic Persons Capital Assets Support
28  Corporation. I AR 82.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
of 132

1 throughout its Opening Brief should not be confused with the meaning of "trust" under

2 California law." Resp. Br. at 31:9-10. The point of using the word "entrust" is that it is the

3 word that the Archbishop used in his letter,[11] and, whether or not a formal trust has been

4 created, the word "entrust" certainly means something *other than* a sale.[12]

5       Furthermore, the intention of the parties that the restructuring was not a sale is

6 manifested not only by Archbishop's letter as noted above, but also on the face of the

7 Deeds. Both Deed A and Deed B expressly state on their face, "No consideration or sale—

8 Transfer of property within The Roman Catholic Church only." I AR 15, 22. The Transfer

9 Tax Affidavits submitted with said Deeds expressly state: "No Transfer Tax Due—No

10 Change in Beneficial Ownership." I AR 206, 227. Similarly, the Preliminary Change of

11 Ownership Reports that were filed in connection with the Deeds state: "Transfer with

12 Roman Catholic Church. No change in beneficial interest." I AR 213, 234. Thus, the very

13 documents relied upon by Respondent with respect to its argument that realty has been

14 "sold" (Resp. Br. at 12:16-28 and 13:1-7) in fact support the opposite conclusion.

15

16

17

18 _____

19 [11] No contrary evidence was produced at the hearing, and the Review Board made no contrary findings.

20 [12] In addition, when then Archbishop Joseph S. Alemany first transferred all of Church property of the Archdiocese of San Francisco to the newly formed Corporation Sole in
21 1854, he did so "in trust" as follows:

22     And all property held by me as such corporation, is held by me in trust for the sole use purpose and behoof of the said Roman Catholic Church in the
23     said Diocese of San Francisco.

24 I AR 290-291. The entrustment of Church property to the Corporation Sole accords with one of the fundamental purposes of a religious corporation, which, as the Courts consistently have held, is "to stand in the capacity of an agent
25 holding title to the property, with the power to manage and control the same in accordance with the interest of the spiritual ends of the church." *Berry v.*
26 *Society of Saint Pius X*, 69 Cal. App. 4th 354, 371 (1999). The entrustment by the incumbent Archbishop of the Parish and School Properties to the Support
27 Corporation plainly was not a sale. Such entrustment was no more a "sale" than was the entrustment of all of the Church's property to the Corporation
28 Sole in 1854.

Case 5:... REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    In sum, the Review Board itself did not find that a sale occurred with respect to

2  either Deed A or Deed B.[13]  Respondent stretches, if not skews, the term "realty sold"

3  beyond any reasonable interpretation.  The administrative record establishes that the Parish

4  and School Properties were not sold pursuant to the Diocesan restructuring.  As such, no

5  sale occurred and the transfer tax cannot be imposed.  Petitioner respectfully submits that

6  on the foregoing basis *alone*, this Court should find that the Board's Ruling is erroneous—

7  whether as a matter of law or on the basis that the Review Board's findings and conclusions

8  are unsupported by substantial evidence.

9          2.      No consideration was involved in the Diocesan restructuring.

10         Even if an actual sale is not required and "valuable consideration" is all that is

11  required for realty to be "sold," the Review Board also erred in that it applied the incorrect

12  legal definition of "consideration."  The Board's Ruling refers to Cal. Civ. Code § 1605.[14]

13  However, Cal. Civ. Code § 1605 sets forth the definition of consideration for purposes of

14  the interpretation of contracts.  See Cal. Civ. Code § 1429.[15]  Whether Deed A and Deed B

15  are invalid instruments under California contract law for lack of consideration is *not* the

16  issue before this Court.  Rather, the issue is whether sufficient consideration exists to

17  support the imposition of a transfer tax.

18         The definition of consideration in Cal. Civ. Code § 1605 is squarely at odds with the

19  federal Documentary Stamp Tax Regulations, which set forth a much narrower definition.

20

---

21  [13] The Review Board stated in the Board's Ruling: "The parties disputed whether the deeds
     covered 'realty sold' within the meaning of the SF Ordinance.  With respect to 'realty
22  sold,' the Board concludes that Grant Deed A and Grant Deed B constitute 'realty sold'
     because valuable consideration existed for both transactions." IX AR 3612:3-5.  The
23  Review Board plainly erred since it failed to address the fundamental issue—i.e., whether
     a sale and purchase of the Parish and School Properties ever occurred.

24  [14] Cal. Civ. Code § 1605 states: "Any benefit conferred, or agreed to be conferred, upon the
25  promisor, by any other person, to which the promisor is not lawfully entitled, or any
     prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the
26  time of consent lawfully bound to suffer, as an inducement to the promisor, is a good
     consideration *for a promise*." (Emphasis added.)

27  [15] Cal. Civ. Code § 1429 provides that the "rules which govern the interpretation of
     contracts" are prescribed by Part II of Division 3 of the Civil Code, of which Cal. Civ.
28  Code § 1605 is a part.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
Of 132

1    In particular, Treas. Reg. § 47.4361-1(a)(4)(ii) provides that "valuable consideration"

2    means "money or anything of value"—not, for example, any benefit conferred.  The

3    narrower definition of consideration for transfer tax purposes is reflected in the examples

4    provided in Treas. Regs. § 47.4361-2(b)(2) that consideration recited on a deed such as "$1

5    and other valuable consideration" and "desire to promote public welfare and $1," do not

6    constitute consideration for transfer tax purposes.[16]  Plainly, what may be consideration for

7    contract law purposes is not sufficient for transfer tax purposes.  As described further

8    below, by resorting to the definition of "consideration" for contract law purposes, the

9    Review Board erroneously has ignored an entire body of transfer tax case law, which is

10   relevant and directly applicable, if not controlling, for purposes of interpreting the SF

11   Transfer Tax Ordinance.  The Review Board relied on an erroneous definition, and thus, the

12   specific items that the Review Board identified as constituting "consideration" do not

13   trigger the transfer tax.

14                    a.      Deed A

15          The Review Board identified the following two items as consideration for the

16   transfer of the School Properties from the Welfare Corporation to the Corporation Sole in

17   Deed A:  (1) the Corporation Sole's assumption of the $33,905,893 of the Welfare

18   Corporation's debt and (2) the Corporation Sole's retention of the operations of the parishes

19   and schools as well as the obligations of the Welfare Corporation (such as the collective

20   bargaining agreement previously held by the Welfare Corporation).  IX AR 3612:26-

21   3613:4.

22

23

24   _____

25   [16]Respondent itself argues that only authorities interpreting the federal Documentary Stamp
     Tax Regulations are applicable (see, e.g., Resp. Br. at 18:6-7), yet it relies on Cal. Civ.
     Code § 1605, which neither relates to transfer taxes nor interprets the Documentary

26   Stamp Tax Regulations.  In addition, Respondent argues that California statutes such as
     RTC § 11925(d) and § 62(k) do not apply to San Francisco as a "charter city with

27   sovereign rights" (Resp. Br. at 37:9-11), but somehow Cal. Civ. Code § 1605 does apply.
     Respondent's argument can only be described as selective "cherry picking" from

28   California's statutes.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    First, the Review Board has mischaracterized the $33,905,893 as "debt" of the

2    Welfare Corporation.  The administrative record does not support a finding that the

3    $33,905,893 was "debt."  Rather, the $33,905,893 was booked as "Total liabilities" on the

4    final balance sheet of the Welfare Corporation at the time of its dissolution.  II AR 386.

5    Such liabilities consisted of $11,669,493 of "Accounts Payable" and a sum of $22,236,399

6    in "Deferred Revenue" and "School Deposits and Loan Fund."  II AR 386.  As Petitioner's

7    witness testified, the deferred revenue and school deposits/loan fund were monies received

8    either from parents who paid their tuition in advance or from internal Church loans.  VII

9    AR 2645:9-21.  Similarly, the accounts payable amount was simply the anticipated payroll

10    for the teachers.  VII AR 2645:3-8.  There were no liabilities owed to outside organizations.

11    VII AR 2645:1-2.  The above amounts were booked as "liabilities" against the $76,382,068

12    of "Cash and Equivalents" (II AR 386) to indicate that a portion of such cash assets was

13    being held in reserve as pre-paid tuition or school deposits—again, not as any debt owed.[17]

14        More importantly, the Corporation Sole's assumption of liabilities—whether the

15    assumption of debt or balance sheet liabilities—is not consideration for transfer tax

16    purposes, because such assumption was not payment or consideration *for* the transfer of the

17    School Properties.  Instead, the return of the School Properties by the Welfare Corporation

18    to the Corporation Sole was required by operation of law.

19        Transfers by operation of law are not subject to transfer tax.  In *Rochelle Inv. Corp.*

20    *v. Fontenot*, 34 F. Supp. 118 (E.D. La. 1940), a federal documentary stamp tax case, the

21    Court held that transfers of realty by operation of law are not subject to transfer tax.  In

22

---

23    [17] As to the second item identified by the Review Board, the collective bargaining
      agreement is not an additional item, but merely relates to the anticipated payroll for the
24    teachers.  See II AR 591.  Moreover, neither the Review Board nor Respondent explains
      why the Corporation Sole's *retention* of the operation of the parishes and schools—
25    something that the Corporation Sole is obligated to do as part of its core mission of
      "administering and managing the affairs, property and temporalities of the Roman
26    Catholic Church in said Archdiocese of San Francisco" (see I AR 121)—constitutes
      consideration for the Parish and School Properties.  As further discussed below with
27    respect to Deed B, even under the authority cited by Respondent, a "promise to do what
      one is already obligated to do is not consideration."  *Beatrice v. State Board of*
28    *Equalization*, 6 Cal. 4th 767, 783 n.9 (1993).

---

702699704                                    13

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION – CGC-10-498795

Case...81 of 132

1  *Rochelle*, two corporations merged pursuant to which the real property of one corporation

2  was transferred to the surviving corporation. 34 F. Supp. at 118. The Court held that such

3  transfer was not subject to transfer tax, agreeing with the plaintiff's contention that the tax

4  "does not apply to all transfers of real estate, but that it applies only to deeds executed to

5  transfer property *sold to a purchaser* or nominee. That the property herein involved was

6  not sold to a purchaser, but was transferred by virtue of the merger agreement *through*

7  *operation of law*, the operating laws being the corporation laws of Delaware and

8  Louisiana." *Id.* at 119 (emphasis added). Such result is wholly consistent with the federal

9  Documentary Stamp Tax Regulations, which expressly indicate that the "[t]ransfer of real

10  estate in a *statutory* merger or consolidation from a constituent corporation to the

11  continuing or new corporation" is not subject to transfer tax. Treas. Regs. § 47.4361-

12  2(b)(12) (emphasis added).

13        Respondent argues that "the government has consistently taken the position that the

14  transfer of ownership rights resulting through voluntary acts of the parties, even though

15  pursuant to statutory requirements or directions of a board of directors, are not transfers

16  'wholly by operation of law.'" Resp. Br. at 19:9-15 (citing *Emporium Capwell Co. v.*

17  *Anglim*, 140 F.2d 224, 226 (9th Cir. 1944)). While the government consistently may have

18  taken such position, Respondent fails to point out that the U.S. Supreme Court resolved this

19  issue in *Seattle-First* by rejecting the government's position. 321 U.S. at 589-90. In

20  *Seattle-First*, the Court held that transfers by operation of law, such as a transfer of assets

21  pursuant to the National Banking Act, were not subject to transfer tax. *Id.* The *Seattle-*

22  *First* Court rejected the government's distinction between so-called "voluntary acts" and

23  transfers by operation of law and held:

24        But in a broad sense, few if any transfers ever take place "wholly by
        operation of law" for every transfer must necessarily be part of a chain of
25        human events, rarely if ever other than voluntary in character. Thus to
        give any real substance to the exemption, we must take a more narrow
26        view and examine the transfer apart from its general background. We
        must look only to the immediate mechanism by which the transfer is made
27        effective. If that mechanism is entirely statutory, effecting an automatic
        transfer without any voluntary action by the parties, then the transfer may
28        truly be said to be "wholly by operation of law."

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 2
THE SECOND CAUSE OF ACTION – CGC-10-498795                          of 132

1   *Id.* at 587-88.  Respondent cites two other cases, *Beatrice Co., supra,* and *Rexall Drug Co.*

2   *v. Peterson,* 113 Cal. App. 2d 528 (1952) (Resp. Br. at 19-20), neither of which is relevant

3   herein, since they involve sales and use taxes (*Beatrice*) and a business license tax (*Rexall*).

4          Here, the Welfare Corporation was a "subordinate corporation" of the Corporation

5   Sole, as indicated in the Bylaws of the Welfare Corporation, Article I of which states in

6   relevant part:

7          This corporation also shall be conducted as a subordinate corporation,
       instituted with the authority of the Roman Catholic Archbishop of San
8          Francisco, a (California) corporation sole, within the meaning of the
       provisions of said Nonprofit Religious Corporation Law relating thereto.
9

10  I AR 336-337.  Cal. Corp. Code § 9132(a), which is part of the California Nonprofit

11  Religious Corporation Law (see Cal. Corp. Code § 9110), provides that in the event of the

12  dissolution of a subordinate corporation, "any assets of the corporation . . . *shall be*

13  *distributed* to the head organization" (emphasis added).  The statutory requirements of Cal.

14  Corp. Code § 9132(a) were embedded in the Articles of Incorporation of the Welfare

15  Corporation, Article 8 of which provided that upon its liquidation or dissolution the

16  "remaining assets of the corporation shall be distributed . . . to The Roman Catholic

17  Archbishop of San Francisco, a (California) corporation sole." I AR 181.  Thus, the return

18  of the School Properties was by operation of law—namely, Cal. Corp. Code § 9132(a).

19  Neither the assumption of liabilities nor any of the other alleged forms of consideration

20  regarding Deed A is relevant as California statutory law required that those properties be

21  returned to the Welfare Corporation upon its dissolution.

22          As indicated in Petitioner's Opening Brief, federal case law supports Petitioner's

23  position.  Pet. Open. Br. at 23:25-28.  In *Socony-Vacuum Oil Co. v. Sheehan,* 50 F. Supp.

24  1010 (E.D. Mo. 1943), and *Tide Water Associated Oil Co. v. Jones,* 57 F. Supp. 482 (W.D.

25  Okla. 1944), a subsidiary corporation transferred all of its assets and liabilities to its parent

26  corporation upon dissolution.  In both cases, the Court held that the assumption or discharge

27  of the subsidiary's liabilities by the parent corporation did not constitute consideration for

28  the assets that were distributed as a consequence of the dissolution.  *Socony-Vacuum,* 50 F.

Case3:... Page 83
of 132

1   Supp. at 1012; *Tide Water*, 57 F. Supp. at 483. Likewise, here, the Welfare Corporation

2   transferred all of its assets to the Corporation Sole upon dissolution, and the Corporation

3   Sole's assumption of any liabilities cannot be regarded as consideration for the transfer for

4   transfer tax purposes.

5          Respondent contends that "transfer tax is owed when a corporation in dissolution

6   transfers its assets to a separate and distinct legal entity, and the new entity assumes the debt

7   of the dissolving corporation." Resp. Br. at 19:7-9 (citing Treas. Reg. § 47.4361-2(a)(8)); see

8   also Resp. Br. at 16:19-28 (citing *R. H. Macy & Co. v. United States*, 107 F. Supp. 883

9   (S.D.N.Y. 1952) and *Greyhound Corp. v. United States*, 1953 U.S. Dist. LEXIS 4352 (N.D.

