# EXHIBIT 3

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 1 of 78

# CENTRAL ADMINISTRATIVE OFFICE OF THE
## ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

———————

### FINANCIAL STATEMENTS
June 30, 2021 and 2020



# CENTRAL ADMINISTRATIVE OFFICE OF THE
# ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

## TABLE OF CONTENTS

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1 |
| Financial Statements: | |
| Statements of Financial Position | 2 |
| Statements of Activities | 3 |
| Statements of Functional Expenses | 4 |
| Statements of Cash Flows | 5 |
| Notes to Financial Statements | 6–30 |



One California Street, Suite 2500, San Francisco, CA 94111
**Phone** 415-421-5757 | **Fax** 415-288-6288 | bpm@bpmcpa.com

## INDEPENDENT AUDITORS' REPORT

Most Reverend Salvatore Joseph Cordileone
The Roman Catholic Archbishop of San Francisco

We have audited the accompanying financial statements of the Central Administrative Office of the Roman Catholic Archdiocese of San Francisco (the "Chancery"), an operating division of The Roman Catholic Archbishop of San Francisco, a California Corporation Sole, which comprise the statements of financial position as of June 30, 2021 and 2020, and the related statements of activities, functional expenses, and cash flows for the years then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Central Administrative Office of The Roman Catholic Archbishop of San Francisco as of June 30, 2021 and 2020, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

BPM LLP

San Francisco, California
December 17, 2021

# CENTRAL ADMINISTRATIVE OFFICE OF THE
# ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

## STATEMENTS OF FINANCIAL POSITION
As of June 30, 2021 and 2020

|  | 2021 | 2020 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 128,130,296 | $ 109,906,619 |
| Time certificates of deposit | 160,000 | 160,000 |
| Investments | 171,845,596 | 141,407,851 |
| Receivables: | | |
| Loans receivable | 504,741 | 768,983 |
| Pledges and assessments, net | 3,148,113 | 4,060,344 |
| Other receivables, net | 4,997,112 | 4,027,911 |
| Prepaid and other assets | 2,777,941 | 2,484,628 |
| Property, land, and equipment, net | 19,556,979 | 23,785,744 |
| Beneficial interest in Real Property Support Corporation net assets | 333,874 | 333,874 |
| Beneficial interest in a perpetual trust | 1,203,213 | 1,005,493 |
| Total assets | $ 332,657,865 | $ 287,941,447 |
| **LIABILITIES AND NET ASSETS** | | |
| Liabilities: | | |
| Accounts payable and accrued liabilities | $ 6,177,132 | $ 7,741,897 |
| Deferred lease revenue | 5,697,391 | 5,799,131 |
| Assets held for schools and institutions | 59,961,835 | 50,582,701 |
| Equity of others in pooled investments | 54,197,018 | 44,647,795 |
| Line of credit - Capital Assets Support Corporation | 990,000 | 1,000,000 |
| Note payable - Paycheck Protection Program | - | 1,876,500 |
| Total liabilities | 127,023,376 | 111,648,024 |
| Commitments and contingencies (Note 23) | | |
| Net assets: | | |
| Without donor restrictions: | | |
| Undesignated | 30,985,988 | 20,204,624 |
| Investment in property, land, and equipment, and beneficial interest in Real Property Support Corporation net assets, net of related note payable | 19,890,853 | 24,119,618 |
| Designated | 103,574,530 | 88,148,458 |
| Total net assets without donor restrictions | 154,451,371 | 132,472,700 |
| With donor restrictions | 51,183,118 | 43,820,723 |
| Total net assets | 205,634,489 | 176,293,423 |
| Total liabilities and net assets | $ 332,657,865 | $ 287,941,447 |

*The accompanying notes are an integral part of these financial statements.*

2

# CENTRAL ADMINISTRATIVE OFFICE OF THE
# ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

## STATEMENTS OF ACTIVITIES
For the years ended June 30, 2021 and 2020

| | 2021 | | | 2020 | | |
|---|---|---|---|---|---|---|
| | Without Donor Restrictions | With Donor Restrictions | Total | Without Donor Restrictions | With Donor Restrictions | Total |
| **Revenues:** | | | | | | |
| Gifts, bequests, and collections | $ 1,026,228 | $ 7,097,470 | $ 8,123,698 | $ 1,406,019 | $ 8,524,232 | $ 9,930,251 |
| Fees for services | 4,724,359 | - | 4,724,359 | 5,057,612 | - | 5,057,612 |
| Investment income, net | 19,947,496 | 8,465,729 | 28,413,225 | 1,556,072 | 117,093 | 1,673,165 |
| Change in beneficial interest in a perpetual trust | - | 197,721 | 197,721 | - | (18,880) | (18,880) |
| Insurance | 38,374,547 | - | 38,374,547 | 39,204,269 | - | 39,204,269 |
| Rental income | 1,946,928 | - | 1,946,928 | 2,065,761 | - | 2,065,761 |
| Other income | 1,998,690 | - | 1,998,690 | 1,326,472 | - | 1,326,472 |
| Net assets released from restrictions | 8,398,525 | (8,398,525) | - | 9,458,502 | (9,458,502) | - |
| Total revenues | 76,416,773 | 7,362,395 | 83,779,168 | 60,074,707 | (836,057) | 59,238,650 |
| **Expenses:** | | | | | | |
| Insurance | 32,968,787 | - | 32,968,787 | 34,077,546 | - | 34,077,546 |
| Compensation and benefits | 10,133,545 | - | 10,133,545 | 11,234,998 | - | 11,234,998 |
| Professional fees | 3,074,813 | - | 3,074,813 | 2,929,783 | - | 2,929,783 |
| Priest retirement benefits | 2,864,840 | - | 2,864,840 | 2,108,849 | - | 2,108,849 |
| Program subsidies | 2,415,943 | - | 2,415,943 | 3,118,590 | - | 3,118,590 |
| Property costs and depreciation | 2,246,408 | - | 2,246,408 | 2,677,941 | - | 2,677,941 |
| Other operating expenses | 1,560,746 | - | 1,560,746 | 1,757,188 | - | 1,757,188 |
| Office expenses | 678,058 | - | 678,058 | 923,184 | - | 923,184 |
| Assessments | 328,878 | - | 328,878 | 299,615 | - | 299,615 |
| Provision for uncollectible accounts | 199,497 | - | 199,497 | 174,407 | - | 174,407 |
| Interest paid to schools and institutions | 48,004 | - | 48,004 | 888,503 | - | 888,503 |
| Total expenses | 56,319,519 | - | 56,319,519 | 60,190,604 | - | 60,190,604 |
| Change in net assets before gains and losses | 20,097,254 | 7,362,395 | 27,459,649 | (115,897) | (836,057) | (951,954) |
| Gain from forgiveness of PPP loan | 1,876,500 | - | 1,876,500 | - | - | - |
| Gain (loss) on sale of property, land, and equipment | 4,917 | - | 4,917 | (322,826) | - | (322,826) |
| Change in net assets | 21,978,671 | 7,362,395 | 29,341,066 | (438,723) | (836,057) | (1,274,780) |
| Net assets, beginning of year | 132,472,700 | 43,820,723 | 176,293,423 | 132,911,423 | 44,656,780 | 177,568,203 |
| Net assets, end of year | $ 154,451,371 | $ 51,183,118 | $ 205,634,489 | $ 132,472,700 | $ 43,820,723 | $ 176,293,423 |

*The accompanying notes are an integral part of these financial statements.*

3

# CENTRAL ADMINISTRATIVE OFFICE OF THE
# ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

## STATEMENTS OF FUNCTIONAL EXPENSES
For the years ended June 30, 2021 and 2020

| | 2021 | | | | | 2020 | | | | |
| | | Supporting Services | | | | | Supporting Services | | | |
| | Program Services | General and Administrative | Development | Total Supporting Services | Total | Program Services | General and Administrative | Development | Total Supporting Services | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Expenses: | | | | | | | | | | |
| Insurance | $ 32,968,787 | $ - | $ - | $ - | $ 32,968,787 | $ 34,077,546 | $ - | $ - | $ - | $ 34,077,546 |
| Compensation and benefits | 7,207,451 | 2,381,282 | 544,812 | 2,926,094 | 10,133,545 | 7,639,915 | 2,977,843 | 617,240 | 3,595,083 | 11,234,998 |
| Professional fees | 1,496,493 | 1,561,221 | 17,099 | 1,578,320 | 3,074,813 | 1,292,969 | 1,629,864 | 6,950 | 1,636,814 | 2,929,783 |
| Priest retirement benefits | 2,864,840 | - | - | - | 2,864,840 | 2,108,849 | - | - | - | 2,108,849 |
| Program subsidies | 2,415,844 | - | 99 | 99 | 2,415,943 | 3,099,333 | 3,684 | 15,573 | 19,257 | 3,118,590 |
| Property costs and depreciation | 789,962 | 1,406,492 | 49,954 | 1,456,446 | 2,246,408 | 1,052,373 | 1,575,642 | 49,926 | 1,625,568 | 2,677,941 |
| Other operating expenses | 1,162,468 | 39,847 | 158,431 | 198,278 | 1,360,746 | 1,514,287 | 54,841 | 188,060 | 242,901 | 1,757,188 |
| Office expenses | 437,613 | 93,187 | 147,258 | 240,445 | 678,058 | 579,030 | 192,793 | 151,361 | 344,154 | 923,184 |
| Assessments | 34,831 | 294,047 | - | 294,047 | 328,878 | 600 | 299,015 | - | 299,015 | 299,615 |
| Provision for uncollectible accounts | 199,497 | - | - | - | 199,497 | 174,407 | - | - | - | 174,407 |
| Interest paid to schools and institutions | 48,004 | - | - | - | 48,004 | 888,503 | - | - | - | 888,503 |
| Total expenses | $ 49,625,790 | $ 5,776,076 | $ 917,653 | $ 6,693,729 | $ 56,319,519 | $ 52,427,812 | $ 6,733,682 | $ 1,029,110 | $ 7,762,792 | $ 60,190,604 |

*The accompanying notes are an integral part of these financial statements.*

# CENTRAL ADMINISTRATIVE OFFICE OF THE
# ROMAN CATHOLIC ARCHDIOCESE OF SAN FRANCISCO

## STATEMENTS OF CASH FLOWS
the years ended June 30, 2021 and 2020

|  | 2021 | 2020 |
|---|---:|---:|
| **Cash flows from operating activities:** | | |
| Change in net assets | $ 29,341,066 | $ (1,274,780) |
| Adjustments to reconcile change in net assets to net cash provided by operating activities: | | |
| Change in beneficial interest in a perpetual trust | (197,720) | 18,880 |
| Investment income | (28,413,225) | (1,673,165) |
| Depreciation | 1,351,590 | 1,722,584 |
| Property write-off charged to expense | 77,510 | - |
| Gain (loss) on sale of property, land and equipment | (4,917) | 322,826 |
| Provision for uncollectable accounts | 199,497 | 174,407 |
| Forgiveness of PPP loan | (1,876,500) | - |
| Change in operating assets and liabilities: | | |
| Receivables | 2,841,015 | (2,716,826) |
| Prepaid and other assets | (293,313) | 254,909 |
| Accounts payable and accrued liabilities | (1,564,765) | 3,194,195 |
| Deferred lease revenue | (101,740) | (101,739) |
| Net cash provided by (used in) operating activities | 1,358,498 | (78,709) |
| **Cash flows from investing activities:** | | |
| Purchase of investments | (103,802,073) | (94,137,012) |
| Proceeds from sale of investments | 115,702,857 | 103,587,459 |
| Purchase of property, land, and equipment | (48,233) | (228,792) |
| Proceeds from sale of property, land, and equipment | 19,575 | 6,344,625 |
| Net cash provided by investing activities | 11,872,126 | 15,566,280 |
| **Cash flows from financing activities:** | | |
| Assets held for schools and institutions liability | 9,379,134 | (267,815) |
| Change in equity held for others in pooled investments | 9,549,223 | (2,699,109) |
| Investment pool (income) loss on equity of others | (13,925,304) | 107,538 |
| Proceeds from line of credit - Capital Assets Support Corporation | - | 1,000,000 |
| Payments on note payable - Capital Assets Support Corporation | (10,000) | (3,220,596) |
| Proceeds from note payable - Paycheck Protection Program | - | 1,876,500 |
| Net cash provided by (used in) financing activities | 4,993,053 | (3,203,482) |
| Net increase in cash and cash equivalents | 18,223,677 | 12,284,089 |
| Cash, cash equivalents and time certificate of deposit, beginning of year | 110,066,619 | 97,782,530 |
| Cash, cash equivalents and time certificate of deposit, end of year | $ 128,290,296 | $ 110,066,619 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid for interest on deposits and note payable | $ 48,004 | $ 888,503 |
| **Noncash disclosures:** | | |
| Reclassification of property to notes receivable | $ 2,833,240 | $ - |

The accompanying notes are an integral part of these financial statements.

Case: 23-30564 Doc# 610-2 Filed: 04/19/24 Entered: 04/19/24 15:35:29 Page 8 of 78     5

## 1. The Chancery

The Roman Catholic Archbishop of San Francisco, a California Corporation Sole (the "Corporation Sole"), was incorporated on February 24, 1854. The Corporation Sole operates the Central Administrative Office of the Roman Catholic Archdiocese of San Francisco (the "Chancery"). Other operating divisions of the Corporation Sole include certain parishes, schools, cemeteries, and certain Catholic sites within the Archdiocese such as the Vallombrosa Center.

The accompanying financial statements include only the Chancery and those funds over which the Chancery maintains direct operational control. Such statements do not include any assets or liabilities of the other operating divisions of the Corporation Sole as described above. In addition, the accompanying financial statements do not include, or pertain to, separate and independent corporate entities affiliated with the Corporation Sole that are located within The Roman Catholic Archdiocese of San Francisco (the "Archdiocese").

A significant portion of the Chancery's revenues are derived from assessments obtained from and fees for services provided to parishes, schools and other Archdiocesan institutions, as well as rental income from certain properties. These revenues are expended by the Chancery for the various programs, ministries, and needs of the Chancery. In addition, the Chancery administers the Archdiocesan insurance program and priest and lay employees' supplemental pension plans.

The Chancery office administers funds on behalf of certain institutions, as well as the Chancery, in an investment pool invested with fund managers in separate custodial accounts. The Chancery also administers a Deposit and Loan fund on behalf of high schools and certain institutions. Ownership by specific funds or entities in the investment pool is accounted for on a pooled unit value method based on fair values. Assets held for schools and institutions and equity of others in pooled investments are reflected as liabilities.

## 2. Assignment to Support Corporations

The Capital Assets Support Corporation ("CASC") and The Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support Corporation ("RPSC"), collectively referred to as the "Support Corporations," are separate and distinct corporations from the Corporation Sole. The Support Corporations have existed since 2008 for the expressed purpose of owning and maintaining certain real properties and capital assets in order for the civil structure of asset ownership to conform closely with Canon law and to support the mission of parishes, schools, and cemeteries that are operated civilly by the Corporation Sole.

To achieve that purpose, in 2008 the Corporation Sole irrevocably and unconditionally assigned, transferred and conveyed rights, title and interest in certain real property to the RPSC. The assignment also affects any real property or improvements thereto as defined by the assignment, including certain real property held by the Chancery (see Note 9).

The Corporation Sole and Support Corporations are financially interrelated organizations; therefore, at the date of transfer of certain real property held by the Chancery, the transfer is treated as an equity transfer and the carrying value of the asset transferred is reclassified as a beneficial interest in the RPSC's net assets (see Note 9).

## 3. Summary of Significant Accounting Policies

### Basis of Presentation

The accounts of the Chancery are maintained in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and the principles of fund accounting. This is the procedure by which resources for various purposes are classified for accounting purposes into funds in accordance with specified activities or objectives. For financial statement purposes, all financial transactions are reported by class of net assets as prescribed for not-for-profit entities. The following is a description of the classes of net assets included in the financial statements.

#### Net Assets without Donor Restrictions

Net assets without donor restriction consist of all resources of the Chancery that have not been restricted by a donor. Certain unrestricted resources have been internally designated for specific purposes.

#### Net Assets without Donor Restrictions - Designated

Designated net assets consist of amounts set aside to supplement the various operations carried on by the Chancery (see Note 15).

#### Net Assets with Donor Restrictions

Net assets with donor restrictions are those assets subject to donor-imposed restrictions. Some donor-imposed restrictions are temporary in nature, such as those that will be met by the passage of time or other events specified by the donor. Other donor-imposed restrictions are perpetual in nature, where the donor stipulates that resources be maintained in perpetuity. The income and appreciation from such resources, once approved by the Chancery, are available for either general operations or specific programs as specified by the donor. Gifts of long-lived assets and gifts of cash restricted for the acquisition of long-lived assets are recognized as with donor restriction revenue when received and net assets released from restriction when the assets are placed in service. Donor-imposed restrictions are released when a restriction expires, that is, when the stipulated time has elapsed, when the stipulated purpose for which the resource was restricted has been fulfilled, or both.

