# EXHIBIT 6

# Parish Finance Update

## CHANCERY FINANCE TEAM

### February 1, 2018

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 2 of 308

# Agenda

- Opening Prayer
- Introduction of Chancery Team
- Parish Finance- Policies & Reporting
- Payroll Update
- Banking Controls
- On-Line Payments
- Quick-Books On-line
- Insurance Summary
- Other Items
  - Special Collections
  - Donations & GuideStar
  - Other
- Answers to your Questions

2

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 3 of 308

# Chancery Finance Support Team-

## Here to Serve!!

- Joe Passarello; 415-614-5511 [passarelloj@sfarch.org](mailto:passarelloj@sfarch.org)

- Mary Connolly; Controller, 415-614-5515

- Kathy Brooks; Accounting Manager, 415-614-5516

- Rodney Yee; Parish and School Finances, 415-614-5513

- Keshia Kelsey; Payroll Manager, 415-614-5539

- Kerry Kelleher; Finance/Systems Manager , 415-614-5514

- Siena Perez; Finance Department Support, 415-614-5510

3

# THE CHANCERY OFFICE- THE BALANCING ACT

Those in "administrative" positions MUST appreciate that the Church is not a business, but the ministry of Christ is called to bring the Good News to the ends of the Earth





Those in "pastoral" positions need to appreciate the critical role that efficient, effective administration plays in the success and future of the Church's ministry



4

4

# Parish Finance- Policies & Reporting

Rodney Yee

# Parish Finance – Control Principles

Internal control is a system for ensuring achievement of the Archdiocese's objectives of operational effectiveness and efficiency, reliable financial reporting, and compliance with established guidelines. Effective internal control allows:

- Safeguarding assets
- Documentation
- Timely and accurate financial reports
- Compliance with policies and procedures

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 7 of 308

# Principles for Administration of Parish Finances

- The Pastor is responsible for financial decisions and will establish a balanced annual budget.

- All financial positions must pass a background check and be fingerprinted.

- All parishes will follow the uniform chart of accounts and established internal accounting controls
  - including online donations

- All financial activities will be the subject of regular parish financial reviews.

- All Bank accounts in financial institutions are included on the annual financial report and subject to the review process.

7

# Role of the Pastor in Finance

## Administration

- The Pastor is responsible for financial decisions and will establish a balanced annual operating and a 5 Year Capital Expenditure Budget in consultation with the Finance Council.

- The actual income and expenditures of the parish should be reviewed monthly by the Pastor and at least quarterly by Finance Council.

- The members of the Parish Finance Council must be given complete access to all financial records and documents relating to the parish.

- The Pastor must consult the Parish Finance Council concerning any major commitment of parish funds in excess of $10,000.

8

# Role of Finance Council

Canon Law mandates a Parish Finance Council.

The role of the Parish Finance Council is to assist and advise the Pastor in overseeing and controlling the financial affairs of the parish.

Structure of the Parish Finance Council:

- Members are appointed by the Pastor and must be active parish members. The Pastor appoints a Chairperson.
- There shall be at least three members and should meet at least quarterly- minutes should be kept.
- Members shall serve for 3 years (staggered terms).
- When a pastorate becomes vacant, the Finance Council ceases.

9

# Function of the Finance Council

- Review/establish a timeline for budget development and implementation.

- Review and approve operating and capital budgets for parish.

- Review monthly/quarterly budget variances and develop corrective measures if needed.

- Review and approve proposed budgets from individual parish organizations (i.e. Men's Club, Women's Club, Bingo, Scrip, Boosters, etc.).

- Provide parishioners with approved Annual financial statements.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 11 of 308

# Function of the Finance Council (con't)

- Ascertain that the parish follows Archdiocesan Reporting, Internal accounting controls and Policies.

- Meet regularly to review financial reports and document meetings with minutes.

- Ensure that bank statements have been reconciled timely. Effective immediately, do not send in quarterly bank reconciliation unless requested by Finance.

- Verify that Finance Council members are represented at school board meetings if applicable.

11

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 12 of 308

# Finance Policy – Excess Cash

- Excess cash is required to be moved to Deposit and Loan or Investment Pool accounts with CASC
  - Excess cash is defined as amounts over 2 months operating cash
  - Exceptions may occur when there are larger than expected expenses and or expenditures in the upcoming months
- New: Donations over $100,000 are required to be reported in writing semi-annually on June 30th and December 31st to the Development Office

12

# Financial Reporting- Currently

Annual financial reports for the year ended June 30th are due to the Chancery by September 30th

- Must be signed and in required Excel format
- Templates will be emailed to Pastors at their sfarch.org email addresses (and bookkeepers of record)
- Please reach out to Rodney Yee at [yeer@sfarch.org](mailto:yeer@sfarch.org) in advance to alert us if LATE or if missing template for your location

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 14 of 308

# Financial Reviews- 3rd Party CPA's

- Purpose is to review your financial controls and procedures, assisting the Pastor and Finance Council in their oversight responsibilities

- The Review allows you to communicate with your parishioners that your accounts have been reviewed

- Financial reviews of Parish and Schools are performed by Independent CPA firms selected by the Audit Committee of the Archdiocese

- The criteria for Review is when there is a change in Pastor or Administrator, or once every 3 years, or when there is a specific concern raised regarding the finances of a Parish

- Cost of the Review is $6,500 for a Parish w/ School and $5,000 for a Parish only

14

# Financial Reviews

- Expect FY17 Reviews to begin immediately, if not already in progress, and must be completed by June 30, 2018

- Onsite Reviews should take no more than 3-4 days if the Parish is prepared.

- The Pastor and the Finance Council are responsible to review the draft Financial Review Report and respond to recommendations in writing by end of Review and issuance of report

- Reports to be provided to the Archbishop

- Reports are reviewed by the Audit Committee of the Archdiocese

15

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 16 of 308

# Parish Finance – Support

Contact me re: Bookkeepers that are familiar with SF Archdiocese reporting requirements to send you a list of available candidates that may be a good fit for your parish or school as needed

Note – These professionals and or their firms may be booked already and may or may not meet your expectations.

The Chancery can direct you on a case by case basis, subject to the professional's availability and YOUR expectations. Fees are negotiated between parties depending on work required.

16

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 17 of 308

# Parish Finance – Support

- We will assist in evaluating prior to hire and ensuring candidate has the required bookkeeping skills needed to be successful by administering a standard bookkeeping test.

- Help with transition to ADSF guidelines and reporting with training and providing resources in person, at your Parish, our offices, or via the web

17

# Parish Finance – Support

Our Finance department can also help with:

- Special projects
- Technology updates
- Best practices
- Other requests

Our most recent and up to date Parish and School Financial Policy and Procedures can be found on our website at http://sfarchdiocese.org/policies-index

18

# Parish Finance – Support

Note that this presentation will be shared with your school personnel after this meeting via PDF, and also at a future Department of Catholic Schools (DCS) meeting with the Principals.

19

# Payroll Update

## Keshia Kelsey

# Payroll Update

## Payroll Team

- Keshia Kelsey – Payroll Manager
  - kelseyk@sfarch.org – 415-614-5539
  - All aspects of Payroll including system issues.
- Suzanne Liu – Payroll Coordinator
  - lius@sfarch.org – 415-614-5527
  - San Francisco and Marin Parishes and Schools
- Mili Calvo-Perez – Payroll Coordinator
  - calvoperezm@sfarch.org – 415-614-5528
  - Four High Schools and San Mateo Parishes and Schools
- Siena Perez – Finance Admin Assistant
  - Perezs@sfarch.org – 415-614-5510

21

# Payroll Update

- <u>Payroll Calendar:</u>

  - The Payroll Calendar-Payroll Processing Schedule is distributed every December for the following year.

  - Listed on the calendar are pay period begin and end dates, pay dates, and processing dates and deadlines.

- <u>Time and Attendance:</u>

  - All hourly employees must complete their time each day worked. This should be verified by their manager/supervisor.

  - At the end of each pay period all employees, and their manager/supervisor, need to approve their timecard confirming the hours worked.

  - All time off requests need to be approved within the pay period to ensure accruals remain accurate.

22

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 23 of 308

# Payroll Update (cont.)

- Training:
  - Training material is available to all new and current site administrators on ADP Workforce Now. On hand training can be scheduled by contacting the Payroll Manager, Keshia Kelsey.
  - An **updated** training manual will be available on ADP Workforce Now by May 1st, 2018.

- Direct Deposit:
  - Secure
  - Convenient and fast
  - Check will not get lost



Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 24 of 308

# Payroll Update (cont.)

- Disaster Recovery Plan:
  - Is being prepared and should be available by July 1, 2018 (New Fiscal Year)
  - The plan will cover procedures that will take place to ensure each employee is paid should a disastrous incident occur.
- Version 8 ADP Upgrade:
  - The upgrade focuses on the elimination of Java content.
  - The upgrade will fix the issues employees are having logging in to Time and Attendance.
  - The upgrade has a new look and is more user friendly.
  - Should be implemented by April 1, 2018.

24

# Banking Controls

Mary Connolly

# Banking Controls

**Retail Banking**

- Most retail accounts have been opened many years ago, at various bank branches and are relationship based.

- The branches are currently reviewing old accounts and requiring new updated paperwork.

- Bank managers have total control over the accounts so some fees are less than on the commercial platform.

**Commercial Banking**

- The Commercial Platform is linked to the Archdiocese.

- We have one banking representative that understands our organization.

- Processes are streamlined, paperwork is standardized and we can assist with requests for new services.

- Bank fees are probably higher than most retail accounts but the bank is currently trying to standardize and reduce our charges.

26

# Banking Controls contd.

- **On-Line Banking Services:**

  - No-one should be using regular on-line banking due to the lack of controls.

  - The alternative is CashPro, the BofA on-line banking service that provides controls.

  - Access using the ADSF account will let you access statement on-line at no cost.

  - An individual CashPro account provides many other services such as the ability to transfer funds between accounts and to other vendors.

  - However, it comes at a price. There is a monthly flat fee and each additional service has a fee.

- **Other Information:**

  - When completing forms to add or delete accounts or signatories or for any other purpose, please make sure that the name on the form exactly matches the name on the bank statement...or the form will be delayed.

27

# Banking Controls contd.

- **Changing Bank Accounts:**
  - If you change bank accounts, please notify the Chancery.
  - Payroll and health benefits are automatically deducted from your account/s and we credit your account/s for monies due to you.
  - These bank set-ups have to be adjusted for the new account numbers.

- **Fraud Protection:**
  - Fraudulent activity is very common. Bank protections should be put in place by all but the smallest locations.
  - Bank of America uses CashPro for this purpose. Check registers can be uploaded through CashPro to verify cashed checks. Random auto debits from accounts can also be prevented.
  - As we go through the QuickBooks Online conversion, we can assist in implementing these protections.

28

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 29 of 308

# On-Line Payment Process

Joe Passarello

# Current Approved Vendors

- Vanco
  - Historically, Vanco has been our only approved vendor
  - In 2014, Vanco was purchased and since then we have seen some negative changes in Vanco
    - Decline in Customer Service and support
    - Pricing Increases
- Our Sunday Visitor (OSV)
  - Provides online giving processing as well as other services such as Envelope services, website design, mobile apps.
  - Competitive pricing with Vanco. Email ADSF for pricing.
  - Will launch redesigned online donation software in 2018 with enhanced functionality
  - Good partner of the Catholic Church

30

# Current Approved Vendors (cont.)

- Vetting New Vendors in 2018/2019
  - We will be vetting new vendors to add to our approved vendor list
  - Note that Square and PayPal have not been vetted and are therefore not currently on our approved vendor list
  - Email ADSF if you have suggestions on companies to vet

31

# Criteria for Vetting Online Vendors

- Security — need to protect cardholder data and funds received
  - PCI Compliant, Service Organization Control Report issued by Independent CPA
  - Controls over changing the bank account where the money received is deposited
- Payment Methods and Funding
  - Offers processing for ACH and Credit Cards (Visa, MC, Discover, Amex)
  - Funds are deposited to location as soon as cleared — funds not held by vendor
- Pricing — competitive pricing
- Reporting — provides reporting by Fund
- Customer Service and support
- Central Administration — allows central processing of application through ADSF. We work with one contact at the vendor.
- Business Stability and Longevity
- Functionality — product offerings meet the needs of locations — i.e. online giving form builder, virtual terminal, mobile swipers, etc.

32

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 33 of 308

# Quick Books On-Line Accounting

## Joe Passarello

# Background Information- Selection criteria

- **Current State –**
  - 150 Parish/School locations use various versions of QuickBooks software.
  - Report each year annual financials manually through an excel template.
  - Approximately one-third of reports have been late each of the past 2 years.

- **Desired Future State –**
  - Standardized software platform for all locations
  - Consistent reporting across all locations, ease of reporting, "Pull verses Push"
  - Cloud based system to ensure data security and storage
  - Ability to assist locations remotely
  - Economical/Relative Low cost
  - Ease of use

- **Software selection process –**
  - Researched multiple accounting packages – Hosted Quickbooks, Quickbooks Online, Intacct and Xero.
  - Spoke with multiple CPA firms and bookkeepers within the Archdiocese
  - Spoke with other (Arch) Diocese representatives

# Advantages of moving to QBO

Over the next 18-24 months we will be transitioning all Parishes and Schools to QuickBooks On-Line

- Data Security

**Advantages:**

- QBO automatically backed up to the cloud. No more lost data.

- Automatic Software Updates

- Take advantage of new functionality automatically without worrying about hardware or software upgrades.

- Automatically on latest version of QBO.



35

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 36 of 308

# Advantages of moving to QBO (cont.)

- Online access anywhere (Remote Access)
  - Up to 5 users and 2 accountant users (one of which will be ADSF) will be able to access QBO anywhere at any time. Allowing for greater efficiency and visibility.
- Improved Collaboration with ADSF
  - With access to your QBO, we will be able to provide you better and more timely accounting assistance and training
  - We will work to streamline and automate the year end financial reporting. We will be able to automate much of the reporting through QBO.
  - Improved and more efficient formal review performed by Independent CPAs

36

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 37 of 308

# Implementation Plan

- Overview
  - Your current QuickBooks desktop file will be migrated to the QBO platform. This means you will have all the same setup as you have currently.
  - All of your historical data will come over to the QBO system.

- Phased Approach
  - Locations will be chosen for the first phase of Implementation

- Pre-Implementation Requirements
  - Identify project main contact–external bookkeeper, business manager, etc.
  - Pre-Implementation Checklist – locations will be asked to complete a pre-implementation checklist to ensure they are ready for conversion
  - QBO Best Practices Guide – please read the QBO Best Practices guide so that you are familiar with how to work in the QBO system

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 38 of 308

# Implementation Plan (cont.)

- Conversion (after ADSF validates the location has done the Pre-implementation steps)

  - Location will use QBO Appointment Tool to schedule conversion

  - QBO team will migrate your data, run diagnostics to ensure data came over correctly and provide general user navigation training. The appointment will last approximately 2-4 hours.

  - ADSF will be available for support before, during and after conversion.

- Pricing

  - ADSF receives 50% of MSRP. Currently the cost will be $25/month - $300/year

  - ADSF will pay for your monthly subscription through the year, and will be reimbursed from your location annually in June for that period you were on QuickBooks

38

# Training

- QBO Best Practices Guide – written by ADSF with links to QBO training articles and videos.

- Navigational Overview will be given on the day of the conversion by QBO representative

- QBO has extensive training and support on their Online Community website
  - https://community.intuit.com/quickbooks-online
  - Watch Training videos
  - Signup for a Training Webinar
  - Search Online Support to find answers to your questions
  - Contact QBO – chat online or call support (1-800-488-7330)
  - Get Certified! – QBO offers a free certification so that you can show everyone that you are an expert in using QBO

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 40 of 308

# Insurance Update

## Joe Passarello

# Archdiocese's Insurance Program

- The Central Office of the Archdiocese, negotiates, purchases and administers the insurance programs for all Parishes, Schools and other entities.

- No Insurance is to be purchased individually.

- The purpose of Insurance is to protect the assets of the Archdiocese in the most economical and prudent manner- Transfer Risk.

- Program includes both retained risk (Self Insurance) and Insurance provided by Commercial Carriers or Underwriters.

- Claim costs and history directly affect the cost of Insurance.

- Compliance with safety and training programs will help reduce claims and program costs.

41

# Workers Compensation Insurance

- **Annual Insurance Premiums in Excess of $1.7 million**
  - Cost Increases due to Claim Activity and Costs of claims
- **Average of 80+ Claims Per Year**
  - Slips, Trips and Falls
  - Strains
- **Cost Reducing Measures for 2018**
  - Nurse Hotline —Claim Reporting
  - Use of a Medical Provider Network (MPN) – Medical Cost Management
  - Online Training
- **Improved Safety is Needed to Reduce Claims/Costs**
  - Location Injury Illness Prevention Program (OSHA required)
  - Participation in Archdiocesan Sponsored Safety Training and Programs

42

# Slip, Trip and Fall Safety

- **Slip, Trip and Fall Accidents are the #1 Cause of Injury**

- **Most Fall Hazards Can Be Controlled by:**
  - Good Housekeeping
  - Inspections
  - Proper Footwear
  - Floors and stairs maintained in good condition
  - Parking lots and sidewalks maintained in good condition
  - Adequate and maintained lighting
  - Removing extension cords and other obstructions from walkw
  - Clean up spills as soon as possible – Use "wet floor" signs

- **Managers and Leaders Can:**
  - Emphasize and enforce good housekeeping rules
  - Immediately report and resolve any hazard or problem
  - Conduct regular inspections to check for fall hazards



43

# Insurance Update- Other

- Bounce-houses
- Dunk Tanks
- Carnivals & Festivals
- Supplemental Insurance
- Hiring and Terminating practices

44

# Other Items

Joe Passarello & Mary Connolly

# Other Items

- Processing of on-line stock donations
  - Efficient processing when donor designates Parish or School
  - Donation letters generally issued by Parish or School

- Use of Guidestar
  - Guidestar is the foremost directory for non-profit organizations
  - Provides capability for Company donations and matching gifts
  - To be listed, some documentation required – call ADSF Finance for assistance
  - Requires Parish/school profile and maintenance

- On-line Giving of Sunday offertory- Reporting

- IRS Letters- 501C (3) Letters for donors

46

# Other Items-contd.

- USCCB Special Collections
  - USCCB requests funds from Archdiocese for special collections 5 months after collection.
  - Chancery remits proceeds from collections 4 months after collection.
  - Parishes to remit funds to chancery by 3 months after the collection.

Donors are donating to specific purposes and expect that their donations are used in a timely manner.

- Disaster Relief Collections
  - Disaster relief collections are taken up on an as-needed basis.
  - We remit the proceeds to the agency within 4-6 weeks.

This enables the agency to use the funds when they are needed.

47

# Other Items-contd.

- Seismic work at SF Schools
  - Reviews for Summer 2018 projects

48

# Questions?



49

# BACK-UP MATERIAL

- Add back-up documents
- Official list of 2nd collections
- Stock Donation instructions
- Payroll Calendar
- Direct deposit payroll form
- June'17 Parish Review list
- Insurance Resources
- Church Mutual Nurse Hotline



# THE ARCHDIOCESE OF SAN FRANCISCO

OFFICE OF DEVELOPMENT

ONE PETER YORKE WAY, SAN FRANCISCO, CA 94109-6601 PHONE & FAX (415) 614-5580

## 2018 Special Collections Schedule

| Date | Collection |
| --- | --- |
| January 14 - March 17 | AAA 2018 Campaign |
| March 18, 2018 | Catholic Relief Services (CRS – USCCB) |
| March 30, 2018 | Holy Land (Good Friday - USCCB) |
| April 29, 2018 | Black & Indian Home Missions/ Catholic Home Missions (USCCB) |
| May 13, 2018 | Catholic Charities CYO Appeal |
| May 27, 2018 | Catholic Communications Campaign (USCCB) |
| July 1, 2018 | Peter's Pence (Holy Father) (USCCB) |
| September 23, 2018 | Priests' Retirement Fund (Archdiocesan collection) |
| October 21, 2018 | World Mission Sunday/Propagation of Faith (USCCB) |
| November 4, 2018 | Saint Patrick Seminary (Archdiocesan collection) |
| November 18, 2018 | Campaign for Human Development (USCCB) |
| December 9, 2018 | Retirement for Religious (USCCB) |

**Transfer instructions for Donors with Stock or Mutual Fund Donations**

**For all gifts of stock:**

A letter of authorization from the donor to the parish is required. A letter sample is attached. If you have any questions call Mike Taylor at the number indicated below. Fax a copy to Mike Taylor at 415-364-4509 and Karen Kwong at 415-614-5512 or email to mtaylor@firstrepublic.com and kwongk@sfarch.org.

## STOCK CONTRIBUTIONS

A. **Transfers from a Donor Account at a Brokerage House**
   **Note: Donor's Broker must initiate transfer.**
   In addition to the letter mentioned above, please give the following information to the donor broker for transferring to the Archdiocesan broker. (Broker to Broker)

   1. First Republic Securities Co., LLC
      Attn: Mike Taylor        Phone: 415-364-4870
      111 Pine Street            Fax:    415-364-4509
      San Francisco, CA 94111
      Email: mtaylor@firstrepublic.com

   2. First Republic Securities Co., LLC   **DTC #0443**

   3. S.F.Archdiocesan Account number is:    **33L-070589**

   4. Account Name:   **Archdiocese of San Francisco**

   5. Instruct your donor's broker to include the following information on the trailer line (second line) of their transfer instructions.

      - **FBO (provide Parish Name)**    **and**    **(Donor Name)**

        **NOTE: Failure to include the above information for each transfer will delay identifying the donation and could cause us not to acknowledge the donation in timely manner.**

B. **Stock Certificates donated directly by Donor**

   1. Instruct the donor to deliver the stock certificate and an executed stock power to your Parish Office.
   2. OR they can deliver their stock certificate and an executed stock power form (via registered mail) to First Republic Securities at the above address. A letter of authorization must accompany the stock certificate and executed stock power.

FRSMemo 10/17

Date: _____

Mike Taylor
First Republic Securities Co., LLC
111 Pine Street
San Francisco, CA 94111

Re:

Dear Mr. Taylor:

Please accept this as your authorization to deposit _____ shares of

_____ stock into account no. 33L-070589, for the

Archdiocese of San Francisco.

This donation is for the benefit of _____ Parish/School.

Sincerely,

_____          _____
Customer Signature                                        PRINT NAME

_____          _____
Joint Customer Signature                                 PRINT NAME

Phone Number: _____

Email address: _____

Email copy to kwongk@sfarch.org at (415) 614-5522

FRSMemo 10/17

# ARCHDIOCESE OF SAN FRANCISCO
## 2018 Coordinated Payroll Schedule

| Master File | Hourly Employees |
| --- | --- |

| Pay Period | Payroll Week # | New Hire/Changes Due Date | Begin Date | End Date | Time & Attendance Entries Due by 3:00 p.m. | Payroll Delivered | Funding Date | Pay Date | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 01/01-01/15 | 2 | 2-Jan | 24-Dec | 8-Jan | 8-Jan | 10-Jan | 8-Jan | 12-Jan | |
| 01/16-01/31 | 4 | 18-Jan | 9-Jan | 23-Jan | 24-Jan | 26-Jan | 24-Jan | 30-Jan | |
| 02/01-02/15 | 7 | 5-Feb | 24-Jan | 8-Feb | 9-Feb | 13-Feb | 9-Feb | 15-Feb | |
| 02/16-02/28 | 9 | 15-Feb | 9-Feb | 23-Feb | 22-Feb | 26-Feb | 22-Feb | 28-Feb | |
| 03/01-03/15 | 11 | 5-Mar | 24-Feb | 8-Mar | 9-Mar | 13-Mar | 9-Mar | 15-Mar | |
| 03/16-03/31 | 13 | 19-Mar | 9-Mar | 23-Mar | 23-Mar | 27-Mar | 23-Mar | 29-Mar | End of Quarter |
| 04/01-04/15 | 15 | 3-Apr | 24-Mar | 8-Apr | 9-Apr | 11-Apr | 9-Apr | 13-Apr | |
| 04/16-04/30 | 17 | 18-Apr | 9-Apr | 23-Apr | 24-Apr | 26-Apr | 24-Apr | 30-Apr | |
| 05/01-05/15 | 19 | 3-May | 24-Apr | 8-May | 9-May | 11-May | 9-May | 15-May | |
| 05/16-05/31 | 21 | 17-May | 9-May | 23-May | 23-May | 25-May | 23-May | 30-May | |
| 06/01-06/15 | 24 | 5-Jun | 24-May | 8-Jun | 11-Jun | 13-Jun | 11-Jun | 15-Jun | |
| 06/16-06/30 | 26 | 19-Jun | 9-Jun | 23-Jun | 25-Jun | 27-Jun | 25-Jun | 29-Jun | End of Quarter |
| 07/01-07/15 | 28 | 2-Jul | 24-Jun | 8-Jul | 9-Jul | 11-Jul | 9-Jul | 13-Jul | |
| 07/16-07/31 | 30 | 18-Jul | 9-Jul | 23-Jul | 24-Jul | 26-Jul | 24-Jul | 30-Jul | |
| 08/01-08/15 | 33 | 3-Aug | 24-Jul | 8-Aug | 9-Aug | 13-Aug | 9-Aug | 15-Aug | |
| 08/16-08/31 | 35 | 20-Aug | 9-Aug | 23-Aug | 24-Aug | 28-Aug | 24-Aug | 30-Aug | |
| 09/01-09/15 | 37 | 4-Sep | 24-Aug | 8-Sep | 10-Sep | 12-Sep | 10-Sep | 14-Sep | |
| 09/16-09/30 | 39 | 18-Sep | 9-Sep | 23-Sep | 24-Sep | 26-Sep | 24-Sep | 28-Sep | End of Quarter |
| 10/01-10/15 | 41 | 2-Oct | 24-Sep | 8-Oct | 9-Oct | 11-Oct | 9-Oct | 15-Oct | |
| 10/16-10/31 | 43 | 18-Oct | 9-Oct | 23-Oct | 24-Oct | 26-Oct | 24-Oct | 30-Oct | |
| 11/01-11/15 | 46 | 2-Nov | 24-Oct | 8-Nov | 8-Nov | 13-Nov | 8-Nov | 15-Nov | |
| 11/16-11/30 | 48 | 16-Nov | 9-Nov | 23-Nov | 26-Nov | 28-Nov | 26-Nov | 30-Nov | |
| 12/01-12/15 | 50 | 4-Dec | 24-Nov | 8-Dec | 10-Dec | 12-Dec | 10-Dec | 14-Dec | |
| 12/16-12/31 | 51 | 11-Dec | 3-Dec | 23-Dec | 17-Dec | 19-Dec | 31-Dec | 21-Dec | End of Quarter |

**NOTES:**

Holiday January 1, Monday
Holiday January 15, Monday
Holiday February 19, Monday
Office closed March 30/ Good Friday
Office closed April 2, Easter Monday
Holiday May 28, Monday
Holiday July 4, Wednesday
Holiday September 3, Monday
Holiday October 8, Monday
Holiday November 12, Monday
Holiday Nov 22 & 23, Thursday & Friday
Holiday Dec 24 through Jan 1, 2019

** Hours to be forcasted for paydate 01/12/18    12/24/18 up to 01/08/18
** Hours to be forcasted for paydate 02/28/18    02/09/18 up to 02/23/18
** Hours to be forcasted for paydate 03/30/18    03/09/18 up to 03/23/18
** Hours to be forcasted for paydate 05/30/18    05/09/18 up to 05/23/18
** Hours to be forcasted for paydate 11/15/18    10/24/18 up to 11/08/18
** Hours to be forcasted for paydate 12/21/18    12/09/18 up to 12/23/18



Archdiocese of San Francisco
# Automatic Payroll Deposit Authorization

\_\_\_\_\_ New direct deposit enrollment

\_\_\_\_\_ Change to existing direct deposit

\_\_\_\_\_ Discontinue existing direct deposit

Instructions:
- Please print or type.
- For checking accounts, attach a voided, preprinted check.
- For a saving account, a photocopy of the top part of the bank statement that shows the financial institution's name and address, employee name and account number.
- Mail or fax (415) 614-5525:
  Archdiocese of San Francisco
  Attn: Payroll Department
  One Peter York Way
  San Francisco, CA  94109-6602
- Please allow up to two full pay periods for the direct deposit to be set up and validated. Notify the payroll contact if the set-up takes more than two pay periods.

Parish/School Location Number: _____

Employee Name: _____

Payroll File Number: _____

Financial Institution Name: _____

ABA No.: _____

Account No.: _____

Type of Account (check one)  _____ Checking  _____ Savings

**I authorize my employer to initiate electronic credit entries (deposits), and if necessary, debit entries and adjustments to correct any previous credits which may have been posted in error.  This authorization continues until I notify my employer in writing to cancel this authorization, allowing my employer a reasonable opportunity to act upon it.**

Employee Signature:_____Date:_____

Revised 4/27/2006          Form 2          Coordinated Payroll

# Financial Reviews FY2017

| Number | Parish | PS | Last review period | Reason | CPA firm |
|---|---|---|---|---|---|
| 107 | ST. ANTHONY OF PADUA SF | P | 06/30/14 | OLD | BPM |
| 111 | ST. BRENDAN | PS | 06/30/14 | OLD | BPM |
| 125 | NATIONAL SHRINE OF ST FRANCIS | P | NA | OLD | BPM |
| 127 | ST. BENEDICT | P | 06/30/14 | OLD | BPM |
| 132 | HOLY NAME OF JESUS | PS | 06/30/14 | OLD | BPM |
| 149 | NOTRE DAME DES VICTOIRES | PS | 06/30/15 | NEW PASTOR | BPM |
| 150 | OUR LADY OF FATIMA | P | NA | OLD | BPM |
| 156 | ST. PAUL OF THE SHIPWRECK | P | 06/30/14 | OLD / NEW PASTOR | BPM |
| 168 | ST. THOMAS MORE SCHOOL | S | 06/30/14 | OLD | BPM |
| 201 | ST. RITA | P | 06/30/14 | OLD | BPM |
| 203 | ST SEBASTIAN | P | 06/30/15 | OLD | BPM |
| 205 | ST. CECILIA LAGUNITAS | P | 06/30/15 | NEW PASTOR | BPM |
| 305 | OUR LADY OF ANGELS | PS | 06/30/14 | OLD | BPM |
| 313 | ST FRANCIS OF ASSISI E PALO ALTO | P | 06/30/14 | OLD | BPM |
| 333 | CHURCH OF THE GOOD SHEPHERD | PS | 06/30/14 | OLD | BPM |
| 347 | ST. BRUNO | P | 06/30/14 | OLD | BPM |
| 353 | ST. BARTHOLOMEW | P | 06/30/14 | OLD | BPM |
| 359 | ST. MATTHEW SM | P | 06/30/14 | OLD | BPM |
| 105 | ST. ANNE OF THE SUNSET | PS | 06/30/14 | OLD | BPM |
| 113 | ST CECILIA | PS | 06/30/15 | NEW PASTOR | BPM |
| 115 | ST. CHARLES BORROMEO SF | PS | 06/30/14 | OLD / NEW PASTOR | DZHP |
| 143 | ST MICHAEL KOREAN | P | 06/30/15 | NEW PASTOR | DZHP |
| 147 | MOST HOLY REDEEMER | P | 06/30/14 | OLD | DZHP |
| 152 | OUR LADY OF LOURDES | P | 06/30/14 | OLD | DZHP |
| 153 | ST. PATRICK SF | P | 06/30/14 | OLD | DZHP |
| 159 | STS PETER AND PAUL | PS | 06/30/14 | OLD / NEW PASTOR | DZHP |
| 163 | STAR OF THE SEA | PS | 06/30/14 | OLD | DZHP |
| 211 | OUR LADY OF MOUNT CARMEL MV | P | 06/30/14 | OLD | DZHP |
| 213 | OUR LADY OF LORETTO | PS | 06/30/14 | OLD | DZHP |
| 302 | ST. MARK | P | 06/30/14 | OLD | DZHP |
| 307 | HOLY ANGELS | PS | 06/30/14 | OLD | DZHP |
| 341 | OUR LADY OF MOUNT CARMEL RWC | PS | 06/30/14 | OLD | DZHP |
| 351 | ST. CHARLES SM | PS | 06/30/16 | OLD | DZHP |
| 136 | ST JAMES | PS | 06/30/16 | OLD | RY* |
| 315 | OUR LADY OF THE PILAR | P | 06/30/16 | NEW PASTOR | RY* |
| 329 | ST RAYMOND | PS | 06/30/16 | NEW PASTOR | RY* |
| 36 | | | | | RY** |

# Insurance Resources

- **Archdiocese of San Francisco:**
  - **Insurance Matters: Joe Passarello, CFO** Passarelloj@sfarch.org, **415-614-5511**
  - **Safety Matters: Derek Gaskin, Director of Safety & Security** Gaskind@sfarch.org **, 415-614-5552**

Summary document describing Insurance coverage is located at the SFAD website and is included in the **Parish and School Finance Policy document (F-3) located at**

Financial Policies and Procedures and Accounting Reporting System (Parishes/Schools)

F-3 Financial Policies and Procedures and Accounting Reporting System (Parishes/Schools)

- **Arthur J. Gallagher & Co.:**
  - **Claims Reporting (other than Workers Compensation)**
    - **E-mail: SF-Claims@aig.com**
  - **Workers Compensation Claims Questions**
    - **Deborah Olson – Phone: (415) 536-8630**
      - **E-mail:** Deborah_Olson@aig.com
  - **Certificates of Insurance and General Questions:**
    - **Shasa Barbour – Phone: (415) 536-8622**
      - **E-mail:** Shasa_Barbour@aig.com





# Church Mutual Nurse Hotline
# (844) 322-4662

*Available for non-life-threatening injuries, 24 hours a day, 7 days a week. If an injury is serious or life-threatening, call 911 immediately.*

## *Here's how it works:*

### Step one: Make the call at the time of injury

- Immediately report the injury to your manager and he or she will make the call.
- If your manager is not available, then you make the call.
- The nurse will retrieve pertinent facts about the injury.

### Step two: The nurse recommendation

- The nurse will provide guidance on injury treatment, either through first aid, the emergency room or a medical clinic.
- A summary of the call, including treatment instructions, will be provided along with the opportunity to ask questions or express concerns.

### Step three: Debrief with manager, if present

- The nurse will summarize the call, the treatment recommendation and the level of urgency.

### Step four: Timely record distribution

- If an outside referral is made, information will be transferred to the medical provider.
- The nurse will submit call information to Church Mutual, which will establish a formal claim only when outside care is administered.

**For more information, visit www.churchmutual.com/nursehotline.**





**Church Mutual Nurse Hotline**
*powered by* 

Listening, Learning, Leading is a registered trademark of Church Mutual Insurance Company.
FM-5805 (02-2014) © 2014 Church Mutual Insurance Company.



Listening. | Learning. | Leading.®

# EXHIBIT 7

# *Parish and School Financial Policy*

# **and**

# *Parish/School Financial Accounting and Reporting System*

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 61 of 308

# Parish and School

# Financial Policy Manual

**The Archdiocese of San Francisco**
**One Peter Yorke Way**
**San Francisco, CA  94109**

# Parish and School Financial Policies Index

A. Principles for Administration of Parish & School Finances

B. Parish Finance Council Guidelines

C. Internal Accounting Controls for Parishes & School

D. Stewardship & Development

E. Investment of Parish Surplus Funds

F. Endowments

G. Loans

H. Contracts, Debts & Capital Asset Leases

I. Employee Pay, Benefits & Employment Policies

J. Building and Renovation Policies & Procedures

K. Real Property not used for Pastoral Purposes

L. Insurance

M. Legal Services

## Section A.
## Principles for Administration of Parish and School Finances

# PRINCIPLES FOR ADMINISTRATION OF
# PARISH AND SCHOOL FINANCES

A. The Pastor is responsible for financial decisions and will establish a balanced annual operating budget in consultation with the Parish Finance Council. The Pastor should also develop in consultation with the Parish Finance Council an annual capital expenditure budget including sources of funds. The Actual income and expenditures of the parish should be compared to the budgets monthly and reviewed by the Parish Finance Council at least quarterly.

B. Each parish shall issue an informative financial report to its parishioners at least annually.

C. All parishes will follow a uniform chart of accounts to facilitate reporting to the parishioners, the Parish Finance Council and the Archdiocese.

D. All parishes will follow established internal accounting controls.

E. All Parish Finance Councils will follow established Archdiocesan Guidelines and participate in Archdiocesan training sessions for priests, administrators and Parish Finance Council members.

F. All parishes will participate in a coordinated payroll system in order to ensure that all employees receive proper benefits and in order to guarantee full compliance with ever more complex laws on taxes and employee benefits. No employee will be paid outside of the coordinated payroll system.

G. All parish financial activities will be the subject of regular independent audits or reviews.

H. All parish accounts in financial institutions will be included on the annual parish financial report and subject to the audit-review process. The Archdiocese will obtain comprehensive lists of all parish accounts from financial institutions and will compare the listing of the accounts with the listings contained on the annual parish reports.

A1

## Section B.
## Parish Finance Council Guidelines

# PARISH FINANCE COUNCILS

**A.**    The Revised Code of Canon Law mandates a Parish Finance Council in each parish. The role of the Parish Finance Council is to assist and advise the Pastor in overseeing and controlling the financial affairs of the parish. The Parish Finance Council is accountable to the Pastor, who has the responsibility for final decisions. It is understood that if the advice of the Parish Finance Council is unanimous on a given matter, the Pastor will give serious consideration to the recommendation and not lightly reject it.

**B.**    Structure of the Parish Finance Council.
Members shall be appointed by the Pastor and must be active Catholic members of the parish. Members should be skilled in business and have some expertise in management, financial, accounting, legal, fund raising or related fields. The membership of the Council cannot include anyone who could have a conflict of interest from such affiliation, nor can any parish staff member or any relative of the Pastor be a member. There shall be at least three members.

Members shall serve for three years. The terms of the Parish Finance Council will be staggered to ensure continuity. Upon initial formation of the Parish Finance Council, the Pastor shall designate either a one, two or three year term, in succession, for each member that the Pastor appointed. Thereafter, members who are appointed or re-appointed shall serve for three years. In the event a member resigns or is removed by the Pastor for a just cause, the replacement shall assume the remainder of the term of the replaced member. The Pastor shall appoint the Chairperson. Other officers may be appointed at the discretion of the Pastor. When a pastorate becomes vacant, the Parish Finance Council ceases to exist.

**C.**    Functions of the Parish Finance Council.
The Pastor is responsible for financial decisions and will establish balanced operating budgets for the parish and school in consultation with the Parish Finance Council. The Pastor should also develop in consultation with the Parish Finance Council an annual capital expenditures budget including sources of funds. The actual income and expenditures of the parish should be compared monthly and reviewed by the Parish Finance Council at least quarterly.

The members of the Parish Finance Council must be given complete access to all records and documents relating to the financial status and operations of the parish. The Pastor must consult the Parish Financial Council concerning any major commitment of parish funds in excess of $10,000, or a series of small amounts for a single purpose that will exceed $10,000. In conjunction with these functions the Parish Finance Council shall do the following:
**1.**    Establish a timeline for budget development and implementation by the parish staff.

2. Review proposed operating and capital budgets.
3. Review significant budget variances and develop a plan of action, if necessary, to correct the problem(s) or amend the budget.
4. Review proposed expenditures which are not included in the approved budget.
5. Review and recommend approval or disapproval of proposed budgets from individual parish organizations having substantial sources of income (i.e. Men's Club, Women's Club, Bingo, Scrip, Boosters, etc.). Financial statements for these organizations and activities shall be submitted to the Parish Finance Council at least annually.
6. Provide parishioners with an approved budget and periodic financial statements, at least annually.
7. Review the annual financial statements published to parishioners and submitted to the Chancery Office for accuracy and completeness. The reports must agree with the books of record and must be accurate. If necessary, supplemental information can be included as a footnote to the reports.
8. Ascertain that the parish follows the Archdiocesan uniform chart of accounts to facilitate reporting to parishioners, the Parish Finance Council, and the Archdiocese.
9. Ascertain that the parish follows established internal accounting controls as specified by the Archdiocese.
10. Follow established Archdiocesan guidelines and participate in Archdiocesan training sessions for priests, administrators and Parish Finance Council Members.
11. Ascertain that all employees are included in the Archdiocesan coordinated payroll system in order to ensure that all employees receive proper benefits and in order to guarantee full compliance with ever more complex laws on taxes and employee benefits. The Parish Finance Council should ascertain that no employee is paid outside of the coordinated payroll system.
12. Ascertain that Independent Contractors comply with Internal Revenue Service regulations.
13. Ascertain that all parish cash with financial institutions is included on the annual parish financial report.
14. Study sources of parish revenue, make recommendations for maintaining and enhancing parish revenue, assist in the development of programs and processes to that end, and coordinate fund raising programs.
   a) Oversee and review fund raising programs and expenditures for the parish, school and affiliated groups/organizations.
   b) In conjunction with the Parish Council, educate parishioners with regard to stewardship.
15. Review all banking and financial institution arrangements, bookkeeping procedures, capital expenditures and contracts of a fiscal nature subject to

Archdiocesan regulations.  Make recommendations for improvements or changes subject to Archdiocesan Regulations or Policies.

16. Advise the Pastor in financial and budgeting aspects of managing and caring for the parish buildings and equipment.  Assist the Pastor in evaluating deferred maintenance and the development of a long range capital improvement budget.

17. **New Measures (Effective October 1, 2022)**
   a. At least quarterly, review non-payroll payments including reimbursements made to pastor and staff to ensure compliance with reimbursement policy.
   b. Review and approve monthly credit card statement including pastors:
      a) Either Wells Fargo Card or Other Credit Card
      b) Recommend review performed by Finance Council Chair
   c. Ascertain if books and records of Parish are being closed at least quarterly and quarterly financial statements are prepared

**D.** Meetings of the Parish Finance Council
The Parish Finance Council shall meet at least on a quarterly basis, preferably monthly.  Special meetings of the Parish Finance Council may be called by the Pastor. There shall be a written record of the actions taken at the Parish Finance Council meetings.

## Section C.
## Internal Accounting Controls for Parishes and Schools

# INTERNAL ACCOUNTING CONTROLS FOR PARISHES AND SCHOOLS

**A.**     Bank Accounts

1.     All bank accounts must bear the parish/school name. No bank accounts shall be in the name of the Pastor or an individual(s).

2.     All parish/school funds must be deposited only in accounts that bear the Parish name.

3.     Bank accounts in the name of the parish/school may be opened or established only by decision of the Pastor and approved in writing by the Archbishop or his designated Attorney-in-fact. The Pastor must be a signatory on all parish/school accounts.

4.     The number of bank accounts should be kept at a minimum. A list of all bank accounts must be given to the Parish Financial Council.

5.     At his request, the Pastor or his delegate may receive unopened bank statements. This person should then scan the statements and the enclosed canceled checks for unusual items prior to forwarding the statement for reconciliation.

6.     The reconciliation should be performed each month by someone who does not have access to cash. In those instances where it is impossible to comply with this requirement, an independent review of the reconciliation shall be made by another member of that organization. Reconciliations may be reviewed periodically by the Parish Finance Council.

7.     All unused checks should be safeguarded in a safe or locked cabinet.

8.     Parish surplus funds, defined as amounts in excess of two months non-school operating cash expenditures of the parish for the previous fiscal year, must be deposited in the Capital Assets Support Corporation Parish Deposit and Loan Fund in accordance with Policy on Investment of Parish Surplus Funds.

9.     Elementary school surplus funds, defined as amounts in excess of two months school operating expenses for the previous fiscal year, must be deposited in the Capital Assets Support Corporation Parish Deposit and Loan Fund in accordance with Policy on Investment of Parish Surplus Funds

C1

**B.** Cash Disbursements

1. All expenditures shall be consistent with and within the budget limits approved by the Pastor and the Parish Finance Council. If possible, proposed significant expenditures beyond budget limits and non-budgeted items should be approved in advance by the Parish Finance Council and the Pastor, otherwise, especially in emergency situations, they should be advised as soon as possible of such expenditures.

2. Prenumbered checks should be used and numerical control maintained. Voided checks should be accounted in the monthly reconciliation.

3. All check disbursements in excess of $500 require two signatures. Bank signature cards signifying the approved signers must be on file in the parish office.

4. It is never permissible to pre-sign blank checks.

5. Checks shall be prepared from approved invoices or check requests. Check requests should be supported by receipts or other appropriate documents indicating for what the expenditure was made. Some notation in writing should be made on the invoice or check request indicating that goods were received or services performed. Invoices should be reviewed for terms, prices, extensions and compared with the check request by the bookkeeper and/or administrative assistant.

6. Check signers should review the supporting data and approvals on the check requests/invoices prior to signing the checks.

**C.** Cash Receipts

1. Mail should be opened by someone other that the person responsible for recording cash receipts. Checks received must be listed and endorsed "for deposit only" before being turned over to the person responsible for deposit.

2. The person responsible for making the deposit (i.e. the person who prepares the deposit slip) should be someone other than the person responsible for recording cash receipts.

3. All receipts should be maintained in a locked file cabinet or safe until deposited. Only the Pastor or his delegated agents should have the combination to this safe or the key to the locked file.

4. Cash receipts must be recorded and deposited intact as soon as possible. Copies of deposit slips must be maintained.

C2

5. No checks made payable to the parish, its school or any of its organizations may be endorsed and converted into cash, nor deposited in accounts other than parish accounts.

6. It is expected that the foregoing procedures will also be applied to tuition collected by parish schools and any monies collected by parish organizations.

**D.** Petty Cash Funds

1. Petty cash funds should be maintained on an imprest basis and periodically replenished for exactly the amount of expenditures from the fund. Imprest basis means that at all times the sum of the cash on hand and the disbursement forms/invoices equals the total amount that is supposed to be in the fund. The size of the fund should be determined by its activity, but can not exceed $500 except for bingo.

2. The fund should be in the sole custody of a single employee. The custodian should balance the fund at least monthly, and periodically, the Pastor or his delegate should count the fund on a surprise basis.

3. Disbursements from the fund should be supported by petty cash disbursement forms which should be either typewritten or prepared in ink. All supporting    data should be attached to the voucher. Upon reimbursement of the fund, every disbursement form (and supporting data) covered by the reimbursing check should be reviewed for reasonableness and canceled in such a manner as to preclude reuse.

4. The petty cash fund should be recorded as a cash account. Cash should be relieved and expense recorded when the petty cash disbursements forms are submitted and the fund is reimbursed.

**E.** Budgets

1. Each parish organization and cost center (e.g. school, rectory, hall) must prepare an annual revenue and expense budget for usage in guiding the parish through the coming fiscal year's financial transactions. All necessary maintenance items should be included.

C3

| 135 | | 2. | A one-year and five-year capital budget should be prepared for all |
| 136 | | | expected and planned capital improvements, including existing and |
| 137 | | | planned sources of funds to be used to pay for such improvements. |
| 138 | | | |
| 139 | | 3. | All budgets must be completed and submitted for review and approval |
| 140 | | | to the Parish Finance Council in time for a spring meeting, except the |
| 141 | | | school budget which must be submitted to the Council after it has been |
| 142 | | | approved by the School Board or (similar body) and prior to being |
| 143 | | | submitted to the Archdiocesan School Department. |
| 144 | | | |
| 145 | | 4. | All budgets should be balanced or result in a surplus.  In those |
| 146 | | | instances where it is not possible to balance the budget, the sources of |
| 147 | | | funds (e.g. savings, loans) to be used to balance the budget should be |
| 148 | | | identified and approved by the Pastor after consultation with the Parish |
| 149 | | | Finance Council.  Any subsidies requested by the school, parish |
| 150 | | | organizations etc. must be approved by the Pastor after consultation |
| 151 | | | and review by the Parish Finance Council. |
| 152 | | | |
| 153 | | 5. | Final approval of all budgets is the responsibility of the Pastor after |
| 154 | | | consultation with the Parish Finance Council. |
| 155 | | | |
| 156 | **F.** | Financial Reports | |
| 157 | | | |
| 158 | | 1. | Financial reports should be submitted on at least a quarterly basis |
| 159 | | | (preferably monthly) to the Pastor and the Parish Finance Council in |
| 160 | | | order to keep them fully informed on the current and future financial |
| 161 | | | condition of parish activities. |
| 162 | | | |
| 163 | | 2. | The financial reports should be prepared on a cumulative year-to-date |
| 164 | | | basis and compare actual revenue and expense items to budgeted |
| 165 | | | amounts.  Significant variations from budget and any unbudgeted |
| 166 | | | items incurred should be explained.  The reports should also include |
| 167 | | | the beginning and ending cash balances. |
| 168 | | | |
| 169 | | 3. | A copy of the parish annual report must be submitted to the Chancery |
| 170 | | | Office by August 31 for each year.  A copy shall be given to the Parish |
| 171 | | | Finance Council. |
| 172 | | | |
| 173 | | 4. | A copy of the parish school's annual financial report must be |
| 174 | | | submitted to the Archdiocesan Department of Education in  August of |
| 175 | | | each year.  The report must be submitted to the Pastor and to the |
| 176 | | | Parish Finance Council for approval before submission to the |
| 177 | | | Archdiocesan Department of Education. |
| 178 | | | |

C4

179                5.      All parish organizations shall prepare an annual financial report and
180                        submit it to the Pastor and the Parish Finance Council by August 31 of
181                        each year.
182
183                6.      Financial statements and supporting records of all parish entities are
184                        subject to review and examination by the Parish Finance Council at
185                        their discretion.
186
187  **G.**     Payroll
188
189                1.      All parish and school employees <u>without exception</u>, will be paid
190                        through the Archdiocesan coordinated payroll system.
191
192                2.      All appropriate federal forms, including W-4's and I-9's, must be filed
193                        in each employee's personnel folder.
194
195  **H.**    Offertory Collection Handling
196
197                1.      A parish representative other than a member of the Collection
198                        Committee will place an ample supply of the tamper-proof pre-
199                        numbered recyclable plastic bags in the church prior to the day's
200                        service.  He will insure that the bag numbers are in numerical
201                        sequence and no numbers are missing.
202
203                2.      The parish ushers at each service will place the offertory collections in
204                        bags.
205
206                3.      The Collection Count Committee will keep a log of the numerical
207                        sequence of the bags.  All missing bag numbers and out of sequence
208                        situations will be researched by the Collection Count Committee at
209                        time of counting the collections.
210
211  **I.**     Collection Counting
212
213                1.      Collections should be counted and checks endorsed for deposit as soon
214                        as possible.
215
216                2.      A Collection Count Committee must be established in sufficient
217                        number to count collections as expeditiously as possible.  In setting up
218                        the Count Committee, the selection of members should be considered
219                        carefully.
220
221                3.      Cash count procedures should be in writing and furnished to each
222                        member of the Collection Count Committee.
223

C5

224  4.  Collections should be recounted by another member and they should
225     agree on the total.
226
227  5.  The amount of offering should be indicated on the outside of the
228     envelope for subsequent posting to parishioner statements.  Loose
229     checks should be listed for subsequent postings to parishioner
230     statements.
231
232  6.  The count results should be written in ink onto a standard count form
233     and the deposit slip forwarded directly to the Pastor and the
234     bookkeeper.
235
236  7.  All Archdiocesan and national collections should be remitted to the
237     Chancery Office as soon as possible, but no later than one month after
238     the collection was taken.
239
240  8.  The Parish Finance Council should perform a periodic review to
241     determine that proper control is being exercised over the collection
242     count by:
243
244       a)  Tracing the copy of the deposit slip to the collection
245           count record.
246
247       b)  Ascertaining that two members of the count committee
248           have signed for the count.
249
250       c)  Tracing collection deposits to bank statements and
251           ascertain that deposits were made in a timely manner.
252
253       d)  Determining that procedures for handling mail receipts
254           are being followed.
255
256       e)  Determining that special collections have been remitted
257           properly to the Chancery Office on a timely basis.
258
259
260  **J.**  Fund Raising Activities
261
262  1.  The reason for each new fund activity should be submitted  for
263     approval to the Pastor and the Parish Finance Council before the
264     activity is started.
265
266  2.  Every parish entity should use adequate control procedures for all
267     fund raising activities. For activities such as bingo and scrip, it is
268     essential that controls over inventories be established.
269

C6

270    3.    Fund raising activities should be included in the budget.  If the profits
271          of an activity are to benefit another parish entity (e.g. parish, school,
272          etc.), the other entity should include this amount in its budget.
273

C7

# Section D.
## Stewardship and Development

# STEWARDSHIP & DEVELOPMENT PROGRAM
## POLICIES AND PROCEDURES

**I. INTRODUCTION**

    **A.** The Stewardship Program recommended by the Archdiocese offers three benefits to the parish:

*Increased Understanding of Christian Stewardship*
*Increased Volunteers for Parish Ministries*
*Increased Weekly Offertory Contributions*

    Stewardship education helps parishioners to recognize that everything we have -- our time on this earth, our talents and abilities, and our material resources are gifts from a loving God. These gifts are not ours to use as we please. As Christians, we are obligated in thanksgiving to God to develop our gifts, and to return a just portion to further the teachings of Christ through the teachings of the Church. The Stewardship concept reverses the reason for support of the Church. In Stewardship, the contribution of time or money becomes a subjective personal commitment, rather than giving time, talent or treasure solely for the objective "needs" of the Church. The challenge of the parish is to forge a meaningful connection between the biblical and theological basis of Stewardship and the practice of Christian Stewardship in the daily lives of people. With a well trained, permanent Stewardship Committee, the Pastor can help parishioners understand the bond between the theology and the practice of Stewardship. This mission is what God calls us to do.

**II. DEVELOPMENT POLICY**

    **A. Premise**

*As disciples of Christ, Catholics recognize God as the origin of life, and source of all we possess. Our resources exist not only to fulfill our own needs, but also to serve others. Therefore, we are obligated as stewards to receive God's gifts gratefully, cultivate them responsibly, and share them in justice with others.*

*Catholics are also collaborators and cooperators in the redemptive work of Jesus Christ. This is the fundamental mission of the Church: to proclaim and teach, to serve and sanctify. Catholics demonstrate their unity and collaboration in the works of the Church through the stewardship of their time, their talents and their financial resources. The fund-raising ministry of all Catholic Schools, Agencies and Parishes is an apostolic activity and based upon scripture and gospel values.*

D1

47      **B.**      **Introduction**
48
49              The Development Policy recognizes the expertise and accomplishments of the
50              Catholic schools, Archdiocesan offices, agencies, and parishes in their fund-
51              raising ministry.  The Policy exists to serve the interests of these entities, and the
52              individual leaders and donors who participate in various appeals.
53
54              The Policy considers the views of the development executives of the Catholic
55              schools and agencies, and the Archbishop's Stewardship Council of Priests, who
56              represent the parishes of the Archdiocese.
57
58              The goal of the Policy is to achieve unity and cooperation, and to foster gospel
59              values and Christian stewardship in the fund-raising activities of all Catholic
60              entities under the jurisdiction of the Archbishop.
61
62                      *"Make every effort to preserve unity.  There is one Lord, one faith, one*
63                      *baptism, one God who is over all and works through all."     Ephesians*
64                      *4:4-6*
65
66                      *"As each one has received a gift, use it to serve one another as good*
67                      *stewards of God's varied grace."     1 Peter 4:10*
68
69              The Policy considers the Code of Ethics and recommended practices of the
70              National Catholic Stewardship Council and National Catholic Development
71              Conference, the National Society of Fund Raising Executives, and the American
72              Association of Fund Raising Counsel.
73
74      **C.**      **Institutions Covered**
75
76              The Archbishop has appointed the Director of Stewardship to administer the
77              Policy among all parishes and missions, schools, (Archdiocesan elementary and
78              high schools), Archdiocesan agencies, departments, offices and apostolates, the
79              Catholic Youth Organization, Catholic Charities, and St. Patrick's Seminary.
80
81              The policy shall not apply to:  Catholic hospitals, Catholic colleges and
82              universities, St. Vincent de Paul Society, and those Catholic schools not operated
83              by the Archdiocese; *except where their fund-raising activities are contrary to*
84              *Catholic faith and morals.*
85
86              The policy requests these institutions to apprise the Archbishop of their fund-
87              raising plans in conformance with Canon 1265 of the Code of Canon Law.
88
89                      *Religious mendicants, or private persons whether physical or juridic are*
90                      *forbidden to raise funds for any pious or ecclesiastical institution or*
91                      *purpose without the written permission of their own ordinary and that of*
92                      *the local ordinary."*
93

D2

| | | |
|---|---|---|
| 94 | **D.** | **Responsibilities of the Stewardship Office** |

In accordance with official Archdiocesan policy, the Stewardship Office is responsible for Stewardship education and development activities in the Archdiocese. Activities include the stewardship education, development policy, general fundraising advice, the Archbishop's Annual Appeal, planned giving (wills, bequests and properties), and general counsel to parishes and Archdiocesan agencies (i.e. Catholic schools, Catholic Charities).

The Policy calls all Catholic schools, Archdiocesan offices, apostolates, agencies and parishes to cooperate and assist the Stewardship Office in carrying out the following responsibilities:

> \* To encourage all Catholic entities to use ethical, standard fund-raising practices that will bring credit to their ministry and will enhance the good image of all Catholic schools, agencies and parishes in the Archdiocese.

> \* To ensure preferential concern for the interests of all Catholics and those of other faiths who participate in appeals as volunteers and/or donors.

> \* To confer with all entities at least once a year and review needs, plans and activities. This review can take place by site visits, meetings at the Stewardship Office, conferences, telephone, group discussions or surveys.

> \* To review and provide recommendations regarding proposals of $100,000 or more to individuals, foundations, corporations and associations.

> • To sponsor an annual seminar regarding development and stewardship activities such as: Planned Giving, Capital Campaigns, Annual Funds, Special Events, Direct Mail, Major Gifts, Foundation and Corporate Giving.

**E.    Archbishop's Annual Appeal**

Every parish and mission is allocated a share of the total Archdiocesan Assessment. These assessments are set by the Archbishop's Stewardship Council, based upon the individual circumstances of each parish. Pastors are advised of their parish's assessment for the following calendar year  in a letter from the Archbishop in late November.

D3

139          In order to meet their assessments, parishes are asked to undertake an actual fund-
140          raising campaign.  Materials for the campaign (brochures, posters and envelopes)
141          are provided to the parishes by the Stewardship Office.  Parishes which utilize
142          these materials and conduct campaigns according to the recommended guidelines
143          have found in many cases that this proven method is very effective in raising not
144          only the entire assessment, but additional funds as well.  Many parishes use the
145          AAA as their own fund-raising campaign to meet parish needs.  All funds raised
146          by parishes in excess of their assessments are returned to the parish for its special
147          needs. For further information, please consult your parish copies of *Stewardship*
148          *Program:  Guidelines and Materials for Increased Offertory Income and New*
149          *Volunteers through Stewardship Education and Sacrificial Giving* and *AAA*
150          *Guidelines for Parish Leaders*
151
152    **F.**        **Procedure for Approval of a Capital or Endowment Campaign**
153
154          The following procedure will facilitate the approval of a capital or endowment
155          campaign:
156
157             The school or parish school, agency, department or parish seeking
158             funds should prepare a statement and plan outlining the capital and
159             endowment needs and costs.  The statement and plan should have the
160             approval of the appropriate person responsible for the school, parish
161             school, agency, department or parish seeking funds (e.g. a Pastor
162             would have the authority over both the parish and the parish school.)
163
164             The entity should present the case statement and plan to the
165             appropriate Archdiocesan authorities *(Office of Education, Building*
166             *Committee, etc.)* for approval in accordance with the procedures of the
167             authority.
168
169             Upon approval by the Archdiocesan authority, the entity should present
170             the statement and plan to the Stewardship Office.  The Office will
171             provide a prompt report of approval or remedial steps necessary for
172             approval.
173
174             The Stewardship Office will recommend that a pre-campaign  survey of
175             leadership and donor potential be undertaken, before approving the
176             announcement of a campaign.
177
178             Upon completion of the preliminary survey, the entity should
179             present the results to the Stewardship Office for review.  The Office
180             will provide a prompt report of approval or remedial steps necessary
181             for approval.
182

D4

183 **G.** **Use of Professional Counsel**
184
185         The following policy will aid in selecting professional counsel:
186
187             All Catholic schools, agencies, offices, apostolates and parishes are free to
188             select outside professional fund-raising counsel of their choice, in
189             accordance with the principles and guidelines as established by the
190             American Bishops.
191
192             All entities are encouraged to include their Board of Directors or
193             appropriate councils or committees in the selection process.
194
195             All entities are encouraged to consider companies or consultants who
196             subscribe to the Code of Ethical Guidelines of:
197
198                 (Companies)   *The American Association of Fund Raising*
199                 *Counsel (AAFRC)*
200                           or
201                 (Consultants)  *The National Society of Fund Raising Executives*
202                 *(NSFRE)*
203                         and
204                 *The National Catholic Stewardship Council and the National*
205                 *Catholic Development Conference*
206
207             All entities that prefer a company or a consultant who is not a member of
208             the AAFRC or the NSFRE are asked to provide the Stewardship Office
209             with the credentials and references of the candidate before a contract is
210             signed by a Vicar General. The Stewardship Office will prepare a prompt
211             recommendation relating to the qualifications of the company or the
212             consultant.
213
214
215         The Stewardship Office can best administer this Development Policy with the
216         cooperation of all entities under the jurisdiction of the Archdiocese. This
217         cooperation will ensure that the best interests of all volunteers, leaders and donors
218         will be served, and the good reputation of all entities and the Archdiocese will be
219         protected.
220
221
222 **III.** **POLICIES FOR THE ACCEPTANCE OF GIFTS OF REAL ESTATE**
223
224         Gifts of real estate, including all forms of interests in real property, may be accepted on
225         behalf of the Archdiocese and its parishes in accordance with these policies, with
226         exceptions allowed as stated below.
227

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 83 of 308

A. **Authority to Accept Gifts of Real Estate.** The following officers of the Archdiocese are authorized to accept gifts of real estate that are permitted by these policies: The Archbishop or his corporate legal delegate acting in consultation with the Stewardship Office, the Real Estate Office and the Finance Office.

B. *Conditions for Acceptance:* A gift of real estate may be accepted only under the following conditions:

1. It is to be used by the Archdiocese in connection with established or specifically approved programs or activities; or

2. It is to be held for the production of income; or

3. It is to be sold with the proceeds used for the general purposes of the Archdiocese, or as provided by the donor.

The Archdiocese will not accept property that would jeopardize its tax-exempt status

C. *Conditions Affecting Acceptance:*

1. If the property is to be used by the Archdiocese, it shall be in good physical condition. If it is not in compliance with applicable building, health, and safety codes, or requires repairs or improvements, a source of funds for the costs of bringing the property into compliance must be identified prior to acceptance.

2. The proposed use must be lawful and consistent with the previously approved strategic plans of the Archdiocese involving the use or acquisition of real property.

3. If the property is to be held for the production of income, a *pro forma* positive cash flow analysis must compare favorably to the amount of income that would be obtained if the property were sold and the proceeds invested as a part of the general endowment pool.

4. If the property is to be sold, it should be marketable within a reasonably short period of time. Acceptance of offers to purchase property from the Archdiocese requires the signature of the Archbishop or his corporate legal delegate, after consultation with the Stewardship Office, the Real Estate Office and the Finance Office.

D6

In rare circumstances, the Archdiocese may consider financing the sale or carrying-back a portion of the purchase price for a credit-worthy purchaser at an interest rate that is comparable with other Archdiocesan investments and is subject to other appropriate terms and conditions.  The terms shall be approved in writing and approved in advance by the Archbishop or his corporate legal delegate, after consultation with the Stewardship Office, the Real Estate Office and the Finance Office.

**D.** *Procedure:* Prior to formal acceptance, the following shall be obtained by Archdiocesan staff:

1. Preliminary title report covering the subject property (the title report shall reflect that title is vested in the donor in the form represented, and is subject to no claims, liabilities, or major defects of title);

2. A suitable property valuation.  The donor may be asked to pay the costs associated with obtaining any necessary final appraisal.

3. A list of improvements to the property;

4. A current list of leases, if any;

5. A list of encumbrances, liens, and current expenses, if any;

6. A commitment for title insurance; and

7. A physical inspection of the property by an employee, agent of, or consultant to   the Archdiocese.

Conditional acceptance may be made subject to satisfactory completion of each of the foregoing.

**E.** *Hazardous Waste Considerations.*  Prior to formal acceptance, a "Phase One" (as defined by the Real Estate Office of the Archdiocese) must be made by an individual or firm competent to advise the Archdiocese whether further investigation is needed.

**F.** *Grant Deed.*  Upon acceptance of the gift of real estate, it is the responsibility of the Real Estate Office to insure that the grant deed is properly conveyed to the Archdiocese. This includes having the donor sign the deed and recording it with the appropriate county.  The Archbishop or his delegate has responsibility for the proper safeguarding of all deeds.

**G.** *Internal Revenue Service Form 8283.*  The internal Revenue Service requires that Form 8283 be completed so as to be filed with the donor's tax return.

D7

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 85 of 308

318          Upon acceptance, the Stewardship Office will be responsible for completing the
319          "Donee Acknowledgment Section" of IRS Form 8283, mailing the original form
320          to the donor and a copy to the Archbishop or his delegate.
321

322 **H.**    *Internal Revenue Service Form 8282.* The Internal Revenue Service requires
323          that Form 8282 be completed and filed (with respect to any real estate for which
324          a Form 8283 has been filed) when that property is disposed of by the donee
325          institution within two years of the date of gift. Upon disposition, the Real
326          Estate Office of the Archdiocese will be responsible for filing Form 8282 in a
327          timely manner.
328

329 **I.**    *Maintenance, Upkeep, Insurance, etc.* Prior to acceptance of any gift of real
330          estate, a source of funds must be identified for maintenance, upkeep, insurance,
331          etc. of the donated property.
332

333 **J.**    *Life Estates.*
334

335      1.    *Simple Life Estate Agreements:* In the case of property donated to the
336              Archdiocese subject to a life estate, the life tenant shall enter into an
337              agreement in writing providing that the life tenant shall pay all the costs
338              of maintenance and upkeep of the property including but not limited to
339              repairs, improvements, taxes, insurance, etc.
340

341      2.    *Life Estate with Lump Sum or Series of Payments:* If the life tenant is
342              also to receive a lump sum payment or a series of payments, a financial
343              analysis will be done to determine the return on investment to the
344              Archdiocese. The analysis will include the life tenant's life expectancy,
345              projected appreciation rate of the property, and estimates of future
346              interest rates. Donor-authorized impounds from the lump sum will be
347              necessary to cover maintenance, upkeep, insurance, property taxes, etc.
348

349 **K.**    *Cost Recovery.* Funds to cover costs such as appraisals, hazardous substance
350          assessments, taxes, insurance, maintenance, and unanticipated expenses may be
351          advanced from other funds of the Archdiocese and recovered at the time
352          disposition of the property is made. The cost of recovery shall include interest
353          on Archdiocesan funds, normally equal to earnings of funds operating as
354          endowment. Donors shall be advised of this policy.
355

356 **L.**    *Documentation of Acceptance of Property.* It is the responsibility of the
357          Stewardship Office to secure acceptance from any of those parties authorized to
358          accept property (see above) and assure documentation of acceptance.
359          Documentation may be in the form of a memo to the file or more formally by
360          letter.
361
362

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 86 of 308

| | | |
|---|---|---|
| 363 | **M.** | *Exception Procedure.* Exceptions to these policies may be made by the |
| 364 | | Archbishop or his corporate legal delegate when such exceptions are deemed to |
| 365 | | be in the best interest of the Archdiocese. Such exceptions shall be in writing |
| 366 | | and set forth the basis of the exception. |

367
368  **V.  POLICY ON SPECIAL FUND RAISING ACTIVITIES**

369
370   A growing number of corporations and commercial enterprises are offering financial
371   incentives to parishes, schools and Archdiocesan institutions. These offers pertain to
372   various telephone services, private insurance packages, household and personal
373   products, banking services, credit cards, and the like.

374
375   Any form of express or implied endorsement or promotion of a commercial enterprise
376   or its product or service which encourages parishioners or other constituents to
377   purchase the goods or services puts the parish, school or institution in the position of
378   favoring one business over another for commercial benefit. This includes
379   announcements, meetings, letters, sharing of mailing lists or other arrangements. A
380   parish, school or institution that accepts these incentives risks being subject to unrelated
381   business income tax liability as determined by the Internal Revenue Service.

382
383   In some situations there may even be conflicts of interest, such as the case where an
384   employee, volunteer, or council/board member also works for the commercial
385   enterprise involved. It is important that the Church remain above reproach in
386   connection with the business affairs of others.

387
388   In addition, in the event of a customer's dissatisfaction or consumer complaint with
389   respect to the product or service, or if any harm comes to an individual as a result of
390   the product or service that was "endorsed by the Church", the parish, school, or
391   institution, and the Archdiocese could be faced with adverse publicity and possibly
392   even lawsuits.

393
394   **More importantly, however, the Archbishop, in consultation with his staff, has**
395   **determined that the Archdiocese and its parishes, schools or institutions must**
396   **avoid any perception that the Church is "for sale". Therefore, involvement**
397   **with such programs is prohibited. This prohibition is also based upon**
398   **"strong caution" from the Archdiocesan attorney and his Legal Affairs Advisory**
399   **Board as well as the Office of General Counsel of the United States Catholic**
400   **Conference.**

401
402   There is nothing wrong with a company or any vendor publicly or unilaterally
403   announcing (e.g. through a television or radio ad or parish bulletin advertisement) that
404   it will voluntarily remit a percentage of sales to a charity. Nor is there anything wrong
405   with a company donating, on an unconditional basis, money, goods or services for an
406   event and for the parish, school or institution to publish a simple, unsolicited
407   acknowledgment of its gratefulness for any such donation.

408

D9

409        Hopefully the above guidelines will be of assistance to you in the event that you receive
410        inquiries from companies or vendors.  Should you have any doubts about a particular
411        proposed arrangement, please contact the Stewardship Office.

D10

## Section E.
## Investment of Surplus Funds

# POLICY ON INVESTMENT OF SURPLUS FUNDS

**A. Introduction**

It is critically important that parishes use and invest their funds wisely in order to provide good fiscal management, sound investment and public accountability. Traditionally, the primary vehicle for the investment of parish funds has been the Capital Assets Support Corporation Deposit and Loan Fund. This fund is designed to provide a safe investment vehicle for parish assets, as well as to provide a low interest rate for parishes which need funds to expand their parish plants and/or pay for major maintenance projects. Every parish has benefited from the Capital Assets Support Corporation Deposit and Loan Fund in the past, and every parish has a responsibility to see to the maintenance of this fund which has contributed so enormously to the common good of the Archdiocese as a whole.

In recent years, the Archdiocese has also allowed parishes and parochial schools to invest surplus funds in a managed investment program directed by the Archdiocese. The primary reason for allowing parish funds into this pooled investment program has been to provide a long term growth and income producing opportunity for parish and school endowments.

No parish or school or agency or institution may invest funds in equities/bonds outside of this Archdiocesan pooled investment program. Any parish, school, agency or institution which reserves stocks as a surplus must immediately convert that stock to cash.

**B. Policy**

With this in mind, the following policies govern the handling of all parish and parochial school liquid assets:

1. Parishes have need for ready access to cash to sustain their normal parish and school operations. In order to provide for this, each parish may retain in outside commercial bank accounts or savings and loan bank accounts, an amount equivalent to two months of the non-school operating expenditures of the parish for the previous fiscal year.

2. A parish school may keep an amount up to two months operating expenses for the school for the previous fiscal year in a school checking account in a commercial bank or savings and loan institution.

E1

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 90 of 308

44     3.     All liquid assets of the parish or parochial school which exceed the amount
45             specified in 1 and 2 above must be invested in the Capital Assets Support
46             Corporation Deposit and Loan Fund.

47     4.     Any parish which has deposited a total of one year's non-school parish
48             operating expenditures for the previous fiscal year in the Capital Assets Support
49             Corporation Deposit and Loan Fund may elect to invest any additional surplus
50             funds either in the Capital Assets Support Corporation Deposit and Loan Fund
51             or in the Capital Assets Support Corporation Investment Pool.

52     5.     All funds belonging to duly constituted endowments of the Archdiocese must be
53             invested in the Capital Assets Support Corporation Investment Pool within six
54             months from receipt by the parish.

55     6.     Most parishes and schools have organizations which substantially enrich the life
56             of the parish by raising funds for organizational activities and by contributing to
57             specific projects which benefit the parish as a whole.
58                    • Funds of parish/parochial school organizations are by civil and
59                      church law owned by the parish
60                    • It is preferable that parishes keep all parish and/or school
61                      organization funds in parish accounts with sub-funds on the parish
62                      books for each organization and disbursements and receipts
63                      conducted through the parish bookkeeping and disbursement
64                      process.
65                    • Alternatively, a Pastor may elect to allow parish and/or school
66                      organizations to maintain organizational checking accounts in
67                      commercial bank or savings and loan institutions. In such a case, the
68                      receipts and expenditures of the organization may be conducted by
69                      duly appointed officers of the organization, but all transactions must
70                      be recorded quarterly on the parish books.  At no time should the
71                      balance of an organization's checking account exceed $10,000.
72                      When an account reaches $10,000 all funds over that amount should
73                      be transferred to the parish either as a gift to the parish or as funds
74                      held for the organization.
75

76     7.     Withdrawals from the Capital Assets Support Corporation Deposit and Loan
77             Fund can be made only with approval of the Pastor.  Although funds will
78             generally be paid by check to the parishes, withdrawn funds will be paid as the
79             Pastor directs. Withdrawals of $5,000 or less may be made at any time by a
80             telephone call from the Pastor to the Chancery Finance Office.  Withdrawals in
81             excess of $5,000 must be requested in writing and will be promptly disbursed.
82             To ensure the Fund's liquidity to meet loan and other withdrawal demands,
83             requests in excess of $50,000 must be made in writing at least 15 days before
84             the funds are needed.
85

86     8.     Withdrawals from the Capital Assets Support Corporation Investment Pool in
87             excess of the annual distribution percentage may be made with the written

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 91 of 308

88          authorization of the Pastor in minimum amounts of $1,000 within the first five
89          days of any calendar
90

E3

91    quarter.  To ensure that adequate time is given for the investment managers to
92    have liquid assets for the distribution, withdrawal requests in excess of $50,000
93    must be made in writing at least 30 days before the end of the quarter when the
94    funds are needed.
95
96    **C. Description Of Restricted/Unrestricted Funds**
97
98        Surplus parish/parochial school funds fall into several different categories which
99        govern their legitimate use.
100
101        Restricted funds are those assets received by the parish/parochial school for a
102        specific purpose which the donor specified at the time of the gift.  There are two
103        major categories of restricted funds:
104
105            Endowments are gifts which specifically provide that the principal of the
106            gift cannot be used and that the income generated from these funds must
107            be used for a specific purpose.  Income is defined as net realized
108            gains(dividends, interest, gains/losses on sales of assets) and unrealized
109            gains (market appreciation of stocks, bonds still held in an investment
110            portfolio and increases in the unit value of funds deposited in the Capital
111            Assets Support Corporation Investment Pool).
112
113            Restricted gifts which have no endowment provision are gifts which
114            allow the depletion of the principal, as well as, any income (if so noted
115            by the donor) for the purpose specified in the donor's gift
116
117        It is not legitimate to use or borrow against these restricted funds for use or for
118        other purpose.
119
120        Unrestricted funds are gifts which were not restricted to a specific purpose by
121        the donor at the time of the gift.  Unrestricted funds constitute general funds of
122        the parish/school.  They cannot be bindingly designated as to future use even by
123        the Pastor.

E4

## Section F.
Endowments

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 94 of 308

# ENDOWMENTS

**I.** **SCHOOL ENDOWMENTS**

    **A.** **Preface:**
The Archdiocesan Pastoral Plan calls for the development of adequate endowment funds to assure the viability and affordability of education in the Catholic Schools. These policies and procedures have been developed to facilitate and govern the establishment and operation of school endowment funds (which include parish elementary schools as well as the Archdiocesan elementary and high schools). Schools should refrain from creating excess numbers of endowments in order to avoid unnecessary confusion and "competition".

    **B.** **Definition of Endowment:** Misunderstandings can arise in the absence of a clear perspective as to the nature, scope and intent behind funds which are classified as "endowment funds". The word "endow" means "to provide with income or a source of income." The idea is that the principal of a fund will remain intact and only the income (including "accrued total return" or " capital appreciation") generated from the investment of the principal will be utilized to serve a defined purpose or purposes.

An endowment is distinguishable from a donor "restricted fund", which simply requires that the monies placed in the particular fund be used for a specific purpose, as in the case of a donor leaving property or money in his/her will. Another example would be a second Sunday collection such as the "Peter's Pence" or St. Vincent de Paul collection. [Note: In some instances a donor may specifically condition that a restricted gift of money be established as an endowment.] A true endowment fund as well as a restricted fund, properly accepted and acknowledged by the Archbishop or his legally authorized corporate delegate, must be used for its specified purpose.

In order to be valid, a formal endowment must be approved in writing by the Archbishop of San Francisco. A standard, basic form, will be utilized. The form sets forth the conditions surrounding the establishment, responsibility for, use of funds, management and investment, and conditions for dissolution of the fund. General, unrestricted parish funds may not be used to establish or add to an endowment fund. Once funds are placed in an authorized endowment they may not be removed. All School Endowment funds shall be invested in the Archdiocesan Investment Pool. The Advisory Committee for each fund shall have the ability to assist Pastor/Administrator in choosing from among several investment strategies/managers which will be made available through the Investment Pool.

In sum, no Pastor or Administrator has the authority to unilaterally set up an endowment. When questions arise in these areas they should be directed to the Stewardship Office in advance of any proposed action.

F1

47
48 **II.     PARISH ENDOWMENTS**
49
50     **A.     Preface**:
51         The Archdiocesan Pastoral Plan calls for the development of adequate endowment
52         funds to assure the viability and affordability of education in the Catholic Schools.
53         The Plan does not specifically address the subject of Non-School endowments, such
54         as those designed to benefit the general or special operations of a parish.  For this
55         reason, and because the philosophy behind the need to establish school endowments
56         (e.g. keeping Catholic education affordable for all) differs in some ways from that
57         of the parishes, separate Policies and Procedures have been developed.
58
59     **B.     Policy & Approval Procedure:**
60         Unrestricted parish funds which a Pastor may  envision for particular purposes shall
61         be treated as "designated funds", not "endowments" or "restricted" funds.  Donors
62         can be encouraged to support the general works of the parish, or to restrict their gift
63         for a particular parish use, without the need to establish an endowment.  These
64         principles are particularly important where there is a parish school endowment, in
65         which case the creation of multiple "endowments" can cause unnecessary intra
66         parish confusion and "competition".
67
68         As a matter of general policy then, the Archdiocese does not encourage the
69         establishment of parish, as opposed to school, endowments.  However, in those rare
70         instances where the Archbishop does approve the establishment of a parish
71         endowment, the following Policies and Procedures shall apply:
72
73         In order to be valid, a formal endowment must be approved in writing by the
74         Archbishop of San Francisco.  A standard, basic form, similar to the School
75         Endowment form, will be utilized.  The form sets forth the conditions surrounding
76         the establishment, responsibility for, use of funds, management and investment, and
77         conditions for dissolution of the fund.   General, unrestricted parish funds may not
78         be used to establish or add to an endowment fund.  Once funds are placed in an
79         authorized endowment they may not be removed.  All Parish Endowment funds
80         shall be invested in the Archdiocesan Investment Pool.  Parish Advisory Councils
81         shall have the ability to assist Pastors in choosing from among several investment
82         strategies/managers which will be made available through the Investment Pool.
83
84 In sum, no Pastor has the authority to unilaterally set up an endowment.  When questions arise in
85 these areas they should be directed to the Stewardship Office in advance of any proposed action.
86
87

F2

# Section G.
## Loans

# LOAN POLICY AND PROCEDURE

**A.**     **Philosophy of the Capital Assets Support Corporation Deposit and Loan Fund**

        To provide a central loan fund from which short and long term borrowing can be made at a reasonable rate of interest.

        To be able to make loans which meet the long term objectives of the Archdiocese without having to obtain permission from, or necessarily meet the standards of the secular financial community

        To provide a vehicle by which all of the parishes and approved entities can help one another.

        To provide a central depository of idle funds upon which a reasonable rate of interest can be earned.

        To provide a capable governance committee overseen by the Archdiocesan Finance Council and to administer the program in order to enhance the control, the safety and the efficiency of such deposits and loans.

**B.**     **Deposit and Loan Funds**

        Two deposit and loan funds will be established. One of these funds shall be reserved for parishes. The other fund will be used for entities other than parishes.

**C.**     **Operations Committee**

        There will be two operations committees: one for the Capital Assets Support Corporation Parish Deposit and Loan Fund and one for the Archdiocesan Institutional Deposit and Loan Fund.

**D.**     **Loan Policy**

        It is the purpose of the Capital Assets Support Corporation Deposit & Loan Fund to assist parishes and other institutions in their funding of various maintenance, new building projects and other funding needs.

        The fund is primarily intended to be a short term bridge financing tool for parishes and institutions to use to get their project started as soon as possible but before all the funds are available.  It is, however, not intended to be a long term financing tool in which the repayment period exceeds 7 to 10 years.  Parishes and institutions in planning their projects need to take into consideration many factors but mainly the

Case: 23-30564     Doc# 610-3     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 98 of 308

ability to finance a project within a reasonable time period without burdening the parish's operating revenue.

The Capital Assets Support Corporation Deposit & Loan Committee has the discretion of modifying the loan terms of applicants it has determined to be financially marginal, in those cases where a parish is unable to meet its commitments or experiences a financial emergency. It remains the goal of the D&L Committee to keep these exceptions to a minimum, but to enable all parishes to apply to the D & L Fund to meet their financial requirements that can be supported by the information accompanying the Application.

For a Parish to receive consideration for a variation from the standard terms of the Capital Assets Support Corporation Deposit & Loan Fund, an Applicant would have to meet the following criteria:

1) The request must be non discretionary or of an emergency nature.. This would include situations that arise from either natural causes or have been mandated by changes in government ordinances.

OR

2) Non-Capital needs beyond the control of the Applicant and have not been foreseen, but if not satisfied might jeopardize the operation of the Parish.

OR

3) New parishes that might be formed in the future that require capital funding.

AND

4) The Applicant must not posses other reserves that might be used to satisfy the need.

The fund also can be used to give loans to parishes or other institutions for other needs. In these cases, the terms will be determined based upon the parish's or institution's ability to pay, the funds currently available, and the future availability of funds.

No parish, school, agency, institution or other entity of the Archdiocese may loan any funds or advance any salary payments without the written

G 2

| | | |
|---|---|---|
| 91 | | authorization of the Archbishop, Moderator of the Curia or Vicar for |
| 92 | | Administration. |
| 93 | | |
| 94 | **E.** | **Procedures for Parish Loans** |
| 95 | | |
| 96 | **1.** | The Loan Application |

In order to apply for a loan, the Pastor must complete and submit a loan application on the Operation Committee's approved form. However, loan applications will not ordinarily be approved until the parish has at least 40% of the cost of the proposed project in cash on hand, with an additional 35% in firmpledges that are due in five years. In addition, a capital campaign budget including estimates of fundraising costs, soft costs directly related to the proposed improvements (improvements include all construction costs, plus site preparation and furnishings/fixtures which may or may not be included in the contractor's bid), and an interest reserve that will carry the financing through the construction phase, in addition to the period that the pledges are to be received. These projections should accompany the loan application when it is submitted for consideration.

The Committee will accept loan applications in the amount of $5,000 and above.

All information requested on the application must be given and the application must be signed by the Pastor.

The fund will not loan to any parish which does not have a functioning Finance Council.

The application must be accompanied by copies of:
- The parish's most recent annual report to the Chancery,
- The parish's current budget with year-to-date actual figures,
- Copies of any estimates, bids, etc., received on the proposed work. The Pastor should not accept a specific bid without prior approval from the Archbishop and the Building Committee of the Archdiocese.
- A copy of a separate statement addressed to the pastor and signed by the chair of the Parish Finance Council stating that the Council supports the loan application.

The application should contain as much information about the proposed project as the Pastor thinks will enable the Committee to understand the parish's loan request.

The signed application should be mailed to:
Finance Office

G 3

| | | |
|---|---|---|
| 137 | | c/o Chancery |
| 138 | | One Peter Yorke Way |
| 139 | | San Francisco, CA 94109 |
| 140 | | |
| 141 | **2.** | Visit/Inspection |
| 142 | | For each loan, a member or members of the Committee may visit the parish to |
| 143 | | discuss the proposed project, the loan application and the parish's |
| 144 | | repayment program. |
| 145 | | |
| 146 | | The Committee will meet with the Pastor and anyone else the Pastor wishes to |
| 147 | | invite or the committee asks to see (for example, the pastoral team, the |
| 148 | | Parish Finance Council, etc.) |
| 149 | | |
| 150 | | The Committee may also be comprised of representatives from the Real Estate |
| 151 | | Committee of the Archdiocese. |
| 152 | | |
| 153 | | The Committee will visit the site of the proposed project and discuss with the |
| 154 | | parish's representatives the project and the parish's plans to repay any |
| 155 | | funds borrowed from the Fund. Specifically, the Committee may seek |
| 156 | | to evaluate the commitment of the parish community for the project. |
| 157 | | |
| 158 | | After the meeting, the visiting team will prepare a brief written report and |
| 159 | | recommendation to the Committee, which will be part of the loan |
| 160 | | application. A copy of the report will be sent to the pastor. |
| 161 | | |
| 162 | | The Pastor will be notified of the date and time of the meeting at which the |
| 163 | | parish's application will be decided. The Pastor is invited to attend. |
| 164 | | |
| 165 | | The Committee's decision will be based on its assessment of the parish's |
| 166 | | financial ability to pay for the proposed project, from outside sources |
| 167 | | and the Fund, within a reasonable period of time. The Committee will |
| 168 | | not base its decision on the details of the proposed project. However, |
| 169 | | the commitment of the parish community to pay for the project and |
| 170 | | repay any loan from the Fund will be important factors in its decision. |
| 171 | | |
| 172 | **3.** | Ordinarily, the Committee will accept applications from the Fund for these |
| 173 | | purposes *and no others:* |
| 174 | | • Building a new church, rectory, convent, school, social hall or |
| 175 | | other building used by the parish community. |
| 176 | | • Remodeling, repairing or renovating any existing facility used |
| 177 | | by the parish community, including any facility leased or newly |
| 178 | | acquired by the parish. |
| 179 | | • Acquiring a new facility for use by the parish community. |
| 180 | | • All loan requests to provide emergency working or operating |
| 181 | | capital to the parish community will be evaluated on a case-by- |
| 182 | | case basis. |

G 4

4. Ordinarily, the Committee will require that the parish have a minimum of 40% of the proposed project cost in cash on hand, with an additional 35% in firm pledges that are due within five years before a loan application is approved. The remaining 25% may be advanced to the parish for a reasonable period of time, providing there is ample operating income to service the debt and there is a history of meeting the parish's obligations in a timely manner.

5. All the Committee's decisions will be reflected in written minutes, which will be maintained at the Chancery.

6. The Pastor will be promptly informed in writing of the Committee's decision by the Vicar General and the Chair of the Committee. The Committee may request more information or a meeting with the Pastor before it makes a final decision and, until additional information has been received, the loan application will be deferred to the next meeting. If additional information is not received within thirty (30) days, the Committee will make a decision on the basis of the information it has received.

7. The original loan application will be maintained in the parish file in the Chancery. A copy will be maintained in the files of the Operations Committee.

8. The Operations Committee will establish a reserve based on a parish's perceived ability to repay a loan currently, rather than upon any future possibility that the loan will be repaid from parish assets.

**F.  Documenting and Funding the Loan**

Before the loan is funded, the Pastor will be asked to sign a simple document acknowledging the loan and stating the terms of repayment. The loan agreement will provide for repayment of the unpaid balance of the loan on demand when, in the Operations Committee's opinion, repayment is in the best interests of the Fund's participants. The original of this document will be maintained in the parish file at the Chancery together with the loan application. A copy will be maintained in the Operations Committee's file for the parish and at the parish.

When the signed acknowledgment of the loan has been received, the Chancery will list the loan on the Chancery's books and disburse the loan proceeds as the Pastor shall direct, provided that construction loans will be disbursed as scheduled progress payments are required.

**G.  Interest Rates**

The Capital Assets Support Corporation Deposit & Loan Committee shall determine rates for loans. Rates for loans shall be fixed at least one percent over the lowest

G 5

228          rate for deposits. Rates for parish building loans shall be as low as possible.
229          Other rates can be at a higher rate but still be below market.
230
231 **H.**      **Loans That Are Really Subsidies**
232
233      Loans to entities which do not have a probable chance to repay their loans shall not be
234          made from the Capital Assets Support Corporation Deposit and Loan Fund.
235          These loans are really subsidies and subsidies shall not be made through the
236          Capital Assets Support Corporation Deposit and Loan Fund. If it becomes
237          necessary to advance funds to an entity which may not be able to repay a loan,
238          an alternate method of funding shall be arranged rather than making the loan.
239
240

G 6

## Section H.
## Contracts, Debts and Capital Asset Lease

# POLICY ON CONTRACTS, DEBT & CAPITAL ASSET LEASES

**A.**    **Contracts**

It is essential that Pastors, Parochial Vicars & Principals, Directors of Parish Programs, etc. keep in mind that they are not authorized to sign "Contracts", "Agreements", "Memorandums of Understanding" and the like which exceed $10,000 in amount or one year in duration. Additionally, no employment contacts (regardless of amount of duration) may be signed unless approved by the Offices of the Vicar General & Legal Counsel except those specifically authorized through the Office of Catholic Schools. Finally, no modifications or amendments may be made to any approved contact forms without the prior review and approval by the above-mentioned offices.

**B.**    **Debt**

It is the policy of the Archdiocese of San Francisco not to allow any of its entities to incur any debt without the written approval of the Archbishop or a Vicar General. All construction, acquisition or maintenance activities must be financed through the normal income stream of the entity, or savings and reserves, or from borrowing from the Archdiocesan or Capital Assets Support Corporation Deposit and Loan Funds.

This policy pertains to all Archdiocesan institutions, corporations and agencies including but not limited to the following:

1.    Parishes (The Roman Catholic Archbishop of San Francisco, a corporation sole)
2.    Archdiocesan elementary/high schools
3.    Other entities
    a)    CYO
    b)    Catholic Charities
    c)    St. Patrick's Seminary
    d)    Catholic Cemeteries
    e)    Propagation of the Faith

**C.**    **Capital Assets purchased through lease agreements**

All Real Property or any tangible personal property over $10,000 in value is defined as a major capital asset. In some instances parishes/schools/other entities may wish to purchase these assets through a deferred payment agreement with the manufacturer or a financing representative. These agreements are considered to be a debt obligation unless the deferred payment agreement does not obligate a commitment to pay if the asset is returned. The term must be on a month to month basis to allow the parish/school/entity to return the item with no further payment commitment in order

H1

45        for the agreement not to be considered a debt obligation.  If the agreement states that
46        the Archdiocese has an obligation to a specified number of payments or is acquiring
47        title to the item,  then it is a debt agreement that obligates the Archdiocese.  In such a
48        case the Archbishop or a Vicar General must sign the agreement.

H2

## Section I.
## Employee Pay, Benefits and Employment Policies

**This section intentionally left blank.**

<u>Section J.</u>
Building and Renovations Policies and Procedures

### *SUMMARY OF THE ARCHDIOCESAN POLICY FOR CONSTRUCTION, RENOVATION & MAINTENANCE PROJECTS*

***Mission Statement*:** The purpose of the Building Committee is to provide an unbiased review and input from professionals to help insure the successful completion of projects. The Committee serves the Archbishop and the parishes and institutions of the Archdiocese by:

- Assisting in the planning of projects,
- Encouraging quality workmanship,
- Ensuring appropriate distribution of legal and insurance risks,
- Promoting the most efficient utilization of financial resources.

1. When construction or renovation is contemplated, the first step should be to make an appointment with an Archdiocesan Building Department Staff member. After receiving a description of the proposed project, the staff member will offer advice on the procedures to be followed.

2. If the services of an Architect are needed one must be selected from the approved Archdiocese list of Architects. The Building Department can provide a list of the approved architects. If one requested is not on the list; there is a process by which such approval may be sought. The Building Department will send out Bids for Architects if the project warrants it.

3. The Pastor should send a letter to the Archbishop briefly describing the project and requesting his approval. The letter should include the purpose or need for the construction, the scope and estimated cost of the project.

4. A Certificate of Funds is filled out by the pastor and sent through the building department to the Archdiocesan Finance Office.

5. Any matter that involves the art and environment of a church or chapel must be reviewed and approved by the Office of Worship.

6. When the preliminary drawings have been complete, an appointment should be made for a presentation to the Building Committee.

7. Usually, the Pastor and Architect make the presentation to the Building Committee. The Committee's recommendations will be made in writing to the Pastor.

8. A copy of Archdiocese Building Construction and Remodeling Policy is available upon request.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 110 of 308

43     • The Building Committee meets twice a month. Parishes and institutions
44       wishing to present projects at these meetings should contact the Building
45       Department at least one week before the meeting to be added to the agenda.
46     • The guidelines above pertain to all roofing and electrical projects over $10K
47       and all other **projects over $15K.**
48
49     • Insurance is required for Architects and Contractors. The requirements for
50       insurance may be obtained through the Building Department.
51
52     • The Vicar of Administration signs contracts over $15,000.
53
54
55          **Archdiocesan Building Committee**
56
57 Rev. William Brady        Rev. David Ghiorso
58 Donald Junkin -Chairman Pro-tempore   Ben Murphy
59 James Hagan        Les McDonald
60
61
62
63          **Building Department Staff**
64
65 Steve Kalpakoff  Building Department Manager   415-614-5561
66 Debbie Ramos  Building Department Office Manager  415-614-5560
67

J2

# *BUILDING CONSTRUCTION AND REMODELING POLICY*

**The Archbishop of San Francisco authorizes the Building Committee to consider and make recommendations on construction, remodeling and improvements of buildings either currently owned or intended to be purchased or built. The Building Committee is authorized to establish policies and procedures to be followed in the construction and maintenance projects of the Archdiocese. The policies and procedures apply to all Archdiocesan parishes, primary schools, high schools and other Archdiocesan properties, including all other institutions, agencies, high schools and entities, which are Archdiocesan corporations. This includes St. Patrick's Seminary, Catholic Charities and Catholic youth Organization.**

**Purpose of the Building Committee**

The purpose of the Building Committee is to provide an unbiased review and advice to help insure the successful completion of projects. The Committee serves the Archbishop, parishes and institutions of the Archdiocese by:

- Assisting in the planning of project
- Encouraging quality workmanship
- Ensuring appropriate distribution of legal and insurance risks
- Promoting the most efficient utilization of financial resources.

Building Committee Meetings are held on the First and Third Wednesday of the Month at the Holy Cross Cemetery in Colma. Emergency meetings may be called when necessary. Parishes and institutions may present projects at these meetings by contacting the Building Department at least one week before the meeting to be placed on the Building Committee Agenda. Call 415-614-5560.

**General Policies**

All projects that exceed $15,000 regardless of whether the project components are undertaken concurrently or phased, must be submitted and presented to the Committee for approval. However, all electrical and roofing projects exceeding $10,000 must be submitted and presented to the Committee for approval. If a project involves volunteer work, the value of the volunteer work must be included in the total value of the project. Even though a project may be under $15, 000 we recommend all projects operate under these general policies.

Before planning begins on new construction, major maintenance or renovation a letter describing the concept of the project must be sent to the Archbishop for his approval. This letter signed by the Pastor or his Parochial Administrator should be sent to the Archbishop stating the following:

- A Description of the Project
- The estimated cost of the Project
- Certificate of Funds, which describes the funding for the project

J3

After the Archbishop has given conceptual approval of the project, but prior to making any agreements or arrangements (even verbal) with any architect, contractor, sales representatives, government agency, or real estate firm, a formal request must be made to the Building Committee. When applicable, there should be prior review and approval of other appropriate committees (e.g. Finance, Worship, Real Estate, Office of Catholic Schools) must be obtained. The Building Committee then submits its recommendations to the Archbishop via the Vicar for Administration. Written approval from either the Archbishop or the Vicar for Administration must be obtained before proceeding with formal bid proposals, etc.

Contractors, architects and engineers and project manager that are approved by the Building Committee, must perform all work on project. Consult Section II for criteria for approval and qualification.

For all projects over $300,000 it is mandatory for contractors to keep in force a performance bond of insurance for the estimated cost of the project.

After obtaining the Building Committee's permission to proceed, three competitive bids from qualified union contractors will be required. Any deviation must be approved prior to seeking bids. The Building Committee also expects that the lowest bidding contractor will be awarded the contract. Where special circumstances exist, the Building Committee must be informed.

There may be some instance in which it is not feasible to use the competitive bid process. In these instances the pastor has the option to choose the negotiated contract procedures. See (Section on Negotiated Contract Procedures.) A minimum of three General Contractors will be required to submit proposals for fee and general conditions. After selection of a General Contractor all subcontracts will be competitively bid. A copy of the Negotiated Contract Procedures is available upon request.

***Relationship to other Committees and Departments:***

- The Real Estate Office shall keep the Building Committee fully informed regarding all sales and purchases of property within the Archdiocese.

- The Building Committee, once it has concluded its consideration and recommendations, when necessary, shall refer the project to the Archdiocesan Finance Council, the Worship Committee, and /or the Office of Catholic Schools.

- All work involving hazardous waste material (e.g., lead, asbestos) must be done with coordination with the Building Department.

- All projects involving the demolition, remodeling and renovation of buildings, regardless of dollar amount must be referred to the Building Department for inspection and appraisal.

J4

156    • Volunteer labor can often be a creative and effective element for some projects. At the
157      same time, offers by volunteers within the parish and community to assist in the
158      completion of a project must be approached with caution. The use of volunteers to
159      perform certain tasks may create a risk. Numerous claims have been made due to
160      injuries to volunteers. Whenever possible, volunteers should work on ground level.
161      Contractors who donate services must be treated in the same manner, from an insurance
162      point of view, and must sign the same contract as contractors who are being paid for
163      their services.
164
165    Any contractual agreement (including those valued under $15,000) must adhere to all Policies
166    and the Archbishop or the Vicar of Administration must sign the contract. Without this
167    signature, all contracts are invalid. The contract serves to protect parishes and agencies and
168    ensures that contracts are in compliance with Archdiocesan policies. All construction and
169    building trade activities of the entities of the Archdiocese must be carried out by union labor or
170    an owner-operated company or through wholly volunteer labor.
171
172    ***Criteria for Selection of Contractor, Architects, Engineers & Project Managers***
173
174    The minimum criteria that must be met by architects, engineers, contractors and project
175    managers, are detailed in the checklist provided in this section. Additional criteria may be
176    required as necessary on a project-by-project basis. The purpose of these criteria is not to
177    limit choice but to protect the Archdiocese, the parishes and institutions. A list of approved
178    architects, engineers and contractors will be maintained and updated every three years.
179    Anyone who is not on the approved list may apply to the Building Committee to be added to
180    the list. The Criteria are listed on Pages 10, to 13 for approval.
181
182    The Criteria for Selection requires, at a minimum, architects, engineers, project managers and
183     contractors to provide proof of appropriate state licensing or accreditation, union standing,
184     financial stability, business experience, Waiver of Liens, and non-discrimination clauses.
185
186    A Certificate of Insurance for a minimum of one million dollars liability and worker
187    compensation insurance, must be approved by Gallagher Heffernan Insurance Brokers or
188    the current insurance carrier for the Archdiocese.
189    The project size and complexity may require that insurance coverage be increased.
190    Appropriate coverage for liability and workers compensations, surety (performance) bonds,
191    errors & omissions may be increased to equal the value of the project. The insurance carrier
192    will advise if this is necessary on case-by-case basis.
193
194    ***Procedures/Sequence (in detail)***
195
196    ***New Construction/Remodel for projects over $15,000***
197    • Send written requests to the Archbishop requesting conceptual approval for the
198      project.
199

J5

200    •  An Initial presentation is by Pastor to the Building Committee (herein referred to as
201       the Committee).   Requests to be on the meeting agenda must be sent at least one week
202       prior to the Committee meeting.  The committee currently meets every 1st and 3rd
203       Wednesday of the month.  The Building Committee will review the presentation and
204       the parish will be notified of the committee's requirements, recommendations, and any
205       additional information that is required. Any contract agreement including those valued
206       under $15,000 must adhere to the policies and must include signature of the contractor
207       and owner's representative.
208
209 ***Selection of Architect/Engineer (To be done after approval of project concept)***
210 ***Determine qualifications***
211       Contact the Building Department for recommended selection, guidelines and
212       recommended list of contractors and architects.  Interview prospective architects and
213       contractors.  Select the most qualified contractor and architect, not necessarily the least
214       expensive.  A minimum of three proposals are required.
215
216 ***Approval of Architect by the Building Department***
217
218       To add an architect/engineers not on approved list;  they must submit resume of previous
219       work experience to the Committee as well as a certificate of insurance for evaluation.  A
220       checklist from the Committee policy (section below) must be submitted,  if they are not on
221       the approved list.
222
223       Architect/engineer consultants shall be submitted to the Building Department  for
224       approval.  A minimum of three firms shall submit proposals.
225
226 ***Contract Negotiations***
227
228    •  This takes place between the Building Department and the Parish.  Decide on the
229       Architects' scope of work.  Submit required insurance certificates and submit
230       architect/engineer proposals and qualifications and AIA Contract to the Building
231       Department for review and approval and the Building Department will forward to the
232       Vicar of Administration for signature.
233
234 ***Conceptual and Design Development***
235
236    •  Architect develops conceptual design in consultation and accordance with parish and
237       in accord with the Committee requirements and recommendations. (The outcome of
238       this phase will be cost estimate, schematics and preliminary specifications).
239
240    •  Presentation of the Conceptual Design is made to the Building Committee by the
241       pastor and architect. (Prior to presentation send copies of plans, at least one week prior
242       to appear before the Committee
243

J6

244       • The Architect continues to develop the conceptual design incorporating the
245         Committee's recommendations, the parish recommendations and in accordance, with
246         the Committee approved schematic design. The concept design is developed into
247         working drawings and specifications.
248

249       • Revise cost estimate after conceptual design is complete to reflect all changes and
250         greater detail
251

252       • Give final presentation to the Committee of Working Drawings.  Provide copies at
253         least one week prior to presentation
254

255       • Authorization is needed from the Committee to proceed with construction document
256

257       • Architect responds to all recommendations from the Committee for construction
258         document s and receives final approval, by letter from the chairman of the Committee
259         before proceeding to bid.
260

261 ***Selection of Contractor*** (To be done after application and approval of project concept)
262 ***Determine qualifications***
263

264       • Contact the Building Department for recommended selection guidelines and approved
265         list of contractors
266       • Select at least four of the most qualified contractors for the project to bid on it.
267

268 ***Approval of contractors by the Building Department***
269

270       • Contact the Building Department for criteria to add a contractor to our approved list.
271

272    The Archdiocese Building Department coordinates the day and time for a mandatory bid
273    walk('walk through') at proposed project site with all bidding contractors, parish and
274    architect.   Allow 1-3 weeks for bid preparation from contractors.
275

276    The Contractors submit their sealed bids and which also includes the list of subcontractors
277    and certificates of  insurance for all subcontractors.
278

279 ***Bid Submittal***
280 All bids must be delivered to the attention of the:  Archdiocesan Building Department :  One
281 Peter Yorke Way, SFCA 94109
282

283 The Pastor and architect are welcome to attend the bid opening.
284

285 ***Contract Finalization***
286    Contractor to submit certificate of insurance with additional insured endorsements naming
287         the Archdiocese of San Francisco as co-insured.

J7

288 The Building Department and architect to review contractor's proposal, qualifications
289          certificates of insurance and AIA Owner/Contractor Agreement  for approval and
290          forwarding to the Vicar General for signature.
291

292 ***Construction***

293      • Regular meeting s will be required at construction site with parish representative,
294         contractors(s) architect/engineer and Archdiocesan Project Manager

295

296      • Archdiocesan Project Manager will have access to all construction areas and shall
297         be kept abreast of all major developments.  Archdiocesan Project manager will
298         have the authority to stop construction.

299

300      • ***Change Order*** (if the project is planned correctly and procedures followed the
301         parish can anticipate a minimum of changes).  Collectively the Architect, Pastor
302         and Archdiocese Project Manager signs change orders up to $10,000 aggregate

303

304 When the aggregate of change orders exceeds $10,000 all further change orders shall be
305          submitted to the Building Department for approval.  The Vicar General must
306          approve anything over $10,000.

307

308      • ***Progress Payment Procedures-***  Progress payments shall be approved by the
309         Archdiocesan Project Manager and the architect (if applicable)

310

311 ***Close out of Project***

312      • Contractor completes all outstanding items on the final checklist created by
313         architect/engineer, pastor  and the Building Department.
314      • Obtain waiver of liens from contractor and for all sub-contractors .
315      • Obtain 3 project manuals from contractor, one to be sent to the Building
316         department.
317      • Obtain 3 sets of equipment manuals from contractor, one to be sent to the building
318         department.
319      • Obtain 2 sets of as-built drawings from contactor and architect, one set is  sent to
320         the building department.
321      • Obtain all warranties in writing from the contractor.
322      • Obtain all permits & sign offs.
323      • Obtain certificate of occupancy
324      • Contractor to test equipment and systems in the presence of Architect, parish
325         representative and archdiocesan project manager.  Obtain extra materials(s)
326         properly marked and stored.

327

328 ***Final payment***

329

330 The final payment shall be approved by the architect and Archdiocesan project manager
331 after all contract documents have been reviewed for compliance and project close out is

J8

332     complete, prior to processing for payment.  Payments to be made 30 days after filing
333     notice of completion
334
335 *Maintenance*
336
337 ***Contact the Building Department -*** What is the work and the reason needed.  A presentation
338 by Pastor normally will not be required.
339
340 The Committee assistance
341     Archdiocesan Project Manger can develop plans and specifications and scope of work for
342     most types of maintenance project in lieu of an architect or engineer (e.g. roofing, paving
343     painting, new flooring, minor mechanical and electrical etc).  Archdiocesan project
344     manager can coordinate bidding process.  Archdiocesan project manager can coordinate
345     work.  Archdiocesan project manger can assist in troubleshooting.  Plans and
346     Specification to be complete enough for bidding purposes.  Contractor selection (bidding
347     /contract) procedures are the same as for new construction
348
349     *Construction*
350
351     Frequent meetings will be required at construction sight with parish and Archdiocesan
352     Project Manager and contractor during construction period
353
354 Archdiocesan Project Manger will coordinate the maintenance work. The building department
355 will have the authority to make an approve minor change to the work.  Archdiocesan Project
356 Manger will have the authority to stop construction
357
358 *Payment*
359
360 All requests for payment shall be approved by Archdiocesan representative and forwarded to
361 the parish for payment
362
363 ***Close Out of Project***
364
365 Procedures are the same as for new construction
366
367 ***Property Insurance Claims***
368
369  *Notification*:  Losses are to be reported promptly and in no case later than 15 days from the
370 date  of occurrence or first knowledge of the loss.
371
372     Initial reports are to be made by telephone to Gallagher Heffernan at 415-546-9300.
373     Claims Coordinator handles the claims for the Archdiocese.
374
375     A written report using the claim form provided to each church or agency is to follow
376     immediately.  It should be sent to Claims Department-Gallagher Heffernan, P.O. Box

J9

377      7443, San Francisco, CA  941200-7443.  Note:  Failure to notify Gallagher Heffernan or
378      the Chancery prior to making normal. Non-emergency repairs may result in denial of the
379      claim.
380
381  Police reports are required for all theft and vandalism losses.
382
383      In emergency situations initial reports may be called directly to the Archdiocesan Building
384      Committee at the Chancery.  Telephone notification and a written report will still need to
385      be made to Gallagher Heffernan as soon as practicable.  Pastors and agency heads are
386      authorized to perform or contract for emergency repairs to secure the premises and
387      prevent potential of injury or loss of life.
388
389
390   *Eligibility*
391  A parish, school or agency presenting a claim must be current in its payment of insurance
392  premiums.  Gallagher Heffernan will call the Chancery to verify and document premium
393  payment status prior to beginning adjustment of any claim reported except to the extent
394  necessary to prevent further loss of property, life or value. If premium payments are not
395  current, authorization will be given for only those steps necessary to secure a damaged area or
396  prevent loss of life.
397
398   *Insurance Coverage*
399
400  Coverage shall be determined and settlement made based on the provision contained in
401  standard policy forms published by the Insurance Services Offices, Inc.  Limits of insurance
402  applicable to specific types of property are contained in full description of the insurance
403  program on file at the Chancery.
404
405
406   *The Claims Process*
407
408  All claims will be assigned a claim number.  The claim number is derived from the date of the
409  loss and   location number of the church or agency on the insurance schedule, e.g. a loss at
410  Mission Dolores, location #144, on June 21, 1993 would be assigned Claim Number 062193-
411  144.  Claim numbers must be referenced on all correspondence, bills and related documents
412  submitted regarding a claim.
413
414  Damage to buildings will be inspected and assessed by the Archdiocesan Project Managers.
415
416   *They will:*
417     • Evaluate the Scope of the damage.
418     • Estimate the cost to repair or replace.
419     • Write specifications and solicit bids.
420     • Contact trades people to perform the work
421     • Coordinate with Gallagher Heffernan to authorize repairs.

J10

422       •  Oversee the restoration process.
423       •  Approve final bills to be submitted to the Self-Insurance Fund for payment.  Bills are
424             due from contractors no later t
425     30 days from date of completion.
426
427    Loss or damage to contents other than buildings will be required includes:
428       •  Identification of items lost or damaged, with original receipts if possible.
429       •  Police report for losses due to burglary theft, or vandalism;
430       •  Estimate of cost to repair or replace;  purchase order or invoice evidencing actual
431             repair or replacement of item(s)
432

433    ***Special Provisions***

434
435     Glass and Fine Arts are covered within the blanket limit of the policy.  A loss to any
436          single item in excess to $5,000 shall require approval from the Chancery prior to
437          replacement.
438
439     Graffiti vandalism is not covered under the self-insurance program.  However, if there is
440    an occurrence that is so egregious or for some other reason ought to be covered by the SIF
441    (Self Insurance Fund), coverage may be authorized by the Chancery on an exception
442    basis.
443
444     Any loss, giving rise to concerns of fraud or dishonesty by an employee or volunteer shall
445          be reported to the Moderator of the Curia or Vicar for Administration immediately.
446

447
448     ***Payment of Claims*** -The Insurance Company will make all payments to contractors
449          within 15 days of receipt of invoices.
450

J11

| 451 | Criteria for Selection of Architects | Checklist |
|------|------|------|

453 Architects must meet the minimum criteria; engineers project managers, and contractors.
454 Additional criteria may be required as necessary on a project-by-project basis. The purpose of
455 these criteria is not to limit choices, but to protect the Archdiocese, the parishes and
456 institutions. A list of approved architects, engineers and contractors will be maintained and
457 updated every three years. A professional not currently on the approved list may still work on
458 a project so long as the necessary criteria are met.

460 Category                                                   Circle

462 LICENSE    Can architect present valid state AIA license?    Y    N

464 FINANCIAL  Can architect provide proof of Financial Stability:
465                  Provide Credit References?    Y    N
466                  Provide Bank References?    Y    N
467                  Provide last three years of income statements?    Y    N

469 EXPERIENCE Can architect provide proof of Business Experience
470                  # of years in business (minimum five)?    _____
471                  # of years operating under this name?    _____
472                  Submit a minimum of 3 references from projects with
473                  Similar project description    Y    N

475 INSURANCE Does architects have adequate insurance protection:
476                  Provide Certificate of Insurance for Errors & Omissions
477                  $250,000 or job value (whichever is higher)    Y    N
478                  Coverage must be "occurrence" not "claims made"    Y    N
479                  Provide written approval by Gallagher Heffernan    Y    N
480                  Insurance Brokers for the above coverage's    Y    N

482 PROJECT MANAGEMENT Does architect have adequate project management staff?
483                  Engineers or consultants?    Y    N
484                  Coordinate with contractor?    Y    N

486 For projects under $15,000, the Committee recommends contracting the Building Committee

J12

| 488 | Criteria for Selection of Contractors | Checklist |
|---|---|---|

488 <u>Criteria for Selection of Contractors</u>                                    <u>Checklist</u>
489
490 Architects must meet the minimum criteria; engineers project managers, and contractors.
491 Additional criteria may be required as necessary on a project-by-project basis.  The purpose of
492 these criteria is not to limit choices, but to protect the Archdiocese, the parishes and
493 institutions.  A list of approved architects, engineers and contractors will be maintained and
494 updated every three years.  A professional not currently on the approved list may still work on
495 a project so long as the necessary criteria are met.
496
497 Category                                                                        Circle
498
499 LICENSE      Can contractor present valid state contractor license?        Y        N
500
501 UNION        Is contractor in good standing with the applicable union(s)   Y        N
502              Are subcontractors in good standing?                          Y        N
503
504 FINANCIAL  Can contractor provide proof of Financial Stability:
505              Provide Credit References?                                    Y        N
506              Provide Bank References?                                      Y        N
507              Provide last three years of income statements?               Y        N
508
509 EXPERIENCE Can contractor provide proof of Business Experience
510              # of years in business (minimum five)?                    _____
511              # of years operating under this name?                     _____
512              Submit a minimum of 3 references from projects with
513              Similar project description                                   Y        N
514
515 INSURANCE Does contractor have adequate insurance protection?
516              Provide Certificate of Insurance for liability coverage of $1
517              Million or job value (whichever is higher)                    Y        N
518              Provide proof of Workers Compensation coverage                Y        N
519              Provide written approval by Gallagher Heffernan               Y        N
520              Insurance Brokers for the above coverage's                    Y        N
521
522 BONDS        Does contractor meet bonding requirements?
523              Is contractor bondable?                                       Y        N
524              Provide surety (performance) bond (required for new
525              Or remodel projects over $)                                   Y        N
526              Does contractor agree to a Waiver of Liens                    Y        N
527              (Required on projects over $500,000)
528

J13

| 529 | Criteria for the Selection of Engineers | | Checklist | |
|---|---|---|---|---|

530

531 Architects must meet the minimum criteria; engineers project managers, and contractors.
532 Additional criteria may be required as necessary on a project-by-project basis. The purpose of
533 these criteria is not to limit choices, but to protect the Archdiocese, the parishes and
534 institutions. A list of approved architects, engineers and contractors will be maintained and
535 updated every three years. A professional not currently on the approved list may still work on
536 a project so long as the necessary criteria are met.

537

538

| 539 | Category | | Circle | |
|---|---|---|---|---|
| 540 | | | | |
| 541 | LICENSE | Can engineer present valid state license? | Y | N |
| 542 | | | | |
| 543 | FINANCIAL | can engineer provide proof of Financial Stability? | | |
| 544 | | Provide Credit References? | Y | N |
| 545 | | Provide Bank References? | Y | N |
| 546 | | Provide last three years of income statements? | Y | N |
| 547 | | | | |
| 548 | EXPERIENCE | Can engineer provide proof of Business Experience | | |
| 549 | | # Of years in business (minimum five)? | _____ | |
| 550 | | # of years operating under this name? | _____ | |
| 551 | | Submit a minimum of 3 references from projects with | | |
| 552 | | Similar project description | Y | N |
| 553 | | | | |
| 554 | INSURANCE | Does contractor have adequate insurance protection: | | |
| 555 | | Provide Certificate of Insurance Errors & Omissions | | |
| 556 | | $250,000 or job valued (whichever is higher) | Y | N |
| 557 | | Provide written approval by Gallagher Heffernan | Y | N |
| 558 | | Insurance Brokers for the above coverage's | Y | N |
| 559 | | | | |

J14

| | | | |
|---|---|---|---|
| 560 | <u>Criteria for the Selection of Project Managers</u> | | <u>Checklist</u> |
| 561 | | | |

562 Architects must meet the minimum criteria; engineers project managers, and contractors.
563 Additional criteria may be required as necessary on a project-by-project basis. The purpose of
564 these criteria is not to limit choices, but to protect the Archdiocese, the parishes and
565 institutions. A list of approved architects, engineers, contractors and project managers will be
566 maintained and updated every three years. A professional not currently on the approved list
567 may still work on a project so long as the necessary criteria are met.

568
569
570 Category                                                                Circle
571

| | | | |
|---|---|---|---|
| 572 | FINANCIAL | Can Project Manager provides proof of Financial Stability? Y | N |
| 573 | | Provide Credit References? | Y N |
| 574 | | Provide Bank References? | Y N |
| 575 | | Provide last three years of income statements? | Y N |
| 576 | | | |
| 577 | EXPERIENCE | Can Project Manager provide proof of Business Experience | |
| 578 | | # Of years in business (minimum five)? | _____ |
| 579 | | # of years operating under this name? | _____ |
| 580 | | Submit a minimum of 3 references from projects with | |
| 581 | | Similar project description | Y N |
| 582 | | | |
| 583 | INSURANCE | Does Project Manager has adequate insurance protection: | |
| 584 | | Provide Certificate of Insurance Errors & Omissions | |
| 585 | | $250,000 or job valued (whichever is higher) | Y N |
| 586 | | Provide written approval by Gallagher Heffernan | Y N |
| 587 | | | |

J15

**NEGOTIATED CONTRACT PROCEDURES**

Parishes, institutions and entities of the Archdiocese have the choice of two options when requesting bids for general contractor services:  the competitive bid process and the negotiated bid process.  In either case, the following procedures <u>must</u> be adhered to, and any deviation requires prior written approval from the Archdiocesan Building Committee:

1.  All requests for a negotiated contract must be made at the inception of the project and, prior to any Architectural design contracts. Pastor, High School Administrator, Rector, or Director shall sign an agreement with the Archdiocesan Building Department as to the contract method, with assistance from the Building Department, if necessary.

2.  A special committee composed of three parishioners, pastor, and three Archdiocesan Building Committee members will hold interviews.  Architects shall have input but no voting rights.

3.  The selection of the bidding contractors shall be through an interview process after which there will be a selection of at least three general contractors to bid competitive fee, labor rates, schedule, general conditions, pre-construction services and bonding capacity.  The bids from these pre-selected general contractors must be delivered sealed to the pastoral center Archdiocesan building dept for opening.  After opening bids the archdiocesan building department and design team will qualify bids and determine who the low bidding contractor is.  At this point without exception, the low bidding contactor will be awarded the job.

4.  Projects estimated at $1,000,000 or more may require a part-time Project Manager, projects estimated at $3,000,000 or more may require a full time Project Manager.  This will be evaluated on a case by case basis by the Building Committee.  Scope of services for Project Manager will be identified by the Archdiocesan Building Department and will be competitively bid.  The Project Manager shall be selected by the Archdiocesan Building Department. All fees for Project Management will be made a part of the project cost and paid for by parishes, institutions or entities of the Archdiocese.

5.  Architect shall be required to complete a full set of Design & Construction Documents. This is also required for a competitive bid.  Design Build Documents are not acceptable unless approved by the Archdiocesan Building Department prior to the architect's contract execution.

6.  General Contractors who contract with The Archdiocese should use contract provided by the Archdiocese for a Guaranteed Maximum Price with a separate contract for pre-construction services.

7.  The General Contractor shall provide three estimates during the Design process at completion of:
    1.  Schematics

J16

<pre>
633                    2.  Design Development
634                    3.  Construction Documents prior to bidding
635         All estimates will be approved by the Archdiocesan Building Department. The
636         Archdiocesan Building Department can audit or fully estimate the project at any time and
637         the parish shall pay the expenses for this.
638
639    8.  A complete set of bid documents and specifications shall be presented to the Archdiocesan
640        Building Department for approval at least three weeks before the project is put out to bid,
641        no exceptions.
642
643    9.  The General Contractor or Parish must submit a sub-contractor invitation list to the
644        Archdiocesan Building Department Representative for approval two weeks prior to bid
645        invitations and three weeks from bid walk through. Invitations shall be sent out one-week
646        prior to walk through.
647
648    10. All work by subcontractor trades must be competitively bid.
649
650    11. Sub-contractors will have at least two weeks from initial walk through to submit their
651        bids.
652
653    12. General Contractors shall coordinate with the Archdiocesan Building Department
654        Representative to schedule a formal sub-contractor's walk through. Bids will be rejected
655        from contractors who do not attend a formal subcontractor walk through. The
656        Archdiocesan Building Department shall approve the invitation letter from the General
657        Contractor to the subcontractors.
658
659    13. The Pastoral Center Building Department (One Peter Yorke Way, S. F. CA 94109) will be
660        the only depository for all sub-contractors bids to be submitted,    No Exceptions.
661
662    14. Sub-contractor sealed bids should be sent or delivered to the Pastoral Center located at
663        One Peter Yorke Way SFCA 94109, Attn: Building Department.  Faxed bids will be
664        allowed only with permission of the Archdiocese Building Committee and faxed directly
665        to the Building Department.
666
667    15. Subcontractor bids delivered by the General Contractor will be rejected.
668
669    16. The Building Committee also expects that the lowest bidding contractor will be awarded
670        the contract.  Where special circumstances exist, the Building Committee must be
671        informed.
672
673    17. The General Contractor will be required to submit copies of all back up and supporting
674        documentation for each progress payments request to the Archdiocesan Building
675        Department and the Project Manager.
676
</pre>

J17

677    18. All change orders and progress payments are to be approved by Project Manager,
678        Architect and the Archdiocesan Building Department Representative.
679
680    19. Weekly construction meetings between Contractor, Architect, Project Manager and
681        Archdiocesan Building Department Representative will be required.
682

J18

**Labor Policy for Contracted Work**
**Archdiocese of San Francisco**
**December 18, 2003**

688 The Archdiocese reaffirms its policy to hire union contractors in work being done in parishes
689 and institutions of the Archdiocese.

690

691 The Archdiocese of San Francisco generally favors the use of union labor for contracted work
692 in our parishes and flows from clear principles of Catholic social doctrine.

693

694 Catholic social teaching over the last 100 years has insisted that the payment of a just living
695 wage is one of many workers' rights.

696

697 "Rights and benefits, such as health insurance, training, pension and vacation, job
698 security, are all essential if workers are to be treated as persons rather than
699 simply as factors of production." (Economic Justice, #103)

700

701 Also,

702

703 "All these rights, together with the need for workers themselves to secure them, give
704 rise to yet another right: the right of association, that is , to form associations for the
705 purpose of defending the vital interests of those employed in the various professions."
706 (Laborem Exercens, #20)

707

708 In the industrial/construction industries in particular, these rights and benefits have been
709 gained over many years of organizing activity, usually as a result of collective bargaining
710 agreements between ownership and management and unions.

711

712 The Archdiocese supports the rights of workers to freely organize themselves. It also
713 supports maintaining a climate in our community that will be favorable to this right of free
714 association.

715

716 If Non union contractors are approved by the Archdiocese Building Committee for projects,
717 then the contractor must pay the prevailing wage including benefits to all employees working
718 on the project and the contractor will be required to certify the payroll. The parish or school
719 should contact the Archdiocesan building department when considering using a non-union
720 contractor for help through this process. The prevailing wage guidelines can be found in the
721 State of California Code, listed per trade. The parish or institutions are responsible for hiring
722 an auditor to certify the payroll according to prevailing wage.

723

724 The Archdiocese reaffirms the policy to use union labor when possible. All contractors, must
725 treat their workers according to the principles of Catholic social teaching and must pay the
726 "prevailing wage and benefits" of the area. The Building Committee of the Archdiocese will
727 monitor and evaluate all contractors.

J19

## Section K.
## Real Property Not Used for Pastoral Purposes

POLICIES AND PROCEDURES REGARDING USE OF
ARCHDIOCESAN PROPERTY BY OUTSIDE ORGANIZATIONS

**Preamble:**  In light of the many and varied charitable, religious and educational works which are carried on under the auspices of the Roman Catholic Church, the Archdiocese of San Francisco is, by necessity, a major property holder.  Inasmuch as these properties include such things as church and school buildings, halls and auditoriums, kitchens, offices and recreational facilities, the parishes, schools and agencies of the Archdiocese are frequently approached by outside individuals and organizations with a request to utilize these facilities for some personal, business, or community use.

The purpose of this document is to provide a summary of the general principles relating to the use of Archdiocesan properties and to outline certain specific procedures to be followed in connection with the application of those general principles.  It must be borne in mind that these policies and procedures are motivated not only by considerations relating to preserving the property and income tax exemptions of the Archdiocesan entities which own the properties, but also by practical, legal and religious considerations which may indicate that an otherwise "profitable", "neighborly" or "convenient" use of the property by others is not appropriate.  While this policy applies only to entities under the civil law auspices of the Archbishop of San Francisco it should serve as a helpful reference tool for other Catholic organizations in the Archdiocese of San Francisco, particularly to the extent that any proposed use of their properties impact the canonical "vigilance" responsibility of the Archbishop of San Francisco.

## I.     THE PROPERTY TAX AND INCOME TAX EXEMPTIONS:

**The Property Tax Exemption** - Nearly all properties owned by Archdiocesan entities are exempt from property taxation under the so-called "Church", "Church Parking Lot", "Religious" and/or "Welfare" exemptions set forth in the California Constitution or the California Revenue and Taxation Code.  Which particular exemption applies to a given piece of property depends on its specific use.  In any event, in order to meet the criteria for at least one of the exemptions, the property essentially must be devoted exclusively to charitable, religious and/or educational uses by an organization which is exempt from income tax (i.e. a non-profit organization).  The property tax exemption would extend to incidental uses of the properties, such as wedding receptions, which follow a religious ceremony taking place on the grounds, or the lease of the property by one organization exempt from income tax to another tax exempt organization for a purpose covered under the property tax exemption laws of California.

Some might argue that it is worth it to simply pay the property tax on all or a portion of the property in order to generate valuable revenues for the Church, school, or agency.

K1

45  Unfortunately, it is not that simple and for this reason it has been long-standing
46  Archdiocesan policy to forbid the use of Archdiocesan property for purposes not covered
47  by the property tax exemption except under the most rare and/or temporary circumstances
48  (e.g. see I.A. *"N.B."* and III.A. "film-making" sections below). A few of the reasons which
49  militate against the use of Archdiocesan property by private individuals and *for-profit*
50  organizations include the following:

51
52  A.  **Once given up, an exemption could be permanently lost.** The property tax
53      exemption is based on the idea that the property for which an exemption is claimed
54      is reasonably necessary to carry out the particular functions of the organization and
55      is not "excess" property (e.g. vacant buildings and lots or a residence bequeathed
56      from an estate and rented out to individuals would not be covered by the
57      exemption). Not only would it be a complex administrative task to attempt to claim,
58      give up, and then subsequently re-claim an exemption on all or part of a given piece
59      of property, there is no guarantee that a claim, once surrendered, could readily be
60      resumed.  This concern is of particular importance in connection with the core,
61      contiguous properties of the parishes, schools and agencies. (*N.B.* As opposed to
62      limited cases where a separate and distinct private lot or residence is bequeathed to
63      a parish and is already subject to property tax. In this circumstance the property
64      may be leased out for an appropriate commercial or residential purpose.)

65
66      Another problem is the fact that even if a proposed commercial lessee offers to pay
67      the property taxes under the applicable terms of the lease, if the lessee fails to do so
68      a lien can be placed on the property by the Assessor's Office which can then create
69      both a cloud on the title to the property as well as pose administrative hassles and
70      significant expense to clear up.

71
72  B.  **Entering the commercial world may jeopardize the Religious Freedom
73      protections of the Archdiocese.** Some would argue that if a religiously affiliated
74      organization chooses to enter the "commercial" world it may be subject to the same
75      non-discrimination laws, etc. that are applicable to other commercial (i.e. *for-profit*)
76      enterprises, thereby jeopardizing the organization's ability to control its own
77      property and to preserve the principles and teachings of its Faith.

78
79  C.  **The appearance may be created of joint commercial ventures and/or
80      endorsements.** Even if the other hurdles, identified above, are adequately
81      addressed there is an additional concern that leases with *for-profit* commercial
82      entities that are operating side-by-side with facilities operated by religious
83      organizations can create the appearance of a joint commercial venture between the
84      respective organizations and/or the implication that the particular business activity
85      is endorsed by the Archdiocesan entity.

86
87  D.  **Potential impact on income tax exemption.** The entities of the Archdiocese of
88      San Francisco enjoy the privilege of exemption from Federal Income Tax under the
89      so-called "Group Ruling". This exemption is premised on the understanding that

K2

| 90 | the organizations listed in Kenedy's Official Catholic Directory are substantially |
| 91 | engaged in the Catholic affiliated activities under which they claim exemption in |
| 92 | the first place (e.g. religious, charitable, educational). A failure to operate within |
| 93 | these parameters can result in either the assessment of an unrelated business income |
| 94 | tax on the commercial activities of the organization and/or the actual total loss of |
| 95 | the exemption if the non-related activities are substantial. There is a limited |
| 96 | exception to the unrelated business income tax provisions which allow an owner to |
| 97 | receive passive rental income on its property from either a *for-profit* or non-profit |
| 98 | organization. (This should not be confused with the <u>property</u> tax exemption which |
| 99 | does <u>not</u> allow rentals to *for-profit* organizations.) However, if the <u>overall</u> rental |
| 100 | activity of the Archdiocese with *for-profit* organizations were to become |
| 101 | "significant" enough, from the IRS' perspective, even the income tax exemption |
| 102 | could be jeopardized. |

**II. <u>USE OF ARCHDIOCESAN PROPERTY REQUIRES THE EXECUTION OF STANDARD ARCHDIOCESAN LEASE OR OCCASIONAL USE FORMS.</u>**

Any use of parish grounds by outside organizations (Catholic or otherwise) must be conditioned on the signing of the applicable <u>standard Archdiocesan User/Lease form</u> (e.g. Occasional Use form, Space in Building form, and Entire Building Lease form) available through the Archdiocesan Real Estate Office. These forms contain, *inter alia*, hold harmless and insurance provisions that will protect the parish/Archdiocese in the event of a claim. The Occasional Use form can be signed (so long as no amendments are made) by the pastor alone. The Lease forms must be signed by the Archbishop or his duly authorized corporate legal delegates at the Chancery.

These forms are also drafted so as to assure that not only an Archdiocesan institution's legal interests are adequately protected, but also to allow appropriate intervention in the event that any activity is proposed, or in fact occurs, which is in conflict with the teachings of the Catholic Church.

**III. <u>SPECIFIC TYPES OF USES.</u>**

A. **Film-making.** There are many beautiful and spacious buildings owned by the entities of the Archdiocese of San Francisco and it is sometimes difficult for government officials, members of the community, and the film-making industry in particular to understand that the Archdiocese of San Francisco is not in the business of renting or leasing its property to production companies and such accommodations can only be considered when the production positively portrays and upholds the principles, morals and values for which the Catholic Church stands. Such filming can not unduly interfere with the primary administrative tasks, goals and time for which the personnel and facilities of the Archdiocese are devoted. Special attention must be given to any proposed use of a church building dedicated

K3

to divine worship.  In this regard the parishes and agencies of the Archdiocese should be guided by the Motion Picture/Television Production Policy Resolution, presented by the Council of Priests and approved by the Archbishop in August of 1994.  For ease of reference that policy is set forth in full below.

1.    *The use of church property for motion picture or television production must be arranged through the Archdiocese Director of Communications.*

2.    *Anyone employed by the Archdiocese who is approached directly by a production company or individual must direct the inquiry to the Director of Communications.*

3.    *The Director of Communications will take the following steps:*

   a)    *Request a working script from the producers in advance.*
   b)    *Make certain the film or television production contains nothing offensive to Church teachings and environment.*
   c)    *Meet with the producers to clarify any questions concerning the script.*
   d)    *Make certain the appropriate compensation is discussed for the selected Archdiocesan property, and any entity which may be inconvenienced by the production and the technical advisors.*
   e)    *Meet with the administrator of the property to make certain the proposed project is supported by him/her and that it will be beneficial to the Church.*

4.    *After the above steps have been followed:*

   a)    *The Director of Communications will present the project proposal to the Archbishop for approval.*
   b)    *If the Archbishop has any concerns or questions he would seek advice and counsel from appropriate sources.*

5.    *If the Archbishop approves the project, then the Director of Communications will:*

   a)    *Inform the appropriate administrators.*
   b)    *Assign a technical advisor to work with the project.*
   c)    *Request the production company meet with the Archdiocesan attorney to draw the contract.*
   d)    *The administrator of the property and/or the Director of Communications will oversee the implementation of the Agreement.*

K4

179      B.      **Political Candidates and the Use of Archdiocesan Property for Purposes of**
180                   **Public Forums, Debates, and Lectures on Archdiocesan Property.**
181
182          In <u>theory, non-partisan</u> activity of this nature is permitted in connection with Church
183          grounds.       <u>However</u>, in <u>practice</u>, this is virtually impossible because the
184          "nonpartisan", "non-biased" standards of the IRS essentially translate to a
185          requirement of uncensored, equal access to <u>all</u> candidates (Including, for example,
186          those promoting even the most blatantly offensive anti-Catholic conduct, platforms,
187          messages, ads, etc. And, even where this does not in fact take place, providing
188          candidates <u>access</u> to Church grounds (<u>either directly</u> by the Church <u>or indirectly</u>
189          through <u>Lessees, etc.</u>) can create the unwanted <u>impression</u> that the Church supports
190          a particular candidate for office). Therefore, no such activity of this nature should
191          take place on Archdiocesan property.
192
193          <u>Note</u>: In situations where a campaign has already been decided and there is a desire
194          by the community to gather, on a non-partisan, ecumenical-sponsored basis to pray
195          that government officials will receive wisdom and guidance, this can be done on
196          church grounds, though prior clearance with the Chancery office should take place.
197
198          **Note also**: The above referenced <u>restrictions</u> concerning political candidates <u>on</u>
199          <u>Archdiocesan property should not be confused with permissible issue oriented</u>
200          <u>speech and lawful lobbying activity which can</u> take place on the property.
201
202 **Conclusion:** The above-referenced Policies and Procedures are designed to provide Pastors,
203 Principals and Agency Heads with a ready resource when faced with proposed uses of
204 Archdiocesan properties by outside individuals and organizations. The Vicar for Administration
205 or Archdiocesan Legal Counsel should be contacted well in advance of the proposed event or use
206 in order to put together the appropriate contract and/or provide assistance when there is doubt as to
207 whether a particular use is in accord with these policies and procedures.

## Section L.
Insurance

**Archdiocese of San Francisco Insurance Program Description**
(Not including employee benefits insurance)


Effective July 1, 2013 – Expiration July 1, 2014


The Archdiocesan Central Office administers the insurance programs for all parishes, schools, and other entities as outlined in this section in order to ensure proper coverage is maintained for each location and to gain favorable rates by pooling the risk throughout the Archdiocese. Coverages, limits, and deductibles may vary. No insurance should be purchased individually unless cleared through the Office of the Vicar for Administration.

The purpose of this program is for the Archdiocese to cover risk exposures through a combination of insurance and self-insurance up to the coverage limits.


A.   PROGRAM OVERVIEW:

The Archdiocese of San Francisco's Property, Casualty and General Liability Insurance Programs are based upon a combination of traditional insurance, self-insurance, and prudent risk management.

The Program consists of the following main coverages:

1.   Primary Property insurance: Because of the risk in California, earthquake insurance is extremely limited in coverage and very expensive. Therefore, the Archdiocese will not actively seek earthquake coverage for its properties.

2.   Equipment Breakdown/Boiler & Machinery insurance.

3.   General Liability, Automobile Liability, and certain Miscellaneous Specialty Liability coverages.

4.   Workers' Compensation and Employers' Liability.

5.   Fidelity and Forgery coverages (Crime insurance).

6.   Fiduciary Liability insurance.

**7.**   Special Events coverage.

B. INSURANCE PROGRAMS:

    1. Property Insurance

    Property and Boiler/Machinery insurance coverage includes the loss of personal property at an Archdiocesan owned or an Archdiocesan assigned residence of incardinated priests of the Archdiocese while engaged in ministry directly on behalf of the Archdiocese. Any personal property in excess of $5,000 will not be covered by our policy (the Parish deductible will be applied to each loss). Thus the priest is encouraged to purchase individual coverage for all his personal items over $5,000.

    Personal property of employees and visitors is not covered. Tuition, fees and program revenues will be included as part of a direct damage property loss should that loss result in an interruption of school business.

    I. **Property exclusions** are based upon our insurance policy in existence at the time of loss. Please check with Arthur J. Gallagher & Co. for clarification.

    **Automobile Comprehensive and Collision Coverage** for owned autos of the Archdiocese is provided. There is no coverage for priest or other religious owned vehicles.

    2. **General Liability, Automobile and Specialty Liability:**

    The liability insurance program is provided to protect the participating Archdiocesan corporations listed below and the priests, other religious, employees and volunteers who act on behalf of the Archdiocese within the scope of their duties. The program provides legal defense and indemnity against for legal liability claims made against the corporations and individuals.

**II.**

III. **General Liability exclusions** are based upon our insurance policy in existence at the time of loss. Please check with Arthur J. Gallagher & Co. for clarification.

IV.

**High Risk Activities:** Certain activities present situations that are not covered by our insurance and are to be avoided. These activities increase the Archdiocese's exposure to injury and financial loss. Any questions regarding acceptable activities should be directed to Arthur J. Gallagher & Co. prior to planning and/or scheduling the activity.

Activities that are considered high risk include but are not limited to:

- Placement of candles on the ground, on stands below waist-level, or at temporary shrines
- Use of vehicles for transportation such as watercraft or aircraft other than public/commercial transit, 15 passenger vans, hay rides.
- Sports activities such as bungee jumping, scuba diving, water skiing, river rafting, boxing or martial arts, rock climbing, ropes or obstacle course events in excess of 12 feet.
- Carnival operations such as "sumo wrestling", human fly, and similar contact/impact events.
- Carnival rides, dunk tanks, moon bounces, etc. except when operated by vendors under approved contracts.
- Fireworks, trampolines and events involving livestock.

## V. Property & Liability Claims Reporting:

All claims are to be reported to Gallagher's Claims Department. Initial reports are to be made by telephone to Gallagher's Claims Department at 415.546.9300, and should be reported promptly or first knowledge of the loss. Please have available the basic facts such as who was injured or what was damaged, where did the incident happen, what time and on what day did the incident happen, who was a witness to it, and how did the incident happen. A written report using a claim form provided by Gallagher is to follow immediately. It should be sent to Arthur J. Gallagher & Co.

**Note on Property and Liability Claims Eligibility:** *A parish, school or agency presenting a claim must be current in its payment of insurance premiums. Gallagher's Claims Department verify premium payment status prior to beginning adjustment of any claim reported except to the extent necessary to prevent further loss to property, life or value. If premium payments are not current, authorization will be given for only those steps necessary to secure a damaged area or prevent loss of life. .*

3. **Workers Compensation and Employers Liability:**

The Archdiocese purchases Workers' Compensation and Employers' Liability coverages as required by law. All employees including private residence employees are covered, as are volunteers.

**Workers Compensation Claims Reporting:**
VI. All workers compensation claims are to be reported directly to Church Mutual. Claim forms and other information, if needed, should be available at your location. When you call please identify yourself as a location of the **Roman Catholic Archbishop of San Francisco**. Also please identify your location code which was sent to you or is available from Arthur J. Gallagher & Co. as noted below. If you need assistance with your claim or you feel the circumstances are unusual or suspicious please call Arthur J. Gallagher & Co..

VII.
VIII.

4. **Employee Dishonesty (Fidelity) and Forgery (Crime Insurance):**

Coverage is afforded to reimburse the Archdiocese for the fraudulent or dishonest acts of employees. A $2,000,000 limit is provided subject to a $2,500 deductible.

Due to the very sensitive nature of these potential losses, they should be handled CONFIDENTIALLY and immediately reported to either the Moderator of the Curia or the Vicar for Administration.

5. **Fiduciary Liability:**

Our General Liability policies do not include coverage for pension plan related liability, Fiduciary Liability insurance is provided to protect trustees and other fiduciaries of pension and retirement plans. A $2,000,000 limit is provided, subject to a $1,000 deductible.

150        **6.**    **Special Events Coverage:**

152        A Special Event Insurance Program has been arranged to provide liability insurance
153        coverage for certain users of Archdiocesan facilities. The primary purpose of this
154        program is to protect the Archdiocese from liabilities that may result from non-profit
155        organizations or individuals using Archdiocesan facilities for short-term events.
156        Premium is based on number of attendees per event/per day:

158            1-100 attendees:        $125 without liquor, $200 with liquor
159            101-500 attendees:       $155 without liquor, $340 with liquor
160            501-1,500 attendees:     $210 without liquor, $470 with liquor

162        You may obtain a rental application from Nathan Justwanto at the Chancery
163        (415.614.5519)

166 C.   RISK MANAGEMENT ASSISTANCE

168        Whether the risk of loss is retained by the Archdiocese or transferred to an insurer,
169        prudent risk management is the key to the long term stability and economic success
170        of your insurance program.

172        In cooperation with Arthur J. Gallagher & Co. and our insurance companies , the
173        Archdiocese has developed specific risk management guidelines to help minimize the
174        possibility of claims and the effects of those losses that do occur.

176        If you become aware of a condition or circumstance for which you feel an unsafe
177        hazard has been created, please contact our representatives below for assistance.
178

179
180 ***RISK MANAGEMENT and INSURANCE CONTACTS:***
181
182 ***For General Questions and Assistance:***

| Jim Buckley – Account Executive | Office | 415.536.8415 |
| | Mobile | 925.998.6946 |
| | Fax | 415.536.8499 |

***For Loss Prevention, Safety and Risk Management Assistance:***

| Ken Urrutia – Loss Control | Office | 415.536.8476 |
| | Mobile | 925.323.2922 |
| | Fax | 415.536.8499 |

***For Property Loss Claims Reporting:***

| Paul Matejzel - Senior Claims Coordinator | Office | 415.536.8542 |
| | Fax | 415.536.4036 |

***For Documentation and Policy Coverage Questions:***

| Linda Reynolds - Sr. Account Manager | Office | 415.536.8442 |
| | Fax | 415.536.8499 |

***For Certificates of Insurance:***

| Amber Gonzalez  – Account Representative | Office | 415.536.8435 |
| | Fax | 415.536.8499 |

***For Workers Compensation Claims Reporting:***

| Church Mutual Insurance Company | Office | 800.554.2642 |
| | Fax | 715.539.4651 |

***For Workers Compensation Claims Questions:***

| Deborah Olson – W. C. - Claims Analyst | Office | 415.536.8630 |
| | Fax | 415.536.8499 |

183
184

# Roman Catholic Archbishop of San Francisco
## 2013 – 2014 Summary of Insurance

**Property**

Insurance Companies: Allied World National Assurance, Maiden Specialty,
Great American, Lloyds of London, Ironshore Specialty, Colony
Insurance AXIS Specialty & Homeland Insurance

| | | |
|---|---|---|
| Term: | 07/01/13 – 07/01/14 | |
| Total Program Limit: | $300,000,000 | Per occurrence |
| Deductible: | $2,500 | Per occurrence (remaining program deductible handled by the Corp.) |

**Automobile Physical Damage**

| | | |
|---|---|---|
| Insurance Company: | Self-insured | |
| Term: | 07/01/13 – 07/01/14 | |
| Total Program Limit: | N/A | |
| Deductible: | $1,000 | Comprehensive and Collision |

**Boiler and Machinery**

| | | |
|---|---|---|
| Insurance Company: | Travelers Property & Casualty | |
| Term: | 07/01/13 – 07/01/14 | |
| Total Program Limit: | $250,000,000 | |
| Deductible: | $1,000 | (remaining program deductible handled by the Corp.) |

**General and Automobile Liability**

Insurance Company: Western Catholic Insurance Company, Allied World Assurance
& Great American Insurance

| | | |
|---|---|---|
| Term: | 07/01/13 – 07/01/14 | |
| Total Program Limit | $50,000,000 | |
| Deductible: | None | (program deductible handled by the Corp.) |

**Sexual Misconduct Liability**

| | | |
|---|---|---|
| Insurance Company: | Western Catholic Insurance Company | |
| Term: | 07/01/13 – 07/01/14 | |
| Total Program Limit | $4,000,000 | |
| Deductible: | Refer to Chancery | (program deductible handled by the Corp.) |

211     **Workers Compensation**
212     Insurance Company:   Church Mutual
                    Term:        01/01/14 – 01/01/15
        Total Program Limit:     Statutory Benefits
                    Deductible:          None   (any program deductible handled by the Corp.)
213
214
215     **Fidelity and Forgery Coverage (Crime)**
216     Insurance Company:   Federal Insurance Company
                    Term:        07/01/13 – 07/01/14
        Total Program Limit:     $2,000,000
                    Deductible:   $2,500          (remaining program deductible handled by the Corp.)
217
218
219
220
221     **Fiduciary Liability**
222     Insurance Company:   Travelers Casualty Insurance Company
                    Term:        07/01/13 – 07/01/14
        Total Program Limit:     $2,000,000
                    Deductible:   $1,000          (remaining program deductible handled by the Corp.)
223
224
225     **Special Event Liability**
226     Insurance Company:   Employers Fire Insurance Company
                    Term:        07/01/13 – 07/01/14
        Total Program Limit:     $1,000,000
                    Deductible:   None
227
228
229     **Special Events 3rd Party Property Coverage**
230     Insurance Company:   Employers Fire Insurance Company
                    Term:        07/01/13 – 07/01/14
        Total Program Limit:     $1,000,000
                    Deductible   $250
231
232
233
234
235
236
237
238
239
240

241
242
243
244

# Section M.

## Legal Services

245

# LEGAL SERVICES

Through the generosity of the Annual Appeal, the Archdiocese of San Francisco's Chancery Office maintains a Legal Office consisting of the General Counsel and one support staff person. This office is responsible for coordinating the legal affairs of all Archdiocesan parishes, schools, corporations, agencies and departments. Most non-litigation work is handled directly, and free of charge, by the Legal Office. Incidents covered under the Archdiocesan Insurance Program (e.g. slip and fall claims) are assigned to insurance defense counsel, subject to oversight by the General Counsel. Given the limited size of the Archdiocesan Legal Office, and the related desire to keep the Annual Appeal assessment for legal services to a minimum, certain legal services must be paid for directly by the parish, school or agency directly affected by, or benefiting from, the service. These include the following types of circumstances:

1. <u>Litigation not covered by insurance</u>. For example, breach of contract suits, land use hearings before local governmental bodies, prescriptive easement claims, will contests, etc. In the case of will contests, the Legal Office will ordinarily "front" the legal costs and be reimbursed out of the parish, school or agency's estate proceeds when received.

2. <u>Real Property Sales</u> (or complex long term lease arrangements). In such cases if the Legal Office does not handle the matter directly, it normally will "front" the legal costs and obtain reimbursement out of the proceeds of the real estate sale or lease.

3. <u>Other complex matters uniquely benefiting a particular parish, school or agency (as opposed to benefiting these bodies as a whole) that require extensive outside legal expertise and/or time</u>. Depending on the actual time and costs involved, the parish, school or agency may be expected to pay for all or some of the costs of retaining outside counsel.

No parish, school or agency may initiate legal action or formally engage the services of outside legal counsel without the approval of, and continued oversight by, the Archdiocesan Legal Office. All probate notices received by parishes, schools, and agencies shall be promptly directed to the Legal Office which shall be responsible for shepherding the matter through the gift distribution stage. The Legal Office will coordinate its efforts with the Archdiocesan Stewardship Office which in turn will work with Pastors, Principals and Agency Heads in terms of providing appropriate recognition to the family of testators etc.

M1

# Parish / School Financial Accounting And Reporting System

**The Archdiocese of San Francisco**
**One Peter Yorke Way**
**San Francisco, CA 94109**

# Financial Accounting & Reporting System

**Preface**

The Parish Financial Accounting and Reporting System is composed of two components the Uniform Chart of Accounts and the Financial Reporting Package. Each component complements the other and together they comprise the main tool a Pastor and Parish Financial Council will use to manage the financial affairs of a parish.

The Uniform Chart of Accounts is essential for the parish/school to use in recording the financial transactions of the unit. A standard account structure throughout the Archdiocese ensures that a standard of control and reporting consistency exists. Also, through standardization a parish/school can compare current year to last year and budget to determine where major variances occur and where corrective action needs to be taken. In addition it also ensures that at the Archdiocesan level comparison from parish to parish or school to school can be made without major variances in interpretations of how parish/school activity is reported.

The Uniform Chart of Accounts consists of the following attributes:

- It is designed to be used in a double entry accounting system where the books balance with Assets equaling Liabilities and Fund balance.

- It is designed to be used with the cash or accrual accounting method. It is strongly recommended the accrual method be used as it depicts a better comparison between revenues and expenses in any given time period.

- The account structure lends itself to enable a parish/school to report either by type of expense (e.g. Salaries, Utilities) or by program (e.g. Liturgy ,Youth).

- Assets and liabilities are to be reported in the Balance Sheet format where the net assets (assets less liabilities) of a parish/school are reported separately from the financial operating activities of a given accounting period be it a month, quarter or year.

- The significant balance sheet categories are:

  - Assets

    - Cash

      - All deposits in banking institutions and on hand which are in the name and/or tax ID number of the parish/school are considered to be an asset of the parish/school and therefore must be recorded in the financial records of the parish/school. This includes parish/school organizational funds.

1

- Receivables
  - Any moneys owed to a parish/school such as tuition, fees, etc. for services performed in the past should be shown as a receivable.
- Investments
  - All investments of funds for the parish/school must be recorded on the books. Parishes/schools shall only have funds invested with the Capital Assets Support Corporation Deposit and Loan Fund or Investment Pool
- Tangible Assets-Land, Buildings and Equipment
  - Refer to the Fixed Asset Accounting Procedure for the identified items to be set up as Fixed Assets. This procedure refers only to future transactions.
- Liabilities
  - Payables
    - Any amounts owed to vendors and suppliers for past services and goods must be recorded in the books even if they are not paid at the end of the accounting reporting period. These are services/products purchased which must be matched to the revenue generated in the proper period.
  - Payroll
    - Any money owed to any lay employee or clergy must be recorded at the end of the accounting reporting period.
  - Funds held for others
    - Any money held for others, including parish/school organizations and special collections, must be shown as a liability.
  - Deferred Revenue
    - Any money received which is for future services must be shown as a liability until that service is received. This would include items such as school tuition and fees paid prior to June 30th for the following school year.

- Net Assets
  - These reflect the excess of assets over liabilities at the end of the accounting period. The excess of Revenue over Expenses of a given

2

accounting period will increase the Net Assets of a parish/school. Conversely excess of expense over revenue in a given accounting period will decrease the Net Assets of a parish/school.

- The Statement of Revenue and Expenses shows the financial activities of a given period of time be it a month, quarter or year which affect the Net Assets of a parish/school. The Statements of Revenue and Expense could be comprised of two components for recording a period's activity.

  - Revenues and Expenses

    - The accounting format allows for the recording of revenue received and expenses incurred for operations by type and by program. This accommodation allows for reporting by program, if the parish/school prefers, to its constituencies or by the type as required for reporting to the Archdiocese.

  - Restricted Gifts

    - The system allows for the recording of gifts/donations by the donors intention when the gifts are not used in the current period. If the donor restricted the use of the gift then it is to be recorded as a restricted gift. If no restriction is stated then the funds are unrestricted and can be used for general parish purposes as deemed appropriate, they are recorded as revenue received for current operations. For a further explanation of restricted/unrestricted gifts see section F.-Investments of Parish Surplus Funds and section G- Endowments.

To aid in the use of the new system, in the following pages of this booklet the structure of the chart of accounts is explained in detail, a summary detail of the standard accounts, as well as a description of each account, and example entries are shown.

In addition, this booklet includes a reporting package that is required to be submitted annually to the Archdiocese for each parish and school.

The system described in this booklet is intended to be used with the control policies and procedures shown in the Archdiocesan Parish and School Financial Policies Manual in order to provide a total system of financial management of a parish/school.

3

# Uniform Parish General Ledger Chart of Accounts

**Introduction**

The Parish and School Uniform Chart of Accounts is to be used by every parish and school in the Archdiocese of San Francisco. This Chart of Accounts provides a standard method of accounting and reporting the operating results of the parish and school. Its use will provide for continuity in the event of a change in bookkeeper, accountant, or other individuals involved in the financial administration of the parish and school. Most importantly, its use will enable the parish and school to consistently classify financial transactions and provide meaningful financial statements that can be used to evaluate current financial status of the parishes and schools and plan for the future. The chart of accounts can be used with either a manual or a computerized bookkeeping system.

**Description of Account Structure and Use**

1. **Modifiable**.
   This Chart of Accounts can be used by parishes and schools with smaller operations which prefer a limited number of accounts, and by larger parishes and schools that may need further breakdown of income and expense by specific programs.

2. **Cash or Accrual**.
   The Chart of Accounts has been developed based on an accrual reporting method. However, the accrued accounts will be required to be used only at year end to recognize goods and/or services received for which no payment has been made and cash received for which no services have been recorded.

3. **Chart of Account Format**.
   The Chart of Accounts uses a six-digit account number. The first four digits identify the 'account class' -- a particular asset, liability, revenue, or expense (with the first two digits the primary class and the last two the sub class). The last two digits of the six digits identify a specific program or function (see below).

**Account Structure**

4

4. **Account Class.**

   The Chart of Accounts is flexible and provides for much greater detail if desired by adding Sub Classes (the last two digits of the four digit 'Account Class'). Some Sub Classes have been set up for you. For example, if a parish/school would like to maintain a breakdown of the different utility bills, it could define additional sub-accounts in the 7320 Light & Power expense.

   | | | |
   |---|---|---|
   | 73XX | Utilities | |
   | 7320 | Light & Power | |
   | 7321 | | Electricity Meter #456-123456 |
   | 7322 | | Electricity Meter #789-456123 |
   | 7323 | | Electricity Meter #123-456789 |
   | 7324 | | Gas |

5. **Program (or Function) Codes**.

   Program codes are optional and do not have to be used. Parishes and schools can choose to use as many, or as few, program codes as they desire. This provides the Pastor and Parish Finance Council with the flexibility to report the financial activity in program or summary form. Program codes are to be used only for revenues and expenditures, and never for assets, liabilities, or fund account.

6. **The definitions of the Sub Classes are different than program breakdown**

   Subclass further breaks down the account. Program/function codes identify for what purposes the money was received/spent.

7. **Familiarity**.

   Familiarity with the Chart of Accounts is essential for the bookkeeper and the accountant. At the outset, these persons must read the program and account definitions. Where possible, the existing accounts should be related to the new program and account codes. This identification (translation) will make the transition from the existing accounting system to the new Uniform Chart of Accounts much easier.

**Programs/Sub-Groupings**

**01    Parish Balance Sheet Items**

All balance sheet accounts (assets, liabilities and fund balances), since they do not relate to a specific program but rather to the parish as a whole, utilize the program code 01. If school books are part of the parish books, its balance sheet account numbers will use 02 so that if desired separate balance sheets can be produced for each entity even though there is only one set of books.

**02    School Balance Sheet Items**

5

School balance sheet accounts will end in 02 to be differentiated from the parish balance sheet.

**10-19  General Parish Operation**
This section would include all general receipts and disbursements not accounted for in the other programs listed below as well as administrative costs of running the parish, such as secretarial, bookkeeping, clergy, rectory, parish office, parish center etc.

**20-29  General School Operations**
This section would include all general receipts and disbursements not accounted for in the other programs listed below as well as administrative costs of running the school.

**30-39  Parish Fund-raisers**
This section would include all parish fund raisers such as auctions, scrip, bingo, parish dinners, parish dances, carnivals, festivals, Reno night, etc. Although there are designated revenue codes for these fund-raisers, the program codes will need to be used if a parish wishes to account for all revenues and expenses by fund-raiser.

**40-49  School Fund-raisers**
This section would include all school fund raisers such as auctions, scrip, bingo, gift wrap, dinners, dances, car washes, bake sales, etc. Although there are designated revenue codes for these fund-raisers, the program codes will need to be used if a school wishes to account for all revenues and expenses by fund-raiser.

**50-69  Parish Programs**
This section would include all parish programs such as liturgy music, RCIA, sacramental preparation, youth, social ministry, social action, evangelization, religious education, adult education, marriage and family life, Pastoral Council, etc.

**70-79  School Programs**
This section would include all school programs such as educational, extended care, athletic, music (band), etc.

**80-89  Parish Facilities**
This section would include tracking of expenditures by "parish" facility or building. School buildings are owned by a parish; therefore all major school facility capital expenditures will be carried on the parish books.

**90-99  Other**
This section would include any program not included under the other sections such as capital campaigns, cemeteries, etc.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 152 of 308

# Master Chart of Accounts
# Parish and School

## Assets

**10XX**       **Cash & Cash Equivalents**

| | |
|---|---|
| 1010-1029 | Checking Account |
| 1030 | Payroll Account |
| 1040 | Savings/Money Market Accounts |
| 1050 | Special Purpose Checking Accounts |
| 1060 | Petty Cash |
| 1080 | Beneficial Interest Deposits in CASC's D&L Fund-Parish |
| 1090 | Beneficial Interest in Deposits in CASC's D&L Fund-School |

**12XX**       **Receivables**

| | | |
|---|---|---|
| 1210 | | Accounts Receivable |
| 1220 | | Tuition/Fees Receivable |
| 1240 | | Provision for Bad Debt |
| **125X** | | **Accounts Receivable Inter/Intra Company** |
| | 1251 | Accounts Receivable-Archdiocese |
| | 1252 | Accounts Receivable-CASC |
| | 1253 | Accounts Receivable-RPSC |

**13XX**       **Other Assets**

| | |
|---|---|
| 1310 | Prepaid Expenses |

**14XX**       **Inventory**

| | |
|---|---|
| 1410-1419 | Scrip Inventory |
| 1420-1429 | Bingo Inventory |
| 1430-1449 | Other Revenue Inventory Items |
| *1499* | *Undeposited Funds  (to be used with Quickbooks system only)* |

**15XX**       **Investments**

| | | |
|---|---|---|
| **151X** | | **Investment Pool** |
| | 1510-1529 | Beneficial Interest in CASC's Investment Pool - Unrestricted/Parish Designated |
| | 1530-1549 | Beneficial Interest in CASC's Investment Pool - Donor Restricted |
| | 1550-1569 | Beneficial Interest in CASC's Investment Pool- Endowed |
| | 1590 | Other Investments* |

***These are temporary accounts to be used only until funds are deposited in the CASC Deposit Fund or Investment Pool.**

**16XX**       **Land, Buildings and Equipment**

| | |
|---|---|
| 1601 | Construction in Progress (CIP) |
| 1620-1629 | Parish/School Furniture, Fixtures, and Equipment (FF&E) |
| 1650-1659 | Parish/School Vehicles |
| **169X** | **Accumulated Depreciation** |

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 153 of 308

|      |      |
|------|------|
| 1692 | Accum. Depreciation - Parish/School Furn, Fixt, & Equip. |
| 1696 | Accum. Depreciation - Parish/School  Vehicles |

## Liabilities

**21XX**    **Accounts Payable**
| 2110 | Accounts Payable-Archdiocese |
|------|------|
| 2111 | Accounts Payable-CASC |
| 2112 | Accounts Payable -RPSC |
| 2120 | Accounts Payable - Trade |
| 2140 | Accounts Payable - Other |

**22XX**    **Accrued Payroll & Withholding**
| 2201 | Accrued Payroll |
|------|------|
| 2202 | Accrued Pension |
| 2203 | Accrued Employer Payroll Tax |
| 2204 | Accrued Employee Medical Insurance |

**23XX**    **Exchange Account**
| 2310 | Exchange Account |
|------|------|

**26XX-28XX**    **Funds Held For Others**
| 2620 | Funds held (on Parish books) for Parish Schools |
|------|------|
| 2630 | Parish Organizations |
| 2640 | School Organizations |

**270X**    **Parish Special Collections -- Archdiocesan/National Collection Funds**
| 2701 | Bishops' Overseas Relief (Catholic Relief Service) |
|------|------|
| 2702 | Black Catholics/Latin America |
| 2703 | Campaign for Human Development |
| 2704 | Catholic Charities |
| 2705 | Catholic University |
| 2706 | Communications |
| 2707 | Holy Father |
| 2708 | Holy Land |
| 2709 | Mission Co-Op |
| 2710 | Operation Rice Bowl |
| 2711 | Priest Retirement |
| 2712 | Religious Retirement Fund |
| 2713 | World Mission |

**28XX**    **Deferred Revenue**
| 2810 | School Tuition |
|------|------|
| 2811 | School Fees |

**2900**    **Reduction in Beneficial Interest CASC- Awards Payable**

## Net Assets

**3XXX**    **Net Assets**

8

| 3000 | *Begin Yr. Equity Bal (to be used with Quickbooks system only)* |
| 3010 | Unrestricted |
| 3050 | Donor Restricted Assets |
| 3070 | Donor Endowment Assets |
| *3901* | *Current Yr. Equity Changes (to be used with Quickbooks system only)* |

## Revenues

| **41XX** | **Collections** |
| 4110 | Sunday Collections |
| 4115 | Christmas |
| 4120 | Easter |
| 4125 | Other holy days |
| 4130 | School Collections |
| 4140 | Annual Appeal-Refund [Deficit] |
| 4145 | Parish Fundraising Collection |
| **42XX** | **Sacramental Offerings** |
| 4201 | Baptisms |
| 4202 | Marriage |
| 4203 | Funeral |
| 4204 | Other |
| **43XX** | **Development/Fund-raisers** |
| 4301 | Scrip Receipts |
| 4305 | Scrip Costs |
| 4310 | Bingo Receipts |
| 4315 | Bingo Games Materials Costs |
| **433X** | **Other Fund Raisers** |
| 4320 | Social Activities |
| 4330 | Festivals, Auctions, & Raffles Receipts |
| 4340 | Festivals, Auctions, & Raffles Costs |
| 4350 | Parish Organizations |
| 4370 | School Organizations |
| 4380 | Parish Drive ( not AAA ) |
| 4381 | Parish Drive Cost ( not AAA ) |
| 4385 | Matching Grant Income |
| 4390 | Other Activities and Events |
| **44XX** | **Educational & Sacramental Fees** |
| 4401 | Baptismal Preparation |
| 4402 | First Communion Preparation Fees |
| 4403 | Confirmation Preparation Fees |
| 4404 | CCD/Religious Education Fees |
| 4405 | RCIA Fees |
| 4406 | Marriage & Family Life Fees |
| 4407 | Youth Ministry Fees |
| 4408 | Community Outreach & Services Fees |

9

| 4409 | Adult Education  Fees |
| 4410 | Preschool  Fees |
| 4411 | Senior Program Fees |
| 4412-4490 | Other Program Fees |

**45XX** **Gifts, Donations and Grants**
| 4501 | Unrestricted Parish/School Gifts & Bequests |
| 4503 | Subsidies - Archdiocese |
| 4504 | Subsidies - Other Parishes |
| 4505 | Government Grants |

**46XX** **Other Operating Income**
| 4610 | Chaplain fees |
| 4615 | Publications -- Advertising Income |
| 4620 | Gifts Shop Sales |
| 4621 | Literature and Pamphlet Sales |
| 4622 | Votive Candles |
| 4623 | Poor Box |
| 4640 | Room & Board |
| 4650 | Rental Property Income |
| 4655 | Facility Rental Income |
| 4656 | Facility Rental Services Income |
| 4660 | Income from Student Services |

**47XX** **Non Operating Income**
| 4710 | Interest Investment Income Earned on Parish Deposits with banks & Other Financial Institutions |
| 4711 | Increase in Beneficial Interest-CASC-Investment Income Earned on Unrestricted Funds in D & L Fund |
| 4712 | Distribution Beneficial Interest-CASC-Awards from Unrestricted Investment Pool Accounts |
| 4713 | Change in Beneficial Interest-CASC- Unrestricted Investment Pool Accounts |
| 4720 | Gain [Loss] on Sales of Assets |
| 4725 | Insurance Settlements |
| 4730 | Other Miscellaneous Revenue |

**48XX** **School Income**
| 4810 | Basic Tuition |
| **482X** | Tuition Assistance |
| 4821 | Archdiocesan Scholarship & Family Grant |
| 4822 | B.A.S.I.C.     Fund Grant |
| 4823 | Making Waves |
| 4824 | Knights of Columbus |
| 4825 | Guardsmen |
| 4826-4829 | Other Program Assistance |

**485X** **Fees**
| 4851 | Registration |
| 4852 | Extended Care |

10

| | | |
|---|---|---|
| | 4853 | Student Activities |
| | 4854 | Outdoor Activities |
| | 4855 | Graduation |
| | 4856-4859 | Other |
| **488X** | **School Subsidies** | |
| | 4881 | Home Parish |
| | 4882 | Out of Parish Tuition Subsidy |
| | 4883 | Archdiocesan |
| | 4884-4889 | Other |
| **49XX** | **Donor Restricted Donations** | |
| | 4910 | Endowments Received |
| | 4911 | Donor Restricted Gifts and Bequests |
| | 4920 | Distribution Beneficial Interest-CASC Endowment Investment Pool Accounts |
| | 4921 | Change in Beneficial Interest-CASC- Endowment Investment Pool Accounts |
| | 4922 | Distribution Beneficial Interest-CASC- Restricted Investment Pool Accounts |
| | 4923 | Change in Beneficial Interest-CASC  Restricted Investment Pool Accounts. |
| | 4924 | Increase in Beneficial Interest-CASC  Income  on Restricted Deposits in Parish Deposit & Loan Fund |
| | 4930 | Net Assets Released from Restrictions |
| | 4940 | Net Restricted Assets Used -- Donor Endowment |
| | 4950 | Net Restricted Assets Used -- Donor Restricted |

## Expenses

| | | |
|---|---|---|
| **61XX** | **Compensation & Wages** | |
| **610X** | **Personnel Costs - Parish** | |
| | 6101 | Compensation:  Priests |
| | 6102 | Compensation:  Priests (Supply) |
| | 6103 | Compensation: Religious (non-school) |
| | 6104 | Compensation:  Deacons |
| | 6105 | Salaries:  Lay |
| **615X** | **Salaries - School** | |
| | 6152 | Salaries: Certified Staff  (Teachers, Principal, Vice Principal) |
| | 6153 | Salaries:  Substitute Teachers |
| | 6154 | Salaries:  Teacher's Aides |
| | 6155 | Salaries:  Professional Staff Non-Teachers |
| | 6156 | Salaries:  Support Staff |
| | 6157 | Salaries:  Maintenance Staff |
| **62XX** | **Payroll Taxes Employer** | |
| | 6201 | Payroll Taxes - FICA |
| | 6202 | Payroll Taxes - SUI |
| | 6203 | Worker's Compensation Expense |
| **63XX** | **Employee Benefits** | |

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 157 of 308

| | | |
|---|---|---|
| 6301 | | Auto Insurance -- Priests |
| 6302 | | Continuing Education/Training(non-clergy) |
| 6303 | | Retreat Fee/Continuing Education |
| 6304 | | Health & Medical Insurance |
| 6305 | | Life Insurance |
| 6306 | | Long Term Disability |
| 6307 | | Accidental Death and Dismemberment |
| 6308 | | Employee Pension Expense |
| 6309 | | Housing, Room & Board |
| 6399 | | Allocated Payroll & Benefits |
| **64XX** | | **Transportation & Travel** |
| 6410 | | Transportation -- Air/Rail/Bus |
| 6420 | | Transportation -- Auto Rental |
| 6430 | | Mileage Reimbursement |
| 6440 | | Conferences & Conventions |
| 6450 | | Food and Lodging |
| 6460 | | Other Travel Related Costs |
| **70XX** | | **Educational Expenses** |
| 7010-7019 | | Textbooks |
| 7020-7029 | | Instructional Materials |
| 7030-7039 | | Equipment Expense |
| 7040-7049 | | Multimedia and Library Books & Expenses |
| 7050-7059 | | Fees |
| 7060-7069 | | Archdiocesan Fees |
| 7070-7079 | | Training Expense |
| 7080-7099 | | Other |
| **71XX** | | **Student Activities & Services** |
| 7110-7119 | | Food Service |
| 7120-7129 | | Extended Care |
| 7130-7139 | | Student Activities |
| 7140-7149 | | Student Services |
| **72XX** | | **Property Costs** |
| 7201 | | Property Management Fees |
| 7210 | | Janitorial |
| 7215 | | Landscape |
| 7220 | | Building Rent |
| 7230 | | Maintenance & Repairs |
| 7235 | | Property Taxes |
| 7240 | | Security |
| 7290 | | Other Property Costs |
| **73XX** | | **Utilities** |
| 7310 | | Refuse |
| 7320 | | Heating |
| 7330 | | Light & Power |
| 7340 | | Water & Sewer |

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 158 of 308

| | | |
|---|---|---|
| 7350 | | Telephone |
| 7360 | | Other |
| **74XX** | **Furniture, Fixtures and Equipment** | |
| 7410 | | Furniture, Fixtures and Equipment |
| 7415 | | Rentals |
| 7420 | | Depreciation -- Furniture, Fixtures and Equipment |
| 7425 | | Depreciation -- Vehicles |
| 7430 | | Maintenance Contracts -- Furniture, Fixtures and Equipment |
| 7431 | | Repairs -- Furniture, Fixtures and Equipment |
| 7435 | | Maintenance & Repair -- Vehicles |
| 7450 | | Other Vehicle Costs |
| **75XX** | **General & Administrative** | |
| 7510 | | Postage |
| **752X** | **Printing and Publications** | |
| 7521 | | Parish/School Directory |
| 7522 | | Bulletin |
| 7525 | | Duplicating |
| 7530 | | Outside Accounting Purchased Services |
| 7540 | | Legal Services |
| 7545 | | Armored Services |
| 7550 | | Payroll Processing Services |
| 7560 | | Outside Professional Purchased Services |
| 7570 | | Subscriptions & Periodicals |
| 7580 | | Supplies |
| 7585 | | Office Supplies |
| 7586 | | Other Supplies |
| 7595 | | Interest Expense |
| 7596 | | Bank Charges |
| 7599 | | Other G&A Expenses |
| **76XX** | **Other Operating Expenses** | |
| 7605 | | Public Relations |
| 7610 | | Dues |
| 7614 | | Insurance Premium -- General Liability / Property |
| 7616 | | Insurance Premium -- Vehicles |
| 7617 | | Insurance Premium -- Student Accident |
| 7618 | | Insurance Losses -- Not Covered by Policies |
| 7620 | | Laundry and Dry Cleaning |
| 7625 | | Worship Supplies |
| 7630 | | Offertory Envelopes |
| 7635 | | Book Rack |
| 7636 | | Gift Shop Cost |
| 7640 | | Votive Candles |
| 7650 | | Entertainment/Appreciation |
| 7700 | | Bad Debt |
| **80XX** | **Other Expenses** | |

13

| | |
|---|---|
| 8003 | Chaplain Fees |
| 8020 | Property Transfer |
| 8021 | Parish Facility Rental Expenses |
| 8022 | Other Rental Property Expense |
| **90XX** | **Subsidies** |
| 9003 | School Subsidies |
| 9004 | Out of Parish School Subsidies |
| 9005 | Subsidies to others |

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 160
of 308

# Master Chart of Accounts
## Parish only

## Assets

**10XX**        **Cash & Cash Equivalents**

| | |
|---|---|
| 1010-1029 | Checking Account |
| 1030 | Payroll Account |
| 1040 | Savings/Money Market Accounts |
| 1050 | Special Purpose Checking Accounts |
| 1060 | Petty Cash |
| 1080 | Beneficial Interest Deposits in CASC's D&L Fund-Parish |
| 1090 | Beneficial Interest Deposits in CASC's D&L Fund-School |

**12XX**        **Receivables**

| | |
|---|---|
| 1210 | Accounts Receivable |
| 1220 | Tuition/Fees Receivable |
| 1240 | Provision for Bad Debt |
| **125X** | **Accounts Receiveable Inter/Intra-Company** |
| 1251 | Accounts Receivable-Archdiocese |
| 1252 | Accounts Receivable-CASC |
| 1253 | Accounts Receivable-RPSC |

**13XX**        **Other Assets**

| | |
|---|---|
| 1310 | Prepaid Expenses |

**14XX**        **Inventory**

| | |
|---|---|
| 1410-1419 | Scrip Inventory |
| 1420-1429 | Bingo Inventory |
| 1430-1449 | Other Revenue Inventory Items |
| *1499* | *Undeposited Funds (to be used with Quickbooks system only)* |

**15XX**        **Investments**

| | |
|---|---|
| **151X** | **Investment Pool** |
| 1510-1529 | Beneficial Interest in CASC's Investment Pool - Unrestricted/Parish Designated |
| 1530-1549 | Beneficial Interest in CASC's Investment Pool -- Donor Restricted |
| 1550-1569 | Beneficial Interest in CASC's Investment Pool- Endowed |
| 1590 | Other Investments* |

**\* These are temporary accounts to be used only until funds are deposited in the CASC Deposit Fund or Investment Pool.**

**16XX**        **Land, Buildings and Equipment**

| | |
|---|---|
| 1601 | Construction in Progress (CIP) |
| 1620-1629 | Parish Furniture, Fixtures, and Equipment (FF&E) |
| 1650-1659 | Parish Vehicles |
| **169X** | **Accumulated Depreciation** |

15

|      | 1692 | Accum. Depreciation -- Parish  Furn., Fixtures, and Equip. |
|      | 1696 | Accum. Depreciation -- Parish  Vehicles |

## Liabilities

| **21XX** | **Accounts Payable** |
| 2110 | Accounts Payable to the Archdiocese |
| 2111 | Accounts Payable-CASC |
| 2112 | Accounts Payable-RPSC |
| 2120 | Accounts Payable - Trade |
| 2140 | Accounts Payable - Other |
| **22XX** | **Accrued Payroll & Withholding** |
| 2201 | Accrued Payroll |
| 2202 | Accrued Pension |
| 2203 | Accrued Employer Payroll Tax |
| 2204 | Accrued Employee Medical Insurance |
| **23XX** | **Exchange Account** |
| 2310 | Exchange Account |
| **26XX-28XX** | **Funds Held For Others** |
| 2620 | Funds held (on Parish books) for Parish Schools |
| 2630 | Parish Organizations |
| 2640 | School Organizations |
| **270X** | **Parish Special Collections -- Archdiocesan/National Collection Funds** |

|      | 2701 | Bishops' Overseas Relief (Catholic Relief Service) |
|      | 2702 | Black Catholics/Latin America |
|      | 2703 | Campaign for Human Development |
|      | 2704 | Catholic Charities |
|      | 2705 | Catholic University |
|      | 2706 | Communications |
|      | 2707 | Holy Father |
|      | 2708 | Holy Land |
|      | 2709 | Mission Co-Op |
|      | 2710 | Operation Rice Bowl |
|      | 2711 | Priest Retirement |
|      | 2712 | Religious Retirement Fund |
|      | 2713 | World Mission |

| **2900** | **Reduction in Beneficial Interest CASC-Awards Payable** |

## Net Assets

| **3XXX** | **Net Assets** |
| 3000 | *Begin Yr. Equity Bal (to be used with Quickbooks system only)* |
| 3010 | Unrestricted |
| 3050 | Donor Restricted Assets |

16

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 3070 | Donor Endowment Assets                                                  |
| *3901* | *Current Yr. Equity Changes (to be used with Quickbooks system only)* |

## **Revenues**

**41XX**    **Collections**
| 4110 | Sunday Collections |
|------|--------------------|
| 4115 | Christmas |
| 4120 | Easter |
| 4125 | Other holy days |
| 4130 | School Collections |
| 4140 | Annual Appeal  Refund  (Deficit) |
| 4145 | Parish Fundraising Collection |

**42XX**    **Sacramental Offerings**
| 4201 | Baptisms |
|------|----------|
| 4202 | Marriage |
| 4203 | Funeral |
| 4204 | Other |

**43XX**    **Development/Fund-raisers**
| 4301 | Scrip Receipts |
|------|----------------|
| 4305 | Scrip Costs |
| 4310 | Bingo Receipts |
| 4315 | Bingo Games Materials Costs |

    **433X**    **Other Fund Raisers**
| 4320 | Social Activities |
|------|-------------------|
| 4330 | Festivals, Auctions, & Raffles Receipts |
| 4340 | Festivals, Auctions, & Raffles Costs |
| 4350 | Parish Organizations |
| 4380 | Parish Drive (not AAA ) |
| 4381 | Parish Drive Cost ( not AAA ) |
| 4385 | Matching Grant Income |
| 4390 | Other Activities and Events |

**44XX**    **Educational & Sacramental Fees**
| 4401 | Baptismal Preparation |
|------|-----------------------|
| 4402 | First Communion Preparation Fees |
| 4403 | Confirmation Preparation Fees |
| 4404 | CCD/Religious Education Fees |
| 4405 | RCIA Fees |
| 4406 | Marriage & Family Life Fees |
| 4407 | Youth Ministry Fees |
| 4408 | Community Outreach & Services Fees |
| 4409 | Adult Education Fees |
| 4410 | Preschool Fees |
| 4411 | Senior Program Fees |

17

| 4412-4490 | Other Program Fees |
| **45XX** | **Gifts, Donations and Grants** |
| 4501 | Unrestricted Parish/School Gifts & Bequests |
| 4503 | Subsidies - Archdiocese |
| 4504 | Subsidies - Other Parishes |
| 4505 | Government Grants |
| **46XX** | **Other Operating Income** |
| 4610 | Chaplain fees |
| 4615 | Publications -- Advertising Income |
| 4620 | Gifts Shop Sales |
| 4621 | Literature and Pamphlet Sales |
| 4622 | Votive Candles |
| 4623 | Poor Box |
| 4640 | Room & Board |
| 4650 | Rental Property Income |
| 4655 | Facility Rental Income |
| 4656 | Facility Rental Services Income |
| **47XX** | **Non Operating Income** |
| 4710 | Interest Investment Income Earned on Parish Depositw with banks & other financial institutions |
| 4711 | Increase in Beneficial Interest-CASC-Investment Income Earned on Unrestricted Funds in Parish Deposit & Loan Fund |
| 4712 | Distribution Beneficial Interest-CASC- Awards from Unrestricted Investment Pool Accounts |
| 4713 | Change in Beneficial Interest-CASC-Unrestricted Investment Pool Accounts |
| 4720 | Gain [Loss] on Sales of Assets |
| 4725 | Insurance Settlements |
| 4730 | Other Miscellaneous Revenue |
| **49XX** | **Donor Restricted Donations** |
| 4910 | Endowments Received |
| 4911 | Donor Restricted Gifts and Bequests |
| 4920 | Distribution Beneficial Investment-CASC Endowment Investment Pool Accounts |
| 4921 | Change in Beneficial Interest-CASC- Endowment Investment Pool Accounts |
| 4922 | Distribution Beneficial Interest-CASC Restricted Investment Pool Accounts |
| 4923 | Change in Beneficial Interest-CASC Restricted Investment Pool Accounts. |
| 4924 | Increase in Beneficial Interest-CASC Income on Restricted Deposits in Parish Deposit & Loan Fund |
| 4930 | Net Assets Released from Restrictions |
| 4940 | Net Restricted Assets Used -- Donor Endowment |
| 4950 | Net Restricted Assets Used -- Donor Restricted |

18

## Expenses

| 610X | **Personnel Costs - Parish** |
|------|------|
| 6101 | Compensation:  Priests |
| 6102 | Compensation:  Priests (Supply) |
| 6103 | Compensation:  Religious(non-school) |
| 6104 | Compensation:  Deacons |
| 6105 | Salaries:  Lay |

| 62XX | **Payroll Taxes Employer** |
|------|------|
| 6201 | Payroll Taxes - FICA |
| 6202 | Payroll Taxes - SUI |
| 6203 | Worker's Compensation Expense |

| 63XX | **Employee Benefits** |
|------|------|
| 6301 | Auto Insurance -- Priests |
| 6302 | Continuing Education/Training(non-clergy) |
| 6303 | Retreat Fee/Continuing Education |
| 6304 | Health & Medical Insurance |
| 6305 | Life Insurance |
| 6306 | Long Term Disability |
| 6307 | Accidental Death and Dismemberment |
| 6308 | Employee Pension Expense |
| 6309 | Housing, Room & Board |
| 6399 | Allocated Payroll & Benefits |

| 64XX | **Transportation & Travel** |
|------|------|
| 6410 | Transportation -- Air/Rail/Bus |
| 6420 | Transportation -- Auto Rental |
| 6430 | Mileage Reimbursement |
| 6440 | Conferences & Conventions |
| 6450 | Food and Lodging |
| 6460 | Other Travel Related Costs |

| 70XX | **Educational Expenses** |
|------|------|
| 7010-7019 | Textbooks |
| 7020-7029 | Instructional Materials |
| 7030-7039 | Equipment Expense |
| 7040-7049 | Multimedia and Library Books & Expenses |
| 7050-7059 | Fees |
| 7060-7069 | Archdiocesan Fees |
| 7070-7079 | Training Expense |
| 7080-7099 | Other |

| 72XX | **Property Costs** |
|------|------|
| 7201 | Property Management Fees |
| 7210 | Janitorial |
| 7215 | Landscape |
| 7220 | Building Rent |
| 7230 | Maintenance & Repairs |
| 7235 | Property Taxes |

19

| | | |
|---|---|---|
| 7240 | | Security |
| 7290 | | Other Property Costs |
| **73XX** | **Utilities** | |
| 7310 | | Refuse |
| 7320 | | Heating |
| 7330 | | Light & Power |
| 7340 | | Water & Sewer |
| 7350 | | Telephone |
| 7360 | | Other |
| **74XX** | **Furniture, Fixtures and Equipment** | |
| 7410 | | Furniture, Fixtures and Equipment |
| 7415 | | Rentals |
| 7420 | | Depreciation -- Furniture, Fixtures and Equipment |
| 7425 | | Depreciation -- Vehicles |
| 7430 | | Maintenance Contracts -- Furniture, Fixtures and Equipment |
| 7431 | | Repairs -- Furniture, Fixtures and Equipment |
| 7435 | | Maintenance & Repair -- Vehicles |
| 7450 | | Other Vehicle Costs |
| **75XX** | **General & Administrative** | |
| 7510 | | Postage |
| 752X | | Printing and Publications |
| | 7521 | Parish/School Directory |
| | 7522 | Bulletin |
| | 7525 | Duplicating |
| 7530 | | Outside Accounting Purchased Services |
| 7540 | | Legal Services |
| 7545 | | Armored Services |
| 7550 | | Payroll Processing Services |
| 7560 | | Outside Professional Purchased Services |
| 7570 | | Subscriptions & Periodicals |
| 7580 | | Supplies |
| 7585 | | Office Supplies |
| 7586 | | Other Supplies |
| 7595 | | Interest Expense |
| 7596 | | Bank Charges |
| 7599 | | Other G&A Expenses |
| **76XX** | **Other Operating Expenses** | |
| 7605 | | Public Relations |
| 7610 | | Dues |
| 7614 | | Insurance Premium -- General Liability / Property |
| 7616 | | Insurance Premium -- Vehicles |
| 7617 | | Insurance Premium -- Student Accident |
| 7618 | | Insurance Losses -- Not Covered by Policies |
| 7620 | | Laundry and Dry Cleaning |
| 7625 | | Worship Supplies |

20

| | | |
|---|---|---|
| | 7630 | Offertory Envelopes |
| | 7635 | Book Rack |
| | 7636 | Gift Shop Cost |
| | 7640 | Votive Candles |
| | 7650 | Entertainment/Appreciation |
| | 7700 | Bad Debt |
| **80XX** | **Other Expenses** | |
| | 8003 | Chaplain Fees |
| | 8020 | Property Transfer |
| | 8021 | Parish Facility Rental Expenses |
| | 8022 | Other Rental Property Expense |
| **90XX** | **Subsidies** | |
| | 9003 | School Subsidies |
| | 9004 | Out of Parish School Subsidies |
| | 9005 | Subsidies to others |

21

## Master Chart of Accounts
## School only

**<u>Assets</u>**

| | | |
|---|---|---|
| **10XX** | | **Cash & Cash Equivalents** |
| | 1010-1029 | Checking Account |
| | 1030 | Payroll Account |
| | 1040 | Savings/Money Market Accounts |
| | 1060 | Petty Cash |
| | 1090 | CASC Deposit/Loan Fund -School |
| **12XX** | | **Receivables** |
| | 1210 | Accounts Receivable |
| | 1220 | Tuition/Fees Receivable |
| | 1240 | Provision for Bad Debt |
| | **1250** | **Accounts Receivable-Inter/Intra Company** |
| | | 1251 Accounts Receivable-Archdiocese |
| | | 1252 Accounts Receivable-CASC |
| | | 1253 Accounts Receivable-RPSC |
| **13XX** | | **Other Assets** |
| | 1310 | Prepaid Expenses |
| **14XX** | | **Inventory** |
| | 1410-1419 | Scrip Inventory |
| | 1420-1429 | Bingo Inventory |
| | 1430-1449 | Other Revenue Inventory Items |
| | *1499* | *Undeposited Funds (to be used with Quickbooks system only)* |
| **15XX** | | **Investments** |
| | **151X** | **Investment Pool** |
| | 1510-1529 | Beneficial Interest in CASC's Investment Pool - Unrestricted/Parish Designated |
| | 1530-1549 | Beneficial Interest in CASC's Investment Pool -Donor Restricted |
| | 1550-1569 | Beneficial Interest in CASC's Investment Pool- Endowed |
| | 1590 | Other Investments* |

***These are temporary accounts to be used only until funds are deposited in the CASC Deposit Fund or Investment Pool.**

| | | |
|---|---|---|
| **16XX** | | **Land, Buildings and Equipment** |
| | 1620-1629 | School Furniture, Fixtures, and Equipment |
| | 1650-1659 | School Vehicles |
| | **169X** | **Accumulated Depreciation** |
| | | 1692 Accum. Depreciation -- School Furn., Fixtures, and Equip. |
| | | 1696 Accum. Depreciation -- School Vehicles |

22

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 168 of 308

## <u>Liabilities</u>

| | | |
|---|---|---|
| **21XX** | **Accounts Payable** | |
| | 2110 | Accounts Payable- Archdiocese |
| | 2111 | Accounts Payable-CASC |
| | 2112 | Accounts Payable-RPSC |
| | 2120 | Accounts Payable - Trade |
| | 2140 | Accounts Payable - Other |
| **22XX** | **Accrued Payroll & Withholding** | |
| | 2201 | Accrued Payroll |
| | 2202 | Accrued Pension |
| | 2203 | Accrued Employer Payroll Tax |
| | 2204 | Accrued Employee Medical Insurance |
| **23XX** | **Exchange Account** | |
| | 2310 | Exchange Account |
| **26XX-28XX** | **Funds Held For Others** | |
| | 2640 | School Organizations |
| **28XX** | **Deferred Revenue** | |
| | 2810 | School Tuition |
| | 2811 | School Fees |
| **2900** | **Reduction in Beneficial Interest CASC-Awards Payable** | |

## <u>Net Assets</u>

| | | |
|---|---|---|
| **3XXX** | **Net Assets** | |
| | *3000* | Begin Yr. Equity Bal *(to be used with Quickbooks system only)* |
| | 3010 | Unrestricted |
| | 3050 | Donor Restricted Assets |
| | 3070 | Donor Endowment Assets |
| | 3901 | Current Yr. Equity Changes *(to be used with Quickbooks system    only)* |

23

## Revenues

**43XX        Development/Fund-raisers**

| | | |
|---|---|---|
| 4301 | Scrip Receipts | |
| 4305 | Scrip Costs | |
| 4310 | Bingo Receipts | |
| 4315 | Bingo Games Materials Costs | |

**433X      Other Fund Raisers**

| | |
|---|---|
| 4320 | Social Activities |
| 4330 | Festivals, Auctions, & Raffles Receipts |
| 4340 | Festivals, Auctions, & Raffles Costs |
| 4370 | School Organizations |
| 4380 | Parish Drive (not AAA ) |
| 4381 | Parish Drive Cost ( not AAA ) |
| 4385 | Matching Grant Income |
| 4390 | Other Activities and Events |

**44XX        Educational & Sacramental Fees**

| | |
|---|---|
| 4402 | First Communion Preparation Fees |
| 4403 | Confirmation Preparation Fees |
| 4410 | Preschool  Fees |
| 4411 | Senior Program Fees |
| 4412-4490 | Other Program Fees |

**45XX        Gifts, Donations and Grants**

| | |
|---|---|
| 4501 | Unrestricted Parish/School Gifts & Bequests |
| 4503 | Subsidies - Archdiocese |
| 4504 | Subsidies - Other Parishes |
| 4505 | Government Grants |

**46XX        Other Operating Income**

| | |
|---|---|
| 4615 | Publications -- Advertising Income |
| 4650 | Rental Property Income |
| 4655 | Facility Rental Income |
| 4656 | Facility Rental Services Income |
| 4660 | Income from Student Services |

**47XX        Non Operating Income**

| | |
|---|---|
| 4710 | Interest Investment Income Earned on Parish Deposits with banks & other Financial Institutions |
| 4711 | Increase in Beneficial Interest-CASC-Investment Income Earned on Unrestricted Deposits in D & L Fund |
| 4712 | Distribution Bendficial Interest-CASC-Awards from Unrestricted Investment Pool Accounts |
| 4713 | Change in Beneficial Interest-CASC- Unrestricted Investment Pool Accounts |
| 4720 | Gain [Loss] on Sales of Assets |
| 4725 | Insurance Settlements |

24

| | | |
|---|---|---|
| 4730 | | Other Miscellaneous Revenue |
| **48XX** | **School Income** | |
| 4810 | | Basic Tuition |
| **482X** | | Tuition Assistance |
| 4821 | | Archdiocesan Scholarship & Family Grant |
| 4822 | | B.A.S.I.C Fund Grant |
| 4823 | | Making Waves |
| 4824 | | Knights of Columbus |
| 4825 | | Guardsmen |
| 4826-4829 | | Other Program Assistance |
| **485X** | **Fees** | |
| 4851 | | Registration |
| 4852 | | Extended Care |
| 4853 | | Student Activities |
| 4854 | | Outdoor Activities |
| 4855 | | Graduation |
| 4856-4859 | | Other |
| **488X** | **School Subsidies** | |
| 4881 | | Home Parish |
| 4882 | | Out of Parish Tuition Subsidy |
| 4883 | | Archdiocesan |
| 4884-4889 | | Other |
| **49XX** | **Donor Restricted Donations** | |
| 4910 | | Endowments Received |
| 4911 | | Donor Restricted Gifts and Bequests |
| 4920 | | Distribution Beneficial Interest-CASC Endowment Investment Pool Accounts |
| 4921 | | Change in Beneficial Interest-CASC Endowment Investment Pool Accounts |
| 4922 | | Distribution Beneficial Interest-CASC Restricted Investment Pool Accounts |
| 4923 | | Change in Beneficial Interest-CASC Restricted Investment Pool Accounts. |
| 4924 | | Increase in Beneficial Interest-CASC Income on Restricted Deposits in Parish Deposit & Loan Fund |
| 4930 | | Net Assets Released from Restrictions |
| 4940 | | Net Restricted Assets Used -- Donor Endowment |
| 4950 | | Net Restricted Assets Used -- Donor Restricted Expenses |

## Expenses

| | | |
|---|---|---|
| **615X** | **Personnel Cost - School** | |
| 6152 | | Salaries: Certified Staff (Teachers, Principal, Vice Principal) |
| 6153 | | Salaries: Substitute Teachers |
| 6154 | | Salaries: Teacher's Aides |
| 6155 | | Salaries: Professional Staff Non-Teachers |

25

| | | |
|---|---|---|
| 6156 | | Salaries: Support Staff |
| 6157 | | Salaries: Maintenance Staff |
| **62XX** | **Payroll Taxes Employer** | |
| 6201 | | Payroll Taxes - FICA |
| 6202 | | Payroll Taxes - SUI |
| 6203 | | Worker's Compensation Expense |
| **63XX** | **Employee Benefits** | |
| 6301 | | Auto Insurance -- Priests |
| 6302 | | Continuing Education/Training(non-clergy) |
| 6303 | | Retreat Fee/Continuing Education |
| 6304 | | Health & Medical Insurance |
| 6305 | | Life Insurance |
| 6306 | | Long Term Disability |
| 6307 | | Accidental Death and Dismemberment |
| 6308 | | Employee Pension Expense |
| 6309 | | Housing, Room & Board |
| 6399 | | Allocated Payroll & Benefits |
| **64XX** | **Transportation & Travel** | |
| 6410 | | Transportation -- Air/Rail/Bus |
| 6420 | | Transportation -- Auto Rental |
| 6430 | | Mileage Reimbursement |
| 6440 | | Conferences & Conventions |
| 6450 | | Food and Lodging |
| 6460 | | Other Travel Related Costs |
| **70XX** | **Educational Expenses** | |
| 7010-7019 | | Textbooks |
| 7020-7029 | | Instructional Materials |
| 7030-7039 | | Equipment Expense |
| 7040-7049 | | Multimedia and Library Books & Expenses |
| 7050-7059 | | Fees |
| 7060-7069 | | Archdiocesan Fees |
| 7070-7079 | | Training Expense |
| 7080-7099 | | Other |
| **71XX** | **Student Activities & Services** | |
| 7110-7119 | | Food Service |
| 7120-7129 | | Extended Care |
| 7130-7139 | | Student Activities |
| 7140-7149 | | Student Services |
| **72XX** | **Property Costs** | |
| 7201 | | Property Management Fees |
| 7210 | | Janitorial |
| 7215 | | Landscape |
| 7220 | | Building Rent |
| 7230 | | Maintenance & Repairs |
| 7235 | | Property Taxes |

26

| | | |
|---|---|---|
| 7240 | | Security |
| 7290 | | Other Property Costs |
| **73XX** | **Utilities** | |
| 7310 | | Refuse |
| 7320 | | Heating |
| 7330 | | Light & Power |
| 7340 | | Water & Sewer |
| 7350 | | Telephone |
| 7360 | | Other |
| **74XX** | **Furniture, Fixtures and Equipment** | |
| 7410 | | Furniture, Fixtures and Equipment |
| 7415 | | Rentals |
| 7420 | | Depreciation -- Furniture, Fixtures and Equipment |
| 7425 | | Depreciation -- Vehicles |
| 7430 | | Maintenance Contracts -- Furniture, Fixtures and Equipment |
| 7431 | | Repairs -- Furniture, Fixtures and Equipment |
| 7435 | | Maintenance & Repair -- Vehicles |
| 7450 | | Other Vehicle Costs |
| **75XX** | **General & Administrative** | |
| 7510 | | Postage |
| **752X** | **Printing and Publications** | |
| 7521 | | Directory |
| 7522 | | Bulletin |
| 7525 | | Duplicating |
| 7530 | | Outside Accounting Purchased Services |
| 7540 | | Legal Services |
| 7545 | | Armored Services |
| 7550 | | Payroll Processing Services |
| 7560 | | Outside Professional Purchased Services |
| 7570 | | Subscriptions & Periodicals |
| 7580 | | Supplies |
| 7585 | | Office Supplies |
| 7586 | | Other Supplies |
| 7595 | | Interest Expense |
| 7596 | | Bank Charges |
| 7599 | | Other G&A Expenses |
| **76XX** | **Other Operating Expenses** | |
| 7605 | | Public Relations |
| 7610 | | Dues |
| 7614 | | Insurance Premium -- General Liability / Property |
| 7616 | | Insurance Premium -- Vehicles |
| 7617 | | Insurance Premium -- Student Accident |
| 7618 | | Insurance Losses -- Not Covered by Policies |
| 7620 | | Laundry and Dry Cleaning |
| 7650 | | Entertainment/Appreciation |

27

| 7700 | Bad Debt |
| **80XX** | **Other Expenses** |
| 8022 | Other Rental Property Expense |

# Chart of Accounts Description (including sample entries)

# ASSETS

**10XX** **CASH & CASH EQUIVALENTS**

**1010** **Operating Checking Accounts**
All checking accounts are be listed here in sequential order starting with 1010. All funds (including parish/school organizations) that are for general operating transactions should be recorded in these accounts. For each bank account, a separate account (from the general ledger chart of accounts) should be used.

**1030** **Payroll Checking**
All checking accounts relating to parish/school payroll. This account will not be needed when parish/school is on Coordinated Payroll.

**1040** **Savings and Money Market Accounts**
Funds deposited in a bank or savings and loan in regular interest-bearing accounts for current operating purposes. This includes funds deposited in Money Market Accounts.

**1050** **Special Purpose Checking Accounts**
Use these accounts if funds are deposited for a special operating purpose and are to be used within one year.

**1060** **Petty Cash**
Cash funds, currency and coin, kept on hand for minor expenses.

**1080** **Beneficial Interest -Deposits in CASC's D&L Fund -Parish**
The investment of parish funds, both restricted and unrestricted in use, which are deposited in the Capital Asset Support Corporation's (CASC)Deposit and Loan Fund.

**1090** **Beneficial Interest -Deposits in CASC's D&L Fund School.** The investment of school funds, both restricted and unrestricted in use, which are deposited in the -Capital Assets Support Corporation's (CASC) Deposit and Loan Fund.

**12XX** **RECEIVABLES**

**1210** **Accounts Receivable**
Amounts owed by outside parties. This account includes amounts due from other funds within the parish, r other Catholic organizations (except the Chancery, CASC, RPSC (see accounts 125X below).

**1220** **Tuition/Fees Receivable**
Amounts owed to the school for tuition/fees for educational programs at time billed. A detailed record for each outstanding receivable must be maintained to support the balance in this account, showing by individual each bill and offsetting payments. Below are examples of the journal entries necessary to enter a tuition receivable for a current fiscal school year and one for a future fiscal school year.
> *In this example a new student begins attending the school at mid-year (December). The school sends a notice to the new student's family on November 15th to inform them of pro-rated tuition due for the school year.*
> *Debit    1220          Tuition/Fees Receivable                     1,500*
> *    Credit    4810              Basic Tuition                              1,500*

29

30

*The new family sends tuition money to the school in late December paying for the remainder of the school year.*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *1,500* | |
| | *Credit* | *1220* | *Tuition/Fees Receivable* | *1,500* |

*In this second example the school sends notices to families by May 31 of tuition due for the following school year. Because the fiscal year ends on June 30th, the tuition money is to be used for a future fiscal year.*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1220* | *Tuition/Fees Receivable* | *20,000* | |
| | *Credit* | *2810* | *Deferred Revenue -- School Tuition* | *20,000* |

*NOTE: See Account 2810 for explanation of recording Tuition/Fees Revenue*

*A family sends tuition money to the school in June to be used for the following school year. To record revenue in the proper fiscal year, see account 2810.*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *2,000* | |
| | *Credit* | *1220* | *Tuition/Fees Receivable* | *2,000* |

**1240    Provision for Bad Debts**

A provision for estimated uncollectable receivables. Below is an example of the journal entries necessary to record a provision for bad debts.

*In the first example a provision for bad debts is established because the parish/school feels tuition of $1,000 will not be collected but they continue collection efforts*

| | | | | |
|---|---|---|---|---|
| *Debit* | *7645* | *Bad Debts* | *1,000* | |
| | *Credit* | *1240* | *Provision for Bad Debts* | *1,000* |

*Provision for bad debts is a "contra" asset account that stays on the Balance Sheet until such time as the school determines the receivable(s) is uncollectable, and all future collection efforts are useless, then an entry is made to permanently write off the Bad Debt.*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1240* | *Provision for Bad Debts* | *1,000* | |
| | *Credit* | *1220* | *Tuition/Fees Receivable* | *1,000* |

**125X    Accounts Receivable-Inter/Intra Company**

**1251    Accounts Receivable-Archdiocese**

Amounts owed by the Archdiocese Central Administrative Office (Chancery)

**1252    Accounts Receivable-Capital Asset Support Corporation(CASC)**

Amounts owed by the Capital Asset Support Corporation.

**1253    Accounts Receivable-Real Property Support Corporation(RPSC)**

Amounts owed by the Real Property Support Corporation.

**13XX    OTHER ASSETS**

**1310    Prepaid Expenses**

All expenditures for goods and services (such as workers' compensation insurance) paid in current fiscal year that are for a succeeding fiscal year. Prepaid expenses are assets because a service or product is "owed" to the parish/school until the service is provided. Below is an example of the journal entries necessary to enter a prepaid expense in the current fiscal year.

31

*In this example the prepaid expense will be for annual workers' compensation, but because a portion of the expense is for a future fiscal year, the accounts affected will be cash and prepaid expense.*

| Debit | 6203 | Workers' Comp Expense(Jan.-Jun.portion) | 5,000 | |
|-------|------|------------------------------------------|-------|--------|
| Debit | 1310 | Prepaid Expenses(July-Dec.portion) | 5,000 | |
| | Credit | 1010 | Operating Checking Account | 10,000 |

*In the succeeding fiscal year, the prepaid expense is recognized as an expense even though the bill was paid in an earlier fiscal year.*

| Debit | 6203 | Workers' Comp Expense(Jul.-Dec.portion) | 5,000 | |
|-------|------|------------------------------------------|-------|--------|
| | Credit | 1310 | Prepaid Expenses | 5,000 |

## <u>14XX</u>   <u>INVENTORY</u>

### 1410-   Scrip Inventory

A physical count of all scrip should be made at end of fiscal year at cost of items is recorded in this account.  Below is an example of the journal entries necessary to record purchases of scrip as well as an end of year entry to adjust scrip inventory.

*In this example scrip is purchased for fund-raising purposes during fiscal year #1.*

| Debit | 4305 | Scrip Costs | 3,000 | |
|-------|------|-------------|-------|-------|
| | Credit | 1010 | Operating Checking Account | 3,000 |

*At the end of the fiscal year #1 an inventory is taken of scrip.  Based on historical per unit purchase prices from earlier in the fiscal year, it is determined the scrip on hand has a value of $1,000.  The accounting records indicate there was no Scrip Inventory at the beginning of the fiscal year.  An entry is made to Scrip Inventory and reduce Scrip Purchases.*

| Debit | 1410 | Scrip Inventory | 1,000 | |
|-------|------|-----------------|-------|-------|
| | Credit | 4305 | Scrip Costs | 1,000 |

*In the first month of fiscal year #2, a reversing entry is made to "empty" the inventory account and increase the expense account.*

| Debit | 4305 | Scrip Costs | 1,000 | |
|-------|------|-------------|-------|-------|
| | Credit | 1410 | Scrip Inventory | 1,000 |

*During fiscal year #2 Scrip is purchased for fund-raising purposes.*

| Debit | 4305 | Scrip Costs | 7,000 | |
|-------|------|-------------|-------|-------|
| | Credit | 1010 | Operating Checking Account | 7,000 |

*At the end of fiscal year #2 an inventory is taken of scrip once again.  Based on historical per unit purchase prices from earlier in the fiscal year, it is determined the scrip on hand has a value of $5,000.*

| Debit | 1410 | Scrip Inventory | 5,000 | |
|-------|------|-----------------|-------|-------|
| | Credit | 4305 | Scrip Costs | 5,000 |

### 1420-29  Bingo Inventory

A physical count of bingo strips, etc. (inclusive of anything with a cash prize value) on hand should be made at the end of the fiscal year and cost of items is to be recorded in this account.  Below is an example of the journal entries necessary to record purchases of bingo game materials as well as an end of year entry to adjust bingo game materials inventory.

*In this example bingo game materials are purchased for fund-raising purposes.*

| Debit | 4315 | Bingo Game Materials Costs | 1,500 |
|-------|------|-----------------------------|-------|

32

> *Credit    1010            Operating Checking Account            1,500*

> *At the end of the fiscal year #1 an inventory is taken of bingo game materials. Based on historical per unit purchase prices from earlier in the fiscal year, it is determined the bingo inventory on hand has a value of $1,000. The accounting records indicate there was no Bingo Inventory at the beginning of the fiscal year. An entry is made to increase Bingo Inventory and reduce Bingo Game Materials.*
> *Debit    1420            Bingo Inventory                    1,000*
> *    Credit    4315            Bingo Game Materials Costs        1,000*

> *In the first month of fiscal year #2, a reversing entry is made to "empty" the inventory account and increase the expense account.*
> *Debit    4315            Bingo Game Materials Costs        1,000*
> *    Credit    1420            Bingo Inventory            1,000*

> *During fiscal year #2 bingo is purchased for fund-raising purposes.*
> *Debit    4315            Bingo Game Materials Costs        7,000*
> *    Credit    1010            Operating Checking Account        7,000*

> *At the end of fiscal year #2 an inventory is taken of bingo game materials once again. Based on historical per unit purchase prices from earlier in the fiscal year, it is determined the bingo inventory on hand has a value of $5,000.*
> *Debit    1420            Bingo Inventory                    5,000*
> *    Credit    4315            Bingo Game Materials Costs        5,000*

**1430-49 Other Revenue Inventory Items**
Any operating or revenue generating items on hand at the end of the fiscal year with a unit or group value of greater than $500.(e.g. Gift Shop Inventory)

**1499    Undeposited Funds**
This account is used by the Quickbooks system to record all receipts. When deposits are made this account is credited and the appropriate bank account debited. For further information refer to the Quickbooks user manual.

## 15XX    INVESTMENTS-BENEFICIAL INTEREST AND OTHER INVESTMENTS

**1510-29 Beneficial Interest in CASC- Investment Pool – Unrestricted/ Parish Designated**
Record all deposits of unrestricted funds, which were made to/from the Capital Asset Support Corporation's (CASC) Investment Pool (see policy section for further definition). If desired separate accounts can be used for each account in the Archdiocesan Investment Pool.

Below is an example of the journal entries necessary to record 1) the receipt of an unrestricted gift and the transfer of that money into the Investment Pool, 2) a withdrawal of money from the investment pool

> *In the first example a donor makes an unrestricted charitable contribution of $20,000 that the parish transfers to the CASC Investment Pool. When the parish initially receives the gift, they would deposit it into their checking account.*

> *Debit    1010            Operating Checking Account.            20,000*
> *    Credit    4501            Unrestricted Parish/School Gifts & Beq.  20,000*

33

*At the end of the quarter, the Parish writes a check to the –CASC to transfer the money into the Investment Pool Account.*

*Debit   1510          Beneficial InterestinCASC- Inv. Pool -- Unrestr.20,000*
*    Credit   1010          Operating Checking Account          20,000*

*In the second example the parish receives $5,000 from the Investment Pool account. When the check for the withdrawal is received from the CASC it would be deposited into the checking account and recorded as follows:*
*Debit   1010          Operating Checking Account          5,000*
*    Credit   1510          Beneficial Interest in CASC-Inv. Pool -- Unrestr.5,000*

### 1530-49      Beneficial Interest in CASC's Investment Pool -- Donor Restricted
Record funds that have been donated to parish/school for a specific purpose which were transferred to the Capital Asset Support Corporation's (CASC) Investment Pool (see policy section for further definition).

Below is an example of the journal entries necessary to record 1) the receipt of a donor restricted gift and the transfer of that money into the Investment Pool, and 2) an award of money from the CASC.

*In this example an estate makes an restricted donation of $100,000 that the parish transfers to the Capital Asset Support Corporation's(CASC) Investment Pool. When the parish initially receives the gift, they would deposit it into their checking account.*

*Debit   1010          Operating Checking Account.          100,000*
*    Credit   4911          Donor Restr Gifts Received          100,000*

*At the end of the quarter, the Parish writes a check to the CASC to transfer the money into the Investment Pool Account.*

*Debit   1530          Beneficial Interest inCASC-Inv. Pool -- Donor Restr.  100,000*
*    Credit   1010          Operating Checking Account          100,000*

*In the second example the parish requests an award of $10,000 from the Investment Pool account to be used for its restricted purpose. When the check is received from the CASC, it would be deposited into the checking account and recorded as follows:*
*Debit   1010          Operating Checking Account          10,000*
*    Credit   1530          Beneficial Interest in CASC-. Inv. Pool – Donor Restr.10,000*

### 1550-1569  Beneficial Interest in CASC- Investment Pool-Endowed Funds
Record funds that have been donated to parish/school for a specific Archdiocesan approved endowment which were transferred to the CASC-Investment Pool (see policy section for further definition and procedure for approval of an endowment).

Below is an example of the journal entries necessary to record 1) the receipt of an endowed and the transfer of that money into the Investment Pool, and 2) an award of money from the CASC

*In this example an estate makes an endowed donation of $100,000 that the parish transfers to the Capital Asset Support Corporation's(CASC) Investment Pool. When the parish initially receives the gift, they would deposit it into their checking account.*

*Debit   1010          Operating Checking Account.          100,000*
*    Credit   4910          Endowed Gifts Received          100,000*

34

*At the end of the quarter, the Parish writes a check to the CASC to transfer the money into the Investment Pool Account.*

*Debit    1550          Beneficial Interest inCASC-Inv. Pool –Endowed .100,000*
*    Credit   1010          Operating Checking Account          100,000*

*In the second example the parish requests an award of $10,000 from the CASC to be used for its restricted purpose. When the check is received from the CASC, it would be deposited into the checking account and recorded as follows:*
*Debit    1010          Operating Checking Account          10,000*
*    Credit   1550          Beneficial Interest in CASC-. Inv. Pool –Endowed 10,000*

**1590    Investment with Others**
The market value of all gifts /donations on deposit with outside investment organizations or on hand at parish/school until the gifts/donations can be liquidated and deposited in an Archdiocesan Fund or Investment Pool.
NOTE: No stock certificates, bonds, cash or other negotiable instruments are to be in outside investment organizations over 6 months from date received.

**16XX    LAND, BUILDINGS AND EQUIPMENT (Refer to Fixed Asset Accounting Procedure Section for more detail)**

**1601    Construction in Progress (CIP)**
Record all costs both hard and soft cost for construction projects in progress but not completed.

**1620-29 Parish/School Furniture, Fixtures & Equipment(FF&E)**
Equipment (either specific items or group of item such as computers purchased at one time only) valued in excess of $50,000 and expected to last longer than 5 years is considered a fixed asset. When purchased it is recorded in these accounts. Equipment valued less than $50,000 is recorded in an appropriate expense account, such as Furniture/Equipment (see account 7410) or Office Supplies (see account 7585). Note: It is not necessary at this time to go back to record prior year purchases. Only record new purchases.

**1650-59 Parish/School Vehicles**
These accounts include the cost of buses, autos, and all automotive equipment requiring state license plates which are used primarily for parish and/or school use.

**169X    Accumulated Depreciation**

**1692    Accumulated Depreciation -- Parish/School Furniture, Fixtures & Equipment**
An allocation of a portion of the cost of carrying parish/school furniture, fixtures and equipment that represents the reduction in value over their useful lives. See account 1690 for an example of the entries necessary to record accumulated depreciation.

**1696    Accumulated Depreciation -- Parish/School Vehicles**
An allocation of a portion of the cost of carrying parish/school vehicles that represents the reduction in value over their useful lives. See account 1690 for an example of the entries necessary to record accumulated depreciation.

# LIABILITIES

**21XX    ACCOUNTS PAYABLE**

**2110    Accounts Payable to the Archdiocese**
Amounts owed to the Archdiocese for (e.g., general liability insurance) or services rendered.
Usually this account will be used only at Year-End to reflect all unpaid bills from the Archdiocese at June 30th, which were for the fiscal year just ended.  Below is an example of the journal entries necessary to enter a payable to the Archdiocese for employee health insurance billed for June which is paid in July.

> *In this example the Archdiocese takes out a policy for all parishes and schools and pays the premium to the insurance company on behalf of the parish and school.  In turn, each parish and school is billed by the Archdiocese for its portion of the premium in June.*
>
> Debit    7614            Insurance Premium -- General Liability   50,000
>       Credit    2110    Accounts Payable to the Archdiocese         50,000
>
> *The following journal entry represents the actual payment to the Archdiocese made in July.*
>
> Debit    2110            Accounts Payable to the Archdiocese        50,000
>      Credit    1010            Operating Checking Account                50,000

**2111    Accounts Payable to the CASC (Capital Asset Support Corporation)**
Record any amounts owed to the CASC.  This does not include planned deposits.  See Account 2900.

**2112    Accounts Payable to the RPSC (Real Property Support Corporation)**
Record any amounts owed to the RPSC.  This does not include transfers of property.

**2120    Accounts Payable -- Trade**
Amounts owed to outside vendors for supplies, goods, or materials purchased or services rendered.
Usually this account will only be used at Year-End to reflect all unpaid bills at June 30th which were for the fiscal year just ended.

**2140    Accounts Payable--Other**
Any other unpaid, non-payroll, items not identified above.


**22XX    ACCRUED PAYROLL AND WITHHOLDINGS**


**2201    Accrued Payroll**
Gross salaries and wages earned which have not been paid as of the end of an accounting period.  This account is usually used only at the end of the fiscal year.

Below is an example of the journal entries necessary to enter an Accrued Payroll at the end of the fiscal year.

> *In this example the parish must record payroll for the final pay period of the fiscal year. The parish employees who have worked the final two weeks of the last month of the fiscal year are "owed" compensation.  This is called accrued payroll and an entry must be made at the end of every fiscal year.*
>
> Debit    6105        Salaries-Lay                6,000
> Debit    6201        Salaries-FICA                700
> Debit    6202        Salaries-SUI                300
>     Credit    2201        Accrued Payroll            6,000
>             2203        Accrued Payroll Tax        1,000

**2202    Accrued Pension**

This records one half of estimated annual pension fees in this account at fiscal year end. Because the Archdiocesan employee pension plan contribution is paid annually on December 31st for the January - December period, at June 30 the parish owes for the current fiscal year one half (1/2) of the pension period (January - June). Below is an example of the journal entries necessary to record Accrued Pension.

> *In this example a parish is preparing to close its accounting records for fiscal year end on June 30th. The pension plan payment is not due until December 31st, however the parish has incurred 6 months of expense. The parish should recognize the 6 months of pension expense as follows:*
> *Debit   6309          Employee Pension(Jan.-Jun. Portion)    15,000*
> *   Credit   2202          Accrued Pension                                       15,000*

> *On December 31 the parish makes the annual pension plan contribution. The expense for the January through June was recognized on June 30th. The parish must recognize expenses for July through December. When the parish makes its contribution it does so as follows:*
> *Debit   6309          Employee Pension(July-Dec.Portion)    15,000*
> *Credit   2202          Accrued Pension(Jan.-Jun. Portion)    15,000*
> *   Credit   1010          Operating Checking Account             30,000*

**2203    Accrued Employer Payroll Tax**
Any unpaid employer payroll tax relating to accrued payroll is recorded here.

**2204    Accrued Employee Medical Insurance**
Medical Insurance payments owed by employer for employee coverage and also deducted from the employee's payroll spouse/family coverage can remain in the account until the actual premium is remitted.

**23XX    EXCHANGE ACCOUNT**

**2310    Exchange Account**
This is an accommodation clearing account to be charged or credited for receipts or disbursements which the parish/school will eventually reimburse or be reimbursed by another party. Use of this account is not intended to impact the Parish/School Income Statement. Funds received which are merely exchanged or accommodated through the parish bank account, typically cash for Annual Archdiocesan Appeal, fees to the Tribunal,, etc. Below is an example of the journal entries necessary to enter a transaction impacting the Exchange account.

> *In this example funds are collected from parishioners for the Archdiocese . These funds are not considered revenue. They are a liability because the parish must pass the money on to the Archdiocese. This liability is differentiated from the account Funds Held for Others (2600 account series).*
> *Debit   1010          Operating Checking Account             450*
> *   Credit   2310          Exchange Account                             450*

> *When the collected funds are turned over to the Archdiocese, the following journal entry is made. Notice that only the Balance Sheet accounts are effected by these two journal entries.*
> *Debit   2310          Exchange Account                             450*
> *   Credit   1010          Operating Checking Account             450*

**26XX-28XX    FUNDS HELD FOR OTHERS**

**2620    Parish School**

37

Funds held for the parish school in a parish bank account. These funds are earmarked for the school but were received by the parish, other than collections from parishioners. This account is to be used only by the parish. Examples: (e.g. Bequests, gifts)

**2630**     **Parish Organizations**
Funds held for parish organizations. This account will show various funds which were raised by parish organizations for a specific purpose and were not included in the parish statement of revenues and expenses. Below is an example of the journal entries necessary to enter a transaction impacting the account Funds Held for Others -- Women's Guild.

> *In this example a Women's Guild has several fund-raisers during the current fiscal year. Before the end of fiscal year, the Women's Guild has $12,000 in their bank account. They transfer $10,000 to the parish to be used for general operating purposes and retain $2,000 for seed money for the following year. The second entry is required to record the Women's Guild bank account on the books of the parish at least at the end of the fiscal year. An example of the entries appear below:*
>
> *Debit    1010             Operating Checking Account         10,000*
> *      Credit    4340      Parish Organization                 10,000*
>
> *Debit    1010             Operating Checking Account         2,000*
> *      Credit    2630      Funds Held for Parish Organizations     2,000*

**2640**     **Parish /School Organizations**
Funds held for parish school organizations such as Parent-Teacher Groups. This account will show various funds which were raised by various Parent-Teacher groups for a specific purpose and were not included in the parish and school statement of revenues and expenses.

**2700**     **Special Collections** -- **Archdiocesan/National Collection Funds**
Amounts received in special collections for the Archdiocese or national/local organizations. Funds are recorded in these liability accounts when received - then removed from these accounts when funds are remitted to the Archdiocese or agency.

        2701     Bishops' Overseas Relief (Catholic Relief Service)
        2702     Black Catholics/Latin America
        2703     Campaign for Human Development
        2704     Catholic Charities
        2705     Catholic University
        2706     Communications
        2707     Holy Father
        2708     Holy Land
        2709     Mission Co-op
        2710     Operation Rice Bowl
        2711     Priests Retirement
        2712     Religious Retirement Fund
        2713     World Mission (Society for the Propagation of the Faith)

**28XX**     **DEFERRED REVENUE**

**2810**     **School Tuition**

Case: 23-30564     Doc# 610-3     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 184 of 308

All tuition received in advance of the fiscal (school) year. Program and Sub-Grouping codes may be used to account for tuition ear-marked for specific purposes, e.g., Kindergarten, Middle School, etc. Below is an example of the journal entries necessary to record deferred revenue for school tuition.

*In this example, the school receives tuition money by May for the following school year. Because the fiscal year ends on June 30th, the tuition money is to be used for a future year even though the school year begins in the same calendar year. (First, a notice is sent to families informing them how much tuition will be for the coming school year. This entry may or may not be initiated with an entry to tuition receivable. See account 1220 for an example of that entry.)*

| | | | |
|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *20,000* |
| | *Credit* | *2810* | *Deferred Revenue -- School Tuition* | *20,000* |

*On July 1st a new fiscal year begins. The balance of deferred revenue -- school tuition may now be applied to school tuition for the current year. The entry may be done at any time after July 1. The account names look the same but one is a liability (2810) and the other is a revenue (4810). A liability means the money received is "owed" to a future fiscal year and the revenue means the money received is to be used in a current fiscal year.*

| | | | |
|---|---|---|---|
| *Debit* | *2810* | *Deferred Revenue -- School Tuition* | *20,000* |
| | *Credit* | *4810* | *School Tuition* | *20,000* |

**2811    School Fees**

All charges received in advance of school year for non-educational services such as registration, student activities, etc. Below is an example of the journal entries necessary to record deferred revenue for school fees.

*In this example, the school receives registration fees by May for the following school year. Because the fiscal year ends on June 30th, the registration fees are to be used for a future year even though the school year begins in the same calendar year. (First, a notice is sent to families informing them how much registration fees will be for the coming school year. This entry may or may not be initiated with an entry to fees receivable. See account 1230 for an example of that entry.)*

| | | | |
|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *100* |
| | *Credit* | *2811* | *Deferred Revenue -- School Fees* | *100* |

*On July 1st a new fiscal year begins. The balance of deferred revenue -- school registration fees may now be applied to school fees for the current year. The entry may be done at any time after July 1. The account names look the same but one is a liability (2811) and the other is a revenue (4851). A liability means the money received is "owed" to a future fiscal year and the revenue means the money received is to be used in a current fiscal year.*

| | | | |
|---|---|---|---|
| *Debit* | *2811* | *Deferred Revenue -- School Fees* | *100* |
| | *Credit* | *4851* | *School Registration Fees* | *100* |

**2900    Reduction in Beneficial Interest in CASC-- Awards Payable**

Amounts planned to be redeposited in the CASC's Deposit & Loan Fund. When funds are awarded to a parish with the stipulation that they will be repaid to the CASC, it is necessary that the parish/school record the awarded amount so their records agree with CASC's records. Repayment of these awards principal

39

only, is recorded in this account. Agreed Interest incurred is recorded at expense account 7595. Below is an example of the journal entries necessary to enter a award to the CASC Deposit & Loan Fund.

*In this example the parish is awarded money from the CASC Deposit & Loan Fund to repair a roof on a facility.*
*Debit    1010              Operating Checking Account           100,000*
*    Credit   2900                    -Reduction in Beneficial Interest in CASC -- Award(s) Pay.*
*              100,000*

*The following journal entry represents spending the money to repair the roof.*
*Debit    7230              Maintenance & Repairs              100,000*
*    Credit   1010              Operating Checking Account           100,000*

*The following journal entry represents a partial re-payment to the CASC Parish Deposit & Loan Fund. In this example the parish is recording the first year's payments of principal plus interest).*
*Debit    2900              Reduction in Beneficial Interest in CASC  31,508*
*Debit    7595              Interest Expense                     4,727*
*    Credit   1010              Operating Checking Account            36,235*

# NET ASSETS

**3XXX   NET ASSETS**

**3000    Beginning Year Equity Balance**
This is a system generated account to be used with Quickbooks only

**3010    Unrestricted**
The historical cumulative excess of revenue over expense in the accounting records of the fund from the beginning of the parish record keeping through the end of the last accounting month. (This term is synonymous with "equity" in accounting terms). Every fiscal year ends with a series of closing entries. These entries should result in zeroing out the revenue and expense accounts. The offsetting entry goes to Net Assets (3XXX). Below is an example of the journal entries necessary to record year end closing.
In this example a parish has the following account balances at the end of its fiscal year. (Revenue and Expense are abbreviated for the example.)

**Note for Quickbooks users this entry is automatically done but it is closed to account 3901.See Quickbooks closing procedures at the end of this section for procedure to close the books.**

| Year | Account Number | Account Name | Balance |
|------|----------------|--------------|---------|
| 1 | 4110 | Sunday Collections | 100,000 |
| 1 | 4501 | Unrestr. Gifts & Bequests | 15000 |
| 1 | 4710 | Investment Income Earned | 15,000 |
|  |  | Total Revenue | 130,000 |
| 1 | 6101 | Compensation:  Priests | 25,000 |

40

| | | | |
|---|---|---|---:|
| 1 | 6105 | Salaries:  Lay | 60,000 |
| 1 | 7590 | Telephone | 5,000 |
| 1 | 7614 | Insurance Premium -- General Liability | <u>5,000</u> |
| | | Total Expenses | 95,000 |
| | | | |
| | | Excess of Income Over Expenses | 35,000 |

*For the fiscal year this parish has an excess of income over expenses of $35,000 (Total Revenue minus Total Expenses).  At the beginning of the next fiscal year all revenue and expense accounts must be reset to zero.  A closing entry will be made to reverse all revenue (debit entry) and expense (credit entry) accounts and increase Net Assets (credit entry).*

| | | | |
|---|---|---|---:|
| *Debit* | *4110* | *Sunday Collections* | *100,000* |
| *Debit* | *4501* | *Unrestr. Gifts & Bequests* | *15,000* |
| *Debit* | *4710* | *Investment Income Earned* | *15,000* |
| *Credit* | *6101* | *Compensation:  Priests* | *60,000* |
| *Credit* | *6105* | *Salaries:  Lay* | *25,000* |
| *Credit* | *7590* | *Telephone* | *5,000* |
| *Credit* | *7614* | *Insurance Premium -- General Liability* | *5,000* |
| *Credit* | *3010* | *Net Assets -- Unrestricted* | *35,000* |

**3050    Donor Restricted**

Donations, gifts, bequests (amount received in accordance with the terms of a will) and their respective investment income [loss] which are intended for a specified, defined or intended by donor to be used for a special or unique purpose.  A separate account number is to be set up for each unique restriction.  The parish should set up one master account for "small donor restricted gifts," but keep a detailed record of these receipts and their designated purpose.  Unrestricted or designated gifts should be separately identifiable from donor restricted gifts and are part of Unrestricted Net Assets (A/C 3010)

**3070    Donor Endowment**

Income specified, defined or intended by donor of this contribution, to be used for a special or unique purpose.  While this sounds a lot like Restricted funds, there is a major difference: with endowments, the original sum, or principal, is designated to remain wholly intact, and only the income from these investments can be used for the specified purpose.  A separate account is to be set up for each type.

**3901    Current Year Equity**

This is a system generated account to be used with Quickbooks only.  Quickbooks users must follow the Quickbooks closing procedures at the end of this section in order to properly allocate the net assets to the Unrestricted, Donor restricted and Donor Endowment accounts.

41

# REVENUES

**41XX**  **COLLECTIONS**
Funds received from parishioners and others for which no repayment, special service or special purpose is specified by the contributor.  Funds received from parishioners through envelopes, checks and cash for general parish support.

**4110**  **Sunday Collections**
Funds received through normal Sunday collections which have not been designated to a specific service, scheduled special collection or special purpose.

**4115**  **Christmas**
Funds received during normal Christmas collection.

**4120**  **Easter**
Funds received during normal Easter collection.

**4125**  **Other Holy Days**
Funds received during normal Holy Day collections.

**4130**  **School Collections**
Funds received either through Sunday collections which were either published or designated for school support.  Below is an example of the journal entries necessary to record school collections -- from the perspective of the parish accounting records.  After this example is another set of journal entries which shows how to record the "subsidy" in the school accounting records.

> *In this example, the parish receives collections earmarked for school support.*
> *Debit    1010          Operating Checking Account           3,500*
> *    Credit    4130          School Collections                    3,500*
>
> *To record the payment to the school, the following entry is made.*
> *Debit    9003          School Subsidies                     3,500*
> *    Credit    1010          Operating Checking Account          3,500*

Below is an example of the journal entries necessary to record an operating subsidy from the home parish -- from the perspective of the school accounting records.

> *In this example, the home parish receives collections earmarked for school support then gives the money to the school in the form of a subsidy.*
> *Debit    1010          Operating Checking Account           3,500*
> *    Credit    4881          Operating Subsidies -- Home Parish      3,500*

**4140**  **Annual Appeal  Refund(Deficit)**
Excess collections (Offertory Program) or refund from the Chancery office of funds collected (Pledge Program)above the assessed amount.  This can be negative (debit balance) if quota is not reached resulting in payment.  Below is an example of the journal entries necessary to record collection and payment of Annual Appeal (Offertory Program).

> *In this example a parish is assessed $15,000 for the Annual Appeal.  It collects only $14,000 which results in the parish paying $1,000 out of its own cash reserves to cover the difference.  The result is a net negative balance in the Annual Appeal account.  The first set of entries is to record collection for the Annual Appeal.*
> *Debit    1010          Operating Checking Account           14,000*
> *    Credit    2310          Exchange Account                    14,000*

42

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 188 of 308

*This second set of entries is to record payment of assessment of the Annual Appeal.*

| | | | |
|---|---|---|---|
| *Debit* | *4140* | *Annual Appeal* | *1,000* |
| *Debit* | *2310* | *Exchange Account* | *14,000* |
| | *Credit 1010* | *Operating Checking Account* | *15,000* |

**4145  Parish Fundraising Collection**
Cash receipts from pledges or collection for special parish fund raisers.


**42XX  SACRAMENTAL OFFERINGS**
Any offerings made to and retained by the Parish. Offerings received from funerals, baptisms, weddings or other parochial functions, unless otherwise specified by the donor. Offerings made directly to Clergy are not recorded here.

**4201  Baptisms**
Any offering made to and retained by the parish for performing Baptismal Service.

**4202  Marriage**
Any offering made to and retained by the parish for performing Matrimonial Service.

**4203  Funeral**
Any offering made to and retained by the parish for performing Funeral Service.

**4204  Other**
Any offering made to and retained by the parish for performing other sacramental service.


**43XX  DEVELOPMENT/FUND-RAISERS**
These accounts represent funds collected from a parish fund raiser held to supplement operating funds or for a special need. The amounts recorded in the fund-raiser accounts (43XX) are the <u>net results of</u> the fund-raising events if a parish/school organization manages the event using a separate approved bank account and submits a report to the parish/school with the net receipts. The exception to reporting net receipts is scrip and bingo functions which must be recorded in the parish/school books using the appropriate revenue, expense and inventory accounts.

**4301  Scrip Receipts**
All revenue that is received from sales of scrip.

**4305  Scrip Costs**
The net cost of all scrip in entered here. At year end this account is adjusted for Scrip Inventory value (see account 1410). Below is an example of the journal entries necessary to record purchases of scrip as well as an end of year entry to adjust Scrip Inventory.

*In this example Scrip is purchased for fund-raising purposes.*

| | | | |
|---|---|---|---|
| *Debit* | *4305* | *Scrip Costs* | *3,000* |
| | *Credit 1010* | *Operating Checking Account* | *3,000* |

*At the end of fiscal year an inventory is taken of Scrip. If there is Scrip, then a valuation must be made using actual purchase unit price.*

| | | | |
|---|---|---|---|
| *Debit* | *1410* | *Scrip Inventory* | *600* |
| | *Credit 4305* | *Scrip Costs* | *600* |

43

**4310    Bingo Receipts**

Includes all revenue received from playing bingo.  These funds may be transferred by the organizations sponsoring bingo.  Funds received from running concession stands for bingo are also included in this account.

**4315    Bingo Games Materials Costs**

The purchase of all Bingo items is entered here such as 'scratch-offs', strips, etc.  At year end this account is adjusted for strip value (see account 1420).  Below is an example of the
journal entries necessary to record purchases of bingo games materials as well as an end of year entry to adjust bingo games materials inventory.

> *In this example bingo games materials are purchased for fund-raising purposes.*
> *Debit    4315          Bingo Games Materials Costs          1,500*
> *   Credit    1010          Operating Checking Account          1,500*
>
> *At the end of fiscal year an inventory is taken of bingo games materials.  If there are materials, then a valuation must be made using actual purchase unit price.*
> *Debit    1420          Bingo Inventory                    300*
> *   Credit    4315          Bingo Games Material  Costs          300*

**433X    Other Fund Raisers**

**4320    Social Activities**

Net funds collected from social activities such as lunches, bake sales, dinners, etc. If other organizations (i.e. not the parish/school) sponsor the event, only the organization's contribution to the parish/school should be credited to this account.  Below is an example of the journal entries necessary to record revenue from social activities.

> *In this example a parish organization holds a fund-raiser dinner with the proceeds to benefit the parish.  The dinner brings in $3,900 in ticket sales (gross revenues) and it cost $1,900 to put on the event including the cost of food, beverages and supplies.  The amount to record in the accounting records is the net difference between gross revenues and gross expenses -- $2,000.*
> *Debit    1010          Operating Checking Account          2,000*
> *   Credit    4320          Social Activities                  2,000*

**4330    Festivals, Auctions, & Raffle Receipts**

Gross funds collected from festivals, auctions, & raffles.  If organizations (i.e. not the parish/school) sponsor the event and maintain a separate bank account, only the organization's contribution to the parish/school should be credited to this account.

**4340    Festival, Auctions & Raffle Costs**

The expenses paid for the parish/school fund raising events such as festivals, auctions and raffles.

**4350    Parish Organizations (many more can be added here)**

Any receipts (donations) received during current year from fund-raising activities of various parish organizations such as Fil-Am Clubs, Women's Guilds, Men's Clubs, etc.

**4370    School Organizations (many more can be added here)**

Any receipts (donations) received during current year from fund-raising activities of various school organizations such as parent-teacher groups, athletic boosters, etc.

**4380    Parish Drive Receipts  (not AAA)**

44

Funds collected from parishioners for special purposes approved by ADSF including capital improvements. These funds are collected in the same fiscal year they are intended to be used. Do not include Annual Archdiocesan Appeal. Otherwise, Parish Drives are normally subject to AAA and will be considered Ordinary Income.

**4381    Parish Drive Costs (not AAA)**
Costs associated with parish drive fund raisers.

**4385    Matching Grants Income**
Unrestricted income received from development activities and events such as annual giving programs, school alumni annual appeal, etc. when this portion was received from a corporation, foundation, etc. as a match to an individual or group gift. This account only reflects the matching portion received from the corporation, foundation, etc. The other portion would be recorded in the appropriate fund raising category.

**4390    Other Activities and Events**


**44XX    EDUCATIONAL & SACRAMENTAL FEES**
These accounts represent Fees collected for parish/school educational programs.

**4401    Baptismal Preparation**
Funds received to help defray the cost of operating the Baptismal Preparation program

**4402    First Communion Preparation Fees**
Funds received to help defray the cost of operating the First Communion Preparation program.

**4403    Confirmation Preparation Fees**
Funds received to help defray the cost of operating the Confirmation Preparation program.

**4404    CCD/Religious Education Fees**
Funds received to help defray the cost of operating the CCD/Religious Education program.

**4405    RCIA Fees**
Funds received to help defray the cost of operating the RCIA program.

**4406    Marriage & Family Life Fees**
Funds received to help defray the cost of operating the Marriage & Family Life program.

**4407    Youth Ministry Fees**
Funds received to help defray the cost of operating the Youth Ministry program.

**4408    Community Outreach & Services Fees**
Funds received to help defray the cost of operating the Community Outreach program.

**4409    Adult Education Fees**
Funds received to help defray the cost of operating the Adult Education program.

**4410    Preschool Fees**
Funds received to help defray the cost of operating the Pre-School program.

**4411    Senior Programs Fees**
Funds received to help defray the cost of operating the Senior program.

**4412-90 Other Programs Fees**

45

Funds received to help defray the cost of operating other programs. A separate account can be established for each program or if small the fees of multiple programs can be grouped together.

### 45XX  GIFTS, DONATIONS (UNRESTRICTED) AND GRANTS

**4501**  **Unrestricted Parish/School Gifts & Bequests**
Gifts, donations or bequests (amounts received in accordance with the terms of a will) of funds, stock, bonds, real estate and other property given to the parish/school by parishioners with no specified use or for general operating purposes. Also, funds received which the parish/school has identified for a designated use but the donor gave without any intent of restricting their use. Report any amount received whether directly from a will or trust or through the conversion of bequeathed assets to cash

**4503**  **Subsidies -- Archdiocese**
Funds given to the parish from the Archdiocese for operating expenses that are not to be repaid. Funds that come to the parish as a specific subsidy grant from the Archdiocese only.

**4504**  **Subsidies -- Other Parishes**
Funds given to the parish from another parish that are not intended for repayment**.**

**4505**  **Government Grants**
Proceeds received from government agencies that resulted from a specific grant proposal; normally issued for a specific purpose, program or period of time.

### 46XX  OTHER INCOME

**4610**  **Chaplain fees**
Includes any funds paid to the parish for chaplain services by any institution or organization.

**4615**  **Publications -- Advertising Income**
Income derived from the sales of a space for advertising purposes, i.e., bulletin/newsletter ads.

**4620**  **Gift Shop Sales**
Sales from a Religious Gift Shop maintained as a parish/school program. Reported in this account are the receipts. The cost of operating the Gift Shop is reported as expenses in account 7636. Below is an example of the journal entries necessary to record revenue from Religious Gift Shop Sales. Also below is an example of the journal entries necessary to record expenses incurred in operating a Religious Gift Shop.

> *In this example, a parish operates a Religious Gift Shop. Gross revenues from the gift shop for one month equal $1,900. Gross expenses associated with operating the gift shop for the same month are $1,100. Gross revenues are recorded in one entry and gross expenses in another entry. The $800 net income (gross revenues minus gross expenses) will be reflected in the Parish Summary Profit and Loss Statement at "Excess [Deficiency] of current year's revenues/expenses."*
>
> *Debit  1010       Operating Checking Account       1,900*
> *     Credit  4620      Gift Shop Sales                1,900*
>
> *Debit  7636       Gift Shop Costs       1,100*
> *     Credit  1010      Operating Checking Account       1,100*

**4621**  **Literature and Pamphlet Sales**
Proceeds from the sales of books, literature, publications and pamphlets other than for a parish education program.

46

**4622    Votive Candles**

Cash donated for lighting of vigil and votive candles. Includes all offerings for candles and all proceeds from the sales of candles as well as all offerings made by the faithful at various shrines in the church. Reported in this account is the gross revenue. The cost of the candles is reported as expenses in account 7640. Below is an example of the journal entries necessary to record revenues from Votive Candle Sales. Also below is an example of the journal entries necessary to record the cost of purchasing votive candles.

*In this example, a parish maintains several shrines in the church. Gross revenues from votive candle donations for one month equal $450. The gross expense of candles is $100. Gross revenues are recorded in one entry and gross expenses in another entry. The $350 net income (gross revenues minus gross expenses) will be reflected in the Parish Summary Profit and Loss Statement at "Excess [Deficiency] of current year's revenues/expenses."*

| *Debit* | *1010* | *Operating Checking Account* | *450* | |
| | *Credit  4622* | *Other Income -- Votive Candles* | | *450* |

| *Debit* | *7640* | *Votive Candles* | *100* | |
| | *Credit  1010* | *Operating Checking Account* | | *100* |

**4623    Poor Box**

Cash donated and designated for poor which are received by parish either through the church poor boxes or collections.

**4640    Room & Board**

Any payments for the room, board or care of retired diocesan or religious priests, visiting clergy or other boarders.

**4650    Rental Property Income**

Funds received for the lease or rental of parish or school properties including month to month arrangements but not single event facility rental. Below is an example of the journal entries necessary to record revenues from Rental Property Income.

*In this example the parish has leased a house for $1,000 per month. When the rent check is received the following entry is made.*

| *Debit* | *1010* | *Operating Checking Account* | *1,000* | |
| | *Credit  4650* | *Rental Property Income* | | *1,000* |

**4655    Facility Rental Income**

Receipts from the single event leases or use of parish or school property. Below is an example of the journal entries necessary to record revenues from Facility Rental Income.

*In this example a wedding reception is to be held at the church's hall. The hall rental for this single event is $1,000.*

| *Debit* | *1010* | *Operating Checking Account* | *1,000* | |
| | *Credit  4655* | *Facility Rental Income* | | *1,000* |

*If the parish sends an invoice to the wedding party, the entries are different. When the invoice is mailed, Accounts Receivable is debited and Facility Rental Income is credited. When the parish receives money from the wedding party, cash is debited and accounts receivable is credited.*

| *Debit* | *1210* | *Accounts Receivable* | *1,000* | |
| | *Credit  4655* | *Facility Rental Income* | | *1,000* |

| *Debit* | *1010* | *Operating Checking Account* | *1,000* | |
| | *Credit  1210* | *Accounts Receivable* | | *1,000* |

47

**4656    Facility Rental Services Income**
Funds received for catering affairs such as weddings and other types of receptions. Below is an example of the journal entries necessary to record revenues from Facility Rental Services Income.

> *In this example a wedding reception is to be held at the church's hall and a cleaning fee of $200 is charged by the parish.*
> *Debit    1010        Operating Checking Account        200*
> *    Credit    4656            Facility Rental Services Income        200*
>
> *If the parish sends an invoice to the wedding party, the entries are different. When the invoice is mailed, Accounts Receivable is debited and Facility Rental Services Income is credited. When the parish receives money from the wedding party, cash is debited and accounts receivable is credited.*
> *Debit    1210        Accounts Receivable        200*
> *    Credit    4656            Facility Rental Services Income        200*
>
> *Debit    1010        Operating Checking Account        200*
> *    Credit    1210            Accounts Receivable        200*

**4660    Income from Student Services**
Proceeds from the sales of candy, soda, and other student services fund-raising activities. Fees associated with student activities are reported in account 4853.


**47XX    NON OPERATING INCOME**

**4710    Interest/Investment Income on Parish Deposits w/h banks & other financial institutions.**
Interest income earned and dividends from funds deposited with savings and loans, money-market funds, interest-bearing checking accounts, and notes receivable. Below is an example of the journal entries necessary to record interest/investment income earned.

> *In this example the parish has funds in a Savings account earning 3% interest. Each month or quarter the parish earns interest.*
> *Debit    1040        Savings Account        150*
> *    Credit    4710            Interest/Investment Income-Parish Deposit    150*

**4711    Increase in Beneficial Interest-CASC- Income on Unrestricted Deposits in Deposit and Loan Fund**
To record the increased beneficial interest in CASC for the interest and/or dividends from unrestricted funds deposited in the Deposit & Loan Fund.

**4712    Distribution-Beneficial Interest-CASC-Awards from Unrestricted Investment Pool Accounts**
Include the quarterly distributions received from the CASC's Investment Pool statements for underlined Investment Pool accounts. The distribution amount is shown on the bottom of the Investment Pool statements. Record this amount whether it is reinvested in your account or paid to you via a check.

Below is an example of the journal entries necessary to record 1) a distribution that is reinvested into the Investment Pool, and 2) a distribution that is paid to you via a check.

> *In this example the parish has a $250 distribution on a $20,000 unrestricted investment that is transferred to the Investment Pool.*
> *Debit    1510        Beneficial Interest in CASC Inv. Pool -.- Unrestr.    250*
> *    Credit    4712        Distribution-Beneficial Interest-CASC- Unrestr. Inv Pool    250*

48

*In this example the parish receives a $250 distribution on a$20,000 unrestricted investment that is paid to them via a check. When the check is received in the parish office, it should be deposited into the parish checking account and recorded as follows:*
**Note: No entry is made to account 4712**

| | | | |
|---|---|---|---|
| *Debit* | *1010* | *Parish Checking Account.* | *250* |
| | *Credit 1510* | *Beneficial Interest in -CASC- Inv. Pool-Unrestr. Inv Pool* | *250* |

**4713    Change in Beneficial Interest –CASC- Unrestricted Investment Pool Accounts**

Each quarter, the investment pool unit value either increases or decreases based upon actual investment performance. The purpose of this account is to record the total increase or decrease in your beneficial interest share of CASC's <u>unrestricted investment</u> due to changes in the pool unit value. This amount should be calculated each quarter based on the information from your investment pool statement.

Caution: (A) You must be careful when calculating the change in market value of your account, as the investment pool account may increase due to cash additions to the pool. For correct accounting for cash additions, see the examples under Account 1510-1529. (B) The investment pool may also increase for distributions that have been reinvested. For the correct accounting for distributions that have been reinvested, see the first example under Account 4712 above. (C) The investment pool account may decrease due to cash withdrawals from the pool. For correct accounting for withdrawals from the pool, see the examples under Account 1510-1529.

The recommended method to calculate the Change in Market Value of the Investment Pool Account is as follows:

*Beginning Number of Units x Beginning Net Unit Value = Beginning Market Value*
*Beginning Number of Units x Ending Net Unit Value = Ending Market Value*
*Ending Market Value – Beginning Market Value = Change in Market Value*

*In this example, a business entity has 100 beginning pool units, with a beginning unit value of $1,000 and an ending unit value of $1,100.*

*100 units x $1,000 = $100,000 Beginning Market Value*
*100 units x $1,100 = $110,000 Ending Market Value*
*$110,000 - $100,000 = $10,000 Change in Market Value*

*The journal entry necessary to record this change in market value is as follows:*

| | | | |
|---|---|---|---|
| *Debit* | *1510* | *Investment in Arch. Inv. Pool -- Unrestr.* | *10,000* |
| | *Credit 4713* | *Change in Beneficial Interest-CASC Unrestr. Inv Pool* | *10,000* |

**4720    Gain [Loss] on Sales of Assets**

Gain [Loss] from the sale of parish or school fixed assets, including land, land improvements, building, equipment, furniture, fixtures, tools, vehicles, etc. Disposition mush be reflected in the proper fixed asset account. Below is an example of the journal entries necessary to record gain [loss] on sales of assets.

*In this example the parish has a 4 year old computer it wishes to sell for $500. The computer is not fully depreciated.*
*The computer was originally purchased with cash for $2,800.*

| | | | |
|---|---|---|---|
| *Debit* | *1620* | *Furniture, Fixtures & Equipment* | *2,800* |
| | *Credit 1010* | *Operating Checking Account* | *2,800* |

*The computer was placed on a 7 year depreciation schedule using the straight line method (equal amounts depreciated over the life of the asset). $2,800 is divided by 7 years resulting in $400 depreciation expense each year.*

| | | | |
|---|---|---|---|
| *Debit* | *7420* | *Depress. -- Furn., Fixtures & Equip.* | *400* |
| | *Credit 1692* | *Accum. Deprec. -- Furn., Fixtures & Equip.* | *400* |

49

*After 4 years the computer asset and accumulated depreciation account have the following balances:*

| Year | Account Number | Account Name | Balance |
|------|----------------|--------------|---------|
| 4 | 1620 | Furniture, Fixtures & Equipment | 2,800 |
| 4 | 1692 | Accum. Deprec. -- Furn., Fix. & Equip | (1,600) |

*The computer's "Book" value is the difference between purchase price and accumulated depreciation. In this example the book value of the computer after 4 years is $1,200. When the "Book" value is greater than the resale price, then a loss (rather than a gain) on the sale of the asset occurs.*

| | | |
|---|---|---|
| | Furniture, Fixtures & Equipment | 2,800 |
| (minus) | Accum. Deprec. -- Furn., Fix. & Equip | (1,600) |
| equals | Book value | 1,200 |
| | Book value | 1,200 |
| (minus) | Sales price of used asset | (500) |
| equals | Loss of Sale of Assets | 700 |

*To record the loss on sale of the computer asset, the following entries are made:*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *500* | |
| *Debit* | *4720* | *Loss on Sale of Assets* | *700* | |
| *Debit* | *1692* | *Accum. Deprcs. -- Furn., Fix. & Equip* | *1,600* | |
| *Credit* | *1620* | *Furniture, Fixtures & Equipment* | *2,800* | |

**4725    Insurance Settlements**
Funds received from the insurance settlements or claims paid for items stolen or damaged, whether from fire, theft, accident, etc.

**4730    Other Miscellaneous Revenue**
All other revenue not specified in the above revenue accounts would be recorded in this account.

**48XX-49XX        SCHOOL INCOME**

**4810    Basic Tuition**
Record either on an accrual basis the annual tuition/student fees or on a cash basis all periodic payments receied in the form of tuition/student fees billed for each student . Note: this account is to record only payment from the students parents, guardian or other individual committed ot suppor the student by paying their annual tuition/fee bill. It does not include awards/grants from institution grants/awards such as the Archdiocese and TIME (Together in the Mission of Education),Knights of Columbus, etc.. They should be recorded in the appropriate account 482x below

482X    Tuition Assistance
Record all tuition assistance/support awarded to individual students annual tuition and student fees for the current school year. . All grants/awards not specific to a student should not be recorded in these accounts.
    **4821    Archdiocesan Subsidy & Family Grant**
    **4822    B.A.S.I.C. Fund Grant**
    **4823    Making Waves**
    **4824    Knights of Columbus**
    **4825    Guardsmen**
    **4826-29 Other Tutition Assistance Programs**

**485X    Fees**
Funds received to defray the cost of non-educational services.

    **4851    Registration**

50

School registration fees.

**4852**     **Extended Care**
Charges for before and after school care.

**4853**     **Student Activities**
Participation fees for school sponsored activities, e.g., athletics, cheerleading, choir, band, etc.

**4854**     **Outdoor Activities**
Participation fees for school sponsored activities, e.g., field trips and other out-of-school educational excursions

**4855**     **Graduation**
Participation fees for graduation ceremony.

**4856-59 Other**
For student charges not defined elsewhere, e.g., books, computers, etc.

**488X**   **School Subsidies**
Charges for on-going operations, not capital improvements.

**4881**     **Home Parish**
Money received from the parish primarily responsible for the school. Below is an example of the journal entries necessary to record a subsidy from the Home Parish. The entries are <u>from the perspective of the school accounting records.</u>

*In this example the Home Parish has contributed $10,000 towards school operations.*
*Debit     1010          Operating Checking Accounts     10,000*
       *Credit    4881         Operating Subsidies -- Home Parish     10,000*

**4882**     **Out of Parish Tuition Subsidy**
Money received from another parish to help defray tuition of students from that parish per Archdiocesan policy. Below is an example of the journal entries necessary to record Out of Parish Tuition Subsidy. The entries are <u>from the perspective of the school accounting records.</u>

*In this example the parish school receives $5,000 from another parish for out of parish tuition subsidy.*
*Debit     1010          Operating Checking Accounts         5,000*
       *Credit    4882         Out of Parish Tuition Subsidy        5,000*

**4883**     **Archdiocesan**
Money received from Archdiocese to help defray operating costs. Below is an example of the journal entries necessary to record Archdiocesan subsidy. The entries are <u>from the perspective of the school accounting records.</u>

*In this example the parish school receives $15,000 from The Archdiocese.*
*Debit     1010          Operating Checking Accounts     15,000*
       *Credit    4883         Operating Subsidies -- Archdiocese     15,000*

**4884-89 Other**
Money received from sources other than the parish, out of parish and Archdiocese.

**49XX**   <u>**DONOR RESTRICTED DONATIONS**</u>

**4910**     **Endowments Received**
Donations received in current year which donor directed be used as an endowment (only income can be used, principal can not be used). Below is an example of the journal entries necessary to record a transfer

51

of an endowed gift io the CASC Investment Pool (for an example of the changes in the investment due to earned investment income see account 4920 for an example).

*In this example an estate makes an endowed donation of $100,000 which the parish invests in the Archdiocesan Investment Pool.*
*Debit   1010      Operating Checking Account          100,000*
*        Credit   4910   Endowments  Received                          100,000*

*Debit   1550      Beneficial Interest-. Inv. Pool@CASC - Endowment  100,000*
*        Credit  1010     Operating Checking Account                  100,000*

**4911    Donor Restricted Gifts and Bequests**
Donations received in current year for which donor restricted as to use (both income and principal can be used).  Note if they are not used in the current year , they will need to be transferred to the CASC and so identified as donor restricted funds.  This will mean that there will be an increase in the Beneficial Interest – Deposit @ CASC A/C # 1080 Parish or A/C # 1090 School.  If  the funds are transferred to the CASC investment pool then there will be an increase in the Beneficial Interest-Investment Pool-Donor Restricted A/C#1530

**4920    Distribution Beneficial Interest @ CASC—Distribution  Endowment Investment Pool Accounts**
Include the quarterly awards from the Investment Pool statements for Endowment accounts.  The award amount is shown on the bottom of the Investment Pool statements.  Record this amount whether it is reinvested in the CASC or paid to you via a check.

Below is an example of the journal entries necessary to record 1) a distribution that is reinvested into the Investment Pool, and 2) a distribution that is paid to you via a check.

*In this example the parish receives a $2,000 award on a $200,000 endowment that they reinvest into the Investment Pool.*
*Debit    1550          Beneficial Interest-. Inv. Pool@CASC -- Endowment        2,000*
*        Credit   4920          Distribution Beneficial InterestCASC- Endow.  2000*

*In this example the parish receives a $2,000 distribution on their $200,000 endowment that is paid to them via a check.  When the check is received in the parish office, it should be deposited into the parish checking account and the Net Assets Released should be recorded as follows:*
***Note: no entry is made to Account 4920 in this example***
*Debit    1010        Parish Checking Account.                  2,000*
*        Credit   1550          Beneficial Interest in CASC- Endow Inv.   2,000*
*Debit    4940         Net Restricted Assets Used - Endowment        2,000*
*        Credit   4930          Net Assets Released from Restrictions                  2,000*

**4921    Change in Beneficial Interest- CASC-Market Value of Endowment Investment Pool Accounts**
Each quarter, the investment pool unit value either increases or decreases based upon actual investment performance.  The purpose of this account is to record the total increase or decrease in your Benefical Interest of Endowment Investment Pool Account due to changes in the pool unit value.  This amount should be calculated each quarter based on the information from your investment pool statement.

Caution:  (A) You must be careful when calculating the change in market value of your account as the investment pool account may increase due to cash additions to the pool.  For correct accounting for cash additions, see the examples under Account 1530-1549.  (B) The investment pool may also increase for distributions that have been reinvested.  For the correct accounting for distributions that have been reinvested, see the first example under Account 4920 above.  (C) The investment pool account may decrease due to cash withdrawals from the pool.  For correct accounting for withdrawals from the pool, see the examples under Account 1530-1549.

52

The recommended method to calculate the Change in Market Value of the Investment Pool Account is as follows:

*Beginning Number of Units x Beginning Net Unit Value = Beginning Market Value*
*Beginning Number of Units x Ending Net Unit Value = Ending Market Value*
*Ending Market Value – Beginning Market Value = Change in Market Value*

*In this example, a business entity has 200 beginning pool units, with a beginning unit value of $2,000 and an ending unit value of $2,250.*

*200 units x $2,000 = $400,000 Beginning Market Value*
*200 units x $2,250 = $450,000 Ending Market Value*
*$450,000 - $400,000 = $50,000 Change in Market Value*
*The journal entry necessary to record this change in market value is as follows:*

| | | | |
|---|---|---|---|
| *Debit* | *1540* | *Beneficial Interest in CASC-. Inv. Pool – Endowment* | *50,000* |
| *Credit* | *4921* | *Change in Market Value of Endowment Inv Pool* | *50,000* |

**4922    Distribution Beneficial Interest  CASC-Restricted Investment Pool Accounts**
Include the quarterly distributions from the Investment Pool statements for <u>Restricted accounts</u>.  The distribution amount is shown on the bottom of the Investment Pool statements.  Record this amount whether it is reinvested in your account or paid to you via a check.

Below is an example of the journal entries necessary to record 1) a distribution that is reinvested into the Investment Pool, and 2) a distribution that is paid to you via a check.

*In this example the parish receives a $1,000 award on a $100,000 Restricted Investment Pool Account that they reinvest into the Investment Pool.*

| | | | |
|---|---|---|---|
| *Debit* | *1530* | *Beneficial Interest in CASC -Inv. Pool  -- Restricted* | *1,000* |
| *Credit* | *4922* | *Distribution Beneficial Interest-CASC- Donor Rest'd.* | *1,000* |

*In this example the parish receives a $1,000 award on a$100,000 Restricted Investment Pool Account that is paid to them via a check.  When the check is received in the parish office, it should be deposited into the parish checking account and the Net Assets Released should be recorded as follows:*

| | | | |
|---|---|---|---|
| *Debit* | *1010* | *Parish Checking Account.* | *1,000* |
| *Credit* | *1530* | *Distribution Beneficial Interest CASC- -Donor Rest'd.* | *1,000* |
| *Debit* | *4950* | *Net Restricted Assets Used - Restricted* | *1,000* |
| *Credit* | *4930* | *Net Assets Released from Restrictions* | *1,000* |

**4923    Change in Beneficial Interest-CASC-Market Value of Restricted Investment Pool Accounts**
Each quarter, the investment pool unit value either increases or decreases based upon actual investment performance.  The purpose of this account is to record the total increase or decrease in your <u>Restricted Investment Pool Account</u> due to changes in the pool unit value.  This amount should be calculated each quarter based on the information from your investment pool statement.

Caution:  (A) You must be careful when calculating the change in market value of your account as the investment pool account may increase due to cash additions to the pool.  For correct accounting for cash additions, see the examples under Account 1530-1549.  (B) The investment pool may also increase for distributions that have been reinvested.  For the correct accounting for distributions that have been reinvested, see the first example under Account 4922 above.  (C) The investment pool account may decrease due to cash withdrawals from the pool.  For correct accounting for withdrawals from the pool, see the examples under Account 1530-1549.

53

The recommended method to calculate the Change in Market Value of the Investment Pool Account is as follows:

*Beginning Number of Units x Beginning Net Unit Value = Beginning Market Value*
*Beginning Number of Units x Ending Net Unit Value = Ending Market Value*
*Ending Market Value – Beginning Market Value = Change in Market Value*

*In this example, a business entity has 150 beginning pool units, with a beginning unit value of $1,000 and an ending unit value of $1,100.*

*150 units x $1,000 = $150,000 Beginning Market Value*
*150 units x $1,100 = $165,000 Ending Market Value*
*$165,000 - $150,000 = $15,000 Change in Market Value*

*The journal entry necessary to record this change in market value is as follows:*
*Debit    1530    Investment in Arch. Inv. Pool – Restricted          15,000*
*    Credit    4923    Change in Beneficial Interest-CASC-Market Value of Restric.-        15,000*

**4924    Increase in Beneficial Interest-CASC- Income Earned on Restricted Deposits in Deposit and Loan Fund**
Interest income earned and/or dividends from restricted funds deposited in the Deposit & Loan Fund.

**4930    Net Assets Released from Restrictions**
The amount of donor restricted and endowment funds used during the current year to fund operating and capital expenses.  Below is an example of the journal entries necessary to record Net Assets Released from Restrictions.

*In this example a school takes receipt of and deposits a donor restricted gift of $1,000,000.  The gift is restricted from use in the year it is received and is deposited into the CASC Investment Pool -- Donor Restricted.  One year later some of the funds are to be used for school operations.  To record the Net Assets Released from Restrictions, two entries must be made.*
*Entry #1-Year 2*
*Debit    1010    Operating Checking Accounts        100,000*
*    Credit    1530    -Beneficial Interest in CASC Inv.Pool Donor Restr.    100,000*

*Entry #2-Year 2*
*Debit    4950.    Net Restricted Assets Used        100,000*
*    Credit    4930    Net Assets Released from Restrictions        100,000*

NOTE*: In  the Financial Statements Account 4930 is shown in current year revenue section with accounts 4940 and 4950 shown below in the summary of charges in donor restricted donations and income as a reduction of Beneficial Interest CASC- donor restricted assets.*

**4940    Net Restricted Assets Used -- Donor Endowment**
The amount of awards for donor endowment funds used during the year for specified purposes.  This account reduces the income Beneficial Interest in CASC-Investment Pool

**4950    Net Restricted Assets Used -- Donor Restricted** The amount of donor restricted funds received from CASC and used during the year for specified purposes. In addition to income the fund balance of these restricted funds may also be used for specified purposes.

54

# EXPENSES

**61XX**   <u>**COMPENSATION AND WAGES**</u>

**610X**   **PERSONNEL COSTS -- PARISH**
**6101**   **Compensation:  Priests**
     Compensation paid to Archdiocesan priests for services including car allowance and self-employment tax reimbursement.  This does not include auto insurance reimbursements,
     educational expenses and retreat fees paid per Archdiocesan policy which are recorded in other accounts.

**6102**   **Compensation:  Priests (Supply)**
     Compensation paid to visiting priests who are contracted to provide services to the parish.  This compensation is not subject to income tax withholding or social security/Medicare withholding.

**6103**   **Compensation:  Religious (non-school)**
     Compensation including pension and health fees paid to religious orders for priests, brothers, and sisters assigned to work in the pastoral services of the parish.

**6104**   **Compensation:  Deacons**
     Compensation paid to deacons assigned to the parish.

**6105**   **Salaries: Lay**
     Taxable wages paid to all lay employees.

**615X**   **SALARIES-- SCHOOL**
**6152**   **Salaries: Certified Staff**
     Wages to both lay and religious for all directly involved in educational activities (e.g. principal, vice-principal and teachers).

**6153**   **Salaries:  Substitute Teachers**
     Wages to both lay and religious paid to substitute teachers.

**6154**   **Salaries:  Teacher's Aides**
     Wages to both lay and religious paid to teacher's aides.

**6155**   **Salaries:  Professional Staff -- Non-Teachers**
     Wages to both lay and religious or those not involved in educational or administrative activities, e.g., librarian, day-care personnel, guidance counselors, athletic coach, band instructor, etc.

**6156**   **Salaries:  Support Staff**
     Wages both lay and religious for support  personnel (e.g. office help, secretaries, etc)

**6157**   **Salaries:  Maintenance Staff**
     Wages to both lay and religious for maintenance personnel.

**62XX**   <u>**PAYROLL TAXES EMPLOYER**</u>

**6201**   **Payroll Taxes -- FICA**
     Employer's portion of social security tax.

**6202**   **Payroll Taxes -- SUI**
     Reimbursement to the Chancery for unemployment tax (SUI).

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 201 of 308

**6203    Worker's Compensation Expense**
Premium for worker's compensation insurance to cover on-the-job injuries suffered by employees: lay, clergy and religious.(See Account 1310 for example of year end entry.)

**63XX    EMPLOYEE BENEFITS**

**6301    Auto Insurance - Priests**
Any auto insurance paid to priests.

**6302    Continuing Education/Training Non-Clergy**
Costs associated with job-related education or training, including tuition, registration fees and supplies for courses or seminars directly related to improvement of job skills

**6303    Retreat Fee/Continuing Education**
Expenses for retreats and continuing education attended by clergy (including clergy study week).

**6304    Health & Medical Insurance**
Employer's portion of medical insurance premium for employees and resident priests. This will also include the special surcharge for priests additional medical fees.

**6305    Life Insurance**
Employer's portion of Life insurance premium for employees.

**6306    Long Term Disability**
Premium payments made for employee's Long Term Disability Insurance.

**6307    Accidental Death and Dismemberment**
Premium payments made for employee's Accidental Death and Dismemberment Insurance.

**6308    Employee Pension expense**
Contributions paid to lay pension fund.

**6309    Housing Room and Board**
Expenditures related primarily to the cost of housing for priests but may also include cost of temporary housing for school executives and teachers. Include room and board allowance, rent, food, supplies, maintenance, janitorial, utilities, minor equipment applicable to residence in this account.

**6399    Allocated Payroll & Benefits**
Include any payroll costs which are allocated between parish and school.

**64XX    TRANSPORTATION & TRAVEL**

**6410    Transportation -- Air/Rail/Bus**
Cost of ticket for travel incurred on official parish and school business except travel to conferences and conventions.

**6420    Transportation -- Auto Rental**
Cost of gasoline, car rentals, parking, tolls, etc. incurred on official parish or school business except travel to conferences and conventions.

**6430    Mileage Reimbursement**
Reimbursement per mile for use of employee's personal automobile for official parish or school business, except for travel to conferences and conventions.

**6440    Conferences & Conventions**
Costs of transportation for employees to attend conferences and conventions. Food and lodging incurred, registration fees paid to attend and all other expenses when an employee attends a conference or convention.

**6450    Food and Lodging**
Cost of meals and lodging incurred on an overnight stay on official business except for travel to conferences and conventions.

**6460    Other Travel Related Costs**
Payments for any other travel costs not identified in the above 64XX accounts.


## 70XX    EDUCATIONAL  EXPENSES

**7010-19 Textbooks**
Expenditure for all printed materials used in the classroom including the cost of manuals and collateral materials.

**7020-29 Instructional Materials**
Expenditure for consumable materials such as pencils, paper, chalk, etc.

**7030-39 Equipment Expense**
Cost of non-capital, non-consumable items including capital equipment maintenance.

**7040-49 Multimedia and Library Books & Expenses**
All multimedia and library related expenses.

**7050-59 Fees**
Cost of external charges for educational services, e.g., testing fees.

**7060-69 Archdiocesan Fees**
Fees levied by Archdiocese. Principally, these fees are the annual administration charge.

**7070-79 Training Expense**
Expenditures relating to staff training.

**7080-99 Other**
Cost of any educational charges and materials not specified in the above 70XX accounts.


## 71XX    SCHOOL:  STUDENT ACTIVITIES & SERVICES

**7110-19 Food Service**
Costs associated with food service for students. These accounts should include the non-capital costs of the cafeteria as well as food provision contracts.

**7120-29 Extended Care**
These accounts are for non-personnel costs of providing non-school care.

57

**7130-39 Student Activities**
   Costs of non-education related activities such as uniform costs, league fees, etc.

**7140-49 Student Services**
   Costs of non-education related service

**72XX    PROPERTY COSTS**
   Expense to maintain the buildings and grounds.

**7201    Property management Fees**
   Fee paid to outside property management firms to management non-pastoral buildings of the parish

**7210    Janitorial**
   Cost of all janitorial supplies and equipment, service charges and equipment rental.

**7215    Landscape**
   Cost of all supplies and materials to established and maintain landscaping and lawns,
   including service charges and equipment rental.

**7220    Building Rent**
   Cost of rent paid to an outside entity for use of building.  Not for Use of RPSC buildings.

**7230    Maintenance & Repairs**
   Expenses for all supplies and parts to repair and maintain facilities, including service charges and
   equipment rental. Expenses incurred for heating, plumbing, electrical supplies and parts to repair and
   maintain plumbing, electrical and heating (including asbestos).

**7235    Property Taxes**
   Local taxes paid for non-exempt real property and assessments paid for proportionate share of construction
   of streets, sewers, water, sidewalks under local Improvement Districts.

**7240    Security**
   Cost of all security expenses, including alarm or guard services and security devices installed.

**7290    Other Property Costs**
   Any additional property costs not described in the above accounts.

**73XX    UTILITIES**

**7310    Refuse**
   Cost of removing refuse from facilities such as scavenger and debris box charges.

**7320    Heating**
   Expenditures for all coal, steam, electricity, gas, fuel oil, and wood used to heat facilities, including
   transportation costs involved in securing them.  If electricity and/or gas are used for heating as well as other
   purposes and the bills cannot be divided between heat and other power usage, the expenditure is recorded
   under whichever account is deemed to have the greater value.

**7330    Light & Power**
   Expenditures for electricity for artificial lighting and power, except when used for heat (see account 7315).

**7340    Water & Sewer**
   Expenditure for water used and for sewage disposal.

58

**7350**    **Telephone**
Cost of installation, monthly operation, long distance, repair, and other telephone charges.

**7360**    **Other**


**74XX**    **FURNITURE, FIXTURES, & EQUIPMENT**

**7410**    **Furniture, Fixtures, & Equipment**
Minor purchases and improvements to real property, such as patching parking lots, etc., not to exceed $5,000. If purchase exceeds $5,000, then item(s) should be capitalized and depreciated (see accounts 1620-1629). Expenditures related to purchases of furniture, fixtures, and equipment whose individual unit value is $5,000 or less.

**7415**    **Rentals**
Expenditures for rented equipment or furniture. Equipment leases should also be included in this account.(See account 7525 for rental of copying equipment.)

**7420**    **Depreciation -- Furniture, Fixtures, & Equipment**
Allocations of the cost or carrying value of parish/school furniture, fixtures, and equipment (from depreciation schedules related to accounts 1620-1629) over their useful life.

**7425**    **Depreciation -- Vehicles**
Allocations of the cost or carrying value of parish/school vehicles (from depreciation schedules related to accounts 1650-1659) over their useful life.

**7430**    **Maintenance Contracts -- Furniture, Fixtures, & Equipment**
Expenditures for all maintenance contracts such as copier machines, computers, elevators and any other fees for upkeep of parish/school furniture, fixtures, and equipment.

**7431**    **Repairs -- Furniture, Fixtures, & Equipment**
Expenditures related directly to the repair of parish/school furniture, fixtures, and equipment. Note: this does not include maintenance contracts which are charged to account 7430.

**7435**    **Maintenance & Repair -- Vehicles**
Expenditures related to repair of parish/school owned vehicles.

**7450**    **Other Vehicle Costs**
Any costs related to parish/school vehicles (such as registration, smog inspection) not deemed to be a repair cost.


**75XX**    **GENERAL & ADMINISTRATIVE**

**7510**    **Postage**
All costs for stamps, postage meter, bulk rate charges, post office box rental, courier services, UPS, etc.

**752X**    **Printing and Publications**
        **7521**    Parish Directory
                All cost associated with the producing a parish directory.
        **7522**    Bulletin
                All printing and publication costs associated with the bulletin.
        **7525**    Duplicating

Costs incurred from use and/or mimeograph equipment, etc. (Exclude cost of copy paper; see account 7585).

**7530**   **Outside Accounting Purchased Services**
Expenses for outside accounting services, including audits, bookkeeping, tax preparation.

**7540**   **Legal Services**
Legal expenses, including attorney fees, court fees, judgments, awards and related expenses.

**7545**   **Armored Services**

**7550**   **Payroll Processing Services**
Fees paid for processing payroll and all reports.

**7560**   **Outside Professional Purchased Services**
Expenditures paid to non-employees, speakers and consultants, temporary help, etc.

**7570**   **Subscriptions & Periodicals**
Costs of subscriptions to magazines and newspapers, including religious periodicals and secular publications such as newspapers.

**7580**   **Supplies**
Include all liturgical, office, classroom and other supplies; expenses incurred in providing services to parishioners, including socials such as coffee and donuts, etc.

**7585**   **Office Supplies**
Supplies related to the office/business/program function of the rectory or parish office and school.

**7586**   **Other Supplies**
Expenditures of any supply item used by parish/school not identified elsewhere in chart of accounts.

**7595**   **Interest Expense**
Interest payments made to others on debt obligations (should not include principal portion).

**7596**   **Bank Charges**
Charges automatically deducted from the checking account by the bank are entered in this expense account. Examples are bank service charges, printing of new checks, and stop check fees.

**7599**   **Other G&A Expenses**
Expenditures for any other general & administrative costs not identified elsewhere in the chart of accounts.


**76XX**   **OTHER OPERATING EXPENSES**

**7605**   **Public Relations**
The cost of all general and miscellaneous materials and services used to promote the parish or school activities including advertising such as Yellow Pages, newspaper ads, etc.

**7610**   **Dues**
Payments/fees to membership organizations such as The National Association of Church Personnel.

**7614**   **Insurance Premium -- General Liability/Property**
All payments made to the Archdiocese for General Liability and Property insurance.

60

**7616    Insurance Premium -- Vehicles**
Premium paid for vehicle insurance.

**7617    Insurance Premium -- Student Accidents**
Premium paid for student accident insurance by school.

**7618    Insurance Losses -- Not Covered by Policies**
Uninsured insurance loss payments made by the parish, and deductible amounts paid for insured losses.

**7620    Laundry and Dry Cleaning**
Cost of cleaning vestments, altar linens and other liturgical church or rectory furnishings.

**7625    Worship Supplies**
Vestments, candles, booklets, missalettes, hymnals, supplies necessary for the church (excluding votive candles; see account 7640).

**7630    Offertory Envelopes**
Cost to print and mail (if bulk rate is included in cost of printing) weekly offertory envelopes.

**7635    Book Rack**
All expenses relating to the printing and publication of the books and pamphlets sold by the parish/school.

**7636    Gift Shop Costs**
Costs associated with operating gift shop other than books and pamphlets..

**7640    Votive Candles**
Cost of votive candles only.

**7650    Entertainment and Appreciation**
Costs associated to entertain parishioners and show appreciation of clergy.

**7700    Bad Debt**
Provision or actual write off of receivable deemed uncollectable.
NOTE: See Account "1230 Provision for Bad Debts" for an explanation of the appropriate journal entries.

**<u>80XX    OTHER EXPENSES</u>**

**8003    Chaplain Fees**
Fees paid for chaplain services**.**

**8020    Property Transfer**
The transfer of Construction-in-Progress projects to RPSC at time of completion or at time of purchase.
*Parish A completes a school classroom buildings which costs $200,000.  At time of completion of project the entry on the parish books is.*
*Debit 8020 Property Transfer                     $200,000*
*Credit 1601 Construction in Progress                          $200,000*

**8021    Parish Facility Rental Expense**
All expenses in the rental of a parish facility for non-parish events (wedding reception, etc.).

**8022    Other Rental Property Expense**
Long term lease expenses.

61

**90XX** <u>**SUBSIDIES**</u>

**9003**   **School Subsidies**
Grants given to help subsidize parish school.

**9004**   **Out of Parish School Subsidies**
Grants given to help subsidize out of parish schools.

**9005**   **Subsidies to others**
Grants given to help subsidize other parishes.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 208 of 308

# Fixed Asset Accounting Procedure

The Archdiocese of San Francisco has determined that all Parish/ School fixed assets will be recorded in the accounting records as outlined in this procedure. This procedure applies to parish/school property (land & land improvements), buildings, building improvements, furniture, fixtures, vehicles and other assets as described in this document.

By definition a fixed asset is a cost of a tangible item, which is used in the mission of the church and has a useful life of over one year. Therefore, in accounting terms the use of the fixed assets needs to be matched over the life that they are used within the mission of the church.

## Assets Descriptions, Useful Lives and Capitalization Values:

### 1. Fixed Asset Definitions

    a. **Land -**the value at time of purchase of a physical location of property without recognition of the buildings or improvements located thereupon. Note for accounting purposes land is not depreciated, as its useful life normally is infinite

    b. **Construction in Progress-**The value of all construction and planning started but not finished. This applies to soft costs (see Building below for definition) as well as hard cost. It includes Land Improvements, Building and Building Improvements.

    c. **Land Improvements**-The value at time of purchase for any infrastructure items such as sidewalks, parking lots, landscaping, sewer, water/electrical lines built to bring utilities to the property site. Note: this type of fixed asset occurs only at the time when a parcel of land is being developed to accommodate a new facility. Normal replacement and improvements to existing developed land are expensed at the time of purchase.

    d. **Building-** The cost to construct or purchase a building. The cost to construct a building not only includes the labor and materials, but all related "soft costs" such as, property taxes paid on the property, legal costs, brokerage commissions, architect and consultant costs. Note: the definition of Building also includes any fixtures that are attached to the building and are considered not movable such as bathrooms, doors, lightning fixtures, etc.

    e. **Building Improvements**-Items expended to increase the available useable space or enhancement the total value of a building are building improvements that may be depreciated over their useful life. Items that are required to maintain a building's existing use such as a roof repair, painting, etc. are not considered an enhancement to the building and thus are expensed at the time of purchase.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 209 of 308

f. **Furniture, Furniture and Equipment**- Any tangible movable property that is not attached to the building such as chairs, desks, church pews, etc. needed to make the interior of a building useable. These items are depreciated over their useful life.

g. **Vehicles-** Any auto, van or bus that is owned and operated by the parish/school. These -items are depreciated over their useful life. Note: There are very few instances where the Archdiocese owns vehicles. Note: No vehicle can be purchase without the prior approval of the Archbishop or his Vicar for Administration.

2. **Useful Life**- The useful life of fixed assets which are to be used in depreciating their value on a straight line basis are:

a. **Land**- No depreciable life. The asset is carried on the books till sale at its original cost.

b. **Construction in Progress**. As these items are not completed and put into use, there is no depreciation taken until they are finished and transferred to the appropriate land improvement, building or building improvement asset account.

c. **Land Improvements**-The useful life is 40 years

d. **Building**-The useful life is 40 years

e. **Building Improvements**. Normally these items are expensed at time of incurring the costs. For those few times that building improvements are capitalized their useful life will be the remaining life left on the building. If the building is fully depreciated then the useful life on the improvements will be 40 years.

f. **Furniture, Fixtures and Equipment**. The useful life for these types of items is 5 years.

g. **Vehicles**. The useful life for these types of items is 5 years.

3. **Asset Value for Capitalization**
   a. **Land-** All land purchased or gifted must be recorded as a fixed asset no matter what its value.

   b. **Building**- Any new building construction over $200,000 should be recorded as a fixed asset. Note: please refer to building improvements above for further restrictions on building improvements on existing buildings.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 210 of 308

c. **Furniture, Fixtures and Equipment**- All individual items purchased or a group of like items purchased at one time that exceed $50,000 should be recorded as a fixed asset. All other items will be expensed at time of purchase. If a group of items is purchased at one time but delivery and payment is staggered over more than six months it will not be considered a group purchase for fixed asset accounting.

d. **Vehicles**- All vehicles whose value exceeds $15,000 will be recorded as a fixed asset. Note: no vehicle is to be purchased/leased by a parish/school without the written approval of the Archbishop or his Vicar for Administration.. In addition, all vehicles must be registered in the Archdiocese Corporate Sole name through the Chancery office.

## Parish/School Fixed Asset Recordkeeping

**Land, Land Improvements, Buildings, Building Improvements and Other Assets.** A Parish/School will not maintain these assets on their accounting records. They will only record the costs they expend while these assets are in construction. They will use the **Construction-in-Progress** account to accumulate the expenditures. After the asset is put into use, the value accumulated in the Construction-in-Progress account will be transferred to the Real Property Support Corporation who will maintain the assets net book value.

**Furniture, Fixtures, Equipment, and Vehicles.** For these fixed assets that are recorded on the parish/schools books a separate asset envelope is to be prepared with the following information. Asset number (if one is assigned), Asset description including serial number or other identifying items, date purchased, costs, date sold, required, scrapped, etc. and the value received at time of retirement.

**The parish/school is required to maintain the original invoice and other documents that support the cost recorded as a fixed asset. These documents are to be maintained in an individual Archdiocesan fixed asset envelope for each asset.**

65

# Year End Closing Procedures

The Archdiocese of San Francisco's fiscal period begins on July 1st and ends June 30th of the following year. Before starting a new fiscal period, you need to perform the following year end closing functions:

**A.**   Record all necessary entries for current fiscal year (receipts, payables, all bank account balances, inventories, Net Assets Released, etc)

**B.**   Transfer the current Fiscal Year's Equity Change to the following accounts
      a.   3010  Unrestricted Net Assets
      b.   3050  Donor Restricted Assets, and
      c.   3070  Donor Endowment Assets

**C.**   Complete and submit the Archdiocese Annual Report along with a diskette of the Trial Balance from QuickBooks.

**D.**   Protect QuickBooks' records for the fiscal year just ended and Backup your Datafile

**E.**   Make sure you have done every step on the Year End Closing Procedure Checklist

---

PLEASE NOTE THAT THIS TRAINING IS BASED ON THE EXISTING CHART OF ACCOUNTS THROUGH JUNE 30TH, 2005. CHANGES TO THE CHART EFFECTIVE JULY 1ST ARE NOT INCLUDED IN THIS SECTION.

WE WILL BE SENDING YOU AN UPDATE ON ALL OF THE ACCOUNT CHANGES THAT ARE EFFECTIVE JULY 1ST.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 212 of 308

# A. Record Adjusting Entries and Reconciliation of Accounts

Before you can proceed with closing QuickBooks records, you need to perform your normal monthly closing procedure. In addition, there are other transactions you may need to record such as year-end inventory adjustments.

The following is a list of general ledger accounts you may need to adjust and reconcile before you can process year-end closing procedures. It is **highly recommended** that you read the **Chart of Accounts Description** section of your **Parish/School Financial Accounting and Reporting System Manual** for accounts descriptions and adjusting entries examples.

The following is a brief explanation of the closing reconciliation process you should perform for all assets and liabilities accounts. For a detailed explanation with examples, please refer to the **Parish/School Financial Accounting and Reporting System Manual**.

**Note:** Depending upon how you customized your chart of accounts, you may need to do more reconciliation work before closing.

**10XX – Cash and Cash Equivalents**

> Need to make sure that **all** cash accounts and transactions are recorded

> Need to reconcile all bank accounts to what is recorded in your general ledger accounts. You may have differences for Outstanding Checks that have not yet been cashed, as well as Deposits in Transit that have not yet been processed by the bank.

> All bank accounts which are in the name or using the Tax ID number of the parish/school are considered to be an asset of the parish/school. These accounts must be reported in the financial records of the parish/school. To be included are the parish/school organizations' fund balances as of June 30th.

**108X and 109X – Deposit and Loan Fund Deposits**

*Record all deposits, earned interest, and withdrawals for all funds deposited into the* Capital Assets Support Corporation *Deposit and Loan. You will need to make sure that you have recorded all activity from each monthly statement that is sent from the* Capital Assets Support Corporation*. If the account contains restricted funds, make sure the interest income from those funds is recorded as restricted revenue in Account 4921 Donor Restricted Gifts and Bequests.*

*If you have a separate general ledger account for each Deposit and Loan fund, then make sure each general ledger account ties to the June 30th Deposit and Loan statement. If you have only one general ledger account for all Deposit and Loan funds, then the total of all the June 30th Deposit and Loan statements should tie to your ending general ledger account balance.*

**15XX – Investments**

> **151X-154X Investment Pool –** Record all deposits, withdrawals, investment distributions, and change in market value from each quarterly Investment Pool statement. It is highly recommended that you read the description of account 1510-49, 4712, 4920,

2

4921 in the Financial Reporting Manual for descriptions and examples of recording activity from the Investment Pool.

> ***Additions*** *– Additions to the investment pool should be recorded to the Investment Pool asset accounts 1510-49.*
>
> ***Withdrawals*** *– Withdrawals from the Investment Pool should be recorded to the Investment Pool asset accounts 1510-49.*
>
> ***Investment Distributions*** *– Each Investment Pool Account receives a distribution each quarter (4% annual rate). You may receive a check for the distribution or reinvest the distribution back into the Account. Either way, the earned income from the distribution needs to be recorded to your income statement. You need to pay careful attention to whether the Investment Pool Account is Unrestricted, Restricted or Endowed. You should record the income into the appropriate general ledger account for the type of Account. This way you are sure you are tracking your Restricted and Endowed assets separately from your Unrestricted assets. For Restricted Accounts, the income should be recorded to Account 4921 Donor Restricted Gifts and Bequests. For Endowment Accounts, the income should be recorded to Account 4920 Income From Endowments. For Unrestricted Accounts, the income should be recorded to 4912 Investment Income on Investment Pool Accounts.*
>
> ***Change in Market Value*** *– Your Investment Pool Accounts will also increase or decrease due to the change in the unit value of the Investment Pool account between the beginning of the quarter and the end of the quarter. The amount of the Change in the Market Value should be recorded to your income statement. You need to pay careful attention to whether the Investment Pool Account is Unrestricted, Restricted or Endowed. You should record the income into the appropriate general ledger account for the type of Account. This way you are sure you are tracking your Restricted and Endowed assets separately from your Unrestricted assets. For Restricted Accounts, the income should be recorded to Account 4921 Donor Restricted Gifts and Bequests. For Endowment Accounts, the income should be recorded to Account 4920 Income From Endowments. For Unrestricted Accounts, the income should be recorded to 4912 Investment Income on Investment Pool Accounts.*

> ***Note:*** *We will go through an example of where to get the above information from your Investment Pool statement when we go through Part C – Completing and submitting the Archdiocese Annual Report.*

*If you have a separate general ledger account for each Investment Pool account, then make sure each general ledger account ties to the July 1ˢᵗ Investment Pool statement. If you have only one general ledger account for all Investment Pool Accounts, then the total of all the July 1st Investment Pool statements should tie to your ending general ledger account balance.*

**12XX – Receivables**
> **1210  Accounts Receivable**
> **1220  Tuition / Fees Receivable**
> **1240  Provision for Bad Debts**

3

Any money owed to a parish/school at the end of the fiscal year must be recorded. This includes tuition, fees, and other services performed in the past that remain unpaid as of June 30th.

**13XX – Other Assets**

# 1310  Prepaid Expenses

All expenditures for good and services paid in the current fiscal year that are for the succeeding fiscal year.  Prepaid expenses are assets because a service or product is "owed" to the parish/school until the service is provided.

**14XX – Inventory**

    **1410 Scrip Inventory** – A physical count of all scrip should be made at the end of the fiscal year and the total cost of items on hand recorded through a General Journal Entry.  Please refer to your Financial Accounting and Reporting System Manual for additional description and example.

    **1420-1429 Bingo Inventory** – A physical count of all Bingo games materials should be made at the end of the fiscal year and the total cost of items on hand recorded through a General Journal Entry.  Please refer to your Financial Accounting and Reporting System Manual for additional description and example

**16XX – Land, Buildings and Equipment**
**All tangible assets, such as land, buildings and equipment, whose useful life is over one year and whose value is in excess of $5,000 should be recorded in the books as a fixed asset.  An appropriate depreciation (account number 742X) expense must be taken each year throughout the useful life of the asset.**

**Please refer to the following sections of the Financial Accounting and Reporting System Manual for additional description and examples:**
    **Account 16xx – Land, Buildings and Equipment**
    **Account 169X – Accumulated Depreciation**
    **Account 742X – Depreciation Expense**

**21XX – Accounts Payable**

    **2110 Accounts Payable to the Archdiocese** – Record all amounts owed to the Archdiocese for goods and/or services rendered.  This account reflects all unpaid bills from the Archdiocese at June 30th which were for the fiscal year just ended.

    **2120 Accounts Payable – Trade**  - Record amounts owed to outside vendors for supplies, goods, or material purchased or services rendered.  This account reflects all unpaid bills at June 30th which were for the fiscal year just ended.

**2140 Accounts Payable – Other** – Any other unpaid, non-payroll items not identified above.

## 22XX – Accrued Payroll and Withholdings

All employee related payables at the end of the fiscal year.

**2201 Accrued Payroll** – Gross salaries and wages earned which have not been paid at the end of an accounting period.

*For example, the teacher's salary agreement covers August through July of the following year. At June 30th, you need to record accrued payroll for the month of July as this payroll was earned in the fiscal year just ended.*

**2202 Accrued Pension** – Record one half of the estimated annual pension fees in this account at the end of the fiscal year. Since the Archdiocesan employee pension plan is paid annually for the prior January – December period, at June 30th the parish owes for the current fiscal year one half of the pension period.

**2203 Accrued Employer Payroll Tax** – Any unpaid employer payroll taxes relating to accrued payroll.

**2204 Accrued Employee Medical Insurance** – Medical insurance payments owed by the employer for employee coverage and also deducted from the employee's payroll for spouse/family coverage can remain in this account until the premium is remitted.

## 26XX-28XX – Funds Held for Others

These are funds held for parish or school organizations. If a parish/school organization is allowed to maintain their own checking account, then at the end of the year (it should be done quarterly), the reconciled balance of that parish/school organization account needs to recorded as a Cash Asset of the parish/school. The offset is this Liability account.

## 28XX – Deferred Revenue

**2810 School Tuition** – All tuition received in advance of the fiscal school year.
**2811 School Fees** – All charges received in advance of the school other than tuition, such as registration, student activities, etc.

If you receive cash payments for tuition and fees which are for the next fiscal school year, these should not be recorded as income on your income statement as they relate to the next year. These amounts should be recorded to the Deferred Revenue liability account. In the following year, an adjustment should be made to reduce the liability account and bring the money into that year's income.

**2900** – Capital Assets Support Corporation **Parish Deposit and Loan Fund – Loans Payable**

5

You need to record all loans payable to the Capital Assets Support Corporation Deposit and Loan Fund as well as any Accrued Interest Expense payable to the Capital Assets Support Corporation as of June 30th, 2005.

**4930 Net Assets Released from Restriction**
The amount of donor restricted and endowment funds used during the current year to fund operating and capital expenses.

**4940 Net Restricted Assets Used – Donor Endowment**
The amount of income from donor endowment funds used during the year for specified purposes.

**4950 Net Restricted Assets Used – Donor Restricted**
The amount of donor restricted funds used during the year for specified purposes. In addition to income, the fund balance of these restricted funds may also be used for specified purposes.

*The important thing to remember about these three accounts, is that the sum of the three accounts should always equal zero. At the end of the fiscal year, you should review the balances in these accounts and ascertain that the total of the three accounts balances out to zero.*

*Account 4930 increases operating or unrestricted income and net assets. Accounts 4940 and 4950 decreases restricted and endowed income and assets. The amount of the increase and the decrease should offset themselves.*

For example, if you have $20,000 in restricted funds in the Capital Assets Support Corporation Deposit and Loan, and you withdraw $5,000 to use for the restricted purpose. The following entries would be made when you receive the check from the Capital Assets Support Corporation Deposit and Loan:

Debit  1010  Operating Checking Account                    5,000
         Credit  1080  Deposit and Loan Fund                        5,000
                      Debit  4950  Net Restricted Assets Used – Restricted      5,000
         Credit  4930  Net Assets Released from Restriction            5,000

Notice that amounts in 4950 and 4930 offset each other. The amount in Account 4930 is considered current unrestricted operating income. The amount in Account 4950 will reduce the total amount of restricted assets you have on hand.

6

# B.  Transfer the Year's Equity Change to Unrestricted, Restricted and Endowed Net Assets

*The total Net Assets of the parish/schools should be maintained in three Net Assets accounts:*

> *3010    Unrestricted Net Assets*
> *3050    Donor Restricted Net Assets*
> *3070     Donor Endowment Net Assets*

*Net Assets are the cumulative excess of revenue over expenses in the accounting records of the fund from the beginning of the parish record keeping through the end of the last accounting month.  The above three accounts maintain the cumulative excess in the Unrestricted, Restricted and Endowment funds.*

*The current year net income or loss is automatically recorded to Account 3901 Retained Earnings by the QuickBooks system.  In order to close out the year properly, you must reclassify the current year net income from Account 3901 to the proper Net Asset account above (3010, 3050 and 3070).*

*After all adjusting entries have been made, the following reports need to be printed to assist you in closing out the current year net income to the proper Net Asset account:*

- ***Profit and Loss Statement** – This is a report summarizing your income and expense accounts and the difference resulting in either profit or loss.*
- ***Balance Sheet** – This report shows your financial position by listing assets, liabilities and the net assets accounts.*
- ***Trial Balance** – This report summarizes your debits and credits subtotaled by each account type on your chart of accounts.*

*Using your Trial Balance and Profit and Loss reports, you must classify the Net Income or Loss to the proper Net Asset account, as follows:*

> ***3010  Unrestricted Net Assets** – This will include all unrestricted account activity which is all accounts not described below for Account 3050 and 3070.*

> ***3050  Donor Restricted Net Assets** – These are donations, gifts and bequests which are intended for a specified period of time or intended by the donor to be used for a special or unique purpose.  The following accounts (per the Chart of Accounts as of 6/30/05) should be closed out to Account 3050:*
> > 4911 - Donor Restricted Gifts and Bequests
> > 4921 - Income from Donor Restricted Gifts and Bequests
> > 4950 -  Restricted Assets Used – Donor Restricted

> ***3070  Donor Endowment Net Assets** – These are donations, gifts and bequests which are intended for a specific purpose (typically scholarship) and whose original sum, or principal, is designated to remain wholly intact.  Only the income from these investments can be used for the specified purpose.  The following accounts (per the Chart of Accounts as of 6/30/05) should be closed out to Account 3070:*

7

4910 - Endowments Received
4920 – Income from Endowments
      4940 – Restricted Assets Used – Donor Endowment

*Since all accounts in the 49XX series of accounts relate to Donor Restricted or Endowment income, the total of these accounts needs to be reclassified to either Account 3050 Donor Restricted Net Assets or Account 3070 Donor Endowment Net Assets.*

*The total amount that needs to be reclassified will show as Net Income on your Balance Sheet. The QuickBooks system automatically closes out this amount to Account 3901 as of July 1st, so if you ran a Balance Sheet on July 1st, you would see the prior year Net Income in Account 3901. As such, your offset to reclassifying the current year Net Income is Account 3901. The net affect of this is that Account 3901 should be zero as of July 1st, and your Net Assets should be properly classified as Unrestricted, Restricted, or Endowment.*

*Please see the example on the following pages:*

8

*UNADJUSTED BALANCE SHEET AS OF JUNE 30TH, 2005*

**Test Company**
**Balance Sheet**
As of June 30, 2005

| | Jun 30, 05 |
|---|---|
| **ASSETS** | |
|   **Current Assets** | |
|     **Checking/Savings** | |
|       **1540 · Investment-Inv Pool-Endowment** ▶ | 150,000.00 ◀ |
|       **10xx · Cash & Cash Equivalents** | |
|         **1010 · Parish/School Checking** | 125,000.00 |
|         **1080 · AD Deposit/Loan Fund-Parish** | 75,000.00 |
|         **10xx · Cash & Cash Equivalents - Other** | 5,000.00 |
|       **Total 10xx · Cash & Cash Equivalents** | 205,000.00 |
| | |
|     **Total Checking/Savings** | 355,000.00 |
| | |
|   **Total Current Assets** | 355,000.00 |
| | |
| **TOTAL ASSETS** | **355,000.00** |
| | |
| **LIABILITIES & EQUITY** | |
|   **Equity** | |
|     **3xxx · Net Assets** | |
|       **3010 · Unrestricted** | 25,00... *Begi* |
|       **3050 · Donor Restricted Assets** | 50,000.00 |
|       **3070 · Donor Endowment Assets** | 100,000.00 |
|     **Total 3xxx · Net Assets** | 175,000.00 |
|     Net Income | 180,000.00 *Curr* |
|   **Total Equity** | 355,000.00 |
| | |
| **TOTAL LIABILITIES & EQUITY** | **355,000.00** |

*Note:* The Current Year Net Income that needs to be classified into the appropriate Net Assets class, is shown under Net Income. In this example, that amount is $180,000.

9

*UNADJUSTED BALANCE SHEET AS OF JULY 1ST, 2005*

**Test Company**
**Balance Sheet**
As of July 1, 2005

|  | Jul 1, 05 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1540 · Investment-Inv Pool-Endowment | 150,000.00 |
| 10xx · Cash & Cash Equivalents | |
| 1010 · Parish/School Checking | 125,000.00 |
| 1080 · AD Deposit/Loan Fund-Parish | 75,000.00 |
| 10xx · Cash & Cash Equivalents - Other | 5,000.00 |
| **Total 10xx · Cash & Cash Equivalents** | 205,000.00 |
| | |
| **Total Checking/Savings** | 355,000.00 |
| | |
| **Total Current Assets** | 355,000.00 |
| | |
| **TOTAL ASSETS** | 355,000.00 |
| | |
| **LIABILITIES & EQUITY** | |
| **Equity** | |
| 3901 · Retained Earnings | 180,000.00 |
| 3xxx · Net Assets | |
| 3010 · Unrestricted | 25,000.00 |
| 3050 · Donor Restricted Assets | 50,000.00 |
| 3070 · Donor Endowment Assets | 100,000.00 |
| **Total 3xxx · Net Assets** | 175,000.00 |
| | |
| **Total Equity** | 355,000.00 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 355,000.00 |

*Prior*
*Year*

**Note:** *If you run a balance sheet as of July 1st before any adjustments, you will see that QuickBooks automatically closed out the prior year Net Income of $180,000 to Account 3901 Retained Earnings.*

10

*PROFIT AND LOSS AS OF JUNE 30TH, 2005*

**Test Company**
**Profit & Loss**
**July 2004 through June 2005**

| | Jul '04 - Jun 05 | |
|---|---:|---|
| **Income** | | |
|   41xx · Collections - Total | | |
|     4110 · Sunday Collections | ▶ 300,000.00 | ◀ |
|   **Total 41xx · Collections - Total** | 300,000.00 | |
| | | |
|   49xx · Donor Restricted Donations | | |
|     4910 · Endowment / Gifts Received | 50,000.00 | |
|     4911 · Donor Restricted Gifts/Bequest | 30,000.00 | |
|   **Total 49xx · Donor Restricted Donations** | 80,000.00 | |
| | | |
|   4930 · Net Assets Released from Restri | 5,000.00 | |
|   4950 · Net Restrict Asst Used-Dnr Rest | -5,000.00 | |
| **Total Income** | 380,000.00 | |
| | | |
| **Expense** | | |
|   610x · Personnel Costs - Parish | | |
|     6101 · Compensation-Priest | 75,000.00 | |
|     6105 · Salaries - Lay | 125,000.00 | |
|   **Total 610x · Personnel Costs - Parish** | 200,000.00 | |
| | | |
| **Total Expense** | 200,000.00 | |
| | | |
| **Net Income** | **180,000.00** | |

**Note:** *The Profit and Loss statement is used to identify which accounts need to be closed out to Unrestricted, Restricted and Endowment Net Assets. In the above example:*

*Restricted Accounts – Total to Close to Restricted Assets = $25,000*
    *4911 Donor Restricted Gifts/Bequests -*    *$30,000*
    *4950 Net Restricted Assets Used -*    *( $5,000)*

    *Endowment Accounts – Total to Close to Endowment Assets = $50,000*
    *4910 Endowment Gifts Received -*    *$50,000*

*Unrestricted Accounts – The remainder of the accounts would be unrestricted.*

11

*The journal entry to reclassify the Net Income to the appropriate Net Assets Account is as follows:*

Debit   3901   Retained Earnings       180,000
        Credit   3050   Donor Restricted Net Assets       25,000
        Credit   3070   Endowment Net Assets       50,000
        Credit   3010   Unrestricted Net Assets       105,000

**ADJUSTED BALANCE SHEET AS OF JUNE 30TH , 2005**



### Test Company
### Balance Sheet
#### As of June 30, 2005

|  | Jun 30, 05 |
|---|---|
| **Current Assets** | |
|   **Checking/Savings** | |
|     **1540 · Investment-Inv Pool-Endowment** | 150,000.00 |
|     **10xx · Cash & Cash Equivalents** | |
|       1010 · Parish/School Checking | 125,000.00 |
|       1080 · AD Deposit/Loan Fund-Parish | 75,000.00 |
|       10xx · Cash & Cash Equivalents - Other | 5,000.00 |
|     **Total 10xx · Cash & Cash Equivalents** | 205,000.00 |
|   **Total Checking/Savings** | 355,000.00 |
| **Total Current Assets** | 355,000.00 |
| **TOTAL ASSETS** | **355,000.00** |
| **LIABILITIES & EQUITY** | |
|   **Equity** | |
|     **3901 · Retained Earnings** | -180,000.00 |
|     **3xxx · Net Assets** | |
|       3010 · Unrestricted | 130,000.00 |
|       3050 · Donor Restricted Assets | 75,000.00 |
|       3070 · Donor Endowment Assets | 150,000.00 |
|     **Total 3xxx · Net Assets** | 355,000.00 |
|   **Net Income** | 180,000.00 |
|   **Total Equity** | 355,000.00 |
| **TOTAL LIABILITIES & EQUITY** | **355,000.00** |

This will be zeroed out as of July 1st.

These amounts are now updated to include the current year Net Income.

This will be zeroed out as of July 1st.

12

*ADJUSTED BALANCE SHEET AS OF JULY 1ST , 2005*

**Test Company**
**Balance Sheet**
**As of July 1, 2005**

|  | Jul 1, 05 |  |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| **Checking/Savings** | | |
| 1540 · Investment-Inv Pool-Endowment | | 150,000.00 |
| 10xx · Cash & Cash Equivalents | | |
| 1010 · Parish/School Checking | 125,000.00 | |
| 1080 · AD Deposit/Loan Fund-Parish | 75,000.00 | |
| 10xx · Cash & Cash Equivalents - Other | 5,000.00 | |
| Total 10xx · Cash & Cash Equivalents | | 205,000.00 |
| | | |
| **Total Checking/Savings** | | 355,000.00 |
| | | |
| **Total Current Assets** | | 355,000.00 |
| | | |
| **TOTAL ASSETS** | | **355,000.00** |
| | | |
| **LIABILITIES & EQUITY** | | |
| **Equity** | | |
| 3xxx · Net Assets | | |
| 3010 · Unrestricted | 130,000.00 | |
| 3050 · Donor Restricted Assets | 75,000.00 | |
| 3070 · Donor Endowment Assets | 150,000.00 | |
| Total 3xxx · Net Assets | | 355,000.00 |
| | | |
| **Total Equity** | | 355,000.00 |
| | | |
| **TOTAL LIABILITIES & EQUITY** | | **355,000.00** |

*Note:* *After posting the closing Net Asset adjustment, the only accounts that should remain in the Equity section on July 1st are Account 3010, 3050, and 3070. You should not post any entries on July 1st so that you can have a clean balance sheet. If current year entries are posted on July 1st, then you will see a Net Income number in the Equity section as well.*

13

## C. Complete and submit the Archdiocese Annual Report along with a diskette of the Trial Balance from QuickBooks

*After all the adjusting entries have been made, and the Current Year Net Income is properly closed out to the appropriate Net Assets Accounts, the Archdiocese Annual Report can now be completed.*

*In order to complete the report, you will need to print out a final adjusted Balance Sheet, Profit and Loss, and Trial Balance.*

*The following are some key areas of the report that should be noted:*

- ***The Annual Report must tie to the QuickBooks reports.*** *Please make sure that the Net Income, Total Assets, Total Liabilities and Total Net Assets on your QuickBooks report tie to the following lines:*

| | Schedule | Parish | School |
|---|---|---|---|
| *Net Income* | *Summary Revenue & Expense* | *line 31* | *line 30* |
| *Total Assets* | *Balance Sheet* | *line 12* | *line 10* |
| *Total Liabilities* | *Balance Sheet* | *line 20* | *line 19* |
| *Total Net Assets* | *Balance Sheet* | *line 24* | *line 23* |

*We have provided a Key for the Balance Sheet and the Summary Revenue and Expense Report, which shows which QuickBooks account roll up into each line item. If you have added accounts to your chart of accounts, then you will have to determine where to include these into the Annual Report. All accounts must be included in the Annual Report in order for it to tie out to the QuickBooks reports.*

- ***Balance Sheet Report*** *-*
*The **Total Assets must equal the Total Liabilities plus Net Assets**. We have added a reconciliation on the bottom of the Balance Sheet this year, to make sure that these numbers equal each other.*

*You also need to make sure that in the Net Asset section your Net Assets are properly classified as Unrestricted, Donor Restricted and Donor Endowment.*

- ***Summary Revenue and Expense Report*** *–*
*The top part of the report (lines 1-26 for parish, lines 1-25 for school) represent only the Unrestricted revenues and expenses for the parish or school. Net Unrestricted Income/(Loss) is shown on line 26 for parish and line 25 for school.*

*Restricted revenues and expenses are shown in the* Change in Donor Restricted Net Assets *section. This should include all activity in the 49xx series of accounts (with the exception of Account 4930 Net Assets Released from Restrictions, which should be shown in the Unrestricted section on line 11 for parish, or line 9 for school. The total Restricted Income/(Loss) is shown on line 30 for parish and line 29 for school.*

14

*Total Net Income/(Loss) which is the sum of the Unrestricted plus the Restricted Net Income/(Loss) is shown on line 31 for parish, line 30 for school.*

*The Net Assets at the end of the year is the sum of the Net Assets at the beginning of the year plus the current year Total Net Income/(Loss). This amount on line 33 for parish and line 32 for school must tie to the Total Net Assets from the Balance Sheet which is on line 24 for parish and line 23 for school. We have added a reconciliation at the bottom of the Summary Revenue and Expense Report to ensure the two numbers tie.*

- ***Schedule 1a  Cash and Cash Equivalents*** –
*List all cash accounts, including Parish/School Organizations. The ending balance should be the reconciled bank balance as shown in your general ledger. The total of these accounts must tie to Line 1 Cash and Cash Equivalents on the Balance Sheet.*

- ***Schedule 1b*** Capital Assets Support Corporation ***Deposit and Loan*** –
*List all accounts on Deposit with the Capital Assets Support Corporation Deposit and Loan. The ending balance in each account as shown in your general ledger should tie to the June 30th statement of the Deposit and Loan account. The total of these accounts must tie to Line 2 Deposits in Capital Assets Support Corporation Parish Deposit and Loan on the Balance Sheet.*

- ***Schedule 3*** Capital Assets Support Corporation ***Investment Pool*** –
*List all accounts invested in the Capital Assets Support Corporation Investment Pool. The Ending Balance of each account should tie to the June 30th statement of the Investment Pool. The total of these accounts must tie to Line 7 for parish or Line 5 for school on the Balance Sheet.*

*You must list the beginning balance, cash additions, Investment Distributions, Increase/(Decrease) in Market Value of the Investment, Withdrawals and Ending Balance for each account. This information can be obtained directly from your Investment Pool statements. You will need to add the four quarters' statements together to get the totals for each account.*

*Please see the end of Section C for examples of where to find the information on your Investment Pool statement.*

- ***Other Schedules*** –
*Pay careful attention on the other schedules for where the total of the schedule is to tie to the Balance Sheet or the Summary of Revenue and Expense. There will be a reconciliation showing if there is a difference.*

- ***Schedule 18 – Other Comments*** –
*Please explain any unusual or large changes in the Balance Sheet, the Summary of Revenue and Expense, and the Other Schedules. This will help avoid misinterpretation of the statements.*

- ***Signatures*** –
*The report needs to be signed by the actual indicated persons. The signatures will not be accepted if they are typed or signed by one person on behalf of the actual indicated person.*

15

The Parish reports must be signed by the Preparer, the Pastor, and the Finance Committee Chairperson. The School reports must be signed by the Preparer, the Principal, the Pastor, the School Board Chairperson, and the parish Finance Committee Chairperson.

- **_Diskette of Trial Balance_** –

This year, we are asking that along with the Financial Report, you also submit a diskette with your QuickBooks TrialBalance in Excel format. Please make sure you run the trial balance in the greatest level of detail available so that all Accounts and SubAccounts are shown.

To run the Trial Balance in QuickBooks, Select Reports, Accountant and Taxes, and Trial Balance from the Main Menu.



**The Trial Balance Report will display. Please make sure you have selected the Trial Balance as of June 30th, 2005. Please make sure that the Trial Balance ties to the information you are submitting on your Financial Report.**

16



*To Export the file to Excel, select the Export button. The following will appear.*

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 228 of 308



Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 229 of 308

*Select the button for Exporting QuickBooks report to a new Excel workbook. Select the Export button on the bottom of the window.*

*QuickBooks will automatically open Excel and export the report into a new workbook. After this has occurred, go to the report in Excel and save the file to a floppy disk. Please name the file with your Parish or School name and submit the file along with the hardcopy of your signed Financial Reports.*

# EXAMPLE 1 FOR SCHEDULE 3 – INVESTMENT POOL ACCOUNTS

*ARCHDIOCESE OF SAN FRANCISCO*
*ONE PETER YORKE WAY, S.F., CA 94109*

# S T A T E M E N T
### B A L A N C E D   I N V E S T M E N T   P O O L

xxxxxxxxxxxxxx
xxxxxxxxxxxxxx
xxxxxxxxxxxxxx
xxxxxxxxxxxxxx

STATEMENT DATE
April 29, 2005

*Investment Pool*     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
*Account:*            **xx.xx–xxxx.xx–xxx.xxx**



|  | NUMBER OF UNITS | X | NET UNIT VALUE | = | TOTALS (Fair Market Value) |
|---|---|---|---|---|---|
| *PREVIOUS STATEMENT* | 46.60 | | $ 1,374.195 | | $ 64,042.73 |

*CURRENT  ACCOUNT  ACTIVITY*



| | | | | | |
|---|---|---|---|---|---|
| New unit value at 3/31/2005 | | | $ 1,336.622 | | |
| **ADDITIONS / REINVESTMENTS**  Credited 4/01/2005 | 0.42 | | $ 1,336.622 | | $ 562.35 |
| **WITHDRAWALS** | 9.39 | | $ 1,336.622 | | $ 12,552.19 |

☐ *ENDING ACCOUNT BALANCE*

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | 37.63 | | $ 1,336.622 | | $ 50,301.85 |

**DISTRIBUTION:  Reinvestment**            in the amount of . . . . . . . .$      **562.35**

Distribution is based on 1.80% X  the number of units in your account at the end of the previous quarter  X  the average of the previous restated 12 quarterly net unit values.  The 12 quarter average unit value for this distribution period is $1,206.655.

**PLEASE NOTE:**  Additions to the Investment Pool will only be accepted during the first five business days of the quarter.  Additions must be at least $1,000.00.

20

If you have any questions regarding your account, please call Helen Lee at (415) 614-5513, or Mary Connolly at (415) 614-5515.

21

**Example 1  (See Investment Pool Statement on previous page)**
**Investment Pool – Recording activity from a <u>Restricted Investment Pool Account</u>**

*1. Investment Pool Additions*- *In this example, the only addition to the Investment Pool was due to a reinvestment of Distributions (which is recorded as shown below under distributions).  There are no other Additions to record)*

*2. Investment Pool Distributions* – *In this example, there is a $562.35 distribution that is reinvested into the Investment Restricted fund.  This is recorded as follows:*

Debit  1530  Investment In Arch Inv Pool – Restricted

562.35

Credit 4921  Income Donor Restricted Gifts                                562.35

*3. Change in Market Value of Investment Pool* –*To record the total increase/(decrease) in investment due to the change in the unit value of the investment.  The best way to calculate the Change in Market Value of the Investment Pool Account is as follows:*
Beginning Number of Units x Beginning Net Unit Value = Beginning Market Value
Beginning Number of Units x Ending Net Unit Value = Ending Market Value
Ending Market Value – Beginning Market Value = Change in Market Value

*In this example, there are 46.60 beginning units, with a beginning unit value of $1,374.195 and an ending unit value of $1,366.622.*

*46.60 X $1,374.195 = 64,038  Beginning Market Value*  *\* there will always be a small rounding difference compared to stmt*
*46.60 X $1,336.622 = 62,287 Ending Market Value*
*62,287 – 64,038 = (1,751) Decrease in Market Value*

*To record this change in market value*
*Debit 4921        Income Donor Restricted Gifts                    1,751*
*Credit 1530      Investment in Arch Inv Pool – Donor Restricted          1,751*

*4. Investment Pool Withdrawals* - *In this example, the parish withdrew $12,552.19 in funds from the Restricted Investment Pool.  When the check is received from the Archdiocese it should be deposited into the checking account and recorded as follows:*

*Debit  1010  Operating Checking Account                    12,552.19*
*Credit  1530  Investment in Arch Inv Pool –Restricted               12,552.19*

*Since the Restricted funds are now being used for their purpose, you must record the Net Asset Release and Use as follows:*

*Debit  4950  Net Restricted Assets Used – Restricted          12,552.19*
*Credit  4930  Net Assets Released from Restrictions              12,552.19*

*When you actually use the funds, you need to record the entry that shows what purpose the funds were used for.*

*Debit  1620  Furniture, Fixture and Equipment                12,552.19*
*Credit 1010  Operating Checking Account                    12,552.19*

*Reporting this on Schedule 3 of Financial Report* –*The above example would be reported on Schedule 3 as follows.*
      *Column A Beginning Balance (from statement) - $64,043*

22

*Column B Cash Additions to Pool (see 3 above)– 0*
*Column C Investment Distributions(see 1 above) - $562.35*
*Column D Increase/(Decrease) in Market Value (see 4 above) – ($1,751)*
*Column E Withdrawals (see 2 above) - $12,552.19*
*Column F Ending Balance = A + B + C + D – E = $50,302  ** ties to statement*

### EXAMPLE 2 FOR SCHEDULE 3 – INVESTMENT POOL ACCOUNTS

*ONE PETER YORKE WAY, S.F., CA 94109*　　　BALANCED INVESTMENT POOL

xxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxx

STATEMENT DATE
January 28, 2005

*Investment Pool*　　xxxxxxxxxxxxxxxxxxxxxxxx
*Account:*　　　　**XX.XX–XXXX.XX–XXX.XXX**

| | NUMBER OF UNITS | X | NET UNIT VALUE | = | TOTALS (Fair Market Value) |
|---|---|---|---|---|---|
| *PREVIOUS STATEMENT* | 171.00 | | $ 1,280.858 | | $ 219,027.74 |

*CURRENT ACCOUNT ACTIVITY*

| | | | | | |
|---|---|---|---|---|---|
| New unit value at 12/31/2004 | | | $ 1,374.195 | | |
| **ADDITIONS / REINVESTMENTS** Credited 1/01/2005 | 28.66 | | $ 1,374.195 | | $ 39,387.31 |
| **WITHDRAWALS** | 0.00 | | $ 1,374.195 | | $ 0.00 |

☐ *ENDING ACCOUNT BALANCE*

| | | | | | |
|---|---|---|---|---|---|
| | 199.66 | | $ 1,374.195 | | $ 274,375.87 |

**DISTRIBUTION:  Check**　　　　　in the amount of . . . . . . . .**$   2,039.46**

Distribution is based on 1.00%  X  the number of units in your account at the end of the previous quarter  X  the average of the previous restated 12 quarterly net unit values.  The 12 quarter average unit value for this distribution period is $1,192.658.

---

**PLEASE NOTE:**  Additions to the Investment Pool will only be accepted during the first five business days of the quarter.  Additions must be at least $1,000.00.

---

If you have any questions regarding your account, please call Helen Lee at (415) 614-5513, or Mary Connolly at (415) 614-5515.

24

**Example 2 (See Investment Pool Statement on previous page)**
**Investment Pool – Recording activity from a <u>Endowment Investment Pool Account</u>**

*1. Investment Pool Distributions* – In this example, there is a $2,039.46 distribution from the Endowment Investment Pool account that is paid to the school via a check.  When the check is received from the Archdiocese, it should be deposited into the operating checking account and the Net Assets should be released  as follows:

| | | | | |
|---|---|---|---|---|
| *Debit 1010* | *Operating Checking Account* | | *2,039.46* | |
| | *Credit 4920* | *Income from Endowments* | | *2,039.46* |
| *Debit 4940* | *Net Assets Used – Donor Endowment* | | *2,039.46* | |
| | *Credit 4930* | *Net Assets Released from Restrictions* | | *2,039.46* |

*2. Investment Pool Withdrawals* - In this example, there were no additional cash withdrawals from the investment pool other than the distribution received by check shown above.

*3. Investment Pool Additions*- In this example, there was a cash addition to the EndowmentInvestment Pool Account of $39,387.31.  That cash was then transferred to the Investment pool.

*As the cash is collected from donors, the following entry is made:*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1010* | *Operating Checking Account* | *39,387.31* | |
| | *Credit* | *4910* | *Endowments Received* | *39,387.31* |

*At the end of the quarter, the cash is transferred to the Investment pool and recorded as follows:*

| | | | | |
|---|---|---|---|---|
| *Debit* | *1540* | *Inv in Arch Pool – Endowment* | *39,387.31* | |
| | *Credit* | *1010* | *Operating Checking Account* | *39,387.31* |

*4. Change in Market Value of Investment Pool* –To record the total increase/(decrease) in investment due to the change in the unit value of the investment.  The best way to calculate the Change in Market Value of the Investment Pool Account is as follows:

Beginning Number of Units x Beginning Net Unit Value = Beginning Market Value
Beginning Number of Units x Ending Net Unit Value = Ending Market Value
Ending Market Value – Beginning Market Value = Change in Market Value

*In this example, there are 171.00 beginning units, with a beginning unit value of $1,280.858 and an ending unit value of $1,374.195.*

*171.00 X $1,280.858 = 219,027  Beginning Market Value*
*171.00 X $1,374.195 =234,987 Ending Market Value*
*234,987 – 219,027 = 15,960 Increase in Market Value*

*To record this change in market value*

| | | | | |
|---|---|---|---|---|
| *Debit 1540* | *Investment in Arch Inv Pool –Endowment* | | *15,960* | |
| | *Credit  4920* | *Income from Endowments* | | *15,960* |

*Reporting this on Schedule 3 on Financial Report* –The above example would be reported on Schedule 3 as follows.

*Column A Beginning Balance (from statement) - $219,028*
*Column B Cash Additions to Pool (see 3 above)– $39,387*
*Column C Investment Distributions(see 1 above) - $2,039.46*
*Column D Increase/(Decrease) in Market Value (see 4 above) – $15,960*
*Column E Withdrawals (see 2 above) - $2,039.46*
*Column F Ending Balance = A + B + C + D – E = $274,375  ** ties to statement*

25

# D. Protect QuickBooks records for the year just ended

*The final steps to closing out the year are (**1**) Protect your QuickBooks records for the year just ended so that you do not accidentally go back and make entries into last year's reconciled and tied amounts by setting a Closing Date. (**2**) Make two backups of your QuickBooks file and store one onsite and one offsite in a secure location.*

*(**1**) To set a Closing Date for the year just ended, Select Edit, Preferences from the Main Menu. The following window will display:*



*Make sure you have selected Accounting Preferences on the far Left, and the Company Preferences tab on the top.*

*On the bottom half of the window, you can set the Closing Date. You should set the closing date to the year just ended. After setting the closing date, a warning message will display if you try to enter a transaction prior to that date. The warning message will display as follows:*



26

*You may also set a Password, so that you will not be able to add a transaction prior to the closing date unless you enter the Password.  To set a Password, select the Set Password button, and the following dialog box will appear.*



If you set the password, if you try to enter a transaction prior to the closing date the following will appear:



Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 238 of 308

**2.** To make a backup of your QuickBooks file, Select File, Backup from the Main Menu. The following will display:



Make sure you name your Filename something that makes sense, such as the name of your parish and the year ending date. Set the location of where you want to backup the file, i.e. a disk or a network drive. Then select OK. You will get a message when your data has been successfully backed up.



Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 239 of 308

# E. Year End Closing Procedure Checklist

☐ Record all deposits through June 30th

☐ Record all bills for goods or services received prior to June 30th. These bills will either have been paid before June 30th, or shown as an Accounts Payable.

☐ Record all Bank, Investment and Petty Cash Accounts. Make sure all bank accounts for organizations using the parish/school Tax ID Number are recorded.

☐ Record Interest Earned on:
  ▪ Savings Accounts
  ▪ Capital Assets Support Corporation Deposit and Loan Accounts
  ▪ Capital Assets Support Corporation Investment Pool Accounts

☐ Reconcile all Bank, Investment and Petty Cash Accounts. Obtain copies of the June statements of account for the Deposit and Loan and the Investment Pool Account from the Capital Assets Support Corporation.

☐ Record ending Inventories for:
  ▪ Bingo games materials
  ▪ Scrip
  ▪ Gift Shop Materials
  ▪ Other Supplies (material amounts only)

☐ Reconcile/Analyze Other Asset and Liability Accounts
  ▪ Accounts Receivable - Trade
  ▪ Tuition/Fees Receivable
  ▪ Prepaid Expense
  ▪ Accounts Payable – Trade
  ▪ Deferred Revenue
  ▪ Other Accrued Expenses
    ➢ Payroll
    ➢ Pension
    ➢ Taxes
    ➢ Insurance
    ➢ Interest
  ▪ Loan Payable to Archdiocese

☐ Create and record any Adjusting Entries

☐ Print preliminary Financial Statements
  ▪ Trial Balance
  ▪ Profit and Loss Statements
  ▪ Balance Sheet

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 240 of 308

- Analyze Current Year Restricted accounts
  - Donor Endowment
  - Donor Restricted
  - Unrestricted

- Create and Record journal entry to transfer the year's Net Income change to:
  - Donor Endowment
  - Donor Restricted
  - Unrestricted

- Print Final Year-End Financial Statements and other reports that you may want to keep as a hard copy
  - Trial Balance
  - Profit and Loss Statements
  - Balance Sheet
  - General Ledger
  - Detailed Transactions by Account/Date
  - Other Reports

- Prepare the Annual Parish/School Financial Reports and Schedules for submission to the Chancery Office. Make sure the reports tie out to the QuickBooks file. Create diskette with QuickBooks Trial Balance in Excel format.

- **IMPORTANT: The Annual Parish/School Financial Reports and the diskette with the Trial Balance is due to the Chancery Office on or before September 15th, 2005.**

- Protect your QuickBooks records for the year just ending by providing a closing date and an optional Password.

- Backup your QuickBooks datafile

30

31

# EXHIBIT 8

# SAMPLE PARISH
# HOLIDAY AND VACATION
# ADDENDUM TO PERSONNEL
# HANDBOOK

ST. _____ PARISH

**HOLIDAY AND VACATION SCHEDULE AND POLICY**

**(This policy, when signed by the Pastor and countersigned by the Archdiocesan Vicar General or Vicar for Administration, constitutes an addendum to the Parish Personnel Handbook and replaces all prior holiday and vacation policies or arrangements, effective as of the date of the signature by the Vicar General or Vicar for Administration.)**

I.       **Holidays.**  The Parish will give employees the following paid holidays.

New Year's Day
Martin Luther King Day
Presidents' Day
Good Friday
Easter Monday
Memorial Day
Independence Day
Labor Day
Veterans' Day
Thanksgiving Day
Day After Thanksgiving
Christmas Eve
Christmas Day

      a.   The Pastor, at his discretion, may designate additional holidays or remove existing ones.

      b.   The Pastor may determine that particular need or individual job duties may require an employee to work on one or all of these holidays. In that event, the Pastor *may*, in his discretion, designate an alternative paid day off for that employee.

      c.   Salaried employees will receive full pay for pay periods during which holidays fall. Holidays for employees who are ordinarily paid on an hourly basis will be paid to the extent of the hours ordinarily scheduled to be worked by that employee on that day. (For example, if an employee ordinarily works four hours on Mondays, the employee will be paid four hours when a holiday falls on Monday.)

      d.   If a holiday falls on a day on which an hourly employee is not ordinarily scheduled to work, that employee will not be paid for that day.  (For example, if an employee ordinarily does not work on Mondays, that employee will not be paid for a holiday that falls on a Monday.)

      e.   The Pastor choose to designate that any particular holiday(s) will be celebrated on a preceding or following Friday or Monday if he believes in his discretion that doing so would be beneficial to the employee and consistent with the efficient operation of the Parish.

II.   **Vacation Leave:**  Vacation leave is provided to all regular full-time and benefitted part-time employees, the latter on a pro-rata basis, to assure a period of rest and relaxation each year.

Vacation leave is as follows:

| Full years of Service: | Annual Vacation: | Accrual per month: |
| --- | --- | --- |
| 1 through 4 | 10 days | 0.83 days |
| 5 through 9 | 15 days | 1.25 days |
| 10 through 14 | 20 days | 1.67 days |
| 15 through 19 | 25 days | 2.08 days |
| 20 and over | 30 days | 2.5 days |

a.   Pay for vacation days will be pro-rated for part-time employees.

b.   The Pastor may grant additional vacation leave with pay for lengthy years of service or for senior or managerial positions.

c.   Vacation will accrue from the beginning of employment as indicated above, but cannot be used until accrued (**Unaccrued vacation may not be "borrowed".)** Except where the Pastor has given special permission, vacation may not ordinarily be used during the first six months of employment.

d.   Although accrued but unused vacation is not forfeited, failure to use vacation each year is harmful to the efficiency of the staff and the finances of the Parish, and may lead to disciplinary action.  Employees are expected to schedule and use all of their accrued vacation hours each year.

e.   In no case may an employee accrue more than two year's annual vacation. Vacation accrual shall cease when the employee's earned vacation reaches that employee's cap, and will resume when sufficient vacation has been used to bring the employee below the maximum.  If an employee changes accrual categories and becomes entitled to additional vacation, the cap shall be adjusted to the higher level.  For example, an employee who is entitled to two week's vacation per year may not accrue more than a total of four week's vacation.   If that employee then completes the fourth full year of employment without using vacation, and therefore becomes entitled to three weeks per year of vacation, vacation may then accrue up to six weeks.  Employees whose accrued vacation currently exceeds the cap will not lose their accrued vacation, but will not accrue further vacation until sufficient vacation is used to bring the accrued total below the maximum.

f.   Vacation will be scheduled in consultation with, and at the prior approval of, the Pastor.  It may not always be possible to accommodate a particular vacation scheduling request.  Employees must request vacation time and dates sufficiently in advance of the proposed vacation to assure that office-scheduling needs are met.  Similarly, employees should not schedule a vacation at times that are seasonally critical for the work of the parish, and requests for vacation during such times may be denied.

g.   Employees will be paid accrued vacation leave upon termination, regardless of length of employment.  Accrued vacation leave may not be used to extend the date of termination.

h. Minimum part-time (unbenefitted) employees (i.e., those who are regularly scheduled to work fewer than 20 hours per week) and temporary employees are not entitled to paid vacation leave. However, with the written permission of the Pastor, such employees may request vacation leave without pay, and it shall be within the discretion of the Pastor whether to grant such a request, and if so, how much unpaid vacation time (if any) will be allowed.

Dated: _____

_____
Pastor

Dated: _____

_____
Vicar General or Vicar for Administration

Documents/102210-Vacation Addendum 3 Form

# EXHIBIT 9

THE ARCHDIOCESE OF SAN FRANCISCO

# POLICIES AND PROCEDURES

## REGARDING

# HARASSMENT

(Rev. 07/2018)

| THE ARCHDIOCESE OF SAN FRANCISCO |
|---|

# TABLE OF CONTENTS

| POLICIES AND PROCEDURES<br><br>REGARDING<br><br>HARASSMENT |
|---|

I.      STUDENT-TO-STUDENT HARASSMENT
POLICY AND PROCEDURES . . . . . . . . . . .    PAGE 1

II.     YOUTH/ADOLESCENT HARASSMENT
POLICY AND PROCEDURES . . . . . . . . . . .    PAGE 7

III.    WORKPLACE HARASSMENT
POLICY AND PROCEDURES . . . . . . . . . . .    PAGE 13

IV.    ACKNOWLEDGMENT . . . . . . . . . . . . . . . . . .    PAGE 17

(Rev. 07/2018)

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 250 of 308

| THE ARCHDIOCESE OF SAN FRANCISCO |
|---|

# I.

## STUDENT-TO-STUDENT HARASSMENT
## POLICY AND PROCEDURES

### I. STUDENT-TO STUDENT HARASSMENT

**A.** __INTRODUCTION__

This document is designed to serve as a policy and teaching tool for the students in Archdiocesan schools. It serves as a tangible witness to the Catholic commitment to live, love, and respect as Jesus did.

As indicated below, student-to-student harassment can take many forms. To the extent it involves child abuse, as defined by law, the Archdiocesan Child Abuse Policy and Procedures, including the requirement to report the abuse to civil authorities, shall be followed.

**B.** __HARASSMENT IN GENERAL__

Catholic teaching and practice affirm the Christian dignity of every person. Harassment is unacceptable conduct that is severe, pervasive, and deliberate. Harassment occurs when an individual is subjected to treatment in a school environment which is hostile, offensive, or intimidating because of the individual's race, religion, creed, color, age, national origin, ancestry, physical or mental disability, medical condition, or sex. Harassment of a student by any other student is prohibited and will not be tolerated. It is the policy of the Archdiocese to provide an educational environment in which all students are treated with respect and dignity.

**C.** __SEXUAL HARASSMENT__

Sexual harassment includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. Sexual harassment can be directed toward a student under conditions such as the following:

*Verbal Harassment:*      Sexually demeaning comments, sexual statements, questions, slurs, jokes, anecdotes, or epithets.

*Written Harassment:*      Suggestive or obscene letters, notes, or invitations.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 251 of 308

| *Physical Harassment:* | Unkind, immoral and/or unlawful physical touching, contact, assault, deliberate impeding or blocking movements, or any intimidating interference with normal study or movement. |
|---|---|
| *Visual Harassment:* | Leering, gesture, display of sexually suggestive objects or pictures, cartoons, or posters. |

**D.   DISCIPLINARY ACTION**

1.   This policy prohibits student-to-student harassment whenever it is related to school activity or attendance, and occurs at any time including, but not limited to, any of the following:

     a.   While on school grounds;

     b.   While going to or coming from school;

     c.   During the lunch period whether on or off campus;

     d.   During, or while going to, or coming from, a school-sponsored activity.

2.   Any student who engages in the harassment of another student is subject to disciplinary action up to and including verbal and/or written warnings and reprimands, counseling, suspension, and expulsion.

     ***Note:***

        Should substantiated conduct outside the school environment come to the attention of the school, this too many serve as grounds for discipline, as students of Archdiocesan schools are expected to conform their lives to Christian principles at all times.

**E.   STUDENT'S RESPONSIBILITY**

It is the student's responsibility to conduct himself or herself in a manner which contributes to a positive school environment.  Students will not commit acts which tend to injure, degrade, disgrace, or threaten the safety, privacy, and respect of other students, teachers, or staff members.

**F.   ADMINISTRATION'S RESPONSIBILITY**

To promote an environment free of harassment, the Principal shall take appropriate actions such as removing vulgar or offending graffiti, establishing site rules, and providing staff in-service or student instruction and counseling.  Teachers shall discuss this policy with their students in age-appropriate ways and shall assure them that they need not endure any form of harassment.  The school will treat allegations of harassment seriously and will review and investigate such allegations of harassment in a prompt, professional, and thorough manner.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 252 of 308

## II.  STUDENT HARASSMENT
## ADMINISTRATIVE PROCEDURES

**A.      DISSEMINATION OF POLICY**

In order to ensure that all students and employees have knowledge of this policy and administrative procedures, a copy of the policy:

1.  will be posted in a prominent location in the administrative building on each campus;

2.  shall be provided to all faculty members, administrative staff, and support staff at the beginning of each school year or at the time that a new employee is hired; and

3.  a summary of the policy shall appear in the parent and student handbooks at each local site.

**B.      COMPLAINT PROCEDURE**

•   Students who feel aggrieved because of conduct that may constitute harassment may, depending on the severity of the conduct, directly inform the person engaging in such conduct that such conduct is offensive and must stop.  In many circumstances, it may be better to directly contact an adult, such as those listed below.

•   If students do not feel comfortable doing this or are unable to do so, they shall direct their verbal complaint to their parents or to a school counselor, principal, or assistant principal.  If a claim of sexual harassment is involved and students are uncomfortable speaking to administrators who are of the opposite sex, then they may request that a same-sex teacher also be present.  These persons have been designated to assist in resolving harassment complaints and are bound by the highest degree of sensitivity, concern, and professionalism.

•   The designee receiving the complaint will follow the school's disciplinary plan and will act in a prompt and timely manner to ensure that the matter is investigated and responded to in accordance with legal and Archdiocesan requirements.  Any investigation will be conducted in as confidential a manner as is consistent with these requirements and a thorough investigation of the complaint.

**C.      PROTECTION AGAINST RETALIATION**

The Archdiocese's policy prohibits retaliation against any student for using this complaint procedure or for assisting or participating in any manner in any investigation of harassment.  Any report of retaliation by the one accused of harassment, or by any teacher, principal, counselor or administrator will also be immediately, effectively and thoroughly investigated.  If a complaint of retaliation is substantiated, appropriate disciplinary action will be taken.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 253 of 308

### III. GENERAL GUIDELINES
### FOR PRINCIPALS, TEACHERS AND COUNSELORS
### DESIGNATED TO INVESTIGATE
### STUDENT HARASSMENT COMPLAINTS

#### STEPS TO TAKE ONCE ANYONE REPORTS

**A.** **FIRST RESPONSE**

1. Take the report seriously.

2. Be sensitive and set the tone.

3. Gather facts.

**B.** **GENERAL INVESTIGATION GUIDELINES**

1. Determine who should conduct the investigation.

2. Create a general investigation plan.

3. Conduct a thorough investigation immediately (within 24 hours, if possible).

4. Exercise confidentiality to an extent consistent with legal and Archdiocesan requirements.

5. Document the results.

6. Select appropriate locations for interviews.

7. If complaint is for sexual harassment, ensure that a person of the same gender as the person being interviewed be present to conduct the interview (unless the student requests otherwise).

**C.** **INTERVIEWING COMPLAINANT**

1. Predetermine initial questions (what, who, when, where, to whom, witnesses, any touching, etc.).

2. Be non-judgmental - do not ask leading questions (i.e., questions that suggest the desired "answers").

3. Clarify context of the events.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 254
of 308

4.  Seek effect on complainant (psychological, emotional, financial, etc.).

5.  Seek information about others subjected to same or similar treatment.

6.  Probe timing of complaint.

7.  Find out what the complainant (and/or parents) wants.

8.  Explain that there will be no retaliation.

9.  Provide copies of appropriate Archdiocesan policies.

10. As appropriate, ask the complainant (or depending on the circumstances, a parent) to prepare a formal, written complaint (be ready if the complainant does not want to make a formal complaint).


**D.    INTERVIEWING ALLEGED HARASSER**

1.  Explain purpose of interview and outline accusations.  Be objective - do not ask leading questions.

2.  Observe reaction.

3.  Expect denial and probe further.

4.  Identify relationship between complainant and alleged harasser.

5.  Explore prior "consensual" relationships.

6.  Discover authority of alleged harasser over complainant.

7.  Provide copies of appropriate Archdiocesan policies.

8.  Emphasize rules about communicating with complainant and remind the alleged harasser that no retaliation will be tolerated.

9.  Interview alleged harasser even if complainant's allegations appear true or are corroborated.

10. Take immediate disciplinary action, if warranted.


**E.    INTERVIEWING WITNESSES**

1.  Use open-ended questions to get information.

2.  Do not provide information from other sources.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 255 of 308

3.  Explain confidentiality of interview.

4.  Do not reveal biases.

**F.**  **RESOLVING THE COMPLAINTS**

1.  Balance the facts known.

2.  Be prepared to respond, even if you cannot determine whether harassment occurred.

3.  Impose a disciplinary response, if warranted.

4.  In consultation with the Superintendent of Schools, inform complainant and alleged harasser (and/or their parents) of results of investigation.

5.  Take steps to resolve the situation and provide appropriate referrals for counseling where deemed necessary.

6.  Create final report and transmit to appropriate superior.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 256 of 308

# II.

## YOUTH/ADOLESCENT HARASSMENT
## POLICY AND PROCEDURES

### I. YOUTH/ADOLESCENT HARASSMENT

**A.**     **INTRODUCTION**

This document is designed to serve as a policy and teaching tool for youths and adolescents participating in the various ministries of the Archdiocese of San Francisco.

It is important for all those involved in youth/adolescent ministries of the Archdiocese to promote a Gospel-inspired atmosphere characterized by mutual respect.   Accordingly, the kind of conduct characterized as harassment will not be tolerated.

As indicated below, harassment can take many forms.  To the extent it involves child abuse, as defined by law, the Archdiocesan Child Abuse Policy and Procedures, including the requirement to report the abuse to civil authorities, shall be followed.

**B.**     **HARASSMENT IN GENERAL**

Catholic teaching and practice affirm the Christian dignity of every person.  Harassment is unacceptable conduct that is severe, pervasive, and deliberate.  Harassment occurs when an individual is subjected to treatment in a ministry environment which is hostile, offensive, or intimidating because of the individual's race, religion, creed, color, age, national origin, ancestry, physical or mental disability, medical condition, or sex.  Harassment of a youth/adolescent by any other youth/adolescent is prohibited and will not be tolerated.   It is the policy of the Archdiocese to provide a ministry environment in which all youths/adolescents are treated with respect and dignity.

**C.**     **SEXUAL HARASSMENT**

Sexual harassment includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.  Sexual harassment can be directed toward an individual under conditions such as the following:

*Verbal Harassment:*          Sexually demeaning comments, sexual statements, questions, slurs, jokes, anecdotes, or epithets.

*Written Harassment:*         Suggestive or obscene letters, notes, or invitations.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 257 of 308

| *Physical Harassment:* | Unkind, immoral and/or unlawful physical touching, contact, assault, deliberate impeding or blocking movements, or any intimidating interference with normal study or movement. *See* <u>Archdiocese of San Francisco Sexual Boundary Guidelines</u> (attached hereto) |
|---|---|
| *Visual Harassment:* | Leering, gesture, display of sexually suggestive objects or pictures, cartoons, or posters. |

## D.   <u>DISCIPLINARY ACTION</u>

1.   This policy prohibits harassment whenever it is related to ministry activity or attendance, and occurs at anytime including, but not limited to, any of the following:

    a.   While on church grounds;

    b.   While going to or coming from such activity;

    c.   During, or while going to, or coming from, a ministry-sponsored activity.

2.   Any youth/adolescent who engages in the harassment of another youth/adolescent is subject to disciplinary action up to and including verbal and/or written warnings and reprimands, counseling, suspension, and expulsion.

## E.   <u>YOUTH/ADOLESCENT'S RESPONSIBILITY</u>

It is the youth/adolescent's responsibility to conduct himself or herself in a manner which contributes to a positive Christian environment.  They must not commit acts which tend to injure, degrade, disgrace, or threaten the safety, privacy, and respect of others.

## F.   <u>ADMINISTRATION'S RESPONSIBILITY</u>

To promote an environment free of harassment, the appropriate program director shall take actions such as removing vulgar or offending graffiti, establishing site rules, and providing in-service instruction and counseling.  Adults responsible for the program shall discuss this policy with young people in age-appropriate ways and shall assure them that they need not endure any form of harassment.  The program will treat allegations of harassment seriously and will review and investigate such allegations of harassment in a prompt, professional, and thorough manner.

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 258 of 308

## II. YOUTH/ADOLESCENT HARASSMENT
## ADMINISTRATIVE PROCEDURES

**A.      DISSEMINATION OF POLICY**

In order to ensure that all persons involved have knowledge of this policy and administrative procedures, a copy of the policy:

1.   will be posted in a prominent location in the administrative building on each ministry site;

2.   shall be provided to all paid staff and regular volunteers involved in youth/adolescent ministry at the beginning of each year or at the time that a new employee or volunteer joins the program; and

3.   a summary of the policy shall be provided to all parents/guardians and appear in any parent and volunteer and/or youth/adolescent handbooks at each local site.

**B.      COMPLAINT PROCEDURE**

•      Youths/adolescents who feel aggrieved because of conduct that may constitute harassment may, depending on the severity of the conduct, directly inform the person engaging in such conduct that such conduct is offensive and must stop.  In many circumstances, it may be better to directly contact an adult, such as those listed below.

•      If youths/adolescents do not feel comfortable doing this or are unable to do so, they shall direct their verbal complaint to their parents or to the program director or other responsible adult.  If a claim of sexual harassment is involved and youths/adolescents are uncomfortable speaking to administrators who are of the opposite sex, then they may request that a same-sex program adult also be present.  These persons have been designated to assist in resolving harassment complaints and are bound by the highest degree of sensitivity, concern, and professionalism.

•      The designee receiving the complaint will follow the program's disciplinary plan and will act in a prompt and timely manner to ensure that the matter is investigated and responded to in accordance with legal and Archdiocesan requirements.  Any investigation will be conducted in as confidential a manner as is consistent with these requirements and a thorough investigation of the complaint.

**C.      PROTECTION AGAINST RETALIATION**

The Archdiocese's policy prohibits retaliation against any person for using this complaint procedure or for assisting or participating in any manner in any investigation of harassment.  Any report of retaliation by the one accused of harassment, or by any program director or other administrator will also be immediately, effectively and thoroughly investigated.  If a complaint of retaliation is substantiated, appropriate disciplinary action will be taken.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 259
of 308

**III. GENERAL GUIDELINES
FOR PROGRAM DIRECTORS, EMPLOYEES AND VOLUNTEERS
DESIGNATED TO INVESTIGATE
HARASSMENT COMPLAINTS**

**STEPS TO TAKE ONCE ANYONE REPORTS**

**A.     FIRST RESPONSE**

    1.   Take the report seriously.

    2.   Be sensitive and set the tone.

    3.   Gather facts.

**B.     GENERAL INVESTIGATION GUIDELINES**

    1.   Determine who should conduct the investigation.

    2.   Create a general investigation plan.

    3.   Conduct a thorough investigation immediately (within 24 hours, if possible).

    4.   Exercise confidentiality to an extent consistent with legal and Archdiocesan requirements.

    5.   Document the results.

    6.   Select appropriate locations for interviews.

    7.   If complaint is for sexual harassment, ensure that a person of the same gender as the person being interviewed be present to conduct the interview (unless the youth/adolescent requests otherwise).

**C.     INTERVIEWING COMPLAINANT**

    1.   Predetermine initial questions (what, who, when, where, to whom, witnesses, any touching, etc.).

    2.   Be non-judgmental - do not ask leading questions (i.e., questions that suggest the desired "answers").

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 260 of 308

3. Clarify context of the events.

4. Seek to determine effect on complainant (psychological, emotional, financial, etc.).

5. Seek information about others subjected to same or similar treatment.

6. Probe timing of complaint.

7. Find out what the complainant (and/or parents/guardians) wants.

8. Explain that there will be no retaliation.

9. Provide copies of appropriate Archdiocesan policies.

10. As appropriate, ask the complainant (or depending on the circumstances, a parent/guardian) to prepare a formal, written complaint.


**D.** **INTERVIEWING ALLEGED HARASSER**

1. Explain purpose of interview and outline accusations. Be objective - do not ask leading questions.

2. Observe reaction.

3. In case of denial, probe further.

4. Identify relationship between complainant and alleged harasser.

5. Explore prior "consensual" relationships.

6. Discover authority of alleged harasser over complainant.

7. Provide copies of appropriate Archdiocesan policies.

8. Emphasize rules about communicating with complainant and remind the alleged harasser that no retaliation will be tolerated.

9. Interview alleged harasser even if complainant's allegations appear true or are corroborated.

10. Take immediate disciplinary action, if warranted.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 261 of 308

**E.** **INTERVIEWING WITNESSES**

1. Use open-ended questions to get information.

2. Do not provide information from other sources.

3. Explain confidentiality of interview.

4. Do not reveal biases.


**F.** **RESOLVING THE COMPLAINTS**

1. Balance the facts known.

2. Be prepared to respond, even if you cannot determine whether harassment occurred.

3. Impose a disciplinary response, if warranted.

4. In consultation with the Archdiocesan Program Director, inform complainant and alleged harasser (and/or their parents/guardians) of results of investigation.

5. Take steps to resolve the situation and provide appropriate referrals for counseling where deemed necessary.

6. Create final report and transmit to appropriate superior.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 262 of 308

| THE ARCHDIOCESE OF SAN FRANCISCO |
| --- |

# III.

## WORKPLACE HARASSMENT
## POLICY AND PROCEDURES

### A.    PURPOSE

In order to provide a productive and pleasant working environment, it is important that we who serve on behalf of the many Archdiocesan parishes, schools, and agencies maintain a Gospel-inspired atmosphere characterized by mutual respect.   Accordingly, the kind of conduct characterized as harassment below cannot, and will not, be tolerated.   In addition, the Archdiocese will endeavor to protect employees, to the extent possible, from reported harassment by non-employees in the workplace.

Harassment in General

Catholic teaching and practice affirm the Christian dignity of every person.  Harassment is unacceptable conduct that is severe, pervasive and deliberate.  In general, ethnic or racial slurs and other verbal, visual or physical conduct relating to a person's race, color, age, creed, ancestry, national origin, physical or mental disability, medical condition, sex or any other category protected by applicable law constitute harassment when they unreasonably interfere with a person's work performance or create an intimidating, offensive or hostile work environment.  It is the policy of the Archdiocese to provide a work environment in which all employees are treated with respect and dignity.

"Sexual Harassment" Defined

Federal law defines sexual harassment as unwanted sexual advances, requests for sexual favors, or visual, verbal or physical conduct of a sexual nature when:

1.    submission to such conduct is made a term or condition of employment; or

2.    submission to or rejection of such conduct is used as basis for employment decisions affecting the individual; or

3.    such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile or offensive working environment.

Sexual harassment can include unwanted sexual advances or visual, verbal or physical conduct of a sexual nature.  *See* Archdiocese of San Francisco Sexual Boundary Guidelines (attached hereto).  This definition includes many forms of offensive behavior.  The following is a partial list:

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 263 of 308

- Unwanted sexual advances.

- Offering employment benefits in exchange for sexual favors.

- Making or threatening reprisals after a negative response to sexual advances.

- Visual conduct: Leering, making sexual gestures, displaying of sexually suggestive objects or pictures, cartoons or posters.

- Verbal conduct: Making or using derogatory comments, epithets, slurs, sexually explicit jokes, or comments about an employee's body or dress.

- Verbal sexual advances or propositions.

- Verbal abuse of a sexual nature, graphic verbal commentary about an individual's body, sexually degrading words to describe an individual, suggestive or obscene letters, notes or invitations.

- Physical conduct: Touching, assault, impeding or blocking movements.

It is unlawful for males to sexually harass females or other males, and for females to sexually harass males or other females. Sexual harassment on the job is unlawful whether it involves co-worker harassment, harassment by a supervisor or manager, or by persons doing business with or for the Archdiocese.


## B.    THE ARCHDIOCESE'S COMPLAINT PROCEDURE

The Archdiocese's complaint procedure provides for an immediate, thorough, and objective investigation of any harassment claim, appropriate disciplinary action against anyone found to have engaged in prohibited harassment, and appropriate remedies to any victim of harassment. An employee may have been subjected to harassment even if he or she has not lost a job or some economic benefit.

Employees who believe they have been harassed on the job, or who are aware of the harassment of others, should provide a written or verbal complaint to their own supervisor or the Director of Human Resources (if school personnel are involved, the Superintendent of Schools; if clergy are involved, the Vicar for Clergy) at the Archdiocesan Chancery Office as soon as possible. Additionally, in the case of sexual harassment allegations, employees are free to raise the issue with another same-sex supervisor if they prefer to do so. The complaint should include details of the incident(s), names of individuals involved, and the names of any witnesses. All incidents of harassment that are reported will be investigated. To the extent it involves child abuse, as defined by law, the Archdiocesan Child Abuse Policy and Procedures, including the requirement to report the abuse to civil authorities, shall be followed.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 264 of 308

In order to assure a prompt, effective, and pastoral investigation and response, the applicable Chancery coordinator will, as the circumstances warrant, make use of experts in such areas as physical, mental and spiritual health, social work, canon law and civil law.

If the Archdiocese determines that harassment has occurred, it will take remedial action commensurate with the circumstances. Appropriate action will also be taken to deter any future harassment. If a complaint of harassment is substantiated, appropriate disciplinary action, up to and including discharge, will be taken.

## C.    PROTECTION AGAINST RETALIATION

The Archdiocese's policy prohibits retaliation against any employee by another employee or by the Archdiocese for using this complaint procedure, or for filing, testifying, assisting or participating in any manner, in any investigation, proceeding or hearing conducted by a federal or state enforcement agency. Additionally, the Archdiocese will not knowingly permit any retaliation against any employee who complains of harassment or who participates in an investigation. The Archdiocese's policy prohibits retaliation against any employee who opposes harassment.

Any report of retaliation by the one accused of harassment, or by co-workers, supervisors or managers, will also be immediately, effectively, and thoroughly investigated in accordance with the Archdiocese's investigation procedure outlined above. If a complaint of retaliation is substantiated, appropriate disciplinary action, up to and including discharge, will be taken.

## D.    LIABILITY FOR SEXUAL HARASSMENT

Any Archdiocesan employee, including any supervisor or manager, who is found to have engaged in unlawful harassment, is subject to disciplinary action up to and including discharge from employment. Clergy are subject to appropriate canonical punishment or action. Any employee or clergy who engages in harassment, including any supervisor or manager who knew about the harassment and took no action to stop it, may be held personally liable for monetary damages. The Archdiocese will <u>not</u> pay damages assessed personally against an employee or clergyman.

## E.    ADDITIONAL ENFORCEMENT INFORMATION

In addition to the Archdiocese's internal complaint procedure, employees should also be aware that the Federal Equal Employment Opportunity Commission (EEOC) investigates and prosecutes complaints of harassment in employment. Employees who believe that they have been harassed may file a complaint with that agency. The EEOC serves as a neutral fact-finder and attempts to help the parties voluntarily resolve disputes.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 265
of 308

**F.    HARASSMENT OF OR BY THIRD PARTIES**

It goes without saying that these principles pertaining to relationships among employees would apply also with respect to Clergy, Religious and Lay Employees in their relationships with parishioners, counselees, students, parents, etc.  That is, harassment (including any form of sexual misconduct or abuse of one's position) is clearly not a part of one's ministry or employment and will not be condoned.  Allegations of this nature will be addressed in a fashion similar to that outlined above.

**G.    A FINAL NOTE**

The Gospel message calls for pastoral concern for both the alleged victim and the alleged perpetrator when investigating and handling allegations of harassment.  This pastoral concern may dictate the need for the Church to respond to the alleged victim in particularly unique ways (e.g., offering spiritual and/or psychological counseling), but this pastoral concern should not be mistaken as an admission of responsibility or legal liability.  These policies and procedures have not been prepared to serve as a precise legal yardstick by which third parties are to measure conduct, but rather as a visible sign of the Archdiocese's genuine moral commitment to serve as responsible stewards of Christ's Church.

# IV.

## ACKNOWLEDGMENT

I hereby acknowledge that I have received and read a copy of the Archdiocese of San Francisco's *Policies and Procedures Regarding Harassment* and I agree to follow the policies and procedures outlined therein during my employment/ministry with the Archdiocese of San Francisco.

_____     _____
*(Date)*                                     *(Signature)*

_____     _____
*(Location: Parish/School)*                  *(Please Print Name)*

---

***NOTE TO SITE SUPERVISOR***
*__If__ the person signing the Acknowledgment form is a <u>paid employee</u>, then send signed <u>original</u> to Archdiocesan Human Resources Office and retain a copy at your site.*
*__If__ the person is a <u>regular volunteer</u>, then the form does not need to be sent to the Human Resources Office, and site should retain original.*

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 267 of 308

# EXHIBIT 10

# R-6
# RECORDS RETENTION GUIDELINES: DESTRUCTION AND RETENTION OF DOCUMENTS

# RECORDS RETENTION GUIDELINES

*Prepared by the Archdiocese of San Francisco Legal Office*
*(January 31, 2007)*

**INTRODUCTION.**

Developing a one-size-fits-all records[1] retention "policy" for parishes, schools, departments and agencies as numerous and diverse in nature and scope as those in the Archdiocese of San Francisco would be impractical if not impossible to design and/or to effectively implement. Different offices and persons have different ideas about what is "important" and what is "junk." Some are motivated to engage in periodic "spring cleaning" while others are proverbial "pack rats." Some are highly categorized and organized in their record keeping practices while others are hopelessly "lost" in this area due to inherent personality traits and/or fairly regular turnover in personnel.

Certain records must be retained, as mandated by civil and/or canon law, for a prescribed number of years, or even permanently. Some records should be kept permanently for utilitarian reasons (e.g. because of their historical/reference value). Still other records have very limited value after their *raison d'être* has expired.[2] **Finally, actual or imminent litigation can cause an automatic suspension in the disposal of any and all records that might be in any way relevant to the litigation.[3]**

In view of the above, the following guidelines have been developed as a quick reference tool, not as a comprehensive policy purporting to identify every conceivable type of record setting forth a definitive, across the board, retention requirement for each such record. Instead, several general

---

[1] All records created or acquired by employees or volunteers in the course of conducting Archdiocesan business, whether in print, handwritten, electronic, or other media, are the property of the Archdiocese and are covered by these guidelines. Employees who create or acquire possession of these records do not attain a proprietary interest in these records; they belong to the Archdiocese and not to the employee or volunteer. The willful destruction, removal, or misuse of Archdiocesan records is prohibited and violators will face disciplinary action up to and including termination. All employees and volunteers are responsible for reporting any actual or threatened loss or misuse of records to their supervisor.

[2] These include, for example, drafts and records that are transitory in nature. Records whose business purpose or use is short-lived, such as telephone messages, routine letters which require no acknowledgement or follow-up such as notes of appreciation, congratulations, plans for meetings, etc., and preliminary working papers, notes, and superseded drafts, should be maintained only for so long as necessary. Drafts generally should be discarded upon completion of the underlying work project.

[3] **Anything that relates to a matter that is known or suspected to be under investigation, in dispute, or subject to litigation must be retained and may not be destroyed or altered, even if it would otherwise be destroyed under these guidelines. Destruction of any materials in these situations could have severe consequences to the Archdiocese and to the individual employees who are responsible for the destruction. These consequences could include jail time and other criminal and civil penalties. If there is a question as to whether something is the subject of an investigation, dispute, or litigation, contact the Archdiocesan Legal Office.**

categories have been established which will assure compliance with the law while at the same time keeping things relatively simple and flexible.[4]

**THE "RULE OF 7"**

The vast majority of records that are subject to a legally mandated retention period must be kept for a time frame ranging somewhere between 1-7 years.  Rather than facing the daunting task of regularly searching for and disposing of diverse records that fall within these numerous time frames, it is recommended that parishes, schools, departments, and agencies simply follow the "Rule of 7."  That is, SUBJECT TO THE EXCEPTIONS TO THE RULE OF 7 SET FORTH HEREIN, records should be retained for a minimum period of the current year (calendar or fiscal as desired) plus 7 (seven) calendar/fiscal years.  NOTE:  Should you desire to dispose of a certain category of records before the 7 year period, please check with the Legal Office to assure that any such proposed disposal meets any applicable minimum retention period required by law.

**EXCEPTIONS TO THE RULE OF 7 (i.e. Situations in which documents which must be maintained should be kept *longer* than seven years)**

**SPECIAL NOTE RE: INVESTIGATIONS, DISPUTES, LITIGATION – See footnote # 3**

**Employee Personnel Files** – There are laws which require the retention of certain employment records (e.g. attendance records, application forms, medical data, etc.) for various periods of time.  There are also compelling business reasons (e.g. long-term evidentiary value) for retaining personnel items pertaining to the handling of performance issues, terminations, etc. As such it is recommended that individual personnel files be kept on a permanent basis.  It may be convenient, however, to place them in storage (e.g. Archdiocesan Archives) after the standard seven-year period.

**Real Property and Building Records** – For historical and legal reference reasons, items such as purchase and sale agreements, deeds, easements, licenses, title insurance, land surveys, hazardous waste tests/disposals, etc. should be kept permanently.  Any major building repairs, improvements, or construction contracts and any related designs, drawings, blue prints, change orders, environmental and feasibility reports should also be retained permanently.

**Contracts and Agreements** - Routine purchase/sale contracts and service agreements involving less than $10,000 – retain for seven years following expiration of the agreement.

**Insurance Policies and Related Records** – seemingly obsolete property, liability, workers compensation and other insurance policies, endorsements, certificates, inventory pictures, etc.,

---

[4] Some will find it convenient to convert certain records from electronic to hard copy format for long-term retention purposes.  Others might prefer to convert their paper records to an electronic form of storage, or have them transferred to CD or DVD-ROM or other more advanced media that comes into use.  One must bear in mind, however, that changes in technology may necessitate back up and/or revised methods of record retention to assure access to same.  Do not rely exclusively on computer system backups alone as those generally have limited time frames.  For example, files deleted by a user might only be maintained in the general backup system for 30 days.

*Records Retention Guidelines, p. 3*

may have significant evidentiary value in relation to unknown future claims, defects, etc. and should be kept permanently.

**Student Files** – Student *cumulative records* and *CSIR* (immunization cards) should *never* be destroyed. Student *disciplinary files* containing matters *involving serious moral turpitude* (e.g. drugs, weapons, sexual misconduct or harassment) should be retained for a period of 10 years after graduation from secondary school and 20 years after graduation from elementary school. Other student file information can be destroyed 7 years after graduation from the institution.

**Historically Significant Records -** (e.g. pictures, publications, programs of commemorative events, etc. should be retained permanently) If one is in doubt about the actual potential historical relevance of a particular item, a call to the Archdiocesan Archives office is recommended.

**Sacramental Records** – It is the expectation and long-held tradition of the Church that sacramental records are kept safely and indefinitely. Therefore, all sacramental records are to be retained permanently.

**Retirement and Pension Records** (including summary plan descriptions) - these must be kept permanently.

**Financial Audits, Financial Statements and Summary General Ledgers** – Retain permanently.

**Employee Earnings Records** – In general, the "Rule of 7" can be applied to most employee earnings records (payroll registers, paysheets, etc.). However, as with other personnel files, and retirement and pension records, **employer copies of W-2's should be retained permanently.**

**Gift Records** – Endowments, restricted gifts, Donor contribution lists - Retain permanently.

**DISPOSAL OF RECORDS.**

Records that have satisfied the applicable retention period may be discarded. Highly sensitive records should be shredded or defaced prior to being deposited in the recycling bin.

**GENERAL TIPS.**

- Some records that may be purged may be filed with records that need to be retained. You may want to retain the whole file in the event that the benefit of purging the records may not outweigh the time it takes to do the purge.

- When storing boxes put a "destroy after" date on the box so the records need not be reviewed again.

- Some records are so important that originals or copies should be kept offsite (e.g. at the Archdiocesan Archives Office). Consider what records are necessary to keep the site running after an emergency. What records are irreplaceable?

- Putting a date on the label of an inactive file can make purging simple.

- Have a "purge day." Set aside a day for the whole office to review, organize, toss, and archive files.

*Records Retention Guidelines, p. 5*

# EXHIBIT 11



Accounting ⌄

Building / Real Estate ⌄

Catholic Charities ⌄

Cemeteries ⌄

Child & Youth ⌄

Ecumenical ⌄

Finance Policies ⌄

Fundraising Policies ⌄

Human Resources Policies ⌃

Policy Regard Stipends

# POLICY REGARDING STIPENDS (HUMAN RESOURCES)

1. When an employee gives a workshop at diocesan-sponsored events that is within the scope of his/her responsibility for the Archdiocese, s(he) will not receive a stipend regardless of the department or office which is sponsoring the event, including one's own department or office. In this case it is understood that the employee makes use of his/her regular weekly work schedule for the preparation and presentation involved.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 275
of 308

(Human Resources)

Memo from Human Resources re: "Pastoral Cen Salary Administratio Program"

Memo from Human Resources, "Archdiocesar Personnel Rehire Policy"

Memo re "Immigrant/N Immigrant Visa/Work Applications"

Sexual Harassment Policy

Memo from Human Resources Of re: Independe Contractors

Personnel Policy:

2. When an employee uses his/her regular weekly work time to prepare and give programs, workshops, or consultations for any group other than Archdiocesan departments/offices, the stipend given for this work is to be given to the appropriate Archdiocesan office.

3. When an employee uses time other than his/her regular weekly work time to prepare and give programs, workshops, or consultations for any group other than Archdiocesan departments/offices, the stipend given belongs to the employee doing the work.

4. Workshops, programs, consultations are to be approved by your supervisor. Any clarifications concerning this policy should be directed to the Vicar for Administration. The Stipend policy may often interact with the Flex Time Off policy. The Archdiocese has a right to a full work week from our employees. Employees have a right to be fairly compensated by others for work done above and beyond the work week.

5. For non-stipended presentations, an employee may claim reimbursement for transportation expenses (e.g. mileage allowance) and reasonable out of pocket meal expenses with the production of a receipt. Such expenses would be reimbursed by the organization requesting the speaker.

6. **For Extended Teaching Assignments at Archdiocesan Institutions and Programs**

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 276
of 308

📄 Termination a
Rehire/Pensic
Plan

📄 Memo from
Human
Resources, "N
Archdiocesan
Employee
Benefit"

📄 Memo from
Human
Resources,
"Benefits for
Employees
Working for
More than On
Archdiocesan
Corporation"

Insurance ⌄

Internet
Technology ⌄
(IT)

Legal ⌄

Marriage ⌄

Media ⌄

Pastoral
Center / ⌄
Chancery

Policies Index ⌄

(i.e. School of Pastoral Leadership; Permanent Diaconate Program; Saint Patrick's Seminary; Retreat Centers)

A. In order to attract and retain high quality teachers and not to inhibit the spread of the gospel and Catholic education, an employee may, with the prior approval of the employee's supervisor and the Vicar for Administration, teach and receive a stipend when invited to teach an extended course or program (e.g. 6 weeks or more) requiring preparation and/or a course syllabus. In considering an employee's request to undertake an extended teaching assignment, the obligations and needs of the employee's particular office shall be paramount.

B. Institutions of the Archdiocese (i.e. School of Pastoral Leadership; Permanent Diaconate Program; St. Patrick's Seminary; Retreat Centers) will formulate their own agreements with individuals to teach or provide presentations in those institutions following the requisite approval from the employee's supervisor and the Vicar for Administration.

C. During the experimental period with the Stipend Policy, any questions or exceptions regarding this provision must be referred to the Vicar for Administration before any commitments are made.

**Stipends**

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 277 of 308

Political
Activities  ⌄

Schools  ⌄

Protecting the
Vulernable  ⌄

USCCB  ⌄

Clergy  ⌄

Offertory  ⌄

Parish
Management  ⌄

Public Policy  ⌄

Sacraments  ⌄

Standards of
Conduct  ⌄

Young Adult
Ministry  ⌄

Addiction  ⌄

Dispute
Resolution  ⌄

Emergency
Operations  ⌄

Diaconate,
Permanent  ⌄

Deacons  ⌄

California
Catholic
Conference
(CCC)  ⌄

Due Process  ⌄

Elder Abuse  ⌄

# What are your Feelings

## Share This Article :     

Still stuck? How can we help?

*Updated on September 14, 2022*

## Parish Employee Handbook (Including Addenda and Acknowledgements) →

*Powered by BetterDocs*

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 278
of 308



Liturgy ⌄

Art & Music ⌄

Episcopal Council ⌄

Communication

Code of Ethics ⌄

Finance Council ⌄

© 2022 Archdiocese of San Francisco

Case: 23-30564     Doc# 610-3     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 279
of 308

# EXHIBIT 12

# Electronic and Internet Fundraising

Dear Pastors and Principals,

It has come to the attention of the Department of Catholic Schools that websites have been developed whereby individuals can engage in "virtual store" shopping on the Internet, with merchants crediting a portion of the total purchase price to the school of the individual's choice. While this type of prograna can indeed benefit local schools, it is important, both for purposes of complying with Internal Revenue Code restrictions on tax-exempt organization business activities as well as Archdiocesan policy prohibiting product and service endorsements, to carefully minimize the active role of the schools in these programs

Given these concerns, the following restrictions shall apply:

1. Any solicitation you may receive from companies seeking your involvement in Internet based shopping/non-profit rebates must be directed to the Development Office.
2. The Development Office will review the proposed program and, if acceptable, will assure that the school "sign-up" forms contain clear terms and conditions which protect the interests of the school and limit the nature and extent of the school's role in marketing the particular website, merchants etc.
3. The Development Office will periodically provide to schools a list of those electronic and website programs which have been found acceptable. The current approved programs include E-Scrip and Schools are cautioned, howevely such listing of a website does not indicate endorsement by the Archdiocese of the particular program. Schools choosing to refer the various websites to potential supporters (e.g., via the weekly envelope and/or on any school website fundraising page) will be required to include a cover note to any materials clarifying that there are various websites available and that the Archdiocese and School do not promote or endorse the products or services of any particular website or participating merchant and that the terms and conditions pertaining to the use of the website and any resulting purchases are between the supporters, the website and participating merchants and that the parish/school makes no representations or warranties concerning the products and/or services of the website operator or participating merchants. Finally, the cover note must state that no portion of payments made by supporters to merchants participating in the program are tax deductible.
4. No ongoing promotional efforts on behalf of a particular website program, merchant group, etc., is permitted. For example, some organizations will recommend full-scale marketing plans which include presentations by website representatives, rallies, visits to merchants, press releases, ongoing flyers, etc. For the reasons stated above, this type of activity is prohibited. Website operators and merchants are, however, free to take out paid ads in the local paper or parish bulletin; though the parish/school must be careful not to allow itself to be referred to as a "sponsor."
5. Under no circumstances is a school authorized to operate, or facilitate the operation of "virtual mall" shopping on the ,school's website. (however, subject to the restrictions set forth in #4 above, the website addresses of approved commercial website shopping operators can be listed on the school's website).

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 281 of 308

# EXHIBIT 13

# Policy Regarding Use and Monitoring of Internet, E-Mail, and Other Technology

## INTRODUCTION #

The Archdiocese of San Francisco's technical resources enable employees and other authorized users to quickly and efficiently access and exchange information. When used properly, these resources greatly enhance productivity and knowledge, and therefore their use is encouraged. Because these technologies, most notably the Internet and E-Mail, are both new and rapidly changing, it is important to explain how they fit within the work of the Archdiocese and within the responsibilities of employees and other authorized users.

For purposes of this policy, the term "Archdiocesan Systems" includes computers, Internet Service Providers ("ISPs") and accounts, telephone lines, or any combination of these, which are provided by and/or paid for by the Archdiocese, including those provided by, to or for agencies, schools and parishes, as opposed to by personal funds.

Examples of access considered to have been performed through an Archdiocesan System include:

- An Archdiocesan ISP account accessed through a privately-owned computer and/or telephone line;
- A personal ISP accessed through an Archdiocesan computer and/or telephone line;
- Archdiocesan work, whether done on a private or Archdiocesan computer or telephone line.

Non-Archdiocesan E-mail or Internet-access accounts of individuals are to be maintained separately from Archdiocesan accounts, and remain the sole responsibility of the personal owner and not of the Archdiocese or any Archdiocesan entity. If an individual desires to maintain an interest in privacy in individual accounts beyond that which is set forth in this policy, such accounts must not include Archdiocesan work, must be kept solely on private computers, must solely use private telephone lines, and must be accessed solely through private ISPs. No Internet or E-Mail access which is done in connection with Archdiocesan business, or which uses Archdiocesan computers, telephone lines, ISPs, or accounts is to be considered private, and all such access remains' subject to regulation, retrieval and review by the Archdiocese, except as expressly set forth in this policy. While this policy seeks to embody the institutional legal rights of the Archdiocese in relation to its systems, Department Heads and other supervisors and/or Users are reminded that these rights also carry with them a moral obligation of respect for individual Users of Archdiocesan Systems. As such, any legal rights retained by this policy should not, from a moral perspective, be used as a means of knowingly reviewing others' personal E-Mails and/or other *personal* communications via Archdiocesan Systems where a significant business concern has not been first articulated. In order to safeguard this moral obligation, Department Heads should consult in advance with the Archbishop, the Archdiocesan Vicar for Administration, or Archdiocesan Legal Counsel to determine whether review of personal E-Mail and/or other personal communications via Archdiocesan Systems is warranted in a given circumstance.

Employees, clergy, religious, volunteers, and other users are collectively referred to as "Users."

Where the term "Department Head" appears in this policy, it also refers to heads of agencies, pastors of parishes, and principals of Archdiocesan schools.

"Computer Systems Manager" refers to that person in the respective department, school, parish, or agency with primary responsibility for supervising computer systems and operations. If there is no such person or if that person is not available, the relevant Dean may be contacted for guidance as to shared expertise among those persons within the Deanery. While this policy focuses on Internet/E-Mail technology, it also applies to computers, fax machines, voice mail, electronic bulletin boards, and like technical resources.

## PURPOSE AND SCOPE #

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 283
of 308

The purpose of this Policy is to outline the parameters for use of computers, and the use and monitoring of the Internet, E-Mail, and the other Archdiocesan technical resource systems referred to above. This policy shall apply to all Users accessing such systems of Archdiocesan departments, agencies, parishes, and schools.

## ARCHDIOCESAN INTERNET SERVICE PROVIDERS #

Each parish, school, agency, or other Archdiocesan entity shall establish a single ISP account with a single ISP to be chosen by that entity's Department Head for use in connection with Archdiocesan Systems and work. No parish, school, agency, or other Archdiocesan entity shall establish additional accounts or ISPs or maintain private (i.e., non-Archdiocesan, including non-agency, non-parish or non-school) account numbers or service providers.

All individual mailboxes, screen names, E-Mail addresses and the like in connection with an Archdiocesan 1SP shall be established and maintained only with the express permission and under the direct supervision of the Department Head and the Computer Systems Manager, and shall be considered Archdiocesan property. No mailboxes, screen names, E-Mail addresses, or the contents of any of these, if maintained in connection with an Archdiocesan System, should be considered by any User to be private.

Except as specifically allowed by this policy, all ArchdiocespEy.4usiness, and only Archdiocesan business, is to be conducted through the designated ISP and on Archdiocesan Systems. Priests and others who reside permanently in their Archdiocesan workplaces, and who desire exclusively private Internet access for personal use, may establish individual Internet accounts with their own computers and ISPs through private telephone lines, so long as such accounts, computers, and phone lines are established with the User's personal funds and in the User's personal name.

## PRIVACY/CONFIDENTIALITY #

Except as specifically set forth in this policy, all information, including E-mail messages and files, that is created, sent, or retrieved over the Archdiocesan Systems (including computers, telephone lines, and/or ISPs, or in connection with Archdiocesan work), is the property of the Archdiocese, and should not be considered private or confidential. Any such material, whether created by, sent to, or received by, the User, may be monitored, retrieved and reviewed at any time, when doing so serves the legitimate interests and obligations of the Archdiocese. For example, the Archdiocese will investigate suspected unauthorized or excessive use and suspected misconduct, or it may conduct periodic spot audits to assure compliance with this policy.

If an Archdiocesan investigation involves messages sent to or by, or information prepared by, a Priest of the Archdiocese, that Priest may request that another Archdiocesan Priest of his choosing be present when any such information is retrieved and reviewed. If an Archdiocesan investigation involves messages sent to or by, or information prepared by, a member of a recognized labor union concerning a labor union matter, that member may request that the member's shop foreman or other immediate union representative be present when any such information is retrieved and reviewed. Any right to have another person present at such a review is not to be construed as creating any expectation of privacy in any such material, or in any way as a veto or right to impede or obstruct the investigation.

## ACCEPTABLE USES OF THE INTERNET AND E-MAIL #

Every User has the responsibility to maintain, enhance, and carry out the mission of the Church, and to use the Internet and E-Mail in a productive and morally acceptable manner.

Archdiocesan ISP accounts may be used for personal use only as authorized by a User's supervisor as set forth in this Policy. Any authorized personal use of an Archdiocesan ISP shall be subject to the same conditions, including employer-inspection rights, as Archdiocesan work. In the case of non-exempt employees, authorized personal use shall take place only during scheduled work breaks or emergencies. In the case of exempt employees, authorized personal use shall not be excessive and/or carried on in a manner that disrupts employees'

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 284 of 308

work priorities and responsibilities. Internet access and E-Mail through Archdiocesan Systems are property of the Archdiocese, and their purpose is solely to facilitate Archdiocesan business.

Subject to the limitations contained in this Policy, including the Archdiocese's right to inspection, a User may have access to the User's private E-Mail or Internet provider through Archdiocesan Systems (including computers, ISPs, and/or telephone lines, or at the workplace). Such access shall be allowed only as expressly permitted by the User's Department Head and Computer Systems Manager. The User's Department Head shall allow access to such private services only at and for such times as is conducive to and compatible with effective and efficient performance of the User's job duties, and may be limited as to scheduling or duration by the Department Head or by the Archdiocese.

## UNACCEPTABLE USES OF THE INTERNET AND E-MAIL AND OTHER TECHNOLOGY [#](#)

Archdiocesan Systems may not be used to transmit, retrieve, or store any type of communication, message, image, or material:

- that is discriminatory, defamatory, or harassing;
- that contains derogatory or inflammatory remarks about an individual's race, age, disability, religion, national origin, or physical attributes, or any other condition or status protected by Federal, State, or local law;
- that is obscene or X-rated;
- that contains abusive, profane, or offensive language;
- that involves "spam" or other means or forms of communication which abuse the privilege of communications or use the system irresponsibly; to that end, no message sent on an Archdiocesan system may be addressed to more than five (5) Archdiocesan E-Mail addresses without the express permission of the Department Head;
- that violates any policy of the Archdiocese of San Francisco, including, but not limited to, its policies regarding child abuse and harassment, or that is otherwise contrary to the religious mission and values of the Archdiocese.

Information traveling through the Archdiocese's systems may not be secure. Therefore, Users are prohibited from sending or posting confidential or proprietary company information through the Internet or by E-mail without the express authorization of their Department Head. If a User's work requires a higher level of security, the Computer Systems Manager should be contacted for guidance on methods to better secure the exchange of E-mail or gathering information from sources such as the Internet. It is recommended that all E-Mail messages concerning Archdiocesan business, and particularly where sensitive material or information is included, contain the following preprogrammed disclaimer:

THIS E-MAIL MAY CONTAIN CONFIDENTIAL OR PROPRIETARY MATERIAL FOR THE SOLE USE OF THE INTENDED RECIPIENT. ANY REVIEW, USE, DISTRIBUTION OR DISCLOSURE BY OTHERS IS STRICTLY PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR AUTHORIZED TO RECEIVE THE INFORMATION FROM THE RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DELETE ALL COPIES OF THIS MESSAGE.

The Archdiocese's systems also may not be used for any purpose that is illegal, against Archdiocesan policy, or contrary to the Archdiocese's interests. Solicitation of nonArchdiocesan business or any use of the systems for personal gain is prohibited.

## COMMUNICATIONS [#](#)

Each User is responsible for the content of all text, audio, and images that the User places into or sends over Archdiocesan Systems. In order to be able to identify the sources of information sent or received over Archdiocesan Systems, every User shall maintain unique individual identification information (such as, where

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 285 of 308

relevant, passwords or access codes, etc.), which shall be made available to the relevant Department Head, who may use such information for appropriate business purposes. In the event that a dispute arises as to appropriate use by the Department Head of such identification or access information, the issue shall be decided in the sole discretion of the Archbishop or such person as the Archbishop may delegate. This identification and access information is not to be given to any third party without the approval of the User's Department Head.

The Archdiocese, through the Archbishop or other person specifically delegated in writing by him, may override any applicable passwords or codes to inspect, investigate, or screen a User's files and messages. In order to facilitate the Archdiocese's access to information on its technical resources, a User may not encrypt or encode any communication or data stored or exchanged on Archdiocesan Systems without the express written permission of the User's Department Head and the Computer Systems Manager, who will establish appropriate procedures for deposit of such information so that it can be accessed in the User's absence. Archdiocesan computers and accounts are not intended for anonymous use. To preserve the integrity and viability of this policy, no electronic communication may be sent that hides the identity of the sender or indicates that the sender is someone else or is from another entity.

Nothing in this section should be construed as creating any privacy right or interest in any material stored by or sent through any Archdiocesan System.

## SOFTWARE [#]

To prevent computer viruses from spreading through the system, anti-virus software shall be implemented on all Archdiocesan Systems. Users are prohibited from downloading software from the Internet, installing software on their computers, or uploading data, from any source, without the express approval of the Department Head and the Computer • Systems Manager. Access codes, passwords, or other means of accessing software on Archdiocesan computers shall not be changed or altered without the express prior consent of the Department Head and the Systems Manager. All software that is downloaded or otherwise installed must be registered to the Archdiocese. Users should contact the Computer Systems Manager if they have any questions.

## COPYRIGHTS [#]

The Archdiocesan Systems may not. Oe.,.used to transmit copyrighted materials that belong to any other individual, business, oi ·6rganization, without the express consent of the owner of the copyright. The Archdiocese is committed to obtaining a license for every copy of copyrighted software that Users need to perform their duties. Users must respect all copyrights and may not copy, use, retrieve, modify, distribute, or sell copyrighted materials.

## VIOLATIONS [#]

Any use of the Internet or E-mail not in keeping with this policy *is* not acceptable and will not be permitted. Users are required to immediately notify their Department Head and the Computer Systems Manager in the event they become aware of security breaches (accidental or otherwise), viruses,' "spare", unsolicited obscene material, copyright infringements, hate mail or otherwise potentially violent communications, or any other use of the Archdiocese's technical resource systems by anyone that involves a real or apparent unacceptable use, as defined in this policy. The failure to comply with this policy may result in disciplinary action, up to and including termination, and the Archdiocese may advise appropriate law enforcement agencies and officials of any illegal activities that involve Archdiocesan Systems.

## ARCHDIOCESAN WEBSITES [#]

No materials are to be placed on authorized Archdiocesan websites without the prior approval of the User's Department Head in regard to content and quality. The Computer Systems Manager should be consulted before any new website is developed. No Archdiocesan User or Entity shall engage as a vendor in any "E-commerce"

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 286
of 308

without the prior written approval of the Archdiocesan Finance Director, and any related registration information shall be on file with the Finance Office.

## AMENDMENTS TO THIS POLICY [#](#)

No amendments to this policy shall be valid unless approved in writing by the Archbishop.

## USER ACKNOWLEDGMENT [#](#)

I hereby acknowledge that I have received and read a copy of the Archdiocese of San Francisco's *Policy Regarding Use and Monitoring of Internet; E-Mail, and Other Technology,* and I agree to follow the policy and procedures outlined therein.

I understand that no one except the Archbishop of San Francisco has the authority to amend this policy and that any such amendment must be in writing and signed by the Archbishop.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 287 of 308

# EXHIBIT 14

# Archdiocese of San Francisco Building Construction, Renovation & Maintenance Policy

## Introduction #

The Archdiocese of San Francisco Real Property Support Corporation (RPSC), through its Board of Directors, authorizes the Corporation's Building Committee to consider and make recommendations on construction, remodeling and improvements of buildings either currently owned or intended to be purchased or built. The Building Committee assists the RPSC Board in establishing policies and procedures to be followed in the construction and maintenance projects of the RPSC. The Policies and Procedures set forth in this document apply to all RPSC owned parishes, primary schools and high schools. The Building Committee also provides assistance to the RCA Corporation Sole upon request.
(Periodic updates and changes are made to the Policies and Procedures. Please call the RPSC Building and Construction Office if you have any questions. Thank you.)

## Building Committee Roles and Responsibilities #

The purpose of the Building Committee is to provide an unbiased review and advice to help ensure the successful completion of projects. The Committee includes pastors as well as professionals with extensive experience in the areas of construction, renovation and

maintenance. The Building Committee serves the RPSC's Board of Directors do Steve Kalpakoff, Director of Building and Construction (hereafter referred to as 'Director), and the parishes and schools owned by the RPSC by:

- *Assisting in the planning of projects*
- *Encouraging quality workmanship*
- *Ensuring appropriate allocation of legal and insurance risks*
- *Promoting the most efficient utilization of financial resources.*

Building Committee meetings are generally held quarterly or as needed at the RPSC's office at 1301 Post Street, Suite 102 in San Francisco. Emergency meetings may be called when necessary. Parish and School representatives may present projects at these

meetings by contacting the RPSC's office at least one month before the meeting to be placed on the Building Committee's Agenda. Call 415-292-0800 Ext. 4.

## General Policies and Procedures #

All projects that **exceed $15,000,** regardless of whether the project components are undertaken concurrently or phased, must be submitted and presented to the RPSC, do the Director, for approval. In addition, *all electrical and roofing projects exceeding $10,000* must be submitted and presented to the Director for approval. If a project involves volunteer work, the value of the volunteer work must be included in the total value of the project. Even though a project may be under $15,000 it is recommended that ALL projects operate under these general policies.

- All work involving hazardous waste material *(e.g., lead, asbestos)* must be coordinated through the RPSC's Office.
- All projects involving the demolition, remodeling and renovation of buildings, regardless of dollar amount must be referred to the RPSC's office for prior inspection and approval.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 289
of 308

'*Volunteer Laboecan* often be a creative and effective element for some projects. At the same time, offers by volunteers within the parish and community to assist in the completion of a project must be approached with caution. The use of volunteers to perform certain tasks may create undue risks. Numerous claims have been made due to injuries to or poor workmanship by, volunteers. Whenever possible, volunteers should work on ground level. Contractors who donate services must be treated in the same manner, from an insurance point of view, and must sign the same contract, as contractors who are being paid for their services.

After the Director has secured from the Archbishop, (when necessary, and generally through the Moderator of the Curia's office) conceptual approval of the project, but prior to making any agreements or arrangements (even verbal) with any architect, contractor, representatives, government agency, or real estate firm, a formal request for review of the project must be made to the Building

Committee, do the Director. When applicable, review and approval of other committees (e.g. Finance, Worship, Real Estate, and Office of Catholic Schools) must be obtained. The Building Committee then submits its recommendations to the Director. Written approval from the RPSC's Officers and/or Board of Directors, do the Director, must be obtained before proceeding with formal bid proposals,

etc. Contractors, architects, engineers and project managers that are approved by the RPSC, do the Director, must perform all work on the project. *(Refer to J-7 et seq. for Criteria for approval and qualifications of these professionals)* All contracts for such services must be signed by an authorized officer(s) of the RPSC.

After obtaining the Building Committee's permission to proceed, three °Competitive Bids" from qualified union contractors will be required. Any proposed deviation from the competitive bidding and/or union contractor requirements must involve exceptional circumstances (eg. small project by a parishioner's owner/operator company, union labor not available or economically feasible for the area/project involved etc.) and must be approved in writing by the RPSC, do Director *prior* to seeking bids. In the event an exception is granted, prevailing wage procedures may be imposed depending on the nature and extent of the project. The Building Committee also expects that the lowest qualified bidding contractor will be awarded the contract. If the RPSC determines that it is not feasible to use the competitive bid process then the Pastor has the option to choose the *'Negotiated Contract'* procedures. A minimum of three General Contractors will be required to submit proposals for Fee and General Conditions. After selection of a General Contractor, all subcontracts will be competitively bid

PLEASE NOTE*!*

Contracts not exceeding $15,000 can be signed by the Pastor or Principal, though it is recommended that they first be sent to the Director for review. Contractual agreements between $15,000 – $100,000 must be signed by the RPSC's Executive Director. Contractual agreements over $100,000, but not exceeding $250,000 may be signed by the Executive Director so long as counter signed by the RPSC's President, Treasurer or Secretary. Contractual agreements in excess of $250,000 must be signed by both the President and Treasurer.

# Deferred Maintenance #

Each Parish or School is required to have a *Deferred Maintenance Assessment Survey* completed for buildings *PRIOR* to any consideration and/or approval of any MAJOR capital improvements, construction or renovation projects. Permission to proceed on Capital Improvements will not be granted until *AFTER* a survey report is completed and approved by the Building Committee and the R.P.S.C.'s office. A representative from the Parish or School must contact the RPSC's office to coordinate a survey of the site and all buildings. The survey will include but not limited to:

*v' An inspection of all building systems (plumbing, mechanical and electrical) V Site work (paving, concrete and retaining walls)*

*V Exterior inspection of the buildings (roofs, windows, doors, walls, stairs and painting, etc.)*

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 290
of 308

Once the survey is completed and approved by the RPSC's office, (including the Building Committee for major capital improvement projects), it will, where applicable, be forwarded to the Archdiocesan Capital Assets Support Corporation, (e.g. its Deposit and Loan Chairperson) for final approval. A survey report will also be sent to the Pastor.

# Routine Maintenance Projects #

Contact the RPSC's office to discuss what the work is and the reason needed. A presentation by the Pastor normally will not be required. In general, Project Manager and/or RPSC Director can develop plans and specifications and scope of work for most types of routine maintenance projects in lieu of an architect or engineer (e.g. roofing, paving painting, new flooring, minor mechanical and electrical etc.). Project manager and/or RPSC Director can coordinate the bidding process. Project Manager and/or RPSC Director will coordinate the work. The RPSC Director can assist in troubleshooting. Plans and Specification must be complete enough for bidding purposes. Contractor selection (bidding /contract) procedures are the same as for new construction

**Procedures and Sequence** (*For New Construction and Remodel Projects Over $15,994*)

1. Send written request to the RPSC do the Director of Building & Construction requesting conceptual approval for the project.
2. An initial presentation is made by the Pastor the Building Committee (*herein referred to as the "Committee"*). Depending on the nature and scope of the proposed project the Committee may defer to the Director alone.
3. Request to be scheduled and placed on the meeting agenda must be sent at least one month prior to the next Committee meeting. The Committee currently meets on a quarterly basis or as needed. The Committee will review the presentation and the parish will be notified of the Committee's requirements, recommendations, and any additional information that is required. Any contract agreement including those valued under **$15,000** must adhere to the policies and must include the signature of the Contractor and Owner's representative.

**\*SEE ALSO the Nine Step Process** on pages **J•12 & 13 applicable to** <u>New *Building Construction*, *Renovation* or *Repair Profects in excess of $100,000*</u> and the **Six Step Process** on page **J.14 for** <u>*Building, Renovation or Repair Projects between $15,000_$100,000.*</u>

# Construction #

1. Regular meetings will be required at construction site with Parish Representative, Contractors(s) Architect/Engineer and RPSC's Director.
2. RPSC, Director and/or Project Manager will have access to all construction areas and shall be kept informed of all major developments.
3. Change Order (If the project is planned correctly, and procedures followed, the parish can anticipate a minimal number of changes). Collectively the Architect, Pastor, Project Manager and RPSC Director will sign ALL change orders up to $10,000 aggregate. When the aggregate of change orders exceeds $10,000 all further change orders shall be submitted to the RPSC's Office for approval. The RPSC's authorized officer(s) must approve anything over **$10,000.**
4. Project Manager and/or RPSC's Director will coordinate the maintenance work. The RPSC will have the authority to make any approved minor change to the work.
5. Progress Payments shall be approved by the RPSC's Director and the Architect (if applicable)

# Close out of Project #

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 291 of 308

1. Contractor completes all outstanding items on the final checklist created by architect/engineer, pastor and the RPSC's office.
2. Obtain waiver of liens from contractor and for all sub-contractors.
3. Obtain 3 project manuals from contractor, one to be sent to the RPSC's office.
4. Obtain 3 sets of equipment manuals from contractor, one to be sent to the RPSC's office.
5. Obtain 2 sets of as-built drawings from contactor and architect, one set is sent to the RPSC's office.
6. Obtain all warranties in writing from the contractor.
7. Obtain all permits & sign offs.
8. Obtain certificate of occupancy
9. Contractor to test equipment and systems in the presence of Architect, parish representative and RPSC project manager. Obtain extra materials(s) properly marked and stored.

# Final payment #

The final payment shall be approved by the architect, project manager and/or RPSC Director of Construction after all contract documents have been reviewed for compliance and project close out is complete, prior to processing for payment. Payments to be made 30 days after filing notice of completion.

# Property Insurance Claims #

**Notification:** Losses are to be reported promptly and in no case later than 15 days from the date of occurrence or first knowledge of the loss. Initial reports are to be made by telephone to the RPSC office, which will coordinate the matter with Gallagher Insurance at 415-536-8542. A Claims Coordinator handles all claims for the RPSC of San Francisco. A written report using the claim form provided to each church or school is to follow immediately. This should be sent to the claims office and RPSC:

**Arthur J. Gallagher & Co.**

**1255 Battery Street, Suite 450, San Francisco, CA 94111**

**Attention: Claims Department**

Note: Failure to notify Gallagher Insurance or the RPSC's office prior to making normal non-emergency repairs may result in denial of the claim. Police reports are required for all theft and vandalism losses.

In emergency situations initial reports may be called directly to the RPSC Office, 415-292-0800 ext. 4 or 5. Outside business hours, call Steve Kalpakoff at 415-699-7177 or Debbie Ramos at 415-987-6625. Telephone notification and a written report will still need to be made to Gallagher Insurance as soon as practicable.

**Eligibility:** A parish or school presenting a claim must be current in its payment of insurance premiums. Gallagher will call the RPSC to verify and document premium payment status prior to beginning adjustment of any claim reported, except to The extent necessary to prevent further loss of property, life or value. If premium payments are not current, authorization will be given for only those steps necessary to secure a damaged area or prevent loss of life or injury.

**Insurance Coverage:** The nature and extent of coverage shall be determined, and settlement made, in accordance with the procedures of the Archdiocese based on the provisions contained in the Archdiocese's standard policy forms. Limits of insurance applicable to specific types of property are contained in full description of the insurance program on file at the Chancery.

**The Claims Process:** All claims will be assigned a claim number. The claim number is derived from the date of the loss and location number of the church or school on the insurance schedule( e.g. a loss at Mission Dolores,

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 292 of 308

location #144, on June 21, 2016 would be assigned Claim Number 062116-144). Claim numbers must be referenced on all correspondence, bills and related documents submitted regarding a claim.

Damage to buildings will be inspected and assessed by the RPSC's Director. Depending on the level of the claim, either the Director or an outside insurance claims adjuster will

- Evaluate the "Scope" of the damage.
- Estimate the cost to repair or replace.
- Write specifications and solicit bids,
- Contact trades people to perform the work
- Coordinate with Gallagher Insurance to authorize repairs.
- Oversee the restoration process.
- Approve final bills to be submitted to the Self-Insurance Fund for payment. Bills are due from contractors no later than 30 days from date of completion.
- Consideration of Loss or damage to contents other than buildings will require:
- Identification of items lost or damaged, with original receipts if possible.
- Police report for losses due to burglary theft, or vandalism;
- Estimate of cost to repair or replace; purchase order or invoice evidencing actual repair or replacement of item(s) **Special Provisions**
- Glass and Fine Arts are covered within the blanket limit of the policy.
- A loss to any single item in excess to $2,500 shall require approval from the RSPC prior to replacement.
- Graffiti vandalism is not covered under the self-insurance program. However, if there is an occurrence that is so egregious or for some other reason ought to be covered by the SIF (Self Insurance Fund), coverage may be authorized by the Chancery on an exception basis.

Any loss, giving rise to concerns of fraud or dishonesty by an employee or volunteer shall be reported to the RPSC's Office immediately.

# Criteria & Checklist for Selection of Contractors, Architects, Engineers & Project Managers [#]

The minimum criteria that must be met by Architects, Engineers, Contractors and Project Managers are detailed in the checklist provided in this section. Additional criteria may be required as necessary on a project-by-project basis. The purpose of these criteria is not to limit choice, but to protect the RPSC and the parishes and schools owned by the RPSC. A list of approved architects, engineers and

contractors will be maintained and updated every three years. Anyone who is not on the approved list may apply to the RPSC's Office to be reviewed and if approved, added to the list.

The Criteria for Selection requires, at a minimum, architects, engineers, project managers and contractors to provide proof of appropriate state licensing or accreditation, union standing where applicable, financial stability, business experience, Waiver of Liens, and non-discrimination clauses.

A *Certificate of insurance* and related endorsement must be secured in a minimum of One to Two Million Dollars (or job value, whichever is higher) liability in such form as acceptable to Gallagher Insurance Brokers, or the current insurance carrier for the RPSC.

The project size and complexity may require that insurance **coverage for** liability and workers compensations, surety *(Performance)* bonds, errors & omissions, **be** increased. The insurance carrier will advise if this is necessary on a case-by-case basis.

**Bid Submittal**

Ali bids must be sealed and delivered by the determined due date and time to:

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 293 of 308

**Real Property Support Corporation**

**1301 Post Street,, Suite # 102, SF CA 94109**
<u>**ATTENTION:**</u> **Steve Kalpakoff, Director of Building & Construction**

**BID FOR:**_____

Bids that are faxed or °mailed will not be accepted unless approved by the Director. The Pastor, designated representative and architect **(if applicable)** are welcome to attend the bid opening. The RPSC and Architect will review contractor's proposal, qualifications, certificates of insurance and AlA Owner/Contractor Agreement for approval and forwarding to the RPSC authorized signatory (ies).

Architect or Vendor/Contractor must submit their updated Certificate of Insurance with additional insured endorsement along with a copy of their W-9.

Contact the RPSC's office for recommended selection, guidelines and recommended list of contractors and architects. Interview prospective architects and contractors. Select the lowest qualified contractor and architect, not necessarily the least expensive. A minimum of three proposals are required.

# Contract Negotiations with Architects #

**In** consultation with the pastor/principal, this takes place between the RPSC's Director and the Architect. Decide on the Architects'

scope of work. Submit required insurance certificates and submit architect/engineer proposals and qualifications and AlA Contract to the RPSC Director, for review and approval and he will forward to the appropriate corporate officer(s) for signature.

# Conceptual and Design Development #

1. Architect develops Conceptual Design in consultation with parish and in accord with Committee requirements and recommendations. (The outcome of this phase may include cost estimates, schematics and preliminary specifications).
2. Presentation of the Conceptual Design is made to the Building Committee by the Pastor and architect. (Prior to presentation send copies of plans, at least one week prior to appearing before the Committee).
3. The Architect continues to develop the Conceptual Design incorporating the Committee's recommendations, the parish recommendations and in accordance with the Committee approved schematic design. The concept design is developed into working drawings and specifications.
4. After Conceptual Design is complete, a cost estimate will be revised.
5. Give final presentation to the Committee of Working Drawings. Provide copies at least one week prior to scheduled presentation.
6. Authorization is needed from the Committee, via the Director, to proceed with construction documents.
7. Architect responds to all recommendations from the Committee for construction documents and receives final approval, by letter from the Chairman of the Building Committee before proceeding to bid.
8. Architects must meet the minimum criteria listed below. Additional criteria may be required as necessary on a project-byproject basis. The purpose of these criteria is not to limit choices, but to protect the parishes and schools owned by the RPSC
9. A list of approved architects will be maintained and updated every three years. A professional not currently on the approved list may still be considered for work on a project so long as the necessary criteria are met.

| <u>CATEGORY</u> | <u>CIRCLE</u> |
|---|---|
| *LICENSE:* | **Can Architect present valid state AlA license?** |

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 294 of 308

*FINANCIAL:*            **Can Architect provide proof of financial stability?**

- Provide Credit References?
- Provide Bank References?

vᐧ Provide last three years of income statements?

*EXPERIENCE:*       **Can Architect provide proof of business experience?**

- Number of years in business (minimum five)?
- Number of years operating under this name?
- Submit a minimum of 3 references with similar project description?

*INSURANCE:*            **Does the Architect have adequate insurance protection?**

- Provide Certificate of Insurance for Errors & Omissions?
  ($1 —2 million or job value (whichever is higher)
- Coverage must be 'occurrence" not 'claims made'
- Provide written approval by *Gallagher Insurance*                    Y      N

*Brokers* for the above coverage?                                          Y      N

**PROJECT MANAGEMENT:** *Does* **the Architect have adequate project management staff?**

- Engineers or consultants?
- Coordinate with contractor?

# Determine qualifications #

Contact the RPSC's Office for recommended selection guidelines and approved list of contractors. Select at least three of the most qualified contractors for the project to bid on it.

# Approval of contractors #

The RPSC's Director coordinates the day and time for a mandatory bid walk (ˋwalk through) at proposed project site with all bidding

contractors, parish and architect. Allow 1-3 weeks for bid preparation from contractors. The Contractors submit their sealed bids which also includes the list of subcontractors and certificates of insurance for all subcontractors.

Contractors must meet the minimum criteria listed below. Additional criteria may be required as necessary on a project-by-project basis. The purpose of these criteria is not to limit choices, but to protect the parishes and schools owned by the RPSC. A list of approved contractors will be maintained and updated every three years. A professional not currency on the approved list may still be considered for work on a project so long as the necessary criteria are met.

**CATEGORY**                                                   **CIRCLE**

*LICENSE:*                **Can contractor present valid state contractor license?**

*UNION (where applicable):*

- Is contractor in good standing with the applicable union(s)?
- Are subcontractors in good standing?

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 295 of 308

*FINANCIAL:* **Can contractor provide proof of financial stability?**                    Y        N

- 7 Provide Bank References?                                              Y        N
- Provide last three years of income statements?              Y        N

*EXPERIENCE:*        **Can contractor provide proof of business experience?**

- Number of years in business (minimum five)?
- Number of years operating under this name?
- Submit a minimum of 3 references with similar project description.

*INSURANCE*   **Does contractor have adequate insurance protection?**

- Provide Certificate of Insurance for liability coverage
  of $1 -2 million or job value (whichever is higher)
- Provide proof of Workers Compensation coverage
- Provide written approval by *Gallagher Insurance*      Y        N
  *Brokers* for the above coverage

*BONDS (where applicable):* **Does contractor meet bonding requirement?**

(Normally required on projects over $500,000)

- Is contractor bondable?
- Provide surety (performance) bond (required for new or remodel projects)?            Y
- Does contractor agree to a Waiver of Liens?

Engineers must meet the minimum criteria listed below. Additional criteria may be required as necessary on a project-by-project basis. The purpose of these criteria is not to limit choices, but to protect the parishes and schools owned by the RPSC. A list of approved engineers will be maintained by the RPSC office and updated every three years. A professional not currently on the approved list may still be considered for work on a project so long as the necessary criteria are met and is approved by the RPSC office.

**CATEGORY CIRCLE**

*LICENSE:*        **Can engineer present valid state license?**

*FINANCIAL:*        **Can engineer provide proof of financial stability?**                    Y        N

- Provide Credit References?                                    Y        N
- Provide Bank References?                                      Y        N
- Provide last three years of income statements?        Y        N

*EXPERIENCE:*        **Can engineer provide proof of business experience?**

- Number of years in business (minimum five)?
- Number of years operating under this name?
- Submit a minimum of 3 references with similar project description?

*INSURANCE:*                **Does contractor have adequate insurance protection?**            Y        N

- Provide Certificate of Insurance Errors & Omissions?
- $1-2 million or job valued (whichever is higher)
- Provide written approval by Gallagher Insurance Brokers for the above coverage? Y N

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 296 of 308

Project Managers must meet the minimum criteria listed below. Additional criteria may be required as necessary on a project-by-project basis. The purpose of these criteria is not to limit choices, but to protect the parishes and schools owned by the RPSC. A list of approved Project Managers will be maintained by the RPSC office and updated every three years. A professional not currently on the approved list may still be considered for work on a project so long as the necessary criteria are met and is approved by the RPSC office.

## CATEGORY CIRCLE

*FINANCIAL:*          **Can Project Manager provide proof of financial stability?**          Y          *N*

- Provide Credit References?                         Y          N
- Provide Bank References?                          Y          N

V Provide last three years of income statements?                                Y          N

*EXPERIENCE:* **Can Project Manager provide proof of Business Experience?**

- Number Of years in business (minimum five)?
- Number of years operating under this name?
- Submit a minimum of 3 references with similar project description?

*INSURANCE:* **Does Project Manager have adequate insurance protection?**

- Provide Certificate of Insurance Errors & Omissions?
  ($1-2 million or job valued (whichever is higher)
- Provide written approval by *Gallagher Insurance Brokers* for the above coverage?

The following specific steps apply to any proposed NEW Building Construction and Building Renovation (as opposed to routine deferred maintenance) projects in excess of $100,000.00. (NOTE: All maintenance and repair work of any nature OVER $15,000 must be coordinated through my office). Upon completion of STEP ONE (Submittal of Detailed Proposal), we will review and proceed to the next listed STEPS. If there are any questions, do not hesitate to contact our office for further guidance. Thank you for your anticipated understanding and assistance.

**PREAMBLE:** *There are a number of important items that must be considered before determining if, and to what extent, a proposed major parishlschool project may proceed. These include such things as current demographics, the parish's I school's long term viability, fundraising feasibility studies, realistic budgets, practicality/buildable nature of buildings, financial health and accountability of parish/school, ability to obtain any necessary loans etc. The following steps have been established to address these issues in a timely and cost efficient manner. Please review and follow them carefully.*

## STEP ONE *(Submittal of Detailed Proposal)*

Send to the Archdiocese of San Francisco — Real Property Support Corporation's (RPSC) Building Committee *(c/o Steve Kalpakoff, Director)* a detailed description of the proposed project, including:

1. The Building Type
2. Purpose/Intent
3. User Groups
4. Area/Square Footage
5. Budget *(List sources of current funding and assumable revenue generated (if any), foreseen operational costs and estimated budget range for loan payments).*
6. Fundraising Feasibility Study

The RPSC *(Steve Kalpakoff)* will evaluate the information to assist the Parish/School in retaining a qualified and informed Architect.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 297 of 308

*FEPTWOSelectinanArcln87dPrearationofPrelint__IiinaSchematics*

After the RPSC *(Steve Kalpakoff)* has obtained the requisite preliminary Canonical conceptual approval from the applicable Pastoral Center representative of the Archbishop *(i.e. the Moderator of the Curia following his consultation with the Capital Assets Support Corporation (CASC) concerning assets on hand/loan possibilities, etc.)* about the proposed nature and extent of the project *(outlined in* **STEP** ONE the RPSC will provide the Parish/School with direction concerning the hiring of an Architect *(NOTE that RPSC officer(s) must approve and sign the Architect contract)*. An Architect will be selected to prepare a simple set of preliminary schematic designs

after the Parish/School **first** makes an affirmative commitment of a minimum of $100,000.00 from Parish/School funds *(via a 'certification of fundeconfirmation* from the Capital Assets Support Corporation to the RPSC to cover the costs of the Architect's preliminary design

work, as well as any more detailed schematics, building permit drawings, preliminary plans, specifications and construction drawings that may be later authorized, pursuant to **STEPS THREE, FOUR** and **FIVE.)**

**STEP THREE** *(Conditional Loan Application/Approval)*

Insofar as financial ability is a critical factor in the determination as to whether a project ultimately will be permitted to proceed, the parishlschool will apply for a loan, if needed, with the CASC. Any loan approval at this stage will be preliminary only. That is, it will be conditioned upon the necessary reviews and approvals set forth in **STEPS FOUR** through **EIGHT.**

**STEP FOUR** *(Architect's Presentation to the Building Committee)*

The Architect and Parish/School Representative (typically the Pastor/Principal and Finance Council Chair at a minimum) will contact the RPSC to schedule a meeting with the Building Committee to present the Preliminary Schematics and related budget and funding sources (e.g. *proposed Capital Campaign I Conditional Loan Application Approval.*

**STEP FIVE** *(Preparation and Presentation of Detailed Designs and Plans)*

*IF* the Building Committee and Archbishop's Pastoral Center representative *(Moderator* of *the Curia)* concur, in principle, with the feasibility of the project *(outlined in* **STEP FOUR)** then the Building Committee will request that the Architect prepare the following:

- A full, detailed set of Schematic Designs
- Preliminary Plans and Specifications
- Building Permit Drawings
- Constructions Drawings and Specifications

The Parish/School understands the possible necessity of re-designing the above referenced documents based on comments *(e.g, pertaining to cost analysis)* by the Building Committee and, accordingly, the possibility of submitting a revised budget.

**STEP SIX** *(Final Canonical Approval of Archbishop, through the Office of the Moderator of the Curia, and Determination* of *Heeded Consultants/Contractorsi*

After the process in **STEP FIVE** is completed the Building Committee will make its recommendation to the Archbishop. **IF** the Archbishop *(through the Moderator of the Curia)* then provides the requisite final canonical approval to proceed with the project *(and subject to final loan approval and compliance with* **STEPS SEVEN and EIGHT)** the Building Committee will work with the Architect to select the appropriate consultants and contractors (subject to the Archdiocese's competitive bid policies and procedures).STEP **SEVEN** *(Competitive Bid Process)* After the drawings have been completed, RPSC will coordinate with the Parish the Pre-Qualification' and selection of contractors who will bid the project. After bids are received and qualified by the

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 298
of 308

RPSC *(Building Committee)*, the total dollar amount for the project will be established and *a Certificate of Funds* form *(outlined in* **STEP EIGHT***)* will need to be completed.

## STEP EIGHT *(Certificate of Funds)*

*IF* the RPSC receives confirmation from the CASC *(via a signed Certification of Funds form)* that the necessary funds are on hand, and are authorized by the Parish/School for distribution, the 'Competitive Bid' process for the various consultants and contractors will begin, and the authorized RPSC officers will review and sign the applicable contracts. *(Projects* <u>exceeding</u> *$100,000 will require the signature of the Parish Finance Council Chairperson.*

## STEP NINE *(Payment of Consultants and Contractors)*

All Consultant/Contractor requests for payment *(or Change Order requests —* COR) **MUST** be forwarded directly to RPSC *(Steve Kalpakoff)* for review and approval. After Steve receives the concurrence of the Parish/School, the Payment Application/Invoice will be forwarded to CASC for **DIRECT** payment to the applicable Consultant/Contractor.

**NOTE:** **It is** *critical* **that ALL BILLS be paid solely and directly by the CASC** *(i.e. no payments are to be paid by the Parishes followed by a request from the Parish to CASC for reimbursement)*. **Otherwise, it is virtually impossible for the Parish/School, CASC, RPSC and/or auditors to compile efficient and accurate account/budget reconciliation.**

**PREAMBLE** *There are a number of important items that must be considered before determining if, and to what extent, a proposed major parish/school project may proceed. These include such things as current demographics, practicality, buildable capacity of buildings and proof of adequate funding sources, The following steps have been established for any proposed construction, renovation or repairs* <u>between $15,000 and $100,000.</u> *The focus of this document is the project tracking, financing and payment process for these projects. Please refer to the RPSC's Construction, Renovation and Maintenance Policies and Procedures for comprehensive guidance on all projects, of any size. Note: All initial paperwork will be sent to the Pastor at the Parish/School. If the Pastor then defers to the Principal to complete the process, the Pastor will nevertheless be cc'd on all signed documents, vendor correspondence, etc. \*PLEASE* **NOTE:** *Regardless of whether the Pastor, Principal or President fills out the form, CASC requires that any withdrawal of parochial Parish/School funds from CAW or any Certificate of Project Completion form if CASC funds are involved, must be authorized by the Pastor as evidenced by his signature in the applicable space* **on** *the COF/Certlfkate of Project Completion form.*

## STEP ONE *(Submittal of Detailed Proposal)*

Submit the following documents to the Archdiocese of San Francisco — Real Property Support Corporation's (RPSC) Building Committee *(c/o Steve Kalpakoff, Director of Building & Construction)* to evaluate the detailed description of the proposed project and to assist the Parish/School in retaining a qualified Architect, General Contractor or Vendor:

 a. The building type; purpose/intent; area/square footage
 b. Scope of Work describing the project
 c. Budget *(List sources of current funding and assumable revenue generated (if any), foreseen operational costs and estimated budget range for loan payments);* also Fundraising Feasibility Study, letters from Donors, etc. (if any).

## STEP TWO *(Selecting an Architect or General Contractor or Vendor)*

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 299 of 308

**> *For Architects Engineers:*** If selection of an Architect or Engineer is required, the Pastor, Principal, President or a designated representative must contact RPSC to review the criteria process. RPSC will provide guidelines outlining the 'Scope of Services' that must accompany all proposals and will recommend Architects I Engineers from the approved list of Vendors. ***NOTE: Only RPSC officer(s) will approve and sign the contract.> *For General Contractors I Vendors:*** When a selection of a General Contractor / Vendor is required, the Pastor, Principal, President or a designated representative must contact RPSC to review the criteria process. RPSC will provide a recommended list of pre-qualified contractors to bid the project. RPSC will provide guidelines for the "Scope of Work" and upon receipt will review the scope of services, specifications and bid documents. If the Parish/School has a Vendor they would like to include in the bid process for the proposed project, the Vendor must first be qualified and approved by RPSC. ***NOTE: Only RPSC officer(s) will approve and sign the contract***.

**STEP THREE** *(Competitive Bid Process)*

If applicable, once the drawings or specifications have been completed, RPSC will coordinate with the Parish/School the 'Pre-Qualification' and selection of Architects or contractors who will bid the project. After bids are received and qualified by the RPSC the total dollar amount for the project will be established and *a Certificate of Funds* form will need to be completed.

**STEP FOUR** *(Certificate **of** Funds)*

RPSC will provide a Certificate of Funds form to the Parish/School to be completed and returned to us for final review. Upon confirmation of funding and approval is granted, a contract will be generated and signed by RPSC. *(Projects **exceeding** $100,000 will require the signature of the Parish Finance Council Chairperson*. **–**

***For Loan Application/Approval:*** Insofar as financial ability is a critical factor in the determination as to whether a project ultimately will be permitted to proceed, a parish/school may need to apply for a loan with CASC. Any loan approval at this stage will be conditioned upon the necessary reviews and approvals. The COF will not be finalized until the loan has been approved. Please allow sufficient time to obtain a loan before starling a project

**STEP FIVE** *(NA Agreements and Contracts)*

Agreements or contracts are executed and signed by RPSC's Officers. Contracts below $15,000 may be signed by the Pastor, Principal or President. A signed copy of the COF accompanied with a fully signed and executed MA Agreement will be sent to the Parish/School confirming the funding is secured and the project may commence.

**STEP *SIX* (*Payment of Consultants and Contractors*)**

All Consultant/Contractor requests for payment **MUST** be forwarded directly to RPSC *(Steve Kalpakoff)* for review and approval. Upon receipt of authorization of payment by the Pastor, Principal or President the Payment Application/Invoice will either be paid by the Parish or through CASC to the applicable Vendor. *\*A status report of all invoices processed will be provided to the Parish/School upon request*.

# INSTRUCTIONS: CERTIFICATE OF FUNDS form (COF) [#]

The Certificate of Funds form identifies funding sources to be applied towards a specific project in excess of $15,000. For projects between ( 5,000 – $100,000, Parishes/Schools will have the option to pay the Architect, General Contractor or Vendor directly as noted in . *art 2* of the COF form. Both the RPSC and CASC offices will review, confirm and approve secured funding prior to initiating any preliminary process or execution of contracts related to your project. Any inaccurate or incomplete information will delay the project's commencement date and/or issuance of payment to the contractor/vendor in a timely manner. Submit completed Certificate of Funds form to RPSC for further processing. No project can be started without **final** confirmation of financial arrangements. All AIA agreements, contracts or proposals exceeding $15,000 must be signed by RPSC. *(Projects **exceeding** $100,000 will require the signature of the Parish Finance Council Chairperson AND will*

Case: 23-30564     Doc# 610-3     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 300 of 308

*follow RPSC's policy whereby Architects, General Contractors or vendor will be paid directly from a designated project funding account by CASC).*

## PART 1 PROJECTED COST OF PROJECT

**Line I** is the base contract amount. If there is more than one contract, add up the totals for the projected Hard Costs. **Line 2** is the total amounts for all soft costs (architectural, consulting fees, permits, etc.)

**Line 3** is the totals for furniture, fixture and equipment towards the project (FFE)

**Line 4** is the MINIMUM contingency amount for any unforeseen condition.

**Line 5** is the projected *BRANDIOTALLOST* for this project

## PART 2 PROJECT PAYMENT OPTIONS

### A. Pay by Parish/School Options

- **Parish/School Bank Account:** Attach a current bank statement verifying and confirming funds will be available for the total project to pay the vendor directly in a timely manner in accordance with the contract and a letter from the Pastor/Principal/President restricting these funds for the exact project amount for this specific project.
- **Withdraw funds from CASC Parish Deposit Account:** To request a withdrawal from CASC Deposit Account **to** fund vendor payment by

he Parish/School, attach a copy of your most recent CASC monthly deposit statement verifying funds. CASC will then cut a check to the

,brishiSchool. Complete the COF with the CASC parish deposit account(s) number and the amount to be withdrawn. The Parish/School is

responsible to have all funds available to pay vendor for the total project directly once the check has been issued.

*(NOTE: Funds in an open CASC Project Funding Account **cannot** be used towards another Project or Project Funding Account. To close a CASC Project Funding Account please complete the Project Completion Notice (CPC) provided by RPSC. All Project Funding Account closures require signatures from Steve Kalpakoff (RPSC) and Pastor/President/Principal on the (CPC) form).*

### B. Pay by CASC Prolect Funding Account Options: *(Must complete PART 3)*

- **Project Funded by Check:** Attach a check for the project cost to be deposited with CASC. CASC will then set up a Project Funding Account to be used solely for CASC to pay the vendors directly for the project. Payment requests with be submitted and approved by RPSC.
- **Project Funded by CASC Deposit Account:** Funds will be transferred from a CASC Parish/School Deposit Account (s) to CASC Project Funding Account to fund the project cost. The account number and dollar amount of the CASC Parish/School Deposit Account from which the funds are being transferred from must be provided.
- **Project Funded by CASC Loan:** Please contact CASC (415) 292-3600 to request a loan to finance project. CASC will guide Pastor, President or Principal through the loan application process and requirements. Loan must be approved before the COF can be **finalized.**

**\*PLEASE NOTE: Regardless of whether the Pastor, Principal or President fills out the form, CASC requires that any withdrawal of parochial Parish/School funds from CASC or any Certificate of Project Completion form if CASC funds are involved, must be authorized by the Pastor as evidenced by his signature in the applicable space on the COFlCertificate of Project Completion form.**

**PART 3 PROJECT COST FINANCING (for *projects being paid by CASC's Project Funding Account (PFA*)**

- **CASC Parish/School Deposit Account:** Provide the CASC Deposit Account number from which the funds will be transferred to a PM.
- **CASC Parish/School Deposit Name:** Provide the CASC Deposit Account from which the funds will be transferred to a PFA.
- **Total Account Balance:** Provide the date of statement and total account balance of the most recent statement received.
- **Balance of Account Encumbered to Project:** Provide the amount of funds from the CASC Deposit Account towards the project.
- **Subtotal:** Subtotal the totals from the CASC Deposit Account(s).

# INSTRUCTIONS: CERTIFICATE OF PROJECT COMPLETION CPC1 #

Certificate of Project Completion (CPC) is a notification to all parties (Parish, School, RPSC and CASC) that the project is completed. This allows time for RPSC to request from the Vendors all required close-out documents **BEFORE** the final payment or retention invoices amount can be processed and released for payment. Do not submit this form until the project has been completed and there are no further invoices to be anticipated after this final payment.

**STEP** Parish or School will contact RPSC with the project completion status. RPSC will provide a final report of invoices paid.

**STEP 2** RPSC will initiate proceedings to obtain all required Close-Out submittal documents as listed in STEP 2 on form:

One set to be sent to the Parish or School and the other set to be sent to RPSC.7 Invoice or Application for Payment reflecting final amount due or Retention amount due if it not yet submitted

**STEP 3** Once the final invoice or retention has been processed and paid and all close-out documents submitted to the Parish and RPSC, the Pastor, Principal or President will need to sign the Certificate of Project Completion form and return to RPSC.

**FINAL AUTHORIZATION** is verification and confirmation that the project has been completed and is considered 'closed'. Any unused project funds you wish to have reimbursed or transferred back to the Parish can be indicated by checking the appropriate box on the form. This request will require the signature of the Pastor, Principal or President. Be sure to provide CASC a copy of the Certificate of Project Completion via Fax or email for final steps to close out project account.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 302 of 308

# EXHIBIT 15

# Policy and Guidelines for Childcare/Preschool Programs in Parishes of the Archdiocese of San Francisco

In light of the growing and crucial need for quality childcare/preschool programs in our society, it is the policy of the Archdiocese of San Francisco to promote and facilitate such programs. Listed below are the types of programs parishes might participate in and the guidelines that pertain to them. Parishes are to consult with the Department of Catholic Schools, Superintendent of Schools, before pursuing any such program.

## TYPES OF PROGRAMS

- **Programs Run Directly by the Parish School** (*In Parishes where there is no parochial school the words "Parish" and Pastor" should be substituted for the words "School" and Principal).*

Under this arrangement, the School would obtain appropriate licensing through the State and would directly run the Childcare Program. No separate corporations are necessary or appropriate for this purpose. Rather, the school program would be sponsored by the corporate operator of the schools, The Roman Catholic Archbishop of San Francisco, A Corporation Sole. Each program would be required to have a qualified director, responsible to the Principal, and an Advisory Board that would assist the Director and Principal.

   a. **Clarification of Roles.** Basic job descriptions should be developed in accordance with personnel guidelines in the Parish. The Department of Catholic Schools can assist in developing "job descriptions" for advisory board members, as well as providing training and technical assistance.

   b. **Structure/Lines of Accountability.** Problems/grievances should be resolved in accordance with an agreed-upon process, as indicated in the following "chain of command":

Local State Licensing Office

Principal

Center Director

Parent

Pastor & Department of Catholic Schools

Advisory Board

- **Programs Run by Independent Organizations.** Licensed, independent, nonprofit organizations specializing in childcare/preschool may be encouraged to rent Parish facilities at full or nominal cost (as the Parish wishes) subject to the following: the organization must sign a standard Archdiocesan written lease (requiring, among other things, its compliance with all applicable licensing and building code requirements and providing adequate liability and insurance protection to the Parish/Archdiocese). Lease forms are available through the Archdiocesan Real Property Support Corporation. Such leases must be reviewed in advance by the Archdiocesan Legal Counsel and signed by the authorized corporate officials of the Archdiocesan Real Property Support Corporation.
- **Programs Organized and Run by Parishioners.** In some cases, parishioners, parent cooperatives, or other types of groups may express a desire to develop licensed programs on their own. Parishes may wish to facilitate the use of Parish space for such programs. However, these programs must be operated entirely by separate corporations/organizations that are not subject to the direction, control, payroll, etc., of the

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 304 of 308

Archdiocese/Parish, and such programs would be subject to the same requirements listed in Option 2 above.

**SPECIAL NOTES REGARDING SCHOOL-SPONSORED EXTENDED CARE PROGRAMS AND CHILD SITTING DURING MASS TIME**

1. **School Extended Care Programs**. Childcare is both legally and technically distinct from school-sponsored extended care programs which are coordinated through the Department of Catholic Schools. Private schools are exempt from licensing requirements **only** for extended care programs: that is, on-site, school-operated programs before or after school which serve kindergarten (4.9 years of age or older) through 8th grade students enrolled at the Parish school.

2. **Child Sitting Service During Mass Time.** The Pastoral Plan for the Archdiocese of San Francisco recommends "Parishes should provide child-care opportunities so that young parents can attend Mass in a prayerful spirit".

The Community Care Licensing Division of the California Department of Social Service advises that no licensing is required for Mass-time Childcare so long as it is provided on the premises where the parents are. However, in setting up any such Mass-time program, please follow the procedures set forth below (which reflect existing policies applicable to various other types of Parish programs).

a. Any paid supervisor or sitter must be paid by the Parish, not the parents, and appropriate tax withholdings must be taken out. (Parishioners can make donations to the Parish to support the program.)

b. Any paid or regular adult volunteer sitter or supervisor (i.e., as opposed to the use of a large, and frequently rotating, pool of well-known individuals) must be fingerprinted and all regular employees and volunteers, whether adult or minors, must participate in the Archdiocese's Safe Environment Training Program.

c. As with any good licensed childcare or youth program, there must be some form of accessible adult supervision of the overall program (e.g., the Director of Religious Education), as well as an appropriate parental "drop-in" policy.

For more information on program facilitation and childcare alternatives, contact the Superintendent of Schools, Department of Catholic Schools, 415 (614-5666)

Those who feel they have a program currently in operation that does not meet the above criteria should contact Mr. Jack Hammel, Legal Counsel, Archdiocese of San Francisco (415.614.5623), to assist in bringing the program into conformance as soon as possible

**OVERVIEW OF OPTIONS FOR CHILDCARE CENTERS AT THE PARISH**

As Parishes determine how they want to support Childcare Programs at the Parish level, there are three options available. The three options refer to programs housed in Parish facilities.

**I. ALL PROGRAMS ON PARISH GROUNDS**

No matter which option for Parish-housed programs a Parish chooses, the following would hold true.

~~ Programs need to be licensed by Community Care Licensing.

~~ Programs should have an informed, responsible Advisory Board.

~~ All programs would have equal access to free training and technical assistance from the Childcare Switchboard, the Childcare Law Center, and the Archdiocesan Department of Catholic Schools.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 305 of 308

~~ All legal contracts involving the Parish need to be reviewed by the Archdiocesan Legal Counsel.

A. **Parish-Run Programs**

**Pros:**

~ Clear ministry of the Church.

~ Inspires more confidence in parents because it is "church-sponsored". ~ Can include religious instruction as part of the program.

~ Can offer parishioners priority for admission.

~ Program is covered under Archdiocesan insurance plan, which means significant financial savings for the program.

**Cons**

~ Lines of accountability/responsibility can be unclear. ~ Archdiocese is legally responsible if a problem arises.

~ Ineligible for most local, state or federal funding if sectarian. ~ More clearly the financial responsibility of the Parish.

- **Parishioner-Sponsored, Separately Incorporated Programs.**

**Pros:**

~ Lines of accountability clearer.

~ Archdiocese is protected from legal liability.

~ Eligible for most local, state, or federal funding if not sectarian. ~ Encourages more financial self-sufficiency.

**Cons**

~ Needs separate insurance coverage, which is expensive. ~ Less clearly identified as a ministry of the Parish.

- **Leasing to Existing Nonprofit Programs**

**Pros**

~ Existing programs have experience and track record at providing financially sound childcare.

~ Would be a source of modest revenue to the Parish, while providing services. ~ Many excellent programs are looking for space to move/expand their services.

**Cons**

~ No control over policies, admission guidelines or tuition once lease is signed. ~ Little Parish identity.

**RECOMMENDATIONS FOR PARISH-RUN CHILDCARE CENTERS**

For Parishes that choose to run a childcare program directly, we would recommend the following guidelines:

**Advisory Board**

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 306 of 308

We strongly recommend that each Parish interested in operating a Childcare Center directly convene an Advisory Board that would assist the Principal in providing adequate oversight to the program. The role of the Advisory Board would be to provide programmatic oversight, help resolve concerns, assist with Center fundraising, and contribute technical assistance. Potential Board members could include parent representatives, representative of school (especially if space is shared), Parish staff, and others with expertise in fundraising, accounting, children's services, etc.

**Accountability**

The Principal would be responsible for hiring/firing and evaluating the Center Director. He/she should do that in consultation with the Advisory Board and the Archdiocesan Human Resources Office, and the Department of Catholic Schools.

**Support Services**

The Archdiocesan Department of Catholic Schools will provide technical assistance to Parishes interested in opening and operating a Childcare Center, including contemplating the licensing process and convening an Advisory Board. Superintendent of Schools, Department of Catholic Schools, will assist and support Principals or Childcare Directors with the educational component of the program.

**Conformity to Licensing Regulations**

Community Care Licensing of the State Department of Social Services is responsible for licensing and monitoring all Childcare Centers on an at-least annual basis to assure compliance with state childcare regulations.

**Insurance**

Parish-run Childcare Programs would be covered under the Archdiocesan insurance policy.

**POLICY AND GUIDELINES FOR CHILDCARE/PRESCHOOL PROGRAMS IN PARISHES OF THE ARCHDIOCESE OF SAN FRANCISCO**

**ADDENDUM**

**Family Day Care.** Parishes can serve as a resource for assisting parishioners and their neighbors in making Family Day Care arrangements. Family Day Care Homes must be licensed by the State Department of Social Services. The license must be renewed every three years and provides for basic health and safety standards.

**DEFINITIONS PERTAINING TO FAMILY DAY CARE:**

**Family Day Care:**

Small group care for children from two or more families (in addition to the caregiver's own children) provided in the caregiver's home for less that 24 hours per day. There are two types of licenses:

**Small Family Day Care Home:**

Care for a maximum of six children, including three infants.

**Large Family Day Care Home:**

Care for 7 – 12 children, including four infants (must have adult assistant).

**II. FAMILY DAY CARE HOMES**

Case: 23-30564   Doc# 610-3   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 307 of 308

The Parish community can serve as a resource in assisting parishioners and neighbors in making day care arrangements, without having to provide a program in Parish facilities. Family Day Care is small group care for the children from two or more families (in addition to the caregiver's own), provided in the caregiver's home. Programs usually serve from 6 to 12 children, and often care for infants, as well as preschool-age children. The Parish can help identify potential Day Care homes and help link them with appropriate resources to get licensed and established. Moreover, they can help publicize these programs in the wider community, though care should be taken to emphasize that these programs are not under the auspices of the parish and that interested persons should check directly with the licensing authorities to determine the program's licensing status, experiences, qualifications, etc…

Family Day Care Homes must also be licensed by Community Care Licensing, although that is the responsibility of the person providing care in their home.

**Pros:**

- It can help interested parishioners stay home with their own children while caring for others.
- It can provide a source of income for families.
- It does not require space in Parish facilities.
- The licensing requirements are not at stringent as for Childcare Centers.
- They would be eligible for state and federal funds.
- Specialized programs could be developed to provide sick child, school break,respite, or other kinds of specialized or emergency care.
- Many parents prefer having their children in smaller, more homelike settings, usually close to home.

**Cons:**

- Harder to monitor. Services smaller numbers of children
- Programs differ widely with regards to philosophy and level of care. Financially more vulnerable.

Case: 23-30564    Doc# 610-3    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 308 of 308