# EXHIBIT 16

# Archdiocese of San Francisco

# Cemetery Department Advisory Board

Bylaws – Adopted March 10, 1999; revised November 22, 2011

## Preface

For centuries the Catholic Cemetery has been an integral part of the religious faith and devotion of the Catholic Church. It is a sacred place of prayer, reflection, and devotion, in which the remains of deceased members of the Catholic Community are laid to rest with Christian reverence and respect.

## Statement of Purpose

It is the duty of the Cemetery Department Advisory Board (herein after referred to as The Board) to ensure that this traditional responsibility is carried out in the Archdiocese of San Francisco through its Cemetery Department in a manner befitting a corporal work of mercy. In fulfilling this responsibility, the Board functions as an advisory to the Ordinary of the Archdiocese in Cemetery matters.

### Members:

The Board shall be made up of at least seven members. Two members are permanently assigned by the Archbishop: one the Director of Cemeteries and the other the Archbishop's representative 9i.e Vicar of Administration). The other members at large may be appointed by the Archbishop and/or Director of Cemeteries, or by majority vote of the existing board members. The board shall reflect a diversity of expertise in its membership.

### Terms of Service:

Each of the members at large will be appointed to a three-year term. Terms will be staggered so that each year the term of two/three members will be completed. (Initially two would be appointed to a one-year term, two to a two-year term and three to a three-year term). Members at large may be appointed to two consecutive terms.

### Officers:

The Chairman of the Board will be the Director of Cemeteries who schedules and conducts the meetings. The Archbishop's representative shall be the Vice Chairman and shall function in the absence of the Chairman. The Secretary shall be a non-voting position appointed by the Chairman.

### Quorum:

One more than half of the board membership will constitute a quorum.

## Frequency of Meetings:

Board meetings will be held not less than semi-annually to review the business of the Catholic Cemeteries. Special meetings may be called by any Board member through the Chairman.

## Notice of Meetings:

Notice of the date and location of meetings shall be sent by the Chairman to all Board members at least two weeks prior to said meeting.

## Duties of the Board:

Review the activities of the cemetery to include, but no limited to the review of construction projects, land disposal or acquisitions, any long-term commitments that the cemeteries are considering (leases, etc.), and any material changes to the organization. Consider new and innovative methods of operation, administration, construction and other matters that may influence the cemeteries.

## Voting:

Each of the members of the board will have one vote. Matters before the Board shall be approved by simple majority of the members present at the meeting, as long as a quorum has been obtained. In the event of a tie vote, the chairman will cast the deciding vote.

## Committees:

The Chairman may designate Standing, Ad Hoc, or Special committees in the nature and in such numbers as the Board shall from time to time deem necessary. Each committee will consist of two or more Directors and such other individuals as may be appointed by a majority of the Directors. Committees shall be solely advisory in nature and may not act on behalf of the Board, but may make recommendations to the Board.

## Absenteeism:

If any Board member shall miss two consecutive meetings with unexcused absences, this member will be deemed to have resigned from the Board.

## Procedures:

All Board meetings shall be conducted by the Chairman, of Vice Chairman in the absence of the Chairman. Meetings shall be conducted in accordance with Roberts Rules of Order.

## Amendments:

Existing provisions of these bylaws may, from time to time, be amended, altered, changed or repealed by Resolution at any regular scheduled meeting by a majority of not less than two thirds of the members present, provided the amendment has been submitted to the membership in writing at least two weeks prior to the meeting.

# ARCHDIOCESE OF SAN FRANCISCO

## CEMETERY DEPARTMENT ADVISORY BOARD

### Bylaws - Adopted March 10, 1999

### Preface

For centuries the Catholic Cemetery has been an integral part of the religious faith and devotion of the Catholic Church. It is a sacred place of prayer, reflection, and devotion, in which the remains of deceased members of the Catholic Community are laid to rest with Christian reverence and respect.

### Statement of Purpose

It is the duty of the Cemetery Department Advisory Board (herein after referred to as The Board) to ensure that this traditional responsibility is carried out in the Archdiocese of San Francisco through its Cemetery Department in a manner befitting a corporal work of mercy. In fulfilling this responsibility, the Board functions as an advisory to the Ordinary of the Archdiocese in Cemetery matters.

**Members:** The Board shall be made up of nine members. Two members are permanently assigned by the Archbishop: one the Director of Cemeteries and the other the Archbishop's representative (i.e. Vicar of Administration). The other seven members at large may be appointed by the Archbishop and/or Director of Cemeteries, or by majority vote of the existing Board members. The Board shall reflect a diversity of expertise in its membership.

**Terms of Service:** Each of the members at large will be appointed to a three-year term. Terms will be staggered so that each year the term of two/three members will be completed. (Initially two would be appointed to a one-year term, two to a two-year term and three to a three-year term). Members at large may be appointed to two consecutive terms.

### Officers:

The Chairman of the Board will be the Director of Cemeteries who schedules and conducts the meetings. The Archbishop's representative shall be the Vice Chairman and shall function in the absence of the Chairman.

**The Secretary** shall be a non-voting position appointed by the Chairman.

**Quorum:** One more than half of the board membership will constitute a quorum.

CEMETERIES 00003

**Frequency of Meetings:** Board meetings will be held not less than semi-annually to review the business of the Catholic Cemeteries.

Special meetings may be called by any Board member through the Chairman.

**Notice of Meetings:** Notice of the date and location of meetings shall be sent by the Chairman to all Board members at least two weeks prior to said meeting.

**Duties of the Board:**

Review the activities of the cemetery to include, but not limited to the review of construction projects, land disposal or acquisitions, any long-term commitments that the cemeteries are considering (leases, etc.), and any material changes to the organization.

Consider new and innovative methods of operation, administration, construction and other matters that may influence the cemeteries.

**Voting:** Each of the nine members of the board will have one vote. Matters before the Board shall be approved by simple majority of the members present at the meeting, as long as a quorum has been obtained. In the event of a tie vote, the chairman will cast the deciding vote.

**Committees:** The Chairman may designate Standing, Ad Hoc, or Special committees in the nature and in such numbers as the Board shall from time to time deem necessary. Each committee will consist of two or more Directors and such other individuals as may be appointed by a majority of the Directors. Committees shall be solely advisory in nature and may not act on behalf of the Board, but may make recommendations to the Board.

**Absenteeism:** If any Board member shall miss two consecutive meetings with unexcused absences, this member will be deemed to have resigned from the Board.

**Procedures:** All Board meetings shall be conducted by the Chairman, or Vice Chairman in the absence of the Chairman. Meetings shall be conducted in accordance with Roberts Rules of Order.

**Amendments:** Existing provisions of these bylaws may, from time to time, be amended, altered, changed or repealed by Resolution at any regular scheduled meeting by a majority of not less than two thirds of the members present, provided the amendment has been submitted to the membership in writing at least two weeks prior to the meeting.

CEMETERIES 00004

# DEPOSIT AGREEMENT WITH ADSF- INSTITUTIONAL DEPOSIT & LOAN

This Deposit Agreement ("Agreement") is entered by and between Roman Catholic Archbishop of San Francisco Department of Cemeteries (EIN 94-3233365) of Colma, California ("Depositor") and the Roman Catholic Archbishop of San Francisco, a corporation sole ("ADSF"), effective February ___, 2023.

## RECITALS

A.    Depositor is a separate operating entity within the Archdiocese of San Francisco.

B.    Depositor is, and will be during the term of this Agreement, in possession of cash assets, and wishes to invest both unrestricted and temporarily-restricted Liquid amounts in such a way that such funds earn interest and are made available for financing the construction, expansion, and maintenance requirements for entities and approved agencies that also participate in the religious purpose and mission of the Roman Catholic Church within the Archdiocese of San Francisco.

C.    Although the parties have maintained an operating relationship for many years that has been entirely consistent with the provisions set forth in this Agreement, ADSF and Depositor now desire to enter into a formal written agreement to memorialize what has been the relationship between the parties concerning ADSF's administration of deposited cash assets of Depositor in the Institutional Deposit & Loan Fund, always held in trust for the participants, subject to the Policies and Procedures of the Institutional Deposit & Loan-REVISED February 25, 2019.

NOW THEREFORE, in consideration of their mutual covenants and promises contained herein, the parties agree as follows:

## AGREEMENT

1.    <u>Introductory Provisions</u>: This Agreement is intended to govern the use of the ADSF's Deposit and Loan services by Depositor. Use of these services is expressly conditioned on mutual acceptance of this Agreement via execution by an authorized signer for both parties. By using these services, Depositor acknowledges that it has reviewed and agrees to abide by the terms and conditions of this Agreement, which will be binding upon Depositor.

2.    <u>Deposits</u>: The parties agree to the following terms concerning deposits in the Institutional Deposit & Loan Fund:

(a)    ADSF has created certain account(s) for the purpose of receiving and holding deposits from Depositor and will maintain each of those accounts solely in Depositor's name and segregated from any other ADSF funds.

(b)    Depositor may make deposits to its account(s) by mailing a check or wiring/transferring funds to ADSF (at the location/address designated by ADSF), along with

CEMETERIES 00005

instructions indicating the account number to which the funds are to be deposited or instructions to open a new account.

3. <u>Withdrawals</u>: Depositor may make withdrawals from its account(s) by providing written notice no less than 5 days in advance of the desired withdrawal date. A withdrawal may be in any amount up to the balance in the account.

4. <u>Term</u>: Funds on deposit are not subject to a minimum investment period.

5. <u>Authorized Signatures</u>: Depositor shall designate the authorized signers for the Depositor's account. The ADSF will only honor requests from an authorized signer for withdrawals or other transactions related to the Depositor's account. Requests for withdrawals must be in writing and must contain a handwritten signature, copies, facsimiles, or signatures that appear to be made by machine or stamp, or otherwise, will not be honored.

6. <u>Statements</u>: Account statement(s) will be "e-mailed" or made available on a quarterly basis and will include a detailed accounting of the transactions for the period, including the amount of interest earned, if any, for the statement period.

7. <u>Interest Calculation</u>: Interest will be calculated and credited to Depositor's account(s) on a quarterly basis based upon the number of days funds are on deposit using the interest rate applicable to the period as approved in advance of the period by the Institutional Deposit & Loan Committee.

8. <u>Ownership of Funds on Deposit</u>: Funds on deposit are held by the ADSF in trust for the Depositor, which is the owner of the funds on deposit and segregated from any ADSF owned funds. No funds placed with the ADSF become funds of the ADSF or of the Archdiocese of San Francisco solely by virtue of their placement in an account, but rather retain their character as property of the Depositor along with any interest earned credited to the account(s) of Depositor. While the funds may be invested jointly with other depositor funds to achieve investment management and other benefits, the ADSF will maintain its records in such a manner as to clearly delineate the actual ownership of the funds being held in trust.

9. <u>Administration of Funds on Deposit</u>: The parties acknowledge and agree to the following provisions concerning administration of funds by the ADSF:

(a) ADSF will incur expenses to manage the day-to-day operations of the investment pool, including financial and administrative services and a prudent loan loss allowance reserve, and such amounts will impact the amount of interest able to be credited to all depositors in the program, including Depositor.

(b) ADSF may contract with third parties to provide financial and administrative services, provided the cost of such services shall not exceed a market value cost.

(c) ADSF may loan funds to eligible borrowers who are also participants of the Institutional Deposit & Loan Fund, according to the ADSF policies and guidelines, as currently in effect and as may be amended from time to time by the ADSF.

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 7
of 123
CEMETERIES 00006

(d)     Depositor acknowledges that it has been provided with a copy of the ADSF Policies and Procedures of the Institutional Deposit & Loan-REVISED February 25, 2019 prior to executing this Agreement.

10.     Acknowledgement:  By execution of this Agreement, Depositor acknowledges that it has been provided with advance notice that monies deposited may be invested jointly with funds of other Depositors for investment purposes; that they may be loaned to eligible borrowers at their request, according to the Policies and Procedures of the Institutional Deposit & Loan-REVISED February 25, 2019; and that these terms and conditions apply to current and future funds on deposit with the Program.

11.     Amendment:  The parties may amend terms of this agreement upon 30 days advance notice.

12.     Dispute Resolution:  Any disputes arising between the Parties regarding the interpretation and/or application of any provision of this Agreement shall be presented to the ADSF Finance Council. The Finance Council shall review the claim(s) and a majority of its members shall make a determination as to how the claim(s) shall be resolved. The finding of the Finance Council is final and binding on the parties.

13.     Miscellaneous:

(a)     The parties agree that this Agreement reflects the full understanding of the Parties regarding the matters set forth herein. The terms of this Agreement cannot and shall not be modified or supplemented, except by mutual written agreement executed by both Parties.

(b)     Failure to invoke any right, condition, or covenant in this Agreement by any party shall not be deemed to imply or constitute a waiver of any rights, condition, or covenant and no party may rely on such failure.

(c)     This Agreement shall be binding upon and inure to the benefit of the administrators, legal representatives, successors and assigns of the parties.

(d)     The invalidity or unenforceability of any term or provision of this Agreement shall not impair or affect the remainder of this Agreement, and the remaining terms and provisions hereof shall not be invalidated but shall remain in full force and effect.

(e)     The parties agree that this Agreement may be executed in counterpart, and a copy signed by any party shall be deemed to constitute an original.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed this date: 3/3/____, 2023

DEPOSITOR:

Roman Catholic Archbishop of San Francisco Department of Cemeteries of Colma, California

_Kevin Field Williams, Director of Cemeteries_

CEMETERIES 00007

By:

Archbishop of San Francisco, a California corporation sole

By: _____

CEMETERIES 00008

# LAND USE CONTRACT

THIS AGREEMENT is made this _3rd_ day of _March_ , 2023, between THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, A CORPORATION SOLE, having a principal place of business at One Peter Yorke Way, San Francisco, CA, 94109, hereinafter referred to as "RCA", and ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO DEPARTMENT OF CEMETERIES (EIN 94-3233365), having a principal place of business at 1500 Mission Road, Colma, California, hereinafter referred to as "CEMETERY."

It is hereby agreed:

1) <u>Term of Contract</u>. This Agreement will become effective upon execution and will continue on a year to year basis unless terminated as herein provided.

2) <u>Memorialization</u>. Although the parties have maintained an operating relationship for many years that has been consistent with the provisions set forth in this Agreement, RCA and CEMETERY now desire to enter into a formal written agreement to memorialize what has been the relationship between the parties concerning CEMETERY'S use of RCA'S land.

3) <u>Fee for Land Use</u>. In consideration for the use of RCA'S land, CEMETERY shall pay RCA the sum of 11.5% of its unrestricted sales consistent with generally accepted accounting principles. Payment shall be made annually.

4) <u>Termination Upon Notice</u>. This Agreement can be terminated by CEMETERY or RCA at any time, for any reason, upon 180 days advance written notice.

5) <u>Time is of the Essence</u>. Time is of the essence in this Agreement.

6) <u>Assignment</u>. Except as expressly provided for herein, neither this Agreement, nor any duties or obligations under this Agreement, may be assigned without the prior written consent of the RCA.

7) <u>Notices</u>. Any notice under this Agreement shall be sufficient if written and delivered personally or by First Class Mail to the addresses listed at the beginning of this Agreement.

8) <u>No Third Party Beneficiaries.</u> This Agreement is not intended to create any rights in any person or entity who is not a party to this agreement, and no such rights are created hereunder.

9) <u>Entire Agreement of the Parties</u>. This Agreement contains the entire Agreement of the parties and supersedes any and all prior agreements, either oral or written, between the parties hereto. Any modification of this Agreement will be effective only if it is in writing signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement the day of the year first above written.

THE ROMAN CATHOLIC ARCHBISHOP
OF SAN FRANCISCO,
A CORPORATION SOLE

By: _____

Its: _____

ROMAN CATHOLIC ARCHBISHOP OF
SAN FRANCISCO DEPARTMENT OF
CEMETERIES

By: _____

Its: _DIRECTOR OF CEMETERIES_

| Cemetery | Location |
|---|---|
| **San Mateo County** | |
| Holy Cross Cemetery | 1500 Mission Road Colma |
| Holy Cross Cemetery | 1975 Santa Cruz Ave.  Menlo Park |
| Our Lady of the Pillar | 926 Miramontes St. Half Moon Bay |
| St. Anthony | Stage Road, Pescadero |
| St. John's | 910 Oregon Ave. San Mateo  **This cemetery is owned but not operated by the Archdiocese; there is no financial relationship |
| | |
| **Marin County** | |
| St. Mary Magdalene | 16 Horseshoe Hill Rd., Bolinas |
| Mt. Olivet | 250 Los Ranchitos Road San Rafael |
| Tomales | 1400 Dillon Beach Road Tomales |

CEMETERIES 00011

| Cemetery | Location | |
|---|---|---|
| Calvary Cemetery | San Francisco | Cemetery closed; then disinterred and removed to Holy Cross in Colma by 1943 |
| Mission Dolores | 3321 16th St. San Francisco | *Not currently overseen by the Cemetery Department; administered by Mission Dolores Basilica |
| Pilarcitos | Hwy 92 Half Moon Bay | |

CEMETERIES 00012

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



Archbishop
Salvatore Cordileone

Auxiliary Bishops
William Justice & Robert McElroy

Vicar for Administration
Msgr. James Tarantino

Cemetery Advisory Board

Executive Secretary
Carol Magdaluyo

Director of Cemeteries
Monica J. Williams

Payroll/Benefits Manager
Laurie Harrington

Controller
Suzanne Tikkanen

Asst. Acct. Mgr.
Kimberly
Guzman-Ariza

Operations Manager
John Bermudez

District Cemeteries
Manager
Mark Addiego

Family Services
Manager
Christine Stinson

Bookkeeper
Pam Appleby

Accounting Clerk
Barbara Thayer

Field Supervisor
Glenn Majeski

Field Supervisor
Jim Celentano

Field Supervisor
Kelly Bonillas

MTO & TOM
Superintendent
*Judy Edmonson

HCMP, OLP,
St. Anthony &
Pillarcitos
Superintendent
*Kathy Wade

Office Supv.
Aitor
Berrueta

Field Crew

Receptionists

Joyce Holthaus
*Nancy Cual

Family Service Counselors

Imelda Contreras
Kathleen Mino
Leslie Roldan
Cristo Matal Sol
*Gerry Davis
*Patricia Allen
*Norman Tinkham

* = Part-time Employee

01/26/2013

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 14 of 123

CEMETERIES 00013

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Auxiliary Bishops**
William Justice & Robert McElroy

**Vicar for Administration**
Rev. John Piderit, S.J.

**Cemetery Advisory Board**
Jim Coriston
Deacon Steve Fox
Fr. Mike Quinn
Joe Passarello
Charlie Shea
Fr. Andrew Spyrow

**Executive Secretary**
Carol Magdaluyo

**Director of Cemeteries**
Monica J. Williams

**Payroll/Benefits Manager**
Laurie Harrington

**Controller**
Suzanne Tikkanen

**Asst. Acct. Mgr.**
Kimberly Guzman-Ariza

**Operations Manager**
John Bermudez

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Services Manager**
Christine Stinson

**Bookkeeper**
Pam Appleby

**Accounting Clerk**
Barbara Thayer

**Field Supervisor**
Glenn Majeski

**Field Supervisor**
Jim Celentano

**Field Supervisor**
Kelly Bonillas

**MTO & TOM Superintendent**
*Judy Edmonson

**HCMP, OLP, St. Anthony & Pillarcitos Superintendent**
*Kathy Wade

**Office Supv.**
Aitor Berrueta

**Field Crew**

**Receptionists**
Joyce Holthaus
*Nancy Cual

**Family Service Counselors**
Imelda Contreras
Kathleen Mino
Leslie Roldan
Cristo Matal Sol
*Gerry Davis
*Patricia Allen
*Norman Tinkham

* = Part-time Employee

01/26/2013

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 15 of 123

CEMETERIES 00014

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Auxiliary Bishop**
William Justice

**Vicar for Administration**
Rev. John Piderit, S.J.

**Cemetery Advisory Board**
Jim Coriston
Deacon Steve Fox
Fr. Mike Quinn
Joe Passarello
Charlie Shea
Fr. Andrew Spyrow

**Executive Secretary**
Carol Magdaluyo

**Director of Cemeteries**
Monica J. Williams

**Payroll/Benefits Manager**
Laurie Harrington

**Controller**
Suzanne Tikkanen

**Asst. Acct. Mgr.**
Kimberly Guzman-Ariza

**Operations Manager**
John Bermudez

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Services Manager**
Steve Chiappari

**Lead Family Services Mgr**
Christine Stinson

**Bookkeeper**
Pam Appleby

**Accounting Clerk**
Barbara Thayer

**Field Supervisor**
Glenn Majeski

**Field Supervisor**
Jim Celentano

**Field Supervisor**
Kelly Bonillas

**MTO & TOM Superintendent**
*Judy Edmonson

**HCMP, OLP, St. Anthony & Pillarcitos Superintendent**
*Kathy Wade

**Field Crew**

**Receptionists/Clerical**

Joyce Holthaus
Nancy Cual

**Family Service Counselors**
Imelda Contreras
David Mehrwein
Kathleen Mino
Sylvia Rivera
Leslie Roldan
*Patricia Allen
*John Fontana

* = Part-time Employee

06/30/2015

CEMETERIES 00015

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



Archbishop
Salvatore Cordileone

Auxiliary Bishop
William Justice

Vicar for Administration
Rev. John Piderit, S.J.

Cemetery Advisory Board
Jim Coriston
Deacon Steve Fox
Fr. Mike Quinn
Joe Passarello
Charlie Shea
Fr. Andrew Spyrow

Executive Secretary
Carol Magdaluyo

Director of Cemeteries
Monica J. Williams

General Manager
John Bermudez

Payroll/Benefits
Manager
Laurie Harrington

Controller
Suzanne Tikkanen

Asst. Acct. Mgr.
Kimberly
Guzman-Ariza

Regional Cemeteries
Operations Manager
Mario Falla

Family Services
Manager
Christine Stinson

Asst. Family
Services Manager
Sylvia Rivera

HCC Field Operations
Manager Kelly Bonillas

Bookkeeper
Pam Appleby

Accounting Clerk
Barbara Thayer

Field Supervisor
Glenn Majeski

Field Supervisor
Francisco Lopez

MTO & TOM &
SMM
Superintendent
*Judy Edmonson

HCMP, OLP,
St. Anthony &
Pillarcitos
Superintendent
*Kathy Wade

Field Crew

Receptionists/Clerical

Joyce Holthaus
Maria Calvillo

Family Service Counselors
Imelda Contreras
Nancy Cual
David Mehrwein
Kathleen Mino
Ryan Nasarow
Leslie Roldan
*John Fontana

* = Part-time Employee

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 17
of 123

CEMETERIES 00016

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



* = Part-time Employee

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 18 of 123

CEMETERIES 00017

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



06/30/2019

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 20 of 123

CEMETERIES 00019

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Vicar for Administration**
Rev. Patrick Summerhays

**Cemetery Advisory Board**
Jim Coriston
Joe Passarello
Fr. Mike Quinn
Fr. Andrew Spyrow

**Director of Cemeteries**
Monica J. Williams

**Controller**
Suzanne Tikkanen

**Payroll/Benefits Manager**
Laurie Harrington

**General Manager**
John Bermudez

**Executive Secretary**
Carol Magdaluyo

**HCC Field Operations Manager**
Kelly Bonillas

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Resources Manager**
Sylvia Rivera

**Accounting Mgr**
Kimberly Guzman-Ariza

**Burial Supervisor**
Ramiro Munoz

**Maintenance Supervisor**
Francisco Lopez

**MTO & TOM & SMM Superintendent**
Judy Edmonson

**HCMP, OLP/PIL, St. Anthony, Superintendent**
*Kathy Wade

**HCMP/OLP Sales Manager**
*Rick Slyter

**Asst. Family Resources Mgr.**
Ryan Nasarow

**Accounts Receivable**
Kriss Leung

**Accounts Payable**
Elnora Calano

**Field Crew****
(31)

**Receptionists/Clerical****
Joyce Holthaus
Maria Calvillo
Michele Burton

**Family Service Advisors****
Imelda Contreras
Leslie Bradshaw
Nancy Cual
Maria Sebastian
Gloria Gonzalez
Emilyn Bourke
*John Fontana

01/15/2021          * = Part-time Employee     **Local 265

Case: 23-30564     Doc# 610-4     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 21 of 123

CEMETERIES 00020

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Vicar for Administration**
Rev. Patrick Summerhays

**Cemetery Advisory Board**
Jim Coriston
Deacon Rich Dizon
Joe Passarello
Fr. Mike Quinn
Fr. Andrew Spyrow

**Director of Cemeteries**
Monica J. Williams

**Controller**
Suzanne Tikkanen

**Payroll/Benefits Manager**
Laurie Harrington

**General Manager**
John Bermudez

**Executive Secretary**
Carol Magdaluyo

**HCC Field Operations Manager**
Kelly Bonillas

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Resources Manager**
Sylvia Rivera

**Accounting Mgr**
Kimberly Guzman-Ariza

**Burial Supervisor**
Ramiro Munoz

**Maintenance Supervisor**
Francisco Lopez

**MTO & TOM & SMM Superintendent**
Judy Edmonson

**HCMP, OLP/PIL, St. Anthony, Superintendent**
*Kathy Wade

**HCMP/OLP Sales Manager**
*Rick Slyter

**Asst. Family Resources Mgr.**
Ryan Nasarow

**Accounts Receivable**
Kriss Leung

**Accounts Payable**
Elnora Calano

**Field Crew****
(32)

**Receptionists/Clerical****
Joyce Holthaus
Eliana Carcamo
Michele Burton

**Family Service Advisors****
Imelda Contreras
Leslie Bradshaw
Nancy Cual
Maria Sebastian
Gloria Gonzalez
Emilyn Bourke
*John Fontana

06/30/2021          * = Part-time Employee    **Local 265

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 22
of 123

CEMETERIES 00021

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Vicar for Administration**
Rev. Patrick Summerhays

**Cemetery Advisory Board**
Deacon Rich Dizon
Joe Passarello
Fr. Mike Quinn
Fr. Andrew Spyrow

**Director of Cemeteries**
Monica J. Williams

**Controller**
Suzanne Tikkanen

**Payroll/Benefits Manager**
Laurie Harrington

**General Manager**
John Bermudez

**Executive Secretary**
Carol Magdaluyo

**HCC Field Operations Manager**
Kelly Bonillas

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Resources Manager**
Sylvia Rivera

**Accounting Mgr**
Kimberly Guzman-Ariza

**Burial Supervisor**
Ramiro Munoz

**Maintenance Supervisor**
Francisco Lopez

**MTO & TOM & SMM Superintendent**
Judy Edmonson

**HCMP, OLP/PIL, St. Anthony, Superintendent**
*Kathy Wade

**MP/OLP/SA Asst. Supt.**
Ryan Nasarow

**Asst. Family Resources Mgr.**
Ryan Nasarow

**Accounts Receivable**
Kriss Leung

**Accounts Payable**
Elnora Calano

**Field Crew****
(35)

**Receptionists/Clerical****
Joyce Holthaus
Eliana Carcamo
Michele Burton

**Family Service Advisors****
Imelda Contreras
Leslie Bradshaw
Nancy Cual
Maria Sebastian
Gloria Gonzalez
Emilyn Bourke
Margo Guerrero
Alejandro Munoz

06/30/2021          * = Part-time Employee     **Local 265

Case: 23-30564     Doc# 610-4     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 23
of 123

CEMETERIES 00022

# CATHOLIC CEMETERIES DEPARTMENT: ORGANIZATIONAL CHART



**Archbishop**
Salvatore Cordileone

**Vicar for Administration**
Rev. Patrick Summerhays

**Cemetery Advisory Board**
Deacon Rich Dizon
Joe Passarello
Fr. Mike Quinn
Fr. Andrew Spyrow

**Director of Cemeteries**
Monica J. Williams

**Controller**
Suzanne Tikkanen

**Payroll/Benefits Manager**
Laurie Harrington

**General Manager**
John Bermudez

**PreNeed and Community Outreach Manager**
David Mehrwein

**Executive Secretary**
Carol Magdaluyo

**Accounting Mgr**
Kimberly Guzman-Ariza

**Regional Cemeteries Operations Manager**
Mario Falla

**Family Resources Manager**
Sylvia Rivera

**Field Supervisor**
Robert Marcellino

**Burial Supervisor**
Ramiro Munoz

**Maintenance Supervisor**
Francisco Lopez

**MTO & TOM & SMM Superintendent**
Judy Edmonson

**HCMP, OLP/PIL, St. Anthony, Superintendent**
*Kathy Wade

**MP/OLP/SA Asst. Supt.**
Ryan Nasarow

**Asst. Family Resources Mgr.**
Ryan Nasarow

**Accounts Receivable**
Kriss Leung

**Accounts Payable**
Elnora Calano

**Field Crew****
(30)

**Receptionists/Clerical****
Eliana Carcamo
Betty Serra
Michele Burton

**Family Service Advisors****
Imelda Contreras
Leslie Bradshaw
Nancy Cual
Maria Sebastian
Gloria Gonzalez
Margo Guerrero
Alejandro Munoz
Ernest Tamayo

08/01/2023

\* = Part-time Employee    \*\*Local 265

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 24 of 123

CEMETERIES 00023

# EXHIBIT 17



# 2022 Report: Measuring Abuse Prevention and Safe Environment Programs as Reported Online in Diocesan Policies and Practices

© 2022 Voice of the Faithful, Inc.


# Executive Summary

Twenty years have passed since the public exposé of clergy sexual abuse within the Catholic Church by *The Boston Globe Spotlight* Team (2002). Yet in many cases our dioceses do not adhere to child protection and safe environment standards set by the U.S. Conference of Catholic Bishops (USCCB) itself and Pope Francis. Nor do they follow best practice recommendations from abuse prevention specialists.

One measure of commitment to the USCCB's "promise to heal and protect" is diocesan website postings of child protection efforts. Website postings serve as a vital point of accountability and transparency. This report highlights the most egregious deficiencies in that commitment and suggests remedies.

