James I. Stang (CA Bar No. 94435)
Andrew W. Caine (CA Bar No. 110345)
Gail Greenwood (CA Bar No. 169939)
Brittany M. Michael (*Pro Hac Vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, California 94104-4436
Telephone: 415-263-7000
Email: jstang@pszjlaw.com
       acaine@pszjlaw.com
       ggreenwood@pszjlaw.com
       bmichael@pszjlaw.com

Timothy W. Burns (*Pro Hac Vice*)
Jesse J. Bair (*Pro Hac Vice*)
BURNS BAIR LLP
10 East Doty Street, Suite 600
Madison, Wisconsin 53703-3392
Telephone: 608-286-2808
Email: tburns@burnsbair.com
       jbair@burnsbair.com

Attorneys for the Official Committee of
Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 23-30564 |
| THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, | Chapter 11 |
| Debtor. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR AN ORDER GRANTING CERTAIN TRIAL-READY SURVIVORS RELIEF FROM THE AUTOMATIC STAY TO PURSUE STATE COURT LITIGATION** |
| | Date: March 27, 2025<br>Time: 1:30 p.m.<br>Place: Via Zoom Teleconference<br>Hon. Dennis Montali |

Pursuant to Rule 201(b) of the Federal Rules of Evidence, the Official Committee of

Unsecured Creditors (the "Committee") of the Roman Catholic Archbishop of San Francisco (the

"Archdiocese" or "Debtor") requests that the Court take judicial notice of the following pleadings that are matters of public record that support the Committee's *Motion for an Order Granting Certain Trial-Ready Survivors Relief From the Automatic Stay,* filed herewith.

1. Attached hereto as **Exhibit A** is a certified transcript of the January 15, 2025 hearing in *The Roman Catholic Diocese of Oakland,* U.S. Bankruptcy Court, N.D. Cal., Oakland Div., case no. 23-40523 (WJL).

2. Attached hereto as **Exhibit B** are excerpts of a certified transcript of the January 21, 2025 hearing in *The Roman Catholic Diocese of Oakland,* U.S. Bankruptcy Court, N.D. Cal., Oakland Div., case no. 23-40523 (WJL).

3. Attached hereto as **Exhibit C** is a copy of a brief filed by certain insurers on December 30, 2024 in *The Roman Catholic Diocese of Oakland,* U.S. Bankruptcy Court, N.D. Cal., Oakland Div., case no. 23-40523 (WJL), entitled *Certain Insurers' Opposition to the Committee's Motion (1) for Standing to Assert, Prosecute and Compromise All Claims and Causes of Action the Debtor and Its Estate Hold Against the Insurers and (II) to Be Substituted as the Named Plaintiff in the Insurance Coverage Actions,* Docket No. 1584.

4. Attached hereto as **Exhibit D** is a copy of a brief filed by the Archdiocese of New York on January 28, 2025 in *The Archdiocese of New York, et al. v. Century Indemnity Co., et al.,* Supreme of the State of New York, County of New York, index no. 652825/2023, entitled *The Archdiocese of New York and Associated Policyholders' Memorandum of Law in Support of Their Motion for an Order That This Action Shall Proceed in Three Phases.*

4904-6894-7483.1 05068.002

Dated: February 21, 2025                    PACHULSKI STANG ZIEHL & JONES LLP


                                            By /s/ James I. Stang
                                               James I. Stang
                                               Andrew W. Caine
                                               Gail Greenwood
                                               Brittany M. Michael

                                            Attorneys for the Official Committee of Unsecured
                                            Creditors

                                            -- and --

                                            BURNS BAIR LLP

                                               Timothy W. Burns (pro hac vice)
                                               Jesse J. Bair (pro hac vice)
                                               10 E. Doty St., Suite 600
                                               Madison, Wisconsin 53703
                                               Telephone: 608-286-2808
                                               Email: tburns@burnsbair.com
                                                      jbair@burnsbair.com

                                            Special Insurance Counsel for the Official Committee of
                                            Unsecured Creditors

4904-6894-7483.1 05068.002

# EXHIBIT A

1

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re:                          ) Case No. 23-40523
                                ) Chapter 11
THE ROMAN CATHOLIC BISHOP OF    )
OAKLAND                         )Oakland, California
                                ) Wednesday, January 15, 2025
                    Debtor.     ) 2:00 PM
_____ )

ORAL RULING ON THE MOTION OF
THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS (I) FOR
STANDING TO ASSERT, PROSECUTE
AND COMPROMISE ALL CLAIMS AND
CAUSES OF ACTION THE DEBTOR
AND ITS ESTATE HOLD AGAINST
THE INSURERS AND (II) TO BE
SUBSTITUTED AS THE NAMED
PLAINTIFF IN THE INSURANCE
COVERAGE ACTIONS FILED BY
OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF THE
ROMAN CATHOLIC BISHOP OF
OAKLAND (DOC. 1538)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM J. LAFFERTY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (All present by video or telephone):
For the Debtor:          SHANE J. MOSES, ESQ.
                         EILEEN R. RIDLEY, ESQ.
                         Foley & Lardner LLP
                         555 California Street
                         Suite 1700
                         San Francisco, CA 94104
                         (415)434-4507

