James I. Stang (CA Bar No. 94435)
Andrew W. Caine (CA Bar No. 110345)
Gail Greenwood (CA Bar No. 169939)
Brittany M. Michael *(Pro Hac Vice)*
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, California 94104-4436
Telephone: 415-263-7000
Email: jstang@pszjlaw.com
acaine@pszjlaw.com
ggreenwood@pszjlaw.com
bmichael@pszjlaw.com

Attorneys for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>Debtor. | Case No. 23-30564<br><br>Chapter 11<br><br>**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE TO DEBTOR'S OBJECTION TO OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S PROPOSED FORM OF ORDER AUTHORIZING DISCLOSURE OF INDEPENDENT REVIEW BOARD MINUTES**<br><br>Date: March 13, 2025<br>Time: 1:30 p.m.<br>Place: Courtroom 17<br>450 Golden Gate Avenue, 16th Fl.<br>San Francisco, CA<br>Hon. Dennis Montali |

**TO THE HONORABLE DENNIS MONTALI, THE DEBTOR, AND ALL OTHER PARTIES IN INTEREST:**

The Debtor's Objection[1] is an inappropriate attempt to seek reconsideration of the Court's decision and to seek relief the Debtor failed to request earlier.

[1] *Debtor's Objection to the Official Committee of Unsecured Creditors' Proposed Form of Order Authorizing Disclosure of Independent Review Board Minutes*, ECF No. 1128 (the "Objection"). Any capitalized terms not otherwise defined have the meanings ascribed to such terms in the Objection.

First, the Debtor is not merely asking for the redaction of the names of the "lay people who voluntarily participate in the IRB process." (Objection at 2:12-13). Instead, the Debtor is making this last-ditch effort to prevent the community from learning what the Archbishop, and other Archdiocesan officers and employees have said behind closed doors as part of the IRB in response to actual claims of child abuse. (Objection at 1:19-20).

Second, there is no ambiguity that the Committee's agreement, cited in the Objection, that "personally identifying information … can remain redacted" in the IRB Minutes was to the Debtor's existing redactions of information related to survivors and perpetrators, not any persons identified in such minutes. As the Debtor's quote indicates, the Committee agreed that information can *"remain* redacted." The Committee did not agree, the Archdiocese did not previously request, and the Court did not order, additional redactions of the IRB Minutes. The Court confirmed that the IRB Minutes already contained sufficient redactions: "As to whether material in the Minutes is scandalous to any accused individual under Section 107, the Minutes are already anonymized (via initialization or nicknames) and redacted."[2]

Further, the Committee was clear in what it was requesting from the Court. At the hearing, Committee counsel stated "I want to state on the record clearly as to the IRB minutes exactly what the committee is asking for. The Committee is asking for the documents filed as Exhibit B to have the confidentiality mark on those documents removed as they are. That is the sole request the committee is making as to Exhibit B."[3] Counsel further clarified, "Your Honor, we would not be requesting to alter the minutes as they were given to the Committee at all."[4]

By its Objection, the Debtor seeks new relief. The Objection does request the redactions of any names listed in the IRB Minutes. Nor was there a single instance in which Debtor's counsel argued in favor of additional redactions to the IRB Minutes at the hearing. Nor was the "expectation of anonymity" of the IRB members raised at the hearing. The Debtor opposed the Committee's request for non-confidentiality of the IRB Minutes in its entirety, without requesting

[2] Decision, ECF 1105, at 10:10-15.

[3] *See* Transcript of March 13, 2025 hearing, attached hereto as Exhibit 1 at 85:21–86:1.

[4] *Id.* at 87:10 -12.

redactions of board member names as an alternative form of relief.[5] If the Debtor had raised this issue earlier, the parties could have appropriately briefed and argued the issue of the Debtor's allegation that the IRB Members have "reasonable and good faith expectation of anonymity." Instead, the Debtor raises the issue (with no factual or legal support) in response to the form of order.

Dated: April 7, 2025

PACHULSKI STANG ZIEHL & JONES LLP

By *_/s/ Gail S. Greenwood_*
James I. Stang
Andrew W. Caine
Gail Greenwood
Brittany M. Michael

Attorneys for the Official Committee of Unsecured Creditors

---

[5] *Compare id.* at 92:15-19 (arguments for opt-in process *if* the Court was inclined to grant motion with respect to Claims Data).

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

In Re: ) Case No. 23-30564
) Chapter 11
THE ROMAN CATHOLIC ARCHBISHOP )
OF SAN FRANCISCO ) San Francisco, California
) Thursday, March 13, 2025
Debtor. ) 1:30 PM
______________________________ )

STATUS CONFERENCE

HEARING ON REQUEST TO ENGAGE REAL ESTATE PROFESSIONALS FILED BY CREDITORS' COMMITEE

MOTION TO UNSEAL PORTIONS OF RECORD AND RELEASE CERTAIN MATTERS FILED BY CREDITORS' COMMITEE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENNIS MONTALI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Roman Catholic Archbishop of San Francisco:

PAUL J. PASCUZZI, ESQ.
Felderstein Fitzgerald et al LLP
500 Capitol Mall
Suite 2250
Sacramento, CA 95814
(916)329-7400

PAUL E. GASPARI, ESQ.
Weintraub Tobin Chediak Coleman & Grodin
475 Sansome Street
Suite 510
San Francisco, CA 94111
415-772-9618

For The Roman Catholic Archbishop of San Francisco (Cont'd):

AMANDA L. COTTRELL, ESQ.
Sheppard Mullin Richter & Hampton LLP
2200 Ross Avenue
20th Floor
Dallas, TX 75201
(469)391-7432

ORI KATZ, ESQ.
Sheppard, Mullin, Richter and Hampton
4 Embarcadero Center
17th Floor
San Francisco, CA 94111
(415)434-9100

Special Insurance Counsel for The Roman Catholic Archbishop of San Francisco:

BARRON L. WEINSTEIN, ESQ.
Blank Rome LLP
2029 Century Park East
6th Floor
Los Angeles, CA 90067
(424)239-3400

For The Official Committee of Unsecured Creditors:

GAIL S. GREENWOOD, ESQ.
Pachulski Stang Ziehl & Jones LLP
One Sansome Street
Suite 3430
San Francisco, CA 94104
(415)263-7000

BRITTANY M. MICHAEL, ESQ.
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, NY 10017
(212) 561-7700

For Office of the United States Trustee:

PHILLIP J. SHINE, ESQ.
U.S. Department of Justice
450 Golden Gate Avenue
Suite 05-0153
San Francisco, CA 94102
(408)535-5525

Also Present:

Abp. Salvatore Joseph Cordileone
(Via Zoom)

Fr. Patrick Summerhays

Also Present (Cont'd): Paula Finigan Carney, Esq.

Melissa Bach (Via Zoom)

Court Recorder: LORENA PARADA
United States Bankruptcy Court
450 Golden Gate Avenue
San Francisco, CA 94102

Transcriber: RIVER WOLFE
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 7 of 118

SAN FRANCISCO, CALIFORNIA, THURSDAY, MARCH 13, 2025, 1:30 PM

-oOo-

(Call to order of the Court.)

THE CLERK: All rise. Court is now in session, the Honorable Dennis Montali presiding.

THE COURT: Good afternoon, everyone. Please be seated. Thank you.

THE CLERK: Calling the matter of the Roman Catholic Archbishop of San Francisco.

THE COURT: One second before we start. Before I take appearances, just for those of you not familiar with the process here and to make sure you're all clear on the agenda, there are three matters on the calendar this afternoon in this case. One is a hearing on a request by the committee to engage real estate professionals. Another is just a status conference that the Court has requested on the conduct of the case. And then the primary agenda item is the motion of the creditors committee to unseal portions of the record and to have the Court release certain matters that are described in the briefs.

I want to take them in that order. So I'd like to get appearances of counsel first who are going to appear on the request for employment of a real estate consultant to work with the creditors' committee and the opposition from the United States Trustee.

Appearances.

Mr. Pascuzzi, good afternoon.

MR. PASCUZZI: Good afternoon, Your Honor. Paul Pascuzzi for the Roman Catholic Archbishop of San Francisco. Your Honor, just for the record, on Zoom, the archbishop is -- Cordileone is on Zoom. Present in court is Fr. Patrick Summerhays and general counsel Paula Carney.

I'll be dealing with the Cushman & Wakefield application and the status conference. The other counsel here also in addition, Paul Gaspari from Weintraub Tobin, Barry Weinstein from Blank Rome, special insurance counsel, and then Ori Katz and Amanda Cottrell from Sheppard Mullen who will be -- Amanda Cottrell will be handling the other committee motion.

THE COURT: Okay. Thank you.

Other counsel.

MS. GREENWOOD: Good afternoon, Your Honor. Gail Greenwood of Pachulski Stang Ziehl & Jones appearing for the committee of unsecured creditors. And I'm here with my colleague Brittany Michael. She'll be arguing other matters. But I'll be arguing the employment application. And we have on Zoom Melissa Bach of Cushman & Wakefield, and she's available if the Court has questions for her. And I'll leave it at that.

THE COURT: Okay. Thank you.

MR. SHINE: And good afternoon, Your Honor. Phillip Shine, appearing on behalf of the United States Trustee.

THE COURT: Again, For those of you that have been following or participating on any Zoom hearings, because the debtor's counsel requested that this be a live in-court hearing, I made the decision to obviously accede to that request but not to them to try to make it into what we call a hybrid, where arguments of counsel would also be presented by Zoom. For technical reasons and other reasons, that just isn't feasible.

But again, consistent with the court being available, that's why the proceedings are available for anyone who wishes to observe them from remote locations. But unlike hearings where there is some interaction with people attending remotely, I don't intend to take any commentary from anyone except counsel or anyone else requesting and authorized to be heard in court. But nothing is anticipated at the moment. So the suggestion that someone might be available to comment or to respond remotely, I'll deal with that if and when it becomes necessary.

So let's go to the question of the -- well, the committee has asked to employ Cushman & Wakefield as a real estate expert. The U.S. Trustee, Mr. Shine has opposed. So let me hear if you've changed your mind or you still want to adhere to that because there's no other opposition and certainly no opposition specifically by the debtor.

MR. SHINE: Yes, Your Honor. The U.S. Trustee opposes

employment of this professional because they don't appear to be disinterested. There appears to be an actual --

THE COURT: Is there a requirement of disinterestedness in Section 1103?

MR. SHINE: Well, Your Honor, I think generally professionals --

THE COURT: Wait. Is that a -- I don't want to make this a cross-examination, but the question lends itself to a yes or no answer first.

MR. SHINE: Your Honor, off the top of --

THE COURT: Disinterestedness is not a required element of an 1103 application, is it?

MR. SHINE: Your Honor, I do not know off the top of my head.

THE COURT: Would you like to borrow my Bankruptcy Code?

MR. SHINE: Yes, Your Honor. May I approach?

THE COURT: You don't really want to, do you? I wouldn't have asked you the question if I didn't know the answer. It's not. This is not a -- this is not a 327 employment under 327(a). You make the argument that there's a conflict. Well, what's the conflict?

MR. SHINE: Your Honor, the potential conflict is that there's dual representation, and they're on both sides of competing interests.

THE COURT: Why is that a conflict?

MR. SHINE: There could be competing interests, Your Honor.

THE COURT: Give me an example. Cushman is a leasing agent for the diocese for some leased facility, right?

MR. SHINE: That's correct, Your Honor.

THE COURT: The committee wants Cushman's advice about values of properties. Where's the conflict?

MR. SHINE: Your Honor, I think that, just generally speaking, dual representation can create a conflict. I can't off the top of my head think of a specific example in this instance.

THE COURT: Well, I find that -- I find that one of these sort of knee jerk reactions, but I'm groping for a conflict. But even if there is one, therefore what? What is the disqualifier? In other words, I questioned you about 327, but if a debtor asked to employ a specialist to do something like evaluation but wanted to hire someone who was also doing something else for someone in controversy -- or who has a different position, does that mean the professional has a has a conflict?

MR. SHINE: It might.

THE COURT: Is there any privilege that might exist between Cushman on the one hand, and the committee on the other --

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 12 of 118

MR. SHINE: Your Honor, I --

THE COURT: -- or Cushman and the debtor? Is there a privilege?

MR. SHINE: Your Honor, I don't think that there's any issue of a privilege here.

THE COURT: Well, look, the reason I'm questioning this is because I want you and the United States Trustee to tell me when you think something's inappropriate, but I'm searching for the inappropriateness of it. I mean, I'm not trying to make it any worse for you. If you have anything -- you want to add anything further?

MR. SHINE: Your Honor, I don't have anything to add.

THE COURT: All right. Mr. Pascuzzi, I need to hear -- I mean, I'm sorry.

Ms. Greenwood, the debtor seems to agree that Cushman can do both things --

Oh, no. I'll ask Ms. Greenwood.

But the debtor wants access to the work product, and I haven't heard from the committee on that. What's your position on that?

MS. GREENWOOD: Yes, Your Honor. I think the debtor has used this as an opportunity to ask for both the cap on the fees and disclosure of all of Cushman's reports and --

THE COURT: The debtor's agreed?

MS. GREENWOOD: Well, the debtor originally six weeks

ago -- no, I'm sorry. The committee stands by its offer of a stipulation that was proposed six weeks ago, by which the debtor would provide Cushman with access and information to the properties and direct that its parishes, schools, and cemeteries do the same. And in exchange, the committee would provide all of Cushman's reports and all of the documents that Cushman relies upon.

The debtor declined that stipulation. And as a result, we're looking at employing Cushman as our real estate valuation expert. And absent a stipulation and a two-way street in terms of providing access and information, we have declined to provide those reports right now, and we're not under an obligation to provide our expert reports. At some point, they may be.

THE COURT: But you agree there's no privilege, is there? In other words, if Cushman says, we've examined this facility and Blackacre and we believe it's worth a million dollars, is there any privilege? Is there any --

MS. GREENWOOD: It would come under an expert work product.

THE COURT: But would it be discoverable?

MS. GREENWOOD: If we intend to use those expert reports at trial, yes.

THE COURT: Well, I got news for you. If they come in with a wrong number, you're not going to use them at trial.

But that's not the point.

MS. GREENWOOD: That's not the point. Cushman is coming in not as an interested party. She's collecting data and providing the reports as to the valuation of these real properties. The entire scope of that project is in flux because it's going to depend upon how far things go in mediation. Right now, the initial set of properties is set to be between twenty to thirty properties. And we'd like to employ Cushman & Wakefield for that purpose.

THE COURT: So Mr. Pascuzzi, what's the problem with -- the diocese has to pay for this to begin with, so a cap doesn't seem unreasonable. But why not just exchange and be willing to let the information be available as the committee's requested?

MR. PASCUZZI: Your Honor, there was more to that stipulation. We had offered to have this be kind of a joint project, where we engage one professional who would be pretty much independently evaluating real property that we both could use. It would be useful to both sides. That was rejected.

And so then we get to the point where we are now, where they just filed their application. We said we just want to see the valuations because we're paying for them. They're supposed to be independent. And so why shouldn't we get access to that data and that information as well?

It's being practical. It's being efficient. It's

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 15 of 118

being collaborative. And that's the way we should be working.

THE COURT: And it doesn't close -- it doesn't close the door to be adverse on some issue in the future, right?

MR. PASCUZZI: I don't see why it would.

THE COURT: So use my example. Cushman comes back and says Blackacre's worth a million. And the committee says, fine, that's what they believe. And you believe it's worth -- if you want two million, half a million, I don't care. Pick a higher or low number. Then what? Is it work product? Are you allowed to see the -- well, under a stipulation, you're allowed to look at the document. What about if there is no such stipulation?

MR. PASCUZZI: I'm sorry.

THE COURT: Well, I mean, if there's an agreement, obviously, we don't have to worry about it.

MR. PASCUZZI: Yeah.

THE COURT: But if I were to say there's no agreement. I'm just allowing them to employ Cushman as their advisor. Do you believe it would still be subject to a some sort of privilege, litigation privilege?

MR. PASCUZZI: Your Honor, their final reports and the data they use to compile those reports, they would allow us to be able to evaluate them. And if we felt necessary, we'd go hire somebody to be able to give an opinion on them.

THE COURT: So do you --

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 16 of 118

MR. PASCUZZI: We're not getting ready for trial, Your Honor. We're trying --

THE COURT: Right. We're not getting ready for trial.

MR. PASCUZZI: -- to gather information.

THE COURT: I mean, look, independently of that, if I decided to authorize Cushman to act as a advisor to the Court to determine the values of these twenty properties, there'd be no privilege. It would just be, they would say, we believe it's this value. And so as I say, in my own experience, if the appraiser gives you the wrong number, you get a new appraiser. But here, what would happen here if --

MR. PASCUZZI: I mean, if we were going to trial over some valuation issue, that might be a relevant question. But we're gathering information to go to mediation and try and reach a global settlement, which is what our goal is and our primary concern and being efficient, Your Honor, so that we don't have to go hire a real estate appraiser as well. We might have to but --

THE COURT: You might have to. You might have to. It would be ironic, wouldn't it, if Cushman comes in too high on one project, but too low on another one.

MR. PASCUZZI: And Your Honor, on the fees thing, at the beginning of this discussion with the committee, we asked them, well, how much are you going to going to spend? And they gave us an estimate of 100,000 dollars for an initial review of

twenty to thirty properties. And we just said, great, why don't we just start with that? If you're going to go above that, a simple application saying, look, we need to go above that for these reasons, it's not a big deal.

THE COURT: Yeah. Mr. Greenwood, the problem that I'm having with the committee's position -- first of all, let me rephrase this. I think it's perfectly reasonable for the committee to ask to get some information on the value. And when somebody else is paying, it's easy. And the debtor says, I'm willing to pay 100,000 dollars, at least for openers.

It strikes me that it's too premature to start getting into a debate about litigation privilege and work product and so on, but rather to say to Cushman & Wakefield, go, value these properties and tell the debtor and the committee what you come up with. And if and when it becomes a litigation privilege, then we described and figure out what to do.

And I'd rather say -- this almost goes back to my discussion with Mr. Shine. There's no conflict. If a reputable company, which Cushman & Wakefield certainly is, says we have the skills and the knowledge to determine a reasonable value for these properties. And here is what we'll -- here's our opinion. That, to me, is progress. And we don't have to turn it into something that it isn't.

MS. GREENWOOD: Your Honor, we have no interest in turning this into a major dispute. And we would like to walk

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 18 of 118

down the cooperative path. And with that said, it's struck us as very uncooperative in terms of the archdiocese refusing to provide access and information to our valuation expert. We're happy to share these reports. But if we can't get the access and information coming from the archdiocese, why should we be providing the additional reports that are being prepared on --

THE COURT: Be a little more specific, if you would, about the access. What does Cushman need that the diocese has that it isn't willing to share at the moment?

MS. GREENWOOD: Here's the contact person that you should talk to in terms of getting into this school and measuring whatever, and we --

THE COURT: But that's done in every appraisal ever. When you hire somebody to come out and appraise your house that you're renting to somebody, you say to the tenant, by the way, the appraiser is going to come out and check the house. What's different about this? I mean, the committee and its experts aren't asking the diocese to go dig in and come up with some history, is it? It's a question of --

MS. GREENWOOD: If they have that available, we'd like it. But nobody has put out any kind of discovery requests or major -- it's meant to be cooperative in terms of you invite them onto the onto the property. You cooperate and provide them with, by the way, here, we've got some toxic soils that you should probably keep into -- but it's meant to make the

expert's valuation of the real estate that much more --

THE COURT: Well, I can assure you, if someone like Cushman & Wakefield says, we think this is great property, but we can't determine its value because we think there's some hazardous waste product but no one will tell us where it is, I'd say, fine. That's not a very good appraisal.

Mr. Pascuzzi, this is a nonissue, isn't it, today?

MR. PASCUZZI: It's a nonissue, Your Honor.

THE COURT: Okay. I'm going to overrule the U.S. Trustee's objection because I don't believe that there is anything in the Bankruptcy Code that prohibits a committee to hire a professional who happens to be using that professional -- I'm sorry, where that professional is providing some service, albeit within the broad category of real estate services, but specifically to advise on leasing of a particular location at the same time to do both chores.

If I want to be technical about it, as I told Mr. Shine, the statute the committee relies on, for starters, doesn't require this disinterested concept, which is a bankruptcy term that the bankruptcy lawyers are familiar with. And it does preclude employment of professionals like Cushman, where they represent an adverse interest. But this, to me, is not adverse.

If Cushman says, oh, by the way, we would like to represent the tenant who's leasing the property from the

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 20 of 118

diocese, then I'd suggest that they're representing two sides of a position, at least lessor/lessee, which is inherently potential for conflict. But on this record and on this proposal, there is none.

So the committee will be authorized to employ Cushman & Wakefield to provide the services that Ms. Greenwood summarized in the papers, say, with the information being available that with the debtor and the committee through Cushman cooperating on things like access or records that are relevant to what Cushman is trying to do, such as a value. So for example, if last year, the diocese commissioned an appraisal of Blackacre, then they should make that appraisal available to Cushman this year or so on and so forth.

And I'll make it subject to a 100,000-dollar cap. And if Cushman needs to or the committee for Cushman's benefit believes there should be an increase in that amount, I'll Direct that the representatives take it up with the debtor first. And if the debtor agrees, I'll approve it without debate. If there's a dispute and Cushman wants an excessive amount of money that the debtor is unwilling to commit to, I'll decide it. But again, this, I think, falls into the category of problems -- I mean, solutions looking for a problem. And I'm not going to worry about at this point.

So Ms. Greenwood. Mr. Pascuzzi. Are you satisfied with where we come out on this?

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 21 of 118

MS. GREENWOOD: Yes, Your Honor.

MR. PASCUZZI: Yes, Your Honor.

THE COURT: Okay. Then the two of you, please agree on an order that that's acceptable to Cushman. And let Mr. Shine have access to it. And again, I don't want to make a big deal of my disagreement with the U.S. Trustee, and I'll leave it at that if they want to visit some other way. Okay. That's easy.

Mr. Pascuzzi, you were good enough to respond to my request and file the debtor's status conference statement.

Ms. Greenwood, are you going to address to that, did you say?

MS. GREENWOOD: That will be Ms. Michael.

THE COURT: Ms. Michael on the status report?

MS. GREENWOOD: Yes, Your Honor.

THE COURT: Okay. Ms. Michael. Just, again, you can stay seated if you want, just stay near the microphone. And let me -- before you respond, let me say that the status was sufficient for me to get a snapshot. And I have no intention of interrogating, questioning, talking, or having any communications with mediators from either the mediators in this case or mediators or judges presiding over other dioceses bankruptcies.

So do you want to add anything further, Ms. Michael?

MS. MICHAEL: Yes, Your Honor. Brittany Michael,

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 22 of 118

Pachulski Stang Ziehl & Jones, on behalf of the committee.

May not shock Your Honor that the committee has a very different view of the status than the status report filed by the debtor here. The committee sees this case at a stage where we need to start receiving rulings on certain issues that are obstacles to getting to a consensual resolution.

THE COURT: I haven't withheld any rulings yet, have I?

MS. MICHAEL: No, not yet.

THE COURT: Okay.

MS. MICHAEL: The status report --

THE COURT: I don't think so.

MS. MICHAEL: Yes.

THE COURT: I want to make sure that I not land the trip on me for some matters that are waiting for a decision on.

MS. MICHAEL: No, not at all. The committee views that, as you are starting to see with the matters before you today and the matters that will be before you two weeks from now as well as a few more that I will describe here, that we're now at a stage where we intend to continue with mediation, but that the mediation efforts would be aided by starting to bring some issues before this Court and before the state court.

The archdiocese, in its filed update --

THE COURT: How can you bring something before the state court if there's a stay in effect?

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 23 of 118

MS. MICHAEL: That is the subject that we will be in front of you --

THE COURT: Oh, okay.

MS. MICHAEL: -- on in two weeks. Yeah.

THE COURT: Oh, yes, I'm aware that that's coming.

MS. MICHAEL: Yeah.

THE COURT: But I thought maybe --

MS. MICHAEL: No.

THE COURT: -- you were jumping the gun on that.

MS. MICHAEL: No. In the archdiocese filed update on paragraph 3, the archdiocese noted that confirmed plans in diocesan cases have all been consensual plans. What it fails to note is that few of those consensual plans occurred without litigation in bankruptcy and/or state court. In most instances, mediation continued concurrent with that litigation. The two are not mutually exclusive. While it's hard to respond to the archdiocese description of the mediation without violating the violating the privilege --

THE COURT: No, I don't want you to do that.

MS. MICHAEL: Yeah. It's worth noting that the committee is concerned that the mediation is being described in paragraph 9 as in the beginning stages, over seven months into mediation.

The issues the committee specifically has or intends to seek rulings on include the need for cases to go to judgment

in state court. That's the matter before you two weeks from today. We need the cases to go forward to judgment in state court in order to give guidance to all the parties, including the insurers, on both liability and damages issues. The cases --

THE COURT: But isn't what mediation is supposed to avoid?

MS. MICHAEL: Mediation is supposed to help us get to a consensual plan. Sometimes, in order for us to get to a consensual plan, we need guidance on the issues that the parties most disagree on.

THE COURT: Okay. Again, don't turn this into the argument for two weeks on the --

MS. MICHAEL: Sure. The archdiocese described that motion as test cases. We want to be clear that those cases are not tests of anything. Those are the two cases that the state court had previously identified as set to move forward first, and they are the trial-ready cases.

THE COURT: Well, but I didn't interpret the word "test" to be like a practice test. To me, it's a real -- it's the real thing for those claimants.

MS. MICHAEL: Yes, absolutely.

THE COURT: And so I mean, you didn't expect -- I mean isn't that what it means? I mean, you've heard the term "bellwether". This could be a bellwether case too, right? I

mean, it happens in lots of mass tort cases. Drugs. Birth control devices. Earplugs. Chemicals. Lots of things, right?

MS. MICHAEL: Absolutely. Yes, Your Honor.

THE COURT: Okay. All right.

MS. MICHAEL: We also disagree with the archdiocese regarding its relationship between the archdiocese and the parishes and other divisions of the debtor. In looking forward to the next few months, we anticipate filing an adversary proceeding, seeking the Court's guidance on those issues as well.

