Mark D. Plevin (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (202) 580-6640
Email: mplevin@plevinturner.com

Miranda H. Turner (admitted *pro hac vice*)
Jordan A. Hess (admitted *pro hac vice*)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 580-6640
Email: mturner@plevinturner.com
jhess@plevinturner.com

Blair E. Kaminsky (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice* )
Benjamin F. Heidlage (admitted *pro hac vice*)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: (646) 837-5151
Email: bkaminsky@hsgllp.com,
nlieberman@hsgllp.com
bheidlage@hsgllp.com

Attorneys for CENTURY INDEMNITY COMPANY, PACIFIC INDEMNITY COMPANY, and WESTCHESTER FIRE INSURANCE COMPANY

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

In re:

THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,

Debtor.

Bankruptcy Case No. 23-30564-DM

Chapter 11

Hon. Dennis Montali

**STATUS CONFERENCE STATEMENT OF CERTAIN INSURERS**

Date: November 5, 2026
Time: 1:30 p.m.
Place: Via ZoomGov

## Table of Contents

**Page**

I. The Plan's unnecessarily complicated structure is designed to prejudice Insurers ........ 6

II. Anticipated Insurer objections turn on facts that must be discovered from Plan Proponents.. ........ 13

III. The confirmation schedule must be long enough to permit reasonable fact discovery, experts, and appropriate briefing ........ 15



Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 2 of 23

## Table of Authorities

**Page(s)**

**Cases**

*Am. Sec. Ins. Co. v. Kottler & Kottler*,,
2019 WL 1449511, at *5 (C.D. Cal. Mar. 29, 2019) .................... 10

*Blue Ridge Ins. Co. v. Jacobsen*,
25 Cal.4th 489 (2001) .................... 13

*Buss v. Superior Court*,
16 Cal.4th 35 (1997) .................... 13

*First Fed. Bank v. McAteer*,
985 F.2d 114 (3d Cir. 1993) .................... 8

*Green v. Welsh*,
956 F.2d 30 (2d Cir. 1992) .................... 6

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
922 F.3d 1031 (9th Cir. 2019) .................... 13

*Hamilton v. Maryland Cas. Co.*,
27 Cal.4th 718 (2002) .................... 9

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024) .................... 13

*Hawxhurst v. Pettibone Corp.*,
40 F.3d 175 (7th Cir. 1994) .................... 8

*In re AIO US, Inc.*,
677 B.R. 509 (Bankr. D. Del. 2025) .................... 6

*In re Beeney*,
142 B.R. 360 (B.A.P. 9th Cir. 1992) .................... 8

*In re Boy Scouts of America*,
137 F.4th 126 (3d Cir. 2025) .................... 14

*In re Edgeworth*,
993 F.2d 51 (5th Cir. 1993) .................... 8

*In re Jet Florida Systems, Inc.*,
883 F.2d 970 (11th Cir. 1989) .................... 8

*In re Thorpe Insulation, Inc.*,
677 F/3d 869 (9th Cir. 2012) .................... 7

*In re Walker*,
927 F.3d 1138 (10th Cir. 1991) .................... 8

*Mission Prod. Holdings v. Tempnology LLC*, 587 U.S. 370 (2019) ........ 5

*Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937 (1976) ........ 9

*RSUI Indem. Co. v. Discover P & C Ins. Co.*, 2013 WL 5375528 (E.D. Cal. Sept. 24, 2013) ........ 10

*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simone & Gladstone*, 107 Cal. App.4th 54 (2003) ........ 8

*Smith v. State Farm Mut. Auto. Ins. Co.*, 5 Cal. App.4th 1104 (1992) ........ 10

*Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024) ........ 13


**Statutes and Rules**

11 U.S.C. § 524(e) ........ 8, 9

11 U.S.C. § 1109(b) ........ 13

11 U.S.C. § 1122 ........ 15

11 U.S.C. § 1123(a)(4) ........ 15

11 U.S.C. § 1129(a)(1) ........ 13, 15

11 U.S.C. § 1129(a)(2) ........ 13

11 U.S.C. § 1129(a)(3) ........ 13

11 U.S.C. § 1129(a)(7) ........ 15

11 U.S.C. § 1129(b) ........ 15

11 U.S.C. § 1141 ........ 9

11 U.S.C. § 1141(d)(1)(A) ........ 10

Cal. Ins. Code § 11580 ........ 9

Cal. Ins. Code § 11580(b)(2) ........ 8


**Treatises**

APPLEMAN ON INSURANCE, § 109.02[5] (2015) ........ 8

COLLIER ON BANKRUPTCY, ¶ 524.05 (2015) ........ 8




Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 4 of 23

The insurers listed on the signature blocks below (the "Insurers") respectfully submit this statement to explain why targeted confirmation discovery, and a schedule that permits it, are necessary before the insurers can fairly present their objections to confirmation of the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Archbishop of San Francisco*, dated September 3, 2026, as amended on October 21, 2026 (Dkt. No. 2016) (the "Plan").[1]