10  Ill. 1953)). Respondent's reliance on the cited authorities is wholly misplaced. First, Treas.

11  Reg. § 47.4361-2(a)(8) provides that the following transfer may be subject to tax:

12          A conveyance of realty by a corporation in liquidation or in dissolution *to
            its shareholders* subject to the debts of the corporation; however, if there
13          are no corporate debts and the conveyance is made solely for the
            cancellation and the retirement of the *capital stock*, the tax does not apply.
14

15  Treas. Reg. § 47.4361-2(a)(8) does not apply because, in the instant case, there was neither a

16  dissolution to *shareholders* nor a conveyance made *subject to* the debts of the Welfare

17  Corporation, as described above. As Respondent concedes, the Welfare Corporation did not

18  have shareholders, because "[a]s a legal matter, nonprofit organizations are not 'owned.' As

19  such, no one has a right to the profits and no one has the right to sell interests in the

20  nonprofit."[18] III AR 804. Thus, Treas. Reg. § 47.4361-2(a)(8) has no applicability here.[19]

21

22

_____

23  [18] In this case, Respondent argues that the Corporation Sole cannot be regarded as the
    shareholder of the Welfare Corporation for purposes of analyzing whether a change in the
24  ultimate ownership of the subject real property has occurred. On the other hand,
    Respondent relies upon Treas. Reg. § 47.4361-2(a)(8), which necessarily requires that the
25  Corporation Sole be regarded as the sole shareholder of the Welfare Corporation.
    Respondent cannot have it both ways.
26
    [19] Respondent also cites, in passing, other examples of taxable transfers under section
27  47.4361-2(a) (e.g., life maintenance, defaulting mortgagor, exchanges for capital stock).
    Resp. Br. at 16:12-18. None of those examples apply here, and Respondent does not
28  indicate the relevance of such examples to the specific facts in the instant case.

1    Similarly, *Greyhound* and *R. H. Macy* are distinguishable because those cases, like

2    Treas. Reg. § 47.4361-2(a)(8), involved transfers of realty to the dissolving corporation's

3    shareholders. The fact that the transfers at issue in *Greyhound* and *R. H. Macy* involved

4    shareholders, and hence capital stock, was a pivotal factor in the court's decision in those

5    cases. In *Greyhound*, for example, the Court stated:

6           What happened in this case was this: Corporate entity A, which owned all of
             the capital stock of corporate entity B, caused all of the assets, including a
7           parcel of real estate, of B, subject to the liabilities of B, to be conveyed to A.
             In consideration thereof, *A surrendered to B all of the capital stock of B*, and,
8           having done this, caused B to be dissolved. The court is of the opinion that
             the *transfer of the assets of B to A, in consideration of the return to B of all of*
9           *its capital stock was a "sale."* It was a transfer of title to realty for a valuable
             consideration, which involved something of value, that is, the *rights of a*
10          *stockholder in the corporation* which was to be dissolved, *evidenced by the*
             *stock thereof.*
11

12   1953 U.S. Dist. LEXIS 4352 at *4 (emphasis added). In other words, the capital stock of

13   the dissolving corporation provided the necessary consideration to treat the conveyance as

14   a taxable sale. No such consideration was involved in the dissolution of the Welfare

15   Corporation, which had neither shareholders nor capital stock.

16          In sum, with respect to Deed A, the Corporation Sole did not purchase or otherwise

17   provide any "valuable consideration" for the School Properties under transfer tax law.

18   Upon its dissolution, the Welfare Corporation was required by operation of law (Cal. Corp.

19   Code § 9132(a)) to transfer all of its remaining assets, including the School Properties to

20   the Corporation Sole. The "liabilities" on the Welfare Corporation's books were not debts

21   owed to third parties. Rather, they consisted of pre-paid tuition and anticipated payroll to

22   be paid to the teachers in the schools. Any such "liabilities" assumed by the Corporation

23   Sole in connection with the dissolution of the Welfare Corporation were wholly unrelated

24   to the subject realty, and the assumption of such "liabilities" was not made in exchange for

25   the realty. Thus, the realty transfer in connection with the Welfare Corporation's

26   dissolution cannot be considered a "sale" that is subject to the transfer tax.

27

28

702699704                                    17

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

Case 3:23-cv-04155... of 132

1        b.     <u>Deed B</u>

2       In its brief, Respondent focuses its "realty sold" and consideration arguments almost

3 entirely on Deed A and not Deed B. Deed B did not involve a corporate dissolution,

4 transfers by operation of law or any assumption of so-called "liabilities." Respondent

5 merely re-states the Review Board's conclusion and asserts that, with respect to Deed B, the

6 Review Board "found ample support that valuable consideration existed in the form of" the

7 Support Corporation's "agreement" to undertake the following items: (1) collect rents and

8 maintain the properties, (2) return the collected rents and profits to the Corporation Sole, (3)

9 allow juridic persons affiliated with the Archdiocese to use the properties and (4) make

10 payments to restore or upgrade facilities. Resp. Br. at 14:6-14 (see Board Ruling at IX AR

11 3613:5-14). The Review Board and Respondent erred on the facts and the law.

12       First, the administrative record does not support a finding that any such alleged

13 "agreement" existed between the Corporation Sole and the Support Corporation.

14 Respondent's witness testified that, with regard to consideration, he "looked at everything

15 that was going on" (VII AR 2486:13-16), yet when specifically asked about the existence of

16 the purported agreement between the Corporation Sole and the Support Corporation, he

17 could not identify any. VI AR 2391:5-9. Respondent's witness testified:

18       Q: You refer to an agreement. What agreement—

19       A: The statement that you referred to to collect the rents from its
        properties and make payments to further use of, to restore and upgrade the
20       facilities used.

21 VI AR 2391:5-9. The "statement" to which Respondent's witness referred was no

22 "agreement." It simply was "Attachment 7E" to the Support Corporation's tax-exemption

23 application to the California Franchise Tax Board. VI AR 2390:8-2391:3. Attachment 7E

24 (see II AR 547) states in full:

25       This corporation will, among other things, collect rents from its properties
        and make payments to or for the use of, or restore or upgrade the facilities
26       used by, the Juridic Persons. It will accomplish its purpose under the
        leadership of a highly qualified and dedicated Board of Directors and Real
27       Estate and Building Advisory Committees. The corporation's Articles and
        Bylaws mandate that all activities shall be conducted in accordance with
28       Federal and State non-profit laws applicable to this type of non-profit

Case: ... of 132

1    corporation and in accordance with the law of the Roman Catholic
     Church.
2

3    Attachment 7E does not indicate the existence of any agreement. Instead, the collection of

4    rents and restoring or upgrading facilities in Attachment 7E simply refers to the Bylaws of

5    the Support Corporation, Section 3.1.3 of which provides:

6            This Corporation shall engage solely and exclusively in activities that shall
             support, or benefit the Corporation Sole, for the purposes stated in This
7            Corporation's Articles of Incorporation, such activities to include, but not
             be limited to, *collecting rents* from This Corporation's properties and
8            making payments to or for the use of, or *restoring or upgrading the
             facilities* used by, the aforementioned Juridic persons affiliated with the
9            Corporation Sole; all in accordance with the laws of The Church, which,
             *inter alia*, respects the *special rights to use of property by Juridic persons*
10           and the concomitant obligation to provide the financial means to maintain
             and enhance that property.
11

12   I AR 250-251 (emphasis added). Thus, contrary to the Review Board's conclusion, the

13   alleged "agreement" referred to in the Board's Ruling simply does not exist.[20]

14           Secondly, in light of Section 3.1.3 of the Support Corporation's Bylaws, the items

15   determined by the Review Board to constitute consideration for Deed B are wholly

16   insufficient as a matter of transfer tax law. Bylaws Section 3.1.3 was in place at the time of

17   the Support Corporation's formation in September 2007 (see I AR 244, 249) and well prior to

18   the execution of Deed B in April 2008 (I AR 22). Even under the authority cited by

19   Respondent, namely, *Beatrice Co.*, the items prescribed in Bylaws Section 3.1.3 are not

20   consideration at all. As the California Supreme Court held in *Beatrice Co.*, a "promise to do

21   what one is already obligated to do is not consideration." 67 Cal. 4th at 783, n.9. Because

22   collecting rents, restoring or upgrading facilities and allowing the juridic persons the right to

23   use property as they are entitled under Church law were inherent, pre-existing undertakings

24

25
     _____
26   [20] The Review Board (IX AR 3613:11) and Respondent (Resp. Br. at 14:11) also point to a
         flow chart (II AR 375) as support that the Support Corporation agreed to collect and pay
27       rents to the Corporation Sole. On its face, the chart shows just the opposite. The chart
         indicates that the "Rents & Profits" are "*for* schools & parishes" not payment or a
28       promise of payment to the Corporation Sole in exchange for any properties.

Case  REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
                          THE SECOND CAUSE OF ACTION – CGC-10-498795
                                            of 132

1  of the Support Corporation at the time of its formation, they cannot constitute consideration

2  for the Parish and School Properties whether under transfer tax law or even contract law.

3      In sum, with respect to Deed B, there was no agreement between the Support

4  Corporation and the Corporation Sole in connection with the transfers of the Parish and

5  School Properties. Further, the items found by the Review Board to constitute "valuable

6  consideration" for the properties are not consideration for transfer tax or other purposes, as

7  such items were inherent obligations of the Support Corporation in its role as a supporting

8  corporation of the Corporation Sole. Thus, the Review Board erred as a matter of law and its

9  conclusions are unsupported by substantial evidence in the record.

10      3.  Any conceivable benefit is not consideration.

11      Respondent also argues that the Review Board "found further valuable

12  consideration resulting from the underlying purpose that the subject transfers would

13  insulate the properties transferred to the Support Corporation from claims against the

14  Corporation Sole." Resp. Br. at 14:25-27. First, as discussed above, there were no existing

15  liabilities or claims against the Corporation Sole at the time of the Diocesan restructuring.

16      Second, Respondent urges this Court to accept that any alleged benefit from the

17  transfer of property is sufficient consideration for transfer tax purposes. As discussed

18  above, that simply is not the law. For transfer tax purposes, consideration is defined as

19  "money or anything of value" (Treas. Reg. § 47.4361-1(a)(4)(ii)), which requires something

20  more than a vague, amorphous or speculative benefit as alleged here. To hold otherwise

21  would be to ignore the legal definitions of "realty sold" and "valuable consideration" and

22  cause all realty transfers to be subject to tax, unless the transferor can show that its was

23  *disadvantaged* by the transfer. Such a requirement obviously does not exist. See, e.g.,

24  *Seattle-First* (no sale or consideration found in bank consolidation that "benefitted" the

25  parties involved).

26      4.  Intra-diocesan transfers are not "sales" under California law.

27      A further reason in support of Petitioner's position is that intra-diocesan transfers

28  are not sales under California law. As discussed in Petitioner's Opening Brief, RTC

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1 § 62(k) provides that the transfer of property between a corporation sole, a religious

2 corporation or public benefit corporation, or any combination thereof, is not a "change of

3 ownership," provided that both the transferor and transferee are "regulated by laws, rules,

4 regulations, or canons of the same religious denomination." Pet. Open. Br. at 47:8-24.

5 While RTC § 62(k) is a property tax provision, Courts consistently have looked to the

6 property tax definition of "change of ownership" to interpret the term "realty sold" for

7 transfer tax purposes. See *McDonald's Corp. v. Board of Supervisors*, 63 Cal. App. 4th

8 612, 615 (1998); *Thrifty Corp. v. County of Los Angeles*, 210 Cal. App. 3d 881, 886 (1989).

9 In *Thrifty*, the Court held that the term "realty sold" for transfer tax purposes is "sufficiently

10 similar to the phrase 'change in ownership'" for property tax purposes "to warrant that each

11 phrase be defined to have the *same meaning*." 210 Cal. App. 3d at 886. The *McDonald's*

12 Court and the Attorney General in his California transfer tax opinion, Opinion No. 98-1203

13 (copy of which is located at II AR 784), both followed *Thrifty*.[21]

14        Here, the Corporation Sole, the Welfare Corporation and the Support Corporation

15 are all religious corporations expressly governed by the laws of the Roman Catholic

16 Church. The Review Board did not find, and Respondent does not contend, otherwise. As

17 such, the transfers of the Parish and School Properties pursuant to the internal Diocesan

18 restructuring (Deed A and Deed B), were not changes of ownership under RTC § 62(k) and

19 thus were not "realty sold" for transfer tax purposes.

20        Respondent argues that the Review Board was correct when it concluded as a matter

21 of law that, in light of San Francisco's status as a charter city, RTC § 62(k) is "not

22 applicable in any determination as to whether documentary transfer taxes are due and

23

24

---

25 [21] Even the Review Board's own legal counsel, Mr. Nakamae, agreed that the phrase "realty sold" in SF Transfer Tax Ordinance § 1102 means "change in ownership":

26     And that's why Section 1102 refers to realty sold, and if I'm not mistaken, you can correct me if I'm wrong, in the context of a transfer tax question,

27     you look to the definitional change in ownership as defining whether a realty has been sold.

28     VII AR 2577:18-22.

702699704                  21

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION – CGC-10-498795

Case 4:23-cv-... [illegible] of 132

1    owing under the ordinance." Resp. Br. at 38:1-2.  Respondent's argument, and the Board's

2    Ruling, fail for several reasons.  First, it is simply untrue that charter cities have unlimited

3    "home rule" powers that give them carte blanche authority to impose a transfer tax on an

4    intra-diocesan restructuring.  The limitations on a charter city's powers are further

5    discussed under Section C, below, relating to RTC § 11925(d).

6         Second, irrespective of San Francisco's status as a charter city, RTC § 62(k) is

7    persuasive authority in interpreting the SF Transfer Tax Ordinance and the meaning of

8    "realty sold" as used therein.  As discussed above, the *McDonalds's* and *Thrifty* Courts (as

9    well as the Attorney General in his California transfer tax opinion (Opinion No. 98-1203)),

10   looked to the property tax provisions, which include RTC § 62(k), for guidance in

11   interpreting the California transfer tax, and the meaning of "realty sold" as used in RTC

12   § 11911 in particular.  As a matter of statutory construction, it is well settled that "[w]here

13   the same term or phrase is used in a similar manner in two related statutes concerning the

14   same subject, the same meaning should be attributed to the term in both statutes unless

15   countervailing indications require otherwise." *Thrifty*, 210 Cal. App. 3d 886 (citation

16   omitted).  So too here, because SF Transfer Tax Ordinance § 1102 and RTC § 11911 both

17   use the same term "realty sold," this Court should look to property tax provisions, such as

18   RTC § 62(k), to interpret "realty sold."  The issue raised before this Court is how the term

19   "realty sold" should be applied in the context of an intra-diocesan restructuring.  RTC

20   § 62(k) answers that question:  intra-Diocesan transfers are not "changes of ownership" and

21   thus should not be considered the sale of realty for transfer tax purposes.  *McDonald's*

22   (First Appellate District) and *Thrifty* not only provide this Court with a legal roadmap but

23   require that this Court look to RTC § 62(k) in support of Petitioner's position.[22]

24

25

26   [22] Indeed, Respondent itself cites to California property tax statutes and cases in support of
     its position.  Resp. Br. at 35:18-36:19.  For example, Respondent urges this Court to look
27   to a case involving RTC § 63.1, a property tax provision relating to the Parent/Child
     Exclusion, but to ignore RTC § 62(k), which specifically relates to intra-denominational
28   transfers such as those at issue here.  Again, Respondent cannot have it both ways.