#### Net Assets with Donor Restrictions - Endowments

Endowment net assets consist of assets which use has been restricted for investment in perpetuity as donor-restricted endowments. The income from endowments is available for either general operations or specific programs as specified by the donor.

Management has interpreted the State of California's enacted version of the Uniform Prudent Management of Institutional Funds Act ("UPMIFA") as requiring the preservation of the fair value of the original gift as of the date donated for the donor-restricted endowment funds absent explicit donor stipulations to the contrary. As a result, the Chancery's net assets with donor restrictions consist of the fair value of the original gifts as of the date donated to the donor-restricted endowment.

### Accrual Basis

The financial statements of the Chancery have been prepared on the accrual basis of accounting.

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 10 of 78

3.    **Summary of Significant Accounting Policies**, continued

*Cash and Cash Equivalents*

For the purposes of these financial statements, cash and cash equivalents are considered to be cash on hand, bank deposits, money market funds, and certain mutual funds, which are highly liquid. Cash and cash equivalents include certain funds that have been internally designated by the Chancery (see Note 5).

*Concentration of Credit Risk*

Financial instruments that potentially subject the Chancery to concentrations of credit risk consist principally of cash and cash equivalents and time certificates of deposit. Such balances with any one institution may, at times, be in excess of federally insured limits. Risks associated with cash and cash equivalents and time certificates of deposit are mitigated by banking with credit-worthy institutions. The Chancery has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk.

Investments, in general, are exposed to various risks, such as interest rate, credit, and overall market volatility. To address the risk of investments, the Chancery maintains a diversified portfolio, subject to an investment policy that sets out performance criteria, investment guidelines, and asset allocation guideline, and requires review of the investment performance. Investments are managed by multiple investment managers, who have responsibility for investing the funds in various investment classes. This entire process is actively overseen by the Investment Committee of the Archdiocese of San Francisco. Investments are secured up to a limit set by the Securities Investor Protection Corporation ("SIPC"). As of June 30, 2021 and 2020, the Chancery held investments in excess of the SIPC insurance limits.

*Investments*

Investments in equity securities and in debt securities are reported at fair value, with current period recognition of increases or decreases in fair value shown in the statements of activities. Investments also include cash and cash equivalents held by investment custodians. Investment income recorded on the statements of activities includes interest and dividend income, as well as realized and unrealized gains and losses. Investments are held in markets which at times are volatile and can result in significant temporary unrealized gains or losses.

*Receivables*

Receivables consist of loans, notes, accounts and other non-trade receivables and assessments receivable from schools and other archdiocesan institutions. Credit is extended based upon the evaluation of the entity's financial condition and other factors and, generally, collateral is not required, except in certain isolated cases where property is sold involving a note receivable and a deed of trust is obtained. Loans and notes receivable have variable maturity dates and are generally due in accordance with scheduled payments. The allowance for doubtful accounts and loan losses are determined based on a consideration of a number of factors, including the Chancery's previous loss history, the entity's previous payment history, financial condition and ability to pay, and the condition of the general economy. The Chancery writes off accounts receivable, loans, and notes receivable to the allowance when they are determined to be uncollectible. The Chancery determined an allowance for doubtful accounts based on credit-worthiness and collectability of its loans. Payments subsequently received on accounts, loans, and notes previously written off are credited to the bad debt provision.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 11 of 78

3. **Summary of Significant Accounting Policies**, continued

*Receivables*, continued

Interest accrues on loans and notes receivable monthly in accordance with the applicable interest rates. Interest accruals are discontinued when it is determined that a specific allowance is required against a loan or note. Interest income is subsequently recognized on such loans, or a note, only to the extent cash is subsequently received.

*Property, Land, and Equipment*

Property, land, and equipment that are legally held in the name of the Corporation Sole, which are used by the Chancery, are stated at cost if purchased or at fair value, at the date of the gift if donated. Also included are certain properties held by the Chancery for which the Chancery has canonical oversight.

For properties placed in service, depreciation is provided in amounts sufficient to amortize the cost of depreciable assets to operations over their estimated services lives, ranging from 5 to 40 years, using the straight-line method.

*Canonical Oversight of Closed Parishes and Parish Schools*

The Chancery, on behalf of the Corporation Sole, assumes canonical responsibility for the management of closed parish and school sites, including the management of property, land, and equipment of those sites. Upon the suppression of a parish and/or its related school, if any, as a juridic person, its properties are passed on to the superior juridic person, the Corporation Sole, if no other juridic person has been established or assigned to care for the property.

If the Chancery does not expect to be the ultimate economic beneficiary of the property of closed parishes and schools or bear the risk of loss, it does not record an asset for the related property. If the economic beneficiary is uncertain, the Chancery records an asset and corresponding liability, as an agent, for the related property. If any of those properties have operations, the Chancery will recognize the related operations if it anticipates being the economic beneficiary of the related property. When the Chancery does not record the property of closed parishes and schools, or recognizes the property as an agent, the related operations are recognized and are accounted for by other responsible parties. When the canonical oversight of certain closed parish and school property has been assigned from the Chancery to another juridic person or responsible party, the Chancery recognizes an equity transfer and a corresponding reduction in any related assets and liabilities.

*Beneficial Interest in Real Property Support Corporation*

A beneficial interest is defined as a future economic benefit of an anticipated future cash flow or service potential. The Chancery has a beneficial interest in the RPSC's net assets (see Note 9) as a result of a transferred asset, the land of a closed parish. The beneficial interest is reported at the book value of the transferred asset at the date of transfer.

*Deferred Lease Revenue*

Deferred lease revenue consists of a lease payment received from a lessee for rental periods subsequent to the statement of financial position date. The non-cancelable minimum lease payment portion of the deferred lease revenue is recognized on a straight-line basis as rental income over the remaining prepayment period of 56 years.

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 12 of 78

3. **Summary of Significant Accounting Policies**, continued

*Assets Held for Schools and Institutions (Liability)*

The Chancery holds deposits for schools and institutions for investment purposes and loaned to other schools and institutions. Deposit interest rates averaged 0.10% and 1.75% for of the years ended June 30, 2021 and 2020, respectively.

Also included in the assets held for schools and institutions are proceeds from special collections administered by the United States Conference of Catholic Bishops and other special collections local to the Archdiocese and administered by the Chancery.

*Revenue Recognition*

**Gifts, Bequests, and Collections**

The Chancery reports gifts, bequests, and collections as net assets without donor restrictions unless they are received with donor stipulations that limit the use of the donated assets, in which case they are recorded as net assets with donor restriction. The Chancery recognizes all unconditional gifts and promises to give in the period notified, if deemed collectible. The Chancery recognizes conditional gifts once the conditions have met and, as of June 30, 2021 and 2020, the Chancery had not received any conditional gifts.

**Fees for Services**

Fees for services are recognized over time as the Chancery satisfies the performance obligation, with the exception of advertising revenue that is recognized at a point in time when the performance obligation is satisfied. Rental income from property leases is recognized on a straight-line basis over the term of the lease. Other income, derived from assessments to other entities, are recognized when assessed.

**Insurance**

The Archdiocesan insurance program provides insurance coverage for parishes, schools, and other operating divisions of the Corporation Sole. The program is administered by the Chancery and provides coverage in areas including, but not limited to, general liability, property, crime, fiduciary liability, medical and health, and workers' compensation. Insurance claims are substantially covered by a variety of insurance policies purchased by the Chancery but are also partially covered by self-insured retention levels and deductible limits. Insurance revenues are recognized in the applicable period insurance coverage is provided to parishes, schools, and other operating divisions.

*Grants Payable*

Grants payable are expensed when the unconditional promise to give is approved by the finance committee of the Archdiocese. Grants are authorized subject to certain restrictions, and failure of the recipients to meet these restrictions may result in cancellations or refunds. Grant refunds are recorded as a reduction of grant expense at the time the grant is refunded to the Foundation. Unconditional grants that are expected to be paid in more than one year are measured at the present value of the estimated future cash flows (see Note 11).

Case: 23-30564     Doc# 610-2     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 13
of 78

3.    **Summary of Significant Accounting Policies**, continued

*Income Taxes*

The Roman Catholic Archbishop of San Francisco is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, as set forth in the Roman Catholic Church's annual group ruling received from the Internal Revenue Service. However, income from activities not related to its tax-exempt purpose may be subject to taxation as unrelated business income. These activities have historically generated losses and the Chancery has accumulated net operating loss carryforwards ("NOLs"). As of June 30, 2020, the most recent tax filing, the Chancery had NOLs of approximately $61,711. There is no limitation on the use of these NOLs and they will begin to expire in 2031. The Chancery's ability to utilize the NOLs or realize any benefits is uncertain and, therefore, a full valuation allowance has been applied against them.

*Fair Value Measurements*

The Chancery follows the fair value measurement standards which define fair value as the exchange price that would be received for an asset or paid to transfer a liability in the principal or most advantageous market for the assets or liabilities in an orderly transaction between market participants on the measurement date. Subsequent changes in fair value of these financial assets and liabilities are recognized in the change in net assets when they occur.

The Chancery uses various valuation approaches. A hierarchy has been established for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Chancery. Unobservable inputs are inputs that reflect the Chancery's assumptions about what market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. There have been no changes in valuation techniques for the years ended June 30, 2021 and 2020.

The Chancery's financial assets and liabilities measured at fair value on a recurring basis are categorized according to the fair value hierarchy consisting of the following three levels:

*Level 1* – Valuation inputs are obtained from real-time quotes for transactions in active exchange markets involving identical assets and liabilities.

*Level 2* – Valuation inputs are obtained from readily-available pricing sources for comparable instruments.

*Level 3* – Valuation inputs are obtained without observable market value and require a high level of judgment to determine the fair value.

The categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 14 of 78

3.    **Summary of Significant Accounting Policies**, continued

*Fair Value Measurements*, continued

**Fair Value of Investments Measured on the Basis of Net Asset Value Per Share**

The Chancery follows fair value guidance measuring fair value for investment in certain investees on the basis of the Net Asset Value per share ("NAV"). The guidance permits, as a practical expedient, the use of the NAV as long as that value is calculated in a manner consistent with the measurement principles governing investment companies. The Chancery believes this method provides a basis for the fair value.

The Chancery uses NAV for determining the fair value of its investment in private real estate funds and global emerging markets mutual funds. These investments may not be immediately liquid nor have readily determinable fair values and are valued at amounts reported to the Chancery by the investee. These values may differ significantly from values that would have been used had a readily available market existed for such investments, and the differences could be material to the change in net assets of the Chancery.

*Use of Estimates*

In preparing financial statements in conformity with U.S. GAAP, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as revenues and expenses during the reporting period. Actual results could differ from those estimates.

The Chancery's allowance for doubtful receivables, pledges and loans are significant estimates. The determination of the balances in the allowances accounts is based on an analysis of the receivables, pledges and loans and reflect amounts which, in management's judgment, are adequate to provide for potential losses after giving consideration to the character of the receivables and loan portfolio, current economic conditions, past collection experience, and such other factors that deserve recognition in estimating losses.

*Conditional Asset Retirement Obligation*

In the ordinary course of business, the Chancery may need to comply with certain legal obligations as part of a demolition or major renovation of a facility. The Chancery currently has no plans for demolition or major renovation. The Chancery will continue to review potential asset retirement obligations and record a liability when sufficient information exists to indicate that such an obligation has been incurred and to estimate the fair value of an asset retirement obligation.

*Functional Classification of Expenses*

The costs of providing the various program services have been summarized on a functional basis in the statement of functional expenses. Accordingly, certain costs have been allocated, principally on a direct basis, among the programs and supporting services.

Certain categories of expenses are attributable to more than one program or supporting function and are allocated on a reasonable basis that is consistently applied. The expenses that are allocated are compensation and benefits and overhead expenses, which are allocated on the basis of estimates of time and effort.

3.    **Summary of Significant Accounting Policies**, continued

*Measure of Operation*

The Chancery includes in its measure of operation all support and revenue and expenses that are an integral part of its programs and supporting activities. The measure of operations does not include the gain from the forgiveness of debt or gain (loss) on disposal of property.

*Changes in Accounting Principles*

In August 2018, the FASB issued ASU 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13"). ASU 2018-13 amends Accounting Standards Codification ("ASC") 820 to add, remove, and modify fair value measurement disclosure requirements. The Chancery adopted ASU 2017-07 effective July 1, 2020. There was no material impact or material additional disclosures added to the financial statements.

*Recent Accounting Pronouncements*

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* ("ASU 2016-02"). ASU 2016-02 requires lessees to recognize a right-of-use asset and lease liability for virtually all leases (other than leases that meet the definition of a short-term lease). ASU 2016-02 was originally effective for years beginning after December 15, 2020. However, in June 2020, the FASB issued ASU 2020-05, *Revenue from Contracts with Customers (Topic 606) and Leases (Topic 842)—Effective Dates for Certain Entities*, which extended the effective date for ASU 2016-02 until years beginning after December 15, 2021. The Chancery is in the process of evaluating the impact of ASU 2016-02 on the Chancery's financial statements.

In September 2020, the FASB issued ASU 2020-07, *Not-for-Profit Entities (Topic 958) Presentation and Disclosure by Not-for-Profit Entities for Contributed Nonfinancial Assets* ("ASU 2020-07"), to improve financial reporting by providing new presentation and disclosure requirements about contributed nonfinancial assets, including additional disclosure requirements for recognized contributed services. ASU 2020-07 is required to be applied retrospectively for annual periods beginning after June 15, 2021 and interim periods within fiscal years beginning after June 15, 2022 with early adoption permitted. The Chancery is currently evaluating the impact of the pending adoptions of ASU 2020-07 on these financial statements.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 16 of 78

4. **Liquidity and Availability**

Financial assets available for general expenditure without donor restrictions limiting their use within one year the balance sheet date comprise the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Cash and cash equivalents and time certificates of deposit | $ 128,290,296 | $ 110,066,619 |
| Investments | 171,845,596 | 141,407,851 |
| Receivables: |  |  |
| Loans receivable | 504,741 | 768,983 |
| Pledges and assessments, net | 3,148,113 | 4,060,344 |
| Other receivables, net | 4,997,112 | 4,027,911 |
| Beneficial interest in a perpetual trust | 1,203,213 | 1,005,493 |
| Total financial assets | 309,989,071 | 261,337,201 |
| Less: net assets with donor restrictions | (51,183,118) | (43,820,723) |
| Less: receivables due in more than one year | (3,337,981) | (695,353) |
| Plus: amount appropriated for expenditure and release of restrictions for the following year | 8,284,770 | 8,549,526 |
| Less: other designated assets: |  |  |
| Assets held for schools and institutions | (59,961,835) | (50,582,701) |
| Equity of others in pooled investments | (54,197,018) | (44,647,795) |
| Other funds: |  |  |
| Deposit and loan | (1,059,228) | (1,127,787) |
| Priests' retirement | (11,743,032) | (12,452,586) |
| Insurance and benefits | (60,751,484) | (51,968,861) |
| Current fund: other operating and priest education | (29,841,690) | (22,543,778) |
| High school loan - committed FY20 | - | (500,000) |
| Financial assets available to meet cash needs for general expenditure within one year | $ 46,198,455 | $ 41,547,143 |

A summary cash and investment report is presented to the Finance Council at least annually, providing the cash and investment position for the current year, plus projections of cash requirements for the next five years. The Finance Council has directed the Chancery to maintain a $15,000,000 reserve in its corpus. As part of the Chancery's liquidity and cash management plan, cash requirements are reviewed on a weekly basis. Excess short-term cash is invested in either money market funds or in Time Certificates of Deposits with a maturity date not to exceed 90 days.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 17 of 78

5.    **Cash and Cash Equivalents and Time Certificates of Deposits**

Cash and cash equivalents and time certificates of deposits were held for the benefit of the following funds as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Current fund - without donor restriction | $ 15,564,444 | $ 13,418,544 |
| Deposit and loan fund | 60,002,478 | 50,080,778 |
| Insurance and benefits | 37,064,459 | 32,051,212 |
| Current fund - with donor restriction | 1,582,129 | 1,596,887 |
| Priests' retirement fund - without donor restriction | 9,256,481 | 9,139,113 |
| Other designated funds | 539,375 | 379,440 |
| Other with donor restriction | 3,555,891 | 2,665,653 |
| Other | 725,039 | 734,992 |
| Total cash and cash equivalents and time certificates of deposit | $ 128,290,296 | $ 110,066,619 |

Cash and cash equivalents and time certificates of deposits consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Cash and cash equivalents | $ 128,130,296 | $ 109,906,619 |
| Time certificates of deposit | 160,000 | 160,000 |
| Total cash and cash equivalents and time certificates of deposit | $ 128,290,296 | $ 110,066,619 |

6.    **Investments**

The Chancery administers an investment pool, as an owner and agent through independent custodial arrangements, for the benefit of various Archdiocesan entities. The funds deposited by, or on behalf of, each participant is the sole property of that participant and are processed by the investment pool service providers and the Chancery as agents and custodians for the participants.