Under the auspices of Voice of the Faithful, researchers examined the websites of all 177 dioceses and archdioceses in the United States and scored each on the content concerning protection of children. Reviewers used a specially developed worksheet that included 33 questions in the following 10 categories: Policy; Code of Conduct; Reporting Abuse; Background Checks; Prevention Education & Training; Contact Information; Annual Audit Reporting; Diocesan Review Boards; List of Accused Clergy; and Victim Assistance. (See Appendix A for the worksheet listing the categories and questions used in this review.)

Overall, out of a possible 100 points, the average score was 67. The most frequently achieved score for all dioceses was 63.5.

Individually, some dioceses are doing well but no diocese was awarded 100 points. Four dioceses received the highest scores, which were in the 90s. Three had the lowest, scoring in the 20s. Reviewers noted that some dioceses had excellent scores in an individual category but a poor overall score. The category scores indicate performance with a specific focus, such as content of abuse reporting information.

Here are some particularly important points from the report:

❖ Diocesan safe environment webpage content must align with its child protection policies. Lack of consistency calls into question the diligence afforded to safe environment and child protection efforts in the diocese and its commitment to transparency. Child protection and safe environment policies must be accessible, clearly stated, and in accord with website content.

❖ Comprehensive abuse prevention efforts must include criminal background checks of all employees, clergy, and volunteers as well as mandatory abuse prevention education and training for all groups. Clearly stated and publicly accessible mandates on these two measures are strong abuse prevention elements and need to be stated within safe environment policies and on diocesan webpages dedicated to child protection efforts.

❖ Dioceses must fully disclose credibly accused offenders' information. VOTF is disappointed that many dioceses received a relatively high total score on this review yet did not disclose information on credibly accused priests (Category #9). Although not a requirement of the USCCB *Charter for the Protection of Children and Young People*, full disclosure of credibly accused offenders' names and their current status, as well as their past assignments, is a best practice for abuse prevention. We urge the bishops to make these disclosures a component of the *Charter* so that dioceses are compelled to disclose this critical information.

❖ Diocesan Review Boards (DRB) must ensure that *Charter*-related policies and procedures are current and clearly stated. The names, credentials, and terms of office of DRB members should be posted on diocesan websites for transparency. During the 2020 Charter audit, the auditors reported finding dysfunction in the operation of DRBs. We recommend that the National Review Board address such dysfunction during the periodic diocesan audits.

❖ The USCCB should enforce mandatory participation in the annual audits that measure diocesan compliance with the *Charter* and *Essential Norms* as well as a time-limited period for correcting deficiencies. In addition, more frequent and regularly scheduled reviews and updates of the USCCB *Charter* and *Essential Norms* are needed.

None of these recommendations will keep our children safe if parishioners do not realize their own key roles in ensuring protection of children. Working with diocesan and parish safe environment personnel, parishioners can bolster safety guidelines at the diocesan level and ensure that safety measures are carried out in their communities.

Alive in the life of Jesus, the entire People of God can transform into a sacramental community where children, youth, and the vulnerable are nurtured and protected in safe environments.

# Measuring and Ranking Diocesan Child Protection, Safe Environment, and Abuse Prevention Efforts

Twenty years have passed since the public exposé of clergy sexual abuse within the Boston Catholic Church by *The Boston Globe Spotlight* Team (2002). It also is 20 years since Boston-area Catholics founded Voice of the Faithful (VOTF) in response to those revelations. The organization quickly grew into an international movement as revelations increased in country after country about persistent sexual abuse and related coverups occurring globally in the Church.

Spurred into action by the horror of abuse revelations and the need to foster safe environments for protecting children in parishes and the broader community, Voice of the Faithful Protection of Children (POC) working group came together in the early months of 2002. Today, the POC mission continues to embrace the creation, education, and maintenance of child protection measures in our parishes.

The breadth of clergy sexual abuse cases within the Church indicates that historical responses to accusations of abuse by the hierarchy were inadequate. Those responses aimed to protect the reputation of the institution rather than support victims and prevent further child abuse within the Church. The hierarchical construct of a privileged, secretive, unaccountable, male-only institution provided the backdrop that produced a culture of leaders who enabled the protection of the abusers and church leadership, placing it above the victims' best interests and the suffering of children.

Some of those same constructs and an unchanging defense of this already damaged institution ignore the need to reform faulty structures such as the bishops' deficient compliance to their own standards and a lack of urgency and decisive actions that would demonstrate their professed resolve to protect and heal.

In reaction to the 2002 media revelations, bishops created "standards of change" to eliminate the potential of future instances of clergy sexual abuse. These standards of abuse prevention in the U.S. Church are spelled out in the mandates of the bishops' *Charter for the Protection of Children and Young People* and the *Essential Norms* and most recently in Pope Francis' 2019 *motu proprio* titled *Vos estis lux mundi*.

Additionally, the U.S. Conference of Catholic Bishops (USCCB) established a National Review Board (NRB) to monitor compliance with the Charter's norms as well as a Committee for the Protection of Children and Young People that provides the bishops with comprehensive planning and recommendations about child and youth protection in coordination with the NRB.

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 29 of 123

The monitoring function, using annual diocesan compliance "audits," is conducted by a contracted agency. The data they collect largely consist of bishops' self-reported answers to prepared inquiries. Thus, bishops remain in control of the information going into the audit. As StoneBridge auditors—the current contractor—note in their 2020 Audit Report, they are engaged by the bishops to audit compliance with the bishops' *Charter* (p.15).

The audit process itself is conducted in two distinct phases: data collection from all dioceses, and on-site audits limited annually to one-third of all dioceses. Results are published in Annual Reports as the "Implementation of the Charter for the Protection of Children and Young People" on the USCCB website. ([Audits | USCCB](#)).

Individual diocesan efforts to maintain standards of child safety can be found on their websites under headings such as Safe Environment, Child Protection, and Abuse Prevention as well as in diocesan policies. Posted diocesan website information reflects efforts to set abuse prevention and child protection standards within that diocese.

To date, an extensive measurement of all website-posted diocesan efforts to meet the *Charter*, the *Essential Norms*, and *Vos estis lux mundi* has not been carried out. Child USA, a think tank headed by attorney Marci Hamilton, did conduct a limited survey that covered 32 Archdiocesan child protection and safe environment polices when conducting a study commissioned by the Ramsey County Attorney's Office, St. Paul MN, on the Archdiocese of St. Paul & Minneapolis (Hamilton, 2020).

After noting the lack of a comprehensive review of all dioceses and archdioceses, VOTF recognized the need for an in-depth review of the publicly accessible policies and procedures regarding abuse prevention and safe environment measures that are posted on every U.S. diocesan website. This report provides that review.

## The Importance of Child Protection, Safe Environment, and Abuse Prevention

During 2021, Voice of the Faithful carried out its first Review of the Safe Environment measures displayed on the websites of all 177 dioceses belonging to the USCCB. VOTF's review focused on diocesan websites because the website display of safe environment policies and procedures presents the public face of bishops' commitment to protect children and prevent further sexual abuse by clergy. Reviewing posted information is a way to identify statements of safety measures as found in the bishops' *Charter* and *Essential Norms,* Pope Francis' *moto proprio* (*Vos estis lux mundi*)*,* and recognized best practices for child protection such as the CDC Guidelines for child protection policies (2007).

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 30 of 123

A diocese's stated policies and procedures are key elements in determining their bishop's public commitment to child protection standards. Note that this website review is not an audit of the bishops' <u>actual</u> compliance with stated policies and child safety commitments, but it sets a critical benchmark against which the faithful can measure accountability.

Also essential to prevent future abuse is raising awareness in our parishes that we need to maintain strong vigilance of safe environment efforts. The diocesan guidelines and stated policies set standards of expectation for the creation and maintenance of safe environments in our parishes. Those posted diocesan guidelines also should clarify the work of parishes to establish and maintain child protection and abuse prevention measures.

The public presentation of those diocesan guidelines is the focus of this study.

Our goal is to inspire parishioners not only to check that comprehensive diocesan guidelines are clearly stated but also to look into potential guideline shortcomings when their local parishes implement the diocesan standards.

If parishioners find deficiencies in posted diocesan abuse prevention measures, we encourage them to work with diocesan personnel such as the diocesan safe environment coordinator and chancellor to enhance those measures.

## *Implications and the Need for Ongoing Vigilance*

The implications of the findings from this Review extend beyond simply identifying posted diocesan safe environment and abuse prevention measures. Total diocesan scores on this survey reflect an <u>aspirational</u> commitment to create safe environments, but they do not guarantee successful <u>implementation</u>. Our review measures the culture of transparency related to child protection measures; it is not an audit of their consistent implementation.

Implementation and posted content may reflect outside pressures on a diocese—local or state civil requirements, legislation, investigations, even court orders may influence the information a diocese displays.

Posted content also may be inconsistent internally. For example, a diocese's policy may stipulate that all volunteers must undergo training and background checks while posted standards cite exceptions to the "all" volunteers.

Another factor to consider is how diocesan standards are carried out at the local, parish level. That implementation may not reflect the breadth and depth of posted abuse prevention measures. Moreover, vigilance is required to ensure that compliance to these standards

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 31
of 123

applies within all dioceses <u>and</u> in the local parishes—policies and standards must match practices as lived out at the local level.

The Review therefore included questions that examined both the standards to which the dioceses aspired and the level of consistency in posted content.

Total scores reflect the combined scores from the 10 categories detailed in the next pages. A diocese may score very high in one category but not in another, and high scores in one category do not ensure a high overall score.

## Review Instrument

The heart of VOTF's Review consists of a worksheet that touches on 10 categories for child protection, abuse prevention, and safe environment measures. The 10 categories of interest (see Table 1) were developed by the POC Team, composed of VOTF officers and members, several of whom have years of experience in child well-being.

Within the 10 categories, the POC Team developed 33 distinct questions, giving special attention to employing objective questions in order to minimize the role of personal opinion. The maximum score achievable was 100 points. (See Appendix A for the worksheet utilized in this review.)

**Table 1 – Assigned Category Points**

| Category | Topic | Maximum Score |
|:---:|:---|:---:|
| 1 | Policy | 10 |
| 2 | Codes of Conduct | 5 |
| 3 | Report Abuse | 8 |
| 4 | Background Checks | 15 |
| 5 | Prevention Education & Training | 18 |
| 6 | Contact Information | 6 |
| 7 | Audit Reporting | 10 |
| 8 | Review Boards | 18 |
| 9 | Publish List of Accused Clergy | 5 |
| 10 | Victim Assistance | 5 |
| | **TOTAL SCORE POSSIBLE** | **100** |

## Data Collection

The review of diocesan websites began in February 2021 and continued through December 2021. Two independent reviewers conducted this comprehensive review. Following the independent reviews, any scoring discrepancies were reconciled by a third POC member to ensure that each diocese received proper credit. (See Appendix B for diocesan scores in alphabetic order and Appendix C for scores in ranked order.)

## Overall Results

The average overall score achieved by the 177 dioceses was 67 out of a possible 100 points. No diocese attained the maximum 100 points. The most frequently achieved overall score on this Review was 63.5. These overall scores reflect total scores from all 10 categories. However, it is important to remember that the individual category scores reveal more than the overall score does about a diocese's adherence to the set standards and guidelines.

### The Top Scoring Dioceses

The top score achieved was 95.5 by the Diocese of Harrisburg PA. Researchers could easily access the link to their child protection policy. The website was well-organized and comprehensive on safe environment measures, which facilitated a speedy completion of questions on the worksheet. The list of credibly accused priests also was comprehensive, perhaps not surprising because the Pennsylvania grand jury's report, released in August 2018, was the broadest examination by a government agency in the U.S. of child sexual abuse in the Catholic Church (https://www.attorneygeneral.gov/report/).

**Table 2 – Top Scoring Dioceses**

| Diocese | Total Score |
|---|---|
| Harrisburg PA | 95.5 |
| Winona-Rochester MN | 93.5 |
| Baltimore MD | 92.5 |
| Venice FL | 92.5 |
| Richmond VA | 89.5 |
| Brooklyn NY | 89.0 |

Likewise, child safety and abuse prevention information was easily located on the websites of Winona-Rochester MN and the other four top scoring dioceses.

## The Lowest Scoring Dioceses

Reviewers were unable to locate child protection policies for the three lowest scoring dioceses, and six of the lowest scoring dioceses did not post lists of credibly accused clergy. But the most evident deficiencies for these dioceses were found in the Audit and Diocesan Review Board categories.

The Archdiocese for Military Services USA differs slightly from the other dioceses in this list. It provides services to the U.S. Armed Forces but has no parishes. Yet that Archdiocese ministers to a large population worldwide and requires many safe environment measures, such as abuse prevention online training; the military Archdiocese also is included in the annual USCCB audit. Unfortunately, it also has one of the lowest overall scores.

**Table 3 – Lowest Scoring Dioceses**

| Diocese | Total Score |
|---|---|
| Lake Charles LA | 49.0 |
| San Francisco CA | 44.5 |
| Pueblo CO | 44.0 |
| Trenton NJ | 43.5 |
| Kalamazoo MI | 43.5 |
| Peoria IL | 41.5 |
| Colorado Springs CO | 41.5 |
| Military Services USA | 38.5 |
| Corpus Christi TX | 27.0 |
| Lubbock TX | 23.5 |
| Shreveport LA | 22.5 |

Also note that during the Review, the USCCB merged two Alaska dioceses into one: Anchorage-Juneau. However, because we included the Military Services archdiocese in the report, we still cover a total of 177 dioceses.

## Detailed Summary—Scoring in Each of the 10 Categories

Scoring information in each of the 10 worksheet categories follows. This analysis provides an indication of compliance with specific mandates of the *Charter, Essential Norms,* and *Vos estis lux mundi.*

### Category 1 – Policy (10 Points)

***Average score = 8.89; maximum score 10, by 72 dioceses***

Reviewers searched for posted website policies under these possible names: abuse prevention, safe environment, child protection, policy. They also scored the total number of required "clicks" to see how easy it was to locate a posted policy and open it. Remarkably, reviewers were unable to locate posted safe environment or child protection policies for the following dioceses: Corpus Christi TX; Las Vegas NV; Lubbock TX; Rochester NY; and Shreveport LA. Of particular note, the only archdiocese with no publicly accessible policy was the Archdiocese of San Francisco CA.

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 34 of 123

Names assigned to safe environment and child protection policies varied. Some were named "Handbooks," "Manuals," or "Policy for Addressing Sexual Abuse" (Kansas City-St. Joseph). Other policies had unclear titles, such as "Abuse Policy" (Fairbanks AK), "Code of Conduct" (Portland ME), and "Morals & Ethics Policy" (Superior WI). Another diocese (Sioux City IA) put its safe environment policy within all the Codes of Conduct it described. Some policies were located under website tabs other than Child Protection or Safe Environment: for example, "Report Abuse" (Erie PA), "Report Misconduct" (Lansing MI), and "Policy against Sexual Misconduct" (Monterrey CA).

Links to a few policies were nonfunctioning (Error 404), such as that for Rochester NY. A note on their website indicated that the website was "under construction" at the time of review.

The length of policies varied from one-page general information postings to detailed 300+-page documents. Researchers also found a wide-range of content within the located policies, which required them to read each policy carefully to score the worksheet questions.

Many dioceses had separate policies for distinct child protection measures, using titles such as Background Checks; Training; Screening of Church Personnel; Ethical Conduct. Some used a listing under Protocols, such as for Visiting Clergy (St. Augustine FL).

Revised and updated safe environment and child protection policies were found on many websites during the review process. However, many dioceses did not eliminate older policies or indicate whether the newer policy superseded or simply added to the older policy. As a result, when reviewers found conflicting or contradicting information between these posted policies or between policy statements and website information, they could not award credit on that worksheet question.

## Category 2 – Code of Conduct (5 Points)
***Average score = 4.76; maximum score 5, by 164 dioceses***

Reviewers searched for postings of Codes of Conduct for various populations: clergy and lay employees, staff, and volunteers. Four dioceses did not post any Codes of Conduct: Military Services, Cincinnati OH, Colorado Springs CO, and Lubbock TX.

Nine dioceses did not post publicly accessible Conduct Codes for one of the populations that should be covered: Austin TX, Fall River MA, Fresno CA, Galveston-Houston TX, Gary IN, Hartford CT, Las Cruces NM, Memphis TN, and San Diego CA.

Some Codes of Conduct for clergy were only accessible through password-protected links. Concealing this information from public review points to a lack of transparency.

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 35 of 123

## Category 3 — Reporting Abuse (8 Points)

***Average score = 7.58; maximum score = 8, by 151 dioceses***

This category contained four questions about the diocesan abuse reporting process, about mandated reporting to law enforcement, and about where to report complaints about bishops with an active link to the Catholic Bishops Abuse Reporting (CBAR) portal. Average score on this category was 7.58 out of 8 points, a welcome level. The average was brought down because 26 dioceses did not receive all possible points, indicating a lack of compliance with both the *Charter* and the 2019 *motu proprio* of Pope Francis: *Vos estis lux mundi*. This Review could not determine whether such omissions were unintentional or careless, but the results indicate a disregard in those dioceses for basic standards of abuse reporting. (See Appendix D for comments on the CBAR compliance.)

## Category 4 — Background Checks (15 Points)

***Average score = 11.01; maximum score 15, by no diocese***

Screening and training of diocesan staff, clergy, and volunteers are important child abuse prevention requirements. Clearly stated standards for the screening and training mandates must be available to the public because the standards are foundational to preventing abuse. In addition, for the standards to be effective, compliance must be monitored in parishes, schools, and diocesan offices. Questions in Categories 4 and 5 covered these two issues in detail.

Reviewers scored each diocese on six questions in Category 4. First, they looked for a requirement specifying criminal background checks for various populations and the frequency of those checks. The populations that should be covered include clergy, lay employees, volunteers, members of religious communities, and visiting or temporarily assigned clergy as well as international priests. Reviewers also looked for description of the process to be followed if criminal information was found during the background check. They also checked for the name of a diocesan office or department that monitors background check compliance.

Three dioceses did not specify background checks for any of the populations that should be covered. Those dioceses are Shreveport LA, Lubbock TX, and Peoria IL.

Many dioceses did not post clearly stated requirements for letters of suitability or a certification of suitability for visiting and international priests to exercise ministry within the diocese. Typically, a priest entering a new diocese has a letter of suitability from the sending bishop or the religious order's superior, indicating that there is no reason the priest should be limited or barred. Reviewers looked for a requirement for suitability letters or certifications in diocesan policy or in information posted on a Safe Environment website.

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 36 of 123

Overall, the reviewers found unclear wording for requirements of both background checks and prevention education and training. Clear mandates on these two measures are essential. Obtaining background checks on all clergy, on all existing and potential employees, and on all volunteers within a diocese is a strong abuse prevention measure according to guidelines from the Centers for Disease Control and Prevention (CDC, 2007). These guidelines also point to the necessity for clear and concise policy statements.

## Category 5 – Prevention Education & Training (18 Points)
*Average score = 12.85; maximum score 18, by 6 dioceses*

This category contained five questions: content on child abuse education and training for adults; mandates for prevention education and training information for clergy; mandates for prevention education for all children in Catholic schools and religious education programs; training mandates for visiting and international priests; training mandates for all volunteers, including those who do not have regular contact with children.

Average score in this category was 13 points out of 18 possible points:

- ❖ Six dioceses received the full credit of 18 points in this category: Indianapolis IN, Chicago IL, Covington KY, Bridgeport CT, Lexington KY, and Springfield IL, indicating full compliance.

- ❖ Forty-three dioceses received less than 10 points in this category.

- ❖ Reviewers were not able to access any prevention training information for the diocese of Lake Charles LA. Access to some of that diocese's training information was password-protected.

## Category 6 – Contact Information (6 Points)
*Average score = 4.42; maximum score 6, by 93 dioceses*

Researchers searched for contact information for the office or person listed as head of the diocesan Child Protection or Safe Environment office; they also searched for a link to a civil authority or agency for filing a child abuse complaint, such as county Family Services or state Child Welfare agencies.

Ninety-three of the 177 dioceses received full credit in this category; 75 dioceses did not display either diocesan contact information or a link for filing a child abuse complaint to a civil authority. Another nine dioceses did not post either piece of contact information and received zero credit: Military Services, Cleveland OH, Fargo ND, Gary IN, Great-Falls-Billings MT, Knoxville TN, Las Cruces NM, Peoria IL, and Steubenville OH.

## Category 7 – Audit Reporting (10 Points)

***Average score = 2.85; maximum score 10, by 9 dioceses***

Reviewers searched for information posted about recent USCCB-sponsored audit findings and whether that audit was conducted onsite or was a data review audit. Additional credit was awarded to dioceses that posted their bishop's notification of or response to the audit findings. Because the USCCB audit monitors adherence to the child protection Charter, each diocese should report its results in that audit to the faithful.

Nineteen dioceses did not post any information concerning USCCB audit report findings.

Only nine of the 177 diocesan websites received full credit on questions in this category.

## Category 8 – Diocesan Review Boards (DRB) (18 Points)

***Average score = 6.58; maximum score 18, by 21 dioceses***

This category utilized four worksheet inquiries: names and credentials of DRB members; whether lay people constituted a majority of the non-employee DRB members; whether the dioceses posted the name of the DRB chair; and whether DRB is notified about all abuse allegations.

Reviewers found variations in the naming of DRBs, which can lead to confusion when someone searches for terminology utilized in *Charter* mandates. Examples of the names used are: Permanent Review Board (Alexandria LA); Independent Oversight Board (Altoona-Johnstown PA, Great Falls-Billings MT, Sacramento CA, St. Augustine FL); Consultative Committee (Biloxi MS); Ministerial Review Board (Crookston MN); Allegation Review Committee (Des Moines and Fall River MA); Case Review Board (Mobile, Washington DC); and Charter Review Board (Wichita).

Thirty-five diocesan websites did not receive any credit for questions in this category about DRBs, and only 21 dioceses received full credit of 18 points in this category. The most frequently missing information was the names of DRB members and their credentials. Some dioceses posted statements that they chose to keep the names of DRB members hidden.

StoneBridge Auditors, hired by the bishops to assess Charter compliance, noted in its 2020 audit how important it is for a diocese to have a functioning and informed diocesan review board—and that some were dysfunctional (StoneBridge, p.18).

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 38 of 123

## Category 9 – Publication of Names of Clergy Accused of Abuse (5 Points)

***Average score = 4.28; maximum score 5, by 149 dioceses***

The vast majority of dioceses published lists of clergy who were credibly accused of abuse (149 out of 177 dioceses); only 23 dioceses did not publish these lists. Another five dioceses posted lists of those credibly accused but did not designate whether the accused was living, deceased, or laicized or they failed to include the location of the accused's past assignments (See Appendix E for the dioceses with incomplete listings).

Disclosure of names of credibly accused clergy is not a requirement of the *Charter,* but such disclosures are a recognized best practice for abuse prevention and as a deterrent to future abuse. Full disclosure can demonstrate diocesan transparency about issues of clergy sexual abuse and positively inform the needed trust in the institution.

Note that in this category, reviewers assumed that some disclosures of credibly accused clergy information were made involuntarily as a result of a court order or of nonmonetary settlements between diocese and survivor (McChesney, 2015). However, full transparency and accountability should not require a court order.

## Category 10 – Victim Assistance (VAC) (5 Points)

***Average score = 4.13; maximum score 5, by 68 dioceses***

Reviewers noted that many diocesan websites listed a member of the clergy (priest or deacon) as the Victim Assistance Coordinator. This can be considered a conflict of interest, especially in providing pastoral care for those abused, their families, and the affected communities. However, the reviewers did not withhold points for those who had a clergy member for the VAC; those dioceses still received full credit.

Sixty-eight dioceses obtained full credit (5 points) in this category, which examined whether contact information for the VAC was posted on the website and whether pastoral and counseling services were made available to survivors, families of survivors, and affected communities. (Clergy sexual abuse affects more than the immediate victims.)

Two dioceses (Norwich CT and Pueblo NM) did not post either contact information for the VAC or a website or policy statement about supporting victims with counseling services.

Many dioceses did not receive full credit in this category because reviewers found incomplete website or policy information on the populations who could receive counseling or pastoral services.

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 39 of 123

# Key Issues: Final Comments and Recommendations

One key issue that can lead to a decline in diocesan child protection and safe environment efforts is the turnover of key staffing positions within a diocese. StoneBridge Auditors noted in their 2020 Audit Report to the USCCB that turnover of key personnel, such as Bishop, Review Board Chair, Safe Environment Coordinator or Director, and Victim Assistance Coordinator may lead in some cases to noncompliance with the *Charter*. (StoneBridge p.15)

In addition to this general assessment, we urge improvements in these areas:

## Website Content

Reviewers noted a huge variance in the safe environment and child protection information posted on diocesan websites. Consistent content and title templates used by multiple dioceses could ensure that critical information is included on the websites and that the faithful can easily find the information needed. We recommend the creation and utilization of best-practice templates for website content on these measures.

Well-organized websites have been noted in this Review; content on those websites can serve as templates for use in other dioceses, especially those scoring low in this Review.

Content of diocesan policies may vary by state requirements, but basic safe environment, abuse prevention, and child safety topics following the *Charter* and *Norms* and best-practice guidelines provide the critical foundation for creating a robust policy. A comprehensive policy need not be lengthy. We recommend that a comprehensive policy should address every Category analyzed in this report.

## Policy

❖ Diocesan safe environment policies need regular reviews, revisions, and updates, just as the *Charter* is reviewed and updated periodically. We recommend that older and outdated policies posted on diocesan websites be archived to avoid posting potentially conflicting information and creating confusion about directives for safe environments and child protection in parishes.

❖ We also recommend regular reviews in a diocese so that content on Safe Environment or Abuse Prevention webpages is in agreement with posted policies. (Reviewers did not distinguish between website content and policy content to score questions on the Worksheet.)

❖ Directives posted on webpages and in policies should be clearly stated, and policy content must agree with information found on website pages. Likewise, policy content should be available to the public and not password-protected.

❖ Policies should be posted in every major language spoken by diocesan members.

❖ Policies on child protection should contain clear statements and mandates. They should be easily located on websites and grouped under intuitive or self-explanatory headings such as Safe Environments, Child Protection, or Abuse Prevention.

## Annual Audits

Audits that measure compliance with the bishops' standards (*Charter* and *Norms*) should include completely independent investigations of diocesan abuse prevention and child protection measures. To ensure credibility, the auditors also should be completely independent of each diocese (Hamilton, 2020).

StoneBridge auditors note in the conclusions section of their 2020 Annual Report that "the structure of the Church and Canon Law leaves the response of the Church in the hands of each Bishop." The auditors' conclusion goes on, encouraging "… Bishops to continue discerning an appropriate path for the U.S. Conference as a whole to pursue regarding *Charter* issues and other forms of abuse within the clergy" (StoneBridge, p.16). This would include mandatory participation in the audit process by every diocese, follow-up on audit findings, and an enforced, time-limited period for correcting deficiencies.

## Diocesan Review Boards (DRB)

As noted in the analysis of Worksheet Category 8 in this report, DRBs are supposed to ensure that *Charter*-related policies and procedures are not only relevant but also are clearly articulated on diocesan websites and in diocesan policies. However, the Annual 2020 Audit noted some dysfunction of Review Boards. That dysfunction must be remedied because this body is charged with oversight of handling all abuse accusations within the diocese (StoneBridge, p.18). We question why dioceses have been found in compliance with an audit when their DRB is noted as dysfunctional.

The names of members who serve on the National Review Board are clearly posted on the USCCB website. So, too, should the names, credentials, and terms of office of DRB members be posted on diocesan websites. Diocesan policies also should contain information on the function and role of DRBs.

Disclosure of Names of Credibly Accused Clergy

Although disclosing names and status of credibly accused clergy is not a requirement of the *Charter,* it is an abuse prevention best practice. If disclosure of these names were made a component of the *Charter,* child protection and survivor healing would be enhanced in our faith communities. More dioceses would feel compelled to disclose this critical information if there were a mandate in the *Charter.*

## Overall Recommendations to Enhance Child Protection

Efforts to understand clergy sexual abuse in the Roman Catholic Church have been underway since the revelations exposed in The *Boston Globe Spotlight Team* Report 20 years ago. National efforts to look into sex abuse in the Church have been undertaken in Ireland, Australia, France, and Germany to name a few, as well as in many U.S. States, notably in Pennsylvania. In the past few years, the Vatican established a Center for Child Protection at the Pontifical Gregorian University, which recently evolved into the university's Safeguarding Institute (IADC) headed by Hans Zollner, S.J.

In comments on the 2022 German Sex Abuse Report, Fr. Zollner stated: "The sexual abuse of children and its cover-up in the Church contain concentrated issues of sex, money, power, leadership, relationships, relationship to the state, to outside experts and to the media." In that interview, he notes that the work of the IADC concerns not only sex abuse, but "it is also about structure, systemic [abuse], accountability, transparency, and much else" (O'Connell, 2022).

Mindful of the need to address all these issues, VOTF adds these recommendations to the ones cited under Key Issues above.

❖ Echoing the recommendation from StoneBridge Auditors in their 2020 Audit of U.S. Catholic dioceses, VOTF recommends that dioceses consult with the USCCB Office of Child and Youth Protection for suggestions and materials to **reduce negative impact of turnover** in key diocesan positions (StoneBridge, p. 15).

❖ Bishops should take responsibility of their diocesan website content on child protection, safe environment, and abuse prevention measures. Bishops must ensure that tenets in child protection **policies are clearly stated and easily accessible to the public** as well as in compliance with the *Charter, Norms,* and *Vos estis lux mundi*. Dioceses should monitor how their website-posted child safety guidelines and mandates are implemented in their parishes.