For Official Committee of  GABRIELLE L. ALBERT, ESQ. (ZOOM)
Unsecured Creditors:     Keller Benvenutti Kim LLP
                         425 Market Street
                         26th Floor
                         San Francisco, CA 94105
                         (415)364-6791

```
 1  For The Continental        MARK D. PLEVIN, ESQ.
    Insurance Company:         Plevin & Turner, LLP
 2                              580 California Street
                                12th Floor
 3                              San Francisco, CA 94104
                                (202)580-6640
 4
    For Certain Underwriters   BETTY LUU, ESQ.
 5  at Lloyd's of London       Duane Morris LLP
    Subscribing:               865 South Figueroa Street
 6                              Suite 3100
                                Los Angeles, CA 90017
 7                              (213)689-7428

 8

 9

10

11

12

13

14

15

16

17

18  Court Recorder:            D CHAMBERS
                               United States Bankruptcy Court
19                             1300 Clay Street
                               Oakland, CA 94612
20

21  Transcriber:               RIVER WOLFE
                               eScribers, LLC
22                             7227 N. 16th Street
                               Suite #207
23                             Phoenix, AZ 85020
                               (800) 257-0885
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

1    OAKLAND, CALIFORNIA, WEDNESDAY, JANUARY 15, 2025, 2:01 PM

2                              -oOo-

3       (Call to order of the Court.)

4          THE CLERK:  Please come to attention.  The Court is in

5    session.  This is the United States Bankruptcy Court Northern

6    District of California, the Honorable William J. Lafferty

7    presiding.

8          THE COURT:  Okay.  Good afternoon, everybody.  This is

9    Judge Lafferty, and I suggested we gather Zoom-ily (sic) today

10   for something that I hope will be helpful, which is a

11   discussion of any ruling on the committee's motion to be

12   substituted in as plaintiff in the insurance litigation pending

13   before Judge Corley in the district court.

14         So let's go ahead and take appearances.

15         THE CLERK:  Your Honor, calling line item number 1 for

16   the Roman Catholic Bishop of Oakland, case number 23-40523.

17   And parties being moved over now.

18         THE COURT:  Okay.  Okay.  Anybody else appearing that

19   we know of?

20         THE CLERK:  It doesn't look like it, Your Honor.

21         THE COURT:  Well, okay.  Perhaps.  That's it?

22         THE CLERK:  Yes, Your Honor.

23         THE COURT:  Okay.  All right.  Let's have appearances.

24         I think you're muted, Mr. Moses.

25         Still.

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 7 of
98

1   THE CLERK:  So Your Honor, on our end, it shows that

2   Mr. Moses is unmuted, so perhaps he --

3   THE COURT:  Oh, well.  I'm sorry then.  We don't know

4   what the problem is.

5   THE CLERK:  -- needs to change his speaker.

6   THE COURT:  Would someone else like to make an

7   appearance, and we'll see if it's us.

8   MS. RIDLEY:  Good afternoon, Your Honor.  This is

9   Eileen Ridley, Foley & Lardner, on behalf of the debtor RCBO.

10   THE COURT:  Okay.

11   MS. RIDLEY:  Mr. Moses is my colleague.  I believe I

12   have other colleagues online.  Can you hear me?

13   THE COURT:  Can you hear you, yeah.

14   MS. RIDLEY:  Okay.

15   MR. MOSES:  Your Honor, this is Shane Moses.

16   THE COURT:  There you are.  Okay.

17   MR. MOSES:  Apologies.

18   THE COURT:  That's all right.  That's okay.  Let's get

19   everybody else's appearances.

20   MS. ALBERT:  Good afternoon, Your Honor.  Gabrielle

21   Albert, Keller Benvenutti Kim, on behalf of the committee.

22   THE COURT:  Okay.  Thank you.

23   MR. PLEVIN:  Good afternoon, Your Honor.  Mark Plevin,

24   Plevin & Turner, for Continental Casualty Company.

25   THE COURT:  Okay.  Thank you.

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 8 of
98

1        MS. LUU:  Good afternoon, Your Honor.  Betty Luu of

2    Duane Morris on behalf of the London Market insurers.

3        THE COURT:  Okay.  Thank you.

4        Any other appearances?  I know we have other people on

5    the Zoom.  Right.  That's it?

6        THE CLERK:  Yes, Your Honor.

7        THE COURT:  Okay.  Can I begin with a moment of

8    levity?  At least I hope it's levity.  Sometimes, I don't know.

9    I am one of those people who is a stickler for how one dresses

10   for a hearing, but counsel in the Foley sweatshirt -- no, I'm

11   going to -- I'm going to -- I'm going to chide myself here.

12   When a judge tells everybody I'd like to see you all in two

13   hours, I really cannot dictate sartorial issues.  Okay.  So

14   this is in the parlance of our debtor, you have an indulgence.

15       MS. RIDLEY:  And I appreciate that, Your Honor.  I --

16       THE COURT:  No.

17       MS. RIDLEY:  -- tried to have a jacket over a shirt

18   so --

19       THE COURT:  No, it's okay.  When smarty-pants judge

20   tells you I want to talk to you about something and gives you

21   no time to get ready, it's not your fault.  Okay.

22       Let me take a moment for a little bit of background

23   here.  I'm aware that there is a motion on before Judge Corley

24   in the insurance -- well, what I'll just loosely call the

25   insurance action that's pending in front of her tomorrow on the

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 9 of
98

1  debtor's request that that matter be abated or held in

2  abeyance.  I deduce that it might be helpful to the parties and

3  to Judge Corley, if I am prepared to resolve this motion before

4  that hearing, that I do so.  I don't believe that my ruling

5  will be the only matter that would be of interest to folks

6  tomorrow, to either the people making arguments or to judge

7  Corley.

8            But to the extent I can level set, I guess is one way

9  to put it, both my disposition of the motion and to the extent

10 that's dependent on where I think we are in a volatile

11 environment involving a disclosure statement and plan that the

12 committee tells me is unconfirmable as a matter of law and that

13 the debtor tells me is being amended and is, while perhaps

14 imperfect, certainly not to be derailed.  So I wanted to give

15 you all some thoughts about that motion.

16           So a little bit of background.  As you all know, the

17 action that's in front of Judge Corley was commenced in front

18 of me.  And it sought various types of relief with respect to

19 the insurance companies, including declaratory relief and

20 including breaches of contract on theories that the insurers

21 were obligated to defend and weren't doing so and are obligated

22 to indemnify and arguably weren't doing so.

23           One series of motions to dismiss were brought before

24 me.  I granted them with leave to amend.  At that point, the

25 parties put their heads together and mutually determined that

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 10
of 98

1   this is a matter for which the reference should be withdrawn.

2   So the Judge Corley, who is a district judge who certainly has

3   experience in determining these kinds of insurance coverage

4   issues, would be able to do that, and I would not, which was

5   perfectly fine with me.  Judge Corley obviously has seen quite

6   a few disputes of this type and certainly knows her way around

7   the resolution thereof.

8          And I did not believe there was any reason to think

9   that my losing control, for what it's worth, of that action was

10   going to be so deleterious to our process here that I should

11   suggest that not happen.  I think that that, in many ways, has

12   been on a separate track.  And that's clearly true because in

13   the meantime, over a period of months, there's been robust

14   motion practice with respect to that action in front of Judge

15   Corley, such that the debtor is on their Fifth Amendment

16   complaint now and such that Judge Corley has very directly told

17   the parties that she expects there to be -- absent the

18   abatement, she expects there to be substantial contemporary

19   progress, even though they're arguably still at a pleading

20   stage, all of which is her discretion and her good judgment.

21   And I have nothing to say about that one way or the other.

22          But now I'm understanding that the committee -- I'm

23   sorry, the debtor, in their mind, synched up with their view of

24   what the plan would accomplish were it confirmed.  The debtor

25   has taken the position that it would be smarter, all in all,

1  not to dismiss the action in front of Judge Corley or even

2  necessarily to, for lack of a better word, dispose of it by

3  some sort of trade or other disposition that would basically

4  terminate that matter, but rather more or less to put it on

5  hold while we go through the matters we need to go through to

6  determine whether this plan and disclosure statement should go

7  forward, and if so whether upon a confirmation hearing that

8  plan could be confirmed.

9          So that's a basic background.  And I will say this,

10  not meaning to be flip, understandably at a juncture where they

11  are not satisfied with the plan in several respects, including

12  the amounts that the diocese is putting into the survivor

13  trust.  Including some aspects of the disposition of the --

14  through the litigation option, the various parties' rights

15  against insurance companies and with respect to also some

16  aspects of the way the debtor is at least implicitly valuing

17  the claims.  The committee has objected to the approval of the

18  disclosure statement on the theory that it describes a plan

19  that cannot be confirmed as a matter of law.

20          Certainly, as part of that analysis, informing it as

21  well is the notion that from the committee standpoint, the plan

22  is so deficient and so unattractive to the folks that

23  represents the abuse survivors that the possibility of getting

24  an affirmative vote through that class is about zero.  And the

25  committee points out that in those circumstances, it is a rare

1   case, if any, that a bankruptcy court has confirmed a plan over

2   the dissenting vote of the abuse survivors, all of which I take

3   at absolute face value.  I think those are good points to make.

4            Whether I find the plan is nonconfirmable as a matter

5   of law is another issue.  The voting is one thing.  Objections

6   are another.  So I have tried to separate those things out in

7   my head, at least to figure out from my bankruptcy-judge-

8   traffic-cop persona how does this go forward and what's the

9   order of progression here.  Consistent with their view of the

10  plan, the committee has asked me to take a number of actions

11  that they believe better reflect the appropriate way forward.

12           One of those is that I grant a motion for relief from

13  stay, and I'll speak somewhat, hopefully, illuminatingly, but

14  not conclusively about that at the end of this discussion.

15           Another is that I permit the committee to take on the

16  prosecution of a number of actions that would have as their

17  goal the assertion of claims that the committee believes the

18  debtor is not currently pursuing.  And that's a classic

19  derivative standing motion.

20           The third, for today's purposes, is a motion that the

21  committee be allowed to take on basically the role of the

22  plaintiff in what I'm calling the insurance litigation, the

23  litigation in front of Judge Corley.  Now, as originally set

24  forth, the committee made the points they wanted to make in

25  that motion, but they did not set it out necessarily under the

1   four-part standard re derivative standing.  And that's not a

2   critique.  That's an observation.

3         In the response by the debtor, the debtor did set

4   forth the four-part standing for -- four-part standard for

5   derivative standing to assert and prosecute a claim.  And

6   although the parties disagree fundamentally about whether

7   certain aspects of that standard are relevant to the analysis

8   we have in light of all the facts and circumstances of the

9   request in light of the insurance litigation, I think nobody

10  has told me that that standard is completely inapplicable here

11  or it wouldn't be helpful in working our way through how we

12  should think about this.  So I think there's some agreement

13  there.

14        So the four-part standard that was identified, and

15  it's from Yellowstone Mountain Club LLC, which is at a Westlaw

16  cite that's at page 13 of the debtors' response to the

17  committee's motion.  One, a demand has been made upon the

18  statutorily authorized party to take action.  Two, the demand

19  is declined.  Three, a colorable claim that would benefit the

20  estate if successful exists based on a cost-benefit analysis

21  performed by the Court.  And four, the inaction is an abuse of

22  discretion or unjustified in light of the debtor-in-

23  possession's duties in a Chapter 11 case.

24        There was initial disagreement about two of those

25  factors.  There was disagreement -- well, one factor and one

1    overall concern.  The debtor took the position that the

2    derivative standing standard, although it would be the way to

3    think about this problem, was in many ways inapplicable and the

4    relief was not available to the committee because the action

5    had been commenced.  So this is not the what might be the more

6    classic version of this problem, where there is an action that

7    is identified by a party who is not presently situated to bring

8    it.  That party writes a letter to the party who has the

9    ability to bring the action, outlines the action, outlines what

10   they believe the benefits of it to be, maybe takes the position

11   about the overall cost benefit analysis, requests that the

12   action be taken, and awaits a response.  This has not played

13   out exactly that way.

14          So the argument presented first by the debtor was,

15   well, without that initial question of an action has not been

16   brought, the committee really is not pursuing this in an

17   appropriate way.  This fails at that initial stage.  And then

18   the case law was cited back and forth for that proposition, the

19   committee taking the position that cases that seem to say that

20   really were distinguishable factually and in other contextual

21   matters.

22          I'm going to agree with the committee on that part.  I

23   do not believe that this is a matter that cannot be considered

24   because there was an action pending.  I think we're going to

25   get past that objection.  To the extent that there was also an

1  objection that, well, the committee did not technically make a

2  request that the action be commenced because one, it has been

3  commenced, and two, they simply didn't couch their request of

4  the debtor in those terms.  And therefore, another necessary

5  factor of the test has not been made.

6          I'm going to rule with the committee on that one too,

7  that, in fact, in light of the whole point of this analysis in

8  this context is what's actually happening in this case.  What

9  have parties done, what would happen if we go different

10 directions, and what really is to be balanced here between the

11 committee's request that the insurance actions simply go

12 forward in a different manner under their direction or that

13 that not happen.

14         So I think with all those factors, and given the fact

15 that what the committee is complaining about here, and I think

16 understandably, is that while the asset is not necessarily

17 being completely forgone, it is being put on a back burner such

18 that the committee believes it is not being utilized as it

19 should be, given the fact that they're doing that because the

20 debtor has proposed a plan that does suggest that the proper

21 way to go forward is to utilize the insurance assets through an

22 option that claimants have to pursue that sort of relief in a

23 different court and along state law lines.

24         Given that reality, I think the committee -- I

25 wouldn't say that it was futile that they would ask, but it was

1 not going to advance the ball in any sort of analytical way for

2 the committee to ask that the debtor just not pursue their plan

3 and therefore do this. So as to that, I'm going to agree with

4 the committee as well, that those two factors, to the extent

5 they're factors, are not gating and aren't disqualifying for

6 this request.

7      So then we get into what's really at stake here. And

8 I think if we look at the cases and we look at the kinds of

9 analysis courts do, what they're trying to figure out is is

10 there a colorable claim. The quick answer to that question is

11 there is because it's been asserted, and it's survived four

12 motions to dismiss. So technically, the first question, is

13 there a colorable claim? Yes, there is.

14      Then the question becomes what should be done about

15 it. And I agree with the debtor that -- well, I agree with the

16 committee that while the fact that an action is pending isn't

17 disqualifying, the fact that an action is pending does change

18 the way we think about these things. The action is out there.

19 It is pending. The debtor has prosecuted it.

20      The debtor's position right now is we've spent a

21 million-and-a-half on this litigation. We're almost done with

22 the pleading stage. And frankly, we have a plan that in our

23 mind, while it undeniably shifts the burden of these

24 determinations away from the debtor and onto the claimants,

25 nonetheless allows for some appropriate understanding and

1  disposition of the question whether there is insurance

2  coverage, number one.  If so, who's on the hook.  And beyond

3  that, whether there are rights -- which is both with respect to

4  the debtor, in name, at least, with respect to the liability,

5  but then possibly with respect to the insurance companies as

6  the parties who may be paying a significant part of this, if

7  not all of it in some circumstances.

8           So what's in front of me is not the traditional simple

9  case of the debtor has decided simply not and never to pursue

10 an action on the theory that it's a bad idea.  The classic

11 instance of that might be you don't want to sue your most

12 important trade creditor for a preference because they don't

13 have to do business with you, and it's better to keep that

14 relationship than to terminate it, effectively.  So what the

15 debtor is telling me is that we're not terminating this action.

16 We're not trading it for something else so that it is no longer

17 available for use.  We're asking that it be put on hold for a

18 while we play out, in our view, what we think is at least at

19 the moment a confirmable plan.

20          The committee's position is that to the extent that is

21 a request that I honor the business judgment of the debtor,

22 that's inappropriate.  We had a long discussion about that and

23 the basis for that argument by the committee during arguments

24 last week.  And I pressed Mr. Burns somewhat on the assertion

25 that I had found in the committee's papers that any deference

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 18
of 98

1   to what we might think of as business judgment rule in favor of

2   the debtor was inappropriate, where the debtor's judgment was

3   arguably tainted and arguably tainted by a conflict.  So we

4   explored to some depth whether this was a conflict or not.  And

5   not meaning to be flip, but Mr. Burns, in the course of that

6   argument, I think, retreated a bit from the position that it

7   either were a conflict or needed to be one to change the

8   analysis for a business judgment rule.  And that conversation

9   went where it went.

10          I will say, for what it's worth, I will reiterate my

11  skepticism that if the committee is alleging a conflict here, I

12  just don't see this that way.  This would be a conflict if

13  there were two entities to whom the debtor owed a duty and the

14  duties were equal and they were adverse and one could not

15  satisfy one without disappointing the other.  And I just don't

16  see this that way.

17          The debtor is a fiduciary, that's absolutely true, to

18  the unsecureds.  But the debtor's decision, in my view, to

19  reformulate the way one would go after and monetize and utilize

20  an asset of the estate, the insurance, the right to insurance,

21  and the proceeds, the debtor's decision to do that in one way

22  rather than another is not the sort of stark I'm favoring one

23  party over another, where I have duties to both.  Scenario that

24  I think describes a conflict.

25          So in my view, it's not a conflict, nor do I see

1    anything in the process that's been revealed to me so far, by

2    which the debtor made that decision, that -- while the

3    committee may not enjoy that decision, may think it's the wrong

4    one, and may someday even convince me that's the case, for sort

5    of threshold gate purposes, I don't see anything in the process

6    that the debtor has taken on here or that has led to the

7    decision that is itself wrongful or corrupt or nefarious or

8    anything that would give me reason to pause about how they got

9    from the initial analysis to the result, which is here's a plan

10   that we think is going to work.

11        So to the extent that we begin with the conflict

12   analysis, I will tell you, I don't find that compelling.  I

13   don't think it's a conflict.  I think this comes down to a

14   question of, among various options, can I make a decision right

15   now that the option to pause this and not to have it go forward

16   as robustly as the committee might like is necessarily harmful

17   to the estate or is necessarily even the wrong answer.  And the

18   bottom line is I cannot do that at this point.

19        The beauty of Chapter 11, as you all know, is that

20   sometimes we have several balls in the air, and that actually

21   helps.  This is one of those moments.  The debtor has proposed

22   a plan.  We will continue the discussion tomorrow about whether

23   the disclosure statement on file now describes a plan that is

24   patently unconfirmable.  I have not made up my mind about that

25   in terms of all the arguments that have been made to me and the

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 20
of 98

1 papers that I have so far.

2       What I can say, and if this is helpful to the parties

3 and to Judge Corley, as I sit here today, I do not have -- I

4 have not reached the conclusion, as I sit here today, that this

5 plan is unconfirmable as a matter of law.  Now, what will

6 happen with the vote is a whole other question, and I am very

7 mindful of that and how we talk about how we proceed from here

8 to a confirmation hearing is something we'll talk about

9 tomorrow and probably after tomorrow.  But to the extent that

10 this would all turn on me determining right now before Judge

11 Corley will have her hearing on the abatement motion that Judge

12 Corely, full speed ahead.  Whatever you want to do.  This plan

13 is a nonstarter.  I have not made that conclusion yet.

14       It doesn't mean it's perfect.  It doesn't mean there

15 won't be lots of robust discussion tomorrow about why I should

16 come to the conclusion that the plan is unconfirmable, and I

17 will listen to all those arguments.  And there's also likely to

18 be lots of discussion about what we need to do to make the plan

19 better than it is.  All that's fine.  But in my view, what I

20 have in front of me now is simply the debtor's decision that

21 the better course of action, for now -- and not for all time.

22 We're not trading the asset.  We're not terminating the asset.

23 For now, the better course of action is to pursue a plan that

24 they believe is, at least theoretically, confirmable, as to

25 which there is no gating objection, because of which I have to

1   stop this process, and that is an intelligent assessment of the

2   risks and rewards.

3         So on all that basis, I think it's appropriate for me

4   to deny the motion. I'll make a couple of other comments.

5   This is not for all time. As I've said in other context, time

6   is a long thing. And if we end up in a situation where I am

7   convinced, either by legal arguments or by the vote of

8   constituents, that the plan the debtor proposes cannot be

9   confirmed, we'll be in a different place. And at that point,

10   it will be -- there will be nothing wrong with reconsidering

11   whether, as part of that scenario, the better course is to is

12   to allow the committee to be more of a protagonist here than

13   they are right now.

14         I will make another couple of comments. In coming to

15   this conclusion, I'm very mindful of the abuse of discretion

16   standard that's referenced. And I think it's referenced both

17   with respect to how the parties who are jostling over these

18   kinds of actions should look at their choices and how a court

19   should review those choices once they are made, perhaps even

20   how a reviewing court would review my choice if someone were to

21   tell them that I made a mistake.

22         But abuse of discretion, as you all know, is an

23   extremely broad standard. And what it basically -- for

24   appellate review standards, what it means is the party making

25   the decision has proceeded in a way -- they have chosen a rule

1 that is consistent with the decision to be made.  And they have

2 exercised that discretion in a way that is not implausible or

3 unlikely or totally without support from the factual record

4 before us.

5       I think I can say at the moment, without making a

6 final decision on this, for abuse of discretion purposes, I

7 think the debtor looking at this from a cost benefit analysis

8 of is it worth pursuing at full speed the insurance litigation

9 in front of a Judge Corley versus this plan, I think, without

10 deciding whether that's ultimately the right decision, I think

11 I can say that it strikes me that from an abuse of discretion

12 standpoint, that is not so wrongful a decision that I would

13 stop it in its tracks right now.

14       I will also remark that the debtor and all the parties

15 are certainly mindful of what is actually at stake before Judge

16 Corley now, and there are certainly arguments.  While the

17 matter is colorable, there are arguments that it's a little

18 less, oh, I don't know, disputatious than it might have been

19 some time ago, as the insurance companies agree that they're

20 going to -- they're going to defend actions.  That's maybe not

21 as salient an argument as it had been before.  And as well as

22 Mr. Plevin and others make remarks to me that for the indemnity

23 purposes, that's not really ripe until one gets a judgment.  I

24 think Judge Corley is very well aware of that doctrine, and she

25 can make those decisions certainly.

1          And to the extent that there's a virtue in determining
2     over time who is responsible at different times for the
3     insurance obligations and who's primary, who's excess, whether
4     things have been exhausted or not, those are all matters that
5     are in front of Judge Corley but for which there are unlikely
6     to be answers tomorrow or the next day.  Those would play out
7     over some time.
8          So that's all to suggest that the exigency of
9     immediately proceeding full speed with the insurance litigation
10    may not be of the highest order either, in the context of where
11    we are today.  So I will make all those observations.
12         I will also observe that the committee's request to be
13    allowed to exercise the privilege of the debtor, given the
14    decision I'm making, I don't have to go into that in detail.  I
15    will tell you.  I paused long over that.  I thought that was
16    potentially of concern.  And although the committee was quite
17    sincere in telling me that this motion to -- that I was the
18    person to whom this motion should be brought re standing,
19    having said that, this was not an attempt to end run something
20    Judge Corley would do or otherwise not do or otherwise
21    complicate that matter unnecessarily.
22         I take the committee's statement at face value that
23    this was a good faith attempt to get the jurist whom they
24    believe has the power to decide who should be prosecuted and
25    actually to make that decision.  Having said that, it is not

1    lost on me that deciding that in the committee's favor right

2    now, especially in light of the abatement motion, would likely

3    have been at least distracting, if not a stronger word than

4    distracting, to Judge Corley's determination of the abatement

5    motion.

6              So for all those reasons, and with enormous respect

7    for the wonderful arguments that everybody made here -- I'm

8    sorry Mr. Burns isn't here to hear my flattery of him.  I think

9    he did a wonderful job conceiving of the problem from his

10   perspective.  But for all those reasons, I'm going to deny the

11   committee's motion to be entitled to assert standing with

12   respect to the insurance motion.  Again, this is not for all

13   time.  This is in light of the facts and circumstances present

14   now.  And if those change, well, we'll take the question up

15   again when those factors change.

16             Unless someone has a question about this, certainly,

17   Mr. Moses, to the extent you folks are the prevailing party, do

18   not try to encapsulate all of my rulings here or all my

19   impressions.  You can simply say that under FRBP 7052, for the

20   reasons stated on the record, the Court has denied the motion.

21             Unless somebody has a particular request to this, I

22   have two other matters I want to touch on very briefly for

23   tomorrow.

24             Anybody?  We're good?

25             Okay.  And I assume that people will inform Judge

1    Corley of this outcome.  You're certainly free to do that.

2    Okay.

3              With respect to the motion for relief from stay, I am

4    leaning toward granting that.  But I am concerned about the

5    following.  And to the extent anyone can give some thought to

6    this and give me some guidance or thoughts or suggestions

7    between now and tomorrow, I'd be grateful.

8              I'm very mindful of the fact that these matters have

9    been -- well, the matters that are in front of the coordination

10   judge in Alameda County are the matters from which maybe as

11   many as six actions would be selected to represent bellwether

12   litigation.  That's fine.  I'm mindful of two things that Mr.

13   Simons told me with great candor, and I appreciate his candor

14   the other day, that of those six, three of those did not

15   involve the Oakland diocese.  And one, I think, had come to a

16   different resolution.

17             So whereas before, I might have been somewhat

18   heartened by there were six matters kind of ready to go, that

19   doesn't seem to be the case now.  So I am a little bit worried

20   about the efficacy of granting the motion for relief from stay

21   if one would go back to square one, even to determine what

22   other four matters would be brought, if six seems to be a

23   reasonably representative number.

24             The second matter that concerns me is I'm mindful of

25   the fact that the judge who had been presiding over this matter

1  now has a different judicial role, and there was a new judge
2  appointed to this. And my understanding, also from Mr. Simons,
3  and I think this was confirmed by others, is I don't remember
4  who that judge is, but whoever that person is has not yet had a
5  hearing of any sort in the consolidated matter. So I'm a
6  little bit concerned that -- again, a granting a motion for
7  relief from stay, I'm just not sure what is going to happen in
8  any kind of prompt schedule. So I'm not suggesting there's an
9  answer to those questions today, but I want to take up this
10 question as well tomorrow and just see what else people can
11 tell me about those questions and about timing and about the
12 efficacy of granting a motion and letting the matters go
13 forward in light of those factors.
14         Secondly, with respect to the committee's other motion
15 to take on standing to prosecute various actions, I understand
16 that the committee the other day had said they would stand on
17 the papers. I know that the debtor's counsel, one, has some
18 points that they want to make in opposition to that motion.
19 And two, their schedule is such that they're asking that that
20 matter be argued first. That's perfectly fine with me. I'm
21 assuming that if there is argument by the debtor, the committee
22 will want to respond at the lectern, and that's understandable.
23 Okay. But the thing I'm grappling with here is what is, to me,
24 kind of an obvious gating question, and I just want to know
25 either why this isn't an obvious gating question or what you

1 guys think we should do about it.

2         If the single biggest piece of this, and not to

3 denigrate all the things the debtor would like to do, that's

4 fine.  If the single biggest and most obvious piece of this is

5 an alleged fraudulent transfer or other clawback action with

6 respect to the money that was transferred from the debtor to

7 OPF prior to the commencement of the case, there seems to be an

8 unarticulated disagreement between the parties as to the

9 consequence of the debtor's position that while those monies

10 might have been property of the estate for broadest 541

11 purposes, they were not usable by the debtor for various

12 purposes because of the terms of the grant.  So they are

13 restricted in some way.

14         So the debtor's position is, well, they may be estate

15 funds, but clawing them back is really kind of meaningless.  So

16 one wouldn't undertake the effort because they're property

17 estate, and they aren't.  They're not usable to pay creditors.

18 So therefore, a fraudulent transfer action really is neither

19 here nor there.

20         The committee seems to disagree with that position,

21 and maybe for several reasons.  And it may be they may include

22 that in order to take advantage of that kind of argument, the

23 debtor would really have to have something more akin to a trust

24 agreement or something that would more satisfy the requirements

25 of California law that an asset not be disposable by the party

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 28
of 98

1   to whom it was given, by the donee.

2          So my question for tomorrow will be whether we should

3   try to figure out a mechanism to answer that question before we

4   get into whether the committee should be taking on matters that

5   the that the debtor doesn't believe should be taken on if

6   there's a gating legal issue as to whether that would benefit

7   the estate in any event.  So if parties could let appropriate

8   folks know that that's on my mind and if people could be

9   prepared to talk about that, I'd be grateful.  This is

10  nothing -- this is not within light years of a decision on the

11  committee's motion, which I think is very intriguing, but it

12  does pose for me a question that if I could answer that at the

13  outset, I might be a lot smarter.

14         So in that context and in that vein, I would pose it

15  back to you folks and ask that we address that fairly early in

16  the presentation.  Okay.  I mean, there's lots of ways we might

17  do that.  There might just be a contested matter now that we

18  could create one that we could just determine in the course of

19  the bankruptcy without having to file a lawsuit.  It may be

20  that you can't do that, and so the committee's position would

21  be, no, we have to follow the lawsuit and we'll have that

22  fight.  That's fine.  But it seems to me that's fairly gating.

23  So I wanted to get that out there.

24         All right.  Okay.  Anything else from anybody?

25         Thank you for your patience.  Thank you for your

1   wonderful arguments on January 8th and before.  And I look

2   forward to seeing all of you tomorrow.  Okay.  Thank you very

3   much.

4         (Whereupon these proceedings were concluded at 2:36 PM)

# EXHIBIT B

1

<pre>
 1                UNITED STATES BANKRUPTCY COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                          -oOo-

 4   In Re:                       ) Case No. 23-40523
                                  ) Chapter 11
 5   THE ROMAN CATHOLIC BISHOP OF )
     OAKLAND                      ) Oakland, California
 6                                )Tuesday, January 21, 2025
                         Debtor.  ) 10:00 AM
 7   _____ )
                                    1. HEARING ON APPROVAL OF
 8                                  DISCLOSURE STATEMENT. CONT'D
                                    FROM 12/18/24, 1/16/25
 9
                                    2. MOTION TO AMEND MEDIATION
10                                  ORDERS AND REQUIRING PARTIES
                                    TO ATTEND GLOBAL MEDIATION
11                                  (DOC. 1612). CONT'D FROM
                                    1/16/25
12
                                    3. STATUS CONFERENCE. CONT'D
13                                  FROM 11/27/24, 1/16/25

14                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM J. LAFFERTY
15              UNITED STATES BANKRUPTCY JUDGE

16   APPEARANCES:
     For the Debtor:            ANN MARIE UETZ, ESQ.
17                              Foley & Lardner LLP
                                500 Woodward Avenue
18                              Suite 2700
                                Detroit, MI 48826
19                              (313)234-2800

20                              EILEEN R. RIDLEY, ESQ.
                                Foley & Lardner LLP
21                              555 California Street
                                Suite 1700
22                              San Francisco, CA 94104
                                (415)434-4507
23

24

25
</pre>

**eScribers, LLC**