The archdiocese also references what is happening right now in state court, in the JCCP. The archdiocese has told Judge Chatterjee, similar to what they told the state court judge in the Cruz case that was before you a few weeks ago that the stay applies to all codefendants in that case.

THE COURT: Well, we got that straightened out, don't we?

MS. MICHAEL: I believe it was straightened out as to the Cruz litigation. I don't know that that has been straightened out as to what is before Judge Chatterjee in the JCCP.

THE COURT: Well, why doesn't somebody educate that judge?

MS. MICHAEL: I understand that there's another status conference coming up in a few weeks. I would defer to some of

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 26 of 118

my state court colleagues who are in the court today. As bankruptcy counsel, we are not in front of Judge Chatterjee in those proceedings.

THE COURT: Well, and I don't want those counsels --

MS. MICHAEL: Sure.

THE COURT: -- to usurp your role. But my job here is to give signals to state court judges where they do not have a stay to worry about, and I don't want that confusion to persist at all. So in any of the diocese cases, or at least here in Northern California, are there similar mis-signals being sent to state court judges?

MS. MICHAEL: My understanding of the status of the proceedings in front of the Judge Chatterjee and the JCCP, which is for all of the Northern California clergy cases, is that the archdiocese filed a statement similar to what you heard in the Cruz case that cited to the Fogerty case in the Second Circuit and to a District of Oregon case that applied Fogerty in similar circumstances dealing with mortgages and that the archdiocese's position that has been filed in the JCCP is that the automatic stay applies to all codefendants.

THE COURT: The judge that you've named, Chatterjee, is that the judge who has replaced former --

MS. MICHAEL: Judge Wise.

THE COURT: -- superior court Judge Wise?

MS. MICHAEL: Yes, Your Honor.

THE COURT: Who's now on the district court? Okay.

MS. MICHAEL: Yes.

THE COURT: And so it's Oakland Superior?

MS. MICHAEL: Yes.

THE COURT: Okay. Well, procedurally -- I'm just thinking out loud then.

MS. MICHAEL: Sure.

THE COURT: But you're standing here telling me that you believe that there is an ongoing misstatement of the law to a superior court judge, and yet nobody's asked me, except your briefs, you the preview here, to do anything about it. I mean, I did it in an existing case --

MS. MICHAEL: Um-hum.

THE COURT: -- and Mr. Pascuzzi differed with me about some law. But I mean, how do you want to tee -- to me, we should tee this up soon. But I mean, for those counsel and the parties before those judges who aren't subject to the stay to act and advise accordingly, I mean, it's one of these circular. How can you go before the judge and say there's a stay that operates here, except that for those folks over there that think there's a stay?

MS. MICHAEL: Yes, Your Honor. I believe that we have also been caught up in some of that circle as well. But I would say that it's my understanding that the plaintiff's liaison counsel have been filing sort of counter-statements in

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 28 of 118

terms of their understanding of the law and that at the moment, Judge Chatterjee has asked the parties to determine a process to put in front of him the question of whether the stay applies to codefendants in those actions but has also noted his understanding that any ruling from a bankruptcy court would take precedence over any determination he makes about --

THE COURT: All lawyers, whether they're state court lawyers or bankruptcy judges know what the Schwartz case says of the Ninth Circuit. It says state court judges can interpret the automatic stay, as long as they interpret it correctly. But if they interpret it incorrectly, then the bankruptcy court has the ultimate call on this, which is another way of saying if a state court lawyer goes and thinks he or she is immune from contempt because a state court judge says the stay doesn't apply, they might be back here as a respondent on a contempt motion.

MS. MICHAEL: Yes, Your Honor.

THE COURT: Okay. All right. Again, you need to tee this up so I --

MS. MICHAEL: Yes.

THE COURT: -- have something I can act on other than one of my advisory opinions.

MS. MICHAEL: Understood, Your Honor.

THE COURT: Okay.

MS. MICHAEL: And that is why we see this as another

issue that we will be seeking -- or that a party in this case will be seeking guidance from you on.

Additionally, in paragraph 11 of the status report, the archdiocese incorrectly states that defense costs in those codefendants actions impact the allegedly shared insurance. While when this issue is teed up, obviously evidence will have to be put in front of Your Honor regarding what the insurance policies do or do not say. But we did want to clarify that from our perspective, that is an incorrect statement of the facts.

THE COURT: Just show me which -- this is in paragraph 11? What line?

MS. MICHAEL: It's paragraph 11, which is page 6. And then it is line 23.

THE COURT: Okay. I got it. Thank you. Thank you.

MS. MICHAEL: And then finally, the committee does not share the same view of how discovery has proceeded as the debtor does. In our experience, when dioceses cooperatively hand over the information at the committee's request, discovery-related fees do not have to represent the majority of the fees in a case.

Further, quantity does not result in quality. It is again, often in cases when dioceses have been the least cooperative regarding discovery, that we see statements regarding the sheer quantity of discovery, rather than the

responsiveness of the discovery. We are still working with the archdiocese and some of its affiliates to narrow issues, but we also expect that we will be back in front of Your Honor regarding discovery issues in the next thirty to sixty days.

THE COURT: Okay. Thank you, Ms. Michael.

MS. MICHAEL: Yes. Thank you, Your Honor.

THE COURT: Mr. Pascuzzi, I don't need any response. I'm not going to act. I mean, you're welcome to make a brief response if you want. But I asked for a status report, and I got one. And I'm not going to say anything other than thank you. But if you want to add something further.

MR. PASCUZZI: Your Honor, you'll hear more about all of this. That was the point of the status conference statement, to alert you to what's going on. I think we have two fundamentally different views of how the case should proceed. We want to go to mediation. Find a resolution as soon as possible. As you heard, the committee has a long list of litigation that it wants to pursue instead.

So we'll get there. We'll keep trying to work together. We'll keep trying to work it work it out. I'm trying to find solutions. But I just wanted to give you the (indiscernible).

THE COURT: Just state the obvious to you, to your client, to most of all the survivors that would like to see some resolution here, is that I've been on this case for a year

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 31 of 118

and a half, and there hasn't been too much for me to do, which in my experience is a good thing, from a judge's point of view. And I've had successes both in my prior life as a lawyer and more recently as a judge that some of the best results happen when the judge is not involved. And I remember as a young lawyer being criticized by a judge because nothing was happening in front of the judge. And I remember explaining to the judge, that's because we're making progress.

And so I do not personally worry that at the eighteen-month mark, we don't have a plan on the table yet. That being said, I do worry about the staggering amount of money being paid out and the fact that this is not going to be like some of the cases in other parts of the country that are at the five-year mark.

And I simply am not -- and I will also say, and this is not irrelevant to what we have to deal with in the next motion today, I am not going to sit idly by if we have victims and survivors of a case here not being on the same track and treatment as the same survivors who might have been the victims of some abuse that happened in the East Bay or in Sonoma County. And I can't solve the problems in Milwaukee or New Orleans or Buffalo, New York.

But in the immediate area of Northern California, in, I might say, an area when I was a young person in Catholic grammar school, there was only one diocese, and it was one.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 32 of 118

There wasn't a separate diocese in Oakland, and I don't think there was one in San Jose and of course, Santa Rosa. And so I find it troublesome to me that there's even a risk that people who survived these tragedies might be treated differently or disparately because one lived in San Francisco, the other lived in Oakland or Vallejo -- or not Vallejo, a different district.

So I just keep that in mind. And so I don't intend to just sit and wait for five years. I intend something to happen. But I'm not jumping the gun either and putting deadlines. And I accept that the committee and the debtor have agreed for at least the short-term a so-called standstill on the exclusivity issue. And I'll deal with these motions that Ms. Michael summarized, as you predicted, as they show up.

So as far as I'm concerned, that's the status report today.

MR. PASCUZZI: Your Honor, there was one other thing. Would it make sense to have another status conference on calendar a few months down the road?

THE COURT: Well, I think you suggested that, yes. But it might not be necessary if I've got a bunch of motions coming up. I mean, why don't we do this? Why don't we -- let me hear the arguments we -- I'm sure a number of people that are waiting for what I'll call the main event for today, and I want to hear those arguments.

And at the conclusion of the hearing, I told you that

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 33 of 118

my expectation is to take the matters under advisement. I'm not a hundred percent sure it's going to be that way. But before we all leave the courtroom today, I will either have announced a decision or announced that I'm not going to yet make a decision, and I will also set a date for a status conference. But if the committee has a whole laundry list of motions coming up, we're not going to duplicate the effort. Okay.

MR. PASCUZZI: Thank you, Your Honor.

THE COURT: All right. All right. So thank you, both counsel, for the status report.

On the motions, I'm going to let the committee take the lead on the argument. But again, I've studied the extensively and more than once. And I don't need to have the wheel reinvented. I need to focus on things that are on my mind.

So Ms. Michael, is it you making the argument again?

MS. MICHAEL: Yes, Your Honor.

THE COURT: Okay. You're going to reserve some time?

MS. MICHAEL: Yes, Your Honor. And --

THE COURT: How much?

MS. MICHAEL: -- before we move to the main event, as you described it, I would be remiss if I was asked to clarify next our next hearing, which is two weeks from today, if the Court intends for that to be a Zoom hearing or back in the

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 34 of 118

courtroom?

THE COURT: Well, no one asked me to do anything. Again, I don't mind accommodating people, but I want to make sure they are accommodated. It is not easy. We can do it, but it's more of a problem to do the hybrid. I know that Judge Lafferty in Oakland is doing it and maybe judges elsewhere do it. It's not that I can't do it. It's just that -- and it was the debtor, not the committee, that asked. Do you have a preference for --

MS. MICHAEL: Your Honor, we do not have a preference.

THE COURT: Okay. Well, then, for now, I'm planning to just do it on Zoom just because --

MS. MICHAEL: Okay.

THE COURT: -- again, it's more convenient for everyone.

MS. MICHAEL: Thank you, Your Honor.

THE COURT: Okay. So how much time do you want to reserve?

MS. MICHAEL: Your Honor, I plan to keep my initial statements brief, so I reserve fifteen minutes.

THE COURT: You want to reserve fifteen?

MS. MICHAEL: Yes, Your Honor.

THE COURT: Well, maybe you won't be as brief because one of the things that you need to focus on -- I'm going to let you make the argument as you wish. And I promise to listen

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 35 of 118

carefully. But I'm concerned about the following.

I'm concerned about -- if I recall correctly, you've got 530 or 540 or whatever different claimants who are impacted by this. They are the claimants whose information is distilled into what I'll call exhibit A. And I'm not going into the merits of it on the public record at this point. But I'm a hundred percent -- I need you to persuade me that there is no single one of them out there that won't be shocked and offended and maybe hurt and troubled by making exhibit A public. I'm going to leave the minutes in what I'll call exhibit B.

Again, for those of you who are not lawyers or who are familiar with this case, but not in the technical way, to me, exhibit A is the distillation of information that the committee has assembled from the 500-and-some-odd proofs of claim that are on file. And exhibit B is what the committee has referred to as the minutes of the diocese review board.

And my concern here is a survivor who is a statistic on exhibit A but in reality is not a -- is not a statistic. It's a survivor of a tragedy. Might have been misled by the promises in the confidential statement and the supplement and all the other information that he or she looked at and the Court approval of what was extracted from them to complete their proof of claim. And I'll make a -- I'll make a hypothetical.

Exhibit A tells us a number of perpetrators and a

number of victims and a laundry list of types of conduct but in many instances, one victim in one location. And I understand that the data shows that a number of perpetrators were in a smaller -- not a tiny number, but a small number of locations.

But let's focus on that one victim in who was the only victim, at least with a proof of claim on file, from that one church or that one school. How do I know that that person isn't disappointed, if not worse, hurt, by exhibit A becoming public? I'll agree with you that on the face of it, there's no names of people. There are names of perpetrators, but not of survivors. And if this person is the survivor who is the one who went to school at that one place where there's one event, that person doesn't need to be told what he or she went through. Same with that person's family. Friends. Advisors. Lawyers. Et cetera.

But is that consistent -- is it consistent with the promise of confidentiality to turn that into a statistic that one could almost figure out what might be the case? And so if I am a -- if I am a person that lived in that neighborhood, do I now presume that someone might have been the victim who is the identity and the person? So with that broad -- it's a broad way of framing the question. And I want you also to tell me why I shouldn't, at the minimum, say that there needs to be more of an opportunity for all those 500-and-some-odd people to affirmatively, either affirmatively ask that their situation be

excluded, or at the minimum, or give them an opportunity so that on a non -- if they say nothing, it could be released.

So with that, you understand the way I'm framing the question?

MS. MICHAEL: Yes, Your Honor.

THE COURT: Okay. And you're free to -- you're free to respond as fully as you choose to and also to make the balance of your argument as you wish. So I'm going to listen to you now.

MS. MICHAEL: Okay. All right. Thank you, Your Honor. I intend to answer your question, but I do want to start by acknowledging and thanking the committee members and all of the other survivors who are in the courtroom today. This issue's incredibly important to the survivor community, and that is why these individuals have taken time off of work in order to be here today. I also understand that there are a number of survivors and committee members on the Zoom who were not able to be in the courtroom today, but by my count, there is over half of the committee who is present in the courtroom today.

And I want to thank Your Honor both for opening the Court to them and for the accommodations the Court continues to make to support survivors experiencing these hearings, but also for having that Zoom available so that those who could not be here could still hear the hearing.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 38 of 118

THE COURT: Okay.

MS. MICHAEL: Your Honor, as you said, you've read the briefing. You understand our argument. So I'm going to go straight to addressing your question.

I understand your concern, and I'm grateful that you are thinking of the survivor experience in that way. I do want to address first the idea that in a situation, we'll use a school, that there's one individual who alleges abuse that occurred at a certain school, that somehow that could be traced back to that individual, that is part of why we compiled the data in the way that we did. We didn't include any dates. We didn't say abuse occurred at school X in the 1970s.

THE COURT: No, but again, I don't pretend to be a statistician or a wizard at breaking codes, but one can easily draw a few inferences from the age of victims and the age of the profiles of the groups. And again, it's one of those concerns.

MS. MICHAEL: All right. I think you could draw some inferences by the age of the victims, but it would be impossible to look at the ages of the victims and say it was one of the victims that is currently in his or her 70s who was abused at this school. And so in order to --

THE COURT: But it doesn't match up. The age and the -- the age and the venue do not match up.

MS. MICHAEL: They do not, no. All of the --

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 39 of 118

THE COURT: But hold on.

MS. MICHAEL: Yeah.

THE COURT: Let pick a hypothetical --

MS. MICHAEL: Sure.

THE COURT: -- location too.

MS. MICHAEL: Okay.

THE COURT: Saint X church. If I happen to live in the neighborhood of Saint X church and I happen to know someone who's in his 60s or 70s, and I now read exhibit A, and I say, were you abused back when you were in that school? I mean, and that person -- if worst. What if that person is the victim? What's happened? What have I done to -- by this public disclosure of this, haven't I, the judge, made the situation for that victim worse?

MS. MICHAEL: I think, in the scenario you're discussing, two issues. I want to walk a line of not saying anything that's in exhibit A, but I think that seeing a location on the list on exhibit A like Saint x --

THE COURT: Saint X.

MS. MICHAEL: -- would still not give the reader any information about the age of the person who is alleging abuse at Saint X or the circumstances around that abuse. So if that person sees the name of Saint X on a list and knows someone who happens to have been affiliated with Saint X and asked that person and through some random coincidence, that is the person

who was abused at Saint X. I don't think that is any different than the scenario that could be happening right now.

THE COURT: What If I am the questioner and I also want to say to X was never abused. But here are my friend who is my age and we both had as a teacher someone whose name is also on exhibit A, then don't I then start putting two things together and say, wait a minute. I wasn't abused. Maybe my good friend who never talks about it was.

MS. MICHAEL: I think that you could have that conversation with your good friend, but I would suspect that you and your good friend also had dozens of other students in your class, let alone other students who had that same teacher at that same school over the many years that that teacher was there. And so again, I don't see that as significantly different than the conversations that I think many people in the Catholic community have already, knowing that the archdiocese is in bankruptcy, knowing that these cases were being filed in state court and thinking I went to Catholic school. This didn't happen to me. But did it happen to my classmates?

And so when we crafted the data that was in exhibit A, we specifically did it -- we didn't include dates. We specifically did it in a way that you would have to pick a needle out of a haystack, which every once in a while that needle might get picked, but you would have to pick a needle

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 41 of 118

out of the haystack in order to correctly identify who was behind any of the data.

THE COURT: What's wrong with asking those 530 people if they mind exhibit A being produced?

MS. MICHAEL: Your Honor, we have no objection to a procedure, assuming that all of the other objections to the committee's motion are overruled.

THE COURT: Well, no, I have --

MS. MICHAEL: Right.

THE COURT: Of course, of course. I mean, I have to -- I have to make a ruling. And I may agree with the diocese and say, no, X is not going to see the light of day. But the point to you is that you seem to say that if I want those 500-plus people to have an option at least to say no, that that's doable. It seems like it's --

MS. MICHAEL: Yes.

THE COURT: -- a relatively minor expense. The church is going to have to pay for the postage, I guess. There shouldn't be a lot of lawyering involved. It should be something. Whether they actually get a draft of exhibit A or not, I haven't thought about that.

MS. MICHAEL: Yeah.

THE COURT: And maybe it's whether they have to affirmatively agree or just an opportunity to opt out.

Well, let's go to the next step. Let's assume this

mailing goes out to 550 individuals, and 5 of them say, I don't want a release. Do you then rerun the data, taking out all the all the input from those five claims?

MS. MICHAEL: Yes, Your Honor. That would be very easy for us to do.

THE COURT: So one of the -- one church or more churches might come off the list, and obviously it seems -- okay. It sounds like it's doable.

MS. MICHAEL: Yes. Yes, Your Honor.

THE COURT: It would seem to me, if a hundred claimants said I want out, then it may be -- there must be a point where it's not worth the effort to produce the exhibit. But I don't know what that number is.

MS. MICHAEL: We would have no objection to a process, I believe, that a process that gave an opportunity to opt out, versus a process that required affirmative consent. The other thing I do want to say. You referenced mailings. I believe this was true in the procedures at the beginning of the case, but I want to be clear, if we do discuss a process like this, that the mailings would be going to these individuals' counsel. A lot of survivors do not feel comfortable receiving mail directly at their homes related to this matter but --

THE COURT: I'm not going to second-guess how it gets there or --

MS. MICHAEL: Yes.

THE COURT: I have had occasion in another mass tort case of some larger magnitude that's highly well known to Northern California that some fire claimants, fire victim claimants, weren't happy with their lawyers at some point, and the communication broke down. I'm not going to worry about it in this case. And I'm going to assume that the committee members themselves, who have participated and worked with counsel, have supported this outcome. And my guess is that it'll be a very small number that would want out.

One related question is why is it necessary for anything for exhibit A to include a list of -- the laundry list of types of abuse.

MS. MICHAEL: Your Honor.

THE COURT: Well, how does that advance the cause for the necessary process that the system has to provide to these claimants? They all know what they were subjected to. Why does the public document have to say it?

MS. MICHAEL: They know what they were individually subjected to, Your Honor. But one of the things we often hear from survivors in these cases, and I'm currently going through the process of sending out checks in a different case, is not understanding their claim in relationship to the other claims in the case. And so exhibit A helps survivors in understanding how their claim situates amongst all of the claims in the case and also the magnitude of the claims in the case.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 44 of 118

THE COURT: Well, unlike the list that has several lines in it with only one instance, there's not one -- there's no one of types of abuse. The smallest number is two digits at least so --

MS. MICHAEL: Yes, Your Honor.

THE COURT: I understand. Okay. All right. Those are my questions. So go ahead with whatever else committee want to make, and then you get to respond to --

MS. MICHAEL: Okay.

THE COURT: -- whatever the debtor says.

MS. MICHAEL: Sorry, Your Honor. Go ahead with my argument? I missed --

THE COURT: Yeah, unless you want to reserve everything. I mean, I took a lot of time. I sort of said that you were going to have twenty minutes total and proceeded to take your time for at least twenty minutes so --

MS. MICHAEL: Your Honor, I'll reserve the remainder of my time.

THE COURT: I want you to feel free to make any other additional opening remarks you want. I'm not going to -- I'm not going to impose time limits on you in an unreasonable way. And the same will be true of debtor's counsel. This is more important. It's more important that we air this discussion fully. So what else do you want to add?

MS. MICHAEL: Okay. Your Honor, I would simply

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 45 of 118

emphasize that the committee is asking the Court to rule that the archdiocese has not met its burden to keep the claims data or the IRB minutes hidden. The claims data informs all parties-in-interest, including the survivor claimants, regarding the scope and depth of the claims, as I mentioned. And that's of central importance to this case. That is what this bankruptcy case is about.

THE COURT: Well, now having said I'm not going to ask any more questions, I'll proceed to ask you another question. What standard applies? Does the standard of Section 107 or the standard of Rule 26 apply? I'll just tell you. We have two sets of data.

MS. MICHAEL: Um-hum.

THE COURT: I'm going to have exhibit A, which we know comes from the claims themselves. And we have exhibit B that comes almost completely, if not a hundred percent, from the diocese. So we have case law from the Father M case that controls. We have a statute that may or may not control all or part of this. We have a Rule 26 and the case law. What standard applies to which of these two documents from your point of view? And I'm going to ask Mr. Pascuzzi the same question, obviously.

MS. MICHAEL: Yes, Your Honor. I believe two different standards apply to these two different sets of documents under Father M. The IRB minutes are business records

that were produced during discovery. The Rule 26 and the common law related to that as described in Father M is the standard that applies to those. So that is the Ninth Circuit's two step, two-and-a-half-step test, which is first looking to whether the party seeking to keep the documents private --

THE COURT: No, I know the --

MS. MICHAEL: Yes. Okay.

THE COURT: I know the test. So you think that applies to both sets of information?

MS. MICHAEL: No, I think that applies to the IRB minutes. And the Section 107 and Father M test regarding Section 107 is what applies to the claims data, which are derived from, arguably, pleadings, which are the proofs of claim and the optional supplements.

THE COURT: Yeah. Do you think the word "scandalous" is relevant at all to Rule 26 analysis? In other words, the Ninth Circuit takes some time telling us how to interpret a word, one word --

MS. MICHAEL: Yes.

THE COURT: -- that's found in the statute, but it's in its discussion about 107, right? Is it relevant to -- if there's scandal in the minutes, is there anything that -- it is protected under Father M, or is it free game for because Rule 26 and discovery?

MS. MICHAEL: Your Honor, I hesitated because I think

the word "scandalous" is only relevant to the Rule 26 analysis under Father M if the party seeking to keep the documents private is including that in their allegations of particularized harm that they would suffer. But I don't think that is the standard under Rule 26. I think what Father M makes clear in its discussion of the personnel files is that as to documents produced in discovery, Section 107 is not the standard.

THE COURT: But am I correct the priest in -- I've got my Fathers M and D mixed up, but one priest had retired. One was still active. And the one who was active focused on the scandal and lost. Right. He lost the argument at the Ninth Circuit because he was still involved in the ministry.

So I think what I'm having trouble is reconciling these two tests. It seems to me that, if it's scandalous, it's scandalous. So do you do the three part, the two-and-a-half part or the three-part test, even if it's scandals?

MS. MICHAEL: Yes. I think that under Father M, if it's a document produced in discovery and under Rule 26, that -- I agree, I get which Father M or Father D confused.

THE COURT: Well, we have a retired father --

MS. MICHAEL: Yes.

THE COURT: -- and an active father. So we can look it up in the decision and --

MS. MICHAEL: So yeah.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 48 of 118

THE COURT: Okay. But the one who was active, he is the one who lost at the court of appeals, right?

MS. MICHAEL: Yes. So ultimately, what the Ninth Circuit ruled was for the active priest, even though that potential scandal was what he argued as the particularized harm, the public interest in step two outweighed that particularized harm.

For the retired priest, that's where the Ninth Circuit got to the third step of their two-step test, which was to say the document could still be made public, but his individual name would be redacted in that document.

And here the documents we are seeking to be made public already have the names redacted.

THE COURT: But the trial judge, the bankruptcy judge, allowed the scandalous words to the public, and the Ninth Circuit reversed her decision on that because it interpreted the word scandalous to be literally the way the statute reads it. And that's one of the things I find difficult working my way through the case.

So in our case here, if the words -- and certainly, it would seem to me that the -- I'm trying to -- I'm trying to think. Well, let's try it a different way. I tell you what. I'm going to let Mr. Pascuzzi tell me what he thinks about how -- and we all have to agree that I am bound by the ruling of the Ninth Circuit, unless it's distinguishable. But when

the Ninth Circuit tells me how to interpret a word, one word of English language, I think I have to follow that interpretation. I don't get to apply a different interpretation depending upon whether it's a Rule 26 or a statute, I don't think.

MS. MICHAEL: Well, I think the Ninth Circuit told you how to interpret both of those. So in Father M, the Ninth Circuit essentially says three things. They said that as to documents produced in discovery --

THE COURT: Right.

MS. MICHAEL: -- it is not the word scandalous under Section 107 that controls. And that's how --

THE COURT: Even though it is scandalous?

MS. MICHAEL: Right.

THE COURT: So that's the anomaly, isn't it? Even though something, by anybody's definition, would find that statement scandalous, it's free game because it's not governed -- because it wasn't filed in a court? That seems so technical.

MS. MICHAEL: It does, but it is what the Ninth Circuit ruled because in the Ninth Circuit's ruling, it allowed three things to happen. It allowed the unredacted personnel file to be made public.

THE COURT: Correct.

MS. MICHAEL: It allowed the second personnel file to be made public, with the names and just the names redacted.

And then it denied making the punitive damages pleading public.

THE COURT: Which I have never read. Have you ever read it?

MS. MICHAEL: It's not public.

THE COURT: It's not public, but if somebody thought it was scandalous.

MS. MICHAEL: Well, and that's where the Ninth Circuit itself made this distinction between a pleading, such as the punitive damages memo, and the documents produced in discovery. And that's why the Ninth Circuit itself had two seemingly opposing results in its own decision.