The Plan seeks to impose a complex set of procedures with respect to Litigation Claims that serve no bankruptcy purpose except to prejudice the Non-Settling Insurers—all in violation of the principle, as stated by the U.S. Supreme Court, that a "debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either."[2] The Plan splits the rights under the policies (by assigning the right to receive coverage to the Trust) from the obligations (such as the duty to cooperate, which goes to Reorganized Debtor). The Plan provides the Trustee with discretion to select some Abuse Claimants, but not others, as Litigation Claimants and to then sequence the release of Litigation Claimants' cases to the tort system. The Plan also creates a procedure for claimants to serve Demands on Insurers but limits Demand Claimants' ability to sue, a procedure with no tort system analogue. The Plan "discharges" claims against Debtor over an indefinite time horizon, by creating an impermissible floating discharge designed to create potential liability for extra-contractual damages that does not presently exist. The Plan gives the appearance of preserving Insurer Contribution Claims by channeling them to the Trust, but does not require the Trust to reserve funds to pay such claims, essentially extinguishing them. Contrary to the Plan's proclamation that it is "insurance neutral," these features, among others, make it anything but.

The foregoing Plan provisions give rise to anticipated objections concerning lack of good faith, lack of insurance neutrality, and failure to satisfy the "best interests" of creditors test as to Class 4, which includes Insurers' contribution and reimbursement claims. Insurers need discovery into why the challenged provisions were adopted and how they were negotiated, how they are

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Plan and Plan Documents.

[2] *Mission Prod. Holdings v. Tempnology LLC*, 587 U.S. 370, 381 (2019) (internal quotes, cites omitted).

intended to operate, and whether the Trust's projected assets and reserves will support the obligations and claims channeled to it. Those facts reside with Debtor and the Committee. Without discovery, Insurers cannot fairly develop these objections, and the Court will lack the evidentiary record necessary to evaluate them.

Plan Proponents spent years hammering out these provisions. Debtor and the Committee negotiated for approximately two years in mediation before reaching agreement in principle. They then spent months drafting, revising, and supplementing the Plan and Plan Documents. Insurers, by contrast, would, if Plan Proponents' preferred schedule were adopted, be forced to evaluate a complex and evolving set of documents, identify and develop objections, and prepare for a confirmation hearing in just a few weeks.

Insurers do not seek broad-ranging discovery or to delay confirmation for its own sake. Rather, they only seek a schedule that permits the limited discovery described below: production of relevant documents; responses to interrogatories and RFAs; a small number of targeted depositions; the opportunity to present expert testimony explaining to the Court how the Plan affects insurance rights and exposure; and sufficient time, once discovery is completed, to file objections to confirmation of the Plan. Without such discovery, Insurers cannot fairly develop the record necessary for the Court's consideration of confirmation. Getting that discovery accomplished in time for an April confirmation hearing will be challenging but, if all interim deadlines are met, achievable. By contrast, getting that done in the two months between now and January 8 would be impossible.

## I. The Plan's unnecessarily complicated structure is designed to prejudice Insurers.

"[I]t is now settled that bankruptcy law intends for the bankruptcy filing of the insured to be as 'neutral' as possible to the rights and obligations of the insurer."[3] Giving lip service to this requirement, the Plan declares that "[n]othing in this Plan modifies or abridges any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies," disclaims any "new obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment," and

[3] *In re AIO US, Inc.*, 677 B.R. 509, 534 (Bankr. D. Del. 2025).

contains purported neutrality language.[4] However, as the Ninth Circuit held in *Thorpe Insulation*, "[t]hough the plan recites that it is insurance neutral, this characterization in and of itself does not settle the issue."[5] Rather, the Ninth Circuit emphasized, a court "must look to the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities."[6]

Here, the Plan appears specifically designed to increase Insurers' exposure and likely liabilities. It seeks to accomplish that prohibited goal by creating a complicated structure that is designed to prejudice insurers. The Plan does so through at least the following mechanisms, none of which are necessary under bankruptcy law to confirm a plan:

- Assigning Debtor's policy rights (but not its policy obligations) to the Trust;
- Vesting the Trust with discretion to allow some Abuse Claimants (but not all) to become Litigation Claimants entitled to sue the Debtor on a nominal basis to liquidate their claims;
- Authorizing the Trust to seek coverage for any judgments obtained by Litigation Claimants;
- Creating a floating discharge for claims against Debtor for the ostensible purpose of preserving coverage for any judgments obtained against Debtor, but which is instead designed to manufacture extra-contractual claims that would not otherwise exist;
- Creating "enhancement" multipliers for Litigation Claimants who push their lawsuits forward rather than settling, thereby discouraging otherwise reasonable settlements;
- Gathering in the insurance proceeds for distribution to Class 3 Abuse Claimants generally;
- Establishing a "Trust Advisory Committee" of former Committee members, likely acting through their lawyers, and funded by the Trust, to "advise" the Trustee;
- Permitting the Trustee to retain counsel to litigate coverage issues at the Trust's expense; and
- Funneling insurers' contribution claims to the Trust while relieving the Trust of any obligation to maintain a reserve to satisfy those claims.

None of this structure is needed to enable an Abuse Claimant to liquidate his or her claim and then

---

[4] Plan §§ 10.2.4, 4.1, 6.8.2.

[5] *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012).

[6] *Id.*


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 7 of 23

seek coverage of the resulting judgment from Debtor's insurers, which begs this question: Why does the Plan build this structure?