702699704                                          22

Case 3-80169 of Petitioner the Roman Catholic Archbishop of San Francisco, a corporation sole, on
of 132

1       Third, irrespective of San Francisco's charter city status, and even if RTC § 62(k)

2   does not apply, long-standing California authorities regarding religious corporations compel

3   a determination that intra-diocesan transfers are not sales for transfer tax purposes.  In

4   *Wheelock v. First Presbyterian Church of Los Angeles,* 119 Cal. 477, 483 (1897), the

5   California Supreme Court explained:

6           The Civil Code of this state . . . expressly permits religious bodies to
            incorporate, but such *incorporation is only permitted as a convenience to*
7           *assist in the conduct of the temporalities of the church.  Notwithstanding*
            *incorporation the ecclesiastical body is still all important.*  The corporation
8           is a subordinate factor in the life and purposes of the church proper.  A
            *religious corporation* like the one at bar, under the laws of this state, is
9           *something peculiar to itself.  Its function and object is to stand in the*
            *capacity of an agent holding the title to the property,* with power to manage
10          and control the same in accordance with the interest of the spiritual ends of
            the church. . . . "The legislature never means by granting or allowing such
11          charters to change the ecclesiastical status of the congregation, but only to
            afford them a *more advantageous* civil status."  [Emphasis added]
12

13  In *Frohliger v. Richardson*, 63 Cal. App. 209 (1923), the Court recognized that, even

14  though civil law title to church property may be held by a religious corporation, the true

15  owner of the church property is the Church itself.  The issue in *Frohliger* was whether State

16  funds could be used for the restoration of the San Diego Mission.  *Id.* at 210.  Under

17  applicable State law, the Legislature was barred from using public funds in the aid of any

18  religious sect or church.  *Id.* at 212.  In *Frohliger*, the Court held:

19          As a matter of common knowledge, we take judicial notice of these facts:  The
            San Diego Mission is owned by the Roman Catholic Church.  The title to the
20          property is in the Archbishop of San Francisco, a corporation sole.

21  *Id.* at 214.  Thus, the fact that title to church property is in the name of a religious

22  corporation does not remove such property from church ownership.

23          Due to the unique features of religious corporations and in light of the foregoing

24  authorities, California taxing authorities have recognized:

25          Title and ownership are not synonymous. . . . [T]he fundamental truth
            recognized by the judicial notice taken in *Frohliger, supra*; namely, that the
26          real owner of property, title to which is vested in the Roman Catholic Bishop,
            a corporation, is the Roman Catholic Church, and since it is recognized that a
27          transfer to an agent is only a transfer of bare legal title, it is now our opinion
            that the subject transfer from one Roman Catholic Bishop, a corporation sole
28          to another should not be considered a change in ownership.

1  V AR 1933 (Opinion letter from Glenn L. Rigby, Assistant Chief Counsel, State Board of

2  Equalization, March 24, 1981). Thus, notwithstanding its charter city status, the City

3  cannot ignore the unique features of religious corporations under California law—that they

4  are "peculiar" unto themselves, whose "function and object is to stand in the capacity of an

5  agent holding the title to the property." The Legislature's intent, in permitting religious

6  bodies to incorporate, was to assist and provide a "more advantageous civil status"—*not to*

7  treat them less favorably, as Respondent attempts to do here, than non-religious

8  corporations.

9      In sum, there was no "sale" upon which the transfer tax can be imposed. Neither the

10  Corporation Sole (Deed A) nor the Support Corporation (Deed B) purchased or paid any

11  consideration in exchange for the Parish and School Properties. In addition, as a matter of

12  California law, intra-diocesan transfers do not constitute a change of ownership and thus are

13  not "sales" for transfer tax purposes. To the extent there is any doubt whether the Diocesan

14  restructuring and the transfers thereto are subject to transfer tax, such doubt *must* be

15  resolved in favor of Petitioner. See, e.g., *McDonald's*, 63 Cal. App. 4th at 617 ("It is, of

16  course, well settled that in case of doubt statutes levying taxes are construed most strongly

17  against the government and in favor of the taxpayer.").[23] If this Court determines that the

18  Diocesan restructuring does not constitute "realty sold" for *any* of the foregoing reasons, it

19  need not go any further. Under SF Transfer Tax Ordinance § 1102, neither transfer is

20  subject to transfer tax.

21

22

23

24
---
[23] Respondent asserts that "exemptions from taxation are strictly construed." Resp. Br. at

25  40:5-6 (citing *Batt v. City and County of San Francisco*, 184 Cal. App. 4th 163, 175
(2010)). Here, however, issues regarding "realty sold," "sale" and "consideration"

26  concern whether the subject transaction is even *subject to* the transfer tax, not whether the
transaction qualifies for one of the enumerated *exemptions* from the tax. Thus, any

27  doubts regarding whether the Parish and School Properties were sold for transfer tax
purposes, must be resolved in Petitioner's favor, just as the Court did in *McDonald's* in

28  holding in favor of the taxpayer's interpretation of "realty sold" for transfer tax purposes.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON 2
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    B.    The Intra-Diocesan Restructuring Is Exempt From Transfer Tax as a
            "Change in Form" Under SF Transfer Tax Ordinance § 1106(d).
2

3        If this Court determines that a sale occurred and consideration existed with respect

4    to either or both of Deed A and Deed B (i.e., that there was "realty sold" to a "purchaser or

5    purchasers"), the issue that arises is whether any of the various *exemptions* from the transfer

6    tax applies in this case.  Petitioner asserts that the Diocesan restructuring is exempt from

7    transfer tax as a "change in form" under SF Transfer Tax Ordinance § 1106(d).

8    Alternatively, Petitioner asserts that the restructuring is exempt under RTC § 11925(d).

9              1.    The Review Board erred in that it applied the wrong legal test for
                     determining whether the change in form exemption applies.
10

11       The Review Board erred as a matter of law in its ruling that Deed A and Deed B are

12   not exempt from transfer tax as a "change in form" under SF Transfer Tax Ordinance

13   § 1106(d).  IX AR 3613, 3616.  In particular, the Review Board erroneously examined

14   factors such as the "differences" in the "purpose, control and/or powers" of the subject

15   corporations to determine whether the transfers reflected in Deed A and Deed B constituted

16   a mere change in form.  IX AR 3614:9-15, 3616:9-12.  The Review Board concluded that

17   the change in form exemption under SF Transfer Tax Ordinance § 1106(d) did not apply

18   because the purpose, control and powers of the Corporation Sole, the Welfare Corporation

19   and the Support Corporation differed from each other.  IX AR 3614:16-20, 3616:12-17.

20   The Review Board's conclusion is erroneous as a matter of law because it applied the

21   wrong legal test to determine whether the change in form exemption applies for transfer tax

22   purposes.  Further, in doing so it erroneously considered a series of factors which are

23   completely irrelevant in making such a determination.  In all, the Board's Ruling is at odds

24   with the key transfer tax case in this area—*Columbia Gas of Pennsylvania, Inc. v. United

25   States*, 446 F.2d 320 (3d Cir. 1971)—and cannot be sustained.

26              a.    The so-called "continuity of interest" test does not apply.

27       The Review Board does not cite any legal authority to support its conclusion that the

28   factors it relied upon (i.e., purpose, control and powers) are at all relevant for purposes of

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
OF 132

1   the change in form exemption.  However, relying upon *Home Construction Corp. v. United*

2   *States*, 439 F.2d 1165 (5th Cir. 1971); *Davant v. Commissioner*, 366 F.2d 874 (5th Cir.

3   1966); and *Security Industrial Ins. Co. v. United States*, 702 F.2d 1234 (5th Cir. 1983)

4   (collectively referred to herein as the *Home Construction* cases), Respondent argues that to

5   qualify as a change in form under SF Transfer Tax Ordinance § 1106(d), the so-called

6   "continuity of interest" test must be satisfied—that is, one corporation must "replace" or be

7   the "alter ego" of the other, or there must be "an identity of shareholders and their

8   proprietary interests."  Resp. Br. at 28.  In applying the continuity of interest test,

9   Respondent contends that it is appropriate to look to the "purposes, governance and powers

10  of the three entities."  Resp. Br. at 28:21-22.[24]  However, Respondent's argument must fail.

11  Its reliance on the *Home Construction* cases is wholly misplaced as those cases involved

12  federal *income* taxes and *not* the federal documentary stamp tax upon which San

13  Francisco's transfer tax is based.

14          In the *Home Construction* cases, the issue was whether a corporate reorganization

15  satisfied the requirements of a tax-free reorganization for federal income tax purposes.  For

16  federal income tax purposes, a reorganization is tax-free if it is described in one of the

17  subsections under Internal Revenue Code ("IRC") section 368(a)(1).  For example, a so-

18  called "A" reorganization is exempt under IRC section 368(a)(1)(A), a "B" reorganization

19  is exempt under IRC section 368(a)(1)(B), and so forth.  An "F" reorganization is exempt

20  under IRC section 368(a)(1)(F) as a "mere change identity, form, or place of organization of

21  one corporation, however effected."  At issue in the *Home Construction* cases was whether

22  the subject reorganization was exempt from federal income tax as an "F" reorganization

23  under IRC § 368(a)(1)(F).[25]  In making the determination whether the reorganization at

24

25  [24] Respondent's witness also admitted that the factors he looked at in determining whether
26  the change in form exemption applied were based on *Home Constr. Corp.*  VI AR
     2397:2-7, 2398:6-11.

27  [25] *Home Constr. Corp.*, 439 F.2d at 1167 ("whether the merger was a reorganization within
     the meaning of § 368(a)(1)(F) of the Internal Revenue Code of 1954"); *Davant*, 366 F.2d
28  at 883 ("we must now decide . . . [whether] this was a 368(a)(1)(D) or (F)

                                                                              (continued...)

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO A CORPORATION SOLE ON
THE SECOND CAUSE OF ACTION – CGC-10-498795                                          of 132

1   issue therein satisfied the requirements of an "F" reorganization, the Court in each case

2   applied the so-called continuity of interest test.

3        Unlike the *Home Construction* cases, the issue in this case is not whether the intra-

4   Diocesan restructuring at issue here qualifies as an "F" reorganization for federal income

5   tax purposes. Indeed, as charitable religious corporations under IRC § 501(c)(3),[26] the

6   Corporation Sole, the Welfare Corporation (prior to its dissolution) and the Support

7   Corporation are not even subject to federal income taxes. Rather, the proper legal test for

8   determining whether the "change in form" exemption applies for transfer tax purposes is set

9   forth in *Columbia Gas*, in which the Third Circuit analyzed the change in form exemption

10  within the specific context of the federal documentary stamp tax.[27] Most importantly, in

11  *Columbia Gas*, the Court expressly rejected the "F" reorganization continuity of interest test

12  upon which the Review Board and Respondent has relied and instead looked to whether

13  there has been any change in the *beneficial ownership of the real property* that was

14  transferred.

15             b.        The *Columbia Gas* beneficial ownership test is controlling.

16       As discussed in Petitioner's Opening Brief (Pet. Open. Br. at 33:18-34:2), in

17  *Columbia Gas*, one corporation transferred its assets to an affiliated corporation, both of

18  which were wholly owned by a common parent corporation. 446 F.2d at 321. The

19  transferor corporation was engaged in the transmission and sale of natural gas in interstate

20  commerce and was subject to the regulation of multiple regulatory agencies, including the

21  Federal Power Commission and the Public Service Commission of Pennsylvania. *Id.*

22

23  _____

24  (...continued)
    reorganization"); *Security Industrial*, 702 F.2d at 1248 ("we reverse the district court and
    hold that the acquisitions . . . do not qualify as F reorganizations").

25  [26] II AR 580-586.

26  [27] Because SF Transfer Tax Ordinance § 1106(d) is patterned after former IRC
    § 4382(b)(1)(D) of the federal Documentary Stamp Tax Act, federal authorities relating

27  thereto apply for purposes of interpreting SF Transfer Tax Ordinance § 1106(d). See
    *Meanley*, 49 Cal. App. 2d at 317 and authorities cited in footnote 8 above; see also SF

28  Transfer Tax Ord. § 1114.

702699704                                    27

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1    Pursuant to an internal business reorganization, the transferor corporation *segregated* its

2    Pennsylvania assets and moved them to a new, *separate and distinct* corporation so that it

3    would no longer be subject to the Pennsylvania state regulatory agencies. *Id.* The issue was

4    whether the transfer of assets was exempt from federal documentary stamp tax under the

5    "change in form" exemption.

6         The government argued in *Columbia Gas* that because the change in form

7    exemption from documentary stamp tax "is couched in language substantially identical with

8    that of § 368(a)(1)(F), it urges that the exemption is inapplicable unless the reorganization

9    qualifies as an "F" reorganization." 446 F.2d at 322. The *Columbia Gas* Court expressly

10   rejected the government's argument and instead held that the term "mere change in form"

11   for transfer tax purposes more broadly covers corporate reorganizations where no shift in

12   the beneficial ownership of the real property has occurred. The Court held:

13        We hold that in using the language "a mere change in identity, form, or place
          of organization" in § 4382(b)(1)(D) [of the federal Documentary Stamp Tax
14        Act] Congress intended to exempt a generic class of formalistic transactions
          *involving no change in ownership* and no new dedication of capital. It did *not*
15        intend to import into the excise tax field a specific definition of whatever type
          of reorganization is covered by § 368(a)(1)(F) [i.e., an "F" reorganization].
16        We agree with the district court that the simple divisive reorganization here in
          issue, involving *no shift in ownership interests*, qualifies as an exempt
17        transaction.

18   *Id.* at 324 (emphasis added). Thus, the *Columbia Gas* Court concluded that the

19   reorganization was not subject to documentary stamp tax because, even though the property

20   was transferred from one corporate affiliate to another, the property remained ultimately

21   owned by both affiliates' common parent corporation.

22        *Columbia Gas* is controlling in the instant case, since it specifically addresses the

23   "change in form" exemption for transfer tax purposes and involves analogous facts—

24   namely, the transfer of property pursuant to an internal corporate reorganization whereby

25   the underlying ownership of such property remained the same. *Columbia Gas* is also

26   significant in that it expressly rejected the same argument that Respondent makes in this

27   case. The Court in *Columbia Gas* unequivocally rejected the government's argument that

28   the "F" reorganization continuity of interest test used for income tax purposes must be

Case3:11-cv-02585-JSW Document34-4 Filed08/05/11 Page96 of 132

1    satisfied to meet the "change in form" exemption for transfer tax purposes.  Rather, the sole

2    and determining factor that must be considered in applying the change in form exemption

3    for transfer tax purposes is whether there has been any *change in the beneficial ownership*

4    *of the real property* transferred—not whether the purpose, power or control of the

5    corporations are identical or whether one corporation is the alter ego or replaces the other

6    corporation.

7           The foregoing is further confirmed by the California Attorney General in a formal

8    published opinion, Opinion No. 98-1203,[28] interpreting the "mere change in form"

9    exemption in the California Transfer Tax Act, under which authority the San Francisco

10   transfer tax ordinance was enacted.[29]  As discussed in Petitioner's Opening Brief (Pet.