The investment pool was established for participants with long-term horizons, moderate growth and income requirements, and moderate risk objectives. The investment pool invests in stocks and bonds and alternative assets. The investment pool is operated under the total return concept, which allocates income (loss) to each participant based upon the total return earned in invested funds, including realized and unrealized gains and losses, and investment management fees.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 18 of 78

6.    **Investments**, continued

Investments were held as follows as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Investment pool: | | |
| Chancery's equity in pooled investments | $ 117,434,477 | $ 94,296,153 |
| Others' equity in pooled investments | 54,054,018 | 44,498,795 |
| | 171,488,495 | 138,794,948 |
| Other investments | 357,101 | 2,612,903 |
| Total investments | $ 171,845,596 | $ 141,407,851 |

Total investment income for the investment pool, including investment income allocated to others in the pooled investments, was $42,155,128 and $265,776 for the years ended June 30, 2021 and 2020, respectively.

The Chancery's investment income, including its investment income from the investment pool, was as follows for the year ended June 30:

| | 2021 | | |
|---|---|---|---|
| | Investment Pool | Other Investment Activities | Total |
| Interest and dividends | $ 270,277 | $ 114,201 | $ 384,478 |
| Net realized and unrealized losses on investments | 27,959,547 | 69,200 | 28,028,747 |
| Investment income | 28,229,824 | $ 183,401 | $ 28,413,225 |
| Investment pool gain on equity of others | 13,275,588 | | |
| Undistributed net earnings | 649,716 | | |
| Total investment pool income, net | $ 42,155,128 | | |

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 19 of 78

6. **Investments**, continued

The Chancery's investment income, including its investment income from the investment pool, was as follows for the year ended June 30:

|  | | 2020 | | | | |
|---|---|---|---|---|---|---|
|  | | Investment Pool | | Other Investment Activities | | Total |
| Interest and dividends | $ | 1,597,082 | $ | 1,311,349 | $ | 2,908,431 |
| Net realized and unrealized gains on investments | | (1,223,769) | | (11,497) | | (1,235,266) |
| Investment income | | 373,313 | $ | 1,299,852 | $ | 1,673,165 |
| Investment pool gain on equity of others | | 122,362 | | | | |
| Undistributed net earnings | | (229,900) | | | | |
| Total investment pool income, net | $ | 265,775 | | | | |

7. **Receivables**

*Loans Receivable*

The Chancery had total loans receivable of $504,741 and $768,983 as of June 30, 2021 and 2020. The loans receivable are described below.

For the year ended June 30, 2021, the Chancery loaned one parish $80,000, using funds received from the line of credit from CASC (see Note 13), and has an outstanding loan balance of $60,295. The receivable is unsecured and matures in August 2022 with interest at 1.0%. Additionally, the Chancery loaned Archbishop Riordan High School $500,000 and has an outstanding loan balance of $444,446. The receivable is unsecured and matures in October 2022 with interest at 0.0%. As of June 30, 2021, no allowance was recorded related to these loans.

The Chancery had a loan outstanding from Junipero Serra High School with a balance $392,281 for the year ended June 30, 2020. The receivable was unsecured and matured through 2025 with interest at 5.5%. Additionally, for the year ended June 30, 2020, the Chancery loaned $375,000 and had an outstanding loan balance of $376,702 from Archbishop Riordan High School. The receivable was unsecured and matured through 2021 with interest at 5.5%. As of June 30, 2021, the High Schools have paid their balances off in full.

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 20 of 78

7. **Receivables**, continued

*Pledges and Assessments, Net*

Pledges and assessments, net, consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Pledges and assessments, net: |  |  |
| Archdiocesan Annual Appeal | $ 3,901,262 | $ 4,503,493 |
| Less: allowance for uncollectible pledges | (753,149) | (443,149) |
| Total pledges and assessments, net | $ 3,148,113 | $ 4,060,344 |

All pledge receivables are initially due within one year.

*Other Receivables, Net*

Other receivables, net consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Other receivables, net: |  |  |
| Note receivable - Diocese of Santa Rosa | $ 1,410,000 | $ 1,410,000 |
| Note receivable - Catholic Charities | 2,833,240 | - |
| Other notes receivable | 64,988 | 64,988 |
| Parish and school receivables | 1,858,840 | 4,266,345 |
| Miscellaneous receivables | 481,937 | 442,005 |
| Less: allowance for doubtful accounts | (1,651,893) | (2,155,427) |
| Total other receivables, net | $ 4,997,112 | $ 4,027,911 |

Notes receivable, which are unsecured, mature at various dates with interest ranging from 0.0% to 8.0%. The Chancery determines an allowance for doubtful accounts based on the credit-worthiness and collectability of each note. The note receivable from the Diocese of Santa Rosa may not be collectible and is included in full in the allowance for doubtful accounts.

In November 2008, the Chancery entered into a line of credit ("LOC") agreement with a principal amount of $6,500,000 with Catholic Charities, CYO of the Archdiocese of San Francisco ("CCCYO") and matured in December 2020 with interest at 0.0%. The LOC was secured by a Deed of Trust on the St. Vincent's parcel of land. Since 2008, the LOC has been included in land on the Statement of Financial Position (see Note 8). In January 2021, the CCCYO extended the LOC through December 2025 and converted the LOC into a note receivable with interest at 1.0%. The remaining principal balance was reclassed to other receivables, net on the Statement of Financial Position. As of June 30, 2021, the unpaid principal is $2,833,240.

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 21 of 78

7.     **Receivables**, continued

*Other Receivables, Net*, continued

Receivables are collected as follows as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Less than one year: | | |
| Pledges and assessments | $ 3,901,262 | $ 4,503,493 |
| Other receivables | 2,405,765 | 4,773,338 |
| Loans receivable | - | 73,630 |
| Note receivables | 1,410,000 | 1,410,000 |
| | 7,717,027 | 10,760,461 |
| More than one year: | | |
| Loans receivable | 504,741 | 695,353 |
| Note receivables | 2,833,240 | - |
| | 3,337,981 | 695,353 |
| Less: allowance for doubtful accounts | (2,405,042) | (2,598,576) |
| Total receivables, net | $ 8,649,966 | $ 8,857,238 |

8.     **Property, Land, and Equipment**

Property, land, and equipment consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Buildings and improvements | $ 39,026,324 | $ 39,026,324 |
| Equipment | 2,488,946 | 2,477,720 |
| Automobiles | 62,730 | 128,096 |
| | 41,578,000 | 41,632,140 |
| Accumulated depreciation | (25,107,100) | (23,831,598) |
| | 16,470,900 | 17,800,542 |
| Land | 3,074,454 | 5,985,202 |
| Construction in progress | 11,625 | - |
| Total property, land, and equipment, net | $ 19,556,979 | $ 23,785,744 |

Depreciation expense totaled $1,351,590 and $1,722,584 for the years ended June 30, 2021 and 2020, respectively.

8. **Property, Land, and Equipment**, continued

The Chancery did not assume canonical responsibility for any parishes and or schools during the years ended June 30, 2021 and 2020 (see Note 3).

Three properties for which the Chancery has oversight remain as property, land, and equipment of the Chancery. They are the National Shrine of St. Francis of Assisi (including building improvement expenditures), St. Brigid Rectory, and St. Michael Convent. They are carried at $3,400,048 and $3,728,060 as of June 30, 2021 and 2020, respectively.

An 8.96% interest in St. Vincent's Property, as a tenant in common, is included in land in the amount of $2,910,748 as of June 30, 2020. In January 2021, the balance was reclassed to notes receivable (see Note 7).

9. **Beneficial Interest in Real Property Support Corporation**

The beneficial interest in the RPSC represents land of a closed parish where the legal title is held by the RPSC for which the Chancery has ongoing canonical oversight (see Note 8). Beneficial interest in RPSC was $333,874 for each of the years ended June 30, 2021 and 2020.

10. **Beneficial Interest in a Perpetual Trust**

The Corporation Sole is an income beneficiary named under two perpetual trusts, which are managed by third parties. The Corporation Sole does not have rights to the trust assets. Income distributed by the trust is to be expended for seminarian development in the form of scholarships and social ethnic and cultural services. The Chancery has recorded the fair value of the trusts' assets held as of June 30, 2021 and 2020. This change in fair value is shown as a change in net assets with donor restrictions (see Note 18).

11. **Accounts Payable and Accrued Liabilities**

Accounts payable and accrued liabilities consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Accounts payable | $ 274,096 | $ 484,357 |
| Accrued vacation | 756,905 | 658,610 |
| Accrued liabilities and other payables | 4,122,129 | 3,626,058 |
| Deferred revenue | 749,030 | 1,584,133 |
| High school grant payable | - | 500,000 |
| Pension payables | 274,972 | 888,739 |
| Total accounts payable and accrued liabilities | $ 6,177,132 | $ 7,741,897 |

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 23 of 78

12. **Assets Held for Schools and Institutions**

Assets held for schools and institutions consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Deposit and loan fund: |  |  |
| Cash and cash equivalents | $ 58,943,249 | $ 48,957,083 |
| Receivables from schools and institutions | - | 768,983 |
|  | 58,943,249 | 49,726,066 |
| Special collections | 312,365 | 153,672 |
| Benedict XVI Institute | 10,000 | 10,000 |
| Society for the Propagation of the Faith funds | 692,890 | 688,432 |
| Other | 3,331 | 4,531 |
| Total assets held for schools and institutions | $ 59,961,835 | $ 50,582,701 |

13. **Borrowing from CASC**

*Line of Credit - Capital Assets Support Corporation*

The Chancery received a line of credit ("LOC") from CASC for a term of three years maturing in April 2023. The LOC is for $1,000,000, with no interest. The purpose of the LOC is to provide additional loans up to $80,000 to individual parishes. As of June 30, 2021 and 2020 $80,000 and $0, respectively, have been loaned to parishes (see Note 7).

14. **Note Payable - Paycheck Protection Program**

In April 2020, the Chancery received loan proceeds in the amount of $1,876,500 under the Paycheck Protection Program ("PPP"). The PPP, established as part of the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), provides for loans to qualifying entities for amounts up to 2.5 times of the average monthly payroll expenses of the qualifying business. The Chancery has accounted for the PPP loan as debt. The loan and accrued interest are eligible for forgiveness after 24 weeks as long as the borrower uses the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities, and maintains its payroll levels. The Chancery received full loan forgiveness on April 22, 2021 by the Small Business Administration for the loan amount of $1,876,500 and interest of $18,611. The gain from forgiveness of PPP loan was recorded for the year ended June 30, 2021.

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 24 of 78

### 15. Net Assets Without Donor Restriction - Designated

Net assets without donor restriction that are designated consisted of the following as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Insurance and benefits | $ 60,751,484 | $ 51,968,861 |
| Other designated | 29,226,135 | 22,044,268 |
| Priests' Retirement/SERP | 10,908,270 | 11,638,375 |
| Deposit & Loan - Institutional | 1,059,228 | 1,127,787 |
| Priests' Surcharge Fund | 834,762 | 814,211 |
| Department of Catholic Schools | 179,096 | 55,446 |
| Priests' education | 615,555 | 499,510 |
| Total designated net assets | $ 103,574,530 | $ 88,148,458 |

### 16. Net Assets With Donor Restrictions

Net assets with donor restrictions were restricted for the following purposes as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Subject to expenditure for specified purpose: |  |  |
| Archdiocesan Annual Appeal | $ 6,533,661 | $6,686,586 |
| Education assistance, tuition, scholarships, and grants | 6,151,012 | 6,312,905 |
| Social, ethnic, and cultural | 896,806 | 913,769 |
| Religious personnel education and development | 297,207 | 381,581 |
| Pastoral programs | 384,766 | 393,289 |
| Building improvements | 46,891 | 52,592 |
|  | 14,310,343 | 14,740,722 |
| Endowments: |  |  |
| Subject to the Chancery's endowment spending policy and appropriation: |  |  |
| Restricted by donors for: |  |  |
| Education assistance and tuition | 34,622,928 | 27,262,143 |
| Not subject to the Chancery's endowment spending policy or appropriation: |  |  |
| Social, ethnic and cultural services | 328,777 | 274,476 |
| Religious personnel education and development | 1,367,401 | 1,118,911 |
| Building improvements | 552,669 | 423,471 |
| Mass stipends | 1,000 | 1,000 |
|  | 36,872,775 | 29,080,001 |
|  | $ 51,183,118 | $ 43,820,723 |

*Continued*

17. **Net Assets Released from Restrictions**

Net assets were released from donor restrictions for the following purposes during the years ended June 30:

|  | 2021 | 2020 |
|---|---|---|
| Archdiocesan Annual Appeal | $ 6,091,482 | $ 6,941,322 |
| Education assistance, tuition, scholarships, and grants | 1,390,266 | 1,287,945 |
| Social, ethnic, and cultural services | 134,760 | 598,668 |
| Religious personnel education and development | 235,507 | 79,180 |
| Pastoral programs | 21,123 | 13,770 |
| Priests' retirement | 518,727 | 499,510 |
| Building improvements | 6,660 | 38,107 |
| Total net assets released from restrictions | $ 8,398,525 | $ 9,458,502 |

18. **Donor Restricted Endowments**

*Endowment Investment and Distribution Policy*

Under Finance Council guidelines, annual distribution for scholarships cannot exceed 4% of a three-year rolling average balance of the endowment or estimated interest and dividends if the fair value of the endowment is less than the donations (underwater). Currently, there is not a spending policy regarding religious education, building improvements, and mass stipends. For the years ended June 30, 2021 and 2020, there were no underwater endowments. To achieve its distribution policy, endowment assets are invested in a balanced portfolio comprised principally of equity securities, debt securities, mutual funds, private real estate and cash designed to achieve a long-term investment objective of moderate growth and income return with prudent risk constraints.

18. **Donor Restricted Endowments**

Changes in endowment net assets were as follows for the years ended June 30:

| | 2021 | 2020 |
|---|---|---|
| | With Donor Restrictions | With Donor Restrictions |
| **Education assistance and tuition** | | |
| Endowment net assets, beginning of year | $ 27,262,143 | $ 28,033,751 |
| Contributions | - | 74,698 |
| Investment income | 8,230,500 | 115,304 |
| Amounts appropriated for expenditure | (869,715) | (961,610) |
| Endowment net assets, end of year | $ 34,622,928 | $ 27,262,143 |
| **Religious personnel education and development** | | |
| Endowment net assets, beginning of year | $ 1,118,911 | $ 1,130,422 |
| Investment income | 105,071 | 1,236 |
| Change in beneficial interest in perpetual trust | 143,419 | (12,747) |
| Endowment net assets, end of year | $ 1,367,401 | $ 1,118,911 |
| **Social, ethnic and cultural services** | | |
| Endowment net assets, beginning of year | $ 274,476 | $ 280,609 |
| Change in beneficial interest in perpetual trust | 54,301 | (6,133) |
| Endowment net assets, end of year | $ 328,777 | $ 274,476 |
| **Building improvements** | | |
| Endowment net assets, beginning of year | $ 423,471 | $ 414,176 |
| Contributions | - | 17,490 |
| Investment income (loss) | 130,158 | (1,330) |
| Amounts appropriated for expenditure | (960) | (6,865) |
| Endowment net assets, end of year | $ 552,669 | $ 423,471 |
| **Mass stipends** | | |
| Endowment net assets, beginning of year | $ 1,000 | $ 1,000 |
| Endowment net assets, end of year | $ 1,000 | $ 1,000 |
| **Total endowment net assets** | | |
| Endowment net assets, beginning of year | $ 29,080,001 | $ 29,859,958 |
| Contributions | - | 92,188 |
| Investment income | 8,465,729 | 115,210 |
| Change in beneficial interest in perpetual trust | 197,720 | (18,880) |
| Amounts appropriated for expenditure | (870,675) | (968,475) |
| Endowment net assets, end of year | $ 36,872,775 | $ 29,080,001 |

Case: 23-30564    Doc# 610-2    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 27 of 78

18. **Donor Restricted Endowments**, continued

*Endowment Investment and Distribution Policy*, continued

Endowment net asset composition was as follows as of June 30:

|  | 2021 | 2020 |
|---|---|---|
| Donor-restricted endowment funds: | | |
| Original donor-restricted gift amount and amounts required to be maintained in perpetuity by donor | $ 19,048,810 | $ 18,851,090 |
| Accumulated investment gains | 17,823,965 | 10,228,911 |
| | $ 36,872,775 | $ 29,080,001 |

19. **Pension Plans - Priests**

*Qualified Pension Trust*

Archdiocesan priests are covered by a defined benefit pension plan (which operates as a multiple employer plan), the benefits of which were modified effective July 1, 2002. A qualified pension trust ("pension trust") was established to hold the pension plan assets.

This plan is not subject to the Employee Retirement Income Security Act of 1974 ("ERISA") funding requirements.