❖ VOTF recommends that **parishioners participate in child protection** efforts by monitoring the comprehensiveness of the posted diocesan guidelines and mandates. The 10 Categories utilized in this Review can be employed as fundamental standards of child safety and abuse prevention. Parishioners can work with diocesan personnel such as the chancellor and diocesan safe environment coordinator / director to ensure that comprehensive measures are in place. Monitoring efforts can ensure the diocesan measures for child safety and abuse prevention are complete, especially with reference to the 10 Categories presented in this Review. Simultaneously, parishioners should be aware of the ongoing need for child protection and safe environment efforts in their parishes and work with the parish safe environment personnel to implement the established diocesan standards.

❖ VOTF recommends that diocesan safe environment coordinators come together as a body and **collaborate on standardizing website content** on child protection, safe environment, and abuse prevention measures.

Reviewers did not differentiate where information was located on webpages or in policy to score the worksheet. We recommend that future reviews make note of where the dioceses post the information.

## Ongoing Child Protection Efforts

Results of this Review indicate the need to enhance diocesan child protection policies and safe environment measures. Actions by all are essential to keep children safe in our church communities. Clearly stated, publicly available, and comprehensive diocesan guidelines for safe environments provide measurable standards that can be modeled in parishes and are essential to prevent further child abuse. The USCCB can more frequently update their *Charter and Norms*. The USCCB National Review Board should monitor compliance with the bishops' own standards for child protection by augmenting annual audits. VOTF will continue to monitor diocesan child protection measures on an annual basis.

Parishioners play a key role in ensuring the protection of children in our parishes. Parishioners should work with diocesan and parish safe environment personnel to bolster safety guidelines at the diocesan level and ensure that safety measures are carried out in their local faith communities.

***Alive in the life of Jesus, the entire People of God can transform into a sacramental community where children, youth, and the vulnerable are nurtured and protected in safe environments.***

Case: 23-30564　Doc# 610-4　Filed: 04/19/24　Entered: 04/19/24 15:35:29　Page 43 of 123

# Appendices

*Appendix A: Worksheet for Measuring Child Protection*

*Appendix B: Transparency Scores, Alphabetical Listing*

*Appendix C: Transparency Scores, Ranked by Score*

*Appendix D: Comments on CBAR-Category 3*

*Appendix E: Category 9 Disclosures*

**Date of search:** _____          **Diocese Name:** _____

**Researcher Name:** _____          **Browser Used:** _____

| Description | Possible Points | Awarded Points | Scoring Instruction | Researcher's Comment |
|---|---|---|---|---|
| **1. Policy -- 10 points total** | | | | |
| 1a Is the Diocesan Child Protection or Safe Environments Policy posted on the Diocesan website? | 3 | _____ | | |
| 1b Does the Diocesan website contain information on parish mandatory compliance with the Diocesan Abuse Prevention / Safe Environments Policy? | 2 | _____ | (May be difficult to find.) | |
| 1c How easily recognizable is it to find Child Protection policies on the home Diocesan webpage? | 5 | _____ | Score: 5 if ONE click or on Homepage; 4 if need TWO clicks; 3 for THREE clicks; 2 for FOUR clicks; 1 for more than FOUR clicks. | |
| **2. Code of Conduct -- 5 points total** | | | | |
| 2a Is a Diocesan Code of Conduct for all clergy, including bishops, and lay employees posted on the website? | 2.5 | _____ | | |
| 2b Is a Diocesan Code of Conduct for **volunteers** posted on the website? | 2.5 | _____ | | |
| **3. Reporting of Abuse -- 8 points total** | | | | |
| 3a Does the Diocesan website provide information on the Diocesan process for reporting abuse? | 2.5 | _____ | Having a system is mandated in *moto proprio* 2019 . | |
| 3b Does that website state that all suspected abuse must be reported to law enforcement or civil authorities? | 2.5 | _____ | | |
| 3c Does the website contain information for reporting complaints **against bishops** for abuse or concerns in dealing with abuse? | 2 | _____ | | |
| 3d Does the website contain a link to Catholic Bishops Abuse Reporting (**CBAR**) portal? | 1 | _____ | | |

© 2022 Voice of the Faithful, Inc.

| Description | Possible Points | Awarded Points | Scoring Instruction | Researcher's Comment |
|---|---|---|---|---|
| **4. Background Checks -- 15 points total** | | | | |
| 4a Does the website post information on **who must undergo** Criminal History Record checks? | 5 | _____ | Award 1 pts each: Clergy; Employees; Volunteers. Award full 5 points if all 3 populations are required to undergo Criminal History Record checks. | |
| 4b Does the website state that Criminal History Record checks for those who come in contact with children while working or volunteering in the diocese are required annually? | 2 | _____ | Score 2 if required **annually**. Score 1 if required, but not annually. | |
| 4c Does the website name who or what Department in the Diocese is responsible for conducting Criminal History Records checks? | 2 | _____ | (may be a special group or simply conducted by the Safe Environment office) | |
| 4d Does the website provide information on what happens when Criminal History Record checks turn up a criminal record? | 2 | _____ | Process/Procedure | |
| 4e Is information posted on the Diocesan website that Criminal History Record checks are required of members of religious communities who work or volunteer with children within the diocese? | 2 | _____ | | |
| 4f Does the website state that Criminal History Record checks and a letter of suitability are required of international and temporarily-assigned parish priests? | 2 | _____ | Award 1 point if only required of either foreign-born or temporarily assigned priests; award 2 points if both. | |
| **5. Prevention Education & Training -- 18 points** | | | | |
| 5a Does the Diocesan website contain information about the child abuse education and prevention training for adults? | 5 | _____ | | |
| 5b Does the website contain information about Diocesan requirements for abuse prevention training of all clergy? | 5 | _____ | | |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 46 of 123

| Description | Possible Points | Awarded Points | Scoring Instruction | Researcher's Comment |
|---|---|---|---|---|
| **5. Prevention Education & Training (*continued*)** | | | | |
| 5c Does the website contain information about Diocesan requirements for abuse prevention training of **temporarily-assigned and visiting international priests**? | 2 | _____ | Assign 1 point if for temporarily-assigned or visiting priests; Assign 2 points if for temporarily assigned and visiting, international priests also included. | |
| 5d Does the website contain information about Diocesan requirements for mandatory abuse prevention training of **all volunteers**? | 2 | _____ | | |
| 5e Does the Diocesan website state that specific prevention training is required of **all children and youth** who participate in religious education, Catholic Schools and youth activities of the Diocese? | 4 | _____ | Note the word "required;" and Training for Children should be at minimum a separate item in a Policy. | |
| **6. Contact Information -- 6 points** | | | | |
| 6a Is contact information for the Diocesan office of Child Protection or Safe Environments posted on the website? | 3 | _____ | | |
| 6b Is there contact information on the Diocesan webpage to a civil authority website for filing a child abuse complaint? | 3 | _____ | May be hard to find | |
| **7. Audit Reporting -- 10 points** | | | | |
| 7a Is the Date of and Findings from the most recent USCCB-sponsored Child Protection Audit for this Diocese posted on the Diocesan website? | 5 | _____ | | |
| 7b Does the Diocesan website contain information whether the most recent USCCB audit was conducted onsite? | 2.5 | _____ | | |

| Description | | Possible Points | Awarded Points | Scoring Instruction | Researcher's Comment |
|---|---|---|---|---|---|
| **7. Audit Reporting (*continued*)** | | | | | |
| 7c | Has the bishop personally addressed and posted on the Diocesan website the results of the most recent USCCB-sponsored Diocesan Audit? | 2.5 | _____ | Letter; Diocesan Article/Interview (may be through a link) | |
| **8. Review Boards -- 18 points** | | | | | |
| 8a | Are the Diocesan Review Board members' names and their credentials posted on website? | 5 | _____ | | |
| 8b | Are the majority of the Diocesan Review Board members lay and not employed by the Diocese? | 4 | _____ | | |
| 8c | Is the Chair of the Diocesan Review Board a lay person not employed by the Diocese? | 4 | _____ | | |
| 8d | Is the Diocesan Review Board notified of all abuse allegations? | 5 | _____ | | |
| **9. Publication of Names of Clergy Accused of Abuse -- 5 points** | | | | | |
| 9a | Is a list of credibly accused clergy including bishops living and deceased from that Diocese posted on the Diocesan webpage **or** is there a statement that no diocesan clergy including bishops have had credible allegations? | 2.5 | _____ | NOTE: There may not be any from this Diocese. | |
| 9b | Does the list include credibly accused laicized / dismissed clergy including bishops of the Diocese? | 2.5 | _____ | There may not have been any from the Diocese. If that is stated, then Score 2.5 on Question 9b. | |
| **10. Victim Assistance -- 5 points** | | | | | |
| 10a | Is contact information for the Victim Assistance Coordinator posted on the website? | 2.5 | _____ | If credit given, note where information was found on the website | |
| 10b | Are the pastoral and counseling services available to survivors, families of survivors and parishes described on the website? | 2.5 | _____ | Score 1 if Survivors; Add 1 if Families are mentioned; Add 0.05 if parishes / communities are mentioned. | |

**Total Points    100**

## Appendix B: Child Protection-Safe Environment Scores 2022

*Alphabetical listing ( **archdioceses** in bold)*     NOTE: Maximum score = 100

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Albany NY | 76.0 | 9.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 2.5 |
| Alexandria LA | 63.5 | 8.0 | 5.0 | 5.0 | 13.0 | 16.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| Allentown PA | 83.5 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | 10.0 | 18.0 | 5.0 | 3.5 |
| Altoona-Johnstown PA | 64.5 | 10.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | - | - | 5.0 | 2.5 |
| Amarillo TX | 67.0 | 8.0 | 5.0 | 5.0 | 13.0 | 15.0 | 6.0 | 2.5 | 5.0 | 5.0 | 2.5 |
| **Anchor.-Juneau AK** | 79.5 | 9.0 | 5.0 | 8.0 | 14.0 | 14.0 | 6.0 | 10.0 | 5.0 | 5.0 | 3.5 |
| **Arch. Mili. Services** | 38.5 | 8.0 | - | 5.0 | 4.0 | 13.0 | - | 5.0 | - | - | 3.5 |
| Arlington VA | 79.5 | 8.0 | 5.0 | 8.0 | 12.0 | 16.0 | 3.0 | 5.0 | 14.0 | 5.0 | 3.5 |
| **Atlanta GA** | 77.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Austin TX | 58.0 | 9.0 | 2.5 | 8.0 | 8.0 | 15.0 | 6.0 | - | - | 5.0 | 4.5 |
| Baker-Redmond OR | 64.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | - | 5.0 | - | 2.5 |
| **Baltimore MD** | 92.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Baton Rouge LA | 62.5 | 10.0 | 5.0 | 5.0 | 8.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Beaumont TX | 73.0 | 10.0 | 5.0 | 5.0 | 11.0 | 16.0 | 3.0 | - | 13.0 | 5.0 | 5.0 |
| Belleville IL | 68.0 | 9.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | - | - | 5.0 | 5.0 |
| Biloxi MS | 61.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | 2.5 | 5.0 | 5.0 | 2.5 |
| Birmingham AL | 60.0 | 8.0 | 5.0 | 5.0 | 10.0 | 16.0 | 6.0 | - | 5.0 | - | 5.0 |
| Bismarck ND | 62.0 | 10.0 | 5.0 | 8.0 | 7.0 | 16.0 | 6.0 | - | - | 5.0 | 5.0 |
| Boise ID | 78.0 | 9.0 | 5.0 | 5.0 | 13.0 | 15.0 | 3.0 | 2.5 | 18.0 | 5.0 | 2.5 |
| **Boston MA** | 82.5 | 10.0 | 5.0 | 8.0 | 13.0 | 9.0 | 6.0 | 7.5 | 14.0 | 5.0 | 5.0 |
| Bridgeport CT | 72.0 | 9.0 | 5.0 | 8.0 | 14.0 | 18.0 | 6.0 | 2.5 | - | 5.0 | 4.5 |
| Brooklyn NY | 89.0 | 9.0 | 5.0 | 8.0 | 12.0 | 15.0 | 3.0 | 10.0 | 18.0 | 5.0 | 4.0 |
| Brownsville TX | 58.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 6.0 | - | - | 5.0 | 4.0 |
| Buffalo NY | 72.0 | 9.0 | 5.0 | 5.0 | 10.0 | 11.0 | 3.0 | 7.5 | 14.0 | 5.0 | 2.5 |
| Burlington VT | 68.5 | 9.0 | 5.0 | 5.0 | 12.0 | 9.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Camden NJ | 86.5 | 8.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | 2.5 | 18.0 | 5.0 | 5.0 |

© 2022 Voice of the Faithful, Inc.

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 49 of 123

*Alphabetical listing (**archdioceses** in bold)*        NOTE: Maximum score = 100

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Charleston SC | 88.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 13.0 | 5.0 | 5.0 |
| Charlotte NC | 74.0 | 9.0 | 5.0 | 8.0 | 14.0 | 12.0 | 6.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Cheyenne WY | 74.0 | 8.0 | 5.0 | 8.0 | 8.0 | 15.0 | 6.0 | - | 14.0 | 5.0 | 5.0 |
| **Chicago IL** | 71.0 | 6.0 | 5.0 | 8.0 | 14.0 | 18.0 | 6.0 | - | 4.0 | 5.0 | 5.0 |
| **Cincinnati OH** | 57.0 | 10.0 | - | 8.0 | 12.0 | 14.0 | 3.0 | - | - | 5.0 | 5.0 |
| Cleveland OH | 88.5 | 10.0 | 5.0 | 8.0 | 13.0 | 17.0 | - | 7.5 | 18.0 | 5.0 | 5.0 |
| Colorado Springs CO | 41.5 | 8.0 | - | 8.0 | 7.0 | 10.0 | 6.0 | - | - | - | 2.5 |
| Columbus OH | 57.5 | 9.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | - | 5.0 | 4.5 |
| Corpus Christi TX | 27.0 | - | 5.0 | 2.5 | 3.0 | 6.0 | 3.0 | - | - | 5.0 | 2.5 |
| Covington KY | 71.5 | 10.0 | 5.0 | 8.0 | 14.0 | 18.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| Crookston MN | 77.0 | 10.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | 7.5 | 5.0 | 5.0 | 3.5 |
| Dallas TX | 57.5 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | - | 5.0 | 2.5 |
| Davenport IA | 71.0 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | 3.0 | 7.5 | 5.0 | 2.5 | 5.0 |
| **Denver CO** | 61.5 | 9.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Des Moines IA | 73.5 | 10.0 | 5.0 | 8.0 | 10.0 | 10.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |
| **Detroit MI** | 87.0 | 6.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | 7.5 | 18.0 | 5.0 | 3.5 |
| Dodge City KS | 67.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| **Dubuque IA** | 62.0 | 10.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | - | 5.0 | 5.0 |
| Duluth MN | 67.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| El Paso TX | 50.5 | 9.0 | 5.0 | 5.5 | 9.0 | 9.0 | 3.0 | - | - | 5.0 | 5.0 |
| Erie PA | 69.5 | 8.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | 7.5 | - | 5.0 | 5.0 |
| Evansville IN | 72.0 | 10.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | 7.5 | - | 5.0 | 2.5 |
| Fairbanks AK | 66.0 | 10.0 | 5.0 | 8.0 | 10.0 | 16.0 | 3.0 | - | 5.0 | 5.0 | 4.0 |
| Fall River MA | 82.5 | 9.0 | 2.5 | 8.0 | 13.0 | 17.0 | 6.0 | - | 18.0 | 5.0 | 4.0 |
| Fargo ND | 61.5 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | - | - | 5.0 | 5.0 | 3.5 |
| Ft Wayne-So.Bend IN | 77.0 | 7.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 7.5 | 9.0 | 5.0 | 4.5 |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 50 of 123

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Fort Worth TX | 60.0 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | 3.0 | - | - | 5.0 | 5.0 |
| Fresno CA | 57.5 | 8.0 | 2.5 | 8.0 | 6.0 | 15.0 | 3.0 | 5.0 | 5.0 | - | 5.0 |
| Gallup NM | 64.0 | 10.0 | 5.0 | 7.0 | 14.0 | 11.0 | 6.0 | - | 5.0 | 2.5 | 3.5 |
| **Galves.-Hous. TX** | 65.0 | 10.0 | 2.5 | 8.0 | 7.0 | 17.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Gary IN | 63.5 | 9.0 | 2.5 | 8.0 | 10.0 | 14.0 | - | - | 10.0 | 5.0 | 5.0 |
| Gaylord MI | 71.5 | 7.0 | 5.0 | 8.0 | 8.0 | 14.0 | 3.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| Grand Island NE | 74.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | 7.5 | 14.0 | - | 3.5 |
| Grand Rapids MI | 58.0 | 7.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | 7.5 | 5.0 | - | 3.5 |
| Grt. Falls-Billings MT | 54.5 | 9.0 | 5.0 | 5.5 | 13.0 | 9.0 | - | - | 8.0 | 2.5 | 2.5 |
| Green Bay WI | 78.5 | 10.0 | 5.0 | 8.0 | 6.0 | 14.0 | 6.0 | 7.5 | 13.0 | 5.0 | 4.0 |
| Greensburg PA | 64.0 | 10.0 | 5.0 | 8.0 | 8.0 | 12.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Harrisburg PA | 95.5 | 10.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 10.0 | 18.0 | 5.0 | 3.5 |
| **Hartford CT** | 68.5 | 9.0 | 2.5 | 8.0 | 13.0 | 14.0 | 3.0 | - | 9.0 | 5.0 | 5.0 |
| Helena MT | 75.5 | 10.0 | 5.0 | 8.0 | 9.0 | 15.0 | 3.0 | 2.5 | 13.0 | 5.0 | 5.0 |
| Honolulu HI | 63.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | 5.0 | - | 3.5 |
| Houma-Thibodeaux LA | 69.0 | 9.0 | 5.0 | 8.0 | 10.0 | 14.0 | 3.0 | 2.5 | 9.0 | 5.0 | 3.5 |
| **Indianapolis IN** | 68.0 | 10.0 | 5.0 | 8.0 | 9.0 | 18.0 | 3.0 | - | 5.0 | 5.0 | 5.0 |
| Jackson MS | 77.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Jefferson City MO | 71.0 | 10.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | 7.5 | - | 5.0 | 2.5 |
| Joliet IL | 67.5 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 9.0 | 5.0 | 4.5 |
| Kalamazoo MI | 43.5 | 8.0 | 5.0 | 8.0 | 5.0 | 10.0 | 3.0 | - | - | - | 4.5 |
| Kansas City KS | 64.5 | 9.0 | 5.0 | 8.0 | 8.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| KC-St. Joseph MO | 82.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | 14.0 | 5.0 | 4.5 |
| Knoxville TN | 77.5 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | - | 7.5 | 13.0 | 5.0 | 5.0 |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 51 of 123

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| La Crosse WI | 75.0 | 7.0 | 5.0 | 5.0 | 11.0 | 14.0 | 3.0 | 2.5 | 18.0 | 5.0 | 4.5 |
| Lafayette IN | 59.0 | 10.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | - | 5.0 | 5.0 |
| Lafayette LA | 61.0 | 10.0 | 5.0 | 5.0 | 11.0 | 14.0 | 6.0 | - | - | 5.0 | 5.0 |
| Lake Charles LA | 49.0 | 10.0 | 5.0 | 5.0 | 6.0 | - | 6.0 | 7.5 | - | 5.0 | 4.5 |
| Lansing MI | 63.5 | 9.0 | 5.0 | 8.0 | 9.0 | 11.0 | 3.0 | - | 10.0 | 5.0 | 3.5 |
| Laredo TX | 54.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 6.0 | - | - | - | 5.0 |
| Las Cruces NM | 58.0 | 9.0 | 2.5 | 5.5 | 14.0 | 17.0 | - | - | - | 5.0 | 5.0 |
| Las Vegas NV | 57.0 | 2.0 | 5.0 | 8.0 | 5.0 | 11.0 | 6.0 | 7.5 | 4.0 | 5.0 | 3.5 |
| Lexington KY | 77.0 | 9.0 | 5.0 | 8.0 | 12.0 | 18.0 | 6.0 | - | 9.0 | 5.0 | 5.0 |
| Lincoln NE | 76.0 | 9.0 | 5.0 | 5.0 | 13.0 | 17.0 | 3.0 | - | 14.0 | 5.0 | 5.0 |
| Little Rock AR | 68.0 | 10.0 | 5.0 | 8.0 | 9.0 | 9.0 | 6.0 | 7.5 | 5.0 | 5.0 | 3.5 |
| **Los Angeles CA** | 67.0 | 10.0 | 5.0 | 8.0 | 13.0 | 10.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| **Louisville KY** | 73.5 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |
| Lubbock TX | 23.5 | - | - | 8.0 | - | 5.0 | 3.0 | - | - | 5.0 | 2.5 |
| Madison WI | 61.0 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 4.0 |
| Manchester NH | 69.5 | 10.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| Marquette MI | 67.0 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.0 |
| Memphis TN | 65.5 | 10.0 | 2.5 | 8.0 | 11.0 | 5.0 | 6.0 | - | 13.0 | 5.0 | 5.0 |
| Metuchen NJ | 57.5 | 8.0 | 5.0 | 8.0 | 12.0 | 5.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| **Miami FL** | 65.0 | 10.0 | 5.0 | 8.0 | 14.0 | 15.0 | 3.0 | - | 5.0 | - | 5.0 |
| Milwaukee WI | 63.5 | 9.0 | 5.0 | 8.0 | 8.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| **Mobile AL** | 63.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | - | - | 5.0 |
| Monterey CA | 56.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | - | 5.0 | 5.0 |
| Nashville TN | 79.0 | 10.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| **New Orleans LA** | 65.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | - | - | 5.0 | 3.5 |
| New Ulm MN | 65.5 | 9.0 | 5.0 | 8.0 | 9.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |

© 2022 Voice of the Faithful, Inc.

**Appendix B: Child Protection-Safe Environment Scores 2022**

*Alphabetical listing ( **archdioceses** in bold)*    NOTE: Maximum score = 100

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
| **New York NY** | 67.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 2.5 | 5.0 | 5.0 | 3.5 |
| **Newark NJ** | 69.5 | 9.0 | 5.0 | 8.0 | 11.0 | 10.0 | 3.0 | - | 14.0 | 5.0 | 4.5 |
| Norwich CT | 68.0 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | - |
| Oakland CA | 66.5 | 8.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | 10.0 | 5.0 | 4.5 |
| Ogdensburg NY | 78.0 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 10.0 | 10.0 | - | 5.0 |
| **Oklahoma City OK** | 72.5 | 9.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | 13.0 | 5.0 | 3.5 |
| Omaha NE | 84.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 7.5 | 14.0 | 5.0 | 5.0 |
| Orange CA | 77.5 | 9.0 | 5.0 | 8.0 | 8.0 | 14.0 | 6.0 | - | 18.0 | 5.0 | 4.5 |
| Orlando FL | 81.0 | 10.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| Owensboro KY | 76.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| Palm Beach FL | 61.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | - | - | - | 3.5 |
| Paterson NJ | 75.5 | 9.0 | 5.0 | 5.0 | 13.0 | 14.0 | 6.0 | - | 14.0 | 5.0 | 4.5 |
| Pensac.-Tallahas. FL | 63.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Peoria IL | 41.5 | 9.0 | 5.0 | 5.0 | - | 9.0 | - | - | 5.0 | 5.0 | 3.5 |
| Philadelphia PA | 76.0 | 10.0 | 5.0 | 8.0 | 14.0 | 9.0 | 6.0 | - | 14.0 | 5.0 | 5.0 |
| Phoenix AZ | 69.0 | 10.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | - | - | 5.0 | 5.0 |
| Pittsburgh PA | 64.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Portland ME | 74.0 | 10.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 10.0 | 5.0 | - | 5.0 |
| Portland  OR | 60.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | - | - | 5.0 |
| Providence RI | 69.5 | 7.0 | 5.0 | 8.0 | 6.0 | 14.0 | 3.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| Pueblo CO | 44.0 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | - | - | - |
| Raleigh NC | 63.0 | 8.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Rapid City SD | 61.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 5.0 |
| Reno NV | 54.5 | 10.0 | 5.0 | 8.0 | 5.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| Richmond VA | 89.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Rochester NY | 63.0 | 2.0 | 5.0 | 8.0 | 9.0 | 10.0 | 3.0 | 7.5 | 9.0 | 5.0 | 4.5 |

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 53 of 123

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
| Rockford IL | 63.5 | 10.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | - | - | 5.0 | 4.5 |
| Rockville Centre NY | 63.0 | 9.0 | 5.0 | 5.0 | 14.0 | 17.0 | 3.0 | 2.5 | 5.0 | - | 2.5 |
| Sacramento CA | 62.0 | 8.0 | 5.0 | 8.0 | 13.0 | 9.0 | 3.0 | 2.5 | 4.0 | 5.0 | 4.5 |
| Saginaw MI | 76.5 | 10.0 | 5.0 | 8.0 | 14.0 | 14.0 | 3.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Saint Augustine FL | 70.0 | 8.0 | 5.0 | 8.0 | 13.0 | 17.0 | 3.0 | - | 9.0 | 2.5 | 4.5 |
| Saint Cloud MN | 59.0 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 4.0 | 5.0 | 5.0 |
| Saint Louis MO | 62.5 | 9.0 | 5.0 | 8.0 | 14.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| St.Paul -Minneap. MN | 70.0 | 9.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Saint Petersburg FL | 72.0 | 10.0 | 5.0 | 8.0 | 13.0 | 10.0 | 6.0 | 7.5 | 4.0 | 5.0 | 3.5 |
| Saint Thomas VI | 50.0 | 8.0 | 5.0 | 7.0 | 10.0 | 10.0 | 3.0 | - | 5.0 | - | 2.0 |
| Salina KS | 75.5 | 8.0 | 5.0 | 8.0 | 11.0 | 10.0 | 6.0 | - | 18.0 | 5.0 | 4.5 |
| Salt Lake City UT | 56.5 | 8.0 | 5.0 | 5.0 | 11.0 | 14.0 | 6.0 | - | - | 5.0 | 2.5 |
| San Angelo TX | 75.0 | 10.0 | 5.0 | 8.0 | 11.0 | 10.0 | 6.0 | 10.0 | 5.0 | 5.0 | 5.0 |
| San Antonio TX | 68.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| San Bernardino CA | 66.5 | 10.0 | 5.0 | 8.0 | 9.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| San Diego CA | 74.0 | 9.0 | 2.5 | 8.0 | 12.0 | 10.0 | 6.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| San Francisco CA | 44.5 | - | 5.0 | 8.0 | 6.0 | 9.0 | 3.0 | - | 10.0 | - | 3.5 |
| San Jose CA | 67.5 | 9.0 | 5.0 | 8.0 | 11.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Santa Fe NM | 67.5 | 9.0 | 5.0 | 5.0 | 12.0 | 16.0 | 3.0 | 2.5 | 5.0 | 5.0 | 5.0 |
| Santa Rosa CA | 72.5 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |
| Savannah GA | 58.5 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | 3.0 | - | - | 5.0 | 2.5 |
| Scranton PA | 75.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 10.0 | - | 5.0 | 5.0 |
| Seattle WA | 73.5 | 9.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | 14.0 | 5.0 | 3.5 |
| Shreveport LA | 22.5 | - | 5.0 | 8.0 | - | 4.0 | 3.0 | - | - | - | 2.5 |
| Sioux City IA | 57.5 | 8.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| Sioux Falls SD | 70.5 | 9.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Spokane WA | 70.5 | 9.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| Springfield IL | 87.0 | 10.0 | 5.0 | 8.0 | 14.0 | 18.0 | 3.0 | 7.5 | 14.0 | 5.0 | 2.5 |
| Springfield MA | 62.0 | 10.0 | 5.0 | 8.0 | 5.0 | 14.0 | 6.0 | - | 4.0 | 5.0 | 5.0 |
| Spring.-Cape Gir. MO | 68.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | - | 5.0 | 4.5 |
| Steubenville OH | 62.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | - | - | 9.0 | 5.0 | 5.0 |
| Stockton CA | 58.5 | 9.0 | 5.0 | 5.0 | 10.0 | 9.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| Superior WI | 69.0 | 8.0 | 5.0 | 8.0 | 11.0 | 17.0 | 6.0 | 7.5 | 4.0 | - | 2.5 |
| Syracuse NY | 88.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Toledo OH | 72.0 | 9.0 | 5.0 | 8.0 | 13.0 | 10.0 | 3.0 | 5.0 | 9.0 | 5.0 | 5.0 |
| Trenton NJ | 43.5 | 7.0 | 5.0 | 5.0 | 6.0 | 9.0 | 3.0 | - | - | 5.0 | 3.5 |
| Tucson AZ | 56.5 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 2.5 |
| Tulsa OK | 72.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | 5.0 | 5.0 | 2.5 |
| Tyler TX | 56.5 | 10.0 | 5.0 | 8.0 | 9.0 | 9.0 | 6.0 | - | - | 5.0 | 4.5 |
| Venice FL | 92.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 10.0 | 18.0 | 5.0 | 4.5 |
| Victoria TX | 65.0 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Washington DC | 60.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 4.0 | 5.0 | 5.0 |
| Wheel.-Charlest. WV | 81.0 | 9.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | - | 18.0 | 5.0 | 5.0 |
| Wichita KS | 64.5 | 7.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Wilmington DE | 64.0 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | 7.5 | - | 5.0 | 4.5 |
| Winona-Rochest. MN | 93.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Worcester MA | 88.0 | 9.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | 7.5 | 18.0 | - | 4.5 |
| Yakima WA | 60.5 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Youngstown OH | 75.0 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | 7.5 | 5.0 | 2.5 | 4.0 |

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 55 of 123

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Harrisburg PA | 95.5 | 10.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 10.0 | 18.0 | 5.0 | 3.5 |
| Winona-Rochest. MN | 93.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| **Baltimore MD** | 92.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Venice FL | 92.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 10.0 | 18.0 | 5.0 | 4.5 |
| Richmond VA | 89.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Brooklyn NY | 89.0 | 9.0 | 5.0 | 8.0 | 12.0 | 15.0 | 3.0 | 10.0 | 18.0 | 5.0 | 4.0 |
| Charleston SC | 88.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 13.0 | 5.0 | 5.0 |
| Cleveland OH | 88.5 | 10.0 | 5.0 | 8.0 | 13.0 | 17.0 | - | 7.5 | 18.0 | 5.0 | 5.0 |
| Syracuse NY | 88.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 7.5 | 18.0 | 5.0 | 5.0 |
| Worcester MA | 88.0 | 9.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | 7.5 | 18.0 | - | 4.5 |
| **Detroit MI** | 87.0 | 6.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | 7.5 | 18.0 | 5.0 | 3.5 |
| Springfield IL | 87.0 | 10.0 | 5.0 | 8.0 | 14.0 | 18.0 | 3.0 | 7.5 | 14.0 | 5.0 | 2.5 |
| Camden NJ | 86.5 | 8.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | 2.5 | 18.0 | 5.0 | 5.0 |
| Omaha NE | 84.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 7.5 | 14.0 | 5.0 | 5.0 |
| Allentown PA | 83.5 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | 10.0 | 18.0 | 5.0 | 3.5 |
| **Boston MA** | 82.5 | 10.0 | 5.0 | 8.0 | 13.0 | 9.0 | 6.0 | 7.5 | 14.0 | 5.0 | 5.0 |
| Fall River MA | 82.5 | 9.0 | 2.5 | 8.0 | 13.0 | 17.0 | 6.0 | - | 18.0 | 5.0 | 4.0 |
| KC-St. Joseph MO | 82.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | 14.0 | 5.0 | 4.5 |
| Orlando FL | 81.0 | 10.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| Wheel.-Charlest. WV | 81.0 | 9.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | - | 18.0 | 5.0 | 5.0 |
| **Anchor.-Juneau AK** | 79.5 | 9.0 | 5.0 | 8.0 | 14.0 | 14.0 | 6.0 | 10.0 | 5.0 | 5.0 | 3.5 |
| Arlington VA | 79.5 | 8.0 | 5.0 | 8.0 | 12.0 | 16.0 | 3.0 | 5.0 | 14.0 | 5.0 | 3.5 |
| Nashville TN | 79.0 | 10.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| Green Bay WI | 78.5 | 10.0 | 5.0 | 8.0 | 6.0 | 14.0 | 6.0 | 7.5 | 13.0 | 5.0 | 4.0 |
| Boise ID | 78.0 | 9.0 | 5.0 | 5.0 | 13.0 | 15.0 | 3.0 | 2.5 | 18.0 | 5.0 | 2.5 |
| Ogdensburg NY | 78.0 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | 10.0 | 10.0 | - | 5.0 |

© 2022 Voice of the Faithful, Inc.