```
 1   For the Debtor (Cont'd):    MARK C. MOORE, ESQ.
                                  Foley & Lardner LLP
 2                                2021 McKinney Avenue
                                  Suite 1600
 3                                Dallas, TX 75201
                                  (214)999-4667
 4
                                 MATTHEW D. LEE, ESQ.
 5                                Foley & Lardner LLP
                                  150 East Gilman Street
 6                                Suite 5000
                                  Madison, WI 53703
 7                                (608)258-4258

 8   For Official Committee of  JEFFREY D. PROL, ESQ.
     Unsecured Creditors:       Lowenstein Sandler LLP
 9                                One Lowenstein Drive
                                  Roseland, NJ 07068
10                                (973)597-2490

11   Special Insurance Counsel  JESSE J. BAIR, ESQ.
     for Official Committee of  TIMOTHY W. BURNS, ESQ.
12   Unsecured Creditors:       Burns Bair LLP
                                  10 East Doty Street
13                                Suite 600
                                  Madison, WI 53703
14                                (608)286-2302

15   For Continental Casualty   MARK D. PLEVIN, ESQ.
     Company:                   Crowell & Moring LLP
16                                Three Embarcadero Center
                                  26th Floor
17                                San Francisco, CA 94111
                                  (415)986-2800
18
     For Westport Insurance     TODD C. JACOBS, ESQ.
19   Corporation:               Parker, Hudson, Rainer & Dobbs LLP
                                  Two North Riverside Plaza
20                                Suite 1850
                                  Chicago, IL 60606
21                                (312)477-3306

22                              BLAISE S. CURET, ESQ.
                                 Sinnott, Puebla, Campagne & Curet,
23                                APLC
                                  2000 Powell Street
24                                Suite 830
                                  Emeryville, CA 94608
25                                (415)352-6200
```

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 33 of 98

```
 1  For Office of the United    JASON BLUMBERG, ESQ.
    States Trustee:             United States Department of
 2                               Justice
                                 501 I Street
 3                              Suite 7-500
                                 Sacramento, CA 95814
 4                              (916)930-2100

 5  For RCC, RCWC, OPF, and     RYAN E. MANNS, ESQ. (ZOOM)
    Aventis:                    Norton Rose Fulbright US LLP
 6                               2200 Ross Avenue
                                 Suite 3600
 7                              Dallas, TX 75201
                                 (214)855-8304
 8
    For Pacific Indemnity       TANCRED V. SCHIAVONI, ESQ.
 9  Company:                    O'Melveny & Myers LLP
                                 7 Times Square
10                               New York, NY 10036
                                 (212)326-2000
11

12

13

14

15

16

17

18  Court Recorder:             PL WRIGHT
                                United States Bankruptcy Court
19                              1300 Clay Street
                                Oakland, CA 94612
20