THE COURT: Well, as a trial judge, I have to follow it. But sometimes, it's difficult to follow if it's almost defies common sense to see a word that means something until it doesn't mean that. There's something wrong with this picture and that I'm struggling with so --

MS. MICHAEL: Yeah. And that is why, from our perspective, what Father M instructs because it means that until it doesn't, the Section 107 and the term scandalous are not the relevant analysis for documents produced in discovery, such as the IRB documents. It's only the relevant analysis for pleadings, such as the punitive damages mention.

THE COURT: But to conclude -- again, I'm going to let you sit down on that point. Exhibit A is not something -- exhibit A had its source from filed documents, but there's

nothing scandalous about it, even though it names people who are identified as perpetrators. But it doesn't -- I mean, beyond that, it's hard to know -- certainly no conduct of the survivors could be deemed scandalous.

And so it is simply the conduct attributed to the perpetrators might be scandalous, but it doesn't matter because under this Rule 26 third-part test, you believe that the opponents here of disclosure, who are the diocese, that they haven't met their particularized harm test and that the fact that the so-called confidential memo that none of us and the public or outside of the actual Portland bankruptcy case saw access to that document. It's sealed because it was scandalous.

MS. MICHAEL: Yes, Your Honor.

THE COURT: Okay.

MS. MICHAEL: It's not the clearest guidance, but based on the results of the Ninth Circuit's decision, that seems to be the standards and the way they split their review of those documents in front of them.

THE COURT: Okay. So but one more point. I keep promising you --

MS. MICHAEL: Yeah.

THE COURT: -- I'm going to let you sit down, and then I promise to ask you another question. Does the committee still believe that it has the right under whatever doctrines

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 52 of 118

you apply to that I could order the diocese to add a committee member to the IRB? That seems to be a stretch. Are you still adhering to that view as something you think is appropriate?

MS. MICHAEL: No, Your Honor. And that's not something we are currently or have ever asked of yo9u.

THE COURT: Well, it's in your motion.

MS. MICHAEL: It is not.

THE COURT: It's not? Well, I thought it was. Then why did I read that that's one of the things you want?

MS. MICHAEL: In our motion, we outlined the history of our negotiations with the archdiocese on this issue. In an attempt to not have to bring this to the Court, it was one of the of the initial measures we asked for. It is something that has been done on a consensual basis in other diocesan cases.

THE COURT: Okay. But you're --

MS. MICHAEL: But I do want to be perfectly clear of what we are asking the Court --

THE COURT: By the way, one thing that I read for a while, and in fact, Mr. Pascuzzi made in his brief a statement that I didn't think was true, and that is that you are asking for this so-called list that the diocese maintained, but then, in fact, you didn't ask for such a list. And so you're now conceding the fact that maybe I just overlooked it because I focused on the history of the list that either exists or doesn't, but you're not asking for it, the member you want to

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 53 of 118

add from the committee to the IRB, which you now concede you're not seeking.

So I got it. I don't have to worry about it. I was prepared to say I wasn't going to authorize that because I didn't think there was any authority to do it. But we're in agreement.

MS. MICHAEL: Yes.

THE COURT: So it's a nonissue?

MS. MICHAEL: Yes. To be clear, the only things the committee is asking for in its motion is for the confidentiality demarcation on the IRB minutes to be removed and --

THE COURT: But the portions of them that are redacted stay redacted, right?

MS. MICHAEL: Yes, Your Honor.

THE COURT: So if I were to grant your request, then exhibit B, you'd be free to disseminate, but in a redacted form?

MS. MICHAEL: Yes, Your Honor, and that's the only form we have it in.

THE COURT: Well, but I have --

MS. MICHAEL: Yeah.

THE COURT: -- been provided on a confidential basis the unredacted version.

MS. MICHAEL: Unless the archdiocese provided that to

you, what we provided you was the redacted version that we received that has no perpetrator names in it.

THE COURT: Why do I have some highlighted portions of the IRB minutes with yellow highlight? That's usually the way I get seen -- I get documents that are sealed but unredacted to the Court. Did I get something I wasn't supposed to have?

MS. MICHAEL: I --

THE COURT: I'm not going to show it to you.

MS. MICHAEL: Yes. No.

THE COURT: But take my word for it.

MS. MICHAEL: Yeah.

THE COURT: This is exhibit B.

MS. MICHAEL: If there are highlights in it, then it is because there were portions in the version that the committee received that had original highlighting --

THE COURT: Well, look, look --

MS. MICHAEL: -- in it, but those were not meant to be redactions.

THE COURT: Look, I'm going to show you something. Okay. There is a page that has the word redacted on it.

MS. MICHAEL: Yes.

THE COURT: But I also have pages which I'm going to hold up but not let you read. I'm going to have -- oh, one second. I'm looking at the wrong version of it. I have several paragraphs that are highlighted in yellow, which is

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 55 of 118

usually the way I get the unredacted portions of sealed documents.

MS. MICHAEL: I apologize, Your Honor. I don't have those documents in front of me. I didn't want to bring any documents that we filed under seal into the public courtroom, but my best guess as to why those are highlighted in yellow is those are the portions that we refer to in our motion. But our request in the motion is simply to take the confidential marker off of the pages as we receive them, which, from our understanding and from the archdiocese, we receive those with all perpetrator names either in initials or redacted and all survivor names redacted.

THE COURT: Well, there's at least one person who is named throughout there.

MS. MICHAEL: If there are any names that --

THE COURT: But that's the name that also shows up on exhibit A.

MS. MICHAEL: Okay. Then if the Court is -- if the committee is allowed to make these documents public, before we did so, we would give the archdiocese an opportunity to review it again and make sure that they did not miss any names when they sent us the redacted version.

THE COURT: Well, I'm going to -- I'm just going to -- I'm not going to let you leave without clarifying what I'm saying. I promise you, although at the moment, for some

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 56 of 118

reason, I can't locate it in the pile of papers that I'm up here on the bench with, I absolutely read a portion of what you filed that had been highlighted in yellow because it's a little harder to read.

MS. MICHAEL: Yeah.

MS. GREENWOOD: Your Honor, I'll confirm that I believe that the highlighted portions are simply what was referred to in the motion, and therefore those were to call your -- because there were so many pages that were submitted as exhibit B, whereas only a few items were referred to in the motion, I believe those were highlighted to direct your attention to it. They are not something that was redacted. That's how they -- that is how the committee received -- the committee received them without redaction.

THE COURT: I am a little confused here.

MS. MICHAEL: Can I back up and try and lay out what I believe is happening?

THE COURT: The brief?

MS. MICHAEL: Yes.

THE COURT: The committee's motion, which has the usual arguments and so on, that has --

MS. MICHAEL: Yes.

THE COURT: -- highlighted portions? Okay.

MS. MICHAEL: So --

THE COURT: You're saying those are not -- those

excerpts are in fact redacted in the actual exhibit B?

MS. MICHAEL: So let me back up. I think there's a few different issues here.

The committee's motion that you received, the unsealed version, the parts of that that we filed with redactions were highlighted on the motion. For exhibit B, the committee received everything included in exhibit B, with redactions already from the archdiocese.

THE COURT: Yes. Yes, which --

MS. MICHAEL: The representation we received from the archdiocese is that perpetrator names were redacted or initialed, and survivor names were redacted, as well as attorney-client privilege or other --

THE COURT: Some of the perpetrators, their initials --

MS. MICHAEL: Yeah.

THE COURT: -- were shown? But --

MS. MICHAEL: And then the highlighted portions in the version you received of exhibit B was simply, as Ms. Greenwood said, to draw your attention to the portions of exhibit B that we discuss in the motion so you didn't have to sort through all of the paper to get to those portions. So the highlights in exhibit B do not relate to redactions.

THE COURT: But what about the highlights on the brief, the motion?

MS. MICHAEL: Those do relate to redactions.

THE COURT: Huh?

MS. MICHAEL: Those do relate to redactions. So those are portions that the public did not see of our brief.

THE COURT: But I did see them.

MS. MICHAEL: But you did see because they discussed the documents that are currently confidential.

THE COURT: Listen, I'm going to -- we're going to get this straightened out.

MS. MICHAEL: Yeah.

THE COURT: But maybe after the hearing. I'll tell you, let's make it clear. I will make no decision today about exhibit B. You've conceded that the committee doesn't seek to put anybody on the board. So the thrust of the committee's request is as to B is to make it available unprotected.

MS. MICHAEL: Yes.

THE COURT: And I'm not going to do -- whether I unprotected or -- well, if I keep -- if I deny your request, it's academic. But if I grant your request, I'm going to -- I'm going to clarify this, but I have to tell you that I'm looking right at the brief that has the heading unredacted version of proposed redacted disclosure motion. So if I -- well, that's what's confusing, and I'm glad that I didn't read any of these aloud. I did read it on my own.

But if it's really a question of something that --

well, never mind. I'm not going to act on this exhibit today. I'm going to listen to what the debtor has to say and what you have by way of closing argument. Okay.

MS. MICHAEL: Your Honor, I will just leave by making very clear what the committee is asking for today. The committee is asking for the removal of confidential from exhibit B, and the committee is asking for the ability to publicly disclose the exhibit A. And the committee is not asking the Court to rule that the archdiocese do anything. Is not asking for the Court to require any actions of the archdiocese. It is simply asking for the ability to make exhibit A and exhibit B available to the public in furtherance --

THE COURT: But you are willing, if I insist on it, to go through at least the preliminary step of giving the survivors an opportunity to be heard on the fate of exhibit A?

MS. MICHAEL: Yes, Your Honor.

THE COURT: Okay. Okay.

MS. MICHAEL: Thank you.

THE COURT: Thanks very much.

Mr. Pascuzzi -- or I'm sorry. I'm sorry. You're going to make the argument? I kept referring to Mr. Pascuzzi, and I --

MS. COTTRELL: It's okay, Your Honor.

THE COURT: -- overlooked the fact that he identified

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 60 of 118

that you were doing -- just repeat your name so --

MS. COTTRELL: Amanda Cottrell for the debtor.

THE COURT: Okay. And --

MS. COTTRELL: I'm with Sheppard Mullin.

THE COURT: No, thank you. And I'm not going to hold you to any strict time limits. I apologize for the confusion here.

MS. COTTRELL: I appreciate that, Your Honor. I want to start with your last question to Ms. Michael about what standard applies. I think Your Honor honed in on the specific question, and it's very clear. Father M, which is decisional in this case, the Ninth Circuit is clear that it distinguishes between documents that are filed with your staff in this court --

THE COURT: Like proofs of claim.

MS. COTTRELL: And like the IRB minutes that are currently filed under seal, exhibit B, on your stand.

THE COURT: But they're not -- so they are "not filed"?

MS. COTTRELL: No, they're very much filed.

THE COURT: Well, okay. But --

MS. COTTRELL: There's a redacted -- there's a redacted motion that has an attachment that's a pleading in this proceeding. 107 doesn't parse between file but not seal, and that would make no sense because all of the documents in

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 61 of 118

Father M that were seeking disclosure were filed under seal.

The sealing order is not the distinction. It's whether or not the documents were simply in the lawyers' filing cabinet as unfiled discovery, never to be filed with the court, sealed or unsealed, or they were filed. And the Ninth Circuit's very clear there's two different standards.

So taking it in order, we have the exhibit A, what the committee counsel has prepared, is an aggregated claim summary.

THE COURT: Right, but extracted from the proofs of claim, right? Agree?

MS. COTTRELL: So 107 controls.

THE COURT: Can you agree with me that?

MS. COTTRELL: 107(a) and (b) controls, as does this Court's bar date order. We already have a controlling order in this case.

THE COURT: Right. But what specifically does 107 dictate must remain private?

MS. COTTRELL: For the claims data, sir?

THE COURT: Hmm?

MS. COTTRELL: I didn't hear your question. I apologize.

THE COURT: Well, you're saying that 107 controls. But therefore what? What doesn't get public?

MS. COTTRELL: So when it comes --

THE COURT: Because the presumption still is public

unless, public unless, scandalous or defamatory.

MS. COTTRELL: Understood. So --

THE COURT: Right? Isn't that what 107 says?

MS. COTTRELL: 107 supplants the common law.

THE COURT: Right.

MS. COTTRELL: And 107 controls. And you're right. Public access, unless one of the three exceptions apply. And the exception that applies here is scandalous or defamatory. 107(b)(2).

THE COURT: Correct. That's what I just asked back to you. Okay.

MS. COTTRELL: And the Ninth Circuit has defined scandalous, that's what you focused on, just based on the dictionary definition. It actually rejected the lower court's definitions.

THE COURT: Correct.

MS. COTTRELL: Now, you said earlier, the Court might not know what that punitive damages memo entailed.

THE COURT: Why would --

MS. COTTRELL: We can't read it. But the Ninth Circuit describes it in detail. In the beginning of that opinion, it tells in the public that it was a filed memorandum.

THE COURT: And by the way, I have it sitting here but --

MS. COTTRELL: So it's --

THE COURT: -- where are you reading in the decision?

MS. COTTRELL: It's at pincite 422.

THE COURT: Yeah. Okay.

MS. COTTRELL: And it's the grammatical paragraph beginning, "In connection with the negotiations to settle the damages claims".

THE COURT: Yes. Yes, I'm reading it.

MS. COTTRELL: The memorandum summarized the pattern and practices evidence and the punitive damages evidence in support of the estimation of five unresolved tort claims. The memo included attachments, twenty-seven priests personnel files, including these two, deposition excerpts, and documents, and they were filed under seal.

So when considering that motion, it's quite analogous to the IRB minutes. The IRB minutes, the committee admits in its motion, goes to the investigation of the pattern and practices of child abuse allegations. And the Ninth Circuit holds definitively that, whereas here, there's a document that includes allegations that a priest or clergy has abused and sexually assaulted a child. That is scandalous. And that's the law of this circuit that the Court must follow.

THE COURT: But it was scandalous, but they still allowed it for disclosure for the priest who was not retired.

MS. COTTRELL: Only as to his single personnel file. There is no motion before Your Honor to publicly disclose any

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 64 of 118

of the alleged perpetrators' personnel files. We are before the Court on internal minutes for a ministerial church purpose. This is governed by church canon law. Its ecclesiastical norms. As a matter of church law, they are required to have an internal review board for this purpose.

The internal review board has limited scope insofar as it's confidential. It's a deliberative body. It's comprised of several members. These are former police personnel. People involved in victim assistance. There's been former judges. Right. This is an independent body that reviews allegations and makes recommendations for whether these priests can have faculties with the church and they can serve in ministry. It is an internal --

THE COURT: No, I understand that. I understand that.

MS. COTTRELL: -- deliberation for how the church is going to run the church.

THE COURT: And it discloses some of those deliberations?

MS. COTTRELL: And it discloses some of the allegations of sexual --

THE COURT: And if I'm not mistaken, it exonerates one individual, who otherwise appears on exhibit A as a perpetrator.

MS. COTTRELL: I would agree with Your Honor.

THE COURT: Pardon?

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 65 of 118

MS. COTTRELL: I would agree with Your Honor.

THE COURT: You agree?

MS. COTTRELL: With that last statement of yours.

THE COURT: You agree?

MS. COTTRELL: That the committee has identified and by name in their motion, not redacted, a priest who's retired. He's older. And they call him out by name as sort of the focus of the relief requested.

THE COURT: Right.

MS. COTTRELL: And the review is without any investigation or adjudication that because the IRB ran a process that they disagree with, they want to publish all of the IRB minutes.

THE COURT: No, no, but I think you are agreeing with me, right? In other words, the IRB minutes reflect the fact that the membership, that board, chose to leave -- not, I mean, still leave in good standing at least one individual, who I'm not -- whose name I'm not going to repeat, but who is named on the committee's exhibit A?

MS. COTTRELL: That's correct.

THE COURT: Okay. So therefore, that deliberative body chose not to discipline or whatever is -- depublish or whatever the right word is. Chose not to take that individual off the rolls. And therefore, that's consistent with what you're saying they do, right? Right?

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 66 of 118

MS. COTTRELL: It's consistent that they have to make a determination.

THE COURT: It's consistent that they have to make a determination, and they made a determination. And that's one of the things that you want to protect because it's their deliberations as an internal managerial entity that's of a creature of the church's management, if you will.

MS. COTTRELL: Exactly. Church autonomy --

THE COURT: Yeah. Yes, yes. Right.

MS. COTTRELL: -- in a ministerial act.

THE COURT: Right.

MS. COTTRELL: Your Honor, the overarching issue in this motion, in addition to those First Amendment issues that we're flagging, is that it's simply not for a bankruptcy purpose. It's not focused on any objectives in this proceeding. This Court's jurisdiction is --

THE COURT: Yeah, well, that's true. But I mean, some people about the survivor statements, too, but --

MS. COTTRELL: But let's focus on what courts have said about this issue in similar situations and agreeing with the debtor's position and opposition. 105 is not a roving mandate to do equity. It has to be tied to something in the Bankruptcy Code. Now, in the Milwaukee case, years after that bankruptcy case had closed, the State of Wisconsin --

THE COURT: No, I what -- yeah.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 67 of 118

MS. COTTRELL: Yeah. Intervened, wanting --

THE COURT: I read that.

MS. COTTRELL: -- to get the same sealed proof of claim information. Among the defects in that motion is that the bankruptcy court there said 105(a) is not a roving license to ignore the binding effect of previous orders, like it would be this Court's bar date order that protects the proof of claim forms and the supplemental proof of claim form.

Your Honor, just to note, in your controlling order from November 21st, 2023 on this issue --

THE COURT: You need to turn your phone off, please, ma'am. Let's wait till she gets that turned off.

UNIDENTIFIED SPEAKER: Sorry.

UNIDENTIFIED SPEAKER: It's okay.

THE COURT: It's all right. It happens. It's happened to me.

MS. COTTRELL: Your Honor.

THE COURT: But I don't hold myself in contempt, nor you.

MS. COTTRELL: So in the November --

THE COURT: You're talking that November 21st order, docket 337.

MS. COTTRELL: Yeah, 337, Your Honor.

THE COURT: What paragraph?

MS. COTTRELL: Page 8. It's 18(d). "The court sets

out the it has already previously defined that permitted parties that can use the survivor proof of claims and any confidential information from those proofs of claims in the supplemental claims form. And it sets out the purposes. Its connection with the valuation, prosecution, and defenses of claims in this proceeding. Other contested matters in this proceeding, insurance/reinsurance coverage issues, settlement negotiations, and mediations. It is never contemplated in the order that this confidential information would be published, despite the strictness of confidentiality promises throughout the motion, the hearing that devolved into the Court's order that we've looked at.

THE COURT: And how is the -- how is the diocese harmed if I disclose it -- if I authorize this? How is your client hurt, harmed by doing it if the survivors consent? And you need.

MS. COTTRELL: Yeah. Let me think about it. No, I understand your question.

THE COURT: I don't believe the committee used the word "standing", but I'm going to use the word "standing". Where is the diocese standing to complain about the protections that were there to protect the survivors? And maybe the survivors consent to the disclosure of what I'll call the extracted data. How is this -- how is the diocese harmed by my allowing that to happen?

MS. COTTRELL: Understood. Your Honor, I don't think that the protections of confidentiality, once entered, only benefit the survivors. I know there's repeated statements that the committee is focused on. But ultimately, the parties negotiated this order and agreed to the entry. And this information was to be kept confidential.

But the harm, let's focus on the exhibit A and some of the observations. Many of the proofs of claims are just signed by lawyers. They're not signed under penalty of perjury. And this exhibit A is drafted by lawyers. It's drafted lawyers' interpretation of what those 500, 550-plus proofs of claims say.

THE COURT: I'm going to interrupt you there. I'll accept your representation that the proofs of claim might be drafted by lawyers. But you, as the diocese lawyer, have access to those same proofs of claim, and you can make sure that what the committee has extracted on exhibit A is consistent with the information in the proofs of claim.

So it isn't as though they're pulling a fast one on you. You can see that they got it right, and if they counted the wrong church or they counted the number of incidents or they counted the number of times a particular priest was identified and they got it wrong, you're there to correct it if you want to. It's the same -- it's 537 proofs of claim, but if there were only two proofs of claim, you could pull out the

data from two proofs of claim if you can pull it out from 527 proofs of claim. Right?

THE COURT: There might still be some interpretation disputes, but accepting that proposition, to answer the Court's direct question, you asked Ms. Michael about this idea of, if claimants don't know about this process, how would they be harmed. And I want to focus on her answer because that directs harm at the debtor.

THE COURT: Okay.

MS. COTTRELL: She answered that, well, Your Honor, we're not putting the age of the person today. That's not stated. The date of the alleged event, that's something that's not stated. There's vagueness. Her answer to the Court was court was the vagueness of some of the information is what ultimately answered your hypothetical question of what do we do in the parish where there's one victim and one accused.

And there's an issue that the Court identified, and the answer from the committee counsel focused on the vagueness. But that same vagueness, the exhibit A is presented to the Court, which is all you have before you, it harms the debtor because it doesn't identify the age of these allegations and the temporal distance from present times.

THE COURT: But the debtor knows the age.

MS. COTTRELL: Yeah, but the public doesn't. The whole purpose, Your Honor --


Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 71 of 118

THE COURT: No, that's true. I agree.

MS. COTTRELL: -- is not to inform the debtor, not to inform the committee or this Court or any of the claimants on the proofs of claims. Your Honor, the general public is not a creditor or a party to this action --

THE COURT: No, that's true.

MS. COTTRELL: -- and they're the only stated beneficiary of this motion. But the harm to the debtor --

THE COURT: Well, but that's not a -- that's not a -- that's not an insignificant fact, given the policy of openness and if you want to use the current word "transparency" of court proceedings and certainly the philosophy of Section 107.

MS. COTTRELL: I would agree with you.

THE COURT: Okay.

MS. COTTRELL: But what court proceeding is this relief for? We don't have an adversary proceeding. We don't have an upcoming hearing. They don't want to de-designate for an evidentiary proceeding or a deposition. It is in a vacuum that they want to take the materials produced and now filed with the Court under confidentiality and seal and publish them for the entire world.

THE COURT: So what's the harm?

MS. COTTRELL: The harm is, is that that the exhibit A is misleading. The harm is, is that this information doesn't

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 72 of 118

identify the distance and time. I think it's still subjective. And then it's damaging to the list of the accused. Your Honor --

THE COURT: I'm sorry. Say again.

MS. COTTRELL: It's damaging to the names on the list. These individuals haven't been adjudicated. They didn't come in and in and litigate their claims. And it just says one parish. They'll have one list. And just like you said, well, can't someone identify one victim and one parish in the high school they all went to? Well, you could do the same thing with the priests. And then you start these very vague allegations of harm.

And so it fits right in with Father M is that it meets the definition of 107(b)(2), which is these are allegations against these priests. And it's scandalous under the Bankruptcy Code's definition.

Your Honor, you said earlier to Ms. Michael, are you asking me to compel the debtor to publish a list of credibly accused? And she said no because they've created one. They created a list of accused for the proofs of claim, and they want the Court to publish that list.

THE COURT: Well, I don't think that's a fair statement. By the way, Ms. Cottrell, it was actually in a brief on your side that criticized the debtor for doing what the debtor isn't doing. And so I talked specifically -- and

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 73 of 118

give me a second, and I'll show you. Maybe you know what I'm referring to.

I'm looking at document number 1028. That's the debtor's opposition. And it says that the sole purpose of the committee's motion is to override the debtor's First Amendment rights -- I'm skipping some words here -- and post on the website -- on the debtor's website, namely a so-called credibly accused priests list. But I've been reading the papers that no such list exists.

MS. COTTRELL: That's correct, Your Honor.

THE COURT: And so the statement, then, you're seeking -- at first, it was hard for me to believe that that's really true because -- and I'm not suggesting you're lying or anyone or the diocese is lying. But the diocese knows who the perpetrators -- who the accused -- excuse me. The diocese knows from the proofs of claim and the state court cases who the claimants are and who the alleged perpetrators are. And all you have to do is count, and you have a list. Now, maybe you didn't write a list on a piece of paper or on an electronic document, but if you see the names of A, B, and C, that's a list.

So I don't know whether a list exists or not. And if it exists, but only in people's minds, it's still a list. But the statement in the brief is that committee is forcing a list of credibly accused priests, and its counsel just said, no,

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 74 of 118

we're not. So how am I supposed to resolve this inconsistent terminology here?

MS. COTTRELL: Well, let me give a try.

THE COURT: Well, I mean, you gave it a try.

MS. COTTRELL: Well, can I --

THE COURT: But the point is, exhibit A is a list of credible -- is a list of accused priests. Maybe they aren't credibly accused, but there is a list there. Go ahead.

MS. COTTRELL: So in the motion filed by the committee, exhibits, I believe, G and H, the committee include correspondence. And the correspondence on January 10th of 2025, January 18th of 2025, the committee counsel demands that the debtor publish a list -- three things. Publish a list of credibly accused, put a person of their choosing on the IRB, --

THE COURT: Right. Right.

MS. COTTRELL: -- and then we remove a particular priest from the list of good standing, which is on their website, and anyone can go look.

THE COURT: Right. Right.

MS. COTTRELL: And the final letter --

THE COURT: So we got the -- we got the -- the member of the IRB is off the table now?

MS. COTTRELL: Right. The final letter on January 31st from Mr. Stang said because you won't concede these three points, and in their motion they say because Your Honor can't

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 75 of 118

compel those issues, our alternative -- and they say this beginning in paragraph 5, numbered 5, page 3 of -- absent the release of a credibly accused list to protect children -- this is their motion -- the committee believes the survivors and the public will benefit from the disclosure of the claims data and access to the IRB minutes.

So in lieu of those things that they want that they don't believe this Court can compel, there's these alternatives that that are before the Court in exhibits A and B. And exhibit A, my point was, is that they've created a list of accused that they'd like published.

THE COURT: But you're telling me there is no list of credibly accused priests. And yet the reason why it's hard for me to believe that is because whether it's an individual, you or -- what I'm getting at is this. Statistically -- no, not statistically. Historically, somebody in the records of the diocese knows the name of every priest who has ever served in the diocese, and it also knows the names of every priest who is currently serving.

So all you have to do is subtract the second list from the names in the first, and then you know all the ones who have passed away or all the ones who have left the priesthood and all the ones that have gone on something else. And then what's left can be what's left. And it may well be that the name of a priest that's still on that list, who was neither accounted for

as dead or transferred or left the ministry and gone off to be a lawyer or something else, it doesn't mean they all were credibly accused. But based upon the fact that the diocese has been dealing with state court litigation for years knows who has been accused, and it can then determine within that list which ones are credibly accused.