Bankruptcy law is clear that, notwithstanding a debtor's discharge, a tort claimant has the right to sue the reorganized debtor on a nominal basis in order to liquidate his or her claim for purposes of accessing the debtor's insurance coverage. Section 524(e) of the Bankruptcy Code states that a "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[7] Accordingly, courts applying § 524(e) have routinely permitted a creditor to bring a post-discharge claim against the debtor "for the purpose of establishing the debtor's liability as a prerequisite to recovery from another entity."[8] Thus, the debtor's discharge does not release the debtor's insurance.[9] This rule is settled law: As the Ninth Circuit BAP has noted, "the vast weight of authority supports this result."[10]

Once a tort claimant has obtained a judgment against a reorganized debtor sued nominally, Section 11580(b)(2) of the California Insurance Code grants the judgment creditor the right to sue the debtor's insurer to recover under the policy.[11] As a result, a plan of reorganization that seeks

---

[7] 11 U.S.C. § 524(e).

[8] *In re Walker*, 927 F.2d 1138, 1142 (10th Cir. 1991).

[9] COLLIER ON BANKRUPTCY, ¶ 524.05 (2015) ("It is generally agreed that the debtor's discharge does not affect the liability of the debtor's insurer for damages caused by the debtor and that the creditor may seek to recover from the insurer"); APPLEMAN ON INSURANCE, § 109.02[5] (2015) ("Courts in every circuit have held that as long as the claimant is only pursuing the debtor in a nominal capacity in furtherance of seeking a recovery from applicable insurance, that act does not violate the discharge injunction").

[10] *In re Beeney*, 142 B.R. 360, 363 (B.A.P. 9th Cir. 1992). *See also, e.g.*, *In re Jet Florida Systems, Inc.*, 883 F.2d 970, 972-73 (11th Cir. 1989); *Green v. Welsh*, 956 F.2d 30, 32-33, 35 (2d Cir. 1992) ("§ 524 permits a plaintiff to proceed against a discharged debtor solely to recover from the debtor's insurer"); *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) ("the protection from liability afforded the debtor under the Code does not affect the liability of the debtor's insurers"); *In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) ("("the scope of a section 524(a) injunction does not affect the liability of liability insurers and does not prevent establishing their liability by proceeding against a discharged debtor"); *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 180 (7th Cir. 1994) ("Permitting a suit to obtain a declaration of liability against a debtor is not equivalent to authorizing the recovery of a barred claim in a bankruptcy proceeding"); *In re Walker*, 927 F.2d 1138, 1142 (10th Cir. 1991) (§ 524 "permits a creditor to bring or continue an action directly against the debtor for the purpose of establishing the debtor's liability when, as here, establishment of that liability is a prerequisite to recovery from another entity").

[11] *See, e.g., Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simone & Gladstone*, 107 Cal. App.4th 54, 68 (2003) ("Under section 11580, a judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits. Such a claim is subject to the terms and limitations of the policy, including any reservation of rights.")(citations omitted; cleaned up).


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 8 of 23

to preserve an Abuse Claimant's right to recover from a diocesan debtor's insurance does not need to create an elaborate, costly, alternative structure such as that contained in the Plan. Instead, the Abuse Claimant can simply exercise his or her right under § 524(e) to sue Debtor nominally to liquidate his or her claim and, if he or she obtains a judgment, seek to recover that judgment from one or more of Debtor's insurers as permitted by Cal. Ins. Code § 11580.

Why, then, does the Plan contain the elaborate Trust structure described above? The structure likely is not something Debtor insisted on; in most instances, when a debtor buys its peace for a negotiated amount, how the claimants decide to seek compensation from a trust or the debtor's insurers is no longer the debtor's concern. Therefore, the structure most likely originated with the Committee or, more specifically, the plaintiffs' lawyers whose clients sit on the Committee, and was supported by Debtor in exchange for a lower contribution from the estate and Participating Parties. What were they intending to accomplish? That is what discovery will help answer. Insurers believe that part of the answer is future guaranteed employment for the trustee and his professionals, including coverage counsel to represent the Trust (which may include the Committee's current coverage counsel).

Another likely part of the answer is the desire to establish an opportunity for Abuse Claimants to seek extracontractual damages from insurers on claims that otherwise would terminate as a matter of California law with Debtor's discharge (hence, the floating discharge that has no support in the provisions of § 1141). In California, all contracts, including insurance policies, are subject to an implied covenant of good faith and fair dealing. California courts have identified implied duties on the part of an insurer that derive from the insurer's contractual obligations and the implied covenant. For example, an insurer has a duty under certain circumstances to accept reasonable settlement demands that are within policy limits, in order to avoid exposing its contractual counter-party, the insured, to a judgment in excess of policy limits.[12] The duty is owed by the insurer ***to the insured***.[13] An insurer that breaches its duty of reasonable settlement therefore may be liable ***to the insured*** for ***the insured's*** damages proximately caused

---

[12] *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718, 724-25 (2002).

[13] *See Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 941 (1976).