11   Open. Br. at 34:3-16), the issue addressed by the Attorney General was whether the transfer

12   of real property from a parent corporation to its wholly-owned subsidiary was subject to

13   transfer tax.  The Attorney General, specifically referencing *Columbia Gas*, concluded in

14   his opinion that such transfer was not subject to transfer tax because the "*beneficial*

15   *ownership* of the property remains the same," even though "a corporation has a *legal status*

16   *distinct* from its officers and shareholder." 82 Ops. Cal. Atty. Gen. at 58-59 (emphasis

17   added).  In a well-reasoned opinion, the Attorney General concluded:

18          In *Columbia Gas of Pennsylvania, Inc. v. United States* (3d Cir. 1971) 446
            F.2d 320, the court concluded that a transfer of real property from one wholly-
19          owned subsidiary corporation to another wholly-owned subsidiary corporation
            was not subject to the federal tax upon which [the California transfer tax] was
20          patterned.  The court found the transfer to be part of a "plan of reorganization
            or adjustment" "whereby a mere change in identity, form, or place of
21          organization is effected," which was exempt from the federal tax, and which is
            similarly expressly exempt under the [California transfer tax] Act.  In effect,
22          the federal court concluded that the parent corporation was the *beneficial*
            *owner of the property* both before and after the transfer and thus the tax was
23          inapplicable.

24

25

26   _____
     [28] 82 Ops. Cal. Atty. Gen. 56 (1999).  This opinion interprets the California transfer tax
27   (Cal. Rev. & Tax. Code § 11901 *et seq.*), which like the SF Transfer Tax Ordinance, was
     patterned after the federal documentary stamp tax.

28   [29] SF Ordinance § 1101.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 7
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1  82 Ops. Cal. Atty. Gen. at 59 (citations omitted) (emphasis added). Thus, consistent with

2  *Columbia Gas*, the Attorney General focused on the beneficial ownership of the property

3  and whether it had changed—not whether the purpose, power or control of the corporations

4  were identical.

5  The Review Board failed to address *Columbia Gas* in its ruling, and Respondent

6  makes only scant reference to the decision. Resp. Br. at 32:4-8. With respect to *Columbia*

7  *Gas*, Respondent merely observes that the court in *Columbia Gas* never used the term

8  "change in *beneficial* ownership." Resp. Br. at 32:6-7. Respondent is off-base. It ignores

9  the *Columbia Gas* Court's express references to "change in ownership" and "shift in

10  ownership interests" as well as Attorney General Opinion No. 98-1203, which looked to the

11  "beneficial owner of the property." 446 F.2d at 324; 82 Ops. Cal. Atty. Gen. at 59.

12  Respondent makes reference to another "Columbia Gas" case, *Columbia Gas of*

13  *Md., Inc. v. United States*, 177 Ct. Cl. 97 (Ct. Cl. 1966), which pre-dated the Pennsylvania

14  decision discussed above. Respondent states that in the Maryland case, the Court of Claims

15  "came to a different conclusion" and "held that Congress intended for the stamp tax

16  exemption to be narrowly construed." Resp. Br. at 32:7-13. What Respondent fails to

17  mention is that in the Pennsylvania decision, the Third Circuit dismissed the Court of

18  Claims' decision in the Maryland case as fatally flawed for a number of reasons: (1) the

19  federal legislation enacting the "change in form" exemption dealt solely with excise (e.g.,

20  transfer) taxes, not income taxes, (2) Congress did not intend to adopt the income tax "F"

21  reorganization test (IRC § 368(a)(1)(F)) for purposes of transfer taxes, and (3) the excise tax

22  exemptions that Congress enacted are entirely independent of IRC § 368(a)(1). 446 F.2d

23  323. Further, the California Attorney General cited to the Third Circuit's decision—not the

24  Court of Claims' decision—in his opinion, as noted above. Finally, even the Court of

25  Claims in the Maryland case itself dismissed the "continuity of interest" factors relied upon

26  by the Review Board and Respondent. 177 Ct. Cl. at 104 ("However, the continuity of

27  interest aspect is not very helpful here because it is really not the issue.") Simply put, the

28  so-called continuity of interest factors (e.g., "purpose, control and powers") are not relevant

Case3:11-cv-02525-JSW Document8-8 Filed08/04/11 Page98 of 132

1 with respect to the application of the change in form exemption for transfer tax purposes—

2 even under the authority cited by Respondent.

3       Finally, Respondent attempts to dismiss the Attorney General's transfer tax opinion

4 on the basis that the SF Transfer Tax Ordinance "requires the Assessor-Recorder to look to

5 the Documentary Stamp Tax Regulations, not interpretations of the current California

6 statute used by non-charter general law cities." Resp. Br. at 32:23-25. Again, Respondent

7 is off-base. Respondent wholly ignores the fact that the Attorney General opinion analyzes

8 and interprets the language, "whereby a mere change in identity, form, or place of

9 organization is effected," which is the *identical language* that is used in the federal

10 documentary stamp tax statute (former IRC § 4382(b)(1)(D)), the California transfer tax

11 statute (RTC § 11923(d)) and the SF Transfer Tax Ordinance (SF Tr. Tax Ord. § 1106(d)).

12 Thus, the Attorney General's opinion constitutes persuasive authority, and in any event the

13 legal authorities cited therein—namely, *Columbia Gas*—are controlling for purposes of the

14 San Francisco transfer tax.

15       In short, whether the purpose, control and powers of the subject corporations differ

16 from each other simply is irrelevant.

17       2.   <u>The Review Board's findings are not supported by substantial</u>
               <u>evidence.</u>
18

19       As noted above, the Review Board erroneously applied the continuity of interest test

20 contained in the federal income tax law, rather than the *Columbia Gas* beneficial ownership

21 test, in reaching its determination that the change in form exemption of SF Transfer Tax

22 Ordinance § 1106(d) does not apply in this case. Even if the factors relied upon the Review

23 Board—purpose, control and powers—are at all relevant, the Board's Ruling is still

24 erroneous as a matter of law and on the facts. The Review Board erred as a matter of law in

25 its failure to give due consideration to the fact that the Corporation Sole, the Welfare

26 Corporation and the Support Corporation are religious corporations governed by Church

27 law under the oversight of the Archbishop.

28

702699704                      31

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

Case 3:13-cv-cc ... Document ... Filed ... Page 99 of 132

1   In addition, the Review Board's findings that the purpose, control and powers of the

2   above corporations are "different" from each other (see IX AR 3614:22-23, 3615:11-12, 22-

3   23, 3616:19-20, 14-15, 25-26) finds no support in the administrative record. Indeed, the

4   evidence presented below establishes precisely the opposite—the purpose, control and

5   powers of the Corporation Sole, the Welfare Corporation and the Support Corporation were

6   the same, in that the Archbishop is the "hub of the wheel" around which the Archdiocesan

7   family of corporations is connected.

8        For example, it is uncontroverted that the purpose of the Corporation Sole, the

9   Welfare Corporation and the Support Corporation is religious, and specifically to conduct

10  and administer the temporalities of the Church, including the management of Church

11  property. I AR 238-239, 272, 308-309. The Certificate of Amendment of Articles of

12  Incorporation of the Corporation Sole state in relevant part:

13       The Roman Catholic Archbishop of San Francisco, a Corporation Sole,
         was duly organized as such by the authority of and in accordance with the
14       laws of the State of California, on February 24, 1854, by Joseph S.
         Alemany, the then Archbishop of the Roman Catholic Archdiocese of San
15       Francisco, *for the purpose of administering and managing the affairs,
         property and temporalities of the Roman Catholic Church in said
16       Archdiocese of San Francisco,* and has ever since continued to be and to
         act as a corporation sole for such purpose. . . .
17
         This corporation is organized and operated exclusively for *religious
18       purposes* within the meaning of *Section 501(c)(3) of the Internal Revenue
         Code.*
19
     I AR 272 (emphasis added).
20
         The Articles of Incorporation of the Welfare Corporation, as amended, provided in
21
     relevant part:
22
         The specific and primary purposes are *religious purposes,* namely, to
23       conduct religious activities of the Roman Catholic Church within the
         Roman Catholic Archdiocese of San Francisco comprising the City and
24       County of San Francisco and the Counties of Marin, San Mateo and Santa
         Clara in the State of California. . . .
25
         The general purposes and powers are: 1) *To own, maintain and operate
26       church-related facilities of the Roman Catholic Church within said
         Archdiocese of San Francisco* including without limitation Catholic
27       parochial and high schools, parish halls and auditoriums, and religious
         centers such as Newman Centers and Confraternity of Christian Doctrine
28       Centers for religious educational and other religious purposes. . . .

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1   Notwithstanding the generality of the foregoing provisions, this
    corporation shall have no purposes or powers, and shall not carry on any
2   activities which will render it ineligible for tax exemption under either
    *501(c)(3) (or corresponding provisions) of the Internal Revenue Code* or
3   Section 23701d of the California Revenue and Taxation Code (or
    corresponding provisions).

4

5   I AR 308-309 (emphasis added).[30]

6           The Articles of Incorporation of the Support Corporation, state:

7           This corporation is a religious corporation and is not organized for the
            private gain of any person.  It is organized under the Nonprofit Religious
8           Corporation Law exclusively for *religious purposes*.

9           This corporation is organized exclusively for *religious purposes within the*
            *meaning of Internal Revenue Code Section 501(c)(3)*, including the
10          corresponding section of any future federal internal revenue law ("IRC"),
            and the canon law of the Roman Catholic Church. . . .
11
            This corporation is organized, and at all times hereafter shall be operated
12          exclusively to *support, benefit, and carry out the purposes* (within the
            meaning of IRC Section 509(a)(3)(B)(ii)) *of The Roman Catholic*
13          *Archbishop of San Francisco, A Corporation Sole*, and specifically for the
            purpose of advancing the mission of those Parish and School Juridic
14          Persons, duly established under the canon law of the Roman Catholic
            Church, that are, pursuant to the canon law of the Roman Catholic Church,
15          governed by the Archbishop of The Roman Catholic Archdiocese of San
            Francisco, and operated civilly by The Roman Catholic Archbishop of San
16          Francisco, A Corporation Sole.

17  I AR 238-239 (emphasis added).

18          Not only does the Board's Ruling misstate the purposes of the Corporation Sole, the

19  Welfare Corporation and the Support Corporation,[31] the Review Board's findings that the

20

21  [30] The Welfare Corporation's Articles were amended in 1981 to reflect the fact that the
    Archdiocese of San Francisco no longer included the County of Santa Clara.  See I AR
22  304.

23  [31] The Board's Ruling misstates the Welfare Corporation's purpose as "to own, maintain
    and operate schools of less than collegiate grade in the Archdiocese of San Francisco."
24  IX AR 3615:3-4.  First, the Review Board cites to the Welfare Corporation's Articles as
    they existed in 1953, which provisions were subsequently amended.  Second and more
25  importantly, the Review Board ignores the specific language in the Articles that the
    specified purposes "includ[e] without limitation" the maintenance and operation of the
26  schools.  Contrary to the Board's Ruling, this does not mean that the Welfare Corporation
    was limited in its purpose to the maintenance and operation of the schools.  And, in any
27  case, operation of the schools is religious.  See, e.g., RTC § 207 (property used for
    religious purposes, including school purposes of less than collegiate grade, is exempt
28  from California property taxation under the religious exemption).

702699704                                    33

1   purposes of these corporations are somehow "different" for transfer tax purposes are wholly

2   unsupported. All of these corporations are religious corporations, operated for religious

3   purposes to carry out religious activities of the Church. They are all operated exclusively

4   for religious purposes in accordance with IRC § 501(c)(3), which exempts charitable and

5   religious organizations from federal income tax.

6         As for the control and powers of these religious corporations being "different," the

7   Review Board's findings are again not supported by the administrative record. The Review

8   Board ignored the central role of the incumbent Archbishop as the "hub" of the

9   Archdiocesan family of corporations, over which the Archbishop has *direct canonical*

10  *oversight.* See VII AR 2520:3-2521:1, 2524:19-23; IX AR 3616:2-6. For example, the

11  Review Board points to the fact that the boards of directors of the subject corporations

12  differ in number and composition. Yet, the Review Board erred in its utter failure to give

13  any significance to the fact that the Corporation Sole exists as the corporate identity of the

14  incumbent Archbishop (see Cal. Corp. Code § 10002) and all of the board of directors of

15  the Welfare Corporation and the Support Corporation are comprised of the Archbishop

16  himself or persons appointed by the Archbishop *at his pleasure* or confirmed by the

17  Archbishop, in *his sole discretion.*

18        For example, with respect to the Welfare Corporation, its board of directors was

19  comprised of 15 members, one of which was the Archbishop and 10 of which were

20  appointed by the Archbishop at his pleasure. I AR 337; IX AR 3615:16-20. What the

21  Review Board failed to consider is that the four remaining members of the Welfare

22  Corporation's board were the persons who held the offices of Vicar General, Chancellor,

23  Director of Finance and Superintendant of Schools of the Archdiocese, all of whom were

24  appointed to such offices solely by the Archbishop. I AR 337 (Welfare Corporation

25  Bylaws, Art. IV, Sec. 2); II AR 357-358 (R. #13).

26        Similarly, the board of directors of the Support Corporation is comprised of seven

27  members, three of which must be members of the Finance Council and four of which must

28  be members of the College of Consultors. I AR 255; IX AR 3617:16-18. The Board's

1    Ruling fails to note that (1) it is the Archbishop who appoints (and can remove) each of the
2    members of the Finance Council and the College of Consultors and (2) the Archbishop has
3    the sole discretion to confirm that members of the Finance Council and the College of
4    Consultors satisfy the canonical standards necessary for membership on those bodies.  I AR
5    253 (Bylaws Sec. 8.3); VII AR 2517:9-20.  Thus, the Review Board's finding that control
6    of the subject corporations was "different" in any meaningful way for transfer tax purposes
7    is contrary to the evidence presented.
8         With respect to the third "factor" under the continuity of interest test, the Review
9    Board again erred in concluding that the powers of the Corporation Sole somehow differed
10   from those of the Welfare Corporation and the Support Corporation.[32]  To illustrate, the
11   Review Board found that the powers of the Corporation Sole were different from those of
12   the Welfare Corporation on the basis that the directors of the Welfare Corporation may
13   select and remove officers and employees of the corporation, prescribe powers and duties of
14   officers, make rules and regulations, conduct and manage the temporal affairs of the
15   corporation, adopt a corporate seal and borrow money.  IX AR 3615:24-3616:1.  There is
16   nothing in the record that the Corporation Sole does not have the above-enumerated
17   powers.  Rather, as previously noted, the Corporation Sole has the power to administer and
18   manage the affairs, property and temporalities of the Church, which include, without
19   limitation, the above-listed powers.  I AR 272.  In any case, the Archbishop controlled the
20   Welfare Corporation's board of directors which made those decisions such as the selection
21   and removal of officers, the powers and duties of officers and other matters regarding the
22   temporal affairs of the corporation.
23        With respect to the Support Corporation the Review Board found that: (1) the
24   corporate powers reside with the board of directors, (2) the Corporation Sole, as the only
25   member, reserves the right to vote on certain matters, and (3) "in the event of a dispute or
26
27   _____
     [32] The Review Board does not articulate how the "control" factor differs from the "powers"
28   factor.

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1   question whether action is in accordance with Canon Law and other applicable church laws,

2   the issue shall be decided, once and for all, by the Chancellor, and his decision will be

3   binding on all parties involved."  IX AR 3618:5-16.  The Review Board made several

4   critical errors in its findings.