The following table sets forth further information about the plan as of and for the plan years ended July 1 (the latest valuation dates):

|  | 2021 | 2020 |
|---|---|---|
| Funding status: | | |
| Present value of accrued liability | $ (26,466,000) | $ (26,052,000) |
| Market value of assets | 35,392,000 | 26,220,000 |
| | $ 8,926,000 | $ 168,000 |
| Contributions from Archdiocese | $ 2,500,000 | $ 1,600,000 |
| Benefit payments to participants | $ 1,616,269 | $ 1,661,253 |

*Supplemental Defined Benefit Plan*

Effective July 1, 2002, the Corporation Sole established a supplemental defined benefit priest retirement plan (which operates as a multiemployer non-qualified plan). This plan is not subject to the ERISA funding requirements.

19. **Pension Plans - Priests**, continued

*Supplemental Defined Benefit Plan*, continued

The following table sets forth further information about the plan as of and for the plan years ended July 1 (the latest valuation dates):

|  | | 2021 | | 2020 |
|---|---|---|---|---|
| Funding status: | | | | |
| Present value of accrued liability | $ | (6,782,000) | $ | (6,384,000) |
| Market value of assets | | 10,914,000 | | 11,638,000 |
| | $ | 4,132,000 | $ | 5,254,000 |
| Contributions from Archdiocese | $ | 335,832 | $ | 397,437 |
| Benefit payments to participants | $ | 311,654 | $ | 359,050 |

20. **Pension Plan - Lay Employees**

All full-time, non-priest employees of the Archdiocesan entities, such as the Chancery, parishes, elementary schools, St. Patrick's Seminary, and Cemeteries are enrolled in the Archdiocese of San Francisco Parochial Pension Plan (the "Plan"), which is a cash balance type plan (which operates as a multiemployer plan). The Plan is noncontributory for employees. Employer contributions are 7% of each participant's annual earnings, and 5% interest is credited to beginning-of-year account balances. This Plan is not subject to the ERISA funding requirements.

The following table sets forth further information about the Plan as of and for the plan years ended December 31 (the latest valuation dates):

|  | | 2021 | | 2020 |
|---|---|---|---|---|
| Funding status: | | | | |
| Present value of all accrued liability | $ | (132,850,000) | $ | (129,724,000) |
| Market value of assets | | 145,190,000 | | 131,533,000 |
| | $ | 12,340,000 | $ | 1,809,000 |
| Contributions from the Archdiocesan entities | $ | 7,660,337 | $ | 7,293,505 |
| Benefit payments to participants | $ | 9,821,768 | $ | 9,010,302 |

Pension cost recognized by the Chancery was $611,619 and $680,252 for the years ended June 30, 2021 and 2020, respectively.

Case: 23-30564     Doc# 610-2     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 29 of 78

### 21. Fair Value Measurements

The following table presents the Chancery's financial assets and liabilities measured at fair value on a recurring basis as of June 30, 2021:

| | 2021 | Quoted Prices in Active Markets of Identical Assets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | NAV |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash equivalents: | | | | | |
| Money market funds | $ 126,138,357 | $ 126,138,357 | $ - | $ - | $ - |
| Certificates of deposit | 160,000 | 160,000 | - | - | - |
| Total cash equivalents | $ 126,298,357 | $ 126,298,357 | $ - | $ - | $ - |
| Beneficial interest in perpetual trust | $ 1,203,213 | $ - | $ - | 1,203,213 | $ - |
| **Investments:** | | | | | |
| Cash equivalents: | | | | | |
| Money market funds | $ 2,584,387 | $ 2,584,387 | $ - | $ - | $ - |
| Total cash equivalents | 2,584,387 | 2,584,387 | | - | - |
| Corporate stocks: | | | | | |
| Materials | 2,514,576 | 2,514,576 | - | - | - |
| Telecommunication services | 7,194,718 | 7,194,718 | - | - | - |
| Consumer discretionary | 9,594,480 | 9,594,480 | - | - | - |
| Consumer staples | 7,942,249 | 7,942,249 | - | - | - |
| Energy | 1,176,698 | 1,176,698 | - | - | - |
| Financial | 11,534,350 | 11,534,350 | - | - | - |
| Health care | 2,918,819 | 2,918,819 | - | - | - |
| Industrial | 8,403,179 | 8,403,179 | - | - | - |
| Technology | 13,973,951 | 13,973,951 | - | - | - |
| Utilities | 736,106 | 736,106 | - | - | - |
| Real estate | 1,691,576 | 1,691,576 | - | - | - |
| Other | 4,387,342 | 4,387,342 | - | - | - |
| Total corporate stocks | 72,068,044 | 72,068,044 | - | - | - |
| Foreign and municipal bonds | 11,249,731 | - | 11,249,731 | - | - |
| U.S. bonds and notes | 17,614,879 | 17,614,879 | - | - | - |
| U.S. government securities | 1,927,519 | - | 1,927,519 | - | - |
| Mutual funds: | | | | | |
| Foreign large blend | 10,980,709 | 10,980,709 | - | - | - |
| World allocation | 19,012,296 | 19,012,296 | - | - | - |
| Moderate allocation | 16,989,737 | 16,989,737 | - | - | - |
| Global emerging markets | 4,430,150 | 4,430,150 | - | - | - |
| Small value | 922,510 | 922,510 | - | - | - |
| Total mutual funds | 52,335,402 | 52,335,402 | - | - | - |
| Alternative investments: | | | | | |
| Private real estate funds | 9,936,547 | - | - | - | 9,936,547 |
| Emerging Markets Fund | 4,129,087 | - | - | - | 4,129,087 |
| Total alternative investments | 14,065,634 | - | - | - | 14,065,634 |
| Total investments | $ 171,845,596 | $ 144,602,712 | $ 13,177,250 | $ - | $ 14,065,634 |

**21.  Fair Value Measurements**, continued

The following table presents the Chancery's financial assets and liabilities measured at fair value on a recurring basis as of June 30, 2020:

| | 2020 | Quoted Prices in Active Markets of Identical Assets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | NAV |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash equivalents: | | | | | |
| Money market funds | $ 106,766,664 | $ 106,766,664 | $ - | $ - | $ - |
| Certificates of deposit | 160,000 | 160,000 | - | - | - |
| Total cash equivalents | $ 106,926,664 | $ 106,926,664 | $ - | $ - | $ - |
| Beneficial interest in perpetual trust | $ 1,005,493 | $ - | $ - | $ 1,005,493 | $ - |
| **Investments:** | | | | | |
| Cash equivalents: | | | | | |
| Money market funds | $ 5,234,605 | $ 5,234,605 | $ - | $ - | $ - |
| Total cash equivalents | 5,234,605 | 5,234,605 | - | - | - |
| Corporate stocks: | | | | | |
| Materials | 1,229,417 | 1,229,417 | - | - | - |
| Telecommunication services | 6,070,750 | 6,070,750 | - | - | - |
| Consumer discretionary | 8,204,094 | 8,204,094 | - | - | - |
| Consumer staples | 8,109,203 | 8,109,203 | - | - | - |
| Energy | 926,641 | 926,641 | - | - | - |
| Financial | 8,726,650 | 8,726,650 | - | - | - |
| Health care | 3,375,927 | 3,375,927 | - | - | - |
| Industrial | 6,983,622 | 6,983,622 | - | - | - |
| Technology | 14,423,597 | 14,423,597 | - | - | - |
| Utilities | 552,462 | 552,462 | - | - | - |
| Real estate | 747,284 | 747,284 | - | - | - |
| Total corporate stocks | 59,349,647 | 59,349,647 | - | - | - |
| Foreign and municipal bonds | 11,944,671 | - | 11,944,671 | - | - |
| U.S. bonds and notes | 5,689,665 | 5,689,665 | - | - | - |
| U.S. government securities | 3,672,066 | - | 3,672,066 | - | - |
| Mutual funds: | | | | | |
| Foreign large blend | 18,321,846 | 18,321,846 | - | - | - |
| World allocation | 6,156,593 | 6,156,593 | - | - | - |
| Moderate allocation | 14,082,729 | 14,082,729 | - | - | - |
| Emerging markets multi-strategy | 3,703,550 | 3,703,550 | - | - | - |
| Small value | 246,087 | 246,087 | - | - | - |
| Total mutual funds | 42,510,805 | 42,510,805 | - | - | - |
| Alternative investments: | | | | | |
| Private real estate funds | 9,402,053 | - | - | - | 9,402,053 |
| Emerging Markets Fund | 3,604,339 | - | - | - | 3,604,339 |
| Total alternative investments | 13,006,392 | - | - | - | 13,006,392 |
| Total investments | $ 141,407,851 | $ 112,784,722 | $ 15,616,737 | $ - | $ 13,006,392 |

21.  **Fair Value Measurements**, continued

The Chancery uses the NAV to determine the fair value of all the underlying investments which a) do not have readily determinable fair values and b) prepare their financial statements consistent with the measurement principles of an investment company or have attributes of an investment company. The Chancery was invested in three private real estate funds valued at $9,936,547 and $9,402,053 as of June 30, 2021 and 2020, respectively. The funds' strategy is an income-oriented core strategy focused on institutional quality assets with an emphasis on long-term stabilized cash flow and market appreciation potential. Two of the three funds have claw back provisions of various percentages and the third provides for redemptions quarterly with a 10 day notice.

The Chancery was invested in one emerging market fund valued at $4,129,087 and $3,604,339 as of June 30, 2021 and 2020, respectively. The fund's strategy is to seek capital appreciation through investment in common stock of growth companies domiciles, headquartered, or with primary business activities or principal trading markets in developing countries. The fund has a lockout period and no restrictions on redemptions.

The beneficial interest in the perpetual trust is classified as Level 3 within the fair value hierarchy. Reconciliations were as follows for the years ended June 30:

|  | 2021 | 2020 |
|---|---|---|
| Beginning balance, at fair value | $ 1,005,493 | $ 1,024,373 |
| Change in fair value | 197,720 | (18,880) |
| Ending balance, at fair value | $ 1,203,213 | $ 1,005,493 |

As a practical expedient, the Chancery uses the fair value of trust assets to value its beneficial interest in the perpetual trust.

22.  **Risk Retention Group**

Prior to July 1, 2015 and again starting on July 1, 2017, the Corporation Sole received its liability coverages through its participation with other dioceses in state-regulated risk retention groups. Effective July 1, 2015, general insurance coverages were procured from insurance underwriters that are separate from the state regulated risk retention groups.

Generally, liability coverages previously provided through the state-regulated risk retention groups will continue to cover claims made on or before July 1, 2015 and after July 1, 2017.

23.  **Commitments and Contingencies**

Effective January 1, 2020, California AB 218 revised the statute of limitations applicable to claims arising from sexual abuse of a minor, including a three-year window in which the claims of individuals previously barred from filing such claims are revived. Among other things, California AB 218 allows treble damages against a defendant where the defendant's alleged "cover-up" has caused the abuse. The Archdiocese is challenging the constitutionality of the addition of treble damages as a penalty.

Case: 23-30564   Doc# 610-2   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 32 of 78

23. **Commitments and Contingencies**, continued

In addition, the Corporation Sole is a party to various actions in the ordinary course of business. In the opinion of management, the outcome of these matters, individually or in the aggregate, would not have a material effect on the Chancery's financial statements.

*COVID-19*

On January 30, 2020, the World Health Organization ("WHO") announced a global health emergency because of a new strain of coronavirus (the "COVID-19 outbreak") and the risks to the international community as the virus spread globally beyond its point of origin. In March 2020, the WHO classified the COVID-19 outbreak as a pandemic. The full impact of the COVID-19 outbreak continues to evolve as of the date of this report. As such, it is uncertain as to the full magnitude of the effect that the pandemic will have on the Chancery's financial condition, liquidity, and future results of operations. Management is actively monitoring the impact on its financial statements, liquidity, operations, and workforce.

24. **Future Minimum Lease Revenue**

The Chancery owns various properties it leases for income with one term ending June 2077. During the years ended June 30, 2021 and 2020, the Chancery recorded $1,946,927 and $2,065,761, respectively, in rental income, primarily from leases on its rental properties, including prepaid rent recognized of $101,739 for each of the years ended June 30, 2021 and 2020. The Chancery has received a prepayment for one of these leases, which is shown as deferred lease revenue on the statements of financial position and is included in the table below. The prepayment is amortized over 56 years on a straight-line basis.

As of June 30, 2021, future minimum lease revenue amounts from long-term non-cancelable operating leases were as follows:

| Years ending June 30: | |
|---|---:|
| 2022 | $ 1,898,742 |
| 2023 | 1,724,732 |
| 2024 | 1,038,377 |
| 2025 | 1,057,110 |
| 2026 | 1,076,218 |
| Thereafter | 8,929,183 |
| Total | $ 15,724,362 |

25. **Subsequent Events**

The Chancery evaluated subsequent events for recognition and disclosure through December 17, 2021, the date which these financial statements were available to be issued. Management has concluded that no additional material subsequent events have occurred since June 30, 2021, that require recognition or disclosure on the financial statements.

# EXHIBIT 4



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Apr-16-2010 3:09 pm

Case Number: CGC-10-498795

Filing Date: Apr-16-2010 2:42

Juke Box: 001   Image: 02822981

COMPLAINT

)LIC ARCHBISHOP OF SAN FRANCISCO, A et al VS. CITY AND COUNTY OF SAN FRANC

001C02822981

**Instructions:**
Please place this sheet on top of the document to be scanned.

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* a municipal corporation AER,
City & County of San Francisco; City & County of San Francisco Real Property
Transfer Tax Review Board; and Phil Ting, Assessor-Recorder of City and
County of San Francisco

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The Roman Catholic Archbishop of San Francisco, A Corporation Sole; The
Archdiocese of San Francisco Parish & School Juridic Persons Real Property
Support Corporation, a California religious corporation AER.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
County of San Francisco
400 McAllister Street
San Francisco, CA 94012

**CASE NUMBER:**
*(Número del Caso):*
**CGC-10-498795**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Pillsbury Winthrop Shaw Pittman LLP (415) 983 1000
Jeffrey M. Vesely #67895; Kerne H. O. Matsubara #178895; Richard E. Nielsen #72104
50 Fremont Street, P.O. Box 7880, San Francisco, CA 94120-7880

DATE: **APR 1 6 2010**
*(Fecha)*

CLERK OF THE COURT
Clerk, by **P. NATT** *(Secretario)* _____ Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:
   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☒ CCP 416.90 (authorized person)
   ☐ other *(specify):* CCP 416.50 (public entity)
4. ☐ by personal delivery on *(date)*:

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Pillsbury Winthrop Shaw Pittman<br>Jeffrey M. Vesely #67895; Kerne H. O. Matsubara #178895;<br>Richard E. Nielsen #72104<br>50 Fremont St., P.O. Box 7880, San Francisco, CA 94120-7880<br>TELEPHONE NO.: (415) 983-1000     FAX NO.: (415) 983-1200 | **F I L E D**<br>Superior Court of California<br>County of San Francisco<br><br>APR 1 6 2010<br><br>CLERK OF THE COURT<br>BY: *Param Natt*<br>Deputy Clerk |

ATTORNEY FOR *(Name):* Plaintiffs and Petitioners

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME: The Roman Catholic Archbishop of San Francisco, A Corporation Sole, et al., v. City and County of San Francisco, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CGC-10-498795<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☒ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties     d. ☐ Large number of witnesses
   b. ☒ Extensive motion practice raising difficult or novel     e. ☐ Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve          in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence     f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☐ monetary b. ☒ nonmonetary; declaratory or injunctive relief     c. ☐ punitive
4. Number of causes of action *(specify):* 4
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: April 16, 2010

Jeffrey M. Vesely
(TYPE OR PRINT NAME)                    ► _____
                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

SUMMONS ISSUED
**F I L E D**
San Francisco County Superior Court

APR 1 6 2010

CLERK OF THE COURT

BY: ~~Deputy Clerk~~
**P. NATT**

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   JEFFREY M. VESELY #67895
2  KERNE H. O. MATSUBARA #178895
   RICHARD E. NIELSEN #72104
3  50 Fremont Street
   Post Office Box 7880
4  San Francisco, CA 94120-7880
   Telephone: (415) 983-1000
5  Facsimile: (415) 983-1200

6  Attorneys for Plaintiffs and Petitioners
   THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION
7  SOLE, and THE ARCHDIOCESE OF SAN FRANCISCO PARISH AND SCHOOL
   JURIDIC PERSONS REAL PROPERTY SUPPORT CORPORATION

8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              CITY AND COUNTY OF SAN FRANCISCO