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Atlanta GA** | 77.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Jackson MS | 77.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Knoxville TN | 77.5 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | - | 7.5 | 13.0 | 5.0 | 5.0 |
| Orange CA | 77.5 | 9.0 | 5.0 | 8.0 | 8.0 | 14.0 | 6.0 | - | 18.0 | 5.0 | 4.5 |
| Crookston MN | 77.0 | 10.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | 7.5 | 5.0 | 5.0 | 3.5 |
| Ft Wayne-So.Bend IN | 77.0 | 7.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 7.5 | 9.0 | 5.0 | 4.5 |
| Lexington KY | 77.0 | 9.0 | 5.0 | 8.0 | 12.0 | 18.0 | 6.0 | - | 9.0 | 5.0 | 5.0 |
| Saginaw MI | 76.5 | 10.0 | 5.0 | 8.0 | 14.0 | 14.0 | 3.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| Albany NY | 76.0 | 9.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | 7.5 | 5.0 | 5.0 | 2.5 |
| Lincoln NE | 76.0 | 9.0 | 5.0 | 5.0 | 13.0 | 17.0 | 3.0 | - | 14.0 | 5.0 | 5.0 |
| Owensboro KY | 76.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 7.5 | 5.0 | 5.0 | 4.5 |
| Philadelphia PA | 76.0 | 10.0 | 5.0 | 8.0 | 14.0 | 9.0 | 6.0 | - | 14.0 | 5.0 | 5.0 |
| Helena MT | 75.5 | 10.0 | 5.0 | 8.0 | 9.0 | 15.0 | 3.0 | 2.5 | 13.0 | 5.0 | 5.0 |
| Paterson NJ | 75.5 | 9.0 | 5.0 | 5.0 | 13.0 | 14.0 | 6.0 | - | 14.0 | 5.0 | 4.5 |
| Salina KS | 75.5 | 8.0 | 5.0 | 8.0 | 11.0 | 10.0 | 6.0 | - | 18.0 | 5.0 | 4.5 |
| La Crosse WI | 75.0 | 7.0 | 5.0 | 5.0 | 11.0 | 14.0 | 3.0 | 2.5 | 18.0 | 5.0 | 4.5 |
| San Angelo TX | 75.0 | 10.0 | 5.0 | 8.0 | 11.0 | 10.0 | 6.0 | 10.0 | 5.0 | 5.0 | 5.0 |
| Scranton PA | 75.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | 10.0 | - | 5.0 | 5.0 |
| Youngstown OH | 75.0 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | 7.5 | 5.0 | 2.5 | 4.0 |
| Charlotte NC | 74.0 | 9.0 | 5.0 | 8.0 | 14.0 | 12.0 | 6.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Cheyenne WY | 74.0 | 8.0 | 5.0 | 8.0 | 8.0 | 15.0 | 6.0 | - | 14.0 | 5.0 | 5.0 |
| Grand Island NE | 74.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | 7.5 | 14.0 | - | 3.5 |
| Portland ME | 74.0 | 10.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 10.0 | 5.0 | - | 5.0 |
| San Diego CA | 74.0 | 9.0 | 2.5 | 8.0 | 12.0 | 10.0 | 6.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| Des Moines IA | 73.5 | 10.0 | 5.0 | 8.0 | 10.0 | 10.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |
| **Louisville KY** | 73.5 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 57 of 123

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
| Seattle WA | 73.5 | 9.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | 14.0 | 5.0 | 3.5 |
| Beaumont TX | 73.0 | 10.0 | 5.0 | 5.0 | 11.0 | 16.0 | 3.0 | - | 13.0 | 5.0 | 5.0 |
| **Oklahoma City OK** | 72.5 | 9.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | 13.0 | 5.0 | 3.5 |
| Santa Rosa CA | 72.5 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 18.0 | 5.0 | 4.5 |
| Bridgeport CT | 72.0 | 9.0 | 5.0 | 8.0 | 14.0 | 18.0 | 6.0 | 2.5 | - | 5.0 | 4.5 |
| Buffalo NY | 72.0 | 9.0 | 5.0 | 5.0 | 10.0 | 11.0 | 3.0 | 7.5 | 14.0 | 5.0 | 2.5 |
| Evansville IN | 72.0 | 10.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | 7.5 | - | 5.0 | 2.5 |
| Saint Petersburg FL | 72.0 | 10.0 | 5.0 | 8.0 | 13.0 | 10.0 | 6.0 | 7.5 | 4.0 | 5.0 | 3.5 |
| Toledo OH | 72.0 | 9.0 | 5.0 | 8.0 | 13.0 | 10.0 | 3.0 | 5.0 | 9.0 | 5.0 | 5.0 |
| Tulsa OK | 72.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | 5.0 | 5.0 | 2.5 |
| Covington KY | 71.5 | 10.0 | 5.0 | 8.0 | 14.0 | 18.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| Gaylord MI | 71.5 | 7.0 | 5.0 | 8.0 | 8.0 | 14.0 | 3.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| **Chicago IL** | 71.0 | 6.0 | 5.0 | 8.0 | 14.0 | 18.0 | 6.0 | - | 4.0 | 5.0 | 5.0 |
| Davenport IA | 71.0 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | 3.0 | 7.5 | 5.0 | 2.5 | 5.0 |
| Jefferson City MO | 71.0 | 10.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | 7.5 | - | 5.0 | 2.5 |
| Sioux Falls SD | 70.5 | 9.0 | 5.0 | 8.0 | 13.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Spokane WA | 70.5 | 9.0 | 5.0 | 8.0 | 13.0 | 15.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| Saint Augustine FL | 70.0 | 8.0 | 5.0 | 8.0 | 13.0 | 17.0 | 3.0 | - | 9.0 | 2.5 | 4.5 |
| St.Paul -Minneap. MN | 70.0 | 9.0 | 5.0 | 8.0 | 12.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Erie PA | 69.5 | 8.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | 7.5 | - | 5.0 | 5.0 |
| Manchester NH | 69.5 | 10.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| **Newark NJ** | 69.5 | 9.0 | 5.0 | 8.0 | 11.0 | 10.0 | 3.0 | - | 14.0 | 5.0 | 4.5 |
| Providence RI | 69.5 | 7.0 | 5.0 | 8.0 | 6.0 | 14.0 | 3.0 | 7.5 | 9.0 | 5.0 | 5.0 |
| Houma-Thibodeaux LA | 69.0 | 9.0 | 5.0 | 8.0 | 10.0 | 14.0 | 3.0 | 2.5 | 9.0 | 5.0 | 3.5 |
| Phoenix AZ | 69.0 | 10.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | - | - | 5.0 | 5.0 |
| Superior WI | 69.0 | 8.0 | 5.0 | 8.0 | 11.0 | 17.0 | 6.0 | 7.5 | 4.0 | - | 2.5 |

Case: 23-30564     Doc# 610-4     Filed: 04/19/24     Entered: 04/19/24 15:35:29     Page 58 of 123

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Burlington VT | 68.5 | 9.0 | 5.0 | 5.0 | 12.0 | 9.0 | 6.0 | 7.5 | 5.0 | 5.0 | 5.0 |
| **Hartford CT** | 68.5 | 9.0 | 2.5 | 8.0 | 13.0 | 14.0 | 3.0 | - | 9.0 | 5.0 | 5.0 |
| San Antonio TX | 68.5 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| Belleville IL | 68.0 | 9.0 | 5.0 | 8.0 | 13.0 | 17.0 | 6.0 | - | - | 5.0 | 5.0 |
| **Indianapolis IN** | 68.0 | 10.0 | 5.0 | 8.0 | 9.0 | 18.0 | 3.0 | - | 5.0 | 5.0 | 5.0 |
| Little Rock AR | 68.0 | 10.0 | 5.0 | 8.0 | 9.0 | 9.0 | 6.0 | 7.5 | 5.0 | 5.0 | 3.5 |
| Norwich CT | 68.0 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | - |
| Spring.-Cape Gir. MO | 68.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | - | 5.0 | 4.5 |
| Dodge City KS | 67.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Duluth MN | 67.5 | 10.0 | 5.0 | 8.0 | 13.0 | 14.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| Joliet IL | 67.5 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 9.0 | 5.0 | 4.5 |
| San Jose CA | 67.5 | 9.0 | 5.0 | 8.0 | 11.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Santa Fe NM | 67.5 | 9.0 | 5.0 | 5.0 | 12.0 | 16.0 | 3.0 | 2.5 | 5.0 | 5.0 | 5.0 |
| Amarillo TX | 67.0 | 8.0 | 5.0 | 5.0 | 13.0 | 15.0 | 6.0 | 2.5 | 5.0 | 5.0 | 2.5 |
| **Los Angeles CA** | 67.0 | 10.0 | 5.0 | 8.0 | 13.0 | 10.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Marquette MI | 67.0 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.0 |
| **New York NY** | 67.0 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 2.5 | 5.0 | 5.0 | 3.5 |
| Oakland CA | 66.5 | 8.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | 10.0 | 5.0 | 4.5 |
| San Bernardino CA | 66.5 | 10.0 | 5.0 | 8.0 | 9.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Fairbanks AK | 66.0 | 10.0 | 5.0 | 8.0 | 10.0 | 16.0 | 3.0 | - | 5.0 | 5.0 | 4.0 |
| Memphis TN | 65.5 | 10.0 | 2.5 | 8.0 | 11.0 | 5.0 | 6.0 | - | 13.0 | 5.0 | 5.0 |
| **New Orleans LA** | 65.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | - | - | 5.0 | 3.5 |
| New Ulm MN | 65.5 | 9.0 | 5.0 | 8.0 | 9.0 | 15.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| **Galves.-Hous. TX** | 65.0 | 10.0 | 2.5 | 8.0 | 7.0 | 17.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| **Miami FL** | 65.0 | 10.0 | 5.0 | 8.0 | 14.0 | 15.0 | 3.0 | - | 5.0 | - | 5.0 |
| Victoria TX | 65.0 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 59 of 123

*Listing by scores (* ***archdioceses*** *in bold)* NOTE: Maximum score = 100

| Diocese | Total Score | Scores per category: Maximum possible per category | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
| Altoona-Johnstown PA | 64.5 | 10.0 | 5.0 | 8.0 | 12.0 | 16.0 | 6.0 | - | - | 5.0 | 2.5 |
| Baker-Redmond OR | 64.5 | 9.0 | 5.0 | 8.0 | 13.0 | 16.0 | 6.0 | - | 5.0 | - | 2.5 |
| Kansas City KS | 64.5 | 9.0 | 5.0 | 8.0 | 8.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Pittsburgh PA | 64.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Wichita KS | 64.5 | 7.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 4.5 |
| Gallup NM | 64.0 | 10.0 | 5.0 | 7.0 | 14.0 | 11.0 | 6.0 | - | 5.0 | 2.5 | 3.5 |
| Greensburg PA | 64.0 | 10.0 | 5.0 | 8.0 | 8.0 | 12.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Wilmington DE | 64.0 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | 7.5 | - | 5.0 | 4.5 |
| Alexandria LA | 63.5 | 8.0 | 5.0 | 5.0 | 13.0 | 16.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| Gary IN | 63.5 | 9.0 | 2.5 | 8.0 | 10.0 | 14.0 | - | - | 10.0 | 5.0 | 5.0 |
| Honolulu HI | 63.5 | 9.0 | 5.0 | 8.0 | 13.0 | 14.0 | 6.0 | - | 5.0 | - | 3.5 |
| Lansing MI | 63.5 | 9.0 | 5.0 | 8.0 | 9.0 | 11.0 | 3.0 | - | 10.0 | 5.0 | 3.5 |
| Milwaukee WI | 63.5 | 9.0 | 5.0 | 8.0 | 8.0 | 14.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| **Mobile AL** | 63.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 3.0 | 7.5 | - | - | 5.0 |
| Pensac.-Tallahas. FL | 63.5 | 9.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Rockford IL | 63.5 | 10.0 | 5.0 | 8.0 | 14.0 | 11.0 | 6.0 | - | - | 5.0 | 4.5 |
| Raleigh NC | 63.0 | 8.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 5.0 |
| Rochester NY | 63.0 | 2.0 | 5.0 | 8.0 | 9.0 | 10.0 | 3.0 | 7.5 | 9.0 | 5.0 | 4.5 |
| Rockville Centre NY | 63.0 | 9.0 | 5.0 | 5.0 | 14.0 | 17.0 | 3.0 | 2.5 | 5.0 | - | 2.5 |
| Baton Rouge LA | 62.5 | 10.0 | 5.0 | 5.0 | 8.0 | 16.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Saint Louis MO | 62.5 | 9.0 | 5.0 | 8.0 | 14.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| Bismarck ND | 62.0 | 10.0 | 5.0 | 8.0 | 7.0 | 16.0 | 6.0 | - | - | 5.0 | 5.0 |
| **Dubuque IA** | 62.0 | 10.0 | 5.0 | 8.0 | 11.0 | 15.0 | 3.0 | - | - | 5.0 | 5.0 |
| Sacramento CA | 62.0 | 8.0 | 5.0 | 8.0 | 13.0 | 9.0 | 3.0 | 2.5 | 4.0 | 5.0 | 4.5 |
| Springfield MA | 62.0 | 10.0 | 5.0 | 8.0 | 5.0 | 14.0 | 6.0 | - | 4.0 | 5.0 | 5.0 |
| Steubenville OH | 62.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | - | - | 9.0 | 5.0 | 5.0 |

© 2022 Voice of the Faithful, Inc.

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Denver CO** | 61.5 | 9.0 | 5.0 | 8.0 | 10.0 | 14.0 | 6.0 | - | - | 5.0 | 4.5 |
| Fargo ND | 61.5 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | - | - | 5.0 | 5.0 | 3.5 |
| Palm Beach FL | 61.5 | 9.0 | 5.0 | 8.0 | 14.0 | 16.0 | 6.0 | - | - | - | 3.5 |
| Biloxi MS | 61.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | 2.5 | 5.0 | 5.0 | 2.5 |
| Lafayette LA | 61.0 | 10.0 | 5.0 | 5.0 | 11.0 | 14.0 | 6.0 | - | - | 5.0 | 5.0 |
| Madison WI | 61.0 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 4.0 |
| Rapid City SD | 61.0 | 9.0 | 5.0 | 8.0 | 12.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 5.0 |
| Yakima WA | 60.5 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 6.0 | - | 5.0 | 5.0 | 2.5 |
| Birmingham AL | 60.0 | 8.0 | 5.0 | 5.0 | 10.0 | 16.0 | 6.0 | - | 5.0 | - | 5.0 |
| Fort Worth TX | 60.0 | 10.0 | 5.0 | 8.0 | 10.0 | 14.0 | 3.0 | - | - | 5.0 | 5.0 |
| Portland OR | 60.0 | 10.0 | 5.0 | 8.0 | 12.0 | 14.0 | 6.0 | - | - | - | 5.0 |
| Washington DC | 60.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 4.0 | 5.0 | 5.0 |
| Lafayette IN | 59.0 | 10.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | - | 5.0 | 5.0 |
| Saint Cloud MN | 59.0 | 10.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 4.0 | 5.0 | 5.0 |
| Savannah GA | 58.5 | 10.0 | 5.0 | 8.0 | 11.0 | 14.0 | 3.0 | - | - | 5.0 | 2.5 |
| Stockton CA | 58.5 | 9.0 | 5.0 | 5.0 | 10.0 | 9.0 | 3.0 | 7.5 | - | 5.0 | 5.0 |
| Austin TX | 58.0 | 9.0 | 2.5 | 8.0 | 8.0 | 15.0 | 6.0 | - | - | 5.0 | 4.5 |
| Brownsville TX | 58.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 6.0 | - | - | 5.0 | 4.0 |
| Grand Rapids MI | 58.0 | 7.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | 7.5 | 5.0 | - | 3.5 |
| Las Cruces NM | 58.0 | 9.0 | 2.5 | 5.5 | 14.0 | 17.0 | - | - | - | 5.0 | 5.0 |
| Columbus OH | 57.5 | 9.0 | 5.0 | 8.0 | 12.0 | 11.0 | 3.0 | - | - | 5.0 | 4.5 |
| Dallas TX | 57.5 | 10.0 | 5.0 | 8.0 | 12.0 | 9.0 | 6.0 | - | - | 5.0 | 2.5 |
| Fresno CA | 57.5 | 8.0 | 2.5 | 8.0 | 6.0 | 15.0 | 3.0 | 5.0 | 5.0 | - | 5.0 |
| Metuchen NJ | 57.5 | 8.0 | 5.0 | 8.0 | 12.0 | 5.0 | 6.0 | - | 5.0 | 5.0 | 3.5 |
| Sioux City IA | 57.5 | 8.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 3.5 |
| **Cincinnati OH** | 57.0 | 10.0 | - | 8.0 | 12.0 | 14.0 | 3.0 | - | - | 5.0 | 5.0 |

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 61 of 123

*Listing by scores ( **archdioceses** in bold)*  NOTE: Maximum score = 100

| Diocese | Total Score | C1: 10 | C2: 5 | C3: 8 | C4: 15 | C5: 18 | C6: 6 | C7: 10 | C8: 18 | C9: 5 | C10: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Scores per category: Maximum possible per category | | | | | | | | | |
| Las Vegas NV | 57.0 | 2.0 | 5.0 | 8.0 | 5.0 | 11.0 | 6.0 | 7.5 | 4.0 | 5.0 | 3.5 |
| Salt Lake City UT | 56.5 | 8.0 | 5.0 | 5.0 | 11.0 | 14.0 | 6.0 | - | - | 5.0 | 2.5 |
| Tucson AZ | 56.5 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 2.5 |
| Tyler TX | 56.5 | 10.0 | 5.0 | 8.0 | 9.0 | 9.0 | 6.0 | - | - | 5.0 | 4.5 |
| Monterey CA | 56.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 3.0 | - | - | 5.0 | 5.0 |
| Grt. Falls-Billings MT | 54.5 | 9.0 | 5.0 | 5.5 | 13.0 | 9.0 | - | - | 8.0 | 2.5 | 2.5 |
| Reno NV | 54.5 | 10.0 | 5.0 | 8.0 | 5.0 | 9.0 | 3.0 | - | 5.0 | 5.0 | 4.5 |
| Laredo TX | 54.0 | 10.0 | 5.0 | 8.0 | 11.0 | 9.0 | 6.0 | - | - | - | 5.0 |
| El Paso TX | 50.5 | 9.0 | 5.0 | 5.5 | 9.0 | 9.0 | 3.0 | - | - | 5.0 | 5.0 |
| Saint Thomas VI | 50.0 | 8.0 | 5.0 | 7.0 | 10.0 | 10.0 | 3.0 | - | 5.0 | - | 2.0 |
| Lake Charles LA | 49.0 | 10.0 | 5.0 | 5.0 | 6.0 | - | 6.0 | 7.5 | - | 5.0 | 4.5 |
| San Francisco CA | 44.5 | - | 5.0 | 8.0 | 6.0 | 9.0 | 3.0 | - | 10.0 | - | 3.5 |
| Pueblo CO | 44.0 | 9.0 | 5.0 | 8.0 | 10.0 | 9.0 | 3.0 | - | - | - | - |
| Kalamazoo MI | 43.5 | 8.0 | 5.0 | 8.0 | 5.0 | 10.0 | 3.0 | - | - | - | 4.5 |
| Trenton NJ | 43.5 | 7.0 | 5.0 | 5.0 | 6.0 | 9.0 | 3.0 | - | - | 5.0 | 3.5 |
| Colorado Springs CO | 41.5 | 8.0 | - | 8.0 | 7.0 | 10.0 | 6.0 | - | - | - | 2.5 |
| Peoria IL | 41.5 | 9.0 | 5.0 | 5.0 | - | 9.0 | - | - | 5.0 | 5.0 | 3.5 |
| **Arch. Mili. Services** | 38.5 | 8.0 | - | 5.0 | 4.0 | 13.0 | - | 5.0 | - | - | 3.5 |
| Corpus Christi TX | 27.0 | - | 5.0 | 2.5 | 3.0 | 6.0 | 3.0 | - | - | 5.0 | 2.5 |
| Lubbock TX | 23.5 | - | - | 8.0 | - | 5.0 | 3.0 | - | - | 5.0 | 2.5 |
| Shreveport LA | 22.5 | - | 5.0 | 8.0 | - | 4.0 | 3.0 | - | - | - | 2.5 |

# Appendix D: CBAR Reporting (Category 3)

CBAR is the Catholic Bishop Abuse Reporting Service that has been established to receive reports of sexual abuse and related misconduct by bishops, including coverups, and to relay those reports to proper Church authorities for investigation. These are the dioceses where links, which should be available in every diocese, do not meet the standard.

| Diocese | Score | Researcher Comment |
| --- | --- | --- |
| Corpus Christi TX | 2.5 | No CBAR information; no mandate to report to law enforcement |
| Alexandria LA | 5.0 | No CBAR information |
| Amarillo TX | 5.0 | No CBAR information |
| Arch Military Serv | 5.0 | No CBAR information |
| Baton Rouge LA | 5.0 | No CBAR information |
| Beaumont TX | 5.0 | No CBAR information |
| Birmingham AL | 5.0 | No CBAR information |
| Boise ID | 5.0 | No CBAR information |
| Buffalo NY | 5.0 | No CBAR information |
| Burlington VT | 5.0 | No CBAR information; broken link |
| La Crosse WI | 5.0 | No CBAR information |
| Lafayette LA | 5.0 | No CBAR information |
| Lake Charles LA | 5.0 | No CBAR information |
| Lincoln NE | 5.0 | No CBAR information |
| Paterson NJ | 5.0 | No CBAR information |
| Peoria IL | 5.0 | No CBAR information |
| Rockville Centre NY | 5.0 | No CBAR information |
| Salt Lake City UT | 5.0 | No CBAR information |
| Santa Fe NM | 5.0 | No CBAR information |
| Stockton CA | 5.0 | No CBAR information |
| Trenton NJ | 5.0 | No CBAR information |
| El Paso TX | 5.5 | No mandate to report to law enforcement |
| Great Falls-Billings MT | 5.5 | No mandate to report to law enforcement |
| Las Cruces NM | 5.5 | No information on process to report abuse |
| Gallup NM | 7.0 | No link to CBAR site |
| St. Thomas VI | 7.0 | No link to CBAR site |

# Appendix E: Reporting on Credibly Accused Priests

Worksheet Category 9 (5 points total) assesses the disclosures on credibly accused priests.

| Diocese | Score | Researcher Comment |
| --- | --- | --- |
| Baker-Redmond OR | 0 | No list found |
| Birmingham AL | 0 | No list found |
| Colorado Springs CO | 0 | No list found |
| Fresno CA | 0 | No list found |
| Grand Island NE | 0 | No list found |
| Grand Rapids MI | 0 | No list found |
| Honolulu HI | 0 | No list found |
| Kalamazoo MI | 0 | No list found |
| Laredo TX | 0 | No list found |
| Miami FL | 0 | No list found |
| Arch. Military Services | 0 | No list found |
| Mobile AL | 0 | No list found |
| Ogdensburg NY | 0 | No list found |
| Palm Beach FL | 0 | No list found |
| Portland OR | 0 | No list found |
| Portland ME | 0 | No list found |
| Pueblo CO | 0 | No list found |
| Rockville Centre NY | 0 | No list found |
| St. Thomas VI | 0 | No list found |
| San Francisco CA | 0 | No list found |
| Shreveport LA | 0 | No list found |
| Superior WI | 0 | No list found |
| Worcester MA | 0 | No list found |
| Davenport IA | 2.5 | List does not indicate which clergy may have been laicized, dismissed, or removed. |
| Gallup NM | 2.5 | No status of allegation found, such as laicized or dismissed |
| Great Falls-Billings MT | 2.5 | List does not indicate which clergy may have been laicized, dismissed, or removed. |
| St. Augustine FL | 2.5 | List included in report to Florida Atty. General; the list notes names but not current status or list of assignments. |
| Youngstown OH | 2.5 | List of names reports who is deceased but not names of those removed from ministry. |

# Exhibit 18

**ROMAN CATHOLIC ARCHBISHOP**

**OF SAN FRANCISCO**

<u>MEETING OF CREDITORS</u>

**SEPTEMBER 28, 2023**



**Court Reporting • Video**

310.230.9700 • els@elitigationservices.com
www.elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 66
of 123

**CEDRIC:** --listen-only mode during today's Q&A session. If you'd like to ask a questions, please press star, then one. And I'd like to turn today's (inaudible) to your host, Mr. Jason Blumberg. Thank you, you may begin.

**BLUMBERG:** Good morning. This is the first meeting of creditors for the Roman Catholic Archbishop of San Francisco. That's case number 23-30564. This case was filed on August 21, 2023. Today's date is September 28, 2023. It's approximately 10:14 a.m. My name is Jason Blumberg. I'm a Trial Attorney with the Office of the United States Trustee.

This meeting is required under Section 341(A) of the Bankruptcy Code. The purpose of the meeting is to allow for an examination of the debtor under oath. Questions may include but are not limited to why the case was filed, the operation of the business, and the prospects for the organization. I will initially question the debtor the some degree. Creditors will also have an opportunity to examine the debtor.

As a reminder, the meeting is being digitally recorded. Please remember that the recorder cannot see who you are or your head nodding so please identify yourself when asking a question and please remember to give verbal responses, which can be picked up by the recorder. The recorder works best when only one person is speaking at a time so please allow for questions to be completed before answering and please wait for answers to be completed before asking follow-up questions. Whenever you are not speaking, please mute your line to prevent background noise. We keep the recording for two years after case closure. If anyone would like to obtain a duplicate of today's proceeding or a transcript, the arrangements are made to the Office of the United States Trustee.

Before we proceed with the 341 meeting, I'm going to take a few minutes to explain what this meeting is and how it will proceed. As I mentioned, this meeting is being conducted under Section 341 of the United States Bankruptcy Code in conjunction with the bankruptcy case currently pending before the United States Bankruptcy Court in the Northern District of California. As such, it is expected that every participant will conduct themselves in a manner appropriate for a legal proceeding.

Preliminarily, the statutory purpose of the meeting is to allow creditors the opportunity to ask questions of the debtor under oath. If you don't have any questions for the debtor's representatives, you may stay on the line and listen, but you also may drop off the call at any time.

The representatives of the debtor are Archbishop Cordileone, Father Patrick Summerhays, and Joseph Passarello. By court order, Father Summerhays has been designated as the debtor's responsible individual in this case. Mr. Passarello is the debtor's senior financial director. He signed the debtor's schedules and statements.

MEETING OF CREDITORS | eLitigation Services, Inc.    2
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

This meeting is an opportunity for creditors to ask questions about the debtor's general financial affairs. If you have concerns about your specific claim or situation, this is not the appropriate time to express those concerns. This is a legal proceeding with the debtor's representatives testifying under oath about the debtor's financial affairs.

To ensure there's enough time for everyone to ask questions, please keep questions concise and avoid asking repeat questions. While I understand that many people's claims arose under very troubling and painful circumstances, this is not the place to address specific claims. To the extent you need additional information about the debtor this bankruptcy case, you should visit the courts electronic docket or the debtor's claims agent website on the Agent Solutions.

Information on the claims agent website is available to you free of charge and will updated as additional information becomes available. The website address is https://omniagentsolution.com/rcasf. You should also carefully review any filings or notices you receive to preserver your rights.