21  Transcriber:                RIVER WOLF
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (800) 257-0885
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.
```

1          THE COURT:  Sure.

2          MR. WEISENBERG:  -- like, Your Honor, but I did want

3     to make clear that we sit on both sides of that argument.

4          THE COURT:  Well, I know I've heard you say that, and

5     I certainly understand it.  I think let's get where we can get

6     with my rulings and what's left that may be -- I mean, some of

7     the matters that are left may be fairly easily dealt with or

8     less consequential.  And if we need to take a break and have

9     Mr. Plevin and Ms. Uetz talk about that.

10          I agree with you.  I saw them as two different issues,

11     and I was not yet as convinced as you'd like me to be that I

12     need to stop the presses with respect to the second one, but

13     I'm going to hear you today.  Okay.  I get it.

14          Makes sense?  Okay.

15          MS. UETZ:  Thanks, Your Honor.

16          THE COURT:  Does anybody else have anything

17     preliminary before I give you guys some thoughts on matters

18     that were sort of hanging out there on Thursday?

19          No?  Ready to go?

20          Okay.  Let me address a few things here.  The first

21     one -- well, the first thing we talked about Thursday was what

22     I think we called in shorthand form the OPF motion, which was

23     the committee's motion to have standing to prosecute various

24     claims, most notably what the committee has identified as at

25     least a potential fraudulent transfer claim or maybe preference

 1  claim that sort of was articulated as we went along, but most
 2  obviously, a fraudulent transfer claim with respect to the
 3  transfer of about 106-million dollars and then I think about 5-
 4  million dollars each within the forty days prior to the
 5  commencement of the bankruptcy case.

 6          The question that I -- well, the first question to
 7  deal with in this analysis most typically is is there a
 8  colorable action here.  And that is usually defined as is there
 9  an action that one believes would survive a 12(b)(6) motion.  I
10  believe that the critical question in that analysis, and I kept
11  trying to figure out if we could preview that or get some sense
12  of that before we decided to go forward with this or not was
13  the fairly simple sounding, but not probably simple in practice
14  question whether there was a transfer of property to the debtor
15  because although I think these funds were located at the
16  diocese, the debtor has arguments that significant portions of
17  them really weren't the debtor's property.

18          There's a significant portion that was belonging to
19  the schools and would have been their -- although it was in the
20  debtor's bank accounts, maybe for investment purposes, it
21  really was money that belonged to the schools.  And there were
22  other funds as to which I'm told, at the very least, the use is
23  restricted.

24          So I began the analysis with, okay, how would we think
25  about those issues and how 12(b)(6)-able (sic) would this be on

Case: 23-30564   Doc# 1017   Filed: 02/21/25   Entered: 02/21/25 12:07:23   Page 36
of 98

1    that basis because I thought that's really where the debtor was

2    coming from.  There was an elongated discussion between me and

3    one of the debtor's counsel where I kept trying to ask, well,

4    is this something more than just that question of property of

5    the estate or debtor's property.  And counsel was urging on me

6    some further theories as to why this couldn't be a fraudulent

7    transfer, which maybe it's my shortcoming, but I didn't find to

8    be all that analytically helpful.  To me, the question keeps

9    coming back to, well, was this the debtor's property or not.

10          So again, the debtor elongated somewhat the

11   description of why that's problematic during oral argument,

12   which is fine.  As to the question of whether some property is

13   the school's, it wasn't so clear to me.  I know that there were

14   different programs referenced for money that came into the

15   diocese but was held for different purposes.

16          One question that I don't think is articulated quite

17   yet is well, in what form was it held.  Were these all held in

18   different segregated accounts, or were they held with some

19   understanding that, gee, this is for this and this is for that,

20   even though it's in the same account?  Some courts have relied

21   on the manner in which the money was held as being very helpful

22   in determining whether this kind of question is 12(b)(6)-able

23   (sic) or not.  I'm not sure I would rely solely on that, but

24   that's a matter as to which I don't think I quite have the

25   understanding that I would need if I were to make a decision on

1  that basis.

2      I'll note as well that all of you guys who are

3  bankruptcy lawyers know that it is frequently the creditors

4  position that, well, I know the debtor's holding that, but it's

5  "really mine".  I don't have a claim to it.  It's mine.  I'll

6  take it.  The rest of you have a lot of -- have a lot of fun

7  with the bankruptcy, and I'll just go home and take my stuff.

8  That's an argument that obviously we hear all too often, and

9  there's a big difference between somebody having a claim and

10  somebody actually being able to assert that was mine.  Those

11  are two very different things.

12      And while the Bankruptcy Code and the bankruptcy cases

13  certainly understand and respect a difference between property

14  that the debtor may hold for another and property the debtor

15  otherwise holds, I think it's also fair to say that the

16  bankruptcy cases take a fairly jaundiced view of the broad way

17  the creditors would like to assert that position.  So I don't

18  think it's a position that I should assume is easily taken or

19  easily proven.

20      So the debtor's statements about, well, it's really

21  the school's money are fine.  I'm not so sure I would accept

22  them at face value enough to be certain that I would grant a

23  12(b)(6) motion on that.  And I think similarly with respect to

24  restricted funds, it may be that there really was something

25  like a trust that was set up here under California law, and

1   that would be a fairly easy answer.  It doesn't sound like it.
2   If that were the case, I think we'd be having -- we'd be
3   hearing different arguments.
4           So the extent of the restriction in my mind is
5   something that would probably take a little bit more legal
6   sleuthing and fact examining than a 12(b)(6) motion would be
7   likely to involve.  It may well be that the debtor would, on a
8   summary judgment motion or something along those lines, be
9   successful or partially successful here.  But in the
10  hypothetical world of I would look at a 12(b)(6) motion, I
11  don't necessarily feel at the moment that it is so certain that
12  I would grant that, that I would find this claim isn't
13  colorable.  But having made that determination for this
14  purpose, I would also want to skip down to the last factor,
15  which is would the pursuit of this action -- sort of cut
16  through and make the language simpler -- benefit the estate.
17  It might, but not now.
18          So my instinct is to recognize that there may well be
19  a claim worth pursuing here, but that I continue to believe
20  that we need to play out some issues with respect to the plan
21  and that allowing the litigation to go forward now would not
22  presently be a benefit to the estate.  It would be, I believe,
23  a significant monetary drain and a significant drain on
24  attention.  Having said that, if we do not make progress with
25  the plan, then I think that this is exactly the thing that, for

1   a whole bunch of reasons, might well be appropriately pursued.

2   So I mean, just hypothetically, for example, if we get to May

3   and the plan is voted down or is not going to be pursued or

4   there other issues that come up, I think I would look at this

5   very differently for that purpose.

6           So I'm basically going to deny the motion without

7   prejudice on the theory that I think the timing is really

8   critical here and the timing very much informs the question of

9   benefit to the estate.  Having said all that, I'm very mindful,

10  as I'm sure the committee is, that there's a two year statute

11  on these kinds of things.  And I'll just say, if the debtor

12  wants to entertain a stipulation with the committee to extend

13  any 546(b) statute of limitation issues, I would approve that.

14  If they don't do it, I'll do it myself.  We are not going to

15  run up against the 546(b) limitations here.  So if you guys

16  want to pay some attention to that, great.  If you don't, I'll

17  just keep it on my docket to do it, and I will extend the

18  deadline on my own.  So that's the OPF motion.

19          With respect to the motion for relief from stay, I was

20  leaning very much toward granting that.  I thought an awful lot

21  of good could come from getting some real data on the claims.

22  And frankly, I don't mean to be flip here, but also from

23  creating in everybody's mind the possibility that you're going

24  to hear something in those determinations that you don't like,

25  which I think has been and an incentive to move cases along

1 more quickly than perhaps they were proceeding without that

2 incentive.

3 But I'm a little bit concerned that what I heard the

4 other day, and I thank Mr. Simons and others for their candor,

5 was that really only one of the six advertised potential

6 bellwether actions is potentially ready anytime soon. That

7 undercuts the practical effect and the practical benefit of

8 this.

9 I'm also somewhat concerned about the fact that

10 there's a new presiding judge with respect to these matters and

11 that that person has yet to have a hearing with respect to the

12 consolidated matter. And I'm both not sure how that judge

13 would otherwise want to handle matters. And I want to be very

14 loathe about either dictating anything in that proceeding or

15 not understanding that once I grant relief from stay, I don't

16 want to ungrant (sic) it. I think that doing it is going to be

17 consequential if and when I do it, and I don't want to do it

18 with any strings.

19 So at the moment, because of my uncertainty about how

20 fast we would get to anything that looked like a helpful data

21 point, for the moment, I'm going to deny the motion for relief

22 from stay, but it's very much without prejudice because things

23 may change, and it may be that it's something that will be very

24 helpful in the future. I don't have the sense that it would be

25 helpful now.

1          Turning to the disclosure statement, I want to deal

2    sort of in tandem with the questions of whether to include

3    charts, and if I let the debtor include charts, whether let the

4    committee include charts, as well as the committee's request

5    that I require that the debtor, for lack of a better word,

6    estimate the total amount of the survivor claims.  I'm going to

7    answer both those questions in the negative.

8          I think that charts, while the debtor may believe that

9    they're helpful in the context of what has been accomplished in

10   different bankruptcy cases, I'm going to agree with the

11   committee that I think every one of these situations is

12   different enough, every context is different enough, that

13   including charts -- I don't think anybody's trying to be

14   misleading here.  I just believe that it's really not terribly

15   helpful to the otherwise uneducated reader of disclosure

16   statements to look at a chart without understanding all the

17   reasons why the context and many base facts might be completely

18   different from one case to another, let alone the fact that

19   there are other ways of resolving these kinds of claims that do

20   not depend upon a bankruptcy case.  And those results might be

21   very different.  And that's exactly something that I think a

22   claimant is entitled to think about, if we're not in a

23   bankruptcy, what might happen.  So I think that for all those

24   reasons, I think charts are better left out of this exercise.

25          And in my mind, analytically, for a similar reason,

1     I'm going to resist the urge to ask the debtor to, for lack of
2     a better word, estimate or come up with a aggregate number with
3     respect to the abuse survivor claims.  I'm going to agree with
4     the debtor that again, there are ways in which every claim is
5     different, although I realize that when we treat these things
6     under the post-confirmation world, we do treat them in a -- we
7     try to routinize them in some fashion.

8          But having said that, these claims are unliquidated,
9     and most of the claim forms, I'm told, don't even purport to
10    include an amount.  And I'm not sure what it would help to have
11    the debtor take even what might be a very educated guess as to
12    what those numbers are.  I think that also would end up being
13    more confusing than anything else, and I don't see that it
14    really helps the process all that much to have the debtor take
15    that position and have somebody who has a dog in that fight in
16    terms of each of their own claims try to make sense of what
17    that means.  So I'm going to resist the urge to have the debtor
18    estimate the claims.

19         With respect to the liquidation analysis and the
20    1129(a)(7) issues, we had an extensive discussion about that.
21    The debtor at the moment is not providing what you would think
22    of as a traditional liquidation analysis on the theory that
23    really, we couldn't be liquidated outside of bankruptcy.  And I
24    think that may well be correct, but it may also be the case
25    that under those circumstances, the debtor simply isn't a good

1    candidate for reorganization under Chapter 11.  I'm going to

2    agree with the committee that 1129(a)(7) is an integral part of

3    the confirmation process.  And the liquidation analysis is

4    required in every case.  And I think that I'm prepared to

5    discuss some practical ways we deal with that, but I think the

6    argument that we can't be liquidated overstates the proposition

7    in a number of ways.

8            The legal protections that underlie that assertion by

9    the debtor, I think, are real.  There clearly are protection of

10   religious functions and First Amendment issues that go to why

11   we would never entertain thoroughly liquidating a debtor.  But

12   those are not protections that go to any particular asset.

13   It's not as if state law says a judgment creditor may execute

14   against assets, except something affiliated with a religious

15   organization.  The point is more that as you go through that

16   liquidation, a time would come, I believe, when the liquidation

17   would severely enough impinge upon the function and the sacred

18   duties of a religious organization that, for public policy

19   reasons, you wouldn't want to continue it.

20           Now, I think all of this in the bankruptcy context is

21   pretty undefined, which is why I was asking the debtor as a

22   matter of disclosure and in the disclosure statement, to

23   articulate what is the theory that would limit the liquidation

24   in your minds in this context.  And it could be anything from

25   well, given that we are providing the service and it's the

1  bishop's sacred duty to do it, given all that, it's whatever we

2  say it is because we're the only ones who can judge at what

3  point we're effectively not being able to perform our religious

4  duties and our religious functions.  If that were the debtor's

5  position, they can say it, and then everybody could decide

6  whether that's consistent with what they believe nonbankruptcy

7  law to be and whether it's "fair and equitable".  It may be

8  that there is a way to articulate a functional agreement that

9  at this point if we liquidate these kinds of assets at this

10 level, at that point, we are unquestionably no longer able to

11 perform our duties.

12        So I think, first of all, what we need from the debtor

13 is just some statement of whatever they think it is that limits

14 that in this context.  And I realize that's -- I'm assuming

15 that the fact that I haven't gotten a lot of case law about

16 this is because I don't think this has been all that well

17 articulated.  So the debtor just has to take a position.

18        And I think that's going to be helpful on a disclosure

19 basis, both to explain, if they have two liquidation analyzes,

20 why one is perfectly persuasive and the other one isn't.  And

21 we'll come back to that in a second.  I think it's also

22 appropriate for creditors to see this because one of the things

23 a creditor decides in voting on a plan is the embrace of the

24 stark reality if they vote a plan down, there may be no other

25 options and then back out in the cold, cruel world.  But I

1   think that's something for creditors to decide.

2          So I think that that analysis and that articulation of

3   the principle would be helpful not only to the Court.  It would

4   be helpful, frankly, to the creditors at disclosure statement

5   time to decide whether this plan comports with their

6   understanding and their sense of what's fair and equitable.

7   And I think that's a fight we have -- we don't have to have

8   that fight now.  We have to be able to have that fight at

9   confirmation, which is why I think it's important for the

10  debtor to articulate it now for all those purposes.

11         Also, I also believe that, although I want to -- I

12  think I'm prepared to hear some flexible approaches to how we

13  have a liquidation analysis.  I think we need one that, at

14  least hypothetically, encompasses everything that might in some

15  world be liquidated.  And I realize that's not going to be

16  easy.  Just for my own curiosity, I went back into the docket

17  and looked at the initial schedule A and schedule B and SOFA

18  statements by the debtor and the various amendments.  And one

19  thing that I noticed, and I know you guys all know this better

20  than I do, as stated and as amended from time to time, the

21  debtor's position on the value of real property was

22  undetermined.  And it's still that, as far as I can tell.

23         So I want to -- in making this determination, I want

24  to be open to ideas as to how we might come up with some

25  numbers or otherwise express this liquidation analysis concept.

1    But I think we need something that goes beyond, well, we

2    couldn't be made to do it, so therefore we're not going to give

3    it to you.  And I'm not trying to be flip because I'm going to

4    give you a number here, and it's a little misleading because a

5    parcel of real property doesn't mean that it's 400-square

6    acres.  It just means that for certain purposes and recording

7    and so on, there are different parcels that are deemed to be

8    separate entities.  There are 205 parcels of real property that

9    the debtor identifies here.  None of them have a value.  Again,

10   I'm willing to be somewhat open minded about how we skin this

11   cat, but this is something that we simply have to address.

12           Moving on a little bit, the request from the committee

13   that I require the affiliates seeking a release to include

14   financial information in the disclosure statement, I think I

15   was a little abrupt with Mr. Prol because I think we were

16   really more in agreement than I was letting on.  I agree with

17   him that -- well, I don't know that we want to hold up the

18   disclosure statement for this information.  I agree with him

19   it's important to anybody voting on this plan and deciding

20   whether to give a release or not.  I think that analysis should

21   be informed by some understanding of what the assets are and

22   what, for lack of a better word, the net worth is of any party

23   seeking such a release.

24           On that matter, I'll give you a preview.  I think we

25   are likely to have a very involved discussion.  If we do

1   approve a disclosure statement here, we're likely to have a

2   very involved discussion of the timing, which would include

3   discovery and which would include voting.  I don't think

4   this -- if I approve a disclosure statement in the next week or

5   so, I don't think that means we have to have votes in twenty-

6   eight or thirty-five days.

7           I think we can -- with your guys indulgence and your

8   intelligent thinking about this, I think we can stage this in a

9   way that will make sense and will make the discovery that I

10  think is fairly important here meaningful to the process and to

11  the people voting on the plan.  So I agree with Mr. Prol that

12  information is important.  I think that all gets worked out in

13  how we schedule the voting and how we schedule the discovery

14  that I'm sure the committee is going to want to take of anybody

15  seeking a release.

16          The last point that I had in my open list was the

17  motion to compel further mediation, which we at least began to

18  talk about.  The place where I'm a little bit stuck here is

19  there are clearly conflicting versions of how things were left

20  in Judge Sontchi's view of the status.  One way or the other,

21  I'm going to want to know his views.  I can literally give him

22  a call and not get into anything that's confidential and behind

23  the settlement mediation privilege.  We could have him file a

24  declaration that would clarify his views.  We could have him

25  appear at a hearing to clarify his views.

1          But before I make a ruling on that motion, I think
2    it's a very important motion.  I would want to be informed by
3    his views.  So we can talk about different ways we do that.
4    But that's a prelude to me to making a decision on that motion.
5          So those are the matters that I had outstanding that I
6    wanted to give you my thoughts on.  With that, I'm prepared to
7    resume discussion of other disclosure statement points or take
8    a break and let Ms. Uetz and Mr. Plevin talk and get square on
9    whatever points they want to make.  So it's your guys'
10   pleasure.
11          MS. UETZ:  Your Honor, I have at least one follow-up
12   question, if I may, posed to the Court, if you're willing to
13   answer it or not.  But I'd like to ask it, if I may, about your
14   ruling so I understand something better.
15          THE COURT:  Sure.
16          MS. UETZ:  Thank you.  And then I have one or two
17   other things.  But your ruling with respect to the charts, my
18   question is I'm trying to understand the scope of the Court's
19   ruling there.  I understand that the charts ought not be in the
20   disclosure statement, and so we will take them out.
21          THE COURT:  Right.  But I think --
22          MS. UETZ:  I take that in your ruling.
23          THE COURT:  But could that be relevant to
24   confirmation?  Sure.  That answer your question?
25          MS. UETZ:  It answers my question, Your Honor.

# EXHIBIT C

1   Mark D. Plevin (State Bar No. 146278)
    PLEVIN & TURNER LLP
2   580 California Street, Suite 1200
    San Francisco, California 94104
3   (202) 580-6640
    mplevin@plevinturner.com
4
    Miranda H. Turner (admitted *pro hac vice*)
5   Jordan A. Hess (admitted *pro hac vice*)