So if there were just discovery, a simple discovery motion, give me the list of everybody in the -- every priest who has ever served in the diocese who has been credibly accused, you could create a list, even if there none exists. Just like any other discovery request, you could make a list of people that fit a definition. Right. Why couldn't you? If I said to said to you, give me a list of everyone that's ever worked in your law firm, you personally might not know, but somebody could.

MS. COTTRELL: I agree it's possible.

THE COURT: Okay. So the point is --

MS. COTTRELL: But it's just --

THE COURT: -- it's discoverable, isn't it?

MS. COTTRELL: We've engaged in extensive --

THE COURT: Pardon? I'm sorry. Say again.

MS. COTTRELL: We've engaged in extensive discovery regarding pre-petition claims.

THE COURT: Has anybody asked you for a list of everybody who's been credibly accused?

MS. COTTRELL: They've asked if we maintain a list of credibly accused.

THE COURT: No, but I'd ask, can you give them a list? Have they asked -- have they asked if you could -- their name for me -- this is a hypothetical -- someone from either a plaintiff or the committee -- says interrogatory one. What are the names of every priest who has been credibly accused of abuse? Why couldn't you -- why couldn't that list be produced?

MS. COTTRELL: Your Honor, I think if you edited your request and you made it time limited, something that folks could research. But just accused, what does accused mean? Is this a letter? Is this a lawsuit?

THE COURT: What does the diocese consider to have been credibly accused?

MS. COTTRELL: Again, as an archdiocese, we don't use that terminology.

THE COURT: I understand, but you could.

MS. COTTRELL: We could, but we don't. And the reality is that's the issue here.

MR. GASPARI: Your Honor, might I intervene for a minute?

THE COURT: No, not right now. I'll come back -- I mean, when we're done. But I want to just continue it, and then I'll let you let you say, obviously.

MS. COTTRELL: Your Honor, so we create a list. Is

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 78 of 118

that then -- and then are we here on a second version 2.0 of the motion to publish that discovery answer?

THE COURT: No, I don't know. I'm trying to figure out what to do because again, I go through -- I read the brief and I say, well is there a list there, or isn't there a list? And then I'm told they're not looking for a list. But then you're telling me that they've actually reverse engineered a list.

MS. COTTRELL: From the proofs of claims that are filed in this lawsuit, and that information is confidential, strictly confidential, under the bar date order.

THE COURT: I know, but then we're back to --

MS. COTTRELL: 107(b).

THE COURT: We're back to do you have standing to make that argument for the beneficiaries of that confidentiality. And you gave me your answer. Whether it was a fiction or not, I don't know, but you gave me an answer. You did. I mean, you did. Of course you did.

MS. COTTRELL: I don't think the -- well, I haven't seen any of the reported case law in these other several dozen archdiocesan dioceses bankruptcy proceedings where courts found the debtor lacked standing to raise these kinds of issues in confidentiality matters.

THE COURT: Does that mean therefore it has standing?

MS. COTTRELL: Well --

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 79 of 118

THE COURT: I don't know. I mean --

MS. COTTRELL: -- for instance, Judge Lafferty in the Oakland case recently considered similar issues. We presented those transcripts. And the debtor was heard. And the court -- so and this district agreed that the information satisfied 107(b), and he didn't release confidential claims information. And that was driven by the debtor's motion.

THE COURT: That doesn't mean -- I may agree. I haven't decided. I promise you, I haven't decided this. That's why we're having this long hearing.

MS. COTTRELL: Yeah. Well, to the extent that it's a claim against the estate and there's a controlling confidentiality order, their motion doesn't seek to amend your order or modify it. I understand the Court could always do that on its own. And the relief they're seeking is to leave the order in place and without consent of any of the claimants, publish a summary list.

THE COURT: Well, you know what I thought -- what I thought the committee's motion was doing was asking, like, a comfort order. They said something like that, sort of a clarification -- or not the word. Let me get the word used correctly. It has serious concerns. No, I'm sorry. Excuse me.

Well, I don't want to sit here and try to read something, but I thought in the preamble to this motion, it was

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 80 of 118

sort of like we're kind of -- we think we can disclose this, but we just want to clarify that maybe we can.

Now, the gentleman that wanted to speak. I'm sorry, now I --

MS. COTTRELL: Can I just -- before Mr. Gaspari comes up, I have a point I want to make sure I emphasize, Your Honor.

THE COURT: Yes.

MS. COTTRELL: 107(b), if it applies, if the exception applies this is scandalous material, the case law says it's without exception. You don't then balance public interest in the data. Father M said that specifically, as do the other cases cited by the committee.

The Anthracite case says the court is required to protect the information and has no discretion to disclose once the information fits within one of the categories of 107(b).

Father M states on page 431, "Under Section 107, the strengths of the public's interest in a particular judicial record is irrelevant. If the exception pertains, the bankruptcy court must issue a protective order."

THE COURT: Wait. I'm sorry, which case is that?

MS. COTTRELL: Father M.

THE COURT: Oh, that's out of the Father M? Okay. I thought you were --

MS. COTTRELL: On page 431.

THE COURT: -- citing another case. Excuse me.

MS. COTTRELL: The In re: Anthracite, 492 B.R. 162. It's the Southern District of New York bankruptcy case from 2013 the committee cites in its reply says the bankruptcy court has no discretion once one of the exceptions to 107 apply.

THE COURT: That's not cited in your --

MS. COTTRELL: No, they raised it in the reply brief that was filed in this proceeding.

And Your Honor, I would like to point out one additional comment before Mr. Gaspari stands up.

The stipulated protective order defines confidential information, capital C, capital I, for discovery materials. So in your hypothetical, you said, well, couldn't they just serve an interrogatory? The stipulated protective order would apply to that interrogatory. The parties, with the Court's assistance, define confidential information. And in paragraph 12, we define confidential information to specifically include for discovery materials the Court deems fits 107(b).

The parties entered in that order knowing what Father M says. We incorporate it into the disclosure of discovery materials the 107(b) standard, and that's the controlling order that's in this proceeding. And so what --

THE COURT: Tell me again the paragraph number of the --

MS. COTTRELL: It's paragraph 12 of --

THE COURT: 12 of the protective order?

MS. COTTRELL: -- stipulated protective order, which is --

THE COURT: No, I understand.

MS. COTTRELL: -- docket 370.

THE COURT: No, I know what it is. I'm just trying to keep up with what you're saying to keep my notes because I have the protective order here, and I've gone through it. But I didn't remember the paragraph number. Okay.

Now, I want to let the gentleman speak. You can just stay there. Just identify yourself and make your --

MR. GASPARI: Thank you, Your Honor. Paul Gaspari, state --

THE COURT: Oh, Mr. Gaspari, I just didn't recognize you. Sorry.

MR. GASPARI: No problem, Your Honor. And relative to your -- I just wanted to address your question, why can't there be a simple interrogatory that you would then answer. Really, two points. One, in the context of this courtroom, and again, I don't want to tread on Mr. Cottrell's bankruptcy expertise, of which I have none, but there would be no bankruptcy purpose for answering such an interrogatory --

THE COURT: Well, if you're not going to use bankruptcy expertise, why are you citing a bankruptcy principle?

MR. GASPARI: Well, but I wanted to do was say in

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 83 of 118

state court -- and that's where I've litigated these cases in --

THE COURT: Right. Understood.

MR. GASPARI: -- state court -- there would be an objection to that question based upon the California doctrine of not reasonably calculated to lead to admissible evidence because in each one of the individual cases, all that is relevant is what the archdiocese knew or did not know about a particular perpetrator. We've litigated this --

THE COURT: But that's an ultimate question, isn't it?

MR. GASPARI: But we've litigated this over and over and over again in state court --

THE COURT: Okay.

MR. GASPARI: -- and would not be required under California law to just disclose anybody that's been accused over the past thirty years. It's got no relevance to a particular -- to a particular state court action.

THE COURT: Okay. Well, all right. I appreciate that.

MR. GASPARI: Thank you, Your Honor.

THE COURT: All right. Ms. Cottrell, do you want to add anything further?

MS. COTTRELL: I just have a final point, Your Honor. In the reply, the committee says that they withdrew their request. The IRB minutes, exhibit B, can stay sealed. And I

would just submit that if it's satisfies sealing doctrine in doctrine in the Ninth Circuit, then it certainly means that the information is satisfying 107(b). And that was the statement in the reply, that they're no longer seeking to unseal exhibit B. And so I think, as of today, that's a problem in terms of they've clawed back some of their relief.

THE COURT: I'm sorry. I just missed the point again, you're making. We had this confusion that I've had with exhibit B. What's redacted, and what isn't. I understood that what the committee wants to do is to take off the limitations on what was stipulated to. This would be a confidential document but that they would now be free to disseminate it, but they couldn't unredacted it. And I thought that that's what --

MS. COTTRELL: Well --

THE COURT: -- their counsel conceded the point. They're not seeking to unredact. They're just seeking to unseal, if you will, the document.

MS. COTTRELL: Well, my point was slightly different, Your Honor, which is that it is currently filed in this proceeding under seal. And there's a standard for sealing, and nobody has opposed the sealing. We all agree that it should be sealed. And in their reply, they took back some. They said we want limited relief. We only want you to remove the redaction, and exhibit B can stay sealed.

And I'm just pointing out that that's inconsistent

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 85 of 118

because if it's a sealed document, 107(b) controls. It's scandalous. It needs to be protected. And I just wanted to point out that issue. I understood your earlier question to them being focused on that issue in their reply.

THE COURT: Okay.

MS. COTTRELL: And finally, Your Honor, in the reply they cite, beginning in footnote 9, a list of state court orders, mostly from New York state courts, their orders from state trial courts in single-plaintiff actions of personal injury cases for orders to compel. They're principally orders where the plaintiff against a priest or the diocese in that case, they're seeking an individual priests' usually a psychiatric, medical evaluation.

But I wanted to end with this, Your Honor, because the cases largely prove a point. This isn't a motion to compel. They have the files. We are not here saying that the committee is not entitled to the records. We've produce them after much objection. We wrote written objections to them. But after many weeks of conferrals, we agreed to produce them as confidential under the protective order. So there's no lack of information for the parties in this case to mediate and address the issues that the Court's considering.

THE COURT: Correct. Correct.

MS. COTTRELL: But in one of the orders that they cite, I'm going to say it wrong, Your Honor, but it's the

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 86 of 118

Lisiecki v. The Roman Catholic Archdiocese of New York. The first, it's L-I-S-I-E-C-K-I. State court order concerning a concerning a Father O. And they wanted his medical records and tests. And what's interesting is that decision distinguishes between that medical record that doctors write up and the review board minutes.

In that order that they cite to the Court, the state court says that this medical record, it doesn't itself contain internal church communication. It references medical tests. It's on the clinic's letterhead. It emphasizes that a doctor wrote it, and he doesn't have any decision making authority within the church over the father. He's not part of the Archdiocese of New York. But that Lisiecki's order that they presented to Your Honor ends with:

> "The defendant is correct that the issue of whether the church complied with its internal policies is beyond this court's ambit. The only stated reason for the Court to disregard 107(b) protection is an improper purpose. They want -- the court" -- or "the public", pardon, "to publicly assess the IRB process and determine court of public opinion what the public thinks about that internal process at the church."

There's no bankruptcy purpose. There's no nonbankruptcy judicial purpose for releasing this information. And we ask, Your Honor, that you deny the motion in its

entirety. Thank you.

THE COURT: Okay. Thank you very much.

Ms. Michael, closing remark.

MS. MICHAEL: Your Honor, to start with, again, I want to focus on the two different buckets of documents we're talking about or information we're talking about here. The archdiocese interpretation of Father M does not explain Father M's decision to allow those personnel files to be made public.

If Section 107 applies to any documents or information in the case, then that interpretation does not reconcile with the treatment of the personnel files under Father M. Here, the IRB minutes, just like the personnel files, are documents that were produced in discovery. They are not pleadings in this court. And the only way for the Father M case to make sense in its various outcomes is to see the distinction between documents that are produced during discovery and pleadings in the court.

Additionally, opposing counsel noted that the parties entered into the protective order knowing what Father M says. What Father M also says on pincite 424, the third paragraph in section 2(a) is --

THE COURT: Hold on. Hold on. Let me just get it with you. Got my Father M decision here. 424?

MS. MICHAEL: Yes.

THE COURT: Okay.

MS. MICHAEL: Paragraph starting, "While courts generally make a finding of good cause".

THE COURT: Yep.

MS. MICHAEL: Says, "when a protective order was a stipulated order and no party has made a good cause showing, then the burden of proof remains with the party seeking protection. If a party takes steps to release documents subject to the stipulated order, the party opposing disclosure has the burden of establishing that there is good cause to continue the protection of discovery material."

From there, the Ninth Circuit goes on to outline its two-step process of determining whether there's good cause to continue protection of discovery of the material. So regardless of any stipulated protective order in the case, it does not make the archdiocese immune to having to meet that two-step process under Father M to keep the IRB minutes protected.

THE COURT: Okay.

MS. MICHAEL: And lastly, because there has been a good deal of confusion, I want to state on the record clearly as to the IRB minutes exactly what the committee is asking for. The committee is asking for the documents filed as exhibit B to have the confidentiality mark on those documents removed as they are. That is the sole request the committee is making as

to exhibit B.

THE COURT: So I have a copy that I just took from the binder that you gave me that is exhibit B. And where do I find the word "confidential"? Where do I find the label? I see, on the very first page, is a title page. "Archdiocese Independent Review 2015". Then it's the bylaws. And then a couple of pages with, like, a heading. And then there is the information of the members of the board with some redactions.

MS. MICHAEL: Yesa.

THE COURT: Now, perfectly reasonable redactions, like the phone numbers and cell numbers of members of the board. But you want that removed or left redacted? What are you -- what are you asking for? Do I redact these members' phone numbers?

MS. MICHAEL: No, Your Honor, the committee is not asking for any redactions to be removed from those documents so --

THE COURT: And what would I do if I wanted to produce the finished product that in your mind should be available to the public?

MS. MICHAEL: At the bottom of the page, there should be, with the Bates stamp, a confidential --

THE COURT: Confidential, subject to mediation privilege?

MS. MICHAEL: That is all we are asking to be removed.

THE COURT: And that would -- at least if the local media got a hold of it, they would know they still can't get the members phone numbers --

MS. MICHAEL: Yes, Your Honor.

THE COURT: -- because it's redacted?

MS. MICHAEL: Yes.

THE COURT: Okay. And then let's get into some more specifics, and now I'm going to again move to a portion of it where there's a discussion about the deliberations and the identifications of somebody. So do you have a physical copy of it yourself?

MS. MICHAEL: I do not, Your Honor. I didn't want to bring any confidential documents into the courthouse.

THE COURT: On a page -- on a page with a Bates number of 73790, there is minutes of a meeting in January of 2018, and there is in pink up at the top the word confidential. But then in the text, there are some other words that are pinked out. So do those get left pink, or do they come off under your request?

MS. MICHAEL: Your Honor, we would not be requesting to alter the minutes as they were given to the committee at all. The highlights that the committee added for the Court to assist the Court in identifying the sections we referred to in our motion --

THE COURT: No, this isn't the yellow mark.

MS. MICHAEL: Yeah. Those, we would remove.

THE COURT: This, again, I'm going to hold it up so you so you can see it. Great big words. Redacted. So you don't want to remove redacted.

MS. MICHAEL: No.

THE COURT: But down here, there's something that's pink. One word, which I can't even read, but I think it says confidential, but I don't know what it says. Does the pink say uncovered or come off?

MS. MICHAEL: Yes, the committee would not be altering the minutes at all from the format in which the archdiocese produced them to us.

THE COURT: Did the Archdiocese produce them to you with the little pink marks?

MS. GREENWOOD: Yes.

MS. MICHAEL: Yes.

THE COURT: Are you sure?

MS. GREENWOOD: Yes.

MS. MICHAEL: Yes.

THE COURT: Okay. I mean, I'm just going to look and see if I see some more. There is a page with a great big word confidential that has a date that's highlighted in yellow. Is that highlighted in yellow because it's marked or because somebody wanted me to see it? Why is it highlighted in yellow?

MS. MICHAEL: Your Honor, I think that at this stage

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 92 of 118

what would be most helpful is to focus. The committee added some highlighting to assist the Court. We would remove that highlighting. Otherwise, the only change we are asking to be made to these documents is to remove the confidential marker on them. Otherwise, we are not asking to change the documents from the format.

THE COURT: Why would the committee see fit to use yellow marking for a date to help me, as if that's relevant?

MS. MICHAEL: Your Honor, I -- oh, sorry.

THE COURT: It's the date years ago.

MS. MICHAEL: Your Honor, I don't know for certain that it -- when we received those documents, they had some highlighting in them. And so some of that highlighting may be from the original documents.

THE COURT: There's another page, Bates 73816, that's has the word redacted, but it's got a yellow Post-it. Now, is it double-redacted? What in the world am I supposed to make of this yellow mark, which I believe is -- I don't know if it's a Post-it. I don't know why I have it, but why is there a yellow mark on a page that has the word redacted covering all the text on the page?

MS. MICHAEL: Your Honor, if the committee receives the relief that it's seeking, which is to have the confidentiality removed from these documents, we would take that opportunity to work with the archdiocese to see if there

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 93 of 118

are color highlighting that needs to needs to be removed from those documents as well.

THE COURT: Ms. Cottrell, could you offer any suggestion on why a page would have a yellow Post-it --

MS. COTTRELL: Your Honor, the committee applied it to their filing.

THE COURT: -- with the word redacted? Pardon?

MS. COTTRELL: The committee applied it to their filing. It's not in the original.

THE COURT: But why is it there? I mean, I mean, this is my frustration. I don't know what I'm being asked to release or not. You made it clear that you want me to take off the footer.

MS. MICHAEL: Yes. Your Honor, if the committee's motion is granted, we would need the archdiocese to reproduce the document to us without that footer. It is a footer --

THE COURT: I'm also going to reference another page that not only has a date highlighted, but it has some -- right below the word redacted, it has three lines that are highlighted in yellow.

MS. MICHAEL: Your Honor --

THE COURT: I don't know what I'm -- I don't know where we are on this.

MS. MICHAEL: Okay. If it helps --

THE COURT: I don't want any more notes. Thank you.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 94 of 118

MS. MICHAEL: I want to be clear that if the committee's relief is granted, then the archdiocese would reproduce this document without the confidential marker Bates stamp on the pages. And what would be made public would be purely that document that the committee receives from the archdiocese.

THE COURT: Okay.

MS. MICHAEL: If any of these markers were things we inadvertently added to the document, those would not be included.

THE COURT: Last question. Ms. Cottrell, do you have a comment on the suggestion that the committee would be willing to give the claimants an opportunity to themselves ask that their data be excluded? Do you have any comment on -- I realize you want me to deny the request across the board. But if I were to grant it, do you have any opinion or position of the diocese on the suggestion that I made that Ms. Michael said the committee could live with?

MS. COTTRELL: Yes, Your Honor. The debtor's position would be that it would have to be an opt-in. There are so many promises on the docket and in these orders of the strictest confidentiality, including the forms that they filed, that in order to ensure that someone waives those rights and is agreeing to the process, you would need an opt-in, not a silence is deemed consent.

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 95 of 118

THE COURT: Okay. But a recipient of the letter or the recipient's counsel, I'm not going to interfere with the attorney-client relationship, if I were to order that, the committee would undertake to deliver to the claimants, are you willing to permit this data to be released? And if the vast majority affirmatively said yes, then that would at least satisfy that element? I realize you remain opposed to any of it, but at least you don't have a problem with that approach?

MS. COTTRELL: If it's an opt-in, I agree that you solve the Court's very first question in this hearing as it relates to this motion, which is how do we deal with the claimants, their rights as with regard to their individual information?

THE COURT: Right. Right. I understand.

MS. COTTRELL: I think the Court would -- we would respectfully request that the Court reconsider the form of this exhibit A and consider what's included and the harm versus the purpose of it. Again, I think Your Honor's heard this, but I'd ask again, I have not heard any bankruptcy purpose --

THE COURT: No, I understand.

MS. COTTRELL: -- for the exhibit A being published.

THE COURT: No, you and your cocounsel both have made that. And I understand that's an argument that's made in the papers and the question I have to decide that. And if I accept your argument, then the motion will be denied across the board.

And we're done. If I don't accept your argument and believe that some disclosure of some aspects of exhibits A and/or B, then obviously, it's different.

All right. I appreciate the time and effort, and I understand the difficulty of it. I appreciate the two of you standing up and answering these questions. Sometimes, I could see a little impatience with my questions. And you're entitled to them, that impatience. And I appreciate your responses, both of you.

And I think I want to say to the representatives of the diocese and to the claimants that both sides have been ably represented by able counsel. I appreciate their efforts.

I'm going to take the matter under advisement in its entirety. I'm not sure what I'm going to do. I'm going to give it further thought based upon everything we discussed today.

And I also want, again, for people, not lawyers, not -- who wish they weren't here for all the various reasons, I'm going to make sure that yellow highlighting on one document or not another document or Post-its aren't going to drive the outcome here. I'm going to make my best decision and my best judgment on the right result here, based upon the applicable law. And if there is a need to restate and revisit -- reengineer -- no, that's the wrong word -- reproduce documents that don't have this confusion about highlighting, I assure

you, I'm not colorblind, but some aspects of what I was reading, I certainly assume that they were perhaps not what they were. And I'll make sure we're clear on that no matter what.

So regardless of regardless of anything else, if I grant even any portion of your request, I'm going to make sure we're clear on all of these aspects. And if I deny it, obviously, it will be because I believe that the law requires an outcome contrary to what you want. But it won't be based upon somebody's yellow highlighter on a piece of paper that I'm looking at.

So I'm going to conclude the hearing, but I'm going to go back to what I discussed with Mr. Pascuzzi and just suggest a status hearing roughly four months out on a -- and we've sort of stuck with Thursday afternoons.

So Ms. Parada, can you tell me an available -- where did she go? She's gone.

I will issue an order. But you can anticipate roughly four months on a Thursday afternoon a status conference. If the committee chooses or if the diocese chooses to make a motion of some sort that needs to be heard and would be heard around that time, I'll just do what I've done in so many cases. I'll move the status conference to the date that that motion is coming up.

So Ms. Michael, if you don't -- if you don't file a

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 98 of 118

motion that you said you're going to file until some other date, don't worry about it. You have one motion on file that that's on track, unless there's a request to continue it. And we'll leave it at that.

So Mr. Pascuzzi, do you want to revisit anything else?

MR. PASCUZZI: No, I was just going to remind you of that.

THE COURT: Yeah. Well, okay. So for those of you -- again, I'm not sure what we're doing. Roughly four weeks from now, I'll -- four months from now. Excuse me. Four months from now, I'll anticipate having a status conference. But based upon what Ms. Michael said, I have a sneaking suspicion that we'll be seeing each other more often and more recently, more sooner than four months from now.

So thank you very much for coming. For being here. Hopefully, it's not pouring rain, and you can go home. And well, court's adjourned.

MS. MICHAEL: Thank you, Your Honor.