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 9 of 23

by the breach.[14] A claimant, however, has no such bad faith claim since, unlike the insured, a claimant has no exposure to a judgment in excess of policy limits. And where a debtor is discharged, it has no further exposure to an excess judgment, and therefore no longer has a claim for unreasonable failure to settle. The purpose of the floating, delayed discharge, therefore, is to manufacture an argument that the Trust can recover bad-faith damages, as an assignee of Debtor's insurance-related rights, because Debtor still has some theoretical sliver of financial exposure to a claim, notwithstanding multiple Plan provisions expressly insulating Debtor from any possibility of having to pay a post-confirmation judgment.[15]

In addition, the structure created by the Plan appears to be specifically designed to prejudice Insurers in order to leverage large settlements. The provisions of the Plan that seem specifically designed to accomplish this goal are briefly described below; how Plan Proponents negotiated these provisions (including who "had the pen") and why they were inserted into the Plan are factual questions that Insurers are entitled to explore during discovery.[16]

First, **the Plan impermissibly splits and reassigns various rights and obligations under the policies**. The Plan assigns, to the Trust, Debtor's and Participating Parties' insurance rights against Non-Settling Insurers but leaves the obligations behind, impermissibly limits those obligations, and fails to provide sufficient guaranteed funding to carry them out.[17] Reorganized

---

[14] *Hamilton*, 27 Cal.4th at 725.

[15] *See, e.g.*, Plan §§ 2.5.5, 6.9, 10.2.2 (c)(ii), 10.6 (all protecting Reorganized Debtor from any potential financial exposure by limiting "recourse" on a Litigation Claim to Non-Settling Insurers' policies and "all other damages . . . that may be recoverable by the Trust from any Non-Settling Insurers").

Although an insured may assign its claims for an insurer's breach of duty to a third-party claimant to pursue, such an assignment becomes effective only after a judgment has been entered against the insured. *Smith v. State Farm Mut. Auto. Ins. Co.*, 5 Cal. App.4th 1104, 1114-15 (1992). *See also RSUI Indem. Co. v. Discover P & C Ins. Co.*, 2013 WL 5375528, *7 (E.D. Cal. Sept. 24, 2013) (dismissing claim against insurer for bad-faith refusal to settle because the plaintiff had not alleged a final judgment in excess of the policy limits); *Am. Sec. Ins. Co. v. Kottler & Kottler*, 2019 WL 1449511, at *5 (C.D. Cal. Mar. 29, 2019) (same). Thus, if Debtor's discharge becomes effective on the Plan's Effective Date (*see* 11 U.S.C. § 1141(d)(1)(A)), any judgment in a Litigation Claimant's lawsuit will post-date the discharge, and could not at that point support assertion of a bad faith claim.

[16] The fact that the Plan's complex structure is completely unnecessary is evidenced by the plan jointly proposed by the debtor and the committee in another religious entity sex abuse bankruptcy case, *In re Franciscan Friars of California, Inc.*, Case No. 23-41723 WJL (Bankr. N.D. Cal. Oct. 16, 2026) (Dkt. No. 1985).

[17] *Id.* §§ 4.5, 6.2.5(a).


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 10 of 23

Debtor and Participating Parties must satisfy only the "Post-Effective Date Preconditions to Coverage," a term defined under the Plan, as opposed to requiring satisfaction of all of the obligations Insurers are owed by Debtor under their contracts. Beyond that, Reorganized Debtor and Participating Parties "shall have no duty or obligations whatsoever" to the Trust with respect to the Insurance Claims.[18] The Trust is to pay Reorganized Debtor's and Participating Parties' costs to carry out their assigned obligations.[19] The Plan provides for the Trust to set aside a reserve to fund obligations in defense of claims, but whether to replenish that reserve is in the Trustee's "sole and exclusive discretion."[20] If the Trustee lets the reserve fall below a specified floor, the insureds—Reorganized Debtor and Participating Parties—are "irrevocably released from any further obligations" under the Plan as to Insurance Claims and Abuse Claims, including any requirement to satisfy the truncated, Plan-defined "Preconditions to Coverage,"[21] but Insurers are not released from their duties under their policies.

Second, **the Plan Documents empower the Trustee to manipulate the pursuit of litigation**. The Trustee, with the approval of a TAC initially composed of Committee members, decides which Abuse Claimants may become "Litigation Claimants" entitled to sue Debtor on a nominal basis, and which may become Demand Claimants permitted to send settlement demands to Non-Settling Insurers. The Trustee and the TAC also must approve the amount of each Demand before it is conveyed.[22] Litigation Claimants must report every settlement demand and offer to the Trustee[23] and may not enter into any settlement that purports to determine, release, or reduce an Insurance Claim without the Trustee's consent.[24] Vesting this degree of control over hundreds of individual lawsuits in a single decision-maker like the Trust is unheard of in the tort system.

---

[18] Plan § 6.2.5(d).

[19] *Id.* § 4.3.1.

[20] Litigation Protocol § 2.6(b); Plan § 6.13.1

[21] Plan § 6.13.1.

[22] Litigation Protocol § 2.11.

[23] *Id.* § 2.7(a).

[24] *Id.* § 2.8(c)).