5          The record below establishes that the incumbent Archbishop—not the Corporation

6   Sole—is the sole member of the Support Corporation with important reserve powers.  I AR

7   247, 253.  In addition, the directors of the Support Corporation must be members of the

8   Finance Council or the College Consultors, all of whom are appointed by the Archbishop.  1

9   AR 253, 255; VII AR 2517:9-20.  Further, the Archbishop has the sole discretion to

10  confirm that members of the Finance Council and the College of Consultors satisfy the

11  canonical standards necessary for membership on those bodies.  I AR 253; VII AR 2517:9-

12  20.  Finally, the Review Board misstates the role of the Chancellor.  The Bylaws of the

13  Support Corporation provide that in "the event of a question or dispute as to whether a

14  director of This Corporation is or is no longer a member of the College of Consultors or

15  Finance Council . . . This Corporation may rely upon a written certification containing the

16  official seal of office of the duly appointed Chancellor of the Diocese, which certification

17  shall be final and binding."  I AR 102-103.  In effect, the Chancellor plays a role along the

18  lines of a Secretary of State (see VII AR 2518:6-15); while it is the Archbishop who retains

19  sole discretion regarding membership on the College of Consultors and the Finance

20  Council.

21         In sum, in light of the Archbishop's central "hub of the wheel" role vis-à-vis the

22  Corporation Sole, the Welfare Corporation and the Support Corporation, the Review Board

23  plainly erred in concluding that the power and control of those corporations were somehow

24  different.

25                  3.      Petitioner satisfied the requirements of the "change in form"
                            exemption under SF Transfer Tax Ordinance § 1106(d).
26

27         In light of *Columbia Gas* and the above authorities, the Review Board and

28  Respondent erred as a matter of law in applying the "F" reorganization continuity of interest

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 104
                            THE SECOND CAUSE OF ACTION – CGC-10-498795     of 132

1    test for determining whether the change in form exemption applies for transfer tax purposes.

2    As established in *Columbia Gas* and as confirmed by the Attorney General's opinion, the

3    proper test that should be applied is whether there has been any change in the beneficial

4    ownership of the real property.  In the proceedings below, the Review Board failed to

5    consider whether the beneficial ownership of the Parish and School Properties changed as a

6    result of the Archdiocesan restructuring.

7                        a.    The administrative record establishes that the Diocesan
                               restructuring did not change the beneficial ownership of the
8                              Parish and School Properties.

9           In this case, the evidence is undisputed that the owner of the Parish and School

10   Properties was and remains the Roman Catholic Church for the benefit of its parishes and

11   schools in San Francisco both before and after the Diocesan restructuring.  The Board's

12   Ruling contains no findings or conclusions contrary to this fact.[33]  Respondent now attempts

13   to refute this heretofore undisputed fact by contending that Petitioner somehow has

14   *admitted* that the restructuring changed the beneficial ownership of the Parish and School

15   Properties.  Resp. Br. at 30:18-22.  Respondent is wholly off the mark.

16          Respondent cites to the testimony of Petitioner's witness at VII AR 2552 (452:14-

17   454:25).  Resp. Br. at 30:20.  However, the cited testimony *confirms* that the beneficial

18   ownership of the subject properties did not change as a result of the restructuring and thus

19   contains no admission to the contrary.  Contrary to Respondent's characterization,

20   Petitioner's witness testified:

21              The beneficial interest, as we constantly maintain remains, with the – under
                the laws of the Catholic Church, that property remains with the juridic person,
22              and that's the way it is

23   VII AR 2552:17-20.  Petitioner's witness confirmed:

24

25   ────────────────────
     [33] Respondent alleges that the Review Board rejected the contention that "for tax purposes
26   only, no substantive changes in beneficial ownership took place." Resp. Br. at 30:21-23.
     Respondent cites to the Board's Ruling "at 3:14-17, 4:23-25, and 8:9-15." Respondent
27   completely misstates the contents of the Board's Ruling.  Neither the cited portions of the
     Board's Ruling nor anywhere else in the Board's Ruling is there any mention of
28   "beneficial ownership." See IX AR 3609:14-17; 3610:23-25; 3614:9-15.

1  We intended to make sure that the property *owned by the Roman Catholic
   Church* was used for the purpose in which it was required to use it for
2  under church law, and which is why we *ad nauseum* put compliance with
   church law, the requirement to do what church law says, and that's why
3  we even put in the name of this new corporation that it's the Archdiocese
   of San Francisco Parish and School, *juridic persons*, Real Property
4  Support Corporation.

5  We wanted to enshrine that concept that *these properties under church
   law are for the use and benefit of these parishes and schools*, they always
6  were, and the intention is that they always will be, and there were all kinds
   of protections inserted in there to make sure that that would continue to be
7  the case.

8  VII AR 2544:1-15. Petitioner's witness re-affirmed that:

9  The Catholic Church owns the 232 properties that are the subject of this
   hearing, as I have said already two or three times.
10

11  VII AR 2525:22-24.

12  Respondent presented no evidence that the beneficial ownership of the Parish and

13  School Properties has changed. It merely made an unsupported assertion. Indeed, as set

14  forth in Petitioner's Opening Brief, the evidence presented below was undisputed that such

15  beneficial ownership did not change in connection with either transfer (Deed A or Deed B).

16  Pet. Open. Br. at 36-41.

17          b.      Respondent refers to other factors that are irrelevant for
                    purposes of the change in form exemption.
18

19  Respondent attempts to shore up the Board's Ruling by referring to other, albeit

20  equally irrelevant, "factors." For example, Respondent contends that the transferor

21  corporation must "replace" or be the "alter ego" of the transferee corporation for the change

22  in form exemption to apply. Resp. Br. at 28:10-13.[34] However, in *Columbia Gas* (and the

23

24  _____

25  [34] Contrary to Respondent's entire argument later in its Brief that the "Corporation Sole
    cannot use alter ego as a sword to defeat payment of a tax" (Resp. Br. at 35:8-37-4),
26  Petitioner has not alleged and does not now allege that the Corporation Sole, the Welfare
    Corporation and the Support Corporation are alter egos of one another. Curiously,
27  Respondent itself recognizes this. See Resp. Br. at 28:12-13 (the "Corporation Sole
    pointedly does not claim that the Support Corporation is the alter ego of the Corporation
28  Sole.").

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 06
                            THE SECOND CAUSE OF ACTION – CGC-10-498795                of 132

1   California Attorney General Opinion No. 98-1203), the transferor corporation neither

2   replaced nor became the alter ego of the transferee corporation. 446 F.2d at 321.

3       Respondent also argues that the change in form exemption cannot apply because the

4   Corporation Sole, the Welfare Corporation and the Support Corporation are "separate and

5   distinct legal entities." Resp. Br. at 21:18-22:4. Respondent does not cite—and indeed

6   cannot cite—any authority that the transferor and transferee cannot be separate and distinct

7   legal entities for the transfer to be exempt as change in form under SF Transfer Tax

8   Ordinance § 1106(d). The authority is in fact to the contrary. In *Columbia Gas*, the Court

9   held that segregating out certain assets of a corporation and transferring them to a separate

10  and distinct corporation qualified for the change in form exemption since the ultimate

11  ownership of the property did not change. 446 F.2d at 324. The California Attorney

12  General's opinion expressly confirms this. 82 Ops. Cal. Atty. Gen. at 58 ("Even though a

13  corporation has a legal status distinct from its officers and shareholders [citations omitted],

14  the transfer of real property from a parent corporation to a wholly-owned subsidiary

15  corporation is not considered a transfer.")

16      Respondent also apparently contends that the change in form exemption cannot

17  apply because the Church transferred assets from one corporate entity to another allegedly

18  for "the protection of the assets of the Church from litigation claims." Resp. Br. at 28:12-

19  17. First, as discussed above, such allegation is wholly unfounded as there were no existing

20  claims against the San Francisco Archdiocese at the time of the restructuring. Secondly, the

21  segregation of assets between corporations does not defeat the change in form exemption.

22  In *Columbia Gas*, the transferor corporation segregated its Pennsylvania assets and

23  transferred them to a new corporation to insulate itself from Pennsylvania state regulators.

24  446 F.2d at 321. The Court held that the transfer was exempt from transfer tax, even where

25  the express purpose of the transfer was to shift state regulatory and other obligations from

26  the transferor to the transferee corporation.

27      Finally, Respondent asserts that "no formal trust was created in connection with the

28  subject transfers." Resp. Br. at 31:2-3. In making such assertion, Respondent seems to

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1 propose that the establishment of a formal trust is somehow required for the change in form

2 exemption to apply. Respondent provides no legal authority in support of such proposition.

3 None of the relevant statutory authorities (e.g., former IRC § 4382(b)(1)(D); RTC

4 § 11923(d); SF Tr. Tax Ord. § 1106(d)), federal documentary stamp (transfer) tax

5 regulations or transfer tax cases state that a formal trust is needed to qualify for the change

6 in form exemption. Again, the entities involved in *Columbia Gas* (as well as in Attorney

7 General Opinion No. 98-1203) were corporations, not trusts, yet the change in form

8 exemption applied. In short, the creation of a formal trust is not required.

9         c.    *Episcopal Church Cases* confirms that church canons are relevant in civil law matters.

10

11      Respondent contends that *Episcopal Church Cases*, 45 Cal. 4th 467 (2009), is not

12 relevant in this case because the instant matter involves taxation, not a question of religious

13 doctrine or faith. Resp. Br. at 33:6-35:7. Respondent also contends that *Episcopal Church*

14 *Cases* is distinguishable because, unlike Episcopal Church canons, Catholic Church canon

15 law allegedly "does not provide for an 'express creation of a trust.'" Resp. Br. at 34:11-12.

16 Finally, Respondent asserts that "Canon law has no application to documentary transfer

17 taxes." Resp. Br. at 34:24. Each of Respondent's contentions are wholly without merit.

18      The importance of *Episcopal Church Cases* is that it re-affirms the principle that,

19 under the "neutral principles of law" approach as articulated by the United States Supreme

20 Court,[35] civil courts must give credence to church laws and canons, where such laws and

21 canons have been incorporated into the civil law organizational documents (e.g., articles

22 and bylaws) of the religious corporation. 45 Cal. 4th at 473, 485.[36] Similarly, the Court in

23 *New v. Kroger,* 167 Cal. App. 4th 800, 820 (2008), in reversing the trial court, held:

24      The trial court's fundamental mistake in deciding this matter under the neutral principles of law approach is that it believed that under this approach

25      it was restrained to rely solely on California corporations law in a vacuum, without reference to the articles of incorporation and bylaws of the Parish

26      corporation, as well as the constitution and canons of the Episcopal Church

27 [35] See *Jones v. Wolf*, 443 U.S. 595, 597 (1979).

28 [36] See also Pet. Open. Br. at 43:3-17.

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 108 of 132
THE SECOND CAUSE OF ACTION – CGC-10-498795

1 and San Diego Diocese, and its failure to recognize that religious
corporations are, in their basic sense, different from ordinary corporations.

2

3 In the instant case, the articles and/or bylaws of the Corporation Sole, the Welfare

4 Corporation and the Support Corporation expressly incorporated Church law and required

5 that such corporations act in accordance with Church law.[37] As set forth in the

6 administrative record, under Church law, it is uncontroverted that the Parish and School

7 Properties were and continue to be owned by the Roman Catholic Church for the benefit of

8 its parishes and schools.[38] The Review Board neither found, nor does Respondent contend,

9 that said properties are *not* owned by the Church for the benefit of its parishes and schools.

10 Rather, Respondent urges this Court, under the guise of the neutral principles of law

11 approach, to ignore Church law and canons and pretend that they do not exist. That simply

12 is not the law.

13 California courts have long recognized that, notwithstanding civil law title, the true

14 owner of church property is the Church itself. In *Frohliger*, 63 Cal. App. at 214, "as a

15 matter of common knowledge" the Court took *judicial notice* of the fact that the San Diego

16 Mission "is owned by the Roman Catholic Church [even though] title to property is in the .

17 . . corporation sole." More recently, the Court in *New* held:

18 As the California Supreme Court has explained, religious corporations are
merely "permitted as a *convenience to assist in the conduct of the*

19 *temporalities of the church. Notwithstanding incorporation, the*
*ecclesiastical body is still all important.* The corporation is a subordinate

20 factor in the life and purposes of the church proper." (*Wheelock v. First*
*Presbyterian Church* (1897) 119 Cal. 477, 483.)

21

22 "A religious corporation . . . is something peculiar to itself. *Its function and*
*object is to stand in the capacity of an agent holding title to the property,*

23 *with power to manage and control the same in accordance with the interest*

24 [37] See, e.g., Welfare Corporation Articles and Bylaws (I AR 308-309, 336-337); Support
Corporation Articles and Bylaws (I AR 238-239, 250, 254); and Corporation Sole

25 Articles (I AR 138-145). Actions by such corporations, including alienation of Church
property, that are not consistent with Church law would constitute an *ultra vires* act. See

26 VII AR 2598:18-2599:16.

[38] See the Archbishop's letter dated December 4, 2007. I AR 81-82 (referring to "the real

27 property and capital assets belonging to the parishes and schools under Church law"); see
also Bylaws Section 3.1.3 of the Support Corporation. I AR 99-100 (referring to "the

28 special rights to use of property by Juridic persons").

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1   *of the spiritual ends of the church.* . . . The legislature never means by
    granting or allowing such charters to change the ecclesiastical status of the
2   congregation, but only to afford them a more advantageous civil status."
    (*Berry v. Society of Saint Pius X* (1999) 69 Cal. App. 4th 354, 371-372.)
3

4   167 Cal. App. 4th at 820. As applied here, California case law confirms that the function

5   and role of religious corporations—such as the Corporation Sole, the Welfare Corporation

6   and the Support Corporation, are not to strip the Church from ownership of its property

7   when civil title has been transferred between or among such corporations, but to "assist in

8   the conduct of the temporalities of the church" and "stand in the capacity of an agent

9   holding title to" Church property. The Diocesan restructuring did not change the key

10  fundamental fact that the Parish and School Properties remain owned by the Roman

11  Catholic Church for the benefit of its parishes and schools.

12          In sum, SF Transfer Tax Ordinance § 1106(d) expressly exempts from tax transfers

13  "whereby a mere change in identity, form, or place of organization is effected." Under

14  *Columbia Gas* and Attorney General Opinion No. 98-1203, this includes transfers whereby

15  no change in the ultimate or beneficial ownership of the property has occurred. The Review

16  Board failed to follow *Columbia Gas* and Attorney General Opinion No. 98-1203 and

17  erroneously applied the continuity of interest test under the federal income tax law. In so

18  doing, the Review Board erroneously considered factors that are irrelevant for transfer tax

19  purposes—namely, the purpose, control and power of the subject corporations. Notably, the

20  Review Board failed to consider the determinative factor: whether the beneficial ownership

21  of the Parish and School Properties changed. As such, the Review Board erred as a matter

22  of law. As previously set forth in Petitioner's Opening Brief, because it is uncontroverted

23  that the beneficial ownership of the Parish and School Properties did not change as a result

24  of the Diocesan restructuring, the restructuring qualifies a mere change in form and thus

25  exempt from transfer tax under SF Transfer Tax Ordinance § 1106(d).

26          C.      The Restructuring Is Also Exempt Under California RTC § 11925(d).

27          With broad strokes, both the Review Board and Respondent summarily dismiss the

28  application of the exemption under RTC § 11925(d) (as well as the applicability of RTC

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

Case 3:17-cv-05053-LB   Document 42-1   Filed 04/02/18   Page 110 of 132

1  § 62(k)) on the basis that San Francisco is a charter city "with sovereign rights in its

2  municipal affairs" and thus does not need to follow those California RTC statutes.  Resp.

3  Br. at 37:9-11 (referring to the Board's Ruling at IX AR 3618:19-27).  The Review Board

4  and Respondent have seriously erred in at least two important respects.  First, charter cities

5  do not have unlimited powers.  Imposition of a transfer tax, specifically in the context of an

6  internal Diocesan restructuring, is contrary to an express overriding statewide concern that

7  such restructuring not be subject to tax.