11               UNLIMITED CIVIL JURISDICTION

12  |  |  |
13  THE ROMAN CATHOLIC ARCHBISHOP )  No. **CGC · 10 · 498795**
    OF SAN FRANCISCO, A CORPORATION )
13  SOLE, a California corporation sole; THE )  VERIFIED COMPLAINT FOR
14  ARCHDIOCESE OF SAN FRANCISCO )  DECLARATORY RELIEF; VERIFIED
    PARISH AND SCHOOL JURIDIC )  PETITION FOR WRITS OF
15  PERSONS REAL PROPERTY SUPPORT )  MANDATE; AND REQUEST FOR
    CORPORATION, a California religious )  STAY ORDER
16  corporation, )
                                           )  (Cal. Code Civil Proc. §§ 1060, 1085,
17         Plaintiffs and Petitioners, )  1094.5)
                                           )
18      vs. )
                                           )
19  CITY AND COUNTY OF SAN )  CASE MANAGEMENT CONFERENCE SET
    FRANCISCO, a municipal corporation, )
20                                         )  SEP 1 7 2010   9:00 AM
             Defendant, )
21                                         )  DEPARTMENT 212
    CITY AND COUNTY OF SAN )
22  FRANCISCO REAL PROPERTY )
    TRANSFER TAX REVIEW BOARD, )
23                                         )
          Defendant and Respondent, and )
24                                         )
    PHIL TING, ASSESSOR - RECORDER OF )
25  CITY AND COUNTY OF SAN )
    FRANCISCO, )
26                                         )
    Defendant, Respondent and Real Party in )
27  Interest. )
                                           )

28

702107422
VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1    Petitioners and Plaintiffs, THE ROMAN CATHOLIC ARCHBISHOP OF SAN

2    FRANCISCO, A CORPORATION SOLE, a California corporation sole, and THE

3    ARCHDIOCESE OF SAN FRANCISCO PARISH AND SCHOOL JURIDIC PERSONS

4    REAL PROPERTY SUPPORT CORPORATION, a California religious corporation,

5    complain of Defendant and Respondent THE REAL PROPERTY TRANSFER TAX

6    REVIEW BOARD OF THE CITY AND COUNTY OF SAN FRANCISCO; the CITY

7    AND COUNTY OF SAN FRANCISCO, a California municipal corporation and PHIL

8    TING, ASSESSOR – RECORDER OF THE CITY AND COUNTY OF SAN

9    FRANCISCO as follows:

10                                    **PARTIES**

11        1.    At all relevant times mentioned herein, Petitioner and Plaintiff,  The Roman

12   Catholic Archbishop of San Francisco, A Corporation Sole ("Corporation Sole"),  has been

13   and now is a nonprofit religious corporation sole, duly incorporated, validly existing and in

14   good standing under the laws of the State of California with all requisite corporate power

15   and authority to own and operate its properties and to carry on its religious non-profit

16   activities as now conducted.  The Corporation Sole is a plaintiff and petitioner on behalf of

17   itself and as the distributee of, and successor-in-interest to, The Roman Catholic Welfare

18   Corporation of San Francisco, a now dissolved California nonprofit religious corporation.

19        2.    At all relevant times mentioned herein, Petitioner and Plaintiff, The

20   Archdiocese of San Francisco Parish and School Juridic Persons Real Property Support

21   Corporation ("Support Corporation") has been and now is a nonprofit religious corporation,

22   duly incorporated, validly existing and in good standing under the laws of the State of

23   California with all requisite corporate power and authority to own and operate its properties

24   and to carry on its religious non-profit activities as now conducted.

25        3.    At all relevant times mentioned herein Defendant, Respondent and Real

26   Party In Interest Phil Ting, current Assessor - Recorder of the City and County of San

27   Francisco ("Recorder"), was in that capacity duly charged by the San Francisco Real

28   Property Transfer Tax Ordinance ("SF Transfer Tax Ordinance") with the responsibility of

1    collecting and administering real property transfer taxes and that the Recorder is, in that

2    capacity, a real party in interest in this matter.

3       4.     At all relevant times mentioned herein, Defendant City and County of San

4    Francisco ("City") was a charter city of the State of California, having adopted a charter as

5    authorized by the Constitution of the State of California, Article XI.

6       5.     At all relevant times mentioned herein, Defendant and Respondent City and

7    County of San Francisco Real Property Transfer Tax Review Board ("Review Board") has

8    been and now is the administrative board duly organized and governed under the Municipal

9    Code and duly charged pursuant therewith to hearing appeals concerning the City's real

10    property transfer tax.

11                        **JURISDICTION AND VENUE**

12       6.     This Court has jurisdiction under Cal. Code Civ. Proc. ("CCP") § 1060 to

13    award declaratory relief in favor of the Corporation Sole and Support Corporation. This

14    Court also has jurisdiction under CCP § 1085 and/or § 1094.5 to issue a writ of mandate

15    and under its general equity powers to issue a stay order.

16       7.     Venue is proper in this County pursuant to CCP § 394 because Plaintiffs,

17    Defendants and Respondents are situated in this County and the events giving rise to claims

18    arose in this County.

19                        **FACTUAL BACKGROUND**

20           _The Archdiocese of San Francisco_

21       8.     The Roman Catholic Archdiocese of San Francisco (the "Archdiocese"),

22    comprised of 450,000 Catholics, including 150,000 in San Francisco, is the ecclesiastical

23    name given to the local manifestation of the Roman Catholic Church (or "Church") and is

24    also a common phrase used in civil-law parlance to describe the specific family of

25    corporations with operations in San Francisco, Marin, and San Mateo Counties under the

26    auspices of the Roman Catholic Archbishop of San Francisco (the "Archbishop").

27

28

702107422

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

9.     The Church is a hierarchical church, and the Archbishop is required under the laws, rules, regulations, codes, canons and discipline of the Church ("Church law") to govern the Archdiocese in accordance with the norms of Church law.

10.     A core function of the Archdiocese is to operate the more than 90 parishes and 60 Archdiocesan schools (kindergarten through grade 12) within the Archdiocese. According to Church law, this core function is under the direct canonical oversight of the Archbishop, represented in civil law as the Corporation Sole.

11.     The Church has to operate within a civil law society and civil law, with respect to contracts, and civil laws in general, should be observed by the Church. The Church may set up civil law corporations to assist in its operations within a civil law society, as recognized by the courts.

12.     Pursuant to Cal. Corp. Code § 10002, a corporation sole exists as the corporate identity of the incumbent "bishop, chief priest, presiding elder, or other presiding officer of any religious denomination . . . for the purpose of administering and managing the affairs, property and temporalities thereof." The Corporation Sole was incorporated in 1854. Pursuant to the rules, regulations and discipline of the Church, the Corporation Sole was formed to administer the temporalities and manage the property of the Church. The incorporating articles of the Corporation Sole provided that "all property held by me as such corporation, is held by me in trust for the sole use, purpose and behoof of the said Roman Catholic Church in the said Diocese of San Francisco."

13.     As a corporation sole, the Corporation Sole does not have a board of directors.

14.     The Archbishop as the Corporation Sole operates the parishes and schools within the Archdiocese.

15.     The current Archdiocesan family of corporations totals five corporations, including the Corporation Sole and the Support Corporation, and prior to its dissolution, a sixth corporation, The Roman Catholic Welfare Corporation of San Francisco, a California religious corporation (the "Welfare Corporation"), all of which are subject to Roman

1    Catholic Church law under the direct canonical oversight of the Archbishop. The

2    Archdiocesan family of corporations is connected as "spokes in a wheel," the "hub" of

3    which is the Archbishop in his ecclesiastical office.

4        16.     The Corporation Sole, the Welfare Corporation (prior to its dissolution) and

5    the Support Corporation are all regulated, pursuant to their respective Articles of

6    Incorporation ("Articles") and/or bylaws ("Bylaws"), by Church law. The actions of the

7    above corporations would be *ultra vires* if conducted in a manner inconsistent with Church

8    law.

9        17.     The Corporation Sole, the Welfare Corporation (prior to its dissolution) and

10    the Support Corporation are all organizations that are exempt from federal income tax

11    under Internal Revenue Code ("IRC") § 501(c)(3).

12        18.     The 232 properties at issue in this case are the parish properties ("Parish

13    Properties") and Archdiocesan school properties ("School Properties," collectively, the

14    "Parish and School Properties") located within the Archdiocese and, specifically, in the

15    City and County of San Francisco that are subject to the direct canonical supervision of the

16    Archbishop. The School Properties are listed on the deed dated April 25, 2008 from the

17    Welfare Corporation to the Corporation Sole (the "First Deed"). The Parish and School

18    Properties are listed on the deed dated April 25, 2008 from the Corporation Sole to the

19    Support Corporation (the "Second Deed").

20        19.     The 232 Parish and School Properties are used directly by the parishes and

21    schools, or portions are leased to other non-profit organizations, with the exception of 17 or

22    18 properties, consisting of 12 leased residential properties, one leased to an elementary

23    school and four or five leased to small mom-and-pop shops, which were given to the

24    Church in individual's wills. Those 17 or 18 properties, and any rental income therefrom,

25    belong to the Church for the benefit of its parishes and schools.

26        20.     A juridic person is a personhood under Church canon law ("Canon Law")

27    that has rights and obligations that are recognized by the Church. A listing of the school

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1 and parish juridic persons in San Francisco is contained in the Official Catholic Directory

2 (the Kenedy Directory).

3     21.     A parish and school juridic person includes both the parish and its related

4 school, if any. The property of a parish and its related school belongs to the same juridic

5 person under Church law. For example, the St. Stephen's parish property and the St.

6 Stephen's school property belong to the St. Stephen's parish and school juridic person

7 under Church law.

8     22.     Canon Law provides that parish and school properties are owned by the

9 Roman Catholic Church and specifically the parish and school juridic persons that were

10 established and erected under Canon Law.

11     23.     Under Canon Law, the approval of the Archbishop, made in accordance with

12 the norm of Church law, is required for the valid alienation of property belonging to a

13 parish and school juridic person.

14     24.     The Welfare Corporation was incorporated on February 18, 1953, and civil

15 law (as distinguished from Canon Law) title to the School Properties was placed in the

16 Welfare Corporation by the Archbishop, as Corporation Sole (without imposition of a

17 transfer tax). Civil law title to the School Properties was thereafter held by the Welfare

18 Corporation, while civil law title to the Parish Properties remained held by the Corporation

19 Sole.

20     25.     Pursuant to its Bylaws, the Welfare Corporation was a "subordinate

21 corporation" of the Corporation Sole within the meaning of the California Nonprofit

22 Religious Corporation Law. The Welfare Corporation incorporated Church law as its

23 Bylaws for the regulation and management of the corporation's affairs. Pursuant to its

24 Articles and Bylaws, the Welfare Corporation was permitted to engage in religious

25 activities authorized by the laws, rules, regulations and discipline of the Church. The

26 Welfare Corporation was not permitted under its Articles and Bylaws to engage in any

27 activities that were not in furtherance of the corporation's religious purposes.

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1      26.     The purpose of the Welfare Corporation was to conduct religious activities

2    of the Church within the Archdiocese.  Specifically, the Welfare Corporation was formed to

3    hold and operate church-related facilities of the Church within the Archdiocese, including,

4    but not limited to, Catholic parochial and high schools, for religious educational and other

5    religious purposes.

6              *Corporate Restructuring of the Archdiocese*

7      27.     Since the establishment of the Corporation Sole over a century and a half

8    ago, the Archdiocese has created and dissolved corporations (without the imposition of

9    transfer tax) to restructure itself in accordance with its religious purposes and goals.

10     28.     In late 2007, the Archbishop decided that the corporate organizational

11   structure of the Archdiocese needed to be simplified and better reflect the unique status of

12   parishes and schools as unified entities (juridic persons) under Church law.  In addition,

13   there was a public misperception that the Archbishop had the unfettered discretion to use

14   the parish and school juridic persons' property in any way he deemed fit.  Under both

15   Church law and civil law, the Archbishop did not, and does not, have such discretion.

16     29.     The restructuring was intended to make the civil organizational structure

17   more clearly reflect Church law and correct the public misperception described in

18   paragraph 28 above.  It was simply another corporate change or evolution in the manner in

19   which the Archbishop chose to hold civil law title to the properties that were under his

20   canonical and civil oversight.

21     30.     At the time of the restructuring all outside claims made concerning the

22   operations of the schools and parishes by the Corporation Sole had been concluded and the

23   restructuring did not have any effect on those former claims.

24     31.     The Archbishop set forth a plan of corporate restructuring and its purpose, as

25   outlined in a letter dated December 4, 2007 to Principals, Presidents, Agency Heads and

26   Chancery Staff.  The corporate restructuring was to be done by entrusting the real property

27   belonging to the parishes and schools under Church law to a single, new corporation, the

28   Support Corporation, which would hold civil law title and administer that property on

702107422
VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

behalf of the Archdiocese under the continued direct canonical oversight of the Archbishop. The sole and exclusive purpose of the Support Corporation would be to benefit the parish and school juridic persons operated civilly by the Corporation Sole.

32. Although civil law title to the parish and school properties may change under the corporate restructuring, such properties continue to be owned by the Roman Catholic Church for the benefit of its parishes and schools, and the discretion of the Archbishop and the limitations thereon with respect to those properties also remain the same.

33. To accomplish this corporate restructuring, the Welfare Corporation was dissolved on April 1, 2008, and as required by law (Cal. Corp. Code §§ 9132(a)(2)(i) & (ii)) and its Articles, all of the Welfare Corporation's assets, including the School Properties, were distributed to the Archbishop as Corporation Sole (the "First Transfer").

34. The California Attorney General approved of the distribution of the Welfare Corporation's assets upon dissolution as described in 33 above.

35. As with any corporation, the Welfare Corporation had a balance sheet that reflected its assets and liabilities. The liabilities "assumed" by the Corporation Sole, as distributee, upon the Welfare Corporation's dissolution totaled $33,905,893, which consisted of accounts payable (employee payroll, insurance and incidental costs), deferred revenue (prepaid tuition and fees) and loans payable (internal canonical loans). These liabilities were either internal to the Archdiocese or voluntarily assumed as part of the Corporation Sole's decision to continue operations of the schools, not in exchange or consideration for the distribution of the real property. There were no liabilities owed to outside organizations or individuals.

36. There was no purchase and sale agreement in connection with the distribution of the School Properties by the Welfare Corporation to the Corporation Sole. The Welfare Corporation did not sell, and the Corporation Sole did not pay for, the School Properties which the Welfare Corporation distributed to the Corporation Sole upon dissolution. Such distribution was not conditioned upon the Corporation Sole's assumption of any liabilities.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST FOR STAY ORDER

1    37.    A new corporation, the Support Corporation, was formed on September 10,
2    2007. The Support Corporation was formed as an IRC § 501(c)(3) supporting organization
3    (under IRC § 509(a)(3), which allows one § 501(c)(3) organization to support another
4    § 501(c)(3) organization) of the Corporation Sole, to be supervised or controlled in
5    connection with the Corporation Sole and in accordance with the Canon Law of the Roman
6    Catholic Church.

7    38.    The Archbishop, in his ecclesiastical office, is the sole member of the
8    Support Corporation with key reservation powers. The board of directors of the Support
9    Corporation is comprised of persons serving as members of either the Finance Council or
10   the College of Consultors. The Archbishop appoints the members of the Finance Council
11   and the College of Consultors. The Archbishop has sole discretion to confirm that
12   members of the College of Consultors and the Finance Council satisfy canonical standards
13   necessary for membership on those bodies.

14   39.    The Archbishop appoints the Chancellor of the Diocese, who under Church
15   law is charged with verifying and keeping certain records, acting as a secretary of state of
16   the Archdiocese. With respect to the Support Corporation, the Chancellor of the Diocese is
17   responsible for ensuring that the Support Corporation operates according to the norms of
18   Church law.

19   40.    The sole purpose of the Support Corporation is to support, benefit and carry
20   out the purposes of the Corporation Sole, and specifically to advance the mission of those
21   parish and school juridic persons which are governed by the Archbishop and operated
22   civilly by the Corporation Sole, all in accordance with Church law, which, *inter alia*,
23   respects the special rights to use of property by such juridic persons.

24   41.    Pursuant to the Support Corporation's Articles and Bylaws, all of the
25   activities of the Support Corporation must be conducted in accordance with Church law.

26   42.    The Support Corporation, pursuant to Section 3.1.3 of its Bylaws, would
27   maintain and upgrade the properties and may collect and pay over rents to the Corporation

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1  Sole, but only as it deems prudent and necessary for the support of the Corporation Sole's
2  operation of the parishes and schools.

3      43.    Section 3.1.2 of the Support Corporation's Bylaws states: "As provided in
4  the Articles of Incorporation of This Corporation, This Corporation has been organized and
5  shall be operated to support, benefit, and carry out the purposes of (within the meaning of
6  IRC Section 509(a)(3)(B)(ii)) the Corporation Sole - specifically, for the purpose of
7  advancing the mission of those Parish and School Juridic persons, duly established under
8  the laws of The Church, that are, pursuant to the laws of The Church, governed by the
9  Archbishop, and operated civilly by the Corporation Sole, within the meaning of IRC
10  Section 509(a)(3)."

11      44.    Section 3.1.3 of the Support Corporation's Bylaws states: "This Corporation
12  shall engage solely and exclusively in activities that shall support, or benefit the
13  Corporation Sole, for the purposes stated in This Corporation's Articles of Incorporation,
14  such activities to include, but not be limited to, collecting rents from This Corporation's
15  properties and making payments to or for the use of, or restoring or upgrading the facilities
16  used by, the aforementioned Juridic persons affiliated with the Corporation Sole, all in
17  accordance with the laws of The Church, which, *inter alia*, respects the special rights to use
18  of property by Juridic persons and the concomitant obligation to provide the financial
19  means to maintain and enhance that property."