The examination today will conducted as if it were in court. This means that only representatives will answer any questions. If a represented does--representative, excuse me, does not know the answer, then the answer will simply be, "I don't know." If the, excuse me, if the purpose of the meeting is being frustrated by anyone's conduct, then I'll stop the meeting.

Of note the following rules need to be followed. First, the same question should not be asked repeated times, even by different people. It is, therefore, important that you listen to each question and each answer and not ask the same question again. Second, only one person may ask questions of the representatives at one time. Third, questions can only be asked of the representatives. It's not appropriate to speak to anyone other than the debtor's representatives. Fourth, if the representatives do not know the answer to a question, please do not ask the question again, including by asking it in a different way. Fifth, the person asking the question should not be combative or engage in personal attacks.

Now that the purpose and rules of the meeting have been established, the order of this meeting will be as follows. I will take the appearance of the debtor and counsel for the Official Committee of Unsecured Creditors. I will, then, permit the rep-- excuse me, I will then put the representatives of the debtor under oath. I will, then, permit the debtor's counsel and the archbishop to make an opening statement. A statement is not mandatory. I will, then, permit counsel for the official committee of unsecured creditors committee, excuse me, counsel for the official committee of unsecured creditors to make its own opening statement if it chooses. After that, I will ask questions of the debtor's representatives. Please listen carefully to all my

MEETING OF CREDITORS | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

3

1     questions. If I've already asked a question, you don't need to repeat the question.
2     After I conclude my questions, I will invite members of the creditors committee to
3     ask questions. I will invite counsel for the creditors committee to ask questions if
4     they have any.

5     And then after that, I will open the line for any other creditor to ask a question
6     during a group question-and-answer period. Please do not indicate that you wish to
7     ask a question until I announce that the question-and-answer portion of the meeting
8     has commenced. Once I announce the general question-and-answer period, that is
9     has started, so to speak, if you do wish to ask a question, you must provide your full
10     name, with spelling, prior to speaking. Please note, if you do not identify yourself, I
11     may have to ask the operator to mute your line.

12     The operator, Cedric, is there anything specific that creditors need to do during the
13     question-and-answer period to indicate that they wish to ask questions?

14 **CEDRIC:**     Yes, that would be star one.

15 **BLUMBERG:**     Star one. So when we get to the question-and-answer period, if you do
16     wish to ask a question, you'll hit star one on your phone. We'll repeat that
17     instruction at that time but just keep that in mind.

18     So if everyone cooperates and there are no repeat questions, this call may be able to
19     be concluded today. However, we will not require the representatives to provide
20     testimony today for more than four hours. If the meeting is not concluded at the
21     four-hour mark, we will discontinue the meeting, and I will decide whether we will
22     schedule a continued meeting of creditors in the future for additional questioning.
23     The notice of the new date and time will be on the website Seth Worth, on the
24     claims agent website, which, again, is https://omniagentsolutions.com/rcasf. It will
25     also be on the case docket for this case.

26     Okay, and so with that out of the way, will the debtor's attorney please make his
27     appearance for the record?

28 **PASCUZZI:**   Good morning, Mr. Blumberg. This is Paul Pascuzzi, Felderstein Fitzgerald
29     Willoughby Pascuzzi & Rios for the debtor.

30 **BLUMBERG:**     Good morning, Mr. Pascuzzi. And will counsel for the creditors
31     committee please make their appearances?

32 **STANG:**     Good morning. James Stang, S-t-a-n-g, Pachulski Stang Ziehl & Jones, counsel for
33     the creditors committee, subject to appointment, pursuant to an employment
34     application that will be filed shortly.

35 **BLUMBERG:**     And is there anyone else, Mr. Stang, from your office making an
36     appearance today?

MEETING OF CREDITORS | eLitigation Services, Inc.   4
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **STANG:**     No.

2   **BLUMBERG:**     Okay.

3   **STANG:**     There are attorneys from my office who are listening in today, but I don't expect
4         that they will be making any statements on the record.

5   **BLUMBERG:**     Thank you. Archbishop Cordileone, are you on the line, sir?

6   **CORDILEONE:**     Yes, I am.

7   **BLUMBERG:**     Good morning.

8   **CORDILEONE:**     Good morning.

9   **BLUMBERG:**     Would you please raise your right hand and let me know when you're
10         doing that.

11   **CORDILEONE:**     Yes, I am.

12   **BLUMBERG:**     Do you swear or affirm that you will tell the truth, the whole truth, and
13         only the truth?

14   **CORDILEONE:**     I do.

15   **BLUMBERG:**     Do you understand that you are testifying under penalty of perjury?

16   **CORDILEONE:**     I do.

17   **BLUMBERG:**     Is there any reason why you can't give your best testimony today?

18   **CORDILEONE:**     No.

19   **BLUMBERG:**     Thank you. I will note for the record that prior to the meeting I received a
20         copy of the archbishop's driver's license, which appears to be in order. Archbishop.
21         to the best of your knowledge, was that a true and correct copy of your driver's
22         license?

23   **CORDILEONE:**     Yes.

24   **BLUMBERG:**     And, Mr. Pascuzzi, can you confirm that this is, in fact, the Archbishop,
25         the representative of your client on the line?

26   **PASCUZZI:**   Yes.

27   **BLUMBERG:**     Thank you. Father Patrick Summerhays, are you on the line, sir?

28   **SUMMER:**  I am.

29   **BLUMBERG:**     Good morning.

MEETING OF CREDITORS | eLitigation Services, Inc.   **5**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **SUMMER:** Good morning.

2 **BLUMBERG:** Would you please raise your right hand and let me know when you're
3 doing that?

4 **SUMMER:** Yeah, I'm doing that.

5 **BLUMBERG:** Do you swear or affirm that you will tell the truth, the whole truth, and
6 only the truth?

7 **SUMMERHAYS:** Yes.

8 **BLUMBERG:** Do you understand that you are testifying under penalty of perjury?

9 **SUMMERHAYS:** Yes.

10 **BLUMBERG:** Is there any reason why you can't give your best testimony today?

11 **SUMMERHAYS:** No.

12 **BLUMBERG:** I will note for the record that prior to meeting I received a copy of Father
13 Summerhays' driver's license, and it appears to be in order. Father Summerhays, to
14 the best of your knowledge, was that a true and correct copy of your driver's
15 license?

16 **SUMMERHAYS:** Yes, it is

17 **BLUMBERG:** And, Mr. Pascuzzi, can you confirm for the record that you recognize Mr.
18 Summerhays as the representative of your client?

19 **PASCUZZI:** Yes, Father Summerhays is sitting right next to me. I recognize him.

20 **BLUMBERG:** Thank you. And, Father Summerhays, would you please state your full
21 name for the record?

22 **SUMMER:** My full name is Patrick John Summerhays.

23 **BLUMBERG:** And what is your position as it relates to the debtor?

24 **SUMMER:** I am the Vicar General and Moderator of the Curia for the Archdiocese of San
25 Francisco.

26 **BLUMBERG:** Thank you. And, Mr. Joseph Passarello, are you on the line, sir?

27 **PASSARELLO:** Yes, I am.

28 **BLUMBERG:** Good morning, sir. Would you please raise your right hand and let me
29 know when you're doing that?

30 **PASSARELLO:** I am doing that.

MEETING OF CREDITORS | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com
6

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 71
of 123

1  **BLUMBERG:**        Do you swear or affirm that you will tell the truth, the whole truth, and
2                 only the truth?

3  **PASSARELLO:**        Yes.

4  **BLUMBERG:**        Do you understand that you are testifying under penalty of perjury?

5  **PASSARELLO:**        Yes, I do.

6  **BLUMBERG:**        Is there any reason why you can't give your best testimony today?

7  **PASSARELLO:**        No, there is not.

8  **BLUMBERG:**        Thank you. I'll note for the record that prior to today's meeting I received a
9                 copy of what purports to be Mr. Passarello's driver's license. Mr. Passarello, to the
10                best of your knowledge, was that a true and correct copy of your driver's license?

11 **PASSARELLO:**        Yes, it is.

12 **BLUMBERG:**        And, Mr. Passarello, can you state your full name for the record?

13 **PASSARELLO:**        Joseph James Passarello, Junior.

14 **BLUMBERG:**        And, Mr. Passarello, are you the same gentleman who signed the
15                schedules and statements in this case?

16 **PASSARELLO:**        Yes, I am.

17 **BLUMBERG:**        And, Mr. Pascuzzi, can you confirm that Mr. Passarello is, in fact, the
18                representative of your client who did sign the pe--excuse me, the schedules and
19                statement?

20 **PASCUZZI:**  Yes. Confirmed.

21 **BLUMBERG:**        Okay. Oh, I should ask one more question to Father Hays [sic]. Father
22                Hays [sic], you are the same Father Hays [sic] who signed the petition in this case,
23                correct?

24 **SUMMER:**  Father Summerhays, yes.

25 **BLUMBERG:**        Summerhays. I apologize. I apologize.

26 **SUMMER:**  That's okay.

27 **BLUMBERG:**        Okay, so, Mr. Pascuzzi, now is the point where the debtor may make a
28                statement, the Archbishop may make a statement, if--if the debtor so chooses. The
29                statement's not mandatory.

MEETING OF CREDITORS | eLitigation Services, Inc.    7
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **PASCUZZI:**   Thank you, Mr. Blumberg. Archbishop, do you want to go ahead with your
2   statement, please?

3   **MALE:**   He just text me and said the line just dropped. Can--can Cedric call the Archbishop
4   back?

5   **BLUMBERG:**   Cedric--Cedric, can you try to connect the Archbishop again, sir?

6   **CEDRIC:**   Sure thing. One moment. Excuse me, the Archbishop has rejoined the call.

7   **BLUMBERG:**   Thank you, Cedric. Archbishop Cordileone, are you back on the line, sir?

8   **CORDILEONE:**   Yes, I'm here.

9   **BLUMBERG:**   So, before you dropped off, I was just--this is Jason Blumberg for the
10  United States Trustee's Office--I was just stating for the record that now was the
11  point in the meeting where either Mr. Pascuzzi, the debtor's counsel, or you, the
12  Archbishop, may make a statement if that is what is chosen, but the statement is not
13  mandatory, and then I'll turn it over to Mr. Pascuzzi for--for any additional
14  commentary.

15  **PASCUZZI:**   Yes, Archbishop, now--

16  **CORDILEONE:**   Yes, (inaudible)--

17  **PASCUZZI:**   --would be the time to make your statement, please.

18  **CORDILEONE:**   Okay, will do. Thank you. And thank you for providing me with this
19  opportunity to share my thoughts with you on how best to facilitate healing and care
20  of sexual abuse survivors who have suffered unspeakable harm because of
21  (inaudible) the church's ministers and staff (inaudible) cares. I'm currently out of the
22  country due to a longstanding commitment I have to an event that I must reach
23  shortly. But I know we have some potential windows of time to decide over the
24  next month and I can address your questions to this important sensitive topic and
25  I've blocked out those windows of time in my calendar.

26  Let me use this brief time to say, first of all, that I wholeheartedly agree with the
27  remark of Pope Francis when he said that if it had been only one case of an abuse of
28  a--of a minor, that would have been monstrous. The Pope called on his brother
29  bishops to shoulder the sins of past generations. So in that spirit, I want to apologize
30  very sincerely for the sexual abuse of the (inaudible) priests and others within the
31  Church and for the suffering endured by abuse survivors and their families.   The
32  fact that some in the Church have succumb to perpetrating this moral (inaudible) on
33  our society, it makes us feel ashamed and people never forget the harm that has
34  been done.

MEETING OF CREDITORS | eLitigation Services, Inc.   8
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    We do believe the Chapter 11 bankruptcy process due to debt solution will provide
2    a fair and equitable compensation to the innocent abuse survivors who have been
3    harmed. At the same time, we know that financial remuneration alone will not
4    compensate for all the suffering caused. That's why I remain committed to helping
5    abuse survivors find healing and some peace of mind as we strive to eradicate this
6    shameful crime from our society as a whole. And, for that, I'm also committed to
7    maintaining a safe environment in our church for all, especially children and young
8    people.

9    I'm grateful to my predecers [sic] and the Archdiocese of San Francisco and other
10   leaders in the archdiocese who have worked hard to put effective educational and
11   preventative measures in place. And I'm encouraged by the fact that occurrency
12   abuse within the Catholic Church by now is very rare. I believe the Church has set
13   the standard today for other organizations showing that we can and--what can and
14   should be done to protect our children. We all should be committed to them.

15   In conclusion, let me say that as a faith community, we continue to pray for
16   survivors of abuse and for their families, the troubles of society, (inaudible)
17   persecution, and justice (inaudible). Thank you.

18   **BLUMBERG:**    Thank--thank you, Archbishop Cordileone. Mr. Pascuzzi, I understand that
19   the Archbishop has to leave shortly, but it's been requested that the Archbishop stay
20   on the line while committee counsel makes a brief statement. I will just note for the
21   record that the United States Trustee appointed a committee of unsecured creditors
22   on September 1, 2023. If you have any questions about the committee, please reach
23   out to our office or to the committee's proposed counsel, Pachulski Stang Ziehl &
24   Jones, LLP.

25   Now, Mr. Stang, on behalf of the committee, committee's proposed counsel, do you
26   wish to make a statement?

27   **STANG:**    I do, but I thought--I thought Mr. Pascuzzi wanted to say something so I would
28   certainly (inaudible).

29   **BLUMBERG:**    Oh, yes, I apologize. Mr. Pascuzzi, did I step over a statement that you
30   wanted to make?

31   **PASCUZZI:**  Yes. If you--if you allow me, it'll be short.

32   **BLUMBERG:**    Absolutely.

33   **PASCUZZI:**  And then we can get Mr. Stang's statement. And then, after that, I believe the
34   Archbishop will have to drop off. So thank you.

35   As reported in our papers that we filed with the bankruptcy court, there are
36   approximately 537 complaints that have been filed against the debtor that are

MEETING OF CREDITORS | eLitigation Services, Inc.    9
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

pending in the joint coordinator proceeding in Alameda County. There were two cases set for trial on August 23. Mediation efforts prior to trial were unsuccessful. Based on the information available now, these AB 218 claims are historical claims. The dates of alleged abuse range from the 1950s to approximately 2008. Nearly half involve clergy members who were previously accused in the last reopening of the statute of limitations in 2003 and/or were clergy members that are long since deceased.

We say that because it's important to the Archbishop and the debtor that this abuse stops and that the procedures are in place to ensure that it doesn't happen again. The archdiocese is and has been, prior to the bankruptcy filing, committed to ensuring the safety of all children. For over 20 years the archdiocese's policies have gone above and beyond the requirements of--and recommendations of the U.S. Conference of Catholic Bishops Charter to protect children from abuse and to provide healing for those who have been harmed, including providing resources, both monetary and nonmonetary, for survivors. Through education and awareness, continuous improvement of policies, proactive measures to prevent abuse, and accountability efforts, the archdiocese has demonstrated its commitment to the safety of all those who are part of the community, especially children.

And while no amount of money can adequately compensate survivors for the harms they've suffered, the archdiocese and its insurers have paid more than $70 million over the past 20 years to survivors, either directly or by funding group settlement funds, to fulfill its responsibility for the abuse by diocesan clergy. At this time, however, the archdiocese has determined that it has neither the financial means nor the practical ability to litigate the multitude of abuse claims on multiple timelines while still serving the Catholic community. So to ensure the archdiocese fulfills both its foundational and morale obligations to the survivors, the faithful, and others who have put their trust in the archdiocese, it made the difficult decision to commence this bankruptcy case.

A large number of these diocesan Chapter 11 cases have allowed religious institutions and non-profit organizations who are debtors to emerge from Chapter 11 with a plan acceptable to survivors, to address and compensate both monetarily and nonmonetary survivors, while continuing to serve their respective constituents. The archdiocese desires a similar outcome in this bankruptcy case and is and will continue to be working diligently toward that end.

Thank you.

**BLUMBERG:**  All right, thank you, Mr. Pascuzzi. Mr. Stang, would you like to make a statement on behalf of the committee?

MEETING OF CREDITORS | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

10

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 75 of 123

**STANG:** Thank you. Archbishop Cordileone, my name is Jim Stang. I'm a principal of the law firm Pachulski Stang Ziehl & Jones that the committee selected to serve as bankruptcy counsel.

Has U.S. Trustee alluded, committee is made up of adults who were sexually abused as children by people for whom the archdiocese is responsible. Neither the committee members nor any of the constituents in the committee wanted the archdiocese to file bankruptcy. It was done without consultation with the constituency or the state court lawyers representing those people. And committee members feel that taking their cases away from the California state court system and bringing them in to a federal bankruptcy court is a fundamental violation of their rights to be heard before a jury. So we will perform our duties as outlined by the bankruptcy code and as required by the court in this reorganization, but this is not something that the survivors wanted.

Archbishop, the committee understands recently that you're out of town, out of the country, but it is disappointed that you don't have enough time in your schedule today to hear from them, to hear their questions, and to respond to their questions. We appreciate that you will be making time soon to do just that in what we hope is a continued first meeting of creditors.

And while Father Summerhays was designated as the responsible individual for the debtor, and he is testifying today and he is available for the entire meeting, that was done before the committee was appointed, it was done without consultation to the state co-counsel, who have cases pe--who had cases pending in the civil court, and there certainly was no opportunity to be heard before Judge Montali. And my point, Archbishop, about Father Summerhays, and it's no criticism of Father Summerhays, he and I have not gotten to know each other yet, but Cali--the Archdiocese of San Francisco, is a corporation sole. And to put it in real layperson's terms, Archbishop, you're the guy.

I have represented close to tw--20 sexual abuse committees in different Chapter 11 cases, and I have learned over the course of the 20 years that I have done that that there will be a settlement in this case if you want there to be a settlement in this case and a more personal involvement is essential to any progress in the case and the accomplishment of the goal of protection of children.

So it is not the intention of the committee to ask Father Summerhays any questions or, and I'm--I'm sorry if I'm mispronouncing his name, Mr. Passarelli [sic], and, of course, you're--you're moving out to another meeting, but we look forward to the opportunity to do it when you're available.

I wasn't intending to say anything about the particulars of your statements because, of course, I didn't know what you were going to say, but there are two things that I

MEETING OF CREDITORS | eLitigation Services, Inc.   11
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 76 of 123

1     want to know. You talked about the Church setting a standard for child protection,
2     this archdiocese is the only archdiocese in the State of California, I'm sorry, diocese
3     in the State of California that has not published a list of credibly accused priests. It
4     has published a list of priests in good standing, but it has not done what every other
5     archdiocese has done. And that will be the subject of questions when we get to meet
6     again.

7     The second thing that I wanted to know, and this is where I'll le--I'll stop, is Mr.
8     Pascuzzi, who I know from our involvement into Diocese of Stockton and who I
9     have very high regard for from our professional relationship over the many years,
10     said that the archdiocese and its insurers have spent $70 million in settlements over
11     the course of some years. A question that I'll be asking at the next meeting is how
12     much was spent in legal defense funds and how much was spent on therapy
13     provided by the archdiocese for survivors.

14     So, Mr. Blumberg, I appreciate the opportunity to make the statement and to
15     highlight at least those two points that I noted from the statements that Mr. Pascuzzi
16     and Archbishop Cordileone made. And the committee will per--attend this meeting,
17     we intend to listen very carefully to the testimony, but we will not be asking any
18     questions.

19 **BLUMBERG:**     All right.

20 **STANG:**     Thank you.

21 **BLUMBERG:**     Thank you, Mr. Stang. I thank you for your statement on behalf of the
22     committee. So now I'm going to switch over to really what I would regard as very
23     bankruptcy-specific, case-specific schedules and statement-specific questions. And,
24     for that, my questions will now turn to Father Summerhays and, in particular, Mr.
25     Passarello.

26     So, Mr. Passarello, you attended the initial debtor interview at--with my office, is
27     that correct, sir?

28 **PASSARELLO:**     Yes. Yes.

29 **BLUMBERG:**     I--I would--

30 **PASSARELLO:**     It was a call in.

31 **BLUMBERG:**     It was a call in, that's correct. I--I will just note for the record that there are
32     a number of documents that my office requested that the debtor is still trying to
33     obtain. I would request that, unless an earlier date has been provided by the
34     bankruptcy analysts for the United States Trustee, that all those documents be
35     provided to my office by no later than October 6.

MEETING OF CREDITORS | eLitigation Services, Inc.    12
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  Mr. Passarello, you signed a questionnaire and submitted it to the United States
2  Trustee in connection with the initial debtor interview, is that correct, sir?

3  **PASSARELLO:**  Yes, I did.

4  **BLUMBERG:**  To the best of your knowledge are each of the responses on the
5  questionnaire true and correct?

6  **PASSARELLO:**  Yes, they are.

7  **BLUMBERG:**  Okay. So my office, I'll just note for the record, has received evidence of
8  the establishment or the conversion of existing accounts into debtor in possession
9  accounts for seven Bank of America accounts, the accounts ending with 220, 233,
10  129, 287, 4577, and, excuse me, 5250, and 083. We haven't yet received evidence
11  for the other accounts that are subject to the cash management order.

12  With respect to insurance, we have received some of the insurance policies
13  referenced on the debtor's submission in connection with the initial ditter--excuse
14  me, the initial debtor interview. We're still waiting for the balance of those policies.
15  I would request that that information that was requested by Ms. Maccabee from my
16  office be provided basically as soon as possible. I think Mr. Pascuzzi has an email
17  with respect to that.

18  Mr. Passarello, does the debtor have worker's compensation insurance coverage?

19  **PASSARELLO:**  Say that again.

20  **BLUMBERG:**  Does the debtor have worker's compensation insurance coverage?

21  **PASSARELLO:**  Yes, we do.

22  **BLUMBERG:**  Okay.

23  **PASSARELLO:**  Yes, we do.

24  **BLUMBERG:**  Thank you. Does the debtor have insurance coverage for property loss
25  with respect to all of the structures it--it owns?

26  **PASSARELLO:**  Yes, we do.

27  **BLUMBERG:**  And does the debtor have liability insurance coverage?

28  **PASSARELLO:**  Yes, we do.

29  **BLUMBERG:**  There was a Toyota Camry on Schedule A/B, I just wanted to ask you to
30  confirm that there's liability insurance coverage in place with respect to that vehicle.

31  **PASSARELLO:**  I believe there is. Yes.

MEETING OF CREDITORS | eLitigation Services, Inc.  **13**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | |
|---|---|
| 1 **BLUMBERG:** | Okay. I'll just ask that you confirm and c--and consult with Mr. Pascuzzi |
| 2 | to get the United States Trustees Office the evidence that that sh--insurance |
| 3 | coverage exists. |
| 4 **PASSARELLO:** | Will do. |
| 5 **BLUMBERG:** | And, Mr. Passarello, has the United States Trustee been added to all the |
| 6 | debtor's insurance policies as a notice party in the vent of policy cancellation? |
| 7 **PASSARELLO:** | I don't know that that has happened completely yet. |
| 8 **BLUMBERG:** | Thank you. |
| 9 **PASSARELLO:** | I don't know if--but we will--we will--we will follow up on that. |
| 10 **PASCUZZI:** | Yes, Mr. Blumberg, this is Paul Pascuzzi, I believe that's in process. We're in |
| 11 | communication with the broker to--to get that to happen. |
| 12 **BLUMBERG:** | Thank you. Mr. Passarello, is the debtor required to file Federal tax |
| 13 | returns? |
| 14 **PASSARELLO:** | No, we are not. |
| 15 **BLUMBERG:** | Is the debtor required to file state tax returns? |
| 16 **PASSARELLO:** | No, we are not. |
| 17 **BLUMBERG:** | Does the debtor need any permits or licenses to operate its business? |
| 18 **PASSARELLO:** | Not that I'm aware of, no. |
| 19 **BLUMBERG:** | And did you receive the debtor's Chapter 11 confirmation worksheet at the |
| 20 | initial debtor interview? |
| 21 **PASCUZZI:** | Mr. Blumberg, this is Mr. Pascuzzi. I don't think we got that from Ms. Maccabee, |
| 22 | but she mentioned it from the Santa Rosa case so I--I'm aware of it. If it's something |
| 23 | you can email me, that would be helpful. |
| 24 **BLUMBERG:** | Absolutely, we--we'll do that. Okay, appreciate that. So let's turn now to |
| 25 | the petition schedules and statements. Before we do that, I'll just make a |
| 26 | preliminate--a preliminary statement that is this: it's important to note that there are |
| 27 | statements of methodology regarding the debtor's statements and schedules attached |
| 28 | to the debtor's schedules and statements. These statements of methodology are not |
| 29 | part of the bankruptcy code or the bankruptcy rules. These statements of |
| 30 | methodology are not authorized by the bankruptcy rules or a part of the official |
| 31 | forms. Debtors are obligated to disclose all assets and liabilities, and although the |
| 32 | statements of methodology clarify items and are appreciated from an informational |
| 33 | standpoint, to the extent that they are otherwise inconsistent with the code rules and |

MEETING OF CREDITORS | eLitigation Services, Inc.    **14**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 statements made in the official forms, the United States Trustee considers the
2 statements of meth--methodology to be irrelevant.

3 Father Summerhays, did you personally sign the petition filed in this bankruptcy
4 case?

5 **SUMMERHAYS:** Yes, I did.

6 **BLUMBERG:** Did you review that document before you signed it?

7 **SUMMERHAYS:** Yes, I did.

8 **BLUMBERG:** To the best of your knowledge, is the information contained in the petition
9 true and correct as of the date this case was filed?

10 **SUMMERHAYS:** Yes, it is.

11 **BLUMBERG:** Is the name of the debtor correctly listed on the petition?

12 **SUMMERHAYS:** Yes, it is.

13 **BLUMBERG:** Section 4 of the petition lists 1 Peter Yorke way in San Francisco as the
14 debtor's address. Is that a good address for quarterly fee notices fo--from the United
15 States Trustee?

16 **SUMMERHAYS:** Yes, it is.

17 **BLUMBERG:** Thank you. Mr. Passarello, did you personally sign the schedules and
18 Statement of Financial Affairs filed in this case as ECF numbers 152 and 153?

19 **PASSARELLO:** Yes, I did.

20 **BLUMBERG:** Were these documents prepared by the debtor's attorney's office?

21 **PASSARELLO:** Yes, they were.

22 **BLUMBERG:** And who provided the information that the debtor's attorney--attorneys
23 used to prepare the documents?

24 **PASSARELLO:** They were provided by ours--our--our information and records.

25 **BLUMBERG:** Did you read, review--

26 **PASSARELLO:** We provi--

27 **BLUMBERG:** Oh, I'm sorry. I over--I spoke over you. Please, please continue, sir.

28 **PASSARELLO:** We provided those records.

MEETING OF CREDITORS | eLitigation Services, Inc.     15
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | Did you read, review, and understand the schedules and Statement of |
| 2 | | Financial Affairs before you signed those documents? |

| | | |
|---|---|---|
| 3 | **PASSARELLO:** | Yes, I did. |

| | | |
|---|---|---|
| 4 | **BLUMBERG:** | Since you've signed those documents, have you become aware of any |
| 5 | | changes which must be made to those documents so they're true, complete, and |
| 6 | | accurate? |

| | | |
|---|---|---|
| 7 | **PASSARELLO:** | I'm not aware of any. |

| | | |
|---|---|---|
| 8 | **BLUMBERG:** | So to the best of your knowledge, do the schedules and Statement of |
| 9 | | Financial Affairs--well, let me--let me rephrase it, to the best of your knowledge, |
| 10 | | are the schedules and Statement of Financial Affairs accurate as to the debtor's |
| 11 | | assets, liabilities, and financial affairs as of the date this case was file? |

| | | |
|---|---|---|
| 12 | **PASSARELLO:** | Yes. |

| | | |
|---|---|---|
| 13 | **BLUMBERG:** | Notwithstanding any reservations or statements in the statements of |
| 14 | | methodology, to the best of your knowledge, are the debtor's schedules and |
| 15 | | statements true, complete, and accurate? |

| | | |
|---|---|---|
| 16 | **PASSARELLO:** | Yes, they are. |

| | | |
|---|---|---|
| 17 | **BLUMBERG:** | Notwithstanding any reservations and statements in the statements of |
| 18 | | methodology, to the best of your knowledge, do the debtor's schedules and |
| 19 | | Statement of Financial Affairs list all of the debtor's assets? |

| | | |
|---|---|---|
| 20 | **PASSARELLO:** | Yes, they--they do. |

| | | |
|---|---|---|
| 21 | **BLUMBERG:** | Do those documents list all of the debtor's debts to the best of your |
| 22 | | knowledge? |

| | | |
|---|---|---|
| 23 | **PASSARELLO:** | Yes, they do. |

| | | |
|---|---|---|
| 24 | **BLUMBERG:** | To the best of your knowledge, do those documents list all of the debtor's |
| 25 | | creditors? |

| | | |
|---|---|---|
| 26 | **PASSARELLO:** | Yes, they do. |

| | | |
|---|---|---|
| 27 | **BLUMBERG:** | I'm gonna direct this question, first, to Father Summerhays and, then, |
| 28 | | perhaps if he doesn't know the answer, maybe Mr. Passarello can jump in. This is |
| 29 | | the question. Father Summerhays, are the various parishes, schools, cemeteries, and |
| 30 | | charitable organizations located within the geographic area of the archdiocese |
| 31 | | incorporated into the debtor's operations and accounting system? |

| | | |
|---|---|---|
| 32 | **MALE:** | Mr. Blumberg, could you be a little bit more clear? What do you mean incorporated |
| 33 | | into? |

MEETING OF CREDITORS | eLitigation Services, Inc.    16
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 81
of 123

1    **BLUMBERG:**        I--I can--I can certainly try. So--

2    **MALE:**        Okay.

3    **BLUMBERG:**        --does--Mr.--Mr.--Father Hays [sic], does--Father Summerhays, does the
4              debtor have an accounting system?