    PLEVIN & TURNER LLP
6   1701 Pennsylvania Avenue, N.W., Suite 200
    Washington, D.C. 20006
7   (202) 580-6640
    mturner@plevinturner.com, jhess@plevinturner.com
8
    Attorneys for Continental Casualty Company
9

10                  UNITED STATES BANKRUPTCY COURT
                    NORTHERN DISTRICT OF CALIFORNIA
11

12  In re:

13  THE ROMAN CATHOLIC BISHOP OF              Chapter 11
    OAKLAND, a California corporation sole,
14                                            Bankruptcy Case No. 23-40523 WJL
                    Debtor.
15

16                                            Date:  January 8, 2025
                                              Time:  2:00 p.m. Pacific Time
17                                            Place: U.S. Bankruptcy Court
                                                     1300 Clay Street, Courtroom 220
18                                                   Oakland, California 94612

19

20
       CERTAIN INSURERS' OPPOSITION TO THE COMMITTEE'S MOTION (I) FOR
21    STANDING TO ASSERT, PROSECUTE AND COMPROMISE ALL CLAIMS AND
      CAUSES OF ACTION THE DEBTOR AND ITS ESTATE HOLD AGAINST THE
22    INSURERS AND (II) TO BE SUBSTITUTED AS THE NAMED PLAINTIFF IN
      THE INSURANCE COVERAGE ACTIONS
23

24

25

26

27

28

# Table of Contents

**Page(s)**

Argument...................................................................................................................2

I.    The Court should continue the hearing on this Motion in deference to the District Court, which has withdrawn the reference with respect to the Insurance Coverage Actions ...............................................................................................................2

II.    The Insurance Coverage Actions are not "colorable" because they are fundamentally flawed, premature, and almost certain to be dismissed yet again ............................................3

    A.    Debtor's claims, which are limited to the duty to indemnify, are premature ..........3

    B.    The Actions are premature as to the Excess Insurers because there has not been any underlying exhaustion ...................................................................7

    C.    The Committee's demand letters should be ignored....................................8

III.    Debtor's refusal to stand aside so the Committee can pursue frivolous coverage theories is justified................................................................................................10

IV.    Turning over Debtor's unspecified privileges and protections to its adversary is highly prejudicial and would breach Debtor's cooperation obligations ...............................12

Conclusion...............................................................................................................13

# Table of Authorities

**Page(s)**

**Cases**

4

5
*Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC,*
   77 Cal. App.5th 729 (2022) ........................................................................4

6
*Certain Underwriters at Lloyd's, London v. Superior Court,*
7
   24 Cal.4th 945 (2001) ............................................................................3, 4

8
*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.,*
   14 Cal.App.4th 1595 (1993) ......................................................................9

9
*Diocese of Winona v. Interstate Fire and Cas. Co.,*
10
   89 F.3d 1386 (8th Cir. 1996) ....................................................................9

11
*Fireman's Fund v. Nat'l Bank for Cooperatives,*
12
   849 F. Supp. 1347 (N.D. Cal. 1994) ........................................................11

13
*First Mercury Ins. Co. v. Great Divide Ins. Co.,*
   203 F. Supp.3d 1043 (N.D. Cal. 2016) .....................................................6

14
*Fox Paine & Co. v. Twin City Fire Ins. Co.,*
15
   104 Cal. App.5th 1034 (2024) ...............................................................7, 8

16
*Fox Paine & Co. v. Twin City Fire Ins. Co.,*
17
   2024 WL 5083234 (Cal. Dec. 11, 2024) ...................................................7

18
*Fritz v. Allstate Ins. Co.,*
   62 F.3d 1424 (9th Cir. 1995) ..................................................................11

19
*Graciano v. Mercury Gen. Corp.,*
20
   231 Cal. App.4th 414 (2014) ..................................................................12

21
*Gray v. Zurich Ins. Co.,*
22
   65 Cal.2d 263 (1963) ................................................................................3

23
*Hamilton v. Maryland Cas. Co.,*
   27 Cal.4th 718 (2002) .............................................................................10

24
*Hartford Cas. Ins. Co. v. Swift Dist., Inc.,*
25
   59 Cal.4th 277 (2014) ..............................................................................3

26
*Horace Mann Ins. Co. v. Barbara B.,*
27
   4 Cal.4th 1076 (1993) ..............................................................................3

28
*Iolab Corp. v. Seaboard Sur. Co.,*
   15 F.3d 1500 (9th Cir. 1994) ....................................................................7

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*,
  5 Cal.5th 216 (2018) .................................................................................. 9

*Ludgate Ins. Co. v. Lockheed Martin Corp.*,
  82 Cal. App.4th 592 (2000) ........................................................................ 7

*Murphy v. Allstate Ins. Co.*,
  17 Cal.3d 937 (1976) ................................................................................. 11

*Royal Globe Ins. Co. v. Whitaker*,
  181 Cal. App.3d 532 (1986) ........................................................................ 9

*San Diego Navy Federal Credit Union v. Cumis Ins. Soc'y*,
  162 Cal. App. 3d 358 (1984) ...................................................................... 13

*Shapero v. Allstate Ins. Co.*,
  14 Cal. App.3d 433 (1971) ........................................................................ 11

*Sodexo Management, Inc. v. Old Republic Ins. Co.*,
  2021 WL 254240 (S.D. Cal. Jan. 26, 2021) ................................................. 5

*Starr Indemnity & Liab. Co. v. Chart Industries, Inc.*,
  2023 WL 2352247 (N.D. Cal. Mar. 3, 2023) ............................................... 5

*Steadfast Ins. Co. v. Essex Portfolio LP*,
  2021 WL 4622816 (N.D. Cal. Oct. 7, 2021) ............................................ 5, 7

*Travelers Propty. & Cas. Co. of Am. v. HPS Mech., Inc.*,
  2024 WL 2786047 (S.D. Cal. Feb. 8, 2024) ............................................ 5, 6

*Travelers Propty. & Cas. Co. of America v. Salesforce.com, Inc.*,
  2021 WL 1376575 (N.D. Cal. Apr. 13, 2021) .............................................. 5

*Travelers Propty. & Cas. Co. of America v. Salesforce.com, Inc.*,
  2024 WL 4286968 (9th Cir. Sep. 25, 2024) ................................................. 5

*Weatherman v. State Farm Ins. Co.*,
  1997 WL 33804 (N.D. Cal. Jan. 10, 1997) ................................................... 9

**Other Authorities**

California Civil Code § 2860(d) ......................................................................... 13

California Insurance Code § 533 ......................................................................... 9

Croskey, *et al.*, *Cal. Prac. Guide: Insurance Litigation* Ch. 7A-G (Aug. 2024) ........................................... 9

1   The Committee's motion (the "Motion," Dkt. No. 1538) should be denied because

2   it fails to establish either that the Insurance Coverage Actions present "colorable" claims or that

3   Debtor's refusal to pursue the Actions now is unjustified.

4   Preliminarily, whether the Insurance Coverage Actions would survive motions to

5   dismiss should be decided by the District Court, which has withdrawn the reference of those

6   Actions.  This Court therefore should continue the hearing on the Committee's Motion to allow

7   the District Court to rule on any motions to dismiss.

8   But if this Court does consider the Motion, it should conclude that the Actions are

9   not colorable because Debtor's operative complaints seek relief only with respect to the duty to

10  indemnify, not the duty to defend, and whether insurers have a duty to indemnify cannot be

11  determined until after underlying judgments have been entered—and there are none.  In addition,

12  the Actions are not colorable with respect to excess insurers because the operative complaints fail

13  to plead actual exhaustion (in fact, they allege that primary insurers have not paid anything).  This

14  conclusion is buttressed by appellate authority issued after this Court dismissed one of Debtor's

15  earlier complaints.  Thus, motions to dismiss the Actions are very highly likely to be granted.

16  Further, Debtor's refusal to pursue the Actions now makes good sense, and

17  Debtor's business judgment on this point should be respected.  Debtor has determined that it

18  should focus its time and resources on confirming its plan of reorganization, not pursuing

19  insurance coverage litigation that is fundamentally flawed—particularly given that its plan preserves

20  the rights of both claimants and insurers to litigate insurance coverage issues when it is appropriate

21  to do so.  That is a very sensible way to proceed, under the present circumstances.  The Committee

22  will have its opportunity to oppose Debtor's Plan, but pursuing the Insurance Coverage Actions

23  now makes no sense when a plan is on file that allows every claimant to elect to pass his or her

24  claim through to the tort system to be resolved.

25  In addition, the Court should not indulge the Committee's request to give it access

26  to, and control over, privileged materials relating to the defense of the claims brought against

27  Debtor by the Committee's constituents.  Providing access to those materials, which include

28  materials in which the insurers share a common legal interest, would breach the cooperation

provisions of Debtor's policies by undermining the defense of claims against Debtor.

**Argument**

**I.    The Court should continue the hearing on this Motion in deference to the District Court, which has withdrawn the reference with respect to the Insurance Coverage Actions.**

The Committee's Motion asks this Court to interfere with the District Court's supervision of the Insurance Coverage Actions, which are pending in that Court and not in this Court pursuant to the District Court's *Order Re: Motions to Withdraw Reference.*[1]

First, the Motion asks this Court to "substitute[ ]" the Committee as the named plaintiff in the Insurance Coverage Actions, in place of Debtor.[2] But the court in which the action is pending, not some other court, should decide whether to substitute one entity for another as the plaintiff.

Second, the Committee urges this Court to find that the Insurance Coverage Actions are "colorable" because the operative complaints would survive motions to dismiss under Rule 12(b)(6).[3] But the District Court may soon be called upon to decide actual motions to dismiss, not hypothetical ones.[4]  In that event, the District Court will have full briefing on the sufficiency of the complaints, as opposed to what is presently before this Court—namely, the Committee's request, unsupported by a citation to even a single case, that the Court rule that motions to dismiss that have not yet even been filed would be denied.  Rather than rule on issues that may soon be before the District Court with full briefing, this Court should continue the hearing on this Motion until at least after the District Court decides the Abatement Motion, and possibly until after the District Court decides any 12(b)(6) motions that are filed.

---

[1]      Dkt. No. 29 in Case No. 3:24-cv-00709 (N.D. Cal. March 18, 2024).

[2]      Motion at 1.

[3]      *See* Motion at 10-12.

[4]      *See* Order Granting Stipulation for Extension of Time to Respond to Fifth Amended Complaint and Discovery, Dkt. No. 157, *In re The Roman Catholic Bishop of Oakland Insurance Adversary Proceeding Litigation*, Case No. 3:24-cv-00709 (N.D. Cal. Dec. 26, 2024).

- 2 -

**II.** **The Insurance Coverage Actions are not "colorable" because they are fundamentally flawed, premature, and almost certain to be dismissed yet again.**

Should the Court nevertheless decide to address whether the Insurance Coverage Actions are "colorable," it should conclude that they are not.

The Committee asserts that the claims asserted in the Insurance Coverage Actions are "colorable," but it cites no case law to explain how the current operative complaints can overcome the fatal flaws that caused previous versions of the complaints to be dismissed, once by this Court and then again, after the reference was withdrawn, by the District Court. It is not enough to say that Debtor may have "take[n] pains" to plead its allegations this time.[5] In fact, the Insurance Coverage Actions are fundamentally flawed and, accordingly, it is almost certain that the Actions will not survive another round of motions to dismiss.

**A.** **Debtor's claims, which are limited to the duty to indemnify, are premature.**

The first fundamental flaw that will lead to Debtor's complaints being dismissed is that they are premature, since no court has yet imposed liability on Debtor for any of the underlying abuse claims against it.

California law recognizes that primary insurers generally have two "core" duties under an insurance policy: a duty to defend, and a duty to indemnify.[6] The extent of these duties is measured differently. The duty to defend is determined by comparing the allegations of the underlying complaint with the terms of the policy.[7] The duty to defend exists when the underlying complaint "create[s] a potential for indemnity under the insurance policy."[8] For this reason, "[t]he duty to defend is broader than the duty to indemnify."[9] Whether an insurer has a duty to defend is typically determined "at the very outset of a case."[10]

---

[5]    Motion at 12.

[6]    *See Hartford Cas. Ins. Co. v. Swift Dist., Inc.*, 59 Cal.4th 277, 286-87 (2014) ("An insurer's duty to indemnify and its duty to defend an insured 'lie at the core of the standard policy'"), quoting *Certain Underwriters at Lloyd's, London v. Superior Court*, 24 Cal.4th 945, 958 (2001).

[7]    *Id.* at 287.

[8]    *Id.*, citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 277-78 (1963).

[9]    *Id.* at 287, quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993).

[10]    *Id.*

In contrast, "[a]n insurer's duty to indemnify 'is only determined when the insured's underlying liability is *established*.'"[11]   In other words, "'[t]he duty to indemnify on a particular claim is determined by the *actual basis* of liability imposed on the insured.'"[12]   Accordingly, an insurer cannot have any duty to indemnify until after a judgment is entered against the insured.  As the California Supreme Court has noted, the duty to defend and the duty to indemnify "differ in their triggering:  Whereas the duty to indemnify can arise only after damages are fixed in their amount, the duty to defend may arise as soon as damages are sought in some amount."[13]   Where there is no judgment, there is no basis for a court to adjudicate whether an insurer has a duty to indemnify.

Although the previous iterations of Debtor's pleadings sought relief concerning the duty to defend, the current one does not.  Debtor makes this fact clear on the face of its Fifth Amended Complaint, which states:

> As of the date of this filing the Debtor has resolved any disputes related to its past claims of breach of contract based on any Defendant's duty to defend the underlying claims.  This Fifth Amended Complaint therefore does not bring any claims for breach of any Defendant's duty to defend and seeks only claims for declaratory relief and breach of statutory duty herein.  As the underlying Suits (defined below) tendered to the defendants are stayed due to the RCBO bankruptcy proceedings, there is no present need for a defense of those Suits.[14]

The absence of any dispute over the existence of insurers' duty to defend Debtor, together with the absence of any judgments against Debtor, is fatal to its current Actions against the Insurers.  Earlier this year, in a similar context, a California federal district court held in *HPS Mechanical* that it lacked subject matter jurisdiction over a declaratory relief claim concerning only the duty to indemnify where the policyholder's liability in the underlying case was not yet fixed. Absent allegations of a judgment against the insured, the court held, "the operative Complaint fails

---

[11]   *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC*, 77 Cal. App.5th 729, 740 (2022) (emphasis added).

[12]   *Id.*

[13]   *Certain Underwriters at Lloyd's of London v. Superior Ct.*, 24 Cal.4th at 958 (internal citations omitted).

[14]   Fifth Amended Complaint, ¶ 32, Dkt. No. 125, *The Roman Catholic Bishop of Oakland v. Pacific Indemnity, et al. (In re The Roman Catholic Bishop of Oakland)*, Case No. 3:24-cv-00709 (N.D. Cal. Oct. 7, 2024).

to plausibly allege facts establishing a substantial controversy of sufficient immediacy as required by Article III.  Accordingly, the Court grants HPS's motion to dismiss."[15]  The court supported its decision by citing "[n]umerous district courts within the Ninth Circuit" that had earlier reached the same conclusion, including:

- *Starr Indemnity & Liab. Co. v. Chart Industries, Inc.*, 2023 WL 2352247, *2 (N.D. Cal. Mar. 3, 2023):  The court dismissed the action as not ripe where the plaintiff did "not cite—and the Court is not aware of—any Ninth Circuit case in which a declaratory judgment action regarding just the duty to indemnify was found to satisfy Article III. . . .  Nor does [plaintiff] explain how its duty to indemnify can be resolved before liability is determined in the [underlying] litigation."

- *Steadfast Ins. Co. v. Essex Portfolio LP*, 2021 WL 4622816, *1 (N.D. Cal. Oct. 7, 2021) (Corley, J.):  "First, because only the duty to indemnify is at issue, a declaratory judgment would clarify only speculative duties and obligations.  As the Court explained in dismissing Essex's counterclaim, Steadfast's duty to indemnify is speculative:  Essex might lose its lawsuit against the design professionals, or it might win a judgment that can be fully satisfied by the design professionals' own insurance without triggering the insurance Essex bought from Steadfast.  As such, the scope of coverage is not of sufficient immediacy and reality to present a live case or controversy" (internal citations omitted).

- *Travelers Propty. & Cas. Co. of America v. Salesforce.com, Inc.*, 2021 WL 1376575, *1 (N.D. Cal. Apr. 13, 2021), *aff'd*, 2024 WL 4286968 (9th Cir. Sep. 25, 2024):  "As to Travelers' claims relating to indemnification and reimbursement, Salesforce is correct that these claims are premature because the Texas state court litigation has not yet concluded."

- *Sodexo Management, Inc. v. Old Republic Ins. Co.*, 2021 WL 254240, *10 (S.D. Cal. Jan. 26, 2021):  "In this case, Sodexo does not allege that any judgment has been entered against

---

[15]  *Travelers Propty. & Cas. Co. of Am. v. HPS Mech., Inc.*, 2024 WL 2786047, *6 (S.D. Cal. Feb. 8, 2024).  The court denied leave to amend, "without prejudice to refiling a lawsuit if and when circumstances arise establishing a controversy ripe for adjudication."  *Id.*

it in any of the Underlying Actions. The Underlying Actions are ongoing, and the dockets do not reflect that Sodexo has incurred liability. Accordingly, Sodexo fails to allege facts sufficient to support an inference that Old Republic has a duty to indemnify Sodexo in the Underlying Actions. The claims for breach of contract (failure to indemnify) and for declaratory relief (duty to indemnify) are premature."

- *First Mercury Ins. Co. v. Great Divide Ins. Co.*, 203 F. Supp.3d 1043, 1053-54 (N.D. Cal. 2016) (internal citations omitted): "Thus, prior to resolution of the underlying state court action, the Court is 'unable to determine the amount of the insurer's indemnity obligation.' Any declaration from this Court about Defendant's indemnity obligations would be purely speculative. As such, the Court finds that Plaintiff's request for a declaratory judgment regarding indemnity is not ripe."

Just as in *HPS Mechanical*, where the court dismissed plaintiff's complaint because plaintiff failed to cite any authority "establish[ing] that a declaratory judgment action is ripe simply because" a party "anticipates a future disagreement over" an insurer's "obligation to indemnify,"[16] the possibility that future disputes may arise between a claimant holding a judgment against Debtor and an insurer is not a sufficient basis for the District Court to exercise jurisdiction over the current complaint. Any litigation against the insurers over their purported duty to indemnify a particular claim therefore must await the entry of judgment and the insurers' refusal to pay the judgment. As a result, the claims the Committee wants to litigate are not "colorable."

The Committee places great emphasis on offhand remarks Judge Corley made at a hearing last July, during which she dismissed the Third Amended Complaint, that she "suspect[ed]" a future amended complaint might pass muster.[17] Those statements were made, of course, before the Fifth Amended Complaint (which dropped claims regarding the duty to defend) was filed, and before any of the above cases had been cited to her in any briefing. Moreover, the Committee's argument ignores the fact that Judge Corley herself ruled to the contrary in a different coverage action, holding that any declaration regarding the duty to indemnify was too speculative when the

---

[16] *Id.* at *5.

[17] *See* Motion at 12.

underlying lawsuit had not concluded.[18]  As such, she ruled that the dispute as to indemnity was "not of sufficient immediacy and reality to present a live case or controversy."[19]

**B.    The Actions are premature as to the Excess Insurers because there has not been any underlying exhaustion.**

In addition, the Fifth Amended Complaint is premature, unripe, and therefore not colorable as to the excess insurers because it does not plead underlying exhaustion.  (In fact, it pleads the opposite—that the primary insurers have failed to pay anything with respect to outstanding Abuse Claims.)

The complaint's failure to plead actual exhaustion of the underlying policies mandates dismissal of the Actions under controlling Ninth Circuit precedent set forth in *Iolab*, which held that excess insurers could not be sued until underlying coverage had been actually exhausted.[20]  In an attempt to avoid this well-established rule, Debtor pleads that the primary policy limits "will be" exhausted.  However, a September, 2024 California Court of Appeal decision—issued after the offhand comments by Judge Corley that the Committee quotes—held that such allegations of hypothetical future exhaustion are not sufficient to state a cause of action against excess insurers.  That decision, *Fox Paine*, sustained demurrers by excess insurers to a coverage complaint on the basis that the complaint had failed to allege actual exhaustion of underlying coverage.  The court ruled, as a matter of law, that there is no cause of action against excess insurers where the policyholder failed to plead actual exhaustion of underlying coverage and, specifically, that allegations the underlying limits "will be exhausted" in the future are not sufficient.[21]  The

---

[18]    *Steadfast Ins. Co. v. Essex Portfolio LP*, 2021 WL 4622816 at *1.

[19]    *Id.*

[20]    *See Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504-05 (9th Cir. 1994).