(Whereupon these proceedings were concluded at 3:39 PM)

I N D E X

| RULINGS: | PAGE | LINE |
| --- | --- | --- |
| Committee is authorized to employ Cushman & Wakefield | 17 | 5 |

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

/s/ RIVER WOLFE, CDLT-265

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date: March 18, 2025

## A

**ability (2)** 56:7,11
**able (4)** 12:23,24;34:18; 93:12
**ably (1)** 93:11
**above (2)** 14:2,3
**absent (2)** 10:10;72:2
**absolutely (3)** 21:22;22:3;53:2
**abuse (9)** 28:20;35:8,12; 36:21,22;40:12;41:3; 60:17;74:8
**abused (6)** 35:22;36:10;37:1,4, 7;60:19
**academic (1)** 55:19
**accede (1)** 6:4
**accept (4)** 29:10;66:14;92:24; 93:1
**acceptable (1)** 18:4
**accepting (1)** 67:4
**access (13)** 9:18;10:3,11;11:23; 15:3,4,8;17:9;18:5; 48:12;59:7;66:16; 72:6
**accommodated (1)** 31:4
**accommodating (1)** 31:3
**accommodations (1)** 34:22
**accordingly (1)** 24:18
**accounted (1)** 72:25
**accused (24)** 67:16;69:2,19,20; 70:8,15,25;71:7,8,14; 72:3,11,13;73:3,5,6, 10,25;74:2,7,11,11, 14;80:15
**acknowledging (1)** 34:12
**across (2)** 91:15;92:25
**act (6)** 13:6;24:18;25:21; 27:8;56:1;63:10
**action (2)** 68:5;80:17
**actions (4)** 25:4;26:5;56:10; 82:9
**active (5)** 44:11,11,23;45:1,4
**actual (3)** 7:2;48:11;54:1
**actually (4)** 38:20;59:14;69:23; 75:7
**add (8)** 9:11,12;18:24; 27:11;41:24;49:1; 50:1;80:22
**added (3)** 87:22;89:1;91:9
**addition (2)** 5:9;63:13
**additional (3)** 15:6;41:20;78:9
**Additionally (2)** 26:3;84:18
**address (4)** 18:11;35:7;79:16; 82:21
**addressing (1)** 35:4
**adhere (1)** 6:23
**adhering (1)** 49:3
**adjourned (1)** 95:17
**adjudicated (1)** 69:6
**adjudication (1)** 62:11
**admissible (1)** 80:6
**admits (1)** 60:15
**advance (1)** 40:14
**adversary (2)** 22:8;68:17
**adverse (3)** 12:3;16:22,23
**advice (1)** 8:7
**advise (2)** 16:15;24:18
**advisement (2)** 30:1;93:13
**advisor (2)** 12:18;13:6
**Advisors (1)** 33:14
**advisory (1)** 25:22
**affiliated (1)** 36:24
**affiliates (1)** 27:2
**affirmative (1)** 39:16
**affirmatively (4)** 33:25,25;38:24; 92:6
**afternoon (7)** 4:6,13;5:1,2,16,24; 94:19
**afternoons (1)** 94:15
**Again (33)** 6:1,9;17:21;18:5, 16;21:12;25:18; 26:23;30:13,17;31:3, 14;32:11;35:13,16; 37:14;47:23;52:21; 69:4;73:21;74:15; 75:4;78:22;79:18; 80:12;81:7;84:4;87:8; 88:2;92:18,19;93:17; 95:9
**against (3)** 69:15;76:12;82:11
**age (10)** 35:15,15,19,23,24; 36:21;37:5;67:11,21, 23
**agenda (2)** 4:12,17
**agent (1)** 8:5
**ages (1)** 35:20
**aggregated (1)** 58:8
**ago (4)** 10:1,2;22:15;89:10
**agree (20)** 9:15;10:15;18:3; 33:9;38:11,24;44:20; 45:24;58:10,12; 61:24;62:1,2,4;68:1, 14;73:16;76:8;81:21; 92:9
**agreed (5)** 9:24;29:11;66:5; 76:5;82:19
**agreeing (3)** 62:14;63:20;91:24
**agreement (3)** 12:14,17;50:6
**agrees (1)** 17:18
**ahead (3)** 41:7,11;71:8
**aided (1)** 19:21
**air (1)** 41:23
**albeit (1)** 16:14
**alert (1)** 27:14
**allegations (8)** 44:3;60:17,19; 61:10,20;67:21; 69:12,14
**alleged (3)** 61:1;67:12;70:17
**allegedly (1)** 26:5
**alleges (1)** 35:8
**alleging (1)** 36:21
**allow (2)** 12:22;84:8
**allowed (8)** 12:10,10;45:15; 46:20,21,24;52:19; 60:23
**allowing (2)** 12:18;65:25
**almost (4)** 14:17;33:18;42:16; 47:13
**alone (1)** 37:12
**aloud (1)** 55:24
**alter (1)** 87:21
**altering (1)** 88:10
**alternative (1)** 72:1
**alternatives (1)** 72:8
**although (1)** 52:25
**always (1)** 76:14
**Amanda (3)** 5:11,12;57:2
**ambit (1)** 83:17
**amend (1)** 76:13
**Amendment (2)** 63:13;70:5
**Among (1)** 64:4
**amongst (1)** 40:24
**amount (3)** 17:16,20;28:11
**analogous (1)** 60:14
**analysis (4)** 43:16;44:1;47:20, 21
**and/or (2)** 20:14;93:2
**announced (2)** 30:4,4
**anomaly (1)** 46:14
**answered (2)** 67:10,15
**Anthracite (2)** 77:13;78:1
**anticipate (3)** 22:8;94:18;95:11
**anticipated (1)** 6:15
**apologize (3)** 52:3;57:6;58:21
**appeals (1)** 45:2
**appear (2)** 4:21;7:1
**appearances (3)** 4:11,21,25
**appearing (2)** 5:17,25
**appears (2)** 7:2;61:22
**applicable (1)** 93:22
**application (5)** 5:8,20;7:12;11:21; 14:3
**applied (3)** 23:17;90:5,8
**applies (14)** 22:15;23:20;25:3; 42:10,20;43:3,9,10, 12;57:10;59:8;77:8,9; 84:9
**apply (8)** 25:15;42:11,24; 46:3;49:1;59:7;78:4, 13
**appraisal (4)** 15:13;16:6;17:12, 12
**appraise (1)** 15:14
**appraiser (4)** 13:10,10,17;15:16
**appreciate (6)** 57:8;80:18;93:4,5, 8,12
**approach (2)** 7:17;92:8
**appropriate (1)** 49:3
**approval (1)** 32:22
**approve (1)** 17:18
**Archbishop (3)** 4:9;5:3,4
**archdiocesan (1)** 75:21
**archdiocese (37)** 15:2,5;19:23;20:10, 11,17;21:14;22:5,6,

11,12;23:15;26:4;27:2;37:17;42:2;49:11;50:25;52:10,20;54:8,11;56:9,11;74:15;80:8;83:1,13;84:7;85:16;86:5;88:11,13;89:25;90:15;91:2,6
**archdiocese's (1)** 23:19
**area (2)** 28:23,24
**arguably (1)** 43:13
**argued (1)** 45:5
**arguing (2)** 5:19,20
**argument (15)** 7:21;21:13;30:13,17;31:25;34:8;35:3;41:12;44:12;56:3,22;75:15;92:23,25;93:1
**arguments (4)** 6:6;29:22,24;53:21
**around (2)** 36:22;94:22
**aspects (3)** 93:2;94:1,7
**assaulted (1)** 60:20
**assembled (1)** 32:14
**assess (1)** 83:20
**assist (2)** 87:23;89:2
**assistance (2)** 61:9;78:15
**assume (3)** 38:25;40:6;94:2
**assuming (1)** 38:6
**assure (2)** 16:2;93:25
**attachment (1)** 57:23
**attachments (1)** 60:11
**attempt (1)** 49:12
**attending (1)** 6:12
**attention (2)** 53:12;54:20
**attorney-client (2)** 54:13;92:3
**attributed (1)** 48:5
**authority (2)** 50:5;83:11
**authorize (3)** 13:6;50:4;65:14
**authorized (2)** 6:14;17:5
**automatic (2)** 23:20;25:10
**autonomy (1)** 63:8
**available (13)** 5:21;6:9,10,16;11:13;15:20;17:8,13;34:24;55:15;56:12;86:19;94:16
**avoid (1)** 21:7
**aware (1)** 20:5
**away (1)** 72:22

**B**

**Bach (1)** 5:21
**back (16)** 12:5;14:17;25:15;27:3;30:25;35:10;36:10;53:16;54:2;59:10;74:22;75:12,14;81:6,22;94:13
**balance (2)** 34:8;77:10
**bankruptcies (1)** 18:23
**Bankruptcy (28)** 7:15;16:11,20,20;20:14;23:2;25:5,8,11;37:17;42:7;45:14;48:11;63:14,23,24;64:5;69:16;75:21;77:19;78:2,3;79:19,20,23,23;83:23;92:19
**bar (3)** 58:14;64:7;75:11
**Barry (1)** 5:9
**based (8)** 48:17;59:13;73:3;80:5;93:15,22;94:9;95:12
**basis (2)** 49:14;50:23
**Bates (4)** 86:22;87:14;89:15;91:3
**Bay (1)** 28:20
**becomes (2)** 6:17;14:15
**becoming (1)** 33:8
**begin (1)** 11:11
**beginning (7)** 13:23;20:22;39:18;59:21;60:5;72:2;82:7
**behalf (2)** 5:25;19:1
**behind (1)** 38:2
**believes (2)** 17:16;72:4
**bellwether (2)** 21:25,25
**below (1)** 90:19
**bench (1)** 53:2
**beneficiaries (1)** 75:15
**beneficiary (1)** 68:8
**benefit (3)** 17:15;66:3;72:5
**best (4)** 28:4;52:6;93:21,21
**beyond (2)** 48:3;83:17
**big (4)** 14:4;18:5;88:3,21
**binder (1)** 86:3
**binding (1)** 64:6
**Birth (1)** 22:1
**Blackacre (2)** 10:17;17:12
**Blackacre's (1)** 12:6
**Blank (1)** 5:10
**board (10)** 32:16;55:14;61:5,6;62:16;83:6;86:8,11;91:15;92:25
**body (3)** 61:7,10;62:22
**borrow (1)** 7:15
**both (16)** 7:24;9:16,22;11:18,19;16:16;21:4;28:3;30:10;34:21;37:5;43:9;46:6;92:22;93:9,11
**bottom (1)** 86:21
**bound (1)** 45:24
**BR (1)** 78:1
**breaking (1)** 35:14
**brief (12)** 27:8;31:20,23;49:19;53:18;54:25;55:4,21;69:24;70:24;75:4;78:6
**briefing (1)** 35:3
**briefs (2)** 4:19;24:11
**bring (5)** 19:21,24;49:12;52:4;87:13
**Brittany (2)** 5:19;18:25
**broad (3)** 16:14;33:21,22
**broke (1)** 40:5
**buckets (1)** 84:5
**Buffalo (1)** 28:22
**bunch (1)** 29:20
**burden (3)** 42:2;85:6,9
**business (1)** 42:25
**bylaws (1)** 86:6

**C**

**cabinet (1)** 58:4
**calculated (1)** 80:6
**calendar (2)** 4:13;29:18
**CALIFORNIA (7)** 4:1;23:10,14;28:23;40:3;80:5,15
**Call (9)** 4:3;6:5;25:12;29:23;32:5,10;53:8;62:7;65:23
**Calling (1)** 4:8
**can (35)** 8:10;9:16;16:2;18:16;19:24;24:19;25:9,21;31:4;35:14;44:23;53:16;58:12;61:11,12;65:2;66:16,20;67:1;71:5,18;72:8,24;73:5;74:3;77:1,2,5;79:9;80:25;81:24;88:3;94:16,18;95:16
**canon (1)** 61:3
**cap (3)** 9:22;11:11;17:14
**capital (2)** 78:11,11
**care (1)** 12:8
**carefully (1)** 32:1
**Carney (1)** 5:6
**case (50)** 4:14,16;18:22;19:4;21:25;22:14,15;23:16,16,17;24:12;25:8;26:1,21;27:15,25;28:18;32:12;33:18;39:18;40:2,6,21,23,24,25;42:6,7,17,17,19;45:19,20;48:11;57:12;58:15;63:23,24;75:20;76:3;77:9,13,20,25;78:2;82:12,21;84:10,14;85:15
**cases (23)** 20:12,25;21:2,5,15,15,16,18;22:1;23:9,14;26:23;28:13;37:17;40:20;49:14;70:16;77:12;80:1,7;82:10,15;94:22
**categories (1)** 77:15
**category (2)** 16:14;17:21
**Catholic (6)** 4:8;5:3;28:24;37:16,18;83:1
**caught (1)** 24:23
**cause (5)** 40:14;85:2,5,10,13
**cell (1)** 86:11
**cemeteries (1)** 10:5
**central (1)** 42:6
**certain (4)** 4:19;19:5;35:9;89:11
**certainly (7)** 6:24;14:19;45:20;48:3;68:12;81:2;94:2
**cetera (1)** 33:15
**change (2)** 89:3,5
**changed (1)** 6:22
**Chatterjee (6)** 22:13,20;23:2,13,21;25:2
**check (1)** 15:16
**checks (1)** 40:21
**Chemicals (1)** 22:2
**child (2)**

60:17,20
**children (1)**
72:3
**choose (1)**
34:7
**chooses (2)**
94:20,20
**choosing (1)**
71:14
**chores (1)**
16:16
**chose (3)**
62:16,22,23
**church (17)**
33:7;36:7,8;38:17;39:6;61:2,3,4,12,15,16;63:8;66:21;83:9,12,16,22
**churches (1)**
39:7
**church's (1)**
63:7
**circle (1)**
24:23
**Circuit (21)**
23:17;25:9;43:17;44:13;45:4,8,16,25;46:1,5,7,20;47:7,10;57:12;59:12,21;60:17,21;81:2;85:12
**Circuit's (4)**
43:3;46:20;48:17;58:6
**circular (1)**
24:18
**circumstances (2)**
23:18;36:22
**cite (3)**
82:7,25;83:7
**cited (3)**
23:16;77:12;78:5
**cites (1)**
78:3
**citing (2)**
77:25;79:23
**claim (22)**
32:14,23;33:6;40:22,24;43:14;57:15;58:8,10;64:4,7,8;66:14,16,18,24,25;67:1,2;69:20;70:16;76:12
**claimants (16)**
21:21;32:3,4;39:11;40:3,4,16;42:4;67:6;68:3;70:17;76:16;91:13;92:4,12;93:11
**claims (24)**
39:3;40:22,24,25;42:2,3,5,15;43:12;58:18;60:6,10;65:2,3,4,6;66:8,11;68:4;69:7;72:5;73:23;75:9;76:6
**clarification (1)**
76:21
**clarify (4)**
26:8;30:23;55:20;77:2
**clarifying (1)**
52:24
**class (1)**
37:12
**classmates (1)**
37:20
**clawed (1)**
81:6
**clear (15)**
4:12;21:15;39:19;44:6;49:16;50:9;55:12;56:5;57:11,12;58:6;90:12;91:1;94:3,7
**clearest (1)**
48:16
**clearly (1)**
85:21
**clergy (2)**
23:14;60:19
**CLERK (2)**
4:4,8
**client (2)**
27:24;65:15
**clinic's (1)**
83:10
**close (2)**
12:2,2
**closed (1)**
63:24
**closing (2)**
56:3;84:3
**cocounsel (1)**
92:22
**Code (3)**
7:16;16:11;63:23
**codefendants (4)**
22:15;23:20;25:4;26:5
**codes (1)**
35:14
**Code's (1)**
69:16
**coincidence (1)**
36:25
**collaborative (1)**
12:1
**colleague (1)**
5:19
**colleagues (1)**
23:1
**collecting (1)**
11:3
**color (1)**
90:1
**colorblind (1)**
94:1
**comfort (1)**
76:20
**comfortable (1)**
39:21
**coming (8)**
11:3;15:5;20:5;22:25;29:21;30:7;94:24;95:15
**comment (4)**
6:16;78:9;91:12,14
**commentary (1)**
6:13
**commissioned (1)**
17:11
**commit (1)**
17:20
**committee (91)**
4:14,18,23;5:12,18;6:20;8:7,24;9:19;10:1,5;12:6;13:23;14:8,14;15:17;16:11,18;17:5,8,15;19:1,2,4,16;20:21,24;26:16;27:17;29:10;30:6,12;31:8;32:13,15;34:12,17,19;40:6;41:7;42:1;48:24;49:1;50:1,10;51:15;52:19;53:13,14;54:6;55:13;56:5,6,7,8;58:8;60:15;62:5;65:19;66:4,17;67:18;68:3;70:24;71:10,10,12;72:4;74:6;77:12;78:3;80:24;81:10;82:16;85:22,23,25;86:15;87:21,22;88:10;89:1,7,22;90:5,8;91:5,12,18;92:4;94:20
**committee's (12)**
11:13;14:6;26:19;38:7;53:20;54:4;55:14;62:19;70:5;76:19;90:14;91:2
**common (3)**
43:2;47:14;59:4
**communication (2)**
40:5;83:9
**communications (1)**
18:21
**community (2)**
34:14;37:16
**company (1)**
14:19
**compel (5)**
69:18;72:1,8;82:10,15
**competing (2)**
7:25;8:2
**compile (1)**
12:22
**compiled (1)**
35:10
**complain (1)**
65:21
**complete (1)**
32:22
**completely (1)**
42:16
**complied (1)**
83:16
**comprised (1)**
61:7
**concede (2)**
50:1;71:24
**conceded (2)**
55:13;81:15
**conceding (1)**
49:23
**concept (1)**
16:19
**concern (3)**
13:16;32:17;35:5
**concerned (4)**
20:21;29:14;32:1,2
**concerning (2)**
83:2,3
**concerns (2)**
35:17;76:22
**conclude (2)**
47:23;94:12
**concluded (1)**
95:19
**conclusion (1)**
29:25
**concurrent (1)**
20:15
**conduct (4)**
4:16;33:1;48:3,5
**conference (10)**
4:15;5:8;18:10;22:25;27:13;29:17;30:6;94:19,23;95:11
**conferrals (1)**
82:19
**confidential (27)**
32:20;48:10;50:23;52:8;55:7;56:6;61:7;65:3,9;66:6;75:10,11;76:6;78:10,15,16;81:11;82:20;86:4,22,23;87:13,16;88:8,22;89:4;91:3
**confidentiality (11)**
33:17;50:11;65:10;66:2;68:21;75:15,23;76:13;85:24;89:24;91:22
**confirm (1)**
53:6
**confirmed (1)**
20:11
**conflict (10)**
7:22,22,23;8:1,8,10,15,21;14:18;17:3
**confused (2)**
44:20;53:15
**confusing (1)**
55:23
**confusion (5)**
23:8;57:6;81:8;85:21;93:25
**connection (2)**
60:5;65:5
**consensual (6)**
19:6;20:12,13;21:9,10;49:14
**consent (5)**
39:16;65:15,23;76:16;91:25
**consider (2)**
74:13;92:17
**considered (1)**
76:3
**considering (2)**
60:14;82:22
**consistent (7)**
6:9;33:16,16;62:24;63:1,3;66:18
**consultant (1)**
4:22
**contact (1)**
15:10
**contain (1)**
83:8
**contemplated (1)**
65:8
**contempt (3)**
25:14,15;64:18
**contested (1)**
65:6
**context (1)**
79:18
**continue (5)**
19:20;74:23;85:10,14;95:3
**continued (1)**
20:15
**continues (1)**
34:22
**contrary (1)**
94:9
**control (2)**
22:2;42:18
**controlling (4)**
58:14;64:9;76:12;78:20
**controls (7)**
42:18;46:11;58:11,13,22;59:6;82:1
**controversy (1)**
8:19
**convenient (1)**
31:14
**conversation (1)**
37:10
**conversations (1)**
37:15
**cooperate (1)**

15:23
**cooperating (1)**
17:9
**cooperative (3)**
15:1,22;26:24
**cooperatively (1)**
26:18
**copy (2)**
86:2;87:10
**Cordileone (1)**
5:5
**correctly (4)**
25:10;32:2;38:1;
76:22
**correspondence (2)**
71:11,11
**costs (1)**
26:4
**Cottrell (101)**
5:11,12;56:24;57:2,
2,4,8,16,20,22;58:11,
13,18,20,24;59:2,4,6,
12,17,20,25;60:2,4,8,
24;61:15,19,24;62:1,
3,5,10,20;63:1,8,10,
12,19;64:1,3,17,20,
23,25;65:17;66:1;
67:10,24;68:2,7,14,
16,24;69:5,23;70:10;
71:3,5,9,16,20,23;
73:16,18,20,22;74:1,
9,15,18,25;75:9,13,
19,25;76:2,11;77:5,8,
21,24;78:1,6,24;79:1,
4;80:21,23;81:14,18;
82:6,24;90:3,5,8;
91:11,19;92:9,15,21
**Cottrell's (1)**
79:19
**counsel (23)**
4:21;5:6,8,10,15;
6:3,6,14;23:2;24:16,
25;30:11;39:20;40:8;
41:22;58:8;67:18;
70:25;71:12;81:15;
84:18;92:2;93:12
**counsels (1)**
23:4
**count (2)**
34:18;70:18
**counted (3)**
66:20,21,22
**counter-statements (1)**
24:25
**country (1)**
28:13
**County (1)**
28:21
**couple (1)**
86:6
**course (4)**
29:2;38:10,10;
75:18
**Court (388)**
4:3,4,6,10,16,19;
5:5,14,22,23;6:1,9,15;
7:3,7,11,15,18;8:1,4,
7,13,23;9:2,6,13,24;
10:15,21,24;11:10;
12:2,5,14,17,25;13:3,
5,6,19;14:5;15:7,13;
16:2,9;18:3,14,16;
19:7,10,12,14,22,22,
24,25;20:3,5,7,9,14,
19;21:1,3,6,12,17,19,
23;22:4,12,14,16,22;
23:1,1,4,6,7,11,21,24,
24;24:1,1,3,5,8,10,14;
25:5,7,7,9,11,13,14,
18,21,24;26:11,15;
27:5,7,23;29:19;
30:10,19,21,25;31:2,
11,14,17,21,23;32:22;
34:6,22,22;35:1,13,
23;36:1,3,5,7,19;37:3,
18;38:3,8,10,17,23;
39:6,10,23;40:1,14;
41:1,6,10,13,19;42:1,
8,14;43:6,8,15,20;
44:9,21,23;45:1,2,14;
46:9,12,14,17,23;
47:2,5,12,23;48:15,
20,23;49:6,8,12,15,
17,18;50:8,13,16,21,
23;51:3,6,8,10,12,16,
19,22;52:13,16,18,23;
53:15,18,20,23,25;
54:9,14,17,24;55:2,5,
8,11,17;56:9,10,14,
18,20,25;57:3,5,14,
15,18,21;58:4,9,12,
16,19,22,25;59:3,5,
10,16,17,19,23;60:1,
3,7,21,22;61:2,14,17,
21,25;62:2,4,9,14,21;
63:3,9,11,17,25;64:2,
5,11,15,18,21,24,25;
65:13,19;66:13;67:3,
9,13,14,17,20,23;
68:1,3,6,9,12,15,16,
21,23;69:4,21,22;
70:11,16;71:4,6,15,
19,21;72:8,9,12;73:4,
17,19,21,24;74:3,13,
17,22;75:3,12,14,24;
76:1,4,8,14,18;77:7,
13,19,20,22,25;78:3,
5,17,22,25;79:3,5,13,
22;80:1,3,4,10,12,13,
17,18,21;81:7,15;
82:5,7,23;83:2,7,8,18,
19,21;84:2,14,17,22,
25;85:3,19;86:2,10,
18,23;87:1,5,7,14,22,
23,25;88:2,6,13,17,
20;89:2,7,10,15;90:3,
7,10,17,22,25;91:7,
11;92:1,14,15,16,20,
22;95:8
**courthouse (1)**
87:13
**courtroom (7)**
30:3;31:1;34:13,18,
19;52:5;79:18
**courts (5)**
63:19;75:21;82:8,9;
85:1
**Court's (12)**
22:9;58:14;59:14;
63:16;64:7;65:11;
67:4;78:14;82:22;
83:17;92:10;95:17
**coverage (1)**
65:7
**covering (1)**
89:20
**crafted (1)**
37:21
**create (3)**
8:10;73:10;74:25
**created (3)**
69:19,20;72:10
**creature (1)**
63:7
**credible (1)**
71:7
**credibly (14)**
69:18;70:7,25;71:8,
14;72:3,13;73:3,6,9,
25;74:2,7,14
**creditor (1)**
68:5
**creditors (2)**
4:17;5:18
**creditors' (1)**
4:23
**criticized (2)**
28:6;69:24
**cross-examination (1)**
7:8
**Cruz (3)**
22:14,19;23:16
**current (1)**
68:11
**currently (7)**
35:21;40:20;49:5;
55:7;57:17;72:19;
81:19
**Cushman (30)**
5:7,21;6:20;8:4,24;
9:2,15;10:3,7,9,16;
11:2,9;12:5,18;13:6,
20;14:13,19;15:8;
16:3,21,24;17:5,9,10,
13,15,19;18:4
**Cushman's (4)**
8:7;9:23;10:6;
17:15

## D

**damages (7)**
21:4;47:1,9,22;
59:18;60:6,9
**damaging (2)**
69:2,5
**data (19)**
11:3,24;12:22;33:3;
35:11;37:21;38:2;
39:2;42:2,3,12;43:12;
58:18;65:24;67:1;
72:5;77:11;91:14;
92:5
**date (11)**
30:5;58:14;64:7;
67:12;75:11;88:22;
89:8,10;90:18;94:23;
95:2
**dates (2)**
35:11;37:22
**day (1)**
38:12
**days (1)**
27:4
**dead (1)**
73:1
**deadlines (1)**
29:10
**deal (7)**
6:17;14:4;18:6;
28:16;29:12;85:21;
92:11
**dealing (3)**
5:7;23:18;73:4
**debate (2)**
14:12;17:19
**debtor (34)**
6:24;8:17;9:2,15,
18,21,25;10:3,8;14:9,
14;17:8,17,18,20;
19:4;22:7;26:18;
29:10;31:8;41:10;
56:2;57:2;67:8,20,23;
68:2,8;69:18,24,25;
71:13;75:22;76:4
**debtor's (10)**
6:3;9:24;18:10;
41:22;63:21;70:4,5,7;
76:7;91:19
**decide (2)**
17:21;92:24
**decided (3)**
13:6;76:9,9
**decision (15)**
6:4;19:15;30:4,5;
44:24;45:16;47:11;
48:17;55:12;60:1;
83:4,11;84:8,23;
93:21
**decisional (1)**
57:11
**declined (2)**
10:8,12
**de-designate (1)**
68:18
**deemed (2)**
48:4;91:25
**deems (1)**
78:17
**defamatory (2)**
59:1,8
**defects (1)**
64:4
**defendant (1)**
83:15
**defense (1)**
26:4
**defenses (1)**
65:5
**defer (1)**
22:25
**defies (1)**
47:14
**define (2)**
78:15,16
**defined (2)**
59:12;65:1
**defines (1)**
78:10
**definition (5)**
46:15;59:14;69:14,
16;73:12
**definitions (1)**
59:15
**definitively (1)**
60:18
**deliberation (1)**
61:15
**deliberations (3)**
61:18;63:6;87:9
**deliberative (2)**
61:7;62:21
**deliver (1)**
92:4
**demands (1)**
71:12
**demarcation (1)**
50:11
**denied (2)**
47:1;92:25
**Dennis (1)**
4:5
**deny (4)**
55:18;83:25;91:15;
94:7
**depend (1)**
11:6
**depending (1)**
46:3
**deposition (2)**
60:12;68:19
**depth (1)**
42:5
**depublish (1)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 105 of 118