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 11 of 23

Third, **the Litigation Protocol rewards protracted litigation**. The Litigation Protocol multiplies a Litigation Claimant's point award—thus increasing the claimant's points by as much as eight times—based on how far the case advances in litigation. These multipliers range from 1.5x for written discovery through 8x upon a verdict.[25] A claimant whose case ends because the Trust settles globally with an insurer keeps any enhancement available at the time of settlement.[26] This encourages protracted litigation, contrary to California's public policy to promote settlement. Further, any resulting judgment is enforceable only against Non-Settling Insurers, and recourse expressly extends to "extra-contractual damages," "judgments in excess of policy limits," and "punitive damages"[27]—provisions expressly designed to drive more litigation and pressure Insurers.

Fourth, **the Plan's delayed discharge provision purports to preserve (non-existent) bad faith claims against the insurers**. As noted above, the Plan does not discharge Abuse Claims on the Effective Date. Instead, each Consenting Class 3 Claim is discharged on its own floating Abuse Claim Discharge Date. The Plan itself acknowledges that the purpose of these provisions is "[t]o preserve coverage under any Non-Settling Insurer Policy" and "[t]o facilitate the pursuit of Insurance Claims against Non-Settling Insurers."[28] The Litigation Protocol then channels collection of unpaid awards through the Trust: a Litigation Claimant may assign an unpaid award to the Trust and may not pursue collection against an insurer without the Trustee's consent.[29] As described above, the Plan's floating discharge provisions are unnecessary to preserve any right to insurance for claims against Debtor and are designed, instead, to create extra-contractual liability claims that would otherwise not exist.

Fifth, **insurers' contribution claims are channeled to the Trust which may lack funds to pay them**. Insurer Contribution Claims recognized under California law—including both (a)

---

[25] Litigation Protocol § 3.2.

[26] *Id.* § 3.2(f).

[27] Plan §§ 2.5.5, 10.2.2(c); Litigation Protocol § 2.9(a).

[28] *Id.*

[29] Litigation Protocol § 2.9(b)

claims for reimbursement of defense and indemnity payments under *Buss* and *Blue Ridge*[30] and (b) contribution claims against Settling Insurers for their fair share of defense and indemnity costs—are channeled to the Trust.[31] Although judgment reduction is available and an insurer nominally "may seek" affirmative recovery from the Trust of any amounts not satisfied by judgment reduction,[32] the Trust need not reserve for those claims, and the Trustee may make Distributions without regard to them.[33] This effectively extinguishes Insurer Contribution Claims without payment and, with respect to the contribution claims against Settling Insurers, in violation of *Purdue.*[34]

## II. Anticipated Insurer objections turn on facts that must be discovered from Plan Proponents.

In light of these features of the Plan, Insurers, parties in interest with standing under Code § 1109(b),[35] anticipate several confirmation objections. However, the relevant facts concerning the purpose, negotiation, operation, and anticipated consequences of key Plan provisions currently reside entirely with Debtor and the Committee. Discovery is therefore necessary not only to permit Insurers to develop their objections, but to provide the Court with an adequate evidentiary record at the confirmation hearing.

**Good faith and compliance with the Code (§ 1129(a)(1)-(3))**. Insurers anticipate objecting that the Plan was not proposed in good faith because its key mechanisms, discussed above, serve no bankruptcy purpose and are not required to confirm a plan under § 1129(a), and instead are designed to generate extra-contractual claims, increase insurer liability, and create settlement pressure on Insurers.[36] Development of this objection depends, *inter alia*, on why these

---

[30] *Buss v. Superior Court*, 16 Cal.4th 35 (1997); *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001).

[31] Plan §§ 6.8.2(e), 10.4.

[32] Plan § 6.8.2(e), (f).

[33] Plan § 10.4; Trust Agreement § 4.6

[34] *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).

[35] *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024).

[36] *See Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) ("§ 1129(a)(3) directs courts to look only to the proposal of a plan, not the terms of the plan" to determine whether it was "proposed in an unlawful manner").


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 13 of 23

provisions were proposed, how they were negotiated, and what Plan Proponents designed and intend them to accomplish. That evidence lies in the negotiation history, drafts of the Plan and Plan Documents, and internal analyses of Debtor and the Committee. Testimony from the Plan's architects as to why such provisions were adopted and the intended outcomes is crucial.

**Lack of insurer neutrality**. Insurers also anticipate several objections that the Plan is not insurer-neutral because it unduly interferes with Insurers' rights under their policies and California law. Anticipated objections include:

- Assignment of insurance rights and the required confirmation findings. The Effective Date is conditioned on findings that the Insurance Claims Assignment is authorized by and does not conflict with the Bankruptcy Code.[37] Insurers anticipate objecting that no statutory predicate exists for assigning non-debtors' insurance rights over an insurer's objection, and that the Plan improperly separates policy rights from policy obligations, necessitating discovery into the factual basis for the requested findings, the claims being assigned, and the funding of the insureds' continuing obligations. Insurers will seek discovery regarding the intended amount of funding, why Plan Proponents think it is sufficient, and what is expected to happen if, as permitted under the Plan, the Trustee decides to cease funding the costs of Reorganized Debtor and Participating Parties fulfilling policy obligations.
- Insurer Contribution Claims. Insurers anticipate objecting that the Plan channels their contribution and reimbursement claims to the Trust without any effective requirement that the Trust pay valid claims that judgment reduction cannot satisfy, such as defense costs after a defense verdict, since there is no requirement that the Trust set aside reserves to pay such claims.[38] Evaluating and supporting such an objection will require information about the Trust's projected assets, reserves, distributions, and the source

---

[37] Plan § 9.1.1(a)

[38] *See In re Boy Scouts of America*, 137 F.4th 126, 169 (3d Cir. 2025)( judgment reduction provision in bankruptcy plan that limited non-settling insurers' contribution rights against settling insurers to an offset from amounts owed to a sexual abuse claims trust was "unlawful insofar as it operates to extinguish the [non-settling insurer's] claims without their consent").

of funds, if any, for paying such claims.