8        Second, even if charter cities have the power to impose a transfer tax and dictate the

9  terms thereof, the issue before this Court is not what the City and County of San Francisco

10 *could have done* in the exercise of its so-called sovereign rights.  Rather, the issue involves

11 what Respondent City *did do* in enacting the SF Transfer Tax Ordinance, using the express

12 language that it enacted, as well as the actions of the Recorder in administering the transfer

13 tax provisions.  The SF Transfer Tax Ordinance plainly "hitched its wagon" to the

14 California transfer tax statute (which includes RTC § 11925(d)) as reflected in both SF

15 Transfer Tax Ordinance § 1101 and the Recorder's actions in accepting exemptions claimed

16 under RTC § 11925(d)).  Having done so, Respondent City cannot now hide behind its

17 charter city status to arbitrarily disavow its actions and assert that the SF Transfer Tax

18 Ordinance means what Respondent says it now means because it allegedly has the

19 sovereign power to do so.

20        1.       San Francisco, as a charter city, does not have unlimited powers.

21       The powers of a charter city are not unlimited.  The California Supreme Court has

22 held that charter city ordinances must give way to conflicting state statutes that are of

23 statewide concern.  *California Federal Savings & Loan Assn. v. City of Los Angeles*, 54

24 Cal. 3d 1, 17 (1991).  Whether a state statute is of statewide concern is an ad-hoc inquiry,

25 must be answered in light of all the facts and circumstances surrounding each case, and any

26

27

28

702699704                                   43

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1  doubt as to the statewide concern must be resolved in favor of the state statute.[39] *Id.* at 16,

2  24. The cases upon which Respondent relies (Resp. Br. at 39:5-9) in support of San

3  Francisco's attempt to impose a transfer tax under the specific "facts and circumstances"

4  here are distinguishable.

5        For example, in *Fisher v. County of Alameda*, 20 Cal. App. 4th 120 (1993),

6  taxpayers sold real property for over $1 million and claimed that the real property transfer

7  tax imposed by the charter city of Berkeley was invalid because it directly conflicted with

8  California Government Code § 53725, which provides:

9        Except as permitted in Section 1 of Article XIII of the California Constitution,
   no local government or district may impose any ad valorem taxes on real

10  property. *No local government or district may impose any transaction tax or
   sales tax on the sale of real property within the city, county, or district.*

11

12  The *Fisher* Court found that Government Code § 53725 was linked to the statewide concern

13  associated with inequitable ad valorem property taxation, noting that "the prohibition on

14  real estate transfer taxes is juxtaposed with restrictions on ad valorem property taxation."

15  *Id.* at 129. The Court found that the statewide concerns with ad valorem property taxation

16  stemmed from the escalation of property values—and therefore rising property taxes—even

17  though those property owners who held on to their property did not realize any cash or

18  money from the mere rise in their property values. *Id.* at 130. In contrast, with respect to

19  transfer taxes, the taxpayers were subject to transfer tax "only upon the successful

20  negotiation of a sale when [the transfer tax] can be paid out of the sales price. Such a tax

21  will lessen the profitability of a sale, but it does not involve the particular inequities that

22  have been a matter of statewide concern in the field of ad valorem taxation." *Id.*

23

24  _____

[39] In *California Federal*, the Court invalidated the imposition of a business license tax by
25  the charter city of Los Angeles on a savings and loan association because the tax
   conflicted with a state statute. The statute at issue limited the taxation of financial
26  corporations to the state income tax, and was in lieu of all other taxes, including any
   license taxes imposed by a charter city. After a detailed review of the history of the state
27  and local taxation of financial corporations, the Court found that the taxation of the
   savings and loan association was a statewide concern, and therefore the statute trumped
28  the conflicting Los Angeles City business license tax ordinance. 54 Cal. 3d at 25.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 2
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    Here, unlike the taxpayers in *Fisher* who realized over $1 million on the property

2    sale, neither the Welfare Corporation nor the Corporation Sole realized anything on the

3    intra-Diocesan property transfers.  There were no sales proceeds generated from which to

4    pay any transfer tax.  Yet, San Francisco seeks to impose millions of dollars in transfer

5    taxes—once on the transfer of the School Properties to the Corporation Sole (Deed A) and a

6    second time on the transfer of the same School Properties, along with the Parish Properties,

7    to the Support Corporation (Deed B).  Thus, the same inequities of statewide concern that

8    California Government Code § 53725 address are present here.

9    Notably, there is another State statute—RTC § 62(k)—which addresses the

10   statewide concern that intra-denominational transfers are not "changes of ownership" for

11   tax purposes.  The legislative history of RTC § 62(k) (see Pet. Open. Br. at 49-50) confirms

12   the State's concern that churches should be permitted to operate in corporate form through

13   the use of religious corporations and freely place title to church property in such

14   corporations as an agent of the church.  The Legislature's intent was aptly summarized by

15   the California Supreme Court in *Wheelock*, as previously discussed:

16       The Civil Code of this state . . . expressly permits religious bodies to
         incorporate, but such *incorporation is only permitted as a convenience to*
17       *assist in the conduct of the temporalities of the church.* Notwithstanding
         incorporation the ecclesiastical body is still all important.  The corporation is a
18       subordinate factor in the life and purposes of the church proper.  A *religious*
         *corporation* like the one at bar, under the laws of this state, is *something*
19       *peculiar to itself.  Its function and object is to stand in the capacity of an*
         *agent holding the title to the property,* with power to manage and control the
20       same in accordance with the interest of the spiritual ends of the church. . . .

21       The legislature never means by granting or allowing such charters to change
         the ecclesiastical status of the congregation, *but only to afford them a more*
22       *advantageous civil status.*

23   119 Cal. at 483 (emphasis added).  As noted, the function and purpose of a religious

24   corporation are to hold title to property as agent of the church.  The City is attempting to

25   thwart such purpose by taxing the Church when it avails itself of the religious corporate

26   vehicles that have been provided as a "convenience to assist"—not hinder—the conduct of

27   the temporal affairs of the Church.

28

1    Moreover, and even more troubling, is the fact that the City is treating religious

2    corporations *less favorably* than for-profit corporations. Here, the City seeks to tax the

3    transfer of the Parish Properties from the Welfare Corporation to the Corporation Sole

4    (Deed A) and the transfer of the Parish and School Properties from the Corporation Sole to

5    the Support Corporation (Deed B). If, instead, a for-profit parent corporation were to

6    transfer property to its wholly owned subsidiary—something that businesses do routinely—

7    the City would not seek to impose a tax.[40] Thus, the City's imposition of a transfer tax in

8    this case, in a manner disadvantageous to religious corporations, is a matter of statewide

9    concern and not purely a local matter over which San Francisco has sovereign powers.

10              2.    San Francisco adopted RTC § 11925(d) through its own ordinance
                       and in practice.

11

12    SF Transfer Tax Ordinance § 1101 expressly states that San Francisco's transfer tax

13    is "adopted pursuant to the authority contained in Part 6.7 (commencing with Section

14    11901) of Division 2 of the Revenue and Taxation Code of the State of California."

15    Respondent contends that "the Corporation Sole overstates the importance of the enabling

16    language in Cal. Rev. & Tax. Code §11901." Resp. Br. at 38:21-22. Respondent argues

17    that the "note contained in § 11901 . . . makes clear that the legislature did not intend to

18    restrict the ability of chartered cities and a 'city and county,' i.e., San Francisco, from

19    adopting its own ordinance." Resp. Br. at 39:14-19.[41] Respondent's argument misses the

20    point. San Francisco adopted its own transfer tax ordinance, but it chose to do so in a

21    manner that expressly linked it to the California transfer tax statute. Having gone down this

22    path, the City must live with the ordinance that it adopted.[42]

23    _____

24    [40] For example, as one member of the public commented during the proceedings below,
         "I cannot understand why major corporations, family partnerships and everything can get
25       away with no tax, yet a tax-exempt organization, you are applying a tax to it." VI AR
         2152:3-8.

26    [41] RTC § 11901 contains no such "note."

27    [42] Respondent also quotes from an article written by Petitioner's counsel (V AR 1681).
         Resp. Br. at 40:27-28. Respondent neglects to note that the sentence immediately
28       following the quoted language states that "the local county rules should be reviewed to
                                                                                    (continued...)

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 114
                               THE SECOND CAUSE OF ACTION – CGC-10-498795                              of 132

1    This Court should not ignore the express language used in SF Transfer Tax

2    Ordinance § 1101 referring to the California Revenue and Taxation Code. Under well-

3    settled principles of statutory construction, significance must be given to every word,

4    phrase, sentence or part of a statute and a construction making some words surplusage is to

5    be avoided. See, e.g., *Moyer v. Workmen's Comp. Appeals Bd.*, 10 Cal. 3d 222, 230 (1973).

6    In addition, both the SF Transfer Tax Ordinance and the California transfer tax statute use

7    identical language (e.g., "realty sold . . . to the purchaser or purchasers," "mere change in . .

8    . form"), which, in turn, is identical to the language in the federal Documentary Stamp Tax

9    Act.[43] Thus, San Francisco's linkage of its transfer tax ordinance to the California transfer

10   tax statute was not only express, but intentional.

11         Respondent also argues that "San Francisco, like other charter cities, may impose

12   documentary transfer taxes at different rates, and may have exemptions and exclusions that

13   are more expansive and less expansive then those afforded under the state statute." Resp.

14   Br. at 39:19-22. Again, Respondent misses the point. When California enacted RTC

15   § 11925(d) in 1999, San Francisco *did not* de-couple from this provision. Nothing in the SF

16   Transfer Tax Ordinance provides that San Francisco does not follow or adopt a less

17   expansive exemption than that afforded under RTC § 11925(d). The issue that Respondent

18   focuses on is whether San Francisco *could have* de-coupled from RTC § 11925(d). The

19   fact is San Francisco *did not* de-couple. Indeed, in February 2009 San Francisco eventually

20   codified RTC § 11925(d) as follows:

21         The tax imposed under this Article shall not apply where the deed, instrument,
           or other writing transferring title to real property between an individual or
22         individuals and a legal entity or between legal entities that results solely in a
           change in the method of holding title and in which the proportional ownership
23         interests in the real property, whether represented by stock, membership

24   (...continued)

25   determine whether a particular transaction will be exempt from transfer tax." As relevant
     here, the key fact is that the SF Transfer Tax Ordinance links itself to the California

26   transfer tax statute, and the article in no way indicates or even remotely suggests that a
     charter city has the power to impose a transfer tax on intra-Diocesan transfers.

27   [43] See SF Transfer Tax Ord. § 1102, RTC § 11911 and former IRC § 4361 ("realty sold . . .
     to the purchaser or purchasers"); SF Transfer Tax Ord. § 1106(d), RTC § 11923(d) and

28   former IRC § 4382(b)(1)(D) ("mere change in . . . form").

REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

Case3:11-cv-02438-JSW Document61-5 Filed09/12/11 Page115 of 132

1    interest, partnership interest, cotenancy interest, or otherwise, directly or
     indirectly, remains exactly the same before and after the transfer.
2

3    SF Transfer Tax Ordinance § 1108(d) (as added by SF Ord. No. 20-09, Feb. 5, 2009).

4         Respondent contends that SF Transfer Tax Ordinance § 1108(d) was adopted

5    subsequent to Deed A and Deed B, which were executed in 2008, and thus does not apply.

6    See Resp. Br. at 37:17-20.  Such contention is belied by the actions of Respondent

7    Recorder's office, which, prior to the adoption of SF Transfer Tax Ordinance § 1108(d) in

8    fact and in practice accepted exemptions claimed under the authority of RTC § 11925(d).

9    As contained in the administrative record, there are numerous examples of deeds, claiming

10   exemption of the transfer tax under RTC § 11925(d), that the Recorder's office

11   affirmatively accepted for recordation without payment of any tax.  VII AR 2665-2723.

12   Such deeds were recorded in 2007-2008, the same time period when Deed A and Deed B

13   were presented to the Recorder's office for recordation.

14        Respondent now apparently asserts that "transfer tax declarations on recorded

15   instruments are not evidence in and of themselves that prove the Assessor-Recorder did not

16   later impose a tax after it discovered the wrongful notations." Resp. Br. at 49:18-21.

17   Respondent's assertion contradicts the testimony of its own witness.  When questioned

18   about the Recorder's recordation and audit practices specifically during the 2007-2008 time

19   period, Respondent's witness testified:

20        Q:     Have the resources and staffing at the Recorder's office changed over
               the years?
21
          A:     They have, and particularly since 2005.  *We don't do post auditing.*
22        We audit everything *at the time of recordation*.  We require any claimant
          claiming an exemption to provide documentation to substantiate the
23        exemption, to substantiate the value.
               We don't have a person who does post auditing.  The examiners have
24        been trained to review and analyze a transaction and to request for
          substantiation.
25

26

27

28

1   VI AR 2366:9-18 (emphasis added).[44]

2         In sum, notwithstanding its status as a charter city, San Francisco does not have the

3   authority to impose a transfer tax on the intra-Diocesan restructuring which occurred in the

4   instant case. As discussed in Petitioner's Opening Brief, the requirements set forth in RTC

5   § 11925(d) have been satisfied herein, because the Parish and School Properties remain

6   owned by the Church for the benefit of its parishes and schools, and the restructuring did

7   not change this. Pet. Open. Br. at 36-41, 46:8-14. The Review Board did not find, and

8   Respondent does not argue, otherwise. Thus, the restructuring is exempt from transfer tax.

9        D.    <u>Deed B Is Not Subject to Tax Because the Transfer of the Parish and School</u>
<u>Properties to the Support Corporation Has Not Been Completed.</u>

10

11        With respect to Deed B in particular, a further reason that the transfer tax cannot be

12   imposed is because the transfer of the Parish and School Properties to the Support

13   Corporation has not been completed. Respondent contends that a "delivery of a grant deed

14   with the intent to transfer the title is necessary before a transfer of real property is valid. . . .

15   In order for the delivery of a deed to be effective and the deed to be operative, acceptance

16   of the deed is required." Resp. Br. at 43:12-19 (citing *Perry v. Wallner*, 206 Cal. App. 2d

17   218, 221-22 (1962)). Respondent contends that "each of the four indicia of acceptance set

18   out in *Henneberry* are met." Resp. Br. at 44:4 (referring to *Henneberry v. Henneberry*, 164

19   Cal. App. 2d 125 (1958)). At least two of the four indicia alleged by Respondent are

20   untrue.

21        First, Respondent alleges that "Grant Deed B was manually handed over to the

22   grantee Support Corporation's representative, Les McDonald." Resp. Br. at 44:5-6.

23   Respondent cites to the following testimony of its witness:

24        Q: Okay. Let me focus my next set of questions now on this series of
transfers that we are talking about in this hearing. When did you first get

25        involved in the Petitioner's transfers?

26

27   ――――――――――――

28   [44]Further testimony of Respondent's witness confirms the same. VII AR 2446:4-10 ("We
don't do post audit. We have an audit at the time of the recording . . . .").

1  A:  I first – as I recall, I first became involved when I received a telephone call
   from a person named Les McDonald, who is a retiree broker, as I remember,
2  *who was assisting the Petitioner* in drafting their deeds or helping them to
   transfer their properties, and he asked me whether or not we would accept the
3  deeds without a full legal description, with only the APNs, the assessor parcel
   numbers.