20      45.    Under the Support Corporation's Bylaws, the alienation of any property by
21  the Support Corporation must be made in accordance with Church law and with the
22  approval of the Archbishop.  In order for the Support Corporation to sell or alienate real
23  property, it also must obtain a written certification from the Chancellor of the Diocese that
24  the requirements of Canon Law and other applicable Church law concerning the alienation
25  of the Church's property have been met.  The directors of the Support Corporation must get
26  permission from the Archbishop and the Chancellor's certification that in fact Church law
27  has been followed by them in attempts to alienate any property.  The Archbishop himself

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1   has to get the advice and consent of the College of Consultors and the Finance Council

2   before property can be alienated.

3       46.    The Corporation Sole proposed to transfer and entrust the Parish and School

4   Properties to the Support Corporation (the "Second Transfer").

5       47.    No purchase and sale agreement was executed with respect to the Second

6   Transfer. The Support Corporation has not paid any money to the Corporation Sole. The

7   Support Corporation's obligation to collect rents and upgrade or restore properties is stated

8   in the Bylaws of the Support Corporation, which were in place long before the First Deed

9   and the Second Deed (the "Deeds") were prepared and signed.

10       *The Deeds*

11       48.    On April 25, 2008, pursuant to the dissolution of the Welfare Corporation,

12   the First Deed was executed by the Welfare Corporation, reflecting the distribution of the

13   School Properties from the Welfare Corporation to the Corporation Sole (the First

14   Transfer).

15       49.    On the same date, the Second Deed was executed by the Corporation Sole

16   with respect to the proposed transfer of the Parish and School Properties from the

17   Corporation Sole to the Support Corporation (the Second Transfer).

18       50.    The Support Corporation did not accept the Second Deed. The Support

19   Corporation, in a letter dated June 16, 2008 from its President, Raymond Marino, indicated

20   to the Corporation Sole that the acceptance of delivery of the Second Deed has always been

21   conditioned on the transfer being free and clear of all costs and charges, including

22   exemption of the transfer from transfer tax. Mr. Marino's letter specified that the Support

23   Corporation would not accept delivery of the Second Deed unless it could be recorded

24   without imposition of a transfer tax.

25       51.    The transfer of the Parish and School Properties from the Corporation Sole

26   to the Support Corporation has not been completed, since the Support Corporation was not

27   willing to accept the properties unless the condition set forth in Mr. Marino's letter was

28   satisfied. Notwithstanding the Recorder's recordation of the Second Deed on

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1　November 30, 2009 discussed below in paragraph 70, Plaintiffs and Petitioners maintain

2　that the Corporation Sole currently holds civil law title to the Parish and School Properties.

3　The Support Corporation has not acted as the owner of the Parish and School Properties

4　located in San Francisco.

5　　　52.　Both the First Deed and the Second Deed reflect that there was no

6　consideration for the respective transfers.

7　　　*Actions of the Recorder*

8　　　53.　In May 2008, a representative of the Corporation Sole went to the

9　Recorder's office to record the Deeds, both of which bore the following notation:

10　　　Transfer Tax:  None
　　　Per Rev & T C § 62(k)
11　　　(No consideration or sale –
　　　transfer of property within
12　　　The Roman Catholic Church only)

13　　　54.　By e-mail dated May 16, 2008, the Recorder's office initially informed the

14　Corporation Sole representative of a tentative opinion (which the Recorder's office

15　confirmed was not yet a final determination), that the Deeds could not be recorded without

16　payment of a transfer tax or additional information or documentation to support an

17　exemption from the tax.

18　　　55.　In July 2008, after the exchange of documentation and numerous discussions

19　with the Recorder's office, the Corporation Sole's representatives were informed that there

20　was a "misunderstanding" created by the reference on the deeds to Revenue and Taxation

21　Code ("RTC") § 62(k).  The Recorder's office indicated that it would not accept RTC

22　§ 62(k) as a valid exemption to the transfer tax and that references to such section should be

23　removed from the Deeds and any transfer tax exemption affidavits.  The Recorder's office,

24　through Deputy Assessor-Recorder Zoon Nguyen, invited resubmission of the Deeds to be

25　recorded that very day without tax, provided the resubmissions were made without mention

26　of RTC § 62(k) and included a completed Transfer Tax Affidavit and a Preliminary Change

27　of Ownership Report ("PCOR") for each parcel.

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF, VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1    56.    When a Corporation Sole representative suggested to the Recorder's office

2    that perhaps it was best to transfer only a single parcel in the second part of the transaction

3    (i.e., from the Corporation Sole to the Support Corporation), he was informed that the

4    Recorder would not want to be faced with the prospect of separately dealing with hundreds

5    of deeds.  In reliance on that statement and the statements by the Recorder's office in

6    paragraph 55 above and on the belief that the Support Corporation's condition for the

7    acceptance of the deed was being met, the First Deed and the Second Deed were presented

8    to the Recorder at the same time.

9    57.    On July 16, 2008, after being invited to bring the Deeds for immediate

10   recording, a representative of the Corporation Sole presented the First Deed, the Second

11   Deed and the completed Transfer Tax Affidavits and PCORs to the Recorder's office for

12   recordation on the condition that no transfer tax would be due.  The transfer tax affidavits

13   which accompanied the respective deeds claimed exemption from the tax for the following

14   reasons, 1) the transfers are being made pursuant to an intra-denominational restructuring

15   whereby a mere change in identity, form or place of organization is effected, 2) the

16   transfers result solely in a change in the method of holding title to realty but no change in

17   beneficial ownership and 3) no consideration has been paid in connection with the transfers.

18   *Determination of Tax Made Prior to Recording*

19   58.    The Recorder's office did not record the Deeds and, by letter dated July 28,

20   2008, presented 14 detailed questions requesting additional documents and information.

21   After the Corporation Sole's representative responded to that request and expressed surprise

22   that the Deeds had not been recorded in accord with the above-referenced understandings,

23   the Recorder's office sent a letter dated August 25, 2008 asking for further information, to

24   which the Corporation Sole's representative promptly responded.

25   59.    The Corporation Sole's representatives met with the Recorder and his staff

26   on November 6, 2008 and December 4, 2008.  At the December 4, 2008 meeting, the

27   Recorder informed the Corporation Sole's representatives of his determination that the

28   above-described transfers were subject to transfer tax.  In response to a request for a written

1  determination, the Recorder indicated that a written determination would not be

2  forthcoming and that his verbal determination should be construed as a determination of tax

3  for purposes of SF Transfer Tax Ordinance § 1115.2. The Recorder did not indicate the

4  amount of transfer tax that was allegedly due on either the First Deed or the Second Deed.

5      60.    SF Transfer Tax Ordinance § 1115.2(b) provides that a determination of tax

6  made prior to recording of a document ("pre-recordation determination of tax") may be

7  appealed if a petition for review is filed with the Review Board within 10 days from the

8  determination of tax.

9      61.    On December 10, 2008, the Corporation Sole timely filed with the Review

10  Board a Petition to Review Transfer Tax Determination pursuant to SF Transfer Tax

11  Ordinance § 1115.2 ("Initial Petition").

12      62.    On June 16, October 6 and October 8, 2009, the Initial Petition came on for

13  hearing before the Review Board.

14      63.    On November 30, 2009, the Review Board orally announced its tentative

15  decision upholding the Recorder's determination and concluding that the Recorder did not

16  err or abuse his discretion in determining that the transfer tax was due on both the First

17  Deed and the Second Deed.

18      64.    On January 26, 2010, the Review Board issued its Findings of Fact and

19  Conclusions of Law, which included its written decision upholding the Recorder's

20  determination (the "Board's Ruling").

21      65.    The Board's Ruling did not indicate the amount of transfer tax that was due

22  on either the First Deed or the Second Deed.

23      66.    The Review Board mailed a copy of the Board's Ruling to the Corporation

24  Sole on January 26, 2010.

25      67.    Pursuant to SF Transfer Tax Ordinance § 1115.2, the Board's Ruling may be

26  set aside by court action commenced within one year from the date that notice of the

27  Board's Ruling was personally served upon or mailed to the taxpayer.

28

702107v22
VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1     *Invalidity of Review Board's Ruling*

2     68.   The Board's Ruling, including the Review Board's Findings of Fact and

3 Conclusions of Law, is erroneous, unsupported by substantial evidence and contrary to law

4 for numerous reasons, including but not limited to, the following:

5     (a)   Neither the First Transfer nor the Second Transfer is subject to transfer tax

6 because no consideration was paid for either transfer. The transfer tax is imposed on

7 "realty sold," which require that consideration be paid for the transfer of realty. The First

8 Transfer involved the return of the School Properties from the Welfare Corporation upon its

9 dissolution to the Corporation Sole, as required by the California Nonprofit Religious

10 Corporation Law and the Welfare Corporation's Articles. The Second Transfer involved

11 the entrustment of the Parish and School Properties from the Corporation Sole to the newly

12 formed Support Corporation. There was no money or other consideration paid in either the

13 First Transfer or the Second Transfer. There was no purchase and sale agreement in

14 connection with either transfer.

15     (b)   The First Transfer and the Second Transfer were pursuant to an internal

16 corporate restructuring within the Archdiocese, which effected a "mere change in form" of

17 organization that is exempt from transfer tax under SF Transfer Tax Ordinance § 1106(d).

18 The Archdiocesan corporate restructuring was a mere change in form because the Parish

19 and School Properties remain owned by the Roman Catholic Church for the benefit of its

20 schools and parishes in San Francisco, and the restructuring has not changed such

21 ownership.

22     (c)   The Archdiocesan corporate restructuring did not change the beneficial

23 ownership of the Parish and School Properties, and thus, both the First Transfer and the

24 Second Transfer are exempt from transfer tax pursuant to RTC § 11925(d). SF Transfer

25 Tax Ordinance § 1101 states that the SF Transfer Tax Ordinance is adopted pursuant to the

26 authority of the RTC, commencing with RTC § 11901. Since at least 2007 and during the

27 time when the First Deed and the Second Deed were presented for recordation, the

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST
FOR STAY ORDER

1   Recorder's office had accepted for recordation without payment of transfer tax deeds,

2   which on their face recited RTC § 11925(d) as the basis for exemption from the tax.

3       (d)     The First Transfer and the Second Transfer involved intra-denominational

4   transfers that were wholly internal to the Archdiocesan family of corporations. The First

5   Transfer and the Second Transfer are exempt from transfer tax because no change in

6   ownership of the Parish and School Properties has occurred. The SF Transfer Tax

7   Ordinance should be interpreted consistently with California's property tax rules and, in

8   particular, RTC § 62(k) which addresses the unique characteristics of religious

9   organizations and provides that intra-denominational transfers are not changes of ownership

10  of the transferred property. More generally and not limited to the property tax context,

11  RTC § 62(k) merely reflects long-standing judicial recognition that, notwithstanding civil

12  law title, the true owner of church property is the Church.

13      (e)     Imposition of a transfer tax on purely intra-denominational transfers violates

14  the California and United States Constitutions by imposing a tax on a church for exercising

15  its recognized constitutional rights to choose and change those civil law corporate forms

16  that best accommodate its religious structure and needs.

17      (f)     The Recorder is estopped from determining that a transfer tax is owed on the

18  First Transfer and the Second Transfer in that such a determination is without precedent,

19  and in fact contravenes the established practice in the City and County of San Francisco as

20  well as in other California counties.

21      (g)     The transfer of the Parish and School Properties from the Corporation Sole

22  to the Support Corporation (the Second Transfer) was conditioned on the transfer being free

23  and clear of all costs and charges, including exemption from the transfer tax. Because the

24  Recorder has asserted a transfer tax in connection with the Second Transfer, the Support

25  Corporation has not accepted the Parish and School Properties or the deed thereto. With

26  respect to the Second Deed, there has been no delivery or transfer upon which the transfer

27  tax can be imposed.

28

*Erroneous Recordation of Deeds and Notices of Delinquent Tax*

69.     SF Transfer Tax Ordinance § 1111 provides that the Recorder shall not record any deed, instrument or writing subject to the transfer tax unless the tax is paid.

70.     The Recorder's office retained possession of the unrecorded Deeds from the time that the Deeds were originally presented for recordation in July 2008.  Over one year later, on November 30, 2009, immediately following the Review Board's oral announcement of its tentative decision, the Recorder recorded both the First Deed and the Second Deed.  The Recorder's office unilaterally recorded the Deeds without Plaintiffs' authorization, or seeking such authorization, in violation of the condition set forth on the face of the Deeds that no transfer tax would be due.

71.     The Recorder's recordation of the Deeds subsequent to the Review Board's oral announcement of its tentative decision was erroneous, in that such recordation violated SF Transfer Tax Ordinance § 1111 and the condition set forth on the face of the Deeds that no transfer tax would be due, and was made without Plaintiffs' authorization.

72.     SF Transfer Tax Ordinance § 1115 in effect at the time of the purported delivery of the Deeds provided that the tax imposed by the SF Transfer Tax Ordinance is delinquent if unpaid at the time that a deed is recorded.

73.     On November 30, 2009, immediately following the recordation of the Deeds, the Recorder erroneously issued Notices of Delinquent Tax to the Corporation Sole and the Support Corporation and recorded the same.  The Recorder's office mailed the Notices of Delinquent Tax to Plaintiffs on December 1, 2009.

74.     The Notices of Delinquent Tax, for the first time, set forth the Recorder's determination of the *amount* of transfer tax, interest and penalties that allegedly was due with respect to the First Deed and the Second Deed, with interest accruing from the date the Deeds were executed.

75.     The Notice of Delinquent Tax on the First Deed was issued to the Welfare Corporation as transferor and the Corporation Sole as transferee in the amount of

VERIFIED COMPLAINT FOR DECLARATORY RELIEF; VERIFIED PETITION FOR WRITS OF MANDATE; AND REQUEST FOR STAY ORDER

# EXHIBIT 5

1
2
3
4
5
6

**THE DISTRICT COURT OF GUAM**

7   In re:                                  Bankruptcy Case No. 19-00010
                                            Chapter 11
8   ARCHBISHOP OF AGAÑA,
9   a Corporation Sole,

10                   Debtor.

11  _____        Adversary Proceeding
                                            Case No. 19-00001
12  OFFICIAL COMMITTEE OF
    UNSECURED CREDITORS,
13
14                   Plaintiff,

15           v.                             **DECISION AND ORDER GRANTING THE
                                            COMMMITTEE'S MOTION FOR PARTIAL
16  ARCHBISHOP OF AGAÑA,                    SUMMARY JUDGMENT UNDER
                                            BANKRUPTCY RULE 7056**
17                   Defendant.

18  _____
19  CATHOLIC SCHOOLS AND PARISHES,

20                   Defendant-Intervenor.

21  _____

22

23          This court heard the Committee's Motion for Partial Summary Judgment Under

24  Bankruptcy Rule 7056, ECF No. 9, on April 16, 2021. After careful consideration and after

25  having reviewed the parties' briefs, relevant cases, and statutes; and having heard argument

26  from counsel on the matter, the court hereby **GRANTS** the Committee's motion for the

27
    reasons stated herein.
28

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2019, the Archbishop of Agaña, a Corporation Sole ("Debtor"), filed a voluntary petition for relief under Chapter 11. Debtor listed certain properties under its Statement of Financial Affairs (exhibits 8, 9, and 10) as properties being held in trust for Parishes and Schools.

On April 6, 2019, the Official Committee of Unsecured Creditors ("Committee") filed a Complaint under Adversary Proceeding No. 19-00001. Compl., ECF No. 1. An Amended Complaint was filed thereafter, alleging that the real and personal properties held "in Trust for Parishes and Schools" and identified on Exhibit A to the Amended Complaint ("Disputed Property") are under Debtor's complete control and domination, and Debtor owns said Disputed Property. *See* Am. Compl. at ¶¶ 12 and 13, ECF No. 5.

On December 7, 2019, the instant motion for partial summary judgment was filed. *See* Mot., ECF No. 9. Therein, the Committee is asking this court to make a finding that the Parishes and Schools are not separate legal entities and thus cannot hold title to property or be the beneficiaries of a trust. *Id.* at 2.

According to the Committee, Debtor claims to hold tens of millions of dollars in assets in trust for other entities. Mem. in Support of Mot. at 4, ECF No. 10. Because those assets are held in trust, such assets are not available to pay the claims of survivors and other creditors in Debtor's bankruptcy case. *Id.* It is the Committee's position that these alleged third parties—the Parishes and Schools—are not separate entities from Debtor. *Id.* It argues that the third parties are divisions of Debtor because (i) the third parties operate as unincorporated divisions of Debtor—operating under Debtor's charter, reports to Debtor,

finances and operations are controlled by Debtor, and properties are titled to Debtor; (ii) Debtor chose not to incorporate its Parishes and Schools separately; and (iii) until the onset of the abuse crisis, Debtor has consistently argued and testified that parishes and schools were not legally distinct from their governing diocese. *Id.*

Debtor, on the other hand, asserts that it has always made its position clear through its bankruptcy schedules that it does not claim ownership of the Parishes and Schools' real and personal property. Debtor's Opp'n. at 5, ECF No. 34. Debtor argues that the Parishes and Schools are separate entities and that Debtor is simply holding the Disputed Property in trust and for the benefit of the Parishes and Schools. *Id.* at 5-6.