5    **SUMMERHAYS:** Yes, we do.

6    **BLUMBERG:**        Does that accounting system include entries that relate to the parishes,
7              parochial schools, and other organizations, non-debtor Catholic entities, located
8              within the archdiocese?

9    **SUMMERHAYS:** Are you asking if we keep their books or--

10   **BLUMBERG:**        Let's start with that. Do you keep their books?

11   **SUMMERHAYS:** We do--we do not keep--we do not keep their books, but there are
12             transactions in our system between our parishes and schools. But we do not keep
13             their books. They keep their own books.

14   **BLUMBERG:**        Does the debtor have access to the books and records and accounting
15             systems of these non-debtor Catholic entities within the archdiocese?

16   **SUMMERHAYS:** We can see them.

17   **BLUMBERG:**        And does the debtor prepare those books and records?

18   **PASSARELLO:**        We do not prepare them. This is Joe Passarello. We do not prepare them.

19   **BLUMBERG:**        Okay. Let me direct this next question, also, to Father Summerhays and,
20             then, Mr. Passarello, free free--feel free to jump in. This is the question. Do the
21             debtor and the parishes have any of the same trustees or board members?

22   **PASCUZZI:**   Mr. Blumberg, the--the debtor is a corporation sole so it doesn't have board
23             members or trustees. And so I guess the answer is no to that, but I'm--I'm not sure
24             the question is applicable.

25   **BLUMBERG:**        Father Summerhays, do you--you've heard Mr. Pascuzzi's response. Does
26             that--is that consisting with your understanding?

27   **SUMMERHAYS:** That is consistent with my understanding.

28   **BLUMBERG:**        Let me ask you this, do any members of the leadership of the debtor,
29             including yourself, serve as trustees or board members with respect or on any of the
30             parishes located in the archdiocese?

31   **SUMMERHAYS:** I don't know.

MEETING OF CREDITORS | eLitigation Services, Inc.        17
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 82
of 123

1    **PASSARELLO:**    I--I don't, either. This is Joe Passarello.

2    **BLUMBERG:**    Are you aware of anyone within the leadership of the archdiocese serving
3    in such a capacity with respect to a parish within the archdiocese?

4    **SUMMERHAYS:** What's that? Yeah, can you repeat the question for me?

5    **BLUMBERG:**    So as I understand your response, Father Summerhays, you don't serve as
6    a trustee or a board member with respect to any of the parish--parishes located in
7    the archdiocese. Is that correct?

8    **SUMMERHAYS:** That is correct.

9    **PASCUZZI:**    Mr. Blumberg, this is Mr. Pascuzzi again. The parishes don't have board members
10    or trustees either. They're governed by a pastor. Each--each parish is governed by a
11    pastor.

12    **BLUMBERG:**    But there are finance committees, is that correct, Father Summerhays?

13    **SUMMERHAYS:** Yes, but the ultimate responsibility financially is the parish that's with the
14    pastor.

15    **BLUMBERG:**    Okay. So aside from the finance committees, to the best of your
16    knowledge, Father Summerhays, are there any other organizations that provide
17    guidance to the pastors for a parish?

18    **SUMMERHAYS:** Well, I guess as far as--professional advice, do you mean?

19    **BLUMBERG:**    No, not professional advice. More like guidance and leadership. Such as
20    the arch--such as the archbishop may provide to a parish.

21    **SUMMERHAYS:** I mean, the--there are pastoral committees that the pastoral counsel that the
22    parish then help, you know, the--the pastors set the agenda and (inaudible) finance
23    counsel. Is that--is that what you're talking about?

24    **BLUMBERG:**    I think so. Well, let me ask you this, do you serve, you yourself, serve on
25    any finance committee for any parish located within the archdie--archdiocese?

26    **SUMMERHAYS:** No, I do not.

27    **BLUMBERG:**    And, Mr. Passarello, same question for you, sir.

28    **PASSARELLO:**    I do not.

29    **BLUMBERG:**    Father Summerhays, are you aware of anyone within the leadership of the
30    debtor who serves on a finance committee for a parish located within the
31    archdiocese?

MEETING OF CREDITORS | eLitigation Services, Inc.    18
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **SUMMERHAYS:** Who would you consider a leader? I mean--

2 **BLUMBERG:** Is there an org--well, who would you consider the leader of the arch--who
3 would you consider the leader of the archdiocese--of the debtor, excuse me?

4 **SUMMERHAYS:** Well, the archbishop is--is the leader of the archdiocese.

5 **BLUMBERG:** Agreed. And would you consider yourself a leader?

6 **SUMMERHAYS:** Yes.

7 **BLUMBERG:** Okay. Is there anyone within the management structure of the debtor aside
8 from the archbishop and yourself?

9 **SUMMERHAYS:** I--the only person I know is--we do have someone at the chancery who turns
10 on his finance--his parish finance council, that he had done that for a long time.

11 **BLUMBERG:** And who's that, sir?

12 **SUMMERHAYS:** Rod Linhares.

13 **BLUMBERG:** Okay. And then I--I kinda wanna just explore the same issue with respect
14 to the entity that's referred to as RPSC in the First Day Declaration of Mr.
15 Passarello. Mr. Passarello, are you familiar with the entity?

16 **PASSARELLO:** Yes, I am.

17 **BLUMBERG:** And can you just state for the record what the full name of that entity is?

18 **PASSARELLO:** The real archdiose--Archdiocese of San Francisco Reap Property Support
19 Corporation.

20 **BLUMBERG:** Okay. So is there a board of directors for that corporation?

21 **PASSARELLO:** Yes, there is.

22 **BLUMBERG:** Okay. Mr. Passarello, do you serve on the board for that corporation?

23 **PASSARELLO:** No, I don't.

24 **BLUMBERG:** Father Summerhays, do you serve on the board of directors for that
25 corporation?

26 **SUMMERHAYS:** I do not.

27 **BLUMBERG:** Does the archbishop serve on the board of that corporation, Father
28 Summerhays?

29 **SUMMERHAYS:** I don't think so.

MEETING OF CREDITORS | eLitigation Services, Inc.     19
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 84
of 123

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | And the gentleman you mentioned, Mr. Linhares? |
| 2 | Summeryhays: | Yes. |
| 3 | **BLUMBERG:** | Father Summerhays, does he serve on the board of the RPSC? |
| 4 | **SUMMERHAYS:** | No, he does not. |
| 5 6 | **BLUMBERG:** | Okay. And then, Mr. Passarello, there was also an entity referred to as CASC in your First Day Declaration. Are you familiar with the entity? |
| 7 | **PASSARELLO:** | Yes, I am. |
| 8 | **BLUMBERG:** | And would you mind just stating its full name for the record, sir? |
| 9 | **PASSARELLO:** | The Archdiocese of San Francisco Capital Assets Support Corporation. |
| 10 | **BLUMBERG:** | Does that entity have a board of directors? |
| 11 | **PASSARELLO:** | Yes, it does. |
| 12 | **BLUMBERG:** | Do you serve on that board of directors, sir? |
| 13 | **PASSARELLO:** | No, I don't. |
| 14 15 | **BLUMBERG:** | Father Summerhays, same question. Do you serve as a director for the CASC corporation? |
| 16 | **SUMMERHAYS:** | No, I do not. |
| 17 | **BLUMBERG:** | Do you know if Mr. Linhares does? |
| 18 | **SUMMERHAYS:** | I know he does not. |
| 19 20 | **BLUMBERG:** | And do you know whether the archbishop serves on the board of that entity? |
| 21 | **SUMMERHAYS:** | No, he does not. |
| 22 23 | **BLUMBERG:** | Father Summerhays. the cemeteries within the archdiocese, who's responsible for their management? |
| 24 | **SUMMERHAYS:** | Monica Williams, the seminary--or the cemeteries director. |
| 25 | **BLUMBERG:** | And is she overseen by anybody? |
| 26 | **SUMMERHAYS:** | She reports to me. |
| 27 28 | **BLUMBERG:** | Okay. The--the high schools, the four high schools that are referenced or are located within the archdiocese--well, let me take a step back because I don't |

MEETING OF CREDITORS | eLitigation Services, Inc. 20
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 85 of 123

1  think I set that up very well. Mr. Passarello, you--you reference four archdiocesan
2  high schools in your declaration, is that correct, sir?

3  **PASSARELLO:**  That's correct.

4  **BLUMBERG:**  And could you just state their names for the record?

5  **PASSARELLO:**  Marin Catholic, Sacred Heart Cathedral Prep, Archbishop Riordan High
6  School, and Junipero Serra High School.

7  **BLUMBERG:**  Okay. Now, not asking kind of for specific questions, more of a general
8  schematic, Father--Father Summerhays, who is in charge with the management of
9  those four high schools, if you know?

10  **SUMMERHAYS:** Well, they're individual presidents and principals and their boards.

11  **BLUMBERG:**  Okay. So--so each high school would have a president, a principal, and a
12  board?

13  **SUMMERHAYS:** I'm not sure if they all do, but that's generally the--the structure that they--they
14  have.

15  **BLUMBERG:**  Okay.

16  **PASSARELLO:**  That is correct. I--they each have a president, a principal, and a--and a
17  board.

18  **BLUMBERG:**  Okay. I appreciate that. So, Father Summerhays, do you serve on the
19  board for any of these high schools?

20  **SUMMERHAYS:** I sit on the board of governance for Sacred Heart Cathedral Prep.

21  **BLUMBERG:**  Okay. Do you know if the archbishop--bishop sits on the board for any of
22  these high schools?

23  **SUMMERHAYS:** He sits on that same board.

24  **BLUMBERG:**  Okay. And, Mr. Passarello, do you sit on any of the boards for the high
25  schools?

26  **PASSARELLO:**  No, I don't.

27  **BLUMBERG:**  Okay. And then, Father Summerhays, the gentleman you had mentioned,
28  Mr. Linhares, do you know if he serves on any boards with respect to the high
29  schools?

30  **SUMMERHAYS:** I don't think he does. I--no, I don't--I do not think he serves on any board of
31  any high school here at the archdiocese.

MEETING OF CREDITORS | eLitigation Services, Inc.  **21**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 86
of 123

1  **BLUMBERG:**　　　　Okay. Thank you. Now, Father Summerhays, we've kinda--we've kinda
2  covered this next question, and the question I would typically ask here is, why did
3  the debtor file for Chapter 11? I'll ask that question to you if you--if you want to
4  give a short kind of response, but I think we've covered it. But if you wouldn't mind
5  just in a sentence or two repeating the reasons, it would be appreciated.

6  **SUMMERHAYS:** Well, I think with--when all the cases came in, we had to assess how we could
7  get to some type of a glo--global mediation to make it manageable. And we tried
8  some mediations and we weren't making any progress and so financially it looked
9  like the best situation for resolving these cases equitably amongst those creditors,
10  making sure that, you know, the first ones to the trial did not end at, you know,
11  exhausting our resources and--and being able to pay out equitably to all our--our
12  plaintiffs, and then, also, allow us to maintain our operations here at the
13  archdiocese, which is our responsibility, too. So it w--it--it came to be able to do
14  those two things and it's in my--it--it was unavoidable because of just the sheer
15  number of cases we were trying to (inaudible).

16  **BLUMBERG:**　　　　To your knowledge, have any active clergy under the jurisdiction of the
17  archbishop been accused of abuse?

18  **SUMMERHAYS:** Yes, there--there are--there are active priests who've been accused.

19  **BLUMBERG:**　　　　Would you tell me, please, the number? How many?

20  **SUMMERHAYS:** I mean, are they--are--can you--are they just priests that are in active
21  ministry?

22  **BLUMBERG:**　　　　Let's start there, yes, sir.

23  **SUMMERHAYS:** I think it's two.

24  **BLUMBERG:**　　　　And then what is the difference between active ministry and inactive
25  ministry?

26  **SUMMERHAYS:** It--well, you could have someone who's retired who is, you know, in good
27  standing and can, you know, have active--he can--he can actually be publically
28  (inaudible).

29  **BLUMBERG:**　　　　Okay. I mean, are there any retired priests that have been accused?

30  **SUMMERHAYS:** Yes.

31  **BLUMBERG:**　　　　Okay. So can you tell how many?

32  **SUMMERHAYS:** I believe there's two.

MEETING OF CREDITORS | eLitigation Services, Inc.　22
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564　Doc# 610-4　Filed: 04/19/24　Entered: 04/19/24 15:35:29　Page 87 of 123

1 **BLUMBERG:** Okay. So I now I just kinda wanna piggyback on something that Mr. Stang
2 may have said, or asked, rather. Does the debtor maintain a list of clergy whom the
3 debtor has determined to have been credibly accused of abuse?

4 **SUMMERHAYS:** Can you rephrase the question?

5 **BLUMBERG:** Sure.

6 **SUMMERHAYS:** To verify.

7 **BLUMBERG:** Sure. Does the debtor maintain a list of clergy whom it believes--let me
8 rephrase it. Does the debtor maintain a credibly accused list?

9 **SUMMERHAYS:** No. We have a list of priests in good standing.

10 **BLUMBERG:** Is the list of priests in good standing publically available?

11 **SUMMERHAYS:** Yes, it is.

12 **BLUMBERG:** And where would I find that?

13 **SUMMERHAYS:** It is on our website.

14 **BLUMBERG:** Are there any active clergy operating or ministering within the archdiocese
15 who are not on the list of good standing?

16 **SUMMERHAYS:** Who are ministering?

17 **BLUMBERG:** Yes.

18 **SUMMERHAYS:** No. No.

19 **BLUMBERG:** Okay. How many employees does the debtor have? And I think I'm going
20 to shift over to Mr. Passarello now.

21 **PASSARELLO:** So, this is Joe Passarello. We have 54 as we filed in our Day One
22 Declaration. We have 51--54 salaried employees, 37 hourly, 32 clergy and
23 (inaudible), and 14 stipend seminarians. So seminarians that are paid a stipend. Not
24 all those employees are full time. There are many that are part time.

25 **BLUMBERG:** Is the debtor current on its post-petition bills, things like electricity, water,
26 gas, wages, salaries, things like that?

27 **PASSARELLO:** Post-petition, we are.

28 **BLUMBERG:** Okay. And is the debtor making timely deposits or timely setting aside
29 amounts for its post-petition payroll tax obligations?

30 **PASSARELLO:** Yes, we are.

MEETING OF CREDITORS | eLitigation Services, Inc. 23
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | And refresh my memory, sir, the debtor uses a payroll service, is that |
| 2 | | correct? |
| 3 | **PASSARELLO:** | Yes, we do. |
| 4 | **BLUMBERG:** | And what--what's the name of that service? |
| 5 | **PASSARELLO:** | ADP. |
| 6 | **BLUMBERG:** | Okay. Thank you. And, Mr. Passarello, I'm just going to ask you to |
| 7 | | estimate the balances in the debtor's accounts, bank accounts, as of today. If--if you |
| 8 | | can't do that, then I understand, it's a lot of money, but I'll ask you to take a try. |
| 9 | **PASSARELLO:** | I--I can't do that. |
| 10 | **BLUMBERG:** | Okay. |
| 11 | **PASSARELLO:** | Or I'm not prepared to do that. |
| 12 | **BLUMBERG:** | Is it generally consistent, to your understanding, with the amounts |
| 13 | | disclosed on Schedule A/B? |
| 14 | **PASSARELLO:** | Yes, I--yes, I think those are a fair representation. |
| 15 | **BLUMBERG:** | Okay. And then, Mr. Pascuzzi, just in terms of a plan, I'm not going to ask |
| 16 | | you the standard plan questions, but there was one question that I wanted to ask Mr. |
| 17 | | Pascuzzi. It was about the bar date issue, and I wanted to ask whether the debtor |
| 18 | | had a sense when it would be filing the motion to set the bar date and a proof of |
| 19 | | claim forms and the (inaudible) relief that we've seen in other cases. |
| 20 | **PASCUZZI:** | Yeah, thank you, Mr. Blumberg. This is Paul Pascuzzi. We are drafting a motion |
| 21 | | right now. We have not discussed a bar date with the committee yet but hope to do |
| 22 | | so very soon. We heard Judge Montali's statement in one of the first hearings that |
| 23 | | he wasn't looking for a long bar date so I believe that is best discussed with the |
| 24 | | committee and hopefully we'll reach agreement with them on it and include the U.S. |
| 25 | | Trustee's input, as well, and hope to get that done very soon. |
| 26 | **BLUMBERG:** | Okay. Appreciate that. Thank you. Right, so now I'm gonna move on to |
| 27 | | the schedules and statements, Docket Number 152, or the schedules, Docket |
| 28 | | Number 153, is the Statement of Financial Affairs. These questions will be |
| 29 | | primarily directed to Mr. Passarella [sic]--Passarello, excuse me, and I find it helps |
| 30 | | to have the document in front of you when answering questions, particularly in a |
| 31 | | case as complex as this one. So, Mr. Passarello, do you have the schedules and |
| 32 | | statements in front of you that you can refer to while I ask questions? |
| 33 | **PASSARELLO:** | Yes, I do. |

MEETING OF CREDITORS | eLitigation Services, Inc.  24
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | Excellent. Okay. So I want to start with Schedule A/B, which is Docket |
| 2 | | Number 152, specifically the Exhibit Schedule A/B-3, which is where the debtor |
| 3 | | disclosed checking, savings, money market, or financial brokerage accounts. It |
| 4 | | starts on page-- |
| 5 | **PASSARELLO:** | They might-- |
| 6 | **BLUMBERG:** | Go ahead, sir. |
| 7 | **PASSARELLO:** | I have this--so I have two documents. There's a 112-page schedule doc--is |
| 8 | | that--that's the one we're looking at-- |
| 9 | **BLUMBERG:** | Yep, that's the one. |
| 10 | **PASSARELLO:** | --right here. |
| 11 | **BLUMBERG:** | That's the one. The 112-page one. So I don't know if you have the--the |
| 12 | | file-stamped copy. I'm working off the file-stan--stamped copy and the Schedule |
| 13 | | A/B-3 exhibit starts on page 21 of 112. |
| 14 | **PASSARELLO:** | Yes, that's the one I'm looking at. 21? |
| 15 | **BLUMBERG:** | Okay. 21. |
| 16 | **PASSARELLO:** | Okay. Okay. |
| 17 | **BLUMBERG:** | Just wanna go through a few of these bank accounts, starting with the |
| 18 | | BOFA Security's Inc. account ending with the digits 9371. Do you see that, sir? |
| 19 | **PASSARELLO:** | Yes, I do. |
| 20 | **BLUMBERG:** | Okay. So my question about this is that I believe in the Declaration you |
| 21 | | submitted as part of Docket Number 87 or 87-1 you may have indicated that this is |
| 22 | | actually just a bank account, not a brokerage account, and that there's actually |
| 23 | | another brokerage account ending with the digits 2C19. Does that refresh your |
| 24 | | memory at all or am I way off base? |
| 25 | **PASSARELLO:** | Yes, it does. Yes. 2C19 is the act--or the correct account number. |
| 26 | **BLUMBERG:** | Okay. So 2C19 is the account that has the approximately 57 million in it? |
| 27 | **PASSARELLO:** | Yes, it is. |
| 28 | **BLUMBERG:** | And then 9371, is that just a normal bank account? |
| 29 | **PASSARELLO:** | I believe so. |
| 30 | **BLUMBERG:** | And what's the approximate balance in that account, if you know? |

MEETING OF CREDITORS | eLitigation Services, Inc.   25
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **PASSARELLO:**     I--I don't know off the top of my head.

2  **BLUMBERG:**      Okay. All right, just going down the list, the Bank of San Francisco
3                     account ending with the digits 1486, do you know the approximate balance of that
4                     account today?

5  **PASSARELLO:**     Probably around the amount stated here of 246,000. It's around--it's
6                     certainly below the 250,000.

7  **BLUMBERG:**      Okay. And then, working on down the list, the First Republic Bank
8                     account ending with the digits 0589, do you know the approximate balance in that
9                     account today?

10 **PASSARELLO:**     I think it's very small because we are, as we get donations that are--that the
11                    proceeds are reflected in there, we are sch--we are transferring those to our
12                    restricted account.

13 **BLUMBERG:**      Okay. Thank you. And then the next account, the First Republic Bank
14                    account ending with the digits 1534, do you know whether that account has been
15                    converted to a debtor in possession account?

16 **PASSARELLO:**     We have--First Republic Bank we have converted our--as--as I'm aware
17                    of, we have converted the First Republic Bank to a debtor in possession, and I
18                    believe we received a letter from the financial--from the bank reflecting that.

19 **BLUMBERG:**      All right. And then the next account is the First Republic Bank account
20                    ending with the digits 9117, can you confirm if that account's been closed?

21 **PASSARELLO:**     Yes, I can.

22 **BLUMBERG:**      All right. Next account is the Bridge Bank account ending with the digits
23                    8561, has that account been converted to a debtor in possession account?

24 **PASSARELLO:**     No, it has not. We've been in communication with the bank on that, and it
25                    has not been converted as of this day.

26 **BLUMBERG:**      Okay. Next account is the City National Bank account ending with the
27                    digits 9001, has that account been converted to a debtor in possession account?

28 **PASSARELLO:**     No, it has not. We have been in communication con--constantly with the
29                    bank and have not received that designation.

30 **BLUMBERG:**      Okay. Then the next account is the California Bank & Trust account
31                    ending with the digits 9479, do you know if that account has been converted to a
32                    debtor in possession account?

MEETING OF CREDITORS | eLitigation Services, Inc.    26
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1<br>2 | **PASSARELLO:** | It's my under--as I sit here today, I'm not aware that that has been converted to a debtor in possession account. |
| 3<br>4<br>5<br>6 | **BLUMBERG:** | Okay. And then just kinda scrolling down to the next page, there's a U.S. Bank account with the account name Segall Bryant, and it has the account number 8815. I believe that's one of the accounts the debtor intended to close. Do I have that right? |
| 7 | **PASSARELLO:** | Yes, and we have, indeed, closed that account. |
| 8<br>9<br>10<br>11<br>12 | **BLUMBERG:** | Okay. All right, and then staying on the same page, the last account is the Charles Schwab account ending with the digit--digits 7149. I didn't see this account listed in paragraph 13 of the cash management motion. Did I miss it or, I--Paul--I mean, Mr. Mas--Mr. Pascuzzi, feel free to jump in, but I--this seems like a new account to me. |
| 13<br>14 | **PASSARELLO:** | This is the--7149 is an account that is held with Charles Schwab. It's a debtor's corpus. It's related to our institutional Deposit and Loan Fund. |
| 15<br>16 | **BLUMBERG:** | Okay. I'll confess, I don't totally understand that. So let me ask it this way, does the debtor own the funds in that account? |
| 17<br>18<br>19<br>20<br>21<br>22<br>23 | **PASSARELLO:** | They are--they are owned by--they are the--owned by the institutional Deposit and Loan. They are owned by the participants in the institutional Deposit and Loan, and we have an institutional Deposit and Loan Fund that is very similar to--acts as a form of a credit union so there are depositors, there are our four high schools, couple of parent entities, a couple schools, and there are legal--separate legal entities, like Saint Patrick Seminary, and Catholic charities that have funds on a deposit there. |
| 24<br>25<br>26<br>27 | | The corpus--the balance reflected here is the--it is the depositor's corpus that's in that fund, and it is held--it is a response--or it is held and owned by the institutional Deposit and Loan and the members. The members are res--are--have control over that account. |
| 28<br>29<br>30 | **PASCUZZI:** | Mr. Blumberg, this is Mr. Pascuzzi. I think that this account should have been listed in, like, funds held for others with the other Schwab accounts that are on the--I think it's the Statement of Financial Affairs. |
| 31 | **BLUMBERG:** | Okay. All right. |
| 32<br>33 | **PASCUZZI:** | And, also, one other thing, if I could back up, your question about the Bank of America 9371-- |
| 34 | **BLUMBERG:** | Yes. |

MEETING OF CREDITORS | eLitigation Services, Inc.    27
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    **PASCUZZI:** So the--there's--I'm getting notes from financial adviser assistant here, and there's
2        nothing in that account. The 58 million roughly, or 57, 298, is actually funds
3        invested in BlackRock. And--and so, those are, like, the investment accounts, or the
4        investments, that are the subject of the cash management motion that we're asking
5        to remain invested and working for all the parties here. So this 9371 is--I think it's
6        kind of like a conduit for money to go in and out of that, but there's nothing in there
7        right now.

8    **BLUMBERG:** So, just so I understand clearly and anyone can feel free to jump in 'cause I
9        wanna make sure I understand it correctly, the account ending with 2C19, that's the
10       account where the--where the value of the $58 million is actually parked?

11    **PASCUZZI:** Yes.

12    **MALE:** Yes.

13    **PASCUZZI:** That's--that's a securities account as it's invested in various securities.

14    **BLUMBERG:** Okay. Let--

15    **PASCUZZI:** We learned that from Bank of America after the motions were filed.

16    **BLUMBERG:** Understood. So let's just go back, Mr. Passarello, to the Schwab account.
17       Is that account in the debtor's name?

18    **PASCUZZI:** Are we talking about the--

19    **BLUMBERG:** Yeah.

20    **PASCUZZI:** --last one on the list--

21    **BLUMBERG:** Yeah--

22    **PASCUZZI:** --there, 7149?

23    **BLUMBERG:** --we're talking about--yes. Schwab, 7149. Is that account in the debtor's
24       name, Mr. Passarello?

25    **PASSARELLO:** I believe it is.

26    **BLUMBERG:** Does the debtor have access to that account?

27    **PASSARELLO:** Yes, we do.

28    **BLUMBERG:** Does the debtor control that account?

29    **PASSARELLO:** It's controlled by the institutional Deposit and Loan committee or advisory
30       board.

MEETING OF CREDITORS | eLitigation Services, Inc.    28
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

BLUMBERG:        Is that committee--all right. I--I'll--I'm gonna have to offline. I'm gonna probably need some additional information about this account. I'm not sure I'm totally understanding it correctly, but we'll look and handle that offline.

PASSARELLO:        Okay.

BLUMBERG:        All right, so the remaining accounts on Schedule A/B-3, there all--they all seem to be at U.S. Bank and they have the numbers--the ending digits 8800 to 8805 and then 8807 to 8818 and then, finally, 8900. Are these the accounts that comprise the investment pool account that was described in the cash management motion?

PASSARELLO:        Yes, they are. And U.S. Bank is our custodial bank.

BLUMBERG:        So what are the--what are the holdings of these accounts? Maybe we'll take a specific example. How 'bout the U.S. Bank account ending with the digits 8809 that has the account name Kimpact Evergreen? What's the holding of that account?

PASSARELLO:        Kimpact Evercame--yes, Kimpact Evergreen, ending 8809, is a private real estate investment that the archdiocese has that they came to the imbalance pool.

BLUMBERG:        So it's--is Kimpact Evergreen, is that the name of the entity into which the debtor has invested?

PASSARELLO:        Yes, it is. It is the name of the fund.

BLUMBERG:        All right. So--

PASSARELLO:        It's associated--

BLUMBERG:        So is it far to say--

PASSARELLO:        It's associated--

BLUMBERG:        --with respect to the Kimpact Evergreen account, the debtor's interest is in a fund as a s--as opposed to specific real property?

PASSARELLO:        That's correct.

BLUMBERG:        How does the debtor choose where to invest the pooled investment funds?

PASSARELLO:        We have a--an investment co--we have an investment advisor who advises us. We have an investment committee who is our--our finan--our experts who advise management on--on, one, the asset--investment policy statement and the asset allocation. And based on their recommendation, we--we invest based on--on an outlook of economic outlook long term related to the portfolio and the asset allocation that is determined appropriate for the Archdiocese of San Francisco. So

MEETING OF CREDITORS | eLitigation Services, Inc.   29
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1        that's--that's our investment advisor and our investment committee advise
2        management, and we invest consistent with their--their input and direction.

3  **BLUMBERG:**      And I apologize if you mentioned it, but what is the name of the debtor's
4        investment advisor?

5  **PASSARELLO:**    It's Beacon Pointe.

6  **BLUMBERG:**      Okay. And so, Mr. Passarello, in a Declaration that was submitted on your
7        behalf as Docket Number 22-1, you identified eight additional bank accounts. Are
8        you familiar with that?

9  **PASSARELLO:**    Yes, I am.

10  **BLUMBERG:**      And then, similarly, in a Declaration submitted on your behalf as Docket
11       Number 87.1, you identified three supplemental additional bank accounts. Are you
12       familiar with that?

13  **PASSARELLO:**   Yes, I am.

14  **BLUMBERG:**     Okay. And as I understood your testimony in those Declarations, it's this:
15       those accounts, the additional bank accounts and the supplemental additional bank
16       accounts, those accounts do not contain the debtor's funds and the debtor does not
17       use or control the operation of those accounts. Is that, first of all, consistent with
18       your Declaration, as you would call it?

19  **PASSARELLO:**   That is, yes, that is consistent--

20  **BLUMBERG:**     And is that s--

21  **PASSARELLO:**   --with my Declar--

22  **BLUMBERG:**     And is that still accurate and true?

23  **PASSARELLO:**   Yes, it is.

24  **BLUMBERG:**     All right. On Part 3 of Schedule A/B on page eight of 112, Item 11, the
25       debtor listed doubtful or uncollectible accounts in the amount of $283,430.30. Do
26       you know why those accounts are listed as such?

27  **PASSARELLO:**   You're on page eight?

28  **BLUMBERG:**     Eight of 112, yes, sir.

29  **MALE:**    Yes.

30  **PASSARELLO:**   So it's 200-and--we--we red--is--it--as part of our annual audit, we review
31       our--the collectability of our accounts receivable, and we set up a--or an allowance

MEETING OF CREDITORS | eLitigation Services, Inc.   **30**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 95
of 123

1     for doubtful accounts to--which reflects an estimate of those accounts that we don't
2     expect or we, in our judgement, we don't expect to realize, meaning we don't expect
3     to collect.