[21]    *Fox Paine & Co. v. Twin City Fire Ins. Co.*, 104 Cal. App.5th 1034, 1050 (2024), *review granted*, 2024 WL 5083234 (Cal. Dec. 11, 2024).  The California Supreme Court's order granting review not only denied a request to depublish the court of appeal's decision, it also stated that the decision could be cited "for its persuasive value."  2024 WL 5083234 at *1.

The plaintiffs in *Fox Paine* placed heavy reliance on an earlier decision, *Ludgate Ins. Co. v. Lockheed Martin Corp.*, 82 Cal. App.4th 592 (2000), which they contended undercut *Iolab* and permitted a suit to proceed if the plaintiff alleged that exhaustion was likely.  The *Fox Paine* court, however, found that "Plaintiffs' argument is not persuasive—and *Ludgate* is not all plaintiffs crack it up to be."  *Fox*

court also affirmed the trial court's ruling denying plaintiffs leave to amend, finding that plaintiffs had made no showing that they could "remedy the defects in their causes of action."[22]

Accordingly, the fact that Debtor's primary coverage has not exhausted makes any claims against the excess insurers not "colorable."  Because the Actions are not colorable, the Committee's Motion should be denied.

### C.    The Committee's demand letters should be ignored.

In a misguided attempt to justify its desire to pursue the Actions notwithstanding their fatal flaws, the Committee points to demands that it sent to the insurers earlier in the case outside the mediation, notwithstanding that the mediation was ongoing at the time the Committee sent its demand letters.[23]  The Committee claims that Debtor "acknowledged" in the Fifth Amended Complaint that these demands are "reasonable, *within policy limits*, and ultimately collectable from its Insurers."[24]  But a fair reading of Debtor's pleading establishes that Debtor was merely describing the Committee's assertions, not "acknowledging" or adopting the Committee's assertions as correct or true.[25]

But it does not matter, for purposes of this Motion, how much money the Committee thinks the Insurers may ultimately have to pay on account of the abuse claims against Debtor.  The issue the Court is being asked to decide is not the ultimate value of the applicable coverage, but whether the estate would benefit from the Committee being given standing, in place of Debtor, to pursue the Insurance Coverage Actions now.  The answer to that is a resounding "no."  The Actions are premature and not ripe as to all insurers because the duty to indemnify

---

*Paine*, 104 Cal. App.5th at 1048.  The court then explained, at great length, why *Ludgate* was "distinguishable."  *See id.* at 1048-52.  Instead, the court followed the Ninth Circuit's decision in *Iolab*. *See id.* at 1048 (quoting *Iolab*'s application of California law with approval), 1053 ("*Iolab* is apt").

[22]    *Id.* at 1060.

[23]    *See* Motion at 14-15.  Given that the Committee chose to make these demands outside the mediation, the Committee plainly had an ulterior motive for doing so:  it wanted to be able to publish the amounts of its demands, which it could not have done had it made the demands inside the mediation.  That ulterior motive is a further reason to disregard the demands.

[24]    *Id.* (emphasis in original).

[25]    The amounts of the demands, cited by the Committee in the Motion, are outlandish and completely unsupported.  The Insurers' requests that the Committee explain how the demands were calculated have been ignored—presumably because there is no good explanation.

(which is the only duty presently at issue) cannot be adjudicated in the absence of any outstanding judgments, and they are premature and not ripe as to the excess insurers because there has been no exhaustion of underlying coverage. And even in the unlikely event that the Coverage Action survives dismissal, whether an individual claim is entitled to coverage will have to be determined on a case-by-case basis. When seeking coverage, the insured bears the initial burden of proving that an accident occurred.[26] The underlying complaints generally allege facts that could preclude coverage, as those facts are inconsistent with accidental injury.[27] California law bars coverage for loss caused by willful acts of the insured, injury that is expected or intended, or the cover-up of claims.[28] Thus for each claimant's claim, there will be factual disputes about the abuse and cover-up allegations, including whether Debtor knew of the sexual abuse or that the alleged perpetrators were credibly accused of such criminal misconduct or were believed to be at risk of committing such acts.[29]

---

[26] *See Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App.3d 532, 537 (1986) (insured has the burden to show that an "accident" not "expected" or "intended" occurred); *Weatherman v. State Farm Ins. Co.*, 1997 WL 33804, at *4 (N.D. Cal. Jan. 10, 1997) ("it is the insured's burden to show that he or she comes within [the] definition" of an 'accident'"), quoting *Whitaker*.

[27] *See* Motion to Withdraw the Reference from Bankruptcy Court to District Court, Dkt. No. 188 at 5-7 (discussing allegations in underlying complaints and plaintiff counsels' representations regarding Debtor's handling of sexual abuse claims), *The Roman Catholic Bishop of Oakland v. Pacific Indemnity et al.*, Case No. 23-04028 (Bankr. N.D. Cal. Feb. 2, 2024).

[28] *See, e.g.*, Cal. Ins. Code § 533 (prohibiting coverage for "wilful acts"); *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal.5th 216, 229-30 (2018) (employer's negligent supervision of an employee who molested a student does not constitute an "accident" as that term is used in the definition of "occurrence" in a general liability policy, if the employer expected the employee's conduct); *Diocese of Winona v. Interstate Fire and Cas. Co.*, 89 F.3d 1386, 1394 (8th Cir. 1996) (holding that priest's sexual abuse of child was "expected" because a "reasonably prudent person in the position of the Diocese should have known there was a substantial probability" that it would occur); Croskey, CALIFORNIA PRACTICE GUIDE: INSURANCE LITIGATION Ch. 7A-G ("there is *no coverage in the first place for intentional (nonaccidental) acts*") (emphasis in original).

[29] On the other hand, the Insurers may be able to show that coverage for the sexual abuse claims is barred because Debtor "allow[ed], condon[ed], and ratif[ied] such intentional conduct as a matter of corporate policy" because "sexual abuse" by diocesan priests, employees, and volunteers was "so widespread, well-known, and so ratified by the [Diocese] as to constitute [an] intentional corporate policy." *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal.App.4th 1595, 1609-13 (1993). The *Coit* court referenced the strong public policy purpose embodied in Ins. Code § 533 which would be undermined if an insured could recover insurance proceeds after knowingly allowing willful sexual misconduct. *Id.* at 1606-07 (observing that the "acts of sexual harassment alleged [were], by their very nature, intentional and wrongful" and it would violate public policy "to allow a wrongdoer . . . to shift the loss resulting from such an unlawful corporate practice to its insurer").

Debtor is right to seek to abate these Actions and focus on confirming its Plan, which by design will provide for a quicker and more efficient resolution. It would waste estate assets to authorize the Committee to pay its counsel out of estate funds to pursue a dead end.

### III.  Debtor's refusal to stand aside so the Committee can pursue frivolous coverage theories is justified.

The Committee must also establish that Debtor's refusal to pursue the Insurance Coverage Action now, in parallel to soliciting its proposed plan, is unjustifiable. The Committee cannot do so because Debtor's approach—to abate litigation that is doomed to fail in favor of focusing its limited resources and efforts on confirming a plan of reorganization that would allow all claimants to pursue their underlying claims and then, if they obtain judgments, seek insurance to pay those judgments—is entirely reasonable under the circumstances.

The Committee sprinkles its motion with assertions that denying it the opportunity to pursue the Insurance Coverage Actions will "diminish," "devalue[ ]," "waste[ ]," or even "destroy" the value of Debtor's insurance policies. The suggestion, albeit unexplained, is that claimants have prepetition rights under Debtor's insurance policies that will be lost if Debtor's Plan is confirmed. However, the Committee identifies no such rights, either by citation to statute or case law. Nor does the Committee explain how the right of a future judgment holder to recover insurance to pay his or her judgment against Debtor will be impaired in any way if the Insurance Coverage Actions are stayed to permit Debtor to focus on the plan process.

At most, the Committee may be identifying a theory that "requires insurers to pay reasonable settlement demands and, if they do not, the insurers become potentially liable for the entirety of the judgment rendered against their insured," regardless of policy limits.[30] The Committee apparently thinks that claimants will in the future be entitled to pursue excess-of-limits recoveries from the insurers, which would put the insurers "at risk of their liability increasing if they do not promptly and fairly compromise the claims."[31] If that is the Committee's theory, it is wrong as a matter of law.

---

[30]    *See* Motion at 3. *See, e.g.*, *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718 (2002).

[31]    *See* Motion at 16.

The principle the Committee describes—an insurer's obligation to accept a reasonable, within policy limits demand—is derived from contract, and only the insurer and the insured are parties to the contract. California law is well established that the protection is for the insured, and *only* the insured. The claimants do not have privity of contract with the insurers, and if an insurer has a duty to settle a particular claim, that duty does not run to the claimants.[32] Underlying claimants have no right to recover from an insurer a judgment in excess of applicable policy limits, regardless of the particular decisions made in connection with settlement. As such, the Committee may not harness its theory to its advantage in coverage litigation or in pursuit of derivative standing, because it California law affords the Committee's constituents no cognizable rights.

The California Supreme Court made clear that an insurer's settlement obligation runs only to the insured in *Murphy*, a case in which the insurer rejected settlement demands within limits and a judgment was ultimately rendered in excess of limits. Following entry of judgment, the claimant sued the insurer, alleging breach of the duty of good faith for the insurer's refusal to settle within policy limits. Acknowledging the rule that an "insurer must settle within policy limits when there is substantial likelihood of recovery in excess of those limits," the Supreme Court nevertheless rejected the claimant's cause of action because "***the duty to settle is intended to benefit the insured and not the injured claimant***."[33] The court ruled that "the insurer's duty to settle run[s] to the insured and not to the injured claimant" and "does not directly benefit the injured claimant."[34]

Moreover, there can be no breach of the duty to settle, giving rise to excess-of-limits liability, where the insured has "no interest, no financial stake in the outcome of the litigation, and no assets which would be exposed to risk by a failure of [the insurer] to settle."[35] Here, any

---

[32] *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 941 (1976).

[33] *Id.* at 943-44 (emphasis added).

[34] *Id.* at 941.

[35] *Shapero v. Allstate Ins. Co.*, 14 Cal. App.3d 433, 438 (1971). *See also Fritz v. Allstate Ins. Co.*, 62 F.3d 1424, *2 (9th Cir. 1995) (table) (affirming dismissal of claim for bad faith failure to settle within policy limits "because, under the rule of *Shapero*, none of the insured's assets were exposed to risk by

confirmed plan will provide Debtor with a discharge and Debtor then will not be at any future risk of having to pay an excess-of-limits verdict. And, of course, Debtor's insurers are defending, no reasonable settlement demands have been made, and there is no bad faith on the part of the insurers whatsoever. The Committee cannot leverage duties that have not been breached and are not owed to the claimants in the first place. Accordingly, to the extent Debtor's refusal to pursue this theory forms some portion of the basis for the Committee's Motion, it should be disregarded.

It is also patently absurd to suggest that the Committee's letters, discussed above, even constitute settlement demands under California law. Those letters did not offer to settle any single claimant's claims against Debtor, nor did they include the information—dates and locations of the claimants' loss, descriptions of the specific injuries allegedly sustained by the claimants, and reasonable proof supporting the underlying claims, like medical records or bills—necessary for the Insurers to evaluate the claims or Debtor's exposure.[36] This information cannot be derived from the underlying actions where little to no discovery has been taken, and the proofs of claim contain the barest of information and the vast majority are not signed by the claimants.

## IV. Turning over Debtor's unspecified privileges and protections to its adversary is highly prejudicial and would breach Debtor's cooperation obligations.

The Committee asks in a footnote to be given control of "any attorney-client privilege, immunity, and/or confidentiality provision or agreement heretofore vested in, or controlled by, the Debtor that are related to the derivative claims." The insurers do not know exactly what the scope of this vague request is, but it cannot be construed as anything other than seeking permission to appoint the fox as guard over the henhouse.

Debtor faced prepetition lawsuits in various stages of litigation. In addition, it now faces claims asserted in proofs of claim. No doubt Debtor's defense of the claims involved

---

the denial of the settlement offer because there were no assets in [the] estate"); *Fireman's Fund v. Nat'l Bank for Cooperatives*, 849 F. Supp. 1347, 1363 (N.D. Cal. 1994) (citing *Shapero* as "directly analogous precedent" and finding no bad faith for failure to defend where the insured was a dissolved corporation, a bankruptcy court had entered an injunction barring any collection from assets of the insured, and the insured therefore "could not have been harmed in any way by the arbitration proceedings and its resulting judgment").

[36]     *See Graciano v. Mercury Gen. Corp.*, 231 Cal. App.4th 414, 425 (2014) (stating the standards for reasonable settlement demands).

attorney-client communications and attorney work product, all of which is entitled to protection from its litigation adversaries. Moreover, the insurers have an interest in the defense of the claims, which were being defended by one or more insurers. The insurers therefore have a common legal interest with Debtor in minimizing or defeating liability and operate pursuant to a shared privilege as a result.[37] Even where a conflict between insurer and insured arises and independent counsel is required, the insured still must "disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes."[38] Regardless of whether insurer-appointed counsel or independent counsel is defending the claims, it would be highly prejudicial to allow the claimants or their representative, the Committee, access to privileged materials that include, presumably, Debtor's evaluation of its exposure and strategy to try to defeat those same claims.

Finally, to the extent the Committee seeks to stand in the shoes of the Debtor for purposes of pursuing coverage, it cannot at the same time obtain access to Debtor's defense strategy and then reveal it to Debtor's adversaries. The party seeking coverage under an insurance policy owes obligations under that policy, including the duty to cooperate with insurers in the defense of the underlying claims. It is hard to overstate how inconsistent deliberately revealing privileged information is with the duty to cooperate. Thus, the Committee's request jeopardizes its constituents' potential access to insurance coverage.

## Conclusion

There is no justification for the Committee to take over the Insurance Coverage Actions. The claims pled in the Fifth Amended Complaint are not colorable because they will not survive a motion to dismiss—and no pleading artifice can make the claims prematurely pled in those Actions appropriate. Allowing the Committee to take control of that litigation would unquestionably lead to distraction, delay, and needless expense and, with respect to its request to breach Debtor's privileges, prejudice to its own constituency. The Court should therefore, if it reaches the merits of the Committee's Motion rather than continuing the hearing in light of the

---

[37]     *San Diego Navy Federal Credit Union v. Cumis Ins. Soc'y*, 162 Cal. App. 3d 358 (1984) (where "there is a single, common goal shared by an insurer and its insured of minimizing or eliminating liability to a third party," "an attorney-client privilege is shared among all of them").

[38]     *Id. See also* Cal. Civ. Code § 2860(d).

- 13 -

1    District Court's withdrawal of the reference, deny the Motion.

2    Dated:  December 30, 2024                    Respectfully submitted,

3                                                 By:    /s/Mark D. Plevin
                                                  Mark D. Plevin
4                                                 PLEVIN & TURNER LLP
                                                  580 California Street, Suite 1200
5                                                 San Francisco, California  94104
                                                  (202) 580-6640
6                                                 mplevin@plevinturner.com

7
                                                  Miranda H. Turner (admitted *pro hac vice*)
8                                                 Jordan A. Hess (admitted *pro hac vice*)
                                                  PLEVIN & TURNER LLP
9                                                 1701 Pennsylvania Avenue, N.W., Suite 200
                                                  Washington, D.C.  20006
10                                                (202) 580-6640
                                                  mturner@plevinturner.com,
11                                                jhess@plevinturner.com

12                                                *Attorneys for Continental Casualty Company*

13

14                                                By: /s/ Mary P. McCurdy
                                                  Mary P. McCurdy (State Bar No. 116812)
15                                                COZEN O'CONNOR
                                                  388 Market Street, Suite 1000
16                                                San Francisco, California  94111
                                                  (415) 644-0914
17                                                MMcCurdy@cozen.com

18                                                *Attorneys for Companhia De Seguros Fidelidade SA (fka*
                                                  *Fidelidade Insurance Company of Lisbon)*

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| THE ARCHDIOCESE OF NEW YORK, et al., | Index No.: 652825/2023 |
| *Plaintiffs/Counterclaim Defendants,* | IAS Part 2 |
| v. | Hon. Lori S. Sattler |
| CENTURY INDEMNITY COMPANY, AS SUCCESSOR TO CCI INSURANCE COMPANY, AS SUCCESSOR TO INSURANCE CO. OF NORTH AMERICA AND AS SUCCESSOR TO INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, et al., | Mot. Seq. __ |
| *Defendants/Counterclaimants,* | **Oral Argument Requested** |
| and | |
| AIU INSURANCE COMPANY, et al., | |
| *Defendants.* | |

**THE ARCHDIOCESE OF NEW YORK AND ASSOCIATED POLICYHOLDERS'**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR AN ORDER**
**THAT THIS ACTION SHALL PROCEED IN THREE PHASES**

**BLANK ROME LLP**
James R. Murray
Jared Zola
Robyn L. Michaelson
Dominique G. Khani
Stephen Wah
1271 Avenue of the Americas
New York, NY 10020

**BLANK ROME LLP**
James S. Carter (admitted *pro hac vice*)
Omid Safa (admitted *pro hac vice*)
1825 Eye Street NW
Washington, DC 20006

**HOGUET NEWMAN REGAL &**
**KENNEY, LLP**
Fredric S. Newman
Bradley J. Nash
One Grand Central Place
60 E 42nd Street, 48th Floor
New York, NY 10165

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND.................................................................................................... 5

    A.    The Coverage Claim ................................................................ 5

    B.    The CVA Actions .................................................................... 6

        1.    The Gaynor Matters................................................. 7

        2.    The Boyle Matters .................................................. 8

ARGUMENT......................................................................................................... 9

    I.    THE COURT SHOULD ENTER AN ORDER PURSUANT TO § 603 THAT DIVIDES DISCOVERY AND TRIAL OF THIS ACTION INTO THREE PHASES........................................................................................... 9

        A.    Phasing Will Allow the Parties and the Court to Focus on Ripe Claims First ......................................................................... 9

        B.    Phasing Will Streamline the Case by Encouraging the Early Resolution of Threshold Legal Issues................................... 11

        C.    Phasing Will Avoid Prejudice to the Insureds in the Active CVA Actions.............................................................................. 16

        D.    Phasing the Claims Will Serve the Interests of Justice and Orderly Adjudication........................................................................ 20

    II.    ALTERNATIVELY, THE COURT SHOULD ENTER A CASE MANAGEMENT ORDER THAT DIVIDES DISCOVERY AND TRIAL OF THIS ACTION INTO THREE PHASES ....................................... 22

CONCLUSION.................................................................................................... 22

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACE Fire Underwriters Ins. Co. v. Orange Ulster Bd. of Co-op. Educ. Servs.*,
    8 A.D.3d 593 (2d Dep't 2004) .......................................................... 19

*Allen v. Krna*,
    723 N.Y.S.2d 730 (3rd Dep't 2001) ................................................. 22

*Axis Surplus Ins. Co. v. GTJ Co., Inc.*,
    139 A.D.3d 604 (1st Dep't 2016) ...................................................... 11

*Century Indem. Co. v. Brooklyn Union Gas Co.*,
    No. 603405/2001, 2024 WL 4366102, at *1 (Sup. Ct. 2024) ................... 11, 14, 15

*Feili v. City of N.Y.*,
    658 N.Y.S.2d 21 (1st Dep't 1997) .................................................... 22

*Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*,
    91 N.Y.2d 169 (1997) .................................................................. 11

*Greenwich Ins. Co. v. City of N.Y.*,
    139 A.D.3d 615 (1st Dep't 2016) ...................................................... 21

*Health Ins. Plan of Greater N.Y. v. Calvary Hosp.*,
    798 N.Y.S.2d 709 (Sup. Ct. 2004) ..................................................... 9

*J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*,
    37 N.Y.3d 552 (2021) ............................................................... 12, 17

*Lewis v. Hertz Corp.*,
    597 N.Y.S.2d 368 (1st Dep't 1993) .................................................. 22

*Mt. Hawley Ins. Co. v. Am. States Ins. Co.*,
    92 N.Y.S.3d, 238 (1st Dep't 2019) .................................................... 11