62:22
**derived (1)**
43:13
**describe (1)**
19:19
**described (6)**
4:19;14:16;20:21;21:14;30:23;43:2
**describes (1)**
59:21
**description (1)**
20:17
**despite (1)**
65:10
**detail (1)**
59:21
**determination (4)**
25:6;63:2,4,4
**determine (6)**
13:7;14:20;16:4;25:2;73:5;83:21
**determining (1)**
85:13
**devices (1)**
22:2
**devolved (1)**
65:11
**dictate (1)**
58:17
**dictionary (1)**
59:14
**differed (1)**
24:14
**different (18)**
8:20;15:17;19:3;27:15;29:6;32:3;37:1,15;40:21;42:24,24;45:22;46:3;54:3;58:6;81:18;84:5;93:3
**differently (1)**
29:4
**difficult (2)**
45:18;47:13
**difficulty (1)**
93:5
**dig (1)**
15:18
**digits (1)**
41:3
**diocesan (2)**
20:12;49:14
**diocese (31)**
8:5;11:11;15:8,18;17:1,11;23:9;28:25;29:1;32:16;38:12;42:17;48:8;49:1,21;65:13,21,24;66:15;70:14,14,15;72:17,18;73:3,9;74:13;82:11;91:17;93:11;94:20
**dioceses (4)**
18:22;26:18,23;75:21
**direct (4)**
10:4;17:17;53:11;67:5
**directly (1)**
39:22
**directs (1)**
67:7
**disagree (3)**
21:11;22:5;62:12
**disagreement (1)**
18:6
**disappointed (1)**
33:8
**discipline (1)**
62:22
**disclose (6)**
56:8;60:25;65:14;77:1,14;80:15
**discloses (2)**
61:17,19
**disclosure (11)**
9:23;36:13;48:8;55:22;58:1;60:23;65:23;72:5;78:19;85:9;93:2
**discoverable (2)**
10:21;73:19
**discovery (26)**
15:21;26:17,24,25;27:1,4;43:1,24;44:7,19;46:8;47:9,20;58:4;73:7,7,11,22;75:2;78:11,17,19;84:13,16;85:11,14
**discovery-related (1)**
26:20
**discretion (2)**
77:14;78:4
**discuss (2)**
39:19;54:21
**discussed (3)**
55:6;93:15;94:13
**discussing (1)**
36:16
**discussion (6)**
13:23;14:18;41:23;43:21;44:6;87:9
**disinterested (2)**
7:2;16:19
**disinterestedness (2)**
7:4,11
**disparately (1)**
29:5
**dispute (2)**
14:25;17:19
**disputes (1)**
67:4
**disqualifier (1)**
8:16
**disregard (1)**
83:18
**disseminate (2)**
50:17;81:12
**distance (2)**
67:22;69:1
**distillation (1)**
32:13
**distilled (1)**
32:4
**distinction (3)**
47:8;58:2;84:15
**distinguishable (1)**
45:25
**distinguishes (2)**
57:12;83:4
**District (5)**
23:17;24:1;29:6;76:5;78:2
**divisions (1)**
22:7
**doable (2)**
38:15;39:8
**docket (3)**
64:22;79:4;91:21
**doctor (1)**
83:10
**doctors (1)**
83:5
**doctrine (3)**
80:5;81:1,2
**doctrines (1)**
48:25
**document (18)**
12:11;40:17;44:19;45:10,11;48:12;60:18;70:3,20;81:12,17;82:1;90:16;91:3,5,9;93:19,20
**documents (39)**
10:6;42:20,25;43:5;44:2,7;45:12;46:8;47:9,20,21,25;48:19;51:5;52:2,4,5,19;55:7;57:13,25;58:3;60:12;84:5,9,12,16;85:8,23,24;86:16;87:13;89:4,5,12,14,24;90:2;93:24
**dollars (3)**
10:18;13:25;14:10
**done (6)**
15:13;36:12;49:14;74:23;93:1;94:22
**door (1)**
12:3
**double-redacted (1)**
89:17
**down (6)**
15:1;29:18;40:5;47:24;48:23;88:6
**dozen (1)**
75:20
**dozens (1)**
37:11
**draft (1)**
38:20
**drafted (3)**
66:10,10,15
**draw (3)**
35:15,18;54:20
**drive (1)**
93:20
**driven (1)**
76:7
**Drugs (1)**
22:1
**dual (2)**
7:24;8:10
**duplicate (1)**
30:7
**during (2)**
43:1;84:16

## E

**earlier (3)**
59:17;69:17;82:3
**Earplugs (1)**
22:2
**easily (1)**
35:14
**East (1)**
28:20
**easy (4)**
14:9;18:8;31:4;39:5
**ecclesiastical (1)**
61:3
**edited (1)**
74:9
**educate (1)**
22:22
**effect (2)**
19:25;64:6
**efficient (2)**
11:25;13:16
**effort (3)**
30:7;39:12;93:4
**efforts (2)**
19:21;93:12
**eighteen- (1)**
28:9
**either (7)**
18:21;29:9;30:3;33:25;49:24;52:11;74:5
**electronic (1)**
70:19
**element (2)**
7:12;92:7
**else (9)**
6:14;8:19;14:9;41:7,24;72:23;73:2;94:5;95:5
**elsewhere (1)**
31:6
**emphasize (2)**
42:1;77:6
**emphasizes (1)**
83:10
**employ (5)**
6:20;8:17;11:9;12:18;17:5
**employing (1)**
10:9
**employment (5)**
4:22;5:20;7:1,21;16:21
**end (1)**
82:14
**ends (1)**
83:14
**engage (2)**
4:14;11:17
**engaged (2)**
73:20,22
**engineered (1)**
75:7
**English (1)**
46:2
**enough (1)**
18:9
**ensure (1)**
91:23
**entailed (1)**
59:18
**entered (3)**
66:2;78:18;84:19
**entire (2)**
11:5;68:22
**entirety (2)**
84:1;93:14
**entitled (2)**
82:17;93:7
**entity (1)**
63:6
**entry (1)**
66:5
**equity (1)**
63:22
**essentially (1)**
46:7
**establishing (1)**
85:10
**estate (8)**
4:15,22;6:21;10:9;13:17;16:1,14;76:12
**estimate (1)**
13:25
**estimation (1)**
60:10
**Et (1)**
33:15
**evaluate (1)**
12:23
**evaluating (1)**
11:18
**evaluation (2)**
8:18;82:13
**even (10)**
8:15;29:3;44:17;45:4;46:12,14;48:1;

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 106 of 118

73:10;88:7;94:6
**event (4)**
29:23;30:22;33:12;67:12
**everybody (2)**
73:8,25
**everyone (3)**
4:6;31:15;73:13
**evidence (4)**
26:6;60:9,9;80:6
**evidentiary (1)**
68:19
**Exactly (2)**
63:8;85:22
**examined (1)**
10:16
**example (4)**
8:4,11;12:5;17:11
**except (3)**
6:13;24:10,20
**exception (4)**
59:8;77:8,10,18
**exceptions (2)**
59:7;78:4
**excerpts (2)**
54:1;60:12
**excessive (1)**
17:19
**exchange (2)**
10:5;11:12
**excluded (2)**
34:1;91:14
**exclusive (1)**
20:16
**exclusivity (1)**
29:12
**excuse (4)**
70:15;76:22;77:25;95:10
**exhibit (59)**
32:5,9,10,13,15,18,25;33:8;36:9,17,18;37:6,21;38:4,20;39:12;40:11,23;42:14,15;47:24,25;50:17;51:12;52:17;53:10;54:1,6,7,19,20,23;55:13;56:1,7,8,12,12,16;57:17;58:7;61:22;62:19;66:7,10,17;67:19;68:24;71:6;72:10;80:25;81:4,9,24;85:23;86:1,3;92:17,21
**exhibits (3)**
71:10;72:9;93:2
**exist (1)**
8:23
**existing (1)**
24:12
**exists (5)**
49:24;70:9,22,23;73:10
**exonerates (1)**
61:21
**expect (2)**
21:23;27:3
**expectation (1)**
30:1
**expense (1)**
38:17
**experience (4)**
13:9;26:18;28:2;35:6
**experiencing (1)**
34:23
**expert (6)**
6:21;10:10,13,19,22;15:3
**expertise (2)**
79:19,23
**experts (1)**
15:17
**expert's (1)**
16:1
**explain (1)**
84:7
**explaining (1)**
28:7
**extensive (2)**
73:20,22
**extensively (1)**
30:14
**extent (1)**
76:11
**extracted (4)**
32:22;58:9;65:24;66:17

**F**

**face (1)**
33:9
**facility (2)**
8:5;10:17
**fact (10)**
28:12;48:9;49:19,22,23;54:1;56:25;62:15;68:10;73:3
**facts (1)**
26:10
**faculties (1)**
61:12
**fails (1)**
20:12
**fair (1)**
69:22
**falls (1)**
17:21
**familiar (3)**
4:11;16:20;32:12
**family (1)**
33:14
**far (2)**
11:6;29:14
**fast (1)**
66:19
**fate (1)**
56:16
**Father (32)**
42:17,25;43:2,11,23;44:2,5,18,20,20,21,23;46:6;47:18;57:11;58:1;69:13;77:11,16,21,22;78:18;83:3,12;84:7,7,11,14,19,20,23;85:17
**Fathers (1)**
44:10
**feasible (1)**
6:8
**feel (2)**
39:21;41:19
**fees (4)**
9:23;13:22;26:20,21
**felt (1)**
12:23
**few (9)**
19:19;20:13;22:8,14,25;29:18;35:15;53:10;54:3
**fiction (1)**
75:16
**fifteen (2)**
31:20,21
**figure (3)**
14:16;33:18;75:3
**file (10)**
18:10;32:15;33:6;46:22,24;57:24;60:24;94:25;95:1,2
**filed (28)**
11:21;19:3,23;20:10;23:15,19;37:18;46:17;47:25;52:5;53:3;54:5;57:13,17,19,20;58:1,4,5;59:22;60:13;68:20;71:9;75:10;78:7;81:19;85:23;91:22
**files (7)**
44:6;60:12;61:1;82:16;84:8,11,12
**filing (5)**
22:8;24:25;58:3;90:6,9
**final (4)**
12:21;71:20,23;80:23
**finally (2)**
26:16;82:6
**find (9)**
8:13,13;27:16,21;29:3;45:18;46:15;86:3,4
**finding (1)**
85:2
**fine (2)**
12:7;16:6
**finished (1)**
86:19
**fire (2)**
40:3,3
**firm (1)**
73:14
**first (14)**
4:21;7:9;14:6;17:18;21:17;35:7;43:4;63:13;70:5,12;72:21;83:2;86:5;92:10
**fit (2)**
73:12;89:7
**fits (3)**
69:13;77:15;78:17
**five (3)**
29:8;39:3;60:10
**five- (1)**
28:13
**flagging (1)**
63:14
**flux (1)**
11:5
**focus (9)**
30:15;31:24;33:5;62:7;63:19;66:7;67:7;84:5;89:1
**focused (7)**
44:11;49:24;59:13;63:15;66:4;67:18;82:4
**Fogerty (2)**
23:16,18
**folks (2)**
24:20;74:10
**follow (4)**
46:2;47:12,13;60:21
**following (2)**
6:2;32:1
**footer (3)**
90:13,16,16
**footnote (1)**
82:7
**forcing (1)**
70:24
**form (5)**
50:18,20;64:8;65:4;92:16
**format (2)**
88:11;89:6
**former (3)**
23:22;61:8,9
**forms (2)**
64:8;91:22
**forth (1)**
17:13
**forward (3)**
21:2,17;22:7
**found (2)**
43:20;75:21
**four (6)**
94:14,19;95:9,10,10,14
**Fr (1)**
5:5
**framing (2)**
33:22;34:3
**FRANCISCO (4)**
4:1,9;5:3;29:5
**free (7)**
34:6,6;41:19;43:23;46:16;50:17;81:12
**friend (4)**
37:4,8,10,11
**Friends (1)**
33:14
**front (9)**
20:2;23:2,13;25:3;26:7;27:3;28:7;48:19;52:4
**frustration (1)**
90:11
**fully (2)**
34:7;41:24
**fundamentally (1)**
27:15
**further (6)**
9:11;18:24;26:22;27:11;80:22;93:15
**furtherance (1)**
56:13
**future (1)**
12:3

**G**

**Gail (1)**
5:16
**game (2)**
43:23;46:16
**Gaspari (13)**
5:9;74:20;77:5;78:9;79:11,11,13,15,25;80:4,11,14,20
**gather (1)**
13:4
**gathering (1)**
13:14
**gave (6)**
13:25;39:15;71:4;75:16,17;86:3
**general (2)**
5:6;68:4
**generally (3)**
7:5;8:9;85:2
**gentleman (2)**
77:3;79:9
**gets (2)**
39:23;64:12
**given (2)**
68:10;87:21
**gives (1)**
13:10

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 107 of 118

**giving (1)**
56:15
**glad (1)**
55:23
**global (1)**
13:15
**goal (1)**
13:15
**goes (5)**
14:17;25:13;39:1;
60:16;85:12
**Good (18)**
4:6;5:1,2,16,24;
16:6;18:9;28:2;37:8,
10,11;62:17;71:17;
85:2,5,10,13,21
**governed (2)**
46:17;61:3
**grammar (1)**
28:25
**grammatical (1)**
60:4
**grant (4)**
50:16;55:19;91:16;
94:6
**granted (2)**
90:15;91:2
**grateful (1)**
35:5
**great (4)**
14:1;16:3;88:3,21
**GREENWOOD (23)**
5:16,17;9:15,17,21,
25;10:19,22;11:2;
14:5,24;15:10,20;
17:6,24;18:1,11,13,
15;53:6;54:19;88:15,
18
**groping (1)**
8:14
**groups (1)**
35:16
**guess (3)**
38:18;40:8;52:6
**guidance (5)**
21:3,10;22:9;26:2;
48:16
**gun (2)**
20:9;29:9

**H**

**half (3)**
12:8;28:1;34:19
**hand (2)**
8:24;26:19
**handling (1)**
5:12
**happen (9)**
13:11;28:4;29:9;
36:7,8;37:19,19;
46:21;65:25
**happened (3)**
28:20;36:12;64:16
**happening (4)**
22:11;28:7;37:2;
53:17
**happens (4)**
16:12;22:1;36:24;
64:15
**happy (2)**
15:4;40:4
**hard (4)**
20:16;48:3;70:12;
72:13
**harder (1)**
53:4
**harm (12)**
44:4;45:6,7;48:9;
66:7;67:8;68:8,23,24,
25;69:12;92:17
**harmed (4)**
65:14,15,24;67:7
**harms (1)**
67:20
**haystack (2)**
37:24;38:1
**hazardous (1)**
16:5
**head (2)**
7:14;8:11
**heading (2)**
55:21;86:7
**hear (8)**
6:22;9:14;27:12;
29:22,24;34:25;
40:19;58:20
**heard (11)**
6:14;9:19;21:24;
23:16;27:17;56:16;
76:4;92:18,19;94:21,
21
**hearing (13)**
4:14;6:4;29:25;
30:24,25;34:25;
55:11;65:11;68:18;
76:10;92:10;94:12,14
**hearings (3)**
6:2,11;34:23
**help (2)**
21:8;89:8
**helpful (1)**
89:1
**helps (2)**
40:23;90:24
**here's (2)**
14:21;15:10
**hesitated (1)**
43:25
**hidden (1)**
42:3
**high (2)**
13:20;69:9
**higher (1)**
12:9
**highlight (1)**
51:4
**highlighted (14)**
51:3,25;52:6;53:3,
7,11,23;54:6,18;
88:22,23,24;90:18,20
**highlighter (1)**
94:10
**highlighting (8)**
51:15;89:2,3,13,13;
90:1;93:19,25
**highlights (4)**
51:13;54:22,24;
87:22
**highly (1)**
40:2
**hire (5)**
8:18;12:24;13:17;
15:14;16:12
**Historically (1)**
72:16
**history (3)**
15:19;49:10,24
**Hmm (1)**
58:19
**hold (8)**
36:1;51:23;57:5;
64:18;84:22,22;87:2;
88:2
**holds (1)**
60:18
**home (1)**
95:16
**homes (1)**
39:22
**honed (1)**
57:10
**Honor (116)**
5:2,4,16,24;6:25;
7:5,10,13,17,23;8:3,6,
9;9:1,4,12,21;11:15;
12:21;13:2,16,22;
14:24;16:8;18:1,2,15,
25;19:2;22:3;23:25;
24:22;25:17,23;26:7;
27:3,6,12;29:16;30:9,
18,20;31:10,16,19,22;
34:5,11,21;35:2;38:5;
39:4,9;40:13,19;41:5,
11,17,25;42:23;
43:25;48:14;49:4;
50:15,19;52:3;53:6;
56:4,17,24;57:8,10;
60:25;61:24;62:1;
63:12;64:9,17,23;
66:1;67:10,25;68:4;
69:3,17;70:10;71:25;
74:9,20,25;77:6;78:8;
79:11,15;80:20,23;
81:19;82:6,14,25;
83:14,25;84:4;86:15;
87:4,12,20;88:25;
89:9,11,22;90:5,14,
21;91:19;95:18
**Honorable (1)**
4:5
**Honor's (1)**
92:18
**Hopefully (1)**
95:16
**house (2)**
15:14,16
**Huh (1)**
55:2
**hundred (4)**
30:2;32:7;39:10;
42:16
**hurt (3)**
32:9;33:8;65:15
**hybrid (2)**
6:6;31:5
**hypothetical (5)**
32:24;36:3;67:15;
74:5;78:12

**I**

**idea (2)**
35:7;67:5
**identifications (1)**
87:10
**identified (6)**
21:17;48:2;56:25;
62:5;66:23;67:17
**identify (5)**
38:1;67:21;69:1,9;
79:10
**identifying (1)**
87:23
**identity (1)**
33:21
**idly (1)**
28:17
**ignore (1)**
64:6
**immediate (1)**
28:23
**immune (2)**
25:13;85:16
**impact (1)**
26:5
**impacted (1)**
32:3
**impatience (2)**
93:7,8
**importance (1)**
42:6
**important (3)**
34:14;41:23,23
**impose (1)**
41:21
**impossible (1)**
35:20
**improper (1)**
83:19
**inadvertently (1)**
91:9
**inappropriate (1)**
9:8
**inappropriateness (1)**
9:9
**incidents (1)**
66:21
**include (6)**
20:25;35:11;37:22;
40:11;71:10;78:16
**included (4)**
54:7;60:11;91:10;
92:17
**includes (1)**
60:19
**including (5)**
21:3;42:4;44:3;
60:12;91:22
**inconsistent (2)**
71:1;81:25
**incorporate (1)**
78:19
**incorrect (1)**
26:9
**incorrectly (2)**
25:11;26:4
**in-court (1)**
6:3
**increase (1)**
17:16
**incredibly (1)**
34:14
**independent (3)**
11:23;61:10;86:5
**independently (2)**
11:18;13:5
**indiscernible (1)**
27:22
**individual (10)**
35:8,10;45:10;
61:22;62:17,23;
72:14;80:7;82:12;
92:12
**individually (1)**
40:18
**individuals (3)**
34:15;39:1;69:6
**individuals' (1)**
39:20
**inferences (2)**
35:15,19
**inform (2)**
68:2,3
**information (38)**
10:3,11;11:13,24;
13:4,14;14:8;15:3,5;
17:7;26:19;32:4,13,
21;36:21;43:9;64:4;
65:3,9;66:6,18;67:14;
68:25;75:10;76:5,6;
77:14,15;78:11,15,16;
81:3;82:21;83:24;
84:6,9;86:7;92:13
**informs (1)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 108 of 118

42:3
**inherently (1)**
17:2
**initial (4)**
11:7;13:25;31:19;49:13
**initialed (1)**
54:12
**initials (2)**
52:11;54:15
**injury (1)**
82:10
**input (1)**
39:3
**insignificant (1)**
68:10
**insist (1)**
56:14
**insofar (1)**
61:6
**instance (3)**
8:12;41:2;76:2
**instances (2)**
20:15;33:2
**instead (1)**
27:18
**instructs (1)**
47:18
**insurance (3)**
5:10;26:5,7
**insurance/reinsurance (1)**
65:7
**insurers (1)**
21:4
**intend (6)**
6:13;10:22;19:20;29:7,8;34:11
**intends (2)**
20:24;30:25
**intention (1)**
18:19
**interaction (1)**
6:12
**interest (5)**
14:24;16:22;45:6;77:10,17
**interested (1)**
11:3
**interesting (1)**
83:4
**interests (2)**
7:25;8:2
**interfere (1)**
92:2
**internal (8)**
61:2,5,6,13;63:6;83:9,16,22
**interpret (7)**
21:19;25:9,10,11;43:17;46:1,6
**interpretation (6)**
46:2,3;66:11;67:3;84:7,10
**interpreted (1)**
45:16
**interrogating (1)**
18:20
**interrogatory (5)**
74:6;78:13,14;79:17,21
**interrupt (1)**
66:13
**intervene (1)**
74:20
**Intervened (1)**
64:1
**into (18)**
6:5;14:12,23,25;15:11,25;17:21;20:22;21:12;32:5,5;33:17;52:5;65:11;78:19;84:19;87:7,13
**investigation (2)**
60:16;62:11
**invite (1)**
15:22
**involved (4)**
28:5;38:19;44:13;61:9
**IRB (22)**
42:3,25;43:10;47:21;49:2;50:1,11;51:4;57:16;60:15,15;62:11,13,15;71:14,22;72:6;80:25;83:20;84:12;85:17,22
**ironic (1)**
13:20
**irrelevant (2)**
28:16;77:18
**issue (17)**
9:5;12:3;13:13;26:1,6;29:12;49:11;63:12,20;64:10;67:17;74:19;77:19;82:3,4;83:15;94:18
**issues (16)**
19:5,22;20:24;21:4,10;22:9;27:2,4;36:16;54:3;63:13;65:7;72:1;75:22;76:3;82:22
**issue's (1)**
34:14
**item (1)**
4:17
**items (1)**
53:10

**J**

**January (4)**
71:11,12,23;87:15
**JCCP (4)**
22:12,21;23:13,19
**jerk (1)**
8:14
**job (1)**
23:6
**joint (1)**
11:16
**Jones (2)**
5:17;19:1
**Jose (1)**
29:2
**Judge (25)**
22:13,14,20,23;23:2,13,21,22,23,24;24:10,19;25:2,14;28:4,5,6,7,8;31:5;36:13;45:14,14;47:12;76:2
**judges (8)**
18:22;23:7,11;24:17;25:8,9;31:6;61:9
**judge's (1)**
28:2
**judgment (3)**
20:25;21:2;93:22
**judicial (2)**
77:17;83:24
**jumping (2)**
20:9;29:9
**jurisdiction (1)**
63:16

**K**

**Katz (1)**
5:11
**keep (13)**
15:25;27:19,20;29:7;31:19;42:2;43:5;44:2;48:20;55:18;79:6,6;85:17
**kept (2)**
56:22;66:6
**kind (3)**
11:16;15:21;77:1
**kinds (1)**
75:22
**knee (1)**
8:14
**knew (1)**
80:8
**knowing (4)**
37:16,17;78:18;84:19
**knowledge (1)**
14:20
**known (1)**
40:2
**knows (7)**
36:23;67:23;70:14,16;72:17,18;73:4

**L**

**label (1)**
86:4
**lack (1)**
82:20
**lacked (1)**
75:22
**Lafferty (2)**
31:6;76:2
**land (1)**
19:14
**language (1)**
46:2
**largely (1)**
82:15
**larger (1)**
40:2
**last (4)**
17:11;57:9;62:3;91:11
**lastly (1)**
85:20
**laundry (3)**
30:6;33:1;40:11
**law (16)**
24:9,15;25:1;42:17,19;43:2;59:4;60:21;61:3,4;73:14;75:20;77:9;80:15;93:23;94:8
**lawsuit (2)**
74:12;75:10
**lawyer (5)**
25:13;28:3,6;66:15;73:2
**lawyering (1)**
38:19
**lawyers (10)**
16:20;25:7,8;32:11;33:15;40:4;66:9,10,15;93:17
**lawyers' (2)**
58:3;66:10
**lay (1)**
53:16
**lead (2)**
30:13;80:6
**leased (1)**
8:5
**leasing (3)**
8:4;16:15,25
**least (15)**
14:10;17:2;23:9;26:23;29:11;33:6;38:14;41:4,16;52:13;56:15;62:17;87:1;92:6,8
**leave (10)**
5:22;18:6;30:3;32:10;52:24;56:4;62:16,17;76:15;95:4
**left (6)**
72:22,24,24;73:1;86:12;87:18
**lends (1)**
7:8
**lessor/lessee (1)**
17:2
**letter (4)**
71:20,23;74:12;92:1
**letterhead (1)**
83:10
**liability (1)**
21:4
**liaison (1)**
24:25
**license (1)**
64:5
**lieu (1)**
72:7
**life (1)**
28:3
**light (1)**
38:12
**limitations (1)**
81:10
**limited (3)**
61:6;74:10;81:23
**limits (2)**
41:21;57:6
**line (3)**
26:12,14;36:16
**lines (2)**
41:2;90:19
**Lisiecki (1)**
83:1
**L-I-S-I-E-C-K-I (1)**
83:2
**Lisiecki's (1)**
83:13
**list (53)**
27:17;30:6;33:1;36:18,23;39:7;40:11,11;41:1;49:21,22,24;69:2,5,8,18,20,21;70:8,9,18,19,21,22,23,24;71:6,7,8,13,13,17;72:3,10,12,20,25;73:5,8,10,11,13,24;74:1,3,8,25;75:5,5,6,8;76:17;82:7
**listen (4)**
31:25;34:8;55:8;56:2
**literally (1)**
45:17
**litigate (1)**
69:7
**litigated (3)**
80:1,9,11
**litigation (8)**
12:20;14:12,15;20:14,15;22:19;27:18;73:4
**little (5)**
15:7;53:3,15;88:14;93:7

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 109 of 118

**live (3)**
6:3;36:7;91:18
**lived (3)**
29:5,5;33:19
**local (1)**
87:1
**locate (1)**
53:1
**location (4)**
16:16;33:2;36:5,18
**locations (2)**
6:11;33:4
**long (3)**
25:10;27:17;76:10
**longer (1)**
81:4
**look (11)**
9:6;12:11;13:5;14:3;35:20;44:23;51:16,16,19;71:18;88:20
**looked (2)**
32:21;65:12
**looking (9)**
10:9;17:22;22:7;43:4;51:24;55:21;70:3;75:6;94:11
**lost (3)**
44:12,12;45:2
**lot (3)**
38:19;39:21;41:14
**lots (2)**
22:1,2
**loud (1)**
24:6
**low (2)**
12:9;13:21
**lower (1)**
59:14
**lying (2)**
70:13,14