- Deferred discharge. Insurers anticipate objecting that a differential, claim-by-claim floating discharge, potentially spanning years as Litigation Claims work their way through the tort system and coverage litigation, is inconsistent with § 1141(d)(1) and serves principally to keep claims alive as vehicles for non-existent bad-faith claims, rather than any valid bankruptcy purpose. Discovery is appropriate to establish the absence of any valid bankruptcy purpose for these provisions.
- Equal treatment and classification (§§ 1129(a)(1), 1122, 1123(a)(4)). All Abuse Claims are placed in a single class, but the Trustee has broad discretion to decide which claimants become Litigation Claimants or Demand Claimants—designations that unlock potential recoveries not available to other class members. Insurers need discovery into the criteria, sequencing plans, and anticipated use of that discretion, including how the 92 claimants who sent pre-confirmation demand letters, often months before the Plan was proposed, reasonably can be treated as Demand Claimants.

**"Best Interests" of creditors/fair and equitable (§§ 1129(a)(7), 1129(b)).** Under the Plan, "Insurer Contribution Claims" are an express subset of "Inbound Contribution Claims,"[39] which are classified in Class 4. Class 4 Claims cannot vote on the Plan and are deemed to reject it[40]—meaning that the Plan can be confirmed only if the Code's "cram down" requirements are met. Insurers, therefore, will necessarily need discovery from Plan Proponents concerning their Liquidation Analysis and any other evidence they may argue supports their contention that the Plan satisfies the "best interests" and "fair and equitable" tests.

## III. The confirmation schedule must be long enough to permit reasonable fact discovery, experts, and appropriate briefing.

Debtor filed this case on August 21, 2023. Debtor moved, with the Committee's assent,

---

[39] Plan §§ 1.1.64 (defining "Inbound Contribution Claim" to include "any Insurer Contribution Claim"); 1.1.72 (defining "Insurer Contribution Claim" to include "without limitation, an insurer's claim for reimbursement of defense and/or settlement costs or other similar cause of action under *Blue Ridge Insurance Co. v. Jacobsen* (2001) 25 Cal.4th 489, and *Buss v. Superior Court* (1997) 16 Cal.4th 35.").

[40] Plan § 2.6.


Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 15 of 23

to refer matters to mediation in May, 2024. Only on June 29, 2026, nearly three years into the case, did Debtor, the Committee, and certain other mediation participants announce a settlement in principle and a term sheet. It then took Debtor and the Committee more than two months, until September 3, 2026, to file their Joint Plan. Even so, Plan Proponents did not file key Plan Documents such as the Litigation Protocol, the Allocation Protocol, the Trust Agreement, and the Litigation Claimant Agreement until three weeks later, on September 25, 2026. An amended Disclosure Statement followed on October 2, and the Plan and key Plan Documents were amended again on October 21, 2026.[41] Indeed, the Court still has not approved the Disclosure Statement because certain required additional changes and additional documents, such as proposed executive summaries for Classes 2 and 3, remain outstanding.

By contrast, Plan Proponents are demanding that Insurers identify and develop objections to a complex Plan and voluminous ancillary Plan Documents affecting hundreds of millions of dollars in asserted insurance exposure within a matter of only a few weeks. This disparity is particularly significant because the facts relevant to many confirmation issues are not publicly available. They concern the negotiation history of the Plan, the rationale for disputed provisions, the anticipated operation of the Trust and Litigation Protocol, and the financial assumptions underlying the Plan—facts known **only** to the Debtor and the Committee.

Insurers do not seek extensive or burdensome discovery but, instead, only targeted and limited discovery. Insurers' proposed schedule proceeds in a logical sequence and proposes fast milestones for each task (taking into account the Thanksgiving, Christmas, and New Year's holidays). The schedule begins with targeted written discovery from the parties who created the Plan. Insurers are prepared to serve such discovery upon Plan Proponents immediately, consisting of requests for production, interrogatories, and requests for admission tied to specific provisions of the Plan, the Litigation Protocol, the Allocation Protocol, the Abuse Claim Discharge Date, the treatment of Insurer Contribution Claims, the RCASF Entities' Post-Effective Date Costs Reserve, and the liquidation analysis. Insurers can also immediately serve Rule 30(b)(6) deposition notices on Debtor and the Committee and will be prepared to take those depositions following receipt and

---

[41] *See* Dkt. Nos. 2016, 2018.



Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 16 of 23

review of responsive documents, answers to interrogatories, and responses to RFAs. Insurers have a small number of additional fact depositions in mind (possibly the Archbishop and Debtor's CFO, as well as any other persons identified by Plan Proponents as trial witnesses).