4

5  VI AR 2326: 4-16 (emphasis added).  The testimony upon which Respondent relies actually

6  supports Petitioner's position.  Respondent's own witness testified that he met with Mr.

7  McDonald, who was assisting the Petitioner—i.e., the Corporation Sole.  The witness did

8  not state that Mr. McDonald was acting in any capacity as the "Support Corporation's

9  representative."  Moreover, the testimony does not mention anything about manually

10  handing over any deeds.

11       Second, citing the above testimony, Respondent alleges that "Grant Deed B was in

12  the possession of the grantee Support Corporation."  Resp. Br. at 44:7.  Again, the cited

13  testimony indicates no such thing.

14       Respondent goes on and describes as "odd" the letter by Raymond Marino (II AR

15  601), President of the Support Corporation, re-affirming the Support Corporation's position

16  that the transfer of any real property from the Corporation Sole "be without consideration

17  AND that the transfer document could be recorded without cost (i.e., no transfer tax)."

18  Resp. Br. at 42:3-5.  Mr. Marino's letter is far from "odd" as it indicates, quite

19  understandably, that he was surprised to learn that the "Corporation Sole . . . has

20  encountered problems with the San Francisco Recorder's office."  II AR 601.  Mr. Marino's

21  letter substantiates the intent and understanding of the parties as shown *on the face* of

22  Deed B that the transfer of any real property to the Support Corporation be without

23  incidence of tax:  "Transfer Tax: None . . . (No consideration or sale—transfer of property

24  within the Roman Catholic Church only)."  I AR 22.  Any such transfer was always

25  conditional upon the transfer being tax-free.  Mr. Marino's letter also confirms that it was

26  the Corporation Sole—not the Support Corporation—that was dealing with the Recorder's

27  office.

28

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 118
THE SECOND CAUSE OF ACTION – CGC-10-498795                                   of 132

1      In short, the evidence presented below establishes that the transfer of the Parish and

2 School Properties to the Support Corporation (Deed B) has not been completed. The

3 Review Board's findings to the contrary are not supported by the record. Thus, even if

4 intra-Diocesan transfers are somehow found to be subject to transfer tax, no transfer tax can

5 be imposed with respect to Deed B, because delivery of that deed to the Support

6 Corporation has not been completed.

7      E.     Respondent Is Estopped From Imposing a Transfer Tax In This Case.

8      Based on the Respondent's conduct and past practices, Respondent must be

9 estopped from imposing a transfer tax in the instant case. The fundamental flaw in

10 Respondent's argument is that it assumes that the Recorder's long-standing interpretation

11 and consistent past practice of not taxing intra-denominational transfers cannot serve as

12 "conduct" for estoppel purposes. An administrative agency's long-standing practice may

13 be evidence of the agency's interpretation of a statute it is charged with administering. *See*,

14 *e.g.*, *Van Wagner Communications, Inc. v. City of Los Angeles*, 84 Cal. App. 4th 499, 509

15 (2000). More weight should be given to an agency's interpretation when it is long-standing

16 and has been consistently maintained. *Yamaha Corp. of America v. State Board of*

17 *Equalization*, 19 Cal. 4th 1, 13 (1998). While Respondent recognizes that even "silence or

18 negative omission" may constitute conduct of a party for purposes of equitable estoppel

19 (Resp. Br. at 46:24-26), it ignores the evidence in the administrative record that intra-

20 denominational transfers of real property in San Francisco *by Petitioner* previously were

21 not taxed *by Respondent*. *See, e.g.*, 1992 Deed from the Corporation Sole to The Sisters of

22 Presentation, PBVM, a California corporation (I AR 43); 1953 Deeds from the Corporation

23 Sole to the Welfare Corporation (II AR 617, 618).[45]

24

25

26

[45] While the deeds from the Corporation Sole to the Welfare Corporation were recorded in
27     1953, prior to San Francisco's adoption of its transfer tax, no federal documentary stamp
    or other transfer tax was paid or collected when such deed was recorded with the San
28     Francisco Recorder's office. II AR 357.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 9
THE SECOND CAUSE OF ACTION – CGC-10-498795    of 132

1    Petitioner not only relied upon the Recorder's past conduct, but *justifiably* relied on

2    such conduct.  Respondent asserts without authority that the standard is "extensive

3    reliance."  Resp. Br. at 50:25.  Rather, the standard is "justifiable reliance."  *Grotenhuis v.*

4    *County of Santa Barbara*, 182 Cal. App. 4th 1158, 1167 (2010).  Here, Petitioner's reliance

5    was justifiable.  Prior to the instant case, the taxation of intra-denominational, non-sale

6    transfers such as those at issue was unprecedented not only in San Francisco but also in

7    other counties throughout the State of California.  For example, in 1982, Petitioner

8    transferred all of its real property located in Santa Clara County without imposition of the

9    transfer tax.  See Deed from the Corporation Sole to The Roman Catholic Bishop of San

10   Jose, a (California) corporation sole (I AR 46).[46]  Other Catholic dioceses throughout the

11   State also made intra-diocesan transfers without imposition of any transfer tax.  See VII AR

12   2728-2831.  Based on its own past dealings with the Recorder and recorders in other

13   counties, Petitioner entered into the Diocesan restructuring based on the expectation that

14   any transfers pursuant thereto would not be subject to transfer tax.  This is confirmed on the

15   face of the Deeds (e.g., "Transfer Tax: None") and in Mr. Marino's June 16, 2008 letter.

16   There was no transfer tax in 1953 when the Corporation Sole transferred the School

17   Properties to the Welfare Corporation, and no transfer tax in 1992 when the Corporation

18   transferred some of its properties to The Sisters of Presentation.  Taken all together,

19   Petitioner's reliance on Respondent's past conduct was justifiable.

20        Respondent accuses Petitioner of being "disingenuous" and "purposely misleading"

21   in referring this Court to the deeds recorded in Marin and San Mateo Counties.  Resp. Br. at

22   48:19-23.  Respondent wholly misses the point of the Marin and San Mateo deeds.  As

23   Petitioner informed this Court, "both Marin and San Mateo Counties accepted deeds, *on*

24   *their face*, for recordation without payment of transfer tax."  Pet. Open. Br. at 52:7-8

25

26

_____

[46] See also 1982 Deeds from the Welfare Corporation and The Roman Catholic Seminary of
27   San Francisco to The Roman Catholic Bishop of San Jose, a (California) corporation sole
     indicating "Transfer Tax: None (No consideration or sale – only division of property
28   within the Roman Catholic Church)."  I AR 47, 48.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
OF 132

1 (emphasis added). The significance is that the Marin and San Mateo deeds (as well as the

2 San Francisco deeds, Deed A and Deed B) expressly state on their face: "Transfer Tax:

3 None . . . (No consideration or sale – transfer of property within the Roman Catholic

4 Church only)." VII AR 2749, 2798. By recording the deeds, both Marin and San Mateo

5 found the "no tax" explanation to be a facially valid one. The Marin Assessor-Recorder

6 confirmed that "[t]he deeds submitted by the Archdiocese for recordation in Marin County

7 without payment of transfer tax *were accepted at face value in reliance upon the declared*

8 *transfer tax exemptions noted on the deeds*, without an evaluation as to the applicability or

9 non-applicability of such deeds." VIII AR 3106 (emphasis added). Similarly, the San

10 Mateo Assessor-County Clerk Recorder stated, "our Recorder staff accepted the deeds

11 recorded by the Archdiocese on May 12, 2008 *at face value in reliance on the declared*

12 *transfer tax exemptions noted on those deeds*." VIII AR 3122 (emphasis added).

13      Finally, under the facts presented, Respondent's argument that Petitioner's taking

14 the Deeds down to the Recorder's office for recordation is presumed to constitute

15 "delivery" must be rejected (see Resp. Br. at 44:3-9). As noted in the record, Petitioner

16 submitted the Deeds for recordation based on oral representations made by the Deputy

17 Assessor-Recorder. Petitioner's witness, Mr. Hammel, testified that the Deputy Assessor-

18 Recorder told Petitioner to *"Bring them down, and you know, I will do it today. You get the*

19 *stuff together, I will do it today."* VII AR 2563:24-2564:1. Respondent does not deny that

20 the Deputy Assessor-Recorder made the representation alleged by Mr. Hammel.[47] Rather,

21 Respondent argues, "[t]here is no testimony from Mr. Hammel or any other shred of

22 evidence of any representation that 'no tax would be owing' or anything of the sort." Resp.

23 Br. at 47:13-14. Respondent is off-base.

24      First, *prior* to Petitioner's submission of the Deeds for recordation in July 2008,

25 Petitioner already was involved in discussions with the Recorder's office regarding the

26

27 _____

[47] Deputy Assessor-Recorder Zoon Nguyen was present at the hearing when Mr. Hammel
28   testified about Ms. Nguyen's representations. VII AR 2437.

1  issue of whether "the proposed real property transactions will be subject to the county

2  transfer tax."  See May 16, 2008 email from Mr. Dziedzic to Mr. Hammel, copying the

3  Deputy Assessor-Recorder (I AR 56).  Thus, transfer tax plainly was the issue at hand.

4       Second, Mr. Hammel's letter to the Deputy Assessor-Recorder dated August 7,

5  2008 (II AR 347) states:

6       We were told that we should remove any references to 62K and formally
         submit the deeds along with individual transfer tax *exemption affidavits*
7       (referencing the San Francisco Transfer Tax ordinance and attaching the
         related supporting documentation submitted earlier in informal fashion) and
8       PCOR statements for each parcel to be transferred.

9  By informing Petitioner to submit *exemption* affidavits and what specifically should be

10 referenced in the affidavit as well as the supporting documentation, the Deputy Assessor-

11 Recorder's representations concerned more than the mechanical act of recordation of the

12 Deeds—it involved the issue of the transfer tax itself and, specifically, *exemption* from tax.

13 The Deputy Assessor-Recorder was aware of the facts surrounding the Deeds, and she

14 invited Petitioner to "bring them down" so that recordation of the Deeds based on the

15 claimed exemptions would get done.  Petitioner relied on such representations and had no

16 reason to believe otherwise.  Plainly, Respondent's conduct in this matter is precisely the

17 type of action or inaction that the doctrine of equitable estoppel was designed to address.

18      F.   Respondent's Attempt to Impose a Transfer Tax in a Non-Neutral Fashion Is
              Violative of the First Amendment.
19
             1.   Petitioner has exhausted its administrative remedies and
20                appropriately preserved the Constitutional issues for review.

21      Petitioner satisfied all the prerequisites for filing a Petition for Review and

22 preserving constitutional issues for review by this Court.  Respondent erroneously argues

23 that Petitioner has failed to exhaust its administrative remedies because it did not present its

24 First Amendment arguments at the administrative level before raising them before the trial

25 court for the first time.  Resp. Br. 51:12-13.  As will be shown below, Petitioner sufficiently

26 articulated its constitutional claims before the Review Board.  As such, Petitioner's First

27 Amendment arguments are properly before this Court.

28

Case ... of 132

1          a.     <u>Petitioner timely filed its petition for review with the Review</u>
                     <u>Board.</u>

2

3         Respondent does not contend that Petitioner did not file the required Petition for

4 Review pursuant to SF Transfer Tax Ordinance § 1115.2(b) with the Review Board. On

5 December 10, 2008, Petitioner filed its Petition for Review with the Review Board. I AR

6 1 – II AR 619. Neither SF Transfer Tax Ordinance § 1115.2(b) nor any other section of

7 such Ordinance sets forth what form or content is required for a petition. The power of the

8 Review Board is to conduct hearings, review the evidence and make rulings upon the

9 Petition. SF Transfer Tax Ord. § 1115.2(c)(1). The Review Board's powers are limited to

10 not making any rulings inconsistent with the requirements of the SF Transfer Tax

11 Ordinance. *Id.*

12         b.     <u>Petitioner's petition for review complied with the Review</u>
                     <u>Board's procedural rule regarding form and content.</u>

13

14         Immediately prior to the initial hearing in this matter, the Review Board met and

15 adopted Rules of Procedure. VI AR 1991:2-15. Rule I(c) sets forth the form and contents

16 for a petition. II AR 624. In addition to name, address, description of the property and

17 facts relied upon to support the petition, "a separate statement of points and authorities

18 (optional)" can be provided. II AR 624. There is no requirement to set forth legal

19 arguments—it is "optional." Therefore, contrary to Respondent's assertion that Petitioner

20 was required to set forth its legal contentions, the rules under which the Review Board

21 operate do not so require. This is consistent with the fact that SF Transfer Tax Ordinance

22 § 1115.2(c)(1) limits the power of the Review Board to not making "any ruling inconsistent

23 with the requirements of this ordinance."

24

25

26

27

28

Case: REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 3
THE SECOND CAUSE OF ACTION – CGC-10-498795       of 132

1                    c.    <u>Petitioner raised and preserved its Constitutional issues below</u>.

2

3          Notwithstanding that there is no administrative requirement to set forth legal

4    arguments in a petition for review, Petitioner indeed did raise and preserve its constitutional

5    arguments below.  First, Petitioner's Petition for Review references the "accommodation of

6    the Free Exercise of religion" required under the law in dealing with religious organizations

7    (II AR 353, response to Q.8[48]) and in the same document states:

8            Because corporations sole are specifically religious entities by statute, to
             single out corporations sole in this way would have significant *Church-state*
9            *constitutional* ramifications as well.
     II AR 359, response to Q.13 (emphasis added).
10

11         Second, Petitioner raised the First Amendment issue in both its Reply and Closing

     Briefs filed below.  Specifically, in Petitioner's pre-hearing Reply Brief the following was
12
     stated:
13
             Of graver concern, Respondent's attempt to exact a transfer tax on internal
14           Church reorganizations undermines a basic right of the Church, under *First*
             *Amendment* protections, to manage its affairs and organize itself in a manner it
15           deems appropriate to operate through civil law structures in accordance with
             Church law.  Here, the San Francisco family of Archdiocesan corporations
16           simply reorganized itself, using as vehicles legally separate corporations
             within such family, while maintaining their unity with the local Catholic
17           church and its Archbishop.  Respondent's determination to impose a transfer
             tax on such an intra-church reorganization cannot be sustained and should be
18           reversed.

19
     V AR 1822 (emphasis added).  Also, in Petitioner's Closing Brief the First Amendment
20
     constraints were referenced:
21
             Moreover, Respondent fails to consider that, like the civil court in *Episcopal Church*
22           *Cases*, the City and County (as part of government) is constrained under the *First*
             *Amendment* and must respect the ownership rights of the Church and the manner in
23           which the Church decides how best to structure its internal affairs, such as those
             wholly within the Archdiocesan family of corporations.  Respondent cannot seek to
24           limit, by way of taxation, the *Constitutional right* to adopt or modify those civil
             corporate structures that the Church needs to operate in a civil law society, based on
25           the Church's internal self-understanding of how that civil structure best fits within
             Church norms.
26

27   _____

     [48] Respondent was certainly aware of this letter as it references the letter for other points in
28   its brief.  See Resp. Br. at 28, fn. 7.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 4
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    VIII AR 3209 (citations omitted) (emphasis added).

2           Third, the First Amendment issues were raised by Petitioner throughout the

3    presentation of its case. See VI AR 2139:2; 2303:14-15. Also, in a statement read by a

4    member of the public to the Review Board, the following was said:

5           Although this particular dispute involves the Catholic church, it is of great
            concern to all religious faiths. The ability to pursue intra-faith corporate
6           restructurings without the threat of taxation by civil authorities is critical to
            the *free exercise of religion.*

7

8    VI AR 2427:23-2428:2 (emphasis added).

9           Fourth, Review Board Member Brown discussed and addressed First Amendment

10   concerns relating to the uneven treatment of the City towards religious organizations. IX

11   AR 3478:22-24 ("I'm just trying to look at why would we grant that sort of leeway, if you

12   will, to other types of corporations but not here to the Archdiocese.").