On January 27, 2020, a motion to intervene was filed by Interested Party Catholic Schools and Parishes ("Intervenor"). *See* Mot. to Intervene, ECF No. 20. The court granted the motion to intervene. *See* Order, ECF No. 50. Similar to Debtor's position, the Intervenor argues that the Parishes and Schools have a trust relationship with Debtor. Intervenor's Opp'n. at 2-3, ECF No. 59. It further argues that there are disputed material facts and raises an established theory of law, which would make summary judgment inappropriate at this time. *Id.* at 3.

The motion was originally set to be heard on May 15, 2020. However, the case was stayed for almost a year as the parties attempted to engage in settlement negotiations. The settlement negotiations were unsuccessful. On April 16, 2021, the court heard the motion and took it under advisement. The court now issues its decision.

## II.     SUMMARY JUDGMENT STANDARD

Pursuant to Bankruptcy Rule 7056, Federal Rule of Civil Procedure 56 applies in

1
2   adversary proceedings.
3
4       "The court shall grant summary judgment if the movant shows that there is no
5   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
6   law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under
7   the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
8   (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury
9   could return a verdict for the nonmoving party." *Id*. Thus, the evidence presented in
10  opposition to summary judgment must be "enough 'to require a jury or judge to resolve the
11  parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897,
12  902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Servs. Co.*, 391 U.S. 253, 288-89
13  (1968).
14
15      A shifting burden of proof governs motions for summary judgment under Rule 56. *In*
16  *re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The party seeking
17  summary judgment bears the initial burden of proving an absence of a genuine issue of
18  material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where, as here,
19  the moving party will have the burden of proof at trial, "the movant must affirmatively
20  demonstrate that no reasonable trier of fact could find other than for the moving party."
21  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).
22
23      If the moving party meets that burden, the burden then shifts to the nonmoving party
24  to set forth "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477
25  U.S. at 250. "The mere existence of a scintilla of evidence . . . will be insufficient" and the
26  nonmoving party "must do more than simply show that there is some metaphysical doubt as
27
28

to the material facts." *Id*. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Viewing the evidence in the light most favorable to the non-moving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

#### a. Applicable Law

This court will apply the neutral-principles approach. *See In re Roman Catholic Archbishop of Portland*, 335 B.R. 842, 850 (Bankr. D. Or. 2005) (acknowledging that "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice[,]" citing *Jones v. Wolf*). The neutral-principles approach relies exclusively on "objective, well-established concepts of trust and property law . . . [and] thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf*, 99 S.Ct. 3020, 3025 (1979).

In applying the "neutral principles of law" approach to settling a church property dispute, state courts have looked to (1) language of the deeds, (2) the state statutes governing the holding of church property, (3) the terms of the corporate charter; and (4) the governing document/constitution of the religious institution concerning the ownership and control of church property. *See generally Presbyterian Church v. Eastern Heights Church*, 225 Ga. 259 (1969); *Carnes v. Smith*, 236 Ga. 30, *cert. denied*, 429 U.S. 868 (1976); and *Maryland & Va. Churches*, 396 U.S. 367 (1970).

In examining religious documents, the Supreme Court articulated the following:

> [A] civil court must take special care to scrutinize the document *in purely secular terms, and not to rely on religious precepts in*

1

2

3   > *determining whether the document indicates that the parties have*
4   > *intended to create a trust.* In addition, there may be cases where the
    > deed, the corporate charter, or the constitution of the general church
5   > incorporates religious concepts in the provisions relating to the
    > ownership of property. If in such a case the interpretation of the
6   > instruments of ownership would require the civil court to resolve a
    > religious controversy, then the court must defer to the resolution of the
7   > doctrinal issue by the authoritative ecclesiastical body.

8   *Jones v. Wolf*, 99 S.Ct. at 3026 (emphasis added).

9   ### b.  Overview

10          Before delving into the parties' arguments, it is important to first lay out the relevant

11  Guam law, Debtor's articles of incorporation, and the governing document or the constitution

12

13  of Debtor's organization.

14          ### 1.  Guam's law governing corporation of a religious institution
                and holding of church property

15

16          The Guam Code Annotated provides for the incorporation of religious institutions.

17  Pursuant to 18 G.C.A. § 10102, "[f]or the administration of the temporalities of any religious

18  denomination, society, or church, and the management of the estates and properties thereof,

19  *it shall be lawful for the bishop*, chief priest, or presiding elder of any such religious

20

21  denomination, society, or church *to become a corporation sole* unless inconsistent with the

22  rules, regulations, or discipline of his religious denomination, society, or church or forbidden

23  by competent authority thereof." (emphasis added).

24          "In order to become a sole corporation, the bishop . . . must file with the Department

25  of Revenue & Taxation articles of incorporation setting forth [among other things] . . . (a)

26  That he is the bishop . . . and that he desires to become a corporation sole[;] (b) That the

27

28  rules, regulations and discipline of his religious denomination . . . are not inconsistent with

his becoming a corporation sole[;] (c) That as such bishop, . . . he is charged with the administration of the temporalities and the management of the estates and properties of his religious denomination . . . within his territorial jurisdiction[.]" 18 G.C.A. § 10103.

"[S]uch *bishop* . . . shall become a corporation sole, and all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop . . . *shall be held in trust by him as a corporation sole* for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof." 18 G.C.A. § 10105 (emphasis added).

Because the bishop is *the* corporation sole, Guam law further provides rules on succession. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

Guam law also provides that "[a]ny corporation sole may purchase and hold real estate and personal property for its church, charitable, benevolent, or educational purpose, and may receive bequests or gifts for such purposes." 18 G.C.A. § 10107.

Under the same chapter 10 of Title 18 of the Guam Code Annotated, it provides incorporation of "any religious society or religious order, or any diocese, synod, or district organization of any church." *See* 18 G.C.A. §§ 10108, 10109, 10110, and 10111.

The Guam Code Annotated also provides that it is "lawful for all *religious associations*, of whatever sect or denomination, whether incorporated in Guam or in some other country, *or not incorporated at all*, to hold land in Guam upon which to build churches,

parsonages, educational or charitable institutions." 18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations" requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the name of three trustees for the use of such associations; the trustees shall be selected by the directing body in Guam for such associations, and vacancies occurring among the trustees by death, resignation, or other cause shall be filled in the same manner as the original selection." 18 G.C.A. § 10113 (emphasis added).

The Guam Business Corporation Act does not define the term "association."[1] However, it provides a definition for the term "entity," which "includes corporation and foreign corporation; not-for-profit corporation; profit and not-for-profit unincorporated association; business trust, estate, partnership, limited liability company, limited partnership, trust, and two or more persons having a joint or common economic interests; and state, United States, and foreign government." 18 G.C.A. § 28110.

### 2. Terms of Debtor's Amended Articles of Incorporation

The Amended Articles of Incorporation provides in part the following:

> SECOND: The *purpose of the corporation is to administer the temporalities, estates and properties, real, personal, or mixed, of the Holy Roman Catholic Church within the Archdiocese of Agaña*, except such property as title to which may be in a specific religious order, society, or association and administered by such.

> THIRD: The Archbishop of Agaña is the supreme ecclesiastical authority within the Archdiocese of Agaña, *exercising within the said Archdiocese the powers and*

---

[1] The Ninth Circuit defined "unincorporated association" as a "voluntary group of persons, without charter, formed by mutual consent for purpose of promoting common objective." *Southern California Darts Ass'n v. Zaffina*, 762 F.3d 921 (9th Cir. 2014).

*responsibilities so delegated to him* by the Supreme Roman Pontiff and, subject to any limitations hereinafter set forth restricting the acquisition and alienation of property, *is within the said Archdiocese charged with and given the responsibility, control, authority, title and disposition of and over all the temporalities, estates and properties, real, personal or mixed, of the Holy Roman Catholic Church and of the Archdiocese of Agaña,* except such property the title to which may be specifically held by some Order, Congregation or Community. . . .

Ex. A to Michael Decl., ECF No. 11-2 (emphasis added).

### 3. Governing document/constitution of the religious institution concerning the ownership and control of church property: Canon Law

The canon law is "the internal legal system of the Roman Catholic Church." Fox Aff. at 4, ECF No. 37.[2] The Parishes and Schools do not have their own separate internal legal system. A thorough secular review of the canon law[3] reveals the following:

A parish has a "juridic personality," Can. 515 § 3, and a "juridic person" owns the goods it acquires, Can. 531 & 1256. These sections may show an intent that a parish is a separate entity owning its own properties.

However, the court may find an intent for the parishes to be part of a diocese based

---

[2] Fox is an ordained Roman Catholic priest who analyzed the canon law for the court and offered his "canonical opinion." Fox Aff., ECF No. 37. Attached to his affidavit includes Exhibit C, an opinion from the Pontifical Council for the Interpretation of Legislative Texts, which Fox notes is the "official body designated to provide definitive interpretations of the Canon Law in the Roman Catholic Church." *Id.* at 7.

The Supreme Court has held that the court "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts[.]" *Jones v. Wolf*, 99 S.Ct. at 3026. Accordingly, this court will not consider Fox's "canonical opinion" and Exhibit C to Fox's Affidavit; as well as the portions of Richards and Byrnes affidavit/declaration offering non-secular reading of the cannon law.

[3] *See* Ex. A to Fox's affidavit, ECF No. 37; and Ex. A to Byrnes' affidavit, ECF No. 36.

on the other sections of canon law. The canon law states that what constitutes a diocese are the parishes, Can. 374 § 1, and that the diocesan bishop represents his diocese in all its juridic affairs, Can. 393. In addition, an overwhelming section of the canon law—again, read purely from a secular view—provides that the diocese has control and authority over parishes.[4] Although the parish's care is entrusted to a pastor, the diocesan bishop has authority over that pastor, Can. 515, § 1.

### c. Analysis

The Committee argues that the Parishes and Schools are unincorporated divisions of the Debtor and are not separate entities from the Debtor. Mem. in Support of Mot. at 11, ECF No. 10. Both Debtor and Intervenor do not fully address corporation law and what constitutes a division of a corporation. *See* Debtor's Opp'n., ECF No. 34; and Intervenor's Opp'n., ECF No. 59. Rather, both conclusively assert without much analysis that the Parishes and Schools are unincorporated associations.

Because the question before this court is whether the Parishes and Schools are separate legal entities from the Debtor, the court will analyze what constitutes a division of a corporation.

### 1. The Parishes and Schools are not separately incorporated.

There is no evidence in this case that the Parishes and Schools are separately incorporated under Guam law. The undisputed fact is that no parish or school is

---

[4] *See e.g.*, Can. 515, § 2; Can. 516, § 2; Can. 517, § 2; Can. 520, § 1; Can. 524; Can. 531; Can. 533, § 3; Can. 536, § 1; Can. 536, § 2; Can. 538, § 1; Can. 538, § 3; Can. 539.

independently incorporated with the Guam Department of Revenue and Taxation.[5] The Parishes and Schools are fictitious names synonymous with the Debtor. *See* Ex. G to Michael Decl., ECF No. 11-4. This is also not a disputed fact.[6]

### 2. There is no Guam law that allows for unincorporated divisions to sue or be sued; and the Parishes and Schools lack property ownership.

The basic principle of corporate law is that corporations are independent legal "persons," who, like natural persons, may sue or be sued. 18 Am. Jur. 2d Corporations § 2. An unincorporated division of a corporation, therefore, lacks existence as a legal entity and the capacity to sue or be sued. *See In re Fed.-Mogul Glob. Inc.,* 411 B.R. 148, 163-64 (Bankr. D. Del. 2008); *United States v. ITT Blackburn Co., a Div. of ITT*, 824 F.2d 628, 631 (8th Cir. 1987) (an unincorporated division of a parent company lacks capacity to be sued).

"[W]here a party in question is neither an individual nor a corporation, capacity to be sued is determined with limited exceptions by 'the law of the state where the court is located.'" *Kaupthing ehf. v. Bricklayers & Trowel Trades Int'l Pension Fund Liquidation Portfolio*, 291 F. Supp. 3d 21, 28 (D.D.C. 2017) (citation omitted).

In the *Archbishop of Portland*, Oregon law authorizes religious corporations (including corporations sole) to sue and be sued, and to hold and dispose of property. 335 B.R. at 866. However, the debtor in that case was unable to cite any state law that would authorize unincorporated parishes to sue or be sued or to hold and dispose of real property.

---

[5] *See* Fact No. 38 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor and Intervenor do not dispute this fact. ECF Nos. 35 at 13, and 60 at 5.

[6] *See* Fact No. 36 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Debtor does not dispute this. ECF No. 35 at 13. Intervenor can neither confirm nor dispute this fact. ECF No. 60 at 4.

*Id.* "Because the parishes are not separately incorporated, as they could be under Oregon religious corporations law, they cannot hold title to real property." *Id.* The court therefore concluded that the parishes are "not separate from, but are merely a part of debtor." *Id.*

Similar to the *Archbishop of Portland*, no Guam law exists that allows for unincorporated divisions to sue or be sued. Focusing its argument on the concept of "unincorporated association" rather than a "division," Debtor argues that "unincorporated associations can sue or be sued pursuant to Guam law," Debtor's Opp'n. at 9 & 14, ECF No. 34, relying upon a 1953 district court case and the statute cited therein, *see Brandt v. United States*, 110 F. Supp. 627, 630 (D. Guam 1953) (citing Guam Code of Civil Procedure § 338, now codified at 7 G.C.A. § 12115). Even assuming *arguendo* that the Parishes and Schools are unincorporated associations, Debtor's reliance on *Brandt* and the statutory provision is misplaced.

Pursuant to 7 G.C.A. § 12115,

> [w]hen two or more persons, associated in any business, transact such business under a common name … the associates may be sued by such common name, the summons in such cases being served on one or more of the associates; and the judgment in the action shall bind the joint property of all the associates, and the individual property of the party or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability.

As its text makes clear, this provision does not permit unincorporated associations to sue and be sued on their own behalf. Rather, it creates a procedural device by which "the associates" may be sued under the common name of the association, resulting in a judgment that is binding "in the same manner as if all [associates] had been named defendants and had been sued upon their joint liability." As the court noted in *Brandt*, "[t]his section was taken

from the California Code and was construed in *Jardine v. Superior Court*." *Brandt*, 110 F.

Supp. at 630. In *Jardine*, the California Supreme Court explained the background of this

statutory provision:

> For a long time the established rule was that in the absence of statute, an unincorporated association could not sue or be sued in its common name; all the members thereof had to appear in their own names as parties plaintiff or defendant. The basic reason was that the association was not, in the eyes of the law, a legal unit or entity, and had no legal capacity to become a party to an action. The difficulty was only one of procedure, and the objection was purely technical. The liabilities or rights of the members were in no way involved, and were not, in theory, impaired by the operation of the rule. They might have brought actions if they all joined as plaintiffs, and they might have been held to any liability imposed upon them by law, if sued and served individually. But where associations with large membership were involved, the operation of the rule frequently had inconvenient and unjust consequences, and various exceptions came to be recognized.…
>
> The many inconveniences of the rule were not wholly evaded by these exceptions, and statutes were widely adopted for the purpose of eliminating this procedural obstacle by permitting suits to be brought against the associates in the common or association name. In most instances, they did not give the association the right to appear as a *plaintiff*. The statutes dealt solely with the manner of bringing actions, and were not intended to effect any change in the substantive law. Members of associations had the same rights and were subject to the same liabilities as before, only now they could be sued by a less complicated and cumbersome process.

*Jardine v. Superior Court in & for Los Angeles Cty.*, 213 Cal. 301, 307-08 (1931) (internal citations omitted) (emphasis in original).

This background underscores what is already clear from the text of the statute.

Section 12115 does not effect any change in the substantive law, nor does it give

unincorporated associations the ability to bring suit in the name of the association. It merely eliminates one purely procedural hurdle that plaintiffs previously had to overcome when attempting to recover from the associates based on their joint liability. A suit brought under this section, although styled as one against the association's common name, is in substance a suit against the associates themselves.

The principle that an unincorporated division of a corporation lacks the legal capacity to sue or be sued is "supported by a pragmatic rational derived from the fact that a division owns no independent assets and is under the control of a larger organization." *Kaupthing ehf.*, 291 F. Supp. 3d at 28 (citation and internal quotes omitted).

Here, the Parishes and Schools at issue do not own independent assets. Debtor holds legal title to the Disputed Property. *See* Debtor's Am. Statement of Financial Affairs, Ex. 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.[7] Further, with the exception of one school,[8] all Parishes' and Schools' bank accounts are held in Debtor's name. *Id.*, Ex. 8, 9 and 10.