4 **BLUMBERG:**     How many different, you know, different account obligors are there with
5     respect to these accounts? The entire amount disclosed or not just the doubtful?

6 **PASSARELLO:**     So the--the total balance of 90 days or less of 9.2 million and the 90 days
7     of 849,000?

8 **BLUMBERG:**     Yes.

9 **PASSARELLO:**     There's probab--and this is off the--off the top of my head, there's at least--
10     there's at least--there's at least 75.

11 **BLUMBERG:**     And of the 75, are all or most of them non-debtor Catholic entities within
12     the archdiocese?

13 **PASSARELLO:**     Yes, they--they all are. Almost exclusively non-debtor.

14 **BLUMBERG:**     Does the debtor own any interests in any other businesses, LLCs,
15     corporations, partnerships, and things like that?

16 **PASSARELLO:**     No, we do not.

17 **BLUMBERG:**     Okay. Item 42.1 on page 13 of 112 lists artwork with a net book value of
18     zero. My question is, do you know if any of that artwork is insured?

19 **PASSARELLO:**     Any--any property that we have would be subject to insurance.

20 **BLUMBERG:**     Okay. Do you know if any of the artwork is specifically identified on any
21     insurance policy or rider there, too?

22 **PASSARELLO:**     I--I am not aware that there is. There could be, but I don't know for sure. I
23     don't know.

24 **BLUMBERG:**     So it's your understanding that any artwork will be generally covered
25     under the debtor's property insurance but not specifically identified, is that fair to
26     say?

27 **PASSARELLO:**     I think that's fair to say. Yes.

28 **BLUMBERG:**     All right. And then eyes--excuse me, Item 47.1 is a 2012 Toyota Camry.
29     Who drives that vehicle?

30 **PASSARELLO:**     I believe it's the archbishop.

MEETING OF CREDITORS | eLitigation Services, Inc.    31
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 96 of 123

| | |
|---|---|
| 1 **BLUMBERG:** | All right, let's jump ahead to the exhibit for Schedule A/B that relates to question 55, or Item 55. I think it's titled in the schedule, Schedule A/B-55, and it starts on page 25 of 112. |
| 4 **PASSARELLO:** | Yes. |
| 5 **BLUMBERG:** | Okay. Are all the properties here titled in the debtor's name? |
| 6 **PASSARELLO:** | I believe they are, yes. |
| 7 **BLUMBERG:** | Are any of these properties held in trust for another party? |
| 8 **PASSARELLO:** | I don't think so. |
| 9 **BLUMBERG:** | Have any of these properties been appraised in the last year? |
| 10 **PASSARELLO:** | We have not had an appraisal completed. |
| 11 **BLUMBERG:** | When was the last time any of these properties have been appraised to your knowledge? |
| 13 **PASSARELLO:** | We haven't a--we haven't had an appraisal to property since I've been here. |
| 14 **BLUMBERG:** | Okay. And I think-- |
| 15 **PASSARELLO:** | Let me-- |
| 16 **BLUMBERG:** | Go ahead. |
| 17 **PASCUZZI:** | Just one second, Mr. Blumberg. Sorry about that, Mr. Blumberg. We were just confirming your appraisal question. |
| 19 **BLUMBERG:** | Thank you. So, Mr. Passarello, is there anything you want to add or change based on that conference? |
| 21 **PASSARELLO:** | No, there isn't. |
| 22 **BLUMBERG:** | Okay. And looking at the First Day Declaration that you submitted, Mr. Passarello, it looks like you began your employment with the debtor in 2014, is that accurate? |
| 25 **PASSARELLO:** | That's correct. |
| 26 **BLUMBERG:** | All right, I just--I think I just had a maybe just a technical question by how this was presented. I wanna make sure I'm understanding it correctly. There are--there are a few instances where the same property, it looks like it's listed twice, for instance, near the top, the six-unit apartment building. It looks like it's listed twice. Is there a reason for that? |

MEETING OF CREDITORS│ eLitigation Services, Inc.    32
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **PASCUZZI:**  Mr. Blumberg, this is Mr. Pascuzzi. I don't think so. I've looked--it looks like the
2  idea was the shaded area is kind of like the total if there were more than one but
3  there's only one for most of these until you get to the last category, or the Holy
4  Cross Cemetery category.

5  **BLUMBERG:**  Okay. And, Mr. Passarello, is that consistent with your understanding?

6  **PASSARELLO:**  Yes, that is exactly right.

7  **BLUMBERG:**  Okay. 1600 Van Ness Avenue, can you kinda very briefly describe what
8  that is?

9  **PASSARELLO:**  1600 Van Ness Avenue is a rental property that had--I believe has two
10  tenants, a Toyota and a Mattress Firm. We rent out that--we rent--we rent out the
11  facili--the property to those two tenants.

12  **BLUMBERG:**  Okay. And then the same question for 1656 California Street. Can you
13  briefly describe what that is?

14  **PASSARELLO:**  That is a rental property, on California Street, that is next door to 1600
15  Van Ness. It is rentaled--rented out to a automated car company, and that lease is
16  due--is up in April.

17  **BLUMBERG:**  Okay. And then same question for 441 Church Street.

18  **PASSARELLO:**  441 Church Street.

19  **BLUMBERG:**  Make sure I'm not missing that one. It's described as office space on page
20  27 of 112.

21  **PASSARELLO:**  Let me just look at that. That is a rental property, that's correct. 441 Chur--
22  I'm sorry, 441 Church Street is a rental property that is located in San Francisco,
23  and we rent to the Children's--Children's Council, which is a non-profit entity here
24  in San Francisco.

25  **BLUMBERG:**  Okay. Thank you. All right, now if I could direct your attention to Part 11
26  of Schedule A/B, which looks like it is on page 17 of 112. The debtor three notes. I
27  just wanted to ask a question or two about those.

28  **PASSARELLO:**  Okay.

29  **BLUMBERG:**  Starting with the note from the Diocese of Santa Rosa, the debt is listed as
30  doubtful or uncollectible. Is that because of the Santa Rosa bankruptcy filing or is
31  there something else I'm missing?

MEETING OF CREDITORS | eLitigation Services, Inc.  33
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **PASSARELLO:**     It is in part b--well, it--we have reserved--we reserved that a number of
2                      years ago and it has been reserved prior to my tenure here at the archdiocese. So it
3                      is--it's because of--we don't expect to collect that.

4  **BLUMBERG:**       Okay. And that--

5  **PASSARELLO:**     And that's been in p--that--that's been in place for--prior to my
6                      commencing here.

7  **BLUMBERG:**       Okay. Thank you. And then the Catholic charities note, do you know
8                      when that's payable?

9  **PASSARELLO:**     That's payable in December of 2025.

10 **BLUMBERG:**       Okay. And then the Junipero Serra High School, do you know when that
11                     note is payable?

12 **PASSARELLO:**     That is payable in November of 2027.

13 **BLUMBERG:**       All right. Schedule A/B, Exhibit 73, that exhibit starts on page 28 and it
14                     goes to page 29 of 112, it lists interest and insurance policies or annuities. My
15                     question really is just, are these the current insurance policies of the debtor or are
16                     these the historical policies that may become relevant as we pr--as we progress in
17                     the case?

18 **PASSARELLO:**     These are the current exhibit--current policies in place.

19 **BLUMBERG:**       Okay.

20 **PASCUZZI:**  I think they also are the old--the older ones, Joe. I'm not--yeah, I--

21 **PASSARELLO:**     I think these are current.

22 **PASCUZZI:**  Okay.

23 **PASSARELLO:**     These--yeah.

24 **BLUMBERG:**       Okay. Well, let me ask--let me ask this, Mr. Passarello, do you know
25                     whether the debtor has made any claims under any of its pol--policies with respect,
26                     insurance policies, that is, with respect to the 537 lawsuits, abuse lawsuits, you
27                     reference in your First Day Declaration?

28 **PASSARELLO:**     Yes, they have. I--I don't believe they're against the current policies, but I
29                     think they're against historical pol--policies that we had in place historically.

30 **BLUMBERG:**       Right. And then backtracking to Item 76 of Schedule A/B, which is on
31                     page 18 of 112, there are three beneficial interests listed in response to Item 76 and
32                     I just wanted to ask a question or two about that.

MEETING OF CREDITORS | eLitigation Services, Inc.    34
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **PASSARELLO:**      Okay.

2 **BLUMBERG:**      So 76.1 is a beneficial interest in RPSC Dashlane. Is that the same RPSC
3            that we discussed maybe a half hour ago, at the outset of the meeting?

4 **PASSARELLO:**      Yes. Yes, it is.

5 **BLUMBERG:**      Okay. And can you describe the beneficial interest that the debtor has?

6 **PASSARELLO:**      It is--it is beneficial interest in, I think, Thomas More land. That is a parish
7            that is--that is--it's no longer a parish.

8 **BLUMBERG:**      And so by--by beneficial interest, does that mean that they--the debtor
9            uses the land or has the ability to sell it? What--what exactly does that mean?

10 **PASSARELLO:**      Beneficial interest reason, we have economic beneficial interest to that
11            property.

12 **BLUMBERG:**      Is there any revenue being generated from that property?

13 **PASSARELLO:**      No, there isn't. There--there is a long-term lease that was signed for--I--I--
14            I'm not--I'm not sure.

15 **BLUMBERG:**      Okay.

16 **PASSARELLO:**      I'm not sure.

17 **BLUMBERG:**      Okay. And then 76.2 is described as a beneficial interest in perpetual
18            trust/regen. What is regen? Or regen, if I'm mispronouncing.

19 **PASSARELLO:**      Regen is--

20 **PASCUZZI:**  Yes, Regen is the party that designated funds that are held by a third party--that
21            are held by a third party and invested in--title to that (inaudible) that--those funds
22            are held in trust by a third party and we receive the--the earnings in the--the
23            earnings provided by that fund and we use that for funding our--or contributing to
24            our seminary and tuition and room and board. And that would be, yes, that is
25            exactly right.

26 **BLUMBERG:**      Okay. And then 76.3, that item is described as beneficial interest in
27            Perpetual Trust-Praut. What is Praut?

28 **PASCUZZI:**  Praut is, again, the donor that aru--provided funds and that are held by a third
29            party trust where we receive the benefits from earnings that, again, are used for the
30            same purpose as the Regen trust.

31 **BLUMBERG:**      All right. Thank you. All right, let's move on to Schedule D, which starts
32            on page 30 of 112. Mr. Passarello, the debtor stated there that there aren't any

MEETING OF CREDITORS | eLitigation Services, Inc.     35
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    creditors with secured claims, and I just wanted to confirm that that's your current
2    understanding as well.

3   **PASSARELLO:**    That is correct.

4   **BLUMBERG:**    And then turning to Schedule E/F, this is just a question for Mr. Pascuzzi
5    that we can probably address offline. I noticed that there are address redactions and
6    for a number of--it looks like employees. And then it looks like Claim 3.29 is
7    entirely redacted even though it's a non-impor--even though it's described as a non-
8    abuse litigation claim. So I'll deal with that--I mean, I won't deal with that, I'll reach
9    out to Mr. Pascuzzi offline, but I was--my, you know, my--I was just wondering
10    why those items are redacted. Mr. Pascuzzi, if you--if you want to address that, that
11    would be welcome. If not, we can talk about it later.

12   **PASCUZZI:**   Yeah, if we could follow up on that, I'd appreciate it.

13   **BLUMBERG:**    All right. All right, Schedule G, Mr. Passarello, it starts on page 80 of 112.
14    I just want to ask about a few of the contracts listed here.

15   **PASSARELLO:**    I'm sorry, is that page 80?

16   **BLUMBERG:**    80 of 112, yes, sir. And specifically, if I could direct your attention to Item
17    2.22, which is described as a lease for 445 Church Street. My question is, does the
18    debtor own 445 Church Street or is it the tenant?

19   **PASSARELLO:**    Let me just get to the right page. I'm sorry.

20   **BLUMBERG:**    Yeah, it's on page 83.

21   **PASSARELLO:**    83, okay. Page 83--

22   **BLUMBERG:**    2.22.

23   **PASSARELLO:**    2.22. That is--that--we--the debtor, that is, the debtor owns that property.

24   **BLUMBERG:**    So is that property connected to the 441 Church Street property that was
25    listed on Schedule A/B?

26   **PASSARELLO:**    It--it's the same.

27   **BLUMBERG:**    Okay. I see. All right, and then Item 2.32 on page 85 lists a royalty
28    agreement, license agreement. Can you tell me what the subject of that agreement
29    is? What's being licensed?

30   **PASSARELLO:**    That is--that's Fivable where we pay a royalty for work that is done related
31    to our website.

MEETING OF CREDITORS | eLitigation Services, Inc.   **36**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **BLUMBERG:**        Oh, I see. Okay. And then 2.34 on the same page is described as mission
2                      partnership letter of understanding. Can you tell me what the subject of that
3                      agreement is?

4  **PASSARELLO:**      This is--mission partnership, my understanding is that it is for the search
5                      for a new superintendent.

6  **BLUMBERG:**        Oh, I see. Okay. And would that be for the four high schools that we
7                      discussed earlier?

8  **PASSARELLO:**      It's--it's for the department of Catholic schools that has oversight over the
9                      four high schools and the--the parish schools.

10 **BLUMBERG:**        All right. There are a number of items here that have a similar description
11                     and that is deposit agreement--deposit agreement with ADSF, institutional Deposit
12                     and Loan. For instance, Item 2.42 has that description, as does 2.46 and 2.63. Are
13                     these all separate contracts? What are these?

14 **PASSARELLO:**      Let me go there, 2.42. That is--2.42 is Junipero Serra High School has a
15                     deposit agreement where they have funds on deposit with the AESF Institutional
16                     Deposit and Loan. So that provides--that is an agreement that--between the
17                     archdiocese and the high school related to funds that are on deposit with the
18                     institution Deposit and Loan by that high school.

19 **BLUMBERG:**        So how does that work? The high school will deposit funds with the
20                     debtor?

21 **PASSARELLO:**      The funds are held in the institutional Deposit and Loan Fund. They are
22                     generally excess operating funds, funds that a high school or an entity would like
23                     to--have access to but would like to earn interest. So it's not in an operating and it's
24                     not invested long term. So it is invest--or it is provided--it is held by the
25                     institutional Deposit and Loan in--in Charles--separate Charles Schwab accounts for
26                     each of the--each of the partic--participants or depositors of the institutional Deposit
27                     and Loan.

28                     So this memorializes the documents that--arrangement of the relationship between
29                     the institutional Deposit and Loan and the high school, Junipero Serra High School
30                     in this regard--

31 **BLUMBERG:**        And--

32 **PASSARELLO:**      --in this case.

33 **BLUMBERG:**        And--and on that schematic, who is the institutional depositor?

MEETING OF CREDITORS | eLitigation Services, Inc.     37
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 102
of 123

1 **PASSARELLO:** The institutional Deposit and Loan is--is maintained by the Archdiocese of
2 San Francisco.

3 **BLUMBERG:** So are the Schwab accounts that are listed on the Statement of Financial
4 Affairs, those accounts are in the debtor's name?

5 **PASSARELLO:** Y--no. There is a name of the--of the--the depositor, Serra High School in
6 this case, Junipero Serra High School.

7 **BLUMBERG:** Okay. I'll probably request a copy of that agreement just so I can
8 understand it better. I'm not sure I am at this point. All right, Item 2.45 is described
9 as a subscription into a real estate fund. And then it lists the other party, the
10 counterparty, and Kimpact Evergreen Real Estate Investment Fund. Is that--does
11 that corref--correspond to the--one of the pooled investment accounts that we
12 discussed with respect to--

13 **PASSARELLO:** Yes, it--

14 **BLUMBERG:** --Schedule A/B?

15 **PASSARELLO:** Yes, it does.

16 **BLUMBERG:** Okay. All right. So anywhere where I see a subscription into a real estate
17 fund description, that corresponds or should correspond to one of the investment
18 accounts at Bank of America list--excuse me, U.S. Bank listed on Schedule A/B?

19 **PASSARELLO:** That's correct.

20 **BLUMBERG:** And then, Item 2.76 on page 92 of 112 is described as a lease for space at
21 RPSC. Can you just tell me what space is the subject of this agreement?

22 **PASSARELLO:** I believe that that is--that there is a lease agreement between the RPSC
23 and the Archdiocese of San Francisco where the Archdiocese of San Francisco,
24 through our parishes and schools, leases the property that's owned by the Real
25 Property Support Corp. and--and so there's a fee that's paid for that. So with the
26 Real Property Support Corp, as you know or--or as I'll state, is--is the owner of the
27 real--real property for the arch--for the--our parishes and school. And the parishes
28 and schools leased that back through a lease agreement between the Archdiocese of
29 San Francisco and the Real Property Support Corp., and there is a fee that's paid for
30 that. And that is paid for by the parishes and schools.

31 **BLUMBERG:** Now, Item 2.77 is described as a masterly sum certain parcels owned by
32 RPSC. Is that any different than what you described with respect to 2.76? Is that a
33 different agreement, I mean?

MEETING OF CREDITORS | eLitigation Services, Inc.    38
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 103 of 123

| | | |
|---|---|---|
| 1 | **PASSARELLO:** | They are different agreements. And I may have 2.76 or 2.77--my |
| 2 | | description of 2.76 may be for 2.77 for the Real Property Support Corp. Let me--let |
| 3 | | me see this.2.77 is the master lease agreement. That one has (inaudible), I'm sorry. |
| 4 | | I'm just going back to a document that I have. That is where the archcioc--the |
| 5 | | parishes and schools to the Archdiocese of San Francisco pay the Real Property |
| 6 | | Support Corp., or we--are charged for these--the cost of renting property, but that's |
| 7 | | owned by the Real Property Support Corp. So our parishes and schools pay a--are |
| 8 | | charged a fee for renting the property that's owned by Real Property Support Corp. |
| 9 | | So that (inaudible) the master lease (inaudible). |
| 10 | **BLUMBERG:** | All right. |
| 11 | **PASSARELLO:** | So that--my statement is for 2.77 and not 2.76. |
| 12 | **BLUMBERG:** | Okay. So 2.77, the debtor's role is described as lessee, 2.76, the debtor's |
| 13 | | role is described as lease. Are--so for--with respect to 2.77, the debtor is leasing |
| 14 | | parcels that are owned by the RPSC, is that correct? |
| 15 | **PASSARELLO:** | Well, the--through the debtor. So the parish and school--the debtor does |
| 16 | | not lease property from Real Property Support Corp. directly, ultimately. |
| 17 | | Ultimately, that is between the parishes and the schools with Real Property Support |
| 18 | | Corp. |
| 19 | **BLUMBERG:** | All right, I can follow up with that offline. All right, let's move on to the |
| 20 | | Statement of Financial Affairs, that is Docket Number 153, and I wanted to direct |
| 21 | | your attention, Mr. Passarello, to question one, which is on page 6 of 51. |
| 22 | **PASSARELLO:** | Okay. |
| 23 | **BLUMBERG:** | First of all, I just wanted to confirm the debtor's fiscal year. It's July 1 to |
| 24 | | June 30? |
| 25 | **PASSARELLO:** | Yes, that's correct. |
| 26 | **BLUMBERG:** | And what fiscal year are we in right now? Is it 2023 or 2024? |
| 27 | **PASSARELLO:** | We're in fiscal year end 2024. |
| 28 | **BLUMBERG:** | Okay. |
| 29 | **PASSARELLO:** | And that began on July 1, 2023. |
| 30 | **BLUMBERG:** | All right. So in response to question one, the debtor listed sources of |
| 31 | | revenue described as other revenue. Can you tell me what that other revenue |
| 32 | | consists of? |

MEETING OF CREDITORS | eLitigation Services, Inc.
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com
39

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 104 of 123

| | | |
|---|---|---|
| 1 | **PASSARELLO:** | Yes, just a second. Just gonna go into the right period here. So for the |
| 2 | | period July 1, 2022--or 1.2, the other revenue of $1,579,000 relates to rental and |
| 3 | | investment tax that is--a ta--a rental and investment tax that's charged to our |
| 4 | | parishes for those e--rental properties and any excess funds in the investment pool |
| 5 | | h--held by Capital Assets Support Corp on--on behalf of the parishes. And at one |
| 6 | | point, again, about 1.5, most of that, that 1,579,000, relates to rental and |
| 7 | | investments. |
| 8 | **BLUMBERG:** | Okay. So these are generally, I think what you've described as taxes, |
| 9 | | charged to the--to the parishes for the investments held by the CASC? |
| 10 | **PASSARELLO:** | Well, it's primar--the--the biggest proportion of that is rental income that |
| 11 | | our parishes earn from rental properties that are--that are leased to third parties. And |
| 12 | | then there are--there's income that--a tax that's assessed and charged on the income |
| 13 | | investments held by Capital Assets Support Corp. |
| 14 | **BLUMBERG:** | I see. And then in question two on the next page, page seven, the debtor |
| 15 | | listed investment income for the various periods. What is the source of the |
| 16 | | investment income? Is it the security/brokerage accounts that we've discussed on |
| 17 | | Schedule A/B? Is it something different? |
| 18 | **PASSARELLO:** | Yes, it is. That's the vast majority of it. |
| 19 | **BLUMBERG:** | Okay. All right, now I just wanna ask a question or two about some |
| 20 | | transfers that were listed on or in response to question three of the Statement of |
| 21 | | Financial Affairs. I'm going to ask you, Mr. Passarello, to direct your attention to |
| 22 | | the exhibit, which starts on page 19. It's--looks like it's called SOFA Three. But it |
| 23 | | runs from page 19 to 29 of 51. |
| 24 | **PASSARELLO:** | Okay. |
| 25 | **BLUMBERG:** | All right. S-- |
| 26 | **PASSARELLO:** | I'm on page 20. |
| 27 | **BLUMBERG:** | Perfect. That's--that's perfect. The first transfer I wanted to ask you about |
| 28 | | was to Archbishop Riordan High School of a million dollars on July 14, 2023. Can |
| 29 | | you provide a little more information about the reason for that transfer? |
| 30 | **PASSARELLO:** | Yeah, the Archbishop Riordan High School made a request of the |
| 31 | | institutional Deposit and Loan to withdraw $1,000,000, and this is when rem--the |
| 32 | | payment of this. |
| 33 | **BLUMBERG:** | Okay. And there's a similar transfer to Sacred Heart Cathedral Prep on |
| 34 | | June 29, 2023 of 5,000,000. It's on page 24 of 51. Just the same question. What was |
| 35 | | the reason for that transfer? |

MEETING OF CREDITORS | eLitigation Services, Inc.    40
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

| | | |
|---|---|---|
| 1<br>2 | **PASSARELLO:** | Let me get to that page. So I'm--what page is that? I'm sorry to say that again. |
| 3 | **BLUMBERG:** | It's 24 of 51. |
| 4<br>5<br>6<br>7 | **PASSARELLO:** | Oh, okay, I'm sorry. $5,000,000 is a withdrawal from the institutional Deposit and Loan Fund by Sacred Heart High School. They requested the withdrawal, $5,000,000 from their fund (inaudible) with the--through Charles Schwab, and this is the payment to them. |
| 8<br>9<br>10<br>11 | **BLUMBERG:** | But just to be clear, and I--I don't want to presume anything, but it's my understanding from the way you've described the institutional Deposit-Loan Fund is that the $5,000,000 was property that belonged to Sacred Heart Cathedral Prep, at least as you understand it? |
| 12 | **PASSARELLO:** | That's correct. |
| 13<br>14<br>15 | **BLUMBERG:** | All right. All right, question 13.2 on the Statement of Financial Affairs, page 10 of 51, shows a transfer of $25,000 for a legal settlement. My question to you, sir, is whether that relates to an abuse claim. |
| 16 | **PASSARELLO:** | No, it doesn't. I'm sorry, can you state the page again? |
| 17 | **BLUMBERG:** | 10 of 51. |
| 18<br>19 | **PASSARELLO:** | Oh, 10. Okay, I'm sorry. That is not a--that is not a--a settlement of (inaudible). |
| 20<br>21<br>22<br>23<br>24 | **BLUMBERG:** | All right. And I just wanna ask you to go to the end of the Statement of Financial Affairs, starting on page 50. It's the exhibit for question 21. So page 51 lists the real property located at 250 Oak Park Grove in Menlow Park. My question to you, sir, is how the debtor determined the value that was listed there for that property. |
| 25<br>26 | **PASSARELLO:** | So the--you're loo--you're at the--the first item there, the Vallombrosa Center? |
| 27 | **BLUMBERG:** | Yes, sir. |
| 28 | **PASSARELLO:** | Yeah, that's based on assessed value. |
| 29<br>30<br>31 | **BLUMBERG:** | Okay. And then the second item was the payroll held in trust for parishes, cash of about 5.9 million. This is just the cash that flows through the debtor's cash management system, is that correct? |
| 32<br>33 | **PASSARELLO:** | Yes, that's correct. That's for our coordinated payroll for the parish--the parishes and schools. We process their payroll (inaudible). |

MEETING OF CREDITORS | eLitigation Services, Inc.   41
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 106 of 123

| | | |
|---|---|---|
| 1 | **BLUMBERG:** | All right. And then the last, one, two, three, four, five, six, seven, eight, nine, 10, approximately 11 items are Charles Schwab investment accounts. Are these the Charles Schwab accounts that correspond to the institutional Deposit-Loan Fund that you've been trying to explain to me but I've not been understanding very well? |

6  **PASSARELLO:** Well, these are the funds that I'm referring to that relate to the institutional Deposit and Loan.

8  **BLUMBERG:** Okay. And these--well, let me rephrase it, the funds in these accounts, to your understanding, don't belong to the debtor, they belong to the--the various entities that are listed on this exhibit, is that correct?

11  **PASSARELLO:** That--that's correct.

12  **BLUMBERG:** And, again, I probably asked this, like, five times but I'm still not sure I understand it, are these Schwab accounts titled in the debtor's name?

14  **PASSARELLO:** Yes, they are.

15  **BLUMBERG:** Okay.

16  **PASSARELLO:** The debtor's name is--yes, they are titled and listed as the accountholder.

17  **BLUMBERG:** And do these non--

18  **PASSARELLO:** (Inaudible).

19  **BLUMBERG:** And do these non-debtor Catholic entities have access to these accounts directly?

21  **PASSARELLO:** Hey, I'm sor--I'm sorry. Could--could you hang on one second?

22  **BLUMBERG:** Sure.

23  **PASCUZZI:** Hey, Mr. Blumberg, cou--could you restate that last question? I think he might've misunderstood.

25  **BLUMBERG:** Okay. Let me ask--let me go back, like, two questions. The Schwab accounts listed on the exhibit to question 21 of the Statement of Financial Affairs, are they titled in the debtor's name?

28  **PASSARELLO:** Yes.

29  **PASCUZZI:** No, not in the debtor's name. They're titled in the--the party listed here, Ma-- Marin Catholic High School, Sacred Heart Cathedral Prep, Junipero Serra, Saint Bridge--Brigid.

MEETING OF CREDITORS | eLitigation Services, Inc.   42
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **BLUMBERG:**          Okay. Does the debtor control these accounts?

2   **PASSARELLO:**          They are controlled by the--the party here. So they--they withdrawal or
3                        contribute to those accounts based on their cash requirements for those entities.

4   **BLUMBERG:**          We had--we had talked about a moment ago, for instance, the $5,000,000
5                        withdrawal, or rather payment or transfer, to Sacred Heart Cathedral Prep. That
6                        5,000,000, would it have come out of the corresponding account listed on this
7                        exhibit, the exhibit to SOFA 21?

8   **PASSARELLO:**          Yes, it would have come out of the Sacred Heart Cathedral Prep Charles
9                        Schwab account.

10  **BLUMBERG:**          If Sacred Heart--let me rephrase that. When Sacred Heart withdrew the
11                       $5,000,000, did it have to go through the debtor or could it deal directly with
12                       Charles Schwab?

13  **PASSARELLO:**          It went through the debtor.

14  **BLUMBERG:**          And why is that, if you know?

15  **PASSARELLO:**          That's the process that we have in place with--with the institutional
16                       Deposit and Loan. We administer the funds.

17  **BLUMBERG:**          Okay. All right. All right, I think that's all the questions I have for now. I
18                       forgot the order we were going to proceed in. Let me ask this--

19  **STANG:**          If--

20  **BLUMBERG:**          Go ahead, sir.

21  **STANG:**          Jason, Mr. Blumberg, it's Jim Stang, well, I did say at the beginning we were not
22                       intending to ask the questions we had prepared, I do have a follow-up two or three
23                       questions to something that I believe it was Father Summerhays testified about.
24                       Could I do that--

25  **BLUMBERG:**          Yes, please.

26  **STANG:**          --(inaudible) time, please?

27  **BLUMBERG:**          Would you--would you like to go now, sir?

28  **STANG:**          Would this be the right time?

29  **BLUMBERG:**          Yeah, I think so.

30  **STANG:**          Okay. And I apologize to Father Summerhays or to Passarello, I--I thought it was
31                       Father Summerhays who said this, in connection with the credibly accused list, that

MEETING OF CREDITORS | eLitigation Services, Inc.     43
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    the archdiocese does not maintain a credibly accused list. Father, was that your
2    testimony or was that Mr. Passerbells [sic]?

3  **SUMMERHAYS:** That was--that was my testimony, Father Summerhays.

4  **STANG:**    Okay. And is there anything you want to chan--my recollection is that you said that
5    the archdiocese did not maintain one, is that--is that--did I get that right?

6  **SUMMERHAYS:** We maintain a list of good standing priests.

7  **STANG:**    Right. So did you attend--well, did you attend the First Day hearings before Judge
8    Montali? I know that someone from one of the priests of the archdiocese was on but
9    I don't remember if it was you.

10  **SUMMERHAYS:** Yes, it was me.

11  **STANG:**    Okay. And do you recollect the co--the discussion between it was either Mr. Katz
12    and Mr. Pass--I think it was Mr. Katz and Judge Montali about whether the wage
13    motion would cover priests who had been credibly accused of sexual abuse?