*NYAT Operating Corp. v. GAN Nat'l Ins. Co.*,
    847 N.Y.S.2d 179 (1st Dep't 2007) .................................................. 19

*N.Y. Public Interest Research Grp. v. Carey*,
    42 N.Y.2d 527, 531, (1977) ............................................................ 9

*Olin Corp. v. Ins. Co. of N. Am.*,
    762 F. Supp. 548 (S.D.N.Y. 1991), *aff'd*, 966 F.2d 718 (2d Cir. 1992) ........ 12, 17

ii

*Olin Corp. v. Lamorak Ins. Co.,*
  332 F. Supp. 3d 818 (S.D.N.Y. 2018) ................................................. 12, 16, 17

*Radiology Resource Network, P.C. v. Fireman's Fund Ins. Co.,*
  784 N.Y.S.2d 101 (1st Dept. 2004) .................................................................. 9

*Raiport v. Gowanda Electronics Corp.,*
  739 N.Y.S.2d 811 (Sup. Ct. 2001) .................................................... 11, 14, 15

*Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford,*
  64 N.Y.2d 419 (1985) ....................................................................................... 10

*Smith v. Mousa,*
  759 N.Y.S.2d 482 (1st Dep't 2003) .............................................................. 22

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,*
  73 F.3d 1178 (2d Cir. 1995) ............................................................................ 12

*Travelers Prop. & Cas. Co. of Am. v. N.Y. Radiation Therapy Mgmt. Servs.,*
  No. 09 Civ. 694 (NRB), 2009 WL 2850691 (S.D.N.Y. Aug. 31, 2009) ............................. 21

*Union Carbide Corp. v. Affiliated FM Ins. Co.,*
  955 N.Y.S.2d 572 (1st Dep't 2012) .............................................................. 13

*Xiao Yang Chen v. Fischer,*
  6 N.Y.3d 94, 102 (2005) ................................................................................... 9

**Other Authorities**

CPLR § 603 ....................................................................................... 5, 10, 23, 24

CPLR § 2004 ............................................................................................... 23, 24

CPLR § 3001 ....................................................................................................... 10

CPLR § 3101 ................................................................................................... 5, 24

CPLR § 3103 ................................................................................................... 5, 24

Plaintiffs/Counterclaim Defendants, the Archdiocese and Associated Policyholders ("Insureds"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Motion for an Order That This Action Shall Proceed in Three Phases.

## PRELIMINARY STATEMENT

Defendants/Counterclaimants' (collectively, "Chubb") initiated this lawsuit involving more than 400 parties and 1,300 underlying sexual abuse actions brought under New York's Child Victims Act ("the CVA") and similar statutes, almost all of which remain in the early stages of active litigation against the Insureds. Structure and organization are needed to address the disputed coverage issues in an orderly manner, notwithstanding Chubb's otherwise unwieldy action that largely involves issues that are unripe for adjudication. Phasing is needed to facilitate prompt and efficient resolution.

The sheer number of underlying actions that allege abuse during Chubb's policy periods (the "CVA Actions") presents significant case management challenges for the parties and the Court, which are exacerbated because the vast majority of the CVA Actions are still being litigated, with many still in the early stages of discovery. Overwhelmingly, the CVA Actions are unripe for decision on Chubb's duty to indemnify. Chubb's attempts to dispute its ongoing duty to defend such CVA Actions are also unripe because Chubb's challenge is predicated on whether Chubb has a duty to indemnify. *See* NYSCEF Doc. No. 2 (Chubb Compl.) at ¶ 565 ("[T]he Chubb Insurers seek a declaration that to the extent they have no indemnification obligation … for any CVA claims … they also have no defense obligation … for such claims.").

To facilitate the Court's and parties' management of this case, the Insureds propose that discovery and trial of the insurance coverage issues in this case be divided into three phases:

> ***Phase One***: Chubb's duty to indemnify the Insureds for loss from the CVA
>
> Actions settled to date. These settlements include CVA Actions alleging

abuse by Edwin Gaynor, one of the biggest alleged perpetrators, and Fr. Gerald Boyle.

***Phase Two***: The remaining CVA Actions on a rolling basis, as each are settled or otherwise resolved, grouped by alleged perpetrator.

***Phase Three***: The Insured's claims against Chubb for breach of the covenant of good faith and fair dealing and violations of General Business Law § 349.

Dividing the case into phases to focus first on the claims that are ripe for adjudication is a far more manageable and efficient way to proceed than attempting to tackle all 1,300 CVA Actions at once and avoids the risk of unfairly prejudicing the ongoing defense of the underlying CVA Actions against the Insureds. Chubb's decision to prematurely file this lawsuit before the CVA Actions are resolved should not be permitted to interfere with the Insureds' ongoing defense of those claims.

***First***, dividing this action into three phases will enable the Court to efficiently resolve coverage for the CVA Actions that are presently ripe for a decision, while allowing time to resolve those that are not. Although Chubb has begrudgingly defended the CVA Actions pursuant to its duty to defend (subject to a reservation of rights), Chubb to has failed honor its duty to indemnify settled claims and refused to pay settlements in the CVA Actions resolved to date. Instead, Chubb has hindered resolution of the CVA Actions, attempted to pressure and coerce the Insureds into abandoning their rights, and deprived the Insureds of insurance proceeds that should be available to compensate survivors in the underlying CVA Actions. Despite Chubb's improper and counter-productive behavior, the Insureds have agreed to a reasonable settlement in a handful of CVA Actions involving certain alleged perpetrators (the "Settled CVA Actions").

2

Under New York law, an insurer's duty to indemnify depends on the ultimate determination of liability in the underlying claims against an insured. Presently, the Insureds have only incurred liability in connection with the Settled CVA Actions. Accordingly, the Settled CVA Actions are the only claims ripe for decision on Chubb's duty to indemnify. Conversely, a decision with respect to Chubb's duty to indemnify Insureds for the CVA Actions that remain pending (the "Active CVA Actions") is premature. For this reason alone, it is proper for the parties and the Court to first resolve the coverage issues applicable to the Settled CVA Actions.

**_Second_**, phasing will streamline the case by encouraging the early resolution of threshold legal issues. Although New York law is clear that Chubb has the ultimate burden to prove this exclusion from coverage, Chubb's positions in this case indicate the insurer intends to challenge the well-established law in effort to reverse the burden and have the Insureds _disprove_ the applicability of Chubb's exclusionary language. Chubb's positions also indicate that the insurer seeks to argue that mere "general" knowledge of "the Church" is sufficient to establish the exclusion, rather having to show that the relevant executives of the relevant insured subjectively expected or intended the perpetrator to commit the abuse alleged in a CVA Action prior to the abuse taking place. While the Insureds strongly disagree with Chubb's positions, they present legal issues that can and should be resolved during the first phase of this case, without the need for discovery into all 1,300 claims. Early resolution of such threshold legal issues will help focus discovery, streamline the remainder of this coverage action, and potentially facilitate a negotiated resolution of the case. Additionally, early resolution of factual questions in Phase One related to the expected or intended issue with respect to a given alleged perpetrator will result in law of the

3

case that the "expected or intended" language does or does not apply to all abuse allegedly happening on or after a certain date for other CVA Actions involving that alleged perpetrator.

*__Third__*, reserving the Active CVA Actions for a Phase Two of the case will prevent the Insureds from being unfairly prejudiced while they continue to litigate those underlying actions, the vast majority of which have yet to reach the point where any facts have been developed. The factual issues presented by Chubb's "expected or intended" defense to coverage overlap with those raised by the CVA claimants' claims for negligent hiring, retention, and supervision. Although the CVA claimants might not need to prove that executives at each Insured "expected or intended" abuse to prove negligence in those cases, the discovery elicited in the CVA Actions inherently encompasses what (if anything) such executives knew about the alleged perpetrators, when they supposedly knew that information (if ever), and what conclusions were drawn (if any). Permitting Chubb to get ahead of the Active CVA Actions by taking discovery and litigating the "expected or intended" issue with respect to those actions in this case would be highly prejudicial to the Insureds' ongoing defenses and raises the potential for inconsistent results.

*__Fourth__*, phasing will promote judicial economy by reducing the burden on the Court, which otherwise would be tasked with adjudicating discovery disputes and conducting separate coverage trials for potentially 1,300 individual CVA Actions. It will also ensure an orderly trial that addresses the issues and evidence in a logical and methodical manner, reducing the likelihood of confusion for a jury tasked with applying complex law to the myriad of factually distinct CVA Actions.

Accordingly, the Insureds respectfully request the Court issue an order that this action shall proceed in three phases, either pursuant to its authority under CPLR § 603 or through its inherent powers under CPLR §§ 3101 and 3103.

## BACKGROUND

### A.     The Coverage Claim

When New York enacted the CVA, the Insureds—consisting of more than 400 independently incorporated entities—looked to their longtime insurer, Chubb, for defense and indemnification.  More than 1,700 claims were brought against the individual Insureds alleging negligence, approximately 1,300 of which implicate Chubb's policy periods.  Significant to this Motion, only certain CVA Actions relate to any given individual Insured.

Chubb flatly denied coverage for the very first CVA Action, forcing the Archdiocese to file suit.  That coverage suit was later dismissed after Chubb agreed to defend CVA Actions.  When the Insureds sought Chubb's help to start resolving the CVA Actions, however, it quickly became clear Chubb would not honor its obligations.

Instead, Chubb is refusing to indemnify the Insureds as they settle CVA Actions, obstructing resolution of those claims, and concealing the true extent of Chubb's obligations and exposure when disclosing financial information to regulators and shareholders.  Chubb has also sought to pressure and coerce the Insureds into relinquishing valuable rights and accepting less coverage, with threats of litigation and a public smear campaign against its own insureds.

When the Insureds did not bow to such tactics, Chubb upped the ante again by filing this lawsuit for declaratory judgment and forcing its Insureds to incur the additional costs and risks associated with simultaneously litigating on two fronts.  Now the Insureds must defend the underlying CVA Actions while engaging in parallel litigation in which Chubb seeks to exclude coverage by alleging its Insureds subjectively "expected or intended" the abuse alleged in each CVA Action before the alleged abuse occurred.  In response, the Insureds assert counterclaims against Chubb for breach of contract, declaratory judgment, and Chubb's breach of the covenant of good faith and fair dealing and violations of General Business Law §349 (GBL § 349).

5

### B.    The CVA Actions

Each of the 1,300 CVA Actions allege various claims for negligence against the Archdiocese and/or one or more of the 400 independently incorporated entities that are insured under the Chubb policies. Each CVA Action is factually distinct (although some of the alleged underlying perpetrators are involved in multiple CVA Actions).

To date, the Insureds have managed to settle several CVA Actions alleging abuse during Chubb's policy periods, including certain claims alleging abuse against Edwin Gaynor and Fr. Gerald Boyle, who are the subject of numerous CVA Actions. In all instances, defense counsel recommended settlement, upon a reasonable anticipation of liability, and the amount of the settlement was within applicable limits of Chubb's policies. Since May 2024, the Insureds have paid a cumulative amount of $6,992,500.00 to settle the CVA Actions, using their own assets to fund the settlements. This amount is in addition to the $67 million that the Insureds paid to settle claims tendered through the Independent Reconciliation and Compensation Program ("IRCP"), *see* NYSCEF Doc. No. 196 (First Am. Countercl.) at ¶ 3, as well as numerous settlements of uninsured claims. The Insureds did not seek to recover funds paid to settle claims through the IRCP from Chubb. Amounts paid to settle claims through the IRCP eliminated Chubb's exposure to those claims.

Although the Insureds requested that Chubb participate in the settlement of each of the Settled CVA Actions, Chubb wrongfully refused to participate. To date, Chubb has contributed zero dollars (nothing) to settle CVA Actions. *See, e.g.*, NYSCEF Doc. No. 196 (First Am. Countercl.) at ¶¶ 616, 619, 622, 625. Chubb's wrongful conduct confirms that its strategy is to adopt a general practice of delay and obstruction to avoid paying any sum towards the settlement

of CVA Actions, protect its bottom line, and improperly pressure the Insureds to abandon their efforts to seek owed insurance for the liabilities. *See id.* at ¶¶ 10–13, 588–89, 601–03.

### 1. The Gaynor Matters

Approximately thirty-six CVA Actions allege abuse by Edwin Gaynor during Chubb's policy periods (the "Gaynor Matters"). Gaynor was a former gym teacher and coach allegedly employed by the Archdiocese and/or various schools located within the territory of the Archdiocese that are individual Insureds under the Chubb policies, including St. Bernard School, Immaculate Heart of Mary School, and Holy Rosary School. The claimants in the Gaynor Matters allege abuse from 1956 to 1971, and from 1985 to 1987, and that the Insureds are liable on the grounds that they negligently hired, retained, and supervised Gaynor. The claimants in the Gaynor Matters further allege that the Insureds knew or should have known Gaynor was committing the alleged abuse.

The Archdiocese and the individual Insureds dispute that they knew or should have known of Gaynor's alleged sexual misconduct and that they had any liability for negligence. Nonetheless, the potential for substantial liability remained given the nature of the underlying allegations, the sympathy of the jury, and other inherent risks. When the Insureds sought Chubb's involvement in settlement negotiations to potentially resolve such claims, Chubb refused to participate. Accordingly, the Insureds were left to settle a handful of the Gaynor Matters alleging abuse during Chubb's policy periods on their own, including:

- *HCVAWCJ v. Archdiocese of N.Y.*, Index No. 70122/2019 (N.Y. Sup. Ct.). *See* NYSCEF Doc. No. 196 (First Am. Countercl.) at ¶¶ 614–16.

- *SCVAWCJ v. Archdiocese of N.Y.*, Index No. 70121/2019 (N.Y. Sup. Ct.). *See id.* at ¶¶ 617–19.

- *LCVAWCR-DOE v. Archdiocese of N.Y.*, Index No. 69029/2019 (N.Y. Sup. Ct.). *See id.* ¶¶ 623–25.

7

- *George Orteig v. Archdiocese of N.Y.*, Index No. 55794/2020 (N.Y. Sup. Ct.).

- *David B. Fox v. Archdiocese of N.Y.*, Index No. 68497/2019 (N.Y. Sup. Ct.).

- *KCVAWCD-DOE v. Archdiocese of N.Y.*, Index No. 69503/2019 (N.Y. Sup. Ct.).

- *Gregory Morra v. Archdiocese of N.Y.*, Index No. 55795/2020 (N.Y. Sup. Ct.).

- *David Pisula v. Archdiocese of N.Y.*, Index No. 69031/2019 (N.Y. Sup. Ct.).

- *Daniel Fagan v. Archdiocese of N.Y.*, Index No. 69030/2019 (N.Y. Sup. Ct.).

- *Peter O'Neill v. Archdiocese of N.Y.*, Index No. 65584/2020 (N.Y. Sup. Ct.).

The remainder of the Gaynor Matters alleging abuse during Chubb's policy periods remain active.

### 2. The Boyle Matters

Approximately three CVA Actions allege abuse by Fr. Gerald Boyle during Chubb's policy periods (the "Boyle Matters"). Boyle was a priest allegedly employed by the Archdiocese and/or various churches located within the territory of the Archdiocese that are individual Insureds under the Chubb policies, including St. Teresa of Avila Church, St. John the Evangelist Church, and Our Lady of Perpetual Help Church. The claimants in the Boye Matters allege abuse from the 1960s to 1970s, and from 1982 to 1983, and allege that the Insureds are liable on the grounds that they negligently hired, retained, and supervised Boyle. The claimants in the Boyle Matters further allege that the Archdiocese and churches knew or should have known Boyle was committing the alleged abuse.

The Archdiocese and insured Churches dispute that they knew or should have known of Boyle's alleged sexual misconduct and that they had any liability for negligence. Nonetheless, the potential for substantial liability remained given the nature of the underlying allegations, the sympathy of the jury, and other inherent risks. When the Insureds sought Chubb's involvement in

settlement negotiations to potentially resolve such claims, Chubb refused to participate. Accordingly, the Insureds were left to settle one Boyle Matter that alleged abuse during Chubb's policy periods on their own: *William Brooks v. Archdiocese of New York & St. Teresa of Avila Church*, Index No. 60952/2021 (N.Y. Sup. Ct.). *See* NYSCEF Doc. No. 196 (First Am. Countercl.) at ¶¶ 620–22.

The remainder of the Boyle Matters alleging abuse during Chubb's policy periods remain active.

## ARGUMENT

## I. THE COURT SHOULD ENTER AN ORDER PURSUANT TO § 603 THAT DIVIDES DISCOVERY AND TRIAL OF THIS ACTION INTO THREE PHASES

Pursuant to CPLR § 603, the Court "may order a separate trial of any claim, or of any separate issue, and the Court may order the trial of any claim or issue "prior to the trial of the others" to promote convenience or to avoid prejudice. Bifurcation is also appropriate if trying all claims together would confuse the trier of fact. *Radiology Resource Network, P.C. v. Fireman's Fund Ins. Co.*, 784 N.Y.S.2d 101, 102 (1st Dept. 2004). "The trial court retains discretion to sever the claims in the interest of convenience." *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 102 (2005) ("the trial court retains discretion to sever the claims in the interest of convenience.").

### A. Phasing Will Allow the Parties and the Court to Focus on Ripe Claims First

It is axiomatic that this Court may only consider actual, ripe, justiciable controversies between the parties to this lawsuit. *See* CPLR § 3001 ("The supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy[.]"); *Health Ins. Plan of Greater N.Y. v. Calvary Hosp.*, 798 N.Y.S.2d 709, at *27 (Sup. Ct. 2004) (citing *N.Y. Public Interest Research Grp. v. Carey*, 42 N.Y.2d 527, 531, (1977)) ("It is well-settled that courts are not permitted to render advisory

9

opinions, determine abstract, moot or hypothetical questions, or issue decisions that "can have no immediate effect[.]").

The central issue in this case is whether Chubb owes the Insureds a duty to indemnify liabilities arising from the 1,300 CVA Actions that allege abuse during the Chubb policy periods.[1] However, the Insureds have only incurred liability in connection with a handful of those claims— the Settled CVA Actions.  Accordingly, only the Settled CVA Actions are ripe for decision.

In contrast to the duty to defend, which is determined by the four corners of the underlying complaint(s) and the insurance policies at issue, the duty to indemnify depends on the ultimate determination of liability in the underlying claims against the insured.  *See, e.g.*, *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985) ("The duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person." (citation omitted)).  In other words, Chubb's indemnification obligations to the individual Insureds only arise if (1) judgments are imposed in the CVA Actions; or (2) the Insureds reach settlements with the underlying claimants based on a reasonable anticipation of liability.

It is therefore a cornerstone of New York law that a coverage action addressing the duty to indemnify is premature where the issues of indemnification and coverage hinge on facts that will necessarily be decided in that underlying action.  *See, e.g.*, *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 178 (1997) (declining to rule on the insurer's duty to indemnify before "any ultimate determination of the insurers' liability" because "the duty to pay is determined by the actual basis for the insured's liability"); *Mt. Hawley Ins. Co. v. Am. States*

---

[1] At present, Chubb is defending the Insureds in the CVA Actions.  However, it has argued that there is no defense obligation to the extent the Court finds it has no duty to indemnify.

10

*Ins. Co.*, 92 N.Y.S.3d, 238, 239 (1st Dep't 2019) ("[I]ssues of fact as to liability in the underlying personal injury action render premature the conclusion that [the insurer] has a duty to indemnify[.]"); *Axis Surplus Ins. Co. v. GTJ Co., Inc.*, 139 A.D.3d 604, 605 (1st Dep't 2016) ("It is after the resolution of [the underlying] action where the extent of plaintiff's indemnification obligations can be fully determined.").

Consistent with this unbroken wall of authority, the only underlying claims at issue in this case that are ripe for a coverage decision are the Settled CVA Actions. *See id.* Conversely, any decision on Chubb's indemnification duty in relation to the Active CVA Actions is "premature," and hinges on facts that will necessarily be decided in those unresolved cases. Thus, a phasing order that contemplates first narrowly focusing discovery and litigation on the Settled CVA Actions[2] will allow the parties to move forward expeditiously, while simultaneously granting the Insureds time to resolve the Active CVA Actions.

**B.      Phasing Will Streamline the Case by Encouraging the Early Resolution of Threshold Legal Issues**

Proceeding in the first phase with the subset of ripe, resolved claims will better allow the parties to take discovery and the Court to make judgments regarding the merits of Chubb's primary defense to coverage—its alleged "expected or intended" defense—with respect to each CVA Action on a claim-by-claim basis. *See, e.g., Century Indem. Co. v. Brooklyn Union Gas Co.*, No. 603405/2001, 2024 WL 4366102, at *1 (Sup. Ct. 2024) (noting court and parties' consensus to divide coverage action into multiple phases); *Raiport v. Gowanda Electronics Corp.*, 739 N.Y.S.2d

---

[2] While the active claims involving the alleged perpetrators specified above (*see supra*, Background, § II) are not ripe, the Insureds acknowledge that discovery regarding all Gaynor Matters and Boyle Matters may be pertinent during Phase One, given that facts relevant to some or all of the claims alleging abuse by a given alleged perpetrator may be relevant to the "expected or intended" inquiry.

11

811, 813 (Sup. Ct. 2001) (granting defendant's motion to phase case to resolve threshold legal issues first).