## M

**ma'am (1)**
64:12
**magnitude (2)**
40:2,25
**mail (1)**
39:21
**mailing (1)**
39:1
**mailings (2)**
39:17,20
**main (2)**
29:23;30:22
**maintain (1)**
74:1
**maintained (1)**
49:21
**major (2)**
14:25;15:22
**majority (2)**
26:20;92:6
**makes (3)**
25:6;44:6;61:11
**making (8)**
28:8;30:17;32:9;47:1;56:4;81:8;83:11;85:25
**management (1)**
63:7
**managerial (1)**
63:6
**mandate (1)**
63:22
**many (8)**
33:2;37:13,15;53:9;66:8;82:19;91:20;94:22
**MARCH (1)**
4:1
**mark (6)**
28:10,14;85:24;87:25;89:18,20
**marked (1)**
88:23
**marker (3)**
52:8;89:4;91:3
**markers (1)**
91:8
**marking (1)**
89:8
**marks (1)**
88:14
**mass (2)**
22:1;40:1
**match (2)**
35:23,24
**material (3)**
77:9;85:11,14
**materials (4)**
68:20;78:11,17,20
**matter (7)**
4:8;21:1;39:22;48:6;61:4;93:13;94:3
**matters (9)**
4:13,19;5:19;19:15,17,18;30:1;65:6;75:23
**May (10)**
7:17;10:14;19:2;38:11;39:11;42:18,18;72:24;76:8;89:13
**maybe (13)**
20:7;31:6,23;32:9;37:7;38:23;49:23;55:11;65:22;70:1,18;71:7;77:2
**mean (36)**
8:20;9:9,14;12:14;13:5,12;15:17;17:22;21:23,23,24;22:1;24:11,15,16,18;27:8;29:21;36:10;38:10;41:14;47:15;48:2;62:16;63:17;71:4;73:2;74:11,23;75:17,24;76:1,8;88:20;90:10,10
**means (4)**
21:24;47:14,18;81:2
**meant (3)**
15:22,25;51:17
**measures (1)**
49:13
**measuring (1)**
15:12
**media (1)**
87:2
**mediate (1)**
82:21
**mediation (12)**
11:7;13:14;19:20,21;20:15,17,21,23;21:6,8;27:16;86:23
**mediations (1)**
65:8
**mediators (3)**
18:21,21,22
**medical (5)**
82:13;83:3,5,8,9
**meet (1)**
85:16
**meeting (1)**
87:15
**meets (1)**
69:13
**Melissa (1)**
5:21
**member (3)**
49:2,25;71:21
**members (7)**
34:12,17;40:7;61:8;86:8,11;87:3
**members' (1)**
86:13
**membership (1)**
62:16
**memo (4)**
47:9;48:10;59:18;60:11
**memorandum (2)**
59:22;60:8
**mention (1)**
47:22
**mentioned (1)**
42:5
**merits (1)**
32:6
**met (2)**
42:2;48:9
**Michael (169)**
5:19;18:13,14,16,24,25,25;19:9,11,13,16;20:1,4,6,8,10,20;21:8,14,22;22:3,5,18,24;23:5,12,23,25;24:2,4,7,13,22;25:17,20,23,25;26:13,16;27:5,6;29:13;30:17,18,20,22;31:10,13,16,19,22;34:5,10;35:2,18,25;36:2,4,6,15,20;37:9;38:5,9,16,22;39:4,9,14,25;40:13,18;41:5,9,11,17,25;42:13,23;43:7,10,19,25;44:18,22,25;45:3;46:5,10,13,19,24;47:4,7,17;48:14,16,22;49:4,7,10,16;50:7,9,15,19,22,25;51:7,9,11,13,17,21;52:3,15,18;53:5,16,19,22,24;54:2,10,16,18;55:1,3,6,10,16;56:4,17,19;57:9;67:5;69:17;84:3,4,24;85:1,4,20;86:9,15,21,25;87:4,6,12,20;88:1,5,10,16,19,25;89:9,11,22;90:14,21,24;91:1,8,17;94:25;95:12,18
**microphone (1)**
18:17
**might (23)**
6:16;8:22,23;13:13,18,19,19;25:15;28:19,24;29:4,20;32:19;33:18,20;37:25;39:7;48:6;59:17;66:14;67:3;73:14;74:20
**million (4)**
10:17;12:6,8,8
**Milwaukee (2)**
28:21;63:23
**mind (7)**
6:22;29:7;30:16;31:3;38:4;56:1;86:19
**minds (1)**
70:23
**minimum (2)**
33:23;34:1
**ministerial (2)**
61:2;63:10
**ministry (3)**
44:13;61:12;73:1
**minor (1)**
38:17
**minute (2)**
37:7;74:21
**minutes (26)**
31:20;32:10,16;41:15,16;42:3,25;43:11,22;50:11;51:4;57:16;60:15,15;61:2;62:13,15;72:6;80:25;83:6;84:12;85:17,22;87:15,21;88:11
**misleading (1)**
68:25
**misled (1)**
32:19
**miss (1)**
52:21
**missed (2)**
41:12;81:7
**mis-signals (1)**
23:10
**misstatement (1)**
24:9
**mistaken (1)**
61:21
**mixed (1)**
44:10
**modify (1)**
76:14
**moment (4)**
6:15;15:9;25:1;52:25
**money (2)**
17:20;28:11
**Montali (1)**
4:5
**month (1)**
28:10
**months (8)**
20:22;22:8;29:18;94:14,19;95:10,10,14
**more (21)**
11:15;15:7;16:1;19:19;27:12;28:4;30:14;31:5,14;33:24;39:6;41:22,23;42:9;48:20;87:7;88:21;90:25;95:13,13,14
**mortgages (1)**
23:18
**most (4)**
20:14;21:11;27:24;89:1
**mostly (1)**
82:8
**motion (48)**
4:17;5:13;21:15;25:16;28:17;38:7;49:6,10;50:10;52:7,8;53:8,11,20;54:4,6,21,25;55:22;57:23;60:14,16,25;62:6;63:13;64:4;65:11;68:8;70:5;71:9,25;72:4;73:8;75:2;76:7,13,19,25;82:15;83:25;87:24;90:15;92:11,25;94:21,23;95:1,2
**motions (4)**
29:12,20;30:7,12
**move (4)**
21:17;30:22;87:8;94:23
**M's (1)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 110 of 118

84:8
**much (11)**
11:18;13:24;16:1;
28:1;30:21;31:17;
56:20;57:20;82:17;
84:2;95:15
**Mullen (1)**
5:11
**Mullin (1)**
57:4
**must (4)**
39:11;58:17;60:21;
77:19
**mutually (1)**
20:16
**myself (1)**
64:18

**N**

**name (11)**
36:23;37:5;45:11;
52:16;57:1;62:6,7,18;
72:17,24;74:4
**named (3)**
23:21;52:14;62:18
**namely (1)**
70:7
**names (18)**
33:10,10;45:13;
46:25,25;48:1;51:2;
52:11,12,15,21;54:11,
12;69:5;70:20;72:18,
21;74:7
**narrow (1)**
27:2
**near (1)**
18:17
**necessary (5)**
6:18;12:23;29:20;
40:10,15
**need (19)**
9:13;14:3;15:8;
19:5;20:25;21:2,10;
25:18;27:7;30:14,15;
31:24;32:7;33:13;
64:11;65:16;90:15;
91:24;93:23
**needle (3)**
37:24,25,25
**needs (6)**
17:15;33:23;82:2;
90:1,1;94:21
**negotiated (1)**
66:5
**negotiations (3)**
49:11;60:5;65:8
**neighborhood (2)**
33:19;36:8
**neither (1)**
72:25
**new (7)**
13:10;28:21,22;

78:2;82:8;83:1,13
**news (1)**
10:24
**next (6)**
22:8;27:4;28:16;
30:24,24;38:25
**Ninth (23)**
25:9;43:3,17;44:12;
45:3,8,15,25;46:1,5,6,
19,20;47:7,10;48:17;
57:12;58:5;59:12,20;
60:17;81:2;85:12
**nobody (2)**
15:21;81:21
**nobody's (1)**
24:10
**non (1)**
34:2
**nonbankruptcy (1)**
83:24
**none (4)**
17:4;48:10;73:10;
79:20
**nonissue (3)**
16:7,8;50:8
**nor (1)**
64:18
**norms (1)**
61:4
**Northern (4)**
23:10,14;28:23;
40:3
**note (2)**
20:13;64:9
**noted (3)**
20:11;25:4;84:18
**notes (2)**
79:6;90:25
**noting (1)**
20:20
**November (3)**
64:10,20,21
**number (19)**
10:25;12:9;13:10;
29:22;32:25;33:1,3,4,
4;34:17;39:13;40:9;
41:3;66:21,22;70:3;
78:22;79:8;87:14
**numbered (1)**
72:2
**numbers (4)**
86:11,11,14;87:3

**O**

**Oakland (5)**
24:3;29:1,6;31:6;
76:3
**objection (5)**
16:10;38:5;39:14;
80:5;82:18
**objections (2)**
38:6;82:18

**objectives (1)**
63:15
**obligation (1)**
10:13
**observations (1)**
66:8
**observe (1)**
6:11
**obstacles (1)**
19:6
**obvious (1)**
27:23
**obviously (8)**
6:4;12:15;26:6;
39:7;42:22;74:24;
93:3;94:8
**occasion (1)**
40:1
**occurred (3)**
20:13;35:9,12
**off (15)**
7:10,13;8:11;34:15;
39:7;52:9;62:24;
64:11,12;71:22;73:1;
81:10;87:18;88:9;
90:12
**offended (1)**
32:8
**offer (2)**
10:1;90:3
**offered (1)**
11:16
**often (3)**
26:23;40:19;95:13
**older (1)**
62:7
**once (5)**
30:14;37:24;66:2;
77:14;78:4
**One (76)**
4:10,14;8:13,15,24;
11:17;13:21,21;16:5;
24:18;25:22;27:10;
28:25,25;29:2,5,16;
31:2,24;32:8;33:2,2,5,
6,7,11,12,12,18;35:8,
14,16,21;39:6,6;
40:10,19;41:2,2,3;
43:18;44:10,10,11;
45:1,2,18;46:1;48:20;
49:9,12,18;51:23;
52:13;59:7;61:21;
62:17;63:4;66:19;
67:16,16;69:7,8,9,9,
19;74:6;77:15;78:4,8;
79:18;80:7;82:24;
88:7;93:19;95:2
**ones (4)**
72:21,22,23;73:6
**ongoing (1)**
24:9
**only (18)**
28:25;33:5;41:2;

44:1;47:21;50:9,19;
53:10;60:24;66:2,25;
68:7;70:23;81:23;
83:17;84:14;89:3;
90:18
**onto (2)**
15:23,23
**oOo- (1)**
4:2
**openers (1)**
14:10
**opening (2)**
34:21;41:20
**openness (1)**
68:11
**operates (1)**
24:20
**opinion (5)**
12:24;14:22;59:22;
83:21;91:16
**opinions (1)**
25:22
**opponents (1)**
48:8
**opportunity (9)**
9:22;33:24;34:1;
38:24;39:15;52:20;
56:16;89:25;91:13
**opposed (3)**
6:21;81:21;92:7
**opposes (1)**
6:25
**opposing (3)**
47:11;84:18;85:9
**opposition (5)**
4:23;6:23,24;63:21;
70:4
**opt (2)**
38:24;39:15
**opt-in (3)**
91:20,24;92:9
**option (1)**
38:14
**optional (1)**
43:14
**order (44)**
4:3,20;18:4;21:3,9;
34:16;35:22;38:1;
49:1;58:2,7,14,14;
64:7,9,21;65:9,11;
66:5;75:11;76:13,14,
16,20;77:19;78:10,13,
18,20,25;79:1,7;
82:20;83:2,7,13;
84:19;85:4,5,8,15;
91:23;92:3;94:18
**orders (7)**
64:6;82:8,8,10,10,
24;91:21
**Oregon (1)**
23:17
**Ori (1)**
5:11

**original (3)**
51:15;89:14;90:9
**originally (1)**
9:25
**Orleans (1)**
28:22
**otherwise (3)**
61:22;89:3,5
**out (36)**
14:16;15:14,16,21;
17:25;22:16,18,20;
24:6;27:20;28:12;
32:8;33:18;37:24;
38:1,24;39:1,2,11,15;
40:9,21;53:16;55:9;
62:7;65:1,4;66:25;
67:1;75:4;77:22;78:8;
81:25;82:3;87:17;
94:14
**outcome (3)**
40:8;93:21;94:9
**outcomes (1)**
84:15
**outline (1)**
85:12
**outlined (1)**
49:10
**outside (1)**
48:11
**outweighed (1)**
45:6
**over (13)**
13:12;18:22;20:22;
24:20;25:6;26:19;
34:19;37:13;80:11,
11,12,16;83:12
**overarching (1)**
63:12
**overlooked (2)**
49:23;56:25
**override (1)**
70:5
**overrule (1)**
16:9
**overruled (1)**
38:7
**own (4)**
13:9;47:11;55:24;
76:15

**P**

**Pachulski (2)**
5:17;19:1
**page (17)**
26:13;51:20;64:25;
72:2;77:16,24;86:5,5,
21;87:14,14;88:21;
89:15,20,21;90:4,17
**pages (5)**
51:22;52:9;53:9;
86:7;91:4
**paid (1)**

28:12
**paper (3)**
54:22;70:19;94:10
**papers (4)**
17:7;53:1;70:8;
92:24
**Parada (1)**
94:16
**paragraph (14)**
20:11,22;26:3,11,
13;60:4;64:24;72:2;
78:15,22,24;79:8;
84:20;85:1
**paragraphs (1)**
51:25
**Pardon (4)**
61:25;73:21;83:20;
90:7
**parish (3)**
67:16;69:8,9
**parishes (2)**
10:4;22:7
**parse (1)**
57:24
**part (5)**
35:10;42:19;44:16,
17;83:12
**participated (1)**
40:7
**participating (1)**
6:2
**particular (7)**
16:15;66:22;71:16;
77:17;80:9,17,17
**particularized (4)**
44:4;45:5,7;48:9
**parties (10)**
21:3,11;24:17;25:2;
65:2;66:4;78:14,18;
82:21;84:18
**parties-in-interest (1)**
42:4
**parts (2)**
28:13;54:5
**party (9)**
11:3;26:1;43:5;
44:2;68:5;85:5,7,7,9
**Pascuzzi (32)**
5:1,2,3;9:13;11:10,
15;12:4,13,16,21;
13:1,4,12,22;16:7,8;
17:24;18:2,9;24:14;
27:7,12;29:16;30:9;
42:21;45:23;49:19;
56:21,22;94:13;95:5,
6
**passed (1)**
72:22
**past (1)**
80:16
**path (1)**
15:1
**Patrick (1)**
5:5
**pattern (2)**
60:8,16
**Paul (3)**
5:2,9;79:11
**Paula (1)**
5:6
**pay (3)**
11:11;14:10;38:18
**paying (2)**
11:22;14:9
**penalty (1)**
66:9
**people (14)**
6:12;29:3,22;31:3;
33:10,24;37:15;38:3,
14;48:1;61:8;63:18;
73:12;93:17
**people's (1)**
70:23
**percent (3)**
30:2;32:7;42:16
**perfectly (3)**
14:7;49:16;86:10
**perhaps (1)**
94:2
**perjury (1)**
66:9
**permit (1)**
92:5
**permitted (1)**
65:1
**perpetrator (5)**
51:2;52:11;54:11;
61:23;80:9
**perpetrators (8)**
32:25;33:3,10;48:2,
6;54:14;70:15,17
**perpetrators' (1)**
61:1
**persist (1)**
23:8
**person (16)**
15:10;28:24;33:7,
11,13,19,21;36:11,11,
21,23,25,25;52:13;
67:11;71:14
**personal (1)**
82:9
**personally (2)**
28:9;73:14
**personnel (10)**
44:6;46:21,24;
60:11,24;61:1,8;84:8,
11,12
**person's (1)**
33:14
**perspective (2)**
26:9;47:18
**persuade (1)**
32:7
**pertains (1)**
77:18
**Phillip (1)**
5:24
**philosophy (1)**
68:12
**phone (4)**
64:11;86:11,13;
87:3
**physical (1)**
87:10
**Pick (4)**
12:8;36:3;37:23,25
**picked (1)**
37:25
**picture (1)**
47:15
**piece (2)**
70:19;94:10
**pile (1)**
53:1
**pincite (2)**
60:2;84:20
**pink (5)**
87:16,18;88:7,8,14
**pinked (1)**
87:17
**place (2)**
33:12;76:16
**plaintiff (2)**
74:6;82:11
**plaintiff's (1)**
24:24
**plan (4)**
21:9,10;28:10;
31:19
**planning (1)**
31:11
**plans (3)**
20:11,12,13
**pleading (3)**
47:1,8;57:23
**pleadings (4)**
43:13;47:22;84:13,
16
**Please (3)**
4:6;18:3;64:11
**PM (2)**
4:1;95:19
**point (25)**
10:14;11:1,2,20;
17:23;27:13;28:2;
32:6;38:13;39:12;
40:4;42:21;47:24;
48:20;71:6;72:10;
73:17;77:6;78:8;
80:23;81:7,15,18;
82:3,15
**pointing (1)**
81:25
**points (2)**
71:25;79:18
**police (1)**
61:8
**policies (2)**
26:8;83:16
**policy (1)**
68:10
**portion (3)**
53:2;87:8;94:6
**portions (12)**
4:18;50:13;51:3,14;
52:1,7;53:7,23;54:18,
20,22;55:4
**Portland (1)**
48:11
**position (8)**
8:20;9:19;14:6;
17:2;23:19;63:21;
91:16,19
**possible (2)**
27:17;73:16
**post (1)**
70:6
**postage (1)**
38:18
**Post-it (3)**
89:16,19;90:4
**Post-its (1)**
93:20
**potential (3)**
7:23;17:3;45:5
**pouring (1)**
95:16
**practical (1)**
11:25
**practice (1)**
21:20
**practices (2)**
60:9,17
**preamble (1)**
76:25
**precedence (1)**
25:6
**preclude (1)**
16:21
**predicted (1)**
29:13
**preference (2)**
31:9,10
**preliminary (1)**
56:15
**premature (1)**
14:11
**prepared (3)**
15:6;50:4;58:8
**pre-petition (1)**
73:23
**Present (3)**
5:5;34:19;67:22
**presented (4)**
6:6;67:19;76:3;
83:14
**presiding (2)**
4:5;18:22
**presume (1)**
33:20
**presumption (1)**
58:25
**pretend (1)**
35:13
**pretty (1)**
11:17
**preview (1)**
24:11
**previous (1)**
64:6
**previously (2)**
21:17;65:1
**priest (15)**
44:9,10;45:4,8;
60:19,23;62:6;66:22;
71:17;72:17,18,25;
73:8;74:7;82:11
**priesthood (1)**
72:22
**priests (8)**
60:11;61:11;69:11,
15;70:8,25;71:7;
72:13
**priests' (1)**
82:12
**primary (2)**
4:17;13:16
**principally (1)**
82:10
**principle (1)**
79:24
**prior (1)**
28:3
**private (3)**
43:5;44:3;58:17
**privilege (13)**
8:23;9:3,5;10:15,
18;12:20,20;13:8;
14:12,16;20:18;
54:13;86:24
**probably (1)**
15:25
**problem (7)**
11:10;14:5;17:22;
31:5;79:15;81:5;92:8
**problems (2)**
17:22;28:21
**procedurally (1)**
24:5
**procedure (1)**
38:6
**procedures (1)**
39:18
**proceed (2)**
27:16;42:9
**proceeded (2)**
26:17;41:15
**proceeding (11)**
22:9;57:24;63:16;
65:6,7;68:16,17,19;
78:7,21;81:20
**proceedings (6)**
6:10;23:3,13;68:12;
75:21;95:19

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 112 of 118

**process (15)**
4:12;25:2;39:14,15,16,19;40:15,21;62:12;67:6;83:20,22;85:13,17;91:24
**produce (5)**
39:12;82:17,19;86:18;88:13
**produced (12)**
38:4;43:1;44:7,19;46:8;47:9,20;68:20;74:8;84:13,16;88:12
**product (6)**
9:18;10:20;12:9;14:12;16:5;86:19
**professional (6)**
7:1;8:20;11:17;16:12,13,13
**professionals (3)**
4:15;7:6;16:21
**profiles (1)**
35:16
**progress (2)**
14:22;28:8
**prohibits (1)**
16:11
**project (3)**
11:5,17;13:21
**promise (5)**
31:25;33:17;48:24;52:25;76:9
**promises (3)**
32:20;65:10;91:21
**promising (1)**
48:21
**proof (7)**
32:23;33:6;64:3,7,8;65:2;85:6
**proofs (18)**
32:14;43:13;57:15;58:9;65:3;66:8,11,14,16,18,24,25;67:1,2;68:4;69:20;70:16;75:9
**properties (9)**
8:8;10:4;11:5,7,8;13:7;14:1,14,21
**property (4)**
11:18;15:23;16:3,25
**proposal (1)**
17:4
**proposed (2)**
10:2;55:22
**proposition (1)**
67:4
**prosecution (1)**
65:5
**protect (4)**
63:5;65:22;72:3;77:14
**protected (3)**
43:23;82:2;85:18
**protection (4)**
83:18;85:7,11,14
**protections (2)**
65:21;66:2
**protective (10)**
77:19;78:10,13,25;79:1,7;82:20;84:19;85:4,15
**protects (1)**
64:7
**prove (1)**
82:15
**provide (8)**
10:3,6,12,13;15:3,23;17:6;40:15
**provided (3)**
50:23,25;51:1
**providing (4)**
10:11;11:4;15:6;16:13
**psychiatric (1)**
82:13
**public (34)**
32:6,9;33:9;36:12;40:17;45:6,10,13,15;46:22,25;47:1,4,5;48:11;52:5,19;55:4;56:12;58:23,25;59:1,7,22;67:24;68:4;72:5;77:10;83:20,21,21;84:8;86:20;91:4
**publicly (3)**
56:8;60:25;83:20
**public's (1)**
77:17
**publish (8)**
62:12;68:21;69:18,21;71:13,13;75:2;76:17
**published (3)**
65:9;72:11;92:21
**pull (2)**
66:25;67:1
**pulling (1)**
66:19
**punitive (5)**
47:1,9,22;59:18;60:9
**purely (1)**
91:5
**purpose (12)**
11:9;61:2,5;63:15;67:25;70:4;79:20;83:19,23,24;92:18,19
**purposes (1)**
65:4
**pursue (1)**
27:18
**put (5)**
15:21;25:3;26:7;55:14;71:14
**putting (3)**
29:9;37:6;67:11

**Q**

**quality (1)**
26:22
**quantity (2)**
26:22,25
**questioner (1)**
37:3
**quite (1)**
60:14

**R**

**rain (1)**
95:16
**raise (1)**
75:22
**raised (1)**
78:6
**ran (1)**
62:11
**random (1)**
36:25
**rather (3)**
14:13,17;26:25
**re (1)**
78:1
**reach (1)**
13:15
**reactions (1)**
8:14
**read (16)**
35:2;36:9;47:2,3;49:9,18;51:23;53:2,4;55:23,24;59:20;64:2;75:4;76:24;88:7
**reader (1)**
36:20
**reading (4)**
60:1,7;70:8;94:2
**reads (1)**
45:17
**ready (2)**
13:1,3
**real (11)**
4:15,22;6:20;10:9;11:4,18;13:17;16:1,14;21:20,21
**reality (2)**
32:18;74:19
**realize (2)**
91:15;92:7
**really (4)**
7:18;55:25;70:13;79:17
**reason (4)**
9:6;53:1;72:13;83:17
**reasonable (3)**
14:7,20;86:10
**reasonably (1)**
80:6
**reasons (4)**
6:7,7;14:4;93:18
**recall (1)**
32:2
**receive (2)**
52:9,10
**received (9)**
51:2,15;53:13,14;54:4,7,10,19;89:12
**receives (2)**
89:22;91:5
**receiving (2)**
19:5;39:21
**recently (3)**
28:4;76:3;95:13
**recipient (1)**
92:1
**recipient's (1)**
92:2
**recognize (1)**
79:13
**recommendations (1)**
61:11
**reconcile (1)**
84:10
**reconciling (1)**
44:14
**reconsider (1)**
92:16
**record (8)**
4:18;5:4;17:3;32:6;77:18;83:5,8;85:21
**records (5)**
17:9;42:25;72:16;82:17;83:3
**redact (1)**
86:13
**redacted (28)**
45:11,13;46:25;50:13,14,17;51:1,20;52:11,12,22;53:12;54:1,11,12;55:22;57:22,23;62:6;81:9;86:12;87:5;88:3,4;89:16,20;90:7,19
**redaction (2)**
53:14;81:23
**redactions (9)**
51:18;54:5,7,23;55:1,3;86:8,10,16
**reengineer (1)**
93:24
**refer (1)**
52:7
**reference (1)**
90:17
**referenced (1)**
39:17
**references (2)**
22:11;83:9
**referred (4)**
32:15;53:8,10;87:23
**referring (2)**
56:22;70:2
**reflect (1)**
62:15
**refusing (1)**
15:2
**regard (1)**
92:12
**regarding (8)**
22:6;26:7,24,25;27:4;42:5;43:11;73:23
**regardless (3)**
85:15;94:5,5
**reinvented (1)**
30:15
**rejected (2)**
11:19;59:14
**relate (3)**
54:23;55:1,3
**related (3)**
39:22;40:10;43:2
**relates (1)**
92:11
**relationship (3)**
22:6;40:22;92:3
**relative (1)**
79:15
**relatively (1)**
38:17
**release (6)**
4:19;39:2;72:3;76:6;85:8;90:12
**released (2)**
34:2;92:5
**releasing (1)**
83:24
**relevance (1)**
80:16
**relevant (9)**
13:13;17:10;43:16,21;44:1;47:20,21;80:8;89:8
**relief (7)**
62:8;68:17;76:15;81:6,23;89:23;91:2
**relies (2)**
10:7;16:18
**remain (2)**
58:17;92:7
**remainder (1)**
41:17
**remains (1)**
85:6
**remark (1)**
84:3
**remarks (1)**
41:20
**remember (3)**
28:5,7;79:8
**remind (1)**
95:6
**remiss (1)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 113 of 118