To accomplish this needed discovery, Insurers have proposed a schedule that is expedited but permits them to review and analyze the documents, take a small number of fact depositions, disclose one or more expert witnesses to explain to the Court how the Plan's mechanisms, individually and together, affect insurance coverage, defense, and settlement dynamics, and the Non-Settling Insurers' exposure, including how those mechanisms combine to foster an attempt to set up bad faith claims. These are technical issues on which expert testimony will assist the Court in assessing good faith and the real-world impact of insurance-related provisions. Finally, the schedule allows for depositions of each side's experts and the submission of briefs that set forth each side's views on whether the Plan should be confirmed.

Plan Proponents' proposed schedule is completely unrealistic. It provides that documents are produced the Tuesday of Thanksgiving week (November 24), then allows only one week—the week after Thanksgiving (November 30 to December 4)—for fact depositions. That is an unreasonably short amount of time to review documents and prepare for, and take, fact depositions. The schedule provides for expert reports to be due later this week, even though the Disclosure Statement has not even been approved, and before any documents have been produced or fact depositions taken—precluding experts from having even a minimal amount of time to prepare their reports. Confirmation objections would be due the same day that expert discovery ends—precluding Insurers from incorporating the results of expert depositions into their objections. Plan Proponents, by contrast, would be able to cite to expert deposition testimony in their response briefs, which is an unfair advantage. Plan Proponents also suggest that their direct testimony declarations be due on December 23 and that motions *in limine* and objections to such declarations be due just a week later—December 30—mandating that Insurer counsel work over Christmas eve, Christmas day, and the days between then and December 30, even though many families and clients are on vacations and/or visiting relatives during that time. Finally, responses to motions *in limine* and objections to declarations would be due January 5, severely limiting the

Court's time to consider the motions and objections before the confirmation hearing would begin on January 7.

Plan Proponents have not demonstrated any exigency that requires such a rushed, off-kilter schedule. They cannot point to any other diocesan bankruptcy case that proceeded from disclosure statement approval to confirmation hearing in no more than 63 days, which is what Plan Proponents are proposing here. When the committee in the *Oakland* case asked for a 6-month schedule, the fastest diocesan case schedule it identified to Judge Lafferty went from disclosure statement approval to confirmation was 108 days, with others clocking in at 126 days, 140 days, and 243 days.[42] Plan Proponents' proposed schedule of 63 days or less is significantly less than even the shortest other diocesan schedule, would deprive plan objectors of due process, and is offered here without any justification.

After years of Plan Proponents negotiating among themselves, followed by months spent by them drafting still-evolving Plan documents, fundamental fairness and due process warrant providing Insurers with a meaningful opportunity to test the factual grounds purportedly supporting confirmation. The Court should therefore adopt Insurers' proposed schedule that permits targeted written discovery, appropriate fact depositions, expert testimony regarding the Plan's insurance impact, and adequate time to prepare confirmation objections based on the resulting record.

Dated: November 2, 2026

Respectfully submitted,

By: *_____/s/Mark D. Plevin_____*

Mark D. Plevin (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California 94104
(202) 580-6640
mplevin@plevinturner.com

Blair E. Kaminsky (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice*)
Benjamin F. Heidlage (admitted *pro hac vice*)

---

[42] *See* Dkt. No. 1986 at 10-11 of 13, citing *In re Roman Catholic Bishop of Oakland*, Case No. 23-40523, Dkt. No. 1846 at 15 (Bankr. N.D. Cal. Mar. 24, 2025).



Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 18 of 23

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: (646) 837-5151
bkaminsky@hsgllp.com
nlieberman@hsgllp.com
bheidlage@hsgllp.com

Miranda H. Turner (admitted *pro hac vice*)
Jordan A. Hess (admitted *pro hac vice*)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., 2d Floor
Washington, D.C. 20006
(202) 580-6640
mturner@plevinturner.com
jhess@plevinturner.com

Alexander Potente (State Bar No. 208240)
Jason J. Chorley (State Bar No. 263225)
CLYDE & CO US LLP
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
alex.potente@clydeco.us
jason.chorley@clydeco.us

*Attorneys for Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America), Pacific Indemnity Company, and Westchester Fire Insurance Company (as successor in interest to Industrial Underwriters Insurance Company for policies JU835-8355 and JU895-0964)*

Harris B. Winsberg (admitted *pro hac vice*)
Matthew M. Weiss (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE, Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Email: hwinsberg@phrd.com
mweiss@phrd.com
mroberts@phrd.com

Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*

PARKER, HUDSON, RAINER & DOBBS LLP
Two N. Riverside Plaza, Suite 1850
Chicago, Illinois 60606
Telephone: (312) 477-3305
Email: tjacobs@phrd.com
jbucheit@phrd.com

Matthew C. Lovell (State Bar No. 189728)
NICOLAIDES FINK THORPE MICHAELIDES AND SULLIVAN LLP
101 Montgomery Street, Suite 2300
San Francisco, California 94104
Telephone: (415) 745-3770
Email: mlovell@nicolaidesllp.com