13          Contrary to Respondent's assertion, the above sufficiently articulates the First

14   Amendment issues and preserved them for review by this Court notwithstanding that the

15   Review Board did not directly address them in its Findings and Conclusions.[49]

16                         d.      The exhaustion doctrine does not preclude consideration of
                                   Petitioner's Constitutional objections.
17

18          The Review Board's function is similar to that of an assessment appeals board in the

19   property tax context in that it is established to deal with valuation issues. In *Star-Kist*

20   *Foods, Inc. v. Quinn*, 54 Cal. 2d 507, 511 (1960), the court held that where the matter

21   involved only constitutional challenges, a taxpayer was not required to seek relief from the

22   local assessment appeals board because there was no question as to valuation that the local

23   board only had competence to decide. Further, prior application to local appeals boards

24   has also not been required where the assessment is a nullity as a matter of law, for example,

25

26   _____

27   [49] All that is generally required is a reviewing body be put on notice of the claimant's
     assertions that a tax is invalid. See *Newman v. Franchise Tax Board*, 208 Cal. App. 3d at
     980, wherein court held that the purpose of refund claim is to put the agency on notice
28   that such right is being asserted.

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 125
          THE SECOND CAUSE OF ACTION – CGC-10-498795        of 132

1  where the property assessed was tax-exempt (*Brenner v. City of Los Angeles*, 160 Cal. 72,

2  79-80 (1911); *Parrott & Co. v. City & County of San Francisco*, 131 Cal. App. 2d 332, 342

3  (1955)), outside the jurisdiction (*Kern River Co. v. County of Los Angeles*, 164 Cal. 751,

4  755-756 (1913)), or nonexistent (*Pac. Coast Co. v. Wells*, 134 Cal. 471, 473 (1901);

5  *Associated Oil Co. v. County of Orange*, 4 Cal. App. 2d 5, 9, 11 (1935)).[50]

6         In this case, neither the underlying ordinance nor the Review Board's Rules of

7  Procedure set forth any details regarding legal challenges at the administrative level,

8  particularly constitutional challenges with respect to the application of the transfer tax

9  provisions.  In such instances, recourse to the administrative agency is not required before

10  the initiation of a court action.  *Park 'N Fly of San Francisco, Inc. v. City of South San*

11  *Francisco*, 188 Cal. App. 3d 1201, 1209 (1987) (citing *Star-Kist Foods*, 54 Cal. 2d at

12  511).[51]

13         In this matter no authority could be located that empowers the Review Board to

14  declare an ordinance unconstitutional on its face or as applied.  Indeed, Respondent has not

15  pointed to any such authority.  At the State level, administrative agencies are precluded

16  under California Constitution, Art. III, § 3.5 from declaring a statute unconstitutional.

17  Arguably, a similar prohibition should exist at the local level.  As observed by the Court in

18  *Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055, 1107 (2004), there is a very

19  good reason for such a prohibition since most local executive officials have no legal

20  training and thus lack the relevant expertise to make constitutional determinations.

21         Finally, there is an exception to the exhaustion requirement where it would be futile

22  for the taxpayer to pursue its administrative remedy.  See *Steinhart v. County of Los*

23

---

24  [50] The recent decision in *Steinhart v. County of Los Angeles*, 47 Cal. 4th 1298 (2010), has
25  not changed the law in this regard.  The Court addressed the various exceptions to the
   exhaustion rule but in the end held that the legislature's action made it unnecessary for it
26  to have to decide whether an exception was applicable under the facts before it.

   [51] In *Andal v. City of Stockton*, 137 Cal. App. 4th 86, 92 (2006), the Court held that the
27  taxpayer could institute a judicial challenge to the imposition of the tax where the city's
   ordinance setting forth the administrative remedy failed to mention constitutional
28  challenges.

Case: 702699704 OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 6
of 132

1 *Angeles*, 47 Cal. 4th 1298, 1313 (2010). In this case for the reasons discussed above, the

2 Review Board lacked the power to invalidate the application of the transfer tax based on

3 Petitioner's First Amendment arguments. Indeed the statement by Board Member

4 Rosenfield is especially clear in this regard:

5       I'd like to thank both parties. This has been a learning experience,
    I think, for all of the board members. I have to say, just to read it into the

6     record, that this is not the sort of case that this body was established to
    decide, from my view.

7

8       We're dealing with issues here that if we were just simply talking
    about a for-profit corporation and trying to deal with the status of parent
    and subsidiary corporations and the application of transfer taxes in a case

9     like this, it would be complicated enough, and layering into that here both
    nonprofit and Canon law issues, as we've talked through, makes it very

10     challenging.

11 IX AR 3595:6-19.

12     Nevertheless, as discussed above, Petitioner did raise its concerns concerning the

13 constitutional implications of imposing a tax in the instant matter and preserved such issues

14 for further court proceedings.

15         2.   The City's failure to administer the transfer tax neutrally violates the
            Establishment and Free Exercise Clauses.

16

17     Respondent contends that Petitioner "is here seeking preferential, not equal,

18 treatment, and . . . 'cannot moor its request for accommodation to the Free Exercise

19 Clause.'" Resp. Br. at 53:6-8. Contrary to Respondent's contentions, Petitioner does not

20 claim it is immune to *neutral* government policies or rules regarding the transfer tax.

21 Rather, Petitioner asserts that the City has failed to administer its transfer tax neutrally,

22 resulting in the violation of Petitioner's rights under the First Amendment to the United

23 States Constitution.[52] To establish a non-taxable transfer of real property, the City has

24 _____

25 [52] Respondent contends that Petitioner "does not claim or refer to any evidence in the record
    that the Ordinance does not meet the first two prongs of the *Lemon* test." Resp. Br. at

26     52:13-14. Respondent is incorrect. To pass muster under the First Amendment, the
    *Lemon* Court held that a statute (1) must have a secular legislative purposes, (2) must

27     have the principal or primary effect of neither advancing or inhibiting religion *and*
    (3) must not foster excessive government entanglement with religion. *Lemon v.*

28     *Kurtzman*, 403 U.S. 602, 612-613 (1971). Petitioner has asserted that at least two
                                   (continued...)

Case 3:23-cv-... REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795

1    interpreted and administered the SF Transfer Tax Ordinance in a manner that imposes

2    additional, if not impossible-to-satisfy, requirements upon the Church that are not imposed

3    on non-religious organizations. This disproportionate burden that the City puts on the

4    Church violates both the Establishment and Free Exercise Clauses.

5         Laws burdening religion that are not neutral and generally applicable are invalid

6    under the First Amendment absent a compelling state interest. *Employment Div., Dept. of*

7    *Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990); *Everson v. Board of*

8    *Education of Ewing*, 330 U.S. 1, 18 (1947). The Free Exercise Clause, like the

9    Establishment Clause, extends beyond facial discrimination and also forbids subtle

10   departures from neutrality. *Church of Lukumi Babalu Aye. Inc. v. Hialeah*, 508 U.S. 520,

11   534 (1993). Laws that in practice are applied in a way that discriminates against religion

12   cannot be shielded by mere compliance with the requirement of facial neutrality. *Id.* Thus,

13   for example, the Establishment Clause "forbids a State to hide behind the application of

14   formally neutral criteria and remain studiously oblivious to the effects of its actions. Not all

15   state policies are permissible under the Religion Clauses simply because they are neutral in

16   form." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 777 (1995).

17        The City historically administered its transfer tax to exempt transfers between

18   commonly controlled entities that are not religious organizations. See VII AR 2665-2723

19   (transfer tax-exempt deeds involving non-religious entities accepted by the City); VII AR

20   2726 (Recorder's written confirmation in a non-religious setting that the transaction was not

21   subject to transfer tax because the beneficial ownership of the real property did not change).

22   Yet, the City has refused to apply the same exemption criteria to the Church. Respondent

23   claims that the "Assessor has the right to assess religious property *just as he or she would*

24   *any other property*." Resp. Br. at 53:20-21. However, in this case, it seeks to assess the

25

26   _____

27   (...continued)
     "prongs" have been violated in that the City's application of the transfer tax both inhibits
     religion and fosters excessive entanglements. If a statute violates *any* of the parts set

28   forth in *Lemon*, the statute must be stricken. *Stone v. Graham*, 449 U.S. 39, 40-41 (1980).

1 Church in a way *unlike* any other property – in a manner less favorable to the Church. This

2 very concern was raised by Review Board Member Brown:

3           Thank you for asking that. I really am more focused on this idea,
and I think it was the Housing Development Corporation, perhaps,

4 transaction, that there is an ability within a corporate family, if you will, to
change title . . . from a subsidiary to a different subsidiary or from a parent

5 to a subsidiary for all kinds of reasons, and . . . that there has *not been
transfer tax assessed* on those in the past because there is this recognition

6 that even if it's a different corporate structure *it's within the same
corporate family*, and that's been with respect to civil nonprofits, not

7 religious corporations per se. So I'm not actually getting into Canon law.
          *I'm just trying to look at why would we grant that sort of leeway, if*

8 *you will, to other types of corporations but not here to the Archdiocese.*

9 IX AR 3478:5-24 (emphasis added). Thus, Petitioner is not seeking preferential treatment,

10 but rightfully demands that it be afforded the same treatment the City has afforded non-

11 religious organizations.

12      The City's less favorable treatment of religious organizations is starkly illustrated in

13 its application of the "change in form" exemption. Respondent argues that, in applying

14 such exemption, it must look to whether there is "an identity of *shareholders* and their

15 proprietary interest" and whether "the same *shareholders* have control of the same assets."

16 Resp. Br. at 28:18-20. Because religious corporations such as Petitioner do not, and by law

17 cannot, have shareholders, Respondent argues that it is appropriate to look "at the purposes,

18 governance, and powers" of the Corporation Sole, the Welfare Corporation and the Support

19 Corporation. Resp. Br. at 28:21-24. As applied by the City, both governance (i.e., control)

20 and powers involve looking to see whether the boards of directors of the subject

21 corporations are identical. Unlike the Welfare Corporation and the Support Corporation,

22 Petitioner as a corporation sole does not even have a board of directors. Thus, the City has

23 interpreted and applied the change in form exemption in such a way that Petitioner could

24 never satisfy the exemption.

25           3.    <u>The City's non-neutral administration of the transfer tax gives rise to
excessive government entanglement in Church affairs.</u>

26

27      The extensive and intrusive nature of the information that the City sought from

28 Petitioner, but not non-religious organizations, interferes with the Church's ongoing

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON Page 129
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1   regulation of its religious affairs, giving rise to excessive entanglement in further violation

2   of the First Amendment.  Moreover, the manner in which the City has applied the transfer

3   tax to Petitioner has a chilling effect on religion and the ability of the Church to organize its

4   civil affairs in a manner consistent with its religious beliefs.

5           The government may not administer its laws in such a way as to foster an excessive

6   entanglement in church affairs. *Lemon*, 403 U.S. at 614.  Surveillance by the government

7   in the taxation of churches may lead to an impermissible degree of such entanglement.

8   *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 675 (1970).

9           Here, the criteria used by the City to determine whether religious organizations such

10  as Petitioner either are subject to the transfer tax or qualify for the "change in form"

11  exemption ("purpose, control, and power") assures that the City will be excessively

12  entangled in church affairs.  It is not simply the volume of information requested, but the

13  nature of the requested information that necessarily delves into issues of Church law and

14  governance, the discretionary decisions of the Archbishop, and the restrictions imposed

15  upon that discretion under Church law.[53]

16          As discussed, under the "neutral principles of law" approach, civil courts must give

17  credence to church laws and canons, especially where such laws and canons have been

18  incorporated in to the civil law organizational documents of the religious corporations, as is

19  the case here. See *Episcopal Church Cases*.  However, in the instant situation, the City has

20  gone too far.  For example, Respondent itself argues in its Opposition Brief that "[i]n the

21  instant case, canon law, unlike the canon law in the *Episcopal Church Cases*, does not

22  provide for an 'express creation of a trust.'" Resp. Br. at 34:11-12.  In so arguing,

23  Respondent is evaluating the content of Roman Catholic Church canons as compared to the

24  content of Episcopal Church canons, and based on such canonical differences—under the

25  _____

26  [53] Respondent asserts that claiming an exemption from tax is "optional" and that the Church
    "voluntarily" provided information in response to requests from the City.  Resp. Br. at
27  52:23-24, 54:4.  Respondent makes a specious argument in that such "request" was made
    under threat of potential tax and penalties of a confiscatory nature (i.e., millions of
28  dollars).

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OR SAN FRANCISCO, A CORPORATION SOLE, ON
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

1    City's view—one church may avail itself of a transfer tax exemption, while the other

2    cannot. Thus, under the City's interpretation and administration of the transfer tax, the

3    specific content of a church's canons apparently is determinative of the applicability of the

4    transfer tax, which, in turn, results in excessive entanglements in the Church's affairs. Such

5    government entanglement into the affairs of the Church cannot be tolerated under the First

6    Amendment as "[t]his kind of state inspection and evaluation of the religious content of a

7    religious organization is fraught with the sort of entanglement that the Constitution

8    forbids." *Lemon*, 403 U.S. at 620.

9         In all, the City's attempt to exact a transfer tax on Petitioner's internal Diocesan

10   restructuring violates a basic right of the Church, under First Amendment protections, to

11   arrange its affairs and operate through religious corporations in a manner that it deems to be

12   in accordance with Church law. As such, the Board's Ruling violates the First Amendment

13   and must be reversed.

14   IV.    <u>CONCLUSION</u>

15         For the foregoing reasons, Petitioner respectfully requests that this Court issue a

16   peremptory writ of mandate directed to the Review Board to set aside the Board's Ruling

17   issued on January 26, 2010.

18   Dated: January 18, 2011.

19                            PILLSBURY WINTHROP SHAW PITTMAN LLP
                             JEFFREY M. VESELY
20                            KERNE H. O. MATSUBARA
                             RICHARD E. NIELSEN
21

22                            By

23                                Attorneys for Petitioner The Roman Catholic
                                 Archbishop of San Francisco, A Corporation
24                                Sole

25

26

27

28

Case REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON 1
THE SECOND CAUSE OF ACTION – CGC-10-498795
of 132

Docket No. CGC-10-498795

PROOF OF SERVICE

I am employed in the City of San Francisco, State of California, in the office of a member of the bar of this Court, at whose direction the service was made. I am over the age of eighteen years, and not a party to the within action. My business address is Pillsbury Winthrop Shaw Pittman LLP, 50 Fremont Street, San Francisco, CA 94105-2228. My mailing address is 50 Fremont Street, P. O. Box 7880, San Francisco, CA 94120-7880. On January 18, 2011, I served the documents titled REPLY BRIEF OF PETITIONER THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, ON THE SECOND CAUSE OF ACTION on the parties in this action as follows:

> Robert L. Stolebarger
> Dena M. Cruz
> Holme Roberts & Owen LLP
> 560 Mission Street, 25th Floor
> San Francisco, CA 94105-2994

☒ **(BY PERSONAL SERVICE)** I delivered to an authorized courier or driver authorized by <u>Nationwide Legal</u> to receive documents to be delivered on the same date.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of January, 2011, at San Francisco, California.

_____
Susan M. Gordon

702755329v1