The issue of whether the Parishes and Schools are under the control of a larger organization will be discussed next.

### 3. Parishes and Schools are under the control of Debtor.

Courts have held that the control that an archdiocese exerts over its parishes and

---

[7] *See* Fact No. 40 of Movant's Concise Statement of Material Facts. ECF Nos. 11 at 5, and 42-1 at 6. Intervenor does not dispute this fact. *See* ECF No. 60 at 5. Debtor does not dispute the existence and contents of the cited documents, though Debtor notes that such properties are being held in trust for the Parishes and Schools. *See* ECF No. 35 at 14.

[8] The bank accounts of one school are held under that school's name. *See* Perez Decl. ¶ 7, ECF No. 32 at 4-5.

schools is a determining factor of whether they are separate from or the same as the archdiocese.

For example, in *F.E.L. Publications*, although the Seventh Circuit did not conduct an in-depth analysis of the relationship between the parishes and the Archdiocese of Chicago, the case is still instructive. The Seventh Circuit reviewed evidence of individual priests' "limited, authorized power to purchase," which supports the Archdiocese of Chicago's position that the parishes and the Archdiocese are one entity. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir. 1985), *cert. denied* 474 U.S. 824 (1985).

In *E.E.O.C.*, the D.C. court conducted a much more in-depth analysis than *F.E.L. Publications. See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71 (D.D.C. 1999), *aff'd sub nom. E.E.O.C. v. St. Francis Xavier Sch.*, 254 F.3d 315 (D.C. Cir. 2000). The plaintiff in *E.E.O.C.* did not deny that the defendants are unincorporated division of a corporation. *Id.* at 74. Nonetheless, the court examined the relationship between the Archdiocese of Washington and the St. Francis Xavier Parish:

> The Archdiocese possesses traditional corporate attributes, such as the powers to contract, to acquire property, and to sue and be sued. The Archdiocese is made up of all the Catholic parishes and related facilities within its territorial jurisdiction, which encompasses the District of Columbia and five surrounding Maryland counties. Although the Canon Law of the Roman Catholic Church views each parish as a separate entity for religious purposes, the parishes are not separately incorporated under civil law.

> [The Parish is] . . . within the territorial jurisdiction of the Archdiocese. It operates independently of other parishes within the jurisdiction. The

1

2

3

Archdiocese owns all of the Parish's property—the Parish does not own any independent assets. . .

4

5

6

7

8

9

10

11

12

*The Archdiocese exerts varying degrees of control over different aspects of the Parish's operations.* As to financial matters, the Archdiocese maintains control over the Parish's budget by requiring the Parish to submit an annual financial report on all of its operations and to undergo periodic financial audits. Although the Archdiocese does not oversee the Parish's daily expenditures, Archdiocese approval is required for any expenditure exceeding $10,000. As to personnel matters, the Archdiocese appoints the pastor and, through the Archdiocese's personnel director, helps to determine the staffing of other priests assigned to work at the Parish. The Archdiocese also influences other Parish personnel decisions, such as the hiring of the School's teaching staff, by providing guidelines on appropriate hiring criteria.

13

14

15

16

17

*E.E.O.C.*, 77 F. Supp. 2d at 74-75 (citations omitted) (emphasis added). Clearly, the court examined whether the Parish was part of the larger Archdiocese by examining the relationship and the degree of control. Based on this, the court found that the Parish itself is part of the larger Archdiocese. *Id.* at 75.

18

19

20

21

22

23

24

25

Here, there is overwhelming evidence of the varying degrees of control that Debtor exerts over the Parishes and Schools. The Parishes and Schools are under the umbrella of the Debtor. *See* Ex. A to Michael Decl., ECF No. 11-2 at 2-3. Debtor is responsible for and has authority over all civil property within the Archdiocese, providing "oversight and support to parishes [and] schools[.]".[9] *See* Ex. I to Michael Decl., ECF No. 11-5 at 2. Debtor appoints the pastors who lead the parishes. In the absence of a pastor, Debtor assigns a parish

26

27

28

[9] *See* Fact No. 1 of Movant's Concise Statement of Material Facts. Intervenor does not dispute this fact. *See* ECF No. 60, at 1. Debtor does not dispute this fact but rather offers clarification that "Debtor would be responsible for making sure the management of the properties (Parishes and Schools) is effective)[,]" but that "these properties are managed and cared for by the pastors and principles." Richards Decl., ECF No. 38, at 2.

administrator. *See* Ex. H to Michael Decl., ECF No. 11-4 at 6. Debtor establishes the pay

schedule for all the priests, and Debtor supervises the priest or other chief administrator of

each parish. *See* Ex. H to Michael Decl., ECF No. 11-4 at 9; and Ex. E to Michael Decl.,

ECF No. 11-3 at 6. In addition, Debtor sets human resources policies that apply to all Parishes

and Schools.[10] *See* Ex. 14 to Second Michael Decl., ECF No. 43-1. The Debtor also regularly

evaluates parishes and schools, assessing their operations and providing recommendations

for improvement.[11] *See* Ex. O to Michael Decl., ECF No. 11-19 (examples of the evaluation

and recommendations). Debtor, along with its advisors as required by its cannon law, has the

power to close a parish or a school.[12]

      The Debtor plays a major role in the finances of the Parishes and Schools. Although

Debtor is not involved in the daily expenditures of the Parishes and Schools, Debtor's

approval is required for all financial transactions exceeding a certain amount. *See* Ex E to

Michael Decl., ECF No. 11-3 at 4-5; and Ex. 1 to Second Michael Decl., ECF No. 43 at 6.

Any lease agreements that binds the parish or the school must first be reviewed by the Debtor.

*See* Ex. H to Michael Decl., ECF No. 11-4 at 7; and Ex. I to Michael Decl., ECF No. 11-5 at

4. Each parish prepares an annual financial report for submission to the Debtor. *See* Ex. H to

---

[10] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor asserts that the applicability of this fact cannot be substantiated for all Parishes and Schools, ECF No. 60 at 4, but does not provide evidence to dispute the evidence provided by the Committee.

[11] Debtor does not dispute this fact but merely provides a reason for why it is being done. *See* Richards Decl., ECF No. 38 at 10. Intervenor is unable to dispute this fact as it can neither confirm nor deny it. ECF No. 60 at 4.

[12] Intervenor is silent on this fact. *See* ECF No. 60. Debtor does not dispute this fact but rather offers clarification that the Archbishop cannot "unilaterally" take such action, since per its canon law, the Archbishop is advised by its Presbyteral Council. *See* Richards Decl., ECF No. 38 at 8.

Michael Decl., ECF No. 11-4 at 7. The Parishes and Schools are also required to submit to the Debtor a monthly financial report.[13] *See* Ex. F to Michael Decl., ECF No. 11-3 at 8; and Ex. 1 to Second Michael Decl., ECF No. 43 at 5. Debtor has continuous access to bank account information of Parishes and Schools.[14] *See* Debtor's Am. Statement of Financial Affairs, Ex. 8, 9 and 10, ECF No. 148 of Bankruptcy Case No. 19-00010.

When deciding to embark on a major renovation or construction of a new facility, the Parishes and Schools are required to notify Debtor for any projects exceeding $15,000.00, and seek approval of Debtor for any projects exceeding $25,000.00. *See* Ex. H to Michael Decl., ECF No. 11-4 at 10. *See also* Ex. L to Michael Decl., ECF Nos. 11-6 to 11-17 (examples of Expenditure Approval Requests); Ex. R to Michael Decl., ECF No. 11-22 (sample of an approval letter from a parish to Debtor/its financial council); and Ex. P to Michael Decl., ECF No. 11-19 (example of a contract agreement with Debtor). Debtor is involved in the process, including having its finance officer provide an initial estimate of the parish's debt capacity. *See* Ex. H to Michael Decl., ECF No. 11-4 at 11.

The varying levels of control and involvement of Debtor in the Parishes' and Schools' operations make clear that the Parishes and Schools are part of the Debtor, and that they are one and the same.

---

[13] Debtor claims the monthly financial report is being done as a result of the bankruptcy filing. *See* Richards Decl., ECF No. 38 at 9. However, evidence shows otherwise, and the monthly financial reports have been in place prior to the bankruptcy filing. *See* Ex. 2 of Second Michael Decl., ECF No. 43 (examples of monthly financial reports for 2014-2015).

[14] Intervenor disputes that Debtor has access to *all* Parishes' and Schools' bank accounts. ECF No. 60 a6 3. However, Intervenor does not dispute that Debtor has access to *bank account information*.

### 4. **Section 10112 of Title 18, Guam Code Annotated has no application in the instant case.**

As discussed *supra*, one of the factors in determining whether an entity is an unincorporated division of a corporation or a separate entity from the corporation is property ownership. As noted, the Parishes and Schools holds no real property under their names.

Debtor and Intervenor argue that Guam law allows for an "unincorporated association" to hold land in Guam, citing 18 G.C.A. § 10112. Debtor's Opp'n. at 8, 14; and Intervenor's Opp'n. at 11, ECF No. 59.

Section 10112 provides in its entirety the following:

> It shall be lawful for all religious associations, of whatever sect or denomination, whether incorporated in Guam or in some other country, or not incorporated at all, to hold land in Guam upon which to build churches, parsonages, or educational or charitable institutions.

18 G.C.A. § 10112. This section is followed by a section on "nonincorporated associations" requiring that "[s]uch religious institutions, *if not incorporated*, shall hold the land in the name of three trustees for the use of such associations; the trustees shall be selected by the directing body in Guam for such associations, and vacancies occurring among the trustees by death, resignation, or other cause shall be filled in the same manner as the original selection." 18 G.C.A. § 10113 (emphasis added).

Debtor is correct in that under Section 10112, "unincorporated associations" are allowed to hold land in Guam. However, there are two problems with Debtor's argument. First, as discussed *supra*, the Parishes and Schools are unincorporated divisions of the Archdiocese of Agaña, not "nonincorporated associations."

Second, assuming *arguendo* that the Parishes and Schools are "nonincorporated associations," for them to hold land under Guam law, the land shall be held in the name of three trustees of said nonincorporated associations. 18 G.C.A. § 10113. There is no evidence that real property of the Parishes and Schools are being held in the name of three trustees.[15]

---

[15] Debtor and Intervenor raise the issue of the Debtor being a corporation sole and is therefore holding the properties in trust for the Parishes and Schools pursuant to 18 G.C.A. § 10105. *See* Debtor's Opp'n. at 7-9, ECF No. 34; and Intervenor's Opp'n. at 5. 10-11, ECF No. 59. Trust relationship is not a question before this court. However, because this issue is closely relevant to the discussion of Sections 10112 and 10113, the court will address this issue.

> Section 10105 states in part,
> > . . . all temporalities, estates and properties of the religious denomination, society, or church theretofore administered or managed by him as such bishop, chief priest, or presiding elder shall held in trust by him as a corporation sole for the use, purpose, behoof, and sole benefit of his religious denomination, society, or church, including hospitals, schools, colleges, orphan asylums, parsonages, and cemeteries thereof.

18 G.C.A. § 10105. A plain reading of the statute is that, the statute allows a natural person, the bishop, to hold all property in trust for his religious organization, the corporation sole. Unlike other types of corporations, a corporation sole does not have directors, shareholders, or officers. *Compare Chapter 2 of Title 18, Guam Code Annotated (Formation of Corporations)*. This provides for a perpetual existence of the corporate body although the natural person holding the office, the bishop, has no perpetual existence. *See* 18 G.C.A. § 10106 (the successor in office of any bishop—or the person authorized under church laws during a vacancy—shall have the same powers as a corporation sole).

> To understand the corporation sole statute, one must understand its historical context. In *Archbishop of Portland*, the bankruptcy judge explained,
> > [R]eligious organizations experienced difficulties with how to continue operations of the organization during a vacancy in the office of the bishop or other church leader, and how to hold church property so that the church would retain ownership in perpetuity. *See, e.g.*, James B. O'Hara, *The Modern Corporation Sole*, 93 Dick. L.Rev. 23 (1988). Property that was given to or otherwise acquired by the religious organization would sometimes be held in fee simple by the parish priest. But that method of ownership was problematic because, upon the priest's death, the property might be claimed by the priest's heirs.[15] *Id.* at 29.

335 B.R. at 856. As a result, many states have adopted corporation sole as a type of corporation for religious organizations. *Id.*

> Applying this historical context of corporation soles, this is where the "in trust" language comes from. The bishop, Byrnes, holds *all* the properties of the religious institution that he manages and administers, as a corporation sole. In the event Byrnes passes away or is sued in a personal capacity, his heirs or personal creditors are not able to take claim of the cathedral building or the chancery office, or any other properties of the religious institution. This is the most common sense reading of Section 10105.

The Parishes and Schools have not availed themselves of this Guam law.

Based on the foregoing, Section 101112 has no applicability in this case.

**d.  The court's holding is limited to the question before it: whether the Parishes and Schools are separate legal entities; and it should not be construed as foreclosing the resulting trust argument.**

As stated above and as pointed out by the Committee in its Reply, ECF No. 42 at 1, the question before this court is very narrow: "Are the Parishes and Schools distinct legal entities or are they divisions of the Debtor?"

Debtor and Intervenor, however, address a completely different issue that is not currently before the court and that is, whether a resulting trust exist between Debtor and the Parishes and Schools. The court finds it necessary to tangentially address Debtor's and Intervenor's resulting trust argument to clarify the exact boundaries of today's decision.

The Committee asserts that a finding that Debtor and Intervenor are the same "legal entity" automatically precludes a possibility of a resulting trust. According to the Committee, "[t]his is true, of course, because property cannot be held in trust for someone or something

---

Section 10105 does not mean *all* the properties under Byrnes as a corporation sole are held in trust in the sense that the corporation sole holds only "bare legal title" to the property without any equitable interest under Bankruptcy Rule 541. If the court were to apply Debtor's and Intervenor's interpretation, there will *not* be any property belonging to the bankruptcy estate. But that is not the case here.

Despite the language in Section 10105 stating that *all* the properties ("*all* temporalities, estates and properties") under Byrnes are to be held in trust for the religious organization, the *undisputed* properties are currently part of the bankruptcy estate and Debtor is not disputing that.

If the court were to apply Debtor's and Intervenor's interpretation of Section 10105, the court will essentially be making a ruling that there will be no properties belonging in the bankruptcy estate. The court cannot say that some are being held in trust with only "bare legal title," while the others are not, when the text of the statute is clear that "all" properties are to be held in trust.

that does not exist in the first place." ECF No. 42 at 2:2-6.

The court is not so sure that this is "true, of course." A holding that the Intervenor has the same legal identity as Debtor is not necessarily a holding that the Intervenor is incapable of holding a unique, equitable interest in the Disputed Properties which may be excluded from the estate under 11 U.S.C. § 541(d). After all, a resulting trust is an equitable remedy that arises from specific facts and circumstances of a particular case.

In this case, it seems unremarkable to observe that the Intervenor has an interest in the Disputed Properties that is dissimilar in nature from Debtor's interest. While this may be a distinction without a difference for purposes of corporate law, it does not automatically foreclose the possibility of an equitable interest that may be protected by the equitable provisions of the Bankruptcy Code. This concept is reflected in the *Comm. of Tort Litigants v. Cath. Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006). The district court there held a triable fact existed regarding whether parishes had a protectable interest in property arising from a resulting trust, such that the property was excluded from the bankruptcy estate of the debtor-diocese.

The Committee called this case a "misguided anomaly" and faulted the opinion for not specifically analyzing whether the parishes were distinct from the debtor-diocese, and failing to consider "any of the established factors used to define and distinguish unincorporated divisions[.]" Mem. in Support of Mot. at 16, ECF No. 10. However, another possible interpretation is that the district court did not specifically analyze whether the parishes or debtor were the same entity because the issue was not determinative on whether the parishes could be the beneficiary of a resulting trust.

Though the court finds the *Spokane* to be particularly persuasive, the court realizes that delving into such matters without the benefit of argument and briefing on this specific issue would be inappropriate. Consequently, the court provides this discussion only to emphasize the limits of the court's holding. Whether a "resulting trust" exists is a separate and distinct issue from whether Debtor and Intervenor are the same entity, not only as a matter of procedure given the limited scope of the partial motion at bar, but also as a legal matter. Stated more simply, the court is declining to rule on the resulting trust argument solely because of the limited nature of the Committee's motion, and not because of a deficiency in the Debtor and Intervenor's legal argument.

### IV. CONCLUSION

The court hereby **ORDERS** the following:

(1) The Committee's Partial Motion for Summary Judgment is hereby **GRANTED**. The court finds that the Parishes and Schools are part of the Debtor and are unincorporated divisions of the Archdiocese of Agaña.

(2) The Clerk is directed to enter partial judgment for the Committee.

**SO ORDERED.**



/s/ **Frances M. Tydingco-Gatewood**
  **Chief Judge**
**Dated: Jul 16, 2021**