14  **SUMMERHAYS:** I--I--I don't remember that conversation but go ahead.

15  **STANG:**    Okay. Well, the order that the court entered at Docket 42 discusses the point, and I'd
16    like to read it to you. And I--I'm sorry we're not sitting across the table from each
17    other. You--I--I will just represent to you I'm reading to you exactly what the
18    entered order says. "Nothing in this (inaudible) order authorizes the debtor to make
19    any payments that benefit, directly or indirectly, any credibly accused perpetrator of
20    abuse, whether for wages, support, housing, prepetition claims, retirement, or
21    otherwise." Is--is that consistent with your understanding of Judge Montali's order?

22  **SUMMERHAYS:** Can you rephrase the question?

23  **STANG:**    Okay, I read to you the text of a entered order by the bankruptcy court, and I asked
24    you if that is consistent with your understanding of the archdiocese's responsibilities
25    under the wage order.

26  **SUMMERHAYS:** Yes.

27  **STANG:**    Okay. How can you know if you are making--whether you're making such
28    payments if you don't have a list of the people who you're not supposed to making
29    the payments to?

30  **SUMMERHAYS:** I think most of these priests are dead. We--we don't maintain a list.

31  **STANG:**    So you don't--so when you run your payroll, you don't know whether or not you're
32    making a payment that benefits directly or indirectly any credibly accused
33    perpetrator of abuse?

MEETING OF CREDITORS | eLitigation Services, Inc.    **44**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **SUMMERHAYS:** I--I--we do know if something's benefiting somebody who's been accused, but
2 we don't make (inaudible) list of credibly accused priests.

3 **STANG:** Well, that--so there is a list of people who you're not paying because their credibly
4 accused?

5 **SUMMERHAYS:** No.

6 **STANG:** Well, how do you know whether you're paying the (inaudible)--

7 **SUMMERHAYS:** (Inaudible)--

8 **STANG:** --or not?

9 **SUMMERHAYS:** --are not in active ministry. I'm sorry. The--the--the--so they wouldn't be
10 getting wages.

11 **STANG:** Does the diocese have an obligation to provide assessments or support to priests
12 who have not be laicized?

13 **SUMMERHAYS:** It does canonically.

14 **STANG:** Okay. Does it make payments to priests who have not been laicized, who are in the-
15 -who are not in active mission?

16 **SUMMERHAYS:** Is it--what? What sort of payments?

17 **STANG:** Well, what--you have a court order that says you are not going to give any
18 payments to any credibly accused perpetrator for wages, support, housing,
19 prepetition claims, retirement, or otherwise. That is an order--

20 **SUMMERHAYS:** But, wh--hold on, hold on, hold on.

21 **STANG:** Let me finish--that the archdiocese submitted to the court (inaudible) and I'm trying
22 to find out is, how do you know you're in compliance with this order if you don't
23 have such a list?

24 **PASCUZZI:** Mr. Stang, this is Mr. Pascuzzi. The order authorizes payment of prepetition,
25 wages, salaries up to the priority amounts, and we were not asking the court to pay
26 any prepetition, salary, benefits, et cetera, in that motion for anybody who's--let's--
27 let's phrase it a little bit better in terms of the way San Francisco looks at it--
28 anybody who's not on the active ministry list. And we will be--the order also
29 provides that if there is any prepetition payments, because we prepay payroll and
30 things like that, it says in the motion, if there are any prepetition payments of wages
31 or expense reimbursements, we have to file a report. And we will do that and we
32 will send you, the committee counsel, and the U.S. Trustee the information of any
33 prepetition amounts that are paid. And I believe that checking with Mr. Passarello

MEETING OF CREDITORS | eLitigation Services, Inc.   **45**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  recently, it's about $2500 that has been paid so far of prepetition and none of it has
2  to do with anybody who is not on the active ministry list.

3  **STANG:** So there--if I understand correctly, there is a (inaudible) priest that are in the
4  Archdiocese of San Francisco and there is a list of priests in active ministry and the
5  difference between those two lists are the people who might be credibly accused or
6  are credibly accused?

7  **PASCUZZI:** Mr. Stang, we'd be happy to discuss this further, and I think Mr. Lucas and Mr.
8  Katz had been discussing this, and we were trying to figure out a way to address the
9  committee's concerns and get it the information it wants on this list of active priests
10  in ministry versus credibly accused. And I'll tell you, we will continue to work with
11  you to figure this out and get you the information you need. But I'm not sure our
12  going back and forth with kind of inconsistent terms is--is really helping anything.

13  **STANG:** Okay. I was simply trying to understand as to how the archdiocese knows it's in
14  compliance with its--with the order that its applied to the (inaudible) this is the
15  bankruptcy court if it does not know or have a list of who's been credibly accused
16  when you've said you're not paying those people. So that's what I was trying to get
17  to because Father Sum--Father, again, I'm sorry, Father Summerhays said there's no
18  such list. So I don't know how you know that you're not paying people if there's no
19  list. But I appreciate your--the efforts that Mr. Lucas and Mr. Katz are making, and
20  we hope it'll lead to our being able to ascertain this list because there are newspaper
21  articles that say that this has been a request made by survivors in the communities
22  since 2003. So, thank--thank you, Mr. Blumberg, for letting me follow up with
23  some questions.

24  **BLUMBERG:** Okay. Thank--thank you, Mr. Stang. So I think we'll proceed in the order
25  we discussed at the outset of this meeting. What I'd like to do now is ask if any
26  members of the official committee of unsecured creditors want to ask question,
27  please press star one. Is that correct, Cedric, star one will make the notification to
28  you?

29  **STANG:** Mr. Blumberg, this is Mr. Stang. As we discussed at the beginning of this call, the
30  members of the committee had questions for the archbishop, and if they do not
31  respond to the invitation you just issued, I hope it is without prejudice or impact on
32  their ability to ask him questions at whatever follow-up 341 there is.

33  **BLUMBERG:** Yep, yep, that's how I understand it, but I just wanna give them the
34  opportunity to ask questions now if they so choose.

35  **LUCAS:** And--and just one thing, this is John Lucas, Mr. Blumberg, I was told that--that one
36  of the committee members did have some questions and I wanted to give her a
37  chance to hit the--the buttons that you had referenced in case that's still true.

MEETING OF CREDITORS | eLitigation Services, Inc.  46
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1 **BLUMBERG:** Okay, that'll be star one.

2 **CEDRIC:** Okay, we do have a question from Margie O'Driscoll. Your line is open.

3 **O'DRISCOLL:** Thank you. My name is Margie O'Driscoll, and I address you today as an
4 abuse survivor and a mother of two sons. And I also serve as co-chair of the
5 survivors creditors' committee. I have one additional specific question for the
6 archbishop and his representatives here today. As Mr. Stang suggested earlier, I'd
7 like to ask specific questions of the archbishop when he can find the time to meet
8 with us. However, my specific question for his counsel today is, can you describe
9 what financial resources have specifically been devoted to child protection and
10 safety since the archbishop was appointed? Thank you.

11 **SUMMERHAYS:** Well, we do maintain a safe environment office to, you know, go ahead and
12 monitor and protocols in place for our safe environment program throughout the
13 archdiocese. That includes training for any adult that works with minors,
14 background checks, and we also have a victim and survivor and we pay out salaries
15 to the people that--to two coordinators of our safe environment program, as well as
16 for our counselor who helps field any calls from survivors and helps set up any
17 counseling or--or pastoral care that they--that--that they request.

18 **PASCUZZI:** Do you want to also mention the independent review board?

19 **SUMMERHAYS:** We also have an independent review board that, you know, evaluates any
20 claims that come in, any accusations for priests. They also weigh in on our policies
21 and procedures and review them regularly. And that independent review board
22 includes a survivor. It also includes a retired law enforcement agent, psychologist,
23 doctors, and others.

24 **PASCUZZI:** And --and this is--

25 **O'DRISCOLL:** Thank you.

26 **PASCUZZI:** --Mr. Pascuzzi. I would also refer you to the motion that we filed. One of the First
27 Day motions was to allow the archdiocese to continue paying and--and performing
28 under the Abuse Survivor's Program that it operates that Father Summerhays was
29 making to the extent there was any prepetition bills that needed to be paid in co--in
30 connection with that, but there's a pretty thorough description in that motion, as
31 well as the supporting declaration of the resources that are devoted. If--if you're
32 asking for, like, a dollar amount or something like that, we would need to go back
33 and research that.

34 **O'DRISCOLL:** That would helpful. Thank you.

35 **BLUMBERG:** So, Ms. O'Driscoll, thank you for your question. Do you have any
36 additional questions at this time?

MEETING OF CREDITORS | eLitigation Services, Inc.    47
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **O'DRISCOLL:**      That's the only question at this time. I'll wait for when we have an
2            opportunity to speak directly with the archbishop to frame some other questions.
3            Thank you.

4   **BLUMBERG:**      Okay. Thank you. Just one last call if there are any members of the
5            committee who want to ask questions, star one.

6   **CEDRIC:**      We have Madeline Mcfeely, your line is open.

7   **MCFEELY:**   I probably should save this question for the archbishop. I have spoken with the
8            committee about what I would say, and if they feel--I--I think this is a question that
9            I would like to direct directly to the archbishop so I will--I will reserve that for
10          when he is able to join us.

11   **BLUMBERG:**      Okay. Thank you, Ms. Mcfeely. All right. One last call for members of the
12           committee if they would like to ask questions of the two representatives who are
13           here right now, Father Summerhays and Mr. Passarello, if you wish to do so, please
14           press star one now.

15   **CEDRIC:**      Okay, we do have one last question in queue. I believe the name is Jan Ceccoli.
16           Your line is open.

17   **CECCOLI:**  Hi. Thank you. I come to you as a sister of two brothers who were abused, one who
18           unfortunately and very painfully committed suicide. I am curious as to--if the
19           parishes were omitted from the bankruptcy, why are their debts being included in
20           this? I also have a question as to the money that was paid in July to Riordan and
21           Sacred Heart, if the clawback ruling will take affect regarding that money being
22           returned. And I also heard that since the insurance companies that are included in
23           these pending 500-plus lawsuits are not included in this, why can't they go forward?
24           I know that's three questions, and I appreciate your answers.

25   **PASCUZZI:**   This is Mr. Pascuzzi, and thank you for your questions. I'm sorry to hear about
26           your--your brothers. So the parishes are not--they did not file bankruptcy. The goal
27           of the bankruptcy, though, is to reach a global settlement of all of the abuse claims,
28           including against parishes or other entities, and that's the way a lot of--that's the
29           way all of these diocesan Chapter 11's have--have occurred--have--have been
30           resolved.

31           With regard to the clawback question on the high schools, I think Mr. Passarello's
32           testimony was that that was their money. That it's--it's basically being administered
33           by the archdiocese in an investment fund, and so it's their money so it's not
34           archdiocese's money that was paid to them. It was just basically conduit from the
35           Charles Schwab account to the high school of their own money.

MEETING OF CREDITORS | eLitigation Services, Inc.    48
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

And regarding the insurance companies, they absolutely will be in--involved in any resolution here, any global settlement, in one way or another. The archdiocese insurance is an asset of the bankruptcy estate and will be--we will be working with the committee and others to obtain contributions based on that insurance coverage to a global settlement.

**MCFEELY:**  I appreciate your--your answers and addressing the situation. I guess my next question regarding your clawback rule is, how is it that the archdiocese holds the funds for Riordan and Sacred Heart as separate entities?

**PASSARELLO:**  We--this is Joe Passarello. Thank you for your question. We hold the institutional Deposit and Loan acts as a conduit that allows high schools and other institutions to deposit funds, earn an interest that's saved, while allowing the lending of funds to participants, members of the institutional Deposit and Loan. Earlier we mentioned that there's a loan to Serra High School that has a balance now of about $6.6 million. Those were funds that were (inaudible) from the institutional Deposit and Loan Fund to that high school for their--for their needs, and that loan application was approved by the institutional Deposit and Loan committee. And--

**MCFEELY:**  Thank you.

**PASSARELLO:**  --(inaudible)--

**MCFEELY:**  In ad--in addition to this, who keeps the interest, then, on these funds that's earned?

**PASSARELLO:**  The interest is remitted back to is--there's an interest rate that is paid to the part of a depositor, so they receive an interest rate. And in some cases, we ha--we pay a dividend based on average balance--we pay a dividend out to the depositors over the la--couple times over the last eight or nine years. So those funds go back to the--to the depositors.

**MCFEELY:**  But the archdiocese takes on the responsibility of managing the funds, which I'm sure includes employee payroll, et cetera, but has no benefit of keeping those funds.

**PASSARELLO:**  No, we--we do not have benefits from that. We are a service organization in many regards, and this is one of the services that we provide to our--to our institution.

**PASCUZZI:**  Mr. Passarello, the--the--you paid for those services though, right?

**PASSARELLO:**  Yes, we are. There's a--there's a fee that's approved by the ins--by the Deposit and Loan committee that the--that the chancery operations receives those.

**MCFEELY:**  They incur (inaudible) with no ROI based on what I'm hearing.

MEETING OF CREDITORS | eLitigation Services, Inc.    49
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **PASSARELLO:**    There's--there--we cover our costs. Our estimated costs of administering
2        these funds are--are covered by the--by the funds on the--that are invested.

3  **MCFEELY:**  So then there is some sort of compensation from managing these funds for the
4        other entities.

5  **PASSARELLO:**    For administering the institutional Deposit and Low [sic] Fund--Loan
6        Fund, it is minimal.

7  **MCFEELY:**  But it's there. Thank you very much.

8  **STANG:**    Mr--Mr. Blumberg, this is Mr. Stang. If the person who was just asking those
9        questions wants to contact the counsel for the committee, again, my name is Jim
10        Stang. My cell phone number, though I'll be traveling tomorrow, is 310-420-7535,
11        and I and my colleagues would be happy to discuss your questions and any other
12        concerns you have. So please feel free to give me a call.

13  **MCFEELY:**  I appreciate that. Thank you very much.

14  **STANG:**    Okay.

15  **BLUMBERG:**    All right, the next group I want to invite to ask questions are the lawyers
16        for abuse survivors. If there any lawyers for abuse survivors who would like to ask
17        questions now, please hit star one on your phones.

18  **CEDRIC:**  One moment. We do have a question. Okay, we did not get a name recorded. If you
19        please--if you queued in for a question, please state your name. Your line is open.
20        You may be on mute. Please hit the mute button.

21  **MAZZETTI:** Yep, I was on mute. I'm sorry. Robert Mazzetti. I'm an attorney for one of the
22        families and also one of the survivors.

23  **BLUMBERG:**    Okay, sir, please go ahead and ask your questions.

24  **MAZZETTI:** I just wanted to clear up something about the hierarchy of the Catholic Church. Is
25        it accurate that the archbishop is the boss of the pastor of the different parishes?

26  **SUMMERHAYS:** He appoints the pastor--I'm sorry, this is Father Summerhays--he does appoint
27        a pastor to the office of pastor at the parishes.

28  **MAZZETTI:** Sure. And that pastor serves at the pleasure of the archbishop, isn't that right?

29  **SUMMERHAYS:** Well, it's a civility of office within the church and so he--he does have rights
30        in--in that appointment and typically serves for a term.

31  **MAZZETTI:** But he serves at the pleasure of the archbishop. If the archbishop wants his--him
32        removed, he can be removed, isn't that right?

MEETING OF CREDITORS | eLitigation Services, Inc.   50
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1  **SUMMERHAYS:** There are legal avenues for that, but there is a stability of office and he does
2  have a right to the office and the bishop could overstep its bounds and he could take
3  him to Church court if he does.

4  **MAZZETTI:** Is the archbishop able to make any demands on the pastor for anything that he
5  might want to occur in the parish?

6  **SUMMERHAYS:** Such as?

7  **MAZZETTI:** Anything at all.

8  **SUMMERHAYS:** He can make a request that, you know, he can state a desire that he'd like to
9  see things happen in the--in the parish. Certainly through (inaudible) we have
10  policies and procedures for, you know, the archdiocese and our parishes.

11  **MAZZETTI:** And those--those requests that are made are usually not refused by the pastor, isn't
12  that right? If the--if the bi--archbishop makes a request, it really is not a request, it's
13  something that he is demanding to be done.

14  **SUMMERHAYS:** Not necessarily.

15  **MAZZETTI:** Well, what happens to the pastor if he refuses a request of the archbishop?

16  **MALE:** (Inaudible)--

17  **SUMMERHAYS:** It--it depends. I mean, if it--if it's--if it's a serious matter, it could be grounds
18  for, you know, shor--a sho--being pulled out of the parish and reassigned.

19  **MAZZETTI:** The parishes, do they have their own liability insurance?

20  **PASCUZZI:** No.

21  **SUMMERHAYS:** No, they do not.

22  **PASSARELLO:** This is Joe Passarello. They're covered under the--the Archdiocesan-wide
23  insurance program.

24  **MAZZETTI:** Are they named as--as additional insureds?

25  **PASSARELLO:** No, not specifically.

26  **MAZZETTI:** How much money, if any, or any type of remuneration, is paid by the archbishop
27  to the Vatican?

28  **SUMMERHAYS:** Do you know?

29  **PASSARELLO:** That I don't--

30  **SUMMERHAYS:** Yeah.

MEETING OF CREDITORS | eLitigation Services, Inc.    51
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 116 of 123

1 **PASSARELLO:**      I--I don't know this. This is Joe Passarello. I'm not aware of that specific
2                 amount.

3 **MAZZETTI:** I'm sorry, you cut out. You're not aware of what?

4 **PASSARELLO:**      I'm not aware of that specific amount, sorry.

5 **MAZZETTI:** But there is an amount, isn't that right?

6 **PASSARELLO:**      It's not--it's not significant.

7 **MAZZETTI:** You didn't answer my question. There is an amount of money or some type of
8                 remuneration the archbishop does pay to the Vatican, isn't that correct?

9 **PASSARELLO:**      I don't know. I don't know.

10 **MAZZETTI:** Well, is that--is that listed anywhere in the--in your bankruptcy records?

11 **PASCUZZI:**  This is Paul Pascuzzi. I don't think it's in the schedules. The--the schedules require
12                 certain questions to be answered, and it must not have come in the timeframe.

13 **MAZZETTI:** How much money in the--or what's the percentage of the archbishop's income in
14                 the past two years that has been paid out for charitable purposes?

15 **PASSARELLO:**      Percentage of his own income?

16 **MAZZETTI:** Well, the--the in--income of the--of the archdiocese.

17 **PASSARELLO:**      It's--it's less than--the dollar amount is less than $40,000 per year.

18 **MAZZETTI:** Is that a--is that a figure by design?

19 **PASSARELLO:**      It's a figure that we have.

20 **MAZZETTI:** That's all I have at this time. Thank you.

21 **BLUMBERG:**      All right, thank you, sir. Again, if there are any--

22 **MAZZETTI:** (Inaudible).

23 **BLUMBERG:**      If there are any lawyers, counsel, for abuse survivors who wish to ask
24                 questions, please press star one.

25 **CEDRIC:**  One moment for the next question. Okay, we have a follow up with Robert
26                 Mazzetti. Your line is open.

27 **MAZZETTI:** Out of the $70 or $71 million that the--was paid for settlement or judgements of
28                 survivors, how much of that was paid by the archbishop or the archdiocese as
29                 opposed to the (inaudible)?

MEETING OF CREDITORS | eLitigation Services, Inc.      52
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1   **SUMMERHAYS:** We don't know.

2   **MAZZETTI:** Do you have that figure available? Is that something you can provide to us?

3   **SUMMERHAYS:** We'll look into to.

4   **MAZZETTI:** Thank you. That's all I have.

5   **BLUMBERG:**     Okay, attorneys for survivors, if you'd like to ask questions, star one.

6   **CEDRIC:**   Showing no questions in queue at this time.

7   **BLUMBERG:**     No questions, Cedric, is that right?

8   **CEDRIC:**   That is correct, no questions.

9   **BLUMBERG:**     Thank you, sir. Okay, at this time I'm gonna open up the floor to any other
10   creditors. Any other creditors on the line who'd like to ask a question, please press
11   star one now.

12   **CEDRIC:**   Okay, we have a question from Jan Ceccoli. Your line is open.

13   **CECCOLI:** Hi, thank you for taking my additional question here. Appreciate that. I'm
14   questioning the fact on the insurance itself. Exactly how many policies are held at
15   perhaps one given time by the Church, such as property insurance, if someone is
16   hurt on your property, or these abused victims were hurt on your property? Is there
17   an EPLI insurance that covers employees' wrongful acts? Are there any other
18   insurances other than one policy that they provide the--the archbishop, the Vatican,
19   the--anyone who is involved in this, would hold at one given time?

20   **PASCUZZI:**   This is Paul Pascuzzi. The archdiocese has hired an insurance lawyer and been
21   working with an insurance lawyer whose job it is to identify the insurance policies,
22   every single insurance policy, from past years, way, way back, to the present, that
23   could be sourced for coverage. It is in the archdiocese's best interest, as--as well as
24   the committee's and other's interest, to thoroughly explore every avenue for
25   insurance coverage to maximize that as a resource here. There are policies that go
26   back decades that, you know, we're trying to basically get our hands on and handle
27   on as--and comparing them to the claims to figure out what coverage might be
28   impacted. So the--the exact details of that are a work in progress, and the insurance
29   lawyer is absolutely working on that and will be working with the committee's
30   insurance people, whether it's at Mr. Stang's firm or if they hire somebody separate.

31   **CECCOLI:** Okay, thank you. And in addition to that, based on if--if there's one policy, two
32   policies, whatever there could be that are out there pending that need to be disclosed
33   and found out, regarding the aggregates on these policies, I think it would also be

MEETING OF CREDITORS | eLitigation Services, Inc.   **53**
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

1    very beneficial for us, the families, to know that if the aggregate is proclaimed, if it
2    is per plaintiff, it is--how that's broken out.

3  **PASCUZZI:**  Yeah, var--it varies--this is Paul Pascuzzi again--it varies by policy over the years
4    and so it--it's not--it--it's gonna be different under every policy potentially and
5    typically the policies are for one-year periods, I think. So that is part of the
6    somewhat complicated analysis that's being done. But, again, we'll be working with
7    the committee in that regard and, you know, I don't know, I'm sorry, I didn't catch if
8    you're a committee member or not, but that information will be with--be with the
9    committee, as well.

10  **CECCOLI:**  I--I thank you. I am not, but I look forward to speaking with Mr. Stang as he put his
11    phone number out there. All right, thank you very much.

12  **PASCUZZI:**  You're welcome.

13  **BLUMBERG:**     All right, thank you. Any other creditors who wish to ask questions, please
14    press star one now. Cedric, has anyone indicated that they would like to ask
15    questions?

16  **CEDRIC:**  We do have a question from Francis Guevara. Your line is open.

17  **GUEVARA:**  My name is Francis Guevara and I operate a small catering company called A
18    Black Tie Affair and we did an event in June for the Archdiocese of San Francisco
19    and I don't--I'm just wondering how do I proceed with--with this because I'm not
20    sure how this works.

21  **PASCUZZI:**  This is Paul Pascuzzi. You--you should file a claim if you have a--an amount that
22    is owed. And if you go to that omniagentsolutions/rsaff website, you can find
23    information on to file a claim. We will be, as mentioned earlier, filing a motion to
24    set a deadline for filing claims at some point soon, I hope, and also establishing the
25    procedures. But if it's a regular creditor claim, the--there's a--official form for filing
26    those kinds of claims, and instructions should be on that website.

27  **GUEVARA:**  Okay.

28  **PASCUZZI:**  And my--my information is also on that website so if you have questions, further
29    questions, about that, you can call me. I can--if you can't find the form or, you
30    know, need to know where to send it or something, I can't advise you on what to do
31    but that--that should be helpful to you.

32  **GUEVARA:**  Okay, I appreciate that. Thank you so much.

33  **PASCUZZI:**  Welcome.

34  **GUEVARA:**  Okay, take care.

MEETING OF CREDITORS | eLitigation Services, Inc.     54
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564    Doc# 610-4    Filed: 04/19/24    Entered: 04/19/24 15:35:29    Page 119 of 123

| | |
|---|---|
| 1<br>2<br>3 | **BLUMBERG:** All right, thank you. Any--any other creditors who wish to ask questions, please press star one now. Okay, Cedric, has anyone indicated they would like to ask questions? |
| 4 | **CEDRIC:** I am showing no further questions at this time. |
| 5<br>6<br>7<br>8<br>9 | **BLUMBERG:** Okay, thank you. Okay, so that concludes the question-and-answer portion for purposes of this session of the meeting of creditors. What we need to do now is to discuss a continue date for the meeting. Mr. Pascuzzi, I believe you had indicated that there were potential dates where the archbishop might be available and perhaps you could purpose those or--or let us know what those are. |
| 10<br>11<br>12<br>13 | **PASCUZZI:** Okay. So this is Paul Pascuzzi. So October 2, which is this coming Monday, don't know if that's too soon, anytime up till 3:00 p.m. Another date October 12 from 9:00 a.m. to noon. Another date is October 13 until 11:30 a.m. Another date is October 25, all day till 2:00 p.m. |
| 14<br>15<br>16 | **BLUMBERG:** Okay, I appreciate that. So I think October 2 will be too soon just because I'm gonna have to get a new dial-in number. Any of those other dates I think are fine with me. Mr--Mr. Stang-- |
| 17 | **LUCAS:** (Inaudible)-- |
| 18 | **BLUMBERG:** --do you have a preference? |
| 19<br>20 | **LUCAS:** I'm sorry, this is John Lucas, Mr. Blumberg. I got the October 2 date, I got the October 25 date. There was a date in between. I'm sorry, I didn't catch it. |
| 21<br>22<br>23 | **BLUMBERG:** So I have written down, and, Mr. Pascuzzi, correct me if I'm wrong, October 12 and October 13, and I think those dates were both generally in the morning. Is that correct, Mr. Pascuzzi? |
| 24<br>25 | **PASCUZZI:** Yeah, October 12, 9:00 to noon. October 13, until 11:30 a.m. Morning until 11:30 a.m. |
| 26<br>27<br>28 | **STANG:** Mr. Blumberg, this is Jim Stang. The 12th or the 13th is best for my calendar. The second conflicts with a meditation in another diocesan case and the date, the last date, I think it's just too long-- |
| 29 | **BLUMBERG:** Okay. |
| 30 | **STANG:** --from now. |
| 31 | **BLUMBERG:** So-- |

MEETING OF CREDITORS| eLitigation Services, Inc.   55
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

**STANG:** I want to point out it is during the National Conference of Bankruptcy judges but I will tear myself--Mr. Lucas and I will tear ourselves away from that exciting event to participate with this.

**LUCAS:** And--and--hey--are we trying to set this in stone now or are we just trying to socialize the dat--I'm sorry, this is John Lucas. And the reason why I ask is because I do think--I want to confirm with the committee members and (inaudible), but I think that the 12th might be the best date given that we already have a prescheduled meeting on that day and so I know that people have allocated time but I need to confirm that.

**BLUMBERG:** I'd like to set the date now just because I have to get a phone number and we have to post it on the Omni Agent Solutions website. So I'm inclined--

**LUCAS:** I--I--I--

**BLUMBERG:** --to do the 12th.

**LUCAS:** --understand that, I mean, but I, you know, I didn't know that this was going to be postponed until minutes before it started, and so I've had--had no time to confer with the committee. And, however, I do expect that probably the October 12 date will work best given that we have a meeting scheduled during that same time and we could swap out one for the other. That's all. But I just--I've had--neither Mr. Stang or I have any kind of (inaudible) about this and, you know, this is being continued on our--at our request and I want to make sure that everybody's available and I'm trying to do that.

**BLUMBERG:** Understood. I'm trying to look at the bankruptcy rule and I think I'm supposed to announce the continuance on the record under rule 2003, I believe. Bear with me a second.

**LUCAS:** No problem.

**BLUMBERG:** Yeah, so I have Rule 2003(e) Bankruptcy Rule, and it says, "The meeting may be adjourned from time to time by announcement at the meeting of the adjourned date and time. The presiding official should promptly file a statement specifying the date and time to which the meeting is adjourned." I don't think I feel comfortable continuing the meeting without a date. I'm certainly content to pick a date now and if--and if you and--and Mr. Pascuzzi have a discussion and say, "This date's just not gonna work," and you can give me enough advance time, we can certainly reschedule it. But I--I don't think--I don't think I can leave the date or the meeting open indefinitely.

**LUCAS:** This is John Lucas, Mr. Blumberg. That works. And--and my suggestion, subject to Mr. Pascuzzi's input, is October 12 at the 9:00 to 12:00 timeframe as Mr. Pascuzzi

MEETING OF CREDITORS | eLitigation Services, Inc.   56
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

Case: 23-30564   Doc# 610-4   Filed: 04/19/24   Entered: 04/19/24 15:35:29   Page 121 of 123

1    suggested, and I will work as quickly as I can to confirm that the committee
2    members and their (inaudible) counsel can attend that timeframe. And--and I expect
3    they can but I just don't want to overpromise everybody but I will work to get that
4    done.

5    **BLUMBERG:**    Okay. I appreciate that. Okay, so this meeting is being continued to
6    October 12, 2023 at 9:00 a.m. I don't have the dial-in information yet. As soon as I
7    get it, I'm going to provide it to Mr. Pascuzzi and Mr. Pascuzzi, I don't want to
8    speak for him, but I believe he will commit to getting that on the Omni Agent
9    Solution's website as soon as possible. So, please, check by there in the next couple
10   days, and that will provide you with the dial-in information.

11   Thank you all. Until then, we're adjourned.

12   **PASCUZZI:**  Thank you.

13

MEETING OF CREDITORS| eLitigation Services, Inc.    57
www.elitigationservices.com
310.230.9700 • els@elitigationservices.com

I hereby certify that the foregoing is a true and correct transcription of the audiotape labeled 9-28-23 JB Recording.

10-4-23
Date

Brittany Baynes
Printed Name

Brittany Baynes
Signature