New York law requires a claim-by-claim analysis of the CVA Actions when an insurer seeks to exclude coverage based on an "expected or intended" defense: a granular analysis of what, if anything, each Insured's executives knew of each alleged perpetrator's propensity to commit abuse, when they had such knowledge (if ever), and what conclusions were drawn from such knowledge (if any). *See Olin Corp. v. Ins. Co. of N. Am.*, 762 F. Supp. 548, 564 (S.D.N.Y. 1991) (the "dispositive question" in determining whether insured intended damage "will be what [the insured's] executives knew, when they knew it, and what conclusions they drew from their knowledge"), *aff'd*, 966 F.2d 718 (2d Cir. 1992).

To that end, a benefit to phasing is that it will streamline this case by allowing for the early resolution of critical threshold legal issues—namely, what standard when Chubb seeks to avoid coverage for a CVA Action based on the exclusionary "expected or intended" language in the Chubb policies, and which of the parties has the burden of proof with respect to that "expected or intended" defense.

New York law places the burden of proving exclusions or limitations squarely on insurers. *See, e.g.*, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 37 N.Y.3d 552, 562 (2021). This is true regardless of where the exclusionary or limiting language appears in the policy. *See, e.g.*, *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995) ("the exclusionary effect of policy language, not its placement, controls the allocation of the burden of proof"). Moreover, with respect to an insurer's "expected or intended" defense, New York law is clear that the insured must have subjectively expected or intended for specific harm to occur prior to that harm taking place, for coverage to be excluded. *See, e.g.*, *Olin Corp. v. Lamorak Ins. Co.*,

332 F. Supp. 3d 818, 844 (S.D.N.Y. 2018); *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 955 N.Y.S.2d 572, 575 (1st Dep't 2012) ("awareness of possible injuries and claims does not amount to an expectation of damage"). Despite these well-established standards, Chubb seeks to champion alternative standards that are contrary to New York law and have been rejected by other courts. First, Chubb seeks to shift the burden of proof with respect to its "expected or intended" exclusions by arguing that the Insureds should have to *disprove* that they expected or intended the abuse in each CVA Action. Second, Chubb argues that a "general awareness" of a risk is purportedly sufficient to support its expected or intended defense.

While the Insureds strongly disagree with Chubb's positions, Chubb's positions present legal issues that can and should be resolved during the first phase of this case, without the need for discovery into all 1,300 claims. Resolving such threshold issues in the first phase of the case, with a specific focus on the Settled CVA Actions that are ripe, will help streamline the remainder of the case by narrowing the issues moving forward. Among other things, resolving such threshold issues is likely to highlight the overbreadth and irrelevance of much of the discovery that Chubb seeks regarding the alleged "generalized" knowledge of "the Church" rather than the specific, independently incorporated Insureds at issue in a particular CVA Action. Resolving such threshold issues may also help to facilitate a negotiated resolution in this coverage action to the extent the parties' positions are shown to be predicated on legal theories that are ultimately invalid and incognizable.

Phasing the case will also allow for the court to make factual determinations in the Settled CVA Actions that will apply to the Active CVA Actions as they are resolved. When Phase One culminates in a trial, the Court will instruct the jury as to the proper burden and standard that applies the expected or intended issue for each alleged perpetrator. The jury will then consider

13

whether or not the Insureds expected or intended that a certain alleged perpetrator would abuse a child as of a certain date. That date can then be used to determine coverage for other CVA Actions involving that alleged perpetrator. For example, when considering coverage for one Settled CVA Action alleging abuse by Edwin Gaynor, once the jury hears the evidence and makes that determination, it will be law of the case that the "expected or intended" language does or does not apply to all abuse allegedly happening on or after that date for the other CVA Actions involving Gaynor.

In other cases involving a large number of claims, this Court has recognized the wisdom of phasing when such threshold issues exist and resolving them would be more efficient and reduce the potential for undue prejudice. In *Century*, for example, the parties and the court determined that the coverage actions should be divided into multiple phases, each addressing coverage for costs incurred by the policyholder to perform government-mandated cleanup of former manufactured-gas plants across New York City. *See* 2024 WL 4366102, at *1. The agreement to phase was premised upon the "factual and legal complexities" involved in litigating coverage for the multitude of plants at once. *Id*.

Likewise, in *Raiport*, an action in which multiple plaintiffs alleged that defendants damaged their property and health, the court granted defendants' motion to phase the litigation so that threshold legal issues could be resolved first. *See* 739 N.Y.S.2d at 813. In that case, the defendants brought a motion to phase not only the trial, but also pretrial discovery, arguing that bifurcation of liability and damages would streamline the case by narrowing the issues and making settlement more likely. *See id.* at 812. Moreover, the defendants argued that, given the number of plaintiffs and the need to obtain discovery for each of them, limiting disclosure in the first phase would result in a quicker resolution than if all disclosure were conducted simultaneously. *Id*. The

14

court granted the motion, finding that the "great degree" of discovery required would frustrate judicial economy and efficiency absent phasing, whereas more limited discovery could provide an "adequate groundwork for both settlement and clarification of the complicated issues[.]" *Id.* at 813–14. Additionally, the court held that dividing the case could "shorten[] significantly the litigation process." *Id.*

Here, like in *Century* and *Raiport*, it is beyond reasonable dispute that resolving coverage for the CVA Actions on a phased basis will be more manageable and efficient than attempting to resolve coverage for all 1,300 claims at once—particularly, when the vast majority of the CVA Actions remain in the early stages of discovery/litigation, the Insureds' liability (if any) in connection with those CVA Actions has yet to be established, and Chubb's duty to indemnify each Active CVA Action is unripe for determination. Allowing the Court and parties to focus on the threshold legal issues in the context of the Settled CVA Actions that are ripe for determination will also help focus discovery, streamline the remainder of this coverage action, and potentially facilitate a negotiated resolution of the case. Moreover, it will help avoid the potential for inconsistent results and unfairly prejudicing the Insureds' underlying defense. Indeed, if Chubb were permitted to proceed ahead of the underlying CVA Actions and adjudicate its "expected or intended" defense with respect to the Active CVA Actions that remain in discovery/litigation, the potential for waste and inconsistent results is very real.

For example, there is no reason to adjudicate whether the relevant Insured "expected or intended" the injury alleged in an underlying CVA Action to the extent the Insured ultimately secures a defense verdict. In that instance, the Insured would have no "liability" and the issue of Chubb's duty to indemnify would never arise. Moreover, there would be no question about the defense costs Chubb paid because the duty to defend is based on the allegations in the underlying

15

complaint.  Allowing Chubb to prematurely litigate the "expected or intended" issue with respect to such a claim risks not only an unnecessary ruling on the duty to indemnify, but confusing the issue of Chubb's duty to defend.  While Insureds believe that New York law precludes Chubb from challenging its duty to defend any CVA Actions as long as *the potential* for coverage remains based on *the allegations* in the underlying complaints, Chubb attempts to do just that by seeking to prematurely move forward with its "expected or intended" defense where the CVA Actions may still result in a defense verdict and a "duty to indemnify" ruling is neither necessary nor appropriate.  *See* NYSCEF Doc. No. 2 (Chubb Compl.) at ¶ 565 ("[T]he Chubb Insurers seek a declaration that to the extent they have no indemnification obligation … for any CVA claims … they also have no defense obligation … for such claims.").

### C.  Phasing Will Avoid Prejudice to the Insureds in the Active CVA Actions

Chubb's central purported defense to coverage is its "expected or intended" exclusionary/limiting language.  Under New York law, Chubb faces an exceptionally high burden to prove that its exclusion applies.  *Lamorak Ins. Co.*, 332 F. Supp. 3d at 844 (citing *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 649 (1993)) (Courts construe "expected or intended" provisions "narrowly, barring recovery only when the insured intended the damages." (emphasis in original)).  Nevertheless, the central questions in both the CVA Actions and this coverage action overlap: both turn on the extent to which, if at all, each Insured's executives knew of the proclivities of certain alleged perpetrators before they allegedly committed sexual abuse.  Therefore, proceeding with discovery and trial regarding coverage for those claims—while the underlying actions are ongoing—could irreparably harm the Insureds in the Active CVA Actions.  To avoid untenable prejudice to the Insureds in those underlying actions, discovery and coverage litigation for those claims should be reserved for a second phase, to be pursued on a rolling basis as the claims are settled or otherwise resolved.

16

Chubb has the burden to show that its "expected or intended" exclusion applies to the alleged injury in each of the ongoing Active CVA Actions. *See J.P. Morgan Sec.*, 37 N.Y.3d at 562 ("[w]hile an insured must establish coverage in the first instance, the insurer bears the burden of proving that an exclusion applies to defeat coverage."). To meet that burden, Chubb must show that the relevant Insured's alleged conduct meets the standard for "expected or intended" injury. *See Ins. Co. of N. Am.*, 762 F. Supp. at 564. Under New York law, whether an insured expected or intended an injury is a subjective question that goes to what an insured actually knew (if anything) prior to the alleged injury. *Lamorak Ins. Co.*, 332 F. Supp. 3d at 844 (citing *Cont'l Cas. Co.*, 80 N.Y.2d at 649) ("[T]he focus is on whether Olin subjectively expected and intended the specific damage that resulted from its waste-disposal practices."). Under this standard, it is not enough for Chubb to show that the relevant insured should have foreseen the potential injury. Instead, Chubb must show that the relevant Insured (specifically, its executives) were practically certain the alleged injury would result. *Id.*

The factual issues implicated by Chubb's duty with respect to its defense—*e.g.*, what, if anything "[the Insureds'] executives knew, when they knew it, and what conclusions they drew from their knowledge" if any (*see Ins. Co. of N. Am.*, 762 F. Supp. at 564)—unquestionably overlap with the issues in the Active CVA Actions. Although the claimants in the Active CVA Actions allege negligence, and not intentional harm, their claims still hinge on the Insureds' executives' awareness and understanding regarding the alleged perpetrators' propensity to commit abuse. For example, the underlying CVA complaints allege that the individual Insureds knew or should have known of the alleged perpetrators' propensities but that they negligently hired, trained, and/or retained the perpetrators. *See, e.g.*, Murray Aff. ¶ 4, Ex. 1 (*William Young v. Archdiocese of N.Y., et. al.*, Index No. 950015/2019, Compl.) at ¶¶ 44–49. Additionally, the underlying complaints

allege that the Insureds were negligent in the supervision of the alleged perpetrators and failed to remove them. *See, e.g., id.* at ¶¶ 38–43. In support of the negligence claims, the CVA claimants allege that the Insureds breached duties of care by failing to protect the claimants from abuse, failing to establish and enforce policies and procedures that were adequate to protect the CVA claimants, and failing to adequately monitor and supervise children during church-related activities. *See, e.g., id.* at ¶¶ 19–37. Chubb itself has acknowledged that the CVA claimants' allegations are "related." *See* NYSCEF Doc. No. 44 (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss or Stay this Action) at 13.

Given that both the CVA claimants and Chubb seek to prove that the damages arise from the facts and circumstances of the individual Insureds' awareness of the alleged perpetrators' propensity to commit abuse, it is undeniable that Chubb's discovery in the Active CVA Actions— if permitted to proceed in parallel—could implicate issues in those underlying actions, impermissibly jeopardizing its insureds' defenses to liability. That Chubb's burden of proof is subject to a different, higher standard does not eliminate the prejudice that its premature discovery and litigation of those facts could cause in the Active CVA Actions; rather, it makes it all the more likely that Chubb will seek to discover and argue facts in this case that are prejudicial to its insureds in the CVA Actions. As Chubb represented to the First Department during oral argument on a previous motion to dismiss, most, if not all of, the information Chubb plans to seek in this case is still to be produced in the underlying CVA Actions. *See* Murray Aff. ¶ 5, Ex. 2 (Oral Argument Tr.) at 11:6–10 ("[M]ost of, if not all of, the information that we are seeking is the same information they would be obligated to produce in the underlying case."). This coverage action— and particularly, Chubb's discovery requests—should not be allowed to get out ahead of discovery in the CVA Actions and increase the risk of prejudicing the Insureds' underlying defense.

18

Indeed, Chubb may not rely solely on the negligence allegations and discovery in the Active CVA Actions to prove its "expected or intended" defense. New York law requires Chubb to make an independent showing that each of the individual Insureds hired, retained, and supervised the alleged perpetrators with the *intent* or *expectation* that the ultimate abuse would occur. *See, e.g.*, *RJC Realty Holding Corp.*, 2 N.Y.3d 158, 164–65 (2004) (allegations of negligent supervision of an employee who committed sexual assault was an "accident" from the insured employer's perspective); *ACE Fire Underwriters Ins. Co. v. Orange Ulster Bd. of Co-op. Educ. Servs.*, 8 A.D.3d 593, 595 (2d Dep't 2004) (same). One court even has held that a finding of negligence in an underlying action forecloses the insurer from proving expected or intended injury in a coverage action. *See NYAT Operating Corp. v. GAN Nat'l Ins. Co.*, 847 N.Y.S.2d 179, 180–81 (1st Dep't 2007) ("[B]ecause [the insured's] liability…was based on its negligent hiring and retention...the sexual assault was a covered 'accident'…and the exclusion for injuries expected or intended…does not apply.").

Chubb already served discovery requests that seek this category of prejudicial information. For example, Chubb served (overbroad) interrogatories that appear to seek witnesses with potential knowledge related to the underlying claims. *See e.g.*, Murray Aff. ¶ 6, Ex. 3 (Chubb First Set of Interrogatories) at Nos. 1 and 3 (requesting the Insureds "Identify all…administrators, agents, employees, officers, or staff members at any time during the five years before and after" the sexual abuse alleged in each underlying claim—including the Active CVA Actions—and demanding the Insureds state, *inter alia*, "whether that Person has knowledge, based on personal experience, or Communications" about "the Sexual Abuse alleged in any Underlying Claim").

19

Because the coverage questions raised by Chubb's defense in this action turn on facts to be litigated in the Active CVA Actions, it is logical to postpone discovery and a decision on coverage for those claims until a second phase.

**D.  Phasing the Claims Will Serve the Interests of Justice and Orderly Adjudication**

An order that directs this case to proceed in the three phases will also serve the interests of justice by conserving judicial resources, avoiding inconsistent decisions, and reducing the likelihood of confusion.

First, phasing the issues will conserve judicial and party resources that could otherwise be used to compensate survivors. For example, an Order that directs the parties to focus first on the Settled CVA Actions will prevent this Court (after the Special Master makes recommendations) from having to address countless inevitable discovery disputes that will surely arise if the Insureds are forced to litigate the Active CVA Actions on a parallel track to those underlying actions. As discussed above, whether Chubb has a duty to indemnify each of the individual Insureds in the Active CVA Actions would necessarily require adjudication of factual matters that are unresolved and very much at issue in those underlying Actions. Pursuant to its duty to defend, Chubb is obligated to defend the Insureds against the underlying CVA Actions in good faith. Chubb should not be permitted to lend support to the underlying plaintiffs and prejudice the Insureds' underlying defense by pursuing discovery and litigating issues that remain unresolved in underlying Actions and have the potential to impact the Insureds' potential liability.

Second, a phasing order that assigns the Active CVA Actions to a second phase, to be addressed on a rolling basis as those actions are settled or otherwise resolved, will eliminate the risk that inconsistent factual decisions will be issued by this Court and those tasked with adjudicating the Active CVA Actions. Courts recognize that the parallel litigation of overlapping

20

factual issues pose a risk of inconsistent decisions that not only prejudice the insured, but also waste scarce judicial resources. *See, e.g.*, *Greenwich Ins. Co. v. City of N.Y.*, 139 A.D.3d 615, 616 (1st Dep't 2016) (staying a coverage action "pending the resolution of the liability phase of the underlying negligence actions"); *Travelers Prop. & Cas. Co. of Am. v. N.Y. Radiation Therapy Mgmt. Servs.*, No. 09 Civ. 694 (NRB), 2009 WL 2850691, at *2 (S.D.N.Y. Aug. 31, 2009) (judicial efficiency not well served by permitting parallel litigation of issues in coverage and underlying case). Here, allowing the parties to reserve discovery and trial of the Active CVA Actions until they are settled or otherwise resolved will circumvent the risk of inconsistent adjudications to the extent that this Court's decision would conflict with findings and decisions reached in those underlying cases.

Third, phasing the issues will reduce the likelihood of confusion for a potential jury that would otherwise result by trying 1,300 CVA Actions at once, and ensure orderly trials that address the issues and evidence in a logical, methodical manner. As discussed above, each of the 1,300 CVA Actions involve different individual insureds, different alleged perpetrators, different claimants, and different alleged facts. Moreover, the vast majority of those claims are still in the early stages of discovery and have yet to reach the point where any facts have been developed. A phasing order will allow the jury to focus on the facts specifically relevant to the ripe CVA Actions and avoid the confusion of having to wade through other evidence and piece together what facts are relevant to which CVA Actions. In the meantime, such phasing will also allow the Insureds the time to litigate and resolve the Active CVA Actions in an orderly fashion. The resolution of, and factual determinations made in, those Active CVA Actions will then in turn help a jury to decide many of the coverage issues in connection with those cases.

Accordingly, consistent with the authorities set forth above, this Court should order that this action proceed in phases.

## II. ALTERNATIVELY, THE COURT SHOULD ENTER A CASE MANAGEMENT ORDER THAT DIVIDES DISCOVERY AND TRIAL OF THIS ACTION INTO THREE PHASES

In the alternative to an order under CPLR § 603, this Court may accomplish the same objectives described above by entering a case management order that divides this action into three phases. The Court has inherent power under the CPLR to manage and supervise discovery and trial. In particular, the Court may extend the time fixed by any statute, rule or order for doing any act, upon a showing of good cause. *See* CPLR § 2004. *See also Smith v. Mousa*, 759 N.Y.S.2d 482, 482–83 (1st Dep't 2003); *Allen v. Krna*, 723 N.Y.S.2d 730, 731 (3rd Dep't 2001). The Court also has broad discretion to limit, condition or regulate discovery devices. *See* CPLR §§ 3101(a) and 3103(a). *See also Lewis v. Hertz Corp.*, 597 N.Y.S.2d 368, 368 (1st Dep't 1993); *Feili v. City of N.Y.*, 658 N.Y.S.2d 21, 22 (1st Dep't 1997). For the reasons described in Argument section I, *supra*, the Court should enter a case management order that directs the parties to engage in discovery and trial of the Settled CVA Actions first, before proceeding to a second phase to engage in discovery and trial of the Active CVA Actions, and which reserves the Insureds' extra-contractual claims for a final phase.

### CONCLUSION

For the reasons set forth above, the Court should enter an order pursuant to CPLR § 603 that divides discovery and resolution of this case into three phases: (1) Settled CVA Actions, (2) Active CVA Actions, (3) Extra-Contractual Claims. Alternatively, this Court should exercise its inherent powers under CPLR §§ 3101 and 3103 and enter a case management order that accomplishes the same objective.

22

Dated: New York, New York
January 28, 2025

Respectfully submitted,

**BLANK ROME LLP**

By: */s/ James R. Murray*

James R. Murray
Jared Zola
Robyn L. Michaelson
Dominique G. Khani
Stephen Wah
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 885-5000
Fax: (212) 885-5001
Jim.Murray@BlankRome.com
Jared.Zola@BlankRome.com
Robyn.Michaelson@BlankRome.com
Dominique.Khani@BlankRome.com
Stephen.Wah@BlankRome.com

James S. Carter (admitted *pro hac vice*)
Omid Safa (admitted *pro hac vice*)
1825 Eye Street NW
Washington, D.C. 20006
Tel: (202) 420-2200
Fax: (202) 420-2201
James.Carter@BlankRome.com
Omid.Safa@BlankRome.com

*Attorneys for the Archdiocese of New York
and Associated Policyholders insured by
insurance policies Chubb and the Additional
Insurers sold*

23

## WORD COUNT CERTIFICATION

I hereby certify pursuant to Part 202.8-b of the Uniform Rules of for the Supreme Court and the County Court that, according to the word count tool on Microsoft Word, the total number of words in this brief, excluding the caption, table of contents, table of authorities, attorney's certification, and signature block, is 6,978 words.

Dated:  January 28, 2025
        New York, New York

*/s/ James R. Murray*
James R. Murray

24

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2025, I caused to be filed and served a true and correct copy of the foregoing The Archdiocese of New York's and Associated Policyholders' Motion for an Order That This Action Shall Proceed in Three Phases and all papers affixed thereto on all counsel of record via the Court's electronic filing system, NYSCEF.

Dated: January 28, 2025              /s/ James R. Murray
      New York, New York          James R. Murray