30:23
**remote (1)** 6:11
**remotely (2)** 6:12,17
**removal (1)** 56:6
**remove (6)** 71:16;81:23;88:1,4;89:2,4
**removed (7)** 50:11;85:24;86:12,16,25;89:24;90:1
**renting (1)** 15:15
**repeat (2)** 57:1;62:18
**repeated (1)** 66:3
**rephrase (1)** 14:7
**replaced (1)** 23:22
**reply (7)** 78:3,6;80:24;81:4,22;82:4,6
**report (7)** 18:14;19:3,11;26:3;27:9;29:14;30:11
**reported (1)** 75:20
**reports (10)** 9:23;10:6,12,13,23;11:4;12:21,22;15:4,6
**represent (3)** 16:22,25;26:20
**representation (4)** 7:24;8:10;54:10;66:14
**representatives (2)** 17:17;93:10
**represented (1)** 93:12
**representing (1)** 17:1
**reproduce (3)** 90:15;91:3;93:24
**reputable (1)** 14:19
**request (19)** 4:14,22;6:5;18:10;26:19;50:16;52:8;55:15,18,19;73:11;74:10;80:25;85:25;87:19;91:15;92:16;94:6;95:3
**requested (4)** 4:16;6:3;11:14;62:8
**requesting (2)** 6:14;87:20
**requests (1)** 15:21
**require (2)** 16:19;56:10
**required (5)** 7:11;39:16;61:4;77:13;80:14
**requirement (1)** 7:3
**requires (1)** 94:8
**rerun (1)** 39:2
**research (1)** 74:11
**reserve (6)** 30:19;31:18,20,21;41:13,17
**resolution (3)** 19:6;27:16,25
**resolve (1)** 71:1
**respectfully (1)** 92:16
**respond (6)** 6:17;18:9,18;20:16;34:7;41:8
**respondent (1)** 25:15
**response (2)** 27:7,9
**responses (1)** 93:8
**responsiveness (1)** 27:1
**restate (1)** 93:23
**result (3)** 10:9;26:22;93:22
**results (3)** 28:4;47:11;48:17
**retired (5)** 44:10,21;45:8;60:23;62:6
**reverse (1)** 75:7
**reversed (1)** 45:16
**review (9)** 13:25;32:16;48:18;52:20;61:5,6;62:10;83:6;86:6
**reviews (1)** 61:10
**revisit (2)** 93:23;95:5
**right (59)** 8:5;9:13;10:12;11:7;12:3;13:3;21:25;22:2,4,12;25:18;30:10,10;34:10;35:18;37:2;38:9;41:6;43:21;44:12;45:2;46:9,13;48:25;50:14;55:21;58:9,10,16;59:3,5,6;61:10;62:9,15,23,25,25;63:9,11;64:15;66:20;67:2;69:13;71:15,15,19,19,23;73:12;74:22;80:3,18,21;90:18;92:14,14;93:4,22
**rights (3)** 70:6;91:23;92:12
**rise (1)** 4:4
**risk (1)** 29:3
**road (1)** 29:18
**role (1)** 23:6
**rolls (1)** 62:24
**Roman (3)** 4:8;5:3;83:1
**Rome (1)** 5:10
**Rosa (1)** 29:2
**roughly (3)** 94:14,18;95:9
**roving (2)** 63:21;64:5
**rule (12)** 42:1,11,19;43:1,16,23;44:1,5,19;46:4;48:7;56:9
**ruled (2)** 45:4;46:20
**ruling (4)** 25:5;38:11;45:24;46:20
**rulings (3)** 19:5,7;20:25
**run (1)** 61:16

## S

**Saint (8)** 36:7,8,18,19,22,23,24;37:1
**same (15)** 10:5;16:16;26:17;28:18,19;33:14;37:12,13;41:22;42:21;64:3;66:16,24;67:19;69:10
**SAN (5)** 4:1,9;5:3;29:2,5
**Santa (1)** 29:2
**satisfied (2)** 17:24;76:5
**satisfies (1)** 81:1
**satisfy (1)** 92:7
**satisfying (1)** 81:3
**saw (1)** 48:11
**saying (9)** 14:3;25:12;36:16;52:25;53:25;58:22;62:25;79:6;82:16
**scandal (3)** 43:22;44:12;45:5
**scandalous (23)** 43:15;44:1,15,16;45:15,17;46:10,12,16;47:6,19;48:1,4,6,13;59:1,8,13;60:20,22;69:15;77:9;82:2
**scandals (1)** 44:17
**scenario (2)** 36:15;37:2
**school (12)** 15:11;28:25;33:7,12;35:8,9,12,22;36:10;37:13,19;69:10
**schools (1)** 10:4
**Schwartz (1)** 25:8
**scope (3)** 11:5;42:5;61:6
**seal (7)** 52:5;57:17,24;58:1;60:13;68:21;81:20
**sealed (9)** 48:12;51:5;52:1;58:5;64:3;80:25;81:22,24;82:1
**sealing (4)** 58:2;81:1,20,21
**searching (1)** 9:9
**seated (2)** 4:7;18:17
**second (7)** 4:10;23:17;46:24;51:24;70:1;72:20;75:1
**second-guess (1)** 39:23
**Section (11)** 7:4;42:10;43:11,12;44:7;46:11;47:19;68:12;77:16;84:9,21
**sections (1)** 87:23
**seeing (2)** 36:17;95:13
**seek (3)** 20:25;55:13;76:13
**seeking (16)** 22:9;26:1,2;43:5;44:2;45:12;50:2;58:1;70:12;76:15;81:4,16,16;82:12;85:7;89:23
**seem (4)** 11:12;38:13;39:10;45:21
**seemingly (1)** 47:10
**seems (7)** 9:15;38:15;39:7;44:15;46:17;48:18;49:2
**sees (2)** 19:4;36:23
**sending (1)** 40:21
**sense (4)** 29:17;47:14;57:25;84:14
**sent (2)** 23:10;52:22
**separate (1)** 29:1
**serious (1)** 76:22
**serve (2)** 61:12;78:12
**served (2)** 72:17;73:9
**service (1)** 16:14
**services (2)** 16:15;17:6
**serving (1)** 72:19
**session (1)** 4:4
**set (4)** 11:7,7;21:17;30:5
**sets (5)** 42:12,24;43:9;64:25;65:4
**settle (1)** 60:5
**settlement (2)** 13:15;65:7
**seven (1)** 20:22
**several (4)** 41:1;51:25;61:8;75:20
**sexual (1)** 61:20
**sexually (1)** 60:20
**share (3)** 15:4,9;26:17
**shared (1)** 26:5
**sheer (1)** 26:25
**Sheppard (2)** 5:11;57:4
**SHINE (19)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 114 of 118

5:24,25;6:21,25;7:5,10,13,17,23;8:2,6,9,22;9:1,4,12;14:18;16:18;18:5
**shock (1)** 19:2
**shocked (1)** 32:8
**short-term (1)** 29:11
**show (5)** 26:11;29:13;51:8,19;70:1
**showing (1)** 85:6
**shown (1)** 54:17
**shows (2)** 33:3;52:16
**side (1)** 69:24
**sides (4)** 7:24;11:19;17:1;93:11
**signals (1)** 23:7
**signed (2)** 66:8,9
**significantly (1)** 37:14
**silence (1)** 91:25
**similar (6)** 22:13;23:10,15,18;63:20;76:3
**simple (3)** 14:3;73:7;79:17
**simply (9)** 28:15;41:25;48:5;52:8;53:7;54:19;56:11;58:3;63:14
**single (2)** 32:8;60:24
**single-plaintiff (1)** 82:9
**sit (5)** 28:17;29:8;47:24;48:23;76:24
**sitting (1)** 59:23
**situates (1)** 40:24
**situation (3)** 33:25;35:7;36:13
**situations (1)** 63:20
**six (2)** 9:25;10:2
**sixty (1)** 27:4
**skills (1)** 14:20
**skipping (1)** 70:6
**slightly (1)** 81:18
**small (2)** 33:4;40:9
**smaller (1)** 33:4
**smallest (1)** 41:3
**snapshot (1)** 18:19
**sneaking (1)** 95:12
**so-called (4)** 29:11;48:10;49:21;70:7
**soils (1)** 15:24
**sole (2)** 70:4;85:25
**solutions (2)** 17:22;27:21
**solve (2)** 28:21;92:10
**somebody (10)** 12:24;14:9;15:14,15;22:22;47:5;72:16;73:15;87:10;88:24
**somebody's (1)** 94:10
**somehow (1)** 35:9
**someone (11)** 6:16;8:18,19;16:2;33:20;36:8,23;37:5;69:9;74:5;91:23
**something's (1)** 9:8
**Sometimes (3)** 21:9;47:13;93:6
**Sonoma (1)** 28:20
**soon (2)** 24:16;27:17
**sooner (1)** 95:14
**sorry (16)** 9:14;10:1;12:13;16:13;41:11;56:21,21;64:13;69:4;73:21;76:22;77:3,20;79:14;81:7;89:9
**sort (10)** 8:14;12:19;24:25;41:14;54:21;62:7;76:20;77:1;94:14,21
**sounds (1)** 39:8
**source (1)** 47:25
**Southern (1)** 78:2
**speak (2)** 77:3;79:9
**SPEAKER (2)** 64:13,14
**speaking (1)** 8:10
**special (1)** 5:10
**specialist (1)** 8:17
**specific (3)** 8:11;15:7;57:10
**specifically (9)** 6:24;16:15;20:24;37:22,23;58:16;69:25;77:11;78:16
**specifics (1)** 87:8
**spend (1)** 13:24
**split (1)** 48:18
**staff (1)** 57:13
**stage (3)** 19:4,20;88:25
**stages (1)** 20:22
**staggering (1)** 28:11
**stamp (2)** 86:22;91:4
**stand (1)** 57:17
**standard (10)** 42:10,10,11,20;43:3;44:5,8;57:10;78:20;81:20
**standards (3)** 42:24;48:18;58:6
**standing (10)** 24:8;62:17;65:20,20,21;71:17;75:14,22,24;93:6
**stands (2)** 10:1;78:9
**standstill (1)** 29:11
**Stang (3)** 5:17;19:1;71:24
**start (9)** 4:10;14:2,11;19:5;34:12;37:6;57:9;69:11;84:4
**starters (1)** 16:18
**starting (3)** 19:17,21;85:1
**state (31)** 19:22,25;20:14;21:1,2,16;22:12,13;23:1,7,11;25:7,9,13,14;27:23;37:18;63:24;70:16;73:4;79:12;80:1,4,12,17;82:7,8,9;83:2,7;85:21
**stated (4)** 67:12,13;68:7;83:17
**statement (12)** 18:10;23:15;26:9;27:14;32:20;46:16;49:19;62:3;69:23;70:11,24;81:3
**statements (4)** 26:24;31:20;63:18;66:3
**States (5)** 4:24;5:25;9:7;26:4;77:16
**statistic (3)** 32:17,18;33:17
**Statistically (2)** 72:15,16
**statistician (1)** 35:14
**status (21)** 4:15;5:8;18:10,14,18;19:3,3,11;22:24;23:12;26:3;27:9,13;29:14,17;30:5,11;94:14,19,23;95:11
**statute (5)** 16:18;42:18;43:20;45:17;46:4
**stay (16)** 18:17,17;19:25;22:15;23:8,20;24:17,19,21;25:3,10,14;50:14;79:10;80:25;81:24
**step (5)** 38:25;43:4;45:6,9;56:15
**steps (1)** 85:7
**still (18)** 6:22;12:19;27:1;34:25;36:20;44:11,13;45:10;48:25;49:2;58:25;60:22;62:17;67:3;69:1;70:23;72:25;87:2
**stipulated (7)** 78:10,13;79:1;81:11;85:5,8,15
**stipulation (6)** 10:2,8,10;11:16;12:10,12
**straight (1)** 35:4
**straightened (4)** 22:16,18,20;55:9
**street (1)** 10:11
**strengths (1)** 77:17
**stretch (1)** 49:2
**strict (1)** 57:6
**strictest (1)** 91:21
**strictly (1)** 75:11
**strictness (1)** 65:10
**strikes (1)** 14:11
**struck (1)** 15:1
**struggling (1)** 47:16
**stuck (1)** 94:15
**students (2)** 37:11,12
**studied (1)** 30:13
**subject (6)** 12:19;17:14;20:1;24:17;85:8;86:23
**subjected (2)** 40:16,19
**subjective (1)** 69:1
**submit (1)** 81:1
**submitted (1)** 53:9
**subtract (1)** 72:20
**successes (1)** 28:3
**suffer (1)** 44:4
**sufficient (1)** 18:19
**suggest (2)** 17:1;94:13
**suggested (1)** 29:19
**suggesting (1)** 70:13
**suggestion (4)** 6:16;90:4;91:12,17
**summarized (3)** 17:7;29:13;60:8
**summary (2)** 58:8;76:17
**Summerhays (1)** 5:6
**superior (3)** 23:24;24:3,10
**supplants (1)** 59:4
**supplement (1)** 32:20
**supplemental (2)** 64:8;65:4

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 115 of 118

**supplements (1)**
43:14
**support (2)**
34:23;60:10
**supported (1)**
40:8
**supposed (6)**
11:23;21:6,8;51:6;
71:1;89:17
**sure (18)**
4:12;19:14;21:14;
23:5;24:7;29:22;30:2;
31:4;36:4;52:21;
66:16;77:6;88:17;
93:14,19;94:3,6;95:9
**survived (1)**
29:4
**survivor (10)**
32:17,19;33:11;
34:14;35:6;42:4;
52:12;54:12;63:18;
65:2
**survivors (17)**
27:24;28:18,19;
33:11;34:13,17,23;
39:21;40:20,23;48:4;
56:16;65:15,22,23;
66:3;72:4
**suspect (1)**
37:10
**suspicion (1)**
95:12
**system (1)**
40:15

**T**

**table (2)**
28:10;71:22
**talk (1)**
15:11
**talked (1)**
69:25
**talking (4)**
18:20;64:21;84:6,6
**talks (1)**
37:8
**teacher (3)**
37:5,12,13
**technical (4)**
6:7;16:17;32:12;
46:18
**tee (3)**
24:15,16;25:18
**teed (1)**
26:6
**telling (4)**
24:8;43:17;72:12;
75:7
**tells (3)**
32:25;46:1;59:22
**temporal (1)**
67:22
**tenant (2)**
15:15;16:25
**term (3)**
16:20;21:24;47:19
**terminology (2)**
71:2;74:16
**terms (6)**
10:11;15:2,11,22;
25:1;81:5
**test (10)**
21:15,20,20;43:4,8,
11;44:17;45:9;48:7,9
**tests (4)**
21:16;44:15;83:4,9
**thanking (1)**
34:12
**Thanks (1)**
56:20
**there'd (1)**
13:7
**therefore (6)**
8:15;53:8;58:23;
62:21,24;75:24
**thinking (3)**
24:6;35:6;37:18
**third (2)**
45:9;84:20
**third-part (1)**
48:7
**thirty (4)**
11:8;14:1;27:4;
80:16
**though (5)**
45:4;46:12,15;48:1;
66:19
**thought (10)**
20:7;38:21;47:5;
49:8;76:18,19,25;
77:23;81:13;93:15
**three (8)**
4:13;44:16;46:7,21;
59:7;71:13,24;90:19
**three-part (1)**
44:17
**throughout (2)**
52:14;65:10
**thrust (1)**
55:14
**THURSDAY (3)**
4:1;94:15,19
**tied (1)**
63:22
**till (1)**
64:12
**times (2)**
66:22;67:22
**tiny (1)**
33:4
**title (1)**
86:5
**Tobin (1)**
5:9
**today (19)**
16:7;19:18;21:2;
23:1;28:17;29:15,23;
30:3,24;34:13,16,18,
20;55:12;56:1,5;
67:11;81:5;93:16
**together (2)**
27:20;37:7
**told (7)**
16:17;22:13,13;
29:25;33:13;46:5;
75:6
**took (3)**
41:14;81:22;86:2
**top (4)**
7:10,13;8:11;87:16
**tort (3)**
22:1;40:1;60:10
**total (1)**
41:15
**toxic (1)**
15:24
**traced (1)**
35:9
**track (2)**
28:18;95:3
**tragedies (1)**
29:4
**tragedy (1)**
32:19
**transcripts (1)**
76:4
**transferred (1)**
73:1
**transparency (1)**
68:11
**tread (1)**
79:19
**treated (1)**
29:4
**treatment (2)**
28:19;84:11
**trial (8)**
10:23,25;13:1,3,12;
45:14;47:12;82:9
**trial-ready (1)**
21:18
**trip (1)**
19:15
**trouble (1)**
44:14
**troubled (1)**
32:9
**troublesome (1)**
29:3
**true (7)**
39:18;41:22;49:20;
63:17;68:1,6;70:13
**Trustee (6)**
4:24;5:25;6:21,25;
9:7;18:6
**Trustee's (1)**
16:10
**try (7)**
6:5;13:14;45:22;
53:16;71:3,4;76:24
**trying (10)**
9:10;13:2;17:10;
27:19,20,21;45:21,21;
75:3;79:5
**turn (4)**
14:23;21:12;33:17;
64:11
**turned (1)**
64:12
**turning (1)**
14:25
**twenty (5)**
11:8;13:7;14:1;
41:15,16
**twenty-seven (1)**
60:11
**two (29)**
12:8;17:1;18:3;
19:18;20:4,16;21:1,
13,16;27:15;30:24;
36:16;37:6;41:3;
42:11,20,23,24;43:4;
44:15;45:6;47:10;
58:6;60:12;66:25;
67:1;79:18;84:5;93:5
**two-and-a-half (1)**
44:16
**two-and-a-half-step (1)**
43:4
**two-step (3)**
45:9;85:13,17
**two-way (1)**
10:10
**types (3)**
33:1;40:12;41:3

**U**

**ultimate (2)**
25:12;80:10
**ultimately (3)**
45:3;66:4;67:15
**Um-hum (2)**
24:13;42:13
**uncooperative (1)**
15:2
**uncovered (1)**
88:9
**under (30)**
7:21;10:13,19;
12:10;30:1;42:25;
43:23;44:2,5,18,19;
46:10;48:7,25;52:5;
57:17;58:1;60:13;
66:9;68:21;69:15;
75:11;77:16;80:14;
81:20;82:20;84:11;
85:17;87:18;93:13
**Understood (6)**
25:23;59:2;66:1;
80:3;81:9;82:3
**undertake (1)**
92:4
**unfiled (1)**
58:4
**UNIDENTIFIED (2)**
64:13,14
**United (3)**
4:23;5:25;9:7
**unless (7)**
41:13;45:25;50:25;
59:1,1,7;95:3
**unlike (2)**
6:11;41:1
**unprotected (2)**
55:15,18
**unreasonable (2)**
11:12;41:21
**unredact (1)**
81:16
**unredacted (6)**
46:21;50:24;51:5;
52:1;55:21;81:13
**unresolved (1)**
60:10
**unseal (3)**
4:18;81:4,17
**unsealed (2)**
54:4;58:5
**unsecured (1)**
5:18
**unwilling (1)**
17:20
**up (28)**
14:15;15:18;17:17;
22:25;24:16,23;
25:19;26:6;29:13,21;
30:7;35:23,24;44:10,
24;51:23;52:16;53:1,
16;54:2;77:6;78:9;
79:6;83:5;87:16;88:2;
93:6;94:24
**upcoming (1)**
68:18
**update (2)**
19:23;20:10
**upon (9)**
10:7;11:6;46:3;
73:3;80:5;93:15,22;
94:10;95:12
**use (12)**
10:22,25;11:19;
12:5,22;35:7;65:2,20;
68:11;74:15;79:22;
89:7
**used (3)**
9:22;65:19;76:21
**useful (1)**
11:19
**using (1)**
16:12
**usual (1)**
53:21
**usually (3)**

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 116 of 118

51:4;52:1;82:12
**usurp (1)**
23:6

## V

**vacuum (1)**
68:19
**vague (1)**
69:11
**vagueness (4)**
67:13,14,18,19
**Vallejo (2)**
29:6,6
**valuation (6)**
10:10;11:4;13:13;15:3;16:1;65:5
**valuations (1)**
11:22
**value (6)**
13:9;14:8,13,21;16:4;17:10
**values (2)**
8:8;13:7
**various (2)**
84:15;93:18
**vast (1)**
92:5
**venue (1)**
35:24
**version (9)**
50:24;51:1,14,24;52:22;54:5,19;55:22;75:1
**versus (2)**
39:16;92:17
**victim (10)**
33:2,5,6,20;36:11,14;40:3;61:9;67:16;69:9
**victims (7)**
28:17,19;33:1;35:15,19,20,21
**view (5)**
19:3;26:17;28:2;42:21;49:3
**views (2)**
19:16;27:15
**violating (2)**
20:18,18
**visit (1)**
18:7

## W

**Wait (5)**
7:7;29:8;37:7;64:12;77:20
**waiting (2)**
19:15;29:23
**waives (1)**
91:23
**Wakefield (8)**
5:7,21;6:20;11:9;14:13,19;16:3;17:6
**walk (2)**
14:25;36:16
**wants (5)**
8:7;9:18;17:19;27:18;81:10
**waste (1)**
16:5
**way (25)**
12:1;15:15,24;16:24;18:7;25:12;30:2;32:12;33:22;34:3;35:6,11;37:23;41:21;45:17,19,22;48:18;49:18;51:4;52:1;56:3;59:23;69:23;84:14
**website (3)**
70:7,7;71:18
**weeks (11)**
9:25;10:2;19:18;20:4;21:1,13;22:14,25;30:24;82:19;95:9
**Weinstein (1)**
5:10
**Weintraub (1)**
5:9
**welcome (1)**
27:8
**weren't (2)**
40:4;93:18
**what's (14)**
7:22;9:19;11:10;15:16;27:14;36:12;38:3;55:23;68:23;72:23,24;81:9;83:4;92:17
**wheel (1)**
30:15
**whereas (2)**
53:10;60:18
**Where's (1)**
8:8
**Whereupon (1)**
95:19
**whole (2)**
30:6;67:25
**who's (5)**
16:25;24:1;36:9;62:6;73:25
**whose (3)**
32:4;37:5;62:18
**willing (6)**
11:13;14:10;15:9;56:14;91:12;92:5
**Wisconsin (1)**
63:24
**Wise (2)**
23:23,24
**wish (3)**
31:25;34:8;93:18
**wishes (1)**
6:10
**withdrew (1)**
80:24
**withheld (1)**
19:7
**within (4)**
16:14;73:5;77:15;83:12
**without (10)**
17:18;20:13,17;52:24;53:14;62:10;76:16;77:10;90:16;91:3
**wizard (1)**
35:14
**word (27)**
21:19;43:15,18,18;44:1;45:17;46:1,1,10;47:14;51:10,20;62:23;65:20,20;68:11;76:21,21;86:4;87:16;88:7,21;89:16,20;90:7,19;93:24
**words (9)**
8:16;10:16;43:16;45:15,20;62:15;70:6;87:17;88:3
**work (10)**
4:22;9:18;10:19;12:9;14:12;27:19,20,20;34:15;89:25
**worked (2)**
40:7;73:14
**working (3)**
12:1;27:1;45:18
**world (2)**
68:22;89:17
**worry (8)**
12:15;17:23;23:8;28:9,11;40:5;50:3;95:2
**worse (3)**
9:10;33:8;36:14
**worst (1)**
36:11
**worth (5)**
10:17;12:6,7;20:20;39:12
**write (2)**
70:19;83:5
**written (1)**
82:18
**wrong (9)**
10:25;13:10;38:3;47:15;51:24;66:21,23;82:25;93:24
**wrote (2)**
82:18;83:11

## Y

**year (4)**
17:11,13;27:25;28:14
**years (6)**
29:8;37:13;63:23;73:4;80:16;89:10
**yellow (16)**
51:4,25;52:6;53:3;87:25;88:22,23,24;89:8,16,18,19;90:4,20;93:19;94:10
**Yep (1)**
85:3
**Yesa (1)**
86:9
**yo9u (1)**
49:5
**York (5)**
28:22;78:2;82:8;83:1,13
**young (2)**
28:5,24

## Z

**Ziehl (2)**
5:17;19:1
**Zoom (9)**
5:4,5,21;6:2,7;30:25;31:12;34:17,24

## 1

**1:30 (1)**
4:1
**100,000 (2)**
13:25;14:10
**100,000-dollar (1)**
17:14
**1028 (1)**
70:3
**105 (1)**
63:21
**105a (1)**
64:5
**107 (18)**
42:10;43:11,12,21;44:7;46:11;47:19;57:24;58:11,16,22;59:3,4,6;68:13;77:16;78:4;84:9
**107a (1)**
58:13
**107b (9)**
75:13;76:6;77:8,15;78:17,20;81:3;82:1;83:18
**107b2 (2)**
59:9;69:14
**10th (1)**
71:11
**11 (3)**
26:3,12,13
**1103 (2)**
7:4,12
**12 (3)**
78:16,24,25
**13 (1)**
4:1
**162 (1)**
78:1
**18d (1)**
64:25
**18th (1)**
71:12
**1970s (1)**
35:12

## 2

**2.0 (1)**
75:1
**2013 (1)**
78:3
**2015 (1)**
86:6
**2018 (1)**
87:15
**2023 (1)**
64:10
**2025 (3)**
4:1;71:12,12
**21st (2)**
64:10,21
**23 (1)**
26:14
**26 (10)**
42:11,19;43:1,16,24;44:1,5,19;46:4;48:7
**2a (1)**
84:21

## 3

**3 (2)**
20:11;72:2
**3:39 (1)**
95:19
**31st (1)**
71:24
**327 (2)**
7:20;8:16
**327a (1)**
7:21
**337 (2)**
64:22,23
**370 (1)**
79:4

## 4

**422 (1)**
60:2
**424 (2)**
84:20,23
**431 (2)**
77:16,24

Case: 23-30564 Doc# 1130 Filed: 04/07/25 Entered: 04/07/25 09:36:04 Page 117 of 118

**492 (1)**
    78:1

**5**

**5 (3)**
    39:1;72:2,2
**500 (1)**
    66:11
**500-and-some-odd (2)**
    32:14;33:24
**500-plus (1)**
    38:14
**527 (1)**
    67:1
**530 (2)**
    32:3;38:3
**537 (1)**
    66:24
**540 (1)**
    32:3
**550 (1)**
    39:1
**550-plus (1)**
    66:11

**6**

**6 (1)**
    26:13
**60s (1)**
    36:9

**7**

**70s (2)**
    35:21;36:9
**73790 (1)**
    87:15
**73816 (1)**
    89:15

**8**

**8 (1)**
    64:25

**9**

**9 (2)**
    20:22;82:7

Case: 23-30564    Doc# 1130    Filed: 04/07/25    Entered: 04/07/25 09:36:04    Page 118
of 118