*Attorneys for Chicago Insurance Company and Fireman's Fund Insurance Company*

Harris B. Winsberg (admitted *pro hac vice*)
Matthew M. Weiss (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
PARKER, HUDSON, RAINER & DOBBS LLP
303 Peachtree Street NE, Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Email: hwinsberg@phrd.com
mweiss@phrd.com
mroberts@phrd.com

Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*
PARKER, HUDSON, RAINER & DOBBS LLP
Two N. Riverside Plaza, Suite 1850
Chicago, Illinois 60606
Telephone: (312) 477-3305
Email: tjacobs@phrd.com
jbucheit@phrd.com

Christina M. Lincoln (State Bar No. 274352)
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 552-0130
Email: clincoln@robinskaplan.com

Melissa M. D'Alelio (admitted *pro hac vice*)
Taylore E. Karpa Schollard (admitted *pro hac*

*vice*)
ROBINS KAPLAN LLP
800 Boylston Street, Suite 2500
Boston, Massachusetts 02199
Telephone: (617) 267-2300
Email: mdalelio@robinskaplan.com
tkarpa@robinskaplan.com

*Attorneys for Appalachian Insurance Company*

Matthew J. Antonelli (State Bar No. 343144)
RUGGERI PARKS WEINBERG LLP
315 Montgomery Street, Suite 900
San Francisco, California 94104
Tel: (415) 429-0998
mantonelli@ruggerilaw.com

Joshua D. Weinberg (admitted *pro hac vice*)
Annette P. Rolain (admitted *pro hac vice*)
RUGGERI PARKS WEINBERG LLP
1875 K Street NW, Suite 800
Washington, DC 20006
Tel: (202) 984-1400
jweinberg@ruggerilaw.com
arolain@ruggerilaw.com

*Attorneys for First State Insurance Company and New England Reinsurance Corporation*

Matthew J. Antonelli (State Bar No. 343144)
RUGGERI PARKS WEINBERG LLP
315 Montgomery Street, Suite 900
San Francisco, California 94104
Tel: (415) 429-0998
mantonelli@ruggerilaw.com

Joshua D. Weinberg (admitted *pro hac vice*)
Annette P. Rolain (admitted *pro hac vice*)
RUGGERI PARKS WEINBERG LLP
1875 K Street NW, Suite 800
Washington, DC 20006
Tel: (202) 984-1400
jweinberg@ruggerilaw.com
arolain@ruggerilaw.com

Blaise S. Curet (State Bar No. 124983)
SINNOTT PUEBLA CAMPAGNE & CURET, APLC
2001 Addison Street, Suite 110
Berkley, California 94704
Tel: (415) 352-6200
bcuret@spcclaw.com

*Attorneys for Westport Insurance Corporation f/k/a Employers Reinsurance Corporation*

Joshua Haevernick (State Bar No. 308380)
DENTONS US LLP
1999 Harrison Street, Suite 1300
Oakland, California 94612
Telephone: (415) 882-5000
Email: joshua.haevernick@dentons.com

Patrick C. Maxcy (admitted *pro hac vice*)
Keith Moskowitz (admitted *pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-8000
Email: patrick.maxcy@dentons.com
keith.moskowitz@dentons.com

Natalie Limber (State Bar No. 304252)
Andrew D. Telles Wyatt (State Bar No. 316740)
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017
Telephone: (213) 623-9300
Email: natalie.limber@dentons.com
andrew.wyatt@dentons.com

*Attorneys for St. Paul Fire and Marine Insurance Company and Travelers Casualty and Surety Company*

Mark D. Plevin (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (202) 580-6640
Email: mplevin@plevinturner.com

Miranda H. Turner (admitted *pro hac vice*)
Jordan A. Hess (admitted *pro hac vice*)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., 2d Floor
Washington, D.C. 20006
Telephone: (202) 580-6640
Email: mturner@plevinturner.com
jhess@plevinturner.com

*Attorneys for Continental Casualty Company*

Russell W. Roten
Jeff D. Kahane
Timothy W. Evanston
Isabelle Cho
SKARZYNSKI MARICK & BLACK LLP
333 South Grand Avenue, Suite 3550
Los Angeles, California 90017
Telephone: (213) 721-0650
rroten@skarzynski.com
jkahane@skarzynski.com
tevanston@skarzynski.com
icho@skarzynski.com

Catalina J. Sugayan
Michael Norton (*pro hac vice*)
Yongli Yang (*pro hac vice*)
CLYDE & CO US LLP
30 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
Telephone: (312) 635-7000
catalina.sugayan@clydeco.us
michael.norton@clydeco.us
yongli.yang@clydeco.us

*Counsel for London Market Insurers*[43]

[43] London Market Insurers include Certain Underwriters at Lloyd's, London; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co. Ltd.); the Ocean Marine Insurance Company Limited (as Part VII transferee of the World Auxiliary Insurance Corporation Limited); River Thames Insurance Company Limited; Dominion Insurance Company Limited; Companhia de Seguros Fidelidade-Mundial f/k/a Fidelidade Insurance Company of Lisbon; and R&Q Gamma Company Limited (as Part VII transferee of Anglo French Ltd.).



Case: 23-30564 Doc# 2038 Filed: 11/02/26 Entered: 11/02/26 15:24:12 Page 